UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

AARON MCCROY,

       Plaintiff,

v.                                                   02-CV-3171

ILLINOIS DEP'T OF
CORRECTIONS, et al.,

       Defendants.

### Order on Preliminary Injunction and Motion to Dismiss Amended Complaint

This case comes before the court on the plaintiff's motion for preliminary injunction (d/e 70) and a partial motion to dismiss the plaintiff's amended complaint (d/e 190).

### Facts

The court finds these facts from the evidentiary hearings of March 19, 2004 (transcript, d/e 123), April 22, 2004 (transcript, d/e 142) and February 1, 2005 (transcript, d/e 174), the evidence submitted by the parties in their position briefs, and the docket. These findings are for purposes of this order only.

The plaintiff suffers from an eye disease called Keratoconus. "a degenerative condition of the cornea in which the cornea begins to change shape, causing irregular astigmatism, and is often accompanied by scarring and decreased vision." (Kass Letter, p. 1 ¶1, d/e 150). Dr. William Zeh, one of the ophthalmologists who has treated the plaintiff, describes three "tiers" of treatment for Keratoconus: "spectacle correction, contact lens correction and cornea transplantation if the first two are not feasible anymore." (Zeh Dep. p. 9).[1]

The plaintiff testified that he was sentenced in 1989 and committed to the Illinois Department of Corrections in 1993, in Stateville Correctional Center. (4/22/04 Tr. p. 5). He remained in Stateville until 1997, when he was transferred to Dixon Correctional Center. (4/22/04 Tr. p. 4). The plaintiff stayed in Dixon Correctional Center in 1997-1998, and was

---

[1] "The rigid [contact] lens sits on the surface of the cornea and basically hides the abnormal shape and presents a nice, smooth spherical surface in which light is bent and focused on the back of the eye. However, it becomes difficult to fit keratoconus patients with rigid lenses simply due to the fact that the cornea is irregular, and if the disease progresses and the contact lens will no longer center appropriately, . . . at whatever point they become intolerant to contact lenses, then usually the recommendation is to proceed with a cornea transplant. . ." (Zeh Dep. p. 8).

transferred back to Stateville Correctional Center in 1998, where he stayed until 1999. (4/22/04 Tr. p. 4). From 1999 to October, 2001, he was incarcerated at Hill Correctional Center. *Id.* In October, 2001, the plaintiff was transferred to Western Correctional Center. (4/22/05 Tr. pp. 4-5).

The plaintiff testified that he had no complaint about the care he received for his Keratoconus while he was incarcerated at Stateville, Dixon and Hill, which included regular refitting for contacts with qualified ophthalmologists and the provision of specially prescribed contact solutions. (4/22/05 Tr. pp. 5-7).

The problems began when the plaintiff was transferred to Western Correctional Center in October, 2001. The plaintiff testified that his contacts and medications were confiscated upon his arrival at Western. (4/22/05 Tr. p. 9). He eventually got his lenses back through grievances, but not his prescribed cleaning solutions. (4/22/05 Tr. p. 9). He filed this lawsuit in July, 2002, alleging in part that the denial of medical treatment was causing irreparable injury to his eyes, and that he was being retaliated against for his complaints. (Complaint, d/e 10). At that time, he sought a preliminary injunction to be transferred to Dixon Correctional Center, and for a corneal transplant (d/e 6).

In February, 2003, while still incarcerated at Western, the plaintiff received a corneal transplant for his left eye, performed by Dr. Feder. (Dr. Zeh Dep. p. 10). The story does not end there. The medical records show that Dr. Feder saw the plaintiff in April, 2003, and noted "doing great postop left eye ready for RGP contact lens, advise Maxitrol ointment left eye twice a day except while wearing contact lens and to follow up in two months." (Zeh Dep. p. 33). The plaintiff saw Dr. Feder again on May 9, 2002, who noted "a little bit of dry eye," but otherwise "graft looks great." On June 24, 2003, the patient saw Dr. Blumthal at Prairie Eye Center , but the contact lens was not fit then because Dr. Blumthal needed a special fitting set for Keratoconus patients called a "Rose K set." (Zeh Dep. p. 25). The plaintiff returned two months later, in August, 2003, but Dr. Zeh believed the contact fitting wasn't done on that day either because Dr. Zeh wanted to first remove the sutures and try to decrease the corneal astigmatism, which he believed would allow for a more successful contact fitting. (Zeh Dep. p. 35). Dr. Zeh testified, "In August [2003], essentially, he was stable with a clear transplant in the left eye. . . And his pressure in the left eye at that time was normal. I asked him to return in three months, or November, to remove one of the two running sutures . . . in the hopes that it would reduce some of the corneal astigmatism." (Zeh Dep. p. 11).

On August 18, 2003, the plaintiff filed a motion for preliminary injunction, citing the defendants' failure to follow post-operative instructions and get him to the follow-up appointments. (d/e 70). He asked to be transferred to a prison closer to a qualified ophthalmologist, so he could receive his prescribed care and follow-up appointments. He also alleged that the defendants were engaging in harassing retaliatory conduct because of his lawsuit and his complaints.

In November, 2003, the plaintiff saw Dr. Zeh, who noted an elevated pressure in the left

eye. (Zeh Dep. p. 11). Dr. Zeh removed both sutures and put the plaintiff on "weight limitations of not lifting more than ten pounds, no bending over, and asked that he be kind of isolated to a place where he would not be, you know, inadvertently jostled or struck or anything like that." (Zeh Dep. p. 11). Dr. Zeh also instructed that the Maxitrol be stopped after three days and replaced with a lower dose steroid because of his concern that the Maxitrol was causing the increased pressure in the plaintiff's left eye. (Zeh Dep. p. 12-14). Dr. Zeh asked the plaintiff to return in one month and "call promptly for any changes in increased pain or decreased vision." (Zeh Dep. p. 13).

Dr. Zeh saw the plaintiff on December 23, 2003, and observed that the pressure in the plaintiff's left eye had increased. The cause of that increased pressure is in dispute, but a reasonable inference arises on the present record that it was induced by the failure of Western Correctional staff to follow prescribed orders about the plaintiff's eye medicines and restrictions on lifting.[2] Dr. Zeh testified that, after the August 2003 appointment, "the problem with the glaucoma supervened and the contact lens fit was not dealt with during that time because he had another more important problem to deal with. After that was controlled, then I recommended the contact lens fitting again," in February, 2004. (Zeh Dep. p. 25). The fitting still had not occurred by the time of Dr. Zeh's deposition in June, 2004, though Dr. Zeh recommended the fitting again in May, 2004. (Zeh Dep. p. 35-36).

On March 19, 2004, the court held an evidentiary hearing on the plaintiff's motion for preliminary injunction, in which Dr. Zeh testified. (Transcript, d/e 123). The hearing was continued to allow Dr. Zeh to review the plaintiff's medical records, and to give the court time to search for pro bono counsel. (4/19/04 Tr. p. 23).

On March 25, 2004, the court appointed pro bono counsel for the plaintiff. (d/e 124). The evidentiary hearing continued on April 22, 2004, with the plaintiff's testimony. (4/22/04 Tr., d/e 142). That hearing was then continued to allow for the deposition of Dr. Zeh. (4/22/04 Tr. 30-33).

On August 17, 2004, the plaintiff filed a motion for a physical examination, citing the alleged overdosing of steroids, delays in fitting contacts, and "wanton and intentional disregard" to his serious medical needs. (d/e 139).

On or about August 21, 2004, the plaintiff was allegedly assigned an cellmate who had just been released from segregation for fighting with his prior cellmate. (Amended Complaint ¶ 57). On September 23, 2004, the cellmate allegedly punched the plaintiff in his left eye, which caused him to permanently lose his left eye (the eye with the transplant).[3] (Amended Complaint

---

[2] Dr. Zeh testified that he believed there may have been a transcription error that the plaintiff should receive the Maxitrol for 30, rather than 3 days. (Zeh Dep. p. 18). On or about January 8, 2004, Dr. Kim diagnosed the patient with "steroid induced glaucoma." (Zeh Dep., Ex. 3).

[3] What remained of the plaintiff's left eye after the altercation was removed in surgery.

¶ 59).

On November 29, 2004, the court appointed as an expert Dr. Michael Kass, Chairman of the Department of Ophthalmology and Visual Sciences at Washington University in St. Louis, Missouri, pursuant to Fed. R. Civ. P. 706(a) (d/e 149). His appointment was solely to inform the court on the plaintiff's current diagnosis, prognosis and recommended treatment for his remaining eye, not on the appropriateness of past diagnoses and treatments.

Dr. Kass examined the plaintiff on December 8, 2004, and wrote a letter to the court regarding his findings (d/e 150):

> Mr. McCroy has keratoconus in the right eye. He also has mild cataract in the right eye. The left eye was eviscerated following trauma after penetrating keratoplasty. He also has hypertension, diabetes, hepatitis C, and migraines. At this point, I think Mr. McCroy needs to have a contact lens fitted for the right eye to improve his vision. Fitting contact lenses for keratoconus is not an easy thing to do, and he should see a practitioner (either an optometrist or ophthalmologist who has expertise in this area) near the prison. He probably will need a minimum of three or four visits in order to fit this contact lens properly. It is impossible for me to predict what kind of vision he will have with this lens. At some point, Mr. McCroy should also have a prosthesis fit for the left eye, although this would be for cosmetic appearance rather than for any visual rehabilitation. I have no idea how long Mr. McCroy is scheduled to be incarcerated. I think it would be dangerous to consider a corneal transplant to the right eye since he lost the left eye following transplant and trauma. Clearly, he is at significant risk to trauma in the right eye should he have surgery while in prison, and this seems to me to be an unacceptable risk. If he is scheduled for release in the next few years, Mr. McCroy might be best served to have a contact lens fit now. If that does not give him better vision, he should considering [sic] having a corneal transplant in the right eye when he can control his situation out of prison. In the meantime, Mr. McCroy should wear safety glasses to protect his one remaining eye.

*Id.* p. 2 ¶ 2.

On or about January 12, 2005, the plaintiff was transferred from Western Correctional Center to Menard Correctional Center. (Amended Complaint, d/e 183, ¶ 65).

On January 24, 2005, the court scheduled a hearing for February 2, 2005, to conclude the hearing on the plaintiff's motion for preliminary injunction. In that order, the court identified the following issues to be determined at the preliminary injunction hearing:

> 1) the plaintiff's appropriate place of incarceration in the IDOC to ensure the care for his remaining eye as advised in Dr. Kass's letter, which includes the fitting of a contact lens, the provision of safety glasses, the plaintiff's timely transportation

      to appointments with an ophthalmologist with expertise with Keratoconus, and the provision of care directed by said ophthalmologist, including the timely transportation to all follow-up appointments. Counsel for defendants shall present witnesses to justify keeping the plaintiff at his current place of incarceration. Counsel for the plaintiff shall present evidence to show his current place of incarceration is ill-suited, and a different IDOC prison is better able and suited, along with satisfying the other requirements for a preliminary injunction.

(1/24/05 Court Order, d/e 155).

      On February 2, 2005, the court finished the hearing on the plaintiff's preliminary injunction and directed the parties to file position briefs. In addition to his position brief, the plaintiff filed an amended complaint pursuant to leave of court. (2/1/05 Tr. p. 174).

      At the February 2, 2005 hearing, the court heard testimony about the plaintiff's care at Menard, where he was then incarcerated. According to Pamela Ann Graubean, the health care administrator at Menard, the plaintiff's medical records reflect that the plan of action was to take the plaintiff to Marion Eye Center for the fitting of a contact lens and to issue clear safety glasses to the plaintiff. (2/5/05 Tr. p. 39). Graubean testified that the plaintiff went to Marion Eye Center for his initial evaluation on January 27, 2005, where "[t]hey recommended that he have the fitting started under another physician. They had to order, an optometrist had to order a special kit. It will be available in approximately next week. That appointment has been made. He has been referred to another Dr. Cook for the prosthetic for his left ye and I was told that that will be about three hours of service and he will have the prosthesis at the end of that appointment." (2/5/05 Tr. p. 39-40). Graubean also testified that the plaintiff had been issued safety glasses. (2/1/05 Tr. p. 40).

      Dr. Cleveland Rayford, the regional director of Wexford Health Sources, Inc., testified at the February 2005 hearing that Wexford had approved payment for the fitting of the contact lens and the prosthesis. (2/1/05 Tr. at p. 47). Dr. Rayford testified that he would see to it that all follow-up appointments were approved. *Id.* at 47-48. The record does not reflect if those appointments have occurred, or whether the plaintiff has received his contact or prosthesis.

      The Illinois Department of Corrections website shows that the plaintiff is currently incarcerated in Pinckneyville Correctional Center, and is scheduled for parole on January 6, 2009. (www.idoc.state.il.us).

### Legal Standard on Preliminary Injunction

      "A preliminary injunction is an extraordinary remedy that is only granted where there is a clear showing of need." *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999). "The purpose of a preliminary injunction is to preserve the status quo pending a final hearing on the merits." *American Hospital Ass'n v. Harris*, 625 F.2d 1328, 1330 (7th Cir. 1980). The prerequisites to the granting of a preliminary injunction are well established. To support the issuance of a

preliminary injunction, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) the inadequacy of a remedy at law; and (3) irreparable harm if the injunction is not issued. *Cooper*, 196 F.3d at 813. If the plaintiff meets this threshold inquiry, the court then balances the harm of wrongfully denying the injunction to the harm of wrongfully issuing it, and the public interests involved. *Id.*. To show a likelihood of success, the plaintiff "need only demonstrate a 'better than negligible chance of succeeding.'" *Id.*, quoting *Boucher v. School Bd. of Greenfield*, 134 F.3d 821, 824 (7th Cir. 1998).

18 U.S.C. Section 3626 sets limits on the prospective relief a court can grant with respect to prison conditions. With regard to preliminary injunctions:

> Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief . . .

18 U.S.C. Section 3626(a)(2). A preliminary injunction automatically expires 90 days after its entry, unless the court enters a final order for prospective relief before then. *Id.*

## Analysis

The plaintiff asks the court to "order he be transferred by Defendant DOC to its institution near Taylorville, Illinois to facilitate convenient follow up treatment for his eye condition in Springfield." (d/e 171, p. 6).

The court believes the plaintiff has shown a likelihood of success on his claims. The facts at this point support an inference that the plaintiff suffers from a complicated and progressive eye disease that requires regular monitoring and contact lens fitting by an experienced ophthalmologist. While the plaintiff did receive a corneal transplant at Western, he has evidence that he did not receive the follow-up care prescribed, that he received an overdose of steroids that caused glaucoma, and that he never received the recommended contact fitting during his entire incarceration at Western. He also has evidence to support his claims that the defendants engaged in a pattern of retaliation against him for filing grievances and pursuing this lawsuit, retaliation which might be causally linked to the permanent loss of his left eye.

However, the court does not believe the plaintiff has met his burden for obtaining a preliminary injunction to be moved to a different prison, primarily because the plaintiff is no longer incarcerated at Western. The evidence centers around the plaintiff's treatment at Western. The plaintiff admitted that he had no problem with the care he received at Stateville, Dixon or Hill correctional centers in the seven years before his transfer to Western, nor does he assert he had problems at Menard in 2005 or with the care he is currently receiving, apparently at Pinckneyville. At the time of the last preliminary injunction hearing, the plaintiff had been, or was to be, scheduled for a contact lens fitting and a prosthesis at Marion Eye Center, and had

been issued safety glasses. There is no evidence in the record that the plaintiff has not been taken to these appointments or taken to other follow-up appointments. The plaintiff does allege in his amended complaint that, as of the date of filing that amended complaint (March 28, 2005), he had "not been provided with the multiple follow-up fittings." (d/e 183, ¶ 62). However, he is not specific about what appointments he was not provided, nor about the care he has received since his transfer to Menard. There is also no evidence that the care he could receive in Springfield is better than that he is receiving at Marion Eye Center. In short, the plaintiff's transfer out of Western effectively moots his request for the preliminary injunctive relief he seeks.[4] His motion for preliminary injunction will therefore be denied.

## Partial Motion to Dismiss Amended Complaint

Defendants IDOC, Hockaday, Schnepel and Fuqua move to dismiss Count III of the amended complaint (Eighth Amendment, failure-to-protect) on the grounds that the plaintiff had not exhausted his administrative remedies on this claim at the time he filed his original complaint in 2002. Exhaustion would have been impossible in 2002, since the claim did not exist until 2004, when the plaintiff was allegedly attacked and lost his eye. The plaintiff asserts he did properly exhaust the claim before filing his amended complaint, which is all he required to do.

A recent Seventh Circuit case (of which the parties did not have the benefit) answers in the plaintiff's favor. In *Barnes v. Briley*, 2005 WL 2008226 (7th Cir., 8/23/05), the Seventh Circuit reversed the district court's dismissal for failure to exhaust claims in an amended complaint under similar circumstances:

> The rationale of the district court demanded that Mr. Barnes [the plaintiff] shoulder an impossible task–to exhaust remedies not yet pertinent to the allegations of the filed complaint. When Mr. Barnes initially sued the CDC, he alleged no cause of action against the state defendants and therefore had no reason to exhaust administrative remedies with respect to them. The filing of the amended complaint was the functional equivalent of filing a new complaint, [citation and quote omitted], and it was only at that time that it became necessary to have exhausted the administrative remedies against the state defendants.

Under *Barnes*, the plaintiff satisfied the exhaustion requirement if he exhausted his administrative remedies for Count III before he filed his amended complaint. The plaintiff asserts he did, an assertion that is accepted as true at this posture.

---

[4] In his amended complaint, the plaintiff seeks, as an alternative, "an injunctive order requiring IDOC and Wexford to strictly follow a treatment plan provided by a qualified ophthalmologist wherever Plaintiff is housed to include strict adherence to a timely contact lens fitting schedule." (d/e 183, p. 15). He does not ask for this alternative relief in his position brief on the preliminary injunction. The court therefore does not address it. Additionally, this order is limited to *preliminary* injunctive relief. The court states no opinion on the plaintiff's request for the permanent injunctive relief in his amended complaint.

These defendants also argue that the court should not allow this new claim because it adds new defendants and new allegations unrelated to the original suit. However, the allegations in the failure-to-protect claim are also part of the plaintiff's retaliation claim against the existing defendants, and, some of the existing defendants are implicated in the failure-to-protect claim along with the new defendants. To disallow the amendment would result in two trials with overlapping evidence and defendants–a waste of judicial resources. The partial motion to dismiss will therefore be denied.

IT IS THEREFORE ORDERED:

1) The plaintiff's motion for a preliminary injunction is denied (d/e 70);

2) The partial motion to dismiss by defendants IDOC et al. is denied (d/e 190);

3) The plaintiff shall disclose expert witnesses and expert testimony pursuant to the requirements of Fed. R. Civ. P. 26(a)(2) by December 31, 2006.

4) The defendants shall disclose expert witnesses and expert testimony pursuant to the requirements of Fed. R. Civ. P. 26(a)(2) by January 31, 2006.

5) Discovery closes January 31, 2006;

6) Dispositive motions are due February 10, 2006;

7) A final pretrial conference is scheduled for March 1, 2006, at 1:30 p.m. by video conference, regardless of whether the court has ruled on pending dispositive motions. The parties are directed to submit a proposed final pretrial order by February 24, 2006. *See Appendix 2* to the Local Rules for a sample form. www.ilcd.uscourts.gov/local rules. The final pretrial order will take the place of all prior pleadings. Any issue not contained in the final pretrial order will not be tried. *CDIL Local Rule 16.3(H)(6)*. The parties should be prepared to argue all pending motions at the final pretrial conference.

8) The proposed final pretrial order must include the names of all witnesses to be called, including: (1) the name, prison number, and place of incarceration for each inmate to be called as a witness, and, the names and addresses of any witnesses who are not incarcerated for whom the plaintiff seeks a trial subpoena. The plaintiff must provide the witness fee and mileage fee to any witness he seeks to subpoena and is responsible for timely obtaining the subpoenas and serving them on the witnesses. Fed. R. Civ. P. 45;

9) The court will draft its own proposed jury instructions and submit them to the parties at the trial. The parties will have an opportunity at that time to review the instructions, make their objections, and propose additional or substitute

instructions.

10) A jury trial is scheduled for March 20, 2006 at 9:00 a.m. at the U.S. Courthouse, 201 S. Vine St., Urbana, IL.  The plaintiff and the defendants shall appear in person before the court sitting in Urbana.  Inmates of the Illinois Department of Corrections who are not parties to this case shall appear by video conference and IDOC employees who are not parties may appear by video conference.

11) The Clerk is directed to issue the appropriate writ to secure the plaintiff's personal appearance at trial, and the necessary video writs to secure the appearance at trial of the witnesses listed in the final pretrial order.

Entered this 26th Day of September, 2005.

s\Harold A. Baker

HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE