IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| AARON MCCROY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02-cv-3171 |
| | ) | |
| THE ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS, ROGER E. | ) | |
| WALKER, JR., (in his official | ) | |
| capacity only), DENNIS HOCKADAY, | ) | |
| KEVIN WINTERS, TERRY POLK, | ) | |
| DAVID SCHNEPEL, SANDRA FUNK, | ) | |
| DEBRAH FUQUA, LIEUTENANT | ) | |
| LAW, CORRECTIONAL OFFICER | ) | |
| KELLERMAN, CORRECTIONAL | ) | |
| OFFICER JUDITH WILSON, | ) | |
| PAMELA A. GRUBMAN, JULIUS | ) | |
| FLAGG, all in their official and | ) | |
| individual capacities, WEXFORD | ) | |
| HEALTH SOURCES, Inc., | ) | |
| Dr. CLEVELAND RAYFORD, MD., | ) | |
| Dr. STANLEY SIMMS, MD., | ) | |
| Dr. LOWELL BROWN, MD., | ) | |
| Dr. LOCHARD, MD., RHONDA | ) | |
| MILLS, NURSE C. SHAW & | ) | |
| Dr. DAVID ANDERSON, OD., | ) | |
| | ) | |
| Defendants. | ) | |

REQUEST FOR ADMISSIONS
DIRECTED TO DEFENDANTS,
THE ILLINOIS DEPARTMENT OF CORRECTIONS,
ROGER E. WALKER, JR., (in his official capacity only),
DENNIS HOCKADAY, KEVIN WINTERS, TERRY POLK,
DAVID SCHNEPEL, SANDRA FUNK, DEBRAH FUQUA,
LIEUTENANT LAW, CORRECTIONAL OFFICER KELLERMAN,
CORRECTIONAL OFFICER JUDITH WILSON,
PAMELA A. GRUBMAN, JULIUS FLAGG, (all in their



PLAINTIFF'S
EXHIBIT
A
Part 1

<u>official and individual capacities),WEXFORD HEALTH SOURCES, Inc.,</u>
<u>Dr. CLEVELAND RAYFORD, MD., Dr. STANLEY SIMMS, MD.,</u>
<u>Dr. LOWELL BROWN, MD., Dr. LOCHARD, MD.,</u>
<u>RHONDA  MILLS, NURSE C. SHAW &</u>
<u>Dr. DAVID ANDERSON, OD.,</u>

Pursuant to Federal Rule of Civil Procedure 36, Plaintiff AARON MCCROY, by and through his attorneys, LONDRIGAN, POTTER & RANDLE, PC., requests the Defendants, THE ILLINOIS DEPARTMENT OF CORRECTIONS and/or ROGER E. WALKER, Jr., in his official capacity, to admit the following:

<u>Altercation</u>

1. Each of the following attached as an Exhibit to these Requests For Admissions is a true copy kept in the normal course of business by Defendants the Illinois Department of Corrections and Roger E. Walker, Jr. in his official capacity:

| Exhibit | Description |
|---|---|
| A | Criminal History Record Information (as of 7/24/02) (BATES #00035-00036) |
| B | Executive Summary (as of 7/25/02) (BATES #00088) |
| C | Transfer in Review Sheet for Institution Hill (7/29/02) (BATES #00087) |
| D | IDOC Internal Classification Form (7/30/02) (BATES #00083-00084) |
| E | Adjustment Committee Final Summary Report on 1/18/03 Disciplinary Report (BATES #00153-00154) |

F           1/28/03 Disciplinary Report
            (BATES #00151)

G           2/4/03 Adjustment Committee Final Summary
            Hearing Report
            (BATES #00149-00150)

H           6/4/03 Disciplinary Report
            (BATES #00145-00146)

I           3/11/04 Disciplinary Report
            (BATES #00068)

J           3/17/04 Adjustment Committee Final Summary
            Hearing Report
            (BATES #00066-00067)

K           3/24/04 IDOC Transfer Report
            (BATES #00054-00055)

L           7/23/04 Incident Report
            (BATES #00123)

M           7/25/04 Incident Report
            (BATES #00124-00125)

N           8/2/04 Incident Report
            (BATES #00120)

O           8/2/04 Disciplinary Report
            (BATES #00117-00118)

P           8/5/04 Adjustment Committee Final Summary
            Hearing Report
            (BATES #00119)

Q           9/23/04 Incident Report of Officer Lindsey
            (BATES #00108)

| | |
|---|---|
| R | 9/23/04 Incident Report of D. Drennen regarding Inmate McCroy (BATES #00107) |
| S | 9/23/04 Incident Report of Sgt. Vancil (BATES #00102-00103) |
| T | 9/23/04 Disciplinary Report (BATES #00099) |
| U | 10/8/04 Adjustment Committee Final Summary Hearing Report (BATES #00101) |
| V | 10/20/04 Good Time Revocation and new Projected Release Date (BATES #00003-00004) |
| W | 11/24/04 Offender Count Adjustment Release Form from WICC (BATES #00019) |
| X | 9/9/93    Optometry Clinic Note (BATES #00988) |
| Y | 4/7/95    Prescription Order (BATES #01058) |
| Z | 9/21/95    Optometry Clinic Note (BATES #00989) |
| AA | 1/23/96    Ltr. To Dr. Elyea from McCroy (BATES #00948) |
| BB | 2/6/96    Prescription Order (BATES #01051) |
| CC | 2/16/96    Ophthalmology Note (BATES #00979) |

DD      2/23/96    Prescription Order
        (BATES #01052)

EE      3/14/96    Optometry Clinic Note
        (BATES #00990)

FF      7/29/96    Ophthalmology Note
        (BATES #00980)

GG      7/29/96    Prescription Order
        (BATES #01053)

HH      8/30/96    Ophthalmology Note
        (BATES #00982)

II      8/30/96    Prescription Order
        (BATES #01059)

JJ      9/27/96    Ophthalmology Note
        (BATES #00981)

KK      10/8/96    Memorandum from Dr. Elyea to McCroy
        (BATES #01094)

LL      12/16/96    Health Status Form for Transfer
        (BATES #00955)

MM      1/6/97    Medical Consultation Report
        (BATES #00991)

NN      1/6/97    Prescription Order
        (BATES #01060)

OO      2/3/97    Consultation Note
        (BATES #00993)

PP      4/14/97    Consultation Note
        (BATES #00995)

QQ        4/14/97    Optical Prescription Order
          (BATES #00997)

RR        5/5/97     Receipt for Eyeglasses
          (BATES #01100)

SS        6/9/97     Consultation Report
          (BATES #00999)

TT        7/14/97    Consultation Report
          (BATES #01001)

UU        11/22/97   Health Status Form for Transfer
          (BATES #00966)

VV        5/21/98    Optometry Clinic Note
          (BATES #00744)

WW        7/23/98    Optometry Clinic Note
          (BATES #00743)

XX        7/23/98    Prescription Order
          (BATES #01063)

YY        3/6/99     Health Status Form for Transfer
          (BATES #00978)

ZZ        6/28/99    Consultation Report
          (BATES #00730)

AAA       7/99       Contact Lenses Order
          (BATES #00745)

BBB       7/5/99     Prescription Order
          (BATES #00814)

CCC       2/2/00     Prescription Order
          (BATES #00816)

DDD 9/27/00  Prescription Order
(BATES #00817)

EEE 10/2/00  Referral Request Form
(BATES #00747)

FFF 10/5/00  Contact Lens Order
(BATES #00746)

GGG 10/19/00 Prescription Order
(BATES #00818)

HHH 3/01   Contact Lens Order
(BATES #00650 and #00649)

III 5/3/01   Prescription Order
(BATES #00819)

JJJ 7/22/01  Prescription Order
(BATES #00820)

KKK 10/01   Contact Lens Order
(BATES #00648 and 00647)

LLL 10/30/01 Health Status Form for Transfer
(BATES #00727)

MMM 11/1/01  WICC Personal Property Inventory Record
(No BATES #)

NNN 11/2/01  Memorandum from Deborah Fuqua to McCroy
(BATES #00903)

OOO 12/17/01 Correspondent to Warden Schnepel and Nurse
Fuqua from McCroy
(2 pages, no BATES numbers)

PPP 12/18/01 Optometrist Note
(BATES #00479)

QQQ        1/9/02      Invoice for glass prescription
           (BATES #00590)

RRR        1/27/02     Grievance Report
           (3 pages, no BATES numbers)

SSS        1/29/02     Receipt for eyeglasses
           (BATES #00589)

TTT        2/26/02     Consultation Report
           (BATES #00535)

UUU        3/5/02      Referral Request Form
           (BATES #00536)

VVV        3/11/02     Grievance Report
           (2 pages, no BATES numbers)

WWW        3/11/02     Grievance Report
           (2 pages, no BATES numbers)

XXX        3/26/02     Correspondence from Dr. Plattner to WICC
           and Medical Progress Note (BATES #00539 and#00487)

YYY        4/2/02      Prescription Order
           (BATES #00621)

ZZZ        4/12/02     Consultation Report
           (BATES #00541)

AAAA       4/16/02     Referral Request Form
           (BATES #00544)

BBBB       5/3/02      Memo to Record Office re: Emergency
           Medical Furlough (BATES #00546)

CCCC       5/13/02     Consultation Report
           (BATES #00548)

DDDD        5/13/02        Prescription Order
            (BATES #00622)

EEEE        5/14/02        Referral Request Form
            (BATES #00550)

FFFF        5/20/02        Fax Memo from Dr. Rayford to Wexford
            (BATES #00551)

GGGG        6/6/02        Grievance Report
            (No BATES number)

HHHH        8/19/02        Referral Request Form
            (BATES #00553)

IIII        8/21/02        Fax Memo from Dr. Rowe to Wexford
            (BATES #00554)

JJJJ        8/21/02        Referral Request Form
            (BATES #00556)

KKKK        9/4/02        Referral Request Form
            (BATES #00560)

LLLL        9/9/02        Fax Memo from Wexford to Lynn/Lori
            (BATES #00562)

MMMM        9/23/02        Correspondence to Dr. Sims from Dr. Schultz
            (BATES #00564 and 00565)

NNNN        9/30/02        Referral Request Form
            (BATES #00568)

OOOO        11/20/02        Consultation Report
            (BATES #0572)

PPPP        12/4/02        Referral Request Form
            (BATES #00573)

QQQQ        12/10/02    Pre-Certification Fax Notification
            (BATES #00575)

RRRR        12/30/02    History & Physical for Outpatients
            (BATES #00581)

SSSS        1/6/03      Progress Note from St. John's Hospital
            (BATES #00379)

TTTT        1/7/03      Consultation Report
            (BATES #00381)

UUUU        1/7/03      Referral Request Form
            (BATES #00382)

VVVV        1/8/03      WICC Memo admitting McCroy to Infirmary
            (BATES #00468)

WWWW        1/13/03     WICC Memo discharging McCroy from
            infirmary (BATES #00469)

XXXX        2/3/03      WICC Memo admitting McCroy to infirmary
            (BATES #00470)

YYYY        2/3/03      Operative Report and Discharge Instructions
            from St. John's Hospital
            (BATES #00473-474, and #00388)

ZZZZ        2/3/03      Outpatient Prescription from St. John's
            (BATES #00389)

a           2/4/03      Consultation Report
            (BATES #00393)

b           2/6/03      Consultation Report
            (BATES #00399)

c           2/11/03     Optometrist Progress Note
            (BATES #00272)

d   3/6/03  Consultation Report
(BATES #00406)

e   3/17/03  WICC Memo from Dr. Sims to McCroy
(BATES #00476)

f   4/8/03  Consultation Report
(BATES #00411)

g   4/16/03  Referral Request Form
(BATES #00412)

h   5/9/03  Consultation Report
(BATES #00415)

i   5/22/03  Referral Request
(BATES #00416)

j   6/25/03  Fax Note from Prairie Eye Center
(BATES #00420)

k   7/28/03  Referral Request
(BATES #00425)

l   8/29/03  Prescription Orders
(BATES #00091 and #00092)

m   10/21/03  Medical Progress Note
(BATES #00048)

n   10/21/03  Referral Request
(BATES #00093)

o   10/22/03  WICC Memo re: medical furlough and WICC
Medical Services Refusal Form
(BATES #00094 and #00095)

p   11/6/03  Consultation Report
(BATES #00102 and 00097)

q        11/21/03    WICC Memo re: McCroy infirmary placement
         (BATES #00179)

r        11/29/03    WICC Memos re: medically unassigned and
         Restrictions (BATES #00180 and #00181)

s        12/23/03    Consultation Report
         (BATES #00101)

t        1/8/04      Consultation Report
         (BATES #ATTYG10210)

u        4/12/04     Consultation Report
         (BATES #ATTYG10200)

v        5/21/04     Consultation Report
         (BATES #ATTYG10204)

w        6/18/04     Progress Note by Dr. Steahly
         (BATES #ATTYG10218)

x        8/9/04      Progress Note by Dr. Lee
         (BATES #ATTYG10223)

y        9/27/04     Correspondence from Dr. Farris to Dr. Diesselar
         (BATES #ATTYG10330)

z        11/21/03    Nurse's Note
         (BATES #00071)

aa       11/21/03    Infirmary Progress Notes
         (BATES #00073)

bb       11/6/03     Prescription Order
         (BATES #00103)

cc       12/9/03     Prescription Order
         (No BATES number)

9.    Employees of the IDOC at the Hill Correctional Center completed an internal classification form for maximum security facilities on 7/30/02 regarding Inmate Durham.  (Exhibit D)

10.    Inmate Durham's criminal and background factors on 7/30/02 included the fact that his current offense involved "violence against others".  (Exhibit D, II.B)

11.    On 7/30/02, Inmate Durham was classified as having a moderate aggression level.  (Exhibit D, IV. B)

12.    Defendants Illinois Department of Corrections and Roger E. Walker, Jr. had access to the information contained in Exhibit D on 7/30/02 and throughout Inmate Durham's incarceration at all IDOC facilities.

13.    There was a disciplinary hearing on 1/23/03 regarding an incident involving Inmate Durham on 1/18/03.  (Exhibit E)

14.    On 1/23/03, Inmate Durham pled guilty to the offenses of unauthorized movement and disobeying a direct order which occurred on 1/18/03.  (Exhibit E)

15.    On 1/23/03, the Hearing Committee noted that Inmate Durham stated he was refusing housing on 1/18/03 due to a conflict with his cell mate, that he feared for his safety on 1/18/03, and that he wished to avoid a fight on 1/18/03.  (Exhibit E)

16.    On 1/23/03, Inmate Durham received the following disciplinary action for the incident of 1/18/03: demotion to C Grade for one month, segregation for one month, and loss of commissary for one month.  (Exhibit E)

17.     Defendants Illinois Department of Corrections and Roger E. Walker, Jr. had access to the information contained in Exhibit E from the date of occurrence, 1/18/03, throughout Inmate Durham's incarceration at all IDOC facilities.

18.     Per the disciplinary Report marked as Exhibit F, there was an incident on 1/28/03 involving Inmate Durham and another inmate. (Exhibit F)

19.     Officer E. Anderson, an employee of defendant IDOC, completed the disciplinary report on 1/28/03 and charged Inmate Durham with intimidation or threats and insolence on 1/28/03.  (Exhibit F)

20.     The disciplinary report indicates Inmate Durham was threatening another inmate on 1/28/03.  (Exhibit F)

21.     Defendants Illinois Department of Corrections and Roger E. Walker, Jr. had access to the information contained in Exhibit F from the date of occurrence, 1/28/03, throughout Inmate Durham's incarceration at all IDOC facilities.

22.     There was a disciplinary hearing on 2/4/03 regarding the incident involving Inmate Durham and his cell mate on 1/28/03.  (Exhibit G)

23.     On 2/4/03, Inmate Durham pled guilty to the offenses of intimidation or threats towards his cell mate and insolence which occurred on 1/28/03.  (Exhibit G)

24.     The Hearing Committee noted that the reporting Officer observed "a heated verbal exchange" on 1/28/03 between Inmate Durham and his cell mate. (Exhibit G)

25.    The Hearing Committee noted that Inmate Durham admitted he and his cell mate "had words and would have fought" on 1/28/03.  (Exhibit G)

26.    On 2/4/03, Inmate Durham received the following disciplinary action for the incident on 1/28/03:  demotion to C Grade for two months, segregation for one month, and loss of commissary for two months.  (Exhibit G)

27.    Defendants Illinois Department of Corrections and Roger E. Walker, Jr. had access to the information contained in Exhibit G from the date of the incident on 1/28/03 throughout Inmate Durham's incarceration at all IDOC facilities.

28.    There was a disciplinary report issued on 6/4/03 for an incident occurring on 6/4/03 involving Inmate Durham and a corrections officer.  (Exhibit H)

29.    Lt. Hornbaker, an employee of defendant IDOC, completed the disciplinary report on 6/4/03 and charged Inmate Durham with disobeying a direct order, insolence, and intimidation or threats on 6/4/03.  (Exhibit H)

30.    On 6/4/03, Lt. Hornbaker was investigating behavior of Inmate Durham which suggested he was concealing something in his clothing.  When confronted, Durham became belligerent and words were exchanged with Lt. Hornbaker. Subsequently, Durham was cuffed and taken to the segregation unit on 6/4/03.  (Exhibit H)

31.    Defendants Illinois Department of Corrections and Roger E. Walker, Jr. had access to the information contained in Exhibit H from the date of the incident, 6/4/03, throughout Inmate Durham's incarceration at all IDOC facilities.

32.    There was a disciplinary report issued on 3/11/04 for an incident involving Inmate Durham and another inmate which occurred on 3/11/04 in the gymnasium. (Exhibit I)

33.    On 3/11/04, Lt. D. Price, an employee of defendant IDOC, completed the disciplinary report and charged Inmate Durham with fighting, aiding and abetting, attempt, solicitation or conspiracy.  (Exhibit I)

34.    The disciplinary report of 3/11/04 (Exhibit I) indicates Inmate Durham was fighting with Inmate "K" on 3/11/04 while on the basketball court.

35.    The 3/11/04 altercation was confirmed by witnesses identified only as "Confidential Sources."  (Exhibit I)

36.    Defendants Illinois Department of Corrections and Roger E. Walker, Jr. had access to the information contained in Exhibit I from the date of occurrence, 3/11/04, throughout Inmate Durham's incarceration at all IDOC facilities.

37.    There was a disciplinary hearing on 3/17/04 regarding the incident involving Inmate Durham on 3/11/04.  (Exhibit J)

38.    On 3/17/04, Inmate Durham pled not guilty to the offenses of fighting and conspiracy which occurred on 3/11/04.  (Exhibit J)

39.    On 3/17/04, the Hearing Committee noted that Internal Affairs provided testimony from "Confidential Sources" which confirmed the verbal and physical fighting between Inmate Durham and Inmate "K" on 3/11/04.  (Exhibit J)

40.    The Hearing Committee noted that at the 3/17/04 hearing Inmate Durham admitted hitting Inmate "K" on 3/11/04.  (Exhibit J)

41.    On 3/17/04, Inmate Durham received the following disciplinary action for the incident of 3/11/04: demotion to C Grade for one months, segregation for one month, revocation of one month's GCC, and transfer to another facility.  (Exhibit J)

42.    Defendants Illinois Department of Corrections and Roger E. Walker, Jr. had access to the information contained in Exhibit J from the date of the incident, 3/11/04, throughout Inmate Durham's incarceration at all IDOC facilities.

43.    On 3/24/04, Inmate Durham was transferred from the Hill Correctional Center to Western Illinois Correctional Center.  (Exhibit K)

44.    The transfer of Inmate Durham on 3/24/04 was a "Disciplinary Level 2 Transfer" because he "provoked a confrontation and fight" with Inmate "K" on 3/11/04. (Exhibit K)

45.    Defendants Illinois Department of Corrections and Roger E. Walker, Jr. had access to the information contained in Exhibit K from the date of incident, 3/11/04, throughout Inmate Durham's incarceration at all IDOC facilities.

46.    On 7/23/04, Officer Jennings, an employee of the IDOC, completed an incident report concerning an altercation occurring on 7/23/04 between Inmate Durham and Inmate "S" at Western Illinois Correctional Center (WICC).  (Exhibit L)

47.    Defendants Illinois Department of Corrections and Roger E. Walker, Jr. had access to the information contained in Exhibit L from the date of the incident, 7/23/04, throughout Inmate Durham's incarceration at all IDOC facilities.

48.    Officer Jennings, an IDOC employee, completed a disciplinary report on 7/25/04 regarding the incident which occurred at WICC on 7/23/04.  (Exhibit M)

49.    On 7/25/04, Officer Jennings charged Inmate Durham with fighting with his cell mate, Inmate "S," on 7/23/04 based upon information received from a "confidential source."  (Exhibit M)

50.    Both inmates admitted they were preparing for a fight on 7/23/04 before the IDOC staff intervened.  (Exhibit M)

51.    On 7/25/04, Inmate Durham received the penalty of temporary confinement for the incident occurring on 7/23/04.  (Exhibit M)

52.    Defendants Illinois Department of Corrections and Roger E. Walker, Jr. had access to the information contained in Exhibit M from the date of the incident, 7/23/04, throughout Inmate Durham's incarceration at all IDOC facilities.

53.    On 8/2/04, Officer DeWitt, an employee of the IDOC, completed an incident report regarding an altercation between Inmate Durham and his cell mate, Inmate "R," which occurred on 8/2/04 at WICC. (Exhibit N)

54.    On 8/2/04, Inmate Durham stated that he could not "live with his cellie" and that he and Inmate "R" were about to "go to blows" if they were not separated. Inmate Durham further stated on 8/2/04 that he was tired of his cell mate telling him what he could and could not do.  (Exhibit N)

55.    After a discussion with Lt. Bigley, an employee of the IDOC, Officer DeWitt cuffed Inmate Durham and moved him to another cell on 8/2/04. (Exhibit N)

56.    Defendants Illinois Department of Corrections and Roger E. Walker, Jr. had access to the information contained in Exhibit N from the date of the incident, 8/2/04, throughout Inmate Durham's incarceration at all IDOC facilities.

57.    On 8/2/04, Officer DeWitt, an employee of the IDOC, completed a disciplinary report regarding the 8/2/04 incident between Inmate Durham and Inmate "R" in their cell. (Exhibit O)

58.    Officer DeWitt charged Inmate Durham with intimidation or threats against his cell mate on 8/2/04.  (Exhibit O)

59.    Defendants Illinois Department of Corrections and Roger E. Walker, Jr. had access to the information contained in Exhibit O from the date of the incident, 8/2/04, throughout Inmate Durham's incarceration at all IDOC facilities.

60.    A disciplinary hearing was held on 8/5/04 regarding the incident which occurred on 8/2/04.  (Exhibit P)

61.    Inmate Durham was charged with threatening his cell mate in segregation on 8/2/04.  (Exhibit P)

62.    One basis for the Adjustment Committee's decision on 8/5/04 was Inmate Durham's admission that he did not get along with his cell mate.  (Exhibit P)

63.    Another basis for the Adjustment Committee's decision on 8/5/04 was documentation that Inmate Durham told Officer DeWitt on 8/2/04 that if he wasn't moved, he and his cell mate would "come to blows."  (Exhibit P)

64.    The Adjustment Committee noted on 8/5/04 that Inmate Durham had two prior intimidation/threat charges.  (Exhibit P)

65.    On 8/5/04, Inmate Durham received the following penalties for the incident of 8/2/04:  one month C grade and 15 days of segregation.  (Exhibit P)

66.    Defendants Illinois Department of Corrections and Roger E. Walker, Jr. had access to the information contained in Exhibit P from the date of the original incident, 8/2/04, throughout Inmate Durham's incarceration at all IDOC facilities.

67.    On 9/23/04, Inmate Durham struck his cell mate, Inmate McCroy, in the left eye while they were in their shared cell.

68.    On 9/23/04, Officer Lindsey, an employee of the IDOC, responded to the emergency call button from the cell occupied by Inmate Durham and Inmate McCroy. (Exhibit Q)

69.    Officer Lindsey noted that on 9/23/04 Inmate Durham told him his cell mate needed medical attention. (Exhibit Q)

70.    Officer Lindsey noted that on 9/23/04 Inmate McCroy told him that his cell mate, Inmate Durham, hit him in the eye. (Exhibit Q)

71.    Sgt. Vancil, an employee of the IDOC, was called and he restrained and removed Inmate Durham from the cell on 9/23/04. (Exhibit Q)

72.    D. Drennen of the health care unit at Western Illinois Correctional Center completed an incident report on 9/23/04 evaluating Inmate McCroy following the altercation with his cell mate. Drennen noted bleeding from the left eye with a thick clear substance. An area on the right side of the foot by the little toe had torn skin and minimal bleeding as well. Dr. Brown was called and he gave the order to send Inmate McCroy to Blessing Hospital Emergency Room for treatment on 9/23/04. (Exhibit R)

73.    Sgt. Vancil, an employee of the IDOC, completed an incident report on 9/23/04 wherein he noted statements made by Inmate McCroy regarding the altercation in the cell. (Exhibit S)

74.    Sgt. Vancil noted on 9/23/04 that Inmate McCroy had a history of problems with his left eye and that McCroy indicated he became blind in the left eye during the altercation on 9/23/04. (Exhibit S)

75.    Sgt. Vancil completed a disciplinary report on 9/23/04 stating that Inmate Durham was placed in a segregation unit under investigative status due to the altercation with Inmate McCroy on 9/23/04. (Exhibit T)

76.    A hearing was held before the Adjustment Committee on 10/8/04 regarding the altercation which occurred on 9/23/04 involving Inmate Durham and Inmate McCroy. (Exhibit U)

77.    At the 10/8/04 hearing, Inmate Durham pled guilty, admitting to having "a struggle" with his cell mate on 9/23/04. (Exhibit U)

78.    On 10/8/04, Inmate Durham received the following penalties for the incident of 9/23/04: 1 month of C grade, 1 month of segregation, 1 month revocation of GCC. (Exhibit U)

79.    Inmate McCroy lost the use of his left eye as a result of the incident which occurred on 9/23/04.

80.    Defendants Illinois Department of Corrections and Roger E. Walker, Jr. had access to the information contained in Exhibits A through P from the date of Inmate Durham's incarceration prior to the incident which occurred on 9/23/04.

81.    On 9/23/04, Defendants IDOC and Roger E. Walker, Jr. knew, or should have known, of Inmate Durham's violent tendencies and history of altercations with cell mates.

82.    Defendants IDOC and Roger E. Walker, Jr., through the actions of their employees, placed Inmate McCroy together in a cell with Inmate Durham despite documentation of Durham's history of violence which resulted in the altercation of 9/23/04 in which Inmate McCroy lost his left eye.

83.    Inmate Durham originally received 90 days good time credit on 7/29/03. (Exhibit V)

84.    Inmate Durham received 30 days revocation of good time credit on 3/29/04.  (Exhibit V)

85.    Inmate Durham received 30 days revocation of good time credit on 10/20/04.  (Exhibit V)

86.    Inmate Durham was discharged from Western Illinois Correctional Center on 11/24/04. (Exhibit W)

### Medical Care

87.    On September 9, 1993, while in the custody of Illinois Department of Corrections, a note from the Optometry Clinic states that the plaintiff has keratoconus in both eyes. (Exhibit X)

88.    Plaintiff had been given soft lenses to treat his keratoconus, on April 7, 1995, a prescription was written by J. Lang RN for Renu soft lens cleaner. (Exhibit Y)

89.    On September 21, 1995, the plaintiff visited the Optometry Clinic at Stateville Correctional Center where the doctor stated that the plaintiff should be referred to an ophthalmologist to evaluate his corneas. (Exhibit Z)

90.    On January 23, 1996, Plaintiff wrote a letter to a Dr. Elyea requesting, among other things, to see a specialist due to his left cornea deteriorating further. (Exhibit AA)

91.    On February 6, 1996, Plaintiff was given a prescription for hard contact lens solution for two months. (Exhibit BB)

92.    On February 16, 1996, Plaintiff was seen by ophthalmologist, James W. Bizzell, M.D., who found that plaintiff suffered from keratoconus and currently wore contacts as treatment. Dr. Bizzell noted that the plaintiff should be seen by him again within three (3) months. (Exhibit CC)

93.    On February 23, 1996, a second prescription was written for Renu Multi-Purpose solution "for lens care x 6 mo." (Exhibit DD)

94.    In March of 1996, plaintiff was seen at the Stateville Correctional Center's Optometry Clinic for a recheck of his vision. (Exhibit EE)

95.     On July 29, 1996, Dr. James Bizzell stated that Plaintiff was not wearing his lenses as he had no cleaner, and Plaintiff should return in two (2) to three (3) weeks when he is wearing his lenses. (Exhibit FF)

96.     On July 29, 1996, a prescription was written after plaintiff's visit to Dr. Bizzell for hard contact lens cleaner for three (3) months. (Exhibit GG)

97.     On August 30, 1996, Dr. James W. Bizzell found the plaintiff needed contact lens cleaner and wrote a prescription for the appropriate lens cleaner for six (6) months. (Exhibits HH and II)

98.     On September 27, 1996, Dr. James W. Bizzell stated he had prescribed the appropriate contact lens cleaner on August 30, 1996 for six (6) months and that he should see the plaintiff again in three (3) months for a recheck. (Exhibit JJ)

99.     On October 8, 1996, in response to a grievance filed by the Plaintiff, Willard O. Elyea, M.D. stated that the plaintiff was receiving twelve (12) ounces of contact lens solution a month and that a bottle of that size should reasonably last plaintiff a year using only 1 cc a day. (Exhibit KK)

100.    On December 16, 1996, Plaintiff was transferred from Stateville Correctional Center to Dixon Correctional Center with the only mention of his disability being that as an assistive device/prosthetic plaintiff has contact lenses. (Exhibit LL)

101.    On January 6, 1997, Thomas K. Bialecke, O.D. stated that due to plaintiff's keratoconus he "has medical need for contact lenses and contact lens solutions" and

wrote a new prescription for Boston II Contact lens care kit for twelve (12) months. (Exhibits MM and NN)

102.    On February 3, 1997, a new contact lens was dispensed to the plaintiff by Dr. Bialecke. (Exhibit OO)

103.    On April 14, 1997, plaintiff was seen by Dr. Bialecke regarding problems with his contacts and a new contact lens was ordered. (Exhibits PP and QQ)

104.    On May 5, 1997, Plaintiff received glasses to wear with his contacts. (Exhibit RR)

105.    On June 16, 1997, Plaintiff went to the specialist to have his contact lens rechecked. (Exhibit SS)

106.    On July 14, 1997, a new contact lens was dispensed to the plaintiff. (Exhibit TT)

107.    On November 22, 1997, when Plaintiff was transferred from Dixon Correctional Center to Stateville Correctional Center a health status form stated that a physical disability/limitation of the plaintiff's was decreased vision and that he wears contacts. (Exhibit UU)

108.    On May 21, 1998, Plaintiff was seen by Thomas K. Bialecke, O.D. who stated that the plaintiff's vision was stable and his contacts were comfortable. (Exhibit VV)

109.   On July 23, 1998, Plaintiff was seen again by Thomas K. Bialecke, O.D. who stated that the plaintiff only wears his contacts twice a week but that his vision is stable and the plaintiff had no complaints. (Exhibit WW)

110.   On July 23, 1998, Dr. Bialecke renewed plaintiff's contact lens conditioner and cleaning kit prescription for two years.   (Exhibit XX)

111.   On March 6, 1999, when Plaintiff was transferred from Stateville Correctional Center to Hill Correctional Center on the health status form it was stated that he suffered from keratoconus which included a medical need for contact lenses. (Exhibit YY)

112.   On June 28, 1999, plaintiff was seen by Dr. Kehoe to refit his left eye with a new lens. (Exhibit ZZ)

113.   Sometime after July 8, 1999, plaintiff was fitted with his new contact lens for his right eye. (Exhibit AAA)

114.   On July 5, 1999, Dr. Kehoe prescribed Boston Advanced Contact lens cleaner and conditioner for six (6) months. (Exhibit BBB)

115.   On February 2, 2000, Dr. Kehoe renewed plaintiff's prescription for Boston Advanced Contact lens cleaner and conditioner for another six (6) months. (Exhibit CCC)

116.   On September 27, 2000, Dr. Kehoe once again renewed plaintiff's prescription for Boston Advanced Contact lens cleaner and conditioner for another six (6) months. (Exhibit DDD)

117.   On October 2, 2000, a Referral Request Form was filed by Dr. Choudy for plaintiff to see Dr. Kehoe as plaintiff had lost a contact lens and needed a new one. (Exhibit EEE)

118.   On October 5, 2000, a new contact was ordered for the plaintiff by Dr. Kehoe. (Exhibit FFF)

119.   On October 19, 2000, Dr. kehoe wrote a prescription for the plaintiff for Boston Advance Contact lens cleaner and conditioner for one (1) year and this prescription could not be substituted. (Exhibit GGG)

120.   In early March, 2001, another set of new contacts were ordered for plaintiff by Dr. Kehoe. (Exhibits HHH-1 and HHH-2)

121.   On May 3, 2001, a prescription was written for the plaintiff for one box of contact solution. (Exhibit III)

122.   On July 22, 2001, Dr. Kehoe prescribed Boston Cleaner, Boston Conditioning Solution and Boston Enzyme for six (6) months with a note that each can be given individually and "should give new bottle only in exchange of nearly empty bottle." (Exhibit JJJ)

123.   In early October, 2001, Dr. Kehoe ordered new contacts for the plaintiff. (Exhibits KKK-1 and KKK-2)

124.   On October 30, 2001, when plaintiff was transferred from Hill Correctional Center to Western Illinois Correctional Center, the health status form stated that the plaintiff suffered from Keratoconus and wore contacts twice a week. (Exhibit LLL)

125.   Upon arrival at Western Illinois Correctional Center, plaintiff had all his contacts and supplies for them confiscated. (Exhibit MMM)

126.   On November 2, 2001, a memo from Deborah Fuqua, RN, CCHP, stated plaintiff was authorized to have one pair of contact lenses, one storage case, one bottle of cleaner and one bottle of soaking solution. (Exhibit NNN)

127.   On November 4, 2001, Plaintiff complained because the lenses and supplies still had not been returned.

128.   On November 7, 2001, and after, plaintiff requested to see an ophthalmologist to check his eyes.

129.   On December 17, 2001, plaintiff sent a letter to Western Illinois Correctional Center Warden Schnepel and Defendant Nurse Fuqua regarding his contact solution and failure to be seen by an eye doctor.  (Exhibits OOO-1 and OOO-2)

130.   On December 18, 2001, plaintiff was seen by Dr. David Anderson who ordered a complete care kit and recheck of the lenses when plaintiff was able to wear them.  (Exhibit PPP)

131.    On January 9, 2002, plaintiff's glasses prescription was received from Dixon Correctional Industries. (Exhibit QQQ)

132.    On January 25, 2002, there was a shakedown of the plaintiff's cell where two bottles of solution were confiscated and returned to the health cart.

133.    On January 27, 2002, plaintiff filed a grievance regarding the events of January 25, 2002. (Exhibits RRR-1, RRR-2, and RRR-3)

134.    On January 29, 2002, the plaintiff received new glasses. (Exhibit SSS)

135.    On February 26, 2002, plaintiff was seen by Dr. Weller who found advanced keratoconus but no corneal ulcer and stated that a corneal transplant should be considered as plaintiff was unable to tolerate the contact in his left eye. (Exhibit TTT)

136.    On March 5, 2002, a Referral Request form was filled out by Dr. David Anderson for the plaintiff to see Dr. Kehoe for a refit of his contact lenses. Appointments were made and later cancelled for March 11, 2002; March 19, 2002; March 25, 2002; and April 1, 2002. (Exhibit UUU)

137.    On March 11, 2002, plaintiff filed an Emergency Grievance regarding what he felt was improper treatment of his keratoconus and asked to see Dr. Kehoe. (Exhibits VVV-1 and VVV-2)

138.    Plaintiffs March 11, 2002 and March 19, 2002 appointments with Dr. kehoe were cancelled by the Warden. (Exhibit UUU)

139.   Plaintiff's March 25, 2002, appointment with Dr. Kehoe was cancelled due to weather.   (Exhibit UUU)

140.   Plaintiff's April 1, 2002, appointment with Dr. Kehoe was also cancelled. (Exhibit UUU)

141.   On March 20, 2002, Plaintiff filed an Emergency Grievance in which he requests to see an ophthalmologist.  (Exhibits WWW-1 and WWW-2)

142.   On March 26, 2002, Brian Plattner, O.D. mailed a contact lens to Western Illinois Correctional Center to have it fitted there. (Exhibits XXX-1 and XXX-2)

143.   On April 2, 2002, Dr. David Anderson prescribed Boston Advance Contact Lens Cleaning and Conditioning Solutions for the period of one year. (Exhibit YYY)

144.   On April 12, 2002, plaintiff was seen by Dr. Kehoe's associate, Dr. Brian Plottner, who stated that he sent the plaintiff with a lens but that it needed to be rechecked in two (2) to three (3) weeks and that the correctional center needed to keep contact lens cleaner on hand. (Exhibit ZZZ)

145.   On April 16, 2002, Dr. David Anderson prescribed Boston enzyme cleaner per Dr. Plottner's order for a period of one year. (Exhibit YYY)

146.   On April 16, 2002, Dr. David Anderson put in a Referral Request Form for plaintiff to see Dr. Kehoe for a three week follow up. (Exhibits AAAA and BBBB)

147.   On May 3, 2002, plaintiff's May 7, 2002, visit to see Dr. Plottner was cancelled by the warden. (Exhibit BBBB)

148.    On May 13, 2002, plaintiff saw Dr. Plottner for his three (3) week follow up where once again Dr. Plottner stated that a corneal transplant should be considered. (Exhibit CCCC)

149.    On May 13, 2002, Dr. David Anderson prescribed artificial tears for a six (6) month period to resolve post contact lens wear problems. (Exhibit DDDD)

150.    On May 14, 2002, Dr. David Anderson put in a request for a corneal transplant that was denied on May 16, 2002. (Exhibit EEEE)

151.    On May 20, 2002, a memo from Wexford was filed denying the transplant as not medically necessary at this time as well as indicating that "[t]he IDOC nor Wexford will pay for transplants. Suggest that patient talk with HCNA if he or his family is willing to take care of the cost of transplantation." (Exhibit FFFF)

152.    On May 29, 2002, the written denial of May 20, 2002, was given to plaintiff.

153.    On August 6, 2002, plaintiff filed a grievance in which he claimed that he was denied the ability to eat at his usual times, trips to the commissary and school. (Exhibit GGGG)

154.    On August 19, 2002, another Referral Request Form was filled out requesting a corneal transplant in the left eye and it was denied on August 21, 2002. (Exhibit HHHH)

155.  On August 21, 2002, a memo from Wexford states that the transplant was not medically necessary at the time and that insufficient time was allowed for adapting to the contact. At that time it was ordered that patient be placed in the infirmary and time of wear for the contact be increased daily to maximum wear ensuring that the patients eyes are moist. (Exhibit IIII)

156.  Also on August 21, 2002, an eye exam was ordered by Dr. Rowe of Wexford and attempted to be performed on the plaintiff. (Exhibit JJJJ)

157.  On September 4, 2002, an appointment was made for plaintiff to see a Doctor at Jacksonville Ophthalmologic Assoc. on September 20, 2002. (Exhibit KKKK)

158.  In a memo from Wexford Employees, Lori/Lynn, on September 9, 2002, it was stated that the doctor at Jacksonville Ophthalmologic Associates would need to speak with Dr. Sims prior to the appointment for plaintiff. (Exhibit LLLL)

159.  On September 23, 2002, Dr. A. George Schultz III stated in a letter to Dr. Sims that after his exam of the plaintiff on September 20, 2002, the plaintiff would need a corneal transplant in his left eye. (Exhibits MMMM-1 and MMMM-2)

160.  On September 30, 2002, an appointment was made with Dr. Joseph Feder a corneal specialist on November 20, 2002 to get his opinion on the corneal transplant. (Exhibit NNNN)

161.  On November 20, 2002, plaintiff was seen by Dr. Joseph M. Feder who also suggested a corneal transplant in plaintiff's left eye. (Exhibit OOOO)

162.   On December 4, 2002, a Referral Request Form was completed for the corneal transplant that was then scheduled on January 6, 2003. (Exhibit PPPP)

163.   On December 10, 2002, the Pre-Certification Notification for plaintiff's corneal transplant, left was sent out to St. John's Hospital and Dr. Joseph Feder. (Exhibit QQQQ)

164.   On December 30, 2002, plaintiff was sent to St. John's Hospital in Springfield, Illinois, for his history and physical examination prior to his surgery. (Exhibit RRRR)

165.   On January 6, 2003, plaintiff's surgery was postponed due to hemorrhaging on plaintiff's left eye as his left retrobular hemorrhage was healing well. (Exhibit SSSS)

166.   On January 7, 2003, plaintiff was seen by Dr. Feder who stated that plaintiff's surgery could be rescheduled asap. (Exhibit TTTT)

167.   Plaintiff's corneal transplant on his left eye was rescheduled for February 3, 2003. (Exhibit UUUU)

168.   On January 8, 2003, plaintiff was admitted to the infirmary. (Exhibit VVVV)

169.   On January 13, 2003, plaintiff was discharged from the infirmary. (Exhibit WWWW)

170.   On February 3, 2003, plaintiff was admitted to the infirmary after his surgery. (Exhibit XXXX)

171.   On February 3, 2003, plaintiff underwent a corneal transplant on his left eye. (Exhibits YYYY-1, YYYY-2, and YYYY-3)

172.   Dr. Feder wrote a prescription for two pairs of sunglasses for the plaintiff on February 3, 2003 as well. (Exhibit ZZZZ)

173.   On February 4, 2003, plaintiff was seen for a follow up by Dr. Feder at which time the left corneal transplant looked great. (Exhibit a)

174.   On February 6, 2003, plaintiff was seen again by Dr. Feder to check his left eye where he stated that plaintiff should be wearing a eye shield over his left eye for at least three weeks and that plaintiff should have sunglasses. (Exhibit b)

175.   On February 11, 203, plaintiff was seen by Dr. David Anderson who checked plaintiff's pressure in his eyes and indicated that it was normal and the referred plaintiff to Dr. Feder for further follow-up. (Exhibit c)

176.   On March 6, 2003, plaintiff was again seen by Dr. Feder who stated that plaintiff should be seen weekly at the institution and that he could be fitted for new contact lenses in both eyes. (Exhibit d)

177.   On March 17, 2003, plaintiff was allowed one pair of sunglasses for medical reasons, this permission was indefinite. (Exhibit e)

178.   On March 18, 2003, plaintiff was seen by Dr. David Anderson who measured his pressure and indicated it was within the normal range.

179.  On April 8, 2003, plaintiff was again seen by Dr. Feder where he states that plaintiff may be fitted for contact lenses. (Exhibit f)

180.  On April 16, 2003, a Referral Request Form was filled out indicating that plaintiff needs to be fitted for contact lenses, which was denied on the same day. (Exhibit g)

181.  On May 9, 2003, plaintiff was seen by Dr. Feder where he states that the corneal transplant looks great and that plaintiff can be fitted for contact lenses. (Exhibit h)

182.  An appointment made for plaintiff on June 3, 2003, was canceled and rescheduled for June 24, 2003 for unknown reasons. (Exhibit i)

183.  On June 24, 2003, Plaintiff was seen at Prairie Eye Center to fit contact lenses but they were unable to do so. (Exhibit j)

184.  On July 28, 2003, another appointment was made for plaintiff to be seen for contact lens placement and fitting. (Exhibit k)

185.  On August 29, 2003, plaintiff after being seen for sensations in his left eye and blurry vision in his right eye received numerous prescriptions from Dr. William G. Zeh. (Exhibits l-1 and l-2)

186.  On October 21, 2003, in a medical note indicates there was a discussion regarding the discharge of the Plaintiff from the infirmary to general population but the

inmate indicates he is legally blind wanting three hours per day and is not comfortable being transferred to general population. (Exhibit m)

187. On October 21, 2003, a Referral Request was filled out for plaintiff with the note "can he be transferred to general population." (Exhibit n)

188. On October 29, 2003, plaintiff was to go and see Dr. Zeh but plaintiff refused and started a hunger strike. (Exhibits o-1 and o-2)

189. On November 6, 2003, plaintiff was seen by Dr. Zeh where he was told no rubbing his eye, no bending and no lifting over seven (7) to ten (10) pounds. (Exhibits p-1 and p-2)

190. On or about November 6, 2003, Dr. Zeh, one of Plaintiff's treating opthomologists from Springfield, prescribed Plaintiff: "Maxitrol OS OID x 3 days and then stop."

191. On November 21, 2003, plaintiff was admitted to or discharged from the infirmary by D. Drennen, P.N. but he was left unassigned. (Exhibit q)

192. On November 29, 2003, Dr. Leonard gave plaintiff a medically unassigned status for the period of a year to be re-evaluated in January 2004 as well as restrictions of no weight lifting and sports. (Exhibits r-1 and r-2)

193. On December 23, 2003, plaintiff was seen at Prairie Eye Center for a follow up visit where it was stated that plaintiff should no longer be receiving maxitrol. (Exhibit s)

194.   Plaintiff was given Maxitrol daily until December 23, 2003.

195.   On January 8, 2004, plaintiff saw Dr. John S. Kim who concluded that plaintiff had steroid induced glaucoma. (Exhibit t)

196.   On February 24, 2004, plaintiff was seen by Dr. Zeh who states that he should see him back for lens fittings. (Exhibit u)

197.   On May 21, 2004, plaintiff again sees Dr. Zeh who again states that he needs a contact lens fitting. (Exhibit v)

198.   On June 18, 2004, plaintiff was seen by Dr. Steahly who stated that plaintiff needs to be seen by Dr. Lee or Dr. Lohse as Dr. Zeh is now leaving the area. (Exhibit w)

199.   On August 9, 2004, plaintiff was seen by Dr. James Lee for an evaluation. (Exhibit x)

200.   On September 24, 2004, plaintiff was involved in an altercation and was punched in his left eye.

201.   On September 27, 2004, a letter was received from Stuart R. Farris, M.D. in which plaintiff is given a bad prognosis. (Exhibit y)

202.   Due to keratoconus and a subsequent injury plaintiff does not have his left eye and he has only 20/400 vision in his right eye.

203.   Due to plaintiff's eye condition, he is disabled within the meaning of both the American's With Disabilities Act and the Rehabilitation Act.

213.  On February 24, 2004, Plaintiff was seen by Dr. Zeh with a request to provide a clear care plan from WICC and/or Wexford who were hoping to minimize transportation needs.

214.  On June 8, 2004, Plaintiff was seen by Dr. Anderson who restricted Plaintiff's weight lifting to five pounds and indicated he could play no contact sports.

215.  On August 9, 2004, Plaintiff was seen by Dr. Lee who instructed that Plaintiff was to get contact lenses fitted.

216.  On September 23, 2004, Plaintiff was in an altercation with cell mate.

217.  On October 11, 2004, in Plaintiff's Surgical Report it is stated that Plaintiff's eye had to be "eviscerated." (Exhibits dd-1 and dd-2)

218.  On December 8, 2004, Plaintiff was seen by Dr. Kass who stated that a contact fitting for the right eye was needed as well as a prosthesis for the left eye. (Exhibit ee)

219.  On December 16, 2004, a Disciplinary Report was filed regarding an insufficient urine sample for a drug test. (Exhibits ff and gg)

220.  On December 17, 2004, the Disciplinary Report mentioned the urine incident and stated that the medical records indicated a single cell; it was later changed to recommend a double cell. (Exhibit hh)

221.  On December 29, 2004, the Final Summary of the Disciplinary Report recommended a transfer.

222.  On January 5, 2005, Plaintiff's Good Conduct Credits/Revocation on the urine specimen was reduced by 3 months.

223.  On January 13, 2005, Plaintiff was transferred to Menard Correctional Center from Western Illinois Correctional Center.

224.  On February 1, 2005, it was recommended that Plaintiff have a double cell on his Segregation Form.  (Exhibit ii)

225.  On April 15, 2005, at Plaintiff's Grievance Hearing, Plaintiff was found guilty, given 6 months segregation, 6 months "C" grade, 6 months revocation of good conduct credits, loss of contact visits for 6 months, and a transfer.  (Exhibit jj)

226.  On September 6, 2005, Plaintiff was given a low bunk assignment indefinitely.  (Exhibit kk)

227.  On September 8, 2005, two memos were written in response to Plaintiff's grievances on removal of his safety glasses in which both indicated his glasses were returned to him.  (Exhibits ll and mm)

228.  On January 16, 2006, Plaintiff was given a prescription for an ADA cell for a year by Dr. Feinerman.  (Exhibit nn)

229.  On January 30, 2006, Plaintiff received a letter regarding Flagg's response to Plaintiff's grievance.  (Exhibit oo)

230.  On March 21, 2006, Christine Brown wrote a memo in response to Plaintiff's grievance regarding an ADA cell.

231.  On March 6, 1999, Plaintiff was transferred from Dixon Correctional Center to Hill Correctional Center.  The IDOC concluded he needed a low bunk and needed to use a cane.

232.  On July 9, 2001, Plaintiff was given a permanent low bunk assignment.

233.  The records herein attached to these requests to admit were made in the regular course of the business.

234.  The entries in the records attached to these requests to admit were made by an employee or representative of Illinois Department of Corrections or Wexford Health Systems, a contractor of the Illinois Department of Corrections, who had personal knowledge of the act, event, or condition that is being recorded in the record.

235.  The records attached to these requests were made at or near the time that the recorded act, event, or condition occurred or reasonably soon thereafter.

236.  The records attached to these requests were kept in a consistent manner, according to a set procedure.

AARON McCROY,  Plaintiff,
BY:    LONDRIGAN, POTTER, & RANDLE, P.C.


BY: _Carissa A. Haning_
       CARISSA A. HANING

Carissa A. Haning
Londrigan, Potter, & Randle, P.C.
P.O. Box 399
Springfield, IL 62705
217-544-9823
217-544-9826 (fax)