E-FILED
Thursday, 19 April, 2007  11:06:10 AM
Clerk, U.S. District Court, ILCD

05415-N3293
TMP/ej/jly

### IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| AARON McCROY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02-3171 |
| | ) | |
| THE ILLINOIS DEPARTMENT OF CORRECTIONS, | ) | |
| ROGER E. WALKER, JR. (in his official capacity only), | ) | |
| DENNIS HOCKADAY, KEVIN WINTERS, SANDRA | ) | |
| FUNK, DEBRAH FUQUA, LIEUTENANT BYRON | ) | |
| LAW, KENNETH KELLERMAN, JULIUS FLAGG, | ) | |
| (all in their official and individual capacities), WEXFORD | ) | |
| HEALTH SOURCES, INC., DR. LOWELL BROWN, | ) | |
| M.D., DR. HUGHES LOCHARD, M.D., and | ) | |
| RHONDA MILLS, | ) | |
| Defendants. | ) | |

### DEFENDANT LOCHARD'S MOTION FOR SUMMARY JUDGMENT

NOW COMES the Defendant, HUGHES LOCHARD, M.D., by his attorney, THERESA M. POWELL of HEYL, ROYSTER, VOELKER & ALLEN, and for his Motion for Summary Judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, states:

### I.  INTRODUCTION

Plaintiff has filed a Third Amended Complaint alleging that Defendant Lochard retaliated against him for exercising his First Amendment Rights.  Plaintiff also alleges that Defendant Lochard violated the Eighth Amendment by failing to protect him and by being deliberately indifferent to a serious medical need during the time that he was incarcerated at the Western Illinois Correctional Center.  Plaintiff alleges that certain acts and/or omissions were performed or committed by Defendant Lochard which constitute the basis of each claim.  Defendant Lochard denies that he committed any of the acts set forth in Counts I, III, and IV of Plaintiff's Third Amended Complaint

HEYL ROYSTER
VOELKER
& ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

and further denies that any act or omission on his part violated any of Plaintiff's constitutional rights. Defendant Lochard further denies that any act or omission on his part caused injury to Mr. McCroy.

Both the Affidavit of Dr. Lochard and his deposition, in conjunction with the medical records, support his position concerning his lack of involvement with respect to the specific allegations contained within Counts I, III, and IV of Plaintiff's Third Amended Complaint.

As there are no genuine issues of material fact in this case with respect to the care and treatment provided to Plaintiff, Aaron McCroy, by Dr. Lochard, Defendant Lochard is entitled to summary judgment.

## II. **MATERIAL FACTS CLAIMED TO BE UNDISPUTED**

1.       Plaintiff was incarcerated at all relevant times relating to this Complaint and at the time he filed his initial lawsuit.  (See Plaintiff's Third Amended Complaint, Par. 2.)

2.       Dr. Lochard is a physician licensed to practice medicine in the state of Illinois (see Dr. Lochard's Affidavit, attached as Exhibit 1).

3.       Dr. Lochard specializes in family medicine and works at the present as the Medical Director at the Jacksonville Correctional Center in Jacksonville, Illinois, (Exhibit 1).

4.       Dr. Lochard's only  connection to Aaron McCroy stems from a brief period in time when he served as the Acting Medical Director for the Western Illinois Correctional Center from September of 2003 through approximately the end of December of 2003 or beginning of January of 2004 (Exhibit 1).

5.       During the time that Dr. Lochard served as the Acting Medical Director at the Western Illinois Correctional Center, he was not made aware of any grievances or lawsuits filed by

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

Aaron McCroy or any other inmate incarcerated at the Western Illinois Correctional Center (Exhibit 1).

6.      During the time that Dr. Lochard served as the Acting Medical Director, he did not change Plaintiff's treating ophthalmologist (Exhibit 1).

7.      Dr. Lochard had no authority nor ability to transfer the Plaintiff to any other correctional center.  (Exhibit 1).

8.      During this time, Dr. Lochard had no reason to believe that Mr. McCroy needed to be transferred to another correctional facility for medical purposes (Exhibit 1).

9.      During this time, Dr. Lochard did not refuse to provide the Plaintiff with prescribed medication (Exhibit 1).

10.      Dr. Lochard did not administer any medication that had not been prescribed (Exhibit 1).

11.      With respect to the prescription order of Maxitrol from Dr. Zeh's office dated November 6, 2003, Dr. Lochard did not personally review the handwritten order from Dr. Zeh. (Exhibit 1, handwritten order and Exhibit 1-A, p. 319.)

12.      In addition, Dr. Lochard was not provided the report of consultation returned from Dr. Zeh's office and dated November 6, 2003  (Exhibit 1 and Exhibit 1-B, p. 320.)

13.      This consultation report was physically returned to the Western Illinois Correctional Center and was reviewed by Dr. Ghosh, who signed the document approving the recommendations made by Dr. Zeh (Exhibit 1).

**HEYLROYSTER**
**VOELKER &ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

3

05415-N3293
TMP/ej/jly

14.    On November 6, 2003, Dr. Lochard was contacted by Nurse Roberts, who advised him of her interpretation of the orders provided by Dr. Zeh's office.  Those orders are documented in her note of that date.  (Exhibit 1 and Exhibit 1-C, p. 956.)

15.    Pursuant to this telephone call, she advised Dr. Lochard of these prescription orders from Dr. Zeh's office and he approved them.  (See Exhibit 1 and Exhibit 1-C, p. 956.)

16.    Once Dr. Lochard approved the prescription order, the order was documented on a physician's order note of the same date.  (See Exhibit 1 and Exhibit 1-D, p. 571.)

17.    Dr. Lochard relied upon the information provided to me by Nurse Roberts. (Exhibit 1).

18    At the time, Dr. Lochard had no reason to dispute the information being provided to him by Nurse Roberts. (Exhibit 1).

19.    In Dr. Lochard's opinion, it is the standard of care for a reasonably well qualified physician to rely upon nurses within a medical setting to provide him with accurate medical information.  (Exhibit 1).

20.    At no time did Nurse Roberts indicate to Dr. Lochard that she had any question concerning the prescription order provided by Dr. Zeh. (Exhibit 1).

21.    At all times Dr. Lochard had involvement with Mr. McCroy, his corneal transplant had already been performed.  (Exhibit 1).

22.    At no time did Dr. Lochard refuse to schedule any needed medical appointments.  (Exhibit 1).

23.    At no time has Dr. Lochard denied Plaintiff access to programs and privileges provided to non-disabled inmates.  (Exhibit 1).

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

4

05415-N3293
TMP/ej/jly

24.     In Dr. Lochard's capacity as the Medical Director, he is not aware of the eligibility requirements of inmates to participate in programs which may lead to early release.  (Exhibit 1).

25.     At no time did Dr. Lochard have any involvement in providing an inmate personal hygiene articles.  Dr. Lochard had no involvement in determining whether or not lights were left on at the Western Illinois Correctional Center in any part of that facility.  (Exhibit 1).

26.     Dr. Lochard played no role in determining whether or not Mr. McCroy was allowed to participate in the commissary.  Dr. Lochard played no role in determining whether or not Mr. McCroy's belongings should or should not be searched. (Exhibit 1).

27.     Dr. Lochard played no role in determining when and if Mr. McCroy was allowed the opportunity to take showers on any specific date.  (Exhibit 1).

28.     At no time did Dr. Lochard ever wake Mr. McCroy up.  Dr. Lochard never requested that Mr. McCroy do any sort of chores or cleaning of his cell, his locker, or his dresser. (Exhibit 1).

29.     Dr. Lochard did not transfer Mr. McCroy from one cell to another at any time.(Exhibit 1).

30.     At no time has Dr. Lochard had any involvement in placing Mr. McCroy in any particular location at the Western Illinois Correctional Center.  (Exhibit 1).

31.     Dr. Lochard has never had any information concerning the name, criminal background, or disciplinary background of any individual who may be housed with Mr. McCroy. (Exhibit 1).

32.     Dr. Lochard is not personally aware of the criminal background of Mr. McCroy. (Exhibit 1).

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

33.     Dr. Lochard plays no role and played no role in determining cell placement of any inmate within the Western Illinois Correctional Center or any other correctional facility as it pertains to inmates in the general population.  (Exhibit 1).

34.     With respect to the random urine test referenced in this case, Dr. Lochard was no longer serving as the Acting Medical Director at the time this was performed.  (Exhibit 1).

35..    Dr. Lochard therefore had no role regarding that matter.  (Exhibit 1).

36.     As the Medical Director, Dr. Lochard has no duty and plays no role in determining the security risk of any inmate, including Mr. McCroy.  (Exhibit 1).

37.     Dr. Lochard played no role and has no authority to transfer inmates from one facility to another. Specifically, Dr. Lochard played no role and had no authority to transfer Mr. McCroy from the Western Illinois Correctional Center to the Menard Correctional Center.  (Exhibit 1).

38.     In fact, Dr. Lochard was not serving at the Western Illinois Correctional Center in any capacity at the time Mr. McCroy was transferred from Western to Menard.  (Exhibit 1).

39.     On November 29, 2003, Dr. Lochard did sign a memorandum indicating that Mr. McCroy was to be medically unassigned.  (Exhibit 1 and Exhibit 1-E, p. 325.)

40.     It is Dr. Lochard's understanding that making an inmate medically unassigned allows that inmate the opportunity to not work as inmates who are not medically unassigned are normally required to work.  (Exhibit 1).

41.     This document indicates that Mr. McCroy may be maintained as medically unassigned from November 29, 2003 through November 29, 2004, as one year is the standard amount of time to make an inmate unassigned.  (Exhibit 1).

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

42.    However, Dr. Locahrd specifically indicated on this document that Mr. McCroy should be reevaluated in January of 2004.  (Exhibit 1 and Exhibit 1-E, p. 325.)

43.    It should also be noted that prior to November 29, 2004, Mr. McCroy had already been deemed medically unassigned on other documents.  (Exhibit 1 and Exhibit 1-F, pp. 270-3, 321.)

44.    On each of these documents, Mr. McCroy is designated as having been unassigned going back at least to January 8, 2003.  (Exhibit 1).

45.    Accordingly, Dr. Lochard did not arbitrarily change his unassigned classification at any time.  (Exhibit 1).

46.    It is Dr. Lochard's understanding that Mr. McCroy was provided commissary, recreation, library, and all other rights and privileges available to every other inmate who was housed in the infirmary as set forth in Exhibit 1-G pages 274 and 275. (Exhibit 1).

47.    Dr. Lochard did not transfer Mr. McCroy from the infirmary to the general population. (Exhibit 1).

48.    During the time that Dr. Lochard served as the Acting Medical Directory, Mr. McCroy was housed in the infirmary for one reason or another.  (Exhibit 1).

49.    Dr. Lochard has no knowledge of the inmates who may have been assigned to the same cell as Mr. McCroy while he was in the infirmary or after he was transferred to the general population.  (Exhibit 1).

50.    Dr. Lochard had no role in determining the cell assignment for Mr. McCroy at any time.

HEYL ROYSTER
VOELKER
& ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

51.     Dr. Lochard is not aware and was not made aware of any events involving Mr. McCroy after he no longer served as the Acting Medical Director and before being served with this lawsuit.  (Exhibit 1).

52.     At no time was Dr. Lochard made aware of any grievances or lawsuits filed by Mr. McCroy during the time that I served as the Acting Medical Director.  (Exhibit 1).

53.     None of Dr. Lochard's actions taken with respect to the care and treatment provided to Aaron McCroy were related in any way to a grievance or lawsuit which may have been filed by Mr. McCroy as Dr. Lochard had no knowledge of them.  (Exhibit 1).

54.     Even if Dr. Lochard had knowledge that Mr. McCroy had filed grievances and/or a lawsuit, his care and treatment would not have been altered by that fact.  (Exhibit 1).

55.     Dr. Lochard had no authority or ability to provide any injunctive relief to Mr. McCroy. (Exhibit 1).

56.     Dr. Lochard's  involvement with Mr. McCroy was limited to those issues that were raised by either the nurse or the nurse practitioner onsite at the Western Illinois Correctional Center (Exhibit 1).

57.     Dr. Lochard was aware that other physicians were taking care of Mr. McCroy's acute needs during the day, and that outside physicians were caring for Mr. McCroy's ophthalmological needs with respect to the follow-up care to the keratoplasty which had been performed in February of 2003.  (Exhibit 1).

58.     Dr. Lochard has been practicing medicine within the Department of Corrections since April 28, 1997.  (See Deposition of Dr. Lochard , p. 6; attached as Exhibit 2.)

59.     Dr. Lochard practices general medicine.  (Exhibit 2, p. 8.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

60.    Dr. Lochard's involvement in providing care and treatment to patients at the Western Illinois Correctional Center took place in the form of him taking call from approximately September 2003 through December 2003 or January of 2004.  (Exhibit 2, pp. 9-10.)

61.    Dr. Lochard did not work onsite at the Western Illinois Correctional Center during those times, but took call after hours.  (Exhibit 2, pp. 9-11.)

62.  Dr. Lochard did not see Aaron McCroy or physically examine him during this time frame. (Exhibit 2, p. 13.)

63.    With respect to any orders relating to Maxitrol from November 6, 2003  Dr. Lochard was not actually presented with the written orders from Dr. Zeh.  (Exhibit 2, pp. 23-24.)

64.    He was advised of this information over the phone.  (Exhibit 2, p. 24.)

65.    Dr. Lochard has no knowledge of the care and treatment provided to Mr. McCroy regarding his corneal transplant in terms of the physicians chosen to evaluate and treat Mr. McCroy for his ongoing keratoconus condition.  (Exhibit 2, pp. 35-36.)

66.    With respect to the transcription error relating to the prescription for Maxitrol, Dr. Lochard did not become aware that this prescription had been misread until after he stopped serving at the Acting Medical Director at Western Illinois Correctional Center.  (Exhibit 2, pp. 40-41.)

67.    With respect to the consultation report of Dr. Zeh dated November 6, 2003, Dr. Ghosh signed off on that document and requested the consultation with Dr. Zeh.  (Exhibit 2, p. 43.)

68.    Dr. Ghosh did not consult with Dr. Lochard regarding that visit.  (Exhibit 2, p. 43.)

69.    Dr. Lochard was not consulted at any time to approve or recommend that Mr. McCroy be sent to the general population.  (Exhibit 2, p. 44.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

70. Dr. Lochard played no role in authorizing or denying the corneal transplant. (Exhibit 2, p. 44.)

71. When Mr. McCroy was made medically unassigned, Dr. Lochard's understanding of the meaning of that term would be that Mr. McCroy would not be given a job. (Exhibit 2, p. 63.)

72. Mr. McCroy would not be given a job as of November of 2003 as a job might require him in certain cases to lift things. One of his recommendations at that time was not to lift anything heavy. (Exhibit 2, p. 63.)

73. Mr. McCroy would not be given a desk job in the general population when medically unassigned as someone who was medically unassigned cannot work until that has been lifted. (Exhibit 2, pp. 63-64.)

74. Dr. Lochard did not have any conversations with Dr. Zeh regarding the Plaintiff's placement in segregation. (Exhibit 2, p. 78.)

75. Dr. Lochard had no knowledge as to Mr. McCroy's specific cell assignments prior to November 1, 2003. (Exhibit 2, p. 78.)

76. Dr. Lochard has no knowledge as to why Mr. McCroy was placed in segregation in November of 2003. (Exhibit 2, p. 79.)

77. Dr. Lochard has no knowledge as to whether or not Mr. McCroy ever filed any grievances concerning his medical care. (Exhibit 2, p. 80.)

78. Dr. Lochard has no involvement in transferring inmates from one facility to another in general or with respect to Mr. McCroy. (Exhibit 2, p. 80.)

79. Dr. Lochard never changed Mr. McCroy's treating physicians regarding his eye care. (Exhibit 2, p. 80.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

10

05415-N3293
TMP/ej/jly

80.     Dr. Lochard had nothing to do with the corneal transplant.  (Exhibit 2, p. 80.)

81.     Dr. Lochard never interfered with any medical appointments that had been made by outside physicians or recommended by an outside physician.  Exhibit 2, p. 81.)

82.     Dr. Lochard has no knowledge as to whether or not the restrictions he placed on Mr. McCroy on November 29, 2003 interfered with Mr. McCroy's ability to access any programs or privileges at the Department of Corrections.  (Exhibit 2, p. 81.)

83.     Dr. Lochard would not have any personal information or personal involvement in determining Mr. McCroy's cell mates.  (Exhibit 2, p. 81.)

84.     Dr. Lochard has no knowledge as to the names and identities of Mr. McCroy's cell mates while he was in the infirmary, nor while he was in the general population.  (Exhibit 2, p. 81.)

85.     Dr. Lochard had no information concerning Mr. McCroy's security risk assignment. (Exhibit 2, p. 82.)

86.     Keratoconus is an abnormality of the cornea in which the cornea is weakened and begins to bulge irregularly.  That causes problems with the way the eye bends and focuses light through the creation of irregular astigmatism.  (See Deposition of Dr. Zeh Deposition, p. 7; attached as Exhibit 3).

87.     The definition of irregular astigmatism would be astigmatism that you can no longer correct with spectacles.  (Exhibit 3, p. 7.)

88.     When patients who have keratoconus can no longer wear spectacles to correct their vision, the next step is to try fitting them with a rigid contact lens.  (Exhibit 3, p. 7.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

89.     The rigid lens sits on the surface of the cornea and basically hides the abnormal shape and presents a nice, smooth spherical surface in which light is bent and focused on the back of the eye.  (Exhibit 3, pp. 7-8.)

90.     Patients with keratoconus have difficulty fitting rigid lenses due to the fact that the cornea is irregular.  (Exhibit 3, p. 8.)

91.     If the keratoconus disease progresses, the contact lenses will no longer center appropriately and these patients can have difficulties with the lens not staying on the eye or being very uncomfortable.  (Exhibit 3, p. 8.)

92.     At whatever point the patient becomes intolerant to contact lenses, then usually the recommendation is to proceed with a cornea transplant.  (Exhibit 3, p. 8.)

93.     The purpose of the corneal transplant is to try to restore more normal shape to the cornea to allow glasses or a rigid contact lens to be used to correct the eye.  (Exhibit 3, p. 8.)

94.     Keratoconus is a progressive disease in some patients.  In the mast majority of patients, the disease exists and then either does not progress or it progresses very slowly.  But in some patients, there is progression.  (Exhibit 3, p. 8.)

95.     There is no known medical treatment that will arrest the progression of keratoconus. (Exhibit 3, p. 8.)

96.     The thought is that rubbing the eye is one of the main reasons that some patients' keratoconus progresses due to mechanical pressure on the cornea.  (Exhibit 3, pp. 8-9.)

97.     However, some patients' keratoconus progresses whether or not they rub their eyes. (Exhibit 3, p. 9.)

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

12

05415-N3293
TMP/ej/jly

98.    The three-tier progression of treatment ranges from spectacle correction, contact lens correction, and then cornea transplantation if the first two are not feasible anymore.  (Exhibit 3, p. 9.)

99.    Proper fitting of contact lenses does not necessarily arrest the progression of keratoconus.  (Exhibit 3, p. 9.)

100.    Proper fitting of contact lenses may allow a patient with the disease to see.  (Exhibit 3, p. 9.)

101.    Dr. Zeh first saw Aaron McCroy on August 29, 2003 after he had already had the corneal transplant on February 3, 2003 performed by Dr. Joseph Fedor.  (Exhibit 3, pp. 9-10.)

102.    On this date, the patient was stable with a clear transplant in the left eye.  The topography showed he had a very high amount of corneal astigmatism in the transplant, which is not extremely uncommon in patients with corneal transplants.  (Exhibit 3, p. 10.)

103.    Dr. Zeh recommended that the patient return in November to have one of the sutures removed in the hopes that it would reduce some of the corneal astigmatism.  (Exhibit 3, pp. 10-11.)

104.    When Mr. McCroy returned in November, the pressure in his left eye was elevated. It measured at 30 mm of mercury.  Dr. Zeh therefore went ahead and tried to remove one of the sutures.  The patient moved during the suture removal and as a result, both sutures had to be removed, which was a bit early compared to what he would have preferred.  (Exhibit 3, p. 11.)

105.    At that time (November 6, 2003), the patient was placed on a weight limitation of not lifting more than ten pounds, no bending over, and was asked that he be isolated to a place where he would not be inadvertently jostled or struck.  (Exhibit 3, p. 11.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

106.    As of November 6, 2003, Dr. Zeh recommended that the patient stop the Maxitrol ointment after three days.  (Exhibit 3, pp. 11-12, 14.)

107.    The patient was switched to a lower potency steroid which tends not to elevate the pressure.  (Exhibit 3, pp. 12-13.)

108.    Ten to fifteen percent of the general population will respond with an elevation of pressure in the eye as a result of steroids.  (Exhibit 3, p. 14.)

109.    On November 6, 2003, Dr. Zeh had the suspicion that the patient might have a steroid-responsive glaucoma (elevation of eye pressure).  (Exhibit 3, pp. 14-15.)

110.    The patient came back on December 23, 2003.  He reported that he was still receiving the Maxitrol and was also receiving the Lotimax.  (Exhibit 3, p. 15.)

111.    The patient's eye pressure was up to a little over 40 in the left eye.  (Exhibit 3, p. 15.)

112.    The patient was referred to Dr. Kim for a glaucoma evaluation at that time.  (Exhibit 3, p. 16.)

113.    With respect to the difference in pressure between 44 on December 23, 2003 and that of 30 documented on November 6, 2003, Dr. Zeh found that 44 was higher than he would have liked it to have been.  (Exhibit 3, p. 17.)

114.    It indicated to him that the glaucoma was not controlled.  (Exhibit 3, p. 17.)

115.    However, he points out that the instruments that read pressure in the eye are made to read pressures predominantly within a normal range.  Once the numbers get past the high end of normal (beyond 30), the machines become less accurate.  Therefore, the difference between 30 and 44 may not necessarily really be 14, the way it would be the difference between 10 and 24.  (Exhibit 3, p. 17.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

14

05415-N3293
TMP/ej/jly

116.    Glaucoma is a condition that can potentially develop in about ten to fifteen percent of the general population in which an eye that is treated with steroids will respond with an elevation of pressure in the eye.  (Exhibit 3, p. 21.)

117.    In most patients, it happens within several days or several weeks of starting the steroid treatment.  (Exhibit 3, p. 21.)

118.    This was a little bit unusual in Mr. McCroy's case because he had been treated with steroids since the time of his transplant, since February 2003, and he had been seen multiple times during that interval between February 2003 and November 2003.  (Exhibit 3, p. 21.)

119.    During that time, Mr. McCroy had not had any elevation in his pressure previously. It is a little unusual for him to develop the condition nine months after the use of steroids.  (Exhibit 3,  pp. 21-22.)

120.    The onset of glaucoma suffered by Aaron McCroy was not necessarily induced by the medication error which occurred in this case because Mr. McCroy actually had an elevated pressure before this transcription error or inadvertent prolonged use had occurred.  (Exhibit 3, p. 22.)

121.    The pressure was elevated longer, potentially longer than would have been desired, because of the failure to discontinue the steroid.  (Exhibit 3, p. 22.)

122.    However, the steroid-induced glaucoma was not induced by the fact that he received the steroids longer than he was supposed to and at a higher dose as well because that condition appeared to exist before that incident occurred.  (Exhibit 3, p. 22.)

123.    The elevation and pressure was initially identified on November 6, 2003.  (Exhibit 3, pp. 22-23.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

15

05415-N3293
TMP/ej/jly

124.    Again, the pressure in the eye remained high, but the elevation was not necessarily induced by the fact that the steroids were not discontinued when ordered.  (Exhibit 3, p. 23.)

125.    Mr. McCroy was seen twice by Dr. Kim, once on January 8, 2004 and once on January 23, 2004.  (Exhibit 3, p. 23.)

126.    On January 23, the pressure in Mr. McCroy's eye was down to 19.  (Exhibit 3,  p.23.)

127.    Dr. Zeh cannot say that the discontinuation of the Maxitrol caused the decrease in pressure, because on January 8, after the Maxitrol had been discontinued, and the patient had been given two glaucoma medications, his pressure was still elevated to 31.  (Exhiibt 3, p. 24.)

128.    As of the date of Dr. Zeh's deposition, June 22, 2004, Mr. McCroy's left cornea was fairly stable.  (Exhibit 3, p. 27.)

129.    In Dr. Zeh's opinion, with the exception of steroid glaucoma postoperatively, the patient's course of treatment has been fairly smooth sailing and he has not had a lot of problems that could potentially occur, such as allograph rejections or wound complications or things such as that. (Exhibit 3, p. 29.)

130.    The stitches have been out and the patient has been doing fine for the last seven months since the suture removal without having wound problems.  (Exhibit 3, p. 29.)

131.    The chance that the patient will suddenly have a problem in the absence of a traumatic injury is not high, but it is also not zero.  (Exhibit 3, p. 29.)

132.    In Dr. Zeh's opinion, providing care within at least 24 hours after a complaint has been made would be sufficient.  (Exhibit 3, pp. 29-30.)

133.    Dr. Zeh last saw Mr. McCroy on May 21, 2004.  (Exhibit 3, p. 31.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

134.    As of that date, the patient's condition of his left eye post-corneal transplant was stable with irregular astigmatism with a recommendation of proceeding with a rigid contact lens fitting for the eye.  (Exhibit 3, pp. 31-32.)

135.    Dr. Zeh's recommendations were rigid contact lens fitting of the left eye, consider cataract surgery if unable to improve visual acuity with the rigid contact lens, to continue the patient's medications unchanged since his pressure was stable, and to follow up again at his practice in three months to see one of the doctors for a cornea check.  (Exhibit 3, p. 32.)

136.    Dr. Zeh referred the patient to Dr. Blumthal for the contact lens fitting.  (Exhibit 3, pp. 33-35.)

137.    Dr. Zeh does not know why the patient had not been fitted with the contact lenses. (Exhibit 3, p. 36.)

138.    Dr. Zeh placed Mr. McCroy on restrictions immediately after the suture removal because of his concerns about a wound dehiscence since the sutures were removed a little bit ahead of time.  (Exhibit 3, pp. 37-38.)

139.    However, from the interval from November 2003 up through February 2004, at which point the patient was a year after the transplant, which is a point Dr. Zeh would normally remove all sutures from a patient anyway, he did not think the patient necessarily had to be on restrictions anymore.  (Exhibit 3, p. 38.)

140.    Mr. McCroy did not convey to Dr. Zeh that the restrictions placed by Dr. Zeh were in any way impeding his (Mr. McCroy's) ability to participate in any sort of rehabilitation classes or anything like that.  He never complained about the restrictive nature of that.  (Exhibit 3, p. 38.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

17

05415-N3293
TMP/ej/jly

141.    After the corneal transplant in February of 2003, Mr. McCroy would have been given steroids from that time all the way through November 2003.  (Exhibit 3, pp. 42-43.)

142.    The medical records do reflect that the patient received the steroid ointment treatment that entire time.  (Exhibit 3, pp. 42-43.)

143.    Glaucoma is a disease of months and years in most cases rather than hours and days. (Exhibit 3, p. 44.)

144.    Dr. Zeh had no criticisms of the care provided to the patient's eye other than the failure to follow his instruction to discontinue the use of Maxitrol.  (Exhibit 3, p. 55.)

145.    Visual rehabilitation with corneal transplant patients often takes a year or more.  That is just the nature of cornea transplantation.  (Exhibit 3, p. 57.)

146.    Patients often have high amounts of astigmatism until sutures are removed and in most cases, all the sutures are not removed for a year or more after the surgery, so Mr. McCroy is not necessarily behind scheduled compared to many people who have transplant procedures performed. (Exhibit 3, p. 57.)

147.    Keratoconus has no known cause.  (Exhibit 3, p. 57.)

148.    Dr. Zeh approved the substitutions of various generic medications for the medications that he had written.  (Exhibit 3, p. 59.)

149.    The patient's failure to have a contact lens at any time has not caused any permanent damage.  (Exhibit 3, p. 64.)

150.    During the time the patient had no contact lens, he just has not had a contact lens to correct his vision for that time.  (Exhibit 3, p. 64.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

151.    Dr. Robert J. Blumthal is an optometrist.  (See Dr. Blumthal Deposition, p. 4; attached as Exhibit 4.)

152.    He currently practices in Springfield, Illinois with the Prairie Eye Center.  (Exhibit 4, p. 5.)

153.    In the course of his practice, he has seen a patient by the name of Aaron McCroy. (Exhibit 4, p. 6.)

154.    The first reference in the medical records generated by Prairie Eye Center relating to contact lenses is dated April 8, 2003.  (Exhibit 4, p. 10.)

155.    Dr. Feder referred the patient to Dr. Blumthal for the contact lens fitting.  (Exhibit 4, p. 10.)

156.    The referral took place within the Prairie Eye Center office.  (Blumthal Deposition, p. 11.)

157.    Dr. Feder saw the patient again on May 9, 2003.  (Exhibit 4, p. 12.)

158.    Dr. Feder would not do the contact lens fitting himself.  (Exhibit 4, p. 12.)

159.    Between April 8, 2003 and May 9, 2003, an appointment had not been made by Prairie Eye Center with Dr. Blumthal as Dr. Blumthal felt Dr. Feder was "trying to deal with something relating to a side effect of the surgery" namely filamentary keratitis.  (Exhibit 4 , p. 13.)

160.    Dr. Blumthal had the opinion that with respect to the filamentary keratitis, this is a condition that he would want to have treated before fitting the patient with contact lenses.  (Exhibit 4, pp. 13-14.)

161.    It would be difficult to fit a lens on the patient with a condition of severe dry eye. (Exhibit 4, p. 14.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

162.    Dr. Blumthal saw the patient on June 24, 2003 in reference to obtaining a rigid gas permeable contact lens.  (Exhibit 4, p. 16.)

163.    The scheduling of visits with Mr. McCroy would have been arranged through the Department of Corrections.  (Exhibit 4, p. 16.)

164.    Dr. Blumthal tried to schedule the earliest visit he had open on his schedule.  (Exhibit 4, p. 17.)

165.    This would be the same for somebody who was not with the Department of Corrections.  (Exhibit 4, p. 17.)

166.    When the patient was seen on June 24, 2003, Dr. Blumthal did not see the patient with respect to fitting a lens in the right eye.  (Exhibit 4, p. 22.)

167.    Based on Dr. Blumthal's evaluation of the patient, he found that he needed to use a lens called a Rose K lens, specifically designed for keratoconus patients.  (Exhibit 4, p. 23.)

168.    He did not have one of those sets on hand at the time he saw Mr. McCroy in June of 2003.  (Exhibit 4, p. 23.)

169.    Neither he nor anyone else would have known that he needed that particular device prior to June 24, 2003.  (Exhibit 4, p. 23.)

170.    Dr. Blumthal ordered the Rose K fitting on that date, June 24, 2003.  (Exhibit 4, pp. 24-25.)

171.    Dr. Blumthal next saw the patient on August 29, 2003 after the Rose K lens had arrived from the lab.  (Exhibit 4, pp. 25-26.)

172.    Dr. Blumthal did not fit the lens on that date because the patient had complaints of a scratching left eye.  (Exhibit 4, p. 26.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

173.    Dr. Blumthal referred the patient back to Dr. Zeh to address the complaint that the patient's eye was scratchy.  (Exhibit 4, p. 27.)

174.    Dr. Blumthal was not able to fit the contact lens on August 29, 2003.  (Exhibit 4, p. 29.)

175.    The reason Mr. McCroy was not fitted for a contact lens was that his eye was not in a stable condition to receive his lens on that date.  (Exhibit 4, p. 30.)

176.    Dr. Blumthal sees patients from as far south as Marion, as far east as Paris and Mattoon, and as far north as Canton, Illinois.  (Exhibit 4, p. 33.)

177.    It is not unusual for patients to travel quite a ways to see their doctors.  (Exhibit 4, p. 34.)

178.    The Plaintiff has testified that he was not initially assigned or housed with Inmate Durham upon his release from the healthcare unit.  (See McCroy Deposition of March 16, 2007, p. 94; Exhibit 5).

179.    Plaintiff is currently incarcerated at the Pinckneyville Correctional Center.  (Exhibit 5, p. 4.)

180.    Plaintiff has been incarcerated at Pinckneyville since August of 2005.  (Exhibit 5, p. 4.)

181.    Plaintiff was incarcerated at the Western Illinois Correctional Center from October of 2001 through January of 2005.  (Exhibit 5, p. 4.)

182.    During the year 2003 through 2004, the Plaintiff's vision in his left eye was limited to hand movements and seeing colors, shapes, and objects.  (Exhibit 5, p. 7.)

183.    He could not read out of his left eye.  (Exhibit 5, p. 8.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

184.    The last time Plaintiff asserts he was able to read out of his left eye was sometime in 2001.  (Exhibit 5, p. 9.)

185.    Plaintiff alleges the first time he complained of Mr. Durham was September 22, 2004. (Exhibit 5, p. 20.)

186.    Plaintiff alleges this was a verbal report to Lieutenant Law and Correctional Officer Kellerman.  (Exhibit 5, p. 17.)

187.    Plaintiff alleges he reported that Mr. Durham would get aggressive by getting loud and that Durham's posture would change.  (Exhibit 5, p. 19.)

188.    Mr. McCroy currently has a cell mate.  He has no difficulties with his current cell mate.  (Exhibit 5, p. 30.)

189.    Plaintiff's current cell mate has no disabilities.  (Exhibit 5, p. 34.)

190.    Mr. McCroy is not complaining about his ADA cell at Pinckneyville.  (Exhibit 5, p. 46.)

191.    Mr. McCroy claims he did complain about cell placement at both Menard and Western Illinois Correctional Centers in that he claims he requested that they not cut the lights over his head and that he be allowed the draw the curtains to block out other people's light.  (Exhibit 5, p. 46.)

192.    With respect to Plaintiff's allegations concerning being denied access to employment, the Plaintiff claims that he was medically unassigned and therefore could not enroll in the early release program.  (Exhibit 5, p. 49.)

193.    According to the Plaintiff, he believes that he was taken out of the early release program because he missed three dates classes, which constitutes a violation.  (Exhibit 5, pp. 54-55.)

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

194.    It is Plaintiff's contention that the reason he did not go to school was because of his eye problems.  (Exhibit 5, p. 55.)

195.    After February 3, 2003, Plaintiff was allowed access to the yard.  (Exhibit 5, p. 57.)

196.    He would leave the infirmary every other day unescorted.  He knew how to get to the yard from the infirmary.  (Exhibit 5, p. 57.)

197.    Mr. McCroy was allowed access to the law library.  (Exhibit 5, p. 57.)

198.    He could go to the law library two to three times a week.  (Exhibit 5, p. 58.)

199.    At the time Mr. McCroy went to the law library, other inmates could be in the law library with him.  (Exhibit 5, p. 60.)

200.    When Mr. McCroy would go the yard at Western, other inmates would be in the yard. (Exhibit 5, pp. 61-62.)

201.    He does not know exactly how many inmates would be there - maybe 25 or 30 approximately.  (Exhibit 5, p. 62.)

202.    Mr. McCroy does not recall every meeting Dr. Lochard.  (Exhibit 5, p. 83.)

203.    According to Mr. McCroy, his complaints against Dr. Lochard relate to the allegation that Dr. Lochard appears to have placed restrictions on Mr. McCroy's activities without evaluating him.  (Exhibit 5, p. 83.)

204.    Mr. McCroy is also complaining that Dr. Lochard made him medically unassigned. (Exhibit 5, p. 83.)

205.    Mr. McCroy believes that Nurse Practitioner Mills canceled medications that had been prescribed to him.  (Exhibit 5, pp. 83-84.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

23

05415-N3293
TMP/ej/jly

206.    Part of Plaintiff's claim against Nurse Practitioner Mills is that he believes she canceled a narcotics prescription for Darvocet.  (Exhibit 5, p. 84.)

207.    While Plaintiff was in the infirmary, he was housed with three other inmates at various time and sometimes alone.  (Exhibit 5, p. 93.)

208.    He does not recall the dates he was housed with other people as opposed to the dates he was housed by himself.  (Exhibit 5, p. 93.)

209.    Mr. McCroy was not immediately housed with Inmate Durham upon being released from the infirmary on June 8, 2004.  (Exhibit 5, p. 94.)

210.    Mr. McCroy does not recall the names of his other cell mates.  (Exhibit 5, p. 94.)

211.    He had three or four different cell mates before Mr. Durham.  (Exhibit 5, p. 94.)

212.    Mr. McCroy did not have any problems with these other cell mates.  (Exhibit 5, p. 94.)

213.    Plaintiff claims that he had difficulty navigating and was unable to function in the general population after being released from the infirmary.  (Exhibit 5, p. 95.)

214.    The Plaintiff was in the general population after June 8, 2004.  He would have to walk approximately 50 feet to travel to the commissary from his cell.  (Exhibit 5, p. 96.)

215.    Every time Mr. McCroy had the ability to go to the law library, he went.  (Exhibit 5, p. 98.)

216.    When he had the ability to go to the chow hall, he chose not to go on certain occasions.  (Exhibit 5, p. 98.)

217.    The law library is approximately 50 feet from the infirmary.  (Exhibit 5, p. 98.)

218.    The yard is approximately 125 feet from the infirmary.  (Exhibit 5, p. 98.)

### III.  APPLICABLE LAW

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

## A.     Summary Judgment Standard.

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a Motion for Summary Judgment, the court must look beyond the pleadings and assess the proof to determine whether or not there is a genuine need for a trial.  If defendants meet their burden in showing there is an absence of evidence to support plaintiff's claim, plaintiff must demonstrate by affidavit, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial.  Celotex Corp. v Catrett, 477 U.S. 317, 324-25, 91 L.Ed.2d 265, 106 S.Ct. 254 (1986).  In determining and evaluating a Motion for Summary Judgment, the court used the evidence in the light most favorable to the opposing party and draws all justifiable inferences in his favor.  A mere scintilla of evidence in support of plaintiff's position is not sufficient to create a genuine issue of material facts.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).

## B.     Count I - Plaintiff Has Failed to Prove a Cause of Action for Retaliation Against Defendant Lochard.

An act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution.  DeWalt v. Carter, 224 F.3d 607, 618 (7th Cir. 1999), citing Mt. Healthy City School Dist. Board of Education v. Doyle, 429 U.S. 274, 283-4, 97 S.Ct. 568 (1977).  In order to prove a retaliation claim, Plaintiff must prove (1) he had engaged in a protected conduct and (2) he was retaliated against for engaging in this protected conduct.  DeWalt v. Carter, 224 F.3d at 618 (7th Cir. 2000).  Even if the Plaintiff proves these elements, this is not enough if the Defendants can show the result would still be the same absent a retaliatory motive.  Mt. Healthy City School Dist. v. Doyle,

HEYL ROYSTER
VOELKER
& ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

429 U.S. 274, 287 (1977). It is not enough for the Plaintiff to merely state retaliation played a part in the Defendants' actions. Babcock v. White, 102 F.3d 267, 275 (7th Cir. 1996).

There is no evidence to indicate that any act or omission on the part of Defendant Lochard was in response to the Plaintiff exercising a constitutional right. Plaintiff suggests that some act or omission on the part of Dr. Lochard was in part the result of Plaintiff having filed grievances or this lawsuit. However, the Plaintiff has no evidence that Dr. Lochard was ever aware that Plaintiff had ever filed any grievances to his medical care, nor was Defendant Lochard aware of this lawsuit until he became a party as a result of the Second Amended Complaint, which was filed years after the care and treatment had been provided to Mr. McCroy by Dr. Lochard.

In addition, the Plaintiff has no evidence to suggest that the patient's care and treatment provided by Dr. Lochard would have been different had Mr. McCroy not filed the grievances or the lawsuit that he filed.

Most importantly, there is simply no evidence to indicate that Dr. Lochard was aware the Plaintiff had exercised any constitutional rights in the form of filing a grievance or a lawsuit at any time prior to the care and treatment provided by Dr. Lochard in conjunction with this patient. Definitively, Plaintiff's claims for retaliation as to this Defendant must fail.

C.    **Count III - Eighth Amendment Failure to Protect.**

There is no evidence to support a cause of action under a theory of failure to protect against Defendant Lochard.

Count III of Plaintiff's Complaint specifically suggests that the Defendants acted with deliberate indifference to the Plaintiff's safety in terms of both his physical and psychological condition when they transferred him from the infirmary to the general population on or about June 8,

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

2004.  (Plaintiff's Third Amended Complaint, Par. 231.)  Additionally, Plaintiff alleges that the

Defendants acted with deliberate indifference to Plaintiff's safety when they assigned him a cell mate,

Inmate Durham, who had a known history of physical violence toward his cell mates.  (Plaintiff's

Third Amended Complaint, Par. 232.)

Plaintiff also alleges in Paragraphs 233 and 234 of Count III of Plaintiff's Third Amended

Complaint that Defendants Law and Kellerman had specific acts of deliberate indifference and that

the Illinois Department of Corrections has a "first fight policy" which led to the loss of Plaintiff's left

eye as a result of an attack by Inmate Durham.

None of the allegations set forth in Plaintiff's Complaint are sufficient to state a cause of

action against the undersigned Defendant.  Moreover, there is no evidence to support a claim for

failure to protect against the undersigned Defendant.

Under the Eighth Amendment, prison officials do have a duty to protect prisoners from

violence at the hands of other prisoners.  Farmer v. Brennan, 511 U.S. 825, 833 (1994).  Specifically,

when an inmate is attacked by another inmate, the Eighth Amendment is violated **only** (emphasis

added) if "deliberate indifference by prison officials effectively condones the attack by allowing it to

happen . . ." Haley v. Gross, 86 F.3d 630, 640 (7th Cir. 1996).  Deliberate indifference is comparable

to criminal recklessness, and is shown by something approaching a total unconcern for one's welfare

in the face of serious risks, or a conscious culpable refusal to prevent harm.  Duane v. Lane, 959 F.2d

673, 677 (7th Cir. 1992).  This total disregard for a prisoner's safety is the "functional equivalent of

wanting harm to come to the prisoner."  McGill v. Duckworth, 944 F.2d 344, 347 (7th Cir. 1991).

Negligence does not satisfy a deliberate indifference standard.  Sellers v. Henman, 41 F.3d 1100,

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

1102 (7th Cir. 1994).  It is not enough to show that a prison official merely failed to act reasonably. Gibbs v. Franklin, 49 F.3d 1206, 1208 (7th Cir. 1995).

Deliberate indifference can be inferred only where defendant know there is a strong likelihood rather than a mere possibility that violence will occur.  Watts v. Laurent, 774 F.2d 168, 172 (7th Cir. 1985).  Prison officials cannot be expected to eliminate the possibility of all dangers.  McGill v. Duckworth, 944 F.2d 344, 347 (7th Cir. 1991).  "Prisons are dangerous places. Thus, the right to reasonable protection does not include the right to protection from random acts."  See, McGill v. Duckworth, 944 F.2d 344, 348 (7th Cir. 1991) (some level of [danger] is inevitable no matter what guards do").

In order to substantiate a claim for failure to protect, the Plaintiff must prove that prison officials were aware of a specific, impending, and substantial threat to his safety, "often by showing that he complained to prison officials about a specific threat to his safety." Pope v. Shafer, 86 F.3d 90, 92 (7th Cir. 1996).  Essentially, Plaintiff must prove the Defendant had to know that there was a substantial risk that Inmate Durham (the one who is alleged to have attacked the Plaintiff) would do so, and yet failed to take action.  Sanville v. McCaughtry, 266 F.3d 724, 733-34 (7th Cir. 2001).

In this particular case, Plaintiff appears to be alleging that Defendant Lochard was deliberately indifferent to the Plaintiff's safety when he was transferred from the infirmary to the general population on or about June 8, 2004.  With respect to Dr. Lochard, there is no evidence that he was involved in the patient's transfer from the infirmary to the general population in June of 2004, as that entry was made by Dr. Lowell Brown.

Nevertheless, even if Dr. Lochard had been involved in transferring the patient from the infirmary to the general population, there is no evidence that Dr. Lochard was aware of the identity

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

28

05415-N3293
TMP/ej/jly

of the specific inmate with whom Mr. McCroy would be assigned upon his release from the healthcare unit. The Plaintiff has testified that he was not initially assigned or housed with Inmate Durham upon his release from the healthcare unit. (McCroy Deposition of March 16, 2007, p. ___.)

There is simply no evidence to indicate that anyone in the healthcare unit, including the undersigned Defendant, was ever advised of the specific cell mate with whom Mr. McCroy would be housed. Accordingly, none of them had any information concerning the backgrounds of any of the inmates at the correctional center, and specifically any inmate who may or may not have been housed with Mr. McCroy at any particular time. There is no evidence to indicate that any of the medical defendants in this case were aware that Mr. Durham had a history of physical violence toward his cell mates. There is no evidence to indicate that any of the medical defendants were aware that Mr. McCroy was ever housed with Inmate Durham until after the alleged incident between Mr. Durham and the Plaintiff.

Accordingly, there is simply no evidence to support a cause of action against this Defendant on a theory of failure to protect under the Eighth Amendment.

With respect to Dr. Lochard in particular, there is no testimony to indicate that Dr. Lochard was working in any capacity at the Western Illinois Correctional Center on June 8, 2004. His service as the Acting Medical Director had ended by January of 2004. During the entire time that Dr. Lochard served as the Acting Medical Director, taking call, Mr. McCroy was housed in the infirmary in one capacity or another. Accordingly, Dr. Lochard is entitled to summary judgment on this particular issue.

**D.    Count IV - Plaintiff's Allegations Are Insufficient to Support a Claim of Deliberate Indifference Against Defendant Lochard.**

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

29

05415-N3293
TMP/ej/jly

As previously asserted, there is no genuine issue of fact in this case regarding the care and treatment provided to the Plaintiff, Aaron McCroy.

In order to prove his cause of action, the Plaintiff must prove deliberate indifference to his serious medical needs. At a minimum, this requires actual knowledge of impending harm, which is easily preventable, so that a conscious, capable refusal to prevent harm can be inferred from the defendant's failure to prevent it. Dixon v. Godinez, 114 F.3d 640, 645 (7th Cir. 1997); Duckworth v. Franzen, 780 F.2d 645, 653 (7th Cir. 1985). Deliberate indifference is more than mere negligence and approaches intentional wrongdoing. Farmer v. Brennan, 511 U.S. 825, 835 (1994). To establish deliberate indifference, Plaintiff must show the Defendant ignored a known risk. Collignon v. Milwaukee County, 163 F.3d 982, 988 (7th Cir. 1988).

Additionally, in order to establish deliberate indifference, Plaintiff must show that the physician or other defendant must both have been aware of the fact from which the inference could be drawn that a substantial risk of serious harm exists, and he must actually draw the inference. Higgins v. Correctional Medical Services, 178 F.3d 508, 511 (7th Cir. 1999); Sanderfer v. Nichols, 62 F.3d 151, 154 (6th Cir. 1995). The exercise by a physician of his professional judgment does not constitute deliberate indifference. Youngber v. Romeo, 457 U.S. 307, 322-323 (1982).

Medical decisions, such as whether one course of treatment is preferable to another, are beyond the Eighth Amendment's purview. Additionally, the Eighth Amendment is not a vehicle for bringing claims of medical malpractice. Snipes v. DeTella, 95 F.3d 586, 590 (7th Cir. 1996). It should also be kept in mind that inappropriate medical treatment based on pure negligence, or even a series of purely negligent acts is not the same as indifference to a serious medical need. Sellers v. Hennan, 41 F.3d 1100, 1102-03 (7th Cir. 1994). While a prisoner has the right to medical care, he

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

30

05415-N3293
TMP/ej/jly

does not have the right to determine the type and scope of the medical care he personally desires. A difference of opinion between a physician and the patient does not give rise to a constitutional right, nor does it state a cause of action under § 1983. Coppinger v. Townsend, 398 F.2d 392, 394 (10th Cir. Col. 1968). See also, Johnson v. Doughty, 433 F.3d 1001 (7th Cir. 2006).

Inattention to a medical condition amounts to a constitutional violation only where the medical condition is serious. Brownell v. Figel, 950 F.2d 1285, 1289 (7th Cir. 1991).

As previously indicated, deliberate indifference may only be found when an official knows of and disregards an excessive risk to inmate health or safety. See Duane v. Lane, 959 F.2d 673, 676 (7th Cir. 1992). Deliberate indifference also requires that Defendant either intended to harm Plaintiff or knew of a risk of harm so significant that an intent to harm could be inferred from a refusal to provide medical care. See Smith-Bey v. Hospital Administrator, 841 F.2d 751, 759 (7th Cir. 1988).

It should also be noted that Plaintiff's claim is one in which he is asserting that the Eighth Amendment has been violated. The Eighth Amendment does not require that prisoners receive "unqualified access to healthcare." Hudson v. McMillian, 503 U.S. 1, 9 (1992); see also, Hernandez v. Keane, 341 F.3d 137 (2d Cir. 2003). Rather, inmates are entitled only to "adequate medical care." Boyce v. Moore, 314 F.3d 884, 888-89 (7th Cir. 2002). Specifically, the Eighth Amendment does not entitle an inmate to demand specific care.

To the extent Plaintiff is merely dissatisfied with Dr. Lochard's care, this is insufficient to support a cause of action for deliberate indifference. See, Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996).

With respect to the Plaintiff's specific complaints, Plaintiff has no evidence to substantiate that Dr. Lochard had any direct involvement in any of the specific allegations set forth in Subparagraphs

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

31

05415-N3293
TMP/ej/jly

a through m under Paragraph 300 of Count IV of Plaintiff's Third Amended Complaint, which are

as follows:

    a.    Refusing to follow Plaintiff's doctors' orders in a timely manner;

    b.    Refusing to transfer Plaintiff to a facility that would allow him to receive the medical care he needs;

    c.    Constantly changing Plaintiff's treating opthomoligist;

    d.    Refusing to provide Plaintiff prescribed medicine.

    e.    Administering medicine that was not prescribed;

    f.    Delaying Plaintiff's needed corneal transplant;

    g.    Trying to make Plaintiff pay for the needed corneal transplant;

    h.    Refusing to allow Plaintiff to be fitted for special contact lenses in both eyes as directed by his treating ophthalmologists in a timely and regular manner;

    i.    Refusing to schedule needed medical appointments;

    j.    Transferring Plaintiff to the general population;

    k.    Assigning Plaintiff a violent cell mate that had recently been sent to segregation for fighting his former cell mate;

    l.    Refusing to place Plaintiff in another cell unless he first agreed to a disciplinary infraction and serving time in segregation;

    m.    Removing Plaintiff from an ADA cell.

    Accordingly, as the record reflects that the Plaintiff was provided with appropriate medical

care with respect to each and every one of his interactions with Dr. Lochard. At best, Plaintiff can

argue that he was dissatisfied or disagreed with some act or omission on the part of Dr. Lochard.

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

This does not constitute deliberate indifference. Accordingly, Defendant Lochard is entitled to summary judgment as to Count IV of Plaintiff's Third Amended Complaint.

**E.   Defendant Lochard is Entitled to Qualified Immunity**

Qualified immunity protects such officials performing discretionary functions who are sued in their individual capacities against liability for monetary damages so long as their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." Behrens v. Pelletier, 516 U.S. 299, 305, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1992). It is the Plaintiff's burden to show that the record supports a finding of an unconstitutional act and that the applicable constitutional standards were clearly established at the time in question once the Defendant raises qualified immunity as a defense. See, Scarver v. Litscher, 371 F. Supp. 2d 986, 1004-1005, citing Tun v. Whitticker, 398 F.3d 899, 901-02 (7th Cir. 2005); Newsome v. McCabe, 319 F.3d 301, 303 (7th Cir. 2003); Magdziak v. Byrd, 96 F.3d 1045, 1047 (7th Cir. 1996).

First, the Plaintiff has no evidence to indicate that Dr. Lochard violated a constitutional right of the Plaintiff. However, even assuming that an act or omission on the part of Dr. Lochard did constitute a violation of the Plaintiff's constitutional rights, there is no evidence to support the contention that Dr. Lochard knew or should have know that his actions in the care and treatment of Mr. McCroy constituted unlawful conduct in that he was violating a clearly established constitutional right of the Plaintiff.

**IV. CONCLUSION**

As there are no genuine issues of material fact regarding the care and treatment provided to the Plaintiff with respect to his complaints and the specific involvement by the undersigned Defendant,

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

Hughes Lochard, M.D. is entitled to summary judgment. Plaintiff's complaints concerning his medical conditions were addressed appropriately by Dr. Lochard as detailed in this Motion and the supporting Affidavit and attached medical records.

First, with respect to Plaintiff's cause of action for the Eighth Amendment retaliation, the Plaintiff has no evidence to suggest that Dr. Lochard was ever aware that the Plaintiff had ever filed a grievance or a lawsuit. As Dr. Lochard was not present at the Western Illinois Correctional Center, he would not have had access to any of those grievances, and most likely would never have been presented with any such grievances. Plaintiff has no evidence to the contrary. Moreover, there is no evidence to indicate that Dr. Lochard committed any act or omission as a result of any grievance or lawsuit that was filed. In particular, Dr. Lochard was not even made part of this lawsuit until the Second Amended Complaint was filed years after the time Dr. Lochard had left as the Acting Medical Director.

With respect to Plaintiff's claims of failure to protect, Dr. Lochard was not working at the Western Illinois Correctional Center in any capacity in June of 2004. As Plaintiff has specifically alleged in Count III of his Third Amended Complaint that the Defendants should have done more to protect Plaintiff from Inmate Durham, Dr. Lochard must be dismissed from this claim as he was not even present at the time this cell assignment occurred, nor would he have had any input as to whether or not a transfer should have taken place.

With respect to Plaintiff's claim of deliberate indifference, the Plaintiff has not set forth any specific acts or omissions on the part of Dr. Lochard which could even remotely constitute deliberate indifference. Dr. Lochard was only serving as the Acting Medical Director for a very short period of time. The only specific acts referenced relate to the approval of the Maxitrol order, which was

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

read to him over the phone incorrectly by a nurse upon whom he relied. Again, this at best constitutes negligence on the part of the nurse. Plaintiff has no evidence to suggest that relying upon a nurse for medical information regarding a patient even constitutes medical negligence.

The only other specific action Plaintiff relates to Dr. Lochard concerns the signing of the medically unassigned form. As indicated herein, making an inmate medically unassigned allows that inmate not to work. As Dr. Lochard has testified, his understanding of being "medically unassigned" simply prevents the particular inmate from having to work due to a medical condition. Dr. Lochard has also indicated that he has no specific knowledge that being medically unassigned would keep Mr. McCroy from participating in any privileges, recreational activities, or early release programs available to other inmates. This document was signed to be consistent with the recommendation that Mr. McCroy not participate in any strenuous activities, which was consistent with Dr. Zeh's recommendation at that time as Mr. McCroy had recently had sutures removed on November 6, 2003. It should also be noted that Dr. Lochard's medically unassigned form specifically requests that the patient be reevaluated in January of 2004.

Accordingly, Defendant Lochard is entitled to summary judgment as to all issues.

WHEREFORE, Defendant, HUGHES LOCHARD, M.D., prays that this Court will grant summary judgment in his favor and against the Plaintiff.

**HEYLROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

Respectfully submitted,

HUGHES LOCHARD, M.D., Defendant,

HEYL, ROYSTER, VOELKER & ALLEN,
Attorneys for Defendant,

BY:    /s/Theresa M. Powell
       Theresa M. Powell, #6230402
       HEYL, ROYSTER, VOELKER & ALLEN
       Suite 575, National City Center
       P. O. Box 1687
       Springfield, IL  62705
       Phone: (217) 522-8822
       Fax:    (217) 523-3902
       E-mail:tpowell@hrva.com

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2007 I electronically filed **Defendant Lochard's Motion for Summary Judgment** with the Clerk of Court using the CM/ECF system which will send notification of such filings(s) to the following:

Douglas J. Quivey
doug@lprpc.com

Thomas F. Londrigan
tom@lprpc.com

Carissa A. Haning
carissa@lprpc.com

Kelly R. Choate
kchoate@atg.state.il.us

Julie L. Morgan
jlmorgan@atg.state.il.us

Carl J. Tenney
ctenney@hhtlaw.com

Alexandra de Saint Phalle
alex@lprpc.com

and I hereby certify that on April 19, 2007, I mailed by United States Postal Service, the document(s) to the following non-registered participants:

None

/s/Theresa M. Powell
Theresa M. Powell, #6230402
HEYL, ROYSTER, VOELKER & ALLEN
Suite 575, National City Center
P. O. Box 1687
Springfield, IL 62705
Phone: (217) 522-8822
Fax:     (217) 523-3902
E-mail:tpowell@hrva.com

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822