3:02-cv-03171-HAB-BGC    # 372-4    Page 1 of 10

**E-FILED**
Thursday, 19 April, 2007  11:16:56 AM
Clerk, U.S. District Court, ILCD

3/6/07                    McCroy v. Illinois Dept. of Corrections
Hughes Lochard, M.D.

## Page 1

```
 1            UNITED STATES DISTRICT COURT
 2         FOR THE CENTRAL DISTRICT OF ILLINOIS
 3                 SPRINGFIELD DIVISION
 4
 5   AARON McCROY,
 6            Plaintiff,
 7        vs.                        No. 02-3171
 8   ILLINOIS DEPARTMENT OF
     CORRECTIONS, et al,
 9
              Defendants.
10
11
12
13        THE DEPOSITION of HUGHES LOCHARD, M.D.,
14   taken in the above-entitled case before Debra K.
15   Baldwin, a Notary Public of Sangamon County, acting
16   within and for the County of Sangamon, State of
17   Illinois, at 2:10 o'clock P.M., on March 6, 2007,
18   at National City Bank Building, Suite 575,
19   Springfield, Sangamon County, Illinois, pursuant
20   to notice.
21
22
          Baldwin Reporting & Legal-Visual Services
23            Serving Illinois, Indiana & Missouri
         24hrs (217)788-2835   Fax (217)788-2838
24                  1-800-248-2835
```

## Page 2

```
 1   APPEARANCES:
 2        LONDRIGAN, POTTER & RANDLE
          BY:  Thomas F. Londrigan, Esq.
 3             1227 South Seventh Street
               Springfield, Illinois 62703
 4             On behalf of Plaintiff.
 5   MR. JAKE SMITH
               Assistant Attorney General
 6             500 South Second Street
               Springfield, Illinois 62706
 7             On behalf of Defendant Illinois
               Department of Corrections.
 8
          HEYL, ROYSTER, VOELKER & ALLEN
 9        BY:  Ms. Theresa Powell
               Attorney at Law
10             National City Bank Building, Suite 575
               Springfield, Illinois 62701
11             On behalf of Defendant.
12        HUGHES, HILL & TENNEY, LLC.
          BY:  Carl J. Tenney, Esq.
13             236 North Water Street
               Decatur, Illinois 62525
14             On behalf of Defendant Doctor David
               Anderson.
15
16
17
18
19
20
21
22
23
24
```

## Page 3

```
 1                     I N D E X
 2   DEPONENT                            PAGE NUMBER
 3   Hughes Lochard, M.D.
 4        Examination by Mr. Londrigan          5
          Examination by Mr. Tenney            72
 5        Examination by Ms. Powell         76, 87
 6
 7
 8
 9
10
                      E X H I B I T S
11
12   NUMBER                       MARKED FOR IDENTIFICATION
13   Exhibits 1 - 4                        5
     Exhibit 2                            25
14   Exhibits 2A, B                       41
     Exhibits 5, 6                        64
15   Exhibit 7                            71
16
17
18
19                        COPY
20
21
22
23
24
```

## Page 4

```
 1                  S T I P U L A T I O N
 2        It is stipulated and agreed, by and
     between the parties hereto, through their
 3   attorneys, that the deposition of HUGHES LOCHARD,
     M.D. may be taken before Debra K. Baldwin, a Notary
 4   Public and Certified Shorthand Reporter and
     Registered Professional Reporter, upon oral
 5   interrogatories, on the 6th of March A.D., 2007, at
     the instance of the Plaintiff at the hour of
 6   2:10 o'clock P.M., National City Bank Building,
     Suite 575, Springfield, Sangamon County, Illinois;
 7
          That the oral interrogatories and the
 8   answers of the witness may be taken down in
     shorthand by the Reporter and afterwards
 9   transcribed;
10        That all requirements of the Federal
     Rules of Civil Procedure and the Rules of the
11   Supreme Court as to dedimus, are expressly waived;
12        That any objections as to competency,
     materiality or relevancy are hereby reserved, but
13   any objection as to the form of question is waived
     unless specifically noted;
14
          That the deposition, or any parts thereof
15   may be used for any purpose for which depositions
     are competent, by any of the parties hereto,
16   without foundation proof;
17        That any party hereto may be furnished
     copies of the deposition at his or her own expense.
18
19
20
21
22
23
24
```

Page 5

```
 1              (Whereupon documents were duly
 2              marked for purposes of
 3              identification as Exhibits 1, 2
 4              3 and 4, as of this date.)
 5              (Whereupon the Deponent was
 6              sworn by the Notary Public.)
 7         H U G H E S   L O C H A R D
 8  having been first duly sworn by the Notary Public,
 9  deposeth and saith as follows:
10              EXAMINATION
11              BY MR. LONDRIGAN:
12      Q    Would you state your name for the
13  record.
14      A    Hughes Lochard.
15      Q    And I won't ask you for an address since
16  everybody is security conscious in this case
17  apparently. But what community to you live in?
18      A    I live in the Springfield area.
19      Q    And that's Doctor Lochard?
20      A    Correct.
21      Q    Would you please outline for me your
22  personal and educational and employment background
23  up to the present.
24      A    My educational background begins with
```

Page 6

```
 1  University of Illinois, 1974 to 1977. And from
 2  there moved to the Dominican Republic and went to
 3  school in the Oosay (sp) from--it was Sayed (sp)
 4  University from 1980 to 1984. And from 1986 to 1989
 5  I went to the University of Asanton Modeste (sp) in
 6  San Pedro, Michael Reese, and Laribruna (sp)
 7  Americana in the West Indes.
 8              And came to the United States 1990,
 9  worked in various jobs as a phlebotomist and
10  employment specialist, quote, unquote, and began a
11  residency at University of Illinois at Methodist
12  Medical Center in Peoria, Illinois, in family
13  practice from 1990 to 1992. And from there I went
14  to the St. Francis Medical Center for residency in
15  neurology.
16              And from there, in 1994 I worked at a
17  clinic in Kewanee, Illinois, Tri-County Clinic, I
18  believe. And from there I went to--. That was from
19  1994 to 1995. Then from there to Princeton Medical
20  Clinic, practiced in Princeton, Illinois, until
21  April 28th, 1997. And I have been in the
22  department of corrections since April 28th, 1997.
23              July 5th, 2005, I worked for HPL in the
24  department of corrections until July 17th of 2006
```

Page 7

```
 1  where I started to work for Wexford again. The
 2  whole time that I worked at the department of
 3  corrections I worked for Wexford Health Sources.
 4  And I'm presently working at the Jacksonville
 5  Correctional Center since July 17th of 2006.
 6      Q    Let me make sure I understand what you're
 7  telling me. When you say you worked with the
 8  department of corrections, was it always as an
 9  employee of Wexford?
10      A    Yes.
11      MS. POWELL: With the exception of the time
12  that he worked for HPL.
13      THE DEPONENT: And I was also an employee of
14  HPL.
15      MR. LONDRIGAN: Q  And what's HPL?
16      A    Health Professionals Limited. It is a
17  vendor which provides medical care to correctional
18  facilities for the department of corrections.
19      Q    A competitor of Wexford?
20      A    Correct.
21      Q    Are there other competitors in that field
22  as it relates to the State of Illinois?
23      A    At this moment there are only two. There
24  are Wexford and HPL. There are many others which
```

Page 8

```
 1  have tried to get the contracts, but they've been
 2  given to HPL and Wexford.
 3      Q    And HPL an acronym for something?
 4      A    For Health Professionals Limited out of
 5  Peoria.
 6      Q    Do you consider yourself then to be a
 7  specialist in one or more areas of medicine?
 8      A    Basically, I would say that I'm general
 9  medical physician specialist in a particular field.
10  I practice general medicine in the field that I'm
11  in.
12      Q    You've had special studies or training
13  though in neurology, is that right?
14      A    Correct.
15      Q    And also I think you said your schooling
16  was in family medicine?
17      A    Correct.
18      Q    You aren't board certified though in
19  either of those specialties, is that right?
20      A    No. That is correct.
21      Q    During what period of time were you
22  assigned by Wexford to work in penitentiaries and
23  institutions here in Illinois?
24      A    April 27, 19--. April 28, 1997.
```

3:02-cv-03171-HAB-BGC    # 372-4    Page 3 of 10

3/6/07                                    McCroy v. Illinois Dept. of Corrections
Hughes Lochard, M.D.

### Page 9

1  Q   Until?
2  A   Until the present day.
3  Q   And when were you at Western?
4  A   At Western. I took call for Western from
5  sometime September 2003 to the end of December 2003
6  until they found a physician. I would answer the
7  telephone for the nurses.
8  Q   I'm not sure I follow that. I thought at
9  first you said September '03.
10 A   September '03 to December '03.
11 Q   And where were you immediately before the
12 time you came to Western?
13 A   Oh, I was never at Western. What I would
14 do is answer the telephone. I would take call. At
15 that I was working at the Taylorville Correctional
16 Center.
17 Q   And when you say you'd take call, what do
18 you mean?
19 A   What happens is when the site does not
20 have a physician someone has to cover for certain
21 issues that arise after hours. For example, if a
22 site does not have a permanent medical director, a
23 physician would go there, say, someone from an
24 agency or another physician from the department of

### Page 10

1  corrections would work there a few days a week to
2  try to provide healthcare. But after hours these
3  physicians do not take call.
4       What Wexford or HPL would do is to ask
5  one of the other physicians that worked for them to
6  take call, answer questions that the nurses may
7  have from four p.m. or from wherever the time that
8  physician would leave until the next day.
9  Q   When you say take call though, you're not
10 talking about answering questions over the
11 telephone, you're talking about physically being
12 present there to substitute for other Wexford
13 physicians that normally have shifts?
14 A   No, sir. When I say take call, I mean
15 literally taking a phone call. Because I have a
16 full-time job myself. So I would not be able to be
17 there on a regular basis so that's why they would
18 hire what we call p.r.n. physicians.
19 Q   Tell me exactly what your full-time job
20 was between September and January '03.
21 MS. POWELL: September of '03 to January of
22 '04. Is that what you're saying?
23 MR. LONDRIGAN: No. I thought he told me
24 earlier, first mentioned September '03 and then

### Page 11

1  said until December '03.
2  MS. POWELL: He did. You just said September
3  '03 to January '03. And I think you meant
4  September '03 to January '04.
5  MR. LONDRIGAN: Okay.
6  MS. POWELL: I'm just clarifying for the
7  record.
8  MR. LONDRIGAN: Q You left at the first of
9  the year, or did you leave sometime in December?
10 A   No. My full-time job the whole time that
11 I was taking call for Western I was a full-time
12 employee at the Taylorville Correctional Center.
13 Q   And what was your job position there?
14 A   I was a medical director.
15 Q   And while you were providing support to
16 Western, who was the medical director at Western?
17 A   They did not have a medical director at
18 the time.
19 Q   And so were you acting as its medical
20 director during that period of time?
21 A   So to speak, I was acting.
22 Q   Well, was anybody else there that was a
23 medical doctor that was assigned by Wexford during
24 that period?

### Page 12

1  A   Yes.
2  Q   And who was that?
3  A   There were numerous physicians. There was
4  a Doctor Grosh. I believe there was a Doctor
5  Rayford was there. I think Doctor Sims had left
6  before that. And there was Doctor Shoup (sp)
7  possibly. There were other physicians that were
8  working there to fill in until they hired a
9  permanent medical director.
10 Q   And Doctor Anderson was there although he
11 was an optometrist, is that right?
12 A   I assume. I have never met him. I've
13 only heard the name through this particular case.
14 Q   Have you ever physically been in
15 attendance at any prisoner/patients at Western
16 during the period of time that you were answering
17 calls?
18 A   Yes. Yes, I was there on various
19 occasions.
20 Q   And what would cause you to physically be
21 present there?
22 A   For example, if one of their physicians
23 that they had hired from another company could not
24 make it, they would ask me to go fill in. It

## Page 13

1 probably would be a weekend, or a Saturday or
2 Sunday, to go fill in.
3    Q    And you would make certain entries in
4 records while you were physically present at
5 Western?
6    A    That is correct. On the patients that I
7 saw and on the charts they had me review.
8    Q    Did you have occasion to physically
9 examine or come into contact with Aaron McCroy who
10 was a patient at Western?
11   A    To the best of my recollection, no, I do
12 not remember that I saw him as a patient.
13   Q    All right. I'm going to share with you a
14 group of exhibits that I've marked as Exhibit 1.
15 And I'm going to ask you a few questions about
16 those.
17   A    (Reviewing document.)
18   Q    First of all, could you tell me how
19 prescription orders are used in the penitentiary
20 system while you were acting as physician for the
21 department of corrections?
22   A    You mean how they are used?
23   Q    Why do they have these forms at the
24 penitentiary?

## Page 14

1    A    These forms are made to write
2 prescriptions that a physician, whether in the
3 department of corrections or from the outside,
4 gives an order for a patient. The nurse would write
5 the prescription, or the nurse practitioner would
6 write the prescription, and at the same time write
7 the physician's name next to it. These
8 prescriptions are then carried out by the nurse,
9 whatever that medication might be.
10   Q    Now, are these prescriptions filled at
11 the penitentiary?
12   A    That is correct.
13   Q    And tell me how that works. How are the
14 nurses given authority to write prescriptions? Is
15 this by rule or regulation, or is this under the
16 direction and authority of a licensed physician?
17        MS. POWELL: Wait a second. I want to object to
18 the form of the question. He's never testified that
19 a nurse can write a prescription.
20        MR. LONDRIGAN:  Q  I thought that's what you
21 just told me.
22   A    No.
23   Q    And feel free. I'm not trying to misstate
24 what you've told me. And maybe Ms. Powell thinks

## Page 15

1 that that was the intent of the question; it isn't.
2 By what authorities do nurses write prescriptions,
3 if at all?
4    A    Nurses will write a prescription on a
5 prescription form like that when given an order by
6 a physician. For example, if a patient goes to see
7 a heart surgeon, for example, or a cardiologist,
8 and he returns with an order for Lopressor, 50
9 milligrams a day, the nurse would write that order
10 on one of these sheets and then would write also
11 the physician's name, or the medical director,
12 whoever is taking call at that time.
13        In this particular case it was me. So
14 she would write that order and then put the name of
15 the physician next to her name.
16   Q    All right. Well, let's look at the first
17 prescription order here and you can tell me how
18 this works. This is for Aaron McCroy and there is a
19 date and a regulation number. What does that number
20 mean to you, N51882?
21   A    That is the patient's number. That is the
22 inmate number that the department of correction
23 gives to them once they are incarcerated with
24 department of corrections.

## Page 16

1    Q    And who is writing in the name and number
2 and date as you look at this record?
3        MS. POWELL: Which one are you looking at? The
4 top?
5        MR. LONDRIGAN:  Q  The first one.
6    A    The first one looks like it is Nurse
7 Drennan.
8    Q    Okay.
9    A    And signed by Doctor Grosh.
10   Q    Now, I see physician, print. Now, where
11 is Doctor Grosh's signature?
12   A    Doctor Grosh's signature is at the bottom
13 where it says "may substitute".
14   Q    Okay. That's his initial and that's his
15 signature?
16   A    Correct.
17   Q    And so this has been filled out by a
18 registered nurse by the name of Drennan?
19   A    That is correct.
20   Q    And it has also been signed off on by a
21 physician Doctor Grosh?
22   A    That is correct.
23   Q    Do you know what Doctor Grosh's specialty
24 in medicine was, if any?

3:02-cv-03171-HAB-BGC  # 372-4  Page 5 of 10

3/6/07  McCroy v. Illinois Dept. of Corrections
Hughes Lochard, M.D.

### Page 17

1    A    I believe he may have been a surgeon
2  before he died. That's what I believe.
3    Q    He's deceased now?
4    A    Yes.
5    Q    All right. Let's look at the next
6  prescription order. Can you tell me who signed off
7  at the bottom here next to "noted by"?
8    A    That is a nurse. Lowell, RN. That's what
9  it looks like to me.
10   Q    Okay. You don't recognize or remember who
11 that nurse was?
12   A    No.
13   Q    And next to the box that says "may
14 substitute", it looks like it's your name. Is that
15 your signature?
16   A    No, sir, that is not my signature.
17   Q    Can you tell me who affixed your
18 signature?
19   A    This was Rhonda Mills, the nurse
20 practitioner. She wrote that and then put my name
21 there. It's actually a print, if you will. She did
22 it because she was a nurse practitioner and I was
23 the medical director acting, so she wrote the order
24 and then wrote my name next to it stating that

### Page 18

1  that's why she's able to do it. Because nurse
2  practitioners in a lot of ways have to practice
3  under a physician. So that's why she did that.
4    Q    And do you have independent recollection
5  of this prescription being filled, or is that your
6  interpretation based upon custom and practice at
7  the hospital?
8    A    Custom and practice. I don't have any
9  particular recollection of it.
10   Q    Should the box have been marked with an
11 "X" or a check?
12   A    (No response.)
13   Q    It says "may substitute", "may not
14 substitute".
15   A    Generally the department of corrections
16 gets its medication from outside pharmacies,
17 pharmacies outside of Illinois, if you will. For
18 example, in this case I think it may be
19 Pennsylvania. They generally do not do that because
20 the pharmacy always sends a generic form anyway.
21        For example, say, if you were to--someone
22 ordered you a high priced medication, say, Cipro.
23 The pharmacy would send you a generic version of
24 Cipro because it's probably 50 or $60 cheaper and

### Page 19

1  it's the same medication.
2        So, for example, a physician in private
3  practice would write may substitute the Cipro
4  generic for the brand name, but if he does not, the
5  pharmacy will generally give them the expensive
6  one. So that's why it's there. They substitute
7  "may not".
8    Q    Isn't there a pharmacy or stocked
9  medications with a long list of all available
10 medications that are maintained in each
11 institution?
12   A    Yes. Some medications are. Many are kept
13 there at the institutions but not all. Some
14 medications have to be brought in on a regular
15 basis.
16   Q    And what's done if an outside treating
17 physician prescribes a specific medication rather
18 than a generic medication?
19   A    If that specific medication is what is
20 needed, that specific medication will be given to
21 the patient. There is a system called backup
22 pharmacy where if the medication is not there in
23 the stock room at the facility, there are ways to
24 contact the pharmacy which provides the medication.

### Page 20

1  They will contact a local pharmacy and a local
2  pharmacy will deliver the medication to the site by
3  taxi.
4    Q    And the only way then that that can be
5  substituted is if directions are given by a medical
6  doctor to a registered nurse that has authority to
7  make these entries on behalf of the doctor?
8    A    As far as a generic and brand name
9  medication?
10   Q    As far as substituting prescriptions.
11   A    No. A nurse cannot substitute. Basically,
12 the pharmacies do that as a matter of practice.
13 Most pharmacies do to try to cut costs. For
14 example, if I get Bactrim DS at bedtime for myself
15 at the pharmacy, they will generally give me a
16 prescription that is generic instead of the Bactrim
17 brand name.
18   Q    No. I'm all for cost-cutting in my own
19 household and in others and as far as the
20 department of corrections is concerned. I'm trying
21 to understand the process though.
22   A    All right.
23   Q    If an outside specialist treating
24 physician prescribes a specific medication, does

3:02-cv-03171-HAB-BGC    # 372-4    Page 6 of 10

3/6/07                          McCroy v. Illinois Dept. of Corrections
Hughes Lochard, M.D.

### Page 21

1  the Wexford doctor have authority to direct a nurse
2  to authorize substitution of the prescribed
3  medication?
4      A    To generic? Generally, the pharmacy will
5  do that by itself. The physician can do that.
6      Q    No. What pharmacy will do that by itself?
7      A    Generally, if the pharmacy--. As I said
8  before, if you take a prescription to a pharmacist
9  and you're--
10     Q    Out in the real world or a pharmacist in
11 the institution?
12     A    Both really. In my personal case, in
13 pharmacies in the real world, they generally will
14 give you a generic as opposed to the brand name
15 medications because they are the same. Generic
16 Cipro is the same as Cipro that you pay $110 for.
17     Q    I'm going to come back because I need to
18 get an answer to this question. I'm not asking you
19 what's generally done outside the institution or
20 inside the institution. I need to know, as a
21 Wexford doctor, whether it's your experience that a
22 nurse under direction of the doctor can mark down
23 here that a drug may be substituted for.
24     A    No. Generally a nurse cannot do that,

### Page 22

1  that a drug may be substituted. No.
2      Q    Can the doctor authorize her to do that?
3      A    Absolutely. If there is a generic form of
4  that drug, sure.
5      Q    Even though he's not a specialist in the
6  area where the prescription was written?
7      A    Generally it is a practice among
8  physicians in the department of corrections and in
9  the regular general population, the regular world.
10     Q    What if the registered nurse would say to
11 you, "Doctor, I'm not sure what this medication and
12 prescription requires, either I don't understand
13 it, I can't read what the doctor's written", what
14 direction do you give them?
15     A    Well, I would tell them to call the
16 physician's office and ask them exactly what that
17 order says. I have done that myself when I'd get a
18 consultation from a physician and I can't read his
19 handwriting so I would call and ask him what that
20 says.
21     Q    And is that what you're trained to do?
22     A    That's what I do personally. But not
23 every physician does that.
24     Q    Some doctors write more legibly than

### Page 23

1  others, I take it?
2      A    True.
3      Q    Would you look at page 3 of these
4  records. Now, this nurse's note appears to be very
5  legible.
6      A    Yes.
7      Q    Can you tell who it was that made this
8  entry into the records?
9      A    It seems like it was Nurse Roberts.
10     Q    And did you know her?
11     A    No. I've spoken to her over the phone. I
12 may have met her, but I couldn't pick her out in a
13 lineup.
14     Q    It says at 12:30 on November 6th, 2006,
15 Doctor Lochard notified of orders received from
16 Doctor Zeh. Does that mean that you received these
17 orders or that the nurse received these orders and
18 then she notified you?
19          MS. POWELL: Doctor, wait a second. I just want
20 to object to the form of the question because I
21 can't understand when you ask him that, when you
22 say "these orders", whether you're talking about
23 what is written on page 3 of Exhibit 1 or whether
24 you're talking about something else. I just want to

### Page 24

1  clarify that.
2          MR. LONDRIGAN: No. I'm talking to the exhibit
3  now.
4          MS. POWELL: Okay.
5          MR. LONDRIGAN: Q Is it your understanding
6  that the nurse receive these written orders and
7  advise you by telephone?
8      A    Yes. That is correct.
9      Q    You weren't actually presented with the
10 written orders and interpreted them?
11     A    No. No, I was not.
12     Q    She told you over the telephone what the
13 prescription required?
14     A    That is correct.
15     Q    Number one, Maxitrol OS qid times --
16 what do you read that as? 30 days?
17     A    That is correct.
18     Q    Then stop?
19          MS. POWELL: I just want to object as you've
20 already read something into the record.
21          MR. LONDRIGAN: All right.
22     Q    I'm going to have you read it and then
23 you tell me what this means to you as a
24 communication from another healthcare provider.

3/6/07  McCroy v. Illinois Dept. of Corrections
Hughes Lochard, M.D.

### Page 25

1   A    Maxitrol OS, which is left eye, qid, four
2   times a day for 30 days, then stop.
3   Q    Okay. And you also see number 7, no
4   bending?
5   A    Yes.
6   Q    And number 8, no lifting. That means
7   greater than?
8   A    Yes.
9   Q    Ten pounds?
10  A    Correct.
11  Q    And number 10, call ASAP. Is that an
12  increase in pain and decrease in vision?
13  A    Correct.
14  Q    Now, who was to be called if that
15  occurred?
16  A    It would be Doctor Zeh's office would be
17  called if that occurred.
18      MR. LONDRIGAN: Would you mark this as
19  Exhibit 2.
20              (Whereupon said document was
21               duly marked for purposes of
22               identification as Exhibit 2, as
23               of this date.)
24      MR. LONDRIGAN:  Q  And would you, first of

### Page 26

1   all, identify what is that.
2   A    That is a prescription for Aaron McCroy
3   from Doctor Zeh's office. It was written on
4   November 6, 2003. It is for Maxitrol.
5   Q    Now, this is the same date as Exhibit 1,
6   11/6/03, is that right?
7   A    That is correct.
8   Q    Would you read that prescription into the
9   record for me, please.
10  A    The one from Doctor Zeh's office?
11  Q    Yes.
12  A    Maxitrol ointment ung. He's referring to
13  that ointment. Ophthalmic, apply to left eye, OS,
14  qid, times three. It looks like a 30, but since I
15  already know what the actual thing was, it's hard
16  for me to fabricate, but to me it looks like 30.
17  I'm not quite sure I can make that out. Then DC.
18  Q    What is it that looks like 30 to you?
19  A    The 3 and the figure next to it.
20  Q    And on which side is the figure next to
21  it located?
22  A    To the right. 3.
23  Q    Do you want to circle what you're reading
24  as 30.

### Page 27

1   A    (So complied with request.)
2   Q    And can I see that?
3   A    (Document tendered to Mr. Londrigan.)
4   Q    When you see apply, what do you read that
5   to say?
6   A    OS. That's left eye.
7   Q    And qid?
8   A    Correct.
9   Q    All right. Where is the "D" in days?
10  A    It's hard to interpret; it really is.
11  Q    Well, if you interpret that symbol, which
12  to me looks like a "D", as a zero, how would you
13  resolve whether or not this type of medication
14  should be given to a patient as eye medicine for as
15  long as 30 days? How would you resolve that?
16  A    Well, in reviewing the record, apparently
17  he had been on it for nine months or eight months
18  before that and he hadn't had a prescription for it
19  for two months. These medications were prescribed
20  by two ophthalmologists, eye specialists, for
21  eight, nine months. That's...
22  Q    Now, you're telling me some information
23  that I don't have in front of me. Have you recently
24  reviewed records in advance of providing your

### Page 28

1   testimony here today?
2   A    I reviewed Mr. McCroy's records. Correct.
3   Q    And when was that?
4   A    I reviewed them today, and I reviewed
5   them a week before, and most probably in the past.
6   Q    And did you bring those records with you
7   to this deposition?
8   A    I most likely have some of them with me.
9   Yes.
10  Q    I want you to show me the prescription
11  records which document the length of time prior to
12  this prescription that this patient had been
13  prescribed Maxitrol.
14      MS. POWELL: And he may not have all of those.
15      THE DEPONENT: I probably just have things that
16  pertain to me.
17      MS. POWELL: I'm sure he doesn't have all
18  those.
19      MR. LONDRIGAN: Well, no.
20      Q  But you're referring in answer to my
21  questions of records that go back for nine months.
22      MS. POWELL: From what I've shown him, yes.
23      THE DEPONENT: This is from February 2003. And
24  I have a prescription here for August 29th, 2003,

7 (Pages 25 to 28)

3:02-cv-03171-HAB-BGC  # 372-4  Page 8 of 10

3/6/07  McCroy v. Illinois Dept. of Corrections
Hughes Lochard, M.D.

### Page 29

1 from Doctor Zeh's office for Maxitrol, apply twice
2 a day to the left eye and refill six times. So that
3 would be a total of seven months.
4     MS. POWELL: And that was in August 29th of
5 '03. Right?
6     THE DEPONENT: Correct.
7     MS. POWELL: Do you want copies, Tom, of all
8 the records?
9     MR. LONDRIGAN: Yes.
10     MS. POWELL: You have copies of all these in
11 your office.
12     MR. LONDRIGAN: No. But I'm going to have to go
13 back and sort this out, so I want to look for this
14 particular record. I've got a number to follow
15 number down here, a bates number in the corner. So
16 should we copy this and mark it separately? Or is
17 this an extra copy?
18     MS. POWELL: No. That's my copy. You can
19 reference that bates number if you want to. You
20 have all those records. And there's more. There's
21 tons of orders in here for medications that are not
22 in Doctor Lochard's possession that we all have.
23     MR. LONDRIGAN: No. I know. And that's why at
24 these depositions I think it's important for the

### Page 30

1 records to be available to the witness. And I
2 appreciate the fact that you brought this here and
3 it's been shared.
4         Without marking this as an exhibit then,
5 show it's bates number 399, and that's a bates
6 number that's been affixed by whom? By Wexford or
7 by IDOC?
8     MS. POWELL: Oh, no. These were produced in the
9 context of discovery in this case by department of
10 corrections. I believe they bate stamped them.
11     MR. LONDRIGAN: Those are IDOC bates numbers?
12     MS. POWELL: That's correct. If you would like
13 to make that an exhibit, I can make a copy and give
14 it to the court reporter.
15     MR. LONDRIGAN: That's what I asked to do first
16 and I'm following your suggestion to do it just the
17 opposite. I don't have a preference as long as I
18 can try to get this nailed down.
19     MS. POWELL: Because I'm not really sure how
20 many different sets of records we have with
21 different numbers on them.
22     MR. LONDRIGAN: Well, I'll tell you what, let's
23 call this Exhibit 1A.
24     MS. POWELL: Before we keep going, do you want

### Page 31

1 me to give you--to show you the records with all
2 these orders?
3     MR. LONDRIGAN: No. I want the witness when I
4 ask him to be able to rely on whatever records that
5 you've shared with him so that I can get a complete
6 picture.
7     MS. POWELL: Well, he doesn't have all these
8 records.
9     MR. LONDRIGAN: I know. I don't want to read
10 through records now, I want him to be able to, if
11 he feels it's important, to reference what he's
12 basing his testimony on.
13     MS. POWELL: Well, you've asked him a question
14 as to how long has the patient been on Maxitrol,
15 and he told you he'd been on it for nine months,
16 and you wanted him to look at what records he has,
17 and he does not have any records. So I guess I'm
18 not really sure of what your question is because I
19 can dig through and find the records.
20     MR. LONDRIGAN: You represent him. He has
21 whatever you give him.
22     MS. POWELL: Right.
23     MR. LONDRIGAN: He's basing his testimony on
24 things that you've shown him.

### Page 32

1     MS. POWELL: Correct.
2     MR. LONDRIGAN: And I'm going to ask him now to
3 show it to me. Okay?
4     MS. POWELL: That's what I want to know. You
5 want him to give you the records that I have?
6     MR. LONDRIGAN: I want him to show me what he
7 bases his testimony on that you've shown him before
8 the deposition and then I'm going to mark them as
9 exhibits.
10     MS. POWELL: Okay. We'll start with this one.
11 But here's the problem. I don't want to keep going
12 to the next record and keep making copies of all
13 these records. There's tons of records that have
14 all these orders on them.
15     MR. LONDRIGAN: And I don't want you to make
16 copies of tons of records. To the extent that he
17 relies on them, I'm going to pull them out one by
18 one and then we'll mark them later. Maybe we'll
19 just scribble a little hieroglyphic on the side and
20 do it later.
21     MS. POWELL: That's fine. If you want to ask a
22 question about this, that will be fine.
23     MR. LONDRIGAN: Q Doctor, when is the first
24 time you saw this record?

Page 33

1    A    I don't recall. It may have been a week
2   ago, two weeks ago, or maybe a year ago. I don't
3   recall.
4    Q    Have you ever consulted the "Physicians'
5   Desk Reference" about the length of time that these
6   prescriptions should be issued for this medication
7   or the associated risks?
8    A    Yes, I have.
9    Q    And when did you do that?
10   A    I've done that sometime in the past. But
11  not recently.
12   Q    Well, when you say sometime in the past,
13  when did you do it with respect to this
14  prisoner/patient Aaron McCroy, with respect to this
15  specific medication Maxitrol?
16   A    In regards to this particular patient, I
17  have never done that.
18   Q    Do you know if anyone else has, that
19  administered this medication while he was at
20  Western?
21   A    I do not know.
22   Q    I will have this marked and then later
23  copied as Exhibit 1A.
24       All right. Would you read from this

Page 34

1   prescription, which is February 6th, 2003, as it
2   relates to Maxitrol.
3       MS. POWELL: I'm just going to object to the
4   form of the question in that it's a consultant's
5   report, not actually a prescription. But that's
6   okay.
7       THE DEPONENT: Maxitrol ointment, or
8   equivalent, one half to left eye every three hours
9   while awake for one week. Then decrease to three
10  times a day. Then it is half hour to the left eye
11  every three hours. No. Half inch to the left eye
12  every three hours while awake for one week and then
13  decrease to just three times a day.
14       MS. POWELL: And you're just asking about the
15  Maxitrol now. Correct?
16       MR. LONDRIGAN: Yes.
17       THE DEPONENT: And there does not seem to be a
18  stop date on here by Doctor Feder.
19       MR. LONDRIGAN: Q Now, this is Doctor Feder
20  and not Doctor Zeh?
21   A    Correct.
22   Q    All right. Do you know how long that
23  medication was continued?
24   A    I suspect that he wanted it to be

Page 35

1   continued for--
2    Q    No. My question is not what you suspect,
3   but do you know, based upon your oversight of this
4   patient and the role that you had at Western,
5   including any review of records that you've been
6   provided after the fact and prior to this
7   deposition, do you know how long this medication
8   was continued after this prescription?
9    A    It was--. Based on this, the consultation
10  that Doctor Feder wrote, he wanted it to be
11  continued non-stop, at least for 2003.
12   Q    And that's your interpretation?
13   A    Yes.
14   Q    Do you know if that was done?
15   A    I do not know personally if it was done.
16   Q    Who would know the answer to that
17  question?
18   A    The nurses administering the medication
19  would know that.
20   Q    So that would be included in the
21  medication records?
22   A    Yes.
23   Q    Do you know why in the time period prior
24  to the corneal transplant this patient was sent to

Page 36

1   several different doctors, one in Galesburg, one in
2   Quincy, one in Jacksonville and several in
3   Springfield? Do you know why that was?
4    A    I don't--I have no knowledge of that,
5   that he had been sent to those different
6   physicians.
7    Q    Well, from a medical standpoint and your
8   long experience in providing healthcare to
9   prisoners under IDOC's control, do you know of any
10  reason--
11   A    Why he would be sent to different eye
12  physicians?
13   Q    Yes.
14   A    Eye doctors? I do not know. It's possible
15  one physician referred him to another, a different
16  specialty. There are multiple different
17  subspecialties of ophthalmology could be why.
18       I suspect all those physicians, those
19  places that you named, were eye specialists?
20   Q    Yes. Who would make the decision to do
21  that?
22   A    To send him to the different eye
23  specialists?
24   Q    Yes. Who would have the authority to do

### Page 37

```
 1   that?
 2        A    The physician evaluating him would take
 3   his case to Wexford, the medical director for
 4   Wexford, present the case, and then they would send
 5   him to these different eye doctors.
 6        MR. LONDRIGAN:  Would you read that back.  I'm
 7   not sure I understand.
 8                    (Whereupon the requested
 9                     portion of the record was read
10                     back by the Reporter.)
11        MR. LONDRIGAN:  Q   When you say the physician
12   evaluating him, who do you mean?  And not by name,
13   but by position.
14        A    Could be the medical director at the
15   medical site, the physician who came in from--
16   for example, in the case of Western, because they
17   did not have a medical director at the time that I
18   was taking call for them, if a physician came from
19   a physician supplier company, that physician would
20   evaluate him and that physician, if he felt that
21   the inmate needed to see an outside eye specialist,
22   he would present the case to the Wexford medical
23   director who's over the whole company, and
24   based on their discussion and need of the patient,
```

### Page 38

```
 1   they would make that decision.
 2        Q    And who was the Wexford medical director
 3   during the period that we're looking at here?
 4        A    I think in 2003 it would have been
 5   Doctor Rayford in Illinois and possibly a Doctor
 6   Rowe in Pennsylvania.
 7        Q    And do you know what those two doctors
 8   specialty are?
 9        A    No, I do not.
10        Q    Do you know whether or not either one of
11   them are ophthalmologists?
12        A    No.  I don't believe so.
13        Q    During the period of time that you were
14   acting in the capacity, as you've described it for
15   Western, who was the chief medical officer for the
16   Illinois Department of Corrections?
17        A    I believe it was Doctor Willard Elyea.
18        Q    And do you know what his specialty is?
19        A    His specialty is family practice and
20   ophthalmology.
21        Q    Now, the prescription that was indicated
22   on this record given by Doctor Feder in February,
23   have you reviewed other records that showed that
24   outside ophthalmologists were prescribing the same
```

### Page 39

```
 1   medication prior to the time that Plaintiff's
 2   Exhibit 1A--
 3        A    I have a record here from August 29th,
 4   2003, for Maxitrol to apply twice a day to the left
 5   eye and with a--it says may substitute, and refill
 6   six times by the ophthalmologist.  I cannot tell
 7   which one that is.  Possibly Doctor Zeh.
 8        Q    And, just for the record, this is IDOC
 9   Number 091.  Do you know if during this period of
10   time at the Prairie Eye Clinic this particular
11   prisoner's eye pressure was being monitored?
12        A    I assume it was because that's why he
13   went to the ophthalmologist.
14        Q    Do you know from your review of these
15   records as to during the year 2003 if this
16   medication was discontinued over periods of time?
17        A    It was discontinued in November I
18   believe.  It would probably relate to that, the
19   original prescription that you showed me where it
20   was read as 30 but actually said 3.  So Doctor Zeh
21   apparently wanted the medication stopped after
22   three days instead of 30 days.
23        Q    And do you know, as you sit there today,
24   why he wanted it discontinued after three days?
```

### Page 40

```
 1        A    Because he wanted to start him on a
 2   different steroid for his eyes.
 3        Q    And do you know why that was?
 4        A    Because he was having increased
 5   intraocular pressure.
 6        Q    And do you know whether or not earlier in
 7   that year he was also discontinued from this
 8   medication because his intraocular pressure began
 9   to increase?
10        A    No, I do not know that.
11        Q    Would that be reflected in any records
12   maintained by IDOC?
13        A    It would probably be reflected in the
14   ophthalmologist's own records of increased
15   intraocular pressure.
16        Q    But you have not seen those?
17        A    No.  As far as I can tell it does not, to
18   the best of my recollection.
19        Q    Do you know how it came to the attention
20   of people working at Western, whether it be Wexford
21   or department of corrections, that this
22   prescription was misread?
23        A    How it came to be?
24        Q    How it came to their attention?
```