3:02-cv-03171-HAB-BGC    # 372-5    Page 1 of 10

E-FILED
Thursday, 19 April, 2007 11:17:59 AM
Clerk, U.S. District Court, ILCD

3/6/07                    McCroy v. Illinois Dept. of Corrections
Hughes Lochard, M.D.

Page 41

1   A   No, I do not know.
2   Q   Were you there at the time?
3   A   No, I was not.
4   Q   That's right. You left at the first of
5   2004?
6   A   Actually, I was never there. Well, I
7   stopped taking call for them.
8   Q   You stopped acting in any supervisory
9   capacity--
10  A   Correct.
11  Q   (Continuing)--at that period of time?
12      And who was it that took your place?
13  A   It was Doctor Brown.
14  MR. LONDRIGAN: Why don't we take a short break
15  now and we'll mark these as 2A and 2B in
16  chronological order.
17              (Whereupon said documents were
18              duly marked for purposes of
19              identification as Exhibits 2A
20              and 2B, as of this date.)
21  MR. LONDRIGAN: Q  I'm going to hand you back
22  Exhibit 3, which bears a date of November 6th, '03.
23  And this is the exhibit I think that you read as
24  30 days.

Page 42

1   MS. POWELL: I'm going to object. He looked at
2   a different piece of paper that he read as 30 days.
3   It was I believe your Exhibit 2. Now you're showing
4   him an Exhibit 3 which is another piece of paper.
5   MR. LONDRIGAN: Okay. You haven't seen that
6   before.
7       Q  You also read that as 30 days, is that
8   right?
9   A   Honestly, since I really know what it is,
10  so it's hard for me to pretend I don't know what it
11  is. So now that I know it's three days, I can't sit
12  here and tell you it looks like 30. But, on first
13  glance, it looks like a zero to me. But since I
14  know that it's a "D" I can't say right now that
15  it's not a "D".
16  Q   Well, let's just look at this. You've
17  looked at this written now two times, I guess, in
18  the handwriting of Doctor Zeh?
19  A   Uh-huh.
20  Q   And, on reflection, you would agree,
21  comparing these two same handwritings, that what he
22  says is three days, then stop?
23  A   Well, I didn't see this originally. I was
24  only going by what the nurse told me over the

Page 43

1   telephone. I never saw this.
2   Q   All right. This was a consult that was
3   requested by Doctor Grosh which you mentioned
4   earlier?
5   A   Correct.
6   Q   And he is a Wexford employee?
7   A   Yes. Before he died, he was a Wexford
8   employee.
9   Q   And, now, let's stop for a minute with
10  regard to the prescription medication which is also
11  located near the bottom of this exhibit and talk
12  about what was the reason for Doctor Grosh's
13  consult with Doctor Zeh?
14  MS. POWELL: I'm going to object just to
15  foundation. Are you asking him what another doctor
16  did?
17  MR. LONDRIGAN:  Q  Were you there?
18  A   I was not there.
19  Q   Were you, as you say, available and on
20  call?
21  A   I was taking call, but Doctor Grosh did
22  not consult me on this.
23  Q   Were you ever consulted about whether or
24  not this type of patient should have been moved

Page 44

1   into the general population?
2   A   No, I was not.
3   Q   Did you realize that there was an effort
4   to get an outside ophthalmologist during this
5   period of time to approve or recommend that this
6   prisoner/patient be sent into the general
7   population?
8   A   I was not aware of that.
9   Q   Do you know if anyone now, as you sit
10  there, who was aware of this at this time?
11  A   Well, at this point, from reading Doctor
12  Grosh's writing there, it says, from eye point of
13  view, need to know if inmate can be moved to
14  general population of the correction center.  With
15  his impaired vision can he move freely and
16  independently. Apparently during the followup of
17  the surgery Doctor Grosh -- I assume this is Doctor
18  Grosh's handwriting, it looks like it is -- wrote
19  that there to get Doctor Zeh's opinion.
20  Q   When this surgery was authorized, did you
21  play any part in authorizing the corneal
22  transplant?
23  A   No.
24  Q   Who would have authority to approve or

Page 45

1  order an outside ophthalmologist to perform a
2  corneal transplant?
3       A    That would be the regional medical
4  director for Wexford, or the CEO, or the chief--
5  or CMO, chief medical officer for Wexford, and the
6  department of corrections' medical director.
7       Q    Are you saying that that would be a joint
8  decision?
9       A    Generally it's a joint decision.
10      Q    Who had the final say?
11      A    The final say--
12      MS. POWELL: In this particular case?
13      MR. LONDRIGAN: Yes. Well, no. No.
14      Q    Let's make it generic. You understand
15 the relationship that Wexford has had over the
16 years with the Illinois Department of Corrections,
17 right?
18      A    Right.
19      Q    In this type of situation, who has the
20 final authority to find out, excuse me, the final
21 authority to determine whether or not this type of
22 treatment or operation should proceed?
23      A    I've never dealt with a corneal
24 transplant in my whole ten years of working for the

Page 46

1  IDOC. This is the only one that I know of that I've
2  been involved in period. A case like this would
3  take the collaboration of the department of
4  corrections as well as Wexford.
5       Q    Are you saying that either or both had a
6  veto over this? Or did one organization have the
7  final authority to make the determination?
8       MS. POWELL: I'm just going to object as to
9  foundation as to whether or not he has any
10 knowledge of that.
11      MR. LONDRIGAN: Q  Who does have knowledge?
12 Who should have knowledge of that question I just
13 asked you? Who has the authority to decide whether
14 or not a corneal transplant should be authorized?
15      A    That would be between the agency medical
16 director for the department of corrections and the
17 chief medical officer for Wexford.
18      Q    So you're saying that that's a joint
19 decision, is that right?
20      A    I assume so, because corneal transplants,
21 although it's not necessarily an organ, it's a
22 tissue, when it comes to those types of things,
23 it's a joint effort I suspect. As I said before,
24 I've never been involved in a corneal transplant

Page 47

1  case at all in these last ten years. This is the
2  only one. So I do not know the specifics of it.
3       Q    No, I'm not asking you to exercise
4  medical judgment as to whether or not--a corneal
5  transplant. I'm trying to find out what the process
6  is, who had the authority, and who, in fact, did
7  authorize the corneal transplant. Is your answer
8  you do not know?
9       A    I honestly do not know. I suspect it
10 would be between department of corrections and
11 Wexford.
12      Q    All right. In order to authorize this
13 type of procedure, which would be done by an
14 outside ophthalmologist, what type of written
15 authority would have to be issued and signed off
16 on?
17      MS. POWELL: Let me just object to the form of
18 the question because he's already testified that he
19 doesn't know who would make that decision and that
20 he doesn't have any experience in this particular
21 type of procedure, ever.
22      MR. LONDRIGAN:  Q  Is your answer based upon
23 that objection, that you don't know?
24      A    Who would make--is your question who

Page 48

1  would make the final decision?
2       Q    Who would you go to? You wouldn't have
3  authority to do that, would you?
4       A    No, I would not.
5       Q    Tell me the steps you would have to take
6  and the levels that you would have to go to get
7  final authority from either or both the defendants
8  in this case, Wexford or the Illinois Department of
9  Corrections?
10      A    In this case the medical director,
11 whoever that was at the time, would fill out a
12 paper and send that paper to Wexford.
13      Q    All right. Good.
14           What type of paper would he send?
15      A    It is a referral request form stating
16 that this is what the patient has and this is what
17 we would like to consult him for.
18      MR. LONDRIGAN: Have you seen that?
19      MS. POWELL: Sure.
20      MR. LONDRIGAN: And is it in the materials that
21 have been produced?
22      MS. POWELL: Yes. And, if you want, it's a
23 document exactly like Exhibit 3, which is a request
24 for consultation.

Page 49

1   MR. LONDRIGAN: Q  So what you would do is
2   fill out a request for consultation?
3   A   Correct.
4   Q   Even though it was a surgical procedure
5   by an outside consultant?
6   A   Yes. Because everything has to go through
7   the proper channels.
8   Q   And that would originate with the
9   department of corrections?
10  A   It would originate with the medical
11  director on site. The medical director, when he
12  evaluates a patient, if he feels that this patient
13  needs something done, he will request for that to
14  be done, and that is approved by Wexford, and the
15  department of corrections in this particular case
16  was involved.
17  Q   I want you to assume that that type of
18  process was initiated by the Illinois Department of
19  Corrections. Who then for Wexford would agree to or
20  approve the operation?
21  A   When you say the department of
22  corrections, do you mean the medical people on site
23  at the facility?
24  Q   Whoever has authority for--to sign off on

Page 50

1   that type of request.
2   A   Well, that would have been--
3   MS. POWELL: Well, I'm going to object to the
4   form of the question because you're asking
5   questions that don't make sense in the context of
6   what actually happened. So I just object to the
7   form because it doesn't make sense.
8   MR. LONDRIGAN: Well, if you'd tell me what
9   actually happened, maybe I could be more specific.
10  I've been trying to find out what actually happened
11  for the last couple of years. Is there anything you
12  want to say for the record?
13  MS. POWELL: I objected to the form of the
14  question because your question doesn't make sense
15  as to what happened. You don't me to be a witness.
16  MR. LONDRIGAN: I want you to make this easier
17  rather than harder.
18  MS. POWELL: Why don't you ask the question and
19  then I will help you with what the question says in
20  terms of how it would make sense, because I didn't
21  really get what you're asking.
22  MR. LONDRIGAN: Q  Assuming that the right
23  paperwork has been initiated by the department of
24  corrections, who has the final say at Wexford, your

Page 51

1   employer, as to whether or not this procedure will
2   go forward?
3   MS. POWELL: Okay. I'm going to object to the
4   form of the question in that no one's testified
5   that the department of corrections completes or
6   signs off on any particular paperwork. Doctor
7   Lochard's testified about the referral request
8   form.
9   MR. LONDRIGAN: Q  All right. What you
10  testified to. I understood what you testified to.
11  Now I'm going to the other side of the coin. Who
12  for Wexford has to approve this paperwork saying
13  that this man needs a corneal transplant?
14  A   That would be the chief medical officer
15  for Wexford at that time.
16  Q   And I think you told me there were two?
17  A   There was one for Illinois and one for
18  Pennsylvania.
19  Q   And what would the one in Pennsylvania
20  have to do with what was going on in Illinois?
21  MS. POWELL: Again, I'm going to object with
22  respect to foundation as to whether or not
23  Doctor Lochard would know what factors go into the
24  request that would be--

Page 52

1   MR. LONDRIGAN: Q  Do you understand what
2   she's telling you is that you should answer "I
3   don't know"?
4   MS. POWELL: No. I'm objecting as to his
5   foundation on behalf of Wexford as far as whether
6   or not he knows what factors the chief medical
7   officer would consider, as well as the regional
8   medical officer would consider with respect to a
9   corneal transplant, which is completely different.
10  MR. LONDRIGAN: That's not what I asked him.
11  MS. POWELL: Well, it sounded like it was.
12  MR. LONDRIGAN: You're confusing this issue.
13  MS. POWELL: No, I'm not.
14  MR. LONDRIGAN: I'm asking him who.
15  Q   Do you understand what I mean when I
16  say "who"?
17  MS. POWELL: Please rephrase the question or
18  reask your question. The question doesn't make
19  sense.
20  MR. LONDRIGAN: Q  Who, for your employer,
21  Wexford, would have the authority to say yes or no
22  to a written request from the department of
23  corrections for a corneal transplant for a prisoner
24  that needed one?

3/6/07  
Hughes Lochard, M.D.  McCroy v. Illinois Dept. of Corrections

### Page 53

1  MS. POWELL: Again, I'm going to object to the
2  form of the question because you've referenced that
3  the department of corrections would be filling out
4  this sort of paperwork or making a specific request
5  and that question does not make factual sense.
6  MR. LONDRIGAN: Theresa, this is a consulting
7  specialist.
8  MS. POWELL: No, it isn't. I'm just objecting
9  to the form of the question.
10  MR. LONDRIGAN: Q I'll tell you what. If you
11  don't understand my question,--
12  MS. POWELL: He can answer it. I'm just
13  objecting for the record. These are evidence
14  depositions.
15  MR. LONDRIGAN: Q If you don't understand my
16  question. I'll ask it over. I want to make sure
17  you understand the information I'm asking you for.
18  If you don't know the answer to a question, you can
19  tell me that. You don't need to be prompted from me
20  or from anybody else in this room.
21  Can you go back and find that last
22  question that I asked him.
23  MS. POWELL: And I'm objecting to you
24  insinuating that I'm obstructing because your

### Page 54

1  questions are factually inaccurate.
2  MR. LONDRIGAN: I'm not going to argue with you
3  anymore.
4  MS. POWELL: I'm not going to argue either.
5  MR. LONDRIGAN: Theresa, if you continue this,
6  I'm going to get this certified before the court.
7  I'm entitled to these answers.
8  MS. POWELL: You can have answers.
9  MR. LONDRIGAN: And you can't continually
10  interrupt him. You can make objections, but quit
11  telling him he doesn't know.
12  MS. POWELL: I'm not telling him that.
13  MR. LONDRIGAN: If he doesn't know, he can tell
14  me that under oath.
15  MS. POWELL: I'm objecting to your question.
16  I'm objecting to the form of the question.
17  MR. LONDRIGAN: No, you aren't. Those are
18  speaking objections, and this can be used, as you
19  point out in prior depositions, as evidentiary
20  testimony, and I'm not going to end up with a
21  needle in a haystack here. I'm entitled to get
22  answers from this witness. Not you.
23  MS. POWELL: That's fine.
24  MR. LONDRIGAN: Can you find that now.

### Page 55

1  MS. POWELL: Go ahead.
2  (Whereupon the requested
3  portion of the record was read
4  back by the Reporter.)
5  THE DEPONENT: For corneal transplants, yes.
6  That, at the particular time, I've never been
7  involved with any corneal transplant cases at all.
8  I would have to say that I do not know.
9  MR. LONDRIGAN: Q Suppose it were another
10  procedure like an amputation. Has that ever
11  occurred because of a fight or some problems that
12  have occurred?
13  A  Yes. Yes.
14  Q  And would you fill out the same type of
15  paperwork and expect that from the Illinois
16  Department of Corrections?
17  A  Yes.
18  Q  Who would have authority under those
19  circumstances at Wexford to say yes or no?
20  A  The chief medical officer.
21  Q  I thought that's what you were trying to
22  tell me.
23  And would that be the chief medical
24  officer in Illinois?

### Page 56

1  A  That would be the one in Pennsylvania.
2  Q  Because he is superior to, in the Wexford
3  chain of command, to the chief medical officer in
4  Illinois?
5  A  That is correct.
6  Q  And should there be some paperwork, some
7  record of the decision that was made that would
8  give the reasons why that decision was made?
9  A  I suspect so.
10  Q  Now I want you to look at the language
11  that is written in by Doctor Grosh at the top of--
12  A  Exhibit 3?
13  Q  Exhibit 3. Who was it that had authority
14  to determine whether or not this patient that's
15  referenced in Exhibit 3 should be placed in the
16  general population?
17  A  That, I do not know.
18  Q  Who would know the answer to that
19  question if you wanted to find an answer? Who would
20  you go to?
21  A  I would go to the administrator at the
22  facility.
23  Q  And at that time, and I'm referring to
24  late in 2003, who would have been the administrator

14 (Pages 53 to 56)

Baldwin Court Reporting & Legal Video Services
1-800-248-2835

3:02-cv-03171-HAB-BGC    # 372-5    Page 5 of 10

3/6/07                       McCroy v. Illinois Dept. of Corrections
Hughes Lochard, M.D.

## Page 57

1  at that facility?
2      A    I believe...
3      Q    Are you talking about the warden?
4      A    No. The administrator would know because
5  she runs the healthcare unit and she keeps in close
6  contact with the warden. I can't remember her name.
7      Q    The supervisor, Debra Fuqua?
8      A    Correct.
9      Q    Or whoever held that position?
10     A    Right. She would know. She would have
11 that information.
12     Q    And did she have authority to do that, or
13 would she have to gain that authority from someone
14 superior to her?
15     A    Again, that, I don't know, because I was
16 not there at the time.
17     Q    Who would make the decision, from a
18 medical standpoint, as to whether or not a patient
19 with these type of medical problems should be
20 placed in the general population, an outside
21 consulting specialist or ophthalmologist or someone
22 inside for either the department of corrections or
23 Wexford?
24     A    It depends on the case. If you're talking

## Page 58

1  about medically only, the physician would base his
2  decisions on the medical aspect of the patient.
3  Security handles everything else.
4      Q    Are you saying that security trumps
5  medical?
6      A    No. No, security does not trump medical.
7  It's just that if medical--if medical's part is
8  finished with a patient, then they are no longer,
9  they no longer deal with the patient.
10          Say, for example, I put somebody in the
11 infirmary for--to rule out appendicitis. At the
12 same time that patient had a fight and he's put in
13 the segregation cell in the infirmary. Once I
14 determine that he does not have appendicitis, my
15 hands are--I discharge him from my care, if you
16 will. Then he totally becomes under the authority
17 of security staff because he's no longer medical.
18     Q    And you say you would discharge him from
19 your care. How would you do that?
20     A    I would write that in the chart.
21     Q    You would write in the charts that you
22 believe that this patient is now physically able to
23 be placed among the general population?
24     A    No, that is not what I would write. I

## Page 59

1  would write that, in the case that I mentioned,
2  appendicitis, appendicitis ruled out and discharge
3  patient from medical care, or discharge from
4  infirmary.
5      Q    All right. Do you know if that was ever
6  done in this case?
7      A    I do not know.
8      Q    With what you know about this patient and
9  his problems and the precautions, who would be the
10 appropriate person, from a medical standpoint, to
11 sign Aaron McCroy out of the infirmary and into the
12 general population?
13     A    Whoever the medical director would be at
14 the time.
15     Q    The medical director where?
16     A    At Western Illinois Correctional Center.
17     Q    So we're talking about Doctor Sims or
18 Doctor Brown or somebody--
19     A    That would be correct.
20     Q    The nurse of the healthcare unit would
21 not have authority to do that. Is that your
22 understanding?
23     A    That is correct.
24     Q    And what type of record or documentation

## Page 60

1  should we find if we look for it?
2      A    That would be written in the infirmary
3  notes, infirmary record.
4      Q    And it would be signed off by a medical
5  doctor?
6      A    Correct.
7      Q    Let me refer you again to Exhibit
8  Number 1, and if you turn back to bates number page
9  071. Nurses note of November 21st, '03. Can you
10 tell me who entered this notation?
11     A    That was nurse note.
12          MS. POWELL: Did you reference a time frame?
13          MR. LONDRIGAN: Yes. I did.
14     A    2:15. Blessing, it looks like is the
15 name. J. Blessing.
16     Q    Do I read this correctly that she placed
17 a call to Doctor Zeh?
18     A    Yes. That is what she wrote.
19     Q    And received order that offender can be
20 placed in segregation, single cell?
21     A    Correct.
22     Q    Does that type of order authorize that
23 this patient, from a medical standpoint, is fit to
24 be placed among the general population?

3:02-cv-03171-HAB-BGC  # 372-5  Page 6 of 10

3/6/07                                    McCroy v. Illinois Dept. of Corrections
Hughes Lochard, M.D.

Page 61

1    A    At that particular time, no.
2    Q    Now, at 2:20, would you read the second
3  entry that was made by Nurse Blessing.
4    A    Discussed case with Mills, nurse
5  practitioner, agreed--agreeable to discharging
6  McCroy from infirmary to place in seg.
7    Q    And does that relate to the prior order
8  that was, excuse me, the prior nurse's note that
9  was entered five minutes before 2:15?
10   A    Yes. In the infirmary in a facility like
11 Western there are segregation cells in the
12 infirmary itself so the patient can be discharged
13 from the medical aspect of it but still kept in
14 segregation for security issues.
15   Q    For security issues and not for health
16 reasons, is that what you're saying?
17   A    Right. For example, because certain
18 facilities have--that are medium, max, for example,
19 such as Western, their infirmary is not open,
20 they're all locked, and some rooms you can put six
21 patients, some rooms only one. So he was apparently
22 placed in a single cell in the infirmary.
23   Q    Do you know why?
24   A    No, I do not know why.

Page 62

1    Q    Would you look at the next page and would
2  you read into the record the summary of reason for
3  admission.
4    A    Needs placement to protect eye from
5  injury, avoid general population, November 21st,
6  2003.
7    Q    And can you tell who made that entry?
8    A    Nurse Practitioner Mills.
9    Q    And while this patient was in
10 segregation, then he was in a single cell. Isn't
11 that right?
12   A    That is correct.
13   Q    And the assigned reason is to protect his
14 eye from injury?
15   MS. POWELL: I'm going to object as to what
16 someone else wrote, having him testify about what
17 someone else wrote and why someone else wrote it.
18   MR. LONDRIGAN: Q Why? Do you agree with
19 that?
20   MS. POWELL: I don't understand why you're
21 asking him about someone else's note.
22   MR. LONDRIGAN: Q Do you have any reason to
23 disagree with the reason for admission, which is on
24 an offender infirmary progress note, that the

Page 63

1  reason that he was placed in segregation in a
2  single cell was to protect his eye from injury and
3  to avoid the general population?
4    MS. POWELL: Object to the form of the
5  question. And foundation.
6    MR. LONDRIGAN: Q Does it appear that he's in
7  there because he's a danger to anybody else in the
8  population?
9    A    I do not know.
10   Q    Look at the same Exhibit 1, page 180. And
11 does that bear your stamp and signature?
12   A    That is correct.
13   Q    And the subject is medically unassigned.
14 What does that mean?
15   A    That means he would not be given a job.
16   Q    And why not?
17   A    Because a job would keep--would require
18 him in certain cases to lift things. And one of the
19 recommendations would be not lifting anything
20 heavy.
21   Q    Could he be given a desk job in the
22 general population under this order?
23   A    No. Once you give someone a medically
24 unassigned, he can never work until that is

Page 64

1  lifted.
2    Q    And the reason was for a medical reason,
3  it wasn't for any type of supervision that was
4  needed over him as a threat to anybody else in the
5  prison population?
6    A    At the time that I ordered it was so that
7  he would not lift and affect his eye.
8    Q    Did you tell me earlier in the deposition
9  that Doctor Brown took over as medical director
10 after the first of the year 2004?
11   A    I don't know the exact date. I believe
12 somewhere along that time.
13   Q    And did you request--.
14        I don't have this marked as an exhibit, I
15 don't believe. Why don't you mark this.
16              (Whereupon said documents were
17              duly marked for purposes of
18              identification as Exhibits 5
19              and 6, as of this date.)
20   MR. LONDRIGAN: Q First of all, identify
21 Exhibit 5, if you would.
22   A    (No response.)
23   Q    Would you tell me what that is.
24   A    This is a consultation from Doctor Zeh on

3:02-cv-03171-HAB-BGC    # 372-5    Page 7 of 10

3/6/07                                              McCroy v. Illinois Dept. of Corrections
Hughes Lochard, M.D.

### Page 65

1  December 23rd, 2003.
2      Q    It's on a State of Illinois Department of
3  Corrections form. What's the title?
4      A    Request for consultation, report of
5  consultation.
6      Q    Who made the request for consultation?
7      A    I believe it was probably the nurse
8  practitioner, but since I was the acting medical
9  director my name is put there.
10     Q    Are you still the acting medical director
11 in January 23rd?
12     A    No. This is December 23rd, of Exhibit 5.
13 And there's a date there January 8th my name
14 appears again. Apparently I was the acting medical
15 director in January 2004. I don't know for how
16 long. That was another referral to Doctor Kim.
17     Q    And Exhibit Number 5 bears what bates
18 number on the bottom?
19     A    December 30th, 2003.
20     Q    No. The bates number, the stamped number
21 in the lower right-hand corner.
22     A    Oh. ATTYG10195.
23     Q    Do you have the same thing that I do?
24     MS. POWELL: Actually, she covered that up with

### Page 66

1  the sticker. Or, no. Actually, you're looking at--
2      THE DEPONENT: These are different.
3      MS. POWELL: You marked yours as 5, which this
4  is marked as 6, so you have them opposites.
5      MR. LONDRIGAN: Okay. Let's take them in
6  chronological order.
7      MS. POWELL: Maybe they're not the same. Let me
8  see your 6.
9      MR. LONDRIGAN: They're not the same. Let's
10 take 5 first. I was asking you questions about 6.
11     MS. POWELL: Can I look at what you have?
12 Because he says one of his documents has
13 Doctor Brown's name on it and neither of these do.
14 He doesn't have this one at all.
15     MR. LONDRIGAN: Let me see 5 and 6.
16     MS. POWELL: That's just a later date.
17     MR. LONDRIGAN: So we can get all of these in
18 sequence, let's take time out and make additional
19 copies. I want to get these in chronological order.
20     MS. POWELL: You just need to mark one of them
21 as 7.
22            (Discussion off the record.)
23     MR. LONDRIGAN: Q  Now that I have these in
24 order, let me go back to 4. Let me direct your

### Page 67

1  attention to the nurse's note. And in addition to
2  the weight restrictions doesn't he deny return to
3  the housing unit or the infirmary, and when I say
4  "he" I mean Doctor Zeh, in response to this
5  telephone call?
6      A    May I read it? Telephone order Doctor
7  Zeh, for clarification, offender McCroy to return
8  to the housing unit or the infirmary. Doctor Zeh
9  stated that offender needed to stay in the
10 infirmary due to weight restrictions and also he
11 doesn't want offender to get--
12     Q    Poked?
13     A    Poked in the eye, to stay in the
14 infirmary for now.
15     Q    Do you know if Doctor Zeh ever changed
16 his position about not wanting this patient to get
17 poked in the eye?
18     A    I do not know that.
19     Q    So the danger was not only the ten pound
20 weight restriction, or work, or heavy bending, or
21 lifting, it was the fact that if he was in the
22 general population he might get poked in the eye?
23     A    Uh-huh.
24     Q    Yes?

### Page 68

1      A    Yes.
2      Q    All right. Take a look at Exhibit Number
3  5.
4      A    I don't believe I have Exhibit 5.
5      MS. POWELL: Oh, here.
6      THE DEPONENT: This is dated December 23rd.
7      MR. LONDRIGAN: Q  This is a request for
8  consultation by you?
9      A    Correct.
10     Q    And you were requesting a consultation
11 with whom?
12     A    Doctor Zeh.
13     Q    And would you interpret his findings that
14 he sent to you.
15     A    He said in assessment, keratoconus left
16 eye, intraocular pressure uncontrolled, patient is
17 not supposed to be getting Maxitrol at all and
18 Lotemax only b.i.d. And then he ordered Lotemax,
19 left eye b.i.d., and then Travalon and Alphagan.
20     Q    What were the clinical findings that he
21 lists there?
22     A    His intraocular pressure was elevated at
23 44 in the left eye and 14 in the right eye.
24     Q    Would you look at Exhibit 6. Now, this is

Page 69

1  after the first of the year. It's another consult
2  requested by you?
3      A    Yes. My name is there because I am the
4  acting medical director.
5      Q    And you're sending him to a Doctor Kim.
6      A    Actually, he was referred to the group
7  and apparently Doctor Kim is the one that could get
8  him to see him that particular day.
9      Q    And did Doctor Kim have the same
10 assessment with respect to steroid induced glaucoma
11 as Doctor Zeh did in December?
12     A    Let me see. Let me see what Doctor Zeh
13 wrote. Doctor Zeh wrote uncontrolled intraocular
14 pressure and Doctor Zeh did not make any comments
15 concerning steroid induced glaucoma, although he
16 did find the increased intraocular pressure.
17          Doctor Kim did write steroid induced
18 glaucoma left eye. As I stated before, Doctor Zeh's
19 office and Doctor Kim's office had had this patient
20 on Maxitrol for a long, long time prior to the time
21 that I was covering for Western Illinois.
22          I have a prescription here from
23 August 29th, 2003, from Doctor Zeh prescribing
24 Maxitrol twice a day to the left eye and with a

Page 70

1  refill for six times.
2      Q    Is that an exhibit that's marked?
3      A    It is on exhibit--that is one of the
4  things I have.
5      MS. POWELL: Yes, I believe it is an exhibit
6  that you marked. But he doesn't have it a marked
7  one if front of him.
8      MR. LONDRIGAN:  Q    What I want you to do is
9  reference the exhibit by number.
10     A    Okay. There's a number 91.
11     MS. POWELL: Let's see here. I think they're
12 with the stuff that you took, Tom.
13     THE DEPONENT: 91 is the page number.
14     MS. POWELL: Here it is.
15     MR. LONDRIGAN:  Q    Exhibit 2B.
16     A    Exhibit 2B.
17     Q    And we've a talked about that before I
18 think?
19     A    Yes.
20     Q    All right. Now, at the bottom, it's again
21 dated 1/8/04.
22     MS. POWELL: Of Exhibit 6?
23     MR. LONDRIGAN: Yes.
24     Q    And before signature of medical

Page 71

1  director, what's written there and who wrote it, if
2  you can tell?
3      A    It says please forward to Doctor Lochard.
4  This is a Doctor Wahl it looks like. W-a-h-l.
5  Doctor Wahl would have been a physician covering
6  for the site until they had a permanent medical
7  director.
8      Q    Okay. He was assigned there by his
9  employer Wexford?
10     A    Correct.
11     Q    Do you know who he is?
12     A    It is a she. I've never met her.
13     Q    I apologize.
14          (Whereupon a document was duly
15          marked for purposes of
16          identification as Exhibit 7, as
17          of this date.)
18     MR. LONDRIGAN:  Q    All right. Let's look
19 forward a couple of weeks to Exhibit 7. It's
20 another request for consultation for Aaron McCroy.
21 This patient was seen by Doctor Kim. Again, my name
22 appears there, January 23rd, 2004.
23     Q    And what's F/U stand for?
24     A    Followup.

Page 72

1      Q    And so this is a followup to your
2  original consult earlier that month?
3      A    Correct.
4      Q    And is the assessment the same with
5  respect to steroid induced glaucoma?
6      A    That is what it say in number 1. Correct.
7      Q    Who is signing off under the signature of
8  the consultant?
9      A    This is Doctor Brown on January 26th,
10 2004.
11     MR. LONDRIGAN: I think that's all I have.
12     MR. TENNEY: I just have one.
13              EXAMINATION
14              BY MR. TENNEY:
15     Q    I just wanted to ask you a question
16 briefly about a document that's been bate stamped
17 number 181.
18     A    Yes.
19     Q    I just have my copy of that. Do you have
20 that?
21     A    Right.
22     Q    Do you see that?
23     A    Yes.
24     Q    Is that a memorandum of yours dated

3/6/07　　　　　　　　　　　McCroy v. Illinois Dept. of Corrections
Hughes Lochard, M.D.

Page 73

1   November 29th, 2003?
2       A    That is correct.
3       Q    And in that note you indicate that
4   Mr. McCroy is to be restricted from weightlifting
5   and sports?
6       A    Correct.
7       Q    And is that for the period effective
8   beginning November 29, '03, through November 29,
9   '04?
10      A    That is correct.
11      Q    And were those restrictions made by
12  reason of Mr. McCroy's medical condition?
13      A    That is correct.
14      Q    Is there any particular reason that you
15  made the length of those restrictions one year?
16      A    Well, there is another page, 180, where I
17  recommended that he be re-evaluated January 2004.
18      Q    I see.
19      A    So I do not know if he was re-evaluated
20  or not because I was not there.
21      Q    The note you referred to, re-evaluation
22  date, January 2004, is that the document that was
23  bate -- it was another exhibit.
24      A    Yes.  180.  Correct.

Page 74

1       Q    And do you know, can you tell what
2   exhibit number that is?
3       A    It doesn't have an exhibit. It simply
4   says number 180 at the bottom.
5       Q    Okay. But despite the re-evaluation date
6   that you indicated to be in January of 2004, still
7   by your note of the same date, you would have the
8   weightlifting and sports restriction go for a whole
9   year until November of '04, right?
10      A    Correct. And I am sure why there are two
11  forms that day. I'm not sure why I was given two
12  forms to fill out, to tell you the truth. But
13  that's what happened.
14      MR. LONDRIGAN: Could we mark--. One of them is
15  marked and one of them isn't?
16      MS. POWELL: One is 181 and one 180 and that's
17  how we've referenced them throughout the
18  deposition.
19      MR. LONDRIGAN: Okay. That's all right. That's
20  fine.
21      MR. TENNEY:  Q  And in the one that is bate
22  stamp number 181 which references weightlifting and
23  sports, I gather that you didn't have any
24  particular number of pounds? In other words, don't

Page 75

1   lift anything over 20 pounds, 50 pounds, ten
2   pounds. What was your thought there? Just don't
3   lift anything?
4       A    Weightlifting in the department of
5   corrections generally involves power lifting, going
6   to the gym and competing with other inmates.
7   Lifting weights. They have contacts for power
8   lifting and some guys can lift 500 pounds. And so
9   that's--basically, I was referring to weightlifting
10  in the gym.
11           And, of course, he can carry his tray of
12  food which would be waited down in certain cases,
13  and sometimes when they go to the commissary they
14  come back with a big shopping bag full of food. And
15  sometimes they're pretty heavy. So I would say I
16  was referring to weightlifting in the gym.
17      Q    Weightlifting as a sport?
18      A    As a sport. Yes.
19      Q    And then you reference other sports as
20  well. Presumably you mean all sports?
21      A    Right. Basketball.
22      MR. TENNEY: Those are all that I have. Thank
23  you.
24      MS. POWELL: Doctor, I just have a couple

Page 76

1   followup questions for you.
2                    EXAMINATION
3                    BY MS. POWELL:
4       Q    With respect to the exhibit you've just
5   been talking about, 181, would those restrictions
6   have been communicated to Mr. McCroy himself?
7       A    Yes.
8       Q    And those were basically for him then?
9       A    Correct.
10      Q    Now, if you could, I want to look at the
11  exhibit that I believe you had some questions asked
12  of you regarding--well, let me show you what
13  plaintiff's counsel marked as Exhibit 1, page 1. At
14  the beginning of the deposition you were asked some
15  questions about prescription orders as they appear
16  on the front. Do you see that?
17      A    Yes.
18      Q    The form that we have on Exhibit 1,
19  that's something that's used within the department
20  of corrections. Correct?
21      A    That is correct.
22      Q    Okay. All prescription orders are written
23  on this form in the department of corrections.
24  Right?

3:02-cv-03171-HAB-BGC  # 372-5  Page 10 of 10

3/6/07                    McCroy v. Illinois Dept. of Corrections
Hughes Lochard, M.D.

Page 77

```
 1      A    That is correct.
 2      Q    And then once the information is placed
 3  on this prescription order, it would be carried
 4  over to the medication administration record?
 5      A    That is correct.
 6      Q    And until it's placed on this particular
 7  form, the inmate's not going to get the medication,
 8  is he?
 9      A    That is correct.
10      Q    On page 3 of Exhibit 1, bate stamp number
11  61, we have the note that was referenced by Nurse
12  Roberts. You don't know her, do you?
13      A    No, I do not.
14      Q    And that was dated November 6th of 2003
15  and references orders received from Doctor Zeh?
16      MR. LONDRIGAN: Just can we have a continuing
17  objection? You're testifying for your own witness,
18  but just asking him to agree with what you have to
19  say, and I don't think it's appropriate, and I'm
20  going to object on that basis if you attempt to use
21  it later.
22      MS. POWELL: That's fine.
23      Q    This is a note from Nurse Roberts that
24  you testified to previously. Correct?
```

Page 78

```
 1      A    That is correct.
 2      Q    From November the 6th of 2003?
 3      A    Yes.
 4      Q    Did you ever see this note in conjunction
 5  with the telephone conference that you had with her
 6  that you testified to previously?
 7      A    No, I did not.
 8      Q    With respect to the note you discussed
 9  with plaintiff's counsel referencing Exhibit 1,
10  bate stamp number 71, you testified earlier about
11  this note from 11/21/03 at 2:15 p.m.?
12      A    Yes.
13      Q    Did you personally ever have a
14  conversation with Doctor Zeh regarding the
15  plaintiff's placement in segregation?
16      A    No, I did not.
17      Q    And do you have any knowledge, as you sit
18  here today, as to where Mr. McCroy was prior to
19  November 21st of 2003?
20      A    No, I do not.
21      Q    With respect to the other note that we
22  have on November 21st, 2003, Exhibit 1, bate stamp
23  number 73, you also testified regarding information
24  there. Do you recall that?
```

Page 79

```
 1      A    Yes.
 2      Q    And with respect to bate stamp number 73,
 3  what type of note is that?
 4      A    This is an infirmary discharge note.
 5      Q    And with respect to what's contained
 6  here, the next part, which you testified to
 7  regarding needs placement to protect eye from
 8  injury, avoid general population, under what
 9  heading did that come under?
10      A    That is a summary of the reason for the
11  original admission.
12      Q    Was the patient being admitted to the
13  infirmary on November 21st of 2003?
14      A    No. He was not.
15      Q    What was the purpose of this note on
16  November 21st, 2003?
17      A    To explain what had transpired throughout
18  his stay in the infirmary and to discharge him from
19  the infirmary.
20      Q    And, as you sit here today, do you know
21  why he was placed in segregation?
22      A    No, I do not.
23      Q    I believe you testified earlier,
24  Doctor Lochard, that you actually never saw
```

Page 80

```
 1  Mr. McCroy. Is that accurate?
 2      A    That is accurate.
 3      Q    Did you know at the time that you served
 4  as the acting medical director whether or not
 5  Mr. McCroy had filed any grievances concerning his
 6  medical care?
 7      A    No, I did not know.
 8      Q    And do you know whether he had filed any
 9  grievances involving you at any time?
10      A    No. I did not know.
11      Q    Doctor Lochard, do you have anything to
12  do with transferring inmates from one facility to
13  another facility?
14      A    No.
15      Q    And in this particular case, did you have
16  anything to do with transferring Mr. McCroy to any
17  other correctional facility?
18      A    No, I did not.
19      Q    Did you ever change Mr. McCroy's treating
20  physicians?
21      A    No, I did not.
22      Q    Did you have anything to do with
23  Mr. McCroy obtaining his corneal transplant?
24      A    No. I did not.
```