1   I'll have too many questions for you.

2                    EXAMINATION

3                    BY MR. TENNEY:

4        Q    In your review of the records that were

5   provided to you from the court, did you see some

6   reference to Doctor Anderson or some of his notes

7   or anything like that?

8        A    I don't believe so. Then again I didn't--

9   I really only tried to look for the records that I

10  thought pertained to, you know, what some of these

11  issues were. And so I focused mainly on--I leafed

12  through the entirely chart, but unless there was

13  something else going on that I thought was relevant

14  to the eye care, I don't think I looked for any

15  specific names.

16       Q    Doctor, it's Doctor David Anderson and

17  he's an optometrist, and at least prior to, I want

18  to say March, I believe March of '03, Doctor

19  Anderson provided some optometry care. I guess my

20  question would be do you have any criticism of

21  anything that Doctor Anderson did or did not do

22  based on the review that you have made to this

23  point in the records?

24       MS. de SAINT PHALLE: I'm going to object on

1  foundation grounds. I don't think that's what
2  Doctor Zeh was looking at.
3      MR. TENNEY: He wasn't looking at--
4      THE DEPONENT: Well, I mean, I would have to
5  say that actually I am completely unaware of
6  specifically whatever care was provided for the
7  patient by Doctor Anderson. I think that, you know,
8  it's not uncommon for patients with severe
9  keratoconus to see several doctors and go through,
10 you know, successful or unsuccessful contact lens
11 fittings. And that's pretty much the nature of the
12 beast.
13      But since I don't know, you know, any of
14 the details of the care that was provided I really
15 don't think I should comment on whether or not it
16 was--you know, I see no evidence that Mr. McCroy
17 suffered because of any care that was provided for
18 him certainly. But without knowing any additional
19 details, I really shouldn't say whether it was
20 acceptable or not.
21     MR. TENNEY:  Q  And that's all right. I only
22 mean to ask you if you do have an opinion one way
23 or another, and, if you don't, that's fine.
24     A   As I say, I don't have any evidence to

Page 62

think that his care was not up to professional standards. But I'd have to leave it at that and say that I don't really know any other details about what was provided.

Q    Now, as long as you have been seeing Mr. McCroy, has Doctor Blumthal, in your office, been the person responsible for Mr. McCroy's optometry care?

A    Yes. But that's been pretty limited because most of his care during the period where I've been there has been something that I've been involved in directly or Doctor Kim. And, really, Doctor Blumthal's role was to attempt the contact lens fit.

The first time he saw him he evidently ordered the Rose K set, and the second time he saw was the day, the first time that I saw him where I said hold off on fitting him until we can get out, you know, one of the sutures and try to reduce the corneal astigmatism.

And he hasn't really seen him since then so his role in Mr. McCroy's care has been, you know, pretty limited. But that's just because, you know, before February, the patient really hasn't

1  been ready to have anything else done
2  optometrically.
3      Q    On the subject of the contact fitting, or
4  lack thereof, has the failure for whoever might
5  have been responsible to provide a new contact lens
6  to Mr. McCroy, has that caused any temporary or
7  permanent kind of problem for Mr. McCroy?
8      A    If that question means has he been
9  permanently damaged by not having a contact lens,
10 the answer is of course not. He just hasn't had a
11 contact lens to correct his vision for that period
12 of time.
13     Q    But otherwise he hasn't suffered any?
14     A    I shouldn't see that he has.
15     MR. TENNEY: That's all I have. Thank you.
16     MS. CHOATE: Hi, Doctor. I'm Kelly Choate and I
17 represent, well, everyone else, the non-medical
18 people from the department of corrections and the
19 department of corrections itself. So I really won't
20 have very many questions for you.
21                 EXAMINATION
22                 BY MS. CHOATE:
23     Q    I just want to make it clear though that
24 when you testified that you continued to see Mr.

```
1   McCroy over the last couple of years that--
2        A    A couple years. I've seen him, the first
3   time I seen him was August 2003, so I've been
4   involved in his care roughly about ten months.
5        Q    Okay. That's fine.
6             During that time when you made a
7   recommendation that he see Doctor Kim, that
8   happened, isn't that correct?
9        A    That's correct.
10       Q    And when you made a recommendation that
11  he except for the last--since February that he see
12  Doctor Blumthal, he saw him, is that correct?
13       A    Well, actually, the appointments with
14  Doctor Blumthal were recommended before I got
15  involved in his care. But he did see Doctor
16  Blumthal for the contact lens fitting and then
17  Doctor Blumthal decided any of the specialty
18  lenses.  He came back on the same day he was
19  scheduled to see me, you know, just basically--
20  I think that was done mainly to decrease any--
21  to transport the patient.
22            But once he, you know, at my request, or
23  my advise, he held off on fitting him that day
24  simply so that we could remove some of the sutures
```

Page 65

1  and try to make that process, give it a higher
2  chance for success. Because 12 diopters is at the
3  range where the chance of success starts to become
4  limited. So if we could do anything to reduce the
5  astigmatism it was worth doing.
6      But, yeah, he saw Doctor Blumthal when
7  Doctor Fedor recommended it, he saw Doctor Kim when
8  I had recommended it, and the only time it appears
9  he's not seen someone when it was recommended was
10 when I ask that he be fit with a contact lens in
11 February and, you know, at this point that hasn't
12 happened yet.
13      Q    And I don't know which exhibit that was.
14 Did you put any specific date that he was supposed
15 to come back or time?
16      A    No. I guess to me it's implied that it's
17 the next available appointment. Often Doctor
18 Blumthal--. Usually it's about a month after. So
19 the fact that he didn't have it immediately, and,
20 you know, once again, it can also depend on Doctor
21 Blumthal's schedule, which I don't have day to day
22 knowledge of, and I just, you know, recommended.
23      My impression when he came back in May
24 was not, you know, my God, why hasn't this man been

Page 66

1  fit with a contact lens, it's just, oh, I would
2  have thought that would have happened by now. And
3  that was more my emotion rather than he had been
4  mistreated by the system. It's more like, well,
5  this needs to be done so let's get it done, but not
6  that he necessarily was way overdue or that his
7  care was inappropriate.
8      Q    So there was no indication that the
9  department or any of the doctors or nurses or
10 administrators would have had that this needed to
11 be done at a certain date or certain amount of
12 time?
13     A    No. I mean, I didn't write stat or urgent
14 or anything like that. I assumed that when I
15 wrote--that I recommended the contact lens fitting
16 be done it be done at the next convenient date for
17 all parties concerned.
18     Q    And you don't know why it wasn't?
19     A    I don't.
20     Q    Do you mostly see private patients in
21 your practice as opposed to incarcerated
22 individuals like Mr. McCroy?
23     A    To a ratio of about 99 to 1.
24     Q    And in your opinion was the care that Mr.

Page 67

```
1   McCroy received at--and you work at Prairie Eye
2   Institute, is that correct, in Springfield?
3        A    Uh-huh.
4        Q    Was that better or worse than the care
5   that your private patients received?
6        A    I try to take care of all my patients
7   equally regardless of whether they're wearing
8   jewelry or not. And I don't know if it's
9   appropriate for me to make jokes, but I try to take
10  care of each of my patients exactly the same way.
11  That's why I made the comment that I don't really
12  want to know why they're incarcerated or other
13  details because I really just try to view them as a
14  patient and not as an inmate or something like
15  that.
16            And I think that the care that he
17  received was equal to the care that the private
18  patient--because certainly when dealing with
19  patients in the private sector sometimes there are
20  similar, you know, patients come back and they're
21  not using their medications the way they're
22  supposed to be.  And that unfortunately happens
23  sometimes too.
24            So what happened to him is not something
```

Baldwin Court Reporting & Legal Video Services
1-800-248-2835

```
 1   that's, you know, that never happens in private
 2   medical practice. So I think that the care that
 3   he's received is equal to all of the other patients
 4   who walk in through our door.
 5       Q    As a physician, would you expect a non-
 6   physician to direct your medical care of a patient?
 7       A    I would not. I would prefer that not be
 8   the case. To date, it has not happened that way.
 9       Q    Would you allow that if one were to try?
10       A    No, I don't think so.
11       Q    You discussed earlier about whether Mr.
12   McCroy should be housed at an institution with an
13   ophthalmologist or optometrist on site or on staff.
14   To your knowledge, do any of the department of
15   corrections facilities have that?
16       A    I have no idea.
17       MS. CHOATE: I don't think I have any further
18   questions.
19       MS. de SAINT PHALLE: Nothing further.
20       MS. POWELL: I don't have anything else.
21       MR. TENNEY: No thanks.
22              (Discussion off the record.)
23       THE DEPONENT: I'll waive.
24              FURTHER DEPONENT SAITH NOT.
```

Page 69

```
 1   STATE OF ILLINOIS  )
                        )  SS
 2   COUNTY OF SANGAMON )

 3                 C E R T I F I C A T E

 4          I, Debra K. Baldwin, a Notary Public and

 5   Certified Shorthand Reporter and Registered

 6   Professional Reporter in and for said County and

 7   State do hereby certify that the Deponent herein,

 8   WILLIAM ZEH, M.D., prior to the taking of the

 9   foregoing deposition, and on the 22nd of June A.D.,

10   2004, was by me duly sworn to testify to the truth,

11   the whole truth and nothing but the truth in the

12   cause aforesaid; that the said deposition was on

13   that date taken down in shorthand by me and

14   afterwards transcribed, and that the attached

15   transcript contains a true and accurate translation

16   of my shorthand notes referred to.

17          Given under my hand and seal this 7th day

18   of July A.D., 2004.

19                       [signature: Debra K. Baldwin]

20                       Notary Public and
                         Certified Shorthand Reporter and
21                       Registered Professional Reporter

22

23   License No. 084-002128

                                 OFFICIAL SEAL
                                 DEBRA K. BALDWIN
                                 NOTARY PUBLIC, STATE OF ILLINOIS
                                 MY COMMISSION EXPIRES 5-20-2006
24
```

Page 70