E-FILED
Thursday, 19 April, 2007 11:28:40 AM
Clerk, U.S. District Court, ILCD

1    A.  Yes, I am.

2    Q.  What's the difference in your mind between an ADA

3    cell and a regular cell?

4    A.  Because of my decreased vision that I don't harm

5    myself in an ADA cell.

6    Q.  Okay.  I want you to tell me what the difference

7    is.  What do you understand the difference to be between an

8    ADA cell and a regular cell?

9    A.  A regular cell has sharp edges and sharp metal

10   protruding which I could cut myself.  And because of the

11   set-up in the cell, I'm hitting things.  I always hit

12   certain things.

13   Q.  Okay.  Tell me exactly, where would the sharp edges

14   be in a regular cell?

15   A.  On the bunk there is, the metal is almost razor

16   edge.  The cabinets are sharp corners.  The boxes, the way

17   the boxes must be situated become a hazard, so forth, there

18   the sharp edges, yeah, sharp edges because of the corners.

19   Q.  Okay.  And an ADA cell has what?

20   A.  It's open.  It's not where you have to maneuver or

21   navigate around objects, sharp objects.  It has no sharp

22   objects on the bunk, no razor edge corners on the bunks.

23   Q.  Are you telling me the bunks are different in an

24   ADA cell than they are in a regular cell?

31

1    A.  Yes, they are.

2    Q.  At every institution?

3    A.  This is the only institution I have been in with an

4  ADA cell.

5    Q.  Okay.  Do ADA cells here have different cabinets

6  than a regular cell?

7    A.  They are positioned differently.

8    Q.  Have you been in a regular cell here?

9    A.  Yes, I have.

10    Q.  And you have been in an ADA cell?

11    A.  Yes, I have.

12    Q.  Have you cut yourself in a regular cell?

13    A.  Yes, I have.

14    Q.  Have you cut yourself in the other cell?

15    A.  No, I haven't.

16    Q.  How did you cut yourself in the regular cell?

17    A.  On the beds where I told you, where the metal is

18  cut.  I cut -- when I come in, I hit my head because I have

19  no depth perception.  I cut myself when I grab certain edges

20  or I have to move around objects.  I hit the cabinets, the

21  way the toilet is and the cabinet is.  Like if I'm using the

22  bathroom to get up, I cut my head because of the cabinet is

23  right above the toilet.  And I have cut my head that way.  I

24  have cut my hands.  I have numerous injuries while I was in

32

1    a regular cell.

2        Q.   And that's all from bumping into things?

3        A.   Yes, bumping into things.

4        Q.   Are you saying that the placement of the bunks and

5    the placement of the cabinets is what causes you to bump

6    into them?

7        A.   And the hazardous, the sharp edges.  I don't know

8    if I can explain it to you correctly, but the bunks are cut

9    in such a way where you can actually cut things on them.  If

10   you wanted to cut your clothing or something, you could just

11   put it right there and cut it.  The way that they are made

12   it's, the way that the bunk, the beds is like they made them

13   as razors or something.  You can actually --

14       Q.   So if they put -- and you're saying that the type

15   of bunks that they have in the ADA cells is different?

16       A.   Yes.

17       Q.   Okay.  So if they put that type of bunk in a

18   regular cell, the regular cell would be fine?

19       A.   No, because the bunk, they don't have bunk beds in

20   ADA cells.

21       Q.   What kind of beds do they have?

22       A.   One bed.

23       Q.   So if they have one bed in a regular cell, that

24   would be fine?

                                                        33

1          A.   No.   That would not be the only problem.

2          Q.   What's the other problems?   Tell me all the

3     problems.

4          A.   The nearness of the cabinets and the protrusions of

5     them because the way you have to -- in the ADA cell

6     everything is positioned not in front of you, but to where

7     you approach it or you make a choice to approach it.   In the

8     regular cell you will, for a person such as myself that has

9     no depth perception and no night vision, snow blindness, if

10    I get out of bed, I will run into something because I can't

11    see.   In an ADA cell I can get out of bed and know there is

12    nothing in front of me.   It's because they are positioned

13    where nothing is in front of you.

14         Q.   Where is the cabinet in the ADA cell?   Do you have

15    one?

16         A.   Yes.

17         Q.   Well, where is it?

18         A.   It's on the wall, but it's not in front of you.   It

19    is away from you to the side.

20         Q.   So if they put the cabinet in a regular cell away

21    from you and to the side, that would be okay?

22         A.   Yes.

23         Q.   Okay.   Does your cellmate have any disabilities?

24         A.   No, he doesn't.

                                                              34

1     Q.  How is it that he is placed in the cell with you

2  then?

3     A.  I don't know.

4     Q.  He doesn't have a wheelchair?

5     A.  No.

6     Q.  And since -- you don't have bunks in there?

7     A.  Yes.  We have beds, but not bunk beds.

8     Q.  So there are two beds side by side rather than on

9  top of each other?

10     A.  Right.

11     Q.  Okay.  So nobody has a low bunk because you don't

12  need one?

13     A.  Right.

14     Q.  All right.  You have as part of your claim in this

15  case allegations that you have been denied privileges under

16  the Americans With Disabilities Act.  Do you know what

17  privileges?

18     MR. LONDRIGAN:  Well --

19     Q.  I mean, do you know what privileges are being

20  referenced?

21     MR. LONDRIGAN:  I am going to object to that because it

22  calls for a legal conclusion, but however you want to frame

23  that question, I am not instructing him not to answer.

24     MS. CHOATE:  Well, as far as the ADA goes, he did bring

35

1    this pro se, and he --

2        MR. LONDRIGAN:  He brought it pro se because he didn't

3    have a lawyer appointed by the court at that time.  He did

4    his best under the circumstances.  He does not hold himself

5    out to be a lawyer or a doctor.

6        MS. CHOATE:  My point was, Tom, that he did make

7    allegations and he alleged under the ADA --

8        MR. LONDRIGAN:  Well, you can ask him about the

9    allegations, but you can't ask him to give you legal

10   conclusions as to what's in violation and what's not.

11       Q.  I am not asking for a legal conclusion, sir.  I am

12   just asking, you have alleged in the complaint you have been

13   denied privileges which fall under the Americans With

14   Disabilities Act.  What privileges are you referencing

15   pursuant to those allegations?

16       A.  In regards to when I filed the complaint, it was

17   the fact that as proposed to all other disabilities, my

18   visual disability was not given the same consideration as

19   those with chronic illnesses or disabilities such as

20   specialty clinics and follow-up care and treatment.  They

21   did not treat my disability.  I had to complain, sustain

22   substantial injury before I would get treated whereas other

23   people with disabilities were scheduled for specialty

24   clinics and were scheduled for follow-up treatments on

36

1    predetermined schedules.  They had treatment plans whereas I

2    was not.  I had to sustain injuries.

3        Q.  So you're saying that you believe that your eye

4    condition requires that you to be seen in a specialty clinic

5    like other clinics?

6        A.  Yes.

7        Q.  Are you aware of what clinics currently exist?

8        A.  Yes.  There is a diabetic clinic.  There's a

9    hypertension clinic.  There's numerous clinics that exist.

10        Q.  Okay.  So part of your claim then is that you

11    believe that under the ADA you're entitled to an eye clinic?

12        A.  I'm not saying which type of clinic.  I am saying

13    that I have a disability called keratoconus that demanded

14    specialized treatment, and I should have been involved in

15    the specialty clinic to monitor my condition.

16        Q.  Well, are you aware of a specialty clinic that

17    exists that would encompass keratoconus?

18        A.  No, I don't.

19        Q.  You're saying that one should be created for you?

20        A.  No.  I am saying that I have been in facilities

21    where other inmates, specifically Hill, who had keratoconus,

22    and we were in a specialty clinic.  I was denied the

23    specialty clinic at Western.

24        Q.  Well, what clinic were you denied?

1      A.  Well, I am not saying clinic.  I don't know

2  what it was, but under Dr. Kehoe's care, me and the other

3  keratoconus patients were seen, if not monthly, bimonthly or

4  whenever to check the progression of our keratoconus.  We

5  were sent out, put on cornea machines to test the damage

6  that it was doing to our eyes to fit our contact lenses and

7  so forth.  So I am saying the care that I received with

8  other keratoconus patients at another facility I was denied

9  at Western.

10     Q.  And where did you receive that care?

11     A.  At Hill Correctional Center.

12     Q.  Okay.  So you're saying that you received different

13  care at Western than you received at Hill?

14     A.  Yes.

15     Q.  And that you were seen at the Kehoe Eye Center when

16  you were at Hill, correct?

17     A.  Yes.

18     Q.  And you were seen at the Kehoe Eye Center when you

19  were at Western?

20     A.  Yes.  I was seen at the Kehoe Eye Center.

21     Q.  For a certain period of time, right?

22     A.  One time.

23     Q.  Okay.

24     A.  Well, twice, I believe.

38

1    Q.  Okay.  And after that you were transferred to other

2    eye physicians, right?

3    A.  Not for care of the keratoconus for the injury

4    caused, for injuries caused.

5    Q.  What does that mean?  For injuries caused?

6    A.  That as a result of when I came to Western, as a

7    result of them not refitting me or continuing to refit of my

8    left contact lens and not having the equipment to know when

9    I had an eye infection, I sustained an injury to my left eye

10   that required, that precipitated the cornea transplant.

11   Q.  What's the injury?

12   A.  The doctor tells me that the contact lens tore into

13   my cornea membrane, and because of the untreated eye

14   infection, I almost lost sight in the eye, and that, and

15   that it caused so much damage to the eye, I no longer could

16   wear contact lenses.

17   Q.  Who told you that?

18   A.  Dr. Weller.

19   Q.  Dr. Weller?

20   A.  Yes.

21   Q.  Dr. Weller was at Quincy, correct?

22   A.  Yes.

23   Q.  Okay.  So getting back to this ADA, you're saying

24   that part of your claim under the ADA is that you wanted to

39

1  continue to be seen by Dr. Kehoe?

2      A.  No.

3      Q.  Well, what is it?  You wanted to be seen by

4  someone?

5      A.  I wanted the treatment of my disease to continue.

6      Q.  Of the keratoconus?

7      A.  Yes.

8      Q.  And you're saying that it wasn't treated?

9      A.  No, it was not.

10     Q.  Do you know when was the last time you saw

11  Dr. Kehoe or someone from his office?

12     A.  It was approximately in 2002.  I think in March of,

13  April or March of 2002.

14     Q.  Okay.  Do you know when you saw Dr. Weller?

15     A.  In February or March of 2002.

16     Q.  Did you have any complaints with respect to

17  Dr. Weller?

18     A.  He only, he, he treated the eye infections and gave

19  recommendations.

20     Q.  I know.  Do you have any complaints about

21  Dr. Weller?

22     A.  No.  Pardon me.  No complaints.

23     Q.  Okay.  Do you recall when it was thereafter that

24  you started being seen by someone in Springfield?

                                                    40

1      MR. LONDRIGAN:  You skipped Jacksonville.

2      A.  Pardon me?

3      MR. LONDRIGAN:  I am saying she has jumped --

4      MS. POWELL:  That's okay.

5      MR. LONDRIGAN:  -- from Quincy to Springfield.

6      Q.  Do you know when it was that you started seeing

7   someone in Springfield?

8      A.  After the surgery, after I was given the

9   transplant.

10     Q.  Well, you saw someone before the transplant because

11  the doctor that gave you the transplant was Dr. Fedder who

12  was in Springfield, right?

13     A.  No.  He was not in -- when I seen him, he was not

14  in Springfield.

15     Q.  Where was he?

16     A.  He was in Jacksonville.

17     Q.  Oh, so he saw you in Jacksonville; is that right?

18     A.  Yes.

19     Q.  Okay.  Did you ever see him while he was in

20  Springfield?

21     A.  After the surgery.

22     Q.  Okay.  So the same doctor?  He has more than one

23  office?

24     A.  Well, Prairie Eye Center has more than one.

41

1    Q.   Right.  It is the same group of physicians.   They

2    just have two locations, right?

3    A.   Yes.

4    Q.   Isn't Jacksonville closer to Western than

5    Springfield?

6    A.   Yes.

7    Q.   Are you complaining that you had to go to

8    Jacksonville?

9    A.   No.

10   MR. LONDRIGAN:  I am going to object to that question.

11   Q.   Are you complaining -- I can ask him if I want to.

12   MR. LONDRIGAN:  I know you can ask him if you want to.

13   I am going to articulate the objection.  The location of

14   Jacksonville is unrelated to any of the complaint that he

15   either he filed pro se or that I filed.  The issue in this

16   complaint is not keeping a single treating physician so he

17   could be followed up on and shopping ophthalmologists in

18   different localities to get different opinions from these

19   doctors.  It's not the location of the doctor.  It is

20   continuing to rotate him from place to place and physician

21   to physician.  And I don't think that's a fair question to

22   ask him whether or not he had objected to going to

23   Jacksonville because it is closer.  That's a non-issue in

24   this case.

42

1    Q.  Do you have any complaints about the physicians at

2  the Prairie Eye Center?

3    A.  No.

4    Q.  Do you know if anyone at the Kehoe Eye Center that

5  specialized in or qualified to perform a corneal transplant?

6    A.  No, I do not.

7    Q.  Do you know if anyone from Dr. Weller's office is

8  qualified to perform a corneal transplant?

9    A.  He named someone, but I do not know the name.

10    Q.  Do you recall the name Dr. Losey?

11    A.  No, I do not.

12    Q.  When Dr. Zeh left the Prairie Eye Center, did you

13  personally know whether or not anyone there was qualified or

14  specialized in corneal care?

15    A.  No, I do not.

16    Q.  Do you have a recollection of going to see

17  Dr. Staley or Dr. Kanuck?

18    A.  Yes, I do.

19    Q.  How many times did you see them?

20    A.  I believe one time.

21    Q.  And do you remember why you went there?  For what

22  condition?

23    A.  For a second opinion.

24    Q.  Okay.  On the day that you went there do you recall

43

1  seeing Dr. Brown?

2      A.  No, I don't.

3      Q.  You don't recall seeing Dr. Brown in the waiting

4  room?

5      A.  Oh, yes.  Yes, him and his wife.  Yes, I did.

6      Q.  Dr. Brown is actually a patient there himself,

7  right?

8      A.  Yes.

9      Q.  And actually the day you went there Dr. Brown was

10 sitting there in the waiting room, wasn't he?

11     A.  With his wife.

12     Q.  Yes.  And you waved at him?

13     A.  No, I did not.

14     Q.  You did not wave at him?

15     A.  No.

16     Q.  You did not see him sitting there?

17     A.  No.  The police told me he was sitting there.

18     Q.  Did he look at you and say anything to you?

19     A.  No, he did not.

20     Q.  Had you ever seen Dr. Brown's wife before?

21     A.  No, I did not.

22     Q.  Are there any other privileges that you're

23 complaining about with respect to the American With

24 Disabilities Act?

44

1    A.  As I do not know what privileges I am entitled to,

2    I can't say at this time.

3    Q.  You also make reference to public accommodations

4    being denied.  What public accommodations do you believe

5    were being denied?

6    A.  Public accommodations?  I am not in the public.

7    MR. LONDRIGAN:  What's the foundation?

8    MS. POWELL:  It's in your complaint.

9    MR. LONDRIGAN:  Well, then we drafted it, and then

10   you should ask me or file a motion with respect to that

11   complaint.  If it in his complaint and it's his terminology,

12   he can answer that question.

13   MS. POWELL:  Well --

14   MR. LONDRIGAN:  He can't answer this question because

15   it calls for a legal conclusion based upon a pleading that

16   he did not file.

17   MS. POWELL:  That's okay.

18   Q.  Are you aware of any public accommodations that

19   you're being denied?

20   A.  No, I am not.

21   Q.  Other than the positioning of the beds and the

22   positioning of the cabinets in your cell, is there anything

23   that you can do in your ADA cell that you can't do in your

24   regular cell?

45