E-FILED
Thursday, 19 April, 2007 11:30:44 AM
Clerk, U.S. District Court, ILCD

1     Q.   Do you do legal research for anything other than

2  this case?

3     A.   Yes.

4     Q.   Do you do research regarding your criminal

5  conviction?

6     A.   Yes.

7     Q.   Do you have an attorney for that as well?

8     A.   No, I do not.

9     Q.   So you do that pro se as well?

10    A.   Yes.

11    Q.   Do you have any current litigation pending with

12  respect to your criminal matters?

13    A.   Yes, I do.

14    Q.   Where is that pending?

15    A.   The Northern District Court, Eastern

16  Division -- well, no, Seventh Circuit Court of Appeals.

17    Q.   Okay.  Do you know what the case number is on that?

18    A.   No, I don't.

19    Q.   How long have you been working on that case?

20    A.   Six years.

21    Q.   When you go to the yard are there other inmates in

22  the yard?

23    A.   I don't go to the yard.

24    Q.   Did you go to the yard when you were at Western?

61

1      A.   Intermittently, yes.

2      Q.   When you would go to the yard were other inmates in

3  the yard?

4      A.   Yes.

5      Q.   How many inmates would be out there?

6      A.   I don't know, maybe twenty-five, thirty

7  approximately.

8      Q.   Are you allowed to talk to other people while you

9  are out there?

10     A.   Yes.

11     Q.   What types of activities would you do when you were

12  in the yard?

13     A.   Nothing.

14     Q.   You didn't do anything?

15     A.   Other than walk and sit down.

16     Q.   So would you walk around the outside perimeter of

17  the yard?

18     A.   No.

19     Q.   What did you do?

20     A.   Probably walk to where the seats were.

21     Q.   Did you ever lift weights out there?

22     A.   No.

23     Q.   You have never lifted weights?

24     A.   No.  What do you mean by ever lifted weights?

62

1    Q.  Have you ever lifted weights in the yard or

2  anywhere else while you were an inmate at Western Illinois

3  Correctional Center?

4    A.  No.  No.

5    Q.  Have you lifted weights since you have been here?

6    A.  No.

7    Q.  As of the present date do you have any restrictions

8  on your activities?

9    A.  I am physically challenged.  That's about it.

10    Q.  Has any doctor told you that you can't do any

11  specific activity or anyone else here at Pinckneyville?

12    A.  No.

13    Q.  Are you allowed to keep your cane in your cell?

14    A.  Yes.

15    Q.  And you're allowed to wear your glasses in the

16  correctional center?  Is that accurate?

17    A.  Yes.

18    Q.  So do you use your cane when you walk around at the

19  facility?

20    A.  Yes.

21    Q.  Did you have that cane when you were in a regular

22  cell at Pinckneyville?

23    A.  For a short period of time.  At Pinckneyville?

24    Q.  Right.

1     A.  For a short period of time, maybe two weeks.

2     Q.  And then what happened?

3     A.  They moved me to a bigger cell.

4     Q.  While you were in the regular cell did you have

5  your cane?

6     A.  Yes.

7     Q.  Did you ever try to use that cane to assist you in

8  not bumping into things while you were in that cell?

9     A.  You can't do that.

10     Q.  Why not?

11     A.  Because there is not enough room.  The cane will

12  get trapped under things.  There's elevations, and like this

13  table, I try to use the cane, and it would go, it will keep

14  going, but there, it will be an obstruction.  Do you

15  understand what I am saying?

16     Q.  Yes.

17     A.  So I can't -- you can't use the cane in the small

18  cell because there will be an obstruction.  Everything is

19  elevated.  So the cane wouldn't detect the obstruction.

20     Q.  Do you know the difference in the sizes of the

21  cells between an ADA cell and the regular cell?

22     A.  Twice the size.

23     Q.  The ADA cells are twice the size?

24     A.  Yes.

                                                              64

1    Q.  Is it your understanding that at this time you

2    think that you are not medically unassigned?

3    A.  Yes.

4    Q.  Okay.  Do you have a property box?

5    A.  Yes.

6    Q.  Are you able to lift that?

7    A.  No.

8    Q.  Who lifts it for you?

9    A.  Attendants.

10    Q.  Who would that be?

11    A.  They hire attendants.  They have attendants

12    specially assigned to persons such as myself.

13    Q.  Have you ever lifted your property box?

14    A.  Not since they -- well, only when forced to and

15    very sparingly.  I know that with my eyes that I shouldn't.

16    I believe I am still under restrictions even though no one

17    has said that, but I have only if an attendant is not

18    around, but normally they are when I move.  I only have to

19    lift it when I move from cell to cell.

20    Q.  What's in your property box?

21    A.  Everything, food, clothing, hygiene, so on and so

22    forth, shoes.

23    Q.  Did you have attendants when you were at Western to

24    assist you with your property box?

65

1      A.   No.

2      Q.   Did you ever ask anybody to help you with your

3   property box while you were at Western?

4      A.   The police did.

5      Q.   Correctional officers?

6      A.   Yeah.

7      Q.   Do you consider yourself to be disabled?

8      A.   Yes, I do.

9      Q.   Can you tell me specifically what you consider your

10   disabilities to be?

11      A.   I am visually impaired.

12      Q.   Okay.  Other than your visual impairment, do you

13   have any disabilities?

14      A.   Other than -- you said that twice.

15      Q.   Other than your visual impairment, do you have any

16   other disabilities?

17      A.   No.

18      Q.   And I think you told me this at the beginning of

19   the deposition.  You are able to see hand movements?

20      A.   Yes.

21      Q.   Shapes, objects, colors, correct?

22      A.   Yes.

23      Q.   Okay.  Can you see the walls in this room?

24      A.   Yes.

66

1    Q.  What color are they?

2    A.  Well, they're blue and white.

3    Q.  Okay.  And you can see what color my shirt is?

4    A.  Gray, I believe.

5    Q.  Okay.  Are there any colors that you can't see?

6    A.  When the colors are closely matched, I can't see.

7    Q.  All right.  So, well, you have on a blue shirt, and

8    your attorney has on a blue shirt.  Can you tell that

9    they're different shades of blue?

10    A.  Yeah.

11    Q.  Okay.  So when you say they are closely matched,

12    what does that mean?

13    A.  What I mean is when they're different degrees of a

14    color or if they are up against something or if I was to

15    have two things that are closely matched together, I

16    wouldn't be able to see.

17    Q.  Okay.  You told us earlier as well that you have

18    had some difficulties with depth perception?

19    A.  Yes.

20    Q.  What do you mean by that?

21    A.  I can't gauge the distance because I only have one

22    eye.  I can't gauge the distance between objects.

23    Q.  Okay.  Can you explain that to me better?

24    A.  I can't -- like I know this table is here.  But in

67

1   order to, whereas if I want to sit something down on it, I

2   could miss it, or when I am pouring a glass of water, I can,

3   to pour into a cup, I can miss the hole in the cup, or if

4   I'm walking, I can hit something even though I see a pole, I

5   know it is there, but I can run into it because I didn't, I

6   cannot gauge the distance to it.

7        Q.  Okay.  Is that what you use your cane to help you

8   with?

9        A.  Yes.

10       Q.  Okay.  Do your glasses impair your ability to judge

11  distances?

12       A.  No.  I am light sensitive.

13       Q.  But I am just asking.  Does the fact that you wear

14  dark glasses impair your ability to judge distances?

15       A.  No.

16       Q.  You said that you're enrolled in the early release

17  program.  What does that mean?

18       A.  Well, I am in school.  I go to college.

19       Q.  Does the early release program mean the same thing

20  for everyone who is an inmate here?

21       A.  No.

22       Q.  So for you it means you're going to school, right?

23       A.  No.  There is only one early release program in

24  Pinckneyville and that is school.

                                                          68

1    Q.  Okay.  Is it different at other correctional

2    centers?

3    A.  Yes.

4    Q.  All right.  So at this particular facility in order

5    to be enrolled in the early release program, you have to

6    take classes?  Is that accurate?

7    A.  Yes.

8    Q.  Is there any other part of the early release

9    program that you have to complete?

10    A.  No.

11    Q.  All right.  And how long have you been enrolled in

12    that program?

13    A.  Approximately a year.

14    Q.  Now, if someone -- can someone have a job and be in

15    the early release program?

16    A.  No.

17    Q.  You can't do both?

18    A.  No.

19    Q.  Why not?

20    A.  Because the early release program is a full-time

21    assignment, so you can't have a job and be in the early

22    release program.

23    Q.  Okay.

24    A.  Here.

69

1    Q.   Okay.  What sort of classes are you taking?

2    A.   Right now I am taking American Government and

3   Marriage and Family.

4    Q.   I didn't catch that?

5    A.   Marriage and Family.

6    Q.   American Family?

7    A.   Marriage and Family.

8    Q.   Marriage and Family?  Okay.  I am sorry.  And how

9   long do you go to school a day?

10    A.   Roughly two hours a day at night.

11    Q.   Do they have classes during the day, too?

12    A.   Yes, they do.

13    Q.   You get to decide when you get to take those

14   classes?

15    A.   I am not eligible for those classes.

16    Q.   Why not?

17    A.   One, my visual limitations will not allow me.

18   Those are all day classes.  I am not -- those are classes,

19   and my visual impairment will not allow me to be able to

20   take the class.

21    Q.   Well, why can't you take classes during the day if

22   you can take classes at night?

23    A.   Because through the use of my contact lenses, I can

24   have somewhat better vision for an hour and a half to two

70

1    hours at night, and that allows me, or in a twenty-four hour

2    period, that allows me to be able to take a night class, but

3    if I am required to be in a class for eight hours a day, and

4    I can only see for two hours, I would be a danger to myself

5    and those around.

6         Q.  At this time are you only wearing your contact

7    lenses two hours day?

8         A.  That's all I can wear them, approximately one hour

9    or one and a half to two hours.

10        Q.  And who keeps track of how long you are wearing

11   those contact lenses?

12        A.  I do.

13        Q.  And who said you could only wear them for an hour

14   and a half to two hours a day?

15        A.  My eyes.  My eye.  Pardon me.

16        Q.  What happens after you wear them for that long?

17        A.  It begins to hurt.

18        Q.  Is that because the contact lens -- your eye

19   becomes sore from the fact that there is a lens in it or

20   does it have to do with reading for so long that it gets

21   tired?

22        A.  I don't know.  Doctors told me that it's not

23   uncommon for keratoconus patients to become resistant to

24   contact lenses because of all of the scarring and so forth.

71

1    So that may be one of the reasons.  I don't know the exact

2    reason why.  This is what some of the doctors have told me.

3        Q.  How long have you only been able to wear them for

4    the one and a half to two hours?

5        A.  Since I went through a period at Western for, I

6    think, two years or approximately two years when I didn't

7    have contact lens or lenses.  And when they finally did fit

8    me or rather I only had the right contact lens and didn't

9    fit me correctly, and when they did finally fit me, my eyes

10   had changed so bad, my eyes had changed so much that I could

11   only wear it, the right contact for one and a half hours or

12   two hours.

13       Q.  How long has it been that way?  How long has it

14   been that you can only wear it for one and a half hours or

15   two hours?

16       A.  Since I was fitted for -- well, the old contact

17   lens did the same thing, the ill-fitting one I had at

18   Western, I couldn't wear that one.  And then when I got

19   fitted for this one, ever since I have been fitted for it,

20   I can't.

21       Q.  When is the last time you had a contact lens you

22   could wear for more than two hours?

23       A.  When I was at Hill Correctional Center.

24       Q.  And how long could you wear it then?

72

1        A.   Approximately seven hours.

2        Q.   And that would be in the right eye, correct?

3        A.   No, both eyes.

4        Q.   Oh, in both eyes?  You filed a grievance in June,

5   it says June 7 of '04, you filed a grievance suggesting that

6   you wanted yard privileges?

7        A.   Yes.

8        Q.   Do you recall that?

9        A.   Yes.

10       Q.   Before June 7 of '04 did you have any yard

11  privileges?

12       A.   They were taken away from me.

13       Q.   Why was that?

14       A.   I don't know.

15       Q.   And was that someone with the Department of

16  Corrections that took away your yard privileges?

17       A.   No.  Someone in the infirmary did.

18       Q.   Who was that?

19       A.   They would not tell me.  They just -- as I told you

20  before, I was going to the yard every other day from the

21  infirmary.  And all of a sudden I was told I couldn't go.

22       Q.   Who told you you couldn't go?

23       A.   The correctional officers.  It was a medical order

24  that I could not go.  And when I asked the medical staff, no

73

1    one knew why I couldn't go, but no one would say I could go.

2        Q.  So you don't know why you couldn't go?

3        A.  No.

4        Q.  What about --

5        MR. LONDRIGAN:  They were working together.

6        Q.  What about recreation?  You said you filed a

7    grievance you wanted to participate in recreation?

8        A.  Yes.

9        Q.  What recreation?

10       A.  That yard, recreation, use the phone.  I couldn't

11   use the phone in the infirmary.

12       Q.  How long did that last?

13       A.  Let's see.  Approximately almost a year, I think,

14   almost a year because, yeah, almost a year.

15       Q.  It was a year after June 7 of '04?

16       A.  It was the year before.

17       Q.  Yeah before?  So you're saying you waited a whole

18   year to file a grievance on that?

19       A.  I thought you meant the phone, the phone situation

20   had been for a year.  The yard situation had been for

21   approximately six months.  Yes, I did wait.

22       Q.  So from December of '03 through June of '04 you did

23   not have any yard privileges?

24       A.  Right.

1       Q.  Were you in segregation during that time?

2       A.  Part of that time, yes.

3       Q.  Do you normally get yard privileges while you are

4   in segregation?

5       A.  I should have, but I didn't.

6       Q.  Does someone who's in segregation normally have

7   phone privileges?

8       A.  No.

9       Q.  And then you also requested a special permit for

10  your television?

11      A.  Yes.

12      Q.  And you got that from Dr. Brown?

13      A.  No.

14      Q.  You never got that from Dr. Brown?

15      A.  No.  I went to seg because of it.

16      Q.  So you don't recall ever having a permit from

17  Dr. Brown for, regarding your television placement?

18      A.  No.

19      Q.  There has been testimony in this case that you

20  requested a transfer to another correctional center?

21      A.  Yes.

22      Q.  From Western?

23      A.  Yes.

24      Q.  Do you recall where you were wanting to go?

1    A.  Dixon.

2    Q.  Why did you want to go to Dixon?

3    A.  Because I believe I could get better medical care

4 at Dixon.

5    Q.  Why do you believe that?

6    A.  Because Dixon is one of IDOC's medical facilities

7 that has, take care, that's specifically designed and

8 equipped to handle inmates with medical problems.

9    Q.  Do you have any personal knowledge as you sit here

10 today that Dixon has different ophthalmologists or specific

11 people that can take care of keratoconus?

12    A.  Yes.

13    Q.  Who?

14    A.  I don't know who, but I know that they did because

15 I was at Dixon.

16    Q.  Who took care of your eyes at Dixon?

17    A.  I can't remember the name.

18    Q.  You don't remember the names of your eye doctors

19 there?

20    A.  No.

21    Q.  Were they people who were working on site?

22    A.  Yes.

23    Q.  And you think those people were ophthalmologists?

24    A.  I don't know.  I don't recall.

76

1    Q.  And do you know whether those people are even still

2    there?

3    A.  No, I don't.

4    Q.  Do you know whether those people were there when

5    you filed your request for a transfer?

6    A.  No, I don't.

7    Q.  Who are you seeing right now?

8    A.  As far as ophthalmologist or --

9    Q.  Right.  For your eyes who do you see right now?

10   A.  Dr. Williams.

11   Q.  Okay.  Is that the same doctor that you saw when

12   you were at Menard?

13   A.  Yes.

14   Q.  Have you seen anyone else other than Dr. Williams

15   since you were transferred from Western?

16   A.  Since I was transferred from Western?

17   Q.  Right.

18   A.  Dr. Ortiz at Marion Eye Center and Dr. Henderson.

19   Q.  Okay.  Are they both at the Marion Eye Center?

20   A.  Yes.

21   Q.  And are those the physicians who obtained your

22   prosthetic eye?

23   A.  No.  Dr. Baker, I believe.  No, not Dr. Baker.

24   Q.  For what specific reason did you see Dr. Ortiz and

77

1    Dr. Henderson?

2         A.  To evaluate may keratoconus and to fit me for a

3    contact lens.

4         Q.  Okay.  And have you ever spoken with Dr. Rayford?

5         A.  Yes, I have.

6         Q.  When did you speak to Dr. Rayford?

7         A.  When I first arrived here.

8         Q.  Did you ever speak to Dr. Rayford while you were an

9    inmate at Western Illinois Correctional Center?

10        A.  No, I did not.

11        Q.  What did you discuss with Dr. Rayford while you

12   were here?

13        A.  My concerns about placement in the ADA cell,

14   placement with problems with cellies, my visual, my visual

15   impairments, the fact that my safety glasses were taken from

16   me when I first got down here, just problems with that.  He

17   knew about my condition and ways to alleviate any more

18   problems that I may have here with people not understanding

19   what condition my eye was.

20        Q.  And did he help you?

21        A.  He, to my understanding, he informed the staff

22   about my need for an ADA cell.  They returned my safety

23   glasses and gave me low bunk low gallery permit and a

24   physically challenged permit.

78

1    Q.  So based on your personal interactions with

2    Dr. Rayford, do you have any complaints about him in this

3    case?

4    A.  Yes.

5    Q.  What is that?

6    A.  That he denied me a transplant without me ever

7    seeing him.

8    Q.  Well, was that based on the denial from May of '02?

9    A.  Yes.

10   Q.  Okay.  Other than that, are you complaining about

11   anything related to Dr. Rayford?

12   A.  I am not aware of all of his actions.  So I can't

13   answer.

14   Q.  Are you aware of any other actions in this case

15   other than the denial?

16   A.  No.

17   Q.  What about Dr. Sims?

18   A.  In regards to what?

19   Q.  Well, do you have any specific complaints about

20   Dr. Sims?

21   A.  He denied me treatment.  He obstructed me obtaining

22   treatment.

23   Q.  Tell me specifically what treatment he denied you.

24   A.  I had been scheduled several times to be fitted for

79