1  Q.  You would need a permit for that?

2  A.  Yes.

3  Q.  You do have a permit for your cane?

4  A.  Yes.

5  Q.  Did you ever physically have a permit to have your
6  television a place other than where it is normally?

7  A.  No, I didn't.

8  Q.  Okay. But you said the assistant warden gave you
9  permission to put the television on the table near you?

10  A.  Yes.

11  Q.  Are there any other complaints about her?

12  A.  Again, as I don't know her extent or involvement in
13  things that happened subsequently during the certain period
14  of time, I can't say.

15  Q.  Now, I have a Bryon Law. I know you mentioned him
16  earlier, that was the one with you doing the drug test, the
17  urine test. What are your complaints about him relating to
18  this lawsuit, if you know?

19  A.  His involvement is the fact that I told him about
20  the situation and asked to be moved, and he told me I either
21  had to fight or commit a disciplinary infraction in order to
22  get away from my cellie even though I tried to tell him that
23  we, you know, I feared that something would happen to me.
24  And he knew about my, because he knew about my condition,

125

knew about the condition of my eye, he did nothing about it and so forth. There is another incident where he took my sunglasses, shook me down and gave me a ticket for them, you know.

    Q. Did you have a permit for the sunglasses at that time?

    A. Yes. Yes.

    Q. So when your cell was shaken down and he took -- you were shaken down? Which was it, you or the cell was shaken down?

    A. The cell was shaken down.

    Q. Did you have a permit with you that Lieutenant Law could look at?

    A. Yes.

    Q. You showed that to him?

    A. Yes.

    Q. And he still took your glasses?

    A. Yes.

    Q. Did you get them back?

    A. No.

    Q. You never got your sunglasses back?

    A. No.

    Q. Do you remember when that happened?

    A. No. I don't remember exactly, but I know I got a

```
 1  ticket for them.  So I pretty well remember it.  The ticket
 2  would reflect when.
 3      Q.  Was it before or after your transplant?
 4      A.  It was after.
 5      Q.  So after?  Was it before or after you were placed
 6  in gen pop?
 7      A.  After.
 8      Q.  So it was during the time between when you were
 9  sent to gen pop in June of '04 and you had the altercation
10  with Dunham, Durham -- Dunham or Durham?
11      MS. POWELL:  Durham.
12      Q.  In September of '04?  Is that fair?
13      A.  Yes.  You mean altercation meaning?
14      Q.  Well, you got a ticket for fighting, too, right?
15      A.  Right.
16      Q.  I mean the fight with you and Durham?
17      A.  Well, it wasn't a fight.
18      Q.  But you did get a ticket, right?
19      A.  Yeah.
20      Q.  Okay.  Now, you also said that he knew about your
21  medical condition.  How did he know about your medical
22  condition?
23      A.  Because I was the only inmate allowed allowed to
24  have tape in the institution, to wear an eye shield, to wear
```

127

1  sunglasses. Sunglasses are against IDOC rules. Inmates
2  cannot wear sunglasses. And it is not every day that you
3  would see an inmate with an eye patch or being able to go to
4  a nurse and say, "I need," or to him and tell him to call a
5  nurse and say, "I need tape." Inmates are not allowed to
6  have tape, plus him as a zone lieutenant to several parts,
7  he was at the infirmary. He knew my condition.
8      Q.  Did you ever tell him about, other than the fact
9  that he saw all of these things, did you ever tell him about
10 your eye condition?
11     A.  No.
12     Q.  And you said earlier, you were talking about the
13 people in the health care unit, you were upset that they had
14 given, I believe, CO Wilson information about your medical
15 condition; is that correct?
16     A.  Yes.
17     Q.  And yet your understanding is that Lieutenant Law
18 would be given this information?
19     A.  No. I don't know if he was or wasn't, but, you
20 know, he may have. I can't say from personal knowledge that
21 he was given this information. All I am saying is that he
22 knew that I had a problem with my eye.
23     Q.  From looking at you?
24     A.  Right.

128

```
 1        Q.   Okay.  And who gave you the sunglasses?
 2        A.   Prairie Eye Center.
 3        Q.   So it was an outside physician?
 4        A.   Right.
 5        Q.   And you said that at the time you had a permit with
 6   you in your cell for those glasses?  Is that fair?
 7        A.   Yes.
 8        Q.   Okay.  And then you also said that you told
 9   Lieutenant Law about your problems.  Are you meaning the
10   problems with your cellmate?
11        A.   Yes.
12        Q.   What did you tell Lieutenant Law?
13        A.   I told him that I felt that my cellie was violent.
14   That your officers had told me, Officer Kellerman in
15   particular told me about him being transferred from
16   Galesburg or Hill for fighting, him getting, just getting
17   out of seg for fighting, him fighting while he was in seg.
18   And I felt that, "Hey, because you all had told me to be
19   careful, why is it that you all -- your officers told me to
20   be careful.  Why is it that you all won't move him?"  He is
21   sitting there telling me, "Well, he is going to home in
22   thirty days, just, you know, just let him, you know, let
23   him, you know, unless you want to go to seg or you want to
24   commit a disciplinary infraction, just wait it out.  He is
```

129

1  going home in thirty days."
2      Q. So he basically told you that you could go to seg
3  if you wanted, you know, or stick it out, correct?
4      A. Yeah.
5      Q. Okay. Did you believe at the time that you got up
6  out of your bunk to talk to Durham over his television set
7  that he was going to punch you out?
8      A. No.
9      Q. Let me ask you about CO Kellerman. You just
10 mentioned him. You said that he warned you about Durham
11 or told you his history?
12     A. Yes.
13     Q. When was that? How soon after Durham got in your
14 cell?
15     A. He told me when I first -- the 22nd, that's when he
16 told me.
17     Q. The 22nd of?
18     A. Of September. The day before the incident.
19     Q. Is that the day you talked to Law?
20     A. Yeah. Yeah.
21     Q. And you talked to Law based on what CO Kellerman
22 told you?
23     A. I talked to Kellerman on the wing. I don't know if
24 you are familiar with how the units are set up.

```
 1       Q.  Yes.
 2       A.  Kellerman was the wing officer.  I talked to
 3   Kellerman on the wing.  He said, "Listen, this is the
 4   situation," and what I told you about him giving me his
 5   history and, "either stick it out, go to seg, refuse
 6   housing, or you fight," you know, but, "go out and ask
 7   Lieutenant Law because he the one that got the power.  I
 8   don't have the power."  So that's when I went out and told
 9   Lieutenant Law.
10       Q.  Now, you also got CO Kellerman in this complaint.
11   Do you know why he is in there?
12       A.  Because he ignored the imminent danger to my
13   safety.
14       Q.  After he had told you about Durham?
15       A.  No, even if he hadn't told me about Durham, it's,
16   what is a correctional officer for if not -- is he here
17   just to stand around?
18       Q.  If you don't know that, then that's not what we are
19   here to talk about.  We are here to talk about what you
20   know.  So Kellerman didn't protect you from Durham
21   basically?
22       A.  Yes.
23       Q.  How about Judith Wilson?  You made some comments
24   about her with regards to the health care unit or the
```

```
 1   infirmary. Are your complaints about Wilson relating to the
 2   time you were in the infirmary or gen pop or both?
 3        A.  Well, as a result of what she he did to me in
 4   general population, Judith Wilson was placed in placement
 5   where she originally came from.  Now, I don't know to what
 6   extent or to how Durham became my cellie, but Judith Wilson
 7   was the person who ultimately had authority to place him in
 8   my cell.
 9        Q.  So you think she was working in placement at the
10   time he was placed in your cell?
11        A.  I know she was working in placement.
12        Q.  Okay.  How do you know that?
13        A.  Because that's where she was.  That's where she
14   originally was.  That's the only -- I don't know if you
15   can -- when she worked placement, it's every -- that's what
16   the police told me.  That's all I can say.
17        Q.  So somebody told you she was in placement?
18        A.  Yes.
19        Q.  Where is placement relative to where you were
20   housed in the infirmary?  Do you know?
21        A.  It's the same building.  Yeah.  It is the same
22   building.  It's the same building, but it's compartmental.
23        Q.  So you believe that Judith Wilson put you in the
24   cell with Durham?  Is that fair?  As a placement officer or
```

```
 1  what?  I am not --
 2      A.  I believe that, yeah.  I believe she put him in the
 3  cell out of seg.
 4      Q.  Okay.  What about other complaints about her?  You
 5  talked about your dealings with her in the infirmary.  What
 6  did she do to you there?
 7      A.  She just harassed me, retaliated against me.  Most
 8  of my tickets for the past two years are from Judith
 9  Wilson.  She would shake down my property every five days, a
10  lot things.  First she give me a ticket for one thing that
11  she has found when she shook me down and leave something
12  else, and then come back in five days later and write me a
13  ticket for something else, besides from leaving the lights
14  on, harassing me, waking me up.
15      Q.  When did she wake you up?  Specifically a certain
16  time?
17      A.  Every morning she would wake me up.  She
18  called -- well, I supposed to go on a med furlough.  She
19  waited even though they tell officers at roll call who goes
20  on med furloughs on the wing, she waited until five minutes
21  to wake me up and told me if I couldn't wash up or brush my
22  teeth and get ready to go for med furlough, I had to get to
23  the administration building.  I asked for a supervisor and
24  told them I was having problems with her, and I felt she was
```

```
 1  harassing me.  She did it on purpose.  That's when they put
 2  me in seg.  I couldn't go to, go to, the med furlough.  And
 3  I went on a hunger strike as a result of that.
 4       Q.  Isn't it true though that you refused to go to the
 5  med furlough without taking a shower?
 6       A.  No, I didn't.
 7       Q.  So you said, "Fine, I don't need to brush my teeth
 8  or take a shower.  Let's go"?
 9       A.  No.  What I said was this:  When the lieutenant
10  came to my cell I said, "I am having problems with CO
11  Wilson."  At the time I was pro se.  I had told the
12  lieutenant that I was presently seeking a preliminary
13  injunction in federal court to stop her from harassing me.
14  In Western once you say you're going to sue somebody, you
15  immediately get a ticket for threats and intimidation
16  because they interpret you saying that, "I am going to sue
17  you," as a threat and intimidation.  And they immediately
18  placed me in seg.
19       Q.  Let me ask you this:  Where is the shower relative
20  to your cell in the infirmary?
21       A.  Five feet away.
22       Q.  It's not in the same room though, right?
23       A.  No.
24       Q.  Okay.  Do you have to -- what do you have to do in
```

134

order to get in the shower? Not, I don't mean the things normal people do to get in the shower, take your clothes off, that sort of thing. I mean, does someone have to let you in the shower?

A. It's open.

Q. It's always open?

A. Yeah.

Q. Is there any sort of schedule that people go by as to who gets to shower when or when the showers are to be used?

A. At the time they denied me a shower that's the time we normally take showers.

Q. So it was usually in the morning?

A. Yeah.

Q. And had you taken a shower the day before?

A. Yes.

Q. Okay. When did you first have problems with CO Wilson?

A. After she came, she came back, and I heard, overheard the conversation between her and Nurse Shaw.

Q. And you had no -- do you remember approximately when that was in relation -- would it have been before your transplant or after?

A. No. I have it documented in one of my grievances.

135

```
 1   It was after my transplant.  I have it documented in one of
 2   my grievances, but I can't remember.  I think it was May.
 3        Q.   May?
 4        A.   This is approximate.
 5        Q.   That's fair.  I don't always remember dates
 6   either.  That's fair.  Now, you heard her talking to Nurse
 7   Shaw, correct, and then you filed a grievance against her?
 8        A.   No.  I heard her talking to Nurse Shaw.  At the
 9   time I did not know that -- I did not know their
10   relationship.  And I did not know that she would harass me.
11   My medical history and lawsuit were well known.  That didn't
12   bother me.  I did not know at the time that she would harass
13   me.  I did not know of their relationship outside of the
14   facility nor did I know that she was even a union
15   representative and she would end up harassing me the way she
16   did.  It wasn't until that happened that I filed a
17   grievance.
18        Q.   So after she harassed you you filed a grievance?
19        A.   Yes.
20        Q.   How about Pam Grubman?  Now, this is someone from
21   Menard; is that right?  Do you remember Pam Grubman?
22        A.   Yes.
23        Q.   Do you know what Pam Grubman's job was?
24        A.   Yes, I do.
```

1    Q.  What was that?

2    A.  She is the health care administrator at Menard.

3    Q.  So she basically had Deb Fuqua's job, but at

4 Menard; is that right?

5    A.  Right.

6    Q.  Now, do you know why she's been named in the

7 amended complaint?

8    A.  Again, what I will say to you is that I went

9 through several things in Menard.  Again, I filed grievances

10 about it in regards to my treatment at Menard that weren't

11 taken care of.

12   Q.  Such as?

13   A.  Such as my cellmates, my ultimate transfer here.

14 My cellmates, I would be given a Level E cellie every thrity

15 days and when I was in a vulnerable state with my eyes and

16 them not recognizing the doctor's order that I be single

17 celled and me ultimately being shipped here when I wasn't

18 supposed to be shipped.  I was in protective custody

19 status.  You couldn't ship me unless I signed out of

20 protective custody.  When I filed my grievance about what

21 medical staff was not doing, they automatically, someone

22 signed me out of protective custody and shipped me here when

23 they couldn't.  I am the only person who can sign myself out

24 of protective custody.  But I am in Pinckneyville.  And I

137

```
 1   never signed myself out of protective custody.
 2       Q.  Did any of your cellmates at Menard assault you?
 3       A.  No, but I had Level E cellies.  These are high
 4   security risk cellmates.  I am meeting them every thirty
 5   days.
 6       Q.  Then you said you were in protective custody at
 7   Menard and then were transferred here to Pinckneyville?
 8       A.  Yes.
 9       Q.  Do you believe Pam Grubman had anything to do with
10   that?
11       A.  I don't know.  I don't know.  They still have not
12   answered that grievance there that I filed.
13       Q.  Is there anything else about Pam Grubman just
14   general?
15       A.  No.
16       Q.  How about Julius Flagg?  He was at Pinckneyville,
17   correct?
18       A.  Yes.
19       Q.  What are your complaints about him, if you know?
20       A.  Well, Julius Flagg gained unauthorized access to my
21   medical records, removed me from an ADA cell, canceled all
22   of my permits.  Then when they were re-issued by Fienerman,
23   he refused to acknowledge them.  He refused again.  He
24   canceled them again.
```

```
 1        Q.   And what were you wanting -- what did Dr. Fienerman
 2   allow you to have that was refused?
 3        A.   Low gallery, ADA cell.
 4        Q.   You were in an upper bunk here?
 5        A.   No.  I said he issued me low bunk, low gallery, ADA
 6   cell permits, physically challenged permits.
 7        Q.   Okay.
 8        A.   Julius, Warden Flagg canceled all of those.
 9        Q.   And so because he canceled those, were you ever
10   placed in an upper bunk?
11        A.   No.
12        Q.   Were you ever placed in an upper gallery?
13        A.   No.
14        Q.   So your complaint is basically about the ADA cell?
15   Is that fair?
16        A.   And the physically challenged status.
17        Q.   What would that get you?
18        A.   Physically challenged is you eat differently.  We
19   shower differently.  You get programs.  You get ADA programs
20   when you physically challenged.
21        Q.   And how do you know that he got unauthorized access
22   to your medical records?
23        A.   I have memos to that effect.  He says it.  He
24   admits it.  He admits it in his memos that he did it.  And
```

139