1  placement admits that he is the one who told them not to
2  honor my eye permits.
3      Q.  But you don't know as you sit here that he ever
4  read through your medical records?
5      A.  How else could he change the criteria of my medical
6  records if he had not read them?
7      Q.  You don't know if someone else might have informed
8  him what was in there or do you?
9      A.  How can you change something if you're not -- how
10 can you cancel something?  I am assuming now, if he canceled
11 them, he had to have access to them.
12     Q.  So you think that his actual signature is in your
13 medical records and not from any sort of separate document?
14     A.  I don't know.  I am saying his, from memos I got
15 from Tammy Giacomo and Sue Ferrari and him himself state
16 that he has reviewed my medical records and determined that
17 I do not fit the criteria.
18     Q.  So Flagg didn't give you that status, and you were
19 not placed in an ADA cell during that time?
20     A.  No.  Dr. Rayford gave me the status.  I was
21 placed in the cell.  Flagg took me out of the status.
22 Dr. Fienerman to contacteract what Flagg had did, with
23 Dr. Rayford's orders issued new permits.  Warden Flagg
24 refused to honor the permits and told, wrote memos to this

140

```
 1  effect.
 2      Q.  Okay.  Approximately how long were you in a non-ADA
 3  cell while you were here at Pinckneyville?
 4      A.  A year.
 5      Q.  Approximately a year?
 6      A.  Yes.
 7      Q.  Okay.  And during that time you were still in a
 8  lower bunk and a lower gallery, right?
 9      A.  Yes.
10      Q.  Did you still have any safety glasses or anything
11  or your sunglasses?
12      A.  Yes, I had them.
13      Q.  Which did you have?
14      A.  I had both.
15      Q.  Both?  Safety and sunglasses?
16      A.  Yes.
17      Q.  Did you have your cane?
18      A.  No.
19      Q.  You didn't have the white cane that you have?
20      A.  No.
21      Q.  Did you have any other special items that you
22  normally wouldn't be allowed to have?  Like you said, the
23  sun glasses you can't have if you're a normal inmate here,
24  right?
```

```
 1        A.   My talking books and tapes.
 2        Q.   And you had those even when you weren't in the
 3   ADA cell?
 4        A.   Yes.
 5        Q.   Anything else you can think of?
 6        A.   Contact lenses.
 7        Q.   And those have to have special permits as well?
 8        A.   Yes.
 9        Q.   Okay.  Do you know why that is?
10        A.   Because inmates are not allowed to have contact
11   lenses.
12        Q.   Because they could be a safety hazard?  Do you
13   know?
14        A.   It is like sunglasses.  Inmates are not allowed to
15   have sunglasses or anything.  It is just something, you
16   know, it depends on the whims of whoever is making rules.
17        Q.   Okay.  Is there anything else about any of the
18   people that I have asked you that you haven't told me that
19   we have left out and you want to --
20        A.   There may be, but I cannot recall at this time.
21        MS. CHOATE:  Okay.  I have nothing further.
22   EXAMINATION BY MR. TENNEY:
23        Q.   Do you remember Dr. Anderson at Western?
24        A.   Yes, I do.
```

1    Q.  Did you get along pretty good with him?

2    A.  Yes, I did.

3    Q.  And he seemed to, from the records, have done a lot
4 of stuff for you.  He got you some contact lens.  He got you
5 solution and cleaner.  And I think he followed up on
6 occasions when outside visits got canceled, and you know,
7 referred you to people.  But he is a defendant in this case,
8 too.  What, if anything, is there that you think
9 Dr. Anderson did why he should be a defendant or what
10 complaints do you have about him you?

11    A.  Nothing at all.

12    MR. TENNEY:  Okay.  All right.  Thank you.

13    MS. POWELL:  Are you going to waive or are you going to
14 reserve, Tom?

15    MR. LONDRIGAN:  I am going to ask him a couple of
16 questions.

17 EXAMINATION BY MR. LONDRIGAN:

18    Q.  Did you request to leave the infirmary and go into
19 general population?

20    A.  No, I did not.

21    Q.  Did you feel you were at risk while you were in the
22 infirmary?  And by that I mean your vision and the condition
23 of your eyes?

24    A.  Only once when they sprayed mace in there.

143

1    Q.   All right.  Did you feel at risk as far as assault
2  from any other patients?
3    MS. CHOATE:  Objection.  Leading.
4    MS. POWELL:  Same objection.
5    MR. LONDRIGAN:  He can answer "yes" or "no."
6    MS. POWELL:  We can still object.
7    Q.   Did you encounter any violent prisoners while you
8  were in the infirmary?
9    A.   No.
10   Q.   What type of patients were in the infirmary while
11 you were there?
12   A.   Dying, terminally ill.  The ones that I had access
13 to were terminally ill.
14   Q.   How old?
15   A.   Sixties, late seventies.
16   Q.   Did you ever have any altercations as it's been
17 defined in this deposition with any patients in the
18 infirmary?
19   A.   No.
20   Q.   Were you ever consulted about the assignment of
21 your cellmates after you were placed in the general
22 population?
23   A.   No.
24   Q.   At the time that you filed this claim pro se on

144

1 your own behalf, did you have any idea who it was that
2 authorized that you be transferred from the health care unit
3 and be treated as a person in the general population even
4 though you were still housed in the infirmary?
5     MS. POWELL:  Objection.  Leading.
6     MS. CHOATE:  Same objection.
7     MS. POWELL:  Compound.
8     A.  No.
9     Q.  All right.  Let me try to break it down into
10 several more questions if the compound nature of that is
11 confusing to anybody.  While you were in the infirmary were
12 you ever informed that you had been transferred into the
13 general population?
14     A.  While I was in the infirmary or after?
15     Q.  Well, at the time -- when were you informed for the
16 first time that you were being transferred in the general
17 population?
18     A.  June 8, 2004.
19     Q.  At the time that you filed this lawsuit pro se did
20 you have any information as to who was responsible for
21 assigning you from the health care unit into the general
22 population?
23     A.  No, I did not.
24     Q.  For the record, tell us, and this is compound, but

145

1  I will break it down into several questions, when and where
2  and who and how you were informed that you were being
3  discharged from the health care unit to the general
4  population?
5      A.  I filed a grievance on June 7 in regards to
6  placement of TV, commissary, being able to go to yard.  I
7  talked to Sandra Fuqua -- I mean, Sandra Funk and
8  Dr. Brown.  He had told me that they were going to have a
9  discussion about me to resolve the problem.  But on June 8
10 he came into the infirmary at around eleven-thirty and told
11 me I was being released to general population.
12     Q.  Did Nurse Practitioner Mills ever come to you in
13 the latter months of 2003 and tell you that she had entered
14 a discharge note that you were being transferred into
15 general population?
16     A.  No, she did not.
17     Q.  Do you know what you were placed in segregation for
18 while you were living in the infirmary in the health care
19 unit?
20     A.  I was placed in segregation in the infirmary three
21 times, three or four times, three I can remember.  First one
22 would be for the incident with Correctional Officer Wilson
23 and the missed appointment.  The second one would be about
24 the TV being on the shelf under the window.  And the third

146

one would be the urine analysis failure. I couldn't give enough urine.

Q. At the time that you were given a ticket with respect to the TV, had you talked to anyone in authority about that and where it should be placed?

A. Yes, I did.

Q. And who was the first person that claimed that you couldn't keep your TV in that particular position?

A. The correctional officer who wrote me the ticket and sent me to seg. I can't remember her name.

Q. Did you normally see her around the infirmary?

A. Yes. She worked the front of the infirmary. She very seldom worked the back.

Q. Did anyone before or after that from security ever come into the infirmary and tell you you couldn't keep your TV in that position?

A. No.

Q. And when was it relative to that that you were issued a ticket and placed in segregation?

A. Three hours later after, after her and Nurse Bower's came in to pass out morning meds at seven o'clock, eight o'clock. She told me to take the TV down. I told her that Warden Funk had given me permission to have the TV where it was. And I thought that was the end of the

147

1   incident.  Approximately one o'clock I was taken to seg.
2       MR. LONDRIGAN:  I think that's all I have.
3   RE-EXAMINATION BY MS. CHOATE:
4       Q.  When you were talking about the officer that you
5   said worked out front, who was that?  Did you say?
6       A.  No, I don't know.  That's the person who took me to
7   seg about the TV, but I can't remember, recall her name.
8       Q.  But that's not who wrote the ticket?
9       A.  That's who wrote the ticket.
10      Q.  That's who wrote the ticket?  You don't know who
11  that is?
12      A.  No.
13      MS. CHOATE:  Okay.  I wasn't sure.
14  RE-EXAMINATION BY MS. POWELL:
15      Q.  When you came into Western Illinois Correctional
16  Center, would you have gone through an orientation process?
17      A.  Yes, I did.
18      Q.  And when you come in through that orientation
19  process, did you receive a handbook regarding the rules and
20  regulations of that facility?
21      A.  Yes, I did.
22      Q.  And would you have signed off that you received
23  that?
24      A.  No.

148

```
 1         Q.  You don't have to sign it, but you did get it,
 2   right?
 3         A.  Yes.
 4         Q.  And that indicates within that handbook what
 5   property you may have?
 6         A.  Yes.
 7         MS. POWELL:  That's all I have.  Thanks.
 8         MR. LONDRIGAN:  We'll waive signature.
 9   ***                    ***                    ***
10             (Deposition ending at 2:30 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

149

```
 1  STATE OF ILLINOIS  )
                       ) ss.
 2  COUNTY OF RANDOLPH )
```

3           I, RETHA R. MEYERHOFF, Certified Shorthand

4  Reporter, Registered Professional Reporter, and Notary

5  Public in and for Randolph County, Illinois, do hereby

6  certify that the matters set forth in the caption to the

7  foregoing deposition are true and correct; that said

8  witness, AARON MCCROY, personally appeared before me at the

9  time and place set forth; that said witness was first duly

10 sworn by me to tell the truth, the whole truth, and nothing

11 but the truth, and thereupon proceeded to testify in said

12 cause; that the questions of Counsel and the answers of said

13 witness were first taken down by me in machine shorthand and

14 thereafter reduced to typewriting by means of computer-aided

15 transcription; and that the foregoing 149 pages comprise a

16 true, complete, and correct transcript of the testimony

17 given and the proceedings held at the taking of said

18 deposition.

19         Witness my hand and seal this 2nd day of April,

20 A.D. 2007.

                                _____
                                Retha R. Meyerhoff
                                Certified Shorthand Reporter
                                Notary Public in and for
                                Randolph County, Illinois.

[SEAL: RETHA R. MEYERHOFF, Notary Public, State of Illinois, My Commission Expires 02-15-08]