05415-N3293
TMP/ej/jly

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

AARON McCROY,                                    )
                                                 )
                    Plaintiff,                   )
                                                 )
         v.                                      )         No. 02-3171
                                                 )
THE ILLINOIS DEPARTMENT OF CORRECTIONS,          )
ROGER E. WALKER, JR. (in his official capacity only), )
DENNIS HOCKADAY, KEVIN WINTERS, SANDRA            )
FUNK, DEBRAH FUQUA, LIEUTENANT BYRON             )
LAW, KENNETH KELLERMAN, JULIUS FLAGG,            )
(all in their official and individual capacities), WEXFORD )
HEALTH SOURCES, INC., DR. LOWELL BROWN,          )
M.D., DR. HUGHES LOCHARD, M.D., and              )
RHONDA MILLS,                                    )
                                                 )
                    Defendants.                  )

## DEFENDANT BROWN'S MOTION FOR SUMMARY JUDGMENT

NOW COMES the Defendant, LOWELL BROWN, M.D., by her attorney, THERESA M.
POWELL of HEYL, ROYSTER, VOELKER & ALLEN, and for his Motion for Summary Judgment
pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, states:

## I.  INTRODUCTION

Plaintiff has filed a Third Amended Complaint alleging that Defendant Brown retaliated
against him for exercising his First Amendment Rights.  Plaintiff also alleges that Defendant Brown
violated the Eighth Amendment by failing to protect him and by being deliberately indifferent to a
serious medical need during the time that he was incarcerated at the Western Illinois Correctional
Center.  Plaintiff alleges that certain acts and/or omissions were performed or committed by
Defendant Brown which constitute the basis of each claim.  Defendant Brown denies that he
committed any of the acts set forth in Counts I, III, and IV of Plaintiff's Third Amended Complaint

HEYL ROYSTER
VOELKER
& ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

and further denies that any act or omission on his part violated any of Plaintiff's constitutional rights. Defendant Lochard further denies that any act or omission on his part caused injury to Mr. McCroy.

Both the Affidavit of Dr. Brown and his deposition, in conjunction with the medical records, support his position concerning his lack of involvement with respect to the specific allegations contained within Counts I, III, and IV of Plaintiff's Third Amended Complaint.

As there are no genuine issues of material fact in this case with respect to the care and treatment provided to Plaintiff, Aaron McCroy, by Dr. Brown, Defendant Brown is entitled to summary judgment.

## II. MATERIAL FACTS CLAIMED TO BE UNDISPUTED

1.      Plaintiff was incarcerated at all relevant times relating to this Complaint and at the time he filed his initial lawsuit.  (See Plaintiff's Third Amended Complaint, Par. 2.)

2.      Dr. Lowell Brown is a medical doctor licensed to practice medicine in the state of Illinois.  (Affidavit of Dr. Lowell Brown attached as Exhibit 1).

3.      Dr. Brown began working at the Western Illinois Correctional Center in January of 2004. (Exhibit 1).

4.      In Dr. Brown's capacity as the Medical Director at the Western Illinois Correctional Center, I saw a patient by the name of Aaron McCroy.  (Exhibit 1).

5       Prior to Dr. Brown's employment at the Western Illinois Correctional Center, he had no contact with Mr. McCroy.  (Exhibit 1).

6.      At the time Dr. Brown began as the Medical Director at the Western Illinois Correctional Center, he was not advised of all inmate grievances and lawsuits.  (Exhibit 1).

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

2

05415-N3293
TMP/ej/jly

7.    No act or omission on Dr. Brown's part was based upon consideration of any grievance or lawsuit filed by any particular inmate, including Aaron McCroy.  (Exhibit 1).

8.    At the time that Dr. Brown began working at the Western Illinois Correctional Center, Aaron McCroy had already received his corneal transplant.  (Exhibit 1).

9.    At no time did Dr. Brown refuse to schedule medically necessary medical appointments with outside physicians or any other physician.  (Exhibit 1).

10.    At no time did Dr. Brown purposefully deny Plaintiff access to programs and privileges provided to non-disabled inmates.  (Exhibit 1).

11.    To the extent any act or omission on Dr. Brown's part led to a denial of access to any such programs or privileges, he was never made aware of it.  (Exhibit 1).

12.    Dr. Brown had no role in determining which lights are left on or turned off at any time in the facility.  (Exhibit 1).

13.    Dr. Brown did not enter any specific orders with respect to Aaron McCroy which would change his access to the commissary, the yard, his shower privileges, his recreation privileges. (Exhibit 1).

14.    Dr. Brown had no role in requiring inmates to clean their cells or empty their lockers or dressers.  (Exhibit 1).

15.    At no time has Dr. Brown provided care and treatment to inmates at the Pinckneyville Correctional Center.  (Exhibit 1).

16.    Dr. Brown did not follow Mr. McCroy once he was transferred from Western Illinois Correctional Center to another correctional facility.  (Exhibit 1).

HEYL ROYSTER
VOELKER
& ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

17.     At no time did Dr. Brown arbitrarily change Plaintiff's medically unassigned classification.  (Exhibit 1).

18.     Mr. McCroy was medically unassigned at the time Dr. Brown arrived at the Western Illinois Correctional Center.  (Exhibit 1).

19.     It is Dr. Brown's understanding that being medically unassigned allows patients/inmates not to hold jobs during their incarceration period.  (Exhibit 1).

20.     Dr. Brown is not aware that being "medically unassigned" makes an inmate ineligible to participate in any early release programs.  (Exhibit 1).

21.     At no time did Dr. Brown deny Mr. McCroy access to the commissary or to recreation.  (Exhibit 1).

22.     Mr. McCroy would have had access to commissary and recreation as set forth by the infirmary rules attached hereto.  (Exhibit 1).

23.     These rules are made by someone within the Department of Corrections and not by me.  (Exhibit 1).

24.     Dr. Brown did write an order transferring Mr. McCroy to the general population on June 8, 2004.  (Exhibit 1).

25.     In Dr. Brown's opinion, there was no medical reason to keep Mr. McCroy in the infirmary beyond that date.  (Exhibit 1).

26.     Dr. Brown had no role in assigning any cell mates to Mr. McCroy once he was transferred to the general population.  (Exhibit 1).

27.     Dr. Brown had no role in assigning any cell mates to Mr. McCroy while he was housed in the infirmary.  (Exhibit 1).

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

28.     At no time was Dr. Brown made aware of the identity of any specific cell mate assigned to Mr. McCroy.  (Exhibit 1).

29.     At no time has anyone advised Dr. Brown of the disciplinary background of Inmate Durham, or any other inmate who may have been assigned as a cell mate to Aaron McCroy.  (Exhibit 1).

30.     Prior to September 23, 2004, Dr. Brown had no knowledge that Inmate Durham was being assigned to Aaron McCroy.  (Exhibit 1).

31.     Prior to September 23, 2004, Dr. Brown had no knowledge that Mr. Durham had any propensities for fighting with his cell mates.  (Exhibit 1).

32.     At no time was Dr. Brown ever made aware of the criminal background or disciplinary history of Mr. McCroy.  (Exhibit 1).

33.     Dr. Brown has never been advised or made aware of the propensities for fighting of Mr. McCroy or any other patient admitted to the infirmary or seen by Dr. Brown on an outpatient basis unless said information was for some reason placed in the patient's medical records.  (Exhibit 1).

34.     Dr. Brown did not punish Mr. McCroy for getting hit in the eye.  (Exhibit 1).

35.     Dr. Brown had no role in placing Mr. McCroy in a cell with any particular inmate. (Exhibit 1).

36.     Dr. Brown had no role in determining which inmates should produce random urine samples for drug testing.  (Exhibit 1).

37.     Dr. Brown had no role and has no role in determining the security risk of any inmate, including Aaron McCroy.  (Exhibit 1).

HEYL ROYSTER
VOELKER
& ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

38.     Dr. Brown had no knowledge and has no knowledge as to what Mr. McCroy's security status is.  (Exhibit 1).

39.     Dr. Brown had no role in transferring Mr. McCroy to the Menard Correctional Center. (Exhibit 1).

40..     In Dr. Brown's medical opinion, there was no medical need to keep Mr. McCroy housed in the infirmary on June 8, 2004.  (Exhibit 1).

41.     It is Dr. Brown's opinion that Mr. McCroy wanted to be transferred from the infirmary in June of 2004.  (Deposition of Lowell Brown, M.D., p. 31; Exhibit 2.)

42.     When Mr. McCroy was housed in the infirmary, he was not kept isolated from other inmates.  (Exhibit 1).

43.     Mr. McCroy was housed from time to time with up to three other inmates while he was housed in the infirmary.  (Exhibit 1).

44.     While he was housed in the infirmary, Mr. McCroy had access to the law library, commissary, and to the yard.    (Exhibit 1).

45.     When Mr. McCroy would exercise those privileges, he would come into contact with many other inmates who were living in the general population.   (Exhibit 1).

46.     Dr. Brown considered Mr. McCroy's risk of injury to his eye to be similar to that of someone on the outside who would come into contact with other individuals more than sixteen months after keratoplasty surgery.    (Exhibit 1).

47.     In Dr. Brown's opinion, Mr. McCroy received better than adequate medical care with respect to his postoperative keratoplasty.    (Exhibit 1).

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

48.    The loss of Mr. McCroy's eye was unfortunate, but was not the result of deliberate indifference on the part of anyone other than the individual who struck him.   (Exhibit 1).

49.    Dr. Brown does not routinely isolate inmates who could suffer harm as a result of a fight with another inmate as it would be highly speculative on Dr. Brown's part to try to predict which inmates are more likely to be involved in an altercation as opposed to any other.   (Exhibit 1).

50.    On January 23, 2004, Dr. Brown reviewed the consultation report concerning the care and treatment of Mr. McCroy's status post-keratoplasty of his left eye. He approved the recommendations contained within the report.  (Exhibit 1-A, p. 336.)

51.    Dr. Brown then scheduled Mr. McCroy to be seen by Dr. Zeh for a continued follow-up visit for February 24, 2004 and requested a care plan in an effort to minimize transportation needs. (Exhibit 1-B, p. 340.)

52.    Mr. McCroy was seen by Dr. Zeh and was provided a plan which suggested medications for the care and treatment of the patient's glaucoma.  The medications included the Lotimax, Travatan, Cosopt, and Alphagan, which were all approved and provided.  The patient was also to return for a fitting of the rigid gas permeable contact lenses.  (Exhibit 1-B, p. 340.)

53.    On the same date, Dr. Brown prepared a referral request form to have the patient returned for follow-up as per Dr. Zeh's recommendations.  (Exhibit 1-C, pp. 341-2.)

54.    Dr. Brown's next entry in Mr. McCroy's progress notes is dated March 19, 2004.  On that date, Dr. Brown saw the patient for complaints of hypertension and noted that Mr. McCroy had glaucoma and other eye issues.  Dr. Brown was not seeing him specifically for any eye problems on that date.  (Exhibit 1-D, p. 989.)

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

55.     Dr. Brown's next entry was dated March 30, 2004 for complaints of left eye irritation for several days.  The patient is hypesthetic in the early morning hours, then painful.  Vision absent left eye. The conjunctiva is infected. Exposed to triple meds for glaucoma.  Dr. Brown's assessment was conjunctivitis.  The patient was given Patanol for one week.  (Exhibit 1-E, p. 990.)

56.     Dr. Brown's next entry for Mr. McCroy was April 7, 2004.  Dr. Brown noted that the Patanol had not helped the patient's condition.  He was noted to be on Cosopt, Alphagan, and Travatan. The patient was being followed by ophthalmologists.  In Dr. Brown's plans, he noted that the patient would be allowed to rest his television close to his bed due to his eye conditions.  (Exhibit 1-F, p. 992.)

57.     Dr. Brown's next entry is dated April 26, 2004.  On that date, Mr. McCroy requested a continuous supply of tears.  Dr. Brown ordered those artificial tears.  (Exhibit 1-G,  p. 993.)

58.     Dr. Brown also completed referral request forms for the patient to see Dr. Zeh on May 10, 2004.  (Exhibit 1-H,  pp. 344-5.)

59.     Dr. Zeh's follow-up care was documented per his consultation report, which Dr. Brown reviewed and approved.  (Exhibit 1-I, p. 346.)

60.     Again, Dr. Brown completed referral requests on May 26, 2004 for the patient to follow up with his outside ophthalmologist.  (Exhibit 1-J, p. 347.)

61.     Dr. Brown's next entry was dated May 27, 2004.  His note from that date reads as follows:

S (subjective): Left eye has cataract and glaucoma and (failed) cornea graft.  Right eye needs contact lens.  Both eyes are "out of focus."

O (objective)\A (assessment): As described above, with periorbital reaction on left to the eye drops.

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

P (plan): Wait second opinion from Dr. Steahly.  Taking Lotemax, Travatan, Alphagan, Cosopt, and artificial tears.  (Exhibit 1-K, p. 999.)

62.    Dr. Brown's next note is dated June 8, 2004, which reads as follows:

No further medical need for detention.  He will continue meds and see ophthalmologist for new opinion.  (Exhibit 1-L, p. 1002.)

63.    It was Dr. Brown's opinion as of that date that Mr. McCroy had no further need for medical detention and could be released to the general population.  It was further Dr. Brown's opinion that Mr. McCroy was happy with this decision.  (Exhibit 1.)

64.    Again, requests were made to send Mr. McCroy to an outside physician on June 11, 2004, with a consultation report having been prepared on June 18, 2004 by Dr. Steahly, who recommended that the patient's medications continue as before.  Dr. Steahly made no recommendations suggesting specific restrictions on Mr. McCroy's activities or his ability to come in contact with other individuals.  (Exhibit 1-M, p. 350.)

65.    Dr. Steahly made no documentation that Mr. McCroy complained of his housing status.  The report suggests the evaluation by Dr. Steahly was focused solely on the patient's eyes and did not include discussions of other issues.  (Exhibit 1-N, p. 351.)

66.    Dr. Brown's next entry was made on June 21, 2004.  At that time, he assessed Mr. McCroy's eye condition in conjunction with a letter he received from Dr. Steahly, who recommended to continue to treat the patient as is.  Dr. Brown's assessment at that time was the patient had keratoconus in his right eye and had a cataract and glaucoma in his left eye.  Dr. Brown's plan was to follow up with Dr. Steahly to elaborate on his recommendations.  (Exhibit 1-O, p. 1003.)

67.    At that time, Mr. McCroy made no complaints to me concerning his housing status. (Exhibit 1).

**HEYL ROYSTER**
**VOELKER**
**& ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

9

05415-N3293
TMP/ej/jly

68.    Dr. Brown completed additional referral request forms on July 8, 2004 (Exhibit 1-P, p. 352) in an effort to transfer the patient out for additional follow-up care for the failed corneal transplant.  The patient also had glaucoma, for which he was being seen at that time.

69.    Dr. Brown's next note is dated July 21, 2004 and relates to the patient's hypertension or cardiovascular clinic.  Dr. Brown did note that the patient had a history of keratoconus in his right eye and glaucoma.  However, the focus of Dr. Brown's care and treatment was the hypertension. (Exhibit 1-Q, p. 1006.)

70.    The patient was seen by Dr. Lee on August 9, 2004 for evaluation of the lens for the keratoconus on the right eye and was noted to be status post-corneal transplant.  The consultation report from Dr. Lee makes reference to recommendations for various medications, which were reviewed and approved by Dr. Brown.  (Exhibit 1-R, p. 355.)

71.    This report makes no reference to any recommendations regarding Mr. McCroy's housing status nor any recommendations to keep Mr. McCroy isolated.  (Exhibit 1-R, pp. 355-6.)

72.    On August 10, 2004, Dr. Brown made an entry referencing a consultation from Dr. Lee.  In Dr. Lee's opinion, the patient's left eye needed more attention for glaucoma and his right eye needed fitted for a contact.  Dr. Brown's plan was for the patient to see Dr. Knupp for the left eye and Dr. Kinser for the right eye.  (Exhibit 1-S, p. 1010.)

73.    Again, Dr. Brown recommended that Mr. McCroy be seen by an outside physician and he completed the appropriate referral request form on August 11, 2004 for Mr. McCroy to see both Dr. Kinser and Dr. Krager for care and treatment of the patient's keratoconus.  (Exhibit 1-T, pp. 357-358.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

74.     Prior to September 23, 2004, Dr. Brown saw no entries suggesting that Mr. McCroy complained of his assignment to the general population.  (Exhibit 1).

75.     On September 24, 2004, Mr. McCroy was admitted to the infirmary following an explosive injury to the left globe the day before.  The patient had been treated in Quincy and was to be transferred to see Dr. Farris in Springfield for further evaluation.  (Exhibit 1-U, p. 1015.)

76.     Dr. Brown's next entry is dated September 28, 2004 referencing our efforts to transfer the patient for surgery in an effort to salvage his left eye.  (Exhibit 1-V, p. 1019.)

77.     Shortly thereafter, Dr. Brown noted that the patient was to have his lens fitting for his right eye during the week of October 4, 2004.  (Exhibit 1-W, p. 1024.)

78.     On October 5, 2004, Dr. Brown noted that the patient was set for his right eye contact lens adaptation.  References to other medical conditions were made at that time.  These conditions are not related to the patient's eyes.  (Exhibit 1-X, p. 1025.)

79.     On October 6, 2004, Dr. Brown made a note indicating that Mr. McCroy was distraught over his misfortune regarding his left eye.  Mr. McCroy asked to speak to a good listener.  Dr. Brown noted his eye surgery was being arranged.  Dr. Brown's plan was to refer Mr. McCroy to the psychologist, Dr. Stiles.  (Exhibit 1-Y,  p. 1027.)

80.     Dr. Brown noted that Mr. McCroy's surgery to his left eye was being rescheduled as of October 7, 2004.  The lens for the right eye could wait as a result of this scheduling change.  The left eye was the issue of focus at that time.  (Exhibit 1-Z, p. 1028.)

81.     Dr. Brown saw Mr. McCroy again on October 20, 2004 regarding his eye status.  Mr. McCroy reported that he was despondent over the loss of his left eye.  In Dr. Brown's assessment, he noted the patient's vision of his right eye was unaffected by the injury to the left eye.  Dr. Brown

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

noted the patient's vision would be enhanced with contact lenses. Dr. Brown's assessment was the patient was blind in the left eye and depressed. Dr. Brown's plan was to continue the patient on his current medications. (Exhibit 1-AA, p. 1046.)

82.    As of October 25, 2004, Dr. Brown noted that the patient's left eye was eviscerated with the right eye awaiting more satisfactory contact lens. For now, the patient felt more secure being housed in the infirmary. Dr. Brown's plan included prescribing the patient additional artificial tears and lens cleaning solution at his bedside. (Exhibit 1-BB, p. 1048.)

83.    On October 27, 2004, Dr. Brown observed Mr. McCroy and noted the patient had no new problems. (Exhibit 1-CC, p. 1050.)

84.    On October 29, 2004, Dr. Brown noted that the patient had special lenses being prepared for his right eye. Dr. Brown also requested safety goggles. (Exhibit 1-CC, p. 1050.)

85.    As of November 1, 2004, Dr. Brown noted the patient was awaiting his contact lens. He did have his protective goggles at that time. Dr. Brown moved Mr. McCroy to chronic care status. (Exhibit 1-DD, p. 1051.)

86.    On November 4, 2004, Dr. Brown noted that appointments for each eye were scheduled as of that time. The patient was stable. His left eye was blind due to trauma and his right eye continued to suffer from the keratoconus. (Exhibit 1-EE, p. 1053.)

87.    Dr. Brown next saw Mr. McCroy in hypertension clinic on November 23, 2004 for those conditions. Dr. Brown kept Mr. McCroy in the infirmary relating to the previous injury to his eye. (Exhibit 1-FF, pp. 1061-2)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

88.    On November 24, 2004, Dr. Brown documented that he cautioned Mr. McCroy on the use of Darvocet for his tolerable pain and noted that the prescription would expire within three weeks.  (Exhibit 1-GG, p. 1063.)

89.    Dr. Brown's counseling at that time was made in an effort to advise Mr. McCroy that Dr. Brown would not allow him to become dependant on the medication.  (Exhibit 1.)

90.    As of December 23, 2004, Dr. Brown was still awaiting the contact lens from the folks at the Springfield Clinic.  The patient's vital signs were stable.  Mr. McCroy occasionally had headaches.  Dr. Brown's assessment at that time was the patient had continued keratoconus in his right eye.  Mr. McCroy was in segregation status as of that date.  (Exhibit 1-HH, p. 1075.)

91.    Dr. Brown next saw Mr. McCroy on December 27, 2004 for complaints unrelated to his eye.  (Exhibit 1-II, p. 1077.)

92.    Similarly, Mr. McCroy had complaints unrelated to his eye on January 3, 2005. (Exhibit 1-JJ, p. 1079) and January 5, 2005 (Exhibit 1-KK, p. 1080.)

93.    Mr. McCroy requested to have possession of his contact lens and to visit the law library on January 7, 2005.  Dr. Brown referred those requests to security.  (Exhibit 1-LL, p. 1081.)

94.    On January 12, 2005, Mr. McCroy was transferred to the Menard Correctional Center. (Exhibit 1-MM, p. 1082.)

95.    Additionally, Dr. Brown had seen Mr. McCroy on January 11, 2005 and noted his transfer would take place the next date.  The patient wondered if his headaches could be treated more intensively.  He seemed ungainly on his feet as if drunk.  (Exhibit 1-NN, 1083.)

96.    Dr. Brown obtained a degree in biology from Stanford University.  (Exhibit 2, p. 5.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

97.    Dr. Brown obtained his medical degree from Creighton University in Omaha, Nebraska. (Exhibit 2, p. 5).

98.    Dr. Brown participated in his internship under the direction of Stanford University. (Exhibit 2, p. 5.)

99.    Dr. Brown is board certified in anatomic and clinical pathology. (Exhibit 2, p. 6.)

100.    Dr. Brown began working at the Western Illinois Correctional Center in January of 2004. (Exhibit 2, p. 7.)

101.    When Dr. Brown started at the Western Illinois Correctional Center, he was the Acting Medical Director. He then became the official Medical Director approximately one year later. (Exhibit 2, pp. 14-15.)

102.    To Dr. Brown's knowledge, security performs an action under the heading of "placement" in order to consider the variables regarding placement of inmates in particular cells. Dr. Brown presumed that process took place when Mr. McCroy went from the infirmary to the general population as that was the policy. (Exhibit 2, p. 51.)

103.    Dr. Brown would not be advised of any inmate's criminal history before seeing him as a patient. (Exhibit 2, p. 58.)

104.    Dr. Brown had nothing to do with transferring Mr. McCroy from the Western Illinois Correctional Center to another. (Exhibit 2, pp. 62-63.)

105.    Dr. Brown played no role in specifically assigning Inmate Durham as a cell mate for Mr. McCroy. (Exhibit 2, p. 63.)

106.    Dr. Brown is not aware of any instance where Mr. McCroy asked to be removed from his medically unassigned classification. (Exhibit 2, p. 63.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

14

05415-N3293
TMP/ej/jly

107. Keratoconus is an abnormality of the cornea in which the cornea is weakened and begins to bulge irregularly. That causes problems with the way the eye bends and focuses light through the creation of irregular astigmatism. (See Deposition of Dr. Zeh Deposition, p. 7; attached as Exhibit 3).

108. The definition of irregular astigmatism would be astigmatism that you can no longer correct with spectacles. (Exhibit 3, p. 7.)

109. When patients who have keratoconus can no longer wear spectacles to correct their vision, the next step is to try fitting them with a rigid contact lens. (Exhibit 3, p. 7.)

110. The rigid lens sits on the surface of the cornea and basically hides the abnormal shape and presents a nice, smooth spherical surface in which light is bent and focused on the back of the eye. (Exhibit 3, pp. 7-8.)

111. Patients with keratoconus have difficulty fitting rigid lenses due to the fact that the cornea is irregular. (Exhibit 3, p. 8.)

112. If the keratoconus disease progresses, the contact lenses will no longer center appropriately and these patients can have difficulties with the lens not staying on the eye or being very uncomfortable. (Exhibit 3, p. 8.)

113. At whatever point the patient becomes intolerant to contact lenses, then usually the recommendation is to proceed with a cornea transplant. (Exhibit 3, p. 8.)

114. The purpose of the corneal transplant is to try to restore more normal shape to the cornea to allow glasses or a rigid contact lens to be used to correct the eye. (Exhibit 3, p. 8.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

115.　Keratoconus is a progressive disease in some patients.  In the mast majority of patients, the disease exists and then either does not progress or it progresses very slowly.  But in some patients, there is progression.  (Exhibit 3, p. 8.)

116.　There is no known medical treatment that will arrest the progression of keratoconus. (Exhibit 3, p. 8.)

117.　The thought is that rubbing the eye is one of the main reasons that some patients' keratoconus progresses due to mechanical pressure on the cornea.  (Exhibit 3, pp. 8-9.)

118.　However, some patients' keratoconus progresses whether or not they rub their eyes. (Exhibit 3, p. 9.)

119.　The three-tier progression of treatment ranges from spectacle correction, contact lens correction, and then cornea transplantation if the first two are not feasible anymore.  (Exhibit 3, p. 9.)

120.　Proper fitting of contact lenses does not necessarily arrest the progression of keratoconus.  (Exhibit 3, p. 9.)

121.　Proper fitting of contact lenses may allow a patient with the disease to see.  (Exhibit 3, p. 9.)

122.　Dr. Zeh first saw Aaron McCroy on August 29, 2003 after he had already had the corneal transplant on February 3, 2003 performed by Dr. Joseph Fedor.  (Exhibit 3, pp. 9-10.)

123.　On this date, the patient was stable with a clear transplant in the left eye.  The topography showed he had a very high amount of corneal astigmatism in the transplant, which is not extremely uncommon in patients with corneal transplants.  (Exhibit 3, p. 10.)

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

124.    Dr. Zeh recommended that the patient return in November to have one of the sutures removed in the hopes that it would reduce some of the corneal astigmatism.  (Exhibit 3, pp. 10-11.)

125.    When Mr. McCroy returned in November, the pressure in his left eye was elevated. It measured at 30 mm of mercury.  Dr. Zeh therefore went ahead and tried to remove one of the sutures.  The patient moved during the suture removal and as a result, both sutures had to be removed, which was a bit early compared to what he would have preferred.  (Exhibit 3, p. 11.)

126.    At that time (November 6, 2003), the patient was placed on a weight limitation of not lifting more than ten pounds, no bending over, and was asked that he be isolated to a place where he would not be inadvertently jostled or struck.  (Exhibit 3, p. 11.)

127.    As of November 6, 2003, Dr. Zeh recommended that the patient stop the Maxitrol ointment after three days.  (Exhibit 3, pp. 11-12, 14.)

128.    The patient was switched to a lower potency steroid which tends not to elevate the pressure.  (Exhibit 3, pp. 12-13.)

129.    Ten to fifteen percent of the general population will respond with an elevation of pressure in the eye as a result of steroids.  (Exhibit 3, p. 14.)

130.    On November 6, 2003, Dr. Zeh had the suspicion that the patient might have a steroid-responsive glaucoma (elevation of eye pressure).  (Exhibit 3, pp. 14-15.)

131.    The patient came back on December 23, 2003.  He reported that he was still receiving the Maxitrol and was also receiving the Lotimax.  (Exhibit 3, p. 15.)

132.    The patient's eye pressure was up to a little over 40 in the left eye.  (Exhibit 3, p. 15.)

133.    The patient was referred to Dr. Kim for a glaucoma evaluation at that time.  (Exhibit 3, p. 16.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

17

05415-N3293
TMP/ej/jly

134.     With respect to the difference in pressure between 44 on December 23, 2003 and that of 30 documented on November 6, 2003, Dr. Zeh found that 44 was higher than he would have liked it to have been.  (Exhibit 3, p. 17.)

135.     It indicated to him that the glaucoma was not controlled.  (Exhibit 3, p. 17.)

136.     However, he points out that the instruments that read pressure in the eye are made to read pressures predominantly within a normal range.  Once the numbers get past the high end of normal (beyond 30), the machines become less accurate.  Therefore, the difference between 30 and 44 may not necessarily really be 14, the way it would be the difference between 10 and 24.  (Exhibit 3, p. 17.)

137.     Glaucoma is a condition that can potentially develop in about ten to fifteen percent of the general population in which an eye that is treated with steroids will respond with an elevation of pressure in the eye.  (Exhibit 3, p. 21.)

138.     In most patients, it happens within several days or several weeks of starting the steroid treatment.  (Exhibit 3, p. 21.)

139.     This was a little bit unusual in Mr. McCroy's case because he had been treated with steroids since the time of his transplant, since February 2003, and he had been seen multiple times during that interval between February 2003 and November 2003.  (Exhibit 3, p. 21.)

140.     During that time, Mr. McCroy had not had any elevation in his pressure previously. It is a little unusual for him to develop the condition nine months after the use of steroids.  (Exhibit 3,  pp. 21-22.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

141.    The onset of glaucoma suffered by Aaron McCroy was not necessarily induced by the medication error which occurred in this case because Mr. McCroy actually had an elevated pressure before this transcription error or inadvertent prolonged use had occurred.  (Exhibit 3, p. 22.)

142.    The pressure was elevated longer, potentially longer than would have been desired, because of the failure to discontinue the steroid.  (Exhibit 3, p. 22.)

143.    However, the steroid-induced glaucoma was not induced by the fact that he received the steroids longer than he was supposed to and at a higher dose as well because that condition appeared to exist before that incident occurred.  (Exhibit 3, p. 22.)

144.    The elevation and pressure was initially identified on November 6, 2003.  (Exhibit 3, pp. 22-23.)

145.    Again, the pressure in the eye remained high, but the elevation was not necessarily induced by the fact that the steroids were not discontinued when ordered.  (Exhibit 3, p. 23.)

146.    Mr. McCroy was seen twice by Dr. Kim, once on January 8, 2004 and once on January 23, 2004.  (Exhibit 3, p. 23.)

147.    On January 23, the pressure in Mr. McCroy's eye was down to 19.  (Exhibit 3, p.23.)

148.    Dr. Zeh cannot say that the discontinuation of the Maxitrol caused the decrease in pressure, because on January 8, after the Maxitrol had been discontinued, and the patient had been given two glaucoma medications, his pressure was still elevated to 31.  (Exhiibt 3, p. 24.)

149.    As of the date of Dr. Zeh's deposition, June 22, 2004, Mr. McCroy's left cornea was fairly stable.  (Exhibit 3, p. 27.)

150.    In Dr. Zeh's opinion, with the exception of steroid glaucoma postoperatively, the patient's course of treatment has been fairly smooth sailing and he has not had a lot of problems that

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

19

05415-N3293
TMP/ej/jly

could potentially occur, such as allograph rejections or wound complications or things such as that. (Exhibit 3, p. 29.)

151.    The stitches have been out and the patient has been doing fine for the last seven months since the suture removal without having wound problems.  (Exhibit 3, p. 29.)

152.    The chance that the patient will suddenly have a problem in the absence of a traumatic injury is not high, but it is also not zero.  (Exhibit 3, p. 29.)

153.    In Dr. Zeh's opinion, providing care within at least 24 hours after a complaint has been made would be sufficient.  (Exhibit 3, pp. 29-30.)

154.    Dr. Zeh last saw Mr. McCroy on May 21, 2004.  (Exhibit 3, p. 31.)

155.    As of that date, the patient's condition of his left eye post-corneal transplant was stable with irregular astigmatism with a recommendation of proceeding with a rigid contact lens fitting for the eye.  (Exhibit 3, pp. 31-32.)

156.    Dr. Zeh's recommendations were rigid contact lens fitting of the left eye, consider cataract surgery if unable to improve visual acuity with the rigid contact lens, to continue the patient's medications unchanged since his pressure was stable, and to follow up again at his practice in three months to see one of the doctors for a cornea check.  (Exhibit 3, p. 32.)

157.    Dr. Zeh referred the patient to Dr. Blumthal for the contact lens fitting.  (Exhibit 3, pp. 33-35.)

158.    Dr. Zeh does not know why the patient had not been fitted with the contact lenses. (Exhibit 3, p. 36.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

159.    Dr. Zeh placed Mr. McCroy on restrictions immediately after the suture removal because of his concerns about a wound dehiscence since the sutures were removed a little bit ahead of time.  (Exhibit 3, pp. 37-38.)

160.    However, from the interval from November 2003 up through February 2004, at which point the patient was a year after the transplant, which is a point Dr. Zeh would normally remove all sutures from a patient anyway, he did not think the patient necessarily had to be on restrictions anymore.  (Exhibit 3, p. 38.)

161.    Mr. McCroy did not convey to Dr. Zeh that the restrictions placed by Dr. Zeh were in any way impeding his (Mr. McCroy's) ability to participate in any sort of rehabilitation classes or anything like that.  He never complained about the restrictive nature of that.  (Exhibit 3, p. 38.)

162.    After the corneal transplant in February of 2003, Mr. McCroy would have been given steroids from that time all the way through November 2003.  (Exhibit 3, pp. 42-43.)

163.    The medical records do reflect that the patient received the steroid ointment treatment that entire time.  (Exhibit 3, pp. 42-43.)

164.    Glaucoma is a disease of months and years in most cases rather than hours and days. (Exhibit 3, p. 44.)

165.    Dr. Zeh had no criticisms of the care provided to the patient's eye other than the failure to follow his instruction to discontinue the use of Maxitrol.  (Exhibit 3, p. 55.)

166.    Visual rehabilitation with corneal transplant patients often takes a year or more.  That is just the nature of cornea transplantation.  (Exhibit 3, p. 57.)

167.    Patients often have high amounts of astigmatism until sutures are removed and in most cases, all the sutures are not removed for a year or more after the surgery, so Mr. McCroy is not

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

21

05415-N3293
TMP/ej/jly

necessarily behind scheduled compared to many people who have transplant procedures performed. (Exhibit 3, p. 57.)

168.    Keratoconus has no known cause.  (Exhibit 3, p. 57.)

169.    Dr. Zeh approved the substitutions of various generic medications for the medications that he had written.  (Exhibit 3, p. 59.)

170.    The patient's failure to have a contact lens at any time has not caused any permanent damage.  (Exhibit 3, p. 64.)

171.    During the time the patient had no contact lens, he just has not had a contact lens to correct his vision for that time.  (Exhibit 3, p. 64.)

172.    Dr. Robert J. Blumthal is an optometrist.  (See Dr. Blumthal Deposition, p. 4; attached as Exhibit 4.)

173.    He currently practices in Springfield, Illinois with the Prairie Eye Center.  (Exhibit 4, p. 5.)

174.    In the course of his practice, he has seen a patient by the name of Aaron McCroy. (Exhibit 4, p. 6.)

175.    The first reference in the medical records generated by Prairie Eye Center relating to contact lenses is dated April 8, 2003.  (Exhibit 4, p. 10.)

176.    Dr. Feder referred the patient to Dr. Blumthal for the contact lens fitting.  (Exhibit 4, p. 10.)

177.    The referral took place within the Prairie Eye Center office.  (Blumthal Deposition, p. 11.)

178.    Dr. Feder saw the patient again on May 9, 2003.  (Exhibit 4, p. 12.)

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

179.    Dr. Feder would not do the contact lens fitting himself.  (Exhibit 4, p. 12.)

180.    Between April 8, 2003 and May 9, 2003, an appointment had not been made by Prairie Eye Center with Dr. Blumthal as Dr. Blumthal felt Dr. Feder was "trying to deal with something relating to a side effect of the surgery" namely filamentary keratitis.  (Exhibit 4 , p. 13.)

181.    Dr. Blumthal had the opinion that with respect to the filamentary keratitis, this is a condition that he would want to have treated before fitting the patient with contact lenses.  (Exhibit 4, pp. 13-14.)

182.    It would be difficult to fit a lens on the patient with a condition of severe dry eye. (Exhibit 4, p. 14.)

183.    Dr. Blumthal saw the patient on June 24, 2003 in reference to obtaining a rigid gas permeable contact lens.  (Exhibit 4, p. 16.)

184.    The scheduling of visits with Mr. McCroy would have been arranged through the Department of Corrections.  (Exhibit 4, p. 16.)

185.    Dr. Blumthal tried to schedule the earliest visit he had open on his schedule.  (Exhibit 4, p. 17.)

186.    This would be the same for somebody who was not with the Department of Corrections.  (Exhibit 4, p. 17.)

187.    When the patient was seen on June 24, 2003, Dr. Blumthal did not see the patient with respect to fitting a lens in the right eye.  (Exhibit 4, p. 22.)

188.    Based on Dr. Blumthal's evaluation of the patient, he found that he needed to use a lens called a Rose K lens, specifically designed for keratoconus patients.  (Exhibit 4, p. 23.)

**HEYLROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

189.    He did not have one of those sets on hand at the time he saw Mr. McCroy in June of 2003.  (Exhibit 4, p. 23.)

190.    Neither he nor anyone else would have known that he needed that particular device prior to June 24, 2003.  (Exhibit 4, p. 23.)

191.    Dr. Blumthal ordered the Rose K fitting on that date, June 24, 2003.  (Exhibit 4, pp. 24-25.)

192.    Dr. Blumthal next saw the patient on August 29, 2003 after the Rose K lens had arrived from the lab.  (Exhibit 4, pp. 25-26.)

193.    Dr. Blumthal did not fit the lens on that date because the patient had complaints of a scratching left eye.  (Exhibit 4, p. 26.)

194.    Dr. Blumthal referred the patient back to Dr. Zeh to address the complaint that the patient's eye was scratchy.  (Exhibit 4, p. 27.)

195.    Dr. Blumthal was not able to fit the contact lens on August 29, 2003.  (Exhibit 4,  p. 29.)

196.    The reason Mr. McCroy was not fitted for a contact lens was that his eye was not in a stable condition to receive his lens on that date.  (Exhibit 4, p. 30.)

197.    Dr. Blumthal sees patients from as far south as Marion, as far east as Paris and Mattoon, and as far north as Canton, Illinois.  (Exhibit 4, p. 33.)

198.    It is not unusual for patients to travel quite a ways to see their doctors.  (Exhibit 4, p. 34.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

199.     The Plaintiff has testified that he was not initially assigned or housed with Inmate Durham upon his release from the healthcare unit.  (See McCroy Deposition of March 16, 2007, p. 94; Exhibit 5).

200.     Plaintiff is currently incarcerated at the Pinckneyville Correctional Center.  (Exhibit 5, p. 4.)

201.     Plaintiff has been incarcerated at Pinckneyville since August of 2005.  (Exhibit 5, p. 4.)

202.     Plaintiff was incarcerated at the Western Illinois Correctional Center from October of 2001 through January of 2005.  (Exhibit 5, p. 4.)

203.     During the year 2003 through 2004, the Plaintiff's vision in his left eye was limited to hand movements and seeing colors, shapes, and objects.  (Exhibit 5, p. 7.)

204.     He could not read out of his left eye.  (Exhibit 5, p. 8.)

205.     The last time Plaintiff asserts he was able to read out of his left eye was sometime in 2001.  (Exhibit 5, p. 9.)

206.     Plaintiff alleges the first time he complained of Mr. Durham was September 22, 2004. (Exhibit 5, p. 20.)

207.     Plaintiff alleges this was a verbal report to Lieutenant Law and Correctional Officer Kellerman.  (Exhibit 5, p. 17.)

208.     Plaintiff alleges he reported that Mr. Durham would get aggressive by getting loud and that Durham's posture would change.  (Exhibit 5, p. 19.)

209.     Mr. McCroy currently has a cell mate.  He has no difficulties with his current cell mate.  (Exhibit 5, p. 30.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

210.    Plaintiff's current cell mate has no disabilities.  (Exhibit 5, p. 34.)

211.    Mr. McCroy is not complaining about his ADA cell at Pinckneyville.  (Exhibit 5, p. 46.)

212.    Mr. McCroy claims he did complain about cell placement at both Menard and Western Illinois Correctional Centers in that he claims he requested that they not cut the lights over his head and that he be allowed the draw the curtains to block out other people's light.  (Exhibit 5, p. 46.)

213.    With respect to Plaintiff's allegations concerning being denied access to employment, the Plaintiff claims that he was medically unassigned and therefore could not enroll in the early release program.  (Exhibit 5, p. 49.)

214.    According to the Plaintiff, he believes that he was taken out of the early release program because he missed three dates classes, which constitutes a violation.  (Exhibit 5, pp. 54-55.)

215.    It is Plaintiff's contention that the reason he did not go to school was because of his eye problems.  (Exhibit 5, p. 55.)

216.    After February 3, 2003, Plaintiff was allowed access to the yard.  (Exhibit 5, p. 57.)

217.    He would leave the infirmary every other day unescorted.  He knew how to get to the yard from the infirmary.  (Exhibit 5, p. 57.)

218.    Mr. McCroy was allowed access to the law library.  (Exhibit 5, p. 57.)

219.    He could go to the law library two to three times a week.  (Exhibit 5, p. 58.)

220.    At the time Mr. McCroy went to the law library, other inmates could be in the law library with him.  (Exhibit 5, p. 60.)

221.    When Mr. McCroy would go the yard at Western, other inmates would be in the yard.  (Exhibit 5, pp. 61-62.)

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

222.    He does not know exactly how many inmates would be there - maybe 25 or 30 approximately.  (Exhibit 5, p. 62.)

223.    Mr. McCroy does not recall every meeting Dr. Lochard.  (Exhibit 5, p. 83.)

224.    According to Mr. McCroy, his complaints against Dr. Lochard relate to the allegation that Dr. Lochard appears to have placed restrictions on Mr. McCroy's activities without evaluating him.  (Exhibit 5, p. 83.)

225.    Mr. McCroy is also complaining that Dr. Lochard made him medically unassigned. (Exhibit 5, p. 83.)

226.    Mr. McCroy believes that Nurse Practitioner Mills canceled medications that had been prescribed to him.  (Exhibit 5, pp. 83-84.)

227.    Part of Plaintiff's claim against Nurse Practitioner Mills is that he believes she canceled a narcotics prescription for Darvocet.  (Exhibit 5, p. 84.)

228.    While Plaintiff was in the infirmary, he was housed with three other inmates at various time and sometimes alone.  (Exhibit 5, p. 93.)

229.    He does not recall the dates he was housed with other people as opposed to the dates he was housed by himself.  (Exhibit 5, p. 93.)

230.    Mr. McCroy was not immediately housed with Inmate Durham upon being released from the infirmary on June 8, 2004.  (Exhibit 5, p. 94.)

231.    Mr. McCroy does not recall the names of his other cell mates.  (Exhibit 5, p. 94.)

232.    He had three or four different cell mates before Mr. Durham.  (Exhibit 5, p. 94.)

233.    Mr. McCroy did not have any problems with these other cell mates.  (Exhibit 5, p. 94.)

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

234.    Plaintiff claims that he had difficulty navigating and was unable to function in the general population after being released from the infirmary.  (Exhibit 5, p. 95.)

235.    The Plaintiff was in the general population after June 8, 2004.  He would have to walk approximately 50 feet to travel to the commissary from his cell.  (Exhibit 5, p. 96.)

236.    Every time Mr. McCroy had the ability to go to the law library, he went.  (Exhibit 5, p. 98.)

237.    When he had the ability to go to the chow hall, he chose not to go on certain occasions.  (Exhibit 5, p. 98.)

238.    The law library is approximately 50 feet from the infirmary.  (Exhibit 5, p. 98.)

239.    The yard is approximately 125 feet from the infirmary.  (Exhibit 5, p. 98.)

### III.  APPLICABLE LAW

**A.    Summary Judgment Standard.**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a Motion for Summary Judgment, the court must look beyond the pleadings and assess the proof to determine whether or not there is a genuine need for a trial.  If defendants meet their burden in showing there is an absence of evidence to support plaintiff's claim, plaintiff must demonstrate by affidavit, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial.  Celotex Corp. v Catrett, 477 U.S. 317, 324-25, 91 L.Ed.2d 265, 106 S.Ct. 254 (1986).  In determining and evaluating a Motion for Summary Judgment, the court used the evidence in the light most favorable to the opposing party and draws all justifiable inferences in his favor.  A mere scintilla of evidence in support of plaintiff's position is

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

not sufficient to create a genuine issue of material facts. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.

242, 252, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).

**B.    Count I - Plaintiff Has Failed to Prove a Cause of Action for Retaliation Against Defendant Brown.**

An act taken in retaliation for the exercise of a constitutionally protected right violates the

Constitution. <u>DeWalt v. Carter</u>, 224 F.3d 607, 618 (7th Cir. 1999), citing <u>Mt. Healthy City School</u>

<u>Dist. Board of Education v. Doyle</u>, 429 U.S. 274, 283-4, 97 S.Ct. 568 (1977).  In order to prove a

retaliation claim, Plaintiff must prove (1) he had engaged in a protected conduct and (2) he was

retaliated against for engaging in this protected conduct. <u>DeWalt v. Carter</u>, 224 F.3d at 618 (7th Cir.

2000).  Even if the Plaintiff proves these elements, this is not enough if the Defendants can show the

result would still be the same absent a retaliatory motive. <u>Mt. Healthy City School Dist. v. Doyle</u>,

429 U.S. 274, 287 (1977).  It is not enough for the Plaintiff to merely state retaliation played a part

in the Defendants' actions. <u>Babcock v. White</u>, 102 F.3d 267, 275 (7th Cir. 1996).

The Plaintiff has no evidence to support a claim for retaliation as it pertains to Defendant

Brown.  Plaintiff must show that the Defendant was aware that the Plaintiff had filed grievances and

lawsuits and that some action was taken as a result or in retaliation for the exercise of a First

Amendment right.  Here, the Plaintiff has no evidence to indicate that Dr. Brown was even aware that

Plaintiff had filed a lawsuit or a grievance.   There was no evidence to suggest that any of the

grievances referenced even relate to Dr. Brown.  Moreover, this lawsuit did not include Dr. Brown

until after the action which formed the basis of the complaints against Dr. Brown had already taken

place.  In addition, the Plaintiff must show that some different result would have occurred in the

absence of the retaliatory motive.  Plaintiff cannot do so here.

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

Plaintiff is alleging that Defendant Brown retaliated in specific ways.

Plaintiff has no evidence to support a claim that Dr. Brown refused to transfer the Plaintiff to a facility that would allow him to receive the medical care he needs. Dr. Brown has nothing to do with transferring an inmate from one facility to another. Dr. Brown denies the Plaintiff was not receiving the medical care that he needs. Dr. Brown denies "constantly" changing Plaintiff's treating ophthalmologist. At any time the ophthalmologist was changed from one location to another, this was either based upon the location of the inmate, the qualifications of the physicians, the physician's refusal to continue to treat the patient, or a lack of responsiveness on the part of the physicians. There is no evidence in this case to indicate that any of the ophthalmologists who were treating the Plaintiff provided him with substandard care.

There is no evidence to indicate that Dr. Brown refused to provide the Plaintiff with medications that he prescribed. Dr. Brown did not administer any medicine that was not prescribed. Dr. Brown did not arrive until after the Plaintiff had already received his corneal transplant. Dr. Brown had nothing to do with the transplant. Dr. Brown relied upon the optometrists and ophthalmologists with respect to recommendations for contact lenses. The testimony from the optometrists sets forth the reasons why the contact lenses were not put in place when first recommended. Dr. Brown did make an entry indicating that the Plaintiff no longer had a medical reason to remain in the Health Care Unit. This is consistent with Dr. Zeh's testimony that a patient who had received a corneal transplant should be stable more than a year from the date of the transplant. There was no testimony to indicate that this Plaintiff had any medical needs which would require him to be kept in the Health Care Unit.

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

Dr. Brown had no role in selecting a cell mate for Mr. McCroy. Moreover, Dr. Brown had no knowledge of who that cell mate might be, nor the background of any such cell mate. There are no ADA cells at Western Illinois Correctional Center. Dr. Brown did not remove Plaintiff from any such cell.

### C.    Count III - Eighth Amendment Failure to Protect.

There is no evidence to support a cause of action under a theory of failure to protect against Defendant Brown.

Count III of Plaintiff's Complaint specifically suggests that the Defendants acted with deliberate indifference to the Plaintiff's safety in terms of both his physical and psychological condition when they transferred him from the infirmary to the general population on or about June 8, 2004. (Plaintiff's Third Amended Complaint, Par. 231.) Additionally, Plaintiff alleges that the Defendants acted with deliberate indifference to Plaintiff's safety when they assigned him a cell mate, Inmate Durham, who had a known history of physical violence toward his cell mates. (Plaintiff's Third Amended Complaint, Par. 232.)

Plaintiff also alleges in Paragraphs 233 and 234 of Count III of Plaintiff's Third Amended Complaint that Defendants Law and Kellerman had specific acts of deliberate indifference and that the Illinois Department of Corrections has a "first fight policy" which led to the loss of Plaintiff's left eye as a result of an attack by Inmate Durham.

There is no evidence to support a claim for failure to protect against the undersigned Defendant.

Under the Eighth Amendment, prison officials do have a duty to protect prisoners from violence at the hands of other prisoners. <u>Farmer v. Brennan</u>, 511 U.S. 825, 833 (1994). Specifically,

HEYL ROYSTER
VOELKER
& ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

when an inmate is attacked by another inmate, the Eighth Amendment is violated **only** (emphasis

added) if "deliberate indifference by prison officials effectively condones the attack by allowing it to

happen . . ." Haley v. Gross, 86 F.3d 630, 640 (7th Cir. 1996). Deliberate indifference is comparable

to criminal recklessness, and is shown by something approaching a total unconcern for one's welfare

in the face of serious risks, or a conscious culpable refusal to prevent harm. Duane v. Lane, 959 F.2d

673, 677 (7th Cir. 1992). This total disregard for a prisoner's safety is the "functional equivalent of

wanting harm to come to the prisoner." McGill v. Duckworth, 944 F.2d 344, 347 (7th Cir. 1991).

Negligence does not satisfy a deliberate indifference standard. Sellers v. Henman, 41 F.3d 1100,

1102 (7th Cir. 1994). It is not enough to show that a prison official merely failed to act reasonably.

Gibbs v. Franklin, 49 F.3d 1206, 1208 (7th Cir. 1995).

Deliberate indifference can be inferred only where defendant know there is a strong likelihood

rather than a mere possibility that violence will occur. Watts v. Laurent, 774 F.2d 168, 172 (7th Cir.

1985). Prison officials cannot be expected to eliminate the possibility of all dangers. McGill v.

Duckworth, 944 F.2d 344, 347 (7th Cir. 1991). "Prisons are dangerous places. Thus, the right to

reasonable protection does not include the right to protection from random acts." See, McGill v.

Duckworth, 944 F.2d 344, 348 (7th Cir. 1991) (some level of [danger] is inevitable no matter what

guards do").

In order to substantiate a claim for failure to protect, the Plaintiff must prove that prison

officials were aware of a specific, impending, and substantial threat to his safety, "often by showing

that he complained to prison officials about a specific threat to his safety." Pope v. Shafer, 86 F.3d

90, 92 (7th Cir. 1996). Essentially, Plaintiff must prove the Defendant had to know that there was

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

a substantial risk that Inmate Durham (the one who is alleged to have attacked the Plaintiff) would do so, and yet failed to take action. <u>Sanville v. McCaughtry</u>, 266 F.3d 724, 733-34 (7th Cir. 2001).

The Plaintiff alleges that Defendant Brown was deliberately indifferent to the Plaintiff's safety when he transferred the patient from the infirmary to the general population on or about June 8, 2004. Dr. Brown testified in his deposition that he had no medical reason to keep Mr. McCroy in the Health Care Unit. Consistent with this testimony is Dr. Zeh's opinion that the Plaintiff had no medical reason to remain in the Health Care Unit as Dr. Zeh would expect that a patient at a point one year after a transplant would not necessarily need to be on restrictions anymore. See Dr. Zeh's deposition, p. 38. Interestingly, Dr. Zeh had no criticisms of the care and treatment provided to this patient other than the error relating to the Maxitrol.

Dr. Zeh's deposition was given at a time just after the patient had been transferred from the Health Care Unit into the general population. No point was made by Plaintiff's counsel who participated in that deposition regarding the current placement of Mr. McCroy. As Dr. Zeh testified that the patient did not need any restrictions and that he had been placed in a separate cell in November of 2003 as a result of removing stitches early, there is no medical evidence to indicate that Mr. McCroy needed to be isolated or housed in the infirmary in June of 2004.

Dr. Brown's exercise of his medical judgment to release the Plaintiff from the Health Care Unit does not create a claim for failure to protect when the threat and harm alleged comes in the form of a specific inmate. This inmate was Inmate Durham. No one, including Dr. Brown, had knowledge that Mr. McCroy would be housed with Mr. Durham. No one had any knowledge regarding Mr. Durham's criminal background, disciplinary background, or propensities toward violence. Mr. McCroy was not immediately housed with Mr. Durham upon release from the Health Care Unit. Not

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

33

05415-N3293
TMP/ej/jly

only were the Health Care Unit employees not advised of Mr. McCroy's cell mate, but they were not advised of changes in his cell mates. There is no evidence in this case to establish that any of the medical defendants, including Dr. Brown, had knowledge that Mr. Durham posed any sort of threat to the safety of the Plaintiff. Accordingly, there are no genuine issues of material fact as they pertain to this Defendant on a theory of failure to protect under the Eighth Amendment. Defendant is therefore entitled to summary judgment.

There is simply no evidence to indicate that anyone in the healthcare unit, including the undersigned Defendant, was ever advised of the specific cell mate with whom Mr. McCroy would be housed. Accordingly, none of them had any information concerning the backgrounds of any of the inmates at the correctional center, and specifically any inmate who may or may not have been housed with Mr. McCroy at any particular time. There is no evidence to indicate that any of the medical defendants in this case were aware that Mr. Durham had a history of physical violence toward his cell mates. There is no evidence to indicate that any of the medical defendants were aware that Mr. McCroy was ever housed with Inmate Durham until after the alleged incident between Mr. Durham and the Plaintiff.

Accordingly, there is simply no evidence to support a cause of action against this Defendant on a theory of failure to protect under the Eighth Amendment.

**D.    Count IV - Plaintiff's Allegations Are Insufficient to Support a Claim of Deliberate Indifference Against Defendant Rhonda Mills.**

As previously asserted, there is no genuine issue of fact in this case regarding the care and treatment provided to the Plaintiff.

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

34

05415-N3293
TMP/ej/jly

In order to prove his cause of action, the Plaintiff must prove deliberate indifference to his serious medical needs. At a minimum, this requires actual knowledge of impending harm, which is easily preventable, so that a conscious, capable refusal to prevent harm can be inferred from the defendant's failure to prevent it. Dixon v. Godinez, 114 F.3d 640, 645 (7th Cir. 1997); Duckworth v. Franzen, 780 F.2d 645, 653 (7th Cir. 1985). Deliberate indifference is more than mere negligence and approaches intentional wrongdoing. Farmer v. Brennan, 511 U.S. 825, 835 (1994). To establish deliberate indifference, Plaintiff must show the Defendant ignored a known risk. Collignon v. Milwaukee County, 163 F.3d 982, 988 (7th Cir. 1988).

Additionally, in order to establish deliberate indifference, Plaintiff must show that the physician or other defendant must both have been aware of the fact from which the inference could be drawn that a substantial risk of serious harm exists, and he must actually draw the inference. Higgins v. Correctional Medical Services, 178 F.3d 508, 511 (7th Cir. 1999); Sanderfer v. Nichols, 62 F.3d 151, 154 (6th Cir. 1995). The exercise by a physician of his professional judgment does not constitute deliberate indifference. Youngber v. Romeo, 457 U.S. 307, 322-323 (1982).

Medical decisions, such as whether one course of treatment is preferable to another, are beyond the Eighth Amendment's purview. Additionally, the Eighth Amendment is not a vehicle for bringing claims of medical malpractice. Snipes v. DeTella, 95 F.3d 586, 590 (7th Cir. 1996). It should also be kept in mind that inappropriate medical treatment based on pure negligence, or even a series of purely negligent acts is not the same as indifference to a serious medical need. Sellers v. Hennan, 41 F.3d 1100, 1102-03 (7th Cir. 1994). While a prisoner has the right to medical care, he does not have the right to determine the type and scope of the medical care he personally desires. A difference of opinion between a physician and the patient does not give rise to a constitutional

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

right, nor does it state a cause of action under § 1983. Coppinger v. Townsend, 398 F.2d 392, 394

(10th Cir. Col. 1968). See also, Johnson v. Doughty, 433 F.3d 1001 (7th Cir. 2006).

Inattention to a medical condition amounts to a constitutional violation only where the

medical condition is serious. Brownell v. Figel, 950 F.2d 1285, 1289 (7th Cir. 1991).

As previously indicated, deliberate indifference may only be found when an official knows of

and disregards an excessive risk to inmate health or safety. See Duane v. Lane, 959 F.2d 673, 676

(7th Cir. 1992). Deliberate indifference also requires that Defendant either intended to harm Plaintiff

or knew of a risk of harm so significant that an intent to harm could be inferred from a refusal to

provide medical care. See Smith-Bey v. Hospital Administrator, 841 F.2d 751, 759 (7th Cir. 1988).

It should also be noted that Plaintiff's claim is one in which he is asserting that the Eighth

Amendment has been violated. The Eighth Amendment does not require that prisoners receive

"unqualified access to healthcare." Hudson v. McMillian, 503 U.S. 1, 9 (1992); see also, Hernandez

v. Keane, 341 F.3d 137 (2d Cir. 2003). Rather, inmates are entitled only to "adequate medical care."

Boyce v. Moore, 314 F.3d 884, 888-89 (7th Cir. 2002). Specifically, the Eighth Amendment does

not entitle an inmate to demand specific care.

Plaintiff's complaints as to Dr. Brown suggest that the Plaintiff is merely dissatisfied or

disagrees with her course of treatment. This is insufficient to support a cause of action for deliberate

indifference. See, Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996).

With respect to the Plaintiff's specific complaints, Plaintiff has no evidence to substantiate that

Dr. Brown had any direct involvement in any of the specific allegations set forth in Subparagraphs

a through m under Paragraph 300 of Count IV of Plaintiff's Third Amended Complaint (which are

set forth below) except for transferring the patient to the general population: a.   R e f u s i n g   t o

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

36

05415-N3293
TMP/ej/jly

f o l l o w
P l a i n t i f f ' s
doctors' orders
in a timely
manner;

b.      Refusing to transfer Plaintiff to a facility that would allow him
to receive the medical care he needs;

c.      Constantly changing Plaintiff's treating opthomoligist;

d.      Refusing to provide Plaintiff prescribed medicine.

e.      Administering medicine that was not prescribed;

f.      Delaying Plaintiff's needed corneal transplant;

g.      Trying to make Plaintiff pay for the needed corneal transplant;

h.      Refusing to allow Plaintiff to be fitted for special contact
lenses in both eyes as directed by his treating ophthalmologists
in a timely and regular manner;

i.      Refusing to schedule needed medical appointments;

j.      Transferring Plaintiff to the general population;

k.      Assigning Plaintiff a violent cell mate that had recently been
sent to segregation for fighting his former cell mate;

l.      Refusing to place Plaintiff in another cell unless he first agreed
to a disciplinary infraction and serving time in segregation;

m.      Removing Plaintiff from an ADA cell.

With respect to the transfer of Mr. McCroy to the general population, the Plaintiff has not

established any medical reason to keep him in the Health Care Unit, but only a risk posed to Mr.

McCroy by an outside source.  These arguments are appropriately and adequately addressed in

subsection C of this Motion addressing the failure to protect argument.

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

With respect to the medical care and treatment provided, Plaintiff has no evidence to indicate that Dr. Brown was deliberately indifferent to the Plaintiff in any respect. Moreover, the Plaintiff has not put forth any evidence to establish that Plaintiff has suffered from an injury relating or resulting from the care and treatment provided by Dr. Brown with respect to his eyes.

Accordingly, as the record reflects the Plaintiff was provided with appropriate medical care with respect to each and every one of his interactions with Dr. Brown. At best, Plaintiff can argue that he was dissatisfied or disagreed with some act or omission on the part of Dr. Brown. Again, this does not constitute deliberate indifference. Accordingly, Defendant Brown is entitled to summary judgment as to Count IV of Plaintiff's Third Amended Complaint.

## E.    Defendant Brown is Entitled to Qualified Immunity

Qualified immunity protects such officials performing discretionary functions who are sued in their individual capacities against liability for monetary damages so long as their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." Behrens v. Pelletier, 516 U.S. 299, 305, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1992). It is the Plaintiff's burden to show that the record supports a finding of an unconstitutional act and that the applicable constitutional standards were clearly established at the time in question once the Defendant raises qualified immunity as a defense. See, Scarver v. Litscher, 371 F. Supp. 2d 986, 1004-1005, citing Tun v. Whitticker, 398 F.3d 899, 901-02 (7th Cir. 2005); Newsome v. McCabe, 319 F.3d 301, 303 (7th Cir. 2003); Magdziak v. Byrd, 96 F.3d 1045, 1047 (7th Cir. 1996).

First, the Plaintiff has no evidence to indicate that Nurse Mills violated a constitutional right of the Plaintiff. Secondly, even assuming that any act or omission on the part of Nurse Practitioner

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

Mills constituted a violation of the Plaintiff's constitutional rights, there is no case law nor statute which would support an allegation that it was clearly established under the constitution that reliance upon the decisions of the Medical Director and/or the Director of Nurses in conjunction with security personnel at a correctional facility constitutes unlawful and unconstitutional conduct. <u>See</u>, <u>Saucier v. Katz</u>, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2004).  In this case, the facts are clear that Nurse Mills is entitled to summary judgment on the merits.  However, to the extent this Court may find that the Plaintiff's constitutional rights have been violated, Nurse Mills is entitled to qualified immunity as there is no evidence to support the contention that she should have known that her actions in the care and treatment of Mr. McCroy constituted unlawful conduct which violated a clearly established constitutional right of the Plaintiff.

## IV.  <u>CONCLUSION</u>

As there are no genuine issues of material fact regarding the care and treatment provided to the Plaintiff with respect to his complaints and the specific involvement by the undersigned Defendant, Lowell Brown, M.D.,  is entitled to summary judgment.  Plaintiff's complaints concerning his medical conditions were addressed appropriately by Dr. Brown as detailed in this Motion and the supporting Affidavit and attached medical records.

Taking each count separately, the Plaintiff has no evidence to support his claims.  First, there is no evidence to indicate that Defendant Brown retaliated against the Plaintiff as Plaintiff has no evidence to indicate that Defendant Brown was aware that Plaintiff had even filed a grievance or a lawsuit.  There is no evidence to indicate that the actions on the part of the Defendant would have been different had the lawsuit or grievance not been filed.  Accordingly, summary judgment is appropriate as to the claims of retaliation.

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

Second, with respect to the claims of failure to protect, the Plaintiff has no evidence to indicate that Defendant Brown was aware of a specific, imminent, and known risk in the form of Inmate Durham was present.  In fact, there is nothing in this case to indicate that any of the medical defendants were aware that Inmate Durham was Mr. McCroy's cell mate.  Mr. McCroy testified specifically that he was not housed with Mr. Durham upon his initial release from the healthcare unit in June of 2004.  As the medical defendants have indicated they were not aware of Mr. McCroy's housing situation at any time, it makes no sense whatsoever that someone in the healthcare unit would have been updated as to not only the specific cell mate with whom Mr. McCroy was being housed, but also that cell mate's disciplinary and criminal background and propensities for violence.  There simply is no evidence to support such a claim of failure to protect against these Defendants and said claim should therefore be dismissed.

Plaintiff makes no specific claim against Dr Brown as it relates to the care and treatment provided.

WHEREFORE, Defendant, LOWELL BROWN, M.D., prays that this Court will grant summary judgment in her favor and against the Plaintiff.

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

Respectfully submitted,

LOWELL BROWN, M.D., Defendant,

HEYL, ROYSTER, VOELKER & ALLEN,
Attorneys for Defendant,

BY:    /s/Theresa M. Powell
       Theresa M. Powell, #6230402
       HEYL, ROYSTER, VOELKER & ALLEN
       Suite 575, National City Center
       P. O. Box 1687
       Springfield, IL  62705
       Phone: (217) 522-8822
       Fax:    (217) 523-3902
       E-mail:tpowell@hrva.com

**HEYL ROYSTER
VOELKER
& ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

41

05415-N3293
TMP/ej/jly

## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2007, I electronically filed **Defendant Brown's Motion for Summary Judgment** with the Clerk of Court using the CM/ECF system which will send notification of such filings(s) to the following:

Douglas J. Quivey
doug@lprpc.com

Thomas F. Londrigan
tom@lprpc.com

Carissa A. Haning
carissa@lprpc.com

Kelly R. Choate
kchoate@atg.state.il.us

Julie L. Morgan
jlmorgan@atg.state.il.us

Carl J. Tenney
ctenney@hhtlaw.com

Alexandra de Saint Phalle
alex@lprpc.com

and I hereby certify that on April 20, 2007, I mailed by United States Postal Service, the document(s) to the following non-registered participants:

None

/s/Theresa M. Powell
Theresa M. Powell, #6230402
HEYL, ROYSTER, VOELKER & ALLEN
Suite 575, National City Center
P. O. Box 1687
Springfield, IL  62705
Phone: (217) 522-8822
Fax:     (217) 523-3902
E-mail:tpowell@hrva.com

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822