E-FILED
Friday, 20 April, 2007 02:21:58 PM
Clerk, U.S. District Court, ILCD

05415-N3293
TMP/ej

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

AARON McCROY, )
)
Plaintiff, )
)
v. ) No. 02-3171
)
THE ILLINOIS DEPARTMENT OF CORRECTIONS, ROGER E. WALKER, JR. (in his official capacity only), DENNIS HOCKADAY, KEVIN WINTERS, SANDRA FUNK, DEBRAH FUQUA, LIEUTENANT BYRON LAW, KENNETH KELLERMAN, JULIUS FLAGG, (all in their official and individual capacities), WEXFORD HEALTH SOURCES, INC., DR. LOWELL BROWN, M.D., DR. HUGHES LOCHARD, M.D., and RHONDA MILLS, )
Defendants. )

STATE OF ILLINOIS )
) SS.
COUNTY OF ___________ )

**AFFIDAVIT**

I, LOWELL BROWN, M.D., being first duly sworn upon my oath, soundly affirm the following statements:

1. I am a medical doctor licensed to practice medicine in the state of Illinois.

2. I began working at the Western Illinois Correctional Center in January of 2004.

3. In my capacity as the Medical Director at the Western Illinois Correctional Center, I saw a patient by the name of Aaron McCroy.

4. Prior to my employment at the Western Illinois Correctional Center, I had no contact with Mr. McCroy.

5. At the time I began as the Medical Director at the Western Illinois Correctional Center, I was not advised of all inmate grievances and lawsuits.

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

EXHIBIT
1

05415-N3293
TMP/ej

6. No act or omission on my part was based upon consideration of any grievance or lawsuit filed by any particular inmate, including Aaron Mccroy.

7. At the time that I began working at the Western Illinois Correctional Center, Aaron McCroy had already received his corneal transplant.

8. At no time did I refuse to schedule medically necessary medical appointments with outside physicians or any other physician.

9. At no time did I purposefully deny Plaintiff access to programs and privileges provided to non-disabled inmates.

10. To the extent any act or omission on my part led to a denial of access to any such programs or privileges, I was never made aware of it.

11. I had no role in determining which lights are left on or turned off at any time in the facility.

12. I did not enter any specific orders with respect to Aaron McCroy which would change his access to the commissary, the yard, his shower privileges, his recreation privileges.

13. I had no role in requiring inmates to clean their cells or empty their lockers or dressers.

14. At no time have I provided care and treatment to inmates at the Pinckneyville Correctional Center.

15. I did not follow Mr. McCroy once he was transferred from Western Illinois Correctional Center to another correctional facility.

16. At no time did I arbitrarily change Plaintiff's medically unassigned classification.

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej

17. Mr. McCroy was medically unassigned at the time I arrived at the Western Illinois Correctional Center.

18. It is my understanding that being medically unassigned allows patients/inmates not to hold jobs during their incarceration period.

19. I am not aware that being "medically unassigned" makes an inmate ineligible to participate in any early release programs.

20. At no time did I deny Mr. McCroy access to the commissary or to recreation.

21. Mr. McCroy would have had access to commissary and recreation as set forth by the infirmary rules attached hereto.

22. These rules are made by someone within the Department of Corrections and not by me.

23. I did write an order transferring Mr. McCroy to the general population on June 8, 2004.

24. In my opinion, there was no medical reason to keep Mr. McCroy in the infirmary beyond that date.

25. I had no role in assigning any cell mates to Mr. McCroy once he was transferred to the general population.

26. I had no role in assigning any cell mates to Mr. McCroy while he was housed in the infirmary.

27. At no time was I made aware of the identity of any specific cell mate assigned to Mr. McCroy.

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej

28. At no time has anyone advised me of the disciplinary background of Inmate Durham, or any other inmate who may have been assigned as a cell mate to Aaron McCroy.

29. Prior to September 23, 2004, I had no knowledge that Inmate Durham was being assigned to Aaron McCroy.

30. Prior to September 23, 2004, I had no knowledge that Mr. Durham had any propensities for fighting with his cell mates.

31. At no time was I ever made aware of the criminal background or disciplinary history of Mr. McCroy.

32. I have never been advised or made aware of the propensities for fighting of Mr. McCroy or any other patient admitted to the infirmary or seen by me on an outpatient basis unless said information was for some reason placed in the patient's medical records.

33. I did not punish Mr. McCroy for getting hit in the eye.

34. I had no role in placing Mr. McCroy in a cell with any particular inmate.

35. I had no role in determining which inmates should produce random urine samples for drug testing.

36. I had no role and have no role in determining the security risk of any inmate, including Aaron McCroy.

37. I had no knowledge and have no knowledge as to what Mr. McCroy's security status is.

38. I had no role in transferring Mr. McCroy to the Menard Correctional Center.

39. In my medical opinion, there was no medical need to keep Mr. McCroy housed in the infirmary on June 8, 2004.

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej

40. It is my opinion that Mr. McCroy wanted to be transferred from the infirmary in June of 2004. (Brown Deposition, p. 31.)

41. When Mr. McCroy was housed in the infirmary, he was not kept isolated from other inmates.

42. Mr. McCroy was housed from time to time with up to three other inmates while he was housed in the infirmary.

43. While he was housed in the infirmary, Mr. McCroy had access to the law library, commissary, and to the yard.

44. When Mr. McCroy would exercise those privileges, he would come into contact with many other inmates who were living in the general population.

45. I considered Mr. McCroy's risk of injury to his eye to be similar to that of someone on the outside who would come into contact with other individuals more than sixteen months after keratoplasty surgery.

46. In my opinion, Mr. McCroy received better than adequate medical care with respect to his postoperative keratoplasty.

47. The loss of Mr. McCroy's eye was unfortunate, but was not the result of deliberate indifference on the part of anyone other than the individual who struck him.

48. I do not routinely isolate inmates who could suffer harm as a result of a fight with another inmate as it would be highly speculative on my part to try to predict which inmates are more likely to be involved in an altercation as opposed to any other.

HEYL ROYSTER VOELKER & ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej

49. On January 23, 2004, I reviewed the consultation report concerning the care and treatment of Mr. McCroy's status post-keratoplasty of his left eye. I approved the recommendations contained within the report. (Exhibit 1-A, p. 336.)

50. I then scheduled Mr. McCroy to be seen by Dr. Zeh for a continued follow-up visit for February 24, 2004 and requested a care plan in an effort to minimize transportation needs. (Exhibit 1-B, p. 340.)

51. Mr. McCroy was seen by Dr. Zeh and was provided a plan which suggested medications for the care and treatment of the patient's glaucoma. The medications included the Lotimax, Travatan, Cosopt, and Alphagan, which were all approved and provided. The patient was also to return for a fitting of the rigid gas permeable contact lenses. (Exhibit 1-B, p. 340.)

52. On the same date, I prepared a referral request form to have the patient returned for follow-up as per Dr. Zeh's recommendations. (Exhibit 1-C, pp. 341-2.)

53. My next entry in Mr. McCroy's progress notes is dated March 19, 2004. On that date, I saw the patient for complaints of hypertension and noted that Mr. McCroy had glaucoma and other eye issues. I was not seeing him specifically for any eye problems on that date. (Exhibit 1-D, p. 989.)

54. My next entry was dated March 30, 2004 for complaints of left eye irritation for several days. The patient is hypesthetic in the early morning hours, then painful. Vision absent left eye. The conjunctiva is infected. Exposed to triple meds for glaucoma. My assessment was conjunctivitis. The patient was given Patanol for one week. (Exhibit 1-E, p. 990.)

55. My next entry for Mr. McCroy was April 7, 2004. I noted that the Patanol had not helped the patient's condition. He was noted to be on Cosopt, Alphagan, and Travatan. The patient

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej

was being followed by ophthalmologists. In my plans, I noted that the patient would be allowed to rest his television close to his bed due to his eye conditions. (Exhibit 1-F, p. 992.)

56. My next entry is dated April 26, 2004. On that date, Mr. McCroy requested a continuous supply of tears. I ordered those artificial tears. (Exhibit 1-G, p. 993.)

57. I also completed referral request forms for the patient to see Dr. Zeh on May 10, 2004. (Exhibit 1-H, pp. 344-5.)

58. Dr. Zeh's follow-up care was documented per his consultation report, which I reviewed and approved. (Exhibit 1-I, p. 346.)

59. Again, I completed referral requests on May 26, 2004 for the patient to follow up with his outside ophthalmologist. (Exhibit 1-J, p. 347.)

60. My next entry was dated May 27, 2004. My note from that date reads as follows:

> S (subjective): Left eye has cataract and glaucoma and (failed) cornea graft. Right eye needs contact lens. Both eyes are "out of focus."
>
> O (objective)\A (assessment): As described above, with periorbital reaction on left to the eye drops.
>
> P (plan): Wait second opinion from Dr. Steahly. Taking Lotemax, Travatan, Alphagan, Cosopt, and artificial tears. (Exhibit 1-K, p. 999.)

61. My next note is dated June 8, 2004, which reads as follows:

> No further medical need for detention. He will continue meds and see ophthalmologist for new opinion. (Exhibit 1-L, p. 1002.)

62. It was my opinion as of that date that Mr. McCroy had no further need for medical detention and could be released to the general population. It was further my opinion that Mr. McCroy was happy with this decision.

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej

63. Again, requests were made to send Mr. McCroy to an outside physician on June 11, 2004, with a consultation report having been prepared on June 18, 2004 by Dr. Steahly, who recommended that the patient's medications continue as before. Dr. Steahly made no recommendations suggesting specific restrictions on Mr. McCroy's activities or his ability to come in contact with other individuals. (Exhibit 1-M, p. 350.)

64. Dr. Steahly made no documentation that Mr. McCroy complained of his housing status. The report suggests the evaluation by Dr. Steahly was focused solely on the patient's eyes and did not include discussions of other issues. (Exhibit 1-N, p. 351.)

65. My next entry was made on June 21, 2004. At that time, I assessed Mr. McCroy's eye condition in conjunction with a letter I received from Dr. Steahly, who recommended to continue to treat the patient as is. My assessment at that time was the patient had keratoconus in his right eye and had a cataract and glaucoma in his left eye. My plan was to follow up with Dr. Steahly to elaborate on his recommendations. (Exhibit 1-O, p. 1003.)

66. At that time, Mr. McCroy made no complaints to me concerning his housing status.

67. I completed additional referral request forms on July 8, 2004 (Exhibit 1-P, p. 352) in an effort to transfer the patient out for additional follow-up care for the failed corneal transplant. The patient also had glaucoma, for which he was being seen at that time.

68. My next note is dated July 21, 2004 and relates to the patient's hypertension or cardiovascular clinic. I did note that the patient had a history of keratoconus in his right eye and glaucoma. However, the focus of my care and treatment was the hypertension. (Exhibit 1-Q, p. 1006.)




Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej

69. The patient was seen by Dr. Lee on August 9, 2004 for evaluation of the lens for the keratoconus on the right eye and was noted to be status post-corneal transplant. The consultation report from Dr. Brown makes reference to recommendations for various medications, which were reviewed and approved by me. (Exhibit 1-R, p. 355.)

70. This report makes no reference to any recommendations regarding Mr. McCroy's housing status nor any recommendations to keep Mr. McCroy isolated. (Exhibit 1-S, pp. 355-6.)

71. On August 10, 2004, I made an entry referencing a consultation from Dr. Lee. In Dr. Lee's opinion, the patient's left eye needed more attention for glaucoma and his right eye needed fitted for a contact. My plan was for the patient to see Dr. Knupp for the left eye and Dr. Kinser for the right eye. (Exhibit 1-T, p. 1010.)

72. Again, I recommended that Mr. McCroy be seen by an outside physician and I completed the appropriate referral request form on August 11, 2004 for Mr. McCroy to see both Dr. Kinser and Dr. Krager for care and treatment of the patient's keratoconus. (Exhibit 1-U, pp. 357-358.)

73. Prior to September 23, 2004, I see no entries suggesting that Mr. McCroy complained of his assignment to the general population.

74. On September 24, 2004, Mr. McCroy was admitted to the infirmary following an explosive injury to the left globe the day before. The patient had been treated in Quincy and was to be transferred to see Dr. Farris in Springfield for further evaluation. (Exhibit 1-V, p. 1015.)

75. My next entry is dated September 28, 2004 referencing our efforts to transfer the patient for surgery in an effort to salvage his left eye. (Exhibit 1-X, p. 1019.)




Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej

76. Shortly thereafter, I noted that the patient was to have his lens fitting for his right eye during the week of October 4, 2004. (Exhibit 1-Y, p. 1024.)

77. On October 5, 2004, I noted that the patient was set for his right eye contact lens adaptation. References to other medical conditions were made at that time. These conditions are not related to the patient's eyes. (Exhibit 1-Z, p. 1025.)

78. On October 6, 2004, I made a note indicating that Mr. McCroy was distraught over his misfortune regarding his left eye. Mr. McCroy asked to speak to a good listener. I noted his eye surgery was being arranged. My plan was to refer Mr. McCroy to the psychologist, Dr. Stiles. (Exhibit 1-AA, p. 1027.)

79. I noted that Mr. McCroy's surgery to his left eye was being rescheduled as of October 7, 2004. The lens for the right eye could wait as a result of this scheduling change. The left eye was the issue of focus at that time. (Exhibit 1-BB, p. 1028.)

80. I saw Mr. McCroy again on October 20, 2004 regarding his eye status. Mr. McCroy reported that he was despondent over the loss of his left eye. In my assessment, I noted the patient's vision of his right eye was unaffected by the injury to the left eye. I noted the patient's vision would be enhanced with contact lenses. My assessment was the patient was blind in the left eye and depressed. My plan was to continue the patient on his current medications. (Exhibit 1-CC, p. 1046.)

81. As of October 25, 2004, I noted that the patient's left eye was eviscerated with the right eye awaiting more satisfactory contact lens. For now, the patient felt more secure being housed in the infirmary. My plan included prescribing the patient additional artificial tears and lens cleaning solution at his bedside. (Exhibit 1-DD, p. 1048.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej

82. On October 27, 2004, I observed Mr. McCroy and noted the patient had no new problems. (Exhibit 1-EE, p. 1050.)

83. On October 29, 2004, I noted that the patient had special lenses being prepared for his right eye. I also requested safety goggles. (Exhibit 1-EE, p. 1050.)

84. As of November 1, 2004, I noted the patient was awaiting his contact lens. He did have his protective goggles at that time. I moved Mr. McCroy to chronic care status. (Exhibit 1-FF, p. 1051.)

85. On November 4, 2004, I noted that appointments for each eye were scheduled as of that time. The patient was stable. His left eye was blind due to trauma and his right eye continued to suffer from the keratoconus. (Exhibit 1-GG, p. 1053.)

86. I next saw Mr. McCroy in hypertension clinic on November 23, 2004 for those conditions. I kept Mr. McCroy in the infirmary relating to the previous injury to his eye. (Exhibit 1-HH, pp. 1061-2)

87. On November 24, 2004, I documented that I cautioned Mr. McCroy on the use of Darvocet for his tolerable pain and noted that the prescription would expire within three weeks. (Exhibit 1-II, p. 1063.)

88. My counseling at that time was made in an effort to advise Mr. McCroy that I would not allow him to become dependant on the medication.

89. As of December 23, 2004, I was still awaiting the contact lens from the folks at the Springfield Clinic. The patient's vital signs were stable. Mr. McCroy occasionally had headaches. My assessment at that time was the patient had continued keratoconus in his right eye. Mr. McCroy was in segregation status as of that date. (Exhibit 1-JJ, p. 1075.)

90. I next saw Mr. McCroy on December 27, 2004 for complaints unrelated to his eye. (Exhibit 1-KK, p. 1077.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej

91. Similarly, Mr. McCroy had complaints unrelated to his eye on January 3, 2005. (Exhibit 1-LL, p. 1079) and January 5, 2005 (Exhibit 1-MM, p. 1080.)

92. Mr. McCroy requested to have possession of his contact lens and to visit the law library on January 7, 2005. I referred those requests to security. (Exhibit 1-NN, p. 1081.)

93. On January 12, 2005, Mr. McCroy was transferred to the Menard Correctional Center. (Exhibit 1-OO, p. 1082.)

94. Additionally, I had seen Mr. McCroy on January 11, 2005 and noted his transfer would take place the next date. The patient wondered if his headaches could be treated more intensively. He seemed ungainly on his feet as if drunk. (Exhibit 1-PP, 1083.)

95. I am competent to testify regarding the facts set forth herein.

96. I make this Affidavit in support of my Motion for Summary Judgment.

Further Affiant Sayeth Not.

______________________________
LOWELL BROWN, M.D.

Subscribed and Sworn to before me this
_____ day of ________________, 2007.

______________________________
Notary Public

HEYL ROYSTER VOELKER & ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej

91. Similarly, Mr. McCroy had complaints unrelated to his eye on January 3, 2005. (Exhibit I-LL, p. 1079) and January 5, 2005 (Exhibit I-MM, p. 1080.)

92. Mr. McCroy requested to have possession of his contact lens and to visit the law library on January 7, 2005. I referred those requests to security. (Exhibit I-NN, p. 1081.)

93. On January 12, 2005, Mr. McCroy was transferred to the Menard Correctional Center. (Exhibit I-OO 1082.)

94. Additionally, I had seen Mr. McCroy on January 11, 2005 and noted his transfer would take place the next date. The patient wondered if his headaches could be treated more intensively. He seemed ungainly on his feet as if drunk. (Exhibit I-PP, 1083.)

95. I am competent to testify regarding the facts set forth herein.

96. I make this Affidavit in support of my Motion for Summary Judgment.

Further Affiant Sayeth Not.

[signature]
LOWELL BROWN, M.D.

Subscribed and Sworn to before me this 12 day of April, 2007.

[signature]
Notary Public




HEYL ROYSTER VOELKER & ALLEN
Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822