3:02-cv-03171-HAB-BGC    # 373-8    Page 1 of 11

E-FILED
Friday, 20 April, 2007  02:26:28 PM
Clerk, U.S. District Court, ILCD

3/8/07
Lowell Brown, M.D.                McCroy v. Illinois Dept. of Corrections

## Page 1

```
                    UNITED STATES DISTRICT COURT
                  FOR THE CENTRAL DISTRICT OF ILLINOIS
                          SPRINGFIELD DIVISION

AARON McCROY,
                Plaintiff,
     vs.                              No. 02-3171
ILLINOIS DEPARTMENT OF
CORRECTIONS, et al,

                Defendants.


         THE DEPOSITION of LOWELL BROWN, M.D.,
taken in the above-entitled case before Debra K.
Baldwin, a Notary Public of Sangamon County, acting
within and for the County of Sangamon, State of
Illinois, at 8:30 o'clock A.M., on March 8, 2007,
at Western Illinois Correctional Center,
Mt. Sterling, Brown County, Illinois, pursuant
to notice.


         Baldwin Reporting & Legal-Visual Services
             Serving Illinois, Indiana & Missouri
        24hrs (217)788-2835    Fax (217)788-2838
                      1-800-248-2835
```

## Page 2

```
APPEARANCES:
    LONDRIGAN, POTTER & RANDLE
    BY: Thomas F. Londrigan, Esq.
        1227 South Seventh Street
        Springfield, Illinois 62703
        On behalf of Plaintiff.
    MS. KELLY CHOATE
        Assistant Attorney General
        500 South Second Street
        Springfield, Illinois 62706
        On behalf of Defendant Illinois
        Department of Corrections.

    HEYL, ROYSTER, VOELKER & ALLEN
    BY: Ms. Theresa Powell
        Attorney at Law
        National City Bank Building, Suite 575
        Springfield, Illinois 62701
        On behalf of Defendant.
    HUGHES, HILL & TENNEY, LLC.
    BY: Ms. Lyndsay Dudgeon
        Attorney at Law
        236 North Water Street
        Decatur, Illinois 62525
        On behalf of Defendant Doctor David
        Anderson.
```

## Page 3

```
                    I N D E X
DEPONENT                              PAGE NUMBER
Lowell Brown, M.D.
    Examination by Mr. Londrigan          5
    Examination by Ms. Powell            58
    Examination by Ms. Choate            65



                  E X H I B I T S
NUMBER                        MARKED FOR IDENTIFICATION
Exhibit 1, 2, 3                         43
```

COPY

## Page 4

```
                 S T I P U L A T I O N
         It is stipulated and agreed, by and
between the parties hereto, through their
attorneys, that the deposition of LOWELL BROWN,
M.D., may be taken before Debra K. Baldwin, a
Notary Public and Certified Shorthand Reporter and
Registered Professional Reporter, upon oral
interrogatories, on the 8th of March A.D., 2007, at
the instance of the Plaintiff at the hour of
8:30 o'clock A.M., Western Illinois Correctional
Center, Mt. Sterling, Brown County, Illinois;
         That the oral interrogatories and the
answers of the witness may be taken down in
shorthand by the Reporter and afterwards
transcribed;
         That all requirements of the Federal
Rules of Civil Procedure and the Rules of the
Supreme Court as to dedimus, and the reading over
and signing of the deposition by the witness, are
expressly waived;
         That any objections as to competency,
materiality or relevancy are hereby reserved, but
any objection as to the form of question is waived
unless specifically noted;
         That the deposition, or any parts thereof
may be used for any purpose for which depositions
are competent, by any of the parties hereto,
without foundation proof;
         That any party hereto may be furnished
copies of the deposition at his or her own expense.
```

Page 5

                    (Whereupon the Deponent was
                    sworn by the Notary Public.)
              L O W E L L    B R O W N
having been first duly sworn by the Notary Public,
deposeth and saith as follows:
                    EXAMINATION
              BY MR. LONDRIGAN:
    Q    Doctor, will you give us your full name.
    A    Lowell Jerome Brown.
    Q    And you are a medical doctor, is that right?
    A    Correct.
    Q    Would you give me your background and training in the field of medicine.
    A    All right.
    Q    And then follow that up with your employment history up to the present.
    A    All right. I obtained a degree from Stanford University in '56 in biology, Bachelor of arts, and then medical school Creighton in Omaha, Nebraska, M.D., 1960, internship at Santa Clara County Hospital, which is in the Silicone Valley, in 1961, rotating under the direction of Stanford University. And a two year general practice

Page 6

residency, Modesto, California. And then in 1963 I commenced a general practice in Los Manus, which went on for three and a half years.
    And then I had to go in the Navy to fight off the Viet Nam situation, and I stayed on for 12 years in the Navy in that time going into pathology. I obtained certification in anatomic and clinical pathology. And, incidentally, moonlighting extensively in emergency rooms. And then entered into the practice of pathology as a civilian in '78 and moving to Springfield, Illinois, in '79, working two years as pathologist at -- I forget what it is now -- what we remember as Doctors Hospital.
    Then going back into family practice in Springfield and finally retiring out of that phase of my career in the year 2000. That was family practice. Then I went into locum tenens for three years and immediately before--
    Q    What did you--
    A    Locum tenens is like a traveling pinch hitter for doctors that are either ill or on vacation. I would take over their practice.
    Q    Okay.

Page 7

    A    That may not have been just a private practice, but I was in Urgent Care centers and Indian health centers and just about anything you can imagine during that three year period, the last of which was a prison in California, High Desert prison, which was a maximum security, and that was my fellowship, you might say, into the correctional medicine scene.
    So when I found an opportunity in Illinois, so I could live close to my home of record and my wife, I took it. And that was in January of '04 right here and I've been here ever since.
    Q    Based on your experience in correctional medicine and also your experience in general practice, as you've outlined it, including your time spent as a pathologist in Springfield, would you explain to me the similarities and/or the dissimilarities between the care provided to patients.
    A    You mean in the civilian sector versus the correctional?
    Q    Yes. What you can do, what you can't do, who you answer to. That type of thing.

Page 8

    A    Well, we have a, you might call it a gatekeeper concept, and this is true in California, as well as here, and perhaps throughout the United States, from what I've learned, that in order to obtain some outside service, such as CAT scans, or consultations, surgery, whatever, we have to present the case to our superior. And those people have--we've rotated through several in my three years here, whose job it is to assess the need for the service.
    Now, they wind up getting about the same as they would on the outside with a few exceptions. I think if someone showed up in my office in Springfield with a hernia, we'd have it fixed within a week or so. I mean, the surgical consultation would take place, no problem, let's get it fixed. Or if it was a lyphoma, a benign tumor, it was a nuisance, it should be removed. It would be removed.
    But, here, well, it's not life-threatening so we won't necessarily just rush out and do it, that lyphoma can get, the hernia can wait. If it became an irreducible, or incarcerated, or a strangulated hernia, or a definite

Page 9

1  life-threatening complication, then it would
2  obviously be fixed pronto.
3         So in some cases things are deferred
4  because they're not truly necessary or they're
5  maybe cosmetic or something. But medical procedures
6  are more easily obtained the way that I practiced
7  for 20 years. And that's in a nutshell.
8      Q   And I think that's fairly clear, although
9  it doesn't go into any detail.
10        Can you tell me if there has been any
11 medical literature generated with respect to
12 explaining this gatekeeper concept and how it
13 works?
14     A   Well, I've read articles. I read a lot of
15 journals and some articles touch upon the
16 correctional healthcare arena. And I think where we
17 have formularies, we have certain medicines to
18 choose from, but then the same is true with
19 Medicaid. So even that's parallel--that's
20 parallel. And I've read a variety of literature.
21     Q   Has there been any literature that's been
22 generated by the department of corrections as to
23 how this gatekeeper concept should work?
24     A   Well, I can't remember specific articles,

Page 10

1  but I've definitely read a myriad of things about
2  medical care in corrections and I have no great
3  criticisms to level against the system.
4      Q   No. I'm not really seeking that. I'm
5  trying to access your long experience and trying to
6  educate myself as to how this concept should work
7  and how it's different in the ways that you should
8  explained to me.
9         Are there written rules and regulations
10 here in Illinois in the department of corrections
11 which relate to the gatekeeper concept and the
12 duties that physicians working in institutions and
13 rules that they should observe in treating
14 patients?
15     A   Yes. We have material on that I've read
16 through. They have handouts or duties of the
17 medical director and so forth and they touch upon
18 all that.
19     Q   And who originates this literature,
20 directives, or regulations?
21     A   Well, the most immediate provider of that
22 information was the Wexford Corporation. But I
23 think they obtained it from some national data
24 bank.

Page 11

1      Q   What about rules of the department of
2  correction here in Illinois?
3      A   (No response.)
4      Q   What rules are you required to follow and
5  be conversant with in the care of prisoners, say,
6  at this institution, Western?
7      A   Well, I don't know that I've seen a book
8  of etiquette on the subject.
9      Q   No, I'm not really concerned about
10 etiquette. I'm talking about patient/prisoner care.
11        Are there any rules, to your knowledge,
12 that you're required to follow that are promulgated
13 by the department of corrections?
14     A   Well, there's a lot of literature out
15 there that I've thumbed through, but it doesn't add
16 anything to what I've already--to the fund of
17 knowledge that I've already arrived here with.
18     Q   Well, let me ask it a different way.
19     A   Do what is right, you know, be ethical.
20     Q   As you sit there today, are you aware of
21 any rules and regulations promulgated by the
22 department of corrections that relate in any way to
23 the care and treatment of Aaron McCroy in this
24 case?

Page 12

1      A   Nothing particularly striking. Just usual
2  patient care. I don't know what specific thing I
3  can point to.
4      Q   I'm not asking for anything specific.
5         I'm asking you a generic question about
6  your awareness of any rules and regulations
7  promulgated by the department of corrections that
8  bear on the care and treatment of Aaron McCroy in
9  this case and the medical problem that he had?
10     A   Well, I guess I have to say, no, I'm not
11 aware of exactly what you might be looking for.
12     Q   That's a fair answer. And if you--.
13        Have you ever had a deposition taken
14 before?
15     A   Yes.
16     Q   Okay. And so you generally understand the
17 process. If my question is confusing to you, let me
18 know and I'll ask it over again. If you don't ask
19 me that, then I'm going to assume that you
20 understood what I asked you in the first place and
21 I'll accept your answer.
22        If you ever get to a question that I ask
23 you that you don't know the answer to, that's
24 perfectly fine to tell me that. But listen to what

3/8/07  McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

Page 13

1    I'm asking you and then try to answer that question
2    and then I'll followup with another question.
3         Are you required to become informed with
4    respect to the grievance procedure here that's
5    available to patients if they have complaints about
6    their care and treatment?
7    A    Yes. They reach my desk invariably, the
8    grievances.
9    Q    All grievances or just those that relate
10   to medical care and treatment?
11   A    The ones I've seen have all been medical.
12   If there are others, I'm not are aware of it.
13   Q    Explain to me, if you would, based upon
14   date and time, as close as you can, as to when you
15   came to Western and what your roles were from the
16   time you came here up to the present.
17   A    And so I arrived on the 16th of January
18   of '04 and I was the sole--well, I had a nurse
19   practitioner working with me, but I was responsible
20   for the bottom line, the buck stops here, for
21   important medical decisions. And so that involves
22   approximately 2000 inmates, and that's 24 hours a
23   day, seven days a week. Some of that obviously by
24   phone since I'm not here at all times.

Page 14

1    Q    And when you came to Western, what was
2    your job title?
3    A    What was my?
4    Q    Your job title?
5    A    Acting medical director.
6    Q    Is that your title today?
7    A    No. I'm medical director.
8    Q    All right. Was there a medical director
9    when you came to Western in January of '04?
10   A    No.
11   Q    Who was acting medical director at that
12   time?
13   A    I don't know that they had anybody in
14   that capacity, unless it would be Doctor Lochard
15   who was available by phone and worked in another
16   correctional facility in Illinois.
17   Q    What's your understanding as to who the
18   last medical director was before you were
19   appointed?
20   A    I believe his name was Sims.
21   Q    And do you recall when it was that
22   Doctor Sims left Western?
23   A    I was told that he left approximately
24   October or September of '03.

Page 15

1    Q    And when were you appointed medical
2    director after you began to serve as acting medical
3    director?
4    A    I think about a year later.
5    Q    Now, although you were the acting medical
6    director at Western in the year 2004, you were not
7    appointed as medical director until approximately a
8    year later?
9    A    That's right.
10   Q    During that period of time you were an
11   employee of Wexford, is that right?
12   A    Yes.
13   Q    And they're often referred to, at least
14   in some of the documents that have been produced in
15   this case, as a vendor. Would you explain to me
16   what a vendor is, as you understand it, as far as
17   your job and responsibilities?
18   A    I look for a brand of subcontract entity
19   whose job it is to provide the hiring and
20   maintenance of medical personnel and goods to a
21   given prison.
22   Q    Do you have authority as medical director
23   to supervise and give direction to other medical
24   personnel at the prison that are in the employ of

Page 16

1    the department of corrections?
2    A    Yes.
3    Q    And they are required to follow your
4    direction?
5    A    Yes.
6    Q    Would you explain to me the process by
7    which a medically unassigned and medically
8    challenged prisoner would be assigned residence in
9    the infirmary of the healthcare unit. Explain the
10   process.
11   A    Well, we have several categories of
12   candidates for infirmary housing. Incidentally,
13   when I say someone needs to be in the infirmary, or
14   when I order someone there, they have no choice,
15   they would have to go. Now, I can entertain their
16   thoughts, their wishes they don't want to go to the
17   infirmary. I don't have to do that.
18        But, at any rate, I have the power to
19   tell someone they're going to go to the infirmary
20   and it will get done. The security people will see
21   to it. If we have--
22   Q    What if a security person said to you,
23   "Doctor, this guy is a threat to other patients
24   and he's caused us problems before and we don't

3/8/07  
Lowell Brown, M.D.  McCroy v. Illinois Dept. of Corrections

Page 17

1  think it's a good idea to have him in the
2  infirmary". Who would make the final decision
3  there? Someone from security or you?
4      MS. POWELL: As far as what I guess?
5      THE DEPONENT: Well, I think it isn't like
6  we're going to have a clash of power here, a power
7  struggle. We always try to satisfy the needs and
8  wishes of the security people here and we manage to
9  work out a solution.
10          If they think that something is necessary
11 for security, wanting them to put them in infirmary
12 or out of the infirmary, I'll certainly reason with
13 them and come up with a good answer I think.
14     MR. LONDRIGAN:  Q  So you're open to their
15 suggestions and any information that they provide
16 you?
17     A   Oh, yes.
18     Q   But, to use a term you used earlier, the
19 buck stops with you?
20     A   Well, in many--in many ways it does.
21 There are other times when I don't seem to have the
22 power.
23     Q   Well, explain that to me. What do you
24 mean by other times you don't seem to have the

Page 18

1  power?
2      A   Well, security runs the place here, at
3  least they think they do, and I think they do for
4  the most part, and there are some things I wish
5  they would do differently, but they don't. So I
6  have to live with it.
7      Q   And would it be fair to say that when you
8  feel that they should do something differently,
9  it's because of your judgment as a medical
10 professional as to what that patient requires?
11     A   Well, it isn't so much one patient, it's
12 like these lockdowns that crop up every so often.
13 Sometimes I think they overreact to a situation and
14 they declare a lockdown for the prison which puts a
15 crimp on our output of goods and services. And we
16 already have--we always operate under a backlog I
17 think and here we are not doing anything and
18 twiddling our thumbs because we can't see the
19 necessary sick call.
20     Q   What I need to understand is what rules
21 and regulations apply here if there is a dispute,
22 say, between you as a medical professional and
23 security at this institution as it relates to the
24 placement of a patient/prisoner. Who makes the

Page 19

1  final decision? Who has the authority to make the
2  final decision as far as placement of that
3  prisoner?
4      A   I don't think we've ever had an impasse
5  where I rigidly held one view against the security
6  holding another view. We've always compromised on
7  any differing viewpoints.
8      Q   Well, I understand that there can be
9  compromised--
10     A   And I've had talks with the warden at
11 times on issues like that.
12     Q   I understand that compromises are
13 sometimes reached, but what I'm asking is under
14 this system of a state agency and a vendor hired to
15 provide healthcare where the matter involves an
16 issue of prisoner health, who has responsibility
17 under the rules and regulations of which you
18 operate to make the final decision?
19     A   I can think of some instances where I
20 made the final decision and the warden and his
21 chain of commands have gone along with it. When I
22 put my foot down, I've never been refused on some
23 issue.
24     Q   How do you document the placement of a

Page 20

1  prisoner/patient when you decide that, from a
2  medical standpoint, it's in his best position to
3  remain in the infirmary?
4      A   So your question is what now? Rephrase
5  that, please.
6      Q   All right. I'll do that.
7          You've told me about you deferring on
8  some occasions to security and security on other
9  occasions accepting your judgment as a medical
10 professional. What I want to know is not examples
11 of how this works, but I want to know what rules
12 and regulations exist to determine who has the
13 ultimate last say as far as prisoner placement
14 where it involves medical judgment?
15     MS. POWELL: I just want to object to the form
16 of the question to the term "placement". I'm not
17 sure what you mean.
18     MR. LONDRIGAN: I meant whether or not he
19 should be in the infirmary.
20     Q   Now, with that clarification, do you
21 understand what my question is?
22     A   I think I have the question. I'm
23 wrestling with the answer to it. I don't know that
24 I have a written rule somewhere that I can go and

5 (Pages 17 to 20)

Baldwin Court Reporting & Legal Video Services  
1-800-248-2835

3:02-cv-03171-HAB-BGC    # 373-8    Page 6 of 11

3/8/07                           McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

**Page 21**

1  cite that states that my word will prevail against
2  all objections on a given point of whether someone
3  should be in the infirmary or not. But we haven't
4  had any real clash that I can ever recall where we
5  haven't worked out a solution. I don't think we
6  have a rule that I've ever gone by.
7     Q   Would you say then it's negotiated on a
8  patient-by-patient, issue-by-issue basis, say,
9  between you and the warden?
10    A   No. I'm sure there are rules written
11 down, but I don't necessarily know what they are or
12 cite them. I go on the negotiation tact.
13    Q   And negotiation is better than open
14 warfare, as we're slowly learning.
15        But what I'm trying to get at is where
16 the buck stops, who has the final word on this type
17 of issue.
18    A   (No response.)
19    Q   Is that clear in your mind, as you sit
20 there today?
21    A   Yeah.
22    Q   No. Not only the question. Is where the
23 buck stops, your term, clear in your mind, as you
24 sit there today, on these types of issues?

**Page 22**

1     A   Medically I'll take the hit on that. I
2  will stop with the buck.
3     Q   In other words, if you felt strongly
4  enough about the issue, you feel you have the
5  authority, as a medical professional, to make that
6  judgment?
7     A   Yes.
8     Q   What type of paperwork is required to be
9  issued and made a matter of record if a patient
10 with a medical problem is transferred into the
11 general population?
12    A   From the infirmary?
13    Q   Yes, sir.
14    A   There's a discharge summary.
15    Q   And who prepares that?
16    A   It would be myself or the nurse
17 practitioner if we had one.
18    Q   You're talking about Debra Fuqua's
19 medical problems now?
20    A   No.
21    Q   You say if you had one.
22    MS. CHOATE: Objection to the form.
23    THE DEPONENT: Debbie Fuqua would be our
24 administrator. She's the nurse administrator of

**Page 23**

1  the unit, of the healthcare unit, but I'm referring
2  to the nurse practitioner, which we don't have any
3  longer, which would be a subordinant to myself,
4  from a medical standpoint.
5     MR. LONDRIGAN:  Q  So if she would be
6  following your direction, would she have authority
7  to sign your name or affix your stamp and put her
8  initials after that to indicate that you authorized
9  the release from the infirmary?
10    A   That would be--yes, that would be all
11 right.
12    MS. CHOATE: Tom, are you talking about the
13 nurse practitioner or Deb? Because you brought up
14 Deb and he's talking about the nurse practitioner.
15    MR. LONDRIGAN: Well, I had that confused in my
16 mind. I think we've straightened that out though.
17    MS. CHOATE: So the last question was regarding
18 the nurse practitioner?
19    MR. LONDRIGAN: The nurse practitioner.
20    Q   And my next question was to be who was
21 the nurse practitioner when you were the acting
22 medical director?
23    A   Rhonda Mills, RN.
24    Q   And if I understand what you told me, she

**Page 24**

1  is no longer the acting medical director?
2     A   No. She's no longer the nurse
3  practitioner here.
4     Q   Excuse me.
5     A   We don't have one.
6     Q   Is she still employed here?
7     A   No.
8     Q   Is she still employed--. Was she an
9  employee of Wexford or an employee--
10    A   She was Wexford.
11    Q   She is still an employee of Wexford?
12    A   No. She's in private practice in
13 Beardstown.
14    Q   Now that I have a little better
15 understanding of how this works, would you tell me
16 how Aaron McCroy happened to be released to the
17 general population with the reasons for it and who
18 made that decision.
19    A   Well, I made the decision for quite some
20 time before the actual release to the general
21 population. He had been given the reasonable
22 privilege of walking outside in the sunshine or
23 fresh air, going to the commissary, which is a big
24 deal around here, and joining in with conversation

3/8/07 McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

### Page 25

1  with more people than you can encounter simply in
2  the infirmary.
3  We allowed the infirmary folks to do
4  this, weather permitting, and so since enjoyed that
5  and did well, we could see no reason to hold him in
6  the infirmary any longer medically or any reason
7  that I can think of. And so we released him to go
8  back to general population and that seemed to be
9  something he was happy about.
10  Q   And when you say "we", who else?
11  A   That's rhetorical.
12  Q   Pardon me?
13  A   That's rhetorical. Meaning myself, I.
14  Q   You made that decision?
15  A   And, of course, it was in conjunction in
16  discussion with the nurse administrator of the
17  place, Ms. Fuqua, and others. You know, we talk
18  about things.
19  Q   Did you consult any of his outside
20  treating ophthalmologists?
21  A   Well,--
22  MS. POWELL: About that issue? Or just in
23  general ever?
24  MR. LONDRIGAN: Q  About that issue.

### Page 26

1  A   I don't know that I brought up that
2  subject, but I sent Mr. McCroy to a pair of
3  ophthalmologists that I knew because I go to them
4  myself and I referred many patients when I was in
5  practice in Springfield. So whether I had
6  conversations with him on that particular
7  development, I don't remember. But I was on good
8  ground, in my opinion, to do so.
9  Q   What is your experience in the specialty
10  of ophthalmology?
11  A   What is that?
12  Q   Ophthalmology.
13  A   What is my experience?
14  Q   Yes.
15  A   My experience is mainly tangential having
16  referred, you know, hundreds of people to various
17  ophthalmologists over the course of twenty plus
18  years. I learn something with each time you do
19  that. And then what experience I've had with my own
20  eye conditions, I guess I learned something from
21  that too.
22  Q   All right. What eye problems do you have?
23  A   I've had glaucoma and cataracts.
24  Q   What is your knowledge or understanding

### Page 27

1  of the disease keratoconus?
2  A   Well, it's a corneal deformity that would
3  either require some rather uncomfortable lens
4  applications, prosthetic glasses, if you will,
5  contact lenses of rather complex proportions, or
6  surgery. Or else the person's not going to see very
7  well.
8  Q   Were you aware of the medical history,
9  and by that I mean did you review with prior
10  treating ophthalmologists and records that they had
11  provided to department of corrections and Wexford--
12  A   Yes.
13  Q   (Continuing)--about his background?
14  A   Yes.
15  Q   Were you aware that before he was
16  discharged by you that there was a prior attempt to
17  have him transferred to general population and
18  written request was made of his treating
19  ophthalmologist?
20  MS. POWELL: I'm going to object as to facts
21  not in evidence as there is no such document, no
22  written document from an outside ophthalmologist on
23  that issue. But you can ask the question.
24  MR. LONDRIGAN: Well, I disagree with that.

### Page 28

1  MS. POWELL: That's okay.
2  MR. LONDRIGAN: There's a transcription in the
3  record that a request was made of his treating
4  ophthalmologist to place him in the general
5  population and he said no, he didn't want him poked
6  in the eye.
7  Q   Did you ever review that before this
8  deposition today?
9  A   Yes. I know all about that.
10  Q   Did you call this treating physician back
11  when you exercised your medical judgment to have
12  this patient transferred into the general
13  population?
14  A   No.
15  Q   Why not?
16  A   I determined that an opinion or
17  recommendation was based on probably unrealistic
18  expectations and playing it safe. He wasn't on the
19  scene, he doesn't know entirely what's going on
20  here, and I decided that I knew better in view of
21  everything that was going on. And he was a previous
22  ophthalmologist, at any rate.
23  Q   How many times was this prisoner/patient
24  required to see different ophthalmologists in

7 (Pages 25 to 28)

3:02-cv-03171-HAB-BGC  # 373-8   Page 8 of 11

3/8/07                           McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

Page 29

1 different localities during the period of time that
2 he was housed here at at Western?
3   A   Well, I don't have a count on that, but I
4 know that I determined that we needed a new
5 opinion. I much preferred the two ophthalmologists
6 that I referred him to over the previous group,
7 from my own experience in Springfield.
8       And, besides that, I think we needed a
9 new opinion, a new fresh outlook on this. And,
10 unfortunately, they later withdrew from the case.
11 They said their malpractice coverage wouldn't cover
12 the correctional inmates.
13      And so we wound up searching for more
14 ophthalmologists. That's a specialty that we've had
15 a lot of trouble with, not just with Mr. McCroy,
16 but with others. They don't want to seem to take
17 care of prisoners.
18  Q   Did you communicate at all with the
19 medical director for department of corrections?
20  MS. POWELL: The agency medical director?
21  MR. LONDRIGAN: Q Yes.
22  A   You mean like Doctor Elyea?
23  Q   Yes.
24  A   I don't know that this case reached his

Page 30

1 desk.
2   Q   Well, you certainly didn't call and ask
3 for his opinion, did you?
4   A   No, I don't believe so.
5   Q   Do you know what his specialty is?
6   A   Ophthalmology.
7   Q   Who did you consult when you made the
8 decision to transfer him to general population?
9   A   I don't know that I spoke specifically to
10 an ophthalmologist about my decision.
11  Q   What was the date of Aaron McCroy being
12 transferred into the general population?
13  A   Something like November of '04. I forgot
14 the date. It was late in the year. September or
15 October, November.
16  Q   Well, it was before he had to be taken
17 for emergency treatment and had his left eye
18 enucleated because of a fight with an assigned
19 roommate, wasn't it?
20  A   Yes.
21  Q   And wasn't it on June 8th, while you were
22 acting medical director and after a dispute arose
23 between some nurses, about where his television set
24 should be placed in the infirmary? Wasn't it the

Page 31

1 day following?
2   A   I guess I don't remember that incident.
3   Q   Do you remember the grievance process
4 that was initiated about that dispute?
5   A   I don't recall that.
6   Q   Do you remember the grievance that was
7 filed by Aaron McCroy after he was assaulted about
8 being transferred into the general population?
9   A   I don't remember specifics of it. But
10 he--that differed from the way he was feeling
11 before he was transferred. I got the impression
12 that he was absolutely delighted with the transfer.
13  Q   Didn't he ask to be transferred to
14 another institution earlier that year?
15  A   Yes, I do recall that.
16  Q   All right. And didn't he ask to be
17 transferred to a place where he could get an
18 ophthalmologist, or access to an ophthalmologist,
19 that would provide him treatment for his eyes?
20  A   I don't doubt that he wants that. That's
21 a common thread with all of the inmates. They want
22 to be transferred to Dixon or someplace that has a
23 lot more atmosphere than this spot.
24  Q   Well, everybody here signed off on him

Page 32

1 being transferred, didn't they?
2   A   Everybody what?
3   Q   Didn't everybody here sign off on him
4 being transferred before he was sent into the
5 general population?
6   A   What do you mean sign off?
7   Q   Well, don't you have to apply to
8 Springfield department of corrections if a prisoner
9 is transferred from one institution to the other?
10  A   Yes. There's quite a procedure for that.
11  Q   All right. And were you aware that that
12 process was initiated as far as he was concerned
13 while he was still housed in the infirmary and
14 before he was transferred into the general
15 population?
16  A   I vaguely remember that, yes.
17  Q   And were you consulted or did you
18 exercise any of your medical judgment as to whether
19 or not that was appropriate?
20  A   I think I mentioned to Ms. Fuqua that I
21 think it would be a favorable thing to do, to
22 transfer him somewhere where he could have--if
23 there is such a place, where he could have better
24 frequently monitoring of his condition since we had

Page 33

1 so much trouble keeping ophthalmologists.
2  Q  Do you know why he was transferred by the
3 ophthalmologist from the Kehoe Clinic where he had
4 been treated for several years both before and
5 after he was transferred here to Western?
6  A  No.
7     I don't think I remember your question.
8 What was your question?
9  Q  Do you know of any medical reason, based
10 on your familiarity with this patient, and also
11 with his medical records, as to why his care and
12 treatment was transferred away from the Kehoe
13 Clinic where he had been treated outside, without
14 complaint, either by the department of corrections,
15 Wexford, or the patient, prior to the time that he
16 came here and after he came here?
17     MS. POWELL: I object to the form of the
18 question. It's compound.
19     THE DEPONENT: I don't know the answer to that.
20     MR. LONDRIGAN: It is compounded. And it was
21 before you came here.
22   Q  But based on your familiarity with his
23 records, can you give me any medical reason now why
24 his care and treatment was transferred away from

Page 34

1 the Kehoe Clinic?
2  A  No.
3  Q  If you wanted to find that out, and we're
4 at Western here today, what would you do? What
5 records would you consult and who would you go talk
6 to?
7  A  Well, I'd go in and talk to our medically
8 librarian who has all the records from correctional
9 facilities. We only have the most recent material.
10 When a chart gets so thick, we have to start a new
11 chart, and so we have old records that may not be
12 what we see on an every day basis. And then if we
13 don't have old records, if they're a civilian or a
14 non-correctional, then we would seek those out.
15  Q  And are these records archived and placed
16 on some type of computerized retrieval system?
17  A  We have the originals though at the
18 prison. If they're housed in our prison, we have
19 the old records.
20  Q  All right. So what you're telling me is
21 that the medical librarian is not here at Western,
22 there's a centralized place where medical records
23 are kept?
24  A  (No response.)

Page 35

1  Q  Is that right?
2  A  Well, I don't know if they have a central
3 data bank of records.
4  Q  And, again, if you don't know the answers
5 to this question, you can tell me you don't know.
6  Q  But you mentioned the medical
7 librarian. Since you've been here treating patients
8 and prisoners, have you ever had occasion to
9 request the medical librarian to provide you with
10 medical history on a patient?
11  A  Yes. She has helped me in seeking out--
12  Q  Tell me how you do that and who the
13 medical librarian is.
14  A  The name of the lady is Lynn Shelton. And
15 on several instances she has researched, made phone
16 calls long distance to learn what happened, or what
17 did some particular consultant do or say, what
18 x-rays there were and so forth. We've looked at
19 medical data by virtue of her research.
20  Q  Where is she employed?
21  A  She is employed I think--I think she's
22 Wexford. Incidentally, she received a better job
23 offer and now she'll be leaving next week.
24     MS. POWELL: Did you mean is she employed here

Page 36

1 at Western or some other city?
2     MR. LONDRIGAN: I'm just trying to find out
3 where.
4     THE DEPONENT: I think her paycheck comes from
5 Wexford.
6     MS. POWELL: I think he wants to know where she
7 is physically. Is she here at Western?
8     THE DEPONENT: Yeah. She's physically right
9 next door here.
10     MR. LONDRIGAN:  Q  But you're saying that
11 she's left now?
12  A  No. Next week I think is her last day.
13  Q  Now, in this case have you yourself
14 researched older medical records, prior to the time
15 that you came here, either with or without the
16 assistance of the medical librarian which is
17 located across the hall?
18     MS. POWELL: Wait a second. I object to the
19 form of your question. Are you talking about right
20 now has he ever looked at any medical records from
21 before he came here? Is that what you're asking?
22     MR. LONDRIGAN:  Q  Yes. For any patient.
23  A  Yes.
24  Q  Have you ever gone through that process?

3:02-cv-03171-HAB-BGC    # 373-8    Page 10 of 11

3/8/07                                McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

Page 37

1   A    Yes.
2   Q    What do you have to do? Do you have to
3   file some type of written requisition as to what
4   you want and why you want it?
5   A    No. No. You just walk in and--
6   Q    Talk to her?
7   A    (Continuing)--say do you have any old
8   records on so and so. And so we go to the wall, and
9   there it is, and I look through the chart, and
10  that's it.
11  Q    And do you know how long the records are
12  maintained here at this institution?
13  A    As long as the patient is here, the
14  records are here.
15  Q    And so those medical records would have
16  been transferred with the patient when he was
17  transferred from here and on to Menard?
18  A    That's my understanding, yes.
19  Q    Since you have been here and since this
20  litigation began, which was before I got involved
21  in this case, have you, or, to your knowledge,
22  anybody else here for Wexford requested prior
23  medical records for review for inmate McCroy?
24  A    I don't know what anybody else did.

Page 38

1   Q    Okay. The reason I said anybody else
2   is--. Let me rephrase it. Did you or anybody at
3   your direction attempt to assemble the complete
4   medical records and history of Aaron McCroy prior
5   to the time that he was transferred out of here and
6   down to Menard?
7   A    I think I looked through all the existing
8   records, but I don't know that I remembered any
9   salient features.
10  Q    Which of the treating outside
11  ophthalmologists retained by Wexford did you
12  personally speak to with regard to the treatment of
13  Aaron McCroy?
14  A    Let's see. I spoke to the two that I
15  referred to already. That would be Knupp and
16  Steahley. And then I think we also utilized
17  Bruninga (sp) from Jacksonville, but I can't be
18  sure if Bruninga was in on McCroy's case.
19  Q    You mentioned Steahley. That's
20  S-t-a-h-l-e-y?
21  A    S-t-e-a-h-l-e-y.
22  Q    And how did you spell the other name?
23  A    K-n-u-p-p. They're situated--. Knupp is
24  formerly from the SIU medical complex and then he

Page 39

1   joined Steahley whose offices are down by Doctors
2   Hospital.
3   Q    Now, do you understand who it was that
4   hired Doctor Zeh?
5   A    That who hired?
6   Q    Doctor Z-e-h. Doctor Zeh.
7   A    Was it Sims? I don't know. That may have
8   been.
9   Q    But it was Wexford. Correct?
10  MS. POWELL: I would object to the term
11  "hired". I don't know what you mean by the term
12  "hired". Do you mean was he ever an employee of
13  Wexford?
14  MR. LONDRIGAN: Q  Paid them to examine, paid
15  them to evaluate and recommend, process, and
16  ultimately Doctor Zeh who performed the corneal
17  transplant.
18  MS. POWELL: I object to the form of the
19  question. That is not accurate. Doctor Zeh did not
20  perform that transplant.
21  MR. LONDRIGAN: Wait a minute. I can't bring
22  his name to my--
23  MS. POWELL: It would be Doctor Feder.
24  MR. LONDRIGAN: Q  Did you have any

Page 40

1   communication with Doctor Feder?
2   A    I don't remember for sure.
3   Q    If you had written correspondence with
4   Doctor Feder, it would be in the patient's file, is
5   that right?
6   A    Yes.
7   Q    Did you have any conversation with
8   Doctor Zeh who provided the followup treatment to
9   the corneal transplant?
10  A    No.
11  Q    Have you reviewed or seen the
12  authorization that you signed off on discharging
13  Aaron McCroy from the infirmary and into general
14  population?
15  MS. POWELL: Again, object to the form of the
16  question in that there's been no evidence that he
17  actually signed off on something that is
18  specifically a discharge summary.
19  MR. LONDRIGAN: Q  Have you seen the discharge
20  summary?
21  A    I've seen it at some time if I wrote it.
22  I know I saw it at the time.
23  Q    Well, does anyone other than you have
24  authority to discharge anyone from the infirmary

3/8/07 McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

Page 41

1  and into general population?
2  A  Well, if I had signed out to someone, if
3  I was on vacation, then whoever that doctor was
4  would have had the authority.
5  Q  Would there be a record of that, wouldn't
6  there?
7  A  Yes.
8  Q  Now, understanding that you are a party
9  to this litigation and that your deposition is
10 being taken today and having the opportunity to
11 speak with counsel, are you telling me today that
12 you have not recently looked at the discharge
13 summary from the infirmary?
14    MS. POWELL: I'm going object to the form
15 question in that I'm not sure what you're talking
16 about when you ask that question. I think I know
17 what you're talking about, but I know what the
18 discharge summary is.
19    MR. LONDRIGAN: Well, let me find out if he
20 doesn't know what I'm talking about.
21    Q  She thinks she knows. Do you think you
22 know?
23    MS. POWELL: Well, I know what a discharge
24 summary is, but I think you're talking about his

Page 42

1  discharge.
2     MR. LONDRIGAN: Well, I'd like to see the
3  discharge summary. I'd like to mark it as an
4  exhibit and ask this witness questions about it.
5     MS. POWELL: Okay. But are you--
6     MR. LONDRIGAN: Can I have it?
7     MS. POWELL: Yes. Are you talking about when
8  the patient was discharged from the infirmary or
9  when Doctor Brown discharged the patient from being
10 housed in the infirmary back to general population,
11 because those are two separate dates?
12    MR. LONDRIGAN: Are they? I'd like to see
13 either and both. Whatever's here. If I have it, it
14 escapes me. I haven't seen anything which amounts
15 to what other witnesses have told me had to be done
16 when the person was discharged.
17    MS. POWELL: So you would like both of those
18 notes?
19    MR. LONDRIGAN: Yes. And then I'll ask him some
20 questions about it.
21    MS. POWELL: Here's your discharge note from
22 being housed in the infirmary. And I will pull out
23 the actual discharge. I will pull out the discharge
24 summary from the infirmary. Here's the infirmary

Page 43

1  discharge note. And what else might be relevant
2  is--
3     THE DEPONENT: I have in my--
4     MS. POWELL: Wait a second. I've got another
5  one too.
6     MR. LONDRIGAN: Could we take a break and get
7  those copied as an exhibit?
8     MS. POWELL: Sure.
9              (Whereupon said documents were
10                duly marked for purposes of
11                identification as Exhibits 1, 2
12                and 3, as of this date.)
13    MR. LONDRIGAN:  Q  Would you identify
14 Exhibit 1 for me. Tell me what that is.
15    A  Well, Exhibit 1 is November of '03. It is
16 a discharge note written by the nurse practitioner
17 whose authority at that point was linked to
18 whatever doctor was covering for us, for example,
19 Doctor Lochard, and relates to the discharge
20 from--. No. Let's see. It's a discharge from the
21 infirmary with a caveat avoid yard activity with
22 others. So as to protect keratoplasty site.
23    Q  Now, is the same or similar type of form
24 filled out and signed off on at the time of

Page 44

1  admission to the infirmary?
2  A  Yes. There is an admission form somewhat
3  similar to that.
4  Q  Was the prisoner/patient Aaron McCroy
5  informed in November of 2003 that he was being
6  discharged from the infirmary?
7  A  Well, I can only assume yes.
8  Q  And why do you assume that?
9  A  Well, I--
10 Q  Did you instruct that that be done?
11 A  No. I wasn't here. I wasn't here in
12 November of '03.
13    MS. POWELL: I object to you asking him
14 questions about things that he wasn't here about.
15 He wasn't here in November of '03 he's testified.
16    MR. LONDRIGAN: That's well taken.
17    Q  If you were there in November of '03,
18 would the patient be informed that he was
19 discharged from the infirmary?
20 A  Yes.
21 Q  Why?
22 A  There's no reason to keep what appears to
23 be obvious a secret.
24 Q  Do you know in November of '03 whether or

11 (Pages 41 to 44)