3:02-cv-03171-HAB-BGC    # 373-9    Page 1 of 10

E-FILED
Friday, 20 April, 2007  02:27:14 PM
Clerk, U.S. District Court, ILCD

3/8/07                    McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

Page 45

1  not on or prior to that date this patient's current
2  treating physician ophthalmologist was contacted
3  about this decision?
4      A    I don't know that.
5      Q    Do you see the summary of the reason for
6  his admission?
7      A    Yes, I see it.
8      Q    Do you agree that at that point in time,
9  and recognizing that this is before you came on
10 board, that there was no longer any reason to
11 protect his eye from injury by avoiding the general
12 population?
13     A    Well, I look upon the procedure of
14 placing him in a single room or sheltering him in
15 some way as being a rather impractical overkill of
16 the problem. I don't think that the infirmary was
17 necessarily a sanctuary from all trouble.
18          I mean, I think he demonstrated that he
19 did get into trouble in the infirmary. There were
20 four people in a room there and he was in a cell
21 with one other person when he was released, so he
22 had one-third of the amount of approximate danger,
23 I would say, in releasing him.
24     Q    Were there--

Page 46

1      A    I don't subscribe to the--to the
2  necessity for isolating him.
3      Q    Is that at this particular point in time
4  or at any particular point in time?
5      A    Well, I would say theoretically looking
6  back on that, I think that was an exaggerated
7  response to the problem generated by an
8  ophthalmologist who was being a little
9  overprotective I think.
10     Q    Now, you've talked about the medical
11 director's ultimate decision and the buck stopping
12 here. Do you know whoever was acting as medical
13 director here, if they made any attempt to consult
14 the treating ophthalmologist that was chosen by
15 Wexford?
16     A    I don't know that.
17     Q    Do you know if they made any attempt to
18 change the treating ophthalmologist to get a second
19 opinion from a specialist in that area?
20     A    I don't know that either.
21     Q    Do you know who authorized Nurse Mills to
22 sign off on this discharge note?
23     A    No, I don't know exactly who. I can only
24 guess.

Page 47

1      Q    Well, who was in a position acting as
2  medical director at that time?
3      A    I don't know that they had anybody
4  formally or informally named in that capacity. I
5  think it was an "as needed" phenomenon. Call Doctor
6  Lochard if something comes up, that type of thing.
7      Q    Is it your understanding, as you sit
8  there, that it was Doctor Lochard that approved
9  this?
10     A    I'm only guessing that he was the only
11 logical person they had available to consult in the
12 capacity of a medical director.
13     Q    You've never talked to Doctor Lochard
14 about it?
15     A    No, I didn't touch on that subject. No.
16     Q    Now, if you'd look at Exhibit Number 2.
17 The first nurse's note entry there several months
18 later, you are now acting medical director, is that
19 right?
20     A    Yes.
21     Q    And the patient at that time is still
22 housed in the infirmary. Is that right?
23     A    Yes.
24     Q    And it says per security. Who was it in

Page 48

1  security that was directing you to keep this
2  patient in the infirmary during this period of
3  time?
4      A    Well, first, I might mention that this is
5  the opinion of the nurse. I don't know how valid
6  that is, but I assume that it's probably correct,
7  that somebody in security, who, I don't know,
8  decided he needed to be in a segregated status, and
9  then they relaxed that directive and now he isn't
10 on security status as of March 31st. But just who
11 the personalities were, I don't know.
12     MR. LONDRIGAN: I want to go on the record
13 now--
14     MS. POWELL: Have we gone off the record?
15     MR. LONDRIGAN: Well, I'm not going to ask any
16 more questions, but I'm going to make a statement
17 on the record now that I'm going to reference back
18 to later on. I'm asking that I be informed of any
19 type of indemnity agreements that exist between the
20 defendants in this case.
21          If they exist now, I'd like to see them
22 prior to the trial. And if there are informal
23 agreements reduced to writing subsequently, I'd
24 like to be advised of those indemnity agreements

3:02-cv-03171-HAB-BGC   # 373-9   Page 2 of 10

3/8/07                           McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

Page 49

1  and have them produced. That last try.
2      MS. POWELL: I want to respond to your
3  question. If you would like to make a request for
4  any documents, I would prefer that you put those in
5  writing.
6      MR. LONDRIGAN: I'll do that. But I'm giving
7  you a heads-up and that's why interrupted this
8  deposition because what's occurred here--
9      MS. POWELL: Thank you.
10     MR. LONDRIGAN: I will do it in writing. I
11 promise you that. But I'm giving you lead time.
12     MS. POWELL: Thank you.
13     MR. LONDRIGAN:  Q  Do you know the date that
14 this patient was placed into the general population
15 the first time?
16     A   It appears to be in the--in mid June of
17 '04.
18     Q   Well, was it--did it occur on June 8th,
19 the date you find on Exhibit 3? All the entries
20 there are June.
21     A   It looks like June 8th would be the right
22 date.
23     Q   What is it that you're looking at here
24 that indicates he's released into--

Page 50

1      A   It says--my note of June 8th, ten a.m.,
2  says no further medical need for detention. He will
3  continue meds and see ophthalmology for new
4  opinion.
5      Q   And that's your signature below the ten
6  a.m. entry?
7      A   Yes.
8      Q   What ophthalmologist was he sent to at
9  that time for a new opinion?
10     A   I think it was the Steahley and Knupp
11 partnership.
12     Q   And that's the--.  Do you have any reports
13 back from Doctor Steahley?
14     A   Yes.
15     Q   And what does he say about releasing him
16 into the general population?
17     A   I don't know that he commented on the
18 nature of the housing of the patient.
19     Q   Did you ask?
20     A   No, I don't think I brought up that
21 issue. But I'd have to read the letter to verify
22 that again.
23     Q   Well, what was done, from a medical
24 standpoint, to make sure that when this patient

Page 51

1  went into the general population that he wouldn't
2  be put together with a known violent cellmate who
3  had previously been placed in segregation for
4  fighting and that had a history of violence?
5      A   Well, there is a--there is an action that
6  security performs under the heading of placement
7  where they're supposed to consider the variables
8  involved in how people get put in certain cells.
9  And I presume that that process took place when he
10 went from the infirmary to the population.
11     Q   Why do you presume that?
12     A   Because that's the policy that takes
13 place.
14     Q   Is this a written policy?
15     A   I expect it is written somewhere.
16     Q   Have you ever seen it?
17     A   I haven't read that one yet.
18     Q   You just assumed that that's something
19 that security would be doing to make sure that this
20 patient wasn't put in with a violent cellmate?
21     A   Well, I've had reputable people tell me
22 that that's what happened so it isn't just a mere
23 assumption.
24     Q   Tell me a couple of those reputable

Page 52

1  people that told you that.
2      A   This is Debbie Fuqua, the healthcare
3  administrator.
4      Q   Anybody else?
5      A   I don't remember any other incidents, but
6  I remember she told me that that's a specific
7  action that is performed. Or should be performed.
8      Q   Do you know her current medical
9  conditions and the type of medication that she's
10 taking?
11     A   Yeah. Currently I haven't seen her for
12 some time. She has a problem, a medical problem
13 now.
14     Q   Have you talked to her about your
15 assumption that this was, in fact, done in this
16 case?
17     A   No.
18     Q   That's just something you believe should
19 have been done based upon the way you know things
20 operate here at Western, is that right?
21     A   Well, some time ago Ms. Fuqua told me
22 about the placement process. This was before she
23 became ill.
24     Q   But after this incident occurred and

3/8/07  
Lowell Brown, M.D.  
McCroy v. Illinois Dept. of Corrections

Page 53

1 after this--after his transfer from -- Western? You
2 say some time after. Give me some framework when
3 you had this conversation with Debra Fuqua.
4     A    December of '06.
5     Q    So it was sometime after the fight?
6     A    Yes.
7     Q    As a matter of fact, it was sometime
8 after the cellmate Durham was discharged from the
9 penitentiary, wasn't it?
10    A    Oh. Well, I don't know his history. But
11 that would be--
12    Q    In having this conversation with you, did
13 Debra Fuqua tell you that she thought that this was
14 a perfectly safe inmate for this type of patient to
15 be housed with?
16    A    I don't know that she stated her opinion
17 of his safety or compatibility. I mean, the result
18 was that it was incompatibility. But I don't know
19 that she had any statement on that regard.
20    Q    Did she tell you who it was under her
21 jurisdiction that was responsible for the
22 placement?
23    MS. CHOATE: Object to the form "under her
24 jurisdiction". There's no evidence to that.

Page 54

1     THE DEPONENT: She doesn't have anything to do
2 with the placement process.
3     MR. LONDRIGAN:  Q  Tell me, as best you can
4 recall, what it was she told you after this
5 occurred.
6     MS. POWELL: About the placement process?
7     MR. LONDRIGAN: Yes.
8     THE DEPONENT: Well, that the placement people
9 review the personality and the profile of the
10 individuals that are to be housed together and try
11 to come up with a match that is going to be
12 mutually beneficial rather than dangerous.
13    MR. LONDRIGAN:  Q  And what I'm learning from
14 you, and also the objections here, is that Debra
15 Fuqua has nothing to do with that process. Is that
16 right? She just explained it, how it should work.
17    A    That's my understanding, yes.
18    Q    Did she explain to you who the people in
19 placement were that made the decision to put these
20 two prisoners together?
21    A    No.
22    Q    How would I learn that information as to
23 who made those assignments?
24    A    Well, you'd have to go through the

Page 55

1 authorities here. There must be a way, but I don't
2 know what it is.
3     Q    Okay. Who would I ask to determine who
4 had the final authority to review placement?
5     A    I guess you'd have to speak to the legal
6 counsel here or the warden or somebody in that
7 capacity.
8     Q    Do you know if when placement occurs if
9 the individual, or individuals, who make that
10 placement record a record and who the person was
11 who made those assignments?
12    A    I don't know this.
13    Q    Would Debra Fuqua know that?
14    A    She might have a glimmer of an eye. I
15 don't know that she does though.
16    MS. CHOATE: Objection.
17    THE DEPONENT: She might.
18    MR. LONDRIGAN:  Q  Do you know whether or not
19 these people that make these same assignments have
20 medical training?
21    A    I don't know that.
22    Q    Did you do anything, or, to your
23 knowledge, did anyone else at your direction to
24 flag this patient, Aaron McCroy, and his medical

Page 56

1 problems so that placement people were aware of the
2 risk should a fight occur?
3     A    I don't know that anything specific was
4 brought to their attention, but I think he was a
5 notorious case that they would know quite a bit
6 about.
7     Q    Well, when you say a notorious case, do
8 you mean because of his medical condition, or the
9 fact that he filed a number of grievances, or
10 something else?
11    A    Well, news travels fast around the
12 prison. And I don't think there are too many
13 secrets that go unnoticed.
14    Q    Okay. What was Aaron McCroy notorious for
15 in the prison, according to your understanding?
16    A    Well, notorious might be too strong a
17 word, but let's say he was well known. But I
18 believe there was some talk, and this is hearsay,
19 of some sexual hostility or aggressiveness. I
20 understood that he he was supposed to have put his
21 arms around and kissed Durham provoking the attack.
22    Q    Do you know of anyone that claimed that
23 other than Durham, his assigned cellmate?
24    A    No, I don't.

14 (Pages 53 to 56)

3:02-cv-03171-HAB-BGC    # 373-9    Page 4 of 10

3/8/07                                    McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

Page 57

1  Q  Have you ever looked at Aaron McCroy's
2  records in the number of years he's been at this
3  institution and other institutions as to whether or
4  not there was ever any indication that he was a
5  predator?
6  A  I don't know that. I didn't know it.
7  Q  Other than the rumor that you heard,
8  which came from the assailant in this case that
9  caused the loss of this eye, have you ever reviewed
10 any of his records to find out if he was a person
11 of violence who had ever been in any fights before?
12 A  No, I didn't do that.
13 Q  Or whether or not he even had homosexual
14 tendencies? There are those records that are kept
15 in this institution, aren't there?
16 A  Well, I had heard one other story
17 somewhere that he did the same type of thing to
18 somebody else.
19 Q  And who told you that story?
20 A  One of the nurses.
21 Q  Who?
22 A  Am I obliged to divulge the name of my
23 source?
24 Q  Yes.

Page 58

1  A  Cathy Ashcraft.
2  MR. LONDRIGAN: I think that's all the
3  questions I have. We're now off the record.
4         (Discussion off the record.)
5  MS. POWELL: Doctor, I just have a few followup
6  questions for you for clarification.
7              EXAMINATION
8              BY MS. POWELL:
9  Q  In general, Doctor, would you be advised
10 of any inmate's criminal history before seeing them
11 as a patient?
12 A  Generally, no.
13 Q  With respect to Exhibit 1, Doctor, it's
14 dated November 21st of 2003. I just wanted to
15 clarify. You were not working at Western Illinois
16 Correctional Center on November 21st, 2003, were
17 you?
18 A  Correct. I wasn't.
19 Q  That document was written by Nurse
20 Practitioner Mills?
21 A  Yes.
22 Q  Okay. And when you testified previously
23 you indicated that of his discharge note, and you
24 specifically referenced, I believe you said there

Page 59

1  was a caveat, referencing avoid yard activity with
2  others so as to protect the keratoplasty site. Do
3  you recall saying that?
4  A  Yes, I certainly do, yes.
5  Q  Can you tell me under what section of
6  that discharge note that language is placed?
7  A  Patient education.
8  Q  And when a note says patient education,
9  can you tell us what patient education means?
10 A  Well, that would be part of the
11 prescription. It would be helpful instructions to
12 promote a better long term result. It would be
13 behavioral advice, lifestyle.
14 Q  That would all be information given to
15 the patient, as it indicates?
16 A  Yes. It would be verbalized.
17 Q  And Exhibit 1 also indicates, Doctor,
18 that the patient was discharged from the infirmary
19 to single cell in segregation. Is that accurate?
20 Where it says under plan.
21 A  That's right. Yeah.
22 Q  You weren't here, so do you know why
23 Mr. McCroy was sent to segregation?
24 A  No, I don't know.

Page 60

1  Q  It could have been for disciplinary
2  reasons?
3  A  That's the usual reasons all right.
4  Q  And if they were for disciplinary
5  reasons, you don't know what those reasons were?
6  A  No.
7  Q  Now, in looking at Exhibit--. Again, with
8  respect to Exhibit 1, if a patient was transferred
9  from the infirmary to segregation, he would be
10 aware of being transferred to segregation by the
11 mere fact that he was moved from one place to the
12 other?
13 MR. LONDRIGAN: Objection. Leading.
14         Go ahead.
15 THE DEPONENT: Yeah. He'd catch on fast. Yeah.
16 MS. POWELL: Q  Now, with respect to
17 Exhibit 2, I think you testified earlier that the
18 patient remained housed in the infirmary per
19 security, and you referenced March 31st of 2004. Do
20 you recall testifying about that date?
21 A  Yes.
22 Q  Okay. If you look further down on
23 Exhibit 2 for the entry on April 4th of '04, can
24 you read what that entry says?

3:02-cv-03171-HAB-BGC   # 373-9   Page 5 of 10

3/8/07                                    McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

### Page 61

1    A    A nurse note, namely, off seg status,
2 7:10 a.m., property returned 8:30 a.m., voices no
3 complaints.
4    Q    Do you know, as you sit here today, or if
5 you have any recollection, whether or not
6 Mr. McCroy was ever off of seg status between the
7 dates of November 21st of '03 and April the 4th of
8 '04?
9    A    I don't--I don't believe he was, but I
10 don't know.
11    Q    Okay. And when Mr. McCroy would be taken
12 off seg status, as the note indicates on April the
13 4th of '04, but kept in the infirmary, where would
14 he go?
15    A    He would go in the four bed ward.
16    Q    And, Doctor, Exhibits 1, 2 and 3 have
17 headings at the top. Do you see those where it says
18 Offender Infirmary Progress Notes and Offender
19 Outpatient Progress Notes?
20    A    Yes.
21    Q    Is there a difference in those headings?
22    A    Well, these pages in their natural form
23 are yellow or gold in color.
24    Q    Would that be with respect to notes such

### Page 62

1 as Exhibit 1?
2    A    Yes. And then these two are on white
3 pages.
4    Q    And that would be with respect to
5 Exhibits 2 and 3. Correct?
6    A    Yes.
7    Q    Exhibits such as Exhibit 1, which
8 reference infirmary progress notes, would it be
9 fair to say that those are used for inmates who are
10 actually admitted to the infirmary?
11    A    Yes.
12    Q    And then Exhibits 2 and 3 you referenced
13 would be white pages. Would those be used for
14 patients who were not actually admitted to the
15 infirmary?
16    A    Yes.
17    Q    During the time that Mr. McCroy was
18 housed with three our people while an inmate in the
19 infirmary, do you recall him making any complaints
20 to you specifically regarding the fact that he was
21 placed with three other inmates?
22    A    No.
23    Q    Doctor, did you have anything to do with
24 transferring Mr. McCroy to a facility outside of

### Page 63

1 Western Illinois Correctional Center?
2    A    No, I didn't have anything to do in the
3 process of transferring. They might ask me am I in
4 favor of it or not, but that's as much as I get
5 involved.
6    Q    Did you play any role in specifically
7 assigning inmate Durham as a cellmate for
8 Mr. McCroy?
9    A    No.
10    Q    You weren't here at the time that
11 Mr. McCroy received his corneal transplant, were
12 you?
13    A    That's true. I was not.
14    Q    Did Mr. McCroy ever ask you to remove his
15 medically unassigned classification?
16    A    I can't--. I don't think so, but I can't
17 remember.
18    Q    Doctor, you gave some testimony earlier
19 about accessing records of patients regarding their
20 prior care and treatment, or for treatment relating
21 to outside physicians that had been received.
22    A    Yes.
23    Q    Prior to the time--. Do you recall that
24 testimony?

### Page 64

1    A    Yes.
2    Q    I just want to clarify. When you were
3 testifying concerning discussing prior histories
4 with the medical librarian, you were talking about
5 someone who worked here at Western Illinois
6 Correctional Center. Right?
7    A    Yes.
8    Q    And when you were discussing accessing
9 records of patients, or inmates, that would be with
10 respect to patients, or inmates, who are currently
11 at the Western Illinois Correctional Center?
12    MR. LONDRIGAN: And, again, all of these
13 questions are leading and you're simply asking this
14 are doctor to agree with you. I'm going to ask
15 later to have them all stricken, certainly from an
16 evidentiary standpoint.
17    THE DEPONENT: Yes, they were at the--the
18 charts are here when the patients are here.
19    MS. POWELL: Q And I think that's what you
20 said, but I just want to clarify. Is a patient's
21 medical record--. With respect to Aaron McCroy,
22 would his records currently be here at Western
23 Illinois Correctional Center?
24    A    No.

3:02-cv-03171-HAB-BGC    # 373-9    Page 6 of 10

3/8/07                                    McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

Page 65

1  Q  So even if you went to the medical
2  librarian right now, she wouldn't have access to
3  his prior records?
4  A  Not the original records. I mean, I'm
5  sure there are some copies floating around, but not
6  the originals.
7  Q  Where is his chart?
8  A  Wherever his facility is situated.
9  MS. POWELL: That's all I have, Doctor. Thank
10 you very much.
11 MS. CHOATE: I have a few questions.
12                EXAMINATION
13                BY MS. CHOATE:
14 Q  Doctor Brown, going back to--or you
15 talked about some office gossip from a Nurse
16 Ashcraft, and you said that she said he had done
17 the same thing to someone else, and that wasn't
18 clear. Do you mean that McCroy had done the same
19 thing, allegedly tried to kiss someone else, or the
20 other inmate had tried to harm someone else? What
21 was your conversation with Ashcraft?
22 A  No. He kissed someone else.
23 Q  That McCroy had done the same thing he
24 was alleged to have done to Durham?

Page 66

1  A  Yes.
2  Q  And did this conversation take place
3  after the fight with Durham, if you recall?
4  A  What now?
5  Q  The conversation with Ashcraft, with
6  Nurse Ashcraft.
7  A  It took place quite recently.
8  Q  As of March, or, I'm sorry, as of
9  June 8th of 2004 when you wrote your note that is
10 in I believe -- is it Exhibit 2, Theresa?
11 MS. POWELL: I think it's 3.
12 MS. CHOATE: 3.
13 Q  Exhibit 3, your progress note on
14 June 8th of 2004. At that time were there any
15 restrictions placed on Mr. McCroy as far as going
16 to commissary?
17 A  Well, it looks like Doctor Anderson, our
18 optometrist, entered a note in there.
19 Q  Did you place any restrictions on
20 Mr. McCroy as far as he could--
21 A  No, I didn't say anything about that. But
22 Mr.--Doctor Anderson had something to say. He said
23 no yard or gym due to eye condition, which is
24 curious.

Page 67

1  Q  Did you believe that Mr. McCroy should
2  not be able to be around other inmates?
3  A  No, I didn't believe that.
4  Q  Did you believe there was any medical
5  reason that he could not be around other inmates?
6  A  No.
7  Q  You talked about Deb Fuqua and said that
8  she was the healthcare unit administrator. Correct?
9  A  Yes.
10 Q  And as the healthcare unit administrator,
11 are you familiar with some of her duties or her
12 role in the healthcare unit?
13 A  Yes.
14 Q  Does Deb Fuqua admit inmates to the
15 infirmary?
16 A  Well, nurses have the power to
17 tentatively place them there pending my--maybe my
18 beeper went crazy or I couldn't be reached or
19 something, so until I show up again, if there's a
20 delay, they have the power to place them in there
21 pending my--I mean they have good sense.
22 Q  How about discharging someone from the
23 infirmary? Did Deb Fuqua have that power, without
24 a doctor's order or okay, to do that?

Page 68

1  A  I believe that would be overstepping that
2  boundary.
3  Q  To your knowledge, has Deb Fuqua ever
4  discharged someone from the infirmary without
5  consulting a physician?
6  A  No. No. She doesn't do that.
7  Q  You also testified that you talked to
8  Ms. Fuqua about the placement office.
9  A  About the what?
10 Q  The placement office and how that's done.
11 During the time that you've known Ms. Fuqua, have
12 you ever known her to work in the placement office?
13 A  I don't know if she did or didn't. She
14 spends a lot of time with the administration.
15 Q  But do you know if she has any
16 specialized knowledge of the placement office?
17 A  I don't know what she knows, but she's
18 pretty sharp.
19 Q  So you don't know if she has actual
20 knowledge of the placement office or if she's also
21 speculating as to what happens in the placement
22 office. Is that fair?
23 A  That's a fair statement.
24 Q  And you also talked about how word gets

Page 69

1  around in an institution. Correct?
2      A    Yes.
3      Q    Pretty much like any other place I
4  imagine.
5           But do you know for a fact, as you sit
6  here, that the people in the placement office had
7  any detailed information about Aaron McCroy's
8  medical condition at the time he was placed in June
9  of '04?
10     A    I don't know what their data bank is
11 there.
12     Q    And you also were asked about Mr. McCroy
13 wanting a transfer. Do you know where he requested
14 to be transferred?
15     A    I'm not sure I remember which one he
16 favored.
17     Q    And do you know, as you sit here, that he
18 would have gotten any better care from
19 ophthalmologists at another institution?
20     A    No. I don't think there is any hierarchy.
21 I think they're all--they're all pretty good.
22     Q    Do you, and let me kind of go back to the
23 placement in the infirmary issue, medical
24 placement, not security placement, but medical

Page 70

1  placements in the infirmary, does anyone from the
2  security staff, warden, assistant warden,
3  superintendent, lieutenants, anyone in security
4  have the authority to admit someone to the
5  infirmary for medical reasons?
6      A    No.
7      Q    Do they have the authority to discharge
8  someone from the infirmary for medical reasons?
9      A    No.
10     Q    You were talking about discussing
11 placement with the warden or other security people
12 like that. Do you discuss with the warden or with
13 anybody in security prior to discharging every
14 inmate?
15     A    No. Just on occasion I'll have a talk
16 with the warden about things.
17     Q    So this isn't a practice that goes on
18 with every inmate. Is that fair?
19     A    That's fair.
20     Q    You also talked about the gatekeeping
21 keeping process and that was a while back we were
22 talking about that. And the gatekeeping process, as
23 you described it, had to do with getting approval
24 for outside tests, or procedures, or physicians,

Page 71

1  that sort of thing. Is that correct?
2      A    Yes.
3      Q    Does the warden have anything to do with
4  that gatekeeping process, as you described it?
5      A    No. It's strictly between me and another
6  doctor.
7      Q    So none of the other non-medical people
8  would have anything to do with that either, would
9  they?
10     A    Yes. That's correct.
11     MS. CHOATE: I have nothing further.
12     MS. DUDGEON: I don't have any questions.
13     MR. LONDRIGAN: I'm fine.
14     MS. POWELL: Do you want to waive signature?
15     THE DEPONENT: Yes, I will.
16         FURTHER DEPONENT SAITH NOT.

Page 72

1  STATE OF ILLINOIS  )
                      ) SS
2  COUNTY OF SANGAMON )
3           C E R T I F I C A T E
4       I, Debra K. Baldwin, a Notary Public and
5  Certified Shorthand Reporter and Registered
6  Professional Reporter in and for said County and
7  State do hereby certify that the Deponent herein,
8  LOWELL BROWN, M.D., prior to the taking of the
9  foregoing deposition, and on the 8th of March A.D.,
10 2007, was by me duly sworn to testify to the truth,
11 the whole truth and nothing but the truth in the
12 cause aforesaid; that the said deposition was on
13 that date taken down in shorthand by me and
14 afterwards transcribed, and that the attached
15 transcript contains a true and accurate translation
16 of my shorthand notes referred to.
17      Given under my hand and seal this 26th
18 day of March A.D., 2007. _K. Baldwin_
19
20      Notary Public and
        Certified Shorthand Reporter and
21      Registered Professional Reporter
22
23 License No. 084-002129

"OFFICIAL SEAL"
DEBRA K BALDWIN
NOTARY PUBLIC
STATE OF ILLINOIS
COMMISSION EXPIRES 05/20/10


EXHIBIT
1
3-8-07 DB

ILLINOIS DEPARTMENT OF CORRECTIONS

## Offender Infirmary Progress Notes

Western Illinois Correctional Center

**Offender Information:**

Last Name: McCroy    First Name: Aaron    MI: ___    ID#: N 51882

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 11-21-03 3⁵ | Infirmary Discharge Note<br>Discharged by: (circle one)  M.D.  (N.P.)  D.D.S.  Psychiatrist | Plan:<br>- Continue present treatment ✓ |
|  | Summary of Reason for Admission:<br>Needs ICU placement to protect eye from injury. Avoid general population. | Follow-up as needed from single cell in segregation |
|  | Course in Infirmary:<br>Nonevenful.<br>Eye drops. |  |
|  | Discharge Diagnosis:<br>Healing process post Keratoplasty |  |
|  | Patient Education:<br>Avoid yard or activity c̄ others so as to protect Keratoplasty site. | R Mell____<br>____<br>C Thompson ln |

Distribution: Offender's Medical Record    DOC 0085 (Eff. 9/2002)

ILLINOIS DEPARTMENT OF CORRECTIONS

Offender Outpatient Progress Notes

<u>Western Illinois Correctional Center</u>


EXHIBIT 2
3-8-07 DB

Offender Information:
McCoy, Aaron     ID#: K5188

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 3/31/04 9am | Nurse Note — Remains housed in inf. per security. Voiced no c/o — | S Moore |
| 4-1-04 8 AM | Nurse note — up & about Cheerful Shower | — |
| 4-4-04 8:30 A | Nurse Note — Off Seg status 7:10 AM. Property returned 8:30 AM Voices Ø c/o — | B Bowery |
| 4-6-04 1:46 AM | Nurse Note: Ø c/o voiced, did request tylenol, as ordered, ↑ ambulating c̄ Ø distress noted — | J Connor cn |

ATTYG10123

ILLINOIS DEPARTMENT OF CORRECTIONS

## Offender Outpatient Progress Notes

### Western Illinois Correctional Center

**EXHIBIT 3** 3-8-07 DB

Offender Information: McCroy, Aaron   ID#: K51882

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 6/8/04 8 AM | Nurse Note — Remains housed in infirmary per security. Noted no c/o | A Mosse LPN |
| 6/8 10:00 A | — MD — No further medical need for detention. He will continue meds and see OPHth. for new opinion. | |
| 6/8/04 10:10 A | Eye Dr — no yard or gym due to eye condition — ↓ VA | H Browning noted 6/8/04 @ 10:35 A Mosse RN. noted [illegible] DL Anderson DO |
| 6/8/04 10:45 A | Nurse Note. Low bunk / low gally permit not need V.O. Dr Boo | A Mosse |

ATTYG10133

Distribution: Offender's Medical Record

DOC 0084 (Eff. 9/2002) (Replaces DC 7147)