1    A.    Yes.

2    Q.    From here on out until you're released, correct?

3    A.    Yes.

4    Q.    But you don't know anything else right offhand that
5 you want?

6    A.    Again, what I would be entitled to under the law is
7 something I don't know right now. And whether I will be in
8 IDOC when injunctive relief will come about is a question,
9 is still a question. That may moot the whole situation.

10   Q.    That's very fair about that. Let me ask you about
11 Don Snyder. I believe he was in your original complaint,
12 right?

13   A.    Yes.

14   Q.    Why did you -- what complaints do you have about
15 Donald Snyder?

16   A.    Well, he is the director, and he is responsible
17 for all of those he supervises. So he has a -- he is
18 responsible.

19   Q.    He's not currently the director though, right? You
20 know that?

21   A.    Not any more.

22   Q.    All right. I am just going down the list. And if
23 there are people that you don't know why they are in this
24 case, you can tell me that. We have had discussions with

```
 1  your attorney.  Nancy Tucker, I believe she was in the
 2  original complaint as well.  Is that fair?
 3       A.  Yes.
 4       Q.  Why is -- what are your complaints about her?
 5       A.  She is the chairman of the ARB.  And she was
 6  presented with evidence of misconduct and ignored it.
 7       Q.  Which misconduct did she ignore?
 8       A.  She ignored the misconduct of Western Illinois and
 9  the documented evidence.
10       Q.  Are we talking about medical misconduct?
11       A.  Yes, medical misconduct and harassment and
12  retaliation.
13       Q.  And did she respond to your appeals of your
14  grievances?
15       A.  Yes, she did.
16       Q.  She didn't respond the way you wanted?  Is that
17  fair?
18       A.  Yeah.  I guess that's fair.
19       Q.  She did respond, right?
20       A.  Yes.
21       Q.  Is that the only complaint you have about her, is
22  regarding how she handled your grievances?
23       A.  Well, my complaint is that, if she, it is her job
24  to resolve grievances in regards, then she is not doing her
```

111

1  job. That she, in fact, aided and abetted what happened to
2  me by not doing her job.
3      Q. Okay. Dennis Hockaday?
4      A. Yes.
5      Q. Who was Dennis Hockaday? Do you recall?
6      A. He was the warden at Western, I believe, at the
7  time.
8      Q. Okay. And what are your complaints about Warden
9  Hockaday?
10     A. Every thing I complained about was brought to his
11 attention and he ignored it.
12     Q. How do you know or what do you base your belief
13 that everything that you complained about was brought to his
14 attention?
15     A. Through grievances.
16     Q. So it is your understanding that he received every
17 grievance that you filed?
18     A. Yes, it is my belief.
19     Q. And you weren't satisfied that your grievances then
20 were handled correctly? Is that fair?
21     A. Yes.
22     Q. Is that because the grievances were denied?
23     A. Yes.
24     Q. Did you receive responses from Hockaday or whoever

```
 1  was standing in his place?
 2       A.  Yes.
 3       Q.  That's how you knew they were denied, right?
 4       A.  Yes.
 5       Q.  How about David Schnepel?  Do you know who he is?
 6       A.  Yes.
 7       Q.  Who was that?
 8       A.  He was the assistant warden of programs at Western.
 9       Q.  At Western?  Okay.  And what are your complaints
10  about Assistant Warden Schnepel?
11       A.  That, also, he was the ADA coordinator in his
12  capacity as assistant warden of programs.  And my problems
13  with medical staff was brought to him directly.  And he was
14  derelict in his duty and had full knowledge of the situation
15  that was going on.
16       Q.  Did you ever speak with him directly?
17       A.  No.  I can't recall if I did.
18       Q.  Now, what were you wanting -- you said he is the
19  ADA coordinator.  What did you want him to do as the ADA
20  coordinator that he didn't do for you?
21       A.  Well, as the ADA coordinator, it's not whether he
22  did or didn't do anything, that's not my call to determine
23  what he will or will not do.  All I can do is present him
24  with a problem.  And I presented him with a problem.
```

1  Q. Which problem?

2  A. The problem of my eyesight and the subsequent

3  injuries, and that's all I did.

4  Q. I am sorry?

5  A. That's all I did. And I can't say what he did or I

6  can't command what he was to do or supposed to do.

7  Q. So because you -- is this all along with the

8  grievances and the relief you were requesting from your

9  grievances?

10  A. Yes.

11  Q. And so David Schnepel was involved in that

12  process? Is that your understanding?

13  A. Yes.

14  Q. And by subsequent injuries do you mean the injuries

15  from the contacts that weren't fitting correctly or the

16  injury that you received during the altercation with

17  Mr. Durham?

18  A. All of it.

19  Q. All of it?

20  A. Well, all incidents that took place while he was

21  there. I believe at some point he left. I am not sure.

22  Q. Okay. Tara Barr?

23  A. Tara Barr.

24  Q. Do you remember who she is?

114

```
 1        A.   She was the grievance officer at Western.
 2        Q.   And what are your complaints about her?
 3        A.   Again, I presented her with evidence of what was
 4   happening to me, and she failed to take action or to
 5   properly investigate.
 6        Q.   Did she respond to your grievances?
 7        A.   Yes, she did.
 8        Q.   And sometimes her response was, "We're not going to
 9   do anything"?  Is that fair?
10        A.   No.  The response was that, "Medical says this and
11   you say that.  We say medical."
12        Q.   And were these about medical issues that you had
13   grieved?
14        A.   Yes.
15        Q.   Did you expect Tara Barr to make medical decisions
16   for you?
17        A.   No.
18        Q.   Did you expect Dennis Hockaday or David Schnepel to
19   make medical decisions for you?
20        A.   No.
21        Q.   How about Greg Voreis?  Do you remember who that
22   is?
23        A.   Grievance officer.
24        Q.   Another grievance officer?  Are your complaints
```

115

1  about Mr. Voreis similar to Tara Barr's or is there anything
2  different?
3      A.  Same.
4      Q.  Same?  Okay.  Now, Deb Fuqua, I believe she was in
5  your original complaint as well?
6      A.  Yes.
7      Q.  What are your complaints about Deb Fuqua?
8      A.  She, as the health care administrator it was her
9  job to act as a liason or arbitrator between Wexford and
10 IDOC inmates.  She didn't.  She allowed what happened to me
11 to happen and actually participated in some of the things.
12     Q.  What did she participate in?
13     A.  The switching of the medication, the harmful
14 medication, the contact cleaners that I believe I wrote the
15 grievance about.  I complained to her on numerous occasions
16 and wrote her letters on numerous occasions.  She took my
17 contact lenses when I first came to Western without any
18 doctor's evaluation.  On her own she took them and wouldn't
19 return them to me until I had everybody call to get them
20 back.  I informed her and Schnepel about the refit for my
21 contact lenses and that I needed them.  And I tried to
22 inform them about my condition and the dangers of what they
23 were doing it would cause to me.  And she ignored it.
24         All of the time I was in the infirmary I brought to

116

```
 1  her attention all of the problems that I was having and she
 2  ignored them.
 3      Q.  By ignoring them do you mean she refused to talk to
 4  you?
 5      A.  No.  She refused to correct them.
 6      Q.  So she basically didn't give you the relief you
 7  were seeking as well?
 8      A.  No.  She refused to allow me to be treated the same
 9  way all other inmates in the infirmary were being treated.
10      Q.  What do you mean by that statement?
11      A.  All other inmates in the infirmary were being
12  allowed to go to the store, to go to yard, to use the phone,
13  and to do other things.  But I was the only one that wasn't
14  allowed to do that.
15      Q.  Now, you're not --
16      A.  Other than the, yeah, the dying.
17      Q.  This wasn't the entire time you were in the
18  infirmary though, right?
19      A.  No.  No.  Not during the entire time, no.
20      Q.  Okay.  So I remember testimony earlier that while
21  you were in the infirmary you did go to yard and you did go
22  to the law library, and at some point you were in seg status
23  during your time in the infirmary, right?
24      A.  Yes.
```

117

1  Q. And during that time you can't use the phone,
2  correct?
3  A. Right.
4  Q. Were you ever able to call out while you were in
5  the infirmary?
6  A. Yes.
7  Q. How many times? Do you remember?
8  A. I think a couple of times. I had to write a
9  grievance to field services. And they arranged for me to be
10 able to use the phone.
11 Q. Now, do you know as you sit here if Deb Fuqua
12 personally stopped you from doing these things you wanted to
13 do or that someone else had determined that?
14 A. No, I do not.
15 Q. But if I am hearing you right, and correct me if I
16 am wrong, but because she was the health care unit
17 administrator, these things should have been taken care of?
18 A. They're under her. That's her, to my
19 understanding, if she cared to do anything about it,
20 she could have.
21 Q. But you don't know as you sit here what the scope
22 of her duties are specifically?
23 A. No.
24 Q. Is that fair?

1    A.  No, I do not.
2    Q.  Okay.  Now, some of these people may be in your
3    amended complaints.  Have you ever read the amended
4    complaints filed on your behalf?
5    A.  Yes, I have.
6    Q.  Is there anything in those complaints that you find
7    improper or incorrect?
8    A.  No.
9    Q.  Now, Roger Walker, Jr., was added as a defendant in
10   this case.  Why is he in there, if you know?
11   A.  Because he took the place of Snyder.
12   Q.  Okay.  So the same things for Snyder is Walker
13   except later?
14   A.  Yes.
15   Q.  Okay.  How about Kevin Winters?
16   A.  Kevin Winters was the warden at Western Illinois
17   Correctional Center.
18   Q.  Okay.  And you said regarding the previous warden
19   that your grievances were denied, right?
20   A.  Yes.
21   Q.  Is that what you're complaining about Kevin Winters
22   also?
23   A.  Yes.
24   Q.  Is there anything else about Mr. Winters?

```
 1        A.  Well, other than, you know, he is the chief
 2   administrative officer.  His job is to answer grievances as
 3   being the administrator.
 4        Q.  Did you not receive -- let me -- that's a
 5   negative.  Let me ask you this way:  Did you receive
 6   responses to your grievances that you filed while
 7   Mr. Winters was the warden?
 8        A.  Yes.
 9        Q.  But they weren't -- they were denied most of the
10   time, correct?
11        A.  Yes.
12        MR. LONDRIGAN:  All of the time.
13        MS. CHOATE:  He can testify to that, Tom.
14        MR. LONDRIGAN:  Yeah, he would.  But you said most of
15   the time.  Your question was most of the time.
16        MS. CHOATE:  And he can correct me.  He is under oath
17   here.  He can correct me if I am wrong.  And I told him
18   that.
19        Q.  Let's move on down to Terry Polk?
20        A.  Yes.
21        Q.  Because he was the warden and the grievances were
22   denied?
23        A.  Yes.
24        Q.  Did you receive the grievances, responses to the
```

```
 1   grievances when Terry Polk was warden?
 2        A.   No.
 3        Q.   Which ones didn't you get back?
 4        A.   Terry Polk, between the time that I wrote the
 5   grievance in regards to the urine analysis test and being
 6   removed from the infirmary, when I resubmitted those
 7   grievances, Terry Polk was the warden.
 8        Q.   So he was the warden when you resubmitted them, but
 9   not when you initially submitted them; is that correct?
10        A.   Right.
11        Q.   Then you didn't get a reply to the resubmitted
12   ones?
13        A.   No.
14        Q.   Did they come back to you at all?
15        A.   No, they didn't.  They came back the first time
16   with stamps showing that I submitted them and so forth, but
17   they didn't come back with answers.
18        Q.   Okay.  So to your knowledge -- go ahead.
19        A.   Pardon me.  Yeah, it came back with answers,
20   initial answers, and according to IDOC rules, the initial
21   answer obtained by the counselor, we supposed to resubmit it
22   back to the grievance committee.  And when I resubmitted
23   them back, they just disappeared.  I never got them back.
24        Q.   Do you know what happened to them?
```

```
 1       A.  Once I put them in the grievance box I can't
 2  account for them.
 3       Q.  So in the cell house there would be a box for
 4  grievances that you would deposit them in?
 5       A.  Yes.
 6       Q.  And then somebody takes care of the grievances from
 7  there; is that right?
 8       A.  The grievance officer comes and gets them.
 9       Q.  So you don't know if the grievance officer lost it
10  or you don't know what happened after that?
11       A.  No.
12       Q.  Okay.  Do you have any other complaints about Terry
13  Polk?
14       A.  Again, I don't know.  Again, there is a period when
15  things happened where he was the warden that I am not privy
16  to the extent of his involvement.
17       Q.  Did you ever speak directly with Mr. Polk about
18  your problems?
19       A.  Yes.
20       Q.  Okay.  What did he say?
21       A.  I talked to him about the situations and he
22  listened, but he didn't --
23       Q.  Now, the situation with your medical care?
24       A.  Medical care, urine analysis, and so forth.
```

```
 1        Q.   So this was after you failed the urine test?
 2        A.   Yes.
 3        Q.   Or were unable to give enough urine?
 4        A.   Right.
 5        Q.   So shortly before you were transferred to Menard?
 6   Is that fair?
 7        A.   Yes.
 8        Q.   How about Sandra Funk?  Who is she?
 9        A.   She is the assistant warden of programs at
10   Western.  And, again, the same would be for Schnepel as
11   Funk.
12        Q.   Was she the ADA coordinator, too?
13        A.   Yes.
14        Q.   So did you ever communicate directly with Assistant
15   Warden Funk?
16        A.   On numerous occasions I did.
17        Q.   And did she -- what did she say to you when you
18   talked with her?
19        A.   That she would resolve the problem, but she
20   didn't.  She allowed the retaliation to continue in regards
21   to the TV, the problems I was having with the TV, I went to
22   seg.  The original person that gave me permission to set me
23   TV off away from the window was Warden Funk.  I had no idea
24   that I wasn't given a permit.  When I was taken to seg, she
```

```
 1  did not, she said she didn't or I didn't have a permit or it
 2  was against the rules.  I constantly tried to communicate
 3  with her the problems I was having with COs and nurses and
 4  so on and so forth.  And she did not do her job.  And I did
 5  grievances and so on and so forth.  And because she was the
 6  around, she was accessible, I did have conversations with
 7  her.
 8      Q.  Do you have a permit for the cane that you
 9  currently have?
10      A.  Yes, I do.
11      Q.  So it's my understanding that the Department of
12  Corrections, if you have something that's outside the norm
13  that inmates are allowed to have, you have to have a
14  permit?  Is that fair?
15      A.  No.  No.
16      Q.  Why would you have a permit for your cane then?
17      A.  It just depends on -- IDOC is not -- it just
18  depends on for lack -- it just depends.  Like I have a, I
19  can't read most of the time.  So I have a talking book.  I
20  don't have a permit for that.
21      Q.  Would you need a permit for, for example, not a
22  cassette, but like a tape player for music or an iPod, that
23  sort of thing?
24      A.  Yes.
```