E-FILED
Friday, 20 April, 2007  03:36:43 PM
Clerk, U.S. District Court, ILCD

05415-N3293
TMP/ej/jly

## IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| AARON McCROY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02-3171 |
| | ) | |
| THE ILLINOIS DEPARTMENT OF CORRECTIONS, | ) | |
| ROGER E. WALKER, JR. (in his official capacity only), | ) | |
| DENNIS HOCKADAY, KEVIN WINTERS, SANDRA | ) | |
| FUNK, DEBRAH FUQUA, LIEUTENANT BYRON | ) | |
| LAW, KENNETH KELLERMAN, JULIUS FLAGG, | ) | |
| (all in their official and individual capacities), WEXFORD | ) | |
| HEALTH SOURCES, INC., DR. LOWELL BROWN, | ) | |
| M.D., DR. HUGHES LOCHARD, M.D., and | ) | |
| RHONDA MILLS, | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANT MILLS' MOTION FOR SUMMARY JUDGMENT

NOW COMES the Defendant, RHONDA S. MILLS, R.N., by her attorney, THERESA M.

POWELL of HEYL, ROYSTER, VOELKER & ALLEN, and for her Motion for Summary Judgment

pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, states:

### I. INTRODUCTION

Plaintiff has filed a Third Amended Complaint alleging that Defendant Mills retaliated against

him for exercising his First Amendment Rights.  Plaintiff also alleges that Defendant Mills violated

the Eighth Amendment by failing to protect him and by being deliberately indifferent to a serious

medical need during the time that he was incarcerated at the Western Illinois Correctional Center.

Plaintiff alleges that certain acts and/or omissions were performed or committed by Defendant Mills

which constitute the basis of each claim.  Defendant Mills denies that she committed any of the acts

set forth in Counts I, III, and IV of Plaintiff's Third Amended Complaint and further denies that any

HEYL ROYSTER
VOELKER
& ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

act or omission on her part violated any of Plaintiff's constitutional rights.  Defendant Mills further denies that any act or omission on her part caused injury to Mr. McCroy.

Both the Affidavit of Nurse Practitioner Mills and her deposition, in conjunction with the medical records, support her position concerning her lack of involvement with respect to the specific allegations contained within Counts I, III, and IV of Plaintiff's Third Amended Complaint.

As there are no genuine issues of material fact in this case with respect to the care and treatment provided to Plaintiff, Aaron McCroy, by Nurse Practitioner Mills, Defendant Mills is entitled to summary judgment.

## II.  MATERIAL FACTS CLAIMED TO BE UNDISPUTED

1.     Plaintiff was incarcerated at all relevant times relating to this Complaint and at the time he filed his initial lawsuit.  (See Plaintiff's Third Amended Complaint, Par. 2.)

2.     Defendant Rhonda Mills is a licensed nurse practitioner currently practicing at the Quincy Medical Group.  (See Rhonda Mills Deposition, pp. 5-8; attached as Exhibit 2)

3.     Nurse Mills has a master's degree in nursing with specialization as a nurse practitioner. (Exhibit 2, pp. 10-11.)

4.     Nurse Mills worked at Western Illinois Correctional Center as a nurse practitioner from September of 2001 through August of 2005.  (Exhibit 2, p. 6.)

5.     Rhonda Mills played no role and had no authority to transfer an inmate from one facility to another.  (Affidavit of Rhonda Mills, attached hereto as Exhibit 1.)

6.     Rhonda Mills played no role and had no authority to select or change Plaintiff's treating ophthalmologist.  (Exhibit 1.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

2

05415-N3293
TMP/ej/jly

7.    In general, the nurse practitioner would not participate in providing or passing out medications to inmates.  (Exhibit 1.)

8.    At no time would Nurse Mills or did Nurse Mills refuse to provide Plaintiff, Aaron McCroy, or any other inmate, medication that had been prescribed by the Medical Director or any other onsite physician.  (Exhibit 1.)

9.    At no time did Rhonda Mills administer medication to Mr. McCroy that had not been prescribed.  (Exhibit 1.)

10.    Rhonda Mills played no role in determining whether or not Mr. McCroy received a corneal transplant.  (Exhibit 1.)

11.    Rhonda Mills played no role in determining the availability of corneal transplants to Mr. McCroy or anyone else.  Whether or not a corneal transplant might have been available to McCroy if he had the means to pay for it prior to the year 2003 is unknown to Rhonda Mills. (Exhibit 1.)

12.    Rhonda Mills played no role in determining whether or not Mr. McCroy should be referred to an outside ophthalmologist.  In addition, she played no role in the frequency of those visits.  (Exhibit 1.)

13.    At no time did Rhonda Mills refuse to schedule needed medical appointments. (Exhibit 1.)

14.    Rhonda Mills played no role and had no authority to determine whether or not Mr. McCroy, or any other inmate, had access to programs and privileges provided to non-disabled or disabled inmates.  (Exhibit 1.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

15.     Rhonda Mills has no knowledge as to the eligibility requirements of the programs and privileges provided to inmates at the Western Illinois Correctional Center.  Rhonda Mills played no role in providing those programs or privileges or in determining who participated in them.  (Exhibit 1.)

16.     At no time did Rhonda Mills' duties as a nurse practitioner include making determinations regarding turning lights off and on for inmates; making decisions regarding requests to go to the commissary; making determinations regarding which inmates, if any, should be searched; determining whether or not an inmate should be allowed an opportunity to shower at any time; determining whether or not an inmate should be allowed to participate in recreation activities; and/or determining tasks and duties assigned to inmates concerning cleaning.  (Exhibit 1.)

17.     Specifically, Rhonda Mills played no role in determining whether or not Mr. McCroy should or should not be allowed to go to the commissary, have his belongings searched, should or should not have access to a shower at any specific time, should or should not be allowed to participate in recreation activities.  Additionally, at no time did Rhonda Mills wake the Plaintiff to ask him to clean his cell or to empty his locker or dresser.  (Exhibit 1.)

18.     Rhonda Mills played no role in determining whether or not Mr. McCroy should be "medically unassigned."  (Exhibit 1.)

19.     An inmate may be deemed medically unassigned in conjunction with a medical condition to prevent that inmate from having to work as a result of that medical condition.  (Exhibit 1.)

20.     Nurse Mills is not aware of the eligibility requirements for participating in any programs which may lead to an early release by an inmate.  (Exhibit 1.)

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

21.    Nurse Mills has no knowledge as to whether or not an inmate who is medically unassigned makes him ineligible to participate in certain programs offered by the Department of Corrections which may or may not lead to an early release.  (Exhibit 1.)

22.    Nurse Practitioner Mills played no role in determining whether or not Plaintiff was allowed to go to the commissary on any particular date.  (Exhibit 1.)

23.    Nurse Mills played no role in determining whether or not Mr. McCroy had access to recreation activities.  (Exhibit 1.)

24.    At no time did Nurse Mills transfer Aaron McCroy to the general population.  (Exhibit 1.)

25.    Nurse Mills played no role in determining cell assignments or any inmates.  (Exhibit 1.)

26.    Nurse Mills played no roles in determining the cell mate of Aaron McCroy.  (Exhibit 1.)

27.    Nurse Mills had no knowledge as to the identity of Mr. McCroy's cell mate when he was released from the infirmary in June of 2004.  (Exhibit 1.)

28.    Nurse Mills was not aware of either the criminal background or the disciplinary background of any of the inmates housed with Mr. McCroy subsequent to his release from the infirmary in June of 2004.  (Exhibit 1.)

29.    Nurse Mills is not aware of any punishment Mr. McCroy may have received as a result of the altercation he had with his cell mate in September of 2004.  (Exhibit 1.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

30.    Nurse Mills had no authority, nor would she play any role in determining whether or not Plaintiff should be disciplined as a result of any altercation, either in the infirmary or elsewhere within the Western Illinois Correctional Center.  (Exhibit 1.)

31.    Rhonda Mills had no involvement with obtaining a urine sample from Aaron McCroy in conjunction with a random drug test.  (Exhibit 1.)

32.    Rhonda Mills had no involvement in determining the security risks of any particular inmate, including Aaron McCroy.  In general, Nurse Practitioner Mills had no specific knowledge concerning the security classifications of each and every inmate.  (Exhibit 1.)

33.    Nurse Practitioner Mills played no role in transferring Plaintiff, Aaron McCroy, to the Menard Correctional Center.  Not only did she have no role in doing so, she had no authority to transfer inmates from one facility to another.  (Exhibit 1.)

34.    Nurse Practitioner Mills is no longer employed at the Western Illinois Correctional Center or any other correctional center.  (Exhibit 1.)

35.    At no time during her employment at Western Illinois Correctional Center was Rhonda Mills made aware of the identity of the cell mate with whom Aaron McCroy was housed in June of 2004 after he was transferred to the general population.  (Exhibit 1.)

36.    Nurse Mills has no recollection of the names of the inmates who were housed with Aaron McCroy while he was housed and/or admitted to the infirmary at any time from 2002 through June of 2004.  Accordingly, Nurse Mills has no information concerning either the criminal history or the disciplinary backgrounds of any of these unidentified inmates.  (Exhibit 1.)

37.    Specifically, Nurse Mills was not familiar with Inmate Durham at any time relevant to this lawsuit.  Likewise, Nurse Mills had no knowledge regarding Mr. Durham's criminal history,

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

6

05415-N3293
TMP/ej/jly

nor his disciplinary background.  That information would not have been provided to her, nor would it have been accessible to her.  (Exhibit 1.)

38.    Plaintiff's Third Amended Complaint references occasions and activities occurring after July 1, 2002.  (Plaintiff's Third Amended Complaint, Par. 21.)

39.    Mr. McCroy was transferred to the Western Illinois Correctional Center from the Hill Correctional Center on October 31, 2001.  (Exhibit 1-A, p. 739.)

40.    It appears that Nurse Mills' first encounter with Mr. McCroy after July 1, 2002 was on December 10, 2002.  On that occasion, Nurse Mills conducted a chart review only for blood pressure and monitoring the patient from the hypertension clinic.  (Exhibit 1-B, p. 786 - her first notation in the record before that is p. 752.)

41.    Subsequent to that date, Nurse Mills personally saw Mr. McCroy on December 12, 2002 in conjunction with his complaints of increased blood pressure.  (Exhibit 1-C, p.787.)

42.    The next time Nurse Mills' name appears in the Plaintiff's progress notes is August 21, 2003.  On that date, Nurse Mills saw Mr. McCroy as the nurse practitioner.  Her note from that date reads as follows:

S (subjective):  Patient just returning from showering when infirmary rounds made. Only complains of occasional dizziness.

O (objective): Eyes - sclera without redness.  No lid edema noted.

A (assessment): 1) keratoplasty; 2) HCV (hepatitis C virus) receiving interferon.

P (plan): Continue present management for those conditions based upon the prior physician's orders noted in the chart.  (Exhibit 1-D, 911.)

43.    Rhonda Mills again made rounds on August 26, 2003 and made an entry in the patient's infirmary progress notes as follows:

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

S (subjective): No complaints. Questions about removal of sutures of left eye. PEG-intron 16.5 mg SC weekly. Initiated 3/19/03. To reevaluate after 24 weeks - at week 20 now. To have follow-up keratoplasty on August 29, 2003.

A (assessment): 1) Hepatitis C; 2) Keratoplasty.

P (plan): Continue present management based upon prior orders entered concerning the patient's care and treatment of his hepatitis C and follow-up care with his outside treating ophthalmologist. (Exhibit 1-E, p. 912.)

44.    Rhonda Mills next saw Mr. McCroy on September 2, 2003. On that date, Mr. McCroy advised her that he had sutures in his left eye which needed to remain six more months. He requested renewal of an antihistamine. Nurse Mills examined him and noted that he was in no acute distress and was well-appearing. He was ambulating steady. She prescribed him some medication for his complaints in the form of Antivert and advised him to follow up as needed for his medications. (Exhibit 1-F, p. 914.)

45.    Rhonda Mills' next visit with Mr. McCroy was on September 15, 2003 concerning his complaints of dermatitis. His care and treatment was unrelated to his eyes. (Exhibit 1-G, p. 918.)

46.    Nurse Mills' next entry in Mr. McCroy's progress notes comes on September 16, 2003 and relates to his ongoing treatment of hepatitis C. Again, this is unrelated to the patient's eye condition at issue in this case. (Exhibit 1-H, p. 919.)

47.    Similarly, Nurse Mills' next entry is on September 22, 2003 pursuant to a chart review relating to the patient's hepatitis C treatment. (Exhibit 1-I, p. 921.)

48.    Nurse Mills next saw Mr. McCroy on September 23, 2003 relating to complaints of constipation. She did not assess him for any complaints relating to his eye condition. (Exhibit 1-J, p. 922.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

49.     On September 29, 2003, Nurse Mills saw Mr. McCroy, who advised that he had run out of Maxitrol and was awaiting evaluation of his hepatitis C treatment.  The Maxitrol was related to the patient's eye condition and was continued per the plan of that date.  (Exhibit 1-K, p. 924.)

50.     This medication was renewed pursuant to Dr. Zeh's order of August 29, 2003 of Maxitrol to be applied to the left eye twice per day, which could be refilled six times.  (Exhibit B, p. 292.)  This recommendation from Dr. Zeh was transcribed in a written prescription order by Dr. Shute, a staff physician, on August 29, 2003.  (Exhibit 1-L, p.566.)

51.     Nurse Mills saw Mr. McCroy on October 6, 2003 for complaints relating to care and treatment of the patient's hepatitis C.  (Exhibit 1-M, p. 927.)

52.     On October 27, 2003, Nurse Mills renewed the patient's Maxitrol per the orders of Dr. Zeh and Dr. Shute noted previously herein. (Exhibit 1-N, p. 942.)

53.     Nurse Mills' next entry in the patient's infirmary progress notes is dated November 17, 2003.  At 10:30 a.m., she conducted infirmary rounds and noted complaints from the patient relating to a rash and constipation.  (Exhibit 1-O, p. 963.)

54.     On November 21, 2003, Nurse Mills signed the patient's infirmary discharge note after a discussion she had with Jennifer Blaesing, the Director of Nursing.  (Exhibit 2, p. 32.)

55.     Pursuant to a telephone call that Jennifer Blaesing had with Dr. Zeh, she noted that the offender could be placed in a single cell in segregation.  She discussed this with Nurse Mills, according to her note.  (Exhibit 1-P, p. 965.)

56.     Nurse Mills does not recall the specifics of that conversation.  (Exhibit 1.)

57.     Mr. McCroy was discharged from the infirmary after having a non-eventful course within the infirmary.  He continued the healing process following his keratoplasty procedure.  He was

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

provided patient education to avoid the yard or activity with others so as to protect the keratoplasty site. He was discharged from the infirmary to a single cell in segregation, which to Nurse Mills' knowledge was also within the infirmary. (Exhibit 1-Q, p. 966.)

58. To Nurse Mills' knowledge, Mr. McCroy was placed in a single cell following his discharge from the infirmary on November 21, 2003. (Exhibit 1.)

59. Nurse Mills' next note in the patient's chart is dated December 9, 2003. On that date, she noted that Dr. Lochard had discussed the patient's care with Dr. Owens and approved a follow-up visit for his keratoplasty post-operative care. (Exhibit 1-R, p. 968.)

60. Nurse Mills' next entry in the patient's progress notes is dated March 19, 2004. On that occasion, she simply noted orders written by Dr. Brown regarding the patient's status relating to his hypertension. (Exhibit 1-S, p. 989.) Nurse Mills made no personal assessment nor any evaluation of the patient of her own on that date.

61. Nurse Mills' next entry in the patient's chart is dated August 12, 2004. On that date, she reviewed the patient's chart and noted that the patient was to be watched when taking medications. (Exhibit 1-T, p. 1011.)

62. Nurse Mills' next entry in the patient's chart is dated October 13, 2004 and relates to the patient's complaints of constipation. This visit was unrelated to the patient's eyes. (Exhibit 1-U, p. 1038.)

63. A similar visit was noted on October 14, 2004 while Nurse Mills was conducting rounds in the infirmary. The patient was seen with respect to his complaints of constipation. She did note the patient had his eye shield in place at that time. (Exhibit 1-V, p. 1040.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

64.    Nurse Mills next saw Mr. McCroy on November 1, 2004.  On that date, Mr. McCroy complained of a headache.  On her assessment, Mr. McCroy was sitting on a chair at bedside with earphones on.  He voiced concerns over not having follow-up with Dr. Farris yet.  He believed he was to go out one month prior.  Her assessment at that time referenced post-operative visits relating to the patient's left eye.  Her plan was to have the patient discuss his complaints with Dr. Brown regarding the need for follow-up visits.  (Exhibit 1-W, p. 1057.)

65.    Nurse Mills would not have had the authority to refer the patient to an outside physician on her own.  (Exhibit 1.)

66.    Nurse Mills' next and last entry relating to Mr. McCroy was dated December 15, 2004.  At that time, Mr. McCroy was noted to have his eye shield over his left eye and advised that he was awaiting his prosthesis.  He complained of headaches and requested narcotics.  In her assessment, the patient was in no acute distress and was well-appearing.  He was laying on his right side with his shield over his left eye.  The patient was awaiting his prosthesis for his left eye.  Nurse Mills' plan was to continue present management of the patient's current medical complaints.  (Exhibit 1-X, p. 1071.)

67.    In Nurse Mills' opinion, Mr. McCroy was treated appropriately.  (Exhibit 1.)

68.    At the time Nurse Mills discharged the patient from the infirmary to a single cell in segregation, there was no medical indication prohibiting Mr. McCroy's transfer to the single cell. (Exhibit 1.)

69.    Based upon a review of the medical records, it appears that Nurse Jennifer Blaesing had a discussion with Dr. Zeh regarding his recommendations, which were followed.  (Exhibit 1.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

70.    Nurse Mills had no involvement in discharging the patient from the infirmary to the general population in June of 2004.  (Exhibit 1.)

71.    Nevertheless, Nurse Mills has no reason to disagree with Dr. Brown's decision to do so.  (Exhibit 1.)

72.    Keratoconus is an abnormality of the cornea in which the cornea is weakened and begins to bulge irregularly.  That causes problems with the way the eye bends and focuses light through the creation of irregular astigmatism.  (See Deposition of Dr. Zeh Deposition, p. 7; attached as Exhibit 3).

73.    The definition of irregular astigmatism would be astigmatism that you can no longer correct with spectacles.  (Exhibit 3, p. 7.)

74.    When patients who have keratoconus can no longer wear spectacles to correct their vision, the next step is to try fitting them with a rigid contact lens.  (Exhibit 3, p. 7.)

75.    The rigid lens sits on the surface of the cornea and basically hides the abnormal shape and presents a nice, smooth spherical surface in which light is bent and focused on the back of the eye.  (Exhibit 3, pp. 7-8.)

76.    Patients with keratoconus have difficulty fitting rigid lenses due to the fact that the cornea is irregular.  (Exhibit 3, p. 8.)

77.    If the keratoconus disease progresses, the contact lenses will no longer center appropriately and these patients can have difficulties with the lens not staying on the eye or being very uncomfortable.  (Exhibit 3, p. 8.)

78.    At whatever point the patient becomes intolerant to contact lenses, then usually the recommendation is to proceed with a cornea transplant.  (Exhibit 3, p. 8.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

79.     The purpose of the corneal transplant is to try to restore more normal shape to the cornea to allow glasses or a rigid contact lens to be used to correct the eye.  (Exhibit 3, p. 8.)

80.     Keratoconus is a progressive disease in some patients.  In the mast majority of patients, the disease exists and then either does not progress or it progresses very slowly.  But in some patients, there is progression.  (Exhibit 3, p. 8.)

81.     There is no known medical treatment that will arrest the progression of keratoconus. (Exhibit 3, p. 8.)

82.     The thought is that rubbing the eye is one of the main reasons that some patients' keratoconus progresses due to mechanical pressure on the cornea.  (Exhibit 3, pp. 8-9.)

83.     However, some patients' keratoconus progresses whether or not they rub their eyes. (Exhibit 3, p. 9.)

84.     The three-tier progression of treatment ranges from spectacle correction, contact lens correction, and then cornea transplantation if the first two are not feasible anymore.  (Exhibit 3, p. 9.)

85.     Proper fitting of contact lenses does not necessarily arrest the progression of keratoconus.  (Exhibit 3, p. 9.)

86.     Proper fitting of contact lenses may allow a patient with the disease to see.  (Exhibit 3, p. 9.)

87.     Dr. Zeh first saw Aaron McCroy on August 29, 2003 after he had already had the corneal transplant on February 3, 2003 performed by Dr. Joseph Fedor.  (Exhibit 3, pp. 9-10.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

88.     On this date, the patient was stable with a clear transplant in the left eye.  The topography showed he had a very high amount of corneal astigmatism in the transplant, which is not extremely uncommon in patients with corneal transplants.  (Exhibit 3, p. 10.)

89.     Dr. Zeh recommended that the patient return in November to have one of the sutures removed in the hopes that it would reduce some of the corneal astigmatism.  (Exhibit 3, pp. 10-11.)

90.     When Mr. McCroy returned in November, the pressure in his left eye was elevated.  It measured at 30 mm of mercury.  Dr. Zeh therefore went ahead and tried to remove one of the sutures.  The patient moved during the suture removal and as a result, both sutures had to be removed, which was a bit early compared to what he would have preferred.  (Exhibit 3, p. 11.)

91.     At that time (November 6, 2003), the patient was placed on a weight limitation of not lifting more than ten pounds, no bending over, and was asked that he be isolated to a place where he would not be inadvertently jostled or struck.  (Exhibit 3, p. 11.)

92.     As of November 6, 2003, Dr. Zeh recommended that the patient stop the Maxitrol ointment after three days.  (Exhibit 3, pp. 11-12, 14.)

93.     The patient was switched to a lower potency steroid which tends not to elevate the pressure.  (Exhibit 3, pp. 12-13.)

94.     Ten to fifteen percent of the general population will respond with an elevation of pressure in the eye as a result of steroids.  (Exhibit 3, p. 14.)

95.     On November 6, 2003, Dr. Zeh had the suspicion that the patient might have a steroid-responsive glaucoma (elevation of eye pressure).  (Exhibit 3, pp. 14-15.)

96.     The patient came back on December 23, 2003.  He reported that he was still receiving the Maxitrol and was also receiving the Lotimax.  (Exhibit 3, p. 15.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

14

05415-N3293
TMP/ej/jly

97.     The patient's eye pressure was up to a little over 40 in the left eye.  (Exhibit 3, p. 15.)

98.     The patient was referred to Dr. Kim for a glaucoma evaluation at that time.  (Exhibit 3, p. 16.)

99.     With respect to the difference in pressure between 44 on December 23, 2003 and that of 30 documented on November 6, 2003, Dr. Zeh found that 44 was higher than he would have liked it to have been.  (Exhibit 3, p. 17.)

100.     It indicated to him that the glaucoma was not controlled.  (Exhibit 3, p. 17.)

101.     However, he points out that the instruments that read pressure in the eye are made to read pressures predominantly within a normal range.  Once the numbers get past the high end of normal (beyond 30), the machines become less accurate.  Therefore, the difference between 30 and 44 may not necessarily really be 14, the way it would be the difference between 10 and 24.  (Exhibit 3, p. 17.)

102.     Glaucoma is a condition that can potentially develop in about ten to fifteen percent of the general population in which an eye that is treated with steroids will respond with an elevation of pressure in the eye.  (Exhibit 3, p. 21.)

103.     In most patients, it happens within several days or several weeks of starting the steroid treatment.  (Exhibit 3, p. 21.)

104.     This was a little bit unusual in Mr. McCroy's case because he had been treated with steroids since the time of his transplant, since February 2003, and he had been seen multiple times during that interval between February 2003 and November 2003.  (Exhibit 3, p. 21.)

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

15

05415-N3293
TMP/ej/jly

105.    During that time, Mr. McCroy had not had any elevation in his pressure previously. It is a little unusual for him to develop the condition nine months after the use of steroids.  (Exhibit 3,  pp. 21-22.)

106.    The onset of glaucoma suffered by Aaron McCroy was not necessarily induced by the medication error which occurred in this case because Mr. McCroy actually had an elevated pressure before this transcription error or inadvertent prolonged use had occurred.  (Exhibit 3, p. 22.)

107.    The pressure was elevated longer, potentially longer than would have been desired, because of the failure to discontinue the steroid.  (Exhibit 3, p. 22.)

108.    However, the steroid-induced glaucoma was not induced by the fact that he received the steroids longer than he was supposed to and at a higher dose as well because that condition appeared to exist before that incident occurred.  (Exhibit 3, p. 22.)

109.    The elevation and pressure was initially identified on November 6, 2003.  (Exhibit 3, pp. 22-23.)

110.    Again, the pressure in the eye remained high, but the elevation was not necessarily induced by the fact that the steroids were not discontinued when ordered.  (Exhibit 3, p. 23.)

111.    Mr. McCroy was seen twice by Dr. Kim, once on January 8, 2004 and once on January 23, 2004.  (Exhibit 3, p. 23.)

112.    On January 23, the pressure in Mr. McCroy's eye was down to 19.  (Exhibit 3,  p.23.)

113.    Dr. Zeh cannot say that the discontinuation of the Maxitrol caused the decrease in pressure, because on January 8, after the Maxitrol had been discontinued, and the patient had been given two glaucoma medications, his pressure was still elevated to 31.  (Exhiibt 3, p. 24.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

16

05415-N3293
TMP/ej/jly

114.    As of the date of Dr. Zeh's deposition, June 22, 2004, Mr. McCroy's left cornea was fairly stable.  (Exhibit 3, p. 27.)

115.    In Dr. Zeh's opinion, with the exception of steroid glaucoma postoperatively, the patient's course of treatment has been fairly smooth sailing and he has not had a lot of problems that could potentially occur, such as allograph rejections or wound complications or things such as that. (Exhibit 3, p. 29.)

116.    The stitches have been out and the patient has been doing fine for the last seven months since the suture removal without having wound problems.  (Exhibit 3, p. 29.)

117.    The chance that the patient will suddenly have a problem in the absence of a traumatic injury is not high, but it is also not zero.  (Exhibit 3, p. 29.)

118.    In Dr. Zeh's opinion, providing care within at least 24 hours after a complaint has been made would be sufficient.  (Exhibit 3, pp. 29-30.)

119.    Dr. Zeh last saw Mr. McCroy on May 21, 2004.  (Exhibit 3, p. 31.)

120.    As of that date, the patient's condition of his left eye post-corneal transplant was stable with irregular astigmatism with a recommendation of proceeding with a rigid contact lens fitting for the eye.  (Exhibit 3, pp. 31-32.)

121.    Dr. Zeh's recommendations were rigid contact lens fitting of the left eye, consider cataract surgery if unable to improve visual acuity with the rigid contact lens, to continue the patient's medications unchanged since his pressure was stable, and to follow up again at his practice in three months to see one of the doctors for a cornea check.  (Exhibit 3, p. 32.)

122.    Dr. Zeh referred the patient to Dr. Blumthal for the contact lens fitting.  (Exhibit 3, pp. 33-35.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

123.    Dr. Zeh does not know why the patient had not been fitted with the contact lenses. (Exhibit 3, p. 36.)

124.    Dr. Zeh placed Mr. McCroy on restrictions immediately after the suture removal because of his concerns about a wound dehiscence since the sutures were removed a little bit ahead of time.  (Exhibit 3, pp. 37-38.)

125.    However, from the interval from November 2003 up through February 2004, at which point the patient was a year after the transplant, which is a point Dr. Zeh would normally remove all sutures from a patient anyway, he did not think the patient necessarily had to be on restrictions anymore.  (Exhibit 3, p. 38.)

126.    Mr. McCroy did not convey to Dr. Zeh that the restrictions placed by Dr. Zeh were in any way impeding his (Mr. McCroy's) ability to participate in any sort of rehabilitation classes or anything like that.  He never complained about the restrictive nature of that.  (Exhibit 3, p. 38.)

127.    After the corneal transplant in February of 2003, Mr. McCroy would have been given steroids from that time all the way through November 2003.  (Exhibit 3, pp. 42-43.)

128.    The medical records do reflect that the patient received the steroid ointment treatment that entire time.  (Exhibit 3, pp. 42-43.)

129.    Glaucoma is a disease of months and years in most cases rather than hours and days. (Exhibit 3, p. 44.)

130.    Dr. Zeh had no criticisms of the care provided to the patient's eye other than the failure to follow his instruction to discontinue the use of Maxitrol.  (Exhibit 3, p. 55.)

131.    Visual rehabilitation with corneal transplant patients often takes a year or more.  That is just the nature of cornea transplantation.  (Exhibit 3, p. 57.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

18

05415-N3293
TMP/ej/jly

132.    Patients often have high amounts of astigmatism until sutures are removed and in most cases, all the sutures are not removed for a year or more after the surgery, so Mr. McCroy is not necessarily behind scheduled compared to many people who have transplant procedures performed. (Exhibit 3, p. 57.)

133.    Keratoconus has no known cause.  (Exhibit 3, p. 57.)

134.    Dr. Zeh approved the substitutions of various generic medications for the medications that he had written.  (Exhibit 3, p. 59.)

135.    The patient's failure to have a contact lens at any time has not caused any permanent damage.  (Exhibit 3, p. 64.)

136.    During the time the patient had no contact lens, he just has not had a contact lens to correct his vision for that time.  (Exhibit 3, p. 64.)

137.    Dr. Robert J. Blumthal is an optometrist. (See Dr. Blumthal Deposition, p. 4; attached as Exhibit 4.)

138.    He currently practices in Springfield, Illinois with the Prairie Eye Center.  (Exhibit 4, p. 5.)

139.    In the course of his practice, he has seen a patient by the name of Aaron McCroy. (Exhibit 4, p. 6.)

140.    The first reference in the medical records generated by Prairie Eye Center relating to contact lenses is dated April 8, 2003.  (Exhibit 4, p. 10.)

141.    Dr. Feder referred the patient to Dr. Blumthal for the contact lens fitting.  (Exhibit 4, p. 10.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

19

05415-N3293
TMP/ej/jly

142.    The referral took place within the Prairie Eye Center office.  (Blumthal Deposition, p. 11.)

143.    Dr. Feder saw the patient again on May 9, 2003.  (Exhibit 4, p. 12.)

144.    Dr. Feder would not do the contact lens fitting himself.  (Exhibit 4, p. 12.)

145.    Between April 8, 2003 and May 9, 2003, an appointment had not been made by Prairie Eye Center with Dr. Blumthal as Dr. Blumthal felt Dr. Feder was "trying to deal with something relating to a side effect of the surgery" namely filamentary keratitis.  (Exhibit 4 , p. 13.)

146.    Dr. Blumthal had the opinion that with respect to the filamentary keratitis, this is a condition that he would want to have treated before fitting the patient with contact lenses.  (Exhibit 4, pp. 13-14.)

147.    It would be difficult to fit a lens on the patient with a condition of severe dry eye.  (Exhibit 4, p. 14.)

148.    Dr. Blumthal saw the patient on June 24, 2003 in reference to obtaining a rigid gas permeable contact lens.  (Exhibit 4, p. 16.)

149.    The scheduling of visits with Mr. McCroy would have been arranged through the Department of Corrections.  (Exhibit 4, p. 16.)

150.    Dr. Blumthal tried to schedule the earliest visit he had open on his schedule.  (Exhibit 4, p. 17.)

151.    This would be the same for somebody who was not with the Department of Corrections.  (Exhibit 4, p. 17.)

152.    When the patient was seen on June 24, 2003, Dr. Blumthal did not see the patient with respect to fitting a lens in the right eye.  (Exhibit 4, p. 22.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

153.    Based on Dr. Blumthal's evaluation of the patient, he found that he needed to use a lens called a Rose K lens, specifically designed for keratoconus patients.  (Exhibit 4, p. 23.)

154.    He did not have one of those sets on hand at the time he saw Mr. McCroy in June of 2003.  (Exhibit 4, p. 23.)

155.    Neither he nor anyone else would have known that he needed that particular device prior to June 24, 2003.  (Exhibit 4, p. 23.)

156.    Dr. Blumthal ordered the Rose K fitting on that date, June 24, 2003.  (Exhibit 4, pp. 24-25.)

157.    Dr. Blumthal next saw the patient on August 29, 2003 after the Rose K lens had arrived from the lab.  (Exhibit 4, pp. 25-26.)

158.    Dr. Blumthal did not fit the lens on that date because the patient had complaints of a scratching left eye.  (Exhibit 4, p. 26.)

159.    Dr. Blumthal referred the patient back to Dr. Zeh to address the complaint that the patient's eye was scratchy.  (Exhibit 4, p. 27.)

160.    Dr. Blumthal was not able to fit the contact lens on August 29, 2003.  (Exhibit 4, p. 29.)

161.    The reason Mr. McCroy was not fitted for a contact lens was that his eye was not in a stable condition to receive his lens on that date.  (Exhibit 4, p. 30.)

162.    Dr. Blumthal sees patients from as far south as Marion, as far east as Paris and Mattoon, and as far north as Canton, Illinois.  (Exhibit 4, p. 33.)

163.    It is not unusual for patients to travel quite a ways to see their doctors.  (Exhibit 4, p. 34.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

164.    The Plaintiff has testified that he was not initially assigned or housed with Inmate Durham upon his release from the healthcare unit.  (See McCroy Deposition of March 16, 2007, p. 94; Exhibit 5).

165.    Plaintiff is currently incarcerated at the Pinckneyville Correctional Center.  (Exhibit 5, p. 4.)

166.    Plaintiff has been incarcerated at Pinckneyville since August of 2005.  (Exhibit 5, p. 4.)

167.    Plaintiff was incarcerated at the Western Illinois Correctional Center from October of 2001 through January of 2005.  (Exhibit 5, p. 4.)

168.    During the year 2003 through 2004, the Plaintiff's vision in his left eye was limited to hand movements and seeing colors, shapes, and objects.  (Exhibit 5, p. 7.)

169.    He could not read out of his left eye.  (Exhibit 5, p. 8.)

170.    The last time Plaintiff asserts he was able to read out of his left eye was sometime in 2001.  (Exhibit 5, p. 9.)

171.    Plaintiff alleges the first time he complained of Mr. Durham was September 22, 2004. (Exhibit 5, p. 20.)

172.    Plaintiff alleges this was a verbal report to Lieutenant Law and Correctional Officer Kellerman.  (Exhibit 5, p. 17.)

173.    Plaintiff alleges he reported that Mr. Durham would get aggressive by getting loud and that Durham's posture would change.  (Exhibit 5, p. 19.)

174.    Mr. McCroy currently has a cell mate.  He has no difficulties with his current cell mate.  (Exhibit 5, p. 30.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

22

05415-N3293
TMP/ej/jly

175.   Plaintiff's current cell mate has no disabilities.  (Exhibit 5, p. 34.)

176.   Mr. McCroy is not complaining about his ADA cell at Pinckneyville.  (Exhibit 5, p. 46.)

177.   Mr. McCroy claims he did complain about cell placement at both Menard and Western Illinois Correctional Centers in that he claims he requested that they not cut the lights over his head and that he be allowed the draw the curtains to block out other people's light.  (Exhibit 5, p. 46.)

178.   With respect to Plaintiff's allegations concerning being denied access to employment, the Plaintiff claims that he was medically unassigned and therefore could not enroll in the early release program.  (Exhibit 5, p. 49.)

179.   According to the Plaintiff, he believes that he was taken out of the early release program because he missed three dates classes, which constitutes a violation.  (Exhibit 5, pp. 54-55.)

180.   It is Plaintiff's contention that the reason he did not go to school was because of his eye problems.  (Exhibit 5, p. 55.)

181.   After February 3, 2003, Plaintiff was allowed access to the yard.  (Exhibit 5, p. 57.)

182.   He would leave the infirmary every other day unescorted.  He knew how to get to the yard from the infirmary.  (Exhibit 5, p. 57.)

183.   Mr. McCroy was allowed access to the law library.  (Exhibit 5, p. 57.)

184.   He could go to the law library two to three times a week.  (Exhibit 5, p. 58.)

185.   At the time Mr. McCroy went to the law library, other inmates could be in the law library with him.  (Exhibit 5, p. 60.)

186.   When Mr. McCroy would go the yard at Western, other inmates would be in the yard. (Exhibit 5, pp. 61-62.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

187.    He does not know exactly how many inmates would be there - maybe 25 or 30 approximately.  (Exhibit 5, p. 62.)

188.    Mr. McCroy does not recall every meeting Dr. Lochard.  (Exhibit 5, p. 83.)

189.    According to Mr. McCroy, his complaints against Dr. Lochard relate to the allegation that Dr. Lochard appears to have placed restrictions on Mr. McCroy's activities without evaluating him.  (Exhibit 5, p. 83.)

190.    Mr. McCroy is also complaining that Dr. Lochard made him medically unassigned. (Exhibit 5, p. 83.)

191.    Mr. McCroy believes that Nurse Practitioner Mills canceled medications that had been prescribed to him.  (Exhibit 5, pp. 83-84.)

192.    Part of Plaintiff's claim against Nurse Practitioner Mills is that he believes she canceled a narcotics prescription for Darvocet.  (Exhibit 5, p. 84.)

193.    While Plaintiff was in the infirmary, he was housed with three other inmates at various time and sometimes alone.  (Exhibit 5, p. 93.)

194.    He does not recall the dates he was housed with other people as opposed to the dates he was housed by himself.  (Exhibit 5, p. 93.)

195.    Mr. McCroy was not immediately housed with Inmate Durham upon being released from the infirmary on June 8, 2004.  (Exhibit 5, p. 94.)

196.    Mr. McCroy does not recall the names of his other cell mates.  (Exhibit 5, p. 94.)

197.    He had three or four different cell mates before Mr. Durham.  (Exhibit 5, p. 94.)

198.    Mr. McCroy did not have any problems with these other cell mates.  (Exhibit 5, p. 94.)

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

199.    Plaintiff claims that he had difficulty navigating and was unable to function in the general population after being released from the infirmary.  (Exhibit 5, p. 95.)

200.    The Plaintiff was in the general population after June 8, 2004.  He would have to walk approximately 50 feet to travel to the commissary from his cell.  (Exhibit 5, p. 96.)

201.    Every time Mr. McCroy had the ability to go to the law library, he went.  (Exhibit 5, p. 98.)

202.    When he had the ability to go to the chow hall, he chose not to go on certain occasions.  (Exhibit 5, p. 98.)

203.    The law library is approximately 50 feet from the infirmary.  (Exhibit 5, p. 98.)

204.    The yard is approximately 125 feet from the infirmary.  (Exhibit 5, p. 98.)

### III.  APPLICABLE LAW

**A.    Summary Judgment Standard.**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a Motion for Summary Judgment, the court must look beyond the pleadings and assess the proof to determine whether or not there is a genuine need for a trial.  If defendants meet their burden in showing there is an absence of evidence to support plaintiff's claim, plaintiff must demonstrate by affidavit, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial.  Celotex Corp. v Catrett, 477 U.S. 317, 324-25, 91 L.Ed.2d 265, 106 S.Ct. 254 (1986).  In determining and evaluating a Motion for Summary Judgment, the court used the evidence in the light most favorable to the opposing party and draws all justifiable inferences in his favor.  A mere scintilla of evidence in support of plaintiff's position is

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

not sufficient to create a genuine issue of material facts. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.

242, 252, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).

**B.    Count I - Plaintiff Has Failed to Prove a Cause of Action for Retaliation Against Defendant Mills.**

An act taken in retaliation for the exercise of a constitutionally protected right violates the

Constitution. <u>DeWalt v. Carter</u>, 224 F.3d 607, 618 (7th Cir. 1999), citing <u>Mt. Healthy City School</u>

<u>Dist. Board of Education v. Doyle</u>, 429 U.S. 274, 283-4, 97 S.Ct. 568 (1977).  In order to prove a

retaliation claim, Plaintiff must prove (1) he had engaged in a protected conduct and (2) he was

retaliated against for engaging in this protected conduct. <u>DeWalt v. Carter</u>, 224 F.3d at 618 (7th Cir.

2000).  Even if the Plaintiff proves these elements, this is not enough if the Defendants can show the

result would still be the same absent a retaliatory motive. <u>Mt. Healthy City School Dist. v. Doyle</u>,

429 U.S. 274, 287 (1977).  It is not enough for the Plaintiff to merely state retaliation played a part

in the Defendants' actions. <u>Babcock v. White</u>, 102 F.3d 267, 275 (7th Cir. 1996).

There is no evidence to indicate that any act or omission on the part of Defendant Mills was

in response to the Plaintiff exercising a constitutional right.  Plaintiff suggests that some act or

omission on the part of Nurse Practitioner Mills was in part the result of Plaintiff having filed

grievances or lawsuits.  However, some of the grievances the Plaintiff references appear to address

the same care and treatment of which he complains.

As indicated, there is no evidence to suggest that any act or omission constituted a retaliatory

action and certainly did not correlate with any exercise of Plaintiff's constitutional rights.

Accordingly, Plaintiff's claims for retaliation must fail.

**C.    Count III - Eighth Amendment Failure to Protect.**

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

26

05415-N3293
TMP/ej/jly

There is no evidence to support a cause of action under a theory of failure to protect against Defendant Mills.

Count III of Plaintiff's Complaint specifically suggests that the Defendants acted with deliberate indifference to the Plaintiff's safety in terms of both his physical and psychological condition when they transferred him from the infirmary to the general population on or about June 8, 2004. (Plaintiff's Third Amended Complaint, Par. 231.) Additionally, Plaintiff alleges that the Defendants acted with deliberate indifference to Plaintiff's safety when they assigned him a cell mate, Inmate Durham, who had a known history of physical violence toward his cell mates. (Plaintiff's Third Amended Complaint, Par. 232.)

Plaintiff also alleges in Paragraphs 233 and 234 of Count III of Plaintiff's Third Amended Complaint that Defendants Law and Kellerman had specific acts of deliberate indifference and that the Illinois Department of Corrections has a "first fight policy" which led to the loss of Plaintiff's left eye as a result of an attack by Inmate Durham.

None of the allegations set forth in Plaintiff's Complaint are sufficient to state a cause of action against the undersigned Defendant. Moreover, there is no evidence to support a claim for failure to protect against the undersigned Defendant.

Under the Eighth Amendment, prison officials do have a duty to protect prisoners from violence at the hands of other prisoners. <u>Farmer v. Brennan</u>, 511 U.S. 825, 833 (1994). Specifically, when an inmate is attacked by another inmate, the Eighth Amendment is violated **only** (emphasis added) if "deliberate indifference by prison officials effectively condones the attack by allowing it to happen . . ." <u>Haley v. Gross</u>, 86 F.3d 630, 640 (7th Cir. 1996). Deliberate indifference is comparable to criminal recklessness, and is shown by something approaching a total unconcern for one's welfare

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

in the face of serious risks, or a conscious culpable refusal to prevent harm.  Duane v. Lane, 959 F.2d 673, 677 (7th Cir. 1992).  This total disregard for a prisoner's safety is the "functional equivalent of wanting harm to come to the prisoner."  McGill v. Duckworth, 944 F.2d 344, 347 (7th Cir. 1991). Negligence does not satisfy a deliberate indifference standard.  Sellers v. Henman, 41 F.3d 1100, 1102 (7th Cir. 1994).  It is not enough to show that a prison official merely failed to act reasonably. Gibbs v. Franklin, 49 F.3d 1206, 1208 (7th Cir. 1995).

Deliberate indifference can be inferred only where a defendant knows there is a strong likelihood rather than a mere possibility that violence will occur.  Watts v. Laurent, 774 F.2d 168, 172 (7th Cir. 1985).  Prison officials cannot be expected to eliminate the possibility of all dangers.  McGill v. Duckworth, 944 F.2d 344, 347 (7th Cir. 1991).  "Prisons are dangerous places. Thus, the right to reasonable protection does not include the right to protection from random acts."  See, McGill v. Duckworth, 944 F.2d 344, 348 (7th Cir. 1991) "(some level of [danger] is inevitable no matter what guards do").

In order to substantiate a claim for failure to protect, the Plaintiff must prove that prison officials were aware of a specific, impending, and substantial threat to his safety, "often by showing that he complained to prison officials about a specific threat to his safety."  Pope v. Shafer, 86 F.3d 90, 92 (7th Cir. 1996).  Essentially, Plaintiff must prove the Defendant had to know that there was a substantial risk that Inmate Durham (the one who is alleged to have attacked the Plaintiff) would do so, and yet failed to take action.  Sanville v. McCaughtry, 266 F.3d 724, 733-34 (7th Cir. 2001).

In this particular case, Plaintiff appears to be alleging that Defendant Mills was deliberately indifferent to the Plaintiff's safety when he was transferred from the infirmary to the general population on or about June 8, 2004.  With respect to Nurse Practitioner Mills, there is no evidence

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

28

05415-N3293
TMP/ej/jly

that she was involved in the patient's transfer from the infirmary to the general population in June of 2004, as that entry was made by Dr. Lowell Brown.

Nevertheless, even if Nurse Mills had been involved in transferring the patient from the infirmary to the general population, there is no evidence that Nurse Practitioner Mills was aware of the identity of the specific inmate with whom Mr. McCroy would be assigned upon his release from the healthcare unit. The Plaintiff has testified that he was not initially assigned or housed with Inmate Durham upon his release from the healthcare unit. (McCroy Deposition of March 16, 2007, p. 94.)

There is no evidence to indicate that anyone in the healthcare unit, including the undersigned Defendant, was ever advised of the specific cell mate with whom Mr. McCroy would be housed. Accordingly, none of them had any information concerning the backgrounds of any of the inmates at the correctional center, and specifically any inmate who may or may not have been housed with Mr. McCroy at any particular time. There is no evidence to indicate that any of the medical defendants in this case were aware that Mr. Durham had a history of physical violence toward his cell mates. There is no evidence to indicate that any of the medical defendants were aware that Mr. McCroy was ever housed with Inmate Durham until after the alleged incident between Mr. Durham and the Plaintiff.

Accordingly, there is no evidence to support a cause of action against this Defendant on a theory of failure to protect under the Eighth Amendment.

**D.    Count IV - Plaintiff's Allegations Are Insufficient to Support a Claim of Deliberate Indifference Against Defendant Rhonda Mills.**

As previously asserted, there is no genuine issue of fact in this case regarding the care and treatment provided to the Plaintiff.

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

29

05415-N3293
TMP/ej/jly

In order to prove his cause of action, the Plaintiff must prove deliberate indifference to his serious medical needs.  At a minimum, this requires actual knowledge of impending harm, which is easily preventable, so that a conscious, capable refusal to prevent harm can be inferred from the defendant's failure to prevent it.  Dixon v. Godinez, 114 F.3d 640, 645 (7th Cir. 1997); Duckworth v. Franzen, 780 F.2d 645, 653 (7th Cir. 1985).  Deliberate indifference is more than mere negligence and approaches intentional wrongdoing.  Farmer v. Brennan, 511 U.S. 825, 835 (1994).  To establish deliberate indifference, Plaintiff must show the Defendant ignored a known risk.  Collignon v. Milwaukee County, 163 F.3d 982, 988 (7th Cir. 1988).

Additionally, in order to establish deliberate indifference, Plaintiff must show that the physician or other defendant must both have been aware of the fact from which the inference could be drawn that a substantial risk of serious harm exists, and he must actually draw the inference. Higgins v. Correctional Medical Services, 178 F.3d 508, 511 (7th Cir. 1999); Sanderfer v. Nichols, 62 F.3d 151, 154 (6th Cir. 1995).  The exercise by a physician of his professional judgment does not constitute deliberate indifference.  Youngber v. Romeo, 457 U.S. 307, 322-323 (1982).

Medical decisions, such as whether one course of treatment is preferable to another, are beyond the Eighth Amendment's purview.  Additionally, the Eighth Amendment is not a vehicle for bringing claims of medical malpractice.  Snipes v. DeTella, 95 F.3d 586, 590 (7th Cir. 1996).  It should also be kept in mind that inappropriate medical treatment based on pure negligence, or even a series of purely negligent acts is not the same as indifference to a serious medical need. Sellers v. Hennan, 41 F.3d 1100, 1102-03 (7th Cir. 1994).  While a prisoner has the right to medical care, he does not have the right to determine the type and scope of the medical care he personally desires. A difference of opinion between a physician and the patient does not give rise to a constitutional

HEYLROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

right, nor does it state a cause of action under § 1983. Coppinger v. Townsend, 398 F.2d 392, 394

(10th Cir. Col. 1968). See also, Johnson v. Doughty, 433 F.3d 1001 (7th Cir. 2006).

Inattention to a medical condition amounts to a constitutional violation only where the

medical condition is serious. Brownell v. Figel, 950 F.2d 1285, 1289 (7th Cir. 1991).

As previously indicated, deliberate indifference may only be found when an official knows of

and disregards an excessive risk to inmate health or safety. See Duane v. Lane, 959 F.2d 673, 676

(7th Cir. 1992). Deliberate indifference also requires that Defendant either intended to harm Plaintiff

or knew of a risk of harm so significant that an intent to harm could be inferred from a refusal to

provide medical care. See Smith-Bey v. Hospital Administrator, 841 F.2d 751, 759 (7th Cir. 1988).

It should also be noted that Plaintiff's claim is one in which he is asserting that the Eighth

Amendment has been violated. The Eighth Amendment does not require that prisoners receive

"unqualified access to healthcare." Hudson v. McMillian, 503 U.S. 1, 9 (1992); see also, Hernandez

v. Keane, 341 F.3d 137 (2d Cir. 2003). Rather, inmates are entitled only to "adequate medical care."

Boyce v. Moore, 314 F.3d 884, 888-89 (7th Cir. 2002). Specifically, the Eighth Amendment does

not entitle an inmate to demand specific care.

It is difficult to determine what the specific complaints are with respect to Nurse Practitioner

Mills. It appears that the Plaintiff is merely dissatisfied or disagrees with her course of treatment.

This is insufficient to support a cause of action for deliberate indifference. See, Snipes v. DeTella,

95 F.3d 586, 592 (7th Cir. 1996).

With respect to the Plaintiff's specific complaints, Plaintiff has no evidence to substantiate that

Nurse Practitioner Mills had direct involvement in any of the specific allegations set forth in

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

Subparagraphs a through m under Paragraph 300 of Count IV of Plaintiff's Third Amended

Complaint, which are as follows:

    a.    Refusing to follow Plaintiff's doctors' orders in a timely manner;

    b.    Refusing to transfer Plaintiff to a facility that would allow him to receive the medical care he needs;

    c.    Constantly changing Plaintiff's treating opthomoligist;

    d.    Refusing to provide Plaintiff prescribed medicine.

    e.    Administering medicine that was not prescribed;

    f.    Delaying Plaintiff's needed corneal transplant;

    g.    Trying to make Plaintiff pay for the needed corneal transplant;

    h.    Refusing to allow Plaintiff to be fitted for special contact lenses in both eyes as directed by his treating ophthalmologists in a timely and regular manner;

    i.    Refusing to schedule needed medical appointments;

    j.    Transferring Plaintiff to the general population;

    k.    Assigning Plaintiff a violent cell mate that had recently been sent to segregation for fighting his former cell mate;

    l.    Refusing to place Plaintiff in another cell unless he first agreed to a disciplinary infraction and serving time in segregation;

    m.    Removing Plaintiff from an ADA cell.

Accordingly, as the record reflects that the Plaintiff was provided with appropriate medical care with respect to each and every one of his interactions with Nurse Practitioner Mills. At best, Plaintiff can argue that he was dissatisfied or disagreed with some act or omission on the part of

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

32

05415-N3293
TMP/ej/jly

Nurse Mills. This does not constitute deliberate indifference. Accordingly, Defendant Mills is entitled to summary judgment as to Count IV of Plaintiff's Third Amended Complaint.

**E. Defendant Mills is Entitled to Qualified Immunity**

Qualified immunity protects such officials performing discretionary functions who are sued in their individual capacities against liability for monetary damages so long as their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." Behrens v. Pelletier, 516 U.S. 299, 305, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1992). It is the Plaintiff's burden to show that the record supports a finding of an unconstitutional act and that the applicable constitutional standards were clearly established at the time in question once the Defendant raises qualified immunity as a defense. See, Scarver v. Litscher, 371 F. Supp. 2d 986, 1004-1005, citing Tun v. Whitticker, 398 F.3d 899, 901-02 (7th Cir. 2005); Newsome v. McCabe, 319 F.3d 301, 303 (7th Cir. 2003); Magdziak v. Byrd, 96 F.3d 1045, 1047 (7th Cir. 1996).

First, the Plaintiff has no evidence to indicate that Nurse Mills violated a constitutional right of the Plaintiff. Secondly, even assuming that any act or omission on the part of Nurse Practitioner Mills constituted a violation of the Plaintiff's constitutional rights, there is no case law nor statute which would support an allegation that it was clearly established under the constitution that reliance upon the decisions of the Medical Director and/or the Director of Nurses in conjunction with security personnel at a correctional facility constitutes unlawful and unconstitutional conduct. See, Saucier v. Katz, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2004). In this case, the facts are clear that Nurse Mills is entitled to summary judgment on the merits. However, to the extent this Court may find that the Plaintiff's constitutional rights have been violated, Nurse Mills is entitled to qualified

HEYL ROYSTER VOELKER & ALLEN
Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

immunity as there is no evidence to support the contention that she should have known that her actions in the care and treatment of Mr. McCroy constituted unlawful conduct which violated a clearly established constitutional right of the Plaintiff.

## IV. CONCLUSION

As there are no genuine issues of material fact regarding the care and treatment provided to the Plaintiff with respect to his complaints and the specific involvement by the undersigned Defendant, Rhonda S. Mills, R.N. is entitled to summary judgment. Plaintiff's complaints concerning his medical conditions were addressed appropriately by Nurse Practitioner Mills as detailed in this Motion and the supporting Affidavit and attached medical records.

Taking each count separately, the Plaintiff has no evidence to support his claims. First, there is no evidence to indicate that Defendant Mills retaliated against the Plaintiff as Plaintiff has no evidence to indicate that Defendant Mills was aware that Plaintiff had even filed a grievance or a lawsuit. There is no evidence to indicate that the actions on the part of the Defendant would have been different had the lawsuit or grievance not been filed. Accordingly, summary judgment is appropriate as to the claims of retaliation.

Second, with respect to the claims of failure to protect, the Plaintiff has no evidence to indicate that Defendant Mills was aware of a specific, imminent, and known risk in the form of Inmate Durham was present. In fact, there is nothing in this case to indicate that any of the medical defendants were aware that Inmate Durham was Mr. McCroy's cell mate. Mr. McCroy testified specifically that he was not housed with Mr. Durham upon his initial release from the healthcare unit in June of 2004. As the medical defendants have indicated they were not aware of Mr. McCroy's housing situation at any time, it makes no sense whatsoever that someone in the healthcare unit would

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

have been updated as to not only the specific cell mate with whom Mr. McCroy was being housed, but also that cell mate's disciplinary and criminal background and propensities for violence. There simply is no evidence to support such a claim of failure to protect against these Defendants and said claim should therefore be dismissed.

With respect to Nurse Practitioner Mills, the allegations seems to suggest that she had some involvement in the renewal of the patient's Maxitrol and in the patient's release from the healthcare unit into the general population. With respect to the Maxitrol, there is no evidence that Mr. McCroy suffered any injury as a result of that prescription error. Additionally, there is no evidence that Nurse Practitioner Mills acted intentionally to provide the patient with this medication for an amount of time longer than was prescribed. No one has suggested that this error was anything more than inadvertent, and at best, was negligence. Additionally, the records clearly indicate that the error was committed by Nurse Mildred Roberts and not by any of the parties in this case.

With respect to the claims relating to the patient's dismissal or discharge from the infirmary to the general population, Nurse Mills had no role in the dismissal in June of 2004. While she did sign the discharge summary in November of 2003 transferring the patient from his ward in the infirmary to a single cell in the infirmary, there is no evidence that Mr. McCroy was injured as a result of that transfer, nor that the discharge on that date led to the subsequent transfer in June of 2004. Accordingly, as Nurse Mills had no direct involvement in any of the specific acts or omissions as set forth in the Plaintiff's Complaint, she is entitled to summary judgment.

WHEREFORE, Defendant, RHONDA S. MILLS, R.N., prays that this Court will grant summary judgment in her favor and against the Plaintiff.

Respectfully submitted,

HEYL ROYSTER
VOELKER
&ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

35

05415-N3293
TMP/ej/jly

RHONDA S. MILLS, R.N., Defendant,

HEYL, ROYSTER, VOELKER & ALLEN,
Attorneys for Defendant,

BY:    /s/Theresa M. Powell
        Theresa M. Powell, #6230402
        HEYL, ROYSTER, VOELKER & ALLEN
        Suite 575, National City Center
        P. O. Box 1687
        Springfield, IL  62705
        Phone: (217) 522-8822
        Fax:    (217) 523-3902
        E-mail:tpowell@hrva.com

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822

05415-N3293
TMP/ej/jly

<div align="center">**CERTIFICATE OF SERVICE**</div>

I hereby certify that on April 20, 2007, I electronically filed **Defendant Mills' Motion for Summary Judgment** with the Clerk of Court using the CM/ECF system which will send notification of such filings(s) to the following:

Douglas J. Quivey
doug@lprpc.com

Thomas F. Londrigan
tom@lprpc.com

Carissa A. Haning
carissa@lprpc.com

Kelly R. Choate
kchoate@atg.state.il.us

Julie L. Morgan
jlmorgan@atg.state.il.us

Carl J. Tenney
ctenney@hhtlaw.com

Alexandra de Saint Phalle
alex@lprpc.com

and I hereby certify that on April 20, 2007, I mailed by United States Postal Service, the document(s) to the following non-registered participants:

None

/s/Theresa M. Powell
Theresa M. Powell, #6230402
HEYL, ROYSTER, VOELKER & ALLEN
Suite 575, National City Center
P. O. Box 1687
Springfield, IL 62705
Phone: (217) 522-8822
Fax:    (217) 523-3902
E-mail:tpowell@hrva.com

HEYL ROYSTER
VOELKER &ALLEN

Suite 575
National City Center
1 N. Old State Capitol Plaza
P.O. Box 1687
Springfield, IL 62705-1687
Fax (217) 523-3902
(217) 522-8822