3/9/07                    McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

## Page 1

```
                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF ILLINOIS

AARON McCROY,
            Plaintiff,
     vs.                           No. 02-3171
ILLINOIS DEPARTMENT OF
CORRECTIONS et al.,
            Defendants.

       THE DEPOSITION of RHONDA S. MILLS, taken
in the above-entitled case before Rhonda K.
O'Neal, CSR, RPR, a Notary Public of Sangamon
County, acting within and for the County of
Sangamon, State of Illinois, at 1:57 o'clock P.M.,
on March 9, 2007, at One North Old State Capitol
Plaza, Suite 575, Springfield, Sangamon County,
Illinois, pursuant to notice.


          BALDWIN REPORTING & LEGAL-VISUAL SERVICES
             SERVING ILLINOIS, INDIANA & MISSOURI
          24 hrs (217) 788-2835  Fax (217) 788-2838
                       1-800-248-2835
```

## Page 2

```
APPEARANCES:
     LONDRIGAN, POTTER & RANDLE, P.C.
     BY: Thomas F. Londrigan, Esq.
          1227 South Seventh Street
          Springfield, Illinois 62703
          On behalf of Plaintiff.
     HEYL, ROYSTER, VOELKER & ALLEN
     BY: Theresa Powell, Attorney at Law
          National City Center
          Suite 575
          One North Old State Capitol Plaza
          Springfield, Illinois 62701
          On behalf of Defendant.
     HUGHES, HILL & TENNEY L.L.C.
     BY: Carl J. Tenney, Esq.
          236 North Water Street
          Decatur, Illinois 62525-0560
          On behalf of Defendant Doctor David Anderson.
     MS. KELLY CHOATE
     Assistant Attorney General
          500 South Second Street
          Springfield, Illinois 62706
          On behalf of Defendant Illinois
          Department of Corrections, via telephone.
```

## Page 3

```
                        I N D E X
DEPONENT                                    PAGE NUMBER
Rhonda Mills
     Examination by Mr. Londrigan              5
     Examination by Ms. Choate                 42


                       E X H I B I T S

NUMBER               MARKED FOR IDENTIFICATION
(None.)
```

COPY

## Page 4

```
                     S T I P U L A T I O N
       It is stipulated and agreed, by and
between the parties hereto, through their
attorneys, that the deposition of RHONDA S. MILLS
may be taken before Rhonda K. O'Neal, a Notary
Public, Certified Shorthand Reporter, and
Registered Professional Reporter, upon oral
interrogatories, on the 9th of March A.D., 2007,
at the instance of the Plaintiff at the hour of
1:57 o'clock P.M., One North Old State Capitol
Plaza, Suite 575, Springfield, Sangamon County,
Illinois;
       That the oral interrogatories and the
answers of the witness may be taken down in
shorthand by the Reporter and afterwards
transcribed;
       That all requirements of the Federal Rules
of Civil Procedure and the Rules of the Supreme
Court as to dedimus, are expressly waived;
       That any objections as to competency,
materiality or relevancy are hereby reserved, but
any objection as to the form of question is waived
unless specifically noted;
       That the deposition, or any parts thereof
may be used for any purpose for which depositions
are competent, by any of the parties hereto,
without foundation proof;
       That any party hereto may be furnished
copies of the deposition at his or her own
expense.
```

Page 5

1      (Whereupon the Deponent was
2      sworn by the Notary Public.)
3      R H O N D A  S.  M I L L S
4  having been first duly sworn by the Notary Public,
5  deposeth and saith as follows:
6      EXAMINATION
7      BY MR. LONDRIGAN:
8  Q  Nurse Mills, have you ever had a
9  deposition taken before?
10 A  Just as a witness for an accident.
11 Q  Okay. But you understand the process and
12 what we're doing here?
13 A  Right.
14 Q  If you have any problems with my
15 questions, tell me, and I'll try and rephrase them
16 so we understand each other.
17 A  (Nodded head up and down.)
18 Q  You want to state your full name, please?
19 A  Rhonda Sue Mills.
20 Q  And how are you currently employed?
21 A  I'm a nurse practitioner at Quincy
22 Medical Group.
23 Q  Okay. Would you briefly outline to us or
24 for us your educational background, your

Page 6

1  certifications, your employment history up to the
2  present?
3  A  Okay. I became a registered nurse in
4  '91. '91. And then I started working, I worked
5  in the hospital and then the local health
6  department. And then in '96 I started out at the
7  correctional center in Mt. Sterling as an RN, and
8  then '98 I went back to school, graduate school,
9  become a nurse practitioner and then graduated in
10 '01. And then September of '01 I started at the
11 correctional center as a nurse practitioner.
12 Q  Okay.
13 A  And stayed there until '05, and then
14 August of '05 I went to the Beardstown Clinic and
15 then left there this past, past December to go
16 start work at January at Quincy Medical Group in
17 Quincy.
18 Q  What if anything did you do by way of
19 employment before you went into nursing?
20 A  I was a medical assistant.
21 Q  And right out of high school so you
22 went--
23 A  Right out of high school I became a
24 medical assistant, and then I--

Page 7

1  Q  And then you got your schooling and your
2  certification?
3  A  Yeah. My certifications I did when I was
4  in corrections received certification as a
5  correctional health care.
6  Q  And what did you have to do to receive
7  that certification?
8  A  Had to do, it was quite an extensive oral
9  test that you did on your own, but it was
10 understanding, understanding different areas about
11 the health care or taking care of prisoners. And
12 you had to have so many years as working in that
13 area. You couldn't just--you had to be at least
14 over a year working in corrections, and then you
15 were eligible to sit--not sit--but eligible to
16 take the exam, then become a certified
17 correctional employee.
18 Q  Understand you to say that the exam was
19 an oral exam?
20 A  No, excuse me, not oral. It was a
21 written. It was a written exam that you did on
22 your own.
23 Q  And what materials were you given to
24 prepare for that test?

Page 8

1  A  Obtained materials on my own that they
2  recommended for references. Can't remember at
3  this time. There was--. There were certain books
4  that I obtained then to prepare for that exam.
5  Q  And Department of Corrections provided
6  you with a bibliography as to how, what to prepare
7  and what to read?
8  A  No. Huh-uh. The certification--.
9  Q  Was it an independent organization?
10 A  Yes. An independent org--yes, yes. A
11 national organization. And in their materials to
12 apply for the test, they recommended certain
13 materials to prepare.
14 Q  And how long was that period of
15 preparation for you beginning with when you
16 applied and you began your course of study and the
17 time you received your exam and certification?
18 A  I do not remember that.
19 Q  See, I don't--this is all new to me.
20    When did they start certifying nurse
21 practitioners historically? When did that first
22 come into being? Do you know?
23 A  I'm not sure.
24 Q  Okay.

2 (Pages 5 to 8)

3/9/07  McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

Page 9

1  A   I mean, I'm not talking about certifying
2  as nurse practitioner in the health care in the,
3  my correctional certification. That's something
4  totally different from that.
5  Q   Okay. That's what you need to explain to
6  me. You became interested in the field of
7  medicine, and thereafter, you decided you wanted
8  to be a nurse practitioner?
9  A   Correct.
10  Q   All right. What did you understand at
11  that time a nurse practitioner to be?
12  A   What did I understand--an
13  advanced-practice nurse. Just taking the nurse
14  education further and combining nursing with some
15  medical knowledge to perform what a nurse
16  practitioner does.
17  Q   Okay. And you need to explain to me--
18  A   Okay. What a nurse practitioner is?
19  Q   (Continuing)--because I know nothing
20  about what a nurse practitioner does.
21  A   Okay. It's taking the nursing education,
22  the RN with a bachelor's degree then is able to go
23  on to get, go to get a master's in nursing, and
24  there's of course several different areas that

Page 10

1  make up for an advanced-practice nurse, one of
2  them being nurse practitioner. And it was a
3  three-year part-time program where you then start
4  combining the medical so you can make diagnoses
5  and give treatment. And it's called mid level.
6  Q   It's a three-year program?
7  A   After having a bachelor's in nursing.
8  Q   Okay.
9  A   But to build upon the nursing.
10  Q   And you're working towards a master's in
11  nursing?
12  A   Yeah. I have a master's in nursing.
13  Q   Okay.
14  A   And my studies then were for the
15  specialization as family nurse practitioner. And
16  so then you get many clinical hours and course of
17  study and a thesis and the whole bit then to get
18  the master's. Then you do much clinical like with
19  other nurse practitioners or MDs.
20  Q   And where is it you did that?
21  A   I did that at Mt. Sterling at the Quincy
22  Medical--I got my degree from Southern Illinois
23  University-Edwardsville.
24  Q   Okay.

Page 11

1  A   Then your clinical could be done in the
2  various office--
3  Q   When you say you got your degree, you're
4  talking about your master's--
5  A   My master's.
6  Q   (Continuing)--degree in nursing?
7  A   Right.
8  Q   And then do I understand you correctly
9  that beyond that you have to get a certification
10  as a nurse practitioner?
11  A   Right. To practice, that's right. And
12  it's American Association of--it's ANCC anyways,
13  letters, and you set for this national exam
14  because otherwise without having that
15  certification, you're not able to practice
16  legally.
17  Q   Okay. Explain to me what you can and
18  cannot do in the field of health care as a nurse
19  practitioner in different settings. In a
20  hospital, working for Department of Corrections,
21  or working, say, for a clinic.
22  A   There is a general scope of practice, but
23  then within each site you work as a nurse
24  practitioner, you must have what's called a

Page 12

1  collaborative agreement with whoever the physician
2  is that you work with.
3  Q   No. I'm trying to find out what you are
4  qualified to do within the system. For instance,
5  you mentioned diagnosis?
6  A   Yeah. Diagnose.
7  Q   You can take a medical history, I assume?
8  A   Right, right.
9  Q   That diagnosis, is it a provisional
10  diagnosis, or you, can you make a definitive
11  diagnosis? Can you write prescriptions, can
12  you--that's the type of question I'm asking.
13  A   Yes. Especially for like acute care
14  simple illnesses, or if I feel that I need, they
15  need more of an evaluation then they would, I
16  would refer them to the MD.
17  Q   I tell you what. Can you reference me to
18  a good text based on your familiarity with the
19  literature that would explain to me if I cared to
20  take the time about what a nurse practitioner is
21  qualified to do vis-a-vis a doctor and a patient?
22  A   Nancy Buford is an author that has made
23  texts on nurse practitioners.
24  Q   Okay. And is this a text that you used

3 (Pages 9 to 12)

3/9/07                          McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

Page 13

```
 1  in your study?  Was it a recommended text?
 2     A   No.  It was something I learned from
 3  different conferences, and she's, does many of the
 4  books on the legal issues with nurse practitioners
 5  as far as setting up contracts for your employment
 6  and setting up your collaborative agreements.
 7     Q   And I take it that you have--
 8     A   A good place to go to would be the
 9  Illinois Department of Regulation under, there's
10  advanced-practice nurse section and nurse
11  practitioners that lines out the scope of nursing,
12  the scope of my practice for nurse practitioner.
13     Q   Okay.
14     A   Because it's going to vary from state to
15  state what a nurse practitioner can legally do.
16     Q   Now, do you have a contract that spells
17  out your duties and responsibilities, or did you
18  have one with Illinois Department of Corrections?
19     A   No.  Not a contract.  Just an agreement
20  letter.  I had a collaborative agreement.
21     Q   And explain that to me.  I should
22  understand these things--I'm a lawyer--but I
23  don't.
24     A   A collaborative agreement is just pretty
```

Page 14

```
 1  much a general statement that the doctor is saying
 2  he's comfortable for me doing in collaboration
 3  with him.  That I am able to diagnose, able to see
 4  the same type of patients that that doctor would
 5  see.  Also like I have an Illinois license in
 6  prescriptive authority, I have my own DEA number.
 7  And that this doctor is saying, you know, as long
 8  as the doctor is always, I'm always able to reach
 9  them either telephone, however, they got to be
10  reachable by me if I would have a question or a
11  situation.
12     Q   You're just going a little bit too fast
13  for me.
14     A   Okay.
15     Q   I can't pick it up.
16     A   Okay.
17     Q   And you may be a little bit nervous.
18  I'll take my time, and you'll probably catch on to
19  what I want or need.
20         You had received your certification when
21  you went to work at Western; is that correct?  As
22  a nurse practitioner?
23     A   Yes, yes.
24     Q   And you mentioned that you had
```

Page 15

```
 1  collaborative agreements?
 2     A   Uh-huh.
 3     Q   Were they with physicians, or were they
 4  with the Department of Corrections?
 5     A   No.  They would be with individual
 6  physicians.
 7     Q   Okay.  Did you have--so would that have
 8  any application at all to what you were qualified
 9  to do while you were acting as a nurse
10  practitioner at Western?
11     A   Yes.
12     Q   Okay.  Would you have in place then a
13  collaborative agreement or agreements, plural,
14  while you were a nurse practitioner at Western?
15     A   Yes.
16     Q   Okay.  And with whom?  Who would be the
17  other party?
18     A   Okay.  When I first started, I'm not
19  sure.  But there was, Dr. Simms was one of my
20  collaborators, Dr. Brown, and then in any absence
21  of a medical director, was Dr. Lochard.
22     Q   Okay.  So these were agreements that were
23  with the individual doctors rather than with the
24  Department of Corrections?
```

Page 16

```
 1     A   Correct.
 2     Q   Is that right?
 3     A   Right.
 4     Q   Are those however on file with the
 5  Illinois Department of Corrections?
 6     A   You have to have one in place so if the
 7  Department of Professional Regulation would ever
 8  request it.  Now, if my health care unit
 9  department actually sent one to IDOC, I would not,
10  I'm not sure.
11     Q   Did you bring a copy of your job
12  description--
13     A   No.
14     Q   (Continuing)--with you?
15     A   The collaborative agreement we used was
16  just--on the Department of Professional Regulation
17  site, there is like a sample of collaborative
18  agreement.  We pretty much did a generic
19  collaborative agreement.  That encompasses, you
20  know, what my scope of practice would be.
21     Q   Since we don't have a copy of that
22  agreement, but I'm sure because you've had a
23  number and with your background you understand it,
24  would you take the time just very slowly to
```

4 (Pages 13 to 16)

3/9/07  McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

### Page 17

1  explain to me as a layman what's contained in that
2  agreement authorizing you, the scope of the
3  services that you deliver to patients that are
4  inmates at Western?
5      A    Okay.
6      MS. POWELL: Let me just object to the form of
7  the question because I think that--well,
8  collaborative agreement is between her and the
9  physician, like she said, which is separate from
10 like what her job description would be as far as
11 providing care and treatment to inmates.
12     MR. LONDRIGAN: That may be correct.
13     MS. POWELL: So I wasn't really sure about
14 what your question was. Just make it clear on the
15 record what you are seeking.
16     MR. LONDRIGAN: Q  I thought you told me that
17 the collaborative agreements were form agreements
18 that were prepared by the Department of Regulation
19 that would outline what your responsibilities were
20 no matter which doctor that you entered an
21 agreement with; is that right?
22     A    Well, it depends on what site you're
23 working in, and so it just has generic statements
24 saying that, you know, within whatever area you're

### Page 18

1  working that you're pretty much mirroring what
2  whoever your collaborator is in those types of
3  patients and kind of mirroring how they would do
4  treatment and that you're just, that you're a
5  team. And that I would be diagnosing, treating,
6  writing prescriptions, but if I ever had any
7  question that I would be then directing those to
8  my collaborator.
9      Q    Those collaborators that you've referred
10 to are doctors employed by the vendor that happens
11 to be at that institution?
12     A    Correct.
13     Q    Is that right?
14     A    Correct.
15     Q    Okay. Who is your immediate supervisor
16 within the department?
17     A    Okay. Two; clinically was the physician,
18 administratively then was the health care unit
19 administrator. So one was a vendor employee, and
20 then one was a state of Illinois employee.
21     Q    And one was a doctor?
22     A    Right.
23     Q    And the--or several doctors?
24     A    Uh-huh. Depending--yeah.

### Page 19

1      Q    And the other person to whom you were
2  responsible was the health care unit administrator
3  who in this case was Debra Fuqua?
4      A    Correct.
5      Q    Another registered nurse?
6      A    Correct.
7      Q    Okay. So you really took direction from
8  two different sources; your collaborating
9  physicians who were with Wexford--
10     A    For any clinical issues was through
11 that--
12     Q    And Debra Fuqua, an employee of the
13 department?
14     A    Correct.
15     Q    Okay. Did you take any direction from
16 employees of the department who were in security?
17     A    No.
18     Q    Why not?
19     A    What are you asking?
20     Q    Well, my grandchildren say, you're not
21 the boss of me. You answered that question very
22 emphatically. And I'm asking you to tell me why
23 you wouldn't take direction from someone who is in
24 security. Suppose assistant warden came down,

### Page 20

1  says, I want you to do this. Told you verbally
2  face to face. Would you follow that direction?
3      A    Well, there's things we have to do with
4  keeping security in mind. We have--. But as far
5  as direct medical orders, no, they would not be
6  making medical--. I don't really like the way the
7  question's worded.
8      Q    All right. I'll reword it differently
9  and more specifically. If someone from security
10 in authority came down and said to you, I think
11 that patient should be placed in the general
12 population, would you follow that order?
13     MS. CHOATE  Object to the form.
14     THE DEPONENT: It depends on what the medical
15 situation would be.
16     MR. LONDRIGAN: Q  So you would make your own
17 independent medical determination? Is that what
18 you're saying?
19     A    Yes.
20     Q    Okay. You wouldn't simply just do what
21 security told you if it weren't in the best
22 interest of the patient?
23     A    Correct.
24     Q    Okay. Are you familiar with the medical

5 (Pages 17 to 20)

Page 21

```
 1  history of the inmate and patient Aaron McCroy
 2  while he was assigned to the health care unit and
 3  the infirmary for treatment of an eye condition?
 4      A    I remember Inmate McCroy being in the
 5  infirmary.
 6      Q    And share with me what you do remember,
 7  and if you don't remember anything other than
 8  that, why, I'll move on to something else.
 9      A    Well, it would be hard not to remember
10  that inmate.  He was very demanding.  And he
11  wanted what he wanted when he wanted it.
12      Q    And there were disputes over medication?
13      A    Yes.
14      Q    Do you recall those?
15           There were disputes about where he could
16  place his television set?  Do you recall those?
17      A    No.
18      Q    There were disputes about whether or not
19  he was given adequate warning when he would go on
20  furlough appointments to ophthalmologists so he'd
21  have an opportunity to take a shower?  Do you
22  recall that dispute?
23      A    No.  But there's reasons, security
24  reasons that you would not want inmates having too
```

Page 22

```
 1  much advanced warning on when they're going out
 2  for a furlough.
 3      Q    Have you ever looked at when he went out
 4  for furlough as to the different categories of his
 5  history, whether or not he had ever attempted an
 6  escape, whether he was a sexual predator, whether
 7  or not he had ever been involved in fights,
 8  whether or not he had ever been a member of a gang
 9  or committed acts of violence?
10      MS. POWELL:  Objection.  Compound question.
11      MR. LONDRIGAN:  Q  Do you know that those
12  categories exist and are maintained by security
13  one way or the other?  Do you know that for a
14  fact?
15      A    No.  But--no.
16      Q    Did you make a judgment at any time that
17  Aaron McCroy as an inmate and a patient was a
18  security risk to others in the institution?
19      A    No.
20      Q    And that would be a security issue
21  anyway; it wouldn't be a medical issue, would it?
22      A    Correct.
23      Q    Now, I mentioned a number of things that
24  resulted in grievances being filed by Aaron McCroy
```

Page 23

```
 1  while he was an inmate and a patient.  Do you
 2  recall any other instances about which he made
 3  demands upon people in the health care unit?
 4      MS. POWELL:  I object to the form of the
 5  question.
 6      MR. LONDRIGAN:  Q  She's going to do that a
 7  lot now.  But the judge later on will rule whether
 8  or not that's an appropriate question, but you
 9  have to answer me here.
10      A    What's the question?
11      MR. LONDRIGAN:  You want to read it back to
12  her.
13               (Whereupon the requested
14                portion of the record was read
15                back by the Reporter.)
16      THE DEPONENT:  Just generally, not in
17  particular.  What--can you be more specific?
18      MR. LONDRIGAN:  Q  I'll give you another
19  specific.
20           Do you remember him making complaints
21  that he was told by his outside treating
22  ophthalmologist that he was suffering from
23  steroid-induced glaucoma in addition to
24  keratoconus?
```

Page 24

```
 1      A    Not specifically.
 2      Q    Okay.  Did Aaron McCroy ever assault any
 3  other patients while he was, spent over a year in
 4  the infirmary--
 5      A    Not that I know of.
 6      Q    (Continuing)--in the health care unit?
 7           He was on different occasions, however,
 8  placed in segregation.  Is that normally a form of
 9  punishment at the institution at Western?
10      A    Not always.  Sometimes it's for security
11  purposes to protect.
12      Q    Protect a patient?
13      A    Well, it's not always punishment.  I
14  mean, it can be punishment, but at times I know
15  there's other security reasons they have placed
16  people in segregation.
17      Q    Sometimes they place people in
18  segregation for fighting with their cell mates?
19      A    Correct, correct.
20      Q    Do you as the licensed practitioner have
21  authority if a patient at risk for being poked in
22  the eye, for instance, should be assigned a single
23  cell and not placed in a cell with other
24  prisoners?
```