3/9/07　　　　　　　　　　McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

### Page 25

1　　　Let me ask it a different way. Have you
2　every done that? Have you ever told placement,
3　this patient because he is at risk medically
4　should be placed in a single cell?
5　　A　Of course, yes.
6　　Q　And when that recommendation is made,
7　does placement usually follow that recommendation?
8　　A　Yes.
9　　Q　Is it mandated?
10　　A　I mean, they're not going to let you put
11　somebody that you're trying to rule out TB or rule
12　out other things be elsewhere. I mean, there's
13　medical conditions that you're not going to have,
14　have them with others.
15　　Q　Okay. Maybe it would be more helpful if
16　we'd go through some exhibits, and then I'll ask
17　you some of the questions in a narrower factual
18　context.
19　　　Let me hand you Exhibit 1, and I'll tell
20　you that those are some of the progress notes that
21　are provided to us in discovery that are
22　maintained at the correction center.
23　　　Do you remember when Aaron McCroy went on
24　a hunger strike?

### Page 26

1　　A　I do not recall, no.
2　　Q　All right. You know who Dr. Elyea is?
3　　A　Yes.
4　　Q　Do you not?
5　　A　Yes.
6　　Q　Do you follow his direction, or is he
7　separate and apart from what you do at the
8　institution?
9　　A　I don't know how to answer that.
10　　Q　Well, do you communicate periodically
11　with Dr. Elyea?
12　　A　No. From his department Cindy Hobrock
13　(sp) could be at our monthly QA meetings
14　representing his office. So, you know, more
15　contact with her.
16　　Q　And does Cindy Hobrock when she comes on
17　a monthly basis to do quality assurance, does she
18　fill out a report as to what she sees and provide
19　it to Dr. Elyea?
20　　A　I believe so.
21　　Q　Take a look at the next page of these
22　medical records under nurse's note 11-6-03. Was
23　the health care unit taking the position that
24　because Aaron McCroy went on a hunger strike to

### Page 27

1　protest what he later filed in a grievance was
2　some medical reason to prevent him from seeing an
3　outside ophthalmologist to treat him for his
4　condition?
5　　A　That wouldn't ben an assessment for me to
6　make. I'm not a physician.
7　　Q　Well, did Debra Fuqua ever talk to you
8　about this issue?
9　　A　No. Not that I recall.
10　　Q　As far as exercising medical judgment and
11　admitting somebody into the infirmary and
12　discharging somebody from the infirmary, denying
13　privileges or access to medications, who would be
14　primarily in charge of that? You or Debra Fuqua?
15　　MS. POWELL: Object to the form of the
16　question. You're assuming those are the only two
17　answers.
18　　MR. LONDRIGAN: Q　Okay. Tell me who then.
19　Who would make those decisions? Who had the
20　authority to make those decisions?
21　　A　I could admit and discharge from the
22　infirmary. But usually that would be the
23　physician. Or I would not be making those
24　decisions without sure that, you know, whoever my

### Page 28

1　supervisor was would be in agreement.
2　　Q　What I'm talking about now is the context
3　of a patient who protests by filing a grievance
4　and also goes on a hunger vehicle. Did you have
5　the discretion to say that he can't go on furlough
6　to see his treating ophthalmologist?
7　　A　I did not make decisions on going on
8　furloughs or who they would see or when. That was
9　not in my duties.
10　　Q　Okay. That's fine. I accept that. Now
11　tell me who was in a position to do this that
12　would cause this issue to be sent up to
13　Dr. Elyea's level?
14　　A　I'm not sure.
15　　Q　Can you tell by looking at this medical
16　record?
17　　A　No.
18　　Q　Who signs out the patients when they go
19　on furlough to go see an outside specialist?
20　　A　What do you mean by signs out?
21　　Q　Authorize them to leave the health care
22　unit and to keep a doctor's appointment. Who has
23　the responsibility for doing that? Approving it,
24　in other words?

7 (Pages 25 to 28)

3/9/07                  McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

Page 29

```
 1    A    A request for referral would come from
 2  the physician, and then I know that physician then
 3  would talk to a higher-up with the vendor company
 4  in getting approvals for them to go out on their
 5  furloughs.
 6    Q    So you're out of that loop?
 7    A    Yes.
 8    Q    It would not be you.  It would be the
 9  doctor?
10    A    It would not be me, yes.
11    Q    A lot of these records I've already been
12  through with the prior head of nursing, so I won't
13  need your help in explaining them, but I do have
14  some specific questions that I may want to ask you
15  about them.
16         If you look at the bottom, a lot of zeros
17  and then a 6 and a 9.  It's probably about 10
18  pages back, 10 or 12.  Just very briefly, this
19  entry of 10:30 a.m. on November 17, '03 is in your
20  handwriting; is that right?
21    A    Uh-huh.  Yes, it is.
22    Q    And is that your initial and signature in
23  the bottom corner?
24    A    Yeah.  My R. Mills CNP?
```

Page 30

```
 1    Q    Yes.
 2    A    Yes.
 3    Q    Now, I want you to find me the next entry
 4  that you've made in these records relative to
 5  patient Aaron McCroy.
 6    A    Okay.  There's a discharge note from
 7  11-21 of '03.
 8    Q    Did you notify the inmate patient that he
 9  was being discharged from the infirmary when this
10  note was written?
11    A    Yes, he would be.
12    Q    And how did you do that?
13    A    Because there's patient education here
14  that he was pretty much told to use common sense
15  and protect his eye.
16    Q    He has to do that in the infirmary,
17  doesn't he?
18    A    No.  Just be like far as anywhere else,
19  clinic setting or whatever.  It's just general
20  patient education that you would let him know.
21    Q    What was the reason that he was admitted
22  to the infirmary in the first place?
23    A    After his surgery in March, he was
24  admitted to the infirmary for this reason here,
```

Page 31

```
 1  for summary of reason for admission that was at
 2  the time of his admission to the infirmary after
 3  his surgery.
 4    Q    To protect his eye from injury?  Are
 5  those your words?
 6    A    That's what I wrote there.
 7    Q    And did you also write to avoid the
 8  general population?
 9    A    That was not at this point in time
10  though.  That was way back.
11    Q    No.  It wasn't.
12    A    Right.
13    Q    But that was the reason he was put there.
14         Do you think that that risk of injury to
15  that eye had ended at the time?
16    A    You know when he was in the infirmary he
17  was in a room with three other inmates.
18    Q    And they were also medical patients?
19    A    Correct.
20    Q    Did you have any, ever have any fights in
21  the infirmary since you've been there or during
22  the period of time that you were there?
23    A    Well, certainly.
24    Q    You did?  Was Aaron present when any of
```

Page 32

```
 1  those fights occurred?
 2    A    I don't know.  But there--I'm not sure.
 3    Q    With whom did you have discussions at the
 4  time that you signed this discharge note?
 5    A    I'm not sure at this time.
 6    Q    Did you talk to the outside treating
 7  ophthalmologist that explained to the doctor what
 8  the risks were and what he wanted done?
 9         MS. POWELL:  I object.  The question is--.
10         MR. LONDRIGAN:  Q  All right.  Did you talk to
11  the outside treating ophthalmologist?
12    A    I did not personally, no.
13    Q    Did you know who that was?
14    A    I now know that that would have been the
15  director of nursing.  Jennifer Blaesing.
16    Q    No.  I'm not talking about the nurses in
17  the infirmary or the nurses at Western.  Did you
18  have any direct contact with his treating
19  physician who was retained by Wexford to provide--
20    A    No.
21    Q    (Continuing)--ophthalmologic care for his
22  eye condition?
23    A    No.
24    Q    On what information then did you base
```

8 (Pages 29 to 32)

Baldwin Court Reporting & Legal Video Services
1-800-248-2835

3/9/07  
Rhonda S. Mills

McCroy v. Illinois Dept. of Corrections

### Page 33

1  this decision to discharge this patient from the
2  infirmary?
3     A   There was a need for segregation, but he
4  never did leave the infirmary. He was still in
5  the infirmary area, put in a cell designated for
6  segregation.
7     MR. LONDRIGAN: I'm sorry. I thought I made
8  that question clear. But would you read it back
9  to her.
10          (Whereupon the requested
11          portion of the record was read
12          back by the Reporter.)
13    THE DEPONENT: This would have been written so
14 he could not be an infirmary patient and just put
15 in another cell to be segregation. Because this
16 is, he was in--.
17    MR. LONDRIGAN: Q Was that a medical decision
18 to be made?
19    A   But he was not being released, I
20 would--to where he would be in any danger. He was
21 going to a--he was in a cell with four people.
22 He's going now to a cell by himself but still in
23 the infirmary.
24    Q   I'm not asking you why you did what you

### Page 34

1  did. What I'm asking you is what medical
2  information did you seek from qualified doctors
3  that were treating his condition as to whether or
4  not he should be discharged from the infirmary?
5     A   Would those medical doctors understand
6  how the institution works though? How would they
7  make a decision far as what's best for an inmate
8  in a institution? Are they well versed in the
9  workings inside the institution?
10    Q   I suppose not. What they are well versed
11 in is what's in the best interest of their patient
12 particularly if they're a specialist that was
13 chosen by a professional group like Wexford to
14 treat this patient's problems.
15       Now, what I'm asking you is what medical
16 reasons were you given by any qualified physician
17 that he should be turned over to security and kept
18 in the infirmary?
19       Nurse Mills, I'm not trying to make it
20 difficult for you. There either was a medical
21 reason which you relied upon and if so, I want you
22 to tell me, and if there wasn't I want you to tell
23 me that too.
24    MS. POWELL: Do you understand what he's

### Page 35

1  asking you?
2     THE DEPONENT: No.
3     MS. POWELL: May I rephrase it?
4     MR. LONDRIGAN: No. Read it back. I don't
5  think I can--there was no objection to the
6  question.
7     MS. POWELL: I don't have an objection. I
8  think the question makes sense, but I think she's
9  confused for some reason.
10    MR. LONDRIGAN: Yes. And I'm unable to answer
11 a question for you to help you through your
12 confusion about the question, but read that back
13 to her and just listen to it closely, and then if
14 you have a problem with that, let me know what it
15 is.
16          (Whereupon the requested
17          portion of the record was read
18          back by the Reporter.)
19    MS. POWELL: Do you understand the question?
20    THE DEPONENT: Yeah. I think, yes.
21    A   But I wouldn't have--. Okay. He
22 wasn't--. I can't see where I would have had any
23 question in this. I do not see how this discharge
24 with knowing where he was going was going to be of

### Page 36

1  any medical risk to him.
2     MR. LONDRIGAN: Q And was that your decision
3  alone, or did you seek input from anybody else
4  that might have more knowledge from a medical
5  standpoint about his condition?
6     A   I don't understand how going from a room
7  with four inmates into this other cell, I don't
8  see where there's any question.
9     Q   There is--
10    A   Any medical question.
11    Q   There is a question, but you're
12 responding to it with an argument. You need to
13 think about the question that I asked you and
14 answer that.
15       What qualified specialist's medical
16 advice did you seek before you decided to remove
17 him from the jurisdiction of the health care unit
18 and place him under the jurisdiction of the
19 security wing of the institution?
20    MS. POWELL: Object to the form of your
21 question. It assumes facts not in evidence.
22    MS. CHOATE: I join the objection too. To the
23 extent that it talks about the jurisdiction of.
24    MR. LONDRIGAN: Q Well, let me ask you

9 (Pages 33 to 36)

3/9/07  McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

Page 37
1  another question. I'm not getting any answers.
2  I'm just asking questions.
3      What does the security division have to
4  do with appropriate health care for patients that
5  have been assigned to the infirmary? Anything?
6  A   You're saying what does security have to
7  do with the health care of an inmate in the
8  infirmary?
9  Q   I'm saying what I said. It didn't draw
10 an objection, and I can't say it any better. You
11 need to answer that. Is this your decision, or is
12 it somebody else's with more knowledge than you
13 that made a recommendation to you that this would
14 be in his best interest?
15 A   I don't recall, but I don't believe so.
16 Q   It's your decision.
17     Who else told you to do this?
18 A   Well, there's this note here--. Okay.
19 According to this note here, that the director of
20 nursing did call Dr. Zeh who had been to the
21 specialist that Inmate McCroy was seeing. And
22 then--.
23 Q   Did you--
24    MS. POWELL: Let her finish her answer.

Page 38
1    MR. LONDRIGAN: I know. She needs to tell me,
2  what is she looking at.
3    MS. POWELL: She's looking at page 71 of
4  Exhibit 1.
5    MR. LONDRIGAN: Seventy-one?
6    MS. POWELL: Yes.
7    THE DEPONENT: So someone in health care did
8  call the specialist to make sure that this was
9  okay with him.
10   MR. LONDRIGAN: Q   And if it wouldn't have
11 been okay with him, you wouldn't have done it?
12 A   Correct.
13 Q   Is that your answer?
14 A   Correct. Correct.
15 Q   Okay. Did anyone from security ask you
16 to turn over Aaron to their jurisdiction and
17 simply keep him in the infirmary?
18   MS. POWELL: Object to the form of the
19 question. I don't know what you mean by their
20 jurisdiction.
21   MS. CHOATE: I object as well.
22   MR. LONDRIGAN: Q   Well, who was calling the
23 shots after he was discharged from the infirmary?
24 Wasn't it security?

Page 39
1  A   Yes.
2  Q   See how easy that is?
3      Do you know that near the first of the
4  year after this discharge note that security was
5  working with the patient inmate McCroy to move him
6  out of the institution and into another prison?
7  A   No. Would not be aware of that.
8  Q   And that really isn't a medical issue.
9      Were you aware that Aaron McCroy had
10 repeatedly asked people in the health care unit
11 and in the institution to transfer him to another
12 institution where they may have an ophthalmologist
13 either on staff or more accessible?
14 A   I don't recall any of the dealings with
15 that.
16 Q   Who was it that transferred Aaron McCroy
17 into the general population?
18 A   Well, at this point he was discharged
19 from the infirmary, so at that point it would be
20 security.
21 Q   So they didn't have to get a discharge
22 from the health care unit in June of the year
23 following because they already had sole custody of
24 the patient even though he was assigned for

Page 40
1  housing?
2    MS. CHOATE: Objection to form.
3    MR. LONDRIGAN: Well, I haven't finished yet,
4  but you can have a continuing objection.
5      Would you read that back and I'll finish
6  it up.
7           (Whereupon the requested
8            portion of the record was read
9            back by the Reporter.)
10   MR. LONDRIGAN: Q   At the time he was released
11 into the general population? They didn't come
12 back to you for permission, did they?
13 A   No. I don't believe so.
14 Q   I believe you told me earlier that if
15 Aaron were discharged from the infirmary and
16 placed into the general population, that you had
17 authority to request that he be placed in a single
18 cell so he wouldn't be confronted with possibly
19 violent cell mate. Did I understand you
20 correctly?
21 A   But he was in the infirmary with four
22 other inmates, so I don't see, I don't understand
23 how, you know.
24 Q   Did you have anybody in the infirmary who

10 (Pages 37 to 40)

Baldwin Court Reporting & Legal Video Services
1-800-248-2835

Page 41

1  had just been released from segregation because of
2  fighting with a cell mate?
3      A    I would not know that.
4      Q    Well, if he were there, you'd know it,
5  wouldn't you?  Wouldn't you have access to his
6  history?
7      A    Not the security reasons.
8      Q    Again, I really do not want to argue with
9  you at least at this time.  Simply want to
10 understand how this happened and who's responsible
11 for it happening.  And what I understand from what
12 you told me, you lost control as far as whether or
13 not this patient would be released into the
14 general population when he was discharged from the
15 health care unit six months before; isn't that
16 right?
17     A    There would be other physicians in and
18 out overseeing Inmate McCroy.
19     Q    Well, there certainly should be,
20 shouldn't there?
21     A    Well, there's other notes here from other
22 doctors.
23     Q    Yes, there are, and I'm not going to take
24 the time to go through all those, but you'll have

Page 42

1  the time between now and May 1 to read again all
2  these records because they'll be with your
3  deposition.  And you'll have that time at your
4  leisure to go through these.
5          Again, I don't want to argue with you,
6  but did anyone even consult you at the time that
7  Aaron was being sent for assignment to the
8  assignment office and placed in the general
9  population?
10     A    I don't believe so.
11     MR. LONDRIGAN:  I don't either.  And that's
12 all the questions that I have.  Thank you.
13     MS. POWELL:  I don't have any questions.
14     MS. CHOATE:  I have just a couple, Theresa.
15     MS. POWELL:  Okay.
16              EXAMINATION
17              BY MS. CHOATE:
18     Q    Hi.  I'm Kelly Choate, and I represent
19 the DOC employees and the Department of
20 Corrections in this case.  Let me ask you
21 something.  You were asked a lot of questions
22 about an inmate, specifically Inmate McCroy, being
23 either under security jurisdiction or under the
24 health care jurisdiction.  Are those necessarily

Page 43

1  separate things?
2      A    No.
3      Q    In other words, can an inmate who is
4  housed in the general population still be under
5  the care of physicians for ongoing problems?
6      A    Yes.
7      Q    Can an inmate who's housed in general
8  population or segregation for that matter go to
9  see a physician whenever he needs to?
10     A    Yes.  Through the proper channels and
11 health care requests, yes.
12     Q    And are inmates who are housed in the
13 infirmary for whatever reason, are they not also
14 subject to security measures?
15     A    Yes.
16     Q    Security is involved even if they're
17 housed in the health care unit; is that correct?
18     A    Yes.
19     Q    And they're subject to health care even
20 when they're not in the health care unit, correct?
21     A    Yes.
   MS. CHOATE:  That's all I have.
22 MR. LONDRIGAN:  No more.
   MS. CHOATE:  Thank you.
23 MS. POWELL:  You have a right to read the
   transcript.  I think we want to read it.
24           (Further deponent saith not.)

Page 44

1  I, RHONDA S. MILLS, having read the above and
2  foregoing, find the same to be true and correct
3  with the following additions and/or corrections,
4  if any:
5  Page_____Line_____Change:
6  Page_____Line_____Change:
7  Page_____Line_____Change:

24 Rhonda S. Mills (03/09/07(          DATE

3/9/07 McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

Page 45

```
 1    STATE OF ILLINOIS )
                        ) SS
 2    COUNTY OF SANGAMON )
 3             C E R T I F I C A T E
 4         I, Rhonda K. O'Neal, a Notary Public,
 5    Certified Shorthand Reporter, and Registered
 6    Professional Reporter, in and for said County and
 7    State do hereby certify that the Deponent herein,
 8    RHONDA S. MILLS, prior to the taking of the
 9    foregoing deposition, and on the 9th of March
10    A.D., 2007, was by me duly sworn to testify to the
11    truth, the whole truth and nothing but the truth
12    in the cause aforesaid; that the said deposition
13    was on that date taken down in shorthand by me and
14    afterwards transcribed, and that the attached
15    transcript contains a true and accurate
16    translation of my shorthand notes referred to.
17         Given under my hand and seal this 15th day
18    of March A.D., 2007.
19            [signature: Rhonda K. O'Neal]
20         Notary Public and
           Certified Shorthand Reporter
21         and Registered Professional Reporter
22
23    License No. 084-004158
24
```

[STAMP: OFFICIAL SEAL / RHONDA K. O'NEAL / NOTARY PUBLIC, STATE OF ILLINOIS / MY COMMISSION EXPIRES 9-13-2008]

12 (Page 45)