1  I'll have too many questions for you.

2                    EXAMINATION

3            BY MR. TENNEY:

4       Q    In your review of the records that were
5  provided to you from the court, did you see some
6  reference to Doctor Anderson or some of his notes
7  or anything like that?

8       A    I don't believe so. Then again I didn't--
9  I really only tried to look for the records that I
10 thought pertained to, you know, what some of these
11 issues were. And so I focused mainly on--I leafed
12 through the entirely chart, but unless there was
13 something else going on that I thought was relevant
14 to the eye care, I don't think I looked for any
15 specific names.

16      Q    Doctor, it's Doctor David Anderson and
17 he's an optometrist, and at least prior to, I want
18 to say March, I believe March of '03, Doctor
19 Anderson provided some optometry care. I guess my
20 question would be do you have any criticism of
21 anything that Doctor Anderson did or did not do
22 based on the review that you have made to this
23 point in the records?

24      MS. de SAINT PHALLE: I'm going to object on

```
 1   foundation grounds. I don't think that's what
 2   Doctor Zeh was looking at.
 3        MR. TENNEY: He wasn't looking at--
 4        THE DEPONENT: Well, I mean, I would have to
 5   say that actually I am completely unaware of
 6   specifically whatever care was provided for the
 7   patient by Doctor Anderson. I think that, you know,
 8   it's not uncommon for patients with severe
 9   keratoconus to see several doctors and go through,
10   you know, successful or unsuccessful contact lens
11   fittings. And that's pretty much the nature of the
12   beast.
13            But since I don't know, you know, any of
14   the details of the care that was provided I really
15   don't think I should comment on whether or not it
16   was--you know, I see no evidence that Mr. McCroy
17   suffered because of any care that was provided for
18   him certainly. But without knowing any additional
19   details, I really shouldn't say whether it was
20   acceptable or not.
21        MR. TENNEY: Q  And that's all right. I only
22   mean to ask you if you do have an opinion one way
23   or another, and, if you don't, that's fine.
24        A    As I say, I don't have any evidence to
```

Page 62

 1  think that his care was not up to professional
 2  standards. But I'd have to leave it at that and say
 3  that I don't really know any other details about
 4  what was provided.
 5      Q    Now, as long as you have been seeing Mr.
 6  McCroy, has Doctor Blumthal, in your office, been
 7  the person responsible for Mr. McCroy's optometry
 8  care?
 9      A    Yes. But that's been pretty limited
10  because most of his care during the period where
11  I've been there has been something that I've been
12  involved in directly or Doctor Kim.  And, really,
13  Doctor Blumthal's role was to attempt the contact
14  lens fit.
15          The first time he saw him he evidently
16  ordered the Rose K set, and the second time he saw
17  was the day, the first time that I saw him where I
18  said hold off on fitting him until we can get out,
19  you know, one of the sutures and try to reduce the
20  corneal astigmatism.
21          And he hasn't really seen him since then
22  so his role in Mr. McCroy's care has been, you
23  know, pretty limited. But that's just because, you
24  know, before February, the patient really hasn't

1  been ready to have anything else done
2  optometrically.
3      Q    On the subject of the contact fitting, or
4  lack thereof, has the failure for whoever might
5  have been responsible to provide a new contact lens
6  to Mr. McCroy, has that caused any temporary or
7  permanent kind of problem for Mr. McCroy?
8      A    If that question means has he been
9  permanently damaged by not having a contact lens,
10 the answer is of course not. He just hasn't had a
11 contact lens to correct his vision for that period
12 of time.
13     Q    But otherwise he hasn't suffered any?
14     A    I shouldn't see that he has.
15     MR. TENNEY: That's all I have. Thank you.
16     MS. CHOATE: Hi, Doctor. I'm Kelly Choate and I
17 represent, well, everyone else, the non-medical
18 people from the department of corrections and the
19 department of corrections itself. So I really won't
20 have very many questions for you.
21                    EXAMINATION
22                    BY MS. CHOATE:
23     Q    I just want to make it clear though that
24 when you testified that you continued to see Mr.

Page 64

```
 1  McCroy over the last couple of years that--
 2       A    A couple years. I've seen him, the first
 3  time I seen him was August 2003, so I've been
 4  involved in his care roughly about ten months.
 5       Q    Okay. That's fine.
 6            During that time when you made a
 7  recommendation that he see Doctor Kim, that
 8  happened, isn't that correct?
 9       A    That's correct.
10       Q    And when you made a recommendation that
11  he except for the last--since February that he see
12  Doctor Blumthal, he saw him, is that correct?
13       A    Well, actually, the appointments with
14  Doctor Blumthal were recommended before I got
15  involved in his care. But he did see Doctor
16  Blumthal for the contact lens fitting and then
17  Doctor Blumthal decided any of the specialty
18  lenses.  He came back on the same day he was
19  scheduled to see me, you know, just basically--
20  I think that was done mainly to decrease any--
21  to transport the patient.
22            But once he, you know, at my request, or
23  my advise, he held off on fitting him that day
24  simply so that we could remove some of the sutures
```

Page 65

1  and try to make that process, give it a higher
2  chance for success. Because 12 diopters is at the
3  range where the chance of success starts to become
4  limited. So if we could do anything to reduce the
5  astigmatism it was worth doing.
6  　　　　But, yeah, he saw Doctor Blumthal when
7  Doctor Fedor recommended it, he saw Doctor Kim when
8  I had recommended it, and the only time it appears
9  he's not seen someone when it was recommended was
10 when I ask that he be fit with a contact lens in
11 February and, you know, at this point that hasn't
12 happened yet.
13 　　Q　And I don't know which exhibit that was.
14 Did you put any specific date that he was supposed
15 to come back or time?
16 　　A　No. I guess to me it's implied that it's
17 the next available appointment. Often Doctor
18 Blumthal--. Usually it's about a month after. So
19 the fact that he didn't have it immediately, and,
20 you know, once again, it can also depend on Doctor
21 Blumthal's schedule, which I don't have day to day
22 knowledge of, and I just, you know, recommended.
23 　　　　My impression when he came back in May
24 was not, you know, my God, why hasn't this man been

Page 66

1  fit with a contact lens, it's just, oh, I would
2  have thought that would have happened by now. And
3  that was more my emotion rather than he had been
4  mistreated by the system. It's more like, well,
5  this needs to be done so let's get it done, but not
6  that he necessarily was way overdue or that his
7  care was inappropriate.
8      Q   So there was no indication that the
9  department or any of the doctors or nurses or
10 administrators would have had that this needed to
11 be done at a certain date or certain amount of
12 time?
13     A   No. I mean, I didn't write stat or urgent
14 or anything like that. I assumed that when I
15 wrote--that I recommended the contact lens fitting
16 be done it be done at the next convenient date for
17 all parties concerned.
18     Q   And you don't know why it wasn't?
19     A   I don't.
20     Q   Do you mostly see private patients in
21 your practice as opposed to incarcerated
22 individuals like Mr. McCroy?
23     A   To a ratio of about 99 to 1.
24     Q   And in your opinion was the care that Mr.

Page 67

```
1   McCroy received at--and you work at Prairie Eye
2   Institute, is that correct, in Springfield?
3       A    Uh-huh.
4       Q    Was that better or worse than the care
5   that your private patients received?
6       A    I try to take care of all my patients
7   equally regardless of whether they're wearing
8   jewelry or not. And I don't know if it's
9   appropriate for me to make jokes, but I try to take
10  care of each of my patients exactly the same way.
11  That's why I made the comment that I don't really
12  want to know why they're incarcerated or other
13  details because I really just try to view them as a
14  patient and not as an inmate or something like
15  that.
16           And I think that the care that he
17  received was equal to the care that the private
18  patient--because certainly when dealing with
19  patients in the private sector sometimes there are
20  similar, you know, patients come back and they're
21  not using their medications the way they're
22  supposed to be. And that unfortunately happens
23  sometimes too.
24           So what happened to him is not something
```

```
 1  that's, you know, that never happens in private
 2  medical practice. So I think that the care that
 3  he's received is equal to all of the other patients
 4  who walk in through our door.
 5      Q    As a physician, would you expect a non-
 6  physician to direct your medical care of a patient?
 7      A    I would not. I would prefer that not be
 8  the case. To date, it has not happened that way.
 9      Q    Would you allow that if one were to try?
10      A    No, I don't think so.
11      Q    You discussed earlier about whether Mr.
12  McCroy should be housed at an institution with an
13  ophthalmologist or optometrist on site or on staff.
14  To your knowledge, do any of the department of
15  corrections facilities have that?
16      A    I have no idea.
17      MS. CHOATE: I don't think I have any further
18  questions.
19      MS. de SAINT PHALLE: Nothing further.
20      MS. POWELL: I don't have anything else.
21      MR. TENNEY: No thanks.
22              (Discussion off the record.)
23      THE DEPONENT: I'll waive.
24                FURTHER DEPONENT SAITH NOT.
```

Page 69

```
1  STATE OF ILLINOIS  )
                      )  SS
2  COUNTY OF SANGAMON )
```

C E R T I F I C A T E

I, Debra K. Baldwin, a Notary Public and Certified Shorthand Reporter and Registered Professional Reporter in and for said County and State do hereby certify that the Deponent herein, WILLIAM ZEH, M.D., prior to the taking of the foregoing deposition, and on the 22nd of June A.D., 2004, was by me duly sworn to testify to the truth, the whole truth and nothing but the truth in the cause aforesaid; that the said deposition was on that date taken down in shorthand by me and afterwards transcribed, and that the attached transcript contains a true and accurate translation of my shorthand notes referred to.

Given under my hand and seal this 7th day of July A.D., 2004.

*Debra K. Baldwin*

Notary Public and
Certified Shorthand Reporter and
Registered Professional Reporter

License No. 084-002128

OFFICIAL SEAL
DEBRA K. BALDWIN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 5-20-2006