E-FILED
Friday, 20 April, 2007 04:03:18 PM
Clerk, U.S. District Court, ILCD

1

1    UNITED STATES DISTRICT COURT
     FOR THE CENTRAL DISTRICT
2           STATE OF ILLINOIS

3

     AARON McCROY,
4
          Plaintiff,
5
          vs.                    No. 02-3171
6
     THE ILLINOIS DEPARTMENT OF CORRECTIONS,
7    ROGER E. WALKER, JR., (in his official
     capacity only), DENNIS HOCKADAY,
8    KEVIN WINTERS, TERRY POLK, DAVID SCHNEPEL,
     SANDRA FUNK, DEBRAH FUQUA, LIEUTENANT LAW,
9    CORRECTIONAL OFFICER JUDITH WILSON,
     PAMELA A. GRAUBEAN, JULIUS FLAGG,
10   (all in their official and individual
     capacities), WEXFORD HEALTH SOURCES, INC.,
11   DR. CLEVELAND RAYFORD, M.D.,
     DR. STANLEY SIMS, M.D., DR. LOWELL BROWN, M.D.,
12   DR. LOCHARD, M.D., RHONDA MILLS,
     NURSE C. SHAW, and DR. DAVID ANDERSON, O.D.,
13
          Defendants.
14

15                 DEPOSITION

16
          Deposition of ROBERT J. BLUMTHAL, O.D.,
17   taken on behalf of the Defendant at the office of
     Prairie Eye and Lasik Center, 2020 West Iles
18   Avenue, Springfield, Illinois, on February 14,
     2007, before Dana Jo Rowe, RPR, Notary Public for
19   the State of Illinois.

20        Deposition taken pursuant to the discovery
     provisions of the Illinois Code of Civil Procedure
21   and the Rules of the Supreme Court promulgated
     pursuant thereto.
22

23                 CSR # 84-003853
24

ORIGINAL

```
 1                        APPEARANCES
 2

 3       Attorney representing the Plaintiff:

 4            Londrigan, Potter & Randle,
              Attorneys at Law
 5            1227 South Seventh Street
              Springfield, Illinois 62705
 6            BY:  Ms. Carissa Anna Haning

 7

         Attorney representing The Illinois Department
 8       of Corrections:

 9            Office of Attorney General,
              500 South Second Street
10            Springfield, Illinois 62706
              BY:  Ms. Kelly R. Choate
11

12       Attorney representing David Anderson:

13            Hughes, Hill & Tenney, LLC,
              Attorneys at Law
14            236 North Water Street, Suite 400
              Decatur, Illinois 62525
15            By:  Mr. Carl J. Tenney

16

         Attorney representing Wexford Health Sources,
17       Inc., Cleveland Rayford, M.D., Hughes Lochard,
         M.D.,  Lowell Brown M.D., Stanley Sims, M.D.,
18       Rhonda Mills, and Nurse C. Shaw:

19            Heyl, Royster, Voelker & Allen,
              Attorneys at Law
20            Suite 575, National City Center
              Springfield, Illinois  62705
21            By:  Ms. Theresa M. Powell

22

23

24
```

3

```
 1                        I-N-D-E-X
 2
 3
 4        EXAMINATION CONDUCTED BY              PAGE
 5
 6    Ms. Powell                                 4
 7    Ms. Choate                                33
 8    Ms. Powell                                34
 9    Mr. Tenney                                35
10
11
12
13
14                     E-X-H-I-B-I-T-S
15
16    None
17
18
19
20
21
22
23
24
```

```
 1          (Whereupon deposition commenced at 2:01 p.m.)

 2                    ROBERT J. BLUMTHAL, O.D.,

 3          The witness having been first duly sworn

 4     upon his oath testified as follows:

 5                    EXAMINATION CONDUCTED

 6                    BY:  MS. POWELL

 7          Q.    Would you please state your name for the

 8     record.

 9          A.    Robert J. Blumthal, B-l-u-m-t-h-a-l.

10          Q.    And Dr. Blumthal, it's my understanding

11     that you are an optometrist --

12          A.    Yes.

13          Q.    -- is that correct?

14          A.    That's correct.

15          Q.    Tell us what an optometrist is as opposed

16     to an ophthalmologist.

17          A.    In this day and age, the main difference

18     between the two of us is that the ophthalmologist

19     does surgery and I don't.

20          Q.    Okay.  Can you prescribe --

21          A.    I diagnose.  I treat.  I see patients.

22          Q.    Can you prescribe medications?

23          A.    Yes.

24          Q.    Okay.  Would it --
```

1      A.   With the exception of some oral

2   medications.

3      Q.   Okay.

4      A.   Mostly eye diseases we treat with topical

5   medication.

6      Q.   Would it be fair to say that most, if not

7   all, of the medications that you're allowed to

8   prescribe would be those that are directly placed

9   into the eye --

10      A.   Right.

11      Q.   -- as opposed to taking by mouth?

12      A.   Correct.  In this state, that's the way it

13   is.  I can prescribe some pain medicines that are

14   non-scheduled drugs orally.  That's it.

15      Q.   Okay.  And you currently practice in

16   Springfield, Illinois with the Prairie Eye Center?

17      A.   Correct.

18      Q.   How long have you --

19      A.   Yes.

20      Q.   -- been with Prairie Eye Center?

21      A.   Let's see.  What's today?  Today's the --

22   in ten days, it will be ten years.

23      Q.   Okay.  We're here today to ask you some

24   questions about a patient named Aaron McCroy.

1          A.    Uh-huh.

2          Q.    Do you recall Mr. McCroy?

3          A.    Well, after reviewing the chart, you know,

4     and -- I remember this gentleman.

5          Q.    Okay.

6          A.    Because he was a prisoner of the

7     Department of Corrections.

8          Q.    When you saw Mr. McCroy, were all of those

9     visits here --

10         A.    Yes --

11         Q.    -- in Springfield, Illinois?

12         A.    -- they were.

13         Q.    And would they have been here at this

14    address --

15         A.    Yes.

16         Q.    -- at 2020 West Iles?

17         A.    Yes, but not in this building right here.

18    Because you're sitting in the new addition.

19         Q.    It would have been in the main part?

20         A.    Yeah.  We just added this building a

21    couple months ago.

22         Q.    Okay.  Now, it's my understanding that

23    Dr. Feder performed the surgery on Mr. McCroy in

24    February of 2003.

1        A.    According to the record, that's what it

2    seems to indicate.

3        Q.    Okay.   And Dr. Feder was affiliated with

4    Prairie Eye Center, as well; is that accurate?

5        A.    Yeah.   He was the cornea specialist at the

6    time.

7        Q.    Okay.   Do you know where Dr. Feder is

8    right now?

9        A.    Somewhere in Illinois.

10        Q.    Okay.

11        A.    I -- my -- I could be wrong, but the last

12    I heard he was in Aurora.   But I'm not sure.

13        Q.    What is his first name?

14        A.    Joseph.   And that's F-e-d-e-r, Feder.

15        Q.    Okay.   And he is an ophthalmologist who

16    specializes in the care and treatment of corneas?

17        A.    Right.   He's an ophthalmologist with a

18    fellowship in corneas, so they call them cornea

19    specialists.   They do -- they do an extra one to

20    two years past their general ophthalmology to be

21    designated as a cornea specialist, so they tend to

22    limit their practice to mainly those specifics.

23        Q.    So Dr. Feder would have experience in

24    treating patients with keratoconus, correct?

1          A.    Dr. Feder came from the medical school,

2    and they're sort of a -- what do you want to call

3    it?  A segregation of labor, all right?

4          The optometrists do all the contact lens

5    fits for the keratoconus patients.   The

6    ophthalmologists do not.

7          Q.    Okay.

8          A.    They prefer to do that because that's

9    more -- we -- we learn -- we spend more time

10   learning contact lens fits than opthalmogists.

11         Q.    Okay.

12         A.    We spend three years.   They spent two

13   weeks.

14         Q.    So Dr. Feder's role would have been

15   limited to the surgery and the follow-up; is

16   that --

17         A.    Correct.

18         Q.    -- accurate?

19         A.    Correct.  And management of the

20   complications.

21         Q.    Okay.  And it appears from the records

22   that Dr. Feder left the practice, and the patient's

23   care was transferred to Dr. Zeh --

24         A.    Correct.

1     Q.    -- at some point?

2     A.    Correct.  That looks like it was

3     transferred at -- August 29th.

4     Q.    Is Dr. Zeh of the same specialty as

5     Dr. Feder?

6     A.    Yes.

7     Q.    And do you know where Dr. Zeh is

8     currently?

9     A.    He's in Indianapolis.  I'm not sure of the

10    name of the practice, but that's -- when he left,

11    that's where he went to.

12    Q.    I also noted that the patient had seen a

13    physician by the name of Dr. Kim.

14    A.    Uh-huh.  Who is a -- who is in the

15    practice for two years and he is a glaucoma

16    specialist.

17    Q.    Okay.

18    A.    And I know that you probably -- in the

19    record -- I didn't review that part of it, but I

20    think --

21    Q.    No, that's okay.  Do you know where

22    Dr. Kim currently is?

23    A.    Yes.  He's in Elkhart, Indiana because he

24    sent us a Christmas card.

1      Q.    All right.  Now, in my review of the

2    records, it appears that the patient was treated by

3    Dr. Feder for the surgery and came back in for

4    follow-up visits.

5      A.    Uh-huh.

6      Q.    And the first reference I have to contact

7    lenses is on April the 8th of 2003.

8      A.    April the 8th?

9      Q.    Right.

10      A.    Oh, I see it here.

11      Q.    There's a reference by Dr. Feder --

12      A.    Yeah.  It says --

13      Q.    -- for R.G.P. contact lenses?

14      A.    Yes.

15      Q.    Would that be -- what does the R stand

16    for?

17      A.    Rigid gas permeable.

18      Q.    And would it make sense that once he has

19    made that reference that he would refer the patient

20    for the contact lens fitting to you, the

21    optometrist?

22      A.    Yes.

23      Q.    Okay.  Now --

24      A.    But he did see him one more time before he

1   saw me.

2      Q.   Right.  Now, when Dr. Feder made the

3   reference to being ready for the rigid gas

4   permeable contact lenses in April of '03, how is it

5   that you would become aware of the need for you to

6   become involved --

7      A.   He would set up --

8      Q.   -- in doing that fitting?

9      A.   He would set up a -- what they would do is

10   when they went to the front desk, they would

11   schedule an appointment with me for a contact lens

12   fitting.  So that's the only way I would know.

13        Him and I shared an office together but,

14   you know, he didn't cross-reference patients unless

15   they had a problem or they would come up and say,

16   oh, I need this, I need you to do this, or I need

17   you to do that, because we both had our own patient

18   base, so --

19      Q.   So if Dr. Feder did not advise you --

20      A.   Direct- -- directly, they would normally

21   follow orders that he had written at the front

22   desk.  And I'm the one that does all the

23   complicated contact lens fits in the practice.

24      Q.   So even though we have a reference that

1   says ready for the contact lens fitting, if he

2   didn't actually fill out an order --

3        A.   No.

4        Q.   -- then nothing is going to be done,

5   correct?

6        A.   No.

7        Q.   So I see that Dr. Feder saw the patient

8   again on May 9, 2003 --

9        A.   Yes.

10       Q.   -- would that be accurate?

11       A.   That would be accurate.  Yeah, because

12  even though the order is written in here, they use

13  a chart slip to write down what the -- on the

14  business form what to do as far as what the

15  diagnosis was.

16            If they don't put a diagnosis in there,

17  referred to so-and-so, the patient's not referred.

18  And he obviously must have picked it up on the next

19  visit, realizing that I hadn't seen the patient

20  yet.

21       Q.   And Dr. Feder isn't going to do the

22  contact lens fitting himself, is he?

23       A.   No.

24       Q.   Now on the visit of May 9, 2003, I don't

1    really see a reference there to --

2        A.    No.

3        Q.    -- to the contact lenses.

4        A.    Right.

5        Q.    Even though he came back on that date

6    to --

7        A.    Well, he came back, I think, because he

8    had a problem.  It says here his diagnosis was

9    filamentary keratitis.  So he's trying to deal with

10   something relating to a side effect of the surgery.

11       Q.    Okay.

12       A.    Which is unrelated to -- the previous

13   visit was a follow-up actually on healing of the

14   transplant, okay?

15            The next one, I think, was a -- was a

16   visit -- much like the patients come in with --

17   it's almost a work-in.  They call and say, I'm

18   having a problem.  We'll bring you in.  This was

19   outside the scope of the normal follow-up for here.

20   His says follow-up in two months, March the 5th.

21   But that makes a date about that time, so maybe it

22   was.

23       Q.    With respect to the condition that he had

24   on May 9th of 2003, is that something that you

1    would want to take care of before having --

2       A.   Yes.

3       Q.   -- the contact lens fitted?

4       A.   Yes.

5       Q.   So it wouldn't make sense to do the

6    contact lenses any way --

7       A.   Right.

8       Q.   -- would it?

9       A.   Correct.

10       Q.   Okay.  And that could explain why you

11    weren't contacted immediately, right?

12       A.   Correct.

13       Q.   All right.  And until and unless that

14    condition's cleared up, the patient probably won't

15    have any success with the contact --

16       A.   It would --

17       Q.   -- lens anyway?

18       A.   It would be difficult to fit a lens on the

19    patient.  And he's had an experience of a severe

20    dry eye and it would be difficult to fit a contact

21    lens on the -- comfortably on the patient's eye at

22    that time.

23       Q.   Okay.  And with respect to this contact

24    lens, we are talking about the left eye, correct?

```
 1          A.    Correct.

 2          Q.    And that would be the right eye that had

 3     the keratoplasty?

 4          A.    Correct.

 5          Q.    And when we look at these optometry

 6     records, we see OS and OD there.  Tell me, OS is

 7     the left eye --

 8          A.    Correct.

 9          Q.    -- and OD would be the right eye?

10          A.    Correct.

11          Q.    Is there an easy way for us to remember

12     that?

13          A.    No.

14          Q.    Okay.

15          A.    Yes.  Want to know why?  Easy way to

16     remember it is the S stands for sinister.

17          Q.    And that's the left hand?

18          A.    And that was your -- suppose to be your

19     evil eye.  That's where it came from.

20          Q.    Doctor, it appears then that the next

21     record we have referencing the contact lens would

22     be June 24th of 2004.

23          A.    That would be correct.

24          Q.    Okay.  And did you see the patient
```

1    yourself on that date?

2        A.    Yes, I did.

3        Q.    Okay.  Now, how was it then that you came

4    to see the patient on June 24th of 2003?

5        A.    He was scheduled in for a rigid gas

6    permeable contact lens.  And the first part of the

7    notes is my assistant's work-up, which they take a

8    history, medications, and they write their visual

9    acuity.  And this was an uncorrected visual acuity.

10   And then I see the patient and I make my

11   assessments.

12       Q.    Would Dr. Feder have arranged that on the

13   May 9, 2003 visit?

14       A.    The actual date of when that was done

15   would be -- I'm not sure --

16       Q.    Did you see --

17       A.    -- to be honest, because it could have

18   been even as far back as the March visits or the

19   April visit, for the simple fact that my schedule's

20   always booked out about sometimes six to eight

21   weeks.

22       Q.    Okay.

23       A.    Depending on what the arrangement was with

24   the Department of Corrections, we try to match up a

1    date that's -- that's common or they can work them

2    in, that circumstance.  And if -- when he came in

3    and said I want to make an appointment and see

4    Dr. Blumthal, they would tell you, well, okay, it's

5    going to be five or six weeks.  So that -- that may

6    have been the earliest visit we had open on the

7    schedule.

8        Q.    That would be the same for somebody who

9    wasn't with the Department --

10        A.    Right.

11        Q.    -- of Corrections, correct?

12        A.    Right.  Wouldn't make a difference.

13   Anybody making an appointment upon that particular

14   day, they would look at the schedule and go, let's

15   see.  Let's go back and look at the schedule.  It

16   may have given particular days that were good for

17   the Department of Corrections to bring him in and

18   they had to go far enough out to find a space for

19   him.

20        Q.    Okay.  Now, it would --

21        A.    I don't remember what -- what day of the

22   week was June 24, 2003?  Anybody know?  I don't

23   know.  Could have --

24        Q.    It could have been this was a day that

1    there was an opening, too, right?

2         A.    Yeah.    This would have been scheduled in

3    as an opening -- a day -- they would have looked at

4    the schedule and found a day that would have fit

5    him in.    That's what, about ten weeks?

6         Q.    From the April date?

7         A.    Yeah.    About ten weeks out.    In my

8    schedule, sometimes, depending on the day, it could

9    be booked -- I know it's booked out four, five,

10   sometimes six weeks.

11        Q.    All right.    Is there --

12        A.    So it could be possible it was that far

13   out they had to book him.

14        Q.    Is there any way that we can tell from

15   looking at the records when they scheduled this

16   visit, whether they did it on the April visit or

17   the May visit?

18        A.    The only way to find that out, I think --

19   oh, God.    Yes.    I would have to see the schedule

20   for that day, the patient schedule.    Because it has

21   the initials of the person that made it and the

22   date it was made.

23        Q.    The initials of the person --

24        A.    The receptionist at the front desk that

1    made the schedule.

2        Q.    Okay.

3        A.    So that's -- that's the one way -- because

4    we'll look at the schedule sometimes and say, well,

5    when was this made.  Oh, Christ.  I didn't make

6    that so far out.

7        Q.    Okay.

8        A.    Or when I see double or triple bookings

9    and I go, who put four patients in at 8:00 o'clock,

10   okay?  So then I can see who did it and when it was

11   done.

12       Q.    All right.  Now, with respect to the

13   June 24th, 2003 visit, you indicated that your

14   assistant would have filled out the information

15   where it says chief complaint?

16       A.    Correct.

17       Q.    And this record says patient here for

18   R.G.P., which you've already indicated is rigid gas

19   permeable fit?

20       A.    Uh-huh.

21       Q.    And the positive sign would be -- would

22   that be after, post-keratoconus?

23       A.    It just means that they should start --

24   positive just means -- because we indicate positive

1    and negative for certain things in terms of did it

2    happen or did it not happen.  This indicates that

3    positive means he had a transplant.

4        Q.    Okay.

5        A.    That's what it stands for.

6        Q.    And it indicates the date of 2-3 --

7        A.    Correct.

8        Q.    -- -'03?  Okay.  You need to make sure

9    that we only have one person talking at a time.

10        A.    Sorry.

11        Q.    That's okay.  And then it says

12    keratoconus --

13        A.    Keratoconus right eye.

14        Q.    Right.  And that would be the OD, correct?

15        A.    Correct.

16        Q.    On my note, it's cut off there.  The

17    patient states -- V.A. is visual acuity?

18        A.    Correct.

19        Q.    No better than the last visit?

20        A.    Correct.

21        Q.    Okay.  Has worn R.G.P.s previously --

22        A.    Correct.

23        Q.    -- for several years.

24        A.    Correct.

1          Q.    Okay.  Prior to P.K.A.O.S., right?

2          A.    Correct.

3          Q.    Doesn't wear the right R.G.P. because fit

4     is messed up?

5          A.    Correct.  When we put a quote like that,

6     it's from the patient.

7          Q.    Right.

8          A.    Okay.

9          Q.    So at this point, is it fair to assume

10    that Mr. McCroy had a contact lens for his right

11    eye?

12         A.    Correct.

13         Q.    And that was in his possession, correct?

14         A.    Correct.  Not that day, but -- but you

15    could -- you could surmise that based upon that

16    response that that patient had worn a contact lens

17    in that eye at least at some time.

18         Q.    Okay.  And he wasn't wearing it now

19    because it didn't fit correctly --

20         A.    Correct.

21         Q.    -- according to him?

22         A.    According to him.

23         Q.    When you saw the patient on June 24, 2003,

24    did you do anything with respect to fitting the

1      lens in the right eye?

2          A.    No.

3          Q.    Okay.  Now, with respect to the left eye,

4      what did you do?

5          A.    Well, what it indicates on -- okay.  Shows

6      the visual acuity and on the back -- the second

7      page of that same day day, shows my signature.  It

8      shows that I made an assessment of his anterior

9      segment.  And in reference to the cornea, I made a

10     notation of what he had.  And it says positive

11     Munson sign, which is a diagnostic sign for

12     keratoconus, saying he was positive for

13     keratoconus.

14          The other eye showed he has cornial folds.

15     And you'll see those on post-keratoplasty patients.

16     It shows the cornea's healing.

17          Now, based upon that, I took a mapping of

18     his eye.  Same day.  I think you all should have

19     it.  I have the colored one, so let's see.  Here it

20     is.  This is dated 6-24-03.

21          Okay.  I took a -- in order to fit this

22     patient, you have to take a map of their eyes.

23     It's called a corneal topography.  And you use that

24     reference to come up with a contact lens design to