E-FILED
Friday, 20 April, 2007 04:06:28 PM
Clerk, U.S. District Court, ILCD

1  A. Yes, I am.

2  Q. What's the difference in your mind between an ADA
3  cell and a regular cell?

4  A. Because of my decreased vision that I don't harm
5  myself in an ADA cell.

6  Q. Okay. I want you to tell me what the difference
7  is. What do you understand the difference to be between an
8  ADA cell and a regular cell?

9  A. A regular cell has sharp edges and sharp metal
10  protruding which I could cut myself. And because of the
11  set-up in the cell, I'm hitting things. I always hit
12  certain things.

13  Q. Okay. Tell me exactly, where would the sharp edges
14  be in a regular cell?

15  A. On the bunk there is, the metal is almost razor
16  edge. The cabinets are sharp corners. The boxes, the way
17  the boxes must be situated become a hazard, so forth, there
18  the sharp edges, yeah, sharp edges because of the corners.

19  Q. Okay. And an ADA cell has what?

20  A. It's open. It's not where you have to maneuver or
21  navigate around objects, sharp objects. It has no sharp
22  objects on the bunk, no razor edge corners on the bunks.

23  Q. Are you telling me the bunks are different in an
24  ADA cell than they are in a regular cell?

1    A.   Yes, they are.

2    Q.   At every institution?

3    A.   This is the only institution I have been in with an
4 ADA cell.

5    Q.   Okay.  Do ADA cells here have different cabinets
6 than a regular cell?

7    A.   They are positioned differently.

8    Q.   Have you been in a regular cell here?

9    A.   Yes, I have.

10   Q.   And you have been in an ADA cell?

11   A.   Yes, I have.

12   Q.   Have you cut yourself in a regular cell?

13   A.   Yes, I have.

14   Q.   Have you cut yourself in the other cell?

15   A.   No, I haven't.

16   Q.   How did you cut yourself in the regular cell?

17   A.   On the beds where I told you, where the metal is
18 cut.  I cut -- when I come in, I hit my head because I have
19 no depth perception.  I cut myself when I grab certain edges
20 or I have to move around objects.  I hit the cabinets, the
21 way the toilet is and the cabinet is.  Like if I'm using the
22 bathroom to get up, I cut my head because of the cabinet is
23 right above the toilet.  And I have cut my head that way.  I
24 have cut my hands.  I have numerous injuries while I was in

32

```
 1   a regular cell.
 2       Q.  And that's all from bumping into things?
 3       A.  Yes, bumping into things.
 4       Q.  Are you saying that the placement of the bunks and
 5   the placement of the cabinets is what causes you to bump
 6   into them?
 7       A.  And the hazardous, the sharp edges.  I don't know
 8   if I can explain it to you correctly, but the bunks are cut
 9   in such a way where you can actually cut things on them.  If
10   you wanted to cut your clothing or something, you could just
11   put it right there and cut it.  The way that they are made
12   it's, the way that the bunk, the beds is like they made them
13   as razors or something.  You can actually --
14       Q.  So if they put -- and you're saying that the type
15   of bunks that they have in the ADA cells is different?
16       A.  Yes.
17       Q.  Okay.  So if they put that type of bunk in a
18   regular cell, the regular cell would be fine?
19       A.  No, because the bunk, they don't have bunk beds in
20   ADA cells.
21       Q.  What kind of beds do they have?
22       A.  One bed.
23       Q.  So if they have one bed in a regular cell, that
24   would be fine?
```

1    A.   No.  That would not be the only problem.

2    Q.   What's the other problems?  Tell me all the
3 problems.

4    A.   The nearness of the cabinets and the protrusions of
5 them because the way you have to -- in the ADA cell
6 everything is positioned not in front of you, but to where
7 you approach it or you make a choice to approach it.  In the
8 regular cell you will, for a person such as myself that has
9 no depth perception and no night vision, snow blindness, if
10 I get out of bed, I will run into something because I can't
11 see.  In an ADA cell I can get out of bed and know there is
12 nothing in front of me.  It's because they are positioned
13 where nothing is in front of you.

14   Q.   Where is the cabinet in the ADA cell?  Do you have
15 one?

16   A.   Yes.

17   Q.   Well, where is it?

18   A.   It's on the wall, but it's not in front of you.  It
19 is away from you to the side.

20   Q.   So if they put the cabinet in a regular cell away
21 from you and to the side, that would be okay?

22   A.   Yes.

23   Q.   Okay.  Does your cellmate have any disabilities?

24   A.   No, he doesn't.

```
 1        Q.   How is it that he is placed in the cell with you
 2   then?
 3        A.   I don't know.
 4        Q.   He doesn't have a wheelchair?
 5        A.   No.
 6        Q.   And since -- you don't have bunks in there?
 7        A.   Yes.  We have beds, but not bunk beds.
 8        Q.   So there are two beds side by side rather than on
 9   top of each other?
10        A.   Right.
11        Q.   Okay.  So nobody has a low bunk because you don't
12   need one?
13        A.   Right.
14        Q.   All right.  You have as part of your claim in this
15   case allegations that you have been denied privileges under
16   the Americans With Disabilities Act.  Do you know what
17   privileges?
18        MR. LONDRIGAN:  Well --
19        Q.   I mean, do you know what privileges are being
20   referenced?
21        MR. LONDRIGAN:  I am going to object to that because it
22   calls for a legal conclusion, but however you want to frame
23   that question, I am not instructing him not to answer.
24        MS. CHOATE:  Well, as far as the ADA goes, he did bring
```

35

1  this pro se, and he --

2  MR. LONDRIGAN: He brought it pro se because he didn't
3  have a lawyer appointed by the court at that time. He did
4  his best under the circumstances. He does not hold himself
5  out to be a lawyer or a doctor.

6  MS. CHOATE: My point was, Tom, that he did make
7  allegations and he alleged under the ADA --

8  MR. LONDRIGAN: Well, you can ask him about the
9  allegations, but you can't ask him to give you legal
10 conclusions as to what's in violation and what's not.

11 Q. I am not asking for a legal conclusion, sir. I am
12 just asking, you have alleged in the complaint you have been
13 denied privileges which fall under the Americans With
14 Disabilities Act. What privileges are you referencing
15 pursuant to those allegations?

16 A. In regards to when I filed the complaint, it was
17 the fact that as proposed to all other disabilities, my
18 visual disability was not given the same consideration as
19 those with chronic illnesses or disabilities such as
20 specialty clinics and follow-up care and treatment. They
21 did not treat my disability. I had to complain, sustain
22 substantial injury before I would get treated whereas other
23 people with disabilities were scheduled for specialty
24 clinics and were scheduled for follow-up treatments on

```
 1   predetermined schedules.  They had treatment plans whereas I
 2   was not.  I had to sustain injuries.
 3        Q.  So you're saying that you believe that your eye
 4   condition requires that you to be seen in a specialty clinic
 5   like other clinics?
 6        A.  Yes.
 7        Q.  Are you aware of what clinics currently exist?
 8        A.  Yes.  There is a diabetic clinic.  There's a
 9   hypertension clinic.  There's numerous clinics that exist.
10        Q.  Okay.  So part of your claim then is that you
11   believe that under the ADA you're entitled to an eye clinic?
12        A.  I'm not saying which type of clinic.  I am saying
13   that I have a disability called keratoconus that demanded
14   specialized treatment, and I should have been involved in
15   the specialty clinic to monitor my condition.
16        Q.  Well, are you aware of a specialty clinic that
17   exists that would encompass keratoconus?
18        A.  No, I don't.
19        Q.  You're saying that one should be created for you?
20        A.  No.  I am saying that I have been in facilities
21   where other inmates, specifically Hill, who had keratoconus,
22   and we were in a specialty clinic.  I was denied the
23   specialty clinic at Western.
24        Q.  Well, what clinic were you denied?
```

```
 1      A.  Well, I am not saying clinic.  I don't know
 2  what it was, but under Dr. Kehoe's care, me and the other
 3  keratoconus patients were seen, if not monthly, bimonthly or
 4  whenever to check the progression of our keratoconus.  We
 5  were sent out, put on cornea machines to test the damage
 6  that it was doing to our eyes to fit our contact lenses and
 7  so forth.  So I am saying the care that I received with
 8  other keratoconus patients at another facility I was denied
 9  at Western.
10      Q.  And where did you receive that care?
11      A.  At Hill Correctional Center.
12      Q.  Okay.  So you're saying that you received different
13  care at Western than you received at Hill?
14      A.  Yes.
15      Q.  And that you were seen at the Kehoe Eye Center when
16  you were at Hill, correct?
17      A.  Yes.
18      Q.  And you were seen at the Kehoe Eye Center when you
19  were at Western?
20      A.  Yes.  I was seen at the Kehoe Eye Center.
21      Q.  For a certain period of time, right?
22      A.  One time.
23      Q.  Okay.
24      A.  Well, twice, I believe.
```

```
 1        Q.  Okay.  And after that you were transferred to other
 2   eye physicians, right?
 3        A.  Not for care of the keratoconus for the injury
 4   caused, for injuries caused.
 5        Q.  What does that mean?  For injuries caused?
 6        A.  That as a result of when I came to Western, as a
 7   result of them not refitting me or continuing to refit of my
 8   left contact lens and not having the equipment to know when
 9   I had an eye infection, I sustained an injury to my left eye
10   that required, that precipitated the cornea transplant.
11        Q.  What's the injury?
12        A.  The doctor tells me that the contact lens tore into
13   my cornea membrane, and because of the untreated eye
14   infection, I almost lost sight in the eye, and that, and
15   that it caused so much damage to the eye, I no longer could
16   wear contact lenses.
17        Q.  Who told you that?
18        A.  Dr. Weller.
19        Q.  Dr. Weller?
20        A.  Yes.
21        Q.  Dr. Weller was at Quincy, correct?
22        A.  Yes.
23        Q.  Okay.  So getting back to this ADA, you're saying
24   that part of your claim under the ADA is that you wanted to
```

1  continue to be seen by Dr. Kehoe?
2      A.  No.
3      Q.  Well, what is it?  You wanted to be seen by
4  someone?
5      A.  I wanted the treatment of my disease to continue.
6      Q.  Of the keratoconus?
7      A.  Yes.
8      Q.  And you're saying that it wasn't treated?
9      A.  No, it was not.
10     Q.  Do you know when was the last time you saw
11 Dr. Kehoe or someone from his office?
12     A.  It was approximately in 2002.  I think in March of,
13 April or March of 2002.
14     Q.  Okay.  Do you know when you saw Dr. Weller?
15     A.  In February or March of 2002.
16     Q.  Did you have any complaints with respect to
17 Dr. Weller?
18     A.  He only, he, he treated the eye infections and gave
19 recommendations.
20     Q.  I know.  Do you have any complaints about
21 Dr. Weller?
22     A.  No.  Pardon me.  No complaints.
23     Q.  Okay.  Do you recall when it was thereafter that
24 you started being seen by someone in Springfield?

```
 1         MR. LONDRIGAN:  You skipped Jacksonville.
 2         A.   Pardon me?
 3         MR. LONDRIGAN:  I am saying she has jumped --
 4         MS. POWELL:  That's okay.
 5         MR. LONDRIGAN:  -- from Quincy to Springfield.
 6         Q.   Do you know when it was that you started seeing
 7   someone in Springfield?
 8         A.   After the surgery, after I was given the
 9   transplant.
10         Q.   Well, you saw someone before the transplant because
11   the doctor that gave you the transplant was Dr. Fedder who
12   was in Springfield, right?
13         A.   No.  He was not in -- when I seen him, he was not
14   in Springfield.
15         Q.   Where was he?
16         A.   He was in Jacksonville.
17         Q.   Oh, so he saw you in Jacksonville; is that right?
18         A.   Yes.
19         Q.   Okay.  Did you ever see him while he was in
20   Springfield?
21         A.   After the surgery.
22         Q.   Okay.  So the same doctor?  He has more than one
23   office?
24         A.   Well, Prairie Eye Center has more than one.
```

```
 1        Q.  Right.  It is the same group of physicians.  They
 2   just have two locations, right?
 3        A.  Yes.
 4        Q.  Isn't Jacksonville closer to Western than
 5   Springfield?
 6        A.  Yes.
 7        Q.  Are you complaining that you had to go to
 8   Jacksonville?
 9        A.  No.
10        MR. LONDRIGAN:  I am going to object to that question.
11        Q.  Are you complaining -- I can ask him if I want to.
12        MR. LONDRIGAN:  I know you can ask him if you want to.
13   I am going to articulate the objection.  The location of
14   Jacksonville is unrelated to any of the complaint that he
15   either he filed pro se or that I filed.  The issue in this
16   complaint is not keeping a single treating physician so he
17   could be followed up on and shopping ophthalmologists in
18   different localities to get different opinions from these
19   doctors.  It's not the location of the doctor.  It is
20   continuing to rotate him from place to place and physician
21   to physician.  And I don't think that's a fair question to
22   ask him whether or not he had objected to going to
23   Jacksonville because it is closer.  That's a non-issue in
24   this case.
```

42

1  Q. Do you have any complaints about the physicians at
2  the Prairie Eye Center?
3  A. No.
4  Q. Do you know if anyone at the Kehoe Eye Center that
5  specialized in or qualified to perform a corneal transplant?
6  A. No, I do not.
7  Q. Do you know if anyone from Dr. Weller's office is
8  qualified to perform a corneal transplant?
9  A. He named someone, but I do not know the name.
10 Q. Do you recall the name Dr. Losey?
11 A. No, I do not.
12 Q. When Dr. Zeh left the Prairie Eye Center, did you
13 personally know whether or not anyone there was qualified or
14 specialized in corneal care?
15 A. No, I do not.
16 Q. Do you have a recollection of going to see
17 Dr. Staley or Dr. Kanuck?
18 A. Yes, I do.
19 Q. How many times did you see them?
20 A. I believe one time.
21 Q. And do you remember why you went there? For what
22 condition?
23 A. For a second opinion.
24 Q. Okay. On the day that you went there do you recall

43

```
 1  seeing Dr. Brown?
 2       A.  No, I don't.
 3       Q.  You don't recall seeing Dr. Brown in the waiting
 4  room?
 5       A.  Oh, yes.  Yes, him and his wife.  Yes, I did.
 6       Q.  Dr. Brown is actually a patient there himself,
 7  right?
 8       A.  Yes.
 9       Q.  And actually the day you went there Dr. Brown was
10  sitting there in the waiting room, wasn't he?
11       A.  With his wife.
12       Q.  Yes.  And you waved at him?
13       A.  No, I did not.
14       Q.  You did not wave at him?
15       A.  No.
16       Q.  You did not see him sitting there?
17       A.  No.  The police told me he was sitting there.
18       Q.  Did he look at you and say anything to you?
19       A.  No, he did not.
20       Q.  Had you ever seen Dr. Brown's wife before?
21       A.  No, I did not.
22       Q.  Are there any other privileges that you're
23  complaining about with respect to the American With
24  Disabilities Act?
```

1  A.  As I do not know what privileges I am entitled to,
2  I can't say at this time.
3  Q.  You also make reference to public accommodations
4  being denied.  What public accommodations do you believe
5  were being denied?
6  A.  Public accommodations?  I am not in the public.
7  MR. LONDRIGAN:  What's the foundation?
8  MS. POWELL:  It's in your complaint.
9  MR. LONDRIGAN:  Well, then we drafted it, and then
10  you should ask me or file a motion with respect to that
11  complaint.  If it in his complaint and it's his terminology,
12  he can answer that question.
13  MS. POWELL:  Well --
14  MR. LONDRIGAN:  He can't answer this question because
15  it calls for a legal conclusion based upon a pleading that
16  he did not file.
17  MS. POWELL:  That's okay.
18  Q.  Are you aware of any public accommodations that
19  you're being denied?
20  A.  No, I am not.
21  Q.  Other than the positioning of the beds and the
22  positioning of the cabinets in your cell, is there anything
23  that you can do in your ADA cell that you can't do in your
24  regular cell?