1    A.  Not get hurt.

2    Q.  Okay.  Other than that?  Other than the factors
3 that you have already described to me regarding the
4 positioning of the objects in the cell, is there anything
5 else about the cell that you're complaining about?

6    A.  I am not complaining about the cell, the ADA cell
7 at all.

8    Q.  Right.  But you're complaining about being put in a
9 regular cell?

10   A.  Yes.

11   Q.  And that has to do with your stay here at
12 Pinckneyville, correct?

13   A.  Well, I have always -- well, since my eyes have
14 deteriorated, I have complained about cell placement at
15 Menard and at Western.

16   Q.  You complained about -- you requested to be in an
17 ADA cell at Western?

18   A.  No.  I requested that -- they don't have any ADA
19 cells at Western.  I requested that I not be, that, that
20 they not cut the lights on over my head and that I be
21 allowed to draw the curtains to block out other people's
22 lights.

23   Q.  Who would you request that from?

24   A.  Warden Funk, Assistant Warden Funk and Nurse Fuqua.

1   Q.   Anyone else?

2   A.   And the correctional officers, whoever would have

3   the infirmary that day.

4   Q.   Okay. Your complaint also makes reference to

5   access to employment?

6   A.   Yes.

7   Q.   Did you want to work?

8   A.   Yes.

9   Q.   When did you want to work?

10   A.   When I get out. When I obtain my freedom, I would

11   want to work.

12   Q.   Okay. So are the references in the complaint that

13   you were not provided access to employment referring to

14   employment when you get on the outside or employment on the

15   inside?

16   MR. LONDRIGAN: Would you clarify for him what

17   complaint you're referring to?

18   MS. POWELL: The second amended complaint.

19   MR. LONDRIGAN: The one we filed?

20   MR. POWELL: Sure. That's the one currently pending.

21   MR. LONDRIGAN: He did not draft that. And you're

22   going to have to ask him in laymen's terms rather than the

23   terms used by the lawyer that pleaded the complaint.

24   Q.   Do you understand what the word employment means?

47

1   A.  Yes, I do.

2   Q.  Okay.  So when you have in your complaint that
3   you -- let me find it specifically.  Your complaint alleges
4   that you were denied certain --

5   MR. LONDRIGAN:  I object to using the term your
6   complaint.  There are two complaints that are filed here,
7   one that has been filed and repled by court appointed
8   attorneys.  His complaint is the pro se complaint.  And I
9   think it is confusing to just refer to it as his complaint.

10  MS. POWELL:  I am going to be like you, Tom, and object
11  to your speaking objections.  I can't sit here -- excuse me.
12  Let me finish.  I cannot sit here and depose you and ask you
13  what you meant by your second amended complaint.  I mean,
14  you have a lot of cases so you know what when you file a
15  complaint that's all I can go from.

16  MR. LONDRIGAN:  Just identify the complaint by its
17  title so he knows what you're talking about and I know
18  what you're talking about.

19  MS. POWELL:  There is only one complaint, Tom.

20  MR. LONDRIGAN:  That's not a difficult thing to ask.

21  MS. POWELL:  Okay.  For purposes of this deposition and
22  for this whole case the only complaint that matters is the
23  one that's currently pending, the second amended complaint.

24  MR. LONDRIGAN:  So your questions relate solely to the

1  last filed pleading that was filed by our office?
2      MS. POWELL: That's the only complaint that is on file.
3      MR. LONDRIGAN: If that's the understanding, I
4  understand it. The witness understands it. I will withdraw
5  my objection.
6      MS. POWELL: That's the one I am referring to. If I
7  was referring to something he wrote, I would specifically
8  say that.
9      MR. LONDRIGAN: Well, I am not so sure about that.
10 That's why I made the objection.
11     MS. POWELL: That's fine.
12     Q. So let me get back to my questions. You're
13 claiming that you were denied access with respect to
14 employment. Are you aware of any employment that you have
15 been denied while you were here in the Department of
16 Corrections?
17     A. Yes.
18     Q. Are you complaining that you wished to be employed
19 at any time that you were not given access to employment?
20     A. I am, yes.
21     Q. Okay. Tell me the specific dates.
22     A. Specific dates is that for the period that I was
23 medically unassigned that I could not enroll in the early
24 release program to obtain my early release.

49

```
 1        Q.  Okay.  That has something to do with -- well, you
 2   understand the term medically unassigned to be that you are
 3   not being assigned a job, correct?
 4        A.  Right.
 5        Q.  Okay.  And whether or not you can participate in
 6   the early release program has nothing to do with your
 7   physicians or any medical providers, correct?
 8        A.  But it has.  You asked about employment.
 9        Q.  I will get back to that.  You would agree that
10   whether or not you can participate in the early release
11   program when you're medically unassigned has nothing to do
12   with your physicians, right?
13        A.  Has nothing to do with my physicians?
14        Q.  Right.
15        A.  The physicians did it.
16        Q.  The physicians made you medically unassigned,
17   correct?
18        A.  Yes.
19        Q.  But they don't determine whether or not you can
20   participate in any other programs?
21        A.  No.  I cannot be assigned period.
22        Q.  Do you want to be given a job?
23        A.  I did at the time in early release, yes.
24        Q.  But do you think you were able to work during the
```

```
 1   time frame that you were recovering from your keratoplasty
 2   surgery?
 3        A.  I could have done what they do here is, in Western
 4   they had, I could have rolled spoons.  I could have done
 5   menial tasks as they do here for the ADA's or people with
 6   disabilities or chronic illnesses for early release.  It
 7   would not have endangered or caused or need to cause any
 8   harm to my eye sight or took any strenuous labor.
 9        Q.  Did you ever ask to do any sort of jobs like that
10   while you were at Western Illinois Correctional Center?
11        A.  I was medically unassigned.
12        Q.  I know.  My question is, did you ever ask to do any
13   sort of job like that while you were at Western Illinois
14   Correctional Center?
15        A.  I asked to be put in the early release program to
16   be taken out of the medically unassigned and to be put in
17   the early release program.  And I did not receive an answer.
18        Q.  Okay.  You asked someone to no longer be medically
19   unassigned?
20        A.  Yes.
21        Q.  When did you do that?
22        A.  When they did it.
23        Q.  Well, when, because I think you were medical
24   unassignment was renewed on a yearly basis, right?
```

1    A.   No.

2    Q.   It wasn't?

3    A.   No. I don't know who made me medically

4 unassigned. I believe that I wrote a grievance in reference

5 to this; that there was no signature on my, the instructions

6 to place me, not to assign me. It was a rubber stamp. So I

7 inquired in regards to that.

8    Q.   Did you file a grievance regarding that?

9    A.   Yes, I do believe I did.

10   Q.   Do you recall when you filed that grievance?

11   A.   No, I don't.

12   Q.   Do you recall reading that in the last few weeks?

13 Any grievance relating to being medically unassigned,

14 because I haven't seen one?

15   A.   No, I don't.

16   Q.   When you came to -- when you went from Western to

17 Menard were you medically unassigned when you arrived at

18 Menard?

19   A.   I was in seg, no. No, I was not assigned.

20   Q.   You were not medically unassigned when you went to

21 Menard?

22   A.   Not to my knowledge.

23   Q.   So did you have a job when you were at Menard?

24   A.   No, I did not.

1   Q.  Is that because you were in segregation at Menard?
2   A.  Yes.
3   Q.  Were you in segregation the entire time?
4   A.  No.
5   Q.  When you were no longer in segregation did you
6   have a job?
7   A.  They wouldn't allow me to have a job.
8   Q.  Why not?
9   A.  I was in protective custody status.
10  Q.  Do you have a job now?
11  A.  No.
12  Q.  Have you ever asked anyone here for a job?
13  A.  No, I have not.
14  Q.  Are you considered medically unassigned now?
15  A.  No.
16  Q.  Then why don't you have a job?
17  A.  I am presently on the early release program.
18  Q.  What does that mean?
19  A.  That I am earning my early release.
20  Q.  Well, what does being medically unassigned have to
21  do with the early release program?
22  A.  If you are medically unassigned, you cannot be
23  assigned to -- the early release program is an assignment.
24  When you're medically unassigned, that tells placement that

53

```
 1  you are unable for medical reasons to be assigned to any
 2  program.
 3       Q.  That's your understanding?
 4       A.  Yes.
 5       Q.  Had you participated in the early release program
 6  at any point in time prior to being in Pinckneyville?
 7       A.  Yes.
 8       Q.  While you were at Hill?
 9       A.  Yes.
10       Q.  And did you ever participate in the early release
11  program while you were at Western?
12       A.  Yes.
13       Q.  Is it fair to say that the only time that you
14  weren't in the early release program was after your
15  keratoconus had started to progress?
16       A.  No.
17       Q.  When did you drop out of the early release program?
18       A.  When they would not, when I would get eye
19  infections, and the hospital would not inform the school
20  that the medication that they were giving me would render me
21  unable to see and I couldn't go to school.  And I obtained
22  three tickets, disciplinary tickets and punishment, and was
23  withdrawn from school from the early release program.
24       Q.  Okay.  So you were taken out of school because you
```

```
 1   missed three occasions, and that's a violation?  Is that
 2   accurate?
 3        A.  Partially, yes.
 4        Q.  Okay.  And you're saying that the reason that you
 5   didn't go to school was because of your eye problems; is
 6   that right?
 7        A.  Yes.
 8        Q.  Okay.  And it was a result of that that you became
 9   medically unassigned?
10        A.  No.  I don't know why I became medically
11   unassigned.  I was not medically unassigned at that point.
12        Q.  After you became medically unassigned at Western
13   did you ever participate again in any early release program?
14        A.  Not at Western.
15        Q.  Okay.  Can people who are medically unassigned go
16   to yard?
17        A.  Yes.
18        Q.  Can people who are medically unassigned go to
19   the gym?
20        A.  Yes.
21        Q.  And can people who are medically unassigned go to
22   the commissary?
23        A.  Yes.
24        Q.  Is there anything people who are medically
```

55

```
 1   unassigned can't do other than participate in a job and the
 2   early release program?
 3        A.   Yes.
 4        Q.   What?
 5        A.   They can't work a job, go to school, and they're
 6   confined more hours than people who are assigned.  They are
 7   confined to their cell more hours than people who are
 8   assigned.
 9        Q.   And why would that be?
10        A.   Because they are assigned.
11        Q.   What does being confined to your cell have to do
12   with being medically unassigned?
13        A.   Unassigned at Western means you can only come out
14   one time a day for an hour; whereas if you were assigned,
15   you were eligible for programs such as going to the gym,
16   well, more often to the gym, more often to the yard, and you
17   had more time out of your cell during the day and evening.
18   If you are unassigned, you could only come out of your cell
19   during the day either at eight to nine or twelve to
20   one-thirty or two o'clock.
21        Q.   Where was your cell in relationship to the yard?
22        A.   I couldn't tell you that.
23        Q.   Well, did you ever walk to the yard from your cell?
24        A.   At that point I couldn't go to the -- what period
```

56

1  are you talking?
2      Q.  Okay.  That's fair.  From any time after February 3
3  of '03 while you were incarcerated at Western Illinois
4  Correctional Center did you go from your cell wherever you
5  were housed to the yard?
6      A.  Yes, I did.
7      Q.  How would you get there?
8      A.  I would leave the infirmary every other day.  I was
9  allowed to go from the infirmary to the yard.
10     Q.  Were you always escorted?
11     A.  No.  I was never escorted.
12     Q.  Okay.  So you knew how to get to the yard from the
13 infirmary, right?
14     A.  Yes.
15     Q.  Now, can you see in the dark very well?
16     A.  No.  No.
17     Q.  But you wanted to have yard access at night?
18     A.  There is no night yard.  There was no night yard at
19 Western.
20     Q.  Is your vision better during the day than it is
21 at night?
22     A.  Yes.
23     Q.  Were you able to go to the law library?
24     A.  Yes.

1  Q. And how many times could you go to law library?
2  A. Two to three times a week.
3  Q. And did you exercise those privileges?
4  A. Yes, I did.
5  Q. Were you able to go to the commissary?
6  A. Intermittently.
7  Q. When you had those rights did you exercise them?
8  A. When allowed to, yes.
9  Q. Okay. And, again, is that something that you could
10 just go on your own to the commissary? Did someone --
11 A. No. No.
12 Q. Did someone have to escort you?
13 A. I would -- it was at the behest of the infirmary
14 staff whether I went or not.
15 Q. So they would determine when you could go and when
16 you couldn't?
17 A. No. They would determine whether they would turn
18 in the slips or not, not when -- they had no control over
19 whether I could go or not. What they had control over was
20 whether they would turn in the slips or not.
21 Q. So you think they didn't turn in the slips?
22 A. All I can say is that I turned slips in and no
23 store was brought to me. I can't account for why that was.
24 Q. Okay. When you went to the law library, were you

58

1  escorted to the law library?
2      A. No.
3      Q. And describe for me what the law library looks like
4  at Western. Is it bigger than this room?
5      A. Yes.
6      Q. So how big is it?
7      A. I can't say what the measurements are.
8      Q. Would it be more than twice the size of this room?
9      A. I can't tell you right now. I just took out my
10 contact lens, so I can't really tell you.
11     Q. Well, you can't see the library because I am asking
12 you something that would be in your mind.
13     A. I understand, but you're asking me about the room,
14 this room. And I can't see this room.
15     Q. Okay. Well, in comparison to what your cell would
16 be, tell me how much bigger it is than your cell, your
17 current cell?
18     A. Twice.
19     Q. The law library is twice the size of your current
20 cell?
21     A. In Western, yes.
22     Q. Okay. And how many inmates can be in the law
23 library at a given time?
24     A. I have no idea.

59

```
 1      Q.   Have you ever been in the law library with someone
 2   else?
 3      A.   Yes.
 4      Q.   So other inmates can be in the law library at the
 5   same time that you would be in there?  Is that accurate?
 6      A.   Yes.
 7      Q.   Okay.  And why did you go to the law library?
 8      A.   At the time that this -- to do legal research.
 9      Q.   Okay.  And are you able to do legal research?
10      A.   Yes.
11      Q.   Do you have any certificates in legal research?
12      A.   I am a certified law clerk.
13      Q.   Okay.  Where did you obtain your certification?
14      A.   Lewis University.
15      Q.   When did you get that?
16      A.   1995 or '96.  I am not sure.
17      Q.   Would that be while you were in incarcerated at
18   which facility?
19      A.   Stateville.
20      Q.   Do you help other inmates with their lawsuits?
21      A.   No, I do not.
22      Q.   Do you ever do any legal research for anyone other
23   than yourself?
24      A.   No, I do not.
```