1  cell as opposed to being in the infirmary? What could you
2  do in your cell that you couldn't do while you were in the
3  infirmary?
4      A. I think the --
5      MR. LONDRIGAN: Wait a minute. Just a second. There
6  are two different questions. Did you withdraw the first
7  one? Do you want him to answer just the second?
8      MS. POWELL: Well, let's just -- I will just rephrase
9  the whole thing.
10     Q. Was there anything that you could do while you were
11 in the general population that you were not allowed to do
12 while you were in the infirmary?
13     A. It's not what I couldn't, I could do; it's what I
14 couldn't do.
15     Q. Okay. Tell me what you couldn't do in the general
16 population that you could do --
17     A. I couldn't see. I couldn't navigate around. I was
18 unable to function.
19     Q. All right. Are you telling me you couldn't
20 navigate in your general population cell, but you could
21 navigate in the infirmary cell?
22     A. I didn't have to navigate in the infirmary cell.
23 Everything was brought to you.
24     Q. Okay. Tell me what was brought to you while you

```
 1  were in the infirmary.
 2       A.  Everything, food, commissary, everything.  Anything
 3  that you wanted was brought to you whereas in population you
 4  had to go out and get it.  And since they had not at that
 5  time allowed me to be fitted for contact lenses as of yet
 6  when they put me in population, I couldn't navigate to go to
 7  chow or anything.
 8       Q.  Did you go to chow when you were in general
 9  population?
10       A.  No.
11       Q.  You didn't go to chow then?  How did you eat?
12       A.  I went some of the time.  Let me rephrase.  I went
13  some of the time.  Most of the time I ate out of my box.  I
14  went to commissary.
15       Q.  And where was commissary?
16       A.  By the dining hall.
17       Q.  How far did you have to walk to go to commissary?
18       A.  Approximately fifty foot.
19       Q.  And how far was the commissary from the dining
20  hall?
21       A.  Approximately fifteen feet.
22       Q.  So why didn't you just walk from the commissary
23  over to the dining hall to eat?
24       A.  We're talking in terms of doing something one time
```

```
 1  a day, one time a week, to doing something fifteen times a
 2  week.
 3       Q.  Well, how many times did you want to go to the
 4  yard?
 5       A.  At least once a week.
 6       Q.  Did you want to go to yard every day?
 7       A.  They wouldn't allow me to go.
 8       Q.  If they would have allowed you to go to yard, would
 9  you have gone every day?
10       A.  No.
11       Q.  Well, you told us already that you went three
12  times a week and that wasn't enough?
13       A.  No.  I never told you that.
14       Q.  You told me that you could go three times a week to
15  yard.  Is that not true?
16       A.  I said before they stopped me from going.
17       Q.  Right.
18       A.  I was going three times a week, yes.
19       Q.  That's right.  And if they would have allowed you
20  to go two more times that week, would you have gone?
21       MR. LONDRIGAN:  What point in time are we talking
22  about?
23       MS. POWELL:  While he was in the infirmary.
24       A.  Okay.  That's a hypothetical.  I could tell you
```

97

```
 1   that I would have went.  It is no, no -- if I wouldn't have
 2   went, that's a hypothetical.
 3       Q.  You told me earlier that every time you had the
 4   ability to go to the law library you went, right?
 5       A.  Yes.
 6       Q.  Okay.  So when you had the ability to go to the
 7   chow hall, you chose not to go on certain occasions, right?
 8       A.  Yes.
 9       Q.  Okay.  You chose to go to commissary on one
10   occasion, and then you would eat in your cell, right?
11       A.  Yes.
12       Q.  How far is the law library from the infirmary?
13       A.  Approximately fifty feet.
14       Q.  And how far is the yard from the infirmary?
15       A.  Approximately a hundred twenty-five feet or so.
16       MS. CHOATE:  We are talking at Western, correct?
17       Q.  All these questions have to do with Western.  And
18   that's what you are answering, correct?
19       A.  Yes.
20       Q.  Are you on any medications today?
21       A.  Yes.
22       Q.  What medications are you on?
23       A.  Clonopin, Prozac, water pill, water pill diuretic,
24   and high blood pressure medication pill.
```

```
 1        Q.  And are any of those medications affecting your
 2   ability to answer my questions or to understand them?
 3        A.  Not to my knowledge, no.
 4        Q.  Okay.  Are any of the medications that you
 5   mentioned related in any way to your eyes?
 6        A.  No.
 7        Q.  Did anyone in the -- did you have any chores that
 8   you had to do when you were in the general population that
 9   you didn't have to do while you were in the infirmary?
10        A.  Chores?
11        Q.  Any tasks or chores?
12        A.  Go to chow, go to the store, that's about it.
13        Q.  Okay.  And you could go to those during the
14   designated hours for this, correct?
15        A.  Yes, I could.
16        MS. POWELL:  I don't have anything else.
17   EXAMINATION BY MS. CHOATE:
18        Q.  I have some.  Luckily we covered most of the
19   activities and things like that by Miss Powell, so we don't
20   have to go over that again.  I did want to clarify some
21   things.  You said at Hill that you were put in investigative
22   segregation.  What was that for?
23        A.  For complaining that my cellie had threatened me
24   and writing grievances.
```

```
 1        Q.   Did you refuse housing?  Is that what they wrote
 2   you up for?
 3        A.   No.
 4        Q.   Okay.
 5        A.   I wasn't written up.  I wasn't given a ticket.
 6        Q.   So you were just placed in investigation?
 7        A.   Yes.
 8        Q.   Do you know what it means to refuse housing?
 9        A.   Yes, I do.
10        Q.   What does that mean?
11        A.   It means that you are committing an IDOC
12   disciplinary infraction where you are refusing to lock up.
13        Q.   You're refusing to lock up or you're refusing to
14   stay in a particular cell you have been assigned?
15        A.   You are refusing to lock up.  Technically you are
16   refusing to lock up because by refusing housing, you are
17   refusing a direct order to lock, to be locked up.
18        Q.   Okay.  What happens when you do this?
19        A.   You are taken to seg and given a disciplinary
20   ticket and punished.
21        Q.   Are you certain that there is -- have you ever done
22   that before?
23        A.   No, I haven't.
24        Q.   So you did not ever refuse to lock up with
```

                                                                100

```
 1   Mr. Durham when you were at Western; is that correct?
 2        A.   No, I did not.
 3        Q.   You mentioned when Ms. Powell was asking about the
 4   difference between ADA cells and the regular cells, and you
 5   said that the corners and things of the bunks are sharp in
 6   the regular cells; is that right?
 7        A.   Yes.
 8        Q.   And you said that you were injured?
 9        A.   Yes.
10        Q.   Did you seek medical care for those injuries?
11        A.   Yes, I did.
12        Q.   Do you remember how many times you did that?
13        A.   Approximately -- I reported it approximately
14   three.  And they finally allowed me to see Dr. Mathis who
15   recorded my injuries.
16        Q.   Where was that at?  Pinckneyville or Western?
17        A.   In Pinckneyville.
18        Q.   And how soon after you were seen by Dr. Mathis,
19   sorry, did you get in the ADA cell?
20        A.   Six months.
21        Q.   Six months later?  Did you have any other injuries
22   between the time that you saw Dr. Mathis and you got into an
23   ADA cell?
24        A.   Yes, I did.
```

1  Q. And did you go see the physician for those?
2  A. No.
3  Q. You said that, and correct me if I am misstating
4  what you said earlier, you said you told Deb Fuqua and
5  Assistant Warden Funk that you didn't want to be medically
6  unassigned; is that right?
7  A. No. I asked who had made me medically unassigned
8  and that it was preventing me from getting into the early
9  release program. And I wanted to be in the early release
10 program.
11 Q. Is that what you then asked Fuqua and Funk?
12 A. Right.
13 Q. What did they tell you?
14 A. They said that Dr. Lochard or rather Dr. Lochard
15 did, and I never saw Dr. Lochard. And I asked to be taken
16 off the list, would they take me off.
17 Q. You also talked about, and I think this was also in
18 relation to Judith Wilson, about not being able to draw
19 curtains and not being able to have your light off. Is that
20 fair?
21 A. Yes.
22 Q. Now, are you allowed to have coverings over your
23 cell here at Pinckneyvile?
24 A. No.

```
 1        Q.  Is that generally something that would cause you to
 2   have discipline?
 3        A.  Yes.
 4        Q.  Do you know why that is?
 5        A.  Because it would obstruct the view; it would
 6   obstruct an officer's view.
 7        Q.  And are you allowed to manipulate the lights
 8   yourself here at Pinckneyville?
 9        A.  Yes.
10        Q.  So you have a light in your cell?
11        A.  Yes.
12        Q.  You can turn it on and off?
13        A.  Yes.
14        Q.  Are there lights in the hallway that are on all of
15   the time?
16        A.  Yes.
17        Q.  Are you allowed to manipulate those lights?
18        A.  No.
19        Q.  So those are handled by the officers?
20        A.  All lights are handled by the officers.
21        Q.  Was it the same way at Western?
22        A.  Yes.
23        Q.  And the lights you were complaining about, were
24   they the ones in the hallway or in your cell?
```

103

```
 1        A.  Over my head, the ones over my head in the
 2   infirmary.
 3        Q.  In the infirmary?
 4        A.  Yes.
 5        Q.  When you were in your gen pop at Western, were you
 6   able to manipulate the lights in your cell?
 7        A.  Yes.
 8        Q.  So this was just an infirmary thing that had the
 9   lights?
10        A.  Yes.
11        Q.  And did -- I am sorry.  Did they ever turn those
12   off for you in your cell in the infirmary?
13        A.  After I complained about it and wrote grievances
14   about it.
15        Q.  Did they leave lights on over the other guys' beds
16   in the infirmary that were with you?
17        A.  Yes.
18        Q.  The one thing we didn't really talk about much
19   before is when you had to give a urine sample for drug
20   testing?
21        A.  Yes.
22        Q.  You understand that is also a part of your amended
23   complaint; is that correct?
24        A.  Yes.
```

104

1   Q.  So this isn't something that your attorney's came
2   up with that you don't know about yet?
3   A.  Yes.
4   Q.  What happened regarding that incident?
5   A.  I was in the infirmary.  Lieutenant Law came and
6   got me and asked me to give a urine sample.  I urinated
7   twice.  The first time I urinated they wrote me a ticket for
8   damaging the misuse of state property because I didn't give
9   enough urine.  The second time I urinated they said it
10  wasn't enough.  And they took me and locked me in seg for
11  drugs and drugs paraphernalia.
12  Q.  Have you ever had any sort of problem like that
13  before during your incarceration at the Department of
14  Corrections?
15  A.  Define problem.
16  Q.  Getting a ticket for drug or drug paraphernalia?
17  A.  Yes, I have.
18  Q.  Where was that?
19  A.  Dixon and Stateville.
20  Q.  At Dixon was it -- what happened with regard to
21  that?
22  A.  I received six months seg.
23  Q.  Was that a ticket because you couldn't provide
24  enough urine as well or did you have drugs found?

1    A. I had drugs found.

2    Q. What about at Stateville?

3    A. I was caught with drugs.

4    Q. You were caught with drugs?

5    A. Yes.

6    Q. So the only time that you were actually written up for not being able to give enough of a sample was at Western? Is that fair?

9    A. Yes.

10    Q. Okay. And how long of a process is that? Getting the drug samples? I am sorry. Urine samples?

12    A. They say two hours.

13    Q. Now, during these two hours are you given anything to drink?

15    A. Yes.

16    Q. And your complaint, if I understand the amended complaint, is that nobody asked you if you were on any medications prior to taking the drug sample?

19    A. No.

20    Q. Or the urine sample? I am sorry?

21    A. No.

22    Q. That's true? No one asked you?

23    A. No one asked me.

24    Q. Do you know if anybody checked about your

106

```
 1   medication prior to being found guilty of the ticket?
 2        A.  I don't know if it was prior to or after, but
 3   Deborah Fuqua, gave the rationale for the guilty, to finding
 4   me guilty.
 5        Q.  So she said that the drugs that you were taking
 6   wouldn't have affected that?
 7        A.  Yes.
 8        Q.  And you were on a diuretic at the time; is that
 9   right?
10        A.  Yes.
11        Q.  Now, you are a certified law clerk, right?
12        A.  Yes.
13        Q.  And you also in your first complaint, not the one
14   that your lawyers worte, the one that you wrote, you asked
15   for injunctive relief from the Department of Corrections; is
16   that right?
17        A.  Yes.
18        Q.  So do you understand what injunctive relief is?
19        A.  Yes.
20        Q.  Okay.  So I am asking you, as we sit here now,
21   what injunctive relief do you want from the Department of
22   Corrections?
23        A.  Well, seeing that as long as I am in IDOC that
24   there is a possibility that the same defendants will become
```

a part of another lawsuit if this situation arises, I seek injunctive relief to stop any such behavior from occurring again.

Q. Okay. What kind of behavior do you want the Department of Corrections to stop?

A. Lack of medical care.

Q. So you want them to basically assure that you get medical care from here on out?

A. Proper medical care.

Q. And who determines the proper medical care under your understanding?

A. Well, a qualified doctor.

Q. Okay. So is there any other injunctive relief that you want from the Department of Corrections as you sit here today?

A. I would have to research it and find out what else would be available to me, but I couldn't say definitively everything that I would want or would be entitled to. I don't know.

Q. Do you want them to house you at a certain place as you sit here today?

A. To house me at a certain place?

Q. Yes, granted with the understanding you can't be released?

```
 1        MR. LONDRIGAN:  Kelly, he is going to be released
 2   supposedly this fall.
 3        MS. CHOATE:  I have the right to find out what he is
 4   wanting from my clients so I can --
 5        MR. LONDRIGAN:  Well, so do I.  So do I.  I have a
 6   right to counsel with him about what I have learned over the
 7   past few months about what he might want to consider by way
 8   of injunctive relief.  Now, with that context, essentially a
 9   vacuum, you can go ahead and ask him all of the legal
10   questions you want, but it's certainly not binding and it
11   certainly has nothing to do with factual information or the
12   information that's been gleaned from clients we have been
13   able to depose so far.
14        Q.  Without -- Mr. McCroy, without saying anything that
15   you and your attorney have spoken about, I don't want to
16   know any of that, have you spoken with your attorney since
17   the second amended complaint was filed over a year ago?
18        A.  Yes.
19        Q.  And when is the most recent time you have spoken
20   with your attorney without saying anything you have
21   discussed?
22        A.  Today.
23        Q.  Now, we are talking about -- so the Department of
24   Corrections, you want to insure proper medical care?
```