**E-FILED**
Friday, 04 May, 2007  02:15:43 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| AARON MCCROY, #N-51882, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No.  02-3171 |
| | ) | |
| ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS' STATEMENT OF
### MATERIAL FACTS CLAIMED TO BE UNDISPUTED

NOW COME the Defendants, ILLINOIS DEPARTMENT OF CORRECTIONS (IDOC), JULIUS FLAGG, SANDRA FUNK, DEBRAH K. FUQUA, DENNIS HOCKADAY, BYRON LAW, ROGER E. WALKER, JR., and KEVIN WINTERS, by and through their attorney, Lisa Madigan, Attorney General of the State of Illinois, and pursuant to local rule 7.1(D),  Fed. R. Civ. P. 56(b), hereby submit their Statement of Material Facts Claimed to be Undisputed as follows:

**FACTS CLAIMED TO BE UNDISPUTED REGARDING DELIBERATE INDIFFERENCE TO PLAINTIFF'S SERIOUS MEDICAL NEEDS**

1.      Plaintiff has received abundant medical care for his Keratoconus, including corneal transplant (see medical records generally as previously submitted to the Court and facts as set forth by Co-Defendant's Motions for Summary Judgment).

1

**FACTS CLAIMED TO BE UNDISPUTED REGARDING IDOC DEFENDANTS' PERSONAL INVOLVEMENT WITH PLAINTIFF'S MEDICAL CARE**

**Dennis Hockaday**

2.    Plaintiff sued Defendant Hockaday for deliberate indifference because he delegated his responsibility to the Assistant Wardens (Plaintiff's Interrogatories).

3.    Plaintiff sued Defendant Hockaday because he ignored every complaint Plaintiff brought to his attention (See doc 372, Exh. 5 - Plaintiff's Dep., p. 112, l. 8 - 11).

4.    Plaintiff notified Defendant Hockaday of his complaints through grievances (See doc 372, Exh. 5 - Plaintiff's Dep., p. 112, l. 12 - 15).

5.    Plaintiff believes his grievances were not handled correctly because they were denied (See doc 372, Exh. 5 - Plaintiff's Dep., p. 112, l. 19 - 23).

6.    Plaintiff received responses to his grievances he alleges he sent to Defendant Hockaday (See doc 372, Exh. 5 - Plaintiff's Dep., p. 112, l. 24  - p. 113, l. 3).

7.    Defendant Hockaday was Warden of Western Illinois Correctional Center from June, 2001 until September, 2002, at which time he retired (Hockaday Dep., generally).

8.    Because of the volume of grievances, Defendant Hockaday delegated the reviewing of inmate grievances to his Assistant Warden of Programs (Hockaday Dep., p. 25, l. 2 & p. 27, l. 18 - 20).

9.    Defendant Hockaday trusted his Assistant Wardens fully to review grievances (Hockaday Dep., p. 112, l. 4 - 6).

10.    Just because an inmate designates a grievance as an emergency, does not make it an emergency grievance (Hockaday Dep., p. 44, l. 14 - 16).

11.    A warden would not make a decision about an outside treating physician (Hockaday Dep., p. 58, l. 13 - 24).

12.    If an inmate believed he was at risk, and feared for his safety, he could refuse housing and would be removed from the situation (Hockaday Dep., p. 104, l. 17 - p. 105, l. 4).

13.    Security placement in the infirmary could be for various reasons, such as a death in the family to give the inmate a place to gather his thoughts (Hockaday Dep., p. 109, l. 3 - 16).

14.    "Medically unassigned" means the inmate cannot have a work assignment (Hockaday Dep., p. 110, l. 6 - 11).

15.    Defendant Hockaday had no authority to determine what medical treatment a person would get (Hockaday Dep., p. 112, l. 21 - p. 113, l. 1).

16.    Defendant Hockaday could not determine where an inmate went on a medical writ or whether an inmate needed or could get a corneal transplant (Hockaday Dep., p. 113, l. 2 - 11).

17.    Defendant Hockaday relied on medical personnel to determine if an inmate got a corneal transplant (Hockaday Dep., p. 113, l. 12 - 14).

**Deborah Fuqua**

18.    Plaintiff's complaints about Deb Fuqua are that "as health care administrator, it was her job to act as a liaison or arbitrator between Wexford and IDOC inmates, and she did not do that (See doc 372, Exh. 5 - Plaintiff's Dep., p. 116, l. 6 - l. 10).

19.    Plaintiff also complains that Deb Fuqua allowed the switching of the medication, the harmful medication, the contact cleaners (See doc 372, Exh. 5 - Plaintiff's Dep., p. 116, l. 13 - 16).

20.    Plaintiff also complains that Deb Fuqua took his contacts when he first came to Western without any doctor's evaluation, and would not return them until he had everyone call to get them back (See doc 372, Exh. 5 - Plaintiff's Dep., p. 116, l. 16 - 20).

21.    Plaintiff complains that he told Defendant Fuqua that he needed the refit for his contact lenses, but she ignored it (See doc 372, Exh. 5 - Plaintiff's Dep., p. 116, l. 20 - 23).

22.    Plaintiff alleges Defendant Fuqua did not refuse to talk to him about his complaints, but refused to correct the problems he brought to her attention (See doc 372, Exh. 5 - Plaintiff's Dep., p. 117, l. 3 - 5).

23.    Plaintiff alleges Defendant Fuqua did not allow him to do the same things the other inmates could do, such as go to the store, to go to the yard, to use the phone, and to do other things (See doc 372, Exh. 5 - Plaintiff's Dep., p. 117, l. 8 - 14).

24.    Plaintiff admits he was not disallowed to do these things the entire time he was in the infirmary (See doc 372, Exh. 5 - Plaintiff's Dep., p. 117, l. 17 - 19).

25.    Plaintiff admits he was allowed to go to the yard and to the law library (See doc 372, Exh. 5 - Plaintiff's Dep., p. 117, l. 20 - 24).

26.    Plaintiff admits he could use the phone while in the infirmary (See doc 372, Exh. 5 - Plaintiff's Dep., p. 118, l. 4 - 10).

27.     Plaintiff was in segregation during some of the time he was in the infirmary and could not use the phone at that time (See doc 372, Exh. 5 - Plaintiff's Dep., p. 117, l. 20 - p. 118, l. 3).

28.     Plaintiff does not know for sure that Defendant Fuqua personally stopped him from doing the things he wanted to do in the infirmary (See doc 372, Exh. 5 - Plaintiff's Dep., p. 118, l. 11 - 14).

29.     Plaintiff believes that because Defendant Fuqua was the Health Care Unit administrator, his issues about activities and privileges should have been taken care of (See doc 372, Exh. 5 - Plaintiff's Dep., p. 118, l. 15 - 23).

30.     Defendant Fuqua was contacted by Terri Anderson of the Administrative Review Board on July 23, 2002 regarding Plaintiff's grievance about medical treatment for his eye (Exhibit 6 to Elyea's Deposition).

31.     In a July 25, 2002 response to the request from Terri Anderson, Defendant Fuqua reviewed the medical file with Dr. Sims, found that the corneal transplant was recommended but denied by Wexford.  She reported to Terri Anderson that Dr. Elyea said they had to do it.  Terri Anderson reported she asked Dr. Sims to get the paper work done that same day to resubmit the corneal transplant recommendation to Wexford for approval (Exhibit 6 to Elyea's Deposition).

32.     On August 16, 2002, Defendant Fuqua responded to a request from Cindy Hobrock about Plaintiff's transplant approval and stated that they were still waiting on the decision (Exhibit 6 to Elyea's Deposition).

33.     In a August 19, 2002 e-mail, Defendant Fuqua responded to Cindy Hobrock that they had received Dr. Elyea's letter to the vendors saying the vendors were responsible for corneal transplants the Friday before (Exhibit 6 to Elyea's Deposition).

34.     On August 19, 2002, Defendant Fuqua reported to Cindy Hobrock that she had asked Dr. Sims to again resubmit the request for the transplant (Exhibit 6 to Elyea's Deposition).

35.     On Wednesday, August 21, 2002, Defendant Fuqua reported to Cindy Hobrock and Dr. Elyea that they resubmitted the request to Wexford on August 19, 2002 after receiving Dr. Elyea's memo, but that the request had come back denied by Dr. Rowe. Defendant Fuqua reported that she faxed the denial to Cindy and Dr. Elyea (Exhibit 6 to Elyea's Deposition).

36.     In an e-mail message from Dr. Elyea to Defendant Fuqua, Elyea wrote that the treatment for Keratoconus is contact lenses unless the cornea is thinning rapidly.  He said the plaintiff may receive a substantial trial of contacts prior to surgery, because if the corneal graft fails, he may have worse vision than now (Exhibit 6 to Elyea's Deposition).

37.     The Health Care Unit Administrator cannot determine what medical restrictions should be placed on a person and are not involved in direct patient care as part of their duties (Elyea Dep., pp. 56 and 57).

38.     The Health Care Unit Administrator does not have the authority to admit or discharge anyone from the infirmary (Elyea Dep., p. 56, l. 9 - 16).

39.     Defendant Fuqua did not have the authority to discharge someone medically from the infirmary (Brown Dep., p. 67, l. 22 - p. 68, l. 6).

6

40.    Defendant Fuqua does not have anything to do with the placement process, but explained to Dr. Brown sometime around December of 2006 how the placement did, or should work (Brown Dep., pp. 53 - 54).

41.    Karen Wear (counselor) received a response from Defendant Fuqua to the grievance received by Karen Wear on 11/30/04 (Wear Deposition).

42.    The original grievance response it returned to the offender, but the written response from the Health Care Unit are not normally maintained (Wear Deposition).

**Roger Walker**

43.    Plaintiff sued Defendant Walker in his official capacity for ignoring Plaintiff's health concerns in his grievances (Plaintiff's Interrogatories).

44.    Plaintiff sued Defendant Walker because he took the place of Donald Snyder (See doc 372, Exh. 5 - Plaintiff's Dep., p. 119, l. 9 - 11).

45.    Plaintiff's complaints against Defendant Walker are essentially the same as against Donald Snyder (See doc 372, Exh. 5 - Plaintiff's Dep., p. 119, l. 12 - 14).

46.    Plaintiff sued Don Snyder because he is the director and is responsible for those he supervises (See doc 372, Exh. 5 - Plaintiff's Dep., p. 110, l. 14 - 18).

**Kevin Winters**

47.    Plaintiff sued Defendant Winters for deliberate indifference because he routinely and repeatedly denied Plaintiff's grievances about his eye problem (Plaintiff's Interrogatories).

48.    Plaintiff's complaints against Defendant Winters are that his grievances were denied (See doc 372, Exh. 5 - Plaintiff's Dep., p. 15 - 23).

49.     Plaintiff does not have any other complaints except that as Chief Administrative Officer, his job is to answer grievances as being the administrator (See doc 372, Exh. 5 - Plaintiff's Dep., p. 119, l. 24 - p. 120, l. 3).

50.     Plaintiff admits he received responses to the grievances he filed while Winters was the Warden (See doc 372, Exh. 5 - Plaintiff's Dep., p. 120, l. 4 - 11).

51.     Defendant Winters was employed from 2000 to December, 2002 as Assistant Warden of Operations at Western Illinois Correctional Center, and from December 2002 until October, 2004 as Warden of Western Illinois Correctional Center (Winters Affidavit).

52.     Defendant Winters is no longer employed by the Department of Corrections (Winters Affidavit).

53.     The grievance officer is the fact finder for the grievance (Winters Affidavit).

54.     In the case of a medical grievance, the grievance officer would likely contact the Health Care Unit to find out if the offender has medical issues that are not known to medical personnel (Winters Affidavit).

55.     The grievance officer then writes a report on the grievance form and forwards the form to the Chief Administrative Officer (CAO) or someone acting in his or stead (Winters Affidavit).

56.     The CAO of a correctional institution is the Warden (Winters Affidavit).

57.     The CAO or designee will then review the grievance and the responses and will determine if he or she agrees with the disposition recommended by the grievance officer and then returns the grievance to the offender who may appeal an unfavorable ruling to the Administrative Review Board in Springfield (Winters Affidavit).

58.    If a grievance is marked by the offender as "emergency" the grievance is sent directly to the CAO for him or his designee to review prior to any investigation by the grievance officer (Winters Affidavit).

59.    The CAO or designee will look at the nature of the grievance and determine if it is truly of an emergency nature, and will expedite a response to the grievance (Winters Affidavit).

60.    If the CAO or his designee determines the grievance is not of an emergency nature, he will return it to the inmate for processing through regular channels (Winters Affidavit).

61.    Winters had little or no involvement in the grievance process when he was Assistant Warden of Operations at Western Illinois Correctional Center, but occasionally might review grievances when he was the duty warden (Winters Affidavit).

62.    The duty to review grievances was primarily delegated to the Assistant Warden of Programs (Winters Affidavit).

63.    When he was Warden, because of the vast number of responsibilities of that office, Defendant Winters delegated the review of offender grievances to his Assistant Warden of Programs (Winters Affidavit).

64.    Winters had full faith in the people he delegated the duty to (Winters Affidavit).

65.    If a grievance is about a medical issue, there is only so much the CAO or his designee can do (Winters Affidavit).

66.    The CAO can only determine that the offender's medical issues are being addressed by health care personnel (Winters Affidavit).

9

67.     This is true even if the offender is not satisfied with his medical care, because neither Winters nor his Assistant Wardens were medically trained or able to make any decision on the care being provided (Winters Affidavit).

68.     The CAO cannot direct the medical care of the offender, nor can he or she change the course of the treatment provided to an offender (Winters Affidavit).

69.     The CAO cannot choose outside physicians or determine when an offender would have an appointment with that physician (Winters Affidavit).

70.     Those decisions and arrangements that have to be made through the medical staff (Winters Affidavit).

**Furloughs**

71.     Security considerations are taken into account when it comes to furloughs for outside medical care (Winters Affidavit).

72.     For example, offenders are generally not informed when they have a furlough for medical care (Winters Affidavit).

73.     This is because the offender will be taken to a non-secure facility, and if he has advance notice, he could contact outside persons to effect an escape.  All offenders are subject to this rule (Winters Affidavit).

74.     Because of staffing considerations, offenders might not be given a great deal of time to prepare for a furlough, and/or a furlough might be postponed due to weather related issues or security issues such as a facility lock down (Winters Affidavit).

75.     Defendant Winters granted emergency status on June 9, 2004 to a grievance dated June 7, 2004.  A copy of that grievance is attached to this Affidavit (Winters Affidavit and attachment).

10

76.    Defendant Winters' designee finalized the grievance (Winters Affidavit).

77.    Defendant Winters denied emergency status on June 28, 2004, to another grievance dated June 24, 2002 (Winters Affidavit and attachment).

78.    In that grievance, McCroy complained of his medical care, a medication error, and that the health care staff was deliberately indifferent to his serious medical needs (Winters Affidavit).

79.    In that grievance, he noted he had gone to see another Ophthalmologist, and was told by a nurse that the pharmacy could not reorder one of his medications until the end of June. The relief requested was to be given the names of individuals who denied him the medication, to be given the medication, to be sent out for another examination as soon as possible and to be compensated (Winters Affidavit).

80.    Defendant Winters did not believe that grievance to be of an emergency nature, and determined it could be resolved through regular channels (Winters Affidavit).

81.    Defendant Winters does not believe he reviewed any other of McCroy's grievances (Winters Affidavit).

**Sandra Funk**

82.    Plaintiff sued Defendant Funk for deliberate indifference because she denied Plaintiff's grievances about his eye problems while acting as Winter's designee (Plaintiff's Interrogatories).

83.    She is also sued because she was aware of a clear and present danger to Plaintiff's vision, and knew recommendations of treating ophthalmologist that Plaintiff should not be in general population (Plaintiff's Interrogatories)

84.    Plaintiff communicated on numerous occasions with Defendant Funk while she was Assistant Warden (See doc 372, Exh. 5 - Plaintiff's Dep., p. 123, l. 8 - 16).

85.    Plaintiff alleges Defendant Funk would tell him she would resolve his problems but did not (See doc 372, Exh. 5 - Plaintiff's Dep., p. 123, l. 17 - 20).

86.    Plaintiff admits that Defendant Funk initially gave him permission to set his television away from the window, but then he was taken to segregation because he did not have a permit (See doc 372, Exh. 5 - Plaintiff's Dep., p. 123, l. 17 - p. 124, l. 7).

87.    Other than the issues already listed, Plaintiff does not know the extent of her involvement in any other complaints (See doc 372, Exh. 5 - Plaintiff's Dep., p. 125, l. 11 - 14).

88.    Sandy Funk is currently employed by the Illinois Department of Corrections as Assistant Manager of the Transfer Coordinator's Office, and has been so employed since March, 2005 (Funk Affidavit).

89.    Sandy Funk was Assistant Warden of Programs at Western Illinois Correctional Center in August, 2002 (Funk Affidavit).

90.    While Assistant Warden of Programs (AW/P), Ms. Funk held a supervisory position over the program areas at Western Illinois Correctional Center which included the Health Care Unit, education, vocational units, the Record Office, and Clinical Services (Funk Affidavit).

91.    Sandy Funk is not licensed to deal with the medical aspects of the Health Care Unit (Funk Dep., p. 21, l. 13 - 17).

**Funk and Grievances**

92.    Sandy Funk acted as the Warden's designee for the purpose of reviewing offender's grievances (Funk Affidavit).

93.    This included determining if a grievance marked "emergency" by an offender truly contained a request or information of an emergency nature (Funk Affidavit).

94.    Often offenders would designate grievances as "emergency" in hopes of expediting the resolution of their grievance, even though the nature of the grievance was one that could be resolved through regular channels (Funk Affidavit).

95.    The regular grievance process entailed the offender writing the grievance and turning it into his counselor.  The counselor would take care o the issue if it was one that could be easily resolved (Funk and Winters Affidavits).

96.    If the counselor was unable to resolve the grievance, either because it was beyond the scope of his duties or because there could be no resolution to the grievance, it would either be forwarded back to the offender for him to decide if he wanted to continue to grieve the issue, or on to the grievance officer for investigation and recommendation (Funk and Winters Affidavits).

97.    Grievances of a medical nature usually involved obtaining information from someone in the Health Care Unit.  Once the information was obtained, the grievance officer's recommendation to the warden or his designee for review (Funk Affidavit).

98.    The warden or his designee could either concur with the recommendation or not concur with the recommendation (Funk Affidavit).

99.    The warden or his designee could also refer the issue back to the Health Care Unit for further information, if the information given was not adequate to make a decision (Funk Affidavit).

100.    Sandy Funk is not licensed or trained as a physician, and cannot determine what care or treatment an offender should receive for a particular ailment (Funk Affidavit).

101.    Sandy Funk relied on the medical personnel in place at the facility to provide medical care (Funk Affidavit).

102.    Funk could not, as a result of the grievance process, grant an offender relief that would be contrary to the medical determination already made by the physicians caring for that offender (Funk Affidavit).

103.    Sandy Funk never based her decisions regarding any offender's grievance on her personal feelings about an offender (Funk Affidavit).

104.    Funk never denied a grievance or otherwise mistreated an offender because he used the grievance process (Funk Affidavit).

105.    Sandy Funk was not apprised by anyone with medical knowledge about the specifics of McCroy's medical condition, other than that which was included in grievances she reviewed (Funk Affidavit).

106.    Funk was not informed McCroy was in any particular danger because of his medical condition, and did not know of any recommendations by an outside physician that Mr. McCroy not be housed in general population (Funk Affidavit).

107.    An offender's medical restrictions are determined by medical personnel within the institution, and to her knowledge no medical doctor at Western Illinois Correctional

14

Center recommended Mr. McCroy not be housed in general population in June of 2004 (Funk Affidavit).

108.    To Funk's knowledge, McCroy was continually under the care of physicians for his medical concerns, and was not precluded from participating in any activities he was medically and physically able to perform (Funk Affidavit).

109.    During her tenure at Western Illinois Correctional Center, Funk did not see any Illinois Department of Corrections' or Wexford employee mistreat, discriminate against, or retaliate against Aaron McCroy (Funk Affidavit).

**Dr. Elyea**

110.    Dr. Elyea was Agency Medical Director for the Illinois Department of Corrections, and had previously done an ophthalmology residency (Elyea Dep. generally).

111.    Dr. Elyea sent a memo on 8/12/02 to all vendors regarding corneal transplants explaining that corneal transplants were not organ transplants (Elyea Dep., p. 20 - 21).

112.    The cost of corneal transplants was not discussed at the quarterly review meetings (Elyea Dep., p. 20, l. 21 - p. 21, l. 6).

113.    The decision about what Ophthalmologist Plaintiff would be sent to would be made by Wexford (Elyea Dep., p. 37, l. 21 - 23).

114.    Keractoconus can be treated with contact lenses for a varying degree of time as long as the cornea is not thinning rapidly.  You can treat Keractoconus for years with contact lenses (Elyea Dep., p. 41, l. 17 - 24).

**Dr. Brown**

115.    The Warden and other non-medical people would have no role in the gate keeping process, which was determining what outside tests or treatment might be approved

15

for an inmate.  That decision, during Dr. Brown's tenure, was between him and another doctor (Brown Dep., p. 8, l. 1 - p. 9, l. 7 & p. 70, l. 20 - p. 71, l. 10).

**Nurse Practitioner Rhonda Mills**

116.    Rhonda Mills is a nurse practitioner (Mills Dep. generally).

117.    Mills did not take direction on medical issues from employees of the department who were in security, even though they do keep security in mind (Mills Dep., p. 19 & 20).

**Bryon Law**

118.    Security staff does not have anything to do with actual health care of inmate other than providing security in the Health Care Unit and providing basic first aid in the cell house (Law Dep., p. 8, l. 12 - 23).

**FACTS CLAIMED TO BE UNDISPUTED REGARDING THE FAILURE TO PROTECT, REGARDING PLAINTIFF'S TRANSFER FROM THE INFIRMARY TO GENERAL POPULATION AND FAILURE TO ALLOW A CELL CHANGE**

119.    Plaintiff was given an eye shield to wear up to and including September 23, 2004 (See doc 372, Exh. 5 - Plaintiff's Dep., p. 14).

120.    Plaintiff states he wore the shield at night to protect his eye at night because he could inadvertently rip the transplant out during his sleep (See doc 372, Exh. 5 - Plaintiff's Dep., p. 14).

121.    Plaintiff was not immediately housed with Durham after being released from the infirmary (See doc 372, Exh. 5 - Plaintiff's Dep., p. 94).

122.    He was housed with other inmates with whom he did not have any problems (See doc 372, Exh. 5 - Plaintiff's Dep., p. 94).

16

123.    Plaintiff was placed in investigative status at Hill Correctional Center for complaining that his cell mate threatened him and for writing grievances (See doc 372, Exh. 5 - Plaintiff's Dep., p. 99).

124.    Plaintiff never received a ticket as a result of the investigation at Hill (See doc 372, Exh. 5 - Plaintiff's Dep., p. 100).

125.    Plaintiff knows when he refuses housing he would be taken to segregation and given a disciplinary ticket (See doc 372, Exh. 5 - Plaintiff's Dep., p. 100).

**Winters and Funk**

126.    Placement of offenders at Western Illinois Correctional Center was done by assignment (Funk and Winters Affidavits).

127.    Offenders who were assigned to jobs or other programs were generally housed together for ease of movement and security considerations (Funk Affidavit).

128.    Offenders who were unassigned, for medical or any other reason, were also housed together (Funk and Winters Affidavits).

129.    Consideration in placement was given to offenders with a designation of "vulnerable" or "predator." (Funk Affidavit).

130.    The designation was one that would generally follow the offender from institution to institution for purpose of alerting staff as to appropriate placement (Funk Affidavit).

131.    An offender who had a medical condition would not necessarily receive a "vulnerable" designation, especially since the counseling and placement staff would not necessarily know what medical conditions offenders suffered from (Funk Affidavit).

17

132.    Any special consideration for an offender's medical concerns would be ordered by the medical personnel.  This might include low bunk/low gallery permits, permits for wheelchair or walking aids, and permits for assistants, etc. (Funk Affidavit).

133.    Special medical consideration could also include an order or request that the person be single celled for medical reasons (Funk Affidavit).

134.    An offender would not be classified as "predator" simply because he had been in physical altercations during his incarceration (Funk Affidavit).

135.    In most cases, the designation of "predator" and vulnerable" was made according to the sexual assault prevention codes (Funk Affidavit).

136.    Consideration in placement was also given to inmates who were members of security threat groups, most commonly known as gangs (Funk Affidavit).

137.    It would compromise the security of the offenders and the institution if too many of one security threat group was housed together, or if members of rival groups were housed closely together (Funk Affidavit).

138.    Additional consideration was also given to offenders who have either listed other inmates as enemies or who have been listed by other inmates as enemies (Funk Affidavit).

139.    Generally, enemies are not housed at the same institution, and that determination is made by the Transfer Coordinator's Office in Springfield (Funk Affidavit).

140.    Vulnerable and predator information, and information about security threat groups are available on the Offender Tracking System (OTS), and would be available to the placement officer (Funk Affidavit).

18

141.   However, medical information is not available on OTS, and would not generally be available to non-medical personnel (Funk Affidavit).

142.   Offender disciplinary histories were generally not part of the determination when placing offenders in general population, as all of the offenders housed at a particular institution such as Western Illinois Correctional Center were deemed appropriate for placement anywhere in general population at the institution (Funk Affidavit).

143.   If an offender was considered to be of great threat to himself or other offenders, he would most likely be in segregation for an extended period or would be transferred to a higher security institution (Funk Affidavit).

144.   During segregation placement, a determination is made to whether an offender can be double celled, but such determination is not considered necessary in general population (Funk Affidavit).

145.   Offenders who have trouble with their cell mates can talk to the security staff on the housing unit, to health care staff, or their counselors (Funk Affidavit).

146.   Sometimes an issue can be resolved between cell mates informally (Funk Affidavit).

147.   While it is possible for an offender to request a cell change because he does not like his cell mate, it is not necessarily given (Funk Affidavit).

148.   If an offender does not feel he is safe with his cell mate, he can refuse the housing assignment.  When he does that, he is immediately taken away from his cell mate and to segregation (Funk Affidavit).

149.   As a result of the housing refusal, the offender is written a disciplinary ticket, and the situation with the cell mate is investigated (Funk Affidavit).

150.    If there is found to be substance to the offender's fears, and he is not refusing housing for some other purpose, he will most likely be found not guilty of the disciplinary ticket and released from segregation to another cell (Funk Affidavit).

151.    Sandy Funk did not participate in the drug test or subsequent discipline that resulted in Mr. MrCroy's transfer to Menard Correctional Center (Funk Affidavit).

152.    While the warden has the ability to have an offender housed in the Health Care Unit, he cannot admit or discharge offenders to the infirmary for medical reasons (Winters Affidavit).

153.    He can have an offender housed in the Health Care Unit for non-medical reasons such as bed space issues, such as the institution at large being full while there are open infirmary beds (Winters Affidavit).

154.    Another time the warden might use the Health Care Unit bed is if segregation was full and an offender needed to be in some type of crisis watch (Winters Affidavit).

155.    While it is possible that Defendant Winters might have had Plaintiff remain in the Health Care Unit after his medical discharge from the infirmary, Defendant Winters does not remember having him so housed (Winters Affidavit).

156.    Defendant Winters was not involved in the determination of whether McCroy was placed in general population or whether he had any restrictions (Winters Affidavit).

157.    Any restrictions after discharge from the infirmary, or generally for medical reasons, are determined by the physicians who are in a position to evaluate that person and decide what restrictions are necessary (Winters Affidavit).

158.    Defendant Winters did not have any involvement in choosing who Aaron McCroy's cell mate would be in general population (Winters Affidavit).

159.   When an offender is discharged from the infirmary, the Health Care Unit notifies the placement office, and the officer in the placement office then places the inmate in the appropriate housing unit (Winters Affidavit).

160.   Offenders are placed in segregation at Western Illinois Correctional Center for a variety of disciplinary reasons, as well as investigative reasons.  For example, if an inmate is suspected by Internal Affairs of being involved in gang activity, he might be placed in segregation during the investigation to separate him from other inmates who might influence the investigation (Winters Affidavit).

161.   An offender who fears for his safety from his cell mate or others in the vicinity can refuse housing (Winters Affidavit).

162.   If an offender refuses housing, he is written a disciplinary ticket and is removed from the situation and taken to segregation.  The disciplinary ticket is investigated, and if there is found to be credence to the offender's fears, the offender will most likely be found not guilty of the offense and will be released from segregation to another cell (Winters Affidavit).

163.   Offenders are not allowed to change cell mates at will due to security and administrative considerations (Winters Affidavit).

164.   Offenders may ask to change cell mates simply because they do not like their current cell mate, in which case, the staff would do little else than assist offenders in changing cells (Winters Affidavit).

165.   Sometimes offenders may ask to be housed with another offender in order to enter into a sexual relationship with that person or because he wants to harm the other offender (Winters Affidavit).

21

166.    Each of these instances compromises the safety and security of the institution (Winters Affidavit).

167.    The placement office has access to the Offender Tracking System or OTS, which contains information about whether an offender has been designated "vulnerable" or predator."  (Winters Affidavit).

168.    A "predator" designation would flag that inmate as sexually dangerous to other inmates who might be designated as "vulnerable."  (Winters Affidavit).

169.    A designation of "vulnerable" is not given to inmates based on a specific medical issue, rather it is a designation that is initiated by the clinical services staff that follows an inmate from institution to institution (Winters Affidavit).

170.    The designation of "vulnerable" most often refers to a person's stature, age, or traits about that offender that would cause him to be at general risk of sexual assault (Winters Affidavit).

171.    A person designated as "predator" has a past history or characteristics that make it more likely he would sexually assault another offender (Winters Affidavit).

172.    Whether an individual is a homosexual is not the determining factor (Winters Affidavit).

173.    A disciplinary history that includes fighting with another inmate, would not necessarily cause an inmate to be designated as a predator, unless other factors were also present (Winters Affidavit).

174.    OTS also has information about smoking preferences and whether an inmate has listed any enemies (Winters Affidavit).

175.    OTS does not generally contain detailed information about an offender's disciplinary history within an institution, but will note time adjustments that have been made and may list the discipline for which the good time was lost (Winters Affidavit).

176.    OTS also does not contain any detailed information about an offender's medical care other than information regarding restrictions such as low bunk/low gallery, and information about dietary restrictions (Winters Affidavit).

177.    When an offender is discharged from the infirmary and there are restrictions, that information is given to the placement office and is based on a medical order (Winters Affidavit).

**Dr. Brown**

178.    As Medical Director, Dr. Brown can give direction to other medical personnel at Western Illinois Correctional Center, and they are required to follow his direction (Brown Dep. generally, and at p. 15, l. 22 - p. 16, l. 5).

179.    When an inmate is discharged from the infirmary, the Medical Director or Nurse Practitioner would do a discharge summary (Brown Dep., p. 22, l. 8 - p. 23, l. 23).

180.    Dr. Brown made the decision to release Plaintiff to general population sometime before he was actually released (Brown Dep., p. 24, l. 14 - p. 25, l. 9).

181.    Dr. Brown believed there was no further reason to hold plaintiff in the infirmary (Brown Dep., p. 25, l. 3 - 7).

182.    Plaintiff seemed happy with the decision to be released to general population (Brown Dep., p. 25, l. 8 - 9 & p. 31, l. 6 - 12).

183.    Plaintiff went to the same Ophthalmologist in Springfield as Dr. Brown (Brown Dep., p. 26, l. 1 - 8).

184.    Dr. Brown knew about the previous treating Ophthalmologist's recommendation that McCroy not be placed in general population, but believed that Ophthalmologist was basing his recommendation on unrealistic expectations (Brown Dep., p. 28, l. 2 - 22).

185.    Dr. Brown referred Plaintiff to new Ophthalmologists in Springfield because he believed he needed a new opinion and because he preferred the new ophthalmologists (Brown Dep., p. 29, l. 3 - 9).

186.    The new ophthalmologists later withdrew from the case because their malpractice insurance coverage would not cover correctional inmates (Brown Dep., p. 29, l. 10 - 12).

187.    They've had problems searching for ophthalmologists because they don't seem to want to take care of prisoners (Brown Dep., p. 29, l. 13 - 17).

188.    The medical director or the MD to whom he had signed out could discharge from the infirmary.  The nurse practitioner's authority would be linked to whatever MD was covering the institution (Brown Dep., p. 40, l. 23 - p. 43, l. 22).

189.    Dr. Brown believed that placing Plaintiff in a single room or sheltering him as being impractical and overkill of the problem (Brown Dep., p. 45, l. 8 - 17).

190.    Dr. Brown does not know that anything specific about Plaintiff's medical condition was brought to the attention of the placement office (Brown Dep., p. 55, l. 22 - p. 56, l. 6).

191.    When Dr. Brown wrote a progress note on June 8, 2004, he did not place any restrictions on McCroy (Brown Dep., p. 66, l. 13 - 24).

24

192.    Dr. Brown did not believe there was any medical reason McCroy should not be around other inmates (Brown Dep., p. 67, l. 1 - 6).

**Lochard**

193.    The Medical Director would be the person who would sign Plaintiff out of the infirmary and into general population medically (See doc 372, Exh. 2 - Lochard Dep., p. 59, l. 8 - 19).

**Barb Bowers**

194.    When an inmate is discharged from the infirmary to general population, the placement office is not provided information about the health or risk of health of the inmate (Bowers Dep., p. 10. l. 21 - p. 11, l. 1).

195.    Plaintiff insisted on going to the yard while he was in the infirmary (Bowers Dep., p. 11, l. 15 - 20).

196.    There were a "whole bunch" of inmates in the yard (Bowers Dep., p. 11, l. 15 - 20).

**Rhonda Mills/Nurse Practitioner**

197.    Mills would not place someone in general population without making an independent medical determination (Mills Dep., p. 20).

198.    Mills has told the placement office before that an inmate should be in a single cell because he was at risk medically, and the placement office followed the recommendation (Mills Dep., p. 25).

199.    Mills could admit and discharge from the infirmary, but usually the doctor would make that decision and whether to deny privileges or access to medications (Mills Dep., p. 27 & 28).

200.    A request for a referral to an outside physician would come from the physician who would talk with the higher-ups in the vendor company (Mills Dep., p. 29).

201.    There have been fights in the infirmary while Mills was there (Mills Dep., p. 31).

202.    Inmates housed in general population can still be under the care of physicians for ongoing problems (Mills Dep., p. 43).

203.    Inmates housed in the infirmary are still subject to security measures (Mills Dep., p. 43).

204.    There are certain medical conditions, such as TB or to rule out other things, that would cause an inmate to not be placed in a cell with others (Mills Dep., p. 25).

**Connie Shaw**

205.    Connie Shaw was an LPN at Western Illinois Correctional Center (Shaw Dep., p. 5 - 6).

206.    Nurse Shaw discussed Dr. Anderson's 6/8/04 restrictions of no contact sports and no weight lifting over 5 pounds with Plaintiff (Shaw Dep., p. 29, l. 19 - p. 30, l. 7).

207.    Even though Plaintiff was repeatedly told he should not go to the gym or yard due to his eye, he insisted on going (Shaw Dep., p. 30, l. 8 - 14).

**Cindy Thompson**

208.    The Nurse Practitioner, Mills, discharged Plaintiff from the infirmary (Thompson Dep., p. 12, l. 8 - 12).

209.    A specific order from a doctor would have to be written to transmit information about an inmate's health care to the placement office (Thompson Dep.,p. 24, l. 6 - 15).

26

210.    If information is given to the placement office about a low bunk or low gallery, the reason for it is not given to the placement office (Thompson Dep., p. 25, l. 7 - 19).

211.    The only way the nurses would provide information to the placement office to avoid placing a person in a cell with a violent cell mate would be if there was a doctor's order (Thompson Dep., p. 29, l. 11 - 20).

212.    The reason the nurses don't provide medical information to the placement office is because of HIPPA laws (Thompson Dep., p. 33, l. 7 - 11).

213.    No one in Health Care would have a role in placing Plaintiff in a particular cell in general population (Thompson Dep., p. 33, l. 7 - 11).

214.    Plaintiff would read in his cell without asking anyone for assistance, and never needed assistance walking, dressing himself, or feeding himself (Thompson Dep., p. 35, l. 16 - p. 36, l. 1).

215.    Nurse Thompson saw Plaintiff go to the yard and library and never saw anyone assist him (Thompson Dep., p. 36, l. 2 - 8).

216.    Plaintiff never complained about being in a cell with three other inmates (in the infirmary)(Thompson Dep., p. 36, l. 19 - 22).

217.    Plaintiff told Nurse Thompson that he would like to be out in general population rather than in the infirmary because he felt like he was locked up (Thompson Dep., p. 37, l. 1 - 4).

**Kenneth Kellerman**

218.    Plaintiff is suing Defendant Kellerman because he said Plaintiff would have to refuse housing to get away from his cell mate (Plaintiff's Interrogatories).

219.    Plaintiff said that Defendant Kellerman told him about his cell mate's history the day before the fight (See doc 372, Exh. 5 - Plaintiff's Dep., p. 130, l. 9 - 30).

220.    Plaintiff alleges Defendant Kellerman told him to tell Defendant Law about his issues with his cell mate because Law had the power (See doc 372, Exh. 5 - Plaintiff's Dep., p. 131, l. 2 - 9).

221.    Plaintiff sued Defendant Kellerman because Kellerman ignored the imminent danger to his safety and did not protect him from his cell mate, Durham (See doc 372, Exh. 5 - Plaintiff's Dep., p. 131, l. 10 - 22).

222.    Defendant Kellerman was a Correctional Officer at Western from 1989 through August of 2006 (Kellerman Dep., p. 5 - p. 8).

223.    Defendant Kellerman does not know how cell mates are chosen at Western (Kellerman Dep., p. 8, l. 23 - p. 9, l. 2).

224.    When an inmate asks to be transferred for their own safety, protocol is for Kellerman to notify the zone lieutenant (Kellerman Dep., p. 9, l. 10 - 14).

225.    After the zone lieutenant was notified, the correctional officer would step out of the situation (Kellerman Dep., p. 9, l. 15 - 20).

226.    Defendant Kellerman had no authority in cell transfers (Kellerman Dep., p. 9, l. 21 - 24).

227.    There is no policy at Western Illinois Correctional Center that inmates have to fight before they are moved (Kellerman Dep., p. 10, l. 7 - 11).

228.    Kellerman did not assist in the urine drug testing (Kellerman Dep., p. 10, l. 12 - 16).

229.   Refusing housing is different than an inmate simply saying they want to change cell mates (Kellerman Dep., p. 11, l. 12 - p. 12, l. 1).

230.   Inmates are not allowed to just change cell mates (Kellerman Dep., p. 12, l. 3 - 6).

231.   Defendant Kellerman would be the go between if an inmate wanted to refuse housing.  The decision would be made by a lieutenant or above (Kellerman Dep., p. 13, l. 4 - 14).

232.   An inmate can refuse housing at any time (Kellerman Dep., p. 13, l. 23 - p. 14, l. 2).

**Byron Law**

233.   Plaintiff is suing Defendant Law because he ignored the danger to Plaintiff and ignored Plaintiff's request for separation from his cell mate (Plaintiff's Interrogatories).

234.   Plaintiff is suing Defendant Law because he alleges when he told Law about the situation with his cell mate and asked to be moved, Law told him Plaintiff either had to fight or commit a disciplinary infraction in order to get away from his cellie (See doc 372, Exh. 5 - Plaintiff's Dep., p. 125, l. 15 - 23).

235.   Plaintiff alleges Bryon Law shook down his cell and took his sunglasses (See doc 372, Exh. 5 - Plaintiff's Dep., p. 126, l. 2 - 22).

236.   Plaintiff alleges Bryon Law knew about his medical condition because Plaintiff was the only inmate in the institution allowed to have tape, to wear an eye shield, and to wear sunglasses, which are against IDOC rules (See doc 372, Exh. 5 - Plaintiff's Dep., p. 127, l. 20 - p. 127, l. 5).

29

237.    Plaintiff also alleges Defendant Law knew about his medical condition because he worked as a zone lieutenant in several parts of the institution, including the infirmary (See doc 372, Exh. 5 - Plaintiff's Dep., 128, l. 6 - 7).

238.    Plaintiff admits he never told Defendant Law about his eye condition (See doc 372, Exh. 5 - Plaintiff's Dep., p. 128, l. 8 - 11).

239.    Plaintiff does not know if Defendant Law was given medical information about him by the people in the Health Care Unit (See doc 372, Exh. 5 - Plaintiff's Dep., p. 128, l. 12 - 24).

240.    Plaintiff alleges he told Defendant Law that he felt his cellie was violent and that Defendant Kellerman had told Plaintiff his cellie had been transferred from Galesburg or Hill for fighting, and that he had just gotten out of segregation for fighting (See doc 372, Exh. 5 - Plaintiff's Dep., p. 129, l. 8 - 17).

241.    Plaintiff admits Defendant Law told him that his cellie was going home in a few days and to just wait it out or go to segregation (See doc 372, Exh. 5 - Plaintiff's Dep., p. 129, l. 20 - p. 130, l. 4).

242.    Plaintiff did not believe when he got up from his bunk to talk to his cellie, Durham, about his television set, that Durham was going to punch him (See doc 372, Exh. 5 - Plaintiff's Dep., p. 130, l. 4 - 8).

243.    Defendant Law does not recall being asked by McCroy for a cell transfer or being told by Kellerman that McCroy had asked for a cell change (Law Dep., p. 10, l. 20 - p. 12, l. 5).

244.    If an inmate came to Defendant Law and told him he fears for his safety, he'd either be placed in investigative confinement, or if he wants to refuse housing and refuses

direct orders to accept a housing assignment, he'd be moved to segregation for his safety. During that time, there would be an investigation into whether or not he had a safety concern (Law Dep., p. 12).

245.    Law did not have anything to do with assigning Plaintiff to a cell with Durham (Law Dep., p. 30).

246.    Defendant Law has no idea about the medical abilities or disabilities of inmates because that information is not passed on to him (Law Dep., p. 31).

247.    The officers are trained to treat all inmates the same as far as infectious diseases go, and they use universal precautions (Law Dep., p. 32).

248.    The determination of who is drug tested is random and comes from Springfield (Law Dep., p. 26 - 27).

249.    If an inmate says he fears for his safety, an incident report would be written and the inmate would be escorted to segregation pending an investigation (Law Dep., p. 14 - p. 15).

250.    Plaintiff never told Law that he feared for his safety (Law Dep., p. 16, l. 3 - 11).

**Plaintiff's Allegations Regarding Failure to Protect**

251.    Plaintiff alleges he told Kellerman and Law he did not want to be celled with Durham on September 22, 2004, the day before the fight (See doc 372, Exh. 5 - Plaintiff's Dep., p. 17).

252.    Plaintiff does not recall ever complaining about Durham prior to September 22, 2004 (See doc 372, Exh. 5 - Plaintiff's Dep., p. 18, l. 5 - 7).

31

253.    Plaintiff's complaints about Durham were that he would continually play his television and listen to rap music and was not very clean; they were incompatible (See doc 372, Exh. 5 - Plaintiff's Dep., p. 18, l. 8 - 14).

254.    Plaintiff told Kellerman that Durham was noisy, that he listened to rap music, wasn't very clean, and when he tried to talk to him, Durham got aggressive with Plaintiff (See doc 372, Exh. 5 - Plaintiff's Dep., p. 18, l. 9 - p. 19, l. 1)

255.    By aggressive, Plaintiff meant Durham would get loud and his posture would change (See doc 372, Exh. 5 - Plaintiff's Dep., p. 19, l. 3 - 8).

256.    Prior to September 22, 2004, Plaintiff states he had the same problems with Durham, but was never hit by him before (See doc 372, Exh. 5 - Plaintiff's Dep., p. 20, l. 5 - 11).

257.    On the date of the altercation between Plaintiff and Durham, Durham was watching TV and eating (See doc 372, Exh. 5 - Plaintiff's Dep., p. 20, l. 23 - p. 21, l. 6).

258.    Plaintiff was on his bunk reading his Bible (See doc 372, Exh. 5 - Plaintiff's Dep., p. 21, l. 7 - 15).

259.    Durham was sitting by the door in a chair (See doc 372, Exh. 5 - Plaintiff's Dep., p. 21, l. 16 - 21).

260.    Plaintiff asked Durham to please cut down the music and give him a half hour to read several chapters of the Bible, but Durham told him he didn't have to (See doc 372, Exh. 5 - Plaintiff's Dep., p. 21 - 22).

261.    Plaintiff explained to Durham that they lived in a space the size of a bathroom and had to show each other common courtesy and would appreciate it if he would cut the music down, but Durham refused (See doc 372, Exh. 5 - Plaintiff's Dep., p. 22).

32

262. Plaintiff got up out of his bunk and walked over to sit on the sink, approximately 2½ - 3 feet from Durham, so he could be closer to Durham to talk to him (See doc 372, Exh. 5 - Plaintiff's Dep., pp. 22 - 23 & p. 24).

263. Plaintiff continued telling Durham to cut it down and to show come common courtesy and talked about buying headphones, but Durham didn't want to do that because he was going home (See doc 372, Exh. 5 - Plaintiff's Dep., pp. 22 - 23).

264. Before he hit him, Durham told Plaintiff to get out of his way and stop talking to him, but Plaintiff would not stop talking (See doc 372, Exh. 5 - Plaintiff's Dep., p. 28).

265. Plaintiff admits he said, "Now, do you understand that about common courtesy and compromises where you want to do something and you're asking me to do something? and I am, the same thing I am doing. I am asking you, would you please cut down your TV, so I can do something?" (See doc 372, Exh. 5 - Plaintiff's Dep., p. 28).

266. Plaintiff says Durham just hit him and doesn't know why he would do that (See doc 372, Exh. 5 - Plaintiff's Dep., pp. 23 & 28).

267. When Plaintiff had these same conversations before with Durham, most of the time he just ignored him (See doc 372, Exh. 5 - Plaintiff's Dep., pp. 28 & 29).

268. Plaintiff says that sometimes when they had the conversations, Durham would become belligerent and aggressive (See doc 372, Exh. 5 - Plaintiff's Dep., p. 30).

269. While Plaintiff was talking to Durham, he was sitting in his chair, watching TV and eating and the television was between Plaintiff and Durham (See doc 372, Exh. 5 - Plaintiff's Dep., p. 23).

270.    Plaintiff admits Durham got up from his chair to hit him and Plaintiff was watching Durham as he got up and walked toward him with a fast movement (See doc 372, Exh. 5 - Plaintiff's Dep., p. 24).

271.    Plaintiff did not get up off of the sink until after Durham hit him (See doc 372, Exh. 5 - Plaintiff's Dep., p. 25).

272.    Plaintiff does not recall whether Durham swung with his right or left hand (See doc 372, Exh. 5 - Plaintiff's Dep., p. 26).

**Phil Crary**

273.    Crary was a wing officer for five years, a training officer for two years, and currently is an investigative officer (Crary Dep., pp. 5 - 7).

274.    In 2004, Crary was a correctional officer in internal affairs (Crary Dep., p. 6, l. 18 - 22).

275.    Crary was not aware of any past discipline or investigations of either McCroy or Durham prior to their fight with each other (Crary Dep., p. 7, l. 16 - p. 8, l. 21).

276.    Crary investigated the fight between Plaintiff and Durham.  He looked at the scene, took pictures of blood on the toilet, got statements from both inmates and issued them both disciplinary reports (Crary Dep., p. 9).

277.    Crary based his conclusion that the fight was mutual on the fact that both inmates had injuries and both told conflicting stories; McCroy that he was attacked, and Durham that McCroy kissed him on the mouth and tried to choke him (Crary Dep., p. 15 - 17).

278.    At the time of the fight, McCroy was 6'1" and weighed 250 pounds and Durham was 5'9" and weighed 160 pounds (Crary Dep., p. 26, l. 10 - 19).

34

279.    Correctional officers are not privy to inmates' medical information, and restrictions such as being celled with anyone else are not available to officers (Crary Dep., p. 26).

**Transfer for Failing to Provide Sufficient Urine for a Drug Test Failed Urine**

280.    Plaintiff admits he had previously gotten tickets for drug or drug paraphernalia at Dixon and Stateville (See doc 372, Exh. 5 - Plaintiff's Dep., p. 105).

281.    At that time, drugs were found on Plaintiff (See doc 372, Exh. 5 - Plaintiff's Dep., p. 106).

282.    Plaintiff states that prior to being found guilty after not being able to produce enough urine for a drug test, Deb Fuqua said the drugs he was taking would not affect the test (See doc 372, Exh. 5 - Plaintiff's Dep., p. 107).

283.    Plaintiff was on a diuretic at the time of the drug test (See doc 372, Exh. 5 - Plaintiff's Dep., p. 107).

284.    Defendant Law does not recall whether he assisted with Plaintiff's drug test or observed it (Law Dep., pp. 19 & 20).

285.    The drug tests are performed according to protocol and includes the officer performing the test and a witness.  The inmate is given 24 ounces of water in a two hour period (8 ounces every 1/2 hour (Law Dep., pp. 19, 23, and 27).

286.    If the inmate gives a sample that is not adequate, he is issued a ticket for damage and misuse of property, given another cup, and charged for the cup they ruined (Law Dep., p. 28).

287.    It's not uncommon for an inmate to fail to produce enough urine for a drug test within the 2 hour time frame (Law Dep., p. 20).

35

288.    The amount of urine needed is pre-determined (Law Dep., p. 36).

289.    Law does not have access to inmate's medical records (Law Dep., p. 37).

290.    The discipline for failure to produce enough urine for a drug test is determined by the Adjustment Committee who determines the guilt or innocence of the charge (Law Dep., p. 21).

**Claims Under the ADA/Rehab Act**

291.    Plaintiff claims he originally brought his complaint pursuant to the ADA because his disability did not get the same consideration as those with chronic illnesses or disabilities such as specialty clinics and follow-up care and treatment (See doc 372, Exh. 5 - Plaintiff's Dep., p. 36).

292.    Plaintiff claims they did not treat his disability, and he had to complain and sustain substantial injury before he could get treated, while others were scheduled for specialty clinics such as hypertension and diabetic clinics, and were scheduled for follow-up treatments on pre-determined schedules (See doc 372, Exh. 5 - Plaintiff's Dep., pp. 36 & 37).

293.    Plaintiff believes because of his disability, he should have been involved in a speciality clinic to monitor his condition, but was denied that at Hill (See doc 372, Exh. 5 - Plaintiff's Dep., p. 37).

294.    Plaintiff says he had been in other facilities, specifically Hill Correctional Center, where others who had Keratoconus were with him in a specialty clinic with Dr. Kehoe (See doc 372, Exh. 5 - Plaintiff's Dep., pp. 37 & 38).

295.   As accommodation under the ADA, Plaintiff wanted the treatment of his disease to continue, not necessarily to continue to be seen by Dr. Kehoe (See doc 372, Exh. 5 - Plaintiff's Dep., pp. 39 & 40).

296.   Plaintiff is not complaining about being denied any other privileges under the ADA because he does not know what privileges he is entitled to (See doc 372, Exh. 5 - Plaintiff's Dep., pp. 44 & 45).

297.   At Western, he asked that they not cut the lights on over his head and that he be allowed to draw the curtains to block out other people's lights (See doc 372, Exh. 5 - Plaintiff's Dep., p. 46).

298.   Plaintiff admits coverings over the cells are not allowed (See doc 372, Exh. 5 - Plaintiff's Dep., p. 103).

299.   Plaintiff admits the only lights over his head he could not manipulate were in the infirmary, and that he was able to manipulate the lights in his cell in gen pop (See doc 372, Exh. 5 - Plaintiff's Dep., pp. 103 - 104).

300.   The lights over the heads of the other inmates in the infirmary were left on too (See doc 372, Exh. 5 - Plaintiff's Dep., p. 104).

301.   Plaintiff also complained that he wanted to work, but not until he got out, except to the extent he could not participate in the early release program (See doc 372, Exh. 5 - Plaintiff's Dep., pp. 47 - 50).

302.   Plaintiff says the physicians made him medically unassigned and therefore he could not participate in the early release program (See doc 372, Exh. 5 - Plaintiff's Dep., p. 50).

37

303.    Plaintiff participated in the early release program at Hill, at Western, and is currently in the program at Pinckneyville (See doc 372, Exh. 5 - Plaintiff's Dep., pp. 53 & 54).

304.    The only time he was off early release program was when he would get eye infections and the hospital would not inform the school that the medication they were giving him would render him unable to see and he couldn't go to school (See doc 372, Exh. 5 - Plaintiff's Dep., p. 54).

305.    He also could not go to school because he received 3 disciplinary tickets (See doc 372, Exh. 5 - Plaintiff's Dep., p. 54).

306.    While Plaintiff was in the infirmary after February 3 of 2003, he would go to the yard unescorted every other day (See doc 372, Exh. 5 - Plaintiff's Dep., p. 57).

307.    Plaintiff went, unescorted, to the law library 2 - 3 times per week (See doc 372, Exh. 5 - Plaintiff's Dep., pp. 57 & 58).

308.    Plaintiff went to the commissary intermittently when the infirmary staff turned in the request slips (See doc 372, Exh. 5 - Plaintiff's Dep., p. 58).

309.    Plaintiff does not know why he was not able to go to the commissary sometimes after turning in the slips.  He just believes it must be because the slips were not turned in (See doc 372, Exh. 5 - Plaintiff's Dep., p. 58).

310.    Plaintiff asked Defendant Fuqua and Defendant Funk who had made him medically unassigned, but did not tell them he did not want to be medically unassigned (See doc 372, Exh. 5 - Plaintiff's Dep., p. 102).

311.    They told him Dr. Lochard had done it (See doc 372, Exh. 5 - Plaintiff's Dep., p. 102).

312.    Other inmates would be in the law library and the yard at the same time as Plaintiff (See doc 372, Exh. 5 - Plaintiff's Dep., p. 60 - 62).

313.    There would be approximately 25 - 30 other inmates in the yard at the same time as Plaintiff (See doc 372, Exh. 5 - Plaintiff's Dep., p. 62).

314.    Currently, Plaintiff is physically challenged, but no doctor has told him he cannot do any specific activity (See doc 372, Exh. 5 - Plaintiff's Dep., p. 63).

315.    ADA cells are twice the size of regular cells (See doc 372, Exh. 5 - Plaintiff's Dep., p. 64).

316.    At Pinckneyville, attendants help Plaintiff lift his property box (See doc 372, Exh. 5 - Plaintiff's Dep., p. 65).

317.    Plaintiff did not have attendants to help him lift his property box at Western, but the correctional officers helped him (See doc 372, Exh. 5 - Plaintiff's Dep., p. 66).

318.    Plaintiff can currently see hand movements, shapes, colors as long as they're not closely matched (See doc 372, Exh. 5 - Plaintiff's Dep., pp. 67 & 68).

319.    Plaintiff has difficulty with depth perception and cannot gauge the distance between objects (See doc 372, Exh. 5 - Plaintiff's Dep., p. 67).

320.    Plaintiff currently goes to college as part of his early release program (See doc 372, Exh. 5 - Plaintiff's Dep., p. 68).

321.    Plaintiff takes night classes for approximately two hours per night because he can only wear his contact lenses for up to two hours per day (See doc 372, Exh. 5 - Plaintiff's Dep., pp. 70 & 71).

**Julius Flagg**

322.   Plaintiff is suing Defendant Flagg for deliberate indifference because he disregarded doctor's orders and removed Plaintiff from an ADA cell (Plaintiff's Interrogatories).

323.   Plaintiff's complaints against Defendant Flagg are that Flagg gained unauthorized access to his medical records and removed Plaintiff from his ADA cell and canceled all of Plaintiff's permits (See doc 372, Exh. 5 - Plaintiff's Dep., p. 138, l. 19 - 22).

324.   Plaintiff also alleges that when his permits were reinstated by Feinerman, Flagg refused to acknowledge them and canceled them again (See doc 372, Exh. 5 - Plaintiff's Dep., p. 138, l. 20 - 24).

325.   Plaintiff had been issued low gallery/low bunk/ADA cell/and physically challenged permits (See doc 372, Exh. 5 - Plaintiff's Dep., p. 139, l. 1 - 8).

326.   After the permits were canceled, Plaintiff was never issued an upper bunk at Pinckneyville (See doc 372, Exh. 5 - Plaintiff's Dep., p. 139, l. 9 - 11).

327.   After the permits were canceled, Plaintiff was never placed in an upper gallery at Pinckneyville (See doc 372, Exh. 5 - Plaintiff's Dep., p. 139, l. 12 - 13).

328.   Plaintiff admits his complaints are about the ADA cell and the physically challenged status, which allows him to get programs (See doc 372, Exh. 5 - Plaintiff's Dep., p. 139, l. 14 - 20).

329.   Plaintiff does not know for a fact that Flagg ever read his medical records, but believes he would not be able to change the criteria of his medical records if he had not done so (See doc 372, Exh. 5 - Plaintiff's Dep., p. 140, l. 3 - 11).

330.    Plaintiff alleges he was not in an ADA cell for a year at Pinckneyville (See doc 372, Exh. 5 - Plaintiff's Dep., p. 141, l. 2 - 6).

331.    Plaintiff was still in a low bunk, a low gallery, had safety glasses and sunglasses, his contact lenses and talking books and tapes during the time he was not in an ADA cell (See doc 372, Exh. 5 - Plaintiff's Dep., p. 141, l. 4 - p. 142, l.16).

332.    Defendant Flagg was Assistant Warden of Programs at Pinckneyville from 2001 to April, 2006.  At one point he became Acting Warden and was also the ADA coordinator (Flagg Dep., pp. 4 - 6).

333.    He is currently Assistant Warden of Operations at Centralia (Flagg Dep., pp. 4 & 5).

334.    The criteria for placement in an ADA cell is made by the placement office and medical personnel (Flagg Dep., p. 20).

335.    The ADA Coordinator makes no ruling on who goes in an ADA cell (Flagg Dep., p. 21).

336.    ADA Cells are basically the same as a regular cell except they are approximately twice as large so wheelchair bound inmates can move around (Flagg Dep., pp. 21 and 70).

337.    If an inmate files a grievance as an ADA violation, it is reviewed by an ADA coordinator (Flagg Dep., p. 30).

338.    The ADA coordinator would look into the inmate's allegations (Flagg Dep., p. 30).

339.    Defendant Flagg was not involved in where Plaintiff was initially placed when he came to Pinckneyville.  That was handled by the placement office (Flagg Dep., p. 31).

41

340.    On January 9, 2006, Defendant Flagg wrote a memo to Plaintiff regarding a letter Plaintiff had written to Deputy Director Meeks regarding not being in an ADA cell (Flagg Dep., pp. 36 & 40).

341.    Defendant Flagg reviewed Plaintiff's medical file to determine whether or not Plaintiff needed to be in an ADA cell (Flagg Dep., p. 36).

342.    Based on his review of Plaintiff's medical file and a discussion with the Health Care Unit Administrator, Defendant Flagg did not believe Plaintiff met the criteria for ADA cell placement (Flagg Dep., p. 44).

343.    However, Flagg did not make the decision to move Plaintiff out of an ADA cell at Pinckneyville (Flagg Dep., p. 58).

344.    That decision was also made by the placement office, which did not have to consult Flagg before making a decision on ADA placement (Flagg Dep., p. 59).

345.    Flagg did not review an ADA permission form on January 9, 2006 that was dated January 16, 2006 as it had not been written yet (Flagg Dep., p. 62).

346.    After the memo of January 9, 2006, Defendant Flagg did not have occasion to revisit the issue of ADA cell placement for Plaintiff (Flagg Dep., p. 62).

**ADA Cell/Dr. Feinerman**

347.    Dr. Feinerman examined Plaintiff at Pinckneyville on January 16, 2006 when McCroy presented asking for an ADA cell (Feinerman Affidavit).

348.    Dr. Feinerman noted Plaintiff had an enucleated left eye and Kerotoconus of his right eye (Feinerman Affidavit).

42

349.    Dr. Feinerman's assessment was that Plaintiff had decreased visual acuity, and his plan was that he was ok for an ADA cell, a low bunk, low gallery, and physically challenged permit (Feinerman Affidavit).

350.    At the time Dr. Feinerman determined Plaintiff could have permission to be housed in an ADA cell, he did not make the determination based on any belief that Plaintiff needed a larger cell, because in Dr. Feinerman's opinion, it would be easier for someone who is visually challenged to maneuver around a smaller area (Feinerman Affidavit).

351.    Dr. Feinerman believed, at the time he examined Plaintiff, that due to his decreased vision, he would benefit from any accommodations that might assist him (Feinerman Affidavit).

352.    Since Plaintiff wanted to be housed in an ADA cell, Dr. Feinerman gave him permission to be in an ADA cell (Feinerman Affidavit).

353.    Dr. Feinerman does not believe that Plaintiff's disability requires him to be in an ADA cell (Feinerman Affidavit).

354.    The larger, ADA cell, would be required for someone in a wheelchair who required additional space as well as for someone who needed the assistance of rails on the wall to get in or out of a chair or on or off of the commode (Feinerman Affidavit).

355.    Plaintiff was not in either situation (Feinerman Affidavit).

**ADA Cell/Plaintiff's Allegations**

356.    Plaintiff says he is currently in an ADA cell (See doc 372, Exh. 5 - Plaintiff's Dep., p. 31).

43

357.    Plaintiff says the difference between an ADA cell and regular cell is that because of his decreased vision, in a regular cell he was always hitting things and cutting himself on the razor sharp edges (See doc 372, Exh. 5 - Plaintiff's Dep., p. 31).

358.    Plaintiff says an ADA cell has room to maneuver and no sharp edges (See doc 372, Exh. 5 - Plaintiff's Dep., p. 31).

359.    Plaintiff says he has numerous injuries from cutting his head on the cabinets because of the way the cabinet is above the toilet (See doc 372, Exh. 5 - Plaintiff's Dep., p. 32).

**ADA Cell/Plaintiff's Alleged Injuries**

360.    On February 12, 2006, Plaintiff was seen by an LPN stating he wanted ointment for all of his bumps and cuts because he was constantly bumping into things.  The nurse's objective note stated, "this nurse looked at so called bumps and cuts - no bumps, cuts or bruises - I/M left angry." (Plaintiff's Medical Records, Exhibit 1, p. 1153).

361.    On March 17, 2006, Plaintiff's medical records show that the Health Care Unit Administrator responded to a grievance related to plaintiff wanting an ADA cell.  The plan noted that there was no order for ADA cell and the offender was not in a wheelchair (Plaintiff's Medical Records, Exhibit 1, p. 1156).

362.    On April 9, 2006, Plaintiff complained of hitting his head frequently, but the nurse could find no marks on his bald head (Plaintiff's Medical Records, Exhibit 1, p. 1159).

363.    On April 20, 2006, when he saw the physician's assistant, Plaintiff did not complain of frequently hitting his head (Plaintiff's Medical Records, Exhibit 1, p. 1161).

364.    Plaintiff complained to the LPN on June 23, 2006 about constantly bumping into things.  The nurse noted a small (dime sized) bruise on top of his head and a medium

44

size, purple bruise on r. shin (approximately 1 1/2 cm).  (Plaintiff's Medical Records, Exhibit 1, p. 1166).

365.    Plaintiff complained to the doctor on June 27, 2006 about headaches he claimed were caused by bumping his head.  The doctor did not note anything superficially about his head (Plaintiff's Medical Records, Exhibit 1, p. 1168).

366.    On January 29, 2007, Plaintiff saw the physician and the plan was to have physically challenged, low bunk and low gallery (Plaintiff's Medical Records, Exhibit 1, p. 1198).

367.    All of the bunks at Pinckneyville are manufactured by Correctional Industries at Shawnee Correctional Center (Terry Epplin Affidavit).

368.    All of the bunks at Pinckneyville are made to the same specifications and all cell furnishings are inspected to make sure there are no sharp edges, as sharp edges in a cell could be a safety hazard for both staff and inmates alike (Epplin Affidavit).

369.    Terry Epplin is the Stationary Engineer Assistant Chief at Pinckneyville Correctional Center and is familiar with all of the furnishings at Pinckneyville, including those in single, double, ADA and segregation (Epplin Affidavit).

370.    Plaintiff says his current cell mate does not have any disabilities (See doc 372, Exh. 5 - Plaintiff's Dep., p. 34).

**Facts Regarding Injunctive Relief and IDOC**

371.    Plaintiff read the Second Amended Complaint and finds nothing in that complaint improper or incorrect (See doc 372, Exh. 5 - Plaintiff's Dep., p. 119, l. 2 - 8).

372.    Plaintiff is a certified law clerk, asked for injunctive relief in his first complaint, and understands what injunctive relief is (See doc 372, Exh. 5 - Plaintiff's Dep., p. 107, l. 11 - 19).

373.    Plaintiff seeks an injunction against the IDOC for future proper medical care as determined by a qualified doctor (See doc 372, Exh. 5 - Plaintiff's Dep., p.107, l. 20 - p. 108, l. 12).

Respectfully submitted,

ILLINOIS DEPARTMENT OF
CORRECTIONS (IDOC), JULIUS FLAGG,
SANDRA FUNK, DEBRAH K. FUQUA,
DENNIS HOCKADAY, BYRON LAW,
ROGER E. WALKER, JR., and KEVIN
WINTERS,

Defendants,

LISA MADIGAN, Attorney General,
State of Illinois

By:   s/ Kelly R. Choate
        Kelly R. Choate, #6269533
        Assistant Attorney General
        Attorney for Defendants
        500 South Second Street
        Springfield, Illinois  62706
        Telephone:  (217) 782-9026
        Facsimile:    (217) 524-5091
        E-Mail:  kchoate@atg.state.il.us

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

AARON MCCROY, #N-51882,      )
                               )
        Plaintiff,         )
                               )
      -vs-             )        No.  02-3171
                               )
ILLINOIS DEPARTMENT OF     )
CORRECTIONS, et al.,       )
                               )
        Defendants.   )

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2007, I electronically filed Defendants' Statement of Material Facts Claimed to Be Undisputed with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to the following:

Thomas Londrigan                 Douglas J. Quivey
Londrigan, Potter & Randle, P.C.   Londrigan, Potter & Randle, P.C.
tom@lprpc.com                     doug@lprpc.com

Theresa Powell                  Carl J. Tenney
Heyl, Royster, Voelker & Allen     Hughes, Hill & Tenney, L.L.C.
tpowell@hrva.com                ctenney@hhtlaw.com

April Gowdy Troemper          Carissa A. Haning
atroemper@hrva.com            carissa@lprpc.com

and I hereby certify that on May 4, 2007, I mailed by United States Postal Service, the document(s) to the following non-registered participant(s):

None

Respectfully Submitted,
 s/ Kelly R. Choate
Kelly R. Choate, #6269533
Assistant Attorney General
Attorney for Defendants
500 South Second Street
Springfield, Illinois  62706
Telephone:  (217) 782-9026
Facsimile:   (217) 524-5091
E-Mail:  kchoate@atg.state.il.us