STATE OF ILLINOIS         )
                          ) ss
COUNTY OF BROWN           )

### AFFIDAVIT

I, KEVIN WINTERS, being first duly sworn upon oath, state that I have personal knowledge of the facts set forth herein, that I am competent to testify and if called to testify would state as follows:

1. I am currently employed by the Illinois Department of Human Services at the Rushville Detention and Treatment Center as a Security Therapist Aid IV.

2. From 2000 to December, 2002, I was Assistant Warden of Operations at Western Illinois Correctional Center. From December, 2002 until October, 2004, I was Warden of Western Illinois Correctional Center.

3. The grievance process within the Illinois Department of Corrections is a means by which offenders can voice complaints to the administration. The first step in the grievance process is the counselor, who receives the grievance and determines if the offender's issue can be resolved informally. If the counselor is unable to resolve the complaint, he or she will notify the offender and either forward the grievance to the grievance officer or return it to the offender for him to forward. Offenders may sometimes direct a grievance to the grievance officer without going through his counselor first. The grievance officer is the fact finder for the grievance. He or she does an initial investigation, which could include contacting another department of the institution to find out if there is substance to the offender's issues. In the case of a medical grievance, the grievance officer would likely contact the Health Care Unit to find out if the offender has medical issues that are not known to medical personnel. The grievance officer then writes a report on the grievance form and forwards the form to the Chief Administrative Officer (CAO) or someone acting in his or her stead. The Chief Administrative Officer of a correctional institution within the Illinois Department of Corrections is the warden. The CAO or designee will then review the grievance and responses and will determine if he or she agrees with the disposition recommended by the grievance officer. The grievance is then returned to the offender, who may appeal any unfavorable ruling to the Administrative Review Board in Springfield.

4. Sometimes offenders will designate their grievances as "emergency."

> This grievance is sent directly to the CAO for him or his designee to review prior to any investigation by the grievance officer. The CAO or his designee will look at the nature of the grievance and determine if it is truly of an emergency nature, and will expedite a response to the grievance. If the CAO or his designee determines the grievance is not of an emergency nature, he will return it to the inmate for processing through regular channels.

5. As Assistant Warden of Operations, I had little or no involvement in the grievance process at Western Illinois Correctional Center. That duty was usually delegated to the Assistant Warden of Programs. My function was primarily in a supervisory position over the security staff at Western Illinois Correctional Center. Occasionally, I might be the duty warden, or the person designated by the warden as CAO in his absence, and might review grievances in that capacity.

6. When I became Warden, because of the vast number of responsibilities that accompanied that position, I delegated the review of offender grievances to my Assistant Warden of Programs. I had full faith in the people who held that position to competently address any issue brought to them by an offender. At any time, the assistant wardens could come to me to discuss any issues they were uncertain of.

7. Regarding medical issues, there is only so much the CAO or his designee can do. He or she can only determine that the offender's medical issues are being addressed by health care personnel. The offender may not be satisfied with the care he is receiving; however, because neither I, nor my Assistant Wardens were medically trained, we could not make any decision on the type of care being given. The CAO cannot direct the medical care of an offender, nor can he or she change the course of the treatment being provided to the offender. The CAO also cannot choose outside physicians or determine when an offender would have an appointment with that physician. Those are all decisions and arrangements that have to be made through the medical staff.

8. Security considerations must be taken into account when it comes to furloughs for outside medical care. For example, offenders are generally not informed when they have a furlough for medical care. The offender will be taken to a non-secure facility, and if he has advance notice, he could contact outside persons to effect an escape. All offenders are subject to this rule.

9. Likewise, because of staffing considerations, offenders might not be given a great deal of time to prepare for a furlough, and/or a furlough might be postponed due to weather related issues or security issues such as a facility lock down.

10. The warden has the ability to have an offender housed in the Health Care Unit. He cannot admit or discharge offenders to the infirmary for medical reasons, but can place offenders in the Health Care Unit for non-medical reasons. These mainly would include bed space issues. If the institution at large was full, and there were infirmary beds available, an offender might remain in, or be housed in the infirmary. Another time when the warden might use an infirmary or Health Care Unit bed might be if segregation was full and an offender needed to be in some type of crisis watch.

11. I do not recall having Aaron McCroy remain in the Health Care Unit after his discharge from the infirmary, but it's possible that I might have had him housed there.

12. I also was not involved in determining whether Aaron McCroy was placed in general population or whether he had any restrictions. Any restrictions on an offender after discharge from the infirmary, or generally for medical reasons, are determined by the physicians, who are in a position to evaluate that person and decide what restrictions are necessary. I also was not involved in choosing who would be Aaron McCroy's cell mate in general population.

13. When an offender is discharged from the infirmary, the Health Care Unit notifies the placement office. The officer in the placement office then places the inmate in the appropriate housing unit. Offenders at Western Illinois Correctional Center are housed according to their assignment. If an offender is unassigned, or does not have a job for whatever reason, he is housed in the unit with other offenders who are unassigned.

14. All the offenders at Western Illinois Correctional Center, are considered appropriate for placement in general population unless they are currently serving segregation time. If an offender is significantly more dangerous than the other offenders housed at Western Illinois Correctional Center, he would most likely be at a higher security facility, including Pontiac, which is an all segregation facility. The determination of what facility an offender is housed at is made by the Transfer Coordinator's Office in Springfield.

15. Offenders are placed in segregation at Western Illinois Correctional Center for a variety of disciplinary reasons, as well as investigative reasons. For example, if an inmate is suspected by Internal Affairs of being involved in gang activity, he might be placed in segregation during the investigation to separate him from other inmates who might influence the investigation.

16. An offender who fears for his safety from his cell mate or others in his

vicinity, can refuse housing. In that instance, he is written a disciplinary ticket and is removed from the situation and taken to segregation. The disciplinary ticket is investigated. If there is found to be credence to the offender's fears, the offender will most likely be found not guilty of the offense and will be released from segregation to another cell.

17. Offenders are not allowed to change cell mates at will due to security and administrative considerations. Offenders may ask to change cell mates simply because they do not like their current cell mate, in which case the staff would do little else than assist offenders in changing cells. However, other offenders may ask to be housed with another offender in order to enter into a sexual relationship with that person or because he wants to harm the other offender. Each of these instances compromises the safety and security of the institution.

18. The placement office has access to the Offender Tracking System or OTS. OTS contains information about whether an offender has been designated "vulnerable" or "predator." A "predator" designation would flag that inmate as sexually dangerous to other inmates who might be designated as "vulnerable." A designation of "vulnerable" is not given to inmates based on a specific medical issue. It is a designation that is initiated by the Clinical Services staff follows an inmate from institution to institution, and most often refers to that person's stature, age, or traits about that offender that would cause him to be at general risk of sexual assault. Likewise, a person designated as "predator" has a past history or characteristics that make it more likely he would sexually assault another offender. Whether either individual is a homosexual is not the determining factor. A disciplinary history that includes fighting with another inmate, would not necessarily cause an inmate to be designated as a predator, unless other factors were also present. OTS also has information about smoking preference and whether that inmate has listed any enemies.

19. OTS does not generally contain detailed information about an offender's disciplinary history within the institution. It will note any time adjustments that have been made and may list the discipline for which the good time was lost.

20. OTS also does not contain an detailed information about an offender's medical care. It would contain information regarding restrictions such as low bunk/low gallery and information about dietary restrictions. When an offender is discharged from the infirmary and there are restrictions, that information is given to the placement office and is based on a medical order.

21. At any time, the Assistant Warden of Programs could discuss issues with

me relating to grievances.

22. I have reviewed documents relating to Plaintiff, Aaron McCroy during the course of my deposition. While I have no independent recollection of reviewing any of Mr. McCroy's grievances, it appears I granted emergency status on June 9, 2004 to a grievance dated June 7, 2004. A copy of the grievance listed as exhibit 21 during the deposition is attached to this affidavit. I did not, however, finalize the grievance. That was done by my designee (see exhibit 23 from deposition).

23. I denied emergency status on June 28, 2004, to another grievance dated June 24, 2002 (see exhibit 25 from my deposition). In that grievance, Aaron McCroy was discussing his medical care and complained that health care unit staff was deliberately indifferent to his medical needs. He complained of a medication error, noted he had gone to see another Ophthalmologist, and was told by a nurse that the pharmacy could not reorder one of his medications until the end of June. The relief he requested was to be given the names of the individuals who denied him the medication, to be given the medication, to be sent out for another examination as soon as possible, and to be compensated.

24. I did not believe this grievance to be of an emergency nature, and determined it could be resolved through regular channels. To my knowledge, I did not review any other of Aaron McCroy's grievances.

FURTHER AFFIANT SAYETH NOT.

_____
KEVIN WINTERS

SUBSCRIBED and SWORN to
before me this 4th Day of ~~March~~ April 30, 2007.

_____
NOTARY PUBLIC

OFFICIAL SEAL
SARAH J. DODDS
COMMISSION NO. 655195
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 7-11-2010

ILLINOIS DEPARTMENT OF CORRECTIONS
**COMMITTED PERSON'S GRIEVANCE**

04-0557E

| | | |
|---|---|---|
| Date: June 7, 2004 | Committed Person: Aaron McCroy | ID#: N51882 |
| Present Facility: Western Illinois C.C. | Facility where grievance issue occurred: Same | |

**NATURE OF GRIEVANCE:**

- [ ] Personal Property
- [x] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Mail Handling
- [ ] Dietary
- [ ] Transfer Denial by Transfer Coordinator
- [ ] Restoration of Good Time
- [x] Medical Treatment
- [x] Disability
- [ ] Other (specify): _____

- [ ] Disciplinary Report: ___/___/___  Date of Report / Facility where issued

Note: Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

**Brief Summary of Grievance:** This Emergency Grievance is filed pursuant to the American With Disability Act, to be forwarded to the Western Illinois C.C. American with Disability Coordinator.

i have been housed in the infirmary for aprs. 18 months because of my visual disability. My visual impairments are well documented. i.e. extremely poor vision, light sensitivity, migraine headaches and etc. Furthermore, my vision has been greatly diminished by the Health Care Units Staff's deliberate indifference to my medical needs. Their actions are directly responsible for causing me to develope Glaucoma and cataract in my left eye and have delayed for over 1 year in sending me to be fitted for contact lenses to improve my vision.

Yet, in spite of Health Care Staff's continual misconduct in treating my health care needs. Either they and or I.D.O.C.'s Correctional Officer's have been retaliating against me for the filing of a Federal Complaint concernign the above described behavior. By not allowing me to go to yard or any recreation and requiring me to place my T.V. under a brightly lit window. Eventhough, they know if I do this it renders my T.V. useless to me because of my eye conditions ( Most of

**Relief Requested:** CONTINUED ON REVERSE INCLUDING RELIEF REQUESTED

[x] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

_____  N51882   6,7,04
Committed Person's Signature      ID#       Date
(Continue on reverse side if necessary)

**Counselor's Response (if applicable)**

Date Received: ___/___/___
[ ] Send directly to Grievance Officer
[ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: _____

Print Counselor's Name | Counselor's Signature | Date of Response

**EMERGENCY REVIEW**

Date Received: 6,9,04
Is this determined to be of an emergency nature?
[x] Yes; expedite emergency grievance
[ ] No; an emergency is not substantiated. Committed person should submit this grievance in the normal manner.

_____  06.09.04
Chief Administrative Officer's Signature    Date

EXHIBIT
tabbies
21
2-26-07 DR



**ILLINOIS DEPARTMENT OF CORRECTIONS**
**COMMITTED PERSON'S GRIEVANCE (Continued)**

which were caused by them) and insuring pain and suffering.

Also, because of an incident where c/o Hendrix and nurse Bowers had me placed in segregation for the false charge of threats and intimidation and for not placing my T.V. on the shelf per so-called institutional rule. I have sought and obtained permission to place my T.V. on a table.

Although, there is no written institution rule stating the above. While in Segregation I had a chance to talk with Warden Funk about the situation and was told by her that if my medical records revealed my visual disability and I got approval from the medical Director Dr. Brown. I could place my T.V. on the table provided to me. This placements allows me to see it and avoids direct sunlight. Thus, also, allowing me to avoid the pain caused by having to sit in direct sunlight.

Accordingly, On April 7, 2004, I received permission from Dr. Brown to place my T.V. on a table.

and on June 4, 2004 I talked to Warden Funk about receiving permission to place my T.V. on the table as per her instructions.

Nonetheless, on June 5, 2004 nurse Bowers in a clear act of malice had my property searched because an inmate King had supposedly misplaced a plastic piece from an breathing machine.

Then on June 6, 2004 either nurse Bowers and or c/o Hendrix, despite their knowledge that I had permission to have my T.V. on the table, had the infirmary officer order me to place my T.V. on the shelf under the brightly lit window.

In regards to my yard and recreation restriction, despite my many requests to be allowed outside or indoor recreation I have been denied since December 2003.

RELIEF REQUESTED.

To be sent out to be fitted with Contact lenses per Doctor's Order's given a written permit to have my T.V. on a table in the infirmary; allowed indoor and outdoor recreation A.S.A.P., allowed to request a transfer in writing and to receive a written response; and for all harrassment and retaliation to stop.

**ILLINOIS DEPARTMENT OF CORRECTIONS**
**RESPONSE TO COMMITTED PERSON'S GRIEVANCE**

### Grievance Officer's Report

Date Received: June 14, 2004  Date of Review: June 16, 2004  Grievance # (optional): 04-0557E

Committed Person: McCroy, Aaron  ID#: N51882

Nature of Grievance: ADA/Accomdations

**Facts Reviewed:** Emergency Grievance-Offender McCroy states that health care actions has delayed him for 1 year to be fitted for contacts and has caused him glaucoma. He is being forced to place his TV under a brightly lit window. Due to his disability, vision impairment, he cannot watch his TV sitting in the sunlight. He states his eyes are sensitive to light. He states he has been housed in Health Care Unit and is denied exercise and recreation by not allowing him to go to the yard. He wants to be fitted for contact lenses, permit to place TV on table, allowed recreation, and a transfer.

Offender's concerns have been reviewed and as of 6/8/04 has been moved to general population. His television issue and his recreation issue are now moot in that he can place his television anywhere in his assigned cell and his recreation restrictions are lifting and contact sports. On 5/21/04, Offender McCroy was seen by Dr. Zeh, Ophthalmologist for follow up. Dr. Zeh recommended a contact lense-fitting try on and continue his present medications. On 5/26/04, a second opinion was ordered and offender has been schedules for this month.

**Recommendation:** Based upon a total review of all available information, it is the recommendation of this Grievance Officer that the offender's grievance be denied.

Sue Redshaw
Print Grievance Officer's Name    Grievance Officer's Signature
(Attach a copy of Committed Person's Grievance, including counselor's response if applicable)

### Chief Administrative Officer's Response

Date Received: 6/16/04    [X] I concur    [ ] I do not concur    [ ] Remand
Comments:

Chief Administrative Officer Signature    6/18/04   Date

### Committed Person's Appeal To The Director

I am appealing the Chief Administrative Officer's decision to the Director. I understand this appeal must be submitted within 30 days after the date of the Chief Administrative Officer's decision to the Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277. (Attach a complete copy of the original grievance, including the counselor's response, if applicable, and any pertinent documents.)

Committed Person's Signature    ID#    Date

Distribution:  A/W Programs
              Master File; Committed Person     Page 1    DOC 0047 (Eff. 10/2001)
                                                          (Replaces DC 3657)

EXHIBIT 23  2-26-07 DB

**ILLINOIS DEPARTMENT OF CORRECTIONS**
**COMMITTED PERSON'S GRIEVANCE**

04-0713

| | |
|---|---|
| Date: June 24, 2004 | Committed Person: Aaron McCroy    ID#: N51882 |
| Present Facility: Western Illinois C.C. | Facility where grievance issue occurred: Same |

**NATURE OF GRIEVANCE:**

- ☐ Personal Property
- ☐ Staff Conduct
- ☐ Transfer Denial by Facility
- ☐ Mail Handling
- ☐ Dietary
- ☐ Transfer Denial by Transfer Coordinator
- ☐ Restoration of Good Time
- ☒ Medical Treatment
- ☒ Disability
- ☐ Other (specify): _____
- ☐ Disciplinary Report: __/__/__  Date of Report    Facility where issued

Note: Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:

Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

**Brief Summary of Grievance:** This Emergency Grievance is filed pursuant to the American With Disability Act, to be forwarded to the Western Illinois Correctional Center's Americans with Disability Cooridinator.
    Due to Health Care Unit Staff's deliberate indifference to my visual disability and the mandated medical care needed to treat my cornea transplant and Keratoconus.
    On 12-23-03 I was diagnosed with steroid induced Glaucoma, that had developed because Health Care Unit Staff had failed to stop the application of the steroid called Maxitrol against Dr. Zeh's Orders.
    Thus, to control the Glaucoma I was prescribed eye drops, to be applied numerous times a day. One of these drops is Alphagan 1.5% to be applied 3 times a day. All prescriptions were prescribed by Dr. Zeh and Dr. Kim to be taken up to or until I have surgery to control the Glaucoma.
    On June 18, 2004 I was sent out to another Ophthalmologist for a so-called second opinion and again the diagnoses of Dr. Zeh and Dr. Kim was confirmed and all medications to treat my Glaucoma recommended to be continued.

**Relief Requested:** _____

~~CONTINUED ON REVERSE~~
~~INCLUDING RELIEF REQUESTED~~

☒ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

_[signature]_    N51882    6,24,04
Committed Person's Signature    ID#    Date
(Continue on reverse side if necessary)    Rebuhn H.O    7-12-04

**Counselor's Response (if applicable)**

Date Received: __/__/__    ☐ Send directly to Grievance Officer    ☐ Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: Offender is scheduled to see a Corneal Ophthalmologist for Contact Lens fitting.

RECEIVED AUG 2 2004

Print Counselor's Name    Counselor's Signature    Date of Response

**EMERGENCY REVIEW**
WESTERN ILLINOIS C.C.
GRIEVANCE OFFICER

Date Received: 06,28,04

Is this determined to be of an emergency nature?
☐ Yes; expedite emergency grievance
☒ No; an emergency is not substantiated. Committed person should submit this grievance in the normal manner.

_[signature]_    06,28,04
Chief Administrative Officer's Signature    Date

Distribution: Master File; Committed Person    Page 1    DOC 0046 (Eff. 10/2001)

EXHIBIT 25
2-26-07 DB



ILLINOIS DEPARTMENT OF CORRECTIONS
COMMITTED PERSON'S GRIEVANCE (Continued)

However, on June 17, 2004 I turn in the refill sticker for the medication called Alphagan 1.5%. A medication I use 3 times a day to treat Glaucoma. I turn in the empty bottle on June 21, 2004 asking for a refill.

But was told on June 23, 2004 by Nurse Edwards that according to some one in the Pharmacy that the Alphagan could not be ordered until June 29, 2004. ( It should now be noted that the Alphagan that I receive comes in a very small bottle, from which I am required to use three times a day).

The withholding of my medication by the Health Care Unit Staff for non-disclosed reasons is not only deliberate indifference to my serious medical needs but is also endangering my left eye sight: because the Alphagan is prescribed to lower my eye pressure and thereby stopping the Glaucoma from robing me of the sight in my left eye.

It should be noted that the repeated indifference to Doctors Order's and my Disibility is the subject of an Evidentiary Hearing to determine if a Preliminary Injunction should be issued in order to stop I.D.O.C. and it's Agent's from engaging in the above described behavior and the likes.

RELIEF REQUESTED

to be given the names of the persons responsible for denying me the Alphagan, to be sent out for eye pressure check and vision and eye examination as soon as possible and to be given the prescribed Alphagan A.S.A.P. and any other measures taken that are deemed need. Also to be compensated in amount and type to be determined.

STATE OF ILLINOIS      )
                       ) ss
COUNTY OF SANGAMON     )

## AFFIDAVIT

I, SANDRA FUNK, being first duly sworn upon oath, state that I have personal knowledge of the facts set forth herein, that I am competent to testify and if called to testify would state as follows:

1. I am currently employed by the Illinois Department of Corrections as Assistant Manager in the Transfer Coordinator's office, and have been so employed since March, 2005. My employment with the Illinois Department of Corrections began in 1992 when I was hired as a Library Technical Assistant at Jacksonville Correctional Center. In August of 1994, I became a Correctional Counselor II, and served in that position until 1998 when I became a Casework Supervisor. I was promoted to Assistant Warden of Programs at Western Illinois Correctional Center in August, 2002.

2. As Assistant Warden of Programs, I held a supervisory position over the program areas at Western Illinois Correctional Center. These areas included the Healthcare Unit, education, vocational units, the Record Office, and Clinical Services.

3. I also acted as the Warden's designee for the purpose of reviewing offenders' grievances. This duty included determining if a grievance marked "emergency" by an offender, truly contained a request or information of an emergency nature. Often, offenders would designate grievances as "emergency" in hopes of expediting the resolution of their grievance, even though the nature of the grievance was one that could be resolved through regular channels.

4. The regular grievance process entailed the offender writing the grievance and turning it into his counselor. The counselor would take care of the issue, if it was one that could be easily resolved. If the counselor was unable to resolve the grievance, either because it was beyond the scope of his duties or because there could be no resolution to the grievance, it would either be forwarded back to the offender for him to decide if he wanted to continue to grieve the issue, or on to the grievance officer for investigation and recommendation.

5. Grievances of a medical nature usually involved obtaining information

from someone in the Health Care Unit. Once the information was obtained, the grievance officer would relay the information received and the grievance officer's recommendation to the warden or his designee for review. The warden or his designee could either concur with the grievance officer's recommendation or not concur with the recommendation. The warden or his designee could also refer the issue back to the Health Care Unit for further information, if the information given was not adequate to make a decision.

6. As designee for the warden, when I reviewed a grievance that contained medical issues, I would review the information from the offender, as well as the information from the grievance officer and Health Care Unit. If the information included in the grievance officer's report as obtained from medical personnel was that the offender was under the care of physicians for the complaint at issue, or that the medical personnel were aware of the complaint, I would most likely concur in the denial of the grievance.

7. I am not licensed or trained as a physician and cannot determine what care or treatment an offender should receive for a particular ailment. I rely on the medical personnel in place at the facility to provide that care. I also cannot, as a result of the grievance process, grant an offender relief that would be contrary to the medical determinations already made by the physicians caring for that offender. I also do not determine when an offender goes on a writ for medical reasons.

8. I never based my decisions regarding any offender's grievance on my personal feelings about an offender. I also never denied a grievance or otherwise mistreated an offender because he utilized the grievance process.

9. Placement of offenders at Western Illinois Correctional Center was done by assignment. Offenders who were assigned to jobs or other programs were generally housed together for ease of movement and security considerations. Offenders who were unassigned, for medical or any other reason, were also housed together.

10. Consideration in placement was given to offenders with a designation of "vulnerable" or "predator." This designation was one that would generally follow the offender from institution to institution for purpose of alerting staff as to appropriate placement. An offender who had a medical condition would not necessarily receive a "vulnerable" designation, especially since the counseling and placement staff would not necessarily know what medical conditions offenders suffered from. Rather, any special consideration for that offender's medical concerns would be ordered by the medical personnel. This might include low bunk/low gallery permits, permits for wheelchair or walking aids, permits for assistants, etc. This

could also include an order or request that the person be single celled for medical reasons.

11. In the same vein, an offender would not be classified as "predator" simply because he had been in physical altercations during his incarceration. In most cases, the designation of "predator" and "vulnerable" was made according to the sexual assault prevention codes.

12. Consideration in placement was also given to inmates who were members of security threat groups, more commonly known as gangs. It would compromise the security of the offenders and the institution if too many of one security threat group was housed together, or if members of rival groups were housed closely together. Additional consideration was also given to offenders who have either listed other inmates as enemies or who have been listed by other inmates as enemies. Generally, enemies are not housed at the same institution, and that determination is made by the Transfer Coordinator's office at Springfield.

13. Vulnerable and predator information, and information about security threat groups are available on the Offender Tracking System, or OTS, and would be available to the placement officer. However, medical information is not available on OTS, and would not generally be available to non-medical personnel.

14. Offender disciplinary histories were generally not part of the determination when placing offenders in general population, as all of the offenders housed at a particular institution such as Western Illinois Correctional Center were deemed appropriate for placement anywhere in general population at that institution. If an offender was considerably more dangerous, he would most likely be housed in a higher security institution or would remain in segregation.

15. During segregation placement, a determination is made as to whether an offender can be double celled. Such consideration is not considered necessary in general population, because a person who is considered to be of great threat to himself or other offenders would most likely be in segregation for an extended period, or would be transferred to a higher security level institution.

16. Offenders who have trouble with their cell mate can talk to the security staff on the housing unit. He could also talk to his counselor or to health care personnel. Sometimes issues can be resolved between cell mates informally. While it's possible for an offender to request a cell change because he does not like his cell mate, it is not necessarily given. However, if an offender does not feel he is safe with his cell mate, he can refuse the housing assignment. When he does that, he is immediately

taken away from the cell mate and to segregation. He is written a disciplinary ticket, and the situation with the cell mate would be investigated. If there is found to be substance to the offender's fears, and he is not refusing housing for some other purpose, he will most likely be found not guilty of the disciplinary ticket and released from segregation to another cell.

17. I am familiar with offender Aaron McCroy, and recall talking with him about various issues while I was Assistant Warden at Western Illinois Correctional Center. At no time did I believe that Mr. McCroy was not receiving proper medical care. At no time did I engage in any harassment or retaliatory behavior regarding Aaron McCroy.

18. I also did not participate in the drug test or subsequent discipline that resulted in Mr. McCroy's transfer to Menard Correctional Center.

19. I was not apprised by anyone with medical knowledge about the specifics Mr. McCroy's medical condition, other than that which was included in grievances I reviewed. I was also not informed that he was in any particular danger because of that medical condition, and did not know of any recommendations by an outside physician that Mr. McCroy not be housed in general population. An offender's medical restrictions are determined by medical personnel within the institution, and to my knowledge, no medical doctor at Western Illinois Correctional Center recommended Mr. McCroy not be housed in general population in June of 2004.

20. To my knowledge, Aaron McCroy was continually under the care of physicians for his medical conditions, and was not precluded from participating in any activities that he was medically and physically able to perform.

21. At no time during my tenure at Western Illinois Correctional Center did I see any Illinois Department of Corrections or Wexford employee mistreat, discriminate against, or retaliate against Aaron McCroy.

FURTHER AFFIANT SAYETH NOT.

*Sandy Funk*
SANDY FUNK

SUBSCRIBED and SWORN to before me this 29th Day of March, 2007.

*Kathleen D. Greer*
NOTARY PUBLIC

OFFICIAL SEAL
KATHLEEN D. GREER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 4-4-2007

STATE OF ILLINOIS        )
                         ) ss
COUNTY OF RANDOLPH       )

## AFFIDAVIT

I, ADRIAN FEINERMAN, M.D., being first duly sworn upon oath, state that I have personal knowledge of the facts set forth herein, that I am competent to testify and if called to testify would state as follows:

1. I am currently employed by the Wexford Health Source as Medical Director of Menard Correctional Center. I have held this position for approximately 2 to 3 years. Prior to that time, I was the Medical Director at Pinckneyville Correctional Center, and held that position for approximately 2 years. Because Pinckneyville Correctional Center is currently without a full-time Medical Director, I also am Acting Medical Director for that facility.

2. I am licensed to practice medicine in the state of Illinois.

3. As part of my duties, I medically evaluate the offenders housed at Pinckneyville and am available to take call from staff who relay offender's medical needs.

4. On January 16, 2006, I saw Aaron McCroy at Pinckneyville. He presented to me asking for an ADA cell. I evaluated him and noted he had an enucleated left eye and kerotoconus of his right eye. My assessment was that he had decreased visual acuity. According to Mr. McCroy's medical records, my plan was that he was ok for an ADA cell, a low bunk, low gallery, and physically challenged permit.

5. At the time I determined he could have permission to be housed in an ADA cell, I did not make that determination based on any belief that Mr. McCroy required a larger cell. In fact, in my opinion, it would be easier for someone who is visually challenged to maneuver around a smaller area. I believed at the time I saw Mr. McCroy, due to his decreased vision, he would benefit from any accommodations that might assist him. Since Mr. McCroy wanted to be housed in an ADA cell, I gave him permission to be so housed.

6. However, while I believe Mr. McCroy can be housed in an ADA cell, I do not believe his disability requires that type of cell. The larger cell would be required for someone in a wheelchair who required additional space. The ADA cell would also be required for someone who needed the assistance of rails on the wall to get in or out of a chair or on or off of the commode. Mr. McCroy is not in either situation.

FURTHER AFFIANT SAYETH NOT.

_____
ADRIAN FEINERMAN, M.D.

SUBSCRIBED and SWORN to before me this 18th day of April, 2007.

_____
NOTARY PUBLIC

OFFICIAL SEAL
DIANA M. DESALLE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 5-14-2007

STATE OF ILLINOIS            )
                             ) ss
COUNTY OF PERRY              )

## AFFIDAVIT

I, TERRY EPPLIN, being first duly sworn upon oath, state that I have personal knowledge of the facts set forth herein, that I am competent to testify and if called to testify would state as follows:

1. I am currently employed by the Illinois Department of Corrections as Stationary Engineer Assistant Chief at Pinckneyville Correctional Center. I have been so employed since September 1, 1999.

2. As part of my duties, I am in charge of the maintenance of the physical plant of the correctional institution.

3. I am familiar with the furnishings in the cells at Pinckneyville, and their upkeep, regardless of whether the cell is a single, ADA or segregation cell or a double cell in general population or segregation.

4. All of the bunks at Pinckneyville are made by Correctional Industries at Shawnee Correctional Center, and all were made to the same specification. Also, all of the cells' furnishings are inspected to make sure there are no sharp edges. Sharp edges in a cell could be a safety hazard for both staff and inmates alike.

FURTHER AFFIANT SAYETH NOT.

_____
TERRY EPPLIN

SUBSCRIBED and SWORN to
before me this 5th Day of April, 2007.

_____
NOTARY PUBLIC

OFFICIAL SEAL
CHALENE A WHITLEY
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:03/03/09

STATE OF ILLINOIS         )
                          )
COUNTY OF SANGAMON        )

## AFFIDAVIT

I, Terri Anderson, having first been duly sworn upon oath, state that I have personal knowledge of the facts set forth herein, that I am competent to testify, and if called to testify I would state as follows:

1. I am currently employed as the Manager of the Office of Inmate Issues. As part of my duties I am a member of and oversee the Administrative Review Board.

2. Director Walker does not receive, review or respond to offender grievances. The Administrative Review Board assists the Director of the Illinois Department of Corrections by reviewing inmate grievance appeals.

3. Director Walker did not receive, review or respond to any grievances from Aaron McCroy, Register No. N51882.

FURTHER AFFIANT SAYETH NOT

_____
Terri Anderson

Subscribed and sworn to before me
this ___ day of April, 2007.

_____
Notary Public

OFFICIAL SEAL
MELODY J. FORD
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 8-8-2007