E-FILED
Friday, 04 May, 2007  02:18:46 PM
Clerk, U.S. District Court, ILCD

2/21/07
Dennis Hockaday

McCroy v. Illinois Dept. of Corrections

```
 1                   UNITED STATES DISTRICT COURT

 2              FOR THE CENTRAL DISTRICT OF ILLINOIS

 3                     SPRINGFIELD DIVISION

 4

 5   AARON McCROY,

 6            Plaintiff,

 7       vs.                        No. 02-3171

 8   ILLINOIS DEPARTMENT OF
     CORRECTIONS, et al,
 9
              Defendants.
10

11

12

13           THE DEPOSITION of DENNIS HOCKADAY, taken

14   in the above-entitled case before Debra K. Baldwin,

15   a Notary Public of Sangamon County, acting within

16   and for the County of Sangamon, State of Illinois,

17   at 10:15 o'clock A.M., on February 21, 2007, at

18   Jacksonville Correctional Center, Morgan County,

19   Illinois, pursuant to notice.

20

21

22           Baldwin Reporting & Legal-Visual Services
               Serving Illinois, Indiana & Missouri
23          24hrs (217)788-2835    Fax (217)788-2838
                         1-800-248-2835
24
```


COPY

Page 1

2/21/07                     McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

```
1       APPEARANCES:

2           LONDRIGAN, POTTER & RANDLE
            BY:   Thomas F. Londrigan, Esq.
3                 1227 South Seventh Street
                  Springfield, Illinois 62703
4                 On behalf of Plaintiff.

5           MS. KELLY CHOATE
                  Assistant Attorney General
6                 500 South Second Street
                  Springfield, Illinois 62706
7                 On behalf of Defendant Illinois
                  Department of Corrections.
8
            HEYL, ROYSTER, VOELKER & ALLEN
9           BY:   Ms. April Troemper
                  Attorney at Law
10                National City Bank Building, Suite 575
                  Springfield, Illinois 62701
11                On behalf of Defendant.

12          HUGHES, HILL & TENNEY, LLC.
            BY:   Carl J. Tenney, Esq.
13                236 North Water Street
                  Decatur, Illinois 62525
14                On behalf of Defendant Doctor David
                  Anderson.
15

16

17

18

19

20

21

22

23

24
                        Page 2
```

2/21/07                           McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1                        I N D E X

2    DEPONENT                                PAGE NUMBER

3    Dennis Hockaday

4          Examination by Mr. Londrigan      5, 168
           Examination by Ms. Troemper        108
5          Examination by Ms. Choate          110

6

7

8

9

10

11                    E X H I B I T S

12   NUMBER                      MARKED FOR IDENTIFICATION

13   Exhibit 1                          26
     Exhibit 2                          33
14   Exhibit 3                          37
     Exhibit 4                          41
15   Exhibit 5                          50
     Exhibit 6                          59
16   Exhibit 7                          61
     Exhibit 8                          62
17   Exhibit 9                          67
     Exhibit 10                         69
18   Exhibit 11                         74
     Exhibit 12                         77
19   Exhibit 13                         83
     Exhibit 14                         85
20   Exhibit 15                        100

21

22

23

24
                          Page 3

2/21/07                           McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1                          S T I P U L A T I O N

2                  It is stipulated and agreed, by and
between the parties hereto, through their
3        attorneys, that the deposition of DENNIS HOCKADAY
may be taken before Debra K. Baldwin, a Notary
4        Public and Certified Shorthand Reporter and
Registered Professional Reporter, upon oral
5        interrogatories, on the 21st of February A.D.,
2007, at the instance of the Plaintiff at the hour
6        of 10:15 o'clock A.M., Jacksonville Correctional
Center, Morgan County, Illinois;

7
                 That the oral interrogatories and the
8        answers of the witness may be taken down in
shorthand by the Reporter and afterwards
9        transcribed;

10               That all requirements of the Federal
Rules of Civil Procedure and the Rules of the
11       Supreme Court as to dedimus, and the reading over
and signing of the deposition by the witness, are
12       expressly waived;

13               That any objections as to competency,
materiality or relevancy are hereby reserved, but
14       any objection as to the form of question is waived
unless specifically noted;

15
                 That the deposition, or any parts thereof
16       may be used for any purpose for which depositions
are competent, by any of the parties hereto,
17       without foundation proof;

18               That any party hereto may be furnished
copies of the deposition at his or her own expense.
19

20

21

22

23

24

                              Page 4

```
 1                    (Whereupon the Deponent was

 2                    sworn by the Notary Public.)

 3              D E N N I S    H O C K A D A Y

 4     having been first duly sworn by the Notary Public,

 5     deposeth and saith as follows:

 6                    EXAMINATION

 7                    BY MR. LONDRIGAN:

 8          Q    Would you state your full name, please.

 9          A    Dennis Hockaday.

10          Q    And are you currently an employee of the

11     department of corrections?

12          A    No, I am not.

13          Q    Who are you employed by at the present

14     time?

15          A    Part-time by Sears.

16          Q    When is the last time that you were

17     employed by the department?

18          A    I retired the end of September of '02.

19          Q    Give me your personal background, where

20     you're from, where did you go to school and your

21     employment history.

22          A    Okay.

23          MS. CHOATE: I would object to the personal

24     information other than what his educational level
```

                                   Page 5

2/21/07                        McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1    is, that sort of thing. Employment history's fine.

2    But as far as personal history, we have safety and

3    security issues and I'm instructing him not to

4    answer that.

5        MR. LONDRIGAN:   Q   And you are recognizing the

6    advice of your attorney?

7        A    Uh-huh.

8        Q    And, I take it, that Ms. Choate is your

9    attorney in this matter, right?

10       A    Correct.

11       Q    And you're not going to answer that

12   question?

13       A    Correct.

14       Q    And that would be true if you were called

15   at trial?  You'd refuse to answer that question, is

16   that right, under her direction?

17       A    Correct.

18       Q    Is there any knowledge that you have,

19   based upon your experience, while you were an

20   employee of the department, and knowing that you

21   were named as a defendant by one of the prisoners

22   that were under your direction and control as to

23   whether or not you would have anything to fear from

24   my appointed client?

Page 6

2/21/07                         McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1        A    No.

2        Q    Anything that you can recall in his

3    record that showed he had a combative or assault

4    propensity against him?

5        A    I don't recall this inmate, so, I mean...

6        Q    There are some inmates though that do

7    have a long history of violence?

8        A    Correct.

9        Q    And you're normally made aware of that

10   through records that are kept in the ordinary

11   course of business by the department?

12       A    Correct.

13       Q    And when a prisoner comes from one

14   institution or is transferred, say, in your case,

15   to Western, you would be provided with all that

16   type of information from the department?

17       A    The institution would have been provided,

18   yes.

19       Q    The background information on that

20   particular prisoner?

21       A    Right.

22       Q    Go through your employment history with

23   me.  As I understand from Ms. Choate, that is not

24   part of her objection.

Page 7

2/21/07                        McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

```
1          A    Okay. My state employment started in '72.

2          Q    No. You can go back before that. Prior to

3     the time that--

4          A    That's when I graduated from high school.

5          Q    Okay. Now I follow you.

6          A    Okay. I started with the state in the

7     fall of '72 at the department of mental health. I

8     stayed with them until '77, August of '77.

9          Q    What did you do with mental health?

10         A    I was a mental health technician.

11         Q    And what does that involve?

12         A    Just dealing in direct care with the

13    patients. The patients I had dealt with mainly were

14    ambulatory, high functioning. Many of these

15    patients have gone on to further their educations

16    and are functioning in--

17         Q    And what was your training prior to take

18    time that you were placed into that position?

19         A    I was trained by the state to work that

20    job.

21         Q    Prior to that, did you have any type of

22    academic or on-the-job training before you went to

23    work for them?

24         A    No.
```

Page 8

1          Q    You were 18 years old and just graduated

2     from high school?

3          A    Uh-huh. Correct.

4          Q    And when was it then that you first came

5     to work for department of corrections?

6          A    '78.

7          Q    And what was your first job there?

8          A    As an officer.

9          Q    Uniformed officer?

10         A    Correct.

11         Q    And what were your job duties?

12         A    Oh. Everything. Everything an officer

13    would do. I worked mostly, in the beginning, 3 to

14    11 shift, working cell houses, working towers,

15    working detail assignments. Just any job an officer

16    could have, I would have done it.

17         Q    Now, you didn't have any particular rank

18    other than officer, is that right?

19         A    At that time.

20         Q    And that was the entry level, or lowest

21    level, was officer?

22         A    Correct.

23         Q    And where was it that you started working

24    when you came?

2/21/07                          McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1          A    Logan.

2          Q    And then you went from Logan to where?

3          A    Well, I worked up through the ranks at

4     Logan. I left Logan in '99.

5          Q    Well, explain that to me. It would be

6     easier for you, in narrative fashion, to just go

7     ahead and explain to me what you did and when you

8     did it up to the present.

9          A    Okay. I would have been an officer in '78

10    and remained an officer until '82. Became a

11    lieutenant. '83, November of '83 I became a

12    captain. Then I remained a captain until '99 until

13    I left Logan for Pontiac.

14         Q    Okay. So in 1999 you were at the rank of

15    captain?

16         A    Uh-huh.

17         Q    And I assume that you have officer, then

18    you have -- is the next up lieutenant?

19         A    Yes.

20         Q    And then captain?

21         A    Uh-huh.

22         Q    Go ahead with your own narrative.

23         A    I went to Pontiac in '99 as chief of

24    security, major. And that was in the fall of '99.

                          Page 10

1    The spring of 2000 I became an assistant warden of

2    operations at Pontiac. I remained there at Pontiac

3    until June of '01 when I came to Western as a

4    warden, and then I retired from the warden in end

5    of September of '02.

6        Q    Tell me what your job was when you were

7    head of security.

8        A    Chief of security there at Pontiac?

9        Q    Yes.

10       A    I was the person of the captains that the

11    three shifts would have answered to. I was under

12    the direction of the assistant warden of

13    operations. So I dealt with just strictly security

14    matters.

15       Q    And what rules and regulations were you

16    required to be familiar with when you were in that

17    position?

18       A    All the directives and administrative

19    directives. Mainly 504.

20       Q    All right. And those are customarily kept

21    where and how are they distributed?

22       A    All the directives?

23       Q    Yes. Are they in some type of manual?

24       A    Correct. In basically all the offices

1    would have copies of that, you know, from the

2    captain's office to the major's office.

3         Q    And they would change, I take it, from

4    year to year?

5         A    Yes. And they would be reviewed every

6    year when you took your--every year all security

7    had to be retrained, 40 hour training, and a big

8    part of that was reviewing new directives and old

9    directives, making sure that you knew those things.

10        Q    Does fighting among cellmates, does that

11   fall under any of the security regulations, as

12   you're familiar with them?

13        A    Yes. Yes.

14        Q    At that time what regulations were in

15   place to prevent fighting or assault upon one

16   cellmate by another cellmate.  The cellmate in this

17   case was at risk. Were there any rules or

18   regulations that applied to that type of situation

19   as far as security is concerned?

20        MS. CHOATE: I would object to "at that time".

21   Was it when he was a major, which in that case

22   there would be a relevance issue. He was at Pontiac

23   as a major, he was at Western as a warden, and the

24   foundation that McCroy was at risk.

2/21/07                        McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1            You can answer, if you know.

2       MR. LONDRIGAN:  Q  We're not at trial and this

3  is not evidence. I'm trying to--

4       MS. CHOATE: Well, it's evidentiary.

5       MS. TROEMPER: This is an evidence deposition

6  in federal court, there are no discovery

7  depositions, so this will be treated as an evidence

8  deposition, and I will join in the objection as

9  well.

10       MR. LONDRIGAN: Well, I stand corrected, but

11  I'm still entitled to get an answer.

12            The fact that these ladies may make

13  objections is their prerogative. They'll be ruled

14  on by a judge at a later time and place.

15       THE DEPONENT: Well, you also said the word

16  "prevent". I'm not for sure if the ER's are

17  exactly what you would say would prevent something.

18  It gave you the parameters on how to report and

19  handle situations.  But to prevent?

20       MR. LONDRIGAN:  Q  All right. What regulations

21  at that time would apply if you knew you had one

22  cellmate that had a propensity and a history of

23  attacking other cellmates if he was placed in a

24  cell with a particularly vulnerable prisoner as far

                        Page 13

1    as his health was concerned?

2        MS. CHOATE: Objection.

3        MR. LONDRIGAN: Well, okay.

4        MS. CHOATE: Could you limit it to what time

5    you're talking about, Tom.

6        MR. LONDRIGAN:  Q  During the time that you

7    were head of security at Pontiac.

8        A    Okay.

9        Q    How would you handle that type of

10   situation? Were there any regulations that applied?

11       A    It was single cell so it wasn't an issue.

12       Q    Pardon me?

13       A    It was single cell so that wasn't an

14   issue.

15       Q    So that was a major security prison?

16       A    Right.

17       Q    What category was it?

18       A    Max. Level one.

19       Q    And do you know why they had single

20   cells?

21       A    It was a segregation prison.

22       Q    And do you know why, if it was a

23   segregation prison with that level of security, why

24   they placed cellmates in separate cells?

Page 14

2/21/07                              McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1        A    By court order that was. Pontiac became a

2   single cell prison sometime back in--by court

3   order.

4        Q    No, I'm not asking you why Pontiac at

5   that time was a maximum security prison, I'm asking

6   if you know, from an institutional standpoint,

7   based upon your background and training as to why

8   cellmates were kept separate, or, excuse me, why

9   prisoners were kept in separate cells?

10       A    At Pontiac?

11       Q    Yes.

12       A    That's just the way it was. It was a

13  single cell segregation. Segregation was single

14  cell.

15       Q    So you don't know of any reason why that

16  was not done?

17       A    No.

18       Q    You didn't know then and you don't know

19  now, is that right?

20       A    When I came in '99, it was single cell.

21  When I left there in '01, it was single cell.  And

22  it still is single cell, to my knowledge.

23       Q    Well, certainly if you have separate

24  prisoners in separate cells, you reduce the risk of

Page 15

2/21/07                    McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1    any type of fighting or attack.

2        A    Uh-huh.

3        Q    Would you agree to that?

4        A    Right. Correct.

5        Q    Now, go ahead with your background and

6    training with the department.

7        A    Okay. Well, when I came there, the--I

8    left Pontiac in June of '01 and went to Western as

9    the warden.

10       Q    You became the warden in Western?

11       A    Western.

12       Q    In June of '01?

13       A    Right. And left in September of '02.

14       Q    Now, while you were the warden at

15   Western, did you, or do you recall, acting or

16   having to take action with respect to the plaintiff

17   in this case Aaron McCroy?

18       A    I don't. I don't specifically recall this

19   inmate or actions.

20       Q    And you haven't been asked to or provided

21   the opportunity to review any records that occurred

22   while you were warden prior to this deposition, is

23   that right?

24       A    The only records I've reviewed are the

1    ones that were submitted in McCroy's lawsuit. I

2    would have reviewed those. I got that packet.

3        Q    I'm not sure what you mean so you've got

4    to explain. How did you happen to get these

5    documents?

6        A    When I got served with the lawsuit.

7        Q    You mean what was attached?

8        A    Exactly. Just those attachments.

9        Q    And filed in court?

10       A    Right. That's all I have.

11       Q    And you knew at the time that the

12   prisoner, Aaron McCroy, filed this suit that he was

13   naming you individually and as the warden at

14   Western?

15       A    Yes. When I read that, yes.

16       Q    And since that time the only thing that

17   you've seen, or reviewed, has been the complaint?

18       A    Uh-huh. And I reviewed my response.

19       Q    Okay. The pleadings that were filed in

20   the case?

21       A    Uh-huh.

22       Q    You have no independent recollection nor

23   have you reviewed any of the records that were kept

24   at Western while you were the warden?

1        A    No.

2        Q    Since you became an employee of the

3    department of corrections, has there always been a

4    grievance procedure?

5        A    Yes.

6        Q    And would you explain to me what your

7    understanding is as to why the department has a

8    grievance procedure.

9        A    For people to--as an avenue for people to

10   voice their complaint.  Whether it's an inmate

11   filing a grievance or an employee filing a

12   grievance, there's a grievance.

13       Q    Tell me how that handled. How does that

14   originate, who does it go to, and when does it come

15   to your attention.

16       A    To the best of my remembrance, basically,

17   the inmate would file the grievance, and that first

18   contact was his counselor who would review it and

19   sign off on it, and it would then go--you know, if

20   the inmate didn't agree with that resolution, they

21   could go higher. I don't really remember everything

22   on the chain of command on that. But it came up

23   through the program site up through operations.

24       Q    But there are rules and regulation that

Page 18

1    cover the program site?

2        A    Right.

3        Q    And you, as warden, at least at that

4    time, were familiar with them?

5        A    Yes. I mean, that would have been--.

6    You're talking about, you know, grievances. As far

7    as I know, they've always been, at least since '78,

8    they'd be times, even like an officer, an inmate

9    would file a grievance.

10            It wouldn't have to be just against

11   administration, it could be just an officer, and

12   you know that the counselor would get that, and the

13   counselor would call and talk to you, or they'd

14   come and talk to you, and this inmate's grieving

15   this situation, you know, what happened, what's

16   your response. So, I mean, yes, throughout the

17   years you answer to grievances on different levels.

18       Q    Tell me how the counselor system

19   operates.

20       A    I'm not--. Basically, there's counselors

21   assigned to each inmate.  A counselor is assigned

22   to them that reviews their caseload. They're not

23   there just for grievance purposes there.

24            They're there to evaluate the inmate's

Page 19

1    progress, making sure, you know, like good time's

2    been submitted, making sure if the inmate's

3    available for reduced security level placement to

4    another institution, or work release, or that type

5    of thing. The counselor deals with that, deals with

6    the inmate's programming.

7         Q    Who is it that assigns the counselor to

8    the inmate?

9         A    Their supervisor. Clinical services

10    supervisor.

11        Q    When you say their supervisor,--

12        A    Right.

13        Q    (Continuing)--who are you referencing?

14    Who are you talking about?

15        A    The counselor. The counselor supervisor

16    would have been the clinical services supervisor.

17        Q    Now, the counselor's supervisor would be

18    working in programs?

19        A    Correct.

20        Q    And you drew a distinction between

21    programs and another service.

22        A    Operations.

23        Q    All right. Would you explain that to me,

24    in laymen terms, and then tell me where and how

Page 20

1    it's defined in the rules and regulations of the

2    department.

3        A    Okay. Basically, inside the prison you

4    got two functions, programs and operations. In

5    programs you had counselors, you had healthcare,

6    education. I'm trying to think if I missed

7    anything. Under operations, you'd have security,

8    you had dietary.  Under programs you had the record

9    office. I think that was about it.

10       Q    Okay. So under programs the counselor of

11   the inmate would help them through the grievance

12   process, is that right?

13       A    Correct.

14       Q    But there are certain rules and

15   regulations that apply to the grievance process--

16       A    Uh-huh.

17       Q    (Continuing)--that are followed

18   institutionally and also that the inmate must

19   follow?

20       A    Correct.

21       Q    And you have forms--

22       A    Correct.

23       Q    (Continuing)--that you utilize?

24            And those forms should be freely provided

1    to the inmate so that they can actually verbalize

2    and put down on paper what they're complaining

3    about?

4        A    (Nodded head up and down.) Uh-huh.

5        MS. CHOATE: You need to answer with a yes or

6    no.

7        THE DEPONENT: Oh, okay.  I'm sitting here

8    nodding. Yes.

9        MR. LONDRIGAN:  Q  And are you, as the warden

10   at Western, between the years of 2002-2004, aware

11   of any grievance that was filed by Aaron McCroy?

12       A    I wasn't warden during those times.  The

13   dates that you just said, I wasn't there.

14       Q    All right. You came in 2001, right?

15       A    Correct. And left the last day of

16   September of 2002.

17       Q    So that at the time that you left, the

18   prisoner, McCroy, had already filed in federal

19   court for relief as to what was occurring at

20   Western. Is that right?

21       A    I don't know.

22       Q    When is the first time that you were

23   provided with any paperwork, that you can recall,

24   whether it was by way of grievance or filing in the

Page 22

1    federal court so that you knew this inmate was

2    making complaints about what was going on there?

3        A    I don't recall. The date that the lawsuit

4    would have been served on me, there would be some

5    date attached to that that I would sign for

6    personally. Because those are all for signature.

7        Q    Were you aware while you were warden at

8    Western of the dispute over whether or not Aaron

9    McCroy should receive a corneal transplant?

10       A    Specifically, I don't recall. I can't go

11   back and say, yes, I remember McCroy was making

12   this issue, specifically. Now, generally, I can

13   remember there was conversation. Whether that

14   conversation was while I was there or after, you

15   know, about some inmate wanting a cornea

16   transplant, and if that's the inmate, I'm not

17   really for sure. So, I mean, I...

18       Q    There's--. Let me start over. I'm going

19   to cover some other areas with you.  Do you recall

20   whether or not Aaron McCroy, compared to other

21   inmates during the time you were warden, filed

22   numerous grievances?

23       MS. TROEMPER: Objection. Foundation.

24       THE DEPONENT: I don't recall them.

Page 23

1        MR. LONDRIGAN:  Q  Do you recall whether or

2   not some inmates filed numerous grievances, much

3   more than the average, while some may have not

4   filed any grievances at all?

5        A    Yeah. Yes.

6        Q    Do you have any recollection of numerous

7   grievances being filed by any inmate, whether it be

8   McCroy or anyone else, during the period of time

9   that you were the warden at Western?

10       MS. TROEMPER: Objection. Relevance.

11       MR. LONDRIGAN:  Q  See, the judge is going to

12  rule on those objections later on, but if you have

13  to answer me now.

14       A    Say that question again.

15       MR. LONDRIGAN: Would you read it back to him,

16  please.                    (Whereupon the requested

17                             portion of the record was read

18                             back by the Reporter.)

19       THE DEPONENT: What do you consider numerous?

20       MR. LONDRIGAN:  Q  I consider numerous if you

21  were sufficiently aware that you thought of this

22  particular inmate as being a problem

23  administratively to you.

24       MS. TROEMPER: Same objection.

Page 24

1          THE DEPONENT: I don't recall them.

2          MR. LONDRIGAN:  Q  And that was your job, to

3    ultimately make a ruling or a disposition on

4    grievances?

5          A    I had a designee on that.

6          Q    Pardon?

7          A    I had a designee on that.

8          Q    And who was that?

9          A    My assistant warden of programs,

10   Assistant Warden Schnepel. And then after he left

11   it was Assistant Warden Funk for the last two

12   months that I was there.

13         Q    And when was it again that you left

14   Western?

15         A    The last day of September of '02.

16         Q    And then you went where?

17         A    Home. I retired.

18         Q    Okay. So you didn't go to another

19   institution before you left?

20         A    No.

21         Q    Well, some of these documents that I show

22   you will be before you left Western and others will

23   be after. But they are Western documents.

24         A    Okay.

                        Page 25

2/21/07                         McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1        Q    So I'm going to ask you to tell me who

2    some of these people are, what their job

3    responsibility was, and what some of these

4    documents mean based on your understanding of how

5    that institution worked.

6        A    Okay.

7                          (Whereupon said document was

8                          duly marked for purposes of

9                          identification as Exhibit 1, as

10                         of this date.)

11       MR. LONDRIGAN:   Q  Let the record show that

12   I'm handing the witness what I've marked as

13   Exhibit 1 and just ask you if you'd tell me what

14   that is.

15       A    Let me read it first.

16       Q    Well, if you--

17       A    Okay. It says it's the response to

18   committed person's grievance.

19       MS. TROEMPER: Can I ask you what the date is

20   on that document?

21       THE DEPONENT: 3/29/02.

22       MS. CHOATE: And that's the response date?

23       THE DEPONENT: Right. This would have been the

24   response from the chief administrator's office.

                        Page 26

1          MR. LONDRIGAN:  Q  Now, Exhibit 1 bears your

2     signature, is that right?

3          A    It's my name. It's signed by

4     Mr. Schnepel.

5          Q    And is that Mr. Schnepel's handwriting

6     above your name?

7          A    Yes.

8          Q    Do you read and approve these chief

9     administrative officers' response, or do you just

10    delegate that to somebody else?

11         A    That was delegated. Grievance

12    procedures--grievances came up through the

13    assistant warden programs office.

14         Q    And by what regulation, rule or authority

15    were you doing that at that time?

16         A    I'm not for sure. It was allowable. I'm

17    not for sure, you know.

18         Q    Well, explain to me why it was allowable?

19    Was it because there was a specific rule?

20         A    Because of the volume.

21         Q    Was there a specific rule, or was that

22    something that you worked out within the prison

23    while you were there?

24         A    That was everywhere. It wasn't just--.

                        Page 27

1    I'm not really for sure. I can't go back and say

2    there was a DR. I'm sure there was an AD or DR per

3    designee. I'm not really for sure what the number

4    is. I know there's something that gives us the

5    authority to designate, not only as an assistant

6    warden, every position I had I had people delegated

7    to do things for me.

8        Q    And you have no way right now, not having

9    those in front of you for pointing out to me, by

10   what authority you delegated this responsibility to

11   someone else?

12       A    Right.

13       Q    Now, if you look beside your signature,

14   are those initials there discernible to you?

15       A    Yes.

16       MS. CHOATE: I would object to calling it his

17   signature. He said he did not sign it, so it's not

18   his signature. It's his name affixed.

19       MR. LONDRIGAN:   Q  Well, it's somebody, who in

20   handwriting, wrote your name down there, right?

21       A    Yes.

22       Q    Now you tell me.  Maybe you can tell by

23   initials who it was that wrote this.

24       MS. CHOATE: Objection. Asked and answered.

2/21/07                    McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1        THE DEPONENT: (No response.)

2        MR. LONDRIGAN: I don't understand that

3   objection, but I don't think I have an answer.

4            Q  So if you did give me an answer, how

5   do you tell who it was that wrote your name on this

6   piece of paper?

7        A    That's his initials.

8        Q    Okay. Now, I'm going to--. Would you

9   circle where the initials, you find those initials

10  on the page.

11       A    (So complied with request.)

12       Q    And would you now write the name of the

13  person that actually signed your name to this

14  grievance.

15       A    (So complied with request.) I believe

16  that he--. I think that's how you spell it.

17       Q    Well, he spelled your name correctly and

18  I suppose that's more important.

19       A    Okay.

20       Q    Do you see at the top where it says facts

21  reviewed?

22       A    Yes.

23       Q    It says the inmate was interviewed. Would

24  that be by his counselor?

                        Page 29

1          MS. TROEMPER: Objection. Foundation.

2          THE DEPONENT: Yes. Yes.

3          MR. LONDRIGAN:  Q  And the inmate told his

4     counselor that he was being denied proper medical

5     treatment and that it was causing him harm. Do you

6     see that there?

7          A     Uh-huh.

8          Q     Do you remember this ever being brought

9     to your attention?

10         A     No.

11         Q     The inmate stated that he had to be

12    rushed to Quincy due to the HCUs. And would you

13    explain for the record what HCU is?

14         A     Healthcare units.

15         Q     And who was the head of the healthcare

16    unit at that time?

17         A     Debbie Fuqua.

18         Q     Due to the healthcare unit's negligence

19    concerning his cleaning solution for his contacts.

20         MS. TROEMPER: Is that a question?

21         MR. LONDRIGAN: Well, I haven't completed the

22    question.

23             Q  Do you see that?

24         A     Yes.

                    Page 30

1        Q    Where it's written?

2        A    Uh-huh.

3        Q    Now, if you look to the bottom, there is

4    a recommendation.  Do you see the name Tara Barr?

5        A    Correct.

6        Q    Now, she is a grievance officer. What are

7    the duties and responsibilities of a grievance

8    officer?

9        A    To accept the grievance from the inmate,

10   review it and interview. Because up above you'll

11   see where she interviewed the nurse concerning what

12   the inmate stated as facts.  And Nurse Shaw was

13   interviewed and that interview was conducted by the

14   grievance officer.

15       Q    Does the grievance officer make a finding

16   of whether or not the inmate had to be rushed to

17   Quincy for medial--emergency medical care?

18       A    Let's see. The grievance officer didn't

19   make that, the nurse did. This is the nurse's

20   statement. What was recorded, Nurse Shaw

21   interviewed, and the following is her statement.

22   The nurse could make that evaluation by reading the

23   reports. So if the nurse said it was not an

24   emergency writ, then it was not an emergency writ.

Page 31

2/21/07                        McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1        Q    Do you know what the result was from the

2    records kept--

3        A    No.

4        Q    (Continuing)--at Quincy as to what the

5    problem was here?

6        A    No, I don't.

7        Q    Do you know, as you sit there today, what

8    those problems were prior to the time that you left

9    the institution?

10        A    I don't recall. That would have been with

11    the recommendation there.

12        Q    That basically nothing he--that the

13    grievance be denied?

14        A    Yeah. They're denying. What the inmate

15    was saying, he was denied proper medical treatment,

16    and what the grievance officer found after talking

17    to Nurse Shaw was that he was not denied proper

18    medical treatment. He was given medical treatment.

19        Q    By being taken to Quincy?

20        A    And seen by whoever saw him at Quincy.

21        MS. CHOATE: And, also for the record, I'd like

22    to object as Exhibit 1 being just a partial

23    document, it's not complete.  It's the last page of

24    the agreement. It's not the entire grievance.

Page 32

2/21/07                McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1        MR. LONDRIGAN: And counsel will have the

2    opportunity to supply any additional pages. In

3    fact, we've asked for additional pages at prior

4    depositions. We're not sure what we have and what

5    we don't have at the present time.  And if you

6    think that this is incomplete or you need any

7    additional pages, I'd suggest that they're

8    available to your counsel, but not to me.

9        MS. CHOATE: I would also like to put on the

10   record that counsel went through Mr. McCroy's

11   master file in which these are found and marked the

12   pages he wanted copied. If they were not copied

13   completely, that wasn't counsel's doing, and we can

14   certainly try and find out, if I am told, which

15   pages are missing and we can try and find those.

16        I would state that this document has

17   nothing to do with this witness, so I certainly

18   would have no reason to show him anything else

19   about it.

20        MR. LONDRIGAN: Would you mark that as

21   Exhibit 2, please.

22                    (Whereupon said document was

23                    duly marked for purposes of

24                    identification as Exhibit 2, as

                    Page 33

1              of this date.)

2         MR. LONDRIGAN:  Q  Let me hand you Exhibit

3    Number 2. Exhibit 2 is labeled as an emergency

4    grievance. It bears the date of March 11th, 2002.

5    And you were the warden at that time at Western, is

6    that right?

7         A    Correct.

8         Q    What is the difference between a normal

9    grievance and an emergency grievance?

10        A    I don't recall. There is definitions for

11   both and I don't recall.

12        Q    Do you normally handle emergency

13   grievances, or are they handled at a higher level?

14        A    They would have been handled--the

15   assistant warden would have reviewed them.

16        Q    Have you ever seen this document that I'm

17   showing you now before I showed it to you today?

18        A    Was it in the packet that I received?

19        Q    I don't know.

20        A    I don't--. I reviewed everything that was

21   in that packet, you know, briefly read through it

22   to see what this was all about.

23        Q    The packet that you received from where?

24   From whom?

                        Page 34

1        A    On the lawsuit in McCroy's.

2        Q    Oh, you're talking about the materials

3    that were filed in court?

4        A    Right. Correct.

5        Q    No. I'm asking you about the emergency

6    grievance here. When an emergency grievance is

7    filed, where does that go?

8        A    It would have been reviewed by the

9    assistant warden of programs.

10       Q    Who was Schnepel?

11       A    Schnepel. At that time, yes.

12       Q    But you wouldn't necessarily know

13   anything about it then unless he brought it to your

14   attention?

15       A    Right. Correct.

16       Q    And you don't recall whether or not he

17   thought it was important enough to bring it to your

18   attention?

19       A    I don't recall specifically where I could

20   say, yes, I know I had these conversations with

21   Assistant Warden Schnepel concerning this inmate.

22   No.

23       Q    I want you to look at the last paragraph

24   here.

2/21/07                 McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1       A    On page 2 or page 1?

2       Q    On page 1.

3       A    Okay.

4       Q    Finally I wrote to assist warden Schnepel

5    and Ms. Fuqua, HCU administrator, asking to see a

6    qualified doctor. Upon seeing the doctor he had me

7    rush to the Quincy Clinic for treatment. The doctor

8    in Quincy disclosed to me that both of my contact

9    lenses are doing great damage to my corneas.

10          Do you recall that ever being discussed

11    with you by Assistant Warden Schnepel in March of

12    2002?

13          MS. TROEMPER: Let me first place an objection.

14    It's hearsay as to that document.  And foundation.

15          THE DEPONENT: Like I said, I don't recall.

16          MR. LONDRIGAN:  Q  Do you know what she means

17    when she says hearsay?

18          A    Just that it's hearsay, this inmate's

19    version.

20          Q    It's part of the official records kept

21    here at the--. You knew that allegation or you

22    didn't know that allegation. This is from prison

23    records, isn't that right?

24          A    Correct.

2/21/07                McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1        Q    You, however, are not aware that he made

2   that complaint in March of 2002?

3        A    Like I said, I don't recall.

4        MR. LONDRIGAN: Would you mark this as 3.

5                      (Whereupon said document was

6                       duly marked for purposes of

7                       identification as Exhibit 3, as

8                       of this date.)

9        MR. LONDRIGAN:  Q  Now, on an emergency

10   grievance, does the institution have the

11   opportunity to first make a ruling, or does it go

12   directly to the director?

13       MS. CHOATE: Objection.  Foundation that it

14   ever goes to the director.

15       THE DEPONENT: From what I remember, an

16   emergency grievance, and it looks like he acted

17   timely because the date on that was like March 11th

18   or something like that, and he responded in written

19   form back to the inmate with the written response.

20       MS. TROEMPER: What's the date on that exhibit?

21       THE DEPONENT: March 12th.

22       MS. CHOATE: '02.

23       MR. LONDRIGAN:  Q  Is there any level for

24   you--. I shouldn't say for you. Is there any level

                        Page 37

1    above warden--

2        A    Yes.

3        Q    (Continuing)--for this institution that

4    acts on emergency grievances? Or do they end at

5    your desk?

6        A    The inmate can file a grievance to

7    Springfield to the Administrative Review Board, you

8    know, if he's not satisfied with what was...

9        Q    Tell me how that process works. Which

10   grievances go to the Administrative Review Board?

11       A    Once an inmate sends them there--. I'm

12   not really familiar because I've never worked over

13   there in Springfield, so I'm not really for sure

14   which ones get to them, you know. It's after--. I

15   know the inmate has got to exhaust institutional

16   grievance procedures before they can file to the

17   ARB. How they get there, I would say they'd have to

18   send it by letter.

19       Q    So there's no way to get around these

20   grievances going over your desk? You can't go

21   directly, in any case, to a higher level, is that

22   right?

23       MS. CHOATE: I would object to foundation as to

24   they go to his desk. He said they go to the

                          Page 38

1    assistant warden of programs desk.

2        THE DEPONENT: They'll end up going to

3    Springfield if the inmate wants them to go to

4    Springfield if he's followed the institutional

5    procedures.

6        MR. LONDRIGAN:  Q  Well, you're talking about

7    a method of review. Is there any direct route,

8    assuming that there truly is an emergency, for an

9    inmate to direct an emergency grievance at a level

10   above warden? That's what I meant by "your desk".

11   Is there a way that you can short-circuit, or

12   leapfrog, your desk and file an emergency grievance

13   at a higher level?

14       A    I don't recall that. I don't remember. I

15   don't--. From what I remember, before the inmate

16   could file to Springfield, it had to be done--

17   the institutional grievance committees had to be

18   exhausted.

19       Q    What were the applicable rules and

20   regulations that were maintained at Western while

21   you were warden that would govern this procedure as

22   it relates to both grievances and emergency

23   grievances?

24       A    I'm not for sure what you're asking.

Page 39

2/21/07                    McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1        Q    What's the name of the book or the

2    regulations that would tell you as warden and tell

3    an inmate what this procedure is and where they can

4    file and with whom they should file an emergency

5    grievance?

6        A    Oh, the inmate would have copies. He

7    could get that at the law library. He'd also have

8    that in his handbook that he would have been--I

9    believe it would have been in his handbook that he

10   would have got in orientation that would tell him

11   basically grievance procedures and such.

12       Q    And what would you have as warden? What

13   would you consult?

14       A    Administrative regulations and

15   directives.

16       Q    And that would be something that would be

17   kept on your desk or in your room?

18       A    In the office.

19       Q    And in your office.

20            Who was responsible for administering and

21   interpreting those regulations? You or Mr.

22   Schnepel?

23       A    They weren't open for interpretation.

24   You had to do them.

                      Page 40

1       Q    Who was responsible ultimately for

2    compliance?

3       A    Oh, I was, as warden.

4       Q    Would you hand this witness Exhibit 4.

5                    (Whereupon said document was

6                    duly marked for purposes of

7                    identification as Exhibit 4, as

8                    of this date.)

9       MR. LONDRIGAN:  Q  Now, would you identify

10   Exhibit 4?

11      A    It's an inmate grievance.

12      MS. CHOATE: Dated 3/30/02.

13      MR. LONDRIGAN:  Q  What's the date?

14      A    3/30/02.

15      Q    And can you tell me who the counselor is

16   at the bottom?

17      A    I don't recognize that. I don't know who

18   that is.

19      Q    Aren't they supposed to print their name

20   so you can read that signature? I can't read the

21   signature and I assume you can't.

22      A    Yeah.

23      Q    And you can't tell me the printed name or

24   what that is?

1        A    Not for sure.

2        Q    This is designated as an emergency

3    grievance. It's typed at the top. How are emergency

4    grievances treated differently from a normal

5    grievance filed in the ordinary course?

6        A    There is a difference. Like I said

7    earlier, I don't remember the definitions on both

8    of them, but each of these are defined differently

9    in different procedures, you know, the time

10   restraints. To me, what I remember there's a time

11   restraint.  There's a quicker time restraint on an

12   emergency grievance.

13       Q    And if this were placed on your desk by

14   Mr. Schnepel during that period of time and you

15   wanted to answer that question in your own mind,

16   what would you take a look at? What internal rules

17   or regulations of the department?

18       A    Again, what did you say?

19       Q    If Schnepel placed this grievance on your

20   desk and said, warden, this is an emergency

21   grievance, this has been repeated a number of

22   times, similar complaints, what do you want me to

23   do about this, what would you consult with respect

24   to the rules and regulations that applied if he

                         Page 42

2/21/07                    McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1    asked for your guidance?

2        A    Specifically on this one?

3        Q    Yes.

4        A    As far as I know, he never did ask me

5    that.

6        Q    Well, I'm assuming he didn't. I'm

7    assuming that, based on what you've told me, none

8    of this came to your attention, it was all handled

9    by Schnepel even though he signed your name.

10           I'm saying what if he came to you and

11   said, look, we've had a number of these, this is

12   health related, it's labeled an emergency

13   grievance, what rules do we follow that are in

14   place within the department?

15       A    Let me go back. I'll answer that. If he

16   came to me and said, you know, the inmate has a

17   real grievance here, there's an issue here,

18   whatever, on an emergency grievance, you know,

19   whatever the issue was, it would be addressed, you

20   know.

21           You know, I can't--I'm not a doctor, so I

22   can't sit there and write an on order. But there is

23   a doctor that's over--the institutional doctor, who

24   is Doctor Elyea, and I could have responded

Page 43

1    directly to Doctor Elyea and said, doc, there's a

2    problem here. So, I mean, there is a recourse there

3    even this is no way in my field.

4            But emergency grievance, just because an

5    inmate writes an emergency grievance -- because I

6    know there is a difference between a regular

7    grievance and an emergency grievance, and an

8    emergency grievance is going to get higher priority

9    and acted on quicker, okay, so just because--

10    Q    What do you understand to be an emergency

11    grievance?

12    A    Well, I'm getting to that.

13    Q    All right.

14    A    Just because an inmate puts an emergency

15    grievance on there does not make it an emergency

16    grievance. I'm assuming, and I'm assuming here

17    because there's nothing to say, and there -- this

18    would have been reviewed by my designee, and he

19    would have looked at this, and this is not an

20    emergency, this is a followup to an emergency --

21    counselor, and this would have probably been a

22    counselor, and counselors handle this routinely,

23    that's why you don't see the dates being as quick.

24            Because any inmate--. If inmates think

Page 44

1    every grievance can be acted on quickly, can get to

2    administrative review quicker, why would they go

3    through the regular grievance procedure?  They

4    would deem all things as an emergency if they had

5    that.

6         Q    I understand.

7         A    Okay.

8         Q    What you're saying to me is that some

9    inmate might think something is an emergency and

10   the higher-ups in the institution don't think so.

11   Is that right?

12        A    Correct.

13        Q    But who has the ultimate responsibility

14   under your rules and regulations--

15        A    The warden.

16        Q    (Continuing)--to decide whether or not an

17   emergency does exit?

18        A    On this? On the grievance?

19        Q    Yes.

20        A    Mr. Schnepel, who would have reviewed

21   that, would have determined whether or not.

22        Q    Through your authority that you delegated

23   to him?

24        A    Exactly.

Page 45

1      Q    And if he did not consult you or ask your

2    advice, he simply signed your name and put his

3    initials next to it. Is that how it operated in the

4    ordinary course?

5      A    Now, he would discuss things with me.

6    You know, whether--. We met daily, me and both my

7    assistant wardens, and we would talk about daily

8    routines. This could have come up in conversations

9    throughout the day, you know, in our meetings that

10   we had every day. I don't recall.

11     Q    You don't recall any instance of

12   Mr. Schnepel coming to you and pointing out that

13   this inmate claimed that he had an emergency

14   medical condition that required prompt action?

15     A    No. And I've reviewed -- and I believe

16   these are the same documents that I got when I got

17   served -- I reviewed through there just to see what

18   this is all about, you know, and by looking at it

19   in a different light, looking at this five years

20   detached from this, I can still go back in there

21   and look and go everything was handled according to

22   procedure.

23          The inmate had a grievance.  It was

24   reviewed. The inmate wanted medical attention.

                        Page 46

1    Inmate got medical attention. Inmate got extreme

2    medical attention. He was sent outside for whatever

3    consultation in Quincy.

4            I look at this and keep thinking what's

5    the issue. Yeah, the inmate had a medical problem

6    and doctors were dealing with it.

7        Q    The issue is whether or not you

8    participated in or were informed about this at the

9    time that the decision was made. And my

10   understanding was, very early on in this

11   deposition, that you told me you hadn't reviewed

12   any materials other than the complaint and what was

13   filed--

14       A    Right.

15       Q    (Continuing)--in court and that you had

16   no independent recollection of any discussions with

17   Schnepel, or anybody else, about an emergency

18   medical condition that this inmate Aaron McCroy

19   had. Is that what you told me earlier?

20       A    Correct. I can't specifically say that I

21   sat with Assistant Warden Schnepel and we discussed

22   these issues.

23       Q    What you're telling me now is that in

24   looking at the exhibits that I've given you here

Page 47

1    that this appears to be okay with you?

2        A    This appears the inmate had a medical

3    issue that was addressed.

4        Q    All right. Are you informed now, as you

5    sit there, what that medical issue was?

6        A    That he had an eye problem.

7        Q    Is that it?

8        A    Yeah. It's an eye issue.

9        Q    Yes, it's an eye issue.

10            Is it an emergency eye issue based upon

11   what information I've provided you here today?

12            MS. TROEMPER: Objection. Foundation. He

13   testified he's not a physician.

14            THE DEPONENT: Yeah.

15            MR. LONDRIGAN: Well, I know.

16        Q    You are in a position to determine

17   whether or not grievances should be treated as

18   emergencies though, aren't you?

19        A    Correct.

20        Q    It's really up to a physician as to

21   whether the extent--nature and extent of the

22   medical problem, isn't it?

23        A    Correct.

24        Q    And you're not a physician, are you?

Page 48

1      A    Correct.

2      Q    Who in the institutional framework did

3   you talk to about whether or not Aaron McCroy had

4   an emergency medical condition?

5      MS. CHOATE: Objection. Foundation. He's never

6   testified to that.

7      THE DEPONENT: I don't recall.

8      MR. LONDRIGAN: I know he didn't testify to it.

9      THE DEPONENT: I don't recall specifically

10   having these conversations.

11      MR. LONDRIGAN:  Q  Well, you didn't have any

12   conversations, did you? You don't have any

13   documents that show you ever had any conversations

14   with medical personnel?

15      A    Correct.

16      Q    You don't have any recollection that you

17   ever had those conversations with medical

18   personnel?

19      A    Correct.

20      Q    But yet you continued, throughout the

21   period that you were warden, just to allow Schnepel

22   to sign your name as the final determination on

23   these grievances. Is that right?

24      A    Correct.

Page 49

1                    (Whereupon said document was

2                    duly marked for purposes of

3                    identification as Exhibit 5, as

4                    of this date.)

5        MR. LONDRIGAN:  Q  Just take a look at Exhibit

6    Number 5, which is dated March 12th, 2002, and this

7    was sent to my client under your signature.

8        A    (Reviewing document.)

9        Q    Have you ever seen that before?

10       A    Yeah. It was in that packet I got.

11       MS. CHOATE: I would object to the foundation

12   as this document being under his signature. His

13   name is on it. It's not been determined if it's his

14   signature or not.

15       MR. LONDRIGAN: I'm going to ask all those

16   questions.

17           Q  You don't know anything about this

18   letter that I've just shown that you purports to

19   contain your signature, do you?

20       A    Other than what I've read once--since I

21   got it.

22       Q    And I just handed it to you?

23       A    Correct.

24       Q    Nobody else has handed it to you before

                    Page 50

1    today?

2         A    No. That was in that packet.

3         Q    Are you saying that was in a packet that

4    you got from your counsel?

5         A    No. From McCroy in the lawsuit.

6         Q    You're saying that that letter was

7    attached to the complaint in the lawsuit?

8         A    (Nodded head up and down.)

9         Q    So you read that then and you are

10   familiar with it? You've seen it before?

11        A    Correct.

12        Q    But the first time that you saw it it was

13   provided to you then by Aaron McCroy when he filed

14   this lawsuit?

15        A    Yeah.

16        Q    Do you understand that Aaron first filed

17   this lawsuit in the federal court and that I was

18   appointed by the federal court to represent him at

19   some time later? Did you understand that?

20        A    Yes.

21        Q    All right. And what you're saying is that

22   when Aaron McCroy filed this suit, we call it pro

23   se, in his own name, that you were getting a

24   package of materials that he filed with the court

2/21/07                        McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1      and it included this letter, Exhibit 5?

2          A    Correct.

3          Q    I want you to familiarize yourself with

4      it. That's the only copy I happen to have and so

5      I'm going to retrieve it from you when you're

6      finished.

7          A    Okay. (Reviewing document.) Okay.

8          Q    Do you know, as you sit there today, who

9      the doctors were in March of 2002 that were

10     recommending that Aaron McCroy receive a corneal

11     transplant?

12         A    Yes. You've got them highlighted there.

13         MS. TROEMPER: I'll interject an objection.

14     Foundation and hearsay.

15         THE DEPONENT: What do you want me to do?  Read

16     this?

17         MR. LONDRIGAN: No. I want you to read it to

18     yourself, not read it into the record.

19         THE DEPONENT: Okay.

20         MR. LONDRIGAN:   Q  Who were the doctors that

21     indicated that Aaron McCroy was going to have to

22     have a corneal transplant in March of 2002?

23         MS. TROEMPER: Same objection.

24         MS. CHOATE: Objection. Foundation.

Page 52

1        MR. LONDRIGAN:  Q  You can always tell me you

2    don't know now and you didn't know then. Do you

3    know, as you sit there today, who the doctors were

4    that recommended that he have a corneal transplant

5    in March of 2002?

6        A    What this document's saying is that

7    Doctor Kehoe in Galesburg, he was seen by him and

8    recommended.

9        Q    So you're relying there on what Doctor

10   Kehoe recommended? Is that how you read that

11   letter?

12       A    I'm relying on what you gave me as to

13   what Doctor Kehoe said, yeah.

14       Q    And I received that from the department

15   and department counsel. It bears your signature. I

16   have nothing to do with the authoring, or the

17   alteration, or anything else on that letter.

18       A    Okay.

19       Q    Now, I'm going to read to you this

20   statement that is on the letter that bears your

21   signature.

22       MS. CHOATE: Objection. Foundation. You can ask

23   him if he signed it.

24       MR. LONDRIGAN:  Q  It's an Illinois Department

                          Page 53

1     of Corrections document that was produced to me in

2     discovery. It doesn't require further foundation in

3     this deposition.

4         MS. CHOATE: If you're asking him to comment on

5     if he authored, it does. He's commenting on

6     something else.

7         MR. LONDRIGAN: I'm not asking him that

8     question. I'll formulate the questions. This is a

9     department of corrections document and it's

10    independently admissible as an admission.

11            Q   I'm going to read to you the statement

12    here.

13        MS. CHOATE: Not by this defendant.

14        MR. LONDRIGAN: Well, he can deny knowledge,

15    but he had responsibility. I'm entitled to ask him

16    about it.

17        MR. LONDRIGAN:   Q   I'm going to read to you a

18    sentence now that you've already read to yourself.

19        A    Uh-huh.

20        Q    Doctors recommend that you receive a

21    corneal transplant, or, be seen by Doctor Kehoe in

22    Galesburg for refitting of your contacts. All

23    right. Number one question is do you know who the

24    doctors, plural, were that were recommending a

Page 54

2/21/07                     McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1    corneal transplant? Are you telling me that it was

2    Doctor Kehoe?

3         A    After reading the document, it says Sims

4    and Anderson.

5         Q    No, wait a minute. I don't need you to

6    interpret the document. I want to find out what

7    your knowledge, or interest, or inquiry was based

8    on your job responsibilities in March of 2002. Were

9    you made aware that doctors, plural, were

10   recommending that Aaron McCroy have a corneal

11   transplant, or, go see Doctor Kehoe?

12        A    I don't recall that specifically. No.

13        Q    Based on any information that you have

14   subsequent to this letter in March of 2002,

15   including any discussions you may have had with

16   Mr. Schnepel, were you aware of this need for a

17   corneal transplant that some undisclosed doctors

18   were saying needed to be provided to Aaron McCroy?

19        A    I don't recall that specifically. No.

20        Q    In the ordinary course of business should

21   that have been brought to your attention as warden?

22        A    And it could have. I'm saying I don't

23   recall having that.

24        Q    In any event, the next sentence says an

                          Page 55

1    order was placed by Doctor Anderson and Doctor Sims

2    for you to be scheduled for Doctor Kehoe. Now, were

3    you aware of who Doctor Kehoe was?

4         A    No.

5         Q    Are you aware now, as you sit there, who

6    Doctor Kehoe was?

7         A    No.

8         Q    How would you authorize -- what's his

9    title, Assistant Warden Schnepel? --

10        A    Uh-huh.

11        Q    (Continuing) -- to issue these types of

12   decisions on emergency grievances? Is there a

13   specific regulation or executive order delegating

14   that type of responsibility to the assistant

15   warden, or is it in his job description? Where does

16   that authority come from?

17        A    It would--. Oh.  I'm not really for sure

18   specifically. I know for signature authority I

19   signed off on forms saying, you know, these people

20   have signature authority for me on this, they have

21   signature for me on this, you know. That was done.

22   There would be documentation showing where I gave

23   significance authority for reviews of whatever the

24   case was.

Page 56

2/21/07                McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1       Q    Well, when the signature in authority

2    mean to you that someone else has the right to

3    affix your signature if you approve of the action,

4    or can they make the final decision on actions and

5    simply sign your name to it?

6       A    They are making the final decision and

7    signing my name to it.

8       Q    Where is the authority for that within

9    the department of regulations?

10       MS. CHOATE: I'm going to object. Asked and

11    answered.

12       THE DEPONENT: I'm not--. I'm not really for

13    sure. It's there.

14       MR. LONDRIGAN:  Q  Do you know why after this

15    letter was written and Assistant Director Schnepel

16    signed your name, Aaron McCroy was transferred to

17    physicians, first, to Quincy, and then to

18    Jacksonville, and then to Springfield rather than

19    going back to Doctor Kehoe who had been treating

20    him for several years?

21       A    I have no knowledge.

22           What are the dates on those transfers?

23       Q    Are you aware that that even happened?

24       A    (Shook head from side to side.) No.

Page 57

1        Q    As you sit there, as a former warden and

2    based upon your current knowledge and materials

3    I've given you to review, most of which for the

4    first time, who would make the decision as to which

5    outside qualified ophthalmologist would be selected

6    to provide treatment to inmate McCroy?

7        MS. TROEMPER: Objection. Foundation.

8        THE DEPONENT: It would have to be Doctor Sims

9    who was our institutional doctor. He worked under--

10   you know, he worked there at Western for Wexford,

11   so he would have worked under those guidelines.

12   It's something that you--

13       MR. LONDRIGAN:   Q   Are you telling me then

14   that Wexford doctors would make the decision as to

15   which outside treater, in this case a qualified

16   ophthalmologist, would see Aaron McCroy for these

17   conditions?

18       A    I believe so.

19       Q    Okay. And that would be independent of

20   any input from Doctor Elyea, or you, or anybody

21   else, is that right? You leave that decision to

22   Wexford?

23       A    It would be independent of what a warden

24   would do. I'm not for sure if that would be

Page 58

1    independent of Doctor Elyea.  That was in his

2    field.

3        Q    Tell me about Doctor Elyea, who he is,

4    what his authority was, and how he served the

5    department, as you understand it.

6        A    He's our state medical director.

7        Q    All right. When you say our state medical

8    director?

9        A    For corrections.

10       Q    For the department of corrections?

11       A    Uh-huh.

12       Q    And his offices are where?

13       A    I'm not--. I don't remember.

14       Q    Springfield? Chicago?

15       A    I don't remember.

16       Q    Either or both.

17                    (Whereupon a document was duly

18                    marked for purposes of

19                    identification as Exhibit 6, as

20                    of this date.)

21   MR. LONDRIGAN:   Q  I'm handing you Number 6.

22   This is a Wexford document, and I'm going to ask

23   you a series of questions, and I'll accept "I don't

24   know" as an answer. Do you know who Doctor

                       Page 59

1    Cleveland Rayford was?

2        A    I don't remember.

3        Q    Do you see the stamp in the left-hand

4    margin, non-approved? Is that a Wexford stamp, or

5    is that a departmental stamp?

6        MS. TROEMPER: Two objections. Hearsay.

7    Foundation.

8        THE DEPONENT: I can't tell.

9        MR. LONDRIGAN:  Q  So, in just looking at

10    Exhibit 6, you couldn't tell me, nor I assume

11    anybody else other than someone from Wexford, who

12    stamped that non-approved?

13        A    I don't know who did.

14        Q    Do you see under item 3 someone has

15    written the IDOC nor Wexford will pay for

16    transplantations, suggest that patient talk with,

17    and I can't read that.  Maybe you're better at

18    deciphering that than I am. Is it HCU?

19        A    I don't know.

20        MS. CHOATE: HCUA.

21        MR. LONDRIGAN:  Q  Or his family is willing to

22    take care of the cost of transplantation. This is

23    in May of 2002. Were you involved in this process

24    of determining whether or not Aaron McCroy required

Page 60

1    a corneal transplant to try and preserve his sight?

2         A    I don't remember.

3         Q    Would that type of thing, if it came to

4    your attention, would that be something that you

5    would remember or possibly forget about?

6         A    I would think I would possibly remember

7    it.

8         MR. LONDRIGAN: Mark this as 7.

9                        (Whereupon said document was

10                       duly marked for purposes of

11                       identification as Exhibit 7, as

12                       of this date.)

13        MS. CHOATE: It's dated 6/17/02. And it's only

14   the first page.

15        MR. LONDRIGAN:   Q  This is a grievance report

16   dated June 17th, '02, at the Western facility.  And

17   do you see where the name of Doctor Cleveland

18   Rayford is mentioned again?

19        A    Yes.

20        Q    And do you also see who Doctor Rayford is

21   is identified in the grievance?

22        A    Yes.

23        Q    And then do you see where apparently this

24   is the committed person language: Also I have never

Page 61

1    been seen by or talked to Doctor Cleveland -- now,

2    that's apparently his first name -- the person who

3    denied the request for corneal grafts as too

4    costly.

5            Now, what you're telling me is that in

6    June of 2002, before you left, that this issue,

7    according to your recollection, was never brought

8    to your attention. Is that right?

9        A    What I'm saying is I don't recall it.

10   Given with what I've got here to review, I don't

11   recall.

12       Q    Well, I'm not asking you necessarily if

13   you agree or--

14       A    Right.

15       Q    (Continuing)--this refreshes your

16   recollection. You came here without any documents,

17   and what you're telling me is you don't recall this

18   ever reaching your level where you personally, as

19   the warden of Western, was ever asked to exercise

20   any judgment or discretion in this case?

21       A    I don't--I don't recall it.

22                    (Whereupon said document was

23                    duly marked for purposes of

24                    identification as Exhibit 8, as

                    Page 62

1                    of this date.)

2        MR. LONDRIGAN:  Q  This is dated August 11th,

3  2002, and it's from Aaron McCroy. And do you see

4  who it's directed to?

5        A    Correct. To me.

6        Q    What, if any, action did you take in

7  response to this letter which was directed to you?

8        A    I don't recall.

9        Q    Do you recall if you ever read it?

10       A    I read it when I got--. I'm assuming that

11  everything that you're showing me today is in that

12  same packet that I got when I got McCroy's lawsuit.

13       Q    Well, you make that assumption,--

14       A    Right.

15       Q    (Continuing)--but I don't think it's a

16  valid assumption.

17       A    Okay.

18       Q    It's not something I agreed to. If you

19  want to make that assumption now, that's entirely

20  up to you and your counsel.

21       A    I don't recall this.

22       Q    All right. In the ordinary course of

23  business would you not read mail directed to you

24  individually and personally as warden from an

                        Page 63

1    inmate in your institution?

2       A    I read mail.  Understand the mail that

3    came to me had already been sorted. You know,

4    people, or whoever sorted the mail, knew where the

5    mail--you know, grievances go here, inmate requests

6    go here, whatever.  There was routing. I got the

7    mail that came to me.

8       Q    Then in the ordinary course of business

9    you would have read this letter even though you

10   weren't the person that responded or--

11      A    Grievances--. Under normal circumstances,

12   grievances go to be reviewed by the assistant

13   warden of programs first.

14      Q    Well, what you're saying, before you ever

15   would take a look at this, according to the policy

16   that existed in your office, this would be diverted

17   to somebody under your authority to respond to it

18   or make a decision?

19      A    Correct.

20      Q    How do you get involved in this process

21   of decision-making? You know there are deciders at

22   some point?

23      A    Yes. Yes. And if there is a situation and

24   if things weren't being handled correctly, then it

Page 64

1    would be brought to me. You know, I had designees

2    in every area. You know, all wardens do. The volume

3    of mail, the volume of decisions, what one person

4    would have to make in a day's time, you know, you

5    couldn't do it and be on top of everything. You

6    know, you may intend--.

7            There's checks and balances too. The

8    warden wasn't in an insulated, isolated area. The

9    warden made daily rounds. You know, you were in

10   touch with--you walked the cell houses, you went

11   through the cell blocks.

12           Inmates had access to you. You walked in

13   the dining room where inmates were eating.  Inmates

14   had access to you and inmates would voice opinions.

15   It wasn't uncommon for an inmate just come up to

16   you and say did you get my request for such and

17   such.

18           Inmates would generally direct things

19   straight to the warden. They have a tendency just

20   to send them straight up there and forget the

21   people down below that would actually handle it.

22   Clothing issues. Instead of sending something to

23   the clothing room, I'll send it straight to the

24   warden.

Page 65

1      Q    I want you to assume that there is a

2    whole history of action and inaction that predates

3    this letter personally addressed to you. My

4    question today is you don't know whether or not the

5    letter that's addressed by Aaron McCroy on this

6    issue was ever brought to your attention despite

7    the fact that this is a letter directed to you

8    personally?

9      A    Right.

10     MS. TROEMPER: I'll respond. Assumes facts not

11   into evidence.

12     MS. CHOATE: I join in that.

13     THE DEPONENT: I don't recall.

14     MR. LONDRIGAN:  Q  Do you know if this was

15   ever responded to by anybody?

16     A    I don't know.

17     Q    And that's despite the fact that you are

18   a named defendant here, you have not had the

19   opportunity, taken the time, or for whatever

20   reason, asked to go back and review all of these

21   materials that I'm going over with you here today.

22   Is that right?

23     A    I don't have access to that. I don't work

24   here.

Page 66