2/21/07                    McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

```
 1                    (Whereupon a document was duly

 2                    marked for purposes of

 3                    identification as Exhibit 9, as

 4                    of this date.)

 5        MR. LONDRIGAN:  Q  Now, this letter is dated

 6   the same date. Do you notice that?

 7        A    Uh-huh.

 8        Q    And it goes to you, it goes to Debbie

 9   Fuqua, and it also goes to Warden Funk.

10        MS. CHOATE: I would object to the

11   characterization "it goes to". It is addressed to

12   those people. Whether it went to them, we don't

13   know.

14        MR. LONDRIGAN: I'll accept that correction.

15        MS. TROEMPER: What's the date, please?

16        MS. CHOATE: August 11th, '02.

17        MR. LONDRIGAN: Q  Is there a process that

18   existed in the institution in August of 2002 that

19   if an inmate wanted to address correspondence to

20   you, to Warden Funk, and to Debbie Fuqua, the

21   healthcare administrator, that those communications

22   would be delivered in the ordinary course?

23        MS. CHOATE: Objection as to characterization

24   of Funk. She was an assistant warden.
```

Page 67

1        MR. LONDRIGAN: All right. Do you want to make

2   the correction for me?

3        THE DEPONENT: What specifically are you asking

4   here?

5        MR. LONDRIGAN:  Q  What was Warden Funk at

6   that time?

7        A    Assistant warden of programs.

8        Q    Now, in the ordinary course of how your

9   prison was run in August of 2002, if an inmate who

10   had concern about his medical condition addressed

11   these two letters, Exhibits 8 and 9, to people in

12   authority at the institution, would they be

13   delivered and received?

14        A    They should be.

15        Q    You've never seen these before though,

16   have you?

17        A    I'm not--. I don't recall them.

18        Q    Do you recall Warden Funk talking to you

19   about this medical problem?

20        A    I don't recall.

21        Q    Do you recall Debbie Fuqua talking to you

22   about this medical problem?

23        A    Again, I don't recall.

24

**Page 68**

2/21/07                      McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1                        (Whereupon a document was duly

2                        marked for purposes of

3                        identification as Exhibit 10,

4                        as of this date.)

5        MR. LONDRIGAN:   Q   Exhibit 10 is dated

6    August 12th, 2002, one day after the two letters

7    that we just looked at. I'm going to ask you some

8    questions so I can interpret what this letter has

9    to say.

10       A   Okay.

11       Q   It went to all vendors. How are vendors

12   defined as used in this letter?

13       A   I don't know. I don't know who he

14   intended to send this to, other than the cc's in

15   the back tell you who it went to.

16       Q   No. We'll get to the cc's in the back

17   later on.

18       A   Okay.

19       Q   Do you consider Wexford to be a vendor?

20       A   Yes.

21       Q   Who else in the context of the subject

22   matter of this correspondence were considered

23   vendors as it relates to Aaron McCroy and the

24   department of corrections?

                       Page 69

2/21/07                    McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1        MS. TROEMPER: Let me object as to foundation.

2    I don't even know what this subject matter is

3    pertaining to.

4        THE DEPONENT: I'm not for sure who the other

5    vendors were besides Wexford.

6        MR. LONDRIGAN:    Q  How would this matter come

7    to the attention of Doctor Elyea other than through

8    you?

9        A    I don't know.

10        Q    How would you not be aware of what's

11    being discussed here on August 12th of 2002 if you

12    were the warden at Western?

13        A    How this would have got to Elyea? I mean,

14    it could be Debbie Fuqua as the medical director at

15    Wexford or another vendor.  We're assuming it's

16    just coming from Western.

17        Q    What's the chain of communication, chain

18    of command here? How is Doctor Elyea advised of a

19    situation or a problem? Do people working under

20    your supervision simply leapfrog over you and go

21    directly to him?

22        A    There's people--. Yes. In medical, they

23    work underneath him. Debbie Fuqua would have been

24    healthcare administrator. I'm assuming the

Page 70

1    healthcare administrators can freely talk to

2    Doctor Elyea. Wexford doctors could talk to

3    Doctor Elyea I'm assuming. And, so, yes, I mean...

4        Q    Okay. Do you know what the quarterly

5    health services meetings are?

6        A    I'm not for sure what Doctor Elyea's

7    talking about there. In the institution they'll be

8    QA meetings, quality assurance meetings, that

9    were--I'm not even for sure. I don't remember how

10   often they were held.

11       Q    This is on Illinois Department of

12   Corrections' stationary--

13       A    Uh-huh.

14       Q    (Continuing)--as George Ryan as governor

15   and Donald Snyder as director at the top, and it

16   talks about a quarterly health services meeting.

17   Are you telling me that you don't understand what

18   that means?

19       A    I'm not so--. I don't know what he's

20   talking about. It says following the recent

21   quarterly health services meeting. What one he's

22   talking about, I don't know.

23       Q    All right. Do you see where it refers to

24   organ transplant being governed by the department

Page 71

2/21/07                    McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1    rule 415, dash, 80? Do you know what that is?

2         A    Just from reading this.

3         MS. TROEMPER: Let me just note an objection to

4    hearsay and foundation.

5         MS. CHOATE: And I'll join in that objection.

6         MR. LONDRIGAN:  Q  Do you know what it is?

7         A    Just this rule.

8         Q    If you were seated in the warden's office

9    in August of 2002, would you know how to find that

10   rule and consult it to see what it said?

11        A    Yeah. If you go to the department rules.

12        Q    Now, you left the next month, September,

13   is that right?

14        A    Right.

15        Q    And you went where from Western?

16        A    I retired.

17        Q    What is the office of health services?

18        A    I don't recall.

19        Q    Pardon me?

20        A    I don't recall what that is.

21        Q    What is the role of Deputy Chief John

22   Castro, program services?

23        A    I don't know.

24        Q    Do you see underneath that, wardens?

                          Page 72

2/21/07                    McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

```
1        A    Correct.

2        Q    Do you understand by looking at that that

3   you, together with all the other wardens, were

4   copied on this communication?

5        A    Correct.

6        Q    Did you read it?

7        A    I'm assuming I read it if I was copied.

8        Q    But you don't remember anything about it,

9   right?

10       A    No.

11       Q    Do you see where it says all healthcare

12  unit administrators?

13       A    Yes.

14       Q    Would that include Debbie Fuqua?

15       A    It should.

16       Q    Did she ever talk to you about this after

17  getting that communication?

18       A    I don't remember.

19       Q    Do you know who they're talking about in

20  here, in this communication?

21       A    No. It's not specific.

22       Q    Do you know of anybody else who had this

23  type of problem during this period of time?

24       A    No.
```

Page 73

1                        (Whereupon a document was duly

2                        marked for purposes of

3                        identification as Exhibit 11,

4                        as of this date.)

5          MR. LONDRIGAN:   Q  This is one day later,

6     Exhibit 11, August 13th, and it's about whom?

7          A    It's about inmate McCroy.

8          Q    And it's on Illinois Department of

9     Corrections stationary?

10         A    Correct.

11         Q    And at the bottom do you see your name?

12         A    Correct.

13         Q    And your affixed signature?

14         A    Correct.

15         Q    Who affixed your signature?

16         A    I can't tell by that.

17         Q    Do you see the subject?

18         A    It looks like SF, which would be Sandy

19     Funk.

20         Q    Okay. Now, Sandy Funk is--

21         A    Assistant warden of programs.

22         Q    And she was one of the people in the

23     earlier exhibit from Aaron McCroy that was copied

24     on communication that was sent to you.

                        Page 74

1        A    Uh-huh.

2        Q    Right?

3        A    And Ms. Fuqua too.

4        Q    The subject matter up there in bold is

5    Emergency Grievance.

6        A    Uh-huh.

7        Q    And it's to my client, Aaron McCroy, and

8    it's supposedly from Dennis L. Hockaday?

9        A    Correct.

10       Q    Warden. Do you remember anything about

11   this?

12       A    I don't recall.

13       Q    Well, who's ever responsible for this is

14   saying that they contacted the healthcare unit and

15   you have been denied by the Wexford Utilization

16   Review physician effective July 25th, '02, and that

17   your issue has been referred to Doctor Elyea. Once

18   that review is complete, Ms. Fuqua, the healthcare

19   unit administrator, will be notified and will

20   notify you. That decision's already been made,

21   hasn't it?

22       MS. TROEMPER: Let met interject my objections.

23   Hearsay, foundation.

24       MR. LONDRIGAN: I'm not offering it for the

Page 75

1    truth of the matter. And, as a matter, I'm offering

2    it for the fact that it was made and it's authored

3    under his signature at a period of time when my

4    client is being told that this issue is still under

5    advisement.

6          Q  This decision had already been made

7    the previous day, hadn't it, on August 12th?

8          A    Well, let's go back to Exhibit 10. It was

9    not received--whatever healthcare unit, it was not

10   received until August 16th. So if that was

11   originated on the 12th, on the 13th, the

12   institution was not aware of this until the 16th.

13         Q    When you say the institution was not

14   aware of it,--

15         A    I don't know where this was--. Since this

16   was to all vendors and all these cc's, I don't know

17   where--

18         Q    Well, the department was aware of it,

19   wasn't it?

20         A    What I'm saying is--

21         Q    The director was aware of it?

22         MS. CHOATE: Objection, foundation, as to who

23   was aware of this letter by Doctor Elyea.

24         THE DEPONENT: Well, it's clear, you know, it

Page 76

1    says a receipt on the 16th at whatever healthcare

2    unit administrator.

3         MR. LONDRIGAN:   Q  All right. When that

4    occurred, do you know what written notification,

5    supposedly, that's promised in this letter, was

6    ever provided to Aaron McCroy?

7         A    I don't recall. This was--

8         Q    You haven't seen any, have you?

9         A    This was sent to them on the 13th. Or

10   dictated on the 13th.

11        MR. LONDRIGAN: I would like to see the

12   response to this, how he was notified.

13        MS. CHOATE: Was there one in the master file?

14        MR. LONDRIGAN: Let's go off the record.

15                        (Discussion off the record.)

16                        (Whereupon a document was duly

17                        marked for purposes of

18                        identification as Exhibit 12,

19                        as of this date.)

20        MR. LONDRIGAN:   Q  Have you ever seen

21   Exhibit 12 before I showed it to you here today?

22        A    I don't recall. Again, if this was in

23   that packet, then I got it.

24        Q    Well, who did you get the packet from?

                        Page 77

1        A    Federal marshall probably.

2        Q    It was official service?

3        A    Yeah.

4        Q    It wasn't from your former employer, your

5    attorney, or anything else?

6        A    No.

7        Q    This is a few days later in August of

8    '02. Now, Doctor Sims is an employee of whom?

9        A    Wexford.

10       Q    And this record is with reference to

11   Aaron McCroy. And it says that the patient can no

12   longer tolerate contact lenses and that a corneal

13   transplant has been recommended. At that time, and

14   this is a month before you left, were you aware

15   that a corneal transplant had been recommended?

16       MS. TROEMPER: Before you respond, I just want

17   to object to reading from the document that there's

18   no foundation laid and it would be hearsay.

19       THE DEPONENT: I don't recall.

20       MR. LONDRIGAN:  Q  All right. And do you see

21   Sims, M.D., 8/19/02 at the bottom?

22       A    Yes.

23       Q    Who is, if you know, looks like Vlynne

24   Shelton?

                        Page 78

2/21/07                              McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

```
 1        A    I don't know.

 2        Q    Would Wexford submit a referral request

 3   form for approval to the department of corrections?

 4   Do you recognize this type of form?

 5        A    No, I don't.

 6        Q    So you don't know how this form was used?

 7        A    No, I don't.

 8        Q    You don't know whether it was ever sent

 9   to the department of corrections?

10        A    Correct.

11        Q    And you don't know, if it was sent, if it

12   was acted upon?

13        A    Correct.

14        Q    Based on your understanding as warden, if

15   this was a referral request form sent to the

16   department of corrections, to whom would it have

17   been sent?

18        A    I don't know.

19        Q    Do you know whose stamp is at the top,

20   non-approved?

21        A    Where is that at?

22        Q    (Indicating.)

23        A    Oh. No, I don't.

24        Q    I'm not going to show you this document
```

Page 79

1    because it's something you've never seen or talked

2    to, but I'm just going to ask you who some people

3    are. Who is Willard Elyea and what was his job

4    responsibilities with the department of corrections

5    before you left in September of 2002?

6        A    He was the state medical director for

7    DOC.

8        Q    And what were his responsibilities and

9    duties?

10        A    Specifically, I don't know what all they

11    were.

12        Q    Did he ever make healthcare decisions

13    about inmates that were assigned to your custody at

14    Western?

15        A    I don't recall.

16        Q    Who is Cindy Hobrock?

17        A    I don't remember.

18        Q    Do you remember if she was an employee of

19    department of corrections?

20        A    I don't remember. I don't remember if she

21    was at DOC or with Wexford, but that name

22    definitely was medical.

23        Q    Who is John Castro? Is that the name?

24        A    It was back here on one of--. He's out of

Page 80

1    Springfield. I don't remember what his title was,

2    but he worked out of Springfield.

3        Q    Who was Terri Anderson?

4        A    I don't know.

5        Q    She bears a title of Administrative

6    Review Board,--

7        A    ARB.

8        Q    (Continuing)--Office on Inmate Issues?

9        A    Yeah.  Inmate issues.

10        Q    And what grievances would originate with

11    that board rather than internal to the particular

12    prison such as Western?

13        A    I believe the only thing that

14    Ms. Anderson at ARB would have got would have been

15    ones that inmates filed directly to the ARB.

16        Q    And that's what I'm asking you. What

17    types of grievances?

18        A    It could be anything.

19        Q    Well, in other words, they had the option

20    of either filing--

21        A    No. No. Once their--their first course

22    was to file grievances locally in the institution.

23    If the inmate did not feel that it was resolved in

24    his--to his satisfaction, then he could take

Page 81

1    another step and that would be reviewed outside the

2    institution.

3        Q    So you're saying they're just there as an

4    administrative review body of what occurred an at

5    the institution, they have no original jurisdiction

6    to entertain emergency grievances?

7        A    I'm not really for sure how many other

8    duties they had, but, you know, they would review

9    things that were sent to them by the inmates.

10       Q    Well, let me put it this way. Do you know

11   of any difference in jurisdiction between the

12   administrative body outside your institution and

13   the grievance procedure as you've explained it

14   earlier in your deposition?

15       A    I don't remember anything further.

16       Q    Do you know who Doctor David Row,

17   R-o-w-e, who was with Wexford?

18       A    No.

19       Q    You never had any communications or

20   discussions with him?

21       A    I don't remember that name.

22       Q    Who took your place?

23       A    Be Winters. Kevin Winters.

24

Page 82

1             (Whereupon a document was duly

2             marked for purposes of

3             identification as Exhibit 13,

4             as of this date.)

5     MR. LONDRIGAN:  Q  Exhibit 13 is after your

6  tenure at Western which you can be a big help in

7  interpreting the document and who the people

8  signing off on these documents are.

9     MS. CHOATE: I would object to the foundation

10  and his competency to discuss documents that came

11  after his tenure.

12     MR. LONDRIGAN:  Q  You have no idea after you

13  left, why, in the ordinary course, that Aaron

14  McCroy or any inmate with a problem would require

15  special attention that wasn't available in the

16  institution--

17     A    I'm not aware.

18     Q    Well, I'm not. I hadn't quite finished.

19     A    Okay.

20     Q    (Continuing)--as to what the criteria was

21  for changing physicians, in this case,

22  ophthalmologists?

23     A    I don't know.

24     Q    This appears to be approved by the--it

Page 83

1    says assistant warden's signature, and it says

2    Kevin Winters, and then it looks like somebody may

3    be signing off for him.

4         A    Yeah. I don't know.

5         Q    Is this a new type of record, or was this

6    record, before the information was filed out on it,

7    was this a record that was used in the ordinary

8    course of business at Western while you were

9    warden?

10        A    Yeah. The form, it's just a writ form.

11        Q    And do you recognize the signature at the

12   bottom?

13        A    No. It's a lieutenant. That's just the

14   lieutenant that was signed by the gate house or as

15   he's living the institution dropping from the

16   count. That's the last point.

17        Q    And there's a record clerk's signature

18   Cathy Heckel.

19        A    Correct.

20        Q    What are the job responsibilities of

21   record clerks at the institution?

22        A    Concerning this? Or their all duties?

23        Q    First, generally. Generic answer. What do

24   the record clerks do?

Page 84

1     A    Maintain the inmate's master file. That

2   would be the biggest.

3     Q    And then when the inmate would be

4   transferred, say, to another institution, his

5   record would follow him?

6     A    Uh-huh.

7     Q    What's left behind by way of records

8   after the inmate has been transferred?

9     A    I'm not really for sure. Everything

10   should have--I believe everything goes with them.

11     Q    All right. Who would be most

12   knowledgeable today here at Western if we were to

13   ask that question of someone? What records would

14   remain behind?

15     A    Probably Cathy, the record office

16   supervisor.

17     Q    Would things like this drop slip request

18   for furlough, that type of thing, would they remain

19   here, or would they go with the prisoner to the

20   next institution?

21     A    It should be in their master file.

22                     (Whereupon a document was duly

23                     marked for purposes of

24                     identification as Exhibit 14,

Page 85

1                    as of this date.)

2       MR. LONDRIGAN:  Q  Is this a record that would

3    accompany a prisoner? This has Aaron McCroy's name

4    on it.

5       MS. TROEMPER: What's the date on that,

6    please?

7       THE DEPONENT: This is dated 2/25/02.

8       MS. CHOATE: But the date of escort is 1/6/03.

9    Somebody may have the dates wrong.

10      MR. LONDRIGAN:  Q  I'm not going to ask you

11   about that.

12      A    That should have been in the writ packet.

13      Q    And that would be true, not only of Aaron

14   McCroy, but of any cellmate that might be assigned

15   to him, isn't that right?

16      A    (No response.)

17      Q    Their escape history, they're assaulted

18   behavior, their gang activity, their possession of

19   weapons?

20      A    This here would be a review. Prior to an

21   inmate leaving the institution on a writ, a

22   security specialist, Benjamin McKee, would review

23   the inmate's master file to see if there are any

24   security concerns. And that's all this is.

Page 86

1      Q    Yes. What I'm saying is after Aaron

2    leaves, or after any inmate leaves, are these

3    records left behind?

4      A    Boy, you know what, I'm not really for

5    sure where those are. You know, I don't know.

6    Because those are--because those would have gone

7    out in the writ packet. I'm not really for sure the

8    filing on that, or whether the writ packet comes

9    back.

10     Q    Someone has to consult the prisoner's

11    records before this form is filled out, isn't that

12    right?

13     A    Correct.

14     Q    And that's for any prisoner that may seek

15    to leave the institution and go on a furlough?

16     A    Correct.

17     Q    You simply want to know what kind of

18    person you're dealing with and what risks people

19    outside might have?

20     A    Correct.

21     Q    What, if any, regulations cover the

22    assignment of prisoners and cellmates here with

23    respect to the safety and security of inmates?

24         MS. CHOATE: I would object to characterization

Page 87

1    of "here". Do you mean here at Jacksonville, or do

2    you mean at Western?

3         MR. LONDRIGAN: I mean Western.

4         MS. CHOATE: And what time limit?

5         MR. LONDRIGAN:  Q  By the way, are these

6    records--. Excuse me. Are these regulations

7    specific to the institution, or do you have some

8    universal regulations within the department that

9    apply whenever inmates are assigned to share a

10   cell?

11        A    Yeah. They're--. Boy, I've been out of it

12   so long. Inmates, when they first come into the

13   institution, they're left in orientation.  Okay?

14   During that orientation, there's a review done,

15   security levels, concerns during that part of

16   orientation.  There's a process of interviews with

17   the counselors, you know, what issues. They would

18   ask that inmate specifically if he has any issues,

19   you know, maybe gang issues, whatever.

20        Q    Homosexual tendencies?

21        A    Right.

22        Q    Whether or not he was a predator, whether

23   or not he had a history of violence or attacking or

24   assaulting other prisoners?

Page 88

1    A    Yeah.

2    Q    And why is that information kept?

3    A    (No response.)

4    Q    By regulation, is it?

5    A    I believe so. Mainly at Western they're

6    housed by assignment too. Now, taking into

7    consideration security concerns, but you would

8    house school in certain wings, you'd house like

9    industries in certain wings, unassigned in certain

10    wings. It just made for control of movement a whole

11    lot better. If you're running a school line, you'd

12    only have to go to one wing instead of 16 wings.

13    So, I mean, we house.

14    Q    What about an inmate who had a history of

15    violence and had been assigned to segregation for

16    attacking another cellmate and then came out and

17    did not have an assignment and was assigned in with

18    other prisoners? What would be done or what should

19    have been done with respect to assessing who would

20    be an appropriate cellmate or whether he should be

21    isolated from other cellmates?

22    A    I'm not really for sure.

23    Q    Who had that responsibility?

24    MS. CHOATE: Objection as relevance as to this

Page 89

1    witness. He wasn't there during the time frame that

2    we're talking about. And foundation as to the

3    issue.

4        MR. LONDRIGAN:   Q   Recognizing now, what was

5    your understanding, while you were here, what did

6    you do as far as the assignment office was

7    concerned to make sure that a violent prisoner

8    wasn't put in together with a prisoner which may be

9    at risk?

10       A    The placement office reviewed those

11   things prior to making the placement.

12       Q    Were they required to do that?

13       A    (No response.)

14       Q    Or is it just your judgment that's

15   something they should have done?

16       A    You know, I'm not really for sure. I know

17   it was done. I know you would review the placement

18   of the--you know, there are certain things. You

19   just couldn't take an inmate and just say, okay,

20   there's an empty bed there. There had to be things

21   done.

22       Q    Why? Why do you say that?

23       A    Safety.

24       Q    Safety of whom?

Page 90

1        A     All inmates involved. You didn't

2    essentially--

3        Q     Now, that makes sense, but what I want to

4    know is what rules or regulations offered guidance

5    to those responsible for placement as to which

6    cellmates should be placed together?

7        A     There's directives.  There's directives

8    that give you direction on that, how to place,

9    dealing with high vulnerables and predators.

10       Q     All right. Assuming I'm hired and that's

11   going to be my responsibility. What would my job

12   position be at the institution, at least while you

13   were here?

14       A     The placement officer?

15       Q     Yes. Who ran the placement office, in

16   other words?

17       A     It was a--there's a couple of people that

18   worked in there, plus a secretary. There was like

19   two or three people that worked in that area.

20       Q     And I'm not so much concerned about the

21   names right now.

22       A     Okay. They worked under security. They

23   were security officers.

24       Q     Okay. Who's in charge of implementing the

                          Page 91

1    rules and regulations as far as prisoner

2    assignment?

3        A    Specifically that was over that office? I

4    mean, ultimately the warden's always--you know,

5    goes up to him. But, I mean, the first level of

6    supervisor in there was--I think they were under

7    the major I believe. Or under--. I don't remember.

8    It was under the major or under clinical services.

9        Q    But you at various times do have

10   organizational charts which map out these different

11   positions with the names of who presently occupies

12   it so you can trace the chain of command, isn't

13   that right?

14       A    Right.

15       Q    Now tell me what regulatory guidance and

16   authorities are given to the people that run the

17   placement office about what criteria to use as far

18   as placement of inmates in cells? What book?  What

19   regulations do you go to?

20       A    There would be directives on it. What

21   number, I don't remember. But, yes, there were

22   directives telling you on placement, you know. The

23   institution, the IDRs, from the ADs and the DRs,

24   you'd make your institutional directives that would

                        Page 92

1    have specifically how Western or any institution

2    handles placement of inmates.

3        Q    And these would be throughout the

4    department, they just wouldn't be unique to

5    Western?

6        A    Each institution--. The ADs and DRs are

7    specific statewide, but in the institutional it

8    would be broke down from, you know, using those

9    specifically for that institution.

10        Q    When you say that institution,--

11        A    Any institution.

12        Q    (Continuing)--who would formulate them

13    and promulgate those regulations?

14        A    I don't know who would have wrote them

15    originally over there, but they would have been

16    written from, you know, from the very beginning of

17    Western. Whoever was there in the beginning, the

18    original administrators--

19        Q    And they might change from time to time?

20        A    (Continuing)--who wrote them, and they

21    would be updated every year. There's a review

22    process on that.

23        Q    When you were warden in there, in 2002,

24    and you were concerned for an inmate's security and

Page 93

1    safety, who would you have called in and asked to

2    tell you what were the applicable rules and

3    regulations and how they were currently being

4    administered?

5         MS. CHOATE: Objection. Relevance and

6    foundation.

7         THE DEPONENT: If I had a concern, a specific

8    concern on an inmate, why he's housed somewhere or,

9    you know, I would--

10        MR. LONDRIGAN:  Q  Not a specific concern

11   about an inmate, a specific concern about how it

12   operated and how the rules were being implemented.

13   Who was the person, while you were there at

14   Western, that you'd call in to ask those questions

15   to?

16        A    I'm trying to think if I ever had any

17   problem with placement.

18        Q    Well, I'm talking about addressing a

19   problem before it becomes a problem, eliminating

20   problems.

21        A    I would talk to the major. I would talk

22   to the major.

23        Q    And who was that when you left here?

24        A    I had a couple different majors. McKee

                        Page 94

2/21/07                        McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1    was at the end.

2         Q    M-c, capital K-e-e?

3         A    Yes.

4         Q    And then who prior to that?

5         A    Simmons. He was only there for a short

6    time.

7         Q    And they were majors?

8         A    Yes.

9         Q    And they had control over the placement

10   office?

11        A    Ultimately, and since there's officers

12   working there, running that, officers would have

13   been under the chief of security. So that's why I'm

14   saying--but also there's an overlap in that area

15   too, program issues, that I would go to the major

16   first.

17        Q    What would have authority to--. Well,

18   I'll tell you what, let me look at these for about

19   five minutes and see if there are any other

20   documents that I want to cover and I may have a

21   couple more questions after that. And then we'll

22   take the next witness.

23                   (Whereupon a short recess

24                    was taken at 12:20 p.m.)

                       Page 95

1          MR. LONDRIGAN:   Q  Who would have the

2     authority to assign a person who had a medical

3     problem and who had been assigned to the infirmary

4     to order that person back into the general

5     population?

6          A    To release a person from--if he's in a

7     medical unit--

8          Q    Yes.

9          A    (Continuing)--when he was released? The

10    doctor. If he had a medical problem--

11         Q    The doctor?

12         A    That would be for medical staff. I don't

13    know that would be a doctor or the nurses, you

14    know, under the doctor, I don't know, if he was

15    placed there for medical reasons.

16         Q    Suppose he was placed in there for

17    medical reasons which were assigned by an outside

18    specialist and gave certain criteria that needed to

19    be followed in the institution. Who within the

20    institution, or outside the institution, would have

21    the authority to determine it was appropriate to

22    place that inmate in the general population?

23         MS. TROEMPER: Objection. Foundation.

24         THE DEPONENT: Are you saying that an outside

Page 96

1    doctor placed an inmate in the infirmary in an

2    institution on his orders and not the orders of the

3    medical staff of the institution?

4        MR. LONDRIGAN:  Q  I'm saying that the medical

5    staff recognized that they initially were going to

6    follow the directives of the treating physician and

7    placed him in the infirmary. Who within the

8    institution would have the authority to place that

9    inmate in the general population? The question is

10   who or what office?

11       A    The medical. If medical assigned him

12   there, medical would release him.

13       Q    So that would be an employee of Wexford?

14       A    Be medical staff.

15       Q    What if the Wexford employees, none of

16   whom were ophthalmologists or held themselves out

17   to be qualified to treat or evaluate the condition

18   of the inmate, would they be authorized, under your

19   understanding, of prison protocol to assign that

20   person into the general population without a

21   recommendation from the treating ophthalmologists?

22       MS. TROEMPER: Objection. Foundation.

23   Incomplete hypothetical.

24       THE DEPONENT: I don't know.

Page 97

2/21/07                    McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1          MR. LONDRIGAN:  Q  Well, you're not a doctor.

2          A    Right.

3          Q    Correct?

4               None of the employees of Illinois

5     Department of Corrections are doctors?

6          A    No.  That's wrong.

7          Q    At Western?

8          A    Right.

9          Q    Do you know of any of the Wexford

10    employees that were ophthalmologists that worked at

11    or visited your prison?

12         A    I'm not aware.

13         Q    Were you ever aware of that being an

14    issue before you left here, that there were no

15    qualified ophthalmologists to treat the condition

16    of this particular inmate?

17         MS. TROEMPER: Objection to the form of the

18    question.

19         THE DEPONENT: I don't remember. It wasn't

20    unusual for Wexford to writ an inmate out to a

21    specialist, you know, for medical treatment.

22         MR. LONDRIGAN:  Q  What documentation should

23    exist of a medically assigned inmate to the

24    infirmary which orders him into the general

                         Page 98

2/21/07                    McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1     population? What documentation?  What records

2     should be there?

3          A    The medical file should show the date of

4     charting.

5          Q    Yes.

6               But by whose authority would the inmate

7     be placed into the general population?

8          A    Once he was--. If he was initially placed

9     in the healthcare unit under medical, it would be

10    medical releases him.

11         Q    So I would look for some type of

12    documentation of the exercise of medical judgment

13    that that inmate was fit to be placed in the

14    general population?

15         MS. TROEMPER: Objection. Leading. Foundation.

16         THE DEPONENT: If he is placed under medical,

17    it would take medical orders to release him.

18         MR. LONDRIGAN:  Q  If you were warden before

19    you left and you wanted to find out why a medical

20    patient had been transferred from the infirmary

21    into the general population, what records would you

22    ask to see?

23         A    I would--. If that happened, I'd call

24    Debbie Fuqua and ask Debbie what happened.

Page 99

2/21/07                          McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1       Q    I'll do that. Let me ask you a couple

2    more things.

3                          (Whereupon a document was duly

4                          marked for purposes of

5                          identification as Exhibit 15,

6                          as of this date.)

7       MR. LONDRIGAN:  Q  I'm going to hand you

8    Exhibit 15, which has been highlighted by me.  Just

9    take a look at it, familiarize yourself with it,

10   and then I'm going to ask you a couple of

11   questions.

12      MS. CHOATE: And, for the record, I'd like to

13   object to this document. It is after his tenure.

14   It's dated 10/29/03. No foundation that he would

15   have anything--any knowledge of that. And the

16   relevance to this witness.

17      MR. LONDRIGAN:  Q  The question I'm going to

18   ask is, because I think you know more than I do and

19   I want you to help me, if you can, in explaining

20   how this particular document is used and whether or

21   not it was used, in fact, while you were here at

22   Western.

23      A    It's just a double cell form. It's the

24   screening that would have been done--. I don't know

                        Page 100

2/21/07                    McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1    who that is.  It's a medical. I don't know if

2    that's Nurse Ashcroft.  But whoever. They've done a

3    review of some type. I don't know if it's

4    interviews or if it's just reviewing files. Just

5    medically recommended for a single cell, no.

6    Psychiatric recommended for single cell, no.

7    Medical records were checked. Recommended double

8    celled.

9        Q    Is that how it was done when you were

10   there?

11       A    Yes. Yeah, that would have been--that's

12   just a standard form.

13       Q    And I assume that this is--

14       A    I don't know how often that was done.

15   Because that was--he was already there, so I don't

16   know if that was something that happened they

17   reviewed again.

18       Q    If a prisoner is disciplined and placed

19   in segregation during the period of time that you

20   were the warden, were they sometimes placed in a

21   double cell with another cellmate even though they

22   were in segregation?

23       A    Yes. Yeah, we had double cells.

24       Q    And that's what this form is about?

Page 101

Baldwin Court Reporting & Legal Video Services
1-800-248-2835

2/21/07                          McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1       A    For segregation.

2       Q    Because you wanted to know why that

3  person was being disciplined and before he was

4  placed in another cell with a person in segregation

5  if he might be a threat to his safety?

6       A    This form here, whoever did it, would

7  have reviewed this inmate specifically, can he be

8  in a cell with another inmate. That would not be a

9  review to say can he be with John Doe. It's just

10  saying that generally he can be in a cell with

11  another inmate.

12      Q    Well, one of the things they looked at

13  was predative and passive home sexual concerns. But

14  my question is not whether or not you take into

15  account the vulnerability of the cellmate to which

16  the predator may be assigned, but whether or not

17  there was a comparable form if you would assign

18  cellmates outside segregation as part of the

19  assignment process. Did they go through this type

20  of analysis when they would decide whether or not

21  two cellmates--

22      A    I don't remember specifically. I know--.

23  Like I said, during the orientation process when an

24  inmate first comes to Western he's housed in

                          Page 102

1    orientation.  And during that orientation period,

2    which lasts several days, there's reviews done on

3    them, you know, what's... and that would be one of

4    the reviews, are there going to be issues when he

5    gets out in population in a multiple cell, you

6    know.

7             Because Western did not have protective

8    custody, but other institutions do have protective

9    custody, so, I mean, you can always send an inmate

10   to PC. If there are specific issues that an inmate,

11   he's going to have problems, he could be

12   recommended for a PC, which would be another

13   institution.

14       Q    What would an inmate have to do if he

15   were assigned a cellmate with a past violent

16   history that had just recently left segregation to

17   protest, or prevent, or get some type of review as

18   to whether or not they should be housed together?

19       A    He could voice that opinion every day

20   every shift. There's supervisors in the cell house

21   that make rounds.

22       Q    And what should they do once that's

23   voiced to them? Should they make a record of it?

24            MS. CHOATE: Objection, foundation, and calls

Page 103

1    for speculation, and it's irrelevant to this

2    witness.

3        THE DEPONENT: It would really depend on what

4    the inmate specifically says his issue is; I don't

5    want to be in my cell with a guy who stinks, or do

6    I want--I fear for my safety.

7        MR. LONDRIGAN:  Q  No. What about I think

8    we're going to end up in a fight?

9        A    (No response.)

10       Q    What was the procedure while you were

11   there in 2002?

12       MS. CHOATE: Objection, foundation.

13       MR. LONDRIGAN:  Q  Was that documented?

14       A    It--. I guess it would depend upon--.

15   Sometimes it would probably be documented, yes. I

16   mean, there's variables there.

17       Q    And what options did the person who felt

18   he was at risk and in fear of his--

19       A    He could refuse housing. He could be

20   placed in segregation.

21       Q    Now, hold on. He could refuse housing.

22   What does that mean?

23       A    Basically, I'm refusing the cell

24   assignment, that he was placed in a cell, I'm

                    Page 104

1    refusing to stay there, the inmate would be taken

2    to segregation where he would be housed away from--

3    whatever issues he's having in that cell house,

4    he's now removed from that issue.

5         Q    Well, isn't segregation normally a

6    disciplinary area?

7         A    It can be normally.  For the most part,

8    yes. But it also can be used as an investigative.

9    Basically, an inmate would be written a ticket for

10   refusing housing, which is a minor offense, and it

11   would be looked at to see if the inmate really had

12   a relevant problem.

13        Q    So if you refused housing, that was

14   considered to be some type of an offense that would

15   allow you to place that patient, or, excuse me, the

16   prisoner who made the request into segregation?

17        A    It would remove him from the situation

18   that he was having in the cell house.

19        Q    And was that his only option?

20        A    He could request protective custody.

21        Q    And what would that involve?

22        A    That would also be--he would be reviewed,

23   he would be taken from that situation, and it would

24   be reviewed to see if he meets criteria for

                        Page 105

2/21/07                    McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1    protective custody.

2        Q    So that would involve a hearing process.

3    Where would he be in the interim?

4        A    Segregation.

5        Q    What is segregation? Would you explain it

6    to me.

7        A    It's separate housing, mainly for

8    discipline problems, but there's also other issues

9    that would be in there too such as that.

10       Q    What about privileges?

11       A    Privileges?

12       Q    When you're in segregation.

13       A    He's still going to get recreation.

14   That's a privilege. He's still going to get

15   showers. That's a privilege. He's still going to

16   get library privileges. You know, are privileges

17   restricted or is movement more controlled? Yeah.

18   But, yes.

19       Q    And how is this all defined? It's in

20   written regulations?

21       A    It's in the ADRs.

22       Q    They change, but they're still a part of

23   the regulations?

24       A    I don't know how much they've changed in

Page 106

2/21/07                    McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1    the last five years, but they changed very little

2    through the years I worked.

3        Q    Did you ever hear, either before or after

4    you left Western, a term called a fight first

5    policy?

6        A    Huh-uh.

7        Q    In other words, you would be transferred

8    and receive discipline if you fought, but you

9    simply couldn't request a change simply because you

10   felt threatened by your cellmate?

11       MS. CHOATE: Objection. Misstates the

12   testimony.

13       THE DEPONENT: I've never heard of that.

14       MR. LONDRIGAN:  Q  If I were an inmate and I

15   felt threatened by my cellmate, the only options

16   that I would have, as you recall it, was as you've

17   outlined it here for me today in this deposition,

18   is that right?

19       A    Yeah. Yes. He would be removed from--

20   that inmate could ask to be removed from that

21   situation by refusing a housing assignment.

22       Q    He couldn't ask the security to place him

23   back in the infirmary, could he?

24       A    Security does have that flexibility,

                    Page 107

1    putting somebody in the healthcare unit for a short

2    period of time. Not medical. It would be a security

3    placement.

4        Q    So you say for security reasons rather

5    than medical--

6        A    Right.

7        Q    (Continuing)--he could have been assigned

8    to the infirmary?

9             And the infirmary does have cells there

10   too, doesn't it?

11       A    Right. Yes.

12       MR. LONDRIGAN: That's all I have. Thank you.

13                       EXAMINATION

14                  BY MS. TROEMPER:

15       Q    I think you just answered the question I

16   had, whether you knew the difference between an

17   inmate being assigned to the infirmary per security

18   versus an inmate being admitted to the infirmary

19   for medical reasons?

20       A    Right.

21       Q    And can you explain the difference?

22       A    Yeah. Medical would be a doctor or

23   medical staff assigning an inmate there especially

24   for some type of medical treatment. It would be,

                      Page 108

2/21/07                    McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1    you know, receiving some type of treatment he

2    couldn't get back in the cell house.

3              Security placement would be for--it could

4    be a variable thing. I mean, many times--maybe one

5    of the incidents I recall is like an inmate getting

6    news that there's been a death in his family.  Now

7    he's out in a noisy cell house, a lot of stuff

8    going on, he just wants to be taken away, just

9    where it's quieter, just to gather his thoughts,

10   you know, he's not really a threat to himself, so

11   he doesn't need--but he just needs separated.

12             And that would be a time that you might

13   want to do a security placement into the medical

14   unit just to get them out of there and then, you

15   know, he'd go back in another day, basically, for

16   less than 24 hours.

17        Q    So your testimony is that the security

18   officers have the authority to place an inmate in

19   the infirmary for non-medical reasons?

20        A    Right.

21        Q    And do you believe you're qualified to

22   render opinions regarding the healthcare unit and

23   how it operates, or who would you defer to?

24        A    I don't have a medical background.  I

Page 109

2/21/07                          McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1      would defer to the healthcare unit administrator.

2          Q    Mrs. Fuqua?

3          A    I would refer to the Wexford doctors.

4          Q    And even Doctor Elyea?

5          A    And Doctor Elyea.  Yes.

6          Q    Do you know what it means to be medically

7      unassigned?

8          A    Yes.

9          Q    What does that mean?

10         A    It means, for whatever reason, the inmate

11     cannot have a work assignment.

12         Q    And if an inmate does not have a work

13     assignment, what does that mean?

14         A    He would be unassigned.

15         Q    And there is a wing for just unassigned

16     inmates?

17         A    Right. Correct. There's inmates that

18     choose I don't want to work, I don't want to go to

19     school, I just want to be left alone and do my

20     time.  And then they stay there.

21         MS. TROEMPER: Okay. That's all I have. Thank

22     you.

23                        EXAMINATION

24                        BY MS. CHOATE:

                          Page 110

2/21/07                    McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1        Q    You were asked at the very beginning of

2    this deposition if you had any issues regarding

3    Aaron McCroy knowing your personal information.

4    Would you feel comfortable having your personal

5    information a part of a public record so that any

6    inmate might be able to access that information?

7        A    I'd rather not.

8        Q    You were asked about Pontiac and you said

9    that was a maximum security institution.  Correct?

10       A    Correct.

11       Q    Were the inmates sent to Pontiac for

12   particular reasons?

13       A    Disciplinary reasons. For long term.

14       Q    Would you consider the inmates at Pontiac

15   to be, for want of a better word, more dangerous

16   than those at Western?

17       A    Correct.

18       Q    You were shown several grievances, and I

19   won't go through each of them independently, but

20   from those grievances that you reviewed during this

21   deposition, did you have any reason to believe that

22   you ever, at the time they were written, reviewed

23   those grievances?

24       A    I don't recall.

Page 111

2/21/07                    McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1       Q    Was there any other grievances that--

2       A      It was not normal for me to review

3    grievances.

4       Q    Did you trust your assistant wardens to

5    take care of that?

6       A    Fully.

7       Q    And, as a warden, you had many other

8    things you had to be doing also?

9       A    Correct.

10       Q    Much like a lawyer has to delegate things

11    like depositions to other people, that sort of

12    thing?

13       A    I guess. And, like I also say, we talk

14    regularly. At the end of the day, we--my assistant

15    wardens, and sometimes the major, but the three of

16    us would meet at the end of the day, have a cup of

17    coffee and talk about what's happened today, what's

18    going on. I mean, we kept abreast. I think our

19    record speaks well what did go on in the

20    institution like we had.

21       Q    The fact that you were possibly kept

22    abreast of medical issues, does that mean that you

23    had any authority to determine what treatment a

24    person would get?

Page 112

2/21/07                McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1      A    No.

2      Q    Did you have any authority as warden to

3  determine where an inmate would be sent on a writ?

4      A    No.

5      Q    Did you have any authority to determine

6  whether an inmate either--a inmate needed, for

7  example, a corneal transplant?

8      A    No.

9      Q    Did you have any authority to determine

10  if that inmate would get a corneal transplant?

11      A    No.

12      Q    And did you rely on the medical people to

13  determine that for you?

14      A    Yes, I did.

15      Q    You were also asked about inmates sending

16  grievances to other places such as the ARB. Did

17  Western Illinois Correctional Center stop inmates

18  from sending letters or grievances out?

19      A    No.

20      Q    So it's your testimony that there was a

21  grievance process.  Correct?

22      MR. LONDRIGAN: Just a second. This has gone

23  on. This is my one objection. This is your client.

24  This is your witness. You can't just lead him

Page 113

1    through and then read these back at trial. You've

2    got to ask him a direct question.

3        MS. CHOATE: I have asked him questions, Tom.

4    Your objection's noted.

5            Q  Dennis, there is a grievance process.

6    Correct?  And you testified to that earlier?

7        A    Correct.

8        Q    Is there anything--

9        MR. LONDRIGAN: Now just a second. My objection

10   is noticed and the first thing you did was ask

11   another leading question concluding with "correct",

12   nodding your head up and down. Ask him direct

13   questions. You can do that.

14       MS. CHOATE: You know what, Tom. You've made

15   your objection much like we did and if you want to

16   object--

17       MR. LONDRIGAN: If it's continuing, I'm going

18   to ask to have all the leading questions stricken.

19   If you agree it's a continuing objection, lead him

20   all you want.

21       MS. CHOATE: I agree you can object whenever

22   you want, Tom.  How's that?

23           Q  Was there anything to stop an inmate

24   from going outside the grievance process?

Page 114

2/21/07                    McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1        A    No.

2        Q    Was there anything to stop an inmate from

3    sending a letter to a family member?

4        A    No.

5        Q    Was there anything to stop an inmate from

6    sending a grievance directly to some other party?

7        A    No. It was not beyond inmates to send

8    correspondence to their attorneys, to their

9    representatives, and it was not unusual for those

10   people to call back and talk to us about specifics.

11       MR. LONDRIGAN: And you read those

12   communications and had authority to read those

13   communications too, didn't you?

14       THE DEPONENT: Those were telephone calls.

15       MS. CHOATE: And I would object to that

16   comment. There's no evidence that he read every

17   communication, Tom.

18       MR. LONDRIGAN: Not every one. I said he had

19   authority to do that, to read communications.

20       MS. CHOATE: This is my turn, please.

21       Q    You were asked about many regulations

22   after you left the department of corrections?

23       A    Right.

24       Q    Do you know, as you sit here, if those

                        Page 115

1      regulations are the same as when you were there?

2          A    I don't know. I'm just assuming.

3          Q    And I talked about inmates being

4      vulnerable or a predator. How is that determination

5      made?

6          A    Specifically, I don't remember everything

7      that took place on that review that was done in the

8      classification of the inmate whether or not he was

9      a predator or vulnerable.

10         Q    Do you know who made that decision?

11         A    I don't remember.

12         Q    Would that be you?

13         A    No.

14         Q    Do you know if Aaron McCroy--

15         MR. LONDRIGAN: Leading. Go ahead.

16         MS. CHOATE:   Q  Do you know if Aaron McCroy

17     was ever vulnerable or a predator?

18         A    I don't recall.

19         Q    Do you know if Aaron--or if an inmate

20     named Dunham was ever listed as a vulnerable or

21     predator?

22         A    I don't know.

23         MR. LONDRIGAN: Foundation. He wasn't even

24     there when the warden was there. Well, ask him

                        Page 116

2/21/07                     McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1    about people mentioning or suggesting that this

2    person was there when he was there. That's not a

3    fair question to even your own client.

4         MS. CHOATE: Tom, I'll ask my questions to my

5    client. Thank you.  And you can object if you don't

6    like them. That's fine.

7              Q  To your knowledge, while you were

8    there, was a vulnerable or predator determination

9    listed anywhere?

10        A    Yes.

11        Q    Where would that be? Do you know?

12        A    I know you can go to OTS and get it off

13   off the OTS.

14        Q    What's OTS?

15        A    It's an inmate offender tracking system.

16        Q    Is that a paper, or is it some other kind

17   of--

18        A    I just get it off the computer.

19        Q    So it's a computer database, to your

20   knowledge?

21        A    Yeah.

22        MR. LONDRIGAN: Can we share that, Kellie?

23        MS. CHOATE: Which ones do you want?

24        MR. LONDRIGAN: The OTS.

                    Page 117

2/21/07                    McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

1      MS. CHOATE: It depends on what you're asking

2  for. We'll talk about it off the record. We can

3  talk about that later.

4      MR. LONDRIGAN: All right.

5      MS. CHOATE:  Q  You talked about the security

6  placement in HCU, healthcare unit.

7      A    Uh-huh.

8      Q    Were those things common when you were

9  there?

10     A    No. No. We're limited on beds. The

11  healthcare unit wasn't a massive thing. And medical

12  would always take priority.

13     Q    And do you know if Aaron McCroy, while

14  you were there, was ever placed--

15     A    I don't know.

16     Q    Let me finish the question for that.

17  (Continuing)--ever placed by security in the

18  healthcare unit?

19     A    Not that I know of.

20     MS. CHOATE: I have nothing further.

21                    EXAMINATION (CONT'D)

22                    BY MR. LONDRIGAN:

23     Q    The question that Ms. Choate asked you

24  about being medically unassigned, what's your

                    Page 118

1    experience as to why an inmate is normally

2    medically unassigned?

3        MS. TROEMPER: Just for the record, it was

4    Ms. Troemper that asked that.

5        THE DEPONENT: It would be the medical unit

6    determined that it causes some medical issue,

7    disability, injury, some type of medical capability

8    that he wasn't able to function on job assignment.

9        MR. LONDRIGAN:  Q  And if he were medically

10   unassigned and placed into the general population,

11   he would be placed with all other unassigned

12   prisoners, isn't that right?

13       A    Should be.

14       Q    Now, a person leaving segregation for

15   fighting with another cellmate is normally

16   unassigned until he's given work duties, isn't that

17   right?

18       A    Yes.

19       Q    Is there any reason or rationale that you

20   can give me why the authorities at Western, after

21   you had left, would take it unto themselves to take

22   and medically unassigned patient who had recently

23   left the infirmary after a corneal transplant and

24   have an unassigned person, as yet unassigned, that

                        Page 119

1    just left segregation for fighting with another

2    cellmate and place them in together in the same

3    cell?

4        A    No.

5        MS. CHOATE: Objection.  Form of the question.

6    Calls for speculation. No relevance.

7        THE DEPONENT: I don't know.

8        MR. LONDRIGAN:   Q   That's my question. Do you

9    know of any rationale basis to justify the

10   placement of those two types of prisoners together

11   in the same cell simply because they were both

12   unassigned?

13       MS. CHOATE: Same objection.

14       THE DEPONENT: I don't know how McCroy was

15   classified. I don't know if he was classified as--

16       MR. LONDRIGAN:   Q   I want you to assume that

17   he was classified as medically unassigned because

18   he had received a corneal transplant after you

19   left.

20       A     If he was back out in population,

21   released from the dispensary, medically unassigned,

22   also meant that he no longer needed to be in

23   special care in the dispensary so now he can go

24   back out.

                        Page 120

1       Q    And that would have to be a medical

2    decision.  Is that what you told me before?

3       A    If he was placed in the healthcare unit

4    medically, he would be released medically.

5       Q    By whom?

6       A    Whoever, medically.

7       Q    Even assuming that that was done

8    appropriately, and we contest that issue, we don't

9    know yet who undertook to themselves to make that

10   decision, but assuming any medically assigned

11   person, whether it be their vision, whether it be

12   their age, whether it may be another type of

13   disability, can you find any justification for

14   housing them with someone who had just come out of

15   segregation for fighting with another cellmate?

16      A    Yes.

17      Q    Why?

18      A    If he no longer--. If the doctor--. Just

19   as I say, if the doctor released him medically from

20   the healthcare unit, just because he's medically

21   unassigned does not mean that he can't participate

22   by what's happening on that unassigned wing.

23           He can still walk to the dining room, he

24   can still go out to the yard with that group, he

                        Page 121

1    can still go to the gym with that group, he can

2    still go to activities with that group. The doctor,

3    whoever determined he can do those things--you

4    know, the healthcare unit's a little more--

5         Q    You're assuming that some doctor made

6    those decisions that he could do those things?

7         A    I'm saying it would be somebody medical.

8    That's why I said just doctor. I just used that as

9    a term, it could have been, you know,--

10        Q    It couldn't be anybody else then in the

11   department of corrections because they wouldn't

12   have the expertise or the responsibility or the

13   right to make that determination, it would have to

14   be a medical decision.  Is that your experience?

15        MS. TROEMPER: Objection to foundation. And

16   assumes facts not yet into evidence.

17        MR. LONDRIGAN: I'm just trying to clear up

18   some of the things that were covered on your cross

19   examination by your attorney.

20            That's all.

21        MS. CHOATE: We already covered those, for the

22   record. We'll waive.

23                FURTHER DEPONENT SAITH NOT.

24

Page 122

```
 1     STATE OF ILLINOIS   )
                           )  SS
 2     COUNTY OF SANGAMON  )

 3                    C E R T I F I C A T E

 4          I, Debra K. Baldwin, a Notary Public and

 5     Certified Shorthand Reporter and Registered

 6     Professional Reporter in and for said County and

 7     State do hereby certify that the Deponent herein,

 8     DENNIS HOCKADAY, prior to the taking of the

 9     foregoing deposition, and on the 21st of February

10     A.D., 2007, was by me duly sworn to testify to the

11     truth, the whole truth and nothing but the truth in

12     the cause aforesaid; that the said deposition was

13     on that date taken down in shorthand by me and

14     afterwards transcribed, and that the attached

15     transcript contains a true and accurate translation

16     of my shorthand notes referred to.

17               Given under my hand and seal this 13th

18     day of March A.D., 2007.

19

20               Notary Public and
                 Certified Shorthand Reporter and
21               Registered Professional Reporter

22

23     License No. 084-002128

24
```

OFFICIAL SEAL
DEBRA K. BALDWIN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6-20-2006

Page 123

**A**

Aaron 1:5 16:17
  17:12 22:11
  23:8,20 47:18
  49:3 51:13,16
  51:22 52:10
  52:21 55:10
  55:18 57:16
  58:16 60:24
  63:3 66:5
  69:23 74:23
  75:7 77:6
  78:11 83:13
  86:3,13 87:1
  111:3 116:14
  116:16,19
  118:13
able 111:6 119:8
about 14:5 19:6
  20:14 21:9
  22:3 23:2,15
  33:19 34:22
  35:2,5,13 39:6
  42:23 46:7,18
  47:8,17 49:3
  50:17 54:16
  59:3 61:5
  68:10,19,22
  71:7,16,20,22
  73:8,16,19
  74:6,7 75:10
  80:13 86:11
  89:14 90:2
  91:20 92:17
  94:11,11,18
  95:18 101:24
  104:7 106:10
  111:8 112:17
  113:15 115:10
  115:21 116:3
  117:1 118:2,3
  118:5,24
above 27:6
  31:10 38:1
  39:10
above-entitled
  1:14
abreast 112:18
  112:22
academic 8:22
accept 31:9
  59:23 67:14
access 65:12,14

66:23 111:6
accompany 86:3
according 46:21
  62:7 64:15
account 102:15
accurate 123:15
acted 37:16 44:9
  45:1 79:12
acting 1:15
  16:15
action 16:16
  46:14 57:3
  63:6 66:2
actions 16:19
  57:4
activities 122:2
activity 86:18
acts 38:4
actually 22:1
  29:13 65:21
AD 28:2
additional 33:2
  33:3,7
address 67:19
addressed 43:19
  48:3 66:3,5
  67:11 68:10
addressing
  94:18
administered
  94:4
administering
  40:20
administration
  19:11
administrative
  11:18 27:9
  38:7,10 40:14
  45:2 81:5 82:4
  82:12
administrativ...
  24:23
administrator
  36:5 67:21
  70:24 75:19
  77:2 110:1
administrators
  71:1 73:12
  93:18
administrator's
  26:24
admissible
  54:10
admission 54:10

admitted 108:18
ADRs 106:21
ADs 92:23 93:6
advice 6:6 46:2
advised 70:18
advisement 76:5
affix 57:3
affixed 28:18
  74:13,15
aforesaid
  123:12
after 23:14
  25:10,23
  32:16 38:14
  55:3 57:14
  69:6 73:16
  83:5,11,12
  85:8 87:1,2
  95:21 100:13
  107:3 115:22
  119:20,23
  120:18
afterwards 4:8
  123:14
again 24:14
  25:13 42:18
  61:18 68:23
  77:22 101:17
against 7:4
  19:10
age 121:12
agree 16:3 18:20
  62:13 114:19
  114:21
agreed 4:2
  63:18
agreement
  32:24
ahead 10:7,22
  16:5 116:15
al 1:8
allegation 36:21
  36:22
ALLEN 2:8
allow 49:21
  105:15
allowable 27:16
  27:18
alone 110:19
already 22:18
  54:18 64:3
  75:20 76:6
  101:15 122:21
alteration 53:17

always 18:3
  19:7 53:1 92:4
  103:9 118:12
ambulatory
  8:14
among 12:10
analysis 102:20
Anderson 2:14
  55:4 56:1 81:3
  81:14
another 12:16
  20:4,21 25:18
  70:15 82:1
  85:4 89:16
  101:21 102:4
  102:8,11
  103:12 109:15
  114:11 119:15
  120:1 121:12
  121:15
answer 6:4,11
  6:15 13:1,11
  19:17 22:5
  24:13 29:3,4
  42:15 43:15
  59:24 84:23
answered 11:11
  28:24 57:11
  108:15
answers 4:8
anybody 47:17
  58:20 60:11
  66:15 73:22
  122:10
anyone 24:8
anything 6:23
  7:2 21:7 33:18
  35:13 50:17
  53:17 73:8
  75:10 78:5
  81:18 82:15
  100:15 114:8
  114:23 115:2
  115:5
anywhere 117:9
apparently
  61:23 62:2
APPEARAN...
  2:1
appears 48:1,2
  83:24
applicable 39:19
  94:2
applied 12:18

14:10 42:24
apply 13:21
  21:15 88:9
appointed 6:24
  51:18
appropriate
  89:20 96:21
appropriately
  121:8
approval 79:3
approve 27:8
  57:3
approved 83:24
April 2:9
ARB 38:17 81:7
  81:14,15
  113:16
area 65:2,8
  91:19 95:14
  105:6
areas 23:19
around 38:19
Ashcroft 101:2
asked 16:20
  28:24 33:3
  43:1 57:10
  62:19 66:20
  94:1 111:1,8
  113:15 114:3
  115:21 118:23
  119:4
asking 15:4,5
  35:5 36:5
  39:24 54:4,7
  62:12 68:3
  81:16 118:1
assault 7:3
  12:15
assaulted 86:17
assaulting 88:24
assessing 89:19
assign 96:2
  97:19 102:17
assigned 19:21
  19:21 80:13
  86:14 88:9
  89:15,17 96:3
  96:17 97:11
  98:23 102:16
  103:15 108:7
  108:17 121:10
assigning
  108:23
assignment

87:22 89:6,17
  90:6 92:2
  102:19 104:24
  107:21 110:11
  110:13 119:8
assignments
  9:15
assigns 20:7
assist 36:4
assistant 2:5
  11:1,12 25:9
  25:10,11
  27:13 28:5
  34:15 35:9,21
  36:11 39:1
  46:7 47:21
  56:9,14 57:15
  64:12 67:24
  68:7 74:21
  84:1 112:4,14
assume 10:17
  41:21 60:10
  66:1 101:13
  120:16
assumes 66:10
  122:16
assuming 39:8
  43:6,7 44:16
  44:16 63:10
  70:15,24 71:3
  73:7 91:10
  116:2 121:7
  121:10 122:5
assumption
  63:13,16,19
assurance 71:8
attached 17:7
  23:5 51:7
  123:14
attachments
  17:8
attack 16:1
attacking 13:23
  88:23 89:16
attention 18:15
  30:9 35:14,18
  43:8 46:24
  47:1,2 55:21
  61:4 62:8 66:6
  70:7 83:15
attorney 2:5,9
  6:6,9 78:5
  122:19
attorneys 4:3

2/21/07                McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

Page 125

115:8
August 8:8 63:2
67:16,18 68:9
69:6 70:11
72:9 74:6 76:7
76:10 78:7
authored 54:5
76:2
authoring 53:16
authorities
92:16 119:20
authority 27:14
28:5,10 45:22
56:16,18,20
56:23 57:1,8
59:4 64:17
68:12 95:17
96:2,21 97:8
99:6 109:18
112:23 113:2
113:5,9
115:12,19
authorize 56:8
authorized
97:18
available 20:3
33:8 83:15
avenue 18:9
average 24:3
aware 7:9 22:10
23:7 24:21
37:1 55:9,16
56:3,5 57:23
70:10 76:12
76:14,18,21
76:23 78:14
83:17 98:12
98:13
away 105:2
109:8
A.D 4:5 123:10
123:18
A.M 1:17 4:6

_____ B _____

B 3:11
back 8:2 15:2
23:11 24:15
24:18 28:1
37:19 43:15
46:20 57:19
66:20 69:15
69:16 76:8
80:24 87:9

96:4 107:23
109:2,15
114:1 115:10
120:20,24
background
5:19 7:19 15:7
16:5 109:24
balances 65:7
Baldwin 1:14,22
4:3 123:4
Bank 2:10
Barr 31:4
based 6:19 15:7
26:4 43:7
48:10 55:7,13
58:2 79:14
basically 11:24
18:16 19:20
21:3 32:12
40:11 104:23
105:9 109:15
basis 120:9
bears 27:1 34:4
53:15,20 81:5
became 10:10
10:11 11:1
15:1 16:10
18:2
becomes 94:19
bed 90:20
beds 118:10
before 1:14 4:3
8:2,22 25:19
25:22 34:17
38:16 39:15
50:9,24 51:10
62:6 64:14
68:15 77:21
78:14,16 80:5
84:6 87:11
94:19 98:14
99:18 102:3
107:3 121:2
beginning 9:13
93:16,17
111:1
behalf 2:4,7,11
2:14
behavior 86:18
behind 85:7,14
87:3
being 24:7,22
30:4,8 32:19
32:22 36:10

44:23 50:12
64:24 70:11
71:24 76:4
94:3,12 98:13
102:3 108:17
108:18 116:3
118:24
believe 29:15
40:9 46:15
58:18 81:13
85:10 89:5
92:7 109:21
111:21
below 65:21
Benjamin 86:22
beside 28:13
besides 70:5
best 18:16
better 60:17
89:11 111:15
between 4:2
20:20 22:10
34:8 44:6
82:11 108:16
beyond 115:7
big 12:7 83:6
biggest 85:2
blocks 65:11
board 38:7,10
81:6,11
body 82:4,12
bold 75:4
book 40:1 92:18
both 34:11 36:8
39:22 42:7
46:6 59:16
120:11
bottom 31:3
41:16 74:11
78:21 84:12
Boy 87:4 88:11
briefly 34:21
bring 35:17
broke 93:8
brought 30:8
35:13 55:21
62:7 65:1 66:6
Building 2:10
business 7:11
55:20 63:23
64:8 84:8

_____ C _____

C 5:3 123:3,3

call 19:13 51:22
94:14 99:23
115:10
called 6:14 94:1
107:4
calling 28:16
calls 103:24
115:14 120:6
came 9:4,24
11:3 15:20
16:7 18:22
22:14 27:12
43:8,10,16
61:3 62:16
64:3,7 83:10
89:16
capability 119:7
capital 95:2
captain 10:12
10:12,15,20
captains 11:10
captain's 12:2
care 8:12 31:17
60:22 112:5
120:23
Carl 2:12
case 1:14 7:14
12:17,21
16:17 17:20
38:21 56:24
58:15 62:20
83:21
caseload 19:22
Castro 72:22
80:23
category 14:17
Cathy 84:18
85:15
cause 123:12
causes 119:6
causing 30:5
cc's 69:14,16
76:16
cell 9:14 13:24
14:11,13 15:2
15:13,14,20
15:21,22
65:10,11
88:10 100:23
101:5,6,21
102:4,8,10
103:5,20
104:5,23,24
105:3,18

109:2,7 120:3
120:11
celled 101:8
cellmate 12:16
12:16,16
13:22 86:14
89:16,20
101:21 102:15
103:15 107:10
107:15 119:15
120:2 121:15
cellmates 12:10
13:23 14:24
15:8 87:22
89:21 91:6
102:18,21
cells 14:20,24
15:9,24 92:18
101:23 108:9
Center 1:18 4:6
113:17
CENTRAL 1:2
certain 21:14
89:8,9,9 90:18
96:18
certainly 15:23
33:14,17
Certified 4:4
123:5,20
certify 123:7
chain 18:22
70:17,17
92:12
change 12:3
93:19 106:22
107:9
changed 106:24
107:1
changing 83:21
characterizati...
67:11,23
87:24
charge 91:24
charting 99:4
charts 92:10
checked 101:7
checks 65:7
Chicago 59:14
chief 10:23 11:8
26:24 27:8
72:21 95:13
Choate 2:5 3:5
5:23 6:8 7:23
12:20 13:4

109:2,7 120:3
120:11
celled 101:8
14:2,4 22:5
26:22 28:16
28:24 32:21
33:9 37:13,22
38:23 41:12
49:5 50:11
52:24 53:22
54:4,13 57:10
60:20 61:13
66:12 67:10
67:16,23 72:5
76:22 77:13
83:9 86:8
87:24 88:4
89:24 94:5
100:12 103:24
104:12 107:11
110:24 114:3
114:14,21
115:15,20
116:16 117:4
117:23 118:1
118:5,20,23
120:5,13
122:21
choose 110:18
Cindy 80:16
circle 29:9
circumstances
64:11
City 2:10
Civil 4:10
claimed 46:13
classification
116:8
classified 120:15
120:15,17
cleaning 30:19
clear 76:24
122:17
clerks 84:21,24
clerk's 84:17
Cleveland 60:1
61:17 62:1
client 6:24 50:7
75:7 76:4
113:23 117:3
117:5
Clinic 36:7
clinical 20:9,16
92:8
clothing 65:22
65:23
coffee 112:17

2/21/07                          McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

Page 126

combative 7:3
come 18:14
  19:14 46:8
  56:16 65:15
  70:6 88:12
  121:14
comes 7:13 87:8
  102:24
comfortable
  111:4
coming 46:12
  70:16
command 18:22
  70:18 92:12
comment 54:4
  115:16
commenting
  54:5
committed
  26:18 61:24
committees
  39:17
common 118:8
communication
  70:17 73:4,17
  73:20 74:24
  115:17
communicatio...
  67:21 82:19
  115:12,13,19
comparable
  102:17
compared 23:20
competency
  4:13 83:10
competent 4:16
complaining
  22:2
complaint 17:17
  18:10 37:2
  47:12 51:7
complaints 23:2
  42:22
complete 32:23
  75:18
completed 30:21
completely
  33:13
compliance 41:2
complied 29:11
  29:15
computer
  117:18,19
concern 68:10

94:7,8,10,11
concerned 12:19
  14:1 90:7
  91:20 93:24
concerning
  30:19 31:11
  35:21 84:22
concerns 86:24
  88:15 89:7
  102:13
concluding
  114:11
condition 46:14
  47:18 49:4
  68:10 97:17
  98:15
conditions 58:17
conducted 31:13
consider 24:19
  24:20 69:19
  111:14
consideration
  89:7
considered
  69:22 105:14
consult 40:13
  42:23 46:1
  72:10 87:10
consultation
  47:3
contact 18:18
  36:8 78:12
contacted 75:14
contacts 30:19
  54:22
contain 50:19
contains 123:15
contest 121:8
context 69:21
continued 49:20
continuing
  20:13 21:17
  21:23 32:4
  38:3 45:16
  47:15 56:11
  62:15 63:15
  71:14 81:8
  83:20 93:12
  93:20 96:9
  108:7 114:17
  114:19 118:17
control 6:22
  89:10 95:9
controlled

106:17
CONT'D 118:21
conversation
  23:13,14
conversations
  35:20 46:8
  49:10,12,13
  49:17
copied 33:12,12
  73:4,7 74:23
copies 4:18 12:1
  40:6
copy 52:4
cornea 23:15
corneal 23:9
  52:10,22 53:4
  54:21 55:1,10
  55:17 61:1
  62:3 78:12,15
  113:7,10
  119:23 120:18
corneas 39:17
correct 6:10,13
  6:17 7:8,12
  9:3,10,22
  11:24 16:4
  20:19 21:13
  21:20,22
  22:15 31:5
  34:7 35:4,15
  36:24 45:12
  47:20 48:19
  48:23 49:1,15
  49:19,24
  50:23 51:11
  52:2 63:5
  64:19 73:1,5
  74:10,12,14
  75:9 79:10,13
  84:19 87:13
  87:16,20 98:3
  110:17 111:9
  111:10,17
  112:9 113:21
  114:6,7,11
corrected 13:10
correction 67:14
  68:2
Correctional
  1:18 4:6
  113:17
corrections 1:8
  2:7 5:11 9:5
  18:3 54:1,9

59:9,10 69:24
  71:12 74:9
  79:3,9,16 80:4
  80:19 98:5
  115:22 122:11
correctly 29:17
  64:24
correspondence
  67:19 69:22
  115:8
cost 60:22
costly 62:4
counsel 33:1,8
  33:10 51:4
  53:15 63:20
counselor 18:18
  19:12,13,18
  19:21 20:5,7
  20:15,15
  21:10 29:24
  30:4 41:15
  44:21,22
counselors
  19:20 21:5
  44:22 88:17
counselor's
  20:17
counsel's 33:13
count 84:16
County 1:15,16
  1:18 4:6 123:2
  123:6
couple 91:17
  94:24 95:21
  100:1,10
course 7:11 42:5
  46:4 55:20
  63:22 64:8
  67:22 68:8
  81:21 83:13
  84:8
court 1:1 4:11
  13:6 15:1,2
  17:9 22:19
  23:1 35:3
  47:15 51:17
  51:18,24
cover 19:1 23:19
  87:21 95:20
covered 122:18
  122:21
criteria 83:20
  92:17 96:18
  105:24

cross 122:18
cup 112:16
current 58:2
currently 5:10
  94:3
custody 80:13
  103:8,9
  105:20 106:1
customarily
  11:20
_____
        D
D 3:1 5:3,3
daily 46:6,7 65:9
damage 36:9
dangerous
  111:15
dash 72:1
database 117:19
date 23:3,5
  26:10,19,22
  34:1,4 37:8,17
  37:20 41:8,13
  50:4 59:20
  61:12 63:1
  67:4,6,15 69:4
  74:4 77:19
  83:4 86:1,5,8
  99:3 100:6
  123:13
dated 41:12
  50:6 61:13,16
  63:2 67:5 69:5
  86:7 100:14
dates 22:13
  44:23 57:22
  86:9
David 2:14
  82:16
day 22:15 25:15
  46:9,10 69:6
  74:5 76:7
  103:19 109:15
  112:14,16
  123:18
days 78:7 103:2
day's 65:4
dealing 8:12
  47:6 87:18
  91:9
deals 20:5,5
dealt 8:13 11:13
death 109:6
Debbie 30:17

67:8,20 68:21
  70:14,23
  73:14 99:24
  99:24
Debra 1:14 4:3
  123:4
Decatur 2:13
decide 45:16
  102:20
deciders 64:21
deciphering
  60:18
decision 47:9
  57:4,6 58:4,14
  58:21 64:18
  76:6 116:10
  121:2,10
  122:14
decisions 56:12
  65:3 80:12
  122:6
decision's 75:20
decision-maki...
  64:21
dedimus 4:11
deem 45:4
defendant 2:7
  2:11,14 6:21
  54:13 66:18
Defendants 1:9
defer 109:23
  110:1
defined 21:1
  42:8 69:12
  106:19
definitely 80:22
definitions
  34:10 42:7
delegate 27:10
  112:10
delegated 27:11
  28:6,10 45:22
delegating 56:13
delivered 67:22
  68:13
denied 30:4
  32:13,15,17
  62:3 75:15
Dennis 1:13 3:3
  4:3 5:9 75:8
  114:5 123:8
deny 54:14
denying 32:14
department 1:8

2/21/07
Dennis Hockaday

McCroy v. Illinois Dept. of Corrections

Page 127

2:7 5:11,17
6:20 7:11,16
8:7 9:5 16:6
18:3,7 21:2
42:17 43:14
53:14,15,24
54:9 57:9 59:5
59:10 69:24
71:11,24
72:11 74:8
76:18 79:3,9
79:16 80:4,19
88:8 93:4 98:5
115:22 122:11
**departmental**
60:5
**depend** 104:3,14
**depends** 118:1
**Deponent** 3:2
5:1 13:15 22:7
23:24 24:19
25:1 26:21,23
29:1 30:2
36:15 37:15
37:21 39:2
48:14 49:7,9
52:15,19
57:12 58:8
60:8 66:13
68:3 70:4
76:24 78:19
86:7 94:7
96:24 97:24
98:19 99:16
104:3 107:13
115:14 119:5
120:7,14
122:23 123:7
**deposeth** 5:5
**deposition** 1:13
4:3,11,15,18
13:5,8 16:22
47:11 54:3
82:14 107:17
111:2,21
123:9,12
**depositions** 4:16
13:7 33:4
112:11
**Deputy** 72:21
**description**
56:15
**designate** 28:5
**designated** 42:2

**designee** 25:5,7
28:3 44:18
**designees** 65:1
**desk** 38:5,20,24
39:1,10,12
40:17 42:13
42:20
**despite** 66:6,17
**detached** 46:20
**detail** 9:15
**determination**
49:22 116:4
117:8 122:13
**determine** 48:16
96:21 112:23
113:3,5,9,13
**determined**
45:21 50:13
119:6 122:3
**determining**
60:24
**dictated** 77:10
**dietary** 21:8
**difference** 34:8
42:6 44:6
82:11 108:16
108:21
**different** 19:17
42:9 46:19
92:10 94:24
**differently** 42:4
42:8
**dining** 65:13
121:23
**direct** 8:12 39:7
39:9 65:18
114:2,12
**directed** 63:4,7
63:23 66:7
**direction** 6:16
6:22 11:12
91:8
**directives** 11:18
11:19,22 12:8
12:9 40:15
91:7,7 92:20
92:22,24 97:6
**directly** 37:12
38:21 44:1
70:21 81:15
115:6
**director** 37:12
37:14 57:15
59:6,8 70:14

71:15 76:21
80:6
**disability** 119:7
121:13
**discernible**
28:14
**disciplinary**
105:6 111:13
**discipline** 106:8
107:8
**disciplined**
101:18 102:3
**disclosed** 36:8
**discovery** 13:6
54:2
**discretion** 62:20
**discuss** 46:5
83:10
**discussed** 36:10
47:21 70:11
**Discussion**
77:15
**discussions**
47:16 55:15
82:20
**dispensary**
120:21,23
**disposition** 25:3
**dispute** 23:8
**distinction**
20:20
**distributed**
11:21
**DISTRICT** 1:1
1:2
**diverted** 64:16
**DIVISION** 1:3
**doc** 44:1 80:7,21
**doctor** 2:14 36:6
36:6,7 43:21
43:23,23,24
44:1 53:7,9,13
54:21 55:2,11
56:1,1,2,3,6
57:19 58:8,9
58:20 59:1,3
59:24 61:17
61:20 62:1
70:7,18 71:2,3
71:6 75:17
76:23 78:8
82:16 96:10
96:11,13,14
97:1 98:1

108:22 110:4
110:5 121:18
121:19 122:2
122:5,8
**doctors** 47:6
52:9,20 53:3
54:20,24 55:9
55:17 58:14
71:2 98:5
110:3
**document** 26:7
26:20 32:23
33:16,22
34:16 36:14
37:5 41:5 50:1
50:8,12 52:7
54:1,9 55:3,6
59:17,22 61:9
62:22 67:1
69:1 74:1
77:16 78:17
79:24 83:1,7
85:22 100:3
100:13,20
**documentation**
56:22 98:22
99:1,12
**documented**
104:13,15
**documents** 17:5
25:21,23 26:4
46:16 49:13
62:16 83:8,10
95:20
**document's** 53:6
**Doe** 102:9
**doing** 27:15
33:13 36:9
112:8
**Donald** 71:15
**done** 9:16 15:16
39:16 56:21
88:14 89:18
89:19 90:15
90:17,21
100:24 101:2
101:9,14
103:2 116:7
121:7
**double** 100:23
101:7,21,23
**down** 4:8 22:2,4
28:20 51:8
65:21 93:8

114:12 123:13
**DR** 28:2,2
**drew** 20:20
**drop** 85:17
**dropping** 84:15
**DRs** 92:23 93:6
**due** 30:12,18
**duly** 5:4 26:8
33:23 37:6
41:6 50:2
59:17 61:10
62:23 67:1
69:1 74:1
77:16 83:1
85:22 100:3
123:10
**Dunham** 116:20
**during** 14:6
22:12 23:21
24:8 42:14
73:23 88:14
88:15 90:1
101:19 102:23
103:1 111:20
**duties** 9:11 31:7
80:9 82:8
84:22 119:16

———————
**E**
**E** 3:1,11 5:3
123:3,3
**each** 19:21 42:8
93:6 111:19
**earlier** 42:7
47:19 74:23
82:14 114:6
**early** 47:10
**easier** 10:6
**eating** 65:13
**education** 21:6
**educational**
5:24
**educations** 8:15
**effective** 75:16
**either** 59:16
81:20 107:3
113:6
**eliminating**
94:19
**Elyea** 43:24
44:1 58:20
59:1,3 70:7,13
70:18 71:2,3
75:17 76:23

80:3 110:4,5
**Elyea's** 71:6
**emergencies**
48:18
**emergency**
31:17,24,24
34:3,9,12 35:5
35:6 37:9,16
38:4 39:8,9,12
39:22 40:4
42:2,3,12,20
43:12,18 44:4
44:5,7,8,10,14
44:15,20,20
45:4,9,17
46:13 47:17
48:10 49:4
56:12 75:5
82:6
**employed** 5:13
5:17
**employee** 5:10
6:20 18:2,11
78:8 80:18
92:15
**employees** 97:15
98:4,10
**employer** 78:4
**employment**
5:21 6:1 7:22
8:1
**empty** 90:20
**end** 5:18 11:4
38:4 39:2 95:1
104:8 112:14
112:16
**enough** 35:17
**entertain** 82:6
**entire** 32:24
**entirely** 63:19
**entitled** 13:11
54:15
**entry** 9:20
**ER's** 13:16
**escape** 86:17
**escort** 86:8
**especially**
108:23
**Esq** 2:2,12
**essentially** 91:2
**et** 1:8
**evaluate** 19:24
97:17
**evaluation**

2/21/07                  McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

Page 128

31:22
even 19:8 43:9
  44:3 57:23
  64:9 70:2 71:9
  101:21 110:4
  116:23 117:3
  121:7
event 55:24
ever 30:8 34:16
  36:10 37:14
  49:13,17 50:9
  62:18,19 63:9
  64:14 66:6,15
  73:16 75:13
  77:6,20 79:8
  80:12 94:16
  98:13 107:3
  111:22 116:17
  116:20 118:14
  118:17
every 12:5,6
  28:6 45:1
  46:10 65:2
  93:21 103:19
  103:20 115:16
  115:18
everything 9:12
  9:12 18:21
  34:20 46:21
  63:11 65:5
  85:9,10 116:6
everywhere
  27:24
evidence 13:3,5
  13:7 66:11
  115:16 122:16
evidentiary 13:4
exactly 13:17
  17:8 45:24
examination 3:4
  3:4,5 5:6
  108:13 110:23
  118:21 122:19
example 113:7
excuse 15:8 88:6
  105:15
executive 56:13
exercise 62:19
  99:12
exhaust 38:15
exhausted 39:18
exhibit 3:13,13
  3:14,14,15,15
  3:16,16,17,17

3:18,18,19,19
  3:20 26:9,13
  27:1 32:22
  33:21,24 34:2
  34:3 37:7,20
  41:4,7,10 50:3
  50:5 52:1
  59:19 60:10
  61:11 62:24
  67:3 69:3,5
  74:3,6,23 76:8
  77:18,21 83:3
  83:5 85:24
  100:5,8
exhibits 47:24
  68:11
exist 98:23
existed 64:16
  67:18
exit 45:17
expense 4:18
experience 6:19
  119:1 122:14
expertise 122:12
explain 10:5,7
  17:4 18:6
  20:23 27:18
  30:13 106:5
  108:21
explained 82:13
explaining
  100:19
expressly 4:12
extent 48:21,21
extreme 47:1
eye 48:6,8,9,10

_____ F _____

F 2:2 123:3
facility 61:16
fact 13:12 33:3
  66:7,17 76:2
  100:21 112:21
facts 29:20
  31:12 66:10
  122:16
fair 117:3
fall 8:7 10:24
  12:11
familiar 11:16
  12:12 19:4
  38:12 51:10
familiarize 52:3
  100:9

family 60:21
  109:6 115:3
far 6:2 12:19
  13:24 19:6
  43:4 90:6 92:1
  92:17
fashion 10:6
Fax 1:23
fear 6:23 104:6
  104:18
February 1:17
  4:5 123:9
federal 4:10
  13:6 22:18
  23:1 51:17,18
  78:1
feel 81:23 111:4
felt 104:17
  107:10,15
few 78:7
field 44:3 59:2
fight 104:8
  107:4
fighting 12:10
  12:15 16:1
  119:15 120:1
  121:15
file 18:17 19:9
  33:11 38:6,16
  39:12,16,40 40:4
  40:4 77:13
  81:22 85:1,21
  86:23 99:3
filed 17:9,12,19
  22:11,18
  23:21 24:2,4,7
  35:3,7 42:5
  47:13 51:13
  51:16,22,24
  81:15 84:6
files 101:4
filing 18:11,11
  22:24 81:20
  87:8
filled 87:11
final 49:22 57:4
  57:6
Finally 36:4
find 29:9 33:14
  33:15 55:6
  72:9 99:19
  121:13
finding 31:15
fine 6:1 117:6

finish 118:16
finished 52:6
  83:18
first 5:4 9:4,7
  18:17 22:22
  26:15 36:13
  37:11 51:12
  51:16 57:17
  58:4 61:14
  62:2 64:13
  81:21 84:23
  88:12 92:5
  95:16 102:24
  107:4 114:10
fit 99:13
five 46:19 95:19
  107:1
flexibility
  107:24
follow 8:5 21:19
  43:13 85:5
  97:6
followed 21:17
  39:4 96:19
following 31:21
  71:20
follows 5:5
followup 44:20
foregoing 123:9
forget 61:5
  65:20
form 4:14 37:19
  79:3,4,6,15
  84:10,10
  87:11 98:17
  100:23 101:12
  101:24 102:6
  102:17 120:5
former 58:1
  78:4
forms 21:21,24
  56:19
formulate 54:8
  93:12
fought 107:8
found 32:16
  33:11
foundation 4:17
  12:24 23:23
  30:1 36:14
  37:13 38:23
  48:12 49:5
  50:11 52:14
  52:24 53:22

54:2 58:7 60:7
  70:1 72:4
  75:23 76:22
  78:18 83:9
  90:2 94:6
  96:23 97:22
  99:15 100:14
  103:24 104:12
  116:23 122:15
frame 90:1
framework 49:2
freely 21:24
  71:1
from 5:20 6:23
  7:13,16,23 8:4
  9:2 10:2 11:4
  12:1,3 15:6
  26:24 31:9
  32:1 34:23,24
  36:22 37:15
  39:15 42:4
  46:20 51:4,5
  52:5 53:14
  56:16 57:24
  58:20 60:11
  63:3,24 70:16
  72:2,15 74:23
  75:8 77:24
  78:4,17 84:15
  89:21 92:23
  93:8,16,16,19
  96:6 97:21
  99:20 105:2,4
  105:17,23
  107:19,20
  111:20 113:18
  114:24 115:2
  115:5 120:21
  121:19
front 28:9
full 5:8
Fully 112:6
function 119:8
functioning 8:14
  8:16
functions 21:4
Funk 25:11 67:9
  67:20,24 68:5
  68:18 74:19
  74:20
Fuqua 30:17
  36:5 67:9,20
  68:21 70:14
  70:23 73:14

75:3,18 99:24
  110:2
furlough 85:18
  87:15
furnished 4:18
further 8:15
  54:2 82:15
  118:20 122:23

_____ G _____

Galesburg 53:7
  54:22
gang 86:18
  88:19
gate 84:14
gather 109:9
gave 13:18
  53:12 56:22
  96:18
general 2:5 96:4
  96:22 97:9,20
  98:24 99:7,14
  99:21 119:10
generally 23:12
  65:18 84:23
  102:10
Generic 84:23
George 71:14
gets 103:5
getting 44:12
  51:23 73:17
  109:5
give 5:19 29:4
  91:8 119:20
given 32:18
  47:24 58:3
  62:10 92:16
  119:16 123:17
gives 28:4
go 5:20 7:22 8:2
  10:6,22 16:5
  18:14,19,21
  23:10 25:18
  28:1 35:7
  37:11 38:10
  38:20,24,24
  39:3 43:15
  45:2 46:20,21
  55:11 64:5,6
  64:12 66:20
  70:20 72:11
  76:8 77:14
  85:19 87:15
  89:12 92:19

2/21/07
Dennis Hockaday

McCroy v. Illinois Dept. of Corrections

Page 129

95:15 102:19
109:15 110:18
111:19 112:19
116:15 117:12
120:23 121:24
122:1,2
goes 37:14 67:8
67:8,9,11
85:10 92:5
going 6:11 23:2
23:18 24:11
26:1 29:8
38:20 39:2
44:8 50:15
52:5,21 53:19
54:11,17
57:10,19
59:22 66:21
69:7 79:24
80:2 86:10
91:11 97:5
100:7,10,17
103:4,11
104:8 106:13
106:14,15
109:8 112:18
114:17,24
gone 8:15 87:6
113:22
good 20:1
govern 39:21
governed 71:24
governor 71:14
graduated 8:4
9:1
grafts 62:3
great 36:9
grievance 18:4,8
18:11,12,12
18:17 19:9,23
21:11,15
22:11,24
26:18 27:11
29:14 31:6,7,9
31:14,15,18
32:13,16,24
34:4,9,9 35:6
35:6 37:10,16
38:6,16 39:9
39:12,17 40:5
40:11 41:11
42:3,5,12,19
42:21 43:13
43:17,18 44:4

44:5,7,7,8,11
44:15,16 45:1
45:3,18 46:23
61:15,21 75:5
82:13 113:21
114:5,24
115:6
grievances 19:6
19:17 23:22
24:2,4,7 25:4
27:12 34:13
38:4,10,20
39:22,23 42:4
48:17 49:23
56:12 64:5,11
64:12 81:10
81:17,22 82:6
111:18,20,23
112:1,3
113:16,18
grieving 19:14
group 121:24
122:1,2
guess 104:14
112:13
guidance 43:1
91:4 92:15
guidelines 58:11
guy 104:5
gym 122:1

_____ H _____

H 3:11 5:3
hand 34:2 41:4
100:7 123:17
handbook 40:8
40:9
handed 50:22
50:24
handing 26:12
59:21
handle 13:19
14:9 34:12
44:22 65:21
handled 18:13
34:13,14 43:8
46:21 64:24
handles 93:2
handwriting
27:5 28:20
happen 17:4
52:4
happened 19:15
57:23 99:23

99:24 101:16
112:17
happening
121:22
harm 30:5
having 5:4
16:16 28:8
49:10 55:23
105:3,18
111:4
HCU 30:13 36:5
60:18 118:6
HCUA 60:20
HCUs 30:12
head 11:7 14:7
22:4 30:15
51:8 57:24
114:12
health 8:7,9,10
14:1 43:12
71:5,16,21
72:17
healthcare 21:5
30:14,15,18
67:21 70:24
71:1 73:11
75:14,18 76:9
77:1 80:12
99:9 108:1
109:22 110:1
118:6,11,18
121:3,20
122:4
hear 107:3
heard 107:13
hearing 106:2
hearsay 36:14
36:17,18
52:14 60:6
72:4 75:23
78:18
Heckel 84:18
held 71:10 97:16
103:20 105:3
105:18 109:2
109:7
her 4:18 6:16
7:24 31:21
hereto 4:2,16,18
HEYL 2:8
high 8:4,14 9:2
91:9
higher 18:21
34:13 38:21
39:13 44:8

higher-ups
45:10
highlighted
52:12 100:8
HILL 2:12
him 6:3 7:4
24:15 30:5
32:20 33:18
40:10 45:23
51:18 53:7,23
54:4,7,15
57:20 70:21
70:23 82:20
84:3 85:5
86:15 92:5
97:7,11,12
98:24 99:10
99:17 105:17
107:22 113:24
114:2,3,12,19
116:24 121:19
himself 109:10
hired 91:10
history 5:21 6:2
7:7,22 13:22
66:2 86:17
88:23 89:14
103:16
history's 6:1
Hobrock 80:16
Hockaday 1:13
3:3 4:3 5:9
75:8 123:8
hold 104:21
home 25:17
102:13
Homosexual
88:20
hour 4:5 12:7
hours 109:16
house 84:14
89:8,8,13
103:20 105:3
105:18 109:2
109:7
housed 89:6
94:8 102:24
103:18 105:2
houses 9:14
65:10
housing 104:19
104:21 105:10
105:13 106:7
107:21 121:14

How's 114:22
HUGHES 2:12
Huh-uh 107:6
hypothetical
97:23

_____ I _____

idea 83:12
identification
3:12 26:9
33:24 37:7
41:7 50:3
59:19 61:11
62:24 67:3
69:3 74:3
77:18 83:3
85:24 100:5
identified 61:21
identify 41:9
IDOC 60:15
IDRs 92:23
Illinois 1:2,8,16
1:19,23 2:3,6
2:7,10,13 4:6
53:24 71:11
74:8 98:4
113:17 123:1
implemented
94:12
implementing
91:24
important 29:18
35:17
inaction 66:2
incidents 109:5
include 73:14
included 52:1
including 55:15
incomplete 33:6
97:23
independent
17:22 47:16
58:19,23 59:1
independently
54:10 111:19
Indiana 1:23
indicated 52:21
Indicating 79:22
individually
17:13 63:24
industries 89:9
infirmary 96:3
97:1,7 98:24
99:20 107:23

108:8,9,17,18
109:19 119:23
information
5:24 7:16,19
48:11 55:13
84:6 89:2
111:3,5,6
informed 47:8
48:4
initially 97:5
99:8
initials 28:14,23
29:7,9,9 46:3
injury 119:7
inmate 7:5
16:19 18:10
18:17,20 19:8
19:21 20:8
21:11,18 22:1
23:1,15,16
24:7,22 29:23
30:3,11 31:9
31:12,16
32:14 35:21
37:19 38:6,11
38:15 39:3,9
39:15 40:3,6
41:11 43:16
44:5,14,24
45:9 46:13,23
46:24 47:1,1,5
47:18 48:2
58:6 64:1,5
65:15 67:19
68:9 74:7 81:8
81:9,23 83:14
85:3,8 86:21
87:2 88:18
89:14 90:19
94:8,11 96:22
97:1,9,18
98:16,20,23
99:6,13 102:7
102:8,11,24
103:9,10,14
104:4 105:1,9
105:11 107:14
107:20 108:17
108:18,23
109:5,18
110:10,12
111:6 113:3,6
113:6,10
114:23 115:2

115:5 116:8
116:19 117:15
119:1
inmates 7:6
23:21 24:2
44:24 65:12
65:13,13,14
65:18 80:13
81:15 82:9
87:23 88:9,12
91:1 92:18
93:2 110:16
110:17 111:11
111:14 113:15
113:17 115:7
116:3
inmate's 19:14
19:24 20:2,6
36:18 85:1
86:23 93:24
input 58:20
inquiry 55:7
inside 21:3
instance 4:5
46:11
instead 65:22
89:12
institution 7:14
7:17 20:4
25:19 26:5
32:9 37:10
38:3 45:10
64:1 67:18
68:12 71:7
76:12,13
81:22 82:2,5
82:12 83:16
84:15,21 85:4
85:20 86:21
87:15 88:7,13
91:12 92:23
93:1,6,9,10,11
96:19,20,20
97:2,3,8
103:13 111:9
112:20
institutional
15:6 38:15
39:4,17 43:23
49:2 58:9
92:24 93:7
institutionally
21:18
institutions

103:8
instructing 6:3
insulated 65:8
intend 65:6
intended 69:14
interest 55:7
interim 106:3
interject 52:13
75:22
internal 42:16
81:11
interpret 55:6
69:8
interpretation
40:23
interpreting
40:21 83:7
interrogatories
4:5,7
interview 31:10
31:13
interviewed
29:23 31:11
31:13,21
interviews 88:16
101:4
investigative
105:8
involve 8:11
105:21 106:2
involved 60:23
64:20 91:1
irrelevant 104:1
isolated 65:8
89:21
issue 12:22
14:11,14
23:12 43:17
43:19 47:5,7
48:3,5,8,9,10
56:11 62:6
66:6 75:17
76:4 90:3
98:14 104:4
105:4 119:6
121:8
issues 6:3 47:22
65:22 81:8,9
88:17,18,19
95:15 103:4
103:10 105:3
106:8 111:2
112:22
item 60:14

_____J_____
J 2:12
Jacksonville
1:18 4:6 57:18
88:1
job 8:20 9:7,11
9:15 11:6 25:2
26:2 55:8
56:15 80:3
84:20 91:11
119:8
John 72:21
80:23 102:9
join 13:8 66:12
72:5
judge 13:14
24:11
judgment 62:20
90:14 99:12
July 75:16
June 11:3 16:8
16:12 61:16
62:6
jurisdiction
82:5,11
just 8:12 9:1,15
10:6 11:13
15:12 17:8
19:10,11,23
22:13 26:13
27:9,24 32:22
36:18 44:4,9
44:14 46:17
49:21 50:5,18
50:22 60:9
65:15,19 69:7
70:16 72:2,3,7
78:16 80:2
82:3 84:10,13
89:10 90:14
90:19,19 93:4
100:8,23
101:4,4,12
102:9 103:16
108:15 109:8
109:8,9,11,14
110:15,19
113:22,24
114:9 116:2
117:18 119:3
120:1 121:14
121:18,20
122:8,8,17

justification
121:13
justify 120:9

_____K_____
K 1:14 4:3 5:3
123:4
keep 47:4
Kehoe 53:7,10
53:13 54:21
55:2,11 56:2,3
56:6 57:19
Kellie 117:22
KELLY 2:5
kept 7:10 11:20
15:8,9 17:23
32:2 36:20
40:17 89:2
112:18,21
Kevin 82:23
84:2
kind 87:17
117:16
knew 12:9 13:21
17:11 23:1
36:21 64:4
108:16
know 12:1 13:1
14:19,22 15:6
15:15,18,18
18:19 19:6,7
19:12,15 20:1
22:21 23:15
27:17 28:4
32:1,7 34:19
34:21 35:12
35:20 36:16
36:22 38:8,14
38:15 41:17
42:9 43:4,16
43:18,20,21
44:6 46:6,9,18
48:15 49:8
50:17 52:8
53:2,2,3 54:23
56:18,19,21
57:14 58:10
59:24,24
60:13,19 64:3
64:5,21 65:1,2
65:4,6,9 66:4
66:14,16
67:13 69:13
69:13 70:2,9

71:4,19,22
72:1,6,9,23
73:19,22
76:15,16,24
77:4 78:23
79:1,6,8,11,18
79:19 80:10
81:4 82:8,10
82:16 83:23
84:4 87:4,5,5
87:17 88:17
88:19 90:16
90:16,17,18
91:4 92:4,22
93:8,14,16
94:9 96:13,14
96:14 97:24
98:9,21
100:18,24
101:1,3,14,16
102:2,22
103:3,6
106:16,24
109:1,10,15
110:6 114:14
115:24 116:2
116:10,14,16
116:19,22
117:11,12
118:13,15,19
120:7,9,14,15
121:9 122:4,9
knowing 6:20
111:3
knowledge 6:18
15:22 54:14
55:7 57:21
58:2 100:15
117:7,20
knowledgeable
85:12
K-e-e 95:2

_____L_____
L 4:1 75:8
labeled 34:3
43:12
ladies 13:12
laid 78:18
language 61:24
last 5:16 22:15
25:11,15
32:23 35:23
84:16 107:1

lasts 103:2
later 13:14
24:12 51:19
69:17 74:5
78:7 118:3
law 2:9 40:7
lawsuit 17:1,6
23:3 35:1 51:5
51:7,14,17
63:12
lawyer 112:10
laymen 20:24
lead 113:24
114:19
leading 99:15
114:11,18
116:15
leapfrog 39:12
70:20
least 19:3,7
91:12
leave 58:21
87:15
leaves 87:2,2
leaving 86:21
119:14
left 10:4,13
15:21 16:8,13
22:15,17
25:10,13,19
25:22 32:8
62:6 72:12
78:14 80:5
83:13 85:7
87:3 88:13
94:23 98:14
99:19 103:16
107:4 110:19
115:22 119:21
119:23 120:1
120:19
left-hand 60:3
Legal-Visual
1:22
lenses 36:9
78:12
less 109:16
let 23:18 26:11
26:15 34:2
36:13 43:15
70:1 72:3
75:22 82:10
95:18 100:1
118:16

2/21/07                    McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

Page 131

letter 38:18
50:18 51:6
52:1 53:11,17
53:20 55:14
57:15 63:7
64:9 66:3,5,7
67:5 69:8,12
76:23 77:5
115:3
letters 68:11
69:6 113:18
let's 31:18 76:8
77:14
level 5:24 9:20
9:21 14:18,23
20:3 34:13
37:23,24
38:21 39:9,13
62:18 92:5
levels 19:17
88:15
library 40:7
106:16
License 123:23
lieutenant 10:11
10:18 84:13
84:14
light 46:19
like 19:8 20:1
32:21 33:9
36:15 37:3,16
37:17,18 42:6
74:18 77:11
78:23 84:2
85:17 89:8
91:18 100:12
102:23 109:5
112:10,11,13
112:20 114:15
117:6
limit 14:4 88:4
limited 118:10
line 89:11
listed 116:20
117:9
little 107:1
122:4
living 84:15
LLC 2:12
locally 81:22
Logan 10:1,2,4
10:4,13
Londrigan 2:2,2
3:4 5:7 6:5

13:2,10,20
14:3,6 22:9
24:1,11,15,20
25:2 26:11
27:1 28:19
29:2 30:3,21
33:1,20 34:2
36:16 37:4,9
37:23 39:6
41:9,13 48:15
49:8,11 50:5
50:15 52:17
52:20 53:1,24
54:7,14,17
57:14 58:13
59:21 60:9,21
61:8,15 63:2
66:14 67:5,14
67:17 68:1,5
69:5 70:6 72:6
74:5 75:24
77:3,11,14,20
78:20 83:5,12
86:2,10 88:3,5
90:4 94:10
96:1 97:4 98:1
98:22 99:18
100:7,17
104:7,13
107:14 108:12
113:22 114:9
114:17 115:11
115:18 116:15
116:23 117:22
117:24 118:4
118:22 119:9
120:8,16
122:17
long 7:7 88:12
111:13
longer 78:12
120:22 121:18
look 28:13 31:3
35:23 42:16
43:11 46:21
47:4 50:5
64:15 95:18
99:11 100:9
looked 44:19
69:7 102:12
105:11
looking 46:18
46:19 47:24
60:9 73:2

looks 37:16
74:18 78:23
84:2
lot 89:11 109:7
lowest 9:20

_____

**M**

made 7:9 37:1
47:9 55:9 65:9
75:20 76:2,6
89:10 105:16
114:14 116:5
116:10 122:5
mail 63:23 64:2
64:2,4,5,7
65:3
mainly 8:13
11:19 89:5
106:7
Maintain 85:1
maintained
39:20
major 10:24
12:21,23
14:15 92:7,8
94:21,22
95:15 112:15
majors 94:24
95:7
major's 12:2
make 13:12 25:3
31:15,19,22
37:11 44:15
57:4 58:4,14
63:13,19
64:18 65:4
68:1 80:12
90:7 92:24
103:21,23
121:9 122:13
makes 91:3
making 12:9
20:1,2 23:2,11
57:6 90:11
manual 11:23
many 8:14 82:7
109:4 112:7
115:21
map 92:10
March 34:4
36:11 37:2,17
37:21 50:6
52:9,22 53:5
55:8,14

123:18
margin 60:4
mark 33:20 37:4
61:8
marked 3:12
26:8,12 33:11
33:23 37:6
41:6 50:2
59:18 61:10
62:23 67:2
69:2 74:2
77:17 83:2
85:23 100:4
marshall 78:1
massive 118:11
master 33:11
77:13 85:1,21
86:23
materiality 4:13
materials 35:2
47:12 51:24
58:2 66:21
matter 6:9 69:22
70:2,6 75:4
76:1,1
matters 11:14
Max 14:18
maximum 15:5
111:9
may 4:3,8,16,18
13:12 24:3
55:15 60:23
65:6 84:2 86:9
87:14 90:8
95:20 102:16
121:12
maybe 28:22
60:17 88:19
109:4
McCROY 1:5
12:24 16:17
17:12 22:11
22:18 23:9,11
23:20 24:8
47:18 49:3
51:5,13,22
52:10,21
55:10,18
57:16 58:6,16
60:24 63:3
66:5 69:23
74:7,23 75:7
77:6 78:11
83:14 86:14

111:3 116:14
116:16 118:13
120:14
McCroy's 17:1
33:10 35:1
63:12 86:3
McKee 86:22
94:24
mean 7:5 17:3,7
19:5,16 23:17
26:4 44:2 57:2
70:13 71:3
88:1,2,3 89:13
92:4,5 103:9
104:16,22
109:4 110:9
110:13 112:18
112:22 121:21
means 36:16
71:18 110:6
110:10
meant 39:10
120:22
medial 31:17
medical 30:4
31:17 32:15
32:18,18
46:14,24 47:1
47:2,5,18 48:2
48:5,22 49:4
49:14,17 59:6
59:7 68:10,19
68:22 70:14
70:22 80:6,22
96:2,7,10,12
96:15,17 97:3
97:4,11,11,12
97:14 98:21
99:3,9,10,12
99:16,17,19
101:1,7 108:2
108:5,19,22
108:23,24
109:13,24
112:22 113:12
118:11 119:5
119:6,7 121:1
122:7,14
medically 98:23
101:5 110:6
118:24 119:2
119:9,22
120:17,21
121:4,4,6,10

121:19,20
meet 112:16
meeting 71:16
71:21
meetings 46:9
71:5,8,8
meets 105:24
member 115:3
mental 8:7,9,10
mentioned
61:18
mentioning
117:1
met 46:6 75:22
method 39:7
might 45:9
86:14 87:19
93:19 102:5
109:12 111:6
mind 42:15
minor 105:10
minute 55:5
minutes 95:19
missed 21:6
missing 33:15
Missouri 1:23
Misstates
107:11
month 72:12
78:14
months 25:12
more 24:3 29:18
95:21 100:2
100:18 106:17
111:15 122:4
Morgan 1:18
4:6
most 58:3 85:11
105:7
mostly 9:13
movement 89:10
106:17
much 24:2 91:20
106:24 112:10
114:15
multiple 103:5
must 21:18
M-c 95:2
M.D 78:21

_____

**N**

N 3:1 4:1 5:3,3
name 5:8 27:3,6
28:18,20 29:5

2/21/07
Dennis Hockaday

McCroy v. Illinois Dept. of Corrections

Page 132

29:12,13,17
31:4 40:1
41:19,23 43:9
46:2 49:22
50:13 51:23
57:5,7,16
61:17 62:2
74:11 80:21
80:23 82:21
86:3
**named** 6:21
66:18 116:20
**names** 91:21
92:11
**naming** 17:13
**narrative** 10:6
10:22
**National** 2:10
**nature** 48:21
**necessarily**
35:12 62:12
**need** 22:5 33:6
55:5,16
109:11
**needed** 55:18
96:18 113:6
120:22
**needs** 109:11
**negligence**
30:18
**never** 38:12
43:4 49:5
61:24 62:7
68:15 80:1
82:19 107:13
**new** 12:8 84:5
**news** 109:6
**next** 10:18 46:3
55:24 72:12
85:20 95:22
**Nobody** 50:24
**Nodded** 22:4
51:8
**nodding** 22:8
114:12
**noisy** 109:7
**none** 43:7 97:15
98:4
**non-approved**
60:4,12 79:20
**non-medical**
109:19
**normal** 34:8
42:4 64:11

112:2
**normally** 7:9
34:12 105:5,7
119:1,15
**North** 2:13
**Notary** 1:15 4:3
5:2,4 123:4,20
**note** 72:3
**noted** 4:14
114:4
**notes** 123:16
**nothing** 32:12
33:17 44:17
53:16 118:20
123:11
**notice** 1:19 67:6
**noticed** 114:10
**notification** 77:4
**notified** 75:19
77:12
**notify** 75:20
**November**
10:11
**number** 3:2,12
28:3 34:3
42:21 43:11
50:6 54:23
59:21 92:21
**numerous** 23:22
24:2,6,19,20
**nurse** 31:11,12
31:19,20,22
31:23 32:17
101:2
**nurses** 96:13
**nurse's** 31:19

_____
**O**

**O** 4:1 5:3
**object** 5:23
12:20 28:16
32:22 38:23
50:11 57:10
67:10 70:1
78:17 83:9
87:24 100:13
114:16,21
115:15 117:5
**objection** 4:14
7:24 13:8 14:2
23:23 24:10
24:24 28:24
29:3 30:1
36:13 37:13

48:12 49:5
52:13,23,24
53:22 58:7
67:23 72:3,5
76:22 89:24
94:5 96:23
97:22 98:17
99:15 103:24
104:12 107:11
113:23 114:9
114:15,19
120:5,13
122:15
**objections** 4:13
13:13 24:12
60:6 75:22
**objection's**
114:4
**occupies** 92:11
**occurred** 16:21
77:4 82:4
**occurring** 22:19
**off** 18:19 56:19
77:14,15 83:8
84:3 117:12
117:13,18
118:2
**offender** 117:15
**offense** 105:10
105:14
**offered** 91:4
**offering** 75:24
76:1
**office** 12:2,2
21:9 26:24
27:13 40:18
40:19 64:16
72:8,17 81:8
85:15 90:6,10
91:15 92:3,17
95:10 97:10
**officer** 9:8,9,12
9:15,18,21
10:9,10,17
19:8,11 31:6,8
31:14,15,18
32:16 91:14
**officers** 27:9
91:23 95:11
95:12 109:18
**offices** 11:24
59:12
**official** 36:20
78:2

**often** 71:10
101:14
**Oh** 9:12 22:7
35:2 40:6 41:3
56:17 79:23
**okay** 5:22 8:1,5
8:6 10:9,14
14:3,8 16:7
17:19 21:3,10
22:7 25:18,24
26:6,17 29:8
29:19 36:3
44:9 45:7 48:1
52:7,7,19
53:18 58:19
63:17 69:10
69:18 71:4
74:20 83:19
88:13 90:19
91:22,24
110:21
**old** 9:1 12:8
**once** 38:11
50:20 75:17
81:21 99:8
103:22
**one** 6:21 7:13
12:15 13:21
14:18 43:2
54:23 65:3
69:6 71:21
74:5,22 77:13
80:24 89:12
102:12 103:3
109:4 113:23
115:18
**ones** 17:1 38:14
81:15 117:23
**only** 16:24 17:16
28:5 52:4
61:13 81:13
86:13 89:12
95:5 105:19
107:15
**on-the-job** 8:22
**open** 40:23
**operated** 46:3
94:12
**operates** 19:19
109:23
**operations** 11:2
11:13 18:23
20:22 21:4,7
**ophthalmologist**

58:5,16
**ophthalmologi...**
83:22 97:16
97:21 98:10
98:15
**opinion** 103:19
**opinions** 65:14
109:22
**opportunity**
16:21 33:2
37:11 66:19
**option** 81:19
105:19
**options** 104:17
107:15
**oral** 4:4,7
**order** 15:1,3
43:22 56:1,13
96:4
**orders** 97:2,2
98:24 99:17
**ordinary** 7:10
42:5 46:4
55:20 63:22
64:8 67:22
68:8 83:13
84:7
**organ** 71:24
**organizational**
92:10
**orientation**
40:10 88:13
88:14,16
102:23 103:1
103:1
**original** 82:5
93:18
**originally** 93:15
**originate** 18:14
81:10
**originated** 76:11
**other** 5:24 9:18
13:23 23:19
23:20 47:12
50:20 60:11
69:14 70:4,7
73:3 81:19
82:7 88:24
89:18,21
91:16 95:19
103:8 106:8
107:7 112:1,7
112:11 113:16
115:6 117:16

119:11
**others** 25:22
**OTS** 117:12,13
117:14,24
**out** 27:22 28:9
33:14 46:12
55:6 80:24
81:2 84:6 87:7
87:11 88:11
89:16 92:10
97:16 98:20
99:19 103:5
109:7,14
113:18 120:20
120:24 121:14
121:24
**outlined** 107:17
**outside** 47:2
58:5,15 82:1
82:12 87:19
96:17,20,24
102:18 114:24
**over** 4:11 23:8
23:18 38:12
38:20 43:23
66:21 70:20
92:3 93:15
95:9
**overlap** 95:14
**own** 4:18 10:22
42:15 51:23
117:3
**o'clock** 1:17 4:6

_____
**P**

**P** 4:1
**package** 51:24
**packet** 17:2
34:18,21,23
50:10 51:2,3
63:12 77:23
77:24 86:12
87:7,8
**page** 3:2 29:10
32:23 36:1,1,2
61:14
**pages** 33:2,3,7
33:12,15
**paper** 22:2 29:6
117:16
**paperwork**
22:23
**paragraph**
35:23

2/21/07
Dennis Hockaday

McCroy v. Illinois Dept. of Corrections

Page 133

parameters
13:18
Pardon 14:12
25:6 72:19
part 7:24 12:8
36:20 88:15
102:18 105:7
106:22 111:5
partial 32:22
participate
121:21
participated
47:8
particular 7:20
9:17 24:22
81:11 98:16
100:20 111:12
particularly
13:24
parties 4:2,16
parts 4:15
party 4:18 115:6
Part-time 5:15
passive 102:13
past 103:15
patient 60:16
78:11 99:20
105:15 119:22
patients 8:13,13
8:15
pay 60:15
PC 103:10,12
people 18:9,9
26:2 28:6
56:19 64:4
65:21 67:12
68:11 70:19
70:22 74:22
80:2 83:7
87:18 91:17
91:19 92:16
112:11 113:12
115:10 117:1
per 28:2 108:17
period 24:8
42:14 49:21
73:23 76:3
101:19 103:1
108:2
person 11:10
29:13 61:24
62:2 64:10
65:3 87:18
94:13 96:2,4,6

97:20 102:3,4
104:17 112:24
117:2 119:14
119:24 121:11
personal 5:19
5:23 6:2 111:3
111:4
personally 23:6
62:18 63:24
66:3,8
personnel 49:14
49:18
person's 26:18
pertaining 70:3
physician 48:13
48:20,24
75:16 97:6
physicians
57:17 83:21
piece 29:6
place 12:15
13:14 36:13
43:14 82:22
91:8 96:22
97:8 105:15
107:22 109:18
116:7 120:2
placed 8:18
13:23 14:24
42:13,19 56:1
91:6 96:15,16
97:1,7 99:7,8
99:13,16
101:18,20
102:4 104:20
104:24 118:14
118:17 119:10
119:11 121:3
placement 20:3
90:10,11,17
91:5,14,15
92:17,18,22
93:2 94:17
95:9 108:3
109:3,13
118:6 120:10
places 113:16
plaintiff 1:6 2:4
4:5 16:16
pleadings 17:19
please 5:8 24:16
33:21 67:15
86:6 115:20
plural 54:24

55:9
plus 91:18
point 64:22
84:16
pointing 28:9
46:12
policy 64:15
107:5
Pontiac 10:13
10:23 11:2,2,8
12:22 14:7
15:1,4,10 16:8
111:8,11,14
population 96:5
96:22 97:9,20
99:1,7,14,21
103:5 119:10
120:20
portion 24:17
position 8:18
11:17 28:6
48:16 91:12
positions 92:11
possession 86:18
possibly 61:5,6
112:21
POTTER 2:2
predates 66:2
predative
102:13
predator 88:22
102:16 116:4
116:9,17,21
117:8
predators 91:9
prerogative
13:13
present 5:13
10:8 33:5
presently 92:11
preserve 61:1
prevent 12:15
13:16,17,19
103:17
previous 76:7
print 41:19
printed 41:23
prior 8:2,17,21
16:22 32:8
33:3 86:20
90:11 95:4
123:8
priority 44:8
118:12

prison 14:15,21
14:23 15:2,5
21:3 27:22
36:22 68:9
81:12 97:19
98:11
prisoner 7:13,20
13:24 17:12
22:18 85:19
86:3 87:14
90:7,8 92:1
101:18 105:16
prisoners 6:21
15:9,24 87:22
88:24 89:18
119:12 120:10
prisoner's 87:10
privilege 106:14
106:15
privileges
106:10,11,16
106:16
pro 51:22
probably 44:21
78:1 85:15
104:15
problem 24:22
32:5 44:2 47:5
48:6,22 68:19
68:22 70:19
73:23 83:14
94:17,19,19
96:3,10
105:12
problems 32:8
94:20 103:11
106:8
procedure 4:10
18:4,8 39:21
40:3 45:3
46:22 82:13
104:10
procedures
27:12 38:16
39:5 40:11
42:9
process 21:12
21:15 38:9
60:23 64:20
67:17 88:16
93:22 102:19
102:23 106:2
113:21 114:5
114:24

produced 54:1
Professional 4:4
123:6,21
program 18:23
19:1 72:22
95:15
programming
20:6
programs 20:18
20:21 21:4,5,8
21:10 25:9
27:13 35:9
39:1 64:13
68:7 74:21
progress 20:1
promised 77:5
prompt 46:14
promulgate
93:13
proof 4:17
propensity 7:4
13:22
proper 30:4
32:15,17
protective 103:7
103:8 105:20
106:1
protest 103:17
protocol 97:19
provide 58:6
provided 7:15
7:17 16:20
21:24 22:23
48:11 51:13
55:18 77:6
Psychiatric
101:6
public 1:15 4:4
5:2,4 111:5
123:4,20
purports 50:18
purpose 4:16
purposes 19:23
26:8 33:23
37:6 41:6 50:2
59:18 61:10
62:23 67:2
69:2 74:2
77:17 83:2
85:23 100:4
pursuant 1:19
put 22:2 33:9
46:2 82:10
90:8

puts 44:14
putting 108:1
p.m 95:24

_____

Q

QA 71:8
qualified 36:6
58:5,15 97:17
98:15 109:21
quality 71:8
quarterly 71:4
71:16,21
question 4:14
6:12,15 24:14
30:20,22
42:15 54:8,23
66:4 85:13
97:9 98:18
100:17 102:14
108:15 114:2
114:11 117:3
118:16,23
120:5,8
questions 50:16
54:8 59:23
69:8 94:14
95:21 100:11
114:3,13,18
117:4
quick 44:23
quicker 42:11
44:9 45:2
quickly 45:1
quieter 109:9
Quincy 30:12
31:17 32:4,19
32:20 36:7,8
47:3 57:17
quite 83:18

_____

R

R 123:3
ran 91:15
RANDLE 2:2
rank 9:17 10:14
ranks 10:3
rather 57:18
81:11 108:4
111:7
rationale 119:19
120:9
Rayford 60:1
61:18,20
reaching 62:18

2/21/07
Dennis Hockaday

McCroy v. Illinois Dept. of Corrections

Page 134

read 17:15
24:15,17
26:15 27:8
34:21 41:20
41:20 50:20
51:9 52:15,17
52:18 53:10
53:19 54:11
54:17,18
60:17 63:9,10
63:23 64:2,9
73:6,7 114:1
115:11,12,16
115:19
reading 4:11
31:22 55:3
72:2 78:17
real 43:17
really 18:21
23:17 28:1,3
38:12,13
48:20 56:17
57:12 82:7
85:9 87:4,7
89:22 90:16
104:3 105:11
109:10
reason 15:15
33:18 66:20
110:10 111:21
119:19
reasons 96:15
96:17 108:4
108:19 109:19
111:12,13
recall 7:2,5
16:15,18
22:23 23:3,10
23:19,24 24:1
25:1 32:10
34:10,11
35:16,19
36:10,15 37:3
39:14 46:10
46:11 49:7,9
55:12,19,23
62:9,11,17,21
63:8,9,21
66:13 68:17
68:18,20,21
68:23 72:18
72:20 75:12
77:7,22 78:19
80:15 107:16

109:5 111:24
116:18
receipt 77:1
receive 23:9
52:10 54:20
107:8
received 34:18
34:23 53:14
68:13 76:9,10
120:18
receiving 109:1
recent 71:20
recently 103:16
119:22
recess 95:23
recognize 41:17
79:4 84:11
recognized 97:5
recognizing 6:5
90:4
recollection
17:22 24:6
47:16 49:16
62:7,16
recommend
54:20
recommendati...
31:4 32:11
97:21
recommended
53:4,8,10
78:13,15
101:5,6,7
103:12
recommending
52:10 54:24
55:10
record 7:3 21:8
24:17 26:11
30:13 32:21
33:10 52:18
77:14,15
78:10 84:5,6,7
84:17,21,24
85:5,15 86:2
100:12 103:23
111:5 112:19
118:2 119:3
122:22
recorded 31:20
records 7:10
16:21,24
17:23 32:2
36:20,23 85:7

85:13 87:3,11
88:6 99:1,21
101:7
recourse 44:2
recreation
106:13
reduce 15:24
reduced 20:3
refer 110:3
reference 78:10
referencing
20:13
referral 79:2,15
referred 75:17
123:16
refers 71:23
refitting 54:22
refreshes 62:15
refuse 6:15
104:19,21
refused 105:13
refusing 104:23
105:1,10
107:21
regarding
109:22 111:2
Registered 4:4
123:5,21
regular 44:6
45:3
regularly
112:14
regulation 18:24
27:14 56:13
89:4
regulations
11:15 12:11
12:14,18
13:20 14:10
21:1,15 39:20
40:2,14,21
42:17,24
44:15 47:9
87:21 88:6,8
91:4 92:1,19
93:13 94:3
106:20,23
115:21 116:1
regulatory
92:15
related 43:12
relates 39:22
69:23
release 20:4

96:6 97:12
99:17
released 96:9
120:21 121:4
121:19
releases 99:10
relevance 12:22
24:10 89:24
94:5 100:16
120:6
relevancy 4:13
relevant 105:12
relief 22:19
rely 113:12
relying 53:9,12
remain 85:14,18
remained 10:10
10:12 11:2
remember 18:21
23:11,13 30:8
37:15 39:14
39:15 42:7,10
59:13,15 60:2
61:2,5,6 71:9
73:8,18 75:10
80:17,18,20
80:20 81:1
82:15,21 92:7
92:21 98:19
102:22 116:6
116:11
remembrance
18:16
remove 105:17
removed 105:4
107:19,20
render 109:22
repeated 42:21
report 13:18
61:15
Reporter 4:4,4,8
24:18 123:5,6
123:20,21
Reporting 1:22
reports 31:23
represent 51:18
representatives
115:9
request 29:11
29:15 62:3
65:16 79:2,15
85:17 105:16
105:20 107:9
requested 24:16

requests 64:5
require 54:2
83:14
required 11:16
46:14 60:24
90:12
requirements
4:10
reserved 4:13
resolution 18:20
resolved 81:23
respect 16:16
42:23 87:23
89:19
respond 64:17
66:10 78:16
responded
37:18 43:24
64:10 66:15
response 17:18
19:16 26:17
26:22,24 27:9
29:1 37:19
63:7 77:12
86:16 89:3
90:13 104:9
responsibilities
31:7 55:8 80:4
80:8 84:20
responsibility
26:3 28:10
45:13 54:15
56:14 89:23
91:11 122:12
responsible
40:20 41:1
75:13 91:5
restraint 42:11
42:11
restraints 42:10
restricted
106:17
result 32:1
retired 5:18
11:4 25:17
72:16
retrained 12:7
retrieve 52:5
review 16:21
18:18 31:10
38:7,10 39:7
45:2 58:3
62:10 66:20
75:16,18 81:6

82:4,8 86:20
86:22 88:14
90:17 93:21
101:3 102:9
103:17 112:2
116:7
reviewed 12:5
16:24 17:2,17
17:18,23
29:21 34:15
34:20 35:8
44:18 45:20
46:15,17,24
47:11 64:12
82:1 90:10
101:17 102:7
105:22,24
111:20,23
reviewing 12:8
50:8 52:7
101:4
reviews 19:22
56:23 103:2,4
right 6:9,16 7:21
9:18 11:20
13:20 14:16
15:19 16:4,13
16:23 17:10
19:2 20:12,23
21:12 22:14
22:14,20
26:23 27:2
28:8,12,20
34:6 35:4,15
36:23 38:22
44:13 45:11
47:14 48:4
49:23 51:21
54:23 57:2
58:21 59:7
62:8,14 63:14
63:22 66:9,22
68:1 71:23
72:13,14 73:9
75:2 77:3
78:20 85:11
86:15 87:12
88:21 91:10
91:21 92:13
92:14 98:2,8
107:18 108:6
108:11,20
109:20 110:17
115:23 118:4

2/21/07
Dennis Hockaday

McCroy v. Illinois Dept. of Corrections

Page 135

119:12,17
122:13
**risk** 12:17,24
15:24 90:9
104:18
**risks** 87:18
**role** 72:21
**room** 40:17
65:13,23
121:23
**rounds** 65:9
103:21
**route** 39:7
**routinely** 44:22
**routines** 46:8
**routing** 64:6
**Row** 82:16
**ROYSTER** 2:8
**rule** 24:12 27:14
27:19,21 72:1
72:7,10
**ruled** 13:13
**rules** 4:10,10
11:15 12:17
18:24 21:1,14
39:19 42:16
42:24 43:13
45:14 72:11
91:4 92:1 94:2
94:12
**ruling** 25:3
37:11
**run** 68:9 92:16
**running** 89:11
95:12
**rush** 36:7
**rushed** 30:12
31:16
**Ryan** 71:14
**R-o-w-e** 82:17

_____ **S** _____

**S** 3:11 4:1 5:3
**safety** 6:2 87:23
90:23,24 94:1
102:5 104:6
**saith** 5:5 122:23
**same** 24:24
46:16 52:23
63:12 67:6
116:1 120:2
120:11,13
**Sandy** 74:18,20
**Sangamon** 1:15

1:16 123:2
**sat** 47:21
**satisfaction**
81:24
**satisfied** 38:8
**saw** 32:20 51:12
**saying** 32:15
43:10 45:8
51:3,6,21 53:6
55:18,22
56:19 62:9
64:14 75:14
76:20 82:3
87:1 95:14
96:24 97:4
102:10 122:7
**says** 26:17 29:20
29:23 36:17
55:3,24 71:20
73:11 77:1
78:11 84:1,1
104:4
**scheduled** 56:2
**Schnepel** 25:10
27:4 35:10,11
35:21 36:4,11
40:22 42:14
42:19 43:9
45:20 46:12
47:17,21
49:21 55:16
56:9 57:15
**Schnepel's** 27:5
**school** 5:20 8:4
9:2 89:8,11
110:19
**screening**
100:24
**se** 51:23
**seal** 123:17
**Sears** 5:15
**seated** 72:8
**second** 2:6
113:22 114:9
**secretary** 91:18
**security** 6:3
10:24 11:7,8
11:13 12:6,11
12:19 14:7,15
14:23 15:5
20:3 21:7
86:22,24
87:23 88:15
89:7 91:22,23

93:24 95:13
107:22,24
108:2,4,17
109:3,13,17
111:9 118:5
118:17
**see** 24:11 29:20
30:6,23 31:4
31:11,18
34:22 36:5
44:23 46:17
55:11 58:16
60:3,14 61:17
61:20,23 63:3
71:23 72:10
72:24 73:11
74:11,17
77:11 78:20
86:23 95:19
99:22 105:11
105:24
**seeing** 36:6
**seek** 87:14
**seen** 17:17 32:20
34:16 50:9
51:10 53:7
54:21 62:1
68:15 77:8,20
80:1
**segregation**
14:21,23
15:13,13
85:9 101:19
101:22 102:1
102:4,18
103:16 104:20
105:2,5,16
106:4,5,12
119:14 120:1
121:15
**selected** 58:5
**send** 38:18
65:20,23
69:14 103:9
115:7
**sending** 65:22
113:15,18
115:3,6
**sends** 38:11
**sense** 91:3
**sent** 47:2 50:7
74:24 77:9
79:8,11,15,17
82:9 111:11

113:3
**sentence** 54:18
55:24
**separate** 14:24
15:8,9,23,24
106:7
**separated**
109:11
**September** 5:18
11:5 16:13
22:16 25:15
72:12 80:5
**series** 59:23
**served** 17:6 23:4
46:17 59:4
**service** 20:21
78:2
**services** 1:22
20:9,16 71:5
71:16,21
72:17,22 92:8
**Serving** 1:23
**Seventh** 2:3
**several** 57:20
103:2 111:18
**sexual** 102:13
**SF** 74:18
**share** 88:9
117:22
**Shaw** 31:12,20
32:17
**Shelton** 78:24
**shift** 9:14
103:20
**shifts** 11:11
**Shook** 57:24
**short** 95:5,23
108:1
**shorthand** 4:4,8
123:5,13,16
123:20
**short-circuit**
39:11
**show** 25:21
26:11 33:18
49:13 79:24
99:3
**showed** 7:3
34:17 77:21
**showers** 106:15
**showing** 34:17
56:22 63:11
**shown** 50:18
111:18

**side** 57:24,24
**sight** 61:1
**sign** 18:19 23:5
28:17 49:22
57:5
**signature** 23:6
27:2 28:13,17
28:18 41:20
41:21 50:7,12
50:14,19
53:15,21
56:18,20,21
57:1,3 74:13
74:15 76:3
84:1,11,17
**signed** 27:3
29:13 43:9
46:2 53:23
56:19 57:16
84:14
**significance**
56:23
**signing** 4:11
57:7 83:8 84:3
**similar** 42:22
**Simmons** 95:5
**simply** 46:2 57:5
70:20 87:17
107:9,9
120:11
**Sims** 55:3 56:1
58:8 78:8,21
**since** 17:16 18:2
19:7 50:20
76:15 95:11
**single** 14:11,13
14:19 15:2,13
15:13,20,21
15:22 101:5,6
**sit** 32:7 43:22
48:5 52:8 53:3
56:5 58:1
115:24
**site** 18:23 19:1
**sitting** 22:7
**situation** 12:18
14:10 19:15
64:23 70:19
105:17,23
107:21
**situations** 13:19
**slip** 85:17
**Snyder** 71:15
**solution** 30:19

**some** 7:6 11:23
23:4,15,19
24:2,3 25:21
26:2,3 45:8
51:19 55:17
64:22 69:7
80:2 88:7
99:11 101:3
103:17 105:14
108:24 109:1
115:6 117:16
119:6,7 122:5
122:18
**somebody** 27:10
28:19 64:17
84:2 86:9
108:1 122:7
**someone** 28:11
57:2 60:11,14
85:13 87:10
121:14
**something** 13:17
27:22 28:4
37:18 40:16
45:9 54:6
58:12 61:4
63:18 65:22
80:1 90:15
101:16
**sometime** 15:2
**sometimes**
101:20 104:15
112:15
**somewhere** 94:8
**sort** 6:1 112:11
**sorted** 64:3,4
**South** 2:3,6
**speaks** 112:19
**special** 83:15
120:23
**specialist** 86:22
96:18 98:21
**specific** 27:19
27:21 56:13
73:21 88:7
93:7 94:7,10
94:11 103:10
**specifically** 4:14
16:18 23:10
23:12 35:19
43:2 47:20
49:9 55:12,19
56:18 68:3
80:10 88:18

92:3 93:1,9
102:7,22
104:4 116:6
specifics 115:10
speculation
104:1 120:6
spell 29:16
spelled 29:17
spring 11:1
Springfield 1:3
2:3,6,10 38:7
38:13 39:3,4
39:16 57:18
59:14 81:1,2
SS 123:1
staff 96:12 97:3
97:5,14
108:23
stamp 60:3,4,5
79:19
stamped 60:12
stand 13:10
standard 101:12
standpoint 15:6
start 23:18
started 8:1,6
9:23
state 1:16 5:8
8:1,6,19 33:16
59:6,7 80:6
123:1,7
stated 30:11
31:12
statement 31:20
31:21 53:20
54:11
STATES 1:1
statewide 93:7
stationary 71:12
74:9
stay 105:1
110:20
stayed 8:8
step 82:1
still 13:11 15:22
46:20 76:4
106:13,14,15
106:22 121:23
121:24 122:1
122:2
stinks 104:5
stipulated 4:2
stop 113:17
114:23 115:2

115:5
straight 65:19
65:20,23
Street 2:3,6,13
stricken 114:18
strictly 11:13
stuff 109:7
subject 69:21
70:2 74:17
75:4
submit 79:2
submitted 17:1
20:2
subsequent
55:14
sufficiently
24:21
suggest 33:7
60:16
suggesting
117:1
suit 17:12 51:22
Suite 2:10
supervision
70:20
supervisor 20:9
20:10,11,15
20:16,17
85:16 92:6
supervisors
103:20
supply 33:2
suppose 29:18
96:16
supposed 41:19
supposedly 75:8
77:5
Supreme 4:11
sure 12:9 13:16
17:3 20:1,2
23:17 27:16
27:17 28:1,2,3
33:4 38:13
39:24 42:1
56:17 57:13
58:24 70:4
71:6,9 82:7
85:9 87:5,7
89:22 90:7,16
sworn 5:2,4
123:10
system 19:18
117:15

T
T 3:11 4:1,1
123:3,3
take 6:8 8:17
12:3 16:16
42:16 50:5
60:22 63:6
64:15 81:24
90:19 95:22
99:17 100:9
102:14 112:5
118:12 119:21
119:21
taken 1:13 4:3,8
32:19 66:19
95:24 105:1
105:23 109:8
123:13
taking 89:6
123:8
talk 19:13,14
46:7 49:3
60:16 71:1,2
73:16 94:21
94:21 112:13
112:17 115:10
118:2,3
talked 62:1 80:1
116:3 118:5
talking 14:5
19:6 20:14
32:16 35:2
39:6 68:18,21
71:7,20,22
73:19 90:2
94:18
talks 71:16
Tara 31:4
technician 8:10
telephone
115:14
tell 11:6 18:13
19:18 20:24
26:1,13 28:22
28:22 29:5
38:9 40:2,2,10
41:15,23 53:1
59:3 60:8,10
69:15 74:16
92:15 94:2
95:18
telling 47:23
55:1 58:13

62:5,17 71:17
92:22
tendencies
88:20
tendency 65:19
Tenney 2:12,12
tenure 83:6,11
100:13
term 127:4
111:13 122:9
terms 20:24
Terri 81:3
testified 48:13
49:6 114:6
testify 49:8
123:10
testimony
107:12 109:17
113:20
Thank 108:12
110:21 117:5
their 4:2 8:15
13:13 18:10
19:22 20:9,11
26:2 41:19
81:21,21
84:22 85:21
86:17,18,18
115:8,8
121:11,12
themselves
97:16 119:21
121:9
thereof 4:15
they'd 19:8,13
38:17
thing 6:1 17:16
20:5 61:3
81:13 85:18
109:4 112:12
114:10 118:11
things 12:9 28:7
45:4 46:5
64:24 65:18
82:9 85:17
90:11,18,20
100:2 102:12
112:8,10
118:8 122:3,6
122:18
think 21:6,9
29:3,16 33:6
44:24 45:9,10
61:6 63:15

92:6 94:16
100:18 104:7
108:15 112:18
thinking 47:4
Thomas 2:2
though 7:6 43:9
48:18 64:9
68:15 101:21
thought 24:21
35:17
thoughts 109:9
threat 102:5
109:10
threatened
107:10,15
three 11:11
91:9 112:15
through 4:2
7:10,22 10:3
18:23,23
21:11 27:12
33:10 34:21
45:3,22 46:17
65:11 70:7
102:19 107:2
111:19 114:1
throughout
19:16 46:9
49:20 93:3
ticket 105:9
time 5:14,16 8:3
8:18 9:19
12:14,20
13:14,21 14:4
14:6 15:5
17:11,16 19:4
22:17,22
23:21 24:8
27:15 30:16
32:8 33:5 34:5
35:11 42:9,10
42:11,14 47:9
51:12,19 58:4
65:4 66:19
68:6 73:23
76:3 78:13
88:4 90:1
93:19,19 95:6
101:19 108:2
109:12 110:20
111:22
timely 37:17
times 19:8 22:12
42:22 92:9

109:4
time's 20:1
title 56:9 81:1,5
today 32:7
34:17 48:11
51:1 52:8 53:3
63:11 66:4,21
77:21 85:12
107:17 112:17
together 73:3
90:8 91:6
103:18 120:2
120:10
told 30:3 33:14
43:7 47:11,19
76:4 121:2
tolerate 78:12
Tom 14:5 114:3
114:14,22
115:17 117:4
top 29:20 42:3
65:5 71:15
79:19
touch 65:10
towers 9:14
trace 92:12
tracking 117:15
trained 8:19
training 8:17,22
12:7 15:7 16:6
transcribed 4:9
123:14
transcript
123:15
transferred 7:14
57:16 85:4,8
99:20 107:7
transfers 57:22
translation
123:15
transplant 23:9
23:16 52:11
52:22 53:4
54:21 55:1,11
55:17 61:1
71:24 78:13
78:15 113:7
113:10 119:23
120:18
transplantation
60:22
transplantatio...
60:16
treat 97:17

2/21/07                           McCroy v. Illinois Dept. of Corrections
Dennis Hockaday

Page 137

98:15
treated 13:7
   42:4 48:17
treater 58:15
treating 57:19
   97:6,21
treatment 30:5
   32:15,18,18
   36:7 58:6
   98:21 108:24
   109:1 112:23
trial 6:15 13:2
   114:1
Troemper 2:9
   3:4 13:5 23:23
   24:10,24
   26:19 30:1,20
   36:13 37:20
   48:12 52:13
   52:23 58:7
   60:6 66:10
   67:15 70:1
   72:3 75:22
   78:16 86:5
   96:23 97:22
   98:17 99:15
   108:14 110:21
   119:3,4
   122:15
true 6:14 86:13
   123:15
truly 39:8
trust 112:4
truth 76:1
   123:11,11,11
try 33:14,15
   61:1
trying 13:3 21:6
   94:16 122:17
turn 115:20
two 21:4 25:11
   60:6 68:11
   69:6 91:19
   102:21 120:10
type 7:16 8:21
   11:23 12:18
   14:9 16:1 20:4
   56:14 61:3
   73:23 79:4
   84:5 85:18
   99:11 101:3
   102:19 103:17
   105:14 108:24
   109:1 119:7

121:12
typed 42:3
types 56:11
   81:17 120:10

_____
   U

U 4:1
Uh-huh 6:7 9:3
   10:16,21 16:2
   17:18,21
   21:16 22:4
   30:7 31:2
   54:19 56:10
   59:11 67:7
   71:13 75:1,6
   85:6 118:7
ultimate 45:13
ultimately 25:3
   41:1 92:4
   95:11
unassigned 89:9
   110:7,14,15
   118:24 119:2
   119:10,11,16
   119:22,24,24
   120:12,17,21
   121:21,22
uncommon
   65:15
under 6:16,22
   11:11 12:11
   21:7,8,10
   45:14 50:7,12
   58:9,11 60:14
   64:11,17
   70:19 76:3,4
   91:22 92:6,7,8
   92:8 95:13
   96:14 97:18
   99:9,16
   123:17
underneath
   70:23 72:24
understand 7:23
   29:2 44:10
   45:6 51:16,19
   59:5 64:2
   71:17 73:2
understanding
   18:7 26:4
   47:10 79:14
   90:5 97:19
undertook
   121:9

undisclosed
   55:17
Uniformed 9:9
unique 93:4
unit 30:16 73:12
   75:14,19 76:9
   77:2 96:7 99:9
   108:1 109:14
   109:22 110:1
   118:6,11,18
   119:5 121:3
   121:20
UNITED 1:1
units 30:14
unit's 30:18
   122:4
universal 88:8
unless 4:14
   35:13
until 8:8 10:10
   10:12,12 11:3
   76:10,12
   119:16
unusual 98:20
   115:9
updated 93:21
use 92:17
used 4:16 69:12
   79:6 84:7
   100:20,21
   105:8 122:8
using 93:8
Utilization
   75:15
utilize 21:23

_____
   V

valid 63:16
variable 109:4
variables 104:16
various 92:9
vendor 69:19
   70:15
vendors 69:11
   69:11,23 70:5
   76:16
verbalize 22:1
version 36:19
versus 108:18
very 47:10
   93:16 107:1
   111:1
violence 7:7
   88:23 89:15

violent 90:7
   103:15
vision 121:11
visited 98:11
Vlynne 78:23
VOELKER 2:8
voice 18:10
   65:14 103:19
voiced 103:23
volume 27:20
   65:2,3
vs 1:7
vulnerability
   102:15
vulnerable
   13:24 116:4,9
   116:17,20
   117:8
vulnerables
   91:9

_____
   W

wait 55:5
waive 122:22
waived 4:12,14
walk 121:23
walked 65:10,12
want 35:23
   42:22 52:3,15
   52:17 55:6
   63:19 66:1
   68:1 78:16
   87:17 91:3
   95:20 100:19
   104:5,6
   109:13 110:18
   110:18,19
   111:15 114:15
   114:20,22
   117:23 120:16
wanted 33:12
   42:15 46:24
   67:19 99:19
   102:2
wanting 23:15
wants 39:3
   109:8
warden 11:1,4,4
   11:12 12:23
   16:9,10,14,22
   17:13,24 19:3
   22:9,12 23:7
   23:21 24:9
   25:9,10,11

27:13 28:6
   34:5,15 35:9
   35:21 36:4,11
   38:1 39:1,10
   39:21 40:2,12
   41:3 42:20
   45:15 47:21
   49:21 55:21
   56:9,15 58:1
   58:23 62:19
   63:24 64:13
   65:8,9,19,24
   67:9,20,24
   68:5,7,18
   70:12 74:21
   75:10 79:14
   84:9 93:23
   99:18 101:20
   112:7 113:2
   116:24
wardens 46:7
   65:2 72:24
   73:3 112:4,15
warden's 72:8
   84:1 92:4
wasn't 14:11,13
   22:12,13
   27:24 33:13
   65:8,15 76:19
   78:4 83:15
   90:1,8 98:19
   116:23 118:11
   119:8
Water 2:13
way 15:12 22:24
   28:8 38:19
   39:11 44:3
   82:10 85:7
   88:5
weapons 86:19
well 10:3,5 13:4
   13:9,10,15
   14:3 15:23
   16:7 25:21
   26:16 27:18
   28:19 29:17
   30:21 39:6
   43:6 44:12
   48:15 49:11
   54:14 57:1
   62:12 63:13
   64:14 75:13
   76:8,18,24
   77:24 81:19

82:10 83:18
   94:18 95:17
   98:1 102:12
   105:5 112:19
   116:24
went 8:22 10:2
   10:23 16:8
   25:16 33:10
   65:10 67:12
   69:11,15
   72:15
were 5:16 6:14
   6:19,21,22
   8:13,18 9:1,11
   10:14 11:6,15
   11:16 12:14
   12:17 14:7,10
   15:8,9 16:14
   16:22 17:1,19
   17:23,24 19:4
   22:22 23:7,7
   23:21 24:9,21
   27:15,23 32:8
   33:12 34:5
   35:3 39:19,20
   39:21 42:13
   47:6,8 49:21
   51:23 52:9,9
   52:20 53:3
   54:24,24 55:8
   55:9,16,18
   56:2 60:23
   65:9,13 69:22
   70:5,12 71:9
   71:10 72:8
   73:3 78:14
   80:8,11,13
   82:9 84:8
   85:12 90:5,12
   91:13,23 92:6
   92:21 93:23
   93:24 94:2,3
   94:12,13 95:7
   96:17 97:5,16
   98:10,13,14
   99:18 100:21
   101:7,9,20,20
   101:22 103:15
   104:10 107:14
   111:1,8,11,18
   111:22 112:21
   113:15 115:14
   115:21 116:1
   117:7 118:8,8

2/21/07
Dennis Hockaday

McCroy v. Illinois Dept. of Corrections

Page 138

| | | | | |
|---|---|---|---|---|
| 118:14 119:9 | wing 89:12 | **Y** | **1227** 2:3 | **4** |
| 120:11 122:18 | 110:15 121:22 | **Y** 5:3 | **13** 3:19 83:3,5 | **4** 3:14 41:4,7,10 |
| **weren't** 40:23 | **wings** 89:8,9,10 | **yard** 121:24 | **13th** 74:6 76:11 | **40** 12:7 |
| 64:10,24 | 89:12 | **yeah** 24:5 32:14 | 77:9,10 | **41** 3:14 |
| **Western** 7:15 | **Winters** 82:23 | 41:22 47:5 | 123:17 | **415** 72:1 |
| 11:3 12:23 | 82:23 84:2 | 48:8,14 50:10 | **14** 3:19 85:24 | |
| 16:8,10,11,15 | **witness** 4:8,11 | 51:15 53:13 | **15** 3:20 100:5,8 | **5** |
| 17:14,24 | 26:12 33:17 | 72:11 78:3 | **16** 89:12 | **5** 3:4,15 50:3,6 |
| 22:10,20 23:8 | 41:4 90:1 | 81:9 84:4,10 | **16th** 76:10,12 | 52:1 |
| 24:9 25:14,22 | 95:22 100:16 | 88:11 89:1 | 77:1 | **50** 3:15 |
| 25:23 34:5 | 104:2 113:24 | 101:11,23 | **168** 3:4 | **500** 2:6 |
| 39:20 58:10 | **word** 13:15 | 106:17 107:19 | **17th** 61:16 | **504** 11:19 |
| 61:16 62:19 | 111:15 | 108:22 117:21 | **18** 9:1 | **575** 2:10 |
| 70:12,16 | **words** 81:19 | **year** 12:4,4,6,6 | **1999** 10:14 | **59** 3:15 |
| 72:15 80:14 | 91:16 107:7 | 93:21 | | |
| 81:12 83:6 | **work** 8:19,23 | **years** 9:1 19:17 | **2** | **6** |
| 84:8 85:12 | 9:5 20:4 66:23 | 22:10 46:19 | **2** 3:13 33:21,24 | **6** 3:15 59:19,21 |
| 88:2,3 89:5 | 70:23 110:11 | 57:20 107:1,2 | 34:3,3 36:1 | 60:10 |
| 93:1,5,17 | 110:12,18 | | **2/25/02** 86:7 | **6/17/02** 61:13 |
| 94:14 98:7 | 119:16 | **0** | **2000** 11:1 | **61** 3:16 |
| 100:22 102:24 | **worked** 9:13 | **01** 11:3 15:21 | **2001** 22:14 | **62** 3:16 |
| 103:7 107:4 | 10:3 26:5 | 16:8,12 | **2002** 22:16 34:4 | **62525** 2:13 |
| 111:16 113:17 | 27:22 38:12 | **02** 5:18 11:5 | 36:12 37:2 | **62701** 2:10 |
| 119:20 | 58:9,10,11 | 16:13 25:15 | 50:6 52:9,22 | **62703** 2:3 |
| **Wexford** 58:10 | 81:2 91:18,19 | 37:22 61:16 | 53:5 55:8,14 | **62706** 2:6 |
| 58:14,22 | 91:22 98:10 | 67:16 75:16 | 60:23 62:6 | **67** 3:17 |
| 59:22 60:4,11 | 107:2 | 78:8 | 63:3 67:18 | **69** 3:17 |
| 60:15 69:19 | **working** 9:14,14 | **02-3171** 1:7 | 68:9 69:6 | |
| 70:5,15 71:2 | 9:15,23 20:18 | **084-002128** | 70:11 72:9 | **7** |
| 75:15 78:9 | 70:19 95:12 | 123:23 | 80:5 93:23 | **7** 3:16 61:8,11 |
| 79:2 80:21 | **works** 38:9 | | 104:11 | **72** 8:1,7 |
| 82:17 97:13 | **wouldn't** 19:10 | **1** | **2002-2004** 22:10 | **74** 3:18 |
| 97:15 98:9,20 | 35:12 93:4 | **1** 3:13 26:9,13 | **2007** 1:17 4:5 | **77** 3:18 8:8,8 |
| 110:3 | 122:11 | 27:1 32:22 | 123:10,18 | **78** 9:6 10:9 19:7 |
| **we'll** 69:16 | **writ** 31:24,24 | 36:1,2 | **21** 1:17 | |
| 95:21 118:2 | 84:10 86:12 | **1-800-248-2835** | **21st** 4:5 123:9 | **8** |
| 122:22 | 86:21 87:7,8 | 1:24 | **217)788-2835** | **8** 3:16 62:24 |
| **we're** 13:2 33:4 | 98:20 113:3 | **1/6/03** 86:8 | 1:23 | 68:11 |
| 70:15 90:2 | **write** 29:12 | **10** 3:17 69:3,5 | **217)788-2838** | **8/19/02** 78:21 |
| 104:8 118:10 | 43:22 | 76:8 | 1:23 | **80** 72:1 |
| **we've** 33:3 | **writes** 44:5 | **10/29/03** 100:14 | **236** 2:13 | **82** 10:10 |
| 43:11 | **written** 31:1 | **10:15** 1:17 4:6 | **24** 109:16 | **83** 3:19 10:11,11 |
| **while** 6:19 16:14 | 37:18,19 | **100** 3:20 | **24hrs** 1:23 | **85** 3:19 |
| 16:22 17:24 | 57:15 60:15 | **108** 3:4 | **25th** 75:16 | |
| 23:7,14 24:3 | 77:4 93:16 | **11** 3:18 9:14 | **26** 3:13 | **9** |
| 27:23 39:20 | 105:9 106:20 | 74:3,6 | | **9** 3:17 67:3 |
| 84:8 90:5 | 111:22 | **11th** 34:4 37:17 | **3** | 68:11 |
| 91:12 94:13 | **wrong** 86:9 98:6 | 63:2 67:16 | **3** 3:14 9:13 37:4 | **99** 10:4,12,23,24 |
| 100:21 104:10 | **wrote** 28:20,23 | **110** 3:5 | 37:7 60:14 | 15:20 |
| 117:7 118:13 | 29:5 36:4 | **12** 3:18 77:18,21 | **3/29/02** 26:21 | |
| **whole** 66:2 | 93:14,20 | **12th** 37:21 50:6 | **3/30/02** 41:12,14 | |
| 89:10 123:11 | | 69:6 70:11 | **33** 3:13 | |
| **Willard** 80:3 | **X** | 76:7,11 | **37** 3:14 | |
| **willing** 60:21 | **X** 3:1,11 | **12:20** 95:24 | | |