E-FILED
Friday, 04 May, 2007 02:21:04 PM
Clerk, U.S. District Court, ILCD

COPY

1    UNITED STATES DISTRICT COURT
2    CENTRAL DISTRICT OF ILLINOIS

3    AARON MCCROY,                        )
                                          )
4                    Plaintiff,           )    NO. 02-3171
                                          )
5            v.                           )
                                          )    DEPOSITION OF
6    ILLINOIS DEPARTMENT OF               )    WILLARD ELYEA,
     CORRECTIONS, et al.,                 )        M.D.
7                                         )
                     Defendants.          )
8

9

10

11

12

13

14

15          DEPOSITION OF WILLARD ELYEA, M.D., taken

16   at the Dixon Correctional Center, 2600 North Brinton

17   Avenue, Dixon, Illinois, on March 7, 2007,

18   commencing at 1:00 p.m., before Julie K. Edeus,

19   Certified Shorthand Reporter and Notary Public in

20   and for the State of Illinois, in pursuance to

21   agreement of the parties in the above-entitled

22   action.

23

24

2

1  APPEARANCES:

2       ATTORNEY THOMAS F. LONDRIGAN,
        of the firm of Londrigan, Potter
3            & Randle, P.C.,
        1227 South Seventh Street,
4       Post Office Box 399,
        Springfield, Illinois, 62705,

5
                    Counsel for the Plaintiff.
6

7       ATTORNEY KELLY CHOATE, AAG,
        Office of the Illinois Attorney General,
8       500 South Second Street,
        Springfield, Illinois, 62706,

9
                    Counsel for Defendants IDOC and
10                  Dr. Elyea.

11

12      ATTORNEY THERESA POWELL,
        Heyl, Royster, Voelker & Allen,
        National City Center, Suite 575,
13      1 North Old State Capitol Plaza,
        Springfield, Illinois, 62705-1687,
14
                    Counsel for Defendants
15                  Wexford, Lochard, Sims, Brown,
                    Shaw and Rayford.
16

17      ATTORNEY LYNDSAY E. DUDGEON,
        of the firm of Hughes, Hill & Tenney, L.L.C.,
18      236 North Water Street,
        Suite 200, P.O. Box 560,
19      Decatur, Illinois, 62525-0560,

20                  Counsel for Defendant
                    Dr. Anderson.
21

22

23

24

3

1                          **INDEX**

2

3            Witness:  WILLARD ELYEA, M.D.

4    **Examination**                              **Page**

5    Attorney Londrigan . . . . . . . . . . . . . . 4

6    Attorney Powell. . . . . . . . . . . . . . . 51

7    Attorney Choate. . . . . . . . . . . . . . . 55

8    Attorney Londrigan . . . . . . . . . . . . . 57

9

10                        **EXHIBITS**

11   **Exhibit**                                  **Marked**

12   Plaintiff's Exhibit No. 1. . . . . . . . . . . 10

13   Plaintiff's Exhibit No. 2. . . . . . . . . . . 15

14   Plaintiff's Exhibit No. 3. . . . . . . . . . . 16

15   Plaintiff's Exhibit No. 4. . . . . . . . . . . 27

16   Plaintiff's Exhibit No. 5. . . . . . . . . . . 34

17   Plaintiff's Exhibit No. 6. . . . . . . . . . . 35

18   Plaintiff's Exhibit No. 7. . . . . . . . . . . 43

19   Plaintiff's Exhibit No. 9. . . . . . . . . . . 44

20   Plaintiff's Exhibit No. 11 . . . . . . . . . . 46

21   Plaintiff's Exhibit No. 14 . . . . . . . . . . 50

22

23

24   Certificate of Shorthand Reporter. . . . . . . 61

4

1          **WILLARD ELYEA, M.D.,**

2          being first duly sworn, was examined and

3          testified as follows:

4                        **EXAMINATION**

5          BY MR. LONDRIGAN:

6    *Q.*    Would you state your full name, please.

7    *A.*    Willard Oswald Elyea.

8    *Q.*    And you are a doctor or a physician; is that

9          right?

10   *A.*    M.D., yes.

11   *Q.*    And would you outline for us your personal

12          educational and professional background up to

13          the present time?

14   *A.*    Graduated from Indiana University in 1962.  AB

15          in chemistry.  In 1966 graduated from the

16          University of Illinois, M.D.  Internship at Cook

17          County Hospital to '67.  From '67 to '69 I spent

18          in the air force.  '69 to '72 I did an

19          ophthalmology residency at Heinz Veterans

20          Hospital.

21   *Q.*    And are you board certified in that specialty?

22   *A.*    Board eligible.

23   *Q.*    Okay.  What about your employment background?

24   *A.*    After the residency I spent 21 years in family

5

1    practice in Warrenville.  One year at the Indian

2    reservation in Phoenix and started in the

3    Department of Corrections in January of 1999.

4  Q.  When did you first become aware of Aaron McCroy

5    as a patient and prisoner in the custody of the

6    Department of Corrections?

7  A.  I don't recall.

8  Q.  Can you recall the circumstances, if you can't

9    give a specific date?

10  A.  I really would not be able to recall all the

11    circumstances.

12  Q.  And have you reviewed any records prior to your

13    giving this deposition?

14  A.  No.

15  Q.  Is that by choice?

16  A.  No.

17  Q.  Why then did you not review any records prior

18    to the deposition?

19  A.  I didn't have time to review them prior to this

20    deposition.

21  Q.  Okay, and when were you noticed that this

22    deposition was going to occur?

23  A.  There was a tentative date approximately two

24    weeks ago, but the actual date and time was

6

1          probably last week.

2     Q.   Do you recall why Aaron McCroy and his health

3          problems were brought to your attention?

4     A.   Something about an eye, but I'm not certain of

5          the details.

6     Q.   And do you recall who brought Aaron McCroy to

7          your attention?

8     A.   The attorney, Ms. Choate.

9     Q.   In what context, had he already filed his

10         pro se lawsuit at that time?

11    A.   When she said that this deposition was

12         scheduled she reminded me that it was something

13         about an eye.  That would be last week.

14    Q.   All right.  Well, without sharing with me what

15         you were told by counsel or Department of

16         Corrections, do you have any recollection of who

17         it was that first brought Aaron McCroy to your

18         attention before there was any litigation?

19    A.   No.

20    Q.   You as an ophthalmologist understand what the

21         eye disease referred to as keratoconus is I take

22         it?

23    A.   Yes.

24    Q.   Would you explain to me your understanding of

| | | |
|---|---|---|
| 1 | | that disease? |
| 2 | *A.* | Keratoconus is a thinning of the cornea |
| 3 | | resulting in a tent-like structure shaped to the |
| 4 | | cornea and it comes in different degrees, |
| 5 | | diagnosed usually early on in life.  There's |
| 6 | | usually some change in the keratometer readings. |
| 7 | | Very difficult to correct with glasses.  Can be |
| 8 | | corrected with contacts. |
| 9 | *Q.* | Does this condition necessarily result |
| 10 | | ultimately in blindness? |
| 11 | *A.* | No. |
| 12 | *Q.* | What -- you've outlined what the conservative |
| 13 | | care and treatment of the disease is.  Is it |
| 14 | | progressive if not treated? |
| 15 | *A.* | Not necessarily. |
| 16 | *Q.* | So it could not progress further than the |
| 17 | | original diagnosis if appropriate care and |
| 18 | | treatment is provided? |
| 19 | *A.* | Actually it could stay at its original |
| 20 | | diagnosis without any care being given at all. |
| 21 | | That would be a mild form. |
| 22 | *Q.* | All right.  What form of keratoconus did |
| 23 | | Aaron McCroy have? |
| 24 | *A.* | I don't know. |

8

1  **Q.**  When are corneal transplants required as far as

2       keratoconus patients?

3  **A.**  As far as keratoconus patients go the only time

4       that a corneal transplant is required is if the

5       cornea thins to a level that the ophthalmologist

6       might be concerned of perforation -- spontaneous

7       perforation or spontaneous rupture.

8  **Q.**  And have you treated others in the care of the

9       Department of Corrections that had this eye

10      condition that's referred to as keratoconus?

11 **A.**  No.

12 **Q.**  Have you in your practice as an ophthalmologist

13      before you came to work for the Department of

14      Corrections in '95 treated patients with

15      keratoconus?

16 **A.**  No.

17 **Q.**  Have you seen patients with keratoconus and had

18      occasion to refer them to others who specialize

19      in that area?

20 **A.**  Yes.

21 **Q.**  On how many occasions have you done that where

22      inmates are in the custody of the Department of

23      Corrections?

24 **A.**  I don't recall any.

9

1    Q.   Okay, and how many did you have occasion to
2         refer them on to a specialist in that area while
3         you were in private practice?
4    A.   Recalling my years from 1972 to '93 probably
5         less than ten.
6    Q.   All right, and can you recall who the
7         specialists were that you referred them to?
8    A.   Dr. Brazis at the Wheaton Eye Clinic who is a
9         corneal specialist and I do not recall any
10        others that I use.
11   Q.   All right, and you referred those patients to
12        that person because you felt that he had more
13        knowledge about that condition of the eye than
14        you had in your experience and training?
15   A.   Correct.
16   Q.   Have you been provided what the court-reported
17        -- or excuse me -- the court-appointed expert in
18        St. Louis said about what type of care and
19        treatment that Aaron McCroy should receive?
20   A.   No.
21   Q.   No one has ever shown that to you or shared it
22        with you?
23   A.   Not that I can recall.
24   Q.   You understand now that Aaron McCroy is still

10

1    in the custody of the Department of Corrections?

2  **A.** Yes.

3  **Q.** If you decided that you wanted to research an

4    issue as far as the current accepted methods of

5    care and treatment of keratoconus what sources

6    of textual material would you consult?

7  **A.** It's been a long while since I did any

8    ophthalmology so I'm not certain of the texts --

9    textbooks that might be available.  I suppose

10    the Internet would be a place that one could

11    research that.

12  **Q.** Okay.  Well, let's go back in time to the last

13    time that you consulted texts in your practice.

14    What did you consider to be the standard of

15    practice as far as the reference work for

16    ophthalmologists in 1995?

17  **A.** 1992, but I don't recall.

18    MR. LONDRIGAN:  Would you hand the doctor

19    Plaintiff's Exhibit 1.

20    (Plaintiff's Exhibit No. 1 marked

21    for identification.)

22  **Q.** Could you identify that?

23  **A.** It appears to be -- to be a letter dated

24    November 29th, 2001 from Aaron McCroy at Western

11

1      Illinois Correctional Center to myself at my
2      office in Chicago.
3  Q.  All right.  Did you read that letter when you
4      received it?
5  A.  I don't know.
6  Q.  Would you in the ordinary course respond to a
7      prisoner and patient who would write to you with
8      respect to their current treatment?
9  A.  This letter may have come to me or may have
10     gone to my regional coordinator.
11 Q.  Who at that time was who?
12 A.  Cindy Hobrock in Springfield.
13 Q.  And is she an ophthalmologist?
14 A.  She's a regional coordinator for the office of
15     health services who would look into this medical
16     treatment and then refer it to me, if necessary.
17 Q.  Now, let me ask the same question again.  Is
18     she a medical doctor?
19 A.  No.
20 Q.  Is she an ophthalmologist?
21 A.  No.
22 Q.  What are her qualifications?
23 A.  She's an RN.
24 Q.  And RNs normally follow the direction of

1    physicians?

2    **A.**    In regard to what?

3    **Q.**    Care and treatment of patients who have in this

4    case eye problems?

5    MS. CHOATE: I'll object to the form. Are

6    you asking all RNs everywhere or just in his

7    experience with working RNs do they

8    follow his --

9    **Q.**    Well, does it work any different in the

10    Department of Corrections than it does in the

11    outside world about what authorities are given

12    to RNs to provide care and treatment?

13    **A.**    No.

14    **Q.**    So you follow the same standards here that the

15    profession follows, I take it?

16    **A.**    In order -- in regard to care and treatment,

17    that's correct.

18    **Q.**    And what type of expertise and knowledge do you

19    believe that an RN would have with respect to

20    the issues that are addressed to you in this

21    letter?

22    **A.**    The expertise that Cindy has is to review to

23    see if the treatment had been given. Not to

24    make the treatment, but to see if the treatment

13

1      had been given.  To review a record perhaps.

2   Q.  And if she reviewed the record and had some

3      concern about what the treatment may or should

4      be she would get back to you or someone else who

5      was a qualified physician; is that right?

6   A.  Correct.

7   Q.  How many ophthalmologists are employed by the

8      Department of Corrections at the various

9      institutions?

10  A.  I'm not certain how many are under contract to

11     -- let me answer that -- none in the Department

12     of Corrections.

13  Q.  All right.  How many are under contract to

14     Wexford -- Wexford has contracts with the

15     Department of Corrections that provide that type

16     of specialized care --

17  A.  I don't know.

18  Q.  -- to patients?  You're here in Dixon, right?

19  A.  At the present time.

20  Q.  And --

21         MS. POWELL:  For this deposition, is that

22     what your question was?

23         MR. LONDRIGAN:  Yes.

24         THE WITNESS:  Yes.

14

1    *Q.*    Were your main offices ever here at Dixon?

2    *A.*    No.

3    *Q.*    Where were they?

4    *A.*    One of my offices is in Chicago at the Thompson

5          Center.  The other office is in Springfield at

6          the Department of Corrections.

7    *Q.*    Did you ever office here at Dixon?

8    *A.*    No.

9    *Q.*    You know why we're having this deposition here

10          in Dixon today?

11   *A.*    No.

12   *Q.*    It's not at your request or convenience that

13          we're here, is it?

14   *A.*    I was told Springfield, Chicago, somewhere

15          neutral.  I said wherever it could be scheduled.

16   *Q.*    So you decided to travel to a neutral venue, is

17          that it?

18   *A.*    It didn't matter to me.

19   *Q.*    So you don't know who, if anyone, responded to

20          this letter that Aaron McCroy wrote November

21          29th, 2001?

22   *A.*    Correct.

23          MR. LONDRIGAN:  Show the doctor Exhibit

24          No. 2.

15

1                         (Plaintiff's Exhibit No. 2 marked
2                              for identification.)
3   *Q.*   Would you identify that for me?
4   *A.*   A letter from the administrative review board,
5         office of inmate issues to Mr. McCroy.
6   *Q.*   You were copied on this, weren't you?
7   *A.*   Yes.
8   *Q.*   And this is a few months later from the first
9         exhibit that I showed you in April of 2002.  Do
10        you know why you were copied on this
11        correspondence?
12  *A.*   A copy is sent to the agency medical director
13        for further review and handling as deemed
14        appropriate.  It's also sent to the regional
15        coordinator -- health services coordinator.
16  *Q.*   And is that done in the ordinary course of any
17        grievance that is health related?
18  *A.*   Not any grievance.  Only those that are sent to
19        the ARB.
20  *Q.*   And I see a copy also went to Warden
21        Dennis Hockaday and to Cindy Hobrock who you
22        mentioned earlier?
23  *A.*   Correct.
24  *Q.*   And to Aaron McCroy?

16

1   *A.*  Correct.

2          MR. LONDRIGAN:  Would you show the doctor

3          Exhibit No. 3.

4                      (Plaintiff's Exhibit No. 3 marked

5                          for identification.)

6   *Q.*  Would you identify that for me?

7   *A.*  This is a memo sent from my office as agency

8          medical director to all of the vendors in the

9          state on August 12, 2002.

10  *Q.*  And did you review this before your deposition

11          here today?

12  *A.*  Yes, I did see this.

13  *Q.*  Now, can you tell me who pencilled in the

14          notations above the Illinois Department of

15          Corrections' logo?

16  *A.*  No, I don't know the answer to that.

17  *Q.*  Do you recognize whose initials are there?

18  *A.*  No.

19  *Q.*  Isn't that Debra Fuqua that we were talking

20          about earlier here in this room?

21  *A.*  Might be, but I don't know her initial

22          signature.

23  *Q.*  Is that your signature across from your name?

24  *A.*  Yes, that is.

1    Q.   Do you keep records of your quarterly health

2         services meetings?

3    A.   Minutes, yes.

4    Q.   Minutes.  And where are they kept?

5    A.   There's a copy kept in my office and there may

6         be a copy in the Springfield office.  The

7         minutes also go to the sites who attended the

8         meeting, so there may be minutes at all those

9         sites.

10   Q.   And who normally is in attendance at these

11        quarterly health services meetings?

12   A.   The quarterly health services meetings are

13        mandated for all medical directors and

14        health-care unit administrators.

15   Q.   And is a record kept of who was in attendance

16        and who was not?

17   A.   Yes.

18   Q.   Have you consulted those meeting minutes before

19        attending this deposition?

20   A.   No.

21   Q.   Were you requested by anyone to do so?

22   A.   No.

23   Q.   Were you requested to bring anything with you

24        at this deposition?

18

1    *A.*    Yesterday or the day before.

2              MS. CHOATE:  Yeah --

3    *A.*    Yeah.

4              MS. CHOATE:  -- I'll be filing written

5        objections to those.  We just got notice of

6        those on Friday afternoon and I didn't represent

7        Dr. Elyea until today actually, so --

8              MR. LONDRIGAN:  Well, in any event if

9        they're here -- apparently from his testimony

10       the records wouldn't be here anyway.

11             MS. CHOATE:  Right.

12             MR. LONDRIGAN:  That's inconvenient -- the

13       venue I mean.

14             Did you author this letter?

15   *A.*    Yes.

16   *Q.*    Would you explain to me in laymen terms what

17       the Department rule for organ transplants said

18       in August of 2002?

19   *A.*    I'll try to paraphrase since I don't know it

20       exactly word for word, but it is a Department

21       rule that says that offenders must pay for their

22       own organ transplants.

23   *Q.*    I want to quote from the first paragraph that

24       bears quote marks:  "That the Department of

19

1      Corrections will be responsible for all organ
2      transplants as governed by the Department
3      Rule 415-80."  Now, you're quoting that.  What
4      are you quoting?
5  A.  Actually we're responsible for -- as opposed to
6      the vendor we're responsible for organ
7      transplants for getting a patient to be
8      evaluated, for instance, but this is a cost
9      thing.  It's a responsibility for cost rather
10     than care.
11 Q.  Now, is this a direct quote from a rule?
12 A.  I don't remember if it's a direct quote or not.
13 Q.  You do agree though that it is in quote marks
14     and that this is your letter and that this is
15     your signature?
16 A.  I agree with that.
17 Q.  Do you disagree with this statement that the
18     Department of Corrections is responsible for all
19     organ transplants?
20 A.  Yes, we're not responsible for the transplant.
21     We're responsible for the -- the -- we're
22     responsible for getting the offender to
23     evaluation, but we are not responsible for the
24     cost of the transplant.

20

**Q.** All right, and who determines who is responsible for the cost of the transplant?

**A.** The offender or his family.

**Q.** All right, so what you're saying is that you will provide the medical care to effectuate the transplant, but the inmate or prisoner must pay for it, is that what you're saying?

**A.** We will get the inmate to -- we will take the inmate to a transplant center for evaluation if it's indicated, but we will not pay for that transplant.

**Q.** All right. When you say a transplant center what do you mean?

**A.** A place where transplants are done -- organ transplants are done, excuse me.

**Q.** Do you consider a corneal transplant an organ transplant?

**A.** The letter is self-explanatory, but no, my decision was that a corneal transplant was not an organ transplant.

**Q.** What was the cost or projected or estimated cost of the corneal transplant to this patient?

**A.** I don't know.

**Q.** It was discussed, wasn't it, at these meetings?

21

1   **A.**   Absolutely not.

2   **Q.**   So at the time you were discussing this you

3        were not discussing what the cost would be, what

4        you were discussing is who was going to pay for

5        it?

6   **A.**   That's correct.

7   **Q.**   When was it that you first told representatives

8        of Wexford that they were required to provide a

9        corneal transplant for Aaron McCroy?

10  **A.**   Well, certainly the issue -- as the letter

11       explains, the issue was raised at the quarterly

12       health services meeting which would have been

13       June of 2002 and the following discussions --

14       the final decision was obviously made on

15       August 12th and a letter went out.

16  **Q.**   And would you explain to me in laymen terms

17       what this decision is so that I can explain it

18       to the client?

19  **A.**   The decision was that corneas are not organs.

20       Eyes are organs, corneas are not organs and

21       therefore it didn't come under the Department

22       rule as far as organ transplant goes which

23       simply means that the vendor is responsible for

24       evaluating the patient, deciding the medical --

1     the appropriate medical care and going from

2     there.

3  Q.  And when you refer to the vendor in this case

4     you're referring to Wexford?

5  A.  In this particular case, yes.

6  Q.  And what was the plan of action after the

7     issuance of this letter and how was it

8     implemented?

9  A.  I'm not sure I understand the question.

10  Q.  All right.  Was this patient authorized then to

11     proceed through the vendor and receive a corneal

12     transplant?

13  A.  No.

14  Q.  What else had to be done?

15  A.  The vendor was notified that they have to

16     evaluate the patient, any patient who might

17     possibly require a corneal transplant.  If the

18     evaluation revealed that the patient did need a

19     corneal transplant that was going to be the

20     responsibility of the vendor.

21  Q.  Hadn't the corneal transplant already been

22     recommended by outside specialists, by

23     specialists I mean ophthalmologists, that were

24     selected by the Department of Corrections and/or

23

1       Wexford?

2   A.  I don't know.

3   Q.  So you don't know whether or not you knew on

4       August 12, 2002 that outside treating

5       ophthalmologists had recommended a corneal

6       transplant?

7   A.  I don't know.

8   Q.  Do you know whether you knew that at this time?

9   A.  I don't know.

10  Q.  You don't remember?

11  A.  I don't remember.

12  Q.  If this had already been recommended by

13      ophthalmologists who had been treating this

14      patient for this condition for several years

15      since the date of diagnosis what would further

16      need to be done as far as evaluation?

17  A.  As far as evaluation nothing further.

18  Q.  So you're saying that if this had been

19      recommended and by that I mean the corneal

20      transplant for this patient, that there was

21      nothing needed to be done further as far as the

22      vendor was concerned?

23  A.  The vendor would have to approve it.

24  Q.  All right.  Who on behalf of the vendor would

24

1          have to approve it?

2    **A.**    Their utilization review team, office,

3          committee.

4    **Q.**    And who did that include?

5    **A.**    I don't know.

6    **Q.**    Did you interface with them?

7    **A.**    I would only interface with them if there was

8          an appeal to my office.

9    **Q.**    From?

10   **A.**    From the medical director on site.

11   **Q.**    The medical director at Western?

12   **A.**    Correct.

13   **Q.**    Now, what would the medical director at Western

14         be appealing and what type of paperwork would he

15         have to follow up with?

16   **A.**    There's no paperwork involved.  He would simply

17         call me if -- if the treatment were denied he

18         would call me and say I disagree.  But the first

19         thing he would do is appeal it through his own

20         company and often times on an appeal they will

21         allow the procedure to be done.

22   **Q.**    Okay.  Now, let's forget about what he's going

23         to do within his own company.  He'd pick up the

24         telephone and he'd call you and he'd tell you on

1      the telephone that he didn't agree?

2   A.   Correct.

3   Q.   Who would that have been in August of 2002?

4   A.   I don't know.

5   Q.   All right.  Aren't any records made of these

6        type of decisions?

7   A.   The appeal decisions?

8   Q.   Well, you described this telephone call as an

9        appeal; is that correct?

10  A.   Correct.

11  Q.   Don't you make a record of that appeal?

12  A.   No.

13  Q.   Is this done pursuant to any formal rule?

14  A.   No, but --

15  Q.   This is just a custom?

16  A.   It's the way that it is done and then the note

17       goes into the patient's chart if there was an

18       appeal.

19  Q.   The note?

20  A.   On the conversation.

21  Q.   And who is responsible according to Department

22       of Correction rules or custom for making that

23       notation in the patient's medical records?

24  A.   The medical director that you talk to that I

26

1      would have talked to.

2  Q.  And that would either be Dr. Sims -- probably

3      would be Dr. Sims during this period of time,

4      wouldn't it?

5  A.  I don't know.

6  Q.  Take a look at Exhibit No. 1.  Whose writing is

7      at the top of that exhibit where it says

8      Dr. Sims, 217-773-2273?

9  A.  I don't know.

10 Q.  Now, assuming that whoever the medical director

11     was and assuming that it might not be Dr. Sims,

12     this is not a telephone call that you have any

13     specific recollection about, is it?

14 A.  No.

15 Q.  That's just what you think according to custom

16     should have been done?

17 A.  I didn't say that.  I said that's the way the

18     appeal process works.  I don't know whether it

19     should have been done or not.  I wasn't involved

20     in the case.

21 Q.  When you say that's the way that the appeal

22     process should work, is this outlined in any

23     type of rule or regulation that operates

24     uniformly from one institution to the other?

27

1  *A.*  I don't know that.

2  *Q.*  Who would know the answer to that question?

3  *A.*  That process predated my position -- my being

4      in this position.

5  *Q.*  Do you know of any written rule that governs

6      that process?

7  *A.*  No.

8  *Q.*  That's just the way it's been done -- it was

9      done that way before and it's being done that

10     way now; is that correct?

11 *A.*  Correct.

12                    (Plaintiff's Exhibit No. 4 marked

13                        for identification.)

14 *Q.*  I want you to look at Exhibit No. 4 which is

15     dated one day after your letter that we just

16     spoke about in Exhibit 3.  The patient -- on

17     Illinois Department of Corrections stationery --

18     is informed under the signature of

19     Dennis L. Hockaday who apparently was signed off

20     on by Assistant Warden Funk, this is to finalize

21     your grievance labeled emergency regarding your

22     denial for a cornea transplant.  Was it your

23     intention the day prior to deny the request for

24     a corneal transplant?

28

1    A.    Could you repeat that question, please?

2          MR. LONDRIGAN:  Yeah.  Would you read that

3          back.

4                (The requested portion of the

5                 record was read.)

6    A.    The day prior to this memorandum?

7    Q.    Yes, August 12th, the prior exhibit, two pages

8          with your signature and dated August 12th, 2002.

9    A.    That memo prior to this memo has nothing to do

10         with each other.

11   Q.    Okay.  Explain that to me because I'm not

12         familiar with the custom and practice that

13         occurred during this period of time.

14   A.    The memo on August 12th was a general memo

15         going to the vendors to explain to them the

16         issue with cornea transplantation.  The memo on

17         August 13, 2002 is an emergency grievance

18         apparently filed at Western by the inmate.  It

19         has nothing to do with the memo that was sent

20         out or my denial or not denying.  Two separate

21         entities.

22   Q.    So despite the fact that on the day prior you

23         had indicated to the vendor that a corneal

24         transplant is appropriate and that the only

29

1    issue left to be resolved was who paid for it,

2    the Department of Corrections notifies

3    Aaron McCroy that his grievance has been

4    finalized regarding a denial for a cornea

5    transplant?

6        MS. POWELL:  And I object to the form of

7    the question that your question assumes that the

8    letter dated August 12th, 2002 from Dr. Elyea is

9    specifically addressing only Mr. McCroy or his

10   condition or makes any statements about

11   Mr. McCroy, but he may answer the question.

12   Q.   All right.  We just had an objection that this

13        doesn't say anything about Aaron McCroy.  Would

14        you read into the record the date of this

15        memorandum?

16   A.   Which memorandum?

17   Q.   Exhibit 4.

18   A.   August --

19        MS. POWELL:  I was talking about

20        Exhibit 3, Tom.

21        MR. LONDRIGAN:  You're back to 3?

22        MS. POWELL:  I'm back to the one that's

23        dated August 12th.  That was my objection.

24   Q.   All right.  Was it your intention on August 12,

30

1  2002 in Exhibit 3 to deny to Aaron McCroy a

2  corneal transplant?

3      MS. POWELL:  And I want to object again to

4  the question in that Exhibit 3 does not make any

5  reference to Aaron McCroy.

6  **Q.** Did you have any other patients during this

7  period of time that were asking for corneal

8  transplants?

9  **A.** No.

10 **Q.** Did you have any since?

11 **A.** I don't know.

12 **Q.** Did you have any before that?

13 **A.** I really don't know.

14 **Q.** Is there any doubt in your mind that this was

15 in relation to the request that was being made

16 by Aaron McCroy based upon recommendations of

17 his outside treating ophthalmologist that he

18 needed a corneal transplant?

19 **A.** The memo on August 12th, 2002 has nothing to do

20 with Aaron McCroy.  It has to do with corneal

21 transplants in general both past, future and

22 present at that time.

23 **Q.** It doesn't have anything to do with

24 Aaron McCroy?

31

1    *A.*    Not at all.

2    *Q.*    How did you happen to be looking at that issue

3          during this period of time?

4    *A.*    I don't know.

5    *Q.*    How did you happen at the top to send blind

6          copies to the people that are indicated there,

7          Dr. Anderson --

8    *A.*    I don't know.

9    *Q.*    -- wasn't he the optometrist at Western?

10          MR. CHOATE:  I would object to your

11          characterization that he sent blind copies.  He

12          said he didn't recognize that writing, so your

13          question is not based on any evidence before --

14          MR. LONGRIGAN:  Well, I'm not saying --

15          MS. CHOATE:  You said he --

16          MR. LONDRIGAN:  I'm not saying that he

17          sent them.  It does indicate on its face that

18          blind copies were sent to a Dr. S., a Dr. Ander,

19          a Dr. Farh., a Jennifer with the initials DKL on

20          8/16/02 which is four days after Exhibit 4 and

21          the denial finalizing the grievance that was

22          asking for a corneal transplant.

23          MS. POWELL:  And I'll just object to the

24          form of the question in that I don't know where

32

1      you're getting the term blind copies from, but

2      -- I don't know what that means.  That's --

3            MR. LONGRIGAN:  We'll just spend some more

4      time.

5            Was this just a coincidence that you were

6      talking about corneal transplants at this time

7      and place?

8   A.  I don't know.

9   Q.  Can you give me any rational reason other than

10     Aaron McCroy and the problems and the grievances

11     that he had and the medical problems that were

12     brought to your attention in writing by him in

13     prior exhibits as to why this should be a memo

14     sent to all vendors?

15  A.  Could you read the question back?

16                    (The requested portion of the

17                     record was read.)

18  A.  I'm not sure I understand that question.

19     Rephrase.

20  Q.  I'll shorten it for you.  Who other than

21     Aaron McCroy within the entire prison system

22     here in Illinois was seeking a cornea transplant

23     during this period of time?

24  A.  I don't know the answer to that.

33

1    *Q.*    Now, take a look at Exhibit 4. Is there any

2          question in your mind as to the date?

3    *A.*    August 13th, 2002.

4    *Q.*    Is there any question in your mind about the

5          emergency grievance?

6    *A.*    It says it's an emergency grievance. Those are

7          grievances at the sites.

8    *Q.*    And have you read the text of this exhibit?

9    *A.*    The emergency grievance?

10   *Q.*    Yes.

11   *A.*    No.

12   *Q.*    Let me read this to you and see if this rings

13         any bells or helps clarify this issue. Have

14         contacted the health-care unit in regard to your

15         issue -- Inmate McCroy's issue and find that

16         although you have been denied by the Wexford

17         utilization review physician, giving the

18         effective date, your issue has been referred to

19         Dr. Elyea, agency medical director, for review

20         and handling. Do you see that?

21   *A.*    Yes.

22   *Q.*    Is that what was going on in August of 2002?

23   *A.*    I must have received this letter from the site,

24         yes.

34

1    **Q.**   Now, tell me what you did, if anything, after

2          you received this letter other than incidental

3          telephone calls?

4    **A.**   I don't recall.

5    **Q.**   And you haven't made any recent search of

6          records to see if there's any documentation as

7          to what was going on during this period of time,

8          have you?

9    **A.**   No.

10   **Q.**   You haven't been asked to do that, have you?

11   **A.**   No.

12                    (Plaintiff's Exhibit No. 5 marked

13                       for identification.)

14   **Q.**   I'm going to show you an Exhibit 5 which is

15          dated a few days later, August 20th.  I want you

16          to assume that by this time this inmate and

17          patient had in his own hand with the assistance

18          of the law library at Western and a counselor

19          filed a lawsuit in federal court to try to get

20          some relief.  Were you aware when that happened?

21   **A.**   No.

22   **Q.**   I want you to read the second paragraph

23          beginning with August 20th, 2002, read that to

24          yourself.  Was there any reason to your

35

1          knowledge for these in-house eye examinations

2          being conducted on this patient during this

3          period of time?

4     **A.**  I don't know.

5     **Q.**  Well, can you give me any medical reason why

6          these doctors who were not ophthalmologists were

7          instructed or felt compelled to conduct eye

8          examinations and evaluations?

9     **A.**  No, I can't.

10    **Q.**  It certainly was not at your direction; is that

11         right?

12    **A.**  No.

13              MS. CHOATE:  And I would object to the

14         form of this exhibit as far as it's all hearsay.

15         We don't know that ever took place.

16              MR. LONGRIGAN:  Would you hand the witness

17         Exhibit 6.

18                        (Plaintiff's Exhibit No. 6 marked

19                         for identification.)

20    **Q.**  This has been provided to me in discovery by

21         the Department of Corrections.  It includes

22         e-mail messages during the period of time that

23         we're talking about now.  Do you remember

24         participating in those e-mails?

36

1   *A.*   No.

2   *Q.*   Well, then let's go back to the end and move

3        forward so we can refresh your recollection.

4        Look on -- what's Bates stamped as Page 99 at

5        the bottom.  Do you know who Terri Anderson is

6        or was with regard to her employment?

7   *A.*   She was obviously from the administrative

8        review board, office of inmate issues.  I don't

9        know that I ever met her.

10  *Q.*   And that's in Springfield?

11  *A.*   I believe so, yes.

12  *Q.*   Do you see where she indicates that she's

13       working on a grievance with regard to an inmate

14       for medical treatment of his eye?

15  *A.*   Yes.

16  *Q.*   And it's talking about the Kehoe Eye Institute

17       in April of 2002?

18  *A.*   Correct.

19  *Q.*   Do you know who that might be other than Inmate

20       McCroy?

21  *A.*   The subject matter is Aaron McCroy, N51882.

22  *Q.*   And Debra Fuqua responds.  Do you see where she

23       said that Inmate McCroy was sent to the Kehoe

24       Eye Institute on April 12th and May 13th and a

37

1          corneal transplant was recommended?

2    *A.*    Yes.

3    *Q.*    And these e-mails are in July of 2002 before

4          this meeting, isn't it?

5    *A.*    That's correct.

6    *Q.*    And do you see Debra Fuqua's response, a

7          corneal transplant was recommended and the Kehoe

8          Clinic is an ophthalmology or eye clinic where

9          qualified -- several qualified ophthalmologists

10         practice.  Is that your understanding?

11   *A.*    I don't know what the Kehoe Clinic is.

12   *Q.*    Okay.  Do you know how long they had been

13         treating this patient as an outpatient basis?

14   *A.*    No.

15   *Q.*    Do you know why after this meeting that you

16         were involved in they started shipping this

17         inmate around to other ophthalmologists in

18         Quincy, in Jacksonville and several in

19         Springfield, do you know why that was done?

20   *A.*    No.

21   *Q.*    Do you know who was making the decision about

22         what ophthalmologist he should see?

23   *A.*    That would be Wexford's decision.

24   *Q.*    Do you see where it says a corneal transplant

38

1    was recommended, Wexford denied this, this is in

2    July and Dr. Elyea told them they have to do it.

3    Was Debbie Fuqua wrong?

4  **A.**  I don't recall that conversation with Wexford.

5  **Q.**  You're not saying that you didn't tell Wexford

6    they had to do it, that -- you just don't

7    recall?

8  **A.**  I don't recall that conversation.

9  **Q.**  I want to show you a little later in the month

10    of July from Cindy Hobrock -- and again, for the

11    record would you explain who Cindy Hobrock is

12    and what her role is for the Department?

13  **A.**  She's a regional coordinator for the office of

14    health services.

15  **Q.**  And her offices are where?

16  **A.**  Springfield.

17  **Q.**  And do you see where she says thanks Terri to

18    Terri Anderson, Dr. Elyea is having John Castro

19    review this case.  I'm sure a response will be

20    received soon.  Tell me who John Castro is and

21    what he is required to do in reviewing cases.

22  **A.**  He was my immediate supervisor, assistant chief

23    of programs.

24  **Q.**  And is he a medical doctor?

39

1    *A.*    No.

2    *Q.*    So therefore he couldn't be an ophthalmologist

3          or have any medical expertise --

4    *A.*    No.

5    *Q.*    -- on this issue?  Is he a -- I hate to use the

6          word -- lawyer?

7    *A.*    No.

8    *Q.*    What is his background?

9    *A.*    Has a big background, large background in the

10         Department of Corrections and he was my

11         immediate supervisor and his input into this

12         would be interpretation of the rules for organ

13         transplants.

14   *Q.*    Okay, but -- he's not a lawyer, but he has a

15         long history in the Department of Corrections?

16   *A.*    Yes.

17   *Q.*    Is he still there?

18   *A.*    No.

19   *Q.*    Is he working for a vendor?

20   *A.*    No.

21   *Q.*    Do you know what happened to him?

22   *A.*    No.

23   *Q.*    Okay, and go ahead and take a look at the

24         follow-ups between Cindy Hobrock and

40

1          Terri Anderson and I want to direct your

2          attention to your e-mail.

3              MS. POWELL:  Can we take like a two-minute

4          break.  I just want to run to the rest room

5          while he's reading that.

6                          (A recess was taken at 2:02 p.m.

7                          and proceedings resumed at 2:06

8                          p.m.)

9    *Q.*   At the time that Wexford was informed that if

10         there were to be a corneal transplant that they

11         would bear the cost as vendor did they request

12         to send this inmate and patient to different

13         ophthalmologists for different opinions?

14   *A.*   No.

15   *Q.*   Were you aware of the history on how long

16         Aaron McCroy had been experimenting with fitted

17         contact lenses to try and improve his

18         keratoconus?

19   *A.*   No.

20   *Q.*   And if you -- moving forward in time,

21         Debbie Fuqua writes Cindy e-mails --

22         Cindy Hobrock that we submitted this to Wexford

23         on 8/19/02 after we got Dr. Elyea's memo and do

24         you recognize what she means by Dr. Elyea's

41

1    memo, the one we previously marked as an exhibit

2    and looked at that went out to all the

3    health-care units and she says it came back

4    today now highlighted in -- in bold type, denied

5    again for a corneal transplant by Dr. Rowe.  I

6    faxed it to you and Dr. Elyea for review.  Do

7    you see your response immediately above that to

8    Debbie Fuqua?

9  A.    Yes.

10  Q.   You bought in to allowing Wexford to send this

11    patient to different ophthalmologists that had

12    no course or care or history of treatment of

13    this patient to find out if there was some

14    alternative to the corneal transplant; isn't

15    that right?

16  A.    No.

17  Q.   What did you mean by the offender may receive a

18    substantial trial of contacts prior to surgery,

19    what did you intend others to understand that to

20    mean?

21  A.    That keratoconus can be treated with contact

22    lenses for a varying degree of time as long as

23    the cornea is not thinning rapidly.  You can

24    treat keratoconus for years with contact lenses.

42

1   *Q.*   And what are some of the things that aggravate

2         fitted lenses, don't they have to be visited and

3         shaped and changed over the course of time?

4   *A.*   Correct.

5   *Q.*   And so you have to have a regular history of

6         appointments with your ophthalmologist, don't

7         you?

8   *A.*   Optometrist also.

9   *Q.*   Was there anybody in-house -- was Dr. Anderson

10       qualified to fit this patient for contact

11       lenses?

12   *A.*   I don't know Dr. Anderson.

13   *Q.*   What about failing to keep these contact lenses

14       clean, would that cause problems?

15   *A.*   If -- if a patient is wearing contact lenses

16       they must be cleaned.

17   *Q.*   And they are normally cleaned by prescribed

18       solutions by the treating ophthalmologist; isn't

19       that right?

20   *A.*   Correct.

21   *Q.*   To your knowledge was there ever an outside

22       referring ophthalmologist that didn't say this

23       patient can be treated conservatively with

24       contact lenses, he doesn't need a corneal

43

1        transplant?

2   A.   I don't know that.

3   Q.   You've never seen anything like that from any

4        qualified ophthalmologist, have you?

5   A.   In this particular case?

6   Q.   It's the only case.  I mean, this is the only

7        case that you know of, it's the only case that I

8        know of, it's the only one that's referenced in

9        all these documents.

10  A.   While I was in private practice I saw a number

11       of times when the cases were treated with

12       contact lenses for a long time without corneal

13       transplant.

14  Q.   I think you told me that each patient is

15       different?

16  A.   Correct.

17  Q.   All right.  If for any number of reasons

18       keratoconus is not treated appropriately it can

19       result in blindness; isn't that right?

20  A.   I've never seen a case resulting in blindness

21       and there are different degrees of blindness.

22            MR. LONGRIGAN:  Hand the witness Exhibit

23       No. 7.

24                      (Plaintiff's Exhibit No. 7 marked

44

1                        for identification.)

2    *Q.*   Did you participate in the decision during this

3          period of time before the corneal transplant to

4          house Inmate McCroy in the infirmary for

5          monitoring purposes?

6    *A.*   I do not recall participating in that.

7    *Q.*   I'm referring you to the third full paragraph.

8          Per Dr. Sims' conversation with you, which would

9          have been McCroy, on August 22nd, '02 you are

10         going to be housed in the infirmary for

11         monitoring purposes on August 26, '02.  This

12         direction was given by Dr. Rowe from Wexford and

13         has been discussed with Dr. Elyea, agency

14         medical director.  Do you recall that

15         discussion?

16   *A.*   No.

17   *Q.*   You're not saying it didn't occur, you just

18         don't recall it?

19   *A.*   I don't recall it.

20   *Q.*   On September 5 of 2002 here's another emergency

21         grievance from Aaron McCroy.  I've marked that

22         as Exhibit 9.

23                        (Plaintiff's Exhibit No. 9 marked

24                           for identification.)

45

1   Q.   Do you see that this is an emergency grievance

2        sent to Dennis Hockaday as warden of Western and

3        part of the relief requested was to be

4        transferred to Dixon for proper treatment.

5        That's the reason I asked you the questions

6        about what your role was here at Dixon.  What --

7        what type of treatment would he have received at

8        that point in time if he had been transferred to

9        Dixon?

10  A.   Treatment for what?

11  Q.   The keratoconus?

12  A.   I don't know.  This -- I don't know.

13  Q.   How close are qualified ophthalmologists to

14       this institution in 2002?

15  A.   I don't know where the ophthalmologists are.

16  Q.   How often did you visit this institution?

17  A.   On a yearly basis.  I'm required to visit on a

18       yearly basis all our sites.

19  Q.   But this isn't a site that you visited more

20       often than others?

21  A.   No.

22  Q.   Did you ever have an ophthalmologist through

23       Wexford that was present on-site here?

24  A.   I don't know.

46

1    *Q.*   Do you know whether or not there was an

2          ophthalmologist at any of the institutions

3          during this period of time I'm talking about,

4          2001 through 2004?

5    *A.*   Yes.

6    *Q.*   There were?

7    *A.*   Yes.

8    *Q.*   Where?

9    *A.*   The only one I know for sure is at Stateville

10         because I worked there.

11                    MR. LONDRIGAN:  Would you show the

12         witness Exhibit 11.

13                           (Plaintiff's Exhibit No. 11

14                            marked for identification.)

15   *Q.*   Do you see where you were copied on this

16         communication to Inmate McCroy?

17   *A.*   Yes.

18   *Q.*   Also the warden, Cindy Hobrock and this

19         C-H-R-O-N period file, is that a chronological

20         file?

21   *A.*   I believe so.

22   *Q.*   Is that -- is that anything different than the

23         inmate's master file?

24   *A.*   I don't know.

47

1    *Q.*    Do you see where you were asked to provide a

2           written report of your findings to the

3           director's office?

4    *A.*    Correct.

5    *Q.*    Did you do that?

6    *A.*    I can't say that I did that, but my impression

7           would be yes.

8    *Q.*    And so the director's office would have -- if

9           -- if you prepared it and sent it as

10          Aaron McCroy was told the director's office

11          would have a copy of that report?

12   *A.*    I'd certainly send it to the director.  I don't

13          know where it's filed.

14   *Q.*    In the ordinary course would you send it to

15          anyone else other than the director?

16   *A.*    No.

17   *Q.*    Were you consulted at all about the grievance

18          that was filed by Aaron McCroy with respect to

19          steroid-induced glaucoma --

20   *A.*    Not that I recall.

21   *Q.*    -- that he was diagnosed with?

22   *A.*    Not that I recall.

23   *Q.*    Are you familiar with the drug Maxitrol and how

24          and why it's used in the field of ophthalmology?

48

1   **A.**   It's been years since I practiced

2       ophthalmology, but yes, I remember Maxitrol as

3       being used to reduce inflammation.

4   **Q.**   And that's a steroid?

5   **A.**   Yes.

6   **Q.**   And based upon your understanding what are the

7       risks associated as far as long-term use of that

8       drug?

9   **A.**   Long-term use of any steroid in the eye can

10      cause an elevation of the pressures.

11  **Q.**   And that's something that has to be monitored

12      closely periodically?

13  **A.**   Yes, it should be watched.

14  **Q.**   And where would a health-care professional or a

15      lay person for that matter go to find out what

16      the proper dosage or recommended dosages are and

17      what the hazards and possible side effects might

18      involve including long-term use?

19  **A.**   Physician Desk Reference would be the best.

20      There's also a Physician Desk Reference for

21      ophthalmological drugs.

22  **Q.**   And the package inserts which essentially

23      repeat the PDR information, are they available?

24  **A.**   Correct.

49

1   **Q.**   And so if these drugs are housed in the

2        institution's pharmacy this information is

3        available in the health-care unit, is that also

4        correct?

5   **A.**   That I don't know.

6   **Q.**   What are health-care professionals

7        nonphysicians, say an RN or an optometrist

8        instructed to do if they're not sure about the

9        administration of a prescribed medication over

10       the course of time?

11  **A.**   If they're not sure of the prescribed

12       medication?  I'm not sure I understand that.

13  **Q.**   Well, if you take a steroidal drug and it's

14       recommended you believe to be for 30 days which

15       is counterindicated (sic) by the literature or

16       possibly you can't interpret the doctor's

17       handwriting, you're not sure about that, what

18       are the health-care professionals instructed to

19       do?

20  **A.**   Under the Nursing Practice Act a nurse is to

21       just simply ask the doctor for clarification.

22  **Q.**   In other words, call him on the phone and say

23       is this what you meant to be prescribed to this

24       patient?

50

1  *A.*  That's correct.

2  *Q.*  You certainly weren't consulted at the time

3      that this inmate was diagnosed with

4      steroidal-induced glaucoma, were you?

5  *A.*  Not that I can recall.

6  *Q.*  Is there any relationship to your knowledge

7      between glaucoma and keratoconus?

8  *A.*  Not that I'm aware of.

9          MR. LONDRIGAN:  Would you hand him the

10      last -- Exhibit 14.

11                      (Plaintiff's Exhibit No. 14

12                       marked for identification.)

13  *Q.*  This -- I'm not going to get into any detail

14      about this particular medication except to say

15      that it does involve a grievance regarding

16      eyedrop medication.  You were copied as agency

17      medical director on this grievance.  Do you

18      recall prior to this time ever being copied on

19      an eyedrop medication problem that existed with

20      this patient before November 22nd, 2004, the

21      date of this exhibit?

22  *A.*  I don't recall any other copying of me.

23          MR. LONDRIGAN:  Okay.  That's all I have.

24                      **EXAMINATION**

51

1    **BY MS. POWELL:**

2  *Q.*  Dr. Elyea, I just have a few questions for you.

3       If you would please look at -- oh, let me ask

4       you this first:  You were asked some questions

5       regarding an appeal process.  Do you recall

6       that?

7  *A.*  Correct.

8  *Q.*  Do you know whether or not an appeal actually

9       took place with respect to Mr. McCroy as you sit

10      here today?

11 *A.*  An appeal to my office?

12 *Q.*  Right.

13 *A.*  Not an appeal to Wexford?

14 *Q.*  Right.

15 *A.*  No, I don't know whether an appeal came to --

16          MR. LONGRIGAN:  Are you talking about a

17      grievance?

18          MS. POWELL:  No.  He testified earlier

19      about some questions you asked him concerning an

20      appeal, keeping track of those documents.  I

21      mean, you know what I was asking you, correct?

22 *A.*  Yes.

23 *Q.*  With respect to Exhibit No. 3, which is your

24      letter to Defendant dated -- to the vendors

52

1      dated August 12th of 2002 is it possible that

2      that letter was generated as a result of the

3      grievances that were filed by Mr. McCroy and the

4      contacts made to your offices as referenced in

5      those e-mails that were shown to you by

6      Plaintiff's counsel?

7  A.   Now that I've seen all of these things that I

8      have been given there is a possibility that the

9      question came up in regard to that issue.

10  Q.   And Doctor, with respect to Exhibit 3 does it

11      contain any opinions by you as to whether or not

12      Mr. McCroy should or should not actually receive

13      a corneal graft?

14  A.   No.

15  Q.   Does Exhibit 3 discuss and address whether or

16      not a corneal graft should be considered an

17      organ transplant?

18  A.   Yes.

19  Q.   Doctor, in the course of your employment as the

20      agency medical director for the Department of

21      Corrections would you determine the meaning of

22      contract terms between the Department of

23      Corrections and the vendors such as Wexford with

24      respect to certain aspects of providing medical

53

1    care?

2  *A.*    My job is to monitor the contract as it stands

3        and hold the vendor to it.

4  *Q.*    Okay.  Would you agree that the contract

5        between the Department of Corrections or the

6        State of Illinois and Wexford does make

7        reference to organ transplants?

8  *A.*    It's in the contract somewhere, yes.

9  *Q.*    Okay.  You probably don't remember every term

10        in the contract without looking at the contract

11        itself; would that be fair to say?

12  *A.*    Correct.

13  *Q.*    All right.  In looking at Exhibit 3 you make

14        reference to the contract between the Department

15        of Corrections and the vendor states:  "That the

16        Illinois Department of Corrections will be

17        responsible for all organ transplants as

18        governed by the Department Rule 415-80."  If the

19        contract specifically indicates that IDOC will

20        have sole responsibility for the cost of organ

21        transplants you would agree that the vendor then

22        would not be responsible for organ transplants?

23  *A.*    Correct.

24  *Q.*    Prior to sending out Exhibit 3 to the vendors

54

1      are you aware of any documents that would have
2      been provided to Wexford or any other vendor
3      specifically advising that corneal transplants
4      are not organ transplants prior to August
5      the 12th of 2002?

6  A.  No, I'm not aware of any.

7  Q.  And Doctor, when your note of August the 12th,
8      2002 identified herein as Exhibit 3 makes
9      reference to Department Rule 415-80 would that
10     be the Illinois Administrative Code, Title
11     2415.80?

12 A.  Correct.

13 Q.  And if that administrative code indicates that
14     the Department shall grant a medical furlough
15     for purposes of obtaining an organ transplant
16     under certain conditions would that be your
17     understanding of the Department's duties with
18     respect to organ transplants?

19 A.  That's correct.

20 Q.  Are you aware of any other duties with respect
21     to transplants?

22 A.  No.

23 Q.  Can an optometrist measure eye pressures in the
24     eye?

55

1  *A.*    Yes.

2          MS. POWELL:  That's all I have for you,

3  Doctor.  Thank you very much.

4          MS. DUDGEON:  I have no questions.

5                    **EXAMINATION**

6  **BY MS. CHOATE:**

7  *Q.*    Dr. Elyea, do you have any reason to believe

8  that Mr. McCroy was not receiving care of

9  qualified ophthalmologists at Western Illinois

10  Correctional Center?

11 *A.*    No.

12         MR. LONDRIGAN:  I object to the form of

13  that question.  There weren't any

14  ophthalmologists at Western.

15 *Q.*    Under the care of -- I'll rephrase that.

16  You're right, Tom.

17         Do you have any reason to believe that

18  Mr. McCroy was not under the care of qualified

19  ophthalmologists while he was an inmate at

20  Western Illinois Correctional Center whether or

21  not those ophthalmologists were in-house or

22  outside?

23 *A.*    No.

24 *Q.*    You were asked several questions about

56

1           Deb Fuqua.  Who is Deb Fuqua?

2    A.    She's the health-care unit administrator at

3           Western.

4    Q.    And is she a medical doctor?

5    A.    She's an RN.

6    Q.    Are you familiar with what the responsibilities

7           of the health-care unit administrator are?

8    A.    Somewhat, yes.

9    Q.    Can the health-care unit administrator, for

10          example, admit somebody to the health-care unit

11          medically?

12   A.    To the infirmary?

13   Q.    To the infirmary, yes.

14   A.    No.

15   Q.    Can they discharge someone?

16   A.    No.

17   Q.    Does the health-care unit administrator

18          determine what medical restrictions might be

19          placed on a person?

20   A.    No.

21   Q.    And in fact, the e-mails that you were shown

22          from Deb Fuqua and -- to you and back and forth,

23          would you consider those e-mails -- let me

24          strike that.

1          To your knowledge are the health-care unit

2     administrators involved in direct patient care

3     as part of their duties as a health-care unit

4     administrator?

5  A.  Not the actual treatment or the care, no.

6          MS. CHOATE:  I have nothing further.

7          MR. LONDRIGAN:  I may have one by way of

8     clarification.

9                    EXAMINATION

10  BY MR. LONDRIGAN:

11  Q.  Assuming that the health-care unit

12     administrator cannot admit someone to the

13     infirmary, can that job position discharge

14     someone from the infirmary?

15  A.  No.

16  Q.  Who has the authority to do that?

17  A.  Physicians, dentists and psychiatrists.

18  Q.  And were all of the physicians, dentists and

19     psychiatrists present at Western employees of

20     Wexford?

21  A.  I believe so.

22  Q.  What paperwork or forms would have to be signed

23     at the time that a patient like McCroy who had a

24     corneal transplant was dismissed to show that

58

1        there was a qualified physician from a medical

2        standpoint discharging them from the infirmary?

3    *A.*    Our records include an infirmary admission note

4        which has to be signed by both the nurse who

5        takes the history and by the doctor and then

6        there's a discharge summary note that is signed

7        by the doctor.

8    *Q.*    Is it on the same piece of paper?

9    *A.*    No.

10   *Q.*    Is it on the same form or is it a separate

11       form?

12   *A.*    Separate forms.

13   *Q.*    Is it white, 8 by 11?

14   *A.*    Standard --

15   *Q.*    Yes.

16   *A.*    -- sheets.

17   *Q.*    On the same type of paper that I'm holding up

18       to you now or that was -- would be used at the

19       time of admission?

20   *A.*    There's standard admission sheets and standard

21       discharge sheets which are approved forms in the

22       Department of Corrections and they're 8 by 11

23       just like the rest of the medical chart.

24            MR. LONDRIGAN:  Okay.  That's all.

59

1          MS. CHOATE:  I don't have anything else.

2          MS. POWELL:  I don't either.

3          MS. CHOATE:  Dr. Elyea, do you want to

4     review this deposition or do you want to --

5          THE WITNESS:  Yeah.

6          MS. CHOATE:  So we'll reserve.

7                    (The deposition was concluded at

8                    2:40 p.m.)

60

ERRATA SHEET OF WILLARD ELYEA, M.D.

I have read the foregoing transcript of my deposition taken on March 7, 2007, and

(    )  It is a true and correct transcript of my deposition given on the day and date aforesaid.

(Or)

(    )  I wish to make the following changes to my deposition:

Pg ___ Ln ___ Change _____

Pg ___ Ln ___ Change _____

Pg ___ Ln ___ Change _____

Pg ___ Ln ___ Change _____

Pg ___ Ln ___ Change _____

Pg ___ Ln ___ Change _____

Pg ___ Ln ___ Change _____

Pg ___ Ln ___ Change _____

Pg ___ Ln ___ Change _____

Pg ___ Ln ___ Change _____

Pg ___ Ln ___ Change _____

Pg ___ Ln ___ Change _____

Pg ___ Ln ___ Change _____

Pg ___ Ln ___ Change _____

DATE: _____    _____
                              WILLARD ELYEA, M.D.

61

## C E R T I F I C A T E

        I, Julie K. Edeus, a Certified Shorthand Reporter in and for the State of Illinois, do hereby certify that, pursuant to the agreement herein contained, there came before me on the 7th day of March 2007, at 1:00 p.m. at the Dixon Correctional Center, 2600 North Brinton Avenue, Dixon, Illinois, the following-named person, to-wit: Willard Elyea, M.D., who was duly sworn to testify to the truth and nothing but the truth of his knowledge concerning the matters in controversy in this cause; that he was thereupon examined on his oath and his examination reduced to writing under my supervision; that the deposition is a true record of the testimony given by the witness, and that the reading and signing of the deposition by said witness were not expressly waived.

        I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of an attorney or counsel employed by the parties hereto or financially interested in the action.

        In witness whereof I have hereunto set my hand this 24th day of March 2007.


Julie K. Edeus
Certified Shorthand Reporter
IL License No. 084-003820
8991 South Prairie Road
Ashton, Illinois 61006

## LAWYER'S NOTES

| Page | Line | |
|------|------|---|
| | | |

'

'02 [2] - 44:9, 44:11
'67 [2] - 4:17
'69 [2] - 4:17, 4:18
'72 [1] - 4:18
'93 [1] - 9:4
'95 [1] - 8:14

**0**

02-3171 [1] - 1:4
084-003820 [1] - 61:23

**1**

1 [5] - 2:13, 3:12, 10:19, 10:20, 26:6
10 [1] - 3:12
11 [5] - 3:20, 46:12, 46:13, 58:13, 58:22
12 [3] - 16:9, 23:4, 29:24
1227 [1] - 2:3
12th [11] - 21:15, 28:7, 28:8, 28:14, 29:8, 29:23, 30:19, 36:24, 52:1, 54:5, 54:7
13 [1] - 28:17
13th [2] - 33:3, 36:24
14 [3] - 3:21, 50:10, 50:11
15 [1] - 3:13
16 [1] - 3:14
1962 [1] - 4:14
1966 [1] - 4:15
1972 [1] - 9:4
1992 [1] - 10:17
1995 [1] - 10:16
1999 [1] - 5:3
1:00 [2] - 1:18, 61:4

**2**

2 [3] - 3:13, 14:24, 15:1
200 [1] - 2:18
2001 [3] - 10:24, 14:21, 46:4
2002 [21] - 15:9, 16:9, 18:18, 21:13, 23:4, 25:3, 28:8, 28:17, 29:8, 30:1, 30:19, 33:3, 33:22, 34:23, 36:17, 37:3, 44:20, 45:14, 52:1, 54:5, 54:8
2004 [2] - 46:4, 50:20
2007 [4] - 1:17, 60:2, 61:4, 61:18

20th [2] - 34:15, 34:23
21 [1] - 4:24
217-773-2273 [1] - 26:8
22nd [2] - 44:9, 50:20
236 [1] - 2:18
2415.80 [1] - 54:11
24th [1] - 61:18
26 [1] - 44:11
2600 [2] - 1:16, 61:5
27 [1] - 3:15
29th [2] - 10:24, 14:21
2:02 [1] - 40:6
2:06 [1] - 40:7
2:40 [1] - 59:8

**3**

3 [14] - 3:14, 16:3, 16:4, 27:16, 29:20, 29:21, 30:1, 30:4, 51:23, 52:10, 52:15, 53:13, 53:24, 54:8
30 [1] - 49:14
34 [1] - 3:16
35 [1] - 3:17
399 [1] - 2:4

**4**

4 [7] - 3:5, 3:15, 27:12, 27:14, 29:17, 31:20, 33:1
415-80 [3] - 19:3, 53:18, 54:9
43 [1] - 3:18
44 [1] - 3:19
46 [1] - 3:20

**5**

5 [4] - 3:16, 34:12, 34:14, 44:20
50 [1] - 3:21
500 [1] - 2:8
51 [1] - 3:6
55 [1] - 3:7
560 [1] - 2:18
57 [1] - 3:8
575 [1] - 2:12

**6**

6 [3] - 3:17, 35:17, 35:18
61 [1] - 3:24
61006 [1] - 61:24
62705 [1] - 2:4
62705-1687 [1] - 2:13
62706 [1] - 2:8

6525-0560 [1] - 2:19

**7**

7 [5] - 1:17, 3:18, 43:23, 43:24, 60:2
7th [1] - 61:4

**8**

8 [2] - 58:13, 58:22
8/16/02 [1] - 31:20
8/19/02 [1] - 40:23
8991 [1] - 61:23

**9**

9 [3] - 3:19, 44:22, 44:23
99 [1] - 36:4

**A**

Aag [1] - 2:7
Aaron [26] - 1:3, 5:4, 6:2, 6:6, 6:17, 7:23, 9:19, 9:24, 10:24, 14:20, 15:24, 21:9, 29:3, 29:13, 30:1, 30:5, 30:16, 30:20, 30:24, 32:10, 32:21, 36:21, 40:16, 44:21, 47:10, 47:18
Ab [1] - 4:14
able [1] - 5:10
above-entitled [1] - 1:21
Absolutely [1] - 21:1
accepted [1] - 10:4
according [2] - 25:21, 26:15
Act [1] - 49:20
action [4] - 1:22, 22:6, 61:14, 61:16
actual [2] - 5:24, 57:5
address [1] - 52:15
addressed [1] - 12:20
addressing [1] - 29:9
administration [1] - 49:9
administrative [3] - 15:4, 36:7, 54:13
Administrative [1] - 54:10
administrator [6] - 56:2, 56:7, 56:9, 56:17, 57:4, 57:12
administrators [2] - 17:14, 57:2
admission [3] - 58:3,

58:19, 58:20
admit [1] - 56:10, 57:12
advising [1] - 54:3
aforesaid [1] - 60:5
afternoon [1] - 18:6
agency [6] - 15:12, 16:7, 33:19, 44:13, 50:16, 52:20
aggravate [1] - 42:1
ago [1] - 5:24
agree [5] - 19:13, 19:16, 25:1, 53:4, 53:21
agreement [2] - 1:21, 61:3
ahead [1] - 39:23
air [1] - 4:18
al [1] - 1:6
Allen [1] - 2:12
allow [1] - 24:21
allowing [1] - 41:10
alternative [1] - 41:14
Ander [1] - 31:18
Anderson [7] - 2:20, 31:7, 36:5, 38:18, 40:1, 42:9, 42:12
answer [5] - 13:11, 16:16, 27:2, 29:11, 32:24
anyway [1] - 34:10
appeal [15] - 24:8, 24:19, 24:20, 25:7, 25:9, 25:11, 25:18, 26:18, 26:21, 51:5, 51:8, 51:11, 51:13, 51:15, 51:20
appealing [1] - 24:14
Appearances [1] - 2:1
appointed [1] - 9:17
appointments [1] - 42:6
appropriate [4] - 7:17, 15:14, 22:1, 28:24
appropriately [1] - 43:18
approve [2] - 23:23, 24:1
approved [1] - 58:21
April [3] - 15:9, 36:17, 36:24
Arb [1] - 15:19
area [2] - 8:19, 9:2
Ashton [1] - 61:24
aspects [1] - 52:24
assistance [1] - 34:17
assistant [1] - 38:22
Assistant [1] - 27:20
associated [1] - 48:7
assume [1] - 34:16

assumes [1] - 29:7
Assuming [1] - 57:11
assuming [2] - 26:10, 26:11
attendance [2] - 17:10, 17:15
attended [1] - 17:7
attending [1] - 17:19
attention [5] - 6:3, 6:7, 6:18, 32:12, 40:2
Attorney [9] - 2:2, 2:7, 2:7, 2:11, 2:17, 3:5, 3:6, 3:7, 3:8
attorney [3] - 6:8, 61:13, 61:15
August [23] - 16:9, 18:18, 21:15, 23:4, 25:3, 28:7, 28:8, 28:14, 28:17, 29:8, 29:18, 29:23, 29:24, 30:19, 33:3, 33:22, 34:15, 34:23, 44:9, 44:11, 52:1, 54:4, 54:7
author [1] - 18:14
authorities [1] - 12:11
authority [1] - 57:16
authorized [1] - 22:10
available [3] - 10:9, 48:23, 49:3
Avenue [2] - 1:17, 61:5
aware [7] - 5:4, 34:20, 40:15, 50:8, 54:1, 54:6, 54:20

**B**

background [4] - 4:12, 4:23, 39:8, 39:9
based [3] - 30:16, 31:13, 48:6
basis [3] - 37:13, 45:17, 45:18
Bates [1] - 36:4
bear [1] - 40:11
bears [1] - 18:24
become [1] - 5:4
beginning [1] - 34:23
behalf [1] - 23:24
bells [1] - 33:13
best [1] - 48:19
between [5] - 39:24, 50:7, 52:22, 53:5, 53:14
big [1] - 39:9
blind [4] - 31:5, 31:11, 31:18, 32:1
blindness [4] - 7:10, 43:19, 43:20, 43:21

board [3] - 4:21, 15:4, 36:8
Board [1] - 4:22
bold [1] - 41:4
bottom [1] - 36:5
bought [1] - 41:10
Box [2] - 2:4, 2:18
Brazis [1] - 9:8
break [1] - 40:4
bring [1] - 17:23
Brinton [2] - 1:16, 61:5
brought [4] - 6:3, 6:6, 6:17, 32:12
Brown [1] - 2:15

C

cannot [1] - 57:12
Capitol [1] - 2:13
Care [1] - 12:3
care [34] - 7:13, 7:17, 7:20, 8:8, 9:18, 10:5, 12:12, 12:16, 13:16, 17:14, 19:10, 20:5, 22:1, 33:14, 41:3, 41:12, 48:14, 49:3, 49:6, 49:18, 53:1, 55:8, 55:15, 55:18, 56:2, 56:7, 56:9, 56:10, 56:17, 57:1, 57:2, 57:3, 57:5, 57:11
case [10] - 12:4, 22:3, 22:5, 26:20, 38:19, 43:5, 43:6, 43:7, 43:20
cases [2] - 38:21, 43:11
Castro [2] - 38:18, 38:20
center [2] - 20:9, 20:12
Center [7] - 1:16, 2:12, 11:1, 14:5, 55:10, 55:20, 61:5
Central [1] - 1:1
certain [5] - 6:4, 10:8, 13:10, 52:24, 54:16
certainly [4] - 21:10, 35:10, 47:12, 50:2
Certificate [1] - 3:24
Certified [3] - 1:19, 61:2, 61:22
certified [1] - 4:21
certify [2] - 61:3, 61:12
change [1] - 7:6
Change [14] - 60:8, 60:9, 60:10, 60:11, 60:12, 60:13, 60:14,

60:15, 60:16, 60:17, 60:18, 60:19, 60:20, 60:21
changed [1] - 42:3
changes [1] - 60:7
characterization [1] - 31:11
chart [2] - 25:17, 58:23
chemistry [1] - 4:15
Chicago [3] - 11:2, 14:4, 14:14
chief [1] - 38:22
Choate [15] - 2:7, 3:7, 6:8, 12:5, 18:2, 18:4, 18:11, 31:10, 31:15, 35:13, 55:6, 57:6, 59:1, 59:3, 59:6
choice [1] - 5:15
Chron [1] - 46:19
chronological [1] - 46:19
Cindy [9] - 11:12, 12:22, 15:21, 38:10, 38:11, 39:24, 40:21, 40:22, 46:18
circumstances [2] - 5:8, 5:11
City [1] - 2:12
clarification [2] - 49:21, 57:8
clarify [1] - 33:13
clean [1] - 42:14
cleaned [2] - 42:16, 42:17
client [1] - 21:18
Clinic [3] - 9:8, 37:8, 37:11
clinic [1] - 37:8
close [1] - 45:13
closely [1] - 48:12
Code [1] - 54:10
code [1] - 54:13
coincidence [1] - 32:5
commencing [1] - 1:18
committee [1] - 24:3
communication [1] - 46:16
company [2] - 24:20, 24:23
compelled [1] - 35:7
concern [1] - 13:3
concerned [2] - 8:6, 23:22
concerning [2] - 51:19, 61:7
concluded [1] - 59:7
condition [5] - 7:9, 8:10, 9:13, 23:14,

29:10
conditions [1] - 54:16
conduct [1] - 35:7
conducted [1] - 35:2
conservative [1] - 7:12
conservatively [1] - 42:23
consider [3] - 10:14, 20:16, 56:23
considered [1] - 52:16
consult [1] - 10:6
consulted [4] - 10:13, 17:18, 47:17, 50:2
contact [8] - 40:17, 41:21, 41:24, 42:10, 42:13, 42:15, 42:24, 43:12
contacted [1] - 33:14
contacts [3] - 7:8, 41:18, 52:4
contain [1] - 52:11
contained [1] - 61:3
context [1] - 6:9
contract [10] - 13:10, 13:13, 52:22, 53:2, 53:4, 53:8, 53:10, 53:14, 53:19
contracts [1] - 13:14
controversy [1] - 61:8
convenience [1] - 14:12
conversation [4] - 25:20, 38:4, 38:8, 44:8
Cook [1] - 4:16
coordinator [5] - 11:10, 11:14, 15:15, 38:13
copied [5] - 15:6, 15:10, 46:15, 50:16, 50:18
copies [4] - 31:6, 31:11, 31:18, 32:1
copy [5] - 15:12, 15:20, 17:5, 17:6, 47:11
copying [1] - 50:22
cornea [8] - 7:2, 7:4, 8:5, 27:22, 28:16, 29:4, 32:22, 41:23
corneal [34] - 8:1, 8:4, 9:9, 20:16, 20:19, 20:22, 21:9, 22:11, 22:17, 22:19, 22:21, 23:5, 23:19, 27:24, 28:23, 30:2, 30:7, 30:18, 30:20, 31:22, 32:6, 37:1, 37:7, 37:24, 40:10, 41:5,

41:14, 42:24, 43:12, 44:3, 52:13, 52:16, 54:3, 57:24
corneas [2] - 21:19, 21:20
Correct [19] - 9:15, 13:6, 14:22, 15:23, 16:1, 24:12, 25:2, 25:10, 27:11, 36:18, 42:4, 42:20, 43:16, 47:4, 48:24, 51:7, 53:12, 53:23, 54:12
correct [11] - 7:7, 12:17, 21:6, 25:9, 27:10, 37:5, 49:4, 50:1, 51:21, 54:19, 60:3
corrected [1] - 7:8
Correction [1] - 25:22
Correctional [5] - 1:16, 11:1, 55:10, 55:20, 61:5
Corrections [27] - 1:6, 5:3, 5:6, 6:16, 8:9, 8:14, 8:23, 10:1, 12:10, 13:8, 13:12, 13:15, 14:6, 19:1, 19:18, 22:24, 27:17, 29:2, 35:21, 39:10, 39:15, 52:21, 52:23, 53:5, 53:15, 53:16, 58:22
Corrections' [1] - 16:15
correspondence [1] - 15:11
cost [9] - 19:8, 19:9, 19:24, 20:2, 20:21, 20:22, 21:3, 40:11, 53:20
Counsel [4] - 2:5, 2:9, 2:14, 2:20
counsel [4] - 6:15, 52:6, 61:13, 61:15
counselor [1] - 34:18
counterindicated [1] - 49:15
County [1] - 4:17
course [7] - 11:6, 15:16, 41:12, 42:3, 47:14, 49:10, 52:19
Court [1] - 1:1
court [3] - 9:16, 9:17, 34:19
court-appointed [1] - 9:17
court-reported [1] - 9:16
current [2] - 10:4, 11:8
custody [3] - 5:5,

8:22, 10:1
custom [4] - 25:15, 25:22, 26:15, 28:12

D

Date [1] - 60:23
date [9] - 5:9, 5:23, 5:24, 23:15, 29:14, 33:2, 33:18, 50:21, 60:4
dated [8] - 10:23, 27:15, 28:8, 29:8, 29:23, 34:15, 51:24, 52:1
days [3] - 31:20, 34:15, 49:14
Deb [3] - 56:1, 56:22
Debbie [3] - 38:3, 40:21, 41:8
Debra [3] - 16:19, 36:22, 37:6
Decatur [1] - 2:19
decided [2] - 10:3, 14:16
deciding [1] - 21:24
decision [7] - 20:19, 21:14, 21:17, 21:19, 37:21, 37:23, 44:2
decisions [2] - 25:6, 25:7
deemed [1] - 15:13
Defendant [2] - 2:20, 51:24
Defendants [3] - 1:7, 2:9, 2:14
degree [1] - 41:22
degrees [2] - 7:4, 43:21
denial [4] - 27:22, 28:20, 29:4, 31:21
denied [4] - 24:17, 33:16, 38:1, 41:4
Dennis [3] - 15:21, 27:19, 45:2
dentists [2] - 57:17, 57:18
deny [2] - 27:23, 30:1
denying [1] - 28:20
Department [37] - 1:6, 5:3, 5:6, 6:15, 8:9, 8:13, 8:22, 10:1, 12:10, 13:8, 13:11, 13:15, 14:6, 16:14, 18:17, 18:20, 18:24, 19:2, 19:18, 21:21, 22:24, 25:21, 27:17, 29:2, 35:21, 38:12, 39:10, 39:15, 52:20, 52:22, 53:5, 53:14,

53:16, 53:18, 54:9, 54:14, 58:22
**Department's** [1] - 54:17
**deposition** [18] - 5:13, 5:18, 5:20, 5:22, 6:11, 13:21, 14:9, 16:10, 17:19, 17:24, 59:4, 59:7, 60:2, 60:4, 60:7, 61:9, 61:11, 61:14
**Deposition** [2] - 1:5, 1:15
**described** [1] - 25:8
**Desk** [2] - 48:19, 48:20
**despite** [1] - 28:22
**detail** [1] - 50:13
**details** [1] - 6:5
**determine** [2] - 52:21, 56:18
**determines** [1] - 20:1
**diagnosed** [3] - 7:5, 47:21, 50:3
**diagnosis** [3] - 7:17, 7:20, 23:15
**different** [8] - 7:4, 12:9, 40:12, 40:13, 41:11, 43:15, 43:21, 46:22
**difficult** [1] - 7:7
**direct** [4] - 19:11, 19:12, 40:1, 57:2
**direction** [3] - 11:24, 35:10, 44:12
**director** [13] - 15:12, 16:8, 24:10, 24:11, 24:13, 25:24, 26:10, 33:19, 44:14, 47:12, 47:15, 50:17, 52:20
**director's** [3] - 47:3, 47:8, 47:10
**directors** [1] - 17:13
**disagree** [2] - 19:17, 24:18
**discharge** [4] - 56:15, 57:13, 58:6, 58:21
**discharging** [1] - 58:2
**discovery** [1] - 35:20
**discuss** [1] - 52:15
**discussed** [2] - 20:24, 44:13
**discussing** [3] - 21:2, 21:3, 21:4
**discussion** [1] - 44:15
**discussions** [1] - 21:13
**disease** [3] - 6:21, 7:1, 7:13
**dismissed** [1] - 57:24
**District** [2] - 1:1, 1:1

**Dixon** [11] - 1:16, 1:17, 13:18, 14:1, 14:7, 14:10, 45:4, 45:6, 45:9, 61:4, 61:5
**DkI** [1] - 31:19
**doctor** [10] - 4:8, 10:18, 11:18, 14:23, 16:2, 38:24, 49:21, 56:4, 58:5, 58:7
**Doctor** [4] - 52:10, 52:19, 54:7, 55:3
**doctor's** [1] - 49:16
**doctors** [1] - 35:6
**documentation** [1] - 34:6
**documents** [3] - 43:9, 51:20, 54:1
**done** [16] - 8:21, 15:16, 20:14, 20:15, 22:14, 23:16, 23:21, 24:21, 25:13, 25:16, 26:16, 26:19, 27:8, 27:9, 37:19
**dosage** [1] - 48:16
**dosages** [1] - 48:16
**doubt** [1] - 30:14
**Dr** [28] - 2:10, 2:20, 9:8, 18:7, 26:2, 26:3, 26:8, 26:11, 29:8, 31:7, 31:18, 31:19, 33:19, 38:2, 38:18, 40:23, 40:24, 41:5, 41:6, 42:9, 42:12, 44:8, 44:12, 44:13, 51:2, 55:7, 59:3
**drug** [3] - 47:23, 48:8, 49:13
**drugs** [2] - 48:21, 49:1
**Dudgeon** [2] - 2:17, 55:4
**duly** [2] - 4:2, 61:6
**during** [10] - 26:3, 28:13, 30:6, 31:3, 32:23, 34:7, 35:2, 35:22, 44:2, 46:3
**duties** [3] - 54:17, 54:20, 57:3

**E**

**e-mail** [2] - 35:22, 40:2
**e-mails** [6] - 35:24, 37:3, 40:21, 52:5, 56:21, 56:23
**early** [1] - 7:5
**Edeus** [3] - 1:18, 61:2, 61:22
**educational** [1] - 4:12
**effective** [1] - 33:18
**effects** [1] - 48:17

**effectuate** [1] - 20:5
**either** [2] - 26:2, 59:2
**elevation** [1] - 48:10
**eligible** [1] - 4:22
**Elyea** [19] - 1:6, 1:15, 2:10, 3:3, 4:1, 4:7, 18:7, 29:8, 33:19, 38:2, 38:18, 41:6, 44:13, 51:2, 55:7, 59:3, 60:1, 60:24, 61:6
**Elyea's** [2] - 40:23, 40:24
**emergency** [7] - 27:21, 28:17, 33:5, 33:6, 33:9, 44:20, 45:1
**employed** [3] - 13:7, 61:13, 61:15
**employee** [1] - 61:15
**employees** [1] - 57:19
**employment** [3] - 4:23, 36:6, 52:19
**end** [1] - 36:2
**entire** [1] - 32:21
**entities** [1] - 28:21
**entitled** [1] - 1:21
**Errata** [1] - 60:1
**essentially** [1] - 48:22
**estimated** [1] - 20:21
**et** [1] - 1:6
**evaluate** [1] - 22:16
**evaluated** [1] - 19:8
**evaluating** [1] - 21:24
**evaluation** [5] - 19:23, 20:9, 22:18, 23:16, 23:17
**evaluations** [1] - 35:8
**event** [1] - 18:8
**everywhere** [1] - 12:6
**evidence** [1] - 31:13
**exactly** [1] - 18:20
**examination** [1] - 61:9
**Examination** [5] - 3:4, 4:4, 50:24, 55:5, 57:9
**examinations** [2] - 35:1, 35:8
**examined** [2] - 4:2, 61:8
**example** [1] - 56:10
**except** [1] - 50:14
**excuse** [2] - 9:17, 20:15
**exhibit** [7] - 15:9, 26:7, 28:7, 33:8, 35:14, 41:1, 50:21
**Exhibit** [45] - 3:11, 3:12, 3:13, 3:14, 3:15, 3:16, 3:17,

3:18, 3:19, 3:20, 3:21, 10:19, 10:20, 14:23, 15:1, 16:3, 16:4, 26:6, 27:12, 27:14, 27:16, 29:17, 29:20, 30:1, 30:4, 31:20, 33:1, 34:12, 34:14, 35:17, 35:18, 43:22, 43:24, 44:22, 44:23, 46:12, 46:13, 50:10, 50:11, 51:23, 52:10, 52:15, 53:13, 53:24, 54:8
**exhibits** [1] - 32:13
**Exhibits** [1] - 3:10
**existed** [1] - 50:19
**experience** [2] - 9:14, 12:7
**experimenting** [1] - 40:16
**expert** [1] - 9:17
**expertise** [3] - 12:18, 12:22, 39:3
**explain** [6] - 6:24, 18:16, 21:16, 21:17, 28:15, 38:11
**Explain** [1] - 28:11
**explains** [1] - 21:11
**explanatory** [1] - 20:18
**expressly** [1] - 61:11
**Eye** [3] - 9:8, 36:16, 36:24
**eye** [13] - 6:4, 6:13, 6:21, 8:9, 9:13, 12:4, 35:1, 35:7, 36:14, 37:8, 48:9, 54:23, 54:24
**eyedrop** [2] - 50:16, 50:19
**Eyes** [1] - 21:20

**F**

**face** [1] - 31:17
**fact** [2] - 28:22, 56:21
**failing** [1] - 42:13
**fair** [1] - 31:19
**familiar** [3] - 28:12, 47:23, 56:6
**family** [2] - 4:24, 20:3
**far** [10] - 8:1, 8:3, 10:4, 10:15, 21:22, 23:16, 23:17, 23:21, 35:14, 48:7
**Farh** [1] - 31:19
**faxed** [1] - 41:6
**federal** [1] - 34:19
**felt** [2] - 9:12, 35:7
**few** [3] - 15:8, 34:15,

51:2
**field** [1] - 47:24
**file** [3] - 46:19, 46:20, 46:23
**filed** [6] - 6:9, 28:18, 34:19, 47:13, 47:18, 52:3
**filing** [1] - 18:4
**final** [1] - 21:14
**finalize** [1] - 27:20
**finalized** [1] - 29:4
**finalizing** [1] - 31:21
**financially** [1] - 61:16
**findings** [1] - 47:2
**firm** [2] - 2:2, 2:17
**first** [8] - 4:2, 5:4, 6:17, 15:8, 18:23, 21:7, 24:18, 51:4
**fit** [1] - 42:10
**fitted** [2] - 40:16, 42:2
**follow** [5] - 11:24, 12:8, 12:14, 24:15, 39:24
**follow-ups** [1] - 39:24
**following** [3] - 21:13, 60:7, 61:6
**following-named** [1] - 61:6
**follows** [2] - 4:3, 12:15
**force** [1] - 4:18
**foregoing** [1] - 60:2
**forget** [1] - 24:22
**form** [9] - 7:21, 7:22, 12:5, 29:6, 31:24, 35:14, 55:12, 58:10, 58:11
**formal** [1] - 25:13
**forms** [3] - 57:22, 58:12, 58:21
**forth** [1] - 56:22
**forward** [2] - 36:3, 40:20
**four** [1] - 31:20
**Friday** [1] - 18:6
**full** [2] - 4:6, 44:7
**Funk** [1] - 27:20
**Fuqua** [8] - 16:19, 36:22, 38:3, 40:21, 41:8, 56:1, 56:22
**Fuqua's** [1] - 37:6
**furlough** [1] - 54:14
**future** [1] - 30:21

**G**

**General** [1] - 2:7
**general** [2] - 28:14, 30:21
**generated** [1] - 52:2
**given** [8] - 7:20, 12:11,

12:23, 13:1, 44:12, 52:8, 60:4, 61:10
**glasses** [1] - 7:7
**glaucoma** [3] - 47:19, 50:4, 50:7
**governed** [2] - 19:2, 53:18
**governs** [1] - 27:5
**Graduated** [1] - 4:14
**graduated** [1] - 4:15
**graft** [2] - 52:13, 52:16
**grant** [1] - 54:14
**grievance** [16] - 15:17, 15:18, 27:21, 28:17, 29:3, 31:21, 33:5, 33:6, 33:9, 36:13, 44:21, 45:1, 47:17, 50:15, 50:17, 51:17
**grievances** [3] - 32:10, 33:7, 52:3

## H

**Hand** [1] - 43:22
**hand** [5] - 10:18, 34:17, 35:16, 50:9, 61:18
**handling** [2] - 15:13, 33:20
**handwriting** [1] - 49:17
**hate** [1] - 39:5
**hazards** [1] - 48:17
**health** [24] - 6:2, 11:15, 15:15, 15:17, 17:1, 17:11, 17:12, 17:14, 21:12, 33:14, 38:14, 41:3, 48:14, 49:3, 49:6, 49:18, 56:2, 56:7, 56:9, 56:10, 56:17, 57:1, 57:3, 57:11
**health-care** [15] - 17:14, 33:14, 41:3, 48:14, 49:3, 49:6, 49:18, 56:2, 56:7, 56:9, 56:10, 56:17, 57:1, 57:3, 57:11
**hearsay** [1] - 35:14
**Heinz** [1] - 4:19
**helps** [1] - 33:13
**hereby** [1] - 61:3
**herein** [2] - 54:8, 61:3
**hereto** [1] - 61:16
**hereunto** [1] - 61:18
**Heyl** [1] - 2:12
**highlighted** [1] - 41:4
**Hill** [1] - 2:17
**history** [5] - 39:15, 40:15, 41:12, 42:5,

58:5
**Hobrock** [7] - 11:12, 15:21, 38:10, 38:11, 39:24, 40:22, 46:18
**Hockaday** [3] - 15:21, 27:19, 45:2
**hold** [1] - 53:3
**holding** [1] - 58:17
**Hospital** [2] - 4:17, 4:20
**house** [4] - 35:1, 42:9, 44:4, 55:21
**housed** [2] - 44:10, 49:1
**Hughes** [1] - 2:17

## I

**identification** [10] - 10:21, 15:2, 16:5, 27:13, 34:13, 35:19, 44:1, 44:24, 46:14, 50:12
**identified** [1] - 54:8
**Identify** [3] - 10:22, 15:3, 16:6
**Idoc** [2] - 2:9, 53:19
**II** [1] - 61:23
**Illinois** [22] - 1:1, 1:6, 1:17, 1:20, 2:4, 2:7, 2:8, 2:13, 2:19, 4:16, 11:1, 16:14, 27:17, 32:22, 53:6, 53:16, 54:10, 55:9, 55:20, 61:3, 61:5, 61:24
**immediate** [2] - 38:22, 39:11
**immediately** [1] - 41:7
**implemented** [1] - 22:8
**impression** [1] - 47:6
**improve** [1] - 40:17
**in-house** [3] - 35:1, 42:9, 55:21
**incidental** [1] - 34:2
**include** [2] - 24:4, 58:3
**includes** [1] - 35:21
**including** [1] - 48:18
**inconvenient** [1] - 18:12
**Index** [1] - 3:1
**Indian** [1] - 5:1
**Indiana** [1] - 4:14
**indicate** [1] - 31:17
**indicated** [3] - 20:10, 28:23, 31:6
**indicates** [3] - 36:12, 53:19, 54:13
**induced** [2] - 47:19,

50:4
**infirmary** [8] - 44:4, 44:10, 56:12, 56:13, 57:13, 57:14, 58:2, 58:3
**inflammation** [1] - 48:3
**information** [2] - 48:23, 49:2
**informed** [2] - 27:18, 40:9
**initial** [1] - 16:21
**initials** [2] - 16:17, 31:19
**inmate** [12] - 15:5, 20:6, 20:8, 20:9, 28:18, 34:16, 36:8, 36:13, 37:17, 40:12, 50:3, 55:19
**Inmate** [5] - 33:15, 36:19, 36:23, 44:4, 46:16
**inmate's** [1] - 46:23
**inmates** [1] - 8:22
**input** [1] - 39:11
**inserts** [1] - 48:22
**instance** [1] - 19:8
**Institute** [2] - 36:16, 36:23
**institution** [3] - 26:24, 45:16, 45:16
**institution's** [1] - 49:2
**institutions** [2] - 13:9, 46:2
**instructed** [3] - 35:7, 49:8, 49:18
**intend** [1] - 41:19
**intention** [2] - 27:23, 29:24
**interested** [1] - 61:16
**interface** [2] - 24:6, 24:7
**Internet** [1] - 10:10
**Internship** [1] - 4:16
**interpret** [1] - 49:16
**interpretation** [1] - 39:12
**involve** [2] - 48:18, 50:15
**involved** [4] - 24:16, 26:19, 37:16, 57:2
**issuance** [1] - 22:7
**issue** [12] - 10:4, 21:10, 21:11, 28:16, 29:1, 31:2, 33:13, 33:15, 33:18, 39:5, 52:9
**issues** [2] - 12:20, 15:5, 36:8
**itself** [1] - 53:11

## J

**Jacksonville** [1] - 37:18
**January** [1] - 5:3
**Jennifer** [1] - 31:19
**job** [2] - 53:2, 57:13
**John** [2] - 38:18, 38:20
**Julie** [3] - 1:18, 61:2, 61:22
**July** [3] - 37:3, 38:2, 38:10
**June** [1] - 21:13

## K

**keep** [2] - 17:1, 42:13
**keeping** [1] - 51:20
**Kehoe** [4] - 36:16, 36:23, 37:7, 37:11
**Kelly** [1] - 2:7
**kept** [3] - 17:4, 17:5, 17:15
**keratoconus** [14] - 6:21, 7:22, 8:2, 8:3, 8:10, 8:15, 8:17, 10:5, 40:18, 41:21, 41:24, 43:18, 45:11, 50:7
**Keratoconus** [1] - 7:2
**keratometer** [1] - 7:6
**knowledge** [7] - 9:13, 12:18, 35:1, 42:21, 50:6, 57:1, 61:7

## L

**labeled** [1] - 27:21
**large** [1] - 39:9
**last** [4] - 6:1, 6:13, 10:12, 50:10
**law** [1] - 34:18
**lawsuit** [2] - 6:10, 34:19
**lawyer** [2] - 39:6, 39:14
**lay** [1] - 48:15
**laymen** [2] - 18:16, 21:16
**left** [1] - 29:1
**lenses** [9] - 40:17, 41:22, 41:24, 42:2, 42:11, 42:13, 42:15, 42:24, 43:12
**less** [1] - 9:5
**letter** [18] - 10:23, 11:3, 11:9, 12:21, 14:20, 15:4, 18:14, 19:14, 20:18, 21:10, 21:15, 22:7, 27:15,

29:8, 33:23, 34:2, 51:24, 52:2
**level** [1] - 8:5
**library** [1] - 34:18
**License** [1] - 61:23
**life** [1] - 7:5
**literature** [1] - 49:15
**litigation** [1] - 6:18
**Llc** [1] - 2:17
**Lr** [14] - 60:8, 60:9, 60:10, 60:11, 60:12, 60:13, 60:14, 60:15, 60:16, 60:17, 60:18, 60:19, 60:20, 60:21
**Lochard** [1] - 2:15
**logo** [1] - 16:15
**Londrigan** [21] - 2:2, 2:2, 3:5, 3:8, 4:5, 10:18, 13:23, 14:23, 16:2, 18:8, 18:12, 28:2, 29:21, 31:16, 46:11, 50:9, 50:23, 55:12, 57:7, 57:10, 58:24
**long-term** [2] - 48:7, 48:18
**Longterm** [1] - 48:9
**Longrigan** [5] - 31:14, 32:3, 35:16, 43:22, 51:16
**Look** [1] - 36:4
**look** [6] - 11:15, 26:6, 27:14, 33:1, 39:23, 51:3
**looked** [1] - 41:2
**looking** [3] - 31:2, 53:10, 53:13
**Louis** [1] - 9:18
**Lyndsay** [1] - 2:17

## M

**mail** [2] - 35:22, 40:2
**mails** [6] - 35:24, 37:3, 40:21, 52:5, 56:21, 56:23
**main** [1] - 14:1
**mandated** [1] - 17:13
**March** [4] - 1:17, 60:2, 61:4, 61:18
**marked** [12] - 10:20, 15:1, 16:4, 27:12, 34:12, 35:18, 41:1, 43:24, 44:21, 44:23, 46:14, 50:12
**Marked** [1] - 3:11
**marks** [2] - 18:24, 19:13
**master** [1] - 46:23
**material** [1] - 10:6

matter [3] - 14:18, 36:21, 48:15
matters [1] - 61:8
Maxitrol [2] - 47:23, 48:2
Mccroy [40] - 1:3, 5:4, 6:2, 6:6, 6:17, 7:23, 9:19, 9:24, 10:24, 14:20, 15:5, 15:24, 21:9, 29:3, 29:9, 29:11, 29:13, 30:1, 30:5, 30:16, 30:20, 30:24, 32:10, 32:21, 36:20, 36:21, 36:23, 40:16, 44:4, 44:9, 44:21, 46:16, 47:10, 47:18, 51:9, 52:3, 52:12, 55:8, 55:18, 57:23
Mccroy's [1] - 33:15
Md [9] - 1:6, 1:15, 3:3, 4:1, 4:10, 4:16, 60:1, 60:24, 61:6
mean [8] - 18:13, 20:13, 22:23, 23:19, 41:17, 41:20, 43:6, 51:21
meaning [1] - 52:21
means [3] - 21:23, 32:2, 40:24
meant [1] - 49:23
measure [1] - 54:23
medical [29] - 11:15, 11:18, 15:12, 16:8, 17:13, 20:5, 21:24, 22:1, 24:10, 24:11, 24:13, 25:23, 25:24, 26:10, 32:11, 33:19, 35:5, 36:14, 38:24, 39:3, 44:14, 50:17, 52:20, 52:24, 54:14, 56:4, 56:18, 58:1, 58:23
medically [1] - 56:11
medication [5] - 49:9, 49:12, 50:14, 50:16, 50:19
meeting [5] - 17:8, 17:18, 21:12, 37:4, 37:15
meetings [4] - 17:2, 17:11, 17:12, 20:24
memo [11] - 16:7, 28:9, 28:14, 28:16, 28:19, 30:19, 32:13, 40:23, 41:1
memorandum [3] - 28:6, 29:15, 29:16
mentioned [1] - 15:22
messages [1] - 35:22

met [1] - 36:9
methods [1] - 10:4
Might [1] - 16:21
might [7] - 8:6, 10:9, 22:16, 26:11, 36:19, 48:17, 56:18
mild [1] - 7:21
mind [3] - 30:14, 33:2, 33:4
minute [1] - 40:3
Minutes [2] - 17:3, 17:4
minutes [3] - 17:7, 17:8, 17:18
monitor [1] - 53:2
monitored [1] - 48:11
monitoring [2] - 44:5, 44:11
month [1] - 38:9
months [1] - 15:8
move [1] - 36:2
moving [1] - 40:20
must [4] - 18:21, 20:6, 33:23, 42:16

N

N51882 [1] - 36:21
name [2] - 4:6, 16:23
named [1] - 61:6
National [1] - 2:12
necessarily [2] - 7:9, 7:15
necessary [1] - 11:16
need [3] - 22:18, 23:16, 42:24
needed [2] - 23:21, 30:18
neutral [2] - 14:15, 14:16
never [2] - 43:3, 43:20
none [1] - 13:11
nonphysicians [1] - 49:7
normally [3] - 11:24, 17:10, 42:17
North [4] - 1:16, 2:13, 2:18, 61:5
Notary [1] - 1:19
notation [1] - 25:23
notations [1] - 16:14
note [5] - 25:16, 25:19, 54:7, 58:3, 58:6
nothing [7] - 23:17, 23:21, 28:9, 28:19, 30:19, 57:6, 61:7
notice [1] - 18:5
noticed [1] - 5:21
notified [1] - 22:15

notifies [1] - 29:2
November [3] - 10:24, 14:20, 50:20
number [2] - 43:10, 43:17
nurse [2] - 49:20, 58:4
Nursing [1] - 49:20

O

oath [1] - 61:8
object [7] - 12:5, 29:6, 30:3, 31:10, 31:23, 35:13, 55:12
objection [2] - 29:12, 29:23
objections [1] - 18:5
obtaining [1] - 54:15
obviously [2] - 21:14, 36:7
occasion [2] - 8:18, 9:1
occasions [1] - 8:21
occur [2] - 5:22, 44:17
occurred [1] - 28:13
offender [3] - 19:22, 20:3, 41:17
offenders [1] - 18:21
Office [2] - 2:4, 2:7
office [16] - 11:2, 11:14, 14:5, 14:7, 15:5, 16:7, 17:5, 17:6, 24:2, 24:8, 36:8, 38:13, 47:3, 47:8, 47:10, 51:11
offices [4] - 14:1, 14:4, 38:15, 52:4
often [3] - 24:20, 45:16, 45:20
Old [1] - 2:13
on-site [1] - 45:23
One [2] - 5:1, 14:4
one [9] - 9:21, 10:10, 26:24, 27:15, 29:22, 41:1, 43:8, 46:9, 57:7
operates [1] - 26:23
ophthalmological [1] - 48:21
ophthalmologist [14] - 6:20, 8:5, 8:12, 11:13, 11:20, 30:17, 37:22, 39:2, 42:6, 42:18, 42:22, 43:4, 45:22, 46:2
ophthalmologists [16] - 10:16, 13:7, 22:23, 23:5, 23:13, 35:6, 37:9, 37:17, 40:13, 41:11, 45:13, 45:15,

55:9, 55:14, 55:19, 55:21
ophthalmology [5] - 4:19, 10:8, 37:8, 47:24, 48:2
opinions [2] - 40:13, 52:11
opposed [1] - 19:5
Optometrist [1] - 42:8
optometrist [3] - 31:9, 49:7, 54:23
order [1] - 12:16
ordinary [3] - 11:6, 15:16, 47:14
organ [18] - 18:17, 18:22, 19:1, 19:6, 19:19, 20:14, 20:16, 20:20, 21:22, 39:12, 52:17, 53:7, 53:17, 53:20, 53:22, 54:4, 54:15, 54:18
organs [3] - 21:19, 21:20
original [2] - 7:17, 7:19
Oswald [1] - 4:7
outline [1] - 4:11
outlined [2] - 7:12, 26:22
outpatient [1] - 37:13
outside [6] - 12:11, 22:22, 23:4, 30:17, 42:21, 55:22
own [4] - 18:22, 24:19, 24:23, 34:17

P

package [1] - 48:22
Page [2] - 3:4, 36:4
pages [1] - 28:7
paid [1] - 29:1
paper [2] - 58:8, 58:17
paperwork [2] - 24:14, 24:16, 57:22
paragraph [3] - 18:23, 34:22, 44:7
paraphrase [1] - 18:19
part [2] - 45:3, 57:3
participate [1] - 44:2
participating [2] - 35:24, 44:6
particular [2] - 22:5, 43:5, 50:14
parties [3] - 1:21, 61:14, 61:16
past [1] - 30:21
patient [26] - 5:5, 11:7, 19:7, 20:22, 21:24, 22:10, 22:16, 22:18,

23:14, 23:20, 27:16, 34:17, 35:2, 37:13, 40:12, 41:11, 41:13, 42:10, 42:15, 42:23, 43:14, 49:24, 50:20, 57:2, 57:23
patient's [2] - 25:17, 25:23
patients [8] - 8:2, 8:3, 8:14, 8:17, 9:11, 12:3, 13:18, 30:6
pay [4] - 18:21, 20:6, 20:10, 21:4
Pc [1] - 2:3
Pdr [1] - 48:23
pencilled [1] - 16:13
people [1] - 31:6
Per [1] - 44:8
perforation [2] - 8:6, 8:7
perhaps [1] - 13:1
period [11] - 26:3, 28:13, 30:7, 31:3, 32:23, 34:7, 35:3, 35:22, 44:3, 46:3, 46:19
periodically [1] - 48:12
person [4] - 9:12, 48:15, 56:19, 61:6
personal [1] - 4:11
Pg [14] - 60:8, 60:9, 60:10, 60:11, 60:12, 60:13, 60:14, 60:15, 60:16, 60:17, 60:18, 60:19, 60:20, 60:21
pharmacy [1] - 49:2
Phoenix [1] - 5:2
phone [1] - 49:22
physician [4] - 4:8, 13:5, 33:17, 58:1
Physician [2] - 48:19, 48:20
physicians [2] - 12:1, 57:18
Physicians [1] - 57:17
pick [1] - 24:23
piece [1] - 58:8
place [5] - 10:10, 20:14, 32:7, 35:15, 51:9
placed [1] - 56:19
Plaintiff [2] - 1:4, 2:5
Plaintiffs [22] - 3:12, 3:13, 3:14, 3:15, 3:16, 3:17, 3:18, 3:19, 3:20, 3:21, 10:19, 10:20, 15:1, 16:4, 27:12, 34:12, 35:18, 43:24, 44:23,

46:13, 50:11, 52:6
**plan** [1] - 22:6
**Plaza** [1] - 2:13
**Pm** [5] - 1:18, 40:6, 40:8, 59:8, 61:4
**Po** [1] - 2:18
**point** [1] - 45:8
**portion** [2] - 28:4, 32:16
**position** [3] - 27:3, 27:4, 57:13
**possibility** [1] - 52:8
**possible** [2] - 48:17, 52:1
**possibly** [2] - 22:17, 49:16
**Post** [1] - 2:4
**Potter** [1] - 2:2
**Powell** [13] - 2:11, 3:6, 13:21, 29:6, 29:19, 29:22, 30:3, 31:23, 40:3, 51:1, 51:18, 55:2, 59:2
**practice** [8] - 5:1, 8:12, 9:3, 10:13, 10:15, 28:12, 37:10, 43:10
**Practice** [1] - 49:20
**practiced** [1] - 48:1
**Prairie** [1] - 61:23
**predated** [1] - 27:3
**prepared** [1] - 47:9
**prescribed** [4] - 42:17, 49:9, 49:11, 49:23
**present** [5] - 4:13, 13:19, 30:22, 45:23, 57:19
**pressures** [2] - 48:10, 54:23
**previously** [1] - 41:1
**prison** [1] - 32:21
**prisoner** [3] - 5:5, 11:7, 20:6
**private** [2] - 9:3, 43:10
**pro** [1] - 6:10
**problem** [1] - 50:19
**problems** [5] - 6:3, 12:4, 32:10, 32:11, 42:14
**procedure** [1] - 24:21
**proceed** [1] - 22:11
**proceedings** [1] - 40:7
**process** [5] - 26:18, 26:22, 27:3, 27:6, 51:5
**profession** [1] - 12:15
**professional** [2] - 4:12, 48:14
**professionals** [2] - 49:6, 49:18

**programs** [1] - 38:23
**progress** [1] - 7:16
**progressive** [1] - 7:14
**projected** [1] - 20:21
**proper** [2] - 45:4, 48:16
**provide** [5] - 12:12, 13:15, 20:5, 21:8, 47:1
**provided** [4] - 7:18, 9:16, 35:20, 54:2
**providing** [1] - 52:24
**psychiatrists** [2] - 57:17, 57:19
**Public** [1] - 1:19
**purposes** [2] - 44:5, 44:11, 54:15
**pursuance** [1] - 1:20
**pursuant** [2] - 25:13, 61:3

### Q

**qualifications** [1] - 11:22
**qualified** [9] - 13:5, 37:9, 42:10, 43:4, 45:13, 55:9, 55:18, 58:1
**quarterly** [4] - 17:1, 17:11, 17:12, 21:11
**questions** [8] - 45:5, 51:2, 51:4, 51:19, 55:4, 55:24
**Quincy** [1] - 37:18
**quote** [5] - 18:23, 18:24, 19:11, 19:12, 19:13
**quoting** [2] - 19:3, 19:4

### R

**raised** [1] - 21:11
**Randle** [1] - 2:3
**rapidly** [1] - 41:23
**rather** [1] - 19:9
**rational** [1] - 32:9
**Rayford** [1] - 2:15
**read** [11] - 11:3, 28:2, 28:5, 29:14, 32:15, 32:17, 33:8, 33:12, 34:22, 34:23, 60:2
**reading** [2] - 40:5, 61:10
**readings** [1] - 7:6
**really** [2] - 5:10, 30:13
**reason** [6] - 32:9, 34:24, 35:5, 45:5, 55:7, 55:17

**reasons** [1] - 43:17
**Recalling** [1] - 9:4
**receive** [4] - 9:19, 22:11, 41:17, 52:12
**received** [5] - 11:4, 33:23, 34:2, 38:20, 45:7
**receiving** [1] - 55:8
**recent** [1] - 34:5
**recess** [1] - 40:6
**recognize** [3] - 16:17, 31:12, 40:24
**recollection** [3] - 6:16, 26:13, 36:3
**recommendations** [1] - 30:16
**recommended** [9] - 22:22, 23:5, 23:12, 23:19, 37:1, 37:7, 38:1, 48:16, 49:14
**record** [9] - 13:1, 13:2, 17:15, 25:11, 28:5, 29:14, 32:17, 38:11, 61:10
**records** [8] - 5:12, 5:17, 17:1, 18:10, 25:5, 25:23, 34:6, 58:3
**reduce** [1] - 48:3
**reduced** [1] - 61:9
**refer** [4] - 8:18, 9:2, 11:16, 22:3
**reference** [5] - 10:15, 30:5, 53:7, 53:14, 54:9
**Reference** [2] - 48:19, 48:20
**referenced** [2] - 43:8, 52:4
**referred** [5] - 6:21, 8:10, 9:7, 9:11, 33:18
**referring** [3] - 22:4, 42:22, 44:7
**refresh** [1] - 36:3
**regard** [6] - 12:2, 12:16, 33:14, 36:6, 36:13, 52:9
**regarding** [4] - 27:21, 29:4, 50:15, 51:5
**regional** [4] - 11:10, 11:14, 15:14, 38:13
**regular** [1] - 42:5
**regulation** [1] - 26:23
**related** [2] - 15:17, 61:13
**relation** [1] - 30:15
**relationship** [1] - 50:6
**relative** [1] - 61:15
**relief** [2] - 34:20, 45:3

**remember** [6] - 19:12, 23:10, 23:11, 35:23, 48:2, 53:9
**reminded** [1] - 6:12
**repeat** [2] - 28:1, 48:23
**Rephrase** [1] - 32:19
**rephrase** [1] - 55:15
**report** [2] - 47:2, 47:11
**reported** [1] - 9:16
**Reporter** [4] - 1:19, 3:24, 61:2, 61:22
**represent** [1] - 18:6
**representatives** [1] - 21:7
**request** [4] - 14:12, 27:23, 30:15, 40:11
**requested** [5] - 17:21, 17:23, 28:4, 32:16, 45:3
**require** [1] - 22:17
**required** [5] - 8:1, 8:4, 21:8, 38:21, 45:17
**research** [2] - 10:3, 10:11
**reservation** [1] - 5:2
**reserve** [1] - 59:6
**residency** [2] - 4:19, 4:24
**resolved** [1] - 29:1
**respect** [9] - 11:8, 12:19, 47:18, 51:9, 51:23, 52:10, 52:24, 54:18, 54:20
**respond** [1] - 11:6
**responded** [1] - 14:19
**responds** [1] - 36:22
**response** [3] - 37:6, 38:19, 41:7
**responsibilities** [1] - 56:6
**responsibility** [3] - 19:9, 22:20, 53:20
**responsible** [13] - 19:1, 19:5, 19:6, 19:18, 19:20, 19:21, 19:22, 19:23, 20:2, 21:23, 25:21, 53:17, 53:22
**rest** [2] - 40:4, 58:23
**restrictions** [1] - 56:18
**result** [3] - 7:9, 43:19, 52:2
**resulting** [2] - 7:3, 43:20
**resumed** [1] - 40:7
**revealed** [1] - 22:18
**review** [14] - 5:17, 5:19, 12:22, 13:1, 15:4, 15:13, 16:10,

24:2, 33:17, 33:19, 36:8, 38:19, 41:6, 59:4
**reviewed** [2] - 5:12, 13:2
**reviewing** [1] - 38:21
**rings** [1] - 33:12
**risks** [1] - 48:7
**Rr** [4] - 11:23, 12:19, 49:7, 56:5
**Rns** [4] - 11:24, 12:6, 12:7, 12:12
**Road** [1] - 61:23
**role** [2] - 38:12, 45:6
**room** [2] - 16:20, 40:4
**Rowe** [2] - 41:5, 44:12
**Royster** [1] - 2:12
**rule** [7] - 18:17, 18:21, 19:11, 21:22, 25:13, 26:23, 27:5
**Rule** [3] - 19:3, 53:18, 54:9
**rules** [2] - 25:22, 39:12
**run** [1] - 40:4
**rupture** [1] - 8:7

### S

**saw** [1] - 43:10
**scheduled** [2] - 6:12, 14:15
**se** [1] - 6:10
**search** [1] - 34:5
**Second** [1] - 2:8
**second** [1] - 34:22
**see** [17] - 12:23, 12:24, 15:20, 16:12, 33:12, 33:20, 34:6, 36:12, 36:22, 37:6, 37:22, 37:24, 38:17, 41:7, 45:1, 46:15, 47:1
**seeking** [1] - 32:22
**selected** [1] - 22:24
**self** [1] - 20:18
**self-explanatory** [1] - 20:18
**send** [5] - 31:5, 40:12, 41:10, 47:12, 47:14
**sending** [1] - 53:24
**sent** [12] - 15:12, 15:14, 15:18, 16:7, 28:19, 31:11, 31:17, 31:18, 32:14, 36:23, 45:2, 47:9
**Separate** [1] - 58:12
**separate** [2] - 28:20, 58:10
**September** [1] - 44:20
**services** [7] - 11:15,

15:15, 17:2, 17:11, 17:12, 21:12, 38:14
**set** [1] - 61:18
**Seventh** [1] - 2:3
**several** [4] - 23:14, 37:9, 37:18, 55:24
**shall** [1] - 54:14
**shaped** [2] - 7:3, 42:3
**shared** [1] - 9:21
**sharing** [1] - 6:14
**Shaw** [1] - 2:15
**Sheet** [1] - 60:1
**sheets** [3] - 58:16, 58:20, 58:21
**shipping** [1] - 37:16
**shorten** [1] - 32:20
**Shorthand** [4] - 1:19, 3:24, 61:2, 61:22
**show** [5] - 16:2, 34:14, 38:9, 46:11, 57:24
**Show** [1] - 14:23
**showed** [1] - 15:9
**shown** [3] - 9:21, 52:5, 56:21
**sic** [1] - 49:15
**side** [1] - 48:17
**signature** [5] - 16:22, 16:23, 19:15, 27:18, 28:8
**signed** [4] - 27:19, 57:22, 58:4, 58:6
**signing** [1] - 61:10
**simply** [3] - 21:23, 24:16, 49:21
**Sims** [5] - 2:15, 26:2, 26:3, 26:8, 26:11
**Sims'** [1] - 44:8
**sit** [1] - 51:9
**site** [4] - 24:10, 33:23, 45:19, 45:23
**sites** [4] - 17:7, 17:9, 33:7, 45:18
**sole** [1] - 53:20
**solutions** [1] - 42:18
**someone** [4] - 13:4, 56:15, 57:12, 57:14
**Somewhat** [1] - 56:8
**somewhere** [2] - 14:14, 53:8
**soon** [1] - 38:20
**sources** [1] - 10:5
**South** [3] - 2:3, 2:8, 61:23
**specialist** [2] - 9:2, 9:9
**specialists** [3] - 9:7, 22:22, 22:23
**specialize** [1] - 8:18
**specialized** [1] - 13:16
**specialty** [1] - 4:21

**specific** [2] - 5:9, 26:13
**specifically** [3] - 29:9, 53:19, 54:3
**spend** [1] - 32:3
**spent** [2] - 4:17, 4:24
**spontaneous** [2] - 8:6, 8:7
**Springfield** [10] - 2:4, 2:8, 2:13, 11:12, 14:5, 14:14, 17:6, 36:10, 37:19, 38:16
**St** [1] - 9:18
**stamped** [1] - 36:4
**Standard** [1] - 58:14
**standard** [3] - 10:14, 58:20
**standards** [1] - 12:14
**standpoint** [1] - 58:2
**stands** [1] - 53:2
**started** [2] - 5:2, 37:16
**state** [2] - 4:6, 16:9
**State** [4] - 1:20, 2:13, 53:6, 61:2
**statement** [1] - 19:17
**statements** [1] - 29:10
**states** [1] - 53:15
**States** [1] - 1:1
**Stateville** [1] - 46:9
**stationery** [1] - 27:17
**stay** [1] - 7:19
**steroid** [3] - 47:19, 48:4, 48:9
**steroid-induced** [1] - 47:19
**steroidal** [2] - 49:13, 50:4
**steroidal-induced** [1] - 50:4
**still** [2] - 9:24, 39:17
**Street** [3] - 2:3, 2:8, 2:18
**strike** [1] - 56:24
**structure** [1] - 7:3
**subject** [1] - 36:21
**submitted** [1] - 40:22
**substantial** [1] - 41:18
**Suite** [2] - 2:12, 2:18
**summary** [1] - 58:6
**supervision** [1] - 61:9
**supervisor** [2] - 38:22, 39:11
**suppose** [1] - 10:9
**surgery** [1] - 41:18
**sworn** [2] - 4:2, 61:6
**system** [1] - 32:21

**T**

**team** [1] - 24:2

**telephone** [5] - 24:24, 25:1, 25:8, 26:12, 34:3
**ten** [1] - 9:5
**Tenney** [1] - 2:17
**tent** [1] - 7:3
**tent-like** [1] - 7:3
**tentative** [1] - 5:23
**term** [5] - 32:1, 48:7, 48:9, 48:18, 53:9
**terms** [3] - 18:16, 21:16, 52:22
**Terri** [4] - 36:5, 38:17, 38:18, 40:1
**testified** [2] - 4:3, 51:18
**testify** [1] - 61:7
**testimony** [2] - 18:9, 61:10
**text** [1] - 33:8
**textbooks** [1] - 10:9
**texts** [2] - 10:8, 10:13
**textual** [1] - 10:6
**therefore** [2] - 21:21, 39:2
**Theresa** [1] - 2:11
**thereupon** [1] - 61:8
**thinning** [2] - 7:2, 41:23
**thins** [1] - 8:5
**third** [1] - 44:7
**Thomas** [1] - 2:2
**Thompson** [1] - 14:4
**Title** [1] - 54:10
**to-wit** [1] - 61:6
**today** [5] - 14:10, 16:11, 18:7, 41:4, 51:10
**Tom** [2] - 29:20, 55:16
**took** [2] - 35:15, 51:9
**top** [2] - 26:7, 31:5
**track** [1] - 51:20
**training** [1] - 9:14
**transcript** [2] - 60:2, 60:4
**transferred** [2] - 45:4, 45:8
**transplant** [41] - 8:4, 19:20, 19:24, 20:2, 20:6, 20:9, 20:11, 20:12, 20:16, 20:17, 20:19, 20:20, 20:22, 21:9, 21:22, 22:12, 22:17, 22:19, 22:21, 23:6, 23:20, 27:22, 27:24, 28:24, 29:5, 30:2, 30:18, 31:22, 32:22, 37:1, 37:7, 37:24, 40:10, 41:5, 41:14, 43:1, 43:13,

44:3, 52:17, 54:15, 57:24
**transplantation** [1] - 28:16
**transplants** [20] - 8:1, 18:17, 18:22, 19:2, 19:7, 19:19, 20:14, 20:15, 30:8, 30:21, 32:6, 39:13, 53:7, 53:17, 53:21, 53:22, 54:3, 54:4, 54:18, 54:21
**travel** [1] - 14:16
**treat** [1] - 41:24
**treated** [7] - 7:14, 8:8, 8:14, 41:21, 42:23, 43:11, 43:18
**treating** [5] - 23:4, 23:13, 30:17, 37:13, 42:18
**Treatment** [1] - 45:10
**treatment** [19] - 7:13, 7:18, 9:19, 10:5, 11:8, 11:16, 12:3, 12:12, 12:16, 12:23, 12:24, 13:3, 24:17, 36:14, 41:12, 45:4, 45:7, 57:5
**trial** [1] - 41:18
**true** [2] - 60:3, 61:10
**truth** [2] - 61:7, 61:10
**try** [3] - 18:19, 34:19, 40:17
**two** [3] - 5:23, 28:7, 40:3
**Two** [1] - 28:20
**two-minute** [1] - 40:3
**type** [9] - 9:18, 12:18, 13:15, 24:14, 25:6, 26:23, 41:4, 45:7, 58:17

**U**

**ultimately** [1] - 7:10
**Under** [2] - 49:20, 55:15
**under** [7] - 13:10, 13:13, 21:21, 27:18, 54:16, 55:18, 61:9
**uniformly** [1] - 26:24
**unit** [11] - 17:14, 33:14, 49:3, 56:2, 56:7, 56:9, 56:10, 56:17, 57:1, 57:3, 57:11
**United** [1] - 1:1
**units** [1] - 41:3
**University** [2] - 4:14, 4:16

**up** [5] - 4:12, 24:15, 24:23, 52:9, 58:17
**ups** [1] - 39:24
**utilization** [2] - 24:2, 33:17

**V**

**various** [1] - 13:8
**varying** [1] - 41:22
**vendor** [16] - 19:6, 21:23, 22:3, 22:11, 22:15, 22:20, 23:22, 23:23, 23:24, 28:23, 39:19, 40:11, 53:3, 53:15, 53:21, 54:2
**vendors** [6] - 16:8, 28:15, 32:14, 51:24, 52:23, 53:24
**venue** [2] - 14:16, 18:13
**Veterans** [1] - 4:19
**visit** [2] - 45:16, 45:17
**visited** [2] - 42:2, 45:19
**Voelker** [1] - 2:12

**W**

**waived** [1] - 61:11
**warden** [2] - 45:2, 46:18
**Warden** [2] - 15:20, 27:20
**Warrenville** [1] - 5:1
**watched** [1] - 48:13
**Water** [1] - 2:18
**wearing** [1] - 42:15
**week** [2] - 6:1, 6:13
**weeks** [1] - 5:24
**Western** [12] - 10:24, 24:11, 24:13, 28:18, 31:9, 34:18, 45:2, 55:9, 55:14, 55:20, 56:3, 57:19
**Wexford** [20] - 2:15, 13:14, 21:8, 22:4, 23:1, 33:16, 38:1, 38:4, 38:5, 40:9, 40:22, 41:10, 44:12, 45:23, 51:13, 52:23, 53:6, 54:2, 57:20
**Wexford's** [1] - 37:23
**Wheaton** [1] - 9:8
**whereof** [1] - 61:17
**white** [1] - 58:13
**Willard** [8] - 1:6, 1:15, 3:3, 4:1, 4:7, 60:1, 60:24, 61:6
**wish** [1] - 60:7

**wit** [1] - 61:6
**witness** [6] - 35:16, 43:22, 46:12, 61:10, 61:11, 61:17
**Witness** [3] - 3:3, 13:24, 59:5
**word** [3] - 18:20, 39:6
**words** [1] - 49:22
**works** [1] - 26:18
**world** [1] - 12:11
**write** [1] - 11:7
**writes** [1] - 40:21
**writing** [4] - 26:6, 31:12, 32:12, 61:9
**written** [3] - 18:4, 27:5, 47:2
**wrote** [1] - 14:20

## Y

**year** [1] - 5:1
**yearly** [2] - 45:17, 45:18
**years** [5] - 4:24, 9:4, 23:14, 41:24, 48:1
**Yesterday** [1] - 18:1
**yourself** [1] - 34:24

*Dr. Arms :*          November 29, 2001
*217-773-2273*

Fr;  Aaron McCroy
     Reg. No. N51882
     P.O. Box 1000
     Western Illinois C.C.
     Mt. Sterling Illinois 62353

To:  Dr. Elyea
     Medical Director of the I.D.O.C.
     100 W. Randolph, Suite 4200
     Chicago, Illinois 60601

Re:  Medical Treatment.

        This letter is in regards to correcting a situation that
involves the medical staff employed by Wexford Health Resources
inc.  To with a change from Dr. Boystun's prescribed treatment
for my chronic disorder, to a less effective treatment by
Wexford's Medical Staff.
        Dr. Boydstun of the Galesburg Clinic is the treating
physician in my case.  He and I have had several consultations
concerning my disorder and his recommendations for treatment.
he advised me that I should consent to P- Interferon treatment
to cure my disorder.  Also, he informed me that this treatment
had a 40% chance of success with my type of Hep-c which is the
type least receptive to treatment.  Taking this treatment would
be better than the 20% chance I would have with Interferon and
Ribavirin treatments.  I agreed to start P-Interferon treatments
in November 2001 and had a liver biopsy on October 8, 2001, in
preparation for the P-Interferon treatment.
        However, I recently found out that Dr. Boydstun's Medical
order's for my treatment would not be followed by Wexford's
Medical Staff.  I was informed by Dr. Hamby at Hill C.C. that i
would be placed on the less effective Interferon and Ribavirin,
which would decrease my chances for a cure by 20%, because they
did not want to pay the additional $10,000. cost for P-Interferon
        Thus, because there is no medically sound reason for this
change and that this less effective treatment was not prescribed
Dr. Boydstun nor agreed to by me.  I am asking you to require
that Wexford provide me with the treatment that Dr. Boydstun
the treating physician in my case prescibed, P-Interferon.

                              -1-

**EXHIBIT**
Elyea-1
3/7/07 d

000000905

In conclusion, I respectfully request that this matter be resolved as soon as possible so that further damage to my liver may be avoided.

Thank You.

c.c.file

Aaron McCroy, #N51882



**Illinois
Department of
Corrections**

**George H. Ryan**
Governor

**Donald N. Snyder Jr.**
Director

01 Concordia Court / P.O. Box 19277 / Springfield IL 62794-9277 / Telephone: (217) 522-2666 / TDD: (800) 526-0844

April 5, 2002

Mr. Aaron McCroy
Register No. N51882
Western Illinois Correctional Center

Dear Mr. McCroy:

This will acknowledge receipt of your grievance to the Administrative Review Board received March 25, 2002, regarding medical treatment (eye problems – keratoconus treatment) at Western Illinois Correctional Center.

Your written grievance dated March 11, 2002, regarding this issue was reviewed. You request to be seen by outside doctors regarding your eye condition.

The Warden addressed this issue as an emergency grievance on March 12, 2002. The Warden determined your concerns had been addressed and indicated to pursue your grievance through routine procedures.

This office contacted the Western Illinois Correctional Center Health Care Unit with regard to medical treatment. Your appointment with Dr. Kehoe has been rescheduled twice due to operational needs and inclement weather. You are currently scheduled for an appointment with Dr. Kehoe for further evaluation on April 12, 2002.

Recommendation: Based upon a total review of all available information this office recommends the grievance be denied as the inmate's concerns are being addressed by the Western Illinois Correctional Center administration. However, a copy of your grievance will be forwarded to the Agency Medical Director for further review and handling as deemed appropriate.

For the Board:

Nancy S. Tucker, Chairperson
Administrative Review Board
Office of Inmate Issues

Concurred.

Donald N. Snyder, Jr., Director

Cc:    Warden Dennis Hockaday, Western Illinois Correctional Center
Dr. Willard Elyea, Agency Medical Director
Ms. Cindy Hobrock, Health Services Coordinator
Aaron McCroy, Register No. N51882
Chron. File

**EXHIBIT**

Elyea-2
3/7/07



Illinois
Department of
Corrections

George H. Ryan
Governor

Donald N. Snyder Jr.
Director

James R. Thompson Center / 100 W. Randolph Street / Suite 4-200 / Chicago, IL 60601 / Telephone: (312) 814-3017 / TDD: (800) 526-0844

Date:       August 12, 2002

To:         All Vendors

From:       Willard O. Elyea, M.D.
            Agency Medical Director

Subject:    Cornea Grafting (Transplantation)

Following the recent Quarterly Health Services Meeting, the issue of cornea grafting (transplantation) was raised as to whether this procedure falls under the Department Rule for organ transplants. The contract between the Department of Corrections and the vendors states "That the Illinois Department of Corrections will be responsible for all organ transplants as governed by the Department Rule 415-80."

The following considerations have been made:

1. In discussing the issue with legal the intent of the Department Rule was to apply organ transplants to solid organ transplantation which is done through transplant centers. This Rule has been extended to include bone marrow transplantation. Cornea transplantation on the other hand can be done by ophthalmologists anywhere.

2. The cornea is not considered an organ as such but rather a part of an organ namely the eye.

3. While organs are truly donated, the cornea is not specifically donated but actually the eyeball itself. The cornea is merely removed from the eyeball to be used in cornea grafting.

4. There is no need to type a cornea donor or to find a suitable cornea donor. Anyone can donate a cornea to someone else provided your cornea is not diseased.

5. Cornea transplantation post-operatively is actually referred to as "graft" similar to skin.

While the Office of Health Services appreciates the fact that a cornea may be construed to be an organ donation, there is obvious difference in what was intended in the contract and the Rule. As a result the decision from the Office of



EXHIBIT

Elyea - 3
3/7/07

P100

Health Services is that the vendors are responsible to provide cornea transplantation through their standard utilization processes.

If there are any further questions, please do not hesitate to call my office.


WOE: dva

cc:    Associate Director George E. DeTella
       Chief Nancy Miller – Office of the Bureau Chief
       Chief Linda Dillon – Program Services
       Deputy Chief John Castro, Program Services
       Wardens
       All Health Care Unit Administrators
       Larry Hewitt, Asst. Medical Director
       Monica Becker, Public Health Coordinator
       Sherry Crone, Health Care Coordinator – Northern
       Cindy Hobrock, Health Care Coordinator – Central
       Patti White, Health Care Coordinator – Southern
       Rachel McKinzie – Legal Services
       File
       Chron

# EMERGENCY GRIEVANCE

## 2 OF 2

and it's present complications; and transfer to Dixon Correctional facility, Because I am fearful of further retaliation and other measures by Wexford's staff and thier unchecked use of correctional officers to facilitate retaliation against me for my conplaints. As of this date i am refusing all medication provided by Wexford unless Warden Hockaday as CEO, agrees to exercise his oversight powers to insure my protiction and their compliance with all Court Orders.

Further relief requested.

-To be provided with the name of the Wexford employees who Dr. Sims alleges ordered him to violate the Court Order. To be provided the name of the nurse who assisted Dr. Sims. To be provided the name of the C/O who was assigned to HCU on 8-20-02 first shift, and to be paid compensation in the amount of $10,000.

Respectfully submitted.

c.c./file

Aaron McCroy, #N51882



George H. Ryan
Governor

Donald N. Snyder Jr.
Director

**Illinois
Department of
Corrections**

Western Illinois Correctional Center / Rt. 99 South , P.O. Box 1000 / Mt.Sterling , IL 62353 / Telephone: (217) 773-4441 / TDD: (800) 526-0844

## M E M O R A N D U M

DATE:         August 13, 2002

TO:           Inmate McCroy, N51882
              R3-D-21

FROM:         Dennis L. Hockaday
              Warden

SUBJECT:      **EMERGENCY GRIEVANCE**

This is to finalize your grievance labeled "emergency" regarding your denial for a cornea transplant.

I have contacted the Health Care Unit in regard to your issue and find that although you have been denied by the Wexford Utilization Review Physician, effective 7/25/02, your issue has been referred to Dr. Elyea, Agency Medical Director, for review and handling. Once that review is complete, Ms. Fuqua, Health Care Unit Administrator, will be notified, and will in turn, notify you with regard to same.

If you still do not agree with how your medical issue is being handled, you may continue with your grievance through routine procedures.

Dennis L. Hockaday
Warden

DLH:pam

Attachment

cc:   A/W Funk
      MRF
      Chron File
      File

EXHIBIT
Elyea-4
3/7/07 dc

: 00548

| Date. 8-20-02 | Commited Person: Aaron McCray | ID # N51862 |
|---|---|---|

Present Facility: Western Illinois C.C.    Facility where grievance issue occurred: Same

.TURE OF GRIEVANCE:

☐ Personal Property          ☐ Mail Handling          Transfer Denial:          ☒ Disability
☒ Staff Conduct             ☐ Dietary                ☐ By Transfer Coordinator   ☒ One: *Violation of*
☐ Restoration of Good Time   ☐ Medical Treatment       ☐ By Institution             *A Court ORDER*
☐ Disciplinary Report - Date: _____          Where Issued: _____             *Cato 4-7-02*

PAGE 1 - Committed person completes and sends to counselor who completes counselor response and returns to committed person. Committed person then decides whether or not to forward to Grievance Officer. Grievances on discipline go directly to Grievance Office;.

PAGE 2 - Grievance Officer completes, forwards to CAO; CAO responds and returns to committed person. Committed person then decides whether or not to forward to ARB.

THIS FORM IS NOT USED FOR PROTECTIVE CUSTODY DENIALS.

Brief Summary of Grievance: ___ This is an emergency American with a disability grievance concerning the continual retaliatory treatment I am receiving from I.D.O.C.; WICC Staff and their agents for filing complaints and their willful disregarding of a standing Court Order.

On August 20, 2002 I was called from school to the Health Care Unit to see Dr. Sims, who informed me that he was instructed by someone in Wexford's Corporate Office to give me an eye exam in light of my pending lawsuit. He and an unknown Nurse attempted to give me an eye exam and asked specific questions about how was I able to see in order to walk to the HCU if I am disabled by my advance Keratoconus. Dr. Anderson another named defendant was present but did not address any questions to me.

I informed Dr. Sims that as one of the named defendants he was in violation of a valid Court Order by seeking to obtain information from me to appose my lawsuit. That he as a defendant have been served with a Court Order instructing him and Wexford that the only communication allowed with me and my disability can only be done by their lawyer through depositions. Despite this fact Dr. sims and the unknown nurse continued to try to pressure me to take an eye exam and on 2 occassions, after I refused I was prevented from leaving the HCU by the C/O assigned to the medical unit. On the third occassion, after I asked to see a Warden or Lt. so that I may inform them of Wexfords Unlawful Acts, then and only then was I allow to leave.

It should be noted that advance Keratoconus can not be faked, it's effects and damage to my eyes are well documented and I have repeatedly informed WICC staff of the complication with my contact lense and asked to be sent to an ophthalmologist as soon as possible. All my requests and letters have been ignored.

Therefore, because Wexford Staff has repeatedly engaged in unlawful acts of retaliation and willfully disregarded a standing Court Order. I am seeking to have Warden Hockaday as CEO of WICC and also a named defendant, insure that I am immediately sent out to see an ophthalmologist for the mandated treatment for my disability

Relief Requested: _____

CONTINUED

1 OF 2

(Attach additional pages, if necessary.)

| COUNSELOR'S RESPONSE |
|---|

Date Received: _____

Response: _____

_____

_____

_____

_____

Counselor: _____

| Signature | Print Name | Date of Response |
|---|---|---|

Outside jurisdiction of this facility grievances which arose from a facility other than the committed person's present location and denials of transfers from the Transfer Coordinator's Office onward directly to the Administrative Review Board. 1301 Concordia Court, P.O. Box 19277, Springfield, IL 62794-9277.

**EXHIBIT**

*Elyea-5*
*3/7/01 sc*

## FUQUA, DEBBIE

| | |
|---|---|
| **From:** | ELYEA, WILLARD |
| **Sent:** | Thursday, August 22, 2002 11:26 AM |
| **To:** | FUQUA, DEBBIE; HOBROCK, CINDY |
| **Subject:** | RE: Aaron McCroy N51882 |

The treatment for Keratoconus is contact lenses unless the cornea is thinning rapidly. The offender may receive a substantial trial of contacts prior to surgery. If the corneal graft fails, he may have worse vision than now.   Thanks WOE

-----Original Message-----
**From:**    FUQUA, DEBBIE
**Sent:**    Wednesday, August 21, 2002 4:43 PM
**To:**    HOBROCK, CINDY
**Cc:**    ELYEA, WILLARD
**Subject:**    FW: Aaron McCroy N51882

Cindy,
We resubmitted this to Wexford on 8-19-02 after we got Dr. Elyea's memo.  It came back today denied again for a corneal transplant by Dr. Rowe.  I faxed it to you and Dr. Elyea for review.

-----Original Message-----
**From:**    HOBROCK, CINDY
**Sent:**    Monday, August 19, 2002 11:02 AM
**To:**    FUQUA, DEBBIE
**Subject:**  RE: Aaron McCroy N51882

Thanks, Debbie.  Keep me posted on the outcome of this.

-----Original Message-----
**From:**    FUQUA, DEBBIE
**Sent:**    Monday, August 19, 2002 9:44 AM
**To:**  HOBROCK, CINDY
**Subject:**    RE: Aaron McCroy N51882

No, Dr. Sims will have to put it through U.R. again.  I have asked him to do this today.

-----Original Message-----
**From:**    HOBROCK, CINDY
**Sent:**    Monday, August 19, 2002 8:55 AM
**To:**    FUQUA, DEBBIE
**Subject:**    RE: Aaron McCroy N51882

So, has Wexford gave their approval for Mr. McCroy to have this procedure done?

-----Original Message-----
**From:**    FUQUA, DEBBIE
**Sent:**    Monday, August 19, 2002 8:52 AM
**To:**    HOBROCK, CINDY
**Subject:**    RE: Aaron McCroy N51882

Cindy,
We received the letter on Friday afternoon.  It said that the vendors are responsible for cornea transplants.

-----Original Message-----
**From:**    HOBROCK, CINDY
**Sent:**    Monday, August 19, 2002 8:23 AM
**To:**    FUQUA, DEBBIE
**Subject:**    RE: Aaron McCroy N51882

Have you received the letter that went out to the vendors, HCUA's and Warden's?  If so, what did the letter say?

EXHIBIT

Elyea - 4   3/7/07

-----Original Message-----
From:       FUQUA, DEBBIE
Sent:       Friday, August 16, 2002 1:23 PM
To:         HOBROCK, CINDY
Subject:    RE: Aaron McCroy N51882

No, we were waiting for the decision on this.

-----Original Message-----
From:       HOBROCK, CINDY
Sent:       Friday, August 16, 2002 1:10 PM
To:         FUQUA, DEBBIE
Subject:    FW: Aaron McCroy N51882

Has anything been done for this offender with Wexford?

-----Original Message-----
From:       ELYEA, WILLARD
Sent:       Friday, August 16, 2002 12:06 PM
To:         HOBROCK, CINDY
Subject:    RE: Aaron McCroy N51882

Corneal transplants are the responsibility of the vendor. A letter went out to the vendors
and all sites (HCUAs and Wardens) this week. You should also receive a copy. Thanks
WOE

-----Original Message-----
From:       HOBROCK, CINDY
Sent:       Friday, August 16, 2002 11:43 AM
To:         ELYEA, WILLARD
Subject:    FW: Aaron McCroy N51882

Have your heard from Mr. Castro on this case?

-----Original Message-----
From:       ANDERSON, TERRI
Sent:       Friday, August 16, 2002 11:13 AM
To:         HOBROCK, CINDY
Subject:    RE: Aaron McCroy N51882

Any news on this? I have another letter from the inmate.

Terri Anderson
Administrative Review Board
Office of Inmate Issues

-----Original Message-----
From:       HOBROCK, CINDY
Sent:       Friday, July 26, 2002 9:24 AM
To:         ANDERSON, TERRI
Subject:    RE: Aaron McCroy N51882

Thanks, Terri.
Dr. Elyea is having John Castro review this case. I'm sure that an
response will be received soon.

-----Original Message-----
From:       ANDERSON, TERRI
Sent:       Friday, July 26, 2002 9:20 AM
To:         HOBROCK, CINDY
Cc:         KIBBY-BROWN, SANDRA
Subject:    FW: Aaron McCroy N51882

Cindy, I thought I should bring this matter to your attention.

2

P97

-----Original Message-----
From:       FUQUA, DEBBIE
Sent:       Thursday, July 25, 2002 10:50 AM
To:         ANDERSON, TERRI
Subject:    RE: Aaron McCroy N51882

Terri,
I reviewed this inmate's medical file with Dr. Sims. Inmate McCroy N51882 was sent to the Kehoe
Eye Institute on April 12, 2002, and May 13, 2002. A corneal transplant was recommended.
Wexford denied this and Dr. Elyea told them they have to do it. Dr. Sims, Western Medical Director
has not done the necessary paper work to resubmit this inmate to Wexford for approval. I have
asked him to get this done today.

   ----Original Message-----
   From:        ANDERSON, TERRI
   Sent:        Tuesday, July 23, 2002 9:20 AM
   To:          FUQUA, DEBBIE
   Subject:     Aaron McCroy N51882

I am working on a grievance for the above inmate regarding medical treatment for his eye. The
counselor indicated that a visit to Kehoe Eye Institute was scheduled for April 12, 2002. Can you
bring me up to date on his condition and treatment. Thank you.


*Terri Anderson*
*Administrative Review Board*
*Office of Inmate Issues*

2

P99



**Illinois**
Department of
**Corrections**

George H. Ryan
Governor

Donald N. Snyder Jr.
Director

stern Illinois Correctional Center / Rt. 99 South , P.O. Box 1000 / Mt.Sterling , IL 62353 / Telephone: (217) 773-4441 / TDD: (800) 526-0844



E M O R A N D U M

TE:          August 23, 2002

':                 Inmate McCroy, N51882
                   R3-D-21

OM:          Dennis L. Hockaday
                   Warden

JBJECT:     **EMERGENCY GRIEVANCE**

his is to finalize your grievance labeled "emergency" regarding your medical treatment.

ou indicate within your grievance that you cannot see any Wexford employee due to your lawsuit, and there is
court order indicating same that Wexford was violating on 8/20/02, when they called you over to the Health
are Unit. However, I have contacted the Health Care Unit in regard to your concerns and find that as of
20/02, no lawsuit had been served on any Health Care employee regarding same. The lawsuit was received on
22/02, and upon reading said lawsuit, there is no court order indicating that you cannot be seen by Wexford
aff for your medical issues—only that the lawsuit cannot be discussed.

ecords indicate that you did refuse your eye exam on 8/20/02, due to your lawsuit issue. You again refused
eatment and patient education on 8/22/02. Unfortunately, there is no way for the Health Care Unit to help you
ith your condition if you continuously refuse all treatment and instruction. Per Dr. Sims' conversation with
ou on 8/22/02, you are going to be housed in the Infirmary for monitoring purposes on 8/26/02. This direction
as given by Dr. Rowe from Wexford and has been discussed with Dr. Elyea, Agency Medical Director.

would like to indicate to you that you may always get copies of your medical records by sending a request slip
) the Medical Records Department, and you will have to pay for the said copies.

: appears by reviewing all pertinent information, that staff are handling your medical issues appropriately.
Iowever, if you still do not agree, you may continue with your grievance through routine procedures.

Dennis L. Hockaday
Warden

EXHIBIT
Elyea-7
3|7|07 JC

)LH:pam

Attachment                                          MRE      Chron File        File        00543

September 5, 2002

# EMERGENCY GRIEVANCE

Fr; Aaron McCroy
HCU-RM 2, reg. No. N51882

To: Dennis Hockaday
Warden; WICC


   This Ekmergency ADA grievance is being submitted on a non-
I.D.O.C. grievance form because I have been unable to get any
grievances forms while I have been housed in the HCU, despite
numerous requests.

this Emergency grievance is to document the ongoing discrimination
and retaliation I am recieving for complaining of acts in violation
of the ADA and the absence of my ability to file notice to the
Court, or a response to my letter to Warden Hockaday, dated 8-25-
02.

On 8-26-02 I was moved to HCU for what I was told was monitoring
of my keratoconus. It is still my contention that this non-emergency
treatment is improper in light of Judge Bakers Orders.

On 8-27-02 and 8-28-02 I was told by Mr. Fuqua and Mrs. Hobrock
that Wexford and Dr. Elyea had agreed to try an alternative
treatment to a corneal transplant, but they were unaware that I
had tried all alternative treatments. Thus I would be receiving a
Corneal transplant, the exact was no specified.

On 8-29-02 Dr. Sims Confronted me about what he had been told was
said to Mrs. Hobrock and urged me to sign a medical refusal for
treatment if I disagree with the validity of his treatment.

From 8-27-02 Until 9-5-02 I have been required to surrender my
right contact lense each day to be given them from a period of 15
minutes the first day, 45 minutes the second day and increases in
wer time, in increments of 30 minutes each day thereafter, until I
reach close to the 4 hours wer time at which point my right eye
rejects the contact lense. On 9-5-02 I was given the contact lense
to retain in my possession.
it is my belief that this entire episode was devised to cause me
mental distress and to force me to sign a medical refusal form.
refusing so-called eye treatment in order not to be housed in HCU
To provide Wexford and I.D.O.C. with a defense to my complaint.

I have been requesting to be allowed access to the law library in
order to file papers to the court informing them of the Defendants
actions but have been denied access.

Furthermore, during my stay in HCU I have been subjected to rediicule
and hostility and have only been allowed to go to the yard twice
in 10 days. Yard is the only relief from my otherwise 24 hours a
day confinement.

-1-

EXHIB

Elyea - 9
3/7/07

On 9-5-02 I was awakened at 4 am to take a blood glucose test. however, because I am fearful to allow any HCU staff to inject me with a needle that in animus can be contaminated with a virus, etc. I refused to have my blood tested for sugar levels.

On 9-05-02 I informed Mrs Fuqua that my refusal to have my blood tested for glucose levels was just that, only for blood testing. I still wish any and all valid treatments for my Keratoconus. Also, she informed me that the problems with me not being allowed to go to the law library and yard had been corrected. Yet, that afternoon I was not allowed to go by c/o Finch because the chart read no yard.

However, the irreparable harm cause by this unorthodox eye treatment and confinement in the HCU is not just what is described above but the loss of EGCC credit which has retarded my release date by aprx. 7 days and counting.

Relief Requested

To be allowed to go to the law library as soon as possible, awarded all loss EGCC credits, to be given at my expense the medical recommendation by anyone having to do with this unorthodox treatment and to be transferred to Dixon C.C. for proper treatment.

Respectfully submitted.

c.c/file

Aaron McCroy #n51882

-2 of 2-



**Rod R. Blagojevich**
Governor

**Illinois**
Department of
**Corrections**

**Roger E. Walker Jr.**
Director

1301 Concordia Court / P.O. Box 19277/ Springfield, IL 62794-9277 / Telephone: (217) 522-2666 / TDD: (800) 526-0844

June 23, 2004

Aaron McCroy
Register No. N51882
Western Illinois Correctional Center

Dear Mr. McCroy:

This is in response to your grievance received on April 2, 2004, regarding medical treatment (alleges prescription not handled appropriately), which was alleged to have occurred at Western Illinois Correctional Center. This office has determined the issue will be addressed without a formal hearing.

The Grievance officer's report, 04-0120E, and subsequent recommendation dated March 3, 2004 and approval by the Chief Administrative Officer on March 8, 2004 have been reviewed.

Recommendation: Based upon a total review of all available information, this office is referring your grievance to Dr. Willard Elyea, Agency Medical Director, requesting a review be conducted with regard to your request. Dr. Elyea is to provide a written report of his findings to the Director's Office.

FOR THE BOARD: _____
Melody J. Ford
Administrative Review Board
Office of Inmate Issues

CONCURRED: _____
Roger E. Walker Jr.
Director

cc: Warden Kevin Winters, Western Illinois Correctional Center
Dr. Willard Elyea, Agency Medical Director
Cincy Hobrock, Central Region Coordinator
Aaron McCroy, Register No. N51882
Chron. File
Tickler

**EXHIBIT**



Elyea-11
3/7/07



Rod R. Blagojevich
Governor

# Illinois
### Department of
# Corrections

Roger E. Walker Jr.
Director

1301 Concordia Court / P.O. Box 19277/ Springfield, IL 62794-9277 / Telephone: (217) 522-2666 / TDD: (800) 526-0844

November 22, 2004



RECEIVED

FEB 2 2 2005

WESTERN ILL. COR. CENTER
WARDEN OFFICE

Aaron McCroy
Register No. N51882
Western Illinois Correctional Center

Dear Mr. McCroy:

This is in response to your grievance received on August 30, 2004, regarding Medical Care (Eyedrop medicine not provided due to 30 day supply requirement), which was alleged to have occurred at Western Illinois Correctional Center. This office has determined the issue will be addressed without a formal hearing.

In your grievance you indicate that you were not provided Alphagan eyedrops on June 17, 2004 because your 30 day supply of the medicine was not due to be filled until June 29, 2004. You further request names of individuals responsible for making this decision. You further request to be seen by another doctor regarding your diagnosis for problems in your left eye.

The Grievance officer's report 04-0713 and subsequent recommendation dated August 3, 2004 and approval by the Chief Administrative Officer on August 4, 2004 have been reviewed. The Grievance officer notes that Health Care Unit staff records indicate a bottle of the eyedrops was issued to you on June 4, 2004. The bottle contained approximately 100 drops and should have lasted 30 days. Therefore, the request to refill the medicine prior to 30 days from the previous issue of medicine was denied by the pharmacy.

Based on a total review of all available information, it is the opinion of this office that the issue was appropriately addressed by the institution administration. It is, therefore, recommended the grievance be denied. However, a copy of the grievance will be forwarded to the Agency Medical Director for review.

FOR THE BOARD: _____
Brian K. Fairchild
Administrative Review Board
Office of Inmate Issues

CONCURRED: _____
Roger E. Walker Jr.
Director

EXHIBIT
Elyea-14
3/7/07

cc:    Warden Terry Polk, Western Illinois Correctional Center
Aaron McCroy, Register No. N51882
Dr. Willard Elyea, Agency Medical Director
Chron. File

