3:02-cv-03171-HAB-BGC    # 380-7    Page 1 of 85

3/8/07
Lowell Brown, M.D.

McCroy v. Illinois Dept. of Corrections

**E-FILED**
Friday, 04 May, 2007 02:22:34 PM
Clerk, U.S. District Court, ILCD

1           UNITED STATES DISTRICT COURT

2        FOR THE CENTRAL DISTRICT OF ILLINOIS

3             SPRINGFIELD DIVISION

4

5   AARON McCROY,

6            Plaintiff,

7       vs.                        No. 02-3171

8   ILLINOIS DEPARTMENT OF
    CORRECTIONS, et al,

9
             Defendants.

10

11

12

13           THE DEPOSITION of LOWELL BROWN, M.D.,

14   taken in the above-entitled case before Debra K.

15   Baldwin, a Notary Public of Sangamon County, acting

16   within and for the County of Sangamon, State of

17   Illinois, at 8:30 o'clock A.M., on March 8, 2007,

18   at Western Illinois Correctional Center,

19   Mt. Sterling, Brown County, Illinois, pursuant

20   to notice.

21

22
         Baldwin Reporting & Legal-Visual Services
23         Serving Illinois, Indiana & Missouri
         24hrs (217)788-2835    Fax (217)788-2838
24                  1-800-248-2835



3/8/07                            McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

```
 1      APPEARANCES:

 2          LONDRIGAN, POTTER & RANDLE
            BY:  Thomas F. Londrigan, Esq.
 3               1227 South Seventh Street
                 Springfield, Illinois 62703
 4               On behalf of Plaintiff.

 5      MS. KELLY CHOATE
                 Assistant Attorney General
 6               500 South Second Street
                 Springfield, Illinois 62706
 7               On behalf of Defendant Illinois
                 Department of Corrections.
 8
            HEYL, ROYSTER, VOELKER & ALLEN
 9          BY:  Ms. Theresa Powell
                 Attorney at Law
10               National City Bank Building, Suite 575
                 Springfield, Illinois 62701
11               On behalf of Defendant.

12          HUGHES, HILL & TENNEY, LLC.
            BY:  Ms. Lyndsay Dudgeon
13               Attorney at Law
                 236 North Water Street
14               Decatur, Illinois 62525
                 On behalf of Defendant Doctor David
15               Anderson.

16

17

18

19

20

21

22

23

24
```

Baldwin Court Reporting & Legal Video Services
1-800-248-2835

1                           I N D E X

2     DEPONENT                              PAGE NUMBER

3     Lowell Brown, M.D.

4          Examination by Mr. Londrigan        5
           Examination by Ms. Powell          58
5          Examination by Ms. Choate          65

6

7

8

9

10

11                        E X H I B I T S

12    NUMBER                    MARKED FOR IDENTIFICATION

13    Exhibit 1, 2, 3                     43

14

15

16

17

18

19

20

21

22

23

24

Baldwin Court Reporting & Legal Video Services
1-800-248-2835

3/8/07                    McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

1                          S T I P U L A T I O N

2                It is stipulated and agreed, by and
        between the parties hereto, through their
3       attorneys, that the deposition of LOWELL BROWN,
        M.D., may be taken before Debra K. Baldwin, a
4       Notary Public and Certified Shorthand Reporter and
        Registered Professional Reporter, upon oral
5       interrogatories, on the 8th of March A.D., 2007, at
        the instance of the Plaintiff at the hour of
6       8:30 o'clock A.M., Western Illinois Correctional
        Center, Mt. Sterling, Brown County, Illinois;
7
                That the oral interrogatories and the
8       answers of the witness may be taken down in
        shorthand by the Reporter and afterwards
9       transcribed;

10              That all requirements of the Federal
        Rules of Civil Procedure and the Rules of the
11      Supreme Court as to dedimus, and the reading over
        and signing of the deposition by the witness, are
12      expressly waived;

13              That any objections as to competency,
        materiality or relevancy are hereby reserved, but
14      any objection as to the form of question is waived
        unless specifically noted;
15
                That the deposition, or any parts thereof
16      may be used for any purpose for which depositions
        are competent, by any of the parties hereto,
17      without foundation proof;

18              That any party hereto may be furnished
        copies of the deposition at his or her own expense.
19

20

21

22

23

24
                              Page 4

Baldwin Court Reporting & Legal Video Services
              1-800-248-2835

```
 1                    (Whereupon the Deponent was

 2                    sworn by the Notary Public.)

 3              L O W E L L   B R O W N

 4   having been first duly sworn by the Notary Public,

 5   deposeth and saith as follows:

 6                         EXAMINATION

 7                    BY MR. LONDRIGAN:

 8        Q    Doctor, will you give us your full name.

 9        A    Lowell Jerome Brown.

10        Q    And you are a medical doctor, is that

11   right?

12        A    Correct.

13        Q    Would you give me your background and

14   training in the field of medicine.

15        A    All right.

16        Q    And then follow that up with your

17   employment history up to the present.

18        A    All right. I obtained a degree from

19   Stanford University in '56 in biology, Bachelor of

20   arts, and then medical school Creighton in Omaha,

21   Nebraska, M.D., 1960, internship at Santa Clara

22   County Hospital, which is in the Silicone Valley,

23   in 1961, rotating under the direction of Stanford

24   University. And a two year general practice
```

Page 5

1    residency, Modesto, California. And then in 1963 I

2    commenced a general practice in Los Manus, which

3    went on for three and a half years.

4          And then I had to go in the Navy to fight

5    off the Viet Nam situation, and I stayed on for

6    12 years in the Navy in that time going into

7    pathology.  I obtained certification in anatomic

8    and clinical pathology.  And, incidentally,

9    moonlighting extensively in emergency rooms. And

10   then entered into the practice of pathology as a

11   civilian in '78 and moving to Springfield,

12   Illinois, in '79, working two years as pathologist

13   at -- I forget what it is now -- what we remember

14   as Doctors Hospital.

15         Then going back into family practice in

16   Springfield and finally retiring out of that phase

17   of my career in the year 2000. That was family

18   practice. Then I went into locum tenens for three

19   years and immediately before--

20   Q    What did you--

21   A    Locum tenens is like a traveling pinch

22   hitter for doctors that are either ill or on

23   vacation.  I would take over their practice.

24   Q    Okay.

Page 6

1         A     That may not have been just a private

2    practice, but I was in Urgent Care centers and

3    Indian health centers and just about anything you

4    can imagine during that three year period, the last

5    of which was a prison in California, High Desert

6    prison, which was a maximum security, and that was

7    my fellowship, you might say, into the correctional

8    medicine scene.

9              So when I found an opportunity in

10   Illinois, so I could live close to my home of

11   record and my wife, I took it.  And that was in

12   January of '04 right here and I've been here ever

13   since.

14        Q    Based on your experience in correctional

15   medicine and also your experience in general

16   practice, as you've outlined it, including your

17   time spent as a pathologist in Springfield, would

18   you explain to me the similarities and/or the

19   dissimilarities between the care provided to

20   patients.

21        A    You mean in the civilian sector versus

22   the correctional?

23        Q    Yes. What you can do, what you can't do,

24   who you answer to. That type of thing.

Page 7

1        A    Well, we have a, you might call it a

2    gatekeeper concept, and this is true in California,

3    as well as here, and perhaps throughout the United

4    States, from what I've learned, that in order to

5    obtain some outside service, such as CAT scans, or

6    consultations, surgery, whatever, we have to

7    present the case to our superior.  And those people

8    have--we've rotated through several in my three

9    years here, whose job it is to assess the need for

10   the service.

11            Now, they wind up getting about the same

12   as they would on the outside with a few exceptions.

13   I think if someone showed up in my office in

14   Springfield with a hernia, we'd have it fixed

15   within a week or so. I mean, the surgical

16   consultation would take place, no problem, let's

17   get it fixed. Or if it was a lyphoma, a benign

18   tumor, it was a nuisance, it should be removed.  It

19   would be removed.

20            But, here, well, it's not

21   life-threatening so we won't necessarily just rush

22   out and do it, that lyphoma can get, the hernia can

23   wait. If it became an irreducible, or incarcerated,

24   or a strangulated hernia, or a definite

Page 8

1    life-threatening complication, then it would

2    obviously be fixed pronto.

3              So in some cases things are deferred

4    because they're not truly necessary or they're

5    maybe cosmetic or something. But medical procedures

6    are more easily obtained the way that I practiced

7    for 20 years. And that's in a nutshell.

8         Q    And I think that's fairly clear, although

9    it doesn't go into any detail.

10             Can you tell me if there has been any

11   medical literature generated with respect to

12   explaining this gatekeeper concept and how it

13   works?

14        A    Well, I've read articles. I read a lot of

15   journals and some articles touch upon the

16   correctional healthcare arena. And I think where we

17   have formularies, we have certain medicines to

18   choose from, but then the same is true with

19   Medicaid.  So even that's parallel--that's

20   parallel. And I've read a variety of literature.

21        Q    Has there been any literature that's been

22   generated by the department of corrections as to

23   how this gatekeeper concept should work?

24        A    Well, I can't remember specific articles,

3/8/07                          McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

1    but I've definitely read a myriad of things about

2    medical care in corrections and I have no great

3    criticisms to level against the system.

4        Q    No. I'm not really seeking that. I'm

5    trying to access your long experience and trying to

6    educate myself as to how this concept should work

7    and how it's different in the ways that you should

8    explained to me.

9            Are there written rules and regulations

10   here in Illinois in the department of corrections

11   which relate to the gatekeeper concept and the

12   duties that physicians working in institutions and

13   rules that they should observe in treating

14   patients?

15       A    Yes. We have material on that I've read

16   through. They have handouts or duties of the

17   medical director and so forth and they touch upon

18   all that.

19       Q    And who originates this literature,

20   directives, or regulations?

21       A    Well, the most immediate provider of that

22   information was the Wexford Corporation. But I

23   think they obtained it from some national data

24   bank.

Page 10

1       Q    What about rules of the department of

2    correction here in Illinois?

3       A    (No response.)

4       Q    What rules are you required to follow and

5    be conversant with in the care of prisoners, say,

6    at this institution, Western?

7       A    Well, I don't know that I've seen a book

8    of etiquette on the subject.

9       Q    No, I'm not really concerned about

10   etiquette. I'm talking about patient/prisoner care.

11           Are there any rules, to your knowledge,

12   that you're required to follow that are promulgated

13   by the department of corrections?

14      A    Well, there's a lot of literature out

15   there that I've thumbed through, but it doesn't add

16   anything to what I've already--to the fund of

17   knowledge that I've already arrived here with.

18      Q    Well, let me ask it a different way.

19      A    Do what is right, you know, be ethical.

20      Q    As you sit there today, are you aware of

21   any rules and regulations promulgated by the

22   department of corrections that relate in any way to

23   the care and treatment of Aaron McCroy in this

24   case?

                          Page 11

1          A     Nothing particularly striking. Just usual

2    patient care. I don't know what specific thing I

3    can point to.

4          Q     I'm not asking for anything specific.

5                I'm asking you a generic question about

6    your awareness of any rules and regulations

7    promulgated by the department of corrections that

8    bear on the care and treatment of Aaron McCroy in

9    this case and the medical problem that he had?

10         A     Well, I guess I have to say, no, I'm not

11   aware of exactly what you might be looking for.

12         Q     That's a fair answer. And if you--.

13               Have you ever had a deposition taken

14   before?

15         A     Yes.

16         Q     Okay. And so you generally understand the

17   process. If my question is confusing to you, let me

18   know and I'll ask it over again. If you don't ask

19   me that, then I'm going to assume that you

20   understood what I asked you in the first place and

21   I'll accept your answer.

22               If you ever get to a question that I ask

23   you that you don't know the answer to, that's

24   perfectly fine to tell me that. But listen to what

1    I'm asking you and then try to answer that question

2    and then I'll followup with another question.

3            Are you required to become informed with

4    respect to the grievance procedure here that's

5    available to patients if they have complaints about

6    their care and treatment?

7        A    Yes. They reach my desk invariably, the

8    grievances.

9        Q    All grievances or just those that relate

10   to medical care and treatment?

11       A    The ones I've seen have all been medical.

12   If there are others, I'm not are aware of it.

13       Q    Explain to me, if you would, based upon

14   date and time, as close as you can, as to when you

15   came to Western and what your roles were from the

16   time you came here up to the present.

17       A    And so I arrived on the 16th of January

18   of '04 and I was the sole--well, I had a nurse

19   practitioner working with me, but I was responsible

20   for the bottom line, the buck stops here, for

21   important medical decisions.  And so that involves

22   approximately 2000 inmates, and that's 24 hours a

23   day, seven days a week. Some of that obviously by

24   phone since I'm not here at all times.

Page 13

1          Q     And when you came to Western, what was

2     your job title?

3          A     What was my?

4          Q     Your job title?

5          A     Acting medical director.

6          Q     Is that your title today?

7          A     No. I'm medical director.

8          Q     All right. Was there a medical director

9     when you came to Western in January of '04?

10         A     No.

11         Q     Who was acting medical director at that

12    time?

13         A     I don't know that they had anybody in

14    that capacity, unless it would be Doctor Lochard

15    who was available by phone and worked in another

16    correctional facility in Illinois.

17         Q     What's your understanding as to who the

18    last medical director was before you were

19    appointed?

20         A     I believe his name was Sims.

21         Q     And do you recall when it was that

22    Doctor Sims left Western?

23         A     I was told that he left approximately

24    October or September of '03.

Page 14

3/8/07                        McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

1        Q    And when were you appointed medical

2    director after you began to serve as acting medical

3    director?

4        A    I think about a year later.

5        Q    Now, although you were the acting medical

6    director at Western in the year 2004, you were not

7    appointed as medical director until approximately a

8    year later?

9        A    That's right.

10       Q    During that period of time you were an

11   employee of Wexford, is that right?

12       A    Yes.

13       Q    And they're often referred to, at least

14   in some of the documents that have been produced in

15   this case, as a vendor. Would you explain to me

16   what a vendor is, as you understand it, as far as

17   your job and responsibilities?

18       A    I look for a brand of subcontract entity

19   whose job it is to provide the hiring and

20   maintenance of medical personnel and goods to a

21   given prison.

22       Q    Do you have authority as medical director

23   to supervise and give direction to other medical

24   personnel at the prison that are in the employ of

                         Page 15

3/8/07                    McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

1      the department of corrections?

2          A    Yes.

3          Q    And they are required to follow your

4      direction?

5          A    Yes.

6          Q    Would you explain to me the process by

7      which a medically unassigned and medically

8      challenged prisoner would be assigned residence in

9      the infirmary of the healthcare unit. Explain the

10     process.

11         A    Well, we have several categories of

12     candidates for infirmary housing. Incidentally,

13     when I say someone needs to be in the infirmary, or

14     when I order someone there, they have no choice,

15     they would have to go. Now, I can entertain their

16     thoughts, their wishes they don't want to go to the

17     infirmary.  I don't have to do that.

18              But, at any rate, I have the power to

19     tell someone they're going to go to the infirmary

20     and it will get done.  The security people will see

21     to it. If we have--

22         Q    What if a security person said to you,

23     "Doctor, this guy is a threat to other patients

24     and he's caused us problems before and we don't

Page 16

3/8/07                    McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

1    think it's a good idea to have him in the

2    infirmary".  Who would make the final decision

3    there? Someone from security or you?

4        MS. POWELL: As far as what I guess?

5        THE DEPONENT: Well, I think it isn't like

6    we're going to have a clash of power here, a power

7    struggle. We always try to satisfy the needs and

8    wishes of the security people here and we manage to

9    work out a solution.

10        If they think that something is necessary

11    for security, wanting them to put them in infirmary

12    or out of the infirmary, I'll certainly reason with

13    them and come up with a good answer I think.

14        MR. LONDRIGAN:  Q  So you're open to their

15    suggestions and any information that they provide

16    you?

17        A    Oh, yes.

18        Q    But, to use a term you used earlier, the

19    buck stops with you?

20        A    Well, in many--in many ways it does.

21    There are other times when I don't seem to have the

22    power.

23        Q    Well, explain that to me. What do you

24    mean by other times you don't seem to have the

Page 17

1    power?

2        A    Well, security runs the place here, at

3    least they think they do, and I think they do for

4    the most part, and there are some things I wish

5    they would do differently, but they don't. So I

6    have to live with it.

7        Q    And would it be fair to say that when you

8    feel that they should do something differently,

9    it's because of your judgment as a medical

10   professional as to what that patient requires?

11       A    Well, it isn't so much one patient, it's

12   like these lockdowns that crop up every so often.

13   Sometimes I think they overreact to a situation and

14   they declare a lockdown for the prison which puts a

15   crimp on our output of goods and services. And we

16   already have--we always operate under a backlog I

17   think and here we are not doing anything and

18   twiddling our thumbs because we can't see the

19   necessary sick call.

20       Q    What I need to understand is what rules

21   and regulations apply here if there is a dispute,

22   say, between you as a medical professional and

23   security at this institution as it relates to the

24   placement of a patient/prisoner. Who makes the

1    final decision? Who has the authority to make the

2    final decision as far as placement of that

3    prisoner?

4        A    I don't think we've ever had an impasse

5    where I rigidly held one view against the security

6    holding another view. We've always compromised on

7    any differing viewpoints.

8        Q    Well, I understand that there can be

9    compromised--

10       A    And I've had talks with the warden at

11   times on issues like that.

12       Q    I understand that compromises are

13   sometimes reached, but what I'm asking is under

14   this system of a state agency and a vendor hired to

15   provide healthcare where the matter involves an

16   issue of prisoner health, who has responsibility

17   under the rules and regulations of which you

18   operate to make the final decision?

19       A    I can think of some instances where I

20   made the final decision and the warden and his

21   chain of commands have gone along with it. When I

22   put my foot down, I've never been refused on some

23   issue.

24       Q    How do you document the placement of a

Page 19

3/8/07                    McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

1    prisoner/patient when you decide that, from a

2    medical standpoint, it's in his best position to

3    remain in the infirmary?

4         A    So your question is what now? Rephrase

5    that, please.

6         Q    All right. I'll do that.

7              You've told me about you deferring on

8    some occasions to security and security on other

9    occasions accepting your judgment as a medical

10   professional. What I want to know is not examples

11   of how this works, but I want to know what rules

12   and regulations exist to determine who has the

13   ultimate last say as far as prisoner placement

14   where it involves medical judgment?

15        MS. POWELL: I just want to object to the form

16   of the question to the term "placement".  I'm not

17   sure what you mean.

18        MR. LONDRIGAN: I meant whether or not he

19   should be in the infirmary.

20            Q  Now, with that clarification, do you

21   understand what my question is?

22        A    I think I have the question. I'm

23   wrestling with the answer to it. I don't know that

24   I have a written rule somewhere that I can go and

                    Page 20

3/8/07                    McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

1    cite that states that my word will prevail against

2    all objections on a given point of whether someone

3    should be in the infirmary or not. But we haven't

4    had any real clash that I can ever recall where we

5    haven't worked out a solution. I don't think we

6    have a rule that I've ever gone by.

7         Q    Would you say then it's negotiated on a

8    patient-by-patient, issue-by-issue basis, say,

9    between you and the warden?

10        A    No. I'm sure there are rules written

11   down, but I don't necessarily know what they are or

12   cite them. I go on the negotiation tact.

13        Q    And negotiation is better than open

14   warfare, as we're slowly learning.

15             But what I'm trying to get at is where

16   the buck stops, who has the final word on this type

17   of issue.

18        A    (No response.)

19        Q    Is that clear in your mind, as you sit

20   there today?

21        A    Yeah.

22        Q    No. Not only the question. Is where the

23   buck stops, your term, clear in your mind, as you

24   sit there today, on these types of issues?

Page 21

1          A     Medically I'll take the hit on that. I

2    will stop with the buck.

3          Q     In other words, if you felt strongly

4    enough about the issue, you feel you have the

5    authority, as a medical professional, to make that

6    judgment?

7          A     Yes.

8          Q     What type of paperwork is required to be

9    issued and made a matter of record if a patient

10   with a medical problem is transferred into the

11   general population?

12         A     From the infirmary?

13         Q     Yes, sir.

14         A     There's a discharge summary.

15         Q     And who prepares that?

16         A     It would be myself or the nurse

17   practitioner if we had one.

18         Q     You're talking about Debra Fuqua's

19   medical problems now?

20         A     No.

21         Q     You say if you had one.

22         MS. CHOATE: Objection to the form.

23         THE DEPONENT: Debbie Fuqua would be our

24   administrator.  She's the nurse administrator of

                          Page 22

1    the unit, of the healthcare unit, but I'm referring

2    to the nurse practitioner, which we don't have any

3    longer, which would be a subordinant to myself,

4    from a medical standpoint.

5         MR. LONDRIGAN:  Q  So if she would be

6    following your direction, would she have authority

7    to sign your name or affix your stamp and put her

8    initials after that to indicate that you authorized

9    the release from the infirmary?

10        A    That would be--yes, that would be all

11   right.

12        MS. CHOATE: Tom, are you talking about the

13   nurse practitioner or Deb? Because you brought up

14   Deb and he's talking about the nurse practitioner.

15        MR. LONDRIGAN: Well, I had that confused in my

16   mind. I think we've straightened that out though.

17        MS. CHOATE: So the last question was regarding

18   the nurse practitioner?

19        MR. LONDRIGAN: The nurse practitioner.

20        Q  And my next question was to be who was

21   the nurse practitioner when you were the acting

22   medical director?

23        A    Rhonda Mills, RN.

24        Q    And if I understand what you told me, she

Page 23

1      is no longer the acting medical director?

2          A    No. She's no longer the nurse

3      practitioner here.

4          Q    Excuse me.

5          A    We don't have one.

6          Q    Is she still employed here?

7          A    No.

8          Q    Is she still employed--. Was she an

9      employee of Wexford or an employee--

10         A    She was Wexford.

11         Q    She is still an employee of Wexford?

12         A    No. She's in private practice in

13     Beardstown.

14         Q    Now that I have a little better

15     understanding of how this works, would you tell me

16     how Aaron McCroy happened to be released to the

17     general population with the reasons for it and who

18     made that decision.

19         A    Well, I made the decision for quite some

20     time before the actual release to the general

21     population. He had been given the reasonable

22     privilege of walking outside in the sunshine or

23     fresh air, going to the commissary, which is a big

24     deal around here, and joining in with conversation

Page 24

1    with more people than you can encounter simply in

2    the infirmary.

3            We allowed the infirmary folks to do

4    this, weather permitting, and so since enjoyed that

5    and did well, we could see no reason to hold him in

6    the infirmary any longer medically or any reason

7    that I can think of. And so we released him to go

8    back to general population and that seemed to be

9    something he was happy about.

10        Q    And when you say "we", who else?

11        A    That's rhetorical.

12        Q    Pardon me?

13        A    That's rhetorical. Meaning myself, I.

14        Q    You made that decision?

15        A    And, of course, it was in conjunction in

16    discussion with the nurse administrator of the

17    place, Ms. Fuqua, and others. You know, we talk

18    about things.

19        Q    Did you consult any of his outside

20    treating ophthalmologists?

21        A    Well,--

22        MS. POWELL: About that issue? Or just in

23    general ever?

24        MR. LONDRIGAN:   Q  About that issue.

Page 25

1          A     I don't know that I brought up that

2     subject, but I sent Mr. McCroy to a pair of

3     ophthalmologists that I knew because I go to them

4     myself and I referred many patients when I was in

5     practice in Springfield. So whether I had

6     conversations with him on that particular

7     development, I don't remember. But I was on good

8     ground, in my opinion, to do so.

9          Q     What is your experience in the specialty

10    of ophthalmology?

11         A     What is that?

12         Q     Ophthalmology.

13         A     What is my experience?

14         Q     Yes.

15         A     My experience is mainly tangential having

16    referred, you know, hundreds of people to various

17    ophthalmologists over the course of twenty plus

18    years. I learn something with each time you do

19    that. And then what experience I've had with my own

20    eye conditions, I guess I learned something from

21    that too.

22         Q     All right. What eye problems do you have?

23         A     I've had glaucoma and cataracts.

24         Q     What is your knowledge or understanding

                          Page 26

1    of the disease keratoconus?

2        A    Well, it's a corneal deformity that would

3    either require some rather uncomfortable lens

4    applications, prosthetic glasses, if you will,

5    contact lenses of rather complex proportions, or

6    surgery. Or else the person's not going to see very

7    well.

8        Q    Were you aware of the medical history,

9    and by that I mean did you review with prior

10   treating ophthalmologists and records that they had

11   provided to department of corrections and Wexford--

12       A    Yes.

13       Q    (Continuing)--about his background?

14       A    Yes.

15       Q    Were you aware that before he was

16   discharged by you that there was a prior attempt to

17   have him transferred to general population and

18   written request was made of his treating

19   ophthalmologist?

20       MS. POWELL: I'm going to object as to facts

21   not in evidence as there is no such document, no

22   written document from an outside ophthalmologist on

23   that issue. But you can ask the question.

24       MR. LONDRIGAN: Well, I disagree with that.

Page 27

1         MS. POWELL: That's okay.

2         MR. LONDRIGAN: There's a transcription in the

3    record that a request was made of his treating

4    ophthalmologist to place him in the general

5    population and he said no, he didn't want him poked

6    in the eye.

7              Q  Did you ever review that before this

8    deposition today?

9         A    Yes. I know all about that.

10        Q    Did you call this treating physician back

11   when you exercised your medical judgment to have

12   this patient transferred into the general

13   population?

14        A    No.

15        Q    Why not?

16        A    I determined that an opinion or

17   recommendation was based on probably unrealistic

18   expectations and playing it safe. He wasn't on the

19   scene, he doesn't know entirely what's going on

20   here, and I decided that I knew better in view of

21   everything that was going on. And he was a previous

22   ophthalmologist, at any rate.

23        Q    How many times was this prisoner/patient

24   required to see different ophthalmologists in

                        Page 28

3/8/07                    McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

1     different localities during the period of time that

2     he was housed here at at Western?

3          A    Well, I don't have a count on that, but I

4     know that I determined that we needed a new

5     opinion. I much preferred the two ophthalmologists

6     that I referred him to over the previous group,

7     from my own experience in Springfield.

8               And, besides that, I think we needed a

9     new opinion, a new fresh outlook on this. And,

10    unfortunately, they later withdrew from the case.

11    They said their malpractice coverage wouldn't cover

12    the correctional inmates.

13              And so we wound up searching for more

14    ophthalmologists. That's a specialty that we've had

15    a lot of trouble with, not just with Mr. McCroy,

16    but with others. They don't want to seem to take

17    care of prisoners.

18         Q    Did you communicate at all with the

19    medical director for department of corrections?

20         MS. POWELL: The agency medical director?

21         MR. LONDRIGAN:  Q  Yes.

22         A    You mean like Doctor Elyea?

23         Q    Yes.

24         A    I don't know that this case reached his

                        Page 29

1    desk.

2        Q    Well, you certainly didn't call and ask

3    for his opinion, did you?

4        A    No, I don't believe so.

5        Q    Do you know what his specialty is?

6        A    Ophthalmology.

7        Q    Who did you consult when you made the

8    decision to transfer him to general population?

9        A    I don't know that I spoke specifically to

10   an ophthalmologist about my decision.

11       Q    What was the date of Aaron McCroy being

12   transferred into the general population?

13       A    Something like November of '04. I forgot

14   the date. It was late in the year. September or

15   October, November.

16       Q    Well, it was before he had to be taken

17   for emergency treatment and had his left eye

18   enucleated because of a fight with an assigned

19   roommate, wasn't it?

20       A    Yes.

21       Q    And wasn't it on June 8th, while you were

22   acting medical director and after a dispute arose

23   between some nurses, about where his television set

24   should be placed in the infirmary? Wasn't it the

3/8/07                     McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

1    day following?

2         A    I guess I don't remember that incident.

3         Q    Do you remember the grievance process

4    that was initiated about that dispute?

5         A    I don't recall that.

6         Q    Do you remember the grievance that was

7    filed by Aaron McCroy after he was assaulted about

8    being transferred into the general population?

9         A    I don't remember specifics of it. But

10   he--that differed from the way he was feeling

11   before he was transferred. I got the impression

12   that he was absolutely delighted with the transfer.

13        Q    Didn't he ask to be transferred to

14   another institution earlier that year?

15        A    Yes, I do recall that.

16        Q    All right. And didn't he ask to be

17   transferred to a place where he could get an

18   ophthalmologist, or access to an ophthalmologist,

19   that would provide him treatment for his eyes?

20        A    I don't doubt that he wants that. That's

21   a common thread with all of the inmates. They want

22   to be transferred to Dixon or someplace that has a

23   lot more atmosphere than this spot.

24        Q    Well, everybody here signed off on him

                          Page 31

1      being transferred, didn't they?

2           A    Everybody what?

3           Q    Didn't everybody here sign off on him

4      being transferred before he was sent into the

5      general population?

6           A    What do you mean sign off?

7           Q    Well, don't you have to apply to

8      Springfield department of corrections if a prisoner

9      is transferred from one institution to the other?

10          A    Yes. There's quite a procedure for that.

11          Q    All right. And were you aware that that

12     process was initiated as far as he was concerned

13     while he was still housed in the infirmary and

14     before he was transferred into the general

15     population?

16          A    I vaguely remember that, yes.

17          Q    And were you consulted or did you

18     exercise any of your medical judgment as to whether

19     or not that was appropriate?

20          A    I think I mentioned to Ms. Fuqua that I

21     think it would be a favorable thing to do, to

22     transfer him somewhere where he could have--if

23     there is such a place, where he could have better

24     frequently monitoring of his condition since we had

                        Page 32

1    so much trouble keeping ophthalmologists.

2          Q     Do you know why he was transferred by the

3    ophthalmologist from the Kehoe Clinic where he had

4    been treated for several years both before and

5    after he was transferred here to Western?

6          A     No.

7                I don't think I remember your question.

8    What was your question?

9          Q     Do you know of any medical reason, based

10   on your familiarity with this patient, and also

11   with his medical records, as to why his care and

12   treatment was transferred away from the Kehoe

13   Clinic where he had been treated outside, without

14   complaint, either by the department of corrections,

15   Wexford, or the patient, prior to the time that he

16   came here and after he came here?

17         MS. POWELL: I object to the form of the

18   question. It's compound.

19         THE DEPONENT: I don't know the answer to that.

20         MR. LONDRIGAN: It is compounded.  And it was

21   before you came here.

22         Q  But based on your familiarity with his

23   records, can you give me any medical reason now why

24   his care and treatment was transferred away from

                       Page 33

1    the Kehoe Clinic?

2        A    No.

3        Q    If you wanted to find that out, and we're

4    at Western here today, what would you do? What

5    records would you consult and who would you go talk

6    to?

7        A    Well, I'd go in and talk to our medically

8    librarian who has all the records from correctional

9    facilities.  We only have the most recent material.

10   When a chart gets so thick, we have to start a new

11   chart, and so we have old records that may not be

12   what we see on an every day basis. And then if we

13   don't have old records, if they're a civilian or a

14   non-correctional, then we would seek those out.

15       Q    And are these records archived and placed

16   on some type of computerized retrieval system?

17       A    We have the originals though at the

18   prison. If they're housed in our prison, we have

19   the old records.

20       Q    All right. So what you're telling me is

21   that the medical librarian is not here at Western,

22   there's a centralized place where medical records

23   are kept?

24       A    (No response.)

Page 34

1       Q    Is that right?

2       A    Well, I don't know if they have a central

3    data bank of records.

4       Q    And, again, if you don't know the answers

5    to this question, you can tell me you don't know.

6            Q   But you mentioned the medical

7    librarian. Since you've been here treating patients

8    and prisoners, have you ever had occasion to

9    request the medical librarian to provide you with

10    medical history on a patient?

11       A    Yes. She has helped me in seeking out--

12       Q    Tell me how you do that and who the

13    medical librarian is.

14       A    The name of the lady is Lynn Shelton. And

15    on several instances she has researched, made phone

16    calls long distance to learn what happened, or what

17    did some particular consultant do or say, what

18    x-rays there were and so forth. We've looked at

19    medical data by virtue of her research.

20       Q    Where is she employed?

21       A    She is employed I think--I think she's

22    Wexford. Incidentally, she received a better job

23    offer and now she'll be leaving next week.

24            MS. POWELL: Did you mean is she employed here

Page 35

1    at Western or some other city?

2        MR. LONDRIGAN: I'm just trying to find out

3    where.

4        THE DEPONENT: I think her paycheck comes from

5    Wexford.

6        MS. POWELL: I think he wants to know where she

7    is physically.  Is she here at Western?

8        THE DEPONENT: Yeah.  She's physically right

9    next door here.

10        MR. LONDRIGAN:  Q  But you're saying that

11    she's left now?

12        A    No. Next week I think is her last day.

13        Q    Now, in this case have you yourself

14    researched older medical records, prior to the time

15    that you came here, either with or without the

16    assistance of the medical librarian which is

17    located across the hall?

18        MS. POWELL: Wait a second. I object to the

19    form of your question. Are you talking about right

20    now has he ever looked at any medical records from

21    before he came here? Is that what you're asking?

22        MR. LONDRIGAN:  Q  Yes. For any patient.

23        A    Yes.

24        Q    Have you ever gone through that process?

Page 36

1        A    Yes.

2        Q    What do you have to do? Do you have to

3    file some type of written requisition as to what

4    you want and why you want it?

5        A    No. No. You just walk in and--

6        Q    Talk to her?

7        A    (Continuing)--say do you have any old

8    records on so and so. And so we go to the wall, and

9    there it is, and I look through the chart, and

10   that's it.

11       Q    And do you know how long the records are

12   maintained here at this institution?

13       A    As long as the patient is here, the

14   records are here.

15       Q    And so those medical records would have

16   been transferred with the patient when he was

17   transferred from here and on to Menard?

18       A    That's my understanding, yes.

19       Q    Since you have been here and since this

20   litigation began, which was before I got involved

21   in this case, have you, or, to your knowledge,

22   anybody else here for Wexford requested prior

23   medical records for review for inmate McCroy?

24       A    I don't know what anybody else did.

Page 37

1       Q      Okay. The reason I said anybody else

2    is--. Let me rephrase it. Did you or anybody at

3    your direction attempt to assemble the complete

4    medical records and history of Aaron McCroy prior

5    to the time that he was transferred out of here and

6    down to Menard?

7       A    I think I looked through all the existing

8    records, but I don't know that I remembered any

9    salient features.

10      Q    Which of the treating outside

11   ophthalmologists retained by Wexford did you

12   personally speak to with regard to the treatment of

13   Aaron McCroy?

14      A    Let's see. I spoke to the two that I

15   referred to already. That would be Knupp and

16   Steahley. And then I think we also utilized

17   Bruninga (sp) from Jacksonville, but I can't be

18   sure if Bruninga was in on McCroy's case.

19      Q    You mentioned Steahley. That's

20   S-t-a-h-l-e-y?

21      A    S-t-e-a-h-l-e-y.

22      Q    And how did you spell the other name?

23      A    K-n-u-p-p. They're situated--. Knupp is

24   formerly from the SIU medical complex and then he

Page 38

1    joined Steahley whose offices are down by Doctors

2    Hospital.

3        Q    Now, do you understand who it was that

4    hired Doctor Zeh?

5        A    That who hired?

6        Q    Doctor Z-e-h.  Doctor Zeh.

7        A    Was it Sims? I don't know. That may have

8    been.

9        Q    But it was Wexford. Correct?

10       MS. POWELL: I would object to the term

11   "hired". I don't know what you mean by the term

12   "hired". Do you mean was he ever an employee of

13   Wexford?

14       MR. LONDRIGAN:  Q  Paid them to examine, paid

15   them to evaluate and recommend, process, and

16   ultimately Doctor Zeh who performed the corneal

17   transplant.

18       MS. POWELL: I object to the form of the

19   question. That is not accurate. Doctor Zeh did not

20   perform that transplant.

21       MR. LONDRIGAN: Wait a minute. I can't bring

22   his name to my--

23       MS. POWELL: It would be Doctor Feder.

24       MR. LONDRIGAN:  Q  Did you have any

3/8/07                          McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

1    communication with Doctor Feder?

2        A    I don't remember for sure.

3        Q    If you had written correspondence with

4    Doctor Feder, it would be in the patient's file, is

5    that right?

6        A    Yes.

7        Q    Did you have any conversation with

8    Doctor Zeh who provided the followup treatment to

9    the corneal transplant?

10       A    No.

11       Q    Have you reviewed or seen the

12   authorization that you signed off on discharging

13   Aaron McCroy from the infirmary and into general

14   population?

15       MS. POWELL: Again, object to the form of the

16   question in that there's been no evidence that he

17   actually signed off on something that is

18   specifically a discharge summary.

19       MR. LONDRIGAN:  Q  Have you seen the discharge

20   summary?

21       A    I've seen it at some time if I wrote it.

22   I know I saw it at the time.

23       Q    Well, does anyone other than you have

24   authority to discharge anyone from the infirmary

                          Page 40

1    and into general population?

2         A    Well, if I had signed out to someone, if

3    I was on vacation, then whoever that doctor was

4    would have had the authority.

5         Q    Would there be a record of that, wouldn't

6    there?

7         A    Yes.

8         Q    Now, understanding that you are a party

9    to this litigation and that your deposition is

10   being taken today and having the opportunity to

11   speak with counsel, are you telling me today that

12   you have not recently looked at the discharge

13   summary from the infirmary?

14        MS. POWELL: I'm going object to the form

15   question in that I'm not sure what you're talking

16   about when you ask that question. I think I know

17   what you're talking about, but I know what the

18   discharge summary is.

19        MR. LONDRIGAN: Well, let me find out if he

20   doesn't know what I'm talking about.

21             Q    She thinks she knows. Do you think you

22   know?

23        MS. POWELL: Well, I know what a discharge

24   summary is, but I think you're talking about his

Page 41

1    discharge.

2        MR. LONDRIGAN: Well, I'd like to see the

3    discharge summary. I'd like to mark it as an

4    exhibit and ask this witness questions about it.

5        MS. POWELL: Okay. But are you--

6        MR. LONDRIGAN: Can I have it?

7        MS. POWELL: Yes. Are you talking about when

8    the patient was discharged from the infirmary or

9    when Doctor Brown discharged the patient from being

10   housed in the infirmary back to general population,

11   because those are two separate dates?

12       MR. LONDRIGAN: Are they? I'd like to see

13   either and both. Whatever's here. If I have it, it

14   escapes me. I haven't seen anything which amounts

15   to what other witnesses have told me had to be done

16   when the person was discharged.

17       MS. POWELL: So you would like both of those

18   notes?

19       MR. LONDRIGAN: Yes. And then I'll ask him some

20   questions about it.

21       MS. POWELL: Here's your discharge note from

22   being housed in the infirmary. And I will pull out

23   the actual discharge. I will pull out the discharge

24   summary from the infirmary. Here's the infirmary

Page 42

1    discharge note. And what else might be relevant

2    is--

3        THE DEPONENT: I have in my--

4        MS. POWELL: Wait a second. I've got another

5    one too.

6        MR. LONDRIGAN: Could we take a break and get

7    those copied as an exhibit?

8        MS. POWELL: Sure.

9                        (Whereupon said documents were

10                       duly marked for purposes of

11                       identification as Exhibits 1, 2

12                       and 3, as of this date.)

13       MR. LONDRIGAN:  Q  Would you identify

14   Exhibit 1 for me. Tell me what that is.

15       A    Well, Exhibit 1 is November of '03. It is

16   a discharge note written by the nurse practitioner

17   whose authority at that point was linked to

18   whatever doctor was covering for us, for example,

19   Doctor Lochard, and relates to the discharge

20   from--. No. Let's see. It's a discharge from the

21   infirmary with a caveat avoid yard activity with

22   others. So as to protect keratoplasty site.

23       Q    Now, is the same or similar type of form

24   filled out and signed off on at the time of

                        Page 43

1    admission to the infirmary?

2        A    Yes. There is an admission form somewhat

3    similar to that.

4        Q    Was the prisoner/patient Aaron McCroy

5    informed in November of 2003 that he was being

6    discharged from the infirmary?

7        A    Well, I can only assume yes.

8        Q    And why do you assume that?

9        A    Well, I--

10       Q    Did you instruct that that be done?

11       A    No.  I wasn't here.  I wasn't here in

12   November of '03.

13       MS. POWELL: I object to you asking him

14   questions about things that he wasn't here about.

15   He wasn't here in November of '03 he's testified.

16       MR. LONDRIGAN: That's well taken.

17       Q  If you were there in November of '03,

18   would the patient be informed that he was

19   discharged from the infirmary?

20       A    Yes.

21       Q    Why?

22       A    There's no reason to keep what appears to

23   be obvious a secret.

24       Q    Do you know in November of '03 whether or

Page 44

1    not on or prior to that date this patient's current

2    treating physician ophthalmologist was contacted

3    about this decision?

4        A    I don't know that.

5        Q    Do you see the summary of the reason for

6    his admission?

7        A    Yes, I see it.

8        Q    Do you agree that at that point in time,

9    and recognizing that this is before you came on

10   board, that there was no longer any reason to

11   protect his eye from injury by avoiding the general

12   population?

13       A    Well, I look upon the procedure of

14   placing him in a single room or sheltering him in

15   some way as being a rather impractical overkill of

16   the problem. I don't think that the infirmary was

17   necessarily a sanctuary from all trouble.

18            I mean, I think he demonstrated that he

19   did get into trouble in the infirmary. There were

20   four people in a room there and he was in a cell

21   with one other person when he was released, so he

22   had one-third of the amount of approximate danger,

23   I would say, in releasing him.

24       Q    Were there--

Page 45

1      A    I don't subscribe to the--to the

2  necessity for isolating him.

3      Q    Is that at this particular point in time

4  or at any particular point in time?

5      A    Well, I would say theoretically looking

6  back on that, I think that was an exaggerated

7  response to the problem generated by an

8  ophthalmologist who was being a little

9  overprotective I think.

10     Q    Now, you've talked about the medical

11 director's ultimate decision and the buck stopping

12 here. Do you know whoever was acting as medical

13 director here, if they made any attempt to consult

14 the treating ophthalmologist that was chosen by

15 Wexford?

16     A    I don't know that.

17     Q    Do you know if they made any attempt to

18 change the treating ophthalmologist to get a second

19 opinion from a specialist in that area?

20     A    I don't know that either.

21     Q    Do you know who authorized Nurse Mills to

22 sign off on this discharge note?

23     A    No, I don't know exactly who. I can only

24 guess.

3/8/07                    McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

1        Q    Well, who was in a position acting as

2    medical director at that time?

3        A    I don't know that they had anybody

4    formally or informally named in that capacity. I

5    think it was an "as needed" phenomenon. Call Doctor

6    Lochard if something comes up, that type of thing.

7        Q    Is it your understanding, as you sit

8    there, that it was Doctor Lochard that approved

9    this?

10       A    I'm only guessing that he was the only

11   logical person they had available to consult in the

12   capacity of a medical director.

13       Q    You've never talked to Doctor Lochard

14   about it?

15       A    No, I didn't touch on that subject.  No.

16       Q    Now, if you'd look at Exhibit Number 2.

17   The first nurse's note entry there several months

18   later, you are now acting medical director, is that

19   right?

20       A    Yes.

21       Q    And the patient at that time is still

22   housed in the infirmary. Is that right?

23       A    Yes.

24       Q    And it says per security. Who was it in

                        Page 47

3/8/07                          McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

1    security that was directing you to keep this

2    patient in the infirmary during this period of

3    time?

4        A    Well, first, I might mention that this is

5    the opinion of the nurse. I don't know how valid

6    that is, but I assume that it's probably correct,

7    that somebody in security, who, I don't know,

8    decided he needed to be in a segregated status, and

9    then they relaxed that directive and now he isn't

10   on security status as of March 31st. But just who

11   the personalities were, I don't know.

12       MR. LONDRIGAN: I want to go on the record

13   now--

14       MS. POWELL: Have we gone off the record?

15       MR. LONDRIGAN: Well, I'm not going to ask any

16   more questions, but I'm going to make a statement

17   on the record now that I'm going to reference back

18   to later on. I'm asking that I be informed of any

19   type of indemnity agreements that exist between the

20   defendants in this case.

21           If they exist now, I'd like to see them

22   prior to the trial. And if there are informal

23   agreements reduced to writing subsequently, I'd

24   like to be advised of those indemnity agreements

                        Page 48

1    and have them produced. That last try.

2          MS. POWELL: I want to respond to your

3    question. If you would like to make a request for

4    any documents, I would prefer that you put those in

5    writing.

6          MR. LONDRIGAN: I'll do that. But I'm giving

7    you a heads-up and that's why interrupted this

8    deposition because what's occurred here--

9          MS. POWELL: Thank you.

10         MR. LONDRIGAN: I will do it in writing.  I

11   promise you that. But I'm giving you lead time.

12         MS. POWELL: Thank you.

13         MR. LONDRIGAN:   Q  Do you know the date that

14   this patient was placed into the general population

15   the first time?

16         A    It appears to be in the--in mid June of

17   '04.

18         Q    Well, was it--did it occur on June 8th,

19   the date you find on Exhibit 3? All the entries

20   there are June.

21         A    It looks like June 8th would be the right

22   date.

23         Q    What is it that you're looking at here

24   that indicates he's released into--

Page 49

1      A    It says--my note of June 8th, ten a.m.,

2   says no further medical need for detention. He will

3   continue meds and see ophthalmology for new

4   opinion.

5      Q    And that's your signature below the ten

6   a.m. entry?

7      A    Yes.

8      Q    What ophthalmologist was he sent to at

9   that time for a new opinion?

10     A    I think it was the Steahley and Knupp

11  partnership.

12     Q    And that's the--. Do you have any reports

13  back from Doctor Steahley?

14     A·   Yes.

15     Q    And what does he say about releasing him

16  into the general population?

17     A    I don't know that he commented on the

18  nature of the housing of the patient.

19     Q    Did you ask?

20     A    No, I don't think I brought up that

21  issue. But I'd have to read the letter to verify

22  that again.

23     Q    Well, what was done, from a medical

24  standpoint, to make sure that when this patient

Page 50

3/8/07                         McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

1    went into the general population that he wouldn't

2    be put together with a known violent cellmate who

3    had previously been placed in segregation for

4    fighting and that had a history of violence?

5         A    Well, there is a--there is an action that

6    security performs under the heading of placement

7    where they're supposed to consider the variables

8    involved in how people get put in certain cells.

9    And I presume that that process took place when he

10   went from the infirmary to the population.

11        Q    Why do you presume that?

12        A    Because that's the policy that takes

13   place.

14        Q    Is this a written policy?

15        A    I expect it is written somewhere.

16        Q    Have you ever seen it?

17        A    I haven't read that one yet.

18        Q    You just assumed that that's something

19   that security would be doing to make sure that this

20   patient wasn't put in with a violent cellmate?

21        A    Well, I've had reputable people tell me

22   that that's what happened so it isn't just a mere

23   assumption.

24        Q    Tell me a couple of those reputable

                        Page 51

1    people that told you that.

2         A    This is Debbie Fuqua, the healthcare

3    administrator.

4         Q    Anybody else?

5         A    I don't remember any other incidents, but

6    I remember she told me that that's a specific

7    action that is performed. Or should be performed.

8         Q    Do you know her current medical

9    conditions and the type of medication that she's

10   taking?

11        A    Yeah. Currently I haven't seen her for

12   some time. She has a problem, a medical problem

13   now.

14        Q    Have you talked to her about your

15   assumption that this was, in fact, done in this

16   case?

17        A    No.

18        Q    That's just something you believe should

19   have been done based upon the way you know things

20   operate here at Western, is that right?

21        A    Well, some time ago Ms. Fuqua told me

22   about the placement process. This was before she

23   became ill.

24        Q    But after this incident occurred and

                          Page 52

1    after this--after his transfer from -- Western? You

2    say some time after. Give me some framework when

3    you had this conversation with Debra Fuqua.

4        A    December of '06.

5        Q    So it was sometime after the fight?

6        A    Yes.

7        Q    As a matter of fact, it was sometime

8    after the cellmate Durham was discharged from the

9    penitentiary, wasn't it?

10       A    Oh. Well, I don't know his history. But

11   that would be--

12       Q    In having this conversation with you, did

13   Debra Fuqua tell you that she thought that this was

14   a perfectly safe inmate for this type of patient to

15   be housed with?

16       A    I don't know that she stated her opinion

17   of his safety or compatibility. I mean, the result

18   was that it was incompatibility. But I don't know

19   that she had any statement on that regard.

20       Q    Did she tell you who it was under her

21   jurisdiction that was responsible for the

22   placement?

23       MS. CHOATE: Object to the form "under her

24   jurisdiction". There's no evidence to that.

Page 53

1       THE DEPONENT: She doesn't have anything to do

2    with the placement process.

3       MR. LONDRIGAN:   Q   Tell me, as best you can

4    recall, what it was she told you after this

5    occurred.

6       MS. POWELL: About the placement process?

7       MR. LONDRIGAN: Yes.

8       THE DEPONENT: Well, that the placement people

9    review the personality and the profile of the

10   individuals that are to be housed together and try

11   to come up with a match that is going to be

12   mutually beneficial rather than dangerous.

13      MR. LONDRIGAN:   Q   And what I'm learning from

14   you, and also the objections here, is that Debra

15   Fuqua has nothing to do with that process. Is that

16   right? She just explained it, how it should work.

17      A    That's my understanding, yes.

18      Q    Did she explain to you who the people in

19   placement were that made the decision to put these

20   two prisoners together?

21      A    No.

22      Q    How would I learn that information as to

23   who made those assignments?

24      A    Well, you'd have to go through the

                        Page 54

3/8/07                          McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

1    authorities here. There must be a way, but I don't

2    know what it is.

3        Q    Okay. Who would I ask to determine who

4    had the final authority to review placement?

5        A    I guess you'd have to speak to the legal

6    counsel here or the warden or somebody in that

7    capacity.

8        Q    Do you know if when placement occurs if

9    the individual, or individuals, who make that

10   placement record a record and who the person was

11   who made those assignments?

12       A    I don't know this.

13       Q    Would Debra Fuqua know that?

14       A    She might have a glimmer of an eye. I

15   don't know that she does though.

16       MS. CHOATE: Objection.

17       THE DEPONENT: She might.

18       MR. LONDRIGAN:   Q  Do you know whether or not

19   these people that make these same assignments have

20   medical training?

21       A    I don't know that.

22       Q    Did you do anything, or, to your

23   knowledge, did anyone else at your direction to

24   flag this patient, Aaron McCroy, and his medical

                        Page 55

3/8/07           McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

1    problems so that placement people were aware of the

2    risk should a fight occur?

3       A    I don't know that anything specific was

4    brought to their attention, but I think he was a

5    notorious case that they would know quite a bit

6    about.

7       Q    Well, when you say a notorious case, do

8    you mean because of his medical condition, or the

9    fact that he filed a number of grievances, or

10    something else?

11       A    Well, news travels fast around the

12    prison. And I don't think there are too many

13    secrets that go unnoticed.

14       Q    Okay. What was Aaron McCroy notorious for

15    in the prison, according to your understanding?

16       A    Well, notorious might be too strong a

17    word, but let's say he was well known. But I

18    believe there was some talk, and this is hearsay,

19    of some sexual hostility or aggressiveness. I

20    understood that he he was supposed to have put his

21    arms around and kissed Durham provoking the attack.

22       Q    Do you know of anyone that claimed that

23    other than Durham, his assigned cellmate?

24       A    No, I don't.

1       Q    Have you ever looked at Aaron McCroy's

2    records in the number of years he's been at this

3    institution and other institutions as to whether or

4    not there was ever any indication that he was a

5    predator?

6       A    I don't know that. I didn't know it.

7       Q    Other than the rumor that you heard,

8    which came from the assailant in this case that

9    caused the loss of this eye, have you ever reviewed

10   any of his records to find out if he was a person

11   of violence who had ever been in any fights before?

12      A    No, I didn't do that.

13      Q    Or whether or not he even had homosexual

14   tendencies? There are those records that are kept

15   in this institution, aren't there?

16      A    Well, I had heard one other story

17   somewhere that he did the same type of thing to

18   somebody else.

19      Q    And who told you that story?

20      A    One of the nurses.

21      Q    Who?

22      A    Am I obliged to divulge the name of my

23   source?

24      Q    Yes.

1         A     Cathy Ashcraft.

2         MR. LONDRIGAN: I think that's all the

3    questions I have. We're now off the record.

4                   (Discussion off the record.)

5         MS. POWELL: Doctor, I just have a few followup

6    questions for you for clarification.

7                        EXAMINATION

8                   BY MS. POWELL:

9         Q     In general, Doctor, would you be advised

10   of any inmate's criminal history before seeing them

11   as a patient?

12        A     Generally, no.

13        Q     With respect to Exhibit 1, Doctor, it's

14   dated November 21st of 2003. I just wanted to

15   clarify. You were not working at Western Illinois

16   Correctional Center on November 21st, 2003, were

17   you?

18        A     Correct. I wasn't.

19        Q     That document was written by Nurse

20   Practitioner Mills?

21        A     Yes.

22        Q     Okay. And when you testified previously

23   you indicated that of his discharge note, and you

24   specifically referenced, I believe you said there

                        Page 58

1    was a caveat, referencing avoid yard activity with

2    others so as to protect the keratoplasty site. Do

3    you recall saying that?

4         A    Yes, I certainly do, yes.

5         Q    Can you tell me under what section of

6    that discharge note that language is placed?

7         A    Patient education.

8         Q    And when a note says patient education,

9    can you tell us what patient education means?

10        A    Well, that would be part of the

11   prescription. It would be helpful instructions to

12   promote a better long term result. It would be

13   behavioral advice, lifestyle.

14        Q    That would all be information given to

15   the patient, as it indicates?

16        A    Yes. It would be verbalized.

17        Q    And Exhibit 1 also indicates, Doctor,

18   that the patient was discharged from the infirmary

19   to single cell in segregation. Is that accurate?

20   Where it says under plan.

21        A    That's right. Yeah.

22        Q    You weren't here, so do you know why

23   Mr. McCroy was sent to segregation?

24        A    No, I don't know.

Page 59

3/8/07                    McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

1        Q    It could have been for disciplinary

2    reasons?

3        A    That's the usual reasons all right.

4        Q    And if they were for disciplinary

5    reasons, you don't know what those reasons were?

6        A    No.

7        Q    Now, in looking at Exhibit--. Again, with

8    respect to Exhibit 1, if a patient was transferred

9    from the infirmary to segregation, he would be

10    aware of being transferred to segregation by the

11    mere fact that he was moved from one place to the

12    other?

13        MR. LONDRIGAN: Objection. Leading.

14            Go ahead.

15        THE DEPONENT: Yeah. He'd catch on fast. Yeah.

16        MS. POWELL:   Q   Now, with respect to

17    Exhibit 2, I think you testified earlier that the

18    patient remained housed in the infirmary per

19    security, and you referenced March 31st of 2004. Do

20    you recall testifying about that date?

21        A    Yes.

22        Q    Okay. If you look further down on

23    Exhibit 2 for the entry on April 4th of '04, can

24    you read what that entry says?

                         Page 60

1          A    A nurse note, namely, off seg status,

2     7:10 a.m., property returned 8:30 a.m., voices no

3     complaints.

4          Q    Do you know, as you sit here today, or if

5     you have any recollection, whether or not

6     Mr. McCroy was ever off of seg status between the

7     dates of November 21st of '03 and April the 4th of

8     '04?

9          A    I don't--I don't believe he was, but I

10    don't know.

11         Q    Okay. And when Mr. McCroy would be taken

12    off seg status, as the note indicates on April the

13    4th of '04, but kept in the infirmary, where would

14    he go?

15         A    He would go in the four bed ward.

16         Q    And, Doctor, Exhibits 1, 2 and 3 have

17    headings at the top. Do you see those where it says

18    Offender Infirmary Progress Notes and Offender

19    Outpatient Progress Notes?

20         A    Yes.

21         Q    Is there a difference in those headings?

22         A    Well, these pages in their natural form

23    are yellow or gold in color.

24         Q    Would that be with respect to notes such

                         Page 61

1    as Exhibit 1?

2        A    Yes. And then these two are on white

3    pages.

4        Q    And that would be with respect to

5    Exhibits 2 and 3.  Correct?

6        A    Yes.

7        Q    Exhibits such as Exhibit 1, which

8    reference infirmary progress notes, would it be

9    fair to say that those are used for inmates who are

10   actually admitted to the infirmary?

11       A    Yes.

12       Q    And then Exhibits 2 and 3 you referenced

13   would be white pages. Would those be used for

14   patients who were not actually admitted to the

15   infirmary?

16       A    Yes.

17       Q    During the time that Mr. McCroy was

18   housed with three our people while an inmate in the

19   infirmary, do you recall him making any complaints

20   to you specifically regarding the fact that he was

21   placed with three other inmates?

22       A    No.

23       Q    Doctor, did you have anything to do with

24   transferring Mr. McCroy to a facility outside of

Page 62

1    Western Illinois Correctional Center?

2         A    No, I didn't have anything to do in the

3    process of transferring. They might ask me am I in

4    favor of it or not, but that's as much as I get

5    involved.

6         Q    Did you play any role in specifically

7    assigning inmate Durham as a cellmate for

8    Mr. McCroy?

9         A    No.

10        Q    You weren't here at the time that

11   Mr. McCroy received his corneal transplant, were

12   you?

13        A    That's true. I was not.

14        Q    Did Mr. McCroy ever ask you to remove his

15   medically unassigned classification?

16        A    I can't--. I don't think so, but I can't

17   remember.

18        Q    Doctor, you gave some testimony earlier

19   about accessing records of patients regarding their

20   prior care and treatment, or for treatment relating

21   to outside physicians that had been received.

22        A    Yes.

23        Q    Prior to the time--. Do you recall that

24   testimony?

                            Page 63

1        A    Yes.

2        Q    I just want to clarify. When you were

3    testifying concerning discussing prior histories

4    with the medical librarian, you were talking about

5    someone who worked here at Western Illinois

6    Correctional Center. Right?

7        A    Yes.

8        Q    And when you were discussing accessing

9    records of patients, or inmates, that would be with

10   respect to patients, or inmates, who are currently

11   at the Western Illinois Correctional Center?

12       MR. LONDRIGAN: And, again, all of these

13   questions are leading and you're simply asking this

14   are doctor to agree with you. I'm going to ask

15   later to have them all stricken, certainly from an

16   evidentiary standpoint.

17       THE DEPONENT: Yes, they were at the--the

18   charts are here when the patients are here.

19       MS. POWELL:   Q   And I think that's what you

20   said, but I just want to clarify. Is a patient's

21   medical record--. With respect to Aaron McCroy,

22   would his records currently be here at Western

23   Illinois Correctional Center?

24       A    No.

                     Page 64

3/8/07                          McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

1       Q    So even if you went to the medical

2    librarian right now, she wouldn't have access to

3    his prior records?

4       A    Not the original records. I mean, I'm

5    sure there are some copies floating around, but not

6    the originals.

7       Q    Where is his chart?

8       A    Wherever his facility is situated.

9       MS. POWELL: That's all I have, Doctor.  Thank

10   you very much.

11      MS. CHOATE: I have a few questions.

12                     EXAMINATION

13                     BY MS. CHOATE:

14      Q    Doctor Brown, going back to--or you

15   talked about some office gossip from a Nurse

16   Ashcraft, and you said that she said he had done

17   the same thing to someone else, and that wasn't

18   clear. Do you mean that McCroy had done the same

19   thing, allegedly tried to kiss someone else, or the

20   other inmate had tried to harm someone else? What

21   was your conversation with Ashcraft?

22      A    No. He kissed someone else.

23      Q    That McCroy had done the same thing he

24   was alleged to have done to Durham?

                          Page 65

3/8/07                        McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

1        A    Yes.

2        Q    And did this conversation take place

3    after the fight with Durham, if you recall?

4        A    What now?

5        Q    The conversation with Ashcraft, with

6    Nurse Ashcraft.

7        A    It took place quite recently.

8        Q    As of March, or, I'm sorry, as of

9    June 8th of 2004 when you wrote your note that is

10    in I believe -- is it Exhibit 2, Theresa?

11        MS. POWELL: I think it's 3.

12        MS. CHOATE: 3.

13        Q    Exhibit 3, your progress note on

14    June 8th of 2004. At that time were there any

15    restrictions placed on Mr. McCroy as far as going

16    to commissary?

17        A    Well, it looks like Doctor Anderson, our

18    optometrist, entered a note in there.

19        Q    Did you place any restrictions on

20    Mr. McCroy as far as he could--

21        A    No, I didn't say anything about that. But

22    Mr.--Doctor Anderson had something to say. He said

23    no yard or gym due to eye condition, which is

24    curious.

Page 66

1        Q    Did you believe that Mr. McCroy should

2   not be able to be around other inmates?

3        A    No, I didn't believe that.

4        Q    Did you believe there was any medical

5   reason that he could not be around other inmates?

6        A    No.

7        Q    You talked about Deb Fuqua and said that

8   she was the healthcare unit administrator. Correct?

9        A    Yes.

10       Q    And as the healthcare unit administrator,

11  are you familiar with some of her duties or her

12  role in the healthcare unit?

13       A    Yes.

14       Q    Does Deb Fuqua admit inmates to the

15  infirmary?

16       A    Well, nurses have the power to

17  tentatively place them there pending my--maybe my

18  beeper went crazy or I couldn't be reached or

19  something, so until I show up again, if there's a

20  delay, they have the power to place them in there

21  pending my--I mean they have good sense.

22       Q    How about discharging someone from the

23  infirmary?  Did Deb Fuqua have that power, without

24  a doctor's order or okay, to do that?

Page 67

1       A     I believe that would be overstepping that

2     boundary.

3       Q     To your knowledge, has Deb Fuqua ever

4     discharged someone from the infirmary without

5     consulting a physician?

6       A     No. No. She doesn't do that.

7       Q     You also testified that you talked to

8     Ms. Fuqua about the placement office.

9       A     About the what?

10      Q     The placement office and how that's done.

11    During the time that you've known Ms. Fuqua, have

12    you ever known her to work in the placement office?

13      A     I don't know if she did or didn't. She

14    spends a lot of time with the administration.

15      Q     But do you know if she has any

16    specialized knowledge of the placement office?

17      A     I don't know what she knows, but she's

18    pretty sharp.

19      Q     So you don't know if she has actual

20    knowledge of the placement office or if she's also

21    speculating as to what happens in the placement

22    office.  Is that fair?

23      A     That's a fair statement.

24      Q     And you also talked about how word gets

Page 68

1    around in an institution. Correct?

2         A    Yes.

3         Q    Pretty much like any other place I

4    imagine.

5              But do you know for a fact, as you sit

6    here, that the people in the placement office had

7    any detailed information about Aaron McCroy's

8    medical condition at the time he was placed in June

9    of '04?

10        A    I don't know what their data bank is

11   there.

12        Q    And you also were asked about Mr. McCroy

13   wanting a transfer. Do you know where he requested

14   to be transferred?

15        A    I'm not sure I remember which one he

16   favored.

17        Q    And do you know, as you sit here, that he

18   would have gotten any better care from

19   ophthalmologists at another institution?

20        A    No. I don't think there is any hierarchy.

21   I think they're all--they're all pretty good.

22        Q    Do you, and let me kind of go back to the

23   placement in the infirmary issue, medical

24   placement, not security placement, but medical

Page 69

1      placements in the infirmary, does anyone from the

2      security staff, warden, assistant warden,

3      superintendent, lieutenants, anyone in security

4      have the authority to admit someone to the

5      infirmary for medical reasons?

6          A    No.

7          Q    Do they have the authority to discharge

8      someone from the infirmary for medical reasons?

9          A    No.

10         Q    You were talking about discussing

11     placement with the warden or other security people

12     like that. Do you discuss with the warden or with

13     anybody in security prior to discharging every

14     inmate?

15         A    No. Just on occasion I'll have a talk

16     with the warden about things.

17         Q    So this isn't a practice that goes on

18     with every inmate. Is that fair?

19         A    That's fair.

20         Q    You also talked about the gatekeeping

21     keeping process and that was a while back we were

22     talking about that. And the gatekeeping process, as

23     you described it, had to do with getting approval

24     for outside tests, or procedures, or physicians,

Page 70

3/8/07                McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

1    that sort of thing. Is that correct?

2        A    Yes.

3        Q    Does the warden have anything to do with

4    that gatekeeping process, as you described it?

5        A    No. It's strictly between me and another

6    doctor.

7        Q    So none of the other non-medical people

8    would have anything to do with that either, would

9    they?

10       A    Yes. That's correct.

11       MS. CHOATE: I have nothing further.

12       MS. DUDGEON: I don't have any questions.

13       MR. LONDRIGAN: I'm fine.

14       MS. POWELL: Do you want to waive signature?

15       THE DEPONENT: Yes, I will.

16                FURTHER DEPONENT SAITH NOT.

17

18

19

20

21

22

23

24

Page 71

1    STATE OF ILLINOIS  )
                       )  SS
2    COUNTY OF SANGAMON )

3                    C E R T I F I C A T E

4         I, Debra K. Baldwin, a Notary Public and

5    Certified Shorthand Reporter and Registered

6    Professional Reporter in and for said County and

7    State do hereby certify that the Deponent herein,

8    LOWELL BROWN, M.D., prior to the taking of the

9    foregoing deposition, and on the 8th of March A.D.,

10   2007, was by me duly sworn to testify to the truth,

11   the whole truth and nothing but the truth in the

12   cause aforesaid; that the said deposition was on

13   that date taken down in shorthand by me and

14   afterwards transcribed, and that the attached

15   transcript contains a true and accurate translation

16   of my shorthand notes referred to.

17        Given under my hand and seal this 26th

18   day of March A.D., 2007.

19

20                     Notary Public and
                       Certified Shorthand Reporter and
21                     Registered Professional Reporter

22

23   License No. 084-002128

"OFFICIAL SEAL"
DEBRA K BALDWIN
COMMISSION EXPIRES 05/20/10

24

                       Page 72

3/8/07                                    McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

Page 73

---

**A**

Aaron 1:5 11:23
12:8 24:16
30:11 31:7
38:4,13 40:13
44:4 55:24
56:14 57:1
64:21 69:7
able 67:2
about 7:3 8:11
10:1 11:1,9,10
12:5 13:5 15:4
20:7 22:4,18
23:12,14 25:9
25:18,22,24
27:13 28:9
30:10,23 31:4
31:7 36:19
41:16,17,20
41:24 42:4,7
42:20 44:14
44:14 45:3
46:10 47:14
50:15 52:14
52:22 54:6
56:6 60:20
63:19 64:4
65:15 66:21
67:7,22 68:8,9
68:24 69:7,12
70:10,16,20
70:22
above-entitled
1:14
absolutely 31:12
accept 12:21
accepting 20:9
access 10:5
31:18 65:2
accessing 63:19
64:8
according 56:15
accurate 39:19
59:19 72:15
across 36:17
acting 1:15 14:5
14:11 15:2,5
23:21 24:1
30:22 46:12
47:1,18
action 51:5 52:7
activity 43:21
59:1

actual 24:20
42:23 68:19
actually 40:17
62:10,14
add 11:15
administration
68:14
administrator
22:24,24
25:16 52:3
67:8,10
admission 44:1
44:2 45:6
admit 67:14
70:4
admitted 62:10
62:14
advice 59:13
advised 48:24
58:9
affix 23:7
aforesaid 72:12
after 15:2 23:8
30:22 31:7
33:5,16 52:24
53:1,1,2,5,8
54:4 66:3
afterwards 4:8
72:14
again 12:18 35:4
40:15 50:22
60:7 64:12
67:19
against 10:3
19:5 21:1
agency 19:14
29:20
aggressiveness
56:19
ago 52:21
agree 45:8 64:14
agreed 4:2
agreements
48:19,23,24
ahead 60:14
air 24:23
al 1:8
alleged 65:24
allegedly 65:19
ALLEN 2:8
allowed 15:7
along 19:21
already 11:16
11:17 18:16

38:15
although 9:8
15:5
always 17:7
18:16 19:6
amount 45:22
amounts 42:14
anatomic 6:7
Anderson 2:15
66:17,22
and/or 7:18
another 13:2
14:15 19:6
31:14 43:4
69:19 71:5
answer 7:24
12:12,21,23
13:1 17:13
20:23 33:19
answers 4:8
35:4
anybody 14:13
37:22,24 38:1
38:2 47:3 52:4
70:13
anyone 40:23,24
55:23 56:22
70:1,3
anything 7:3
11:16 12:4
18:17 42:14
54:1 55:22
56:3 62:23
63:2 66:21
71:3,8
APPEARAN...
2:1
appears 44:22
49:16
applications
27:4
apply 18:21
32:7
appointed 14:19
15:1,7
appropriate
32:19
approval 70:23
approved 47:8
approximate
45:22
approximately
13:22 14:23
15:7

April 60:23 61:7
61:12
archived 34:15
area 46:19
arena 9:16
arms 56:21
arose 30:22
around 24:24
56:11,21 65:5
67:2,5 69:1
arrived 11:17
13:17
articles 9:14,15
9:24
arts 5:20
Ashcraft 58:1
65:16,21 66:5
66:6
asked 12:20
69:12
asking 12:4,5
13:1 19:13
36:21 44:13
48:18 64:13
assailant 57:8
assaulted 31:7
assemble 38:3
assess 8:9
assigned 16:8
30:18 56:23
assigning 63:7
assignments
54:23 55:11
55:19
assistance 36:16
assistant 2:5
70:2
assume 12:19
44:7,8 48:6
assumed 51:18
assumption
51:23 52:15
atmosphere
31:23
attached 72:14
attack 56:21
attempt 27:16
38:3 46:13,17
attention 56:4
Attorney 2:5,9
2:13
attorneys 4:3
authorities 55:1
authority 15:22

19:1 22:5 23:6
40:24 41:4
43:17 55:4
70:4,7
authorization
40:12
authorized 23:8
46:21
available 13:5
14:15 47:11
avoid 43:21 59:1
avoiding 45:11
aware 11:20
12:11 13:12
27:8,15 32:11
56:1 60:10
awareness 12:6
away 33:12,24
A.D 4:5 72:9,18
a.m 1:17 4:6
50:1,6 61:2,2

---

**B**

B 3:11 5:3
Bachelor 5:19
back 6:15 25:8
28:10 42:10
46:6 48:17
50:13 65:14
69:22 70:21
background
5:13 27:13
backlog 18:16
Baldwin 1:15,22
4:3 72:4
bank 2:10 10:24
35:3 69:10
based 7:14
13:13 28:17
33:9,22 52:19
basis 21:8 34:12
bear 12:8
Beardstown
24:13
became 8:23
52:23
become 13:3
bed 61:15
beeper 67:18
before 1:14 4:3
6:19 12:14
14:18 16:24
24:20 27:15
28:7 30:16

31:11 32:4,14
33:4,21 36:21
37:20 45:9
52:22 57:11
58:10
began 15:2
37:20
behalf 2:4,7,11
2:14
behavioral
59:13
being 30:11 31:8
32:1,4 41:10
42:9,22 44:5
45:15 46:8
60:10
believe 14:20
30:4 52:18
56:18 58:24
61:9 66:10
67:1,3,4 68:1
below 50:5
beneficial 54:12
benign 8:17
besides 29:8
best 20:2 54:3
better 21:13
24:14 28:20
32:23 35:22
59:12 69:18
between 4:2
7:19 18:22
21:9 30:23
48:19 61:6
71:5
big 24:23
biology 5:19
bit 56:5
board 45:10
book 11:7
both 33:4 42:13
42:17
bottom 13:20
boundary 68:2
brand 15:18
break 43:6
bring 39:21
brought 23:13
26:1 50:20
56:4
Brown 1:13,19
3:3 4:3,6,5:9
42:9 65:14
72:8

3/8/07                          McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

Page 74

Bruninga 38:17
38:18
buck 13:20
17:19 21:16
21:23 22:2
46:11
Building 2:10

**C**

C 72:3,3
California 6:1
7:5 8:2
call 8:1 18:19
28:10 30:2
47:5
calls 35:16
came 13:15,16
14:1,9 33:16
33:16,21
36:15,21 45:9
57:8
candidates
16:12
capacity 14:14
47:4,12 55:7
care 7:2,19 10:2
11:5,10,23
12:2,8 13:6,10
29:17 33:11
33:24 63:20
69:18
career 6:17
case 1:14 8:7
11:24 12:9
15:15 29:10
29:24 36:13
37:21 38:18
48:20 52:16
56:5,7 57:8
cases 9:3
CAT 8:5
cataracts 26:23
catch 60:15
categories 16:11
Cathy 58:1
cause 72:12
caused 16:24
57:9
caveat 43:21
59:1
cell 45:20 59:19
cellmate 51:2,20
53:8 56:23
63:7

cells 51:8
Center 1:18 4:6
58:16 63:1
64:6,11,23
centers 7:2,3
central 1:2 35:2
centralized
34:22
certain 9:17
51:8
certainly 17:12
30:2 59:4
64:15
certification 6:7
Certified 4:4
72:5,20
certify 72:7
chain 19:21
challenged 16:8
change 46:18
chart 34:10,11
37:9 65:7
charts 64:18
Choate 2:5 3:5
22:22 23:12
23:17 53:23
55:16 65:11
65:13 66:12
71:11
choice 16:14
choose 9:18
chosen 46:14
cite 21:1,12
city 2:10 36:1
Civil 4:10
civilian 6:11
7:21 34:13
claimed 56:22
Clara 5:21
clarification
20:20 58:6
clarify 58:15
64:2,20
clash 17:6 21:4
classification
63:15
clear 9:8 21:19
21:23 65:18
Clinic 33:3,13
34:1
clinical 6:8
close 7:10 13:14
color 61:23
come 17:13

54:11
comes 36:4 47:6
commands
19:21
commenced 6:2
commented
50:17
commissary
24:23 66:16
common 31:21
communicate
29:18
communication
40:1
compatibility
53:17
competency
4:13
competent 4:16
complaint 33:14
complaints 13:5
61:3 62:19
complete 38:3
complex 27:5
38:24
complication
9:1
compound
33:18
compounded
33:20
compromised
19:6,9
compromises
19:12
computerized
34:16
concept 8:2 9:12
9:23 10:6,11
concerned 11:9
32:12
concerning 64:3
condition 32:24
56:8 66:23
69:8
conditions 26:20
52:9
confused 23:15
confusing 12:17
conjunction
25:15
consider 51:7
consult 25:19
30:7 34:5

46:13 47:11
consultant
35:17
consultation
8:16
consultations
8:6
consulted 32:17
consulting 68:5
contact 27:5
contacted 45:2
contains 72:15
continue 50:3
Continuing
27:13 37:7
conversant 11:5
conversation
24:24 40:7
53:3,12 65:21
66:2,5
conversations
26:6
copied 43:7
copies 4:18 65:5
corneal 27:2
39:16 40:9
63:11
Corporation
10:22
correct 5:12
39:9 48:6
58:18 62:5
67:8 69:1 71:1
71:10
correction 11:2
correctional
1:18 4:6 7:7
7:14,22 9:16
14:16 29:12
34:8 58:16
63:1 64:6,11
64:23
corrections 1:8
2:7 9:22 10:2
10:10 11:13
11:22 12:7
16:1 27:11
29:19 32:8
33:14
correspondence
40:3
cosmetic 9:5
counsel 41:11
55:6

count 29:3
County 1:15,16
1:19 4:6 5:22
72:2,6
couple 51:24
course 25:15
26:17
Court 1:1 4:11
cover 29:11
coverage 29:11
covering 43:18
crazy 67:18
Creighton 5:20
criminal 58:10
crimp 18:15
criticisms 10:3
crop 18:12
curious 66:24
current 45:1
52:8
currently 52:11
64:10,22

**D**

D 3:1
danger 45:22
dangerous
54:12
data 10:23 35:3
35:19 69:10
date 13:14 30:11
30:14 43:12
45:1 49:13,19
49:22 60:20
72:13
dated 58:14
dates 42:11 61:7
David 2:14
day 13:23 31:1
34:12 36:12
72:18
days 13:23
deal 24:24
Deb 23:13,14
67:7,14,23
68:3
Debbie 22:23
52:2
Debra 1:14 4:3
22:18 53:3,13
54:14 55:13
72:4
Decatur 2:14
December 53:4

decide 20:1
decided 28:20
48:8
decision 17:2
19:1,2,18,20
24:18,19
25:14 30:8,10
45:3 46:11
54:19
decisions 13:21
declare 18:14
dedimus 4:11
Defendant 2:7
2:11,14
defendants 1:9
48:20
deferred 9:3
deferring 20:7
definite 8:24
definitely 10:1
deformity 27:2
degree 5:18
delay 67:20
delighted 31:12
demonstrated
45:18
department 1:8
2:7 9:22 10:10
11:1,13,22
12:7 16:1
27:11 29:19
32:8 33:14
Deponent 3:2
5:1 17:5 22:23
33:19 36:4,8
43:3 54:1,8
55:17 60:15
64:17 71:15
71:16 72:7
deposeth 5:5
deposition 1:13
4:3,11,15,18
12:13 28:8
41:9 49:8 72:9
72:12
depositions 4:16
described 70:23
71:4
Desert 7:5
desk 13:7 30:1
detail 9:9
detailed 69:7
detention 50:2
determine 20:12

3/8/07                          McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

Page 75

55:3
**determined**
28:16 29:4
**development**
26:7
**differed** 31:10
**difference** 61:21
**different** 10:7
11:18 28:24
29:1
**differently** 18:5
18:8
**differing** 19:7
**directing** 48:1
**direction** 5:23
15:23 16:4
23:6 38:3
55:23
**directive** 48:9
**directives** 10:20
**director** 10:17
14:5,7,8,11,18
15:2,3,6,7,22
23:22 24:1
29:19,20
30:22 46:13
47:2,12,18
**director's** 46:11
**disagree** 27:24
**discharge** 22:14
40:18,19,24
41:12,18,23
42:1,3,21,23
42:23 43:1,16
43:19,20
46:22 58:23
59:6 70:7
**discharged**
27:16 42:8,9
42:16 44:6,19
53:8 59:18
68:4
**discharging**
40:12 67:22
70:13
**disciplinary**
60:1,4
**discuss** 70:12
**discussing** 64:3
64:8 70:10
**discussion** 25:16
58:4
**disease** 27:1
**dispute** 18:21

30:22 31:4
**dissimilarities**
7:19
**distance** 35:16
**DISTRICT** 1:1
1:2
**DIVISION** 1:3
**divulge** 57:22
**Dixon** 31:22
**doctor** 2:14 5:8
5:10 14:14,22
16:23 29:22
39:4,6,6,16,19
39:23 40:1,4,8
41:3 42:9
43:18,19 47:5
47:8,13 50:13
58:5,9,13
59:17 61:16
62:23 63:18
64:14 65:9,14
66:17,22 71:6
**doctors** 6:14,22
39:1
**doctor's** 67:24
**document** 19:24
27:21,22
58:19
**documents**
15:14 43:9
49:4
**doing** 18:17
51:19
**done** 16:20
42:15 44:10
50:23 52:15
52:19 65:16
65:18,23,24
68:10
**door** 36:9
**doubt** 31:20
**down** 4:8 19:22
21:11 38:6
39:1 60:22
72:13
**Dudgeon** 2:12
71:12
**due** 66:23
**duly** 5:4 43:10
72:10
**Durham** 53:8
56:21,23 63:7
65:24 66:3
**during** 7:4

15:10 29:1
48:2 62:17
68:11
**duties** 10:12,16
67:11

_____
**E**
_____

E 3:1,11 5:3
72:3,3
**each** 26:18
**earlier** 17:18
31:14 60:17
63:18
**easily** 9:6
**educate** 10:6
**education** 59:7
59:8,9
**either** 6:22 27:3
33:14 36:15
42:13 46:20
71:8
**Elyea** 29:22
**emergency** 6:9
30:17
**employ** 15:24
**employed** 24:6,8
35:20,21,24
**employee** 15:11
24:9,9,11
39:12
**employment**
5:17
**encounter** 25:1
**enjoyed** 25:4
**enough** 22:4
**entered** 6:10
66:18
**entertain** 16:15
**entirely** 28:19
**entity** 15:18
**entries** 49:19
**entry** 47:17 50:6
60:23,24
**enucleated**
30:18
**escapes** 42:14
**Esq** 2:2
**et** 1:8
**ethical** 11:19
**etiquette** 11:8
11:10
**evaluate** 39:15
**even** 9:19 57:13
65:1

**ever** 7:12 12:13
12:22 19:4
21:4,6 25:23
28:7 35:8
36:20,24
39:12 51:16
57:1,4,9,11
61:6 63:14
68:3,12
**every** 18:12
34:12 70:13
70:18
**everybody**
31:24 32:2,3
**everything**
28:21
**evidence** 27:21
40:16 53:24
**evidentiary**
64:16
**exactly** 12:11
46:23
**exaggerated**
46:6
**Examination**
3:4,4,5 5:6
58:7 65:12
**examine** 39:14
**example** 43:18
**examples** 20:10
**exceptions** 8:12
**Excuse** 24:4
**exercise** 32:18
**exercised** 28:11
**exhibit** 3:13
42:4 43:7,14
43:15 47:16
49:19 58:13
59:17 60:7,8
60:17,23 62:1
62:7 66:10,13
**Exhibits** 43:11
61:16 62:5,7
62:12
**exist** 20:12
48:19,21
**existing** 38:7
**expect** 51:15
**expectations**
28:18
**expense** 4:18
**experience** 7:14
7:15 10:5 26:9
26:13,15,19

29:7
**explain** 7:18
13:13 15:15
16:6,9 17:23
54:18
**explained** 10:8
54:16
**explaining** 9:12
**expressly** 4:12
**extensively** 6:9
**eye** 26:20,22
28:6 30:17
45:11 55:14
57:9 66:23
**eyes** 31:19

_____
**F**
_____

F 2:2 72:3
**facilities** 34:9
**facility** 14:16
62:24 65:8
**fact** 52:15 53:7
56:9 60:11
62:20 69:5
**facts** 27:20
**fair** 12:12 18:7
62:9 68:22,23
70:18,19
**fairly** 9:8
**familiar** 67:11
**familiarity**
33:10,22
**family** 6:15,17
**far** 15:16 17:4
19:2 20:13
32:12 66:15
66:20
**fast** 56:11 60:15
**favor** 63:4
**favorable** 32:21
**favored** 69:16
**Fax** 1:23
**features** 38:9
**Feder** 39:23
40:1,4
**Federal** 4:10
**feel** 18:8 22:4
**feeling** 31:10
**fellowship** 7:7
**felt** 22:3
**few** 8:12 58:5
65:11
**field** 5:14
**fight** 6:4 30:18

53:5 56:2 66:3
**fighting** 51:4
**fights** 57:11
**file** 37:3 40:4
**filed** 31:7 56:9
**filled** 43:24
**final** 17:2 19:1,2
19:18,20
21:16 55:4
**finally** 6:16
**find** 34:3 36:2
41:19 49:19
57:10
**fine** 12:24 71:13
**first** 5:4 12:20
47:17 48:4
49:15
**fixed** 8:14,17 9:2
**flag** 55:24
**floating** 65:5
**folks** 25:3
**follow** 5:16 11:4
11:12 16:3
31:1
**follows** 5:5
**followup** 13:2
40:8 58:5
**foot** 19:22
**foregoing** 72:9
**forget** 6:13
**forgot** 30:13
**form** 4:14 20:15
22:22 33:17
36:19 39:18
40:15 41:14
43:23 44:2
53:23 61:22
**formally** 47:4
**formerly** 38:24
**formularies**
9:17
**forth** 10:17
35:18
**found** 7:9
**foundation** 4:17
**four** 45:20 61:15
**framework** 53:2
**frequently**
32:24
**fresh** 24:23 29:9
**from** 5:18 8:4
9:18 10:23
13:15 17:3

3/8/07
Lowell Brown, M.D.

McCroy v. Illinois Dept. of Corrections

20:1 22:12
23:4,9 26:20
27:22 29:7,10
31:10 32:9
33:3,12,24
34:8 36:4,20
37:17 38:17
38:24 40:13
40:24 41:13
42:8,9,21,24
43:20,20 44:6
44:19 45:11
45:17 46:19
50:13,23
51:10 53:1,8
54:13 57:8
59:18 60:9,11
64:15 65:15
67:22 68:4
69:18 70:1,8
**full** 5:8
**fund** 11:16
**Fuqua** 22:23
25:17 32:20
52:2,21 53:3
53:13 54:15
55:13 67:7,14
67:23 68:3,8
68:11
**Fuqua's** 22:18
**furnished** 4:18
**further** 50:2
60:22 71:11
71:16

**G**
**gatekeeper** 8:2
9:12,23 10:11
**gatekeeping**
70:20,22 71:4
**gave** 63:18
**general** 2:5 5:24
6:2 7:15 22:11
24:17,20 25:8
25:23 27:17
28:4,12 30:8
30:12 31:8
32:5,14 40:13
41:1 42:10
45:11 49:14
50:16 51:1
58:9
**generally** 12:16
58:12

**generated** 9:11
9:22 46:7
**generic** 12:5
**gets** 34:10 68:24
**getting** 8:11
70:23
**give** 5:8,13
15:23 33:23
53:2
**given** 15:21 21:2
24:21 59:14
72:17
**giving** 49:6,11
**glasses** 27:4
**glaucoma** 26:23
**glimmer** 55:14
**go** 6:4 9:9 16:15
16:16,19
20:24 21:12
25:7 26:3 34:5
34:7 37:8
48:12 54:24
56:13 60:14
61:14,15
69:22
**goes** 70:17
**going** 6:6,15
12:19 16:19
17:6 24:23
27:6,20 28:19
28:21 41:14
48:15,16,17
54:11 64:14
65:14 66:15
gold 61:23
**gone** 19:21 21:6
36:24 48:14
**good** 17:1,13
26:7 67:21
69:21
**goods** 15:20
18:15
**gossip** 65:15
**gotten** 69:18
**great** 10:2
**grievance** 13:4
31:3,6
**grievances** 13:18
13:9 56:9
**ground** 26:8
**group** 29:6
**guess** 12:10 17:4
26:20 31:2
46:24 55:5

**guessing** 47:10
**guy** 16:23
**gym** 66:23

**H**
**H** 3:11
**half** 6:3
**hall** 36:17
**hand** 72:17
**handouts** 10:16
**happened** 24:16
35:16 51:22
**happens** 68:21
**happy** 25:9
**harm** 65:20
**having** 5:4
26:15 41:10
53:12
**heading** 51:6
**headings** 61:17
61:21
**heads-up** 49:7
**health** 7:3 19:16
**healthcare** 9:16
16:9 19:15
23:1 52:2 67:8
67:10,12
**heard** 57:7,16
**hearsay** 56:18
**held** 19:5
**helped** 35:11
**helpful** 59:11
**her** 4:18 23:7
35:19 36:4,12
37:6 52:8,11
52:14 53:16
53:20,23
67:11,11
68:12
**hereto** 4:2,16,18
**hernia** 8:14,22
8:24
**HEYL** 2:8
**hierarchy** 69:20
**High** 7:5
**HILL** 2:12
**him** 17:1 25:5,7
26:6 27:17
28:4,5 29:6
30:8 31:19,24
32:3,22 42:19
44:13 45:14
45:14,23 46:2
50:15 62:19

**hired** 19:14 39:4
39:5,11,12
**hiring** 15:19
**histories** 64:3
**history** 5:17
27:8 35:10
38:4 51:4
53:10 58:10
**hit** 22:1
**hitter** 6:22
**hold** 25:5
**holding** 19:6
**home** 7:10
**homosexual**
57:13
**Hospital** 5:22
6:14 39:2
**hostility** 56:19
**hour** 4:5
**hours** 13:22
**housed** 29:2
32:13 34:18
42:10,22
47:22 53:15
54:10 60:18
62:18
**housing** 16:12
50:18
**HUGHES** 2:12
**hundreds** 26:16

**I**
**idea** 17:1
**identification**
3:12 43:11
**identify** 43:13
**ill** 6:22 52:23
**Illinois** 1:2,8,17
1:18,19,23 2:3
2:6,7,10,14
4:6,6 6:12
7:10 10:10
11:2 14:16
58:15 63:1
64:5,11,23
**imagine** 7:4 69:4
**immediate**
10:21
**immediately**
6:19
**impasse** 19:4
**important** 13:21
**impractical**

45:15
**impression**
31:11
**incarcerated**
8:23
**incident** 31:2
52:24
**incidentally** 6:8
16:12 35:22
**incidents** 52:5
**including** 7:16
**incompatibility**
53:18
**indemnity** 48:19
48:24
**Indian** 7:3
**Indiana** 1:23
**indicate** 23:8
**indicated** 58:23
**indicates** 49:24
59:15,17
61:12
**indication** 57:4
**individual** 55:9
**individuals**
54:10 55:9
**infirmary** 16:9
16:12,13,17
16:19 17:2,11
17:12 20:3,19
21:3 22:12
23:9 25:2,3,6
30:24 32:13
40:13,24
41:13 42:8,10
42:22,24,24
43:21 44:1,6
44:19 45:16
45:19 47:22
48:2 51:10
59:18 60:9,18
61:13,18 62:8
62:10,15,19
67:15,23 68:4
69:23 70:1,5,8
**informal** 48:22
**informally** 47:4
**information**
10:22 17:15
54:22 59:14
69:7
**informed** 13:3
44:5,18 48:18
**initials** 23:8

**initiated** 31:4
32:12
**injury** 45:11
**inmate** 37:23
53:14 62:18
63:7 65:20
70:14,18
**inmates** 13:22
29:12 31:21
62:9,21 64:9
64:10 67:2,5
67:14
**inmate's** 58:10
**instance** 4:5
**instances** 19:19
35:15
**institution** 11:6
18:23 31:14
32:9 37:12
57:3,15 69:1
69:19
**institutions**
10:12 57:3
**instruct** 44:10
**instructions**
59:11
**internship** 5:21
**interrogatories**
4:5,7
**interrupted**
49:7
**invariably** 13:7
**involved** 37:20
51:8 63:5
**involves** 13:21
19:15 20:14
**irreducible** 8:23
**isolating** 46:2
**issue** 19:16,23
21:17 22:4
25:22,24
27:23 50:21
69:23
**issued** 22:9
**issues** 19:11
21:24
**issue-by-issue**
21:8

**J**
**Jacksonville**
38:17
**January** 7:12
13:17 14:9

3/8/07                          McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

Page 77

Jerome 5:9
job 8:9 14:2,4
  15:17,19
  35:22
joined 39:1
joining 24:24
journals 9:15
judgment 18:9
  20:9,14 22:6
  28:11 32:18
June 30:21
  49:16,18,20
  49:21 50:1
  66:9,14 69:8
jurisdiction
  53:21,24
just 7:1,3 8:21
  12:1 13:9
  20:15 25:22
  29:15 36:2
  37:5 48:10
  51:18,22
  52:18 54:16
  58:5,14 64:2
  64:20 70:15

_____
          K
K 1:14 4:3 72:4
keep 44:22 48:1
keeping 33:1
  70:21
Kehoe 33:3,12
  34:1
KELLY 2:5
kept 34:23
  57:14 61:13
keratoconus
  27:1
keratoplasty
  43:22 59:2
kind 69:22
kiss 65:19
kissed 56:21
  65:22
knew 26:3 28:20
know 11:7,19
  12:2,18,23
  14:13 20:10
  20:11,23
  21:11 25:17
  26:1,16 28:9
  28:19 29:4,24
  30:5,9 33:2,9
  33:19 35:2,4,5

36:6 37:11,24
38:8 39:7,11
40:22 41:16
41:17,20,22
41:23 44:24
45:4 46:12,16
46:17,20,21
46:23 47:3
48:5,7,11
49:13 50:17
52:8,19 53:10
53:16,18 55:2
55:8,12,13,15
55:18,21 56:3
56:5,22 57:6,6
59:22,24 60:5
61:4,10 68:13
68:15,17,19
69:5,10,13,17
knowledge
  11:11,17
  26:24 37:21
  55:23 68:3,16
  68:20
known 51:2
  56:17 68:11
  68:12
knows 41:21
  68:17
Knupp 38:15,23
  50:10
K-n-u-p-p 38:23

_____
          L
L 4:1 5:3,3,3
lady 35:14
language 59:6
last 7:4 14:18
  20:13 23:17
  36:12 49:1
late 30:14
later 15:4,8
  29:10 47:18
  48:18 64:15
Law 2:9,13
lead 49:11
leading 60:13
  64:13
learn 26:18
  35:16 54:22
learned 8:4
  26:20
learning 21:14
  54:13

least 15:13 18:3
leaving 35:23
left 14:22,23
  30:17 36:11
legal 55:5
Legal-Visual
  1:22
lens 27:3
lenses 27:5
let 11:18 12:17
  38:2 41:19
  69:22
letter 50:21
let's 8:16 38:14
  43:20 56:17
level 10:3
librarian 34:8
  34:21 35:7,9
  35:13 36:16
  64:4 65:2
License 72:23
lieutenants 70:3
lifestyle 59:13
life-threatening
  8:21 9:1
like 6:21 17:5
  18:12 19:11
  29:22 30:13
  42:2,3,12,17
  48:21,24 49:3
  49:21 66:17
  69:3 70:12
line 13:20
linked 43:17
listen 12:24
literature 9:11
  9:20,21 10:19
  11:14
litigation 37:20
  41:9
little 24:14 46:8
live 7:10 18:6
LLC 2:12
localities 29:1
located 36:17
Lochard 14:14
  43:19 47:6,8
  47:13
lockdown 18:14
lockdowns
  18:12
locum 6:18,21
logical 47:11
Londrigan 2:2,2

3:4 5:7 17:14
20:18 23:5,15
23:19 25:24
27:24 28:2
29:21 33:20
36:2,10,22
39:14,21,24
40:19 41:19
42:2,6,12,19
43:6,13 44:16
48:12,15 49:6
49:10,13 54:3
54:7,13 55:18
58:2 60:13
64:12 71:13
long 10:5 35:16
  37:11,13
  59:12
longer 23:3 24:1
  24:2 25:6
  45:10
look 15:18 37:9
  45:13 47:16
  60:22
looked 35:18
  36:20 38:7
  41:12 57:1
looking 12:11
  46:5 49:23
  60:7
looks 49:21
  66:17
Los 6:2
loss 57:9
lot 9:14 11:14
  29:15 31:23
  68:14
Lowell 1:13 3:3
  4:3 5:9 72:8
Lyndsay 2:12
Lynn 35:14
lyphoma 8:17
  8:22

_____
          M
made 19:20 22:9
  24:18,19
  25:14 27:18
  28:3 30:7
  35:15 46:13
  46:17 54:19
  54:23 55:11
mainly 26:15
maintained

37:12
maintenance
  15:20
make 17:2 19:1
  19:18 22:5
  48:16 49:3
  50:24 51:19
  55:9,19
makes 18:24
making 62:19
malpractice
  29:11
manage 17:8
Manus 6:2
many 17:20,20
  26:4 28:23
  56:12
March 1:17 4:5
  48:10 60:19
  66:8 72:9,18
mark 42:3
marked 3:12
  43:10
match 54:11
material 10:15
  34:9
materiality 4:13
matter 19:15
  22:9 53:7
maximum 7:6
may 4:3,8,16,18
  7:1 34:11 39:7
maybe 9:5 67:17
McCROY 1:5
  11:23 12:8
  24:16 26:2
  29:15 30:11
  31:7 37:23
  38:4,13 40:13
  44:4 55:24
  56:14 59:23
  61:6,11 62:17
  62:24 63:8,11
  63:14 64:21
  65:18,23
  66:15,20 67:1
  69:12
McCroy's 38:18
  57:1 69:7
mean 7:21 8:15
  17:24 20:17
  27:9 29:22
  32:6 35:24
  39:11,12

45:18 53:17
56:8 65:4,18
67:21
Meaning 25:13
means 59:9
meant 20:18
Medicaid 9:19
medical 5:10,20
  9:5,11 10:2,17
  12:9 13:10,11
  13:21 14:5,7,8
  14:11,18 15:1
  15:2,5,7,20,22
  15:23 18:9,22
  20:2,9,14 22:5
  22:10,19 23:4
  23:22 24:1
  27:8 28:11
  29:19,20
  30:22 32:18
  33:9,11,23
  34:21,22 35:6
  35:9,10,13,19
  36:14,16,20
  37:15,23 38:4
  38:24 46:10
  46:12 47:2,12
  47:18 50:2,23
  52:8,12 55:20
  55:24 56:8
  64:4,21 65:1
  67:4 69:8,23
  69:24 70:5,8
medically 16:7,7
  22:1 25:6 34:7
  63:15
medication 52:9
medicine 5:14
  7:8,15
medicines 9:17
meds 50:3
Menard 37:17
  38:6
mention 48:4
mentioned
  32:20 35:6
  38:19
mere 51:22
  60:11
mid 49:16
might 7:7 8:1
  12:11 43:1
  48:4 55:14,17
  56:16 63:3

3/8/07 McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

Page 78

Mills 23:23
46:21 58:20
mind 21:19,23
23:16
minute 39:21
Missouri 1:23
Modesto 6:1
monitoring
32:24
months 47:17
moonlighting
6:9
more 9:6 25:1
29:13 31:23
48:16
most 10:21 18:4
34:9
moved 60:11
moving 6:11
Mt 1:19 4:6
much 18:11 29:5
33:1 63:4
65:10 69:3
must 55:1
mutually 54:12
myriad 10:1
myself 10:6
22:16 23:3
25:13 26:4
M.D 1:13 3:3
4:3 5:21 72:8

___ N ___

N 3:1 4:1 5:3
Nam 6:5
name 5:8 14:20
23:7 35:14
38:22 39:22
57:22
named 47:4
namely 61:1
national 2:10
10:23
natural 61:22
nature 50:18
Navy 6:4,6
Nebraska 5:21
necessarily 8:21
21:11 45:17
necessary 9:4
17:10 18:19
necessity 46:2
need 8:9 18:20
50:2

needed 29:4,8
47:5 48:8
needs 16:13
17:7
negotiated 21:7
negotiation
21:12,13
never 19:22
47:13
new 29:4,9,9
34:10 50:3,9
news 56:11
next 23:20 35:23
36:9,12
none 71:7
non-correctio...
34:14
non-medical
71:7
North 2:13
Notary 1:15 4:4
5:2,4 72:4,20
note 42:21 43:1
43:16 46:22
47:17 50:1
58:23 59:6,8
61:1,12 66:9
66:13,18
noted 4:14
notes 42:18
61:18,19,24
62:8 72:16
nothing 12:1
54:15 71:11
72:11
notice 1:20
notorious 56:5,7
56:14,16
November
30:13,15
43:15 44:5,12
44:15,17,24
58:14,16 61:7
nuisance 8:18
number 3:2,12
47:16 56:9
57:2
nurse 13:18
22:16,24 23:2
23:13,14,18
23:19,21 24:2
25:16 43:16
46:21 48:5
58:19 61:1

65:15 66:6
nurses 30:23
57:20 67:16
nurse's 47:17
nutshell 9:7

___ O ___

O 4:1 5:3,3
object 20:15
27:20 33:17
36:18 39:10
39:18 40:15
41:14 44:13
53:23
objection 4:14
22:22 55:16
60:13
objections 4:13
21:2 54:14
obliged 57:22
observe 10:13
obtain 8:5
obtained 5:18
6:7 9:6 10:23
obvious 44:23
obviously 9:2
13:23
occasion 35:8
70:15
occasions 20:8,9
occur 49:18
56:2
occurred 49:8
52:24 54:5
occurs 55:8
October 14:24
30:15
off 6:5 31:24
32:3,6 40:12
40:17 43:24
46:22 48:14
58:3,4 61:1,6
61:12
Offender 61:18
61:18
offer 35:23
office 8:13 65:15
68:8,10,12,16
68:20,22 69:6
offices 39:1
often 15:13
18:12
Oh 17:17 53:10
okay 6:24 12:16

28:1 38:1 42:5
55:3 56:14
58:22 60:22
61:11 67:24
old 34:11,13,19
37:7
older 36:14
Omaha 5:20
one 18:11 19:5
22:17,21 24:5
32:9 43:5
45:21 51:17
57:16,20
60:11 69:15
ones 13:11
one-third 45:22
only 21:22 34:9
44:7 46:23
47:10,10
open 17:14
21:13
operate 18:16
19:18 52:20
ophthalmologist
27:19,22 28:4
28:22 30:10
31:18,18 33:3
45:2 46:8,14
46:18 50:8
ophthalmologi...
25:20 26:3,17
27:10 28:24
29:5,14 33:1
38:11 69:19
ophthalmology
26:10,12 30:6
50:3
opinion 26:8
28:16 29:5,9
30:3 46:19
48:5 50:4,9
53:16
opportunity 7:9
41:10
optometrist
66:18
oral 4:4,7
order 8:4 16:14
67:24
original 65:4
originals 34:17
65:6
originates 10:19
other 15:23

16:23 17:21
17:24 20:8
22:3 32:9 36:1
38:22 40:23
42:15 45:21
52:5 56:23
57:3,7,16
60:12 62:21
65:20 67:2,5
69:3 70:11
71:7
others 13:12
25:17 29:16
43:22 59:2
out 6:16 8:22
11:14 17:9,12
21:5 23:16
34:3,14 35:11
36:2 38:5 41:2
41:19 42:22
42:23 43:24
57:10
outlined 7:16
outlook 29:9
Outpatient
61:19
output 18:15
outside 8:5,12
24:22 25:19
27:22 33:13
38:10 62:24
63:21 70:24
over 4:11 6:23
12:18 26:17
29:6
overkill 45:15
overprotective
46:9
overreact 18:13
overstepping
68:1
own 4:18 26:19
29:7
o'clock 1:17 4:6

___ P ___

P 4:1
PAGE 3:2
pages 61:22
62:3,13
paid 39:14,14
pair 26:2
paperwork 22:8
parallel 9:19,20

Pardon 25:12
part 18:4 59:10
particular 26:6
35:17 46:3,4
particularly
12:1
parties 4:2,16
partnership
50:11
parts 4:15
party 4:18 41:8
pathologist 6:12
7:17
pathology 6:7,8
6:10
patient 12:2
18:10,11 22:9
28:12 33:10
33:15 35:10
36:22 37:13
37:16 42:8,9
44:18 47:21
48:2 49:14
50:18,24
51:20 53:14
55:24 58:11
59:7,8,9,15,18
60:8,18
patients 7:20
10:14 13:5
16:23 26:4
35:7 62:14
63:19 64:9,10
64:18
patient's 40:4
45:1 64:20
patient-by-pat...
21:8
patient/prisoner
11:10 18:24
paycheck 36:4
pending 67:17
67:21
penitentiary
53:9
people 8:7 16:20
17:8 25:1
26:16 45:20
51:8,21 52:1
54:8,18 55:19
56:1 62:18
69:6 70:11
71:7
per 47:24 60:18

3:02-cv-03171-HAB-BGC    # 380-7    Page 79 of 85

3/8/07                          McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

Page 79

perfectly 12:24
53:14
perform 39:20
performed
39:16 52:7,7
performs 51:6
perhaps 8:3
period 7:4 15:10
29:1 48:2
permitting 25:4
person 16:22
42:16 45:21
47:11 55:10
57:10
personalities
48:11
personality 54:9
personally
38:12
personnel 15:20
15:24
person's 27:6
phase 6:16
phenomenon
47:5
phone 13:24
14:15 35:15
physically 36:7
36:8
physician 28:10
45:2 68:5
physicians
10:12 63:21
70:24
pinch 6:21
place 8:16 12:20
18:2 25:17
28:4 31:17
32:23 34:22
51:9,13 60:11
66:2,7,19
67:17,20 69:3
placed 30:24
34:15 49:14
51:3 59:6
62:21 66:15
69:8
placement 18:24
19:2,24 20:13
20:16 51:6
52:22 53:22
54:2,6,8,19
55:4,8,10 56:1
68:8,10,12,16

68:20,21 69:6
69:23,24,24
70:11
placements 70:1
placing 45:14
Plaintiff 1:6 2:4
4:5
plan 59:20
play 63:6
playing 28:18
please 20:5
plus 26:17
point 12:3 21:2
43:17 45:8
46:3,4
poked 28:5
policy 51:12,14
population
22:11 24:17
24:21 25:8
27:17 28:5,13
30:8,12 31:8
32:5,15 40:14
41:1 42:10
45:12 49:14
50:16 51:1,10
position 20:2
47:1
POTTER 2:2
Powell 2:9 3:4
17:4 20:15
25:22 27:20
28:1 29:20
33:17 35:24
36:6,18 39:10
39:18,23
40:15 41:14
41:23 42:5,7
42:17,21 43:4
43:8 44:13
48:14 49:2,9
49:12 54:6
58:5,8 60:16
64:19 65:9
66:11 71:14
power 16:18
17:6,6,22 18:1
67:16,20,23
practice 5:24
6:2,10,15,18
6:23 7:2,16
24:12 26:5
70:17
practiced 9:6

practitioner
13:19 22:17
23:2,13,14,18
23:19,21 24:3
43:16 58:20
predator 57:5
prefer 49:4
preferred 29:5
prepares 22:15
prescription
59:11
present 5:17 8:7
13:16
presume 51:9,11
pretty 68:18
69:3,21
prevail 21:1
previous 28:21
29:6
previously 51:3
58:22
prior 27:9,16
33:15 36:14
37:22 38:4
45:1 48:22
63:20,23 64:3
65:3 70:13
72:8
prison 7:5,6
15:21,24
18:14 34:18
34:18 56:12
56:15
prisoner 16:8
19:3,16 20:13
32:8
prisoners 11:5
29:17 35:8
54:20
prisoner/patient
20:1 28:23
44:4
private 7:1
24:12
privilege 24:22
probably 28:17
48:6
problem 8:16
12:9 22:10
45:16 46:7
52:12,12
problems 16:24
22:19 26:22
56:1

procedure 4:10
13:4 32:10
45:13
procedures 9:5
70:24
process 12:17
16:6,10 31:3
32:12 36:24
39:15 51:9
52:22 54:2,6
54:15 63:3
70:21,22 71:4
produced 15:14
49:1
professional 4:4
18:10,22
20:10 22:5
72:6,21
profile 54:9
progress 61:18
61:19 62:8
66:13
promise 49:11
promote 59:12
promulgated
11:12,21 12:7
pronto 9:2
proof 4:17
property 61:2
proportions
27:5
prosthetic 27:4
protect 43:22
45:11 59:2
provide 15:19
17:15 19:15
31:19 35:9
provided 7:19
27:11 40:8
provider 10:21
provoking 56:21
Public 1:15 4:4
5:2,4 72:4,20
pull 42:22,23
purpose 4:16
purposes 43:10
pursuant 1:19
put 17:11 19:22
23:7 49:4 51:2
51:8,20 54:19
56:20
puts 18:14

_____

_____ Q _____

question 4:14
12:5,17,22
13:1,2 20:4,16
20:21,22
21:22 23:17
23:20 27:23
33:7,8,18 35:5
36:19 39:19
40:16 41:15
41:16 49:3
questions 42:4
42:20 44:14
48:16 58:3,6
64:13 65:11
71:12
quite 24:19
32:10 56:5
66:7

_____ R _____

R 5:3 72:3
RANDLE 2:2
rate 16:18 28:22
rather 27:3,5
45:15 54:12
reach 13:7
reached 19:13
29:24 67:18
read 9:14,14,20
10:1,15 50:21
51:17 60:24
reading 4:11
real 21:4
really 10:4 11:9
reason 17:12
25:5,6 33:9,23
38:1 44:22
45:5,10 67:5
reasonable
24:21
reasons 24:17
60:2,3,5,5
70:5,8
recall 14:21
21:4 31:5,15
54:4 59:3
60:20 62:19
63:23 66:3
received 35:22
63:11,21
recent 34:9
recently 41:12
66:7
recognizing

45:9
recollection
61:5
recommend
39:15
recommendati...
28:17
record 7:11 22:9
28:3 41:5
48:12,14,17
55:10,10 58:3
58:4 64:21
records 27:10
33:11,23 34:5
34:8,11,13,15
34:19,22 35:3
36:14,20 37:8
37:11,14,15
37:23 38:4,8
57:2,10,14
63:19 64:9,22
65:3,4
reduced 48:23
reference 48:17
62:8
referenced
58:24 60:19
62:12
referencing 59:1
referred 15:13
26:4,16 29:6
38:15 72:16
referring 23:1
refused 19:22
regard 38:12
53:19
regarding 23:17
62:20 63:19
Registered 4:4
72:5,21
regulations 10:9
10:20 11:21
12:6 18:21
19:17 20:12
relate 10:11
11:22 13:9
relates 18:23
43:19
relating 63:20
relaxed 48:9
release 23:9
24:20
released 24:16
25:7 45:21

3/8/07                          McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

Page 80

49:24
**releasing** 45:23
  50:15
**relevancy** 4:13
**relevant** 43:1
**remain** 20:3
**remained** 60:18
**remember** 6:13
  9:24 26:7 31:2
  31:3,6,9 32:16
  33:7 40:2 52:5
  52:6 63:17
  69:15
**remembered**
  38:8
**remove** 63:14
**removed** 8:18
  8:19
**rephrase** 20:4
  38:2
**Reporter** 4:4,4,8
  72:5,6,20,21
**Reporting** 1:22
**reports** 50:12
**reputable** 51:21
  51:24
**request** 27:18
  28:3 35:9 49:3
**requested** 37:22
  69:13
**require** 27:3
**required** 11:4
  11:12 13:3
  16:3 22:8
  28:24
**requirements**
  4:10
**requires** 18:10
**requisition** 37:3
**research** 35:19
**researched**
  35:15 36:14
**reserved** 4:13
**residence** 16:8
**residency** 6:1
**respect** 9:11
  13:4 58:13
  60:8,16 61:24
  62:4 64:10,21
**respond** 49:2
**response** 11:3
  21:18 34:24
  46:7
**responsibilities**

15:17
**responsibility**
  19:16
**responsible**
  13:19 53:21
**restrictions**
  66:15,19
**result** 53:17
  59:12
**retained** 38:11
**retiring** 6:16
**retrieval** 34:16
**returned** 61:2
**review** 27:9 28:7
  37:23 54:9
  55:4
**reviewed** 40:11
  57:9
**rhetorical** 25:11
  25:13
**Rhonda** 23:23
**right** 5:11,15,18
  7:12 11:19
  14:8 15:9,11
  20:6 23:11
  26:22 31:16
  32:11 34:20
  35:1 36:8,19
  40:5 47:19,22
  49:21 52:20
  54:16 59:21
  60:3 64:6 65:2
**rigidly** 19:5
**risk** 56:2
**RN** 23:23
**role** 63:6 67:12
**roles** 13:15
**room** 45:14,20
**roommate** 30:19
**rooms** 6:9
**rotated** 8:8
**rotating** 5:23
**ROYSTER** 2:8
**rule** 20:24 21:6
**rules** 4:10,10
  10:9,13 11:1,4
  11:11,21 12:6
  18:20 19:17
  20:11 21:10
**rumor** 57:7
**runs** 18:2
**rush** 8:21

_____
S

**S** 3:11 4:1
**safe** 28:18 53:14
**safety** 53:17
**saith** 5:5 71:16
**salient** 38:9
**same** 8:11 9:18
  43:23 55:19
  57:17 65:17
  65:18,23
**sanctuary** 45:17
**Sangamon** 1:15
  1:16 72:2
**Santa** 5:21
**satisfy** 17:7
**saw** 40:22
**saying** 36:10
  59:3
**says** 47:24 50:1
  50:2 59:8,20
  60:24 61:17
**scans** 8:5
**scene** 7:8 28:19
**school** 5:20
**seal** 72:17
**searching** 29:13
**second** 2:6
  36:18 43:4
  46:18
**secret** 44:23
**secrets** 56:13
**section** 59:5
**sector** 7:21
**security** 7:6
  16:20,22 17:3
  17:8,11 18:2
  18:23 19:5
  20:8,8 47:24
  48:1,7,10 51:6
  51:19 60:19
  69:24 70:2,3
  70:11,13
**see** 16:20 18:18
  25:5 27:6
  28:24 34:12
  38:14 42:2,12
  43:20 45:5,7
  48:21 50:3
  61:17
**seeing** 58:10
**seek** 34:14
**seeking** 10:4
  35:11
**seem** 17:21,24
  29:16

**seemed** 25:8
**seen** 11:7 13:11
  40:11,19,21
  42:14 51:16
  52:11
**seg** 61:1,6,12
**segregated** 48:8
**segregation** 51:3
  59:19,23 60:9
  60:10
**sense** 67:21
**sent** 26:2 32:4
  50:8 59:23
**separate** 42:11
**September**
  14:24 30:14
**serve** 15:2
**service** 8:5,10
**services** 1:22
  18:15
**Serving** 1:23
**set** 30:23
**seven** 13:23
**Seventh** 2:3
**several** 8:8
  16:11 33:4
  35:15 47:17
**sexual** 56:19
**sharp** 68:18
**sheltering** 45:14
**Shelton** 35:14
**she'll** 35:23
**shorthand** 4:4,8
  72:5,13,16,20
**show** 67:19
**showed** 8:13
**sick** 18:19
**sign** 23:7 32:3,6
  46:22
**signature** 50:5
  71:14
**signed** 31:24
  40:12,17 41:2
  43:24
**signing** 4:11
**Silicone** 5:2
**similar** 43:23
  44:3
**similarities** 7:18
**simply** 25:1
  64:13
**Sims** 14:20,22
  39:7
**since** 7:13 13:24

25:4 32:24
  35:7 37:19,19
**single** 45:14
  59:19
**sir** 22:13
**sit** 11:20 21:19
  21:24 47:7
  61:4 69:5,17
**site** 43:22 59:2
**situated** 38:23
  65:8
**situation** 6:5
  18:13
**SIU** 38:24
**slowly** 21:14
**sole** 13:18
**solution** 17:9
  21:5
**some** 8:5 9:3,15
  10:23 13:23
  15:14 18:4
  19:19,22 20:8
  24:19 27:3
  30:23 34:16
  35:17 36:1
  37:3 40:21
  42:19 45:15
  52:12,21 53:2
  53:2 56:18,19
  63:18 65:5,15
  67:11
**somebody** 48:7
  55:6 57:18
**someone** 8:13
  16:13,14,19
  17:3 21:2 41:2
  64:5 65:17,19
  65:20,22
  67:22 68:4
  70:4,8
**someplace** 31:22
**something** 9:5
  17:10 18:8
  25:9 26:18,20
  30:13 40:17
  47:6 51:18
  52:18 56:10
  66:22 67:19
**sometime** 53:5,7
**sometimes** 18:13
  19:13
**somewhat** 44:2
**somewhere**
  20:24 32:22

51:15 57:17
**sorry** 66:8
**sort** 71:1
**source** 57:23
**South** 2:3,6
**sp** 38:17
**speak** 38:12
  41:11 55:5
**specialist** 46:19
**specialized**
  68:16
**specialty** 26:9
  29:14 30:5
**specific** 9:24
  12:2,4 52:6
  56:3
**specifically** 4:14
  30:9 40:18
  58:24 62:20
  63:6
**specifics** 31:9
**speculating**
  68:21
**spell** 38:22
**spends** 68:14
**spent** 7:17
**spoke** 30:9
  38:14
**spot** 31:23
**Springfield** 1:3
  2:3,6,10 6:11
  6:16 7:17 8:14
  26:5 29:7 32:8
**SS** 72:1
**staff** 70:2
**stamp** 23:7
**standpoint** 20:2
  23:4 50:24
  64:16
**Stanford** 5:19
  5:23
**start** 34:10
**state** 1:16 19:14
  72:1,7
**stated** 53:16
**statement** 48:16
  53:19 68:23
**states** 1:1 8:4
  21:1
**status** 48:8,10
  61:1,6,12
**stayed** 6:5
**Steahley** 38:16
  38:19 39:1

Page 81

50:10,13
Sterling 1:19
  4:6
still 24:6,8,11
  32:13 47:21
stipulated 4:2
stop 22:2
stopping 46:11
stops 13:20
  17:19 21:16
  21:23
story 57:16,19
straightened
  23:16
strangulated
  8:24
Street 2:3,6,13
stricken 64:15
strictly 71:5
striking 12:1
strong 56:16
strongly 22:3
struggle 17:7
subcontract
  15:18
subject 11:8
  26:2 47:15
subordinant
  23:3
subscribe 46:1
subsequently
  48:23
suggestions
  17:15
Suite 2:10
summary 22:14
  40:18,20
  41:13,18,24
  42:3,24 45:5
sunshine 24:22
superintendent
  70:3
superior 8:7
supervise 15:23
supposed 51:7
  56:20
Supreme 4:11
sure 20:17 21:10
  38:18 40:2
  41:15 43:8
  50:24 51:19
  65:5 69:15
surgery 8:6 27:6
surgical 8:15

sworn 5:2,4
  72:10
system 10:3
  19:14 34:16
S-t-a-h-l-e-y
  38:20
S-t-e-a-h-l-e-y
  38:21

─────── T ───────

T 3:11 4:1,1
  72:3,3
tact 21:12
take 6:23 8:16
  22:1 29:16
  43:6 66:2
taken 1:14 4:3,8
  12:13 30:16
  41:10 44:16
  61:11 72:13
takes 51:12
taking 52:10
  72:8
talk 25:17 34:5
  34:7 37:6
  56:18 70:15
talked 46:10
  47:13 52:14
  65:15 67:7
  68:7,24 70:20
talking 11:10
  22:18 23:12
  23:14 36:19
  41:15,17,20
  41:24 42:7
  64:4 70:10,22
talks 19:10
tangential 26:15
television 30:23
tell 9:10 12:24
  16:19 24:15
  35:5,12 43:14
  51:21,24
  53:13,20 54:3
  59:5,9
telling 34:20
  41:11
ten 50:1,5
tendencies
  57:14
tenens 6:18,21
TENNEY 2:12
tentatively
  67:17

term 17:18
  20:16 21:23
  39:10,11
  59:12
testified 44:15
  58:22 60:17
  68:7
testify 72:10
testifying 60:20
  64:3
testimony 63:18
  63:24
tests 70:24
Thank 49:9,12
  65:9
their 4:2 6:23
  13:6 16:15,16
  17:14 29:11
  56:4 61:22
  63:19 69:10
theoretically
  46:5
thereof 4:15
Theresa 2:9
  66:10
thick 34:10
thing 7:24 12:2
  32:21 47:6
  57:17 65:17
  65:19,23 71:1
things 9:3 10:1
  18:4 25:18
  44:14 52:19
  70:16
think 8:13 9:8
  9:16 10:23
  15:4 17:1,5,10
  17:13 18:3,3
  18:13,17 19:4
  19:19 20:22
  21:5 23:16
  25:7 29:8
  32:20,21 33:7
  35:21,21 36:4
  36:6,12 38:7
  38:16 41:16
  41:21,24
  45:16,18 46:6
  46:9 47:5
  50:10,20 56:4
  56:12 58:2
  60:17 63:16
  64:19 66:11
  69:20,21

thinks 41:21
Thomas 2:2
though 23:16
  34:17 55:15
thought 53:13
thoughts 16:16
thread 31:21
threat 16:23
three 6:3,18 7:4
  8:8 62:18,21
through 4:2 8:8
  10:16 11:15
  36:24 37:9
  38:7 54:24
throughout 8:3
thumbed 11:15
thumbs 18:18
time 6:6 7:17
  13:14,16
  14:12 15:10
  24:20 26:18
  29:1 33:15
  36:14 38:5
  40:21,22
  43:24 45:8
  46:3,4 47:2,21
  48:3 49:11,15
  50:9 52:12,21
  53:2 62:17
  63:10,23
  66:14 68:11
  68:14 69:8
times 13:24
  17:21,24
  19:11 28:23
title 14:2,4,6
today 11:20
  14:6 21:20,24
  28:8 34:4
  41:10,11 61:4
together 51:2
  54:10,20
told 14:23 20:7
  23:24 42:15
  52:1,6,21 54:4
  57:19
Tom 23:12
top 61:17
touch 9:15
  10:17 47:15
training 5:14
  55:20
transcribed 4:9
  72:14

transcript 72:15
transcription
  28:2
transfer 30:8
  31:12 32:22
  53:1 69:13
transferred
  22:10 27:17
  28:12 30:12
  31:8,11,13,17
  31:22 32:1,4,9
  32:14 33:2,5
  33:12,24
  37:16,17 38:5
  60:8,10 69:14
transferring
  62:24 63:3
translation
  72:15
transplant
  39:17,20 40:9
  63:11
traveling 6:21
travels 56:11
treated 33:4,13
treating 10:13
  25:20 27:10
  27:18 28:3,10
  35:7 38:10
  45:2 46:14,18
treatment 11:23
  12:8 13:6,10
  30:17 31:19
  33:12,24
  38:12 40:8
  63:20,20
trial 48:22
tried 65:19,20
trouble 29:15
  33:1 45:17,19
true 8:2 9:18
  63:13 72:15
truly 9:4
truth 72:10,11
  72:11
try 13:1 17:7
  49:1 54:10
trying 10:5,5
  21:15 36:2
tumor 8:18
twenty 26:17
twiddling 18:18
two 5:24 6:12
  29:5 38:14

42:11 54:20
  62:2
type 7:24 21:16
  22:8 34:16
  37:3 43:23
  47:6 48:19
  52:9 53:14
  57:17
types 21:24

─────── U ───────

U 4:1
ultimate 20:13
  46:11
ultimately 39:16
unassigned 16:7
  63:15
uncomfortable
  27:3
under 5:23
  18:16 19:13
  19:17 51:6
  53:20,23 59:5
  59:20 72:17
understand
  12:16 15:16
  18:20 19:8,12
  20:21 23:24
  39:3
understanding
  14:17 24:15
  26:24 37:18
  41:8 47:7
  54:17 56:15
understood
  12:20 56:20
unfortunately
  29:10
unit 16:9 23:1,1
  67:8,10,12
United 1:1 8:3
University 5:19
  5:24
unless 4:14
  14:14
unnoticed 56:13
unrealistic
  28:17
until 15:7 67:19
Urgent 7:2
use 17:18
used 4:16 17:18
  62:9,13
usual 12:1 60:3

3/8/07 McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

utilized 38:16

**V**
vacation 6:23
  41:3
vaguely 32:16
valid 48:5
Valley 5:22
variables 51:7
variety 9:20
various 26:16
vendor 15:15,16
  19:14
verbalized
  59:16
verify 50:21
versus 7:21
very 27:6 65:10
Viet 6:5
view 19:5,6
  28:20
viewpoints 19:7
violence 51:4
  57:11
violent 51:2,20
virtue 35:19
**VOELKER** 2:8
voices 61:2
vs 1:7

**W**
W 5:3,3
wait 8:23 36:18
  39:21 43:4
waive 71:14
waived 4:12,14
walk 37:5
walking 24:22
wall 37:8
want 16:16
  20:10,11,15
  28:5 29:16
  31:21 37:4,4
  48:12 49:2
  64:2,20 71:14
wanted 34:3
  58:14
wanting 17:11
  69:13
wants 31:20
  36:6
ward 61:15
warden 19:10
  19:20 21:9

55:6 70:2,2,11
  70:12,16 71:3
warfare 21:14
wasn't 28:18
  30:19,21,24
  44:11,11,14
  44:15 51:20
  53:9 58:18
  65:17
Water 2:13
way 9:6 11:18
  11:22 31:10
  45:15 52:19
  55:1
ways 10:7 17:20
weather 25:4
week 8:15 13:23
  35:23 36:12
well 8:1,3,20
  9:14,24 10:21
  11:7,14,18
  12:10 13:18
  16:11 17:5,20
  17:23 18:2,11
  19:8 23:15
  24:19 25:5,21
  27:2,7,24 29:3
  30:2,16 31:24
  32:7 34:7 35:2
  40:23 41:2,19
  41:23 42:2
  43:15 44:7,9
  44:16 45:13
  46:5 47:1 48:4
  48:15 49:18
  50:23 51:5,21
  52:21 53:10
  54:8,24 56:7
  56:11,16,17
  57:16 59:10
  61:22 66:17
  67:16
went 6:3,18 51:1
  51:10 65:1
  67:18
were 13:15
  14:18 15:1,5,6
  15:10 23:21
  27:8,15 30:21
  32:11,17
  35:18 43:9
  44:17 45:19
  45:24 48:11
  54:19 56:1

58:15,16 60:4
  60:5 62:14
  63:11 64:2,4,8
  64:17 66:14
  69:12 70:10
  70:21
weren't 59:22
  63:10
Western 1:18
  4:6 11:6 13:15
  14:1,9,22 15:6
  29:2 33:5 34:4
  34:21 36:1,7
  52:20 53:1
  58:15 63:1
  64:5,11,22
Wexford 10:22
  15:11 24:9,10
  24:11 27:11
  33:15 35:22
  36:5 37:22
  38:11 39:9,13
  46:15
we're 17:6 21:14
  34:3 58:3
we've 8:8 19:4,6
  23:16 29:14
  35:18
Whatever's
  42:13
while 30:21
  32:13 62:18
  70:21
white 62:2,13
whole 72:11
wife 7:11
wind 8:11
wish 18:4
wishes 16:16
  17:8
withdrew 29:10
witness 4:8,11
  42:4
witnesses 42:15
word 21:1,16
  56:17 68:24
words 22:3
work 9:23 10:6
  17:9 54:16
  68:12
worked 14:15
  21:5 64:5
working 6:12
  10:12 13:19

58:15
works 9:13
  20:11 24:15
wouldn't 29:11
  41:5 51:1 65:2
wound 29:13
wrestling 20:23
writing 48:23
  49:5,10
written 10:9
  20:24 21:10
  27:18,22 37:3
  40:3 43:16
  51:14,15
  58:19
wrote 40:21
  66:9

**X**
X 3:1,11
x-rays 35:18

**Y**
yard 43:21 59:1
  66:23
Yeah 21:21 36:8
  52:11 59:21
  60:15,15
year 5:24 6:17
  7:4 15:4,6,8
  30:14 31:14
years 6:3,6,12
  6:19 8:9 9:7
  26:18 33:4
  57:2
yellow 61:23

**Z**
Zeh 39:4,6,16,19
  40:8
Z-e-h 39:6

**0**
02-3171 1:7
03 14:24 43:15
  44:12,15,17
  44:24 61:7
04 7:12 13:18
  14:9 30:13
  49:17 60:23
  61:8,13 69:9
06 53:4
084-002128
  72:23

| **1** |
| 1 3:13 43:11,14 |
| 43:15 58:13 |
| 59:17 60:8 |
| 61:16 62:1,7 |
**1-800-248-2835**
  1:24
12 6:6
1227 2:3
16th 13:17
1960 5:21
1961 5:23
1963 6:1

| **2** |
| 2 3:13 43:11 |
| 47:16 60:17 |
| 60:23 61:16 |
| 62:5,12 66:10 |
20 9:7
2000 6:17 13:22
2003 44:5 58:14
  58:16
2004 15:6 60:19
  66:9,14
2007 1:17 4:5
  72:10,18
21st 58:14,16
  61:7
217)788-2835
  1:23
217)788-2838
  1:23
236 2:13
24 13:22
24hrs 1:23
26th 72:17

| **3** |
| 3 3:13 43:12 |
| 49:19 61:16 |
| 62:5,12 66:11 |
| 66:12,13 |
31st 48:10 60:19

| **4** |
| 4th 60:23 61:7 |
| 61:13 |
43 3:13

| **5** |
| 5 3:4 |
500 2:6
56 5:19

575 2:10
58 3:4

| **6** |
| 62525 2:14 |
62701 2:10
62703 2:3
62706 2:6
65 3:5

| **7** |
| 7:10 61:2 |
78 6:11
79 6:12

| **8** |
| 8 1:17 |
8th 4:5 30:21
  49:18,21 50:1
  66:9,14 72:9
8:30 1:17 4:6
  61:2

SEG

EXHIBIT
2
3-8-07 DB

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

**Western Illinois Correctional Center**

Offender Information:

McCoy — Last Name    Aaron — First Name    MI    ID#: K51883

| Date/Time | Subjective, Objective, Assessment | Plans |
|-----------|-----------------------------------|-------|
| 3/31/04 9am | Nurse Note. Remains housed in inf. per security. Voiced no c/o — | S Moore RN |
| 4-1-04 8AM | Nurse note. Pleasant Cheerful Shower — | — |
| 4-4-04 8³⁰A | Off Seg status 7¹⁰AM. Property returned 8³⁰AM Voices Ø c/o. — | B Bower RN |
| 4-6-04 7⁴⁶AM | Nurse Note: Ø C/O voiced, did request tylenol, as ordered. UP ambulating c̄ Ø distress noted — | J Conser RN |

ATTYG10123

Printed on Recycled Paper

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

**Western Illinois Correctional Center**

EXHIBIT
3
3-8-07 DB

Offender Information:

McCroy        Aaron
Last Name        First Name        MI        ID#: K51882

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 6/8/04 8 AM | Nurse Note Remains housed in infirmary per security noted. No c/o | A Mosse LPN |
| 6/8 10:00 A | — M D — No further medical need for detention. He will continue meds and see OPHth for new opinion. | ATTYG10133 J H Browning MD noted 6/8/04 @ 10:35A A Mosse RN |
| 6/8/04 10:10 AM | Eye Dr no yard or gym due to eye condition — ↓ VA | noted S Shaw LPN D L Anderson DO |
| 6/8/04 10:45A | Nurse Note. low bunk / low gally permit not need V.O. Dr Bross | A Mosse |

*Printed on Recycled Paper*

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)