3:02-cv-03171-HAB-BGC    # 380-10    Page 1 of 52    **E-FILED**

3/9/07                McCroy v. Illinois Dept. of Corrections    Friday, 04 May, 2007 02:24:30 PM
Rhonda S. Mills                                                  Clerk, U.S. District Court, ILCD

1                 UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF ILLINOIS

3

4

5    AARON McCROY,

6              Plaintiff,

7       vs.                          No. 02-3171

8    ILLINOIS DEPARTMENT OF
     CORRECTIONS et al.,
9
               Defendants.
10

11

12        THE DEPOSITION of RHONDA S. MILLS, taken

13   in the above-entitled case before Rhonda K.

14   O'Neal, CSR, RPR, a Notary Public of Sangamon

15   County, acting within and for the County of

16   Sangamon, State of Illinois, at 1:57 o'clock P.M.,

17   on March 9, 2007, at One North Old State Capitol

18   Plaza, Suite 575, Springfield, Sangamon County,

19   Illinois, pursuant to notice.

20

21

22

          BALDWIN REPORTING & LEGAL-VISUAL SERVICES
23          SERVING ILLINOIS, INDIANA & MISSOURI
          24 hrs (217) 788-2835  Fax (217) 788-2838
24                   1-800-248-2835

COPY

Page 1

```
 1     APPEARANCES:

 2         LONDRIGAN, POTTER & RANDLE, P.C.
           BY: Thomas F. Londrigan, Esq.
 3             1227 South Seventh Street
               Springfield, Illinois 62703
 4             On behalf of Plaintiff.

 5         HEYL, ROYSTER, VOELKER & ALLEN
           BY: Theresa Powell, Attorney at Law
 6             National City Center
               Suite 575
 7             One North Old State Capitol Plaza
               Springfield, Illinois 62701
 8             On behalf of Defendant.

 9         HUGHES, HILL & TENNEY L.L.C.
           BY: Carl J. Tenney, Esq.
10             236 North Water Street
               Decatur, Illinois 62525-0560
11             On behalf of Defendant Doctor David Anderson.

12         MS. KELLY CHOATE
           Assistant Attorney General
13             500 South Second Street
               Springfield, Illinois 62706
14             On behalf of Defendant Illinois
               Department of Corrections, via telephone.

15

16

17

18

19

20

21

22

23

24
```

Page 2

3/9/07                    McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

1                    I N D E X
    DEPONENT                          PAGE NUMBER
2   Rhonda Mills
        Examination by Mr. Londrigan       5
3       Examination by Ms. Choate         42

4

5

6

7

8

9
                    E X H I B I T S
10

11  NUMBER                  MARKED FOR IDENTIFICATION

12  (None.)

13

14

15

16

17

18

19

20

21

22

23

24

Page 3

3/9/07                    McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

1                    S T I P U L A T I O N

2           It is stipulated and agreed, by and
    between the parties hereto, through their
3   attorneys, that the deposition of RHONDA S. MILLS
    may be taken before Rhonda K. O'Neal, a Notary
4   Public, Certified Shorthand Reporter, and
    Registered Professional Reporter, upon oral
5   interrogatories, on the 9th of March A.D., 2007,
    at the instance of the Plaintiff at the hour of
6   1:57 o'clock P.M., One North Old State Capitol
    Plaza, Suite 575, Springfield, Sangamon County,
7   Illinois;

8           That the oral interrogatories and the
    answers of the witness may be taken down in
9   shorthand by the Reporter and afterwards
    transcribed;
10
            That all requirements of the Federal Rules
11  of Civil Procedure and the Rules of the Supreme
    Court as to dedimus, are expressly waived;
12
            That any objections as to competency,
13  materiality or relevancy are hereby reserved, but
    any objection as to the form of question is waived
14  unless specifically noted;

15          That the deposition, or any parts thereof
    may be used for any purpose for which depositions
16  are competent, by any of the parties hereto,
    without foundation proof;
17
            That any party hereto may be furnished
18  copies of the deposition at his or her own
    expense.
19

20

21

22

23

24

                          Page 4

1                     (Whereupon the Deponent was

2                     sworn by the Notary Public.)

3            R H O N D A   S.   M I L L S

4    having been first duly sworn by the Notary Public,

5    deposeth and saith as follows:

6                     EXAMINATION

7                     BY MR. LONDRIGAN:

8        Q    Nurse Mills, have you ever had a

9    deposition taken before?

10       A    Just as a witness for an accident.

11       Q    Okay.  But you understand the process and

12   what we're doing here?

13       A    Right.

14       Q    If you have any problems with my

15   questions, tell me, and I'll try and rephrase them

16   so we understand each other.

17       A    (Nodded head up and down.)

18       Q    You want to state your full name, please?

19       A    Rhonda Sue Mills.

20       Q    And how are you currently employed?

21       A    I'm a nurse practitioner at Quincy

22   Medical Group.

23       Q    Okay.  Would you briefly outline to us or

24   for us your educational background, your

                     Page 5

1    certifications, your employment history up to the

2    present?

3         A    Okay.  I became a registered nurse in

4    '91.  '91.  And then I started working, I worked

5    in the hospital and then the local health

6    department.  And then in '96 I started out at the

7    correctional center in Mt. Sterling as an RN, and

8    then '98 I went back to school, graduate school,

9    become a nurse practitioner and then graduated in

10   '01.  And then September of '01 I started at the

11   correctional center as a nurse practitioner.

12        Q    Okay.

13        A    And stayed there until '05, and then

14   August of '05 I went to the Beardstown Clinic and

15   then left there this past, past December to go

16   start work at January at Quincy Medical Group in

17   Quincy.

18        Q    What if anything did you do by way of

19   employment before you went into nursing?

20        A    I was a medical assistant.

21        Q    And right out of high school so you

22   went--

23        A    Right out of high school I became a

24   medical assistant, and then I--

Page 6

1        Q    And then you got your schooling and your

2    certification?

3        A    Yeah.  My certifications I did when I was

4    in corrections received certification as a

5    correctional health care.

6        Q    And what did you have to do to receive

7    that certification?

8        A    Had to do, it was quite an extensive oral

9    test that you did on your own, but it was

10   understanding, understanding different areas about

11   the health care or taking care of prisoners.  And

12   you had to have so many years as working in that

13   area.  You couldn't just--you had to be at least

14   over a year working in corrections, and then you

15   were eligible to sit--not sit--but eligible to

16   take the exam, then become a certified

17   correctional employee.

18       Q    Understand you to say that the exam was

19   an oral exam?

20       A    No, excuse me, not oral.  It was a

21   written.  It was a written exam that you did on

22   your own.

23       Q    And what materials were you given to

24   prepare for that test?

Page 7

3/9/07                          McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

1      A    Obtained materials on my own that they

2  recommended for references.  Can't remember at

3  this time.  There was--.  There were certain books

4  that I obtained then to prepare for that exam.

5      Q    And Department of Corrections provided

6  you with a bibliography as to how, what to prepare

7  and what to read?

8      A    No.  Huh-uh.  The certification--.

9      Q    Was it an independent organization?

10     A    Yes.  An independent org--yes, yes.  A

11  national organization.  And in their materials to

12  apply for the test, they recommended certain

13  materials to prepare.

14     Q    And how long was that period of

15  preparation for you beginning with when you

16  applied and you began your course of study and the

17  time you received your exam and certification?

18     A    I do not remember that.

19     Q    See, I don't--this is all new to me.

20         When did they start certifying nurse

21  practitioners historically?  When did that first

22  come into being?  Do you know?

23     A    I'm not sure.

24     Q    Okay.

1       A     I mean, I'm not talking about certifying

2    as nurse practitioner in the health care in the,

3    my correctional certification.  That's something

4    totally different from that.

5       Q     Okay.  That's what you need to explain to

6    me.  You became interested in the field of

7    medicine, and thereafter, you decided you wanted

8    to be a nurse practitioner?

9       A     Correct.

10      Q     All right.  What did you understand at

11   that time a nurse practitioner to be?

12      A     What did I understand--an

13   advanced-practice nurse.  Just taking the nurse

14   education further and combining nursing with some

15   medical knowledge to perform what a nurse

16   practitioner does.

17      Q     Okay.  And you need to explain to me--

18      A     Okay.  What a nurse practitioner is?

19      Q     (Continuing)--because I know nothing

20   about what a nurse practitioner does.

21      A     Okay.  It's taking the nursing education,

22   the RN with a bachelor's degree then is able to go

23   on to get, go to get a master's in nursing, and

24   there's of course several different areas that

Page 9

3/9/07                          McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

1     make up for an advanced-practice nurse, one of

2     them being nurse practitioner.  And it was a

3     three-year part-time program where you then start

4     combining the medical so you can make diagnoses

5     and give treatment.  And it's called mid level.

6          Q     It's a three-year program?

7          A     After having a bachelor's in nursing.

8          Q     Okay.

9          A     But to build upon the nursing.

10         Q     And you're working towards a master's in

11    nursing?

12         A     Yeah.  I have a master's in nursing.

13         Q     Okay.

14         A     And my studies then were for the

15    specialization as family nurse practitioner.  And

16    so then you get many clinical hours and course of

17    study and a thesis and the whole bit then to get

18    the master's.  Then you do much clinical like with

19    other nurse practitioners or MDs.

20         Q     And where is it you did that?

21         A     I did that at Mt. Sterling at the Quincy

22    Medical--I got my degree from Southern Illinois

23    University-Edwardsville.

24         Q     Okay.

                         Page 10

1        A     Then your clinical could be done in the

2   various office--

3        Q     When you say you got your degree, you're

4   talking about your master's--

5        A     My master's.

6        Q     (Continuing)--degree in nursing?

7        A     Right.

8        Q     And then do I understand you correctly

9   that beyond that you have to get a certification

10  as a nurse practitioner?

11       A     Right.  To practice, that's right.  And

12  it's American Association of--it's ANCC anyways,

13  letters, and you set for this national exam

14  because otherwise without having that

15  certification, you're not able to practice

16  legally.

17       Q     Okay.  Explain to me what you can and

18  cannot do in the field of health care as a nurse

19  practitioner in different settings.  In a

20  hospital, working for Department of Corrections,

21  or working, say, for a clinic.

22       A     There is a general scope of practice, but

23  then within each site you work as a nurse

24  practitioner, you must have what's called a

Page 11

1    collaborative agreement with whoever the physician

2    is that you work with.

3        Q    No.  I'm trying to find out what you are

4    qualified to do within the system.  For instance,

5    you mentioned diagnosis?

6        A    Yeah.  Diagnose.

7        Q    You can take a medical history, I assume?

8        A    Right, right.

9        Q    That diagnosis, is it a provisional

10   diagnosis, or you, can you make a definitive

11   diagnosis?  Can you write prescriptions, can

12   you--that's the type of question I'm asking.

13       A    Yes.  Especially for like acute care

14   simple illnesses, or if I feel that I need, they

15   need more of an evaluation then they would, I

16   would refer them to the MD.

17       Q    I tell you what.  Can you reference me to

18   a good text based on your familiarity with the

19   literature that would explain to me if I cared to

20   take the time about what a nurse practitioner is

21   qualified to do vis-a-vis a doctor and a patient?

22       A    Nancy Buford is an author that has made

23   texts on nurse practitioners.

24       Q    Okay.  And is this a text that you used

Page 12

1    in your study?  Was it a recommended text?

2        A    No.  It was something I learned from

3    different conferences, and she's, does many of the

4    books on the legal issues with nurse practitioners

5    as far as setting up contracts for your employment

6    and setting up your collaborative agreements.

7        Q    And I take it that you have--

8        A    A good place to go to would be the

9    Illinois Department of Regulation under, there's

10   advanced-practice nurse section and nurse

11   practitioners that lines out the scope of nursing,

12   the scope of my practice for nurse practitioner.

13       Q    Okay.

14       A    Because it's going to vary from state to

15   state what a nurse practitioner can legally do.

16       Q    Now, do you have a contract that spells

17   out your duties and responsibilities, or did you

18   have one with Illinois Department of Corrections?

19       A    No.  Not a contract.  Just an agreement

20   letter.  I had a collaborative agreement.

21       Q    And explain that to me.  I should

22   understand these things--I'm a lawyer--but I

23   don't.

24       A    A collaborative agreement is just pretty

Page 13

3/9/07　　　　　　　　McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

1　much a general statement that the doctor is saying

2　he's comfortable for me doing in collaboration

3　with him.  That I am able to diagnose, able to see

4　the same type of patients that that doctor would

5　see.  Also like I have an Illinois license in

6　prescriptive authority, I have my own DEA number.

7　And that this doctor is saying, you know, as long

8　as the doctor is always, I'm always able to reach

9　them either telephone, however, they got to be

10　reachable by me if I would have a question or a

11　situation.

12　　　　Q　　You're just going a little bit too fast

13　for me.

14　　　　A　　Okay.

15　　　　Q　　I can't pick it up.

16　　　　A　　Okay.

17　　　　Q　　And you may be a little bit nervous.

18　I'll take my time, and you'll probably catch on to

19　what I want or need.

20　　　　　　You had received your certification when

21　you went to work at Western; is that correct?  As

22　a nurse practitioner?

23　　　　A　　Yes, yes.

24　　　　Q　　And you mentioned that you had

Page 14

1    collaborative agreements?

2        A    Uh-huh.

3        Q    Were they with physicians, or were they

4    with the Department of Corrections?

5        A    No.  They would be with individual

6    physicians.

7        Q    Okay.  Did you have--so would that have

8    any application at all to what you were qualified

9    to do while you were acting as a nurse

10   practitioner at Western?

11       A    Yes.

12       Q    Okay.  Would you have in place then a

13   collaborative agreement or agreements, plural,

14   while you were a nurse practitioner at Western?

15       A    Yes.

16       Q    Okay.  And with whom?  Who would be the

17   other party?

18       A    Okay.  When I first started, I'm not

19   sure.  But there was, Dr. Simms was one of my

20   collaborators, Dr. Brown, and then in any absence

21   of a medical director, was Dr. Lochard.

22       Q    Okay.  So these were agreements that were

23   with the individual doctors rather than with the

24   Department of Corrections?

                          Page 15

1       A    Correct.

2       Q    Is that right?

3       A    Right.

4       Q    Are those however on file with the

5    Illinois Department of Corrections?

6       A    You have to have one in place so if the

7    Department of Professional Regulation would ever

8    request it.  Now, if my health care unit

9    department actually sent one to IDOC, I would not,

10   I'm not sure.

11      Q    Did you bring a copy of your job

12   description--

13      A    No.

14      Q    (Continuing)--with you?

15      A    The collaborative agreement we used was

16   just--on the Department of Professional Regulation

17   site, there is like a sample of collaborative

18   agreement.  We pretty much did a generic

19   collaborative agreement.  That encompasses, you

20   know, what my scope of practice would be.

21      Q    Since we don't have a copy of that

22   agreement, but I'm sure because you've had a

23   number and with your background you understand it,

24   would you take the time just very slowly to

Page 16

1    explain to me as a layman what's contained in that

2    agreement authorizing you, the scope of the

3    services that you deliver to patients that are

4    inmates at Western?

5        A    Okay.

6        MS. POWELL:  Let me just object to the form of

7    the question because I think that--well,

8    collaborative agreement is between her and the

9    physician, like she said, which is separate from

10   like what her job description would be as far as

11   providing care and treatment to inmates.

12       MR. LONDRIGAN:  That may be correct.

13       MS. POWELL:  So I wasn't really sure about

14   what your question was.  Just make it clear on the

15   record what you are seeking.

16       MR. LONDRIGAN:  Q  I thought you told me that

17   the collaborative agreements were form agreements

18   that were prepared by the Department of Regulation

19   that would outline what your responsibilities were

20   no matter which doctor that you entered an

21   agreement with; is that right?

22       A    Well, it depends on what site you're

23   working in, and so it just has generic statements

24   saying that, you know, within whatever area you're

Page 17

1    working that you're pretty much mirroring what

2    whoever your collaborator is in those types of

3    patients and kind of mirroring how they would do

4    treatment and that you're just, that you're a

5    team.  And that I would be diagnosing, treating,

6    writing prescriptions, but if I ever had any

7    question that I would be then directing those to

8    my collaborator.

9         Q    Those collaborators that you've referred

10   to are doctors employed by the vendor that happens

11   to be at that institution?

12        A    Correct.

13        Q    Is that right?

14        A    Correct.

15        Q    Okay.  Who is your immediate supervisor

16   within the department?

17        A    Okay.  Two; clinically was the physician,

18   administratively then was the health care unit

19   administrator.  So one was a vendor employee, and

20   then one was a state of Illinois employee.

21        Q    And one was a doctor?

22        A    Right.

23        Q    And the--or several doctors?

24        A    Uh-huh.  Depending--yeah.

                         Page 18

1        Q    And the other person to whom you were

2    responsible was the health care unit administrator

3    who in this case was Debra Fuqua?

4        A    Correct.

5        Q    Another registered nurse?

6        A    Correct.

7        Q    Okay.  So you really took direction from

8    two different sources; your collaborating

9    physicians who were with Wexford--

10       A    For any clinical issues was through

11   that--

12       Q    And Debra Fuqua, an employee of the

13   department?

14       A    Correct.

15       Q    Okay.  Did you take any direction from

16   employees of the department who were in security?

17       A    No.

18       Q    Why not?

19       A    What are you asking?

20       Q    Well, my grandchildren say, you're not

21   the boss of me.  You answered that question very

22   emphatically.  And I'm asking you to tell me why

23   you wouldn't take direction from someone who is in

24   security.  Suppose assistant warden came down,

Page 19

1    says, I want you to do this.  Told you verbally

2    face to face.  Would you follow that direction?

3         A    Well, there's things we have to do with

4    keeping security in mind.  We have--.  But as far

5    as direct medical orders, no, they would not be

6    making medical--.  I don't really like the way the

7    question's worded.

8         Q    All right.  I'll reword it differently

9    and more specifically.  If someone from security

10   in authority came down and said to you, I think

11   that patient should be placed in the general

12   population, would you follow that order?

13        MS. CHOATE  Object to the form.

14        THE DEPONENT:  It depends on what the medical

15   situation would be.

16        MR. LONDRIGAN:  Q  So you would make your own

17   independent medical determination?  Is that what

18   you're saying?

19        A    Yes.

20        Q    Okay.  You wouldn't simply just do what

21   security told you if it weren't in the best

22   interest of the patient?

23        A    Correct.

24        Q    Okay.  Are you familiar with the medical

Page 20

1    history of the inmate and patient Aaron McCroy

2    while he was assigned to the health care unit and

3    the infirmary for treatment of an eye condition?

4        A    I remember Inmate McCroy being in the

5    infirmary.

6        Q    And share with me what you do remember,

7    and if you don't remember anything other than

8    that, why, I'll move on to something else.

9        A    Well, it would be hard not to remember

10   that inmate.  He was very demanding.  And he

11   wanted what he wanted when he wanted it.

12       Q    And there were disputes over medication?

13       A    Yes.

14       Q    Do you recall those?

15            There were disputes about where he could

16   place his television set?  Do you recall those?

17       A    No.

18       Q    There were disputes about whether or not

19   he was given adequate warning when he would go on

20   furlough appointments to ophthalmologists so he'd

21   have an opportunity to take a shower?  Do you

22   recall that dispute?

23       A    No.  But there's reasons, security

24   reasons that you would not want inmates having too

                        Page 21

1    much advanced warning on when they're going out

2    for a furlough.

3         Q    Have you ever looked at when he went out

4    for furlough as to the different categories of his

5    history, whether or not he had ever attempted an

6    escape, whether he was a sexual predator, whether

7    or not he had ever been involved in fights,

8    whether or not he had ever been a member of a gang

9    or committed acts of violence?

10        MS. POWELL:  Objection.  Compound question.

11        MR. LONDRIGAN:  Q  Do you know that those

12   categories exist and are maintained by security

13   one way or the other?  Do you know that for a

14   fact?

15        A    No.  But--no.

16        Q    Did you make a judgment at any time that

17   Aaron McCroy as an inmate and a patient was a

18   security risk to others in the institution?

19        A    No.

20        Q    And that would be a security issue

21   anyway; it wouldn't be a medical issue, would it?

22        A    Correct.

23        Q    Now, I mentioned a number of things that

24   resulted in grievances being filed by Aaron McCroy

                        Page 22

3/9/07                          McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

1     while he was an inmate and a patient.  Do you

2     recall any other instances about which he made

3     demands upon people in the health care unit?

4          MS. POWELL:  I object to the form of the

5     question.

6          MR. LONDRIGAN:  Q  She's going to do that a

7     lot now.  But the judge later on will rule whether

8     or not that's an appropriate question, but you

9     have to answer me here.

10         A     What's the question?

11         MR. LONDRIGAN:  You want to read it back to

12    her.

13                    (Whereupon the requested

14                    portion of the record was read

15                    back by the Reporter.)

16         THE DEPONENT:  Just generally, not in

17    particular.  What--can you be more specific?

18         MR. LONDRIGAN:  Q  I'll give you another

19    specific.

20         Do you remember him making complaints

21    that he was told by his outside treating

22    ophthalmologist that he was suffering from

23    steroid-induced glaucoma in addition to

24    keratoconus?

                         Page 23

1       A     Not specifically.

2       Q     Okay.  Did Aaron McCroy ever assault any

3   other patients while he was, spent over a year in

4   the infirmary--

5       A     Not that I know of.

6       Q     (Continuing)--in the health care unit?

7             He was on different occasions, however,

8   placed in segregation.  Is that normally a form of

9   punishment at the institution at Western?

10      A     Not always.  Sometimes it's for security

11  purposes to protect.

12      Q     Protect a patient?

13      A     Well, it's not always punishment.  I

14  mean, it can be punishment, but at times I know

15  there's other security reasons they have placed

16  people in segregation.

17      Q     Sometimes they place people in

18  segregation for fighting with their cell mates?

19      A     Correct, correct.

20      Q     Do you as the licensed practitioner have

21  authority if a patient at risk for being poked in

22  the eye, for instance, should be assigned a single

23  cell and not placed in a cell with other

24  prisoners?

Page 24

1          Let me ask it a different way.  Have you

2    every done that?  Have you ever told placement,

3    this patient because he is at risk medically

4    should be placed in a single cell?

5          A    Of course, yes.

6          Q    And when that recommendation is made,

7    does placement usually follow that recommendation?

8          A    Yes.

9          Q    Is it mandated?

10          A    I mean, they're not going to let you put

11    somebody that you're trying to rule out TB or rule

12    out other things be elsewhere.  I mean, there's

13    medical conditions that you're not going to have,

14    have them with others.

15          Q    Okay.  Maybe it would be more helpful if

16    we'd go through some exhibits, and then I'll ask

17    you some of the questions in a narrower factual

18    context.

19          Let me hand you Exhibit 1, and I'll tell

20    you that those are some of the progress notes that

21    are provided to us in discovery that are

22    maintained at the correction center.

23          Do you remember when Aaron McCroy went on

24    a hunger strike?

Page 25

1        A    I do not recall, no.

2        Q    All right.  You know who Dr. Elyea is?

3        A    Yes.

4        Q    Do you not?

5        A    Yes.

6        Q    Do you follow his direction, or is he

7   separate and apart from what you do at the

8   institution?

9        A    I don't know how to answer that.

10       Q    Well, do you communicate periodically

11   with Dr. Elyea?

12       A    No.  From his department Cindy Hobrock

13   (sp) could be at our monthly QA meetings

14   representing his office.  So, you know, more

15   contact with her.

16       Q    And does Cindy Hobrock when she comes on

17   a monthly basis to do quality assurance, does she

18   fill out a report as to what she sees and provide

19   it to Dr. Elyea?

20       A    I believe so.

21       Q    Take a look at the next page of these

22   medical records under nurse's note 11-6-03.  Was

23   the health care unit taking the position that

24   because Aaron McCroy went on a hunger strike to

Page 26

1    protest what he later filed in a grievance was

2    some medical reason to prevent him from seeing an

3    outside ophthalmologist to treat him for his

4    condition?

5        A    That wouldn't ben an assessment for me to

6    make.  I'm not a physician.

7        Q    Well, did Debra Fuqua ever talk to you

8    about this issue?

9        A    No.  Not that I recall.

10       Q    As far as exercising medical judgment and

11   admitting somebody into the infirmary and

12   discharging somebody from the infirmary, denying

13   privileges or access to medications, who would be

14   primarily in charge of that?  You or Debra Fuqua?

15       MS. POWELL:  Object to the form of the

16   question.  You're assuming those are the only two

17   answers.

18       MR. LONDRIGAN:  Q  Okay.  Tell me who then.

19   Who would make those decisions?  Who had the

20   authority to make those decisions?

21       A    I could admit and discharge from the

22   infirmary.  But usually that would be the

23   physician.  Or I would not be making those

24   decisions without sure that, you know, whoever my

Page 27

1     supervisor was would be in agreement.

2         Q    What I'm talking about now is the context

3     of a patient who protests by filing a grievance

4     and also goes on a hunger vehicle.  Did you have

5     the discretion to say that he can't go on furlough

6     to see his treating ophthalmologist?

7         A    I did not make decisions on going on

8     furloughs or who they would see or when.  That was

9     not in my duties.

10        Q    Okay.  That's fine.  I accept that.  Now

11    tell me who was in a position to do this that

12    would cause this issue to be sent up to

13    Dr. Elyea's level?

14        A    I'm not sure.

15        Q    Can you tell by looking at this medical

16    record?

17        A    No.

18        Q    Who signs out the patients when they go

19    on furlough to go see an outside specialist?

20        A    What do you mean by signs out?

21        Q    Authorize them to leave the health care

22    unit and to keep a doctor's appointment.  Who has

23    the responsibility for doing that?  Approving it,

24    in other words?

                    Page 28

3/9/07                    McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

1        A    A request for referral would come from

2    the physician, and then I know that physician then

3    would talk to a higher-up with the vendor company

4    in getting approvals for them to go out on their

5    furloughs.

6        Q    So you're out of that loop?

7        A    Yes.

8        Q    It would not be you.  It would be the

9    doctor?

10        A    It would not be me, yes.

11        Q    A lot of these records I've already been

12    through with the prior head of nursing, so I won't

13    need your help in explaining them, but I do have

14    some specific questions that I may want to ask you

15    about them.

16            If you look at the bottom, a lot of zeros

17    and then a 6 and a 9.  It's probably about 10

18    pages back, 10 or 12.  Just very briefly, this

19    entry of 10:30 a.m. on November 17, '03 is in your

20    handwriting; is that right?

21        A    Uh-huh.  Yes, it is.

22        Q    And is that your initial and signature in

23    the bottom corner?

24        A    Yeah.  My R. Mills CNP?

Page 29

1     Q     Yes.

2     A     Yes.

3     Q     Now, I want you to find me the next entry

4     that you've made in these records relative to

5     patient Aaron McCroy.

6     A     Okay.  There's a discharge note from

7     11-21 of '03.

8     Q     Did you notify the inmate patient that he

9     was being discharged from the infirmary when this

10    note was written?

11    A     Yes, he would be.

12    Q     And how did you do that?

13    A     Because there's patient education here

14    that he was pretty much told to use common sense

15    and protect his eye.

16    Q     He has to do that in the infirmary,

17    doesn't he?

18    A     No.  Just be like far as anywhere else,

19    clinic setting or whatever.  It's just general

20    patient education that you would let him know.

21    Q     What was the reason that he was admitted

22    to the infirmary in the first place?

23    A     After his surgery in March, he was

24    admitted to the infirmary for this reason here,

Page 30

1    for summary of reason for admission that was at

2    the time of his admission to the infirmary after

3    his surgery.

4        Q    To protect his eye from injury?  Are

5    those your words?

6        A    That's what I wrote there.

7        Q    And did you also write to avoid the

8    general population?

9        A    That was not at this point in time

10   though.  That was way back.

11       Q    No.  It wasn't.

12       A    Right.

13       Q    But that was the reason he was put there.

14            Do you think that that risk of injury to

15   that eye had ended at the time?

16       A    You know when he was in the infirmary he

17   was in a room with three other inmates.

18       Q    And they were also medical patients?

19       A    Correct.

20       Q    Did you have any, ever have any fights in

21   the infirmary since you've been there or during

22   the period of time that you were there?

23       A    Well, certainly.

24       Q    You did?  Was Aaron present when any of

Page 31

1    those fights occurred?

2        A    I don't know.  But there--I'm not sure.

3        Q    With whom did you have discussions at the

4    time that you signed this discharge note?

5        A    I'm not sure at this time.

6        Q    Did you talk to the outside treating

7    ophthalmologist that explained to the doctor what

8    the risks were and what he wanted done?

9        MS. POWELL:  I object.  The question is--.

10       MR. LONDRIGAN:  Q  All right.  Did you talk to

11   the outside treating ophthalmologist?

12       A    I did not personally, no.

13       Q    Did you know who that was?

14       A    I now know that that would have been the

15   director of nursing.  Jennifer Blaesing.

16       Q    No.  I'm not talking about the nurses in

17   the infirmary or the nurses at Western.  Did you

18   have any direct contact with his treating

19   physician who was retained by Wexford to provide--

20       A    No.

21       Q    (Continuing)--ophthalmologic care for his

22   eye condition?

23       A    No.

24       Q    On what information then did you base

Page 32

1      this decision to discharge this patient from the

2      infirmary?

3          A      There was a need for segregation, but he

4      never did leave the infirmary.  He was still in

5      the infirmary area, put in a cell designated for

6      segregation.

7          MR. LONDRIGAN:  I'm sorry.  I thought I made

8      that question clear.  But would you read it back

9      to her.

10                         (Whereupon the requested

11                          portion of the record was read

12                          back by the Reporter.)

13         THE DEPONENT:  This would have been written so

14     he could not be an infirmary patient and just put

15     in another cell to be segregation.  Because this

16     is, he was in--.

17         MR. LONDRIGAN:  Q  Was that a medical decision

18     to be made?

19         A      But he was not being released, I

20     would--to where he would be in any danger.  He was

21     going to a--he was in a cell with four people.

22     He's going now to a cell by himself but still in

23     the infirmary.

24         Q      I'm not asking you why you did what you

                        Page 33

1    did.  What I'm asking you is what medical

2    information did you seek from qualified doctors

3    that were treating his condition as to whether or

4    not he should be discharged from the infirmary?

5        A    Would those medical doctors understand

6    how the institution works though?  How would they

7    make a decision far as what's best for an inmate

8    in a institution?  Are they well versed in the

9    workings inside the institution?

10       Q    I suppose not.  What they are well versed

11   in is what's in the best interest of their patient

12   particularly if they're a specialist that was

13   chosen by a professional group like Wexford to

14   treat this patient's problems.

15       Now, what I'm asking you is what medical

16   reasons were you given by any qualified physician

17   that he should be turned over to security and kept

18   in the infirmary?

19       Nurse Mills, I'm not trying to make it

20   difficult for you.  There either was a medical

21   reason which you relied upon and if so, I want you

22   to tell me, and if there wasn't I want you to tell

23   me that too.

24       MS. POWELL:  Do you understand what he's

Page 34

3/9/07                    McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

1    asking you?

2        THE DEPONENT:  No.

3        MS. POWELL:  May I rephrase it?

4        MR. LONDRIGAN:  No.  Read it back.  I don't

5    think I can--there was no objection to the

6    question.

7        MS. POWELL:  I don't have an objection.  I

8    think the question makes sense, but I think she's

9    confused for some reason.

10        MR. LONDRIGAN:  Yes.  And I'm unable to answer

11    a question for you to help you through your

12    confusion about the question, but read that back

13    to her and just listen to it closely, and then if

14    you have a problem with that, let me know what it

15    is.

16                    (Whereupon the requested

17                     portion of the record was read

18                     back by the Reporter.)

19        MS. POWELL:  Do you understand the question?

20        THE DEPONENT:  Yeah.  I think, yes.

21        A    But I wouldn't have--.  Okay.  He

22    wasn't--.  I can't see where I would have had any

23    question in this.  I do not see how this discharge

24    with knowing where he was going was going to be of

                         Page 35

1    any medical risk to him.

2        MR. LONDRIGAN:  Q  And was that your decision

3    alone, or did you seek input from anybody else

4    that might have more knowledge from a medical

5    standpoint about his condition?

6        A    I don't understand how going from a room

7    with four inmates into this other cell, I don't

8    see where there's any question.

9        Q    There is--

10       A    Any medical question.

11       Q    There is a question, but you're

12   responding to it with an argument.  You need to

13   think about the question that I asked you and

14   answer that.

15           What qualified specialist's medical

16   advice did you seek before you decided to remove

17   him from the jurisdiction of the health care unit

18   and place him under the jurisdiction of the

19   security wing of the institution?

20       MS. POWELL:  Object to the form of your

21   question.  It assumes facts not in evidence.

22       MS. CHOATE:  I join the objection too.  To the

23   extent that it talks about the jurisdiction of.

24       MR. LONDRIGAN:  Q  Well, let me ask you

1    another question.  I'm not getting any answers.

2    I'm just asking questions.

3            What does the security division have to

4    do with appropriate health care for patients that

5    have been assigned to the infirmary?  Anything?

6        A    You're saying what does security have to

7    do with the health care of an inmate in the

8    infirmary?

9        Q    I'm saying what I said.  It didn't draw

10   an objection, and I can't say it any better.  You

11   need to answer that.  Is this your decision, or is

12   it somebody else's with more knowledge than you

13   that made a recommendation to you that this would

14   be in his best interest?

15       A    I don't recall, but I don't believe so.

16       Q    It's your decision.

17           Who else told you to do this?

18       A    Well, there's this note here--.  Okay.

19   According to this note here, that the director of

20   nursing did call Dr. Zeh who had been to the

21   specialist that Inmate McCroy was seeing.  And

22   then--.

23       Q    Did you--

24       MS. POWELL:  Let her finish her answer.

Page 37

1        MR. LONDRIGAN:  I know.  She needs to tell me,

2    what is she looking at.

3        MS. POWELL:  She's looking at page 71 of

4    Exhibit 1.

5        MR. LONDRIGAN:  Seventy-one?

6        MS. POWELL:  Yes.

7        THE DEPONENT:  So someone in health care did

8    call the specialist to make sure that this was

9    okay with him.

10       MR. LONDRIGAN:  Q  And if it wouldn't have

11   been okay with him, you wouldn't have done it?

12       A    Correct.

13       Q    Is that your answer?

14       A    Correct.  Correct.

15       Q    Okay.  Did anyone from security ask you

16   to turn over Aaron to their jurisdiction and

17   simply keep him in the infirmary?

18       MS. POWELL:  Object to the form of the

19   question.  I don't know what you mean by their

20   jurisdiction.

21       MS. CHOATE:  I object as well.

22       MR. LONDRIGAN:  Q  Well, who was calling the

23   shots after he was discharged from the infirmary?

24   Wasn't it security?

                    Page 38

1      A    Yes.

2      Q    See how easy that is?

3           Do you know that near the first of the

4    year after this discharge note that security was

5    working with the patient inmate McCroy to move him

6    out of the institution and into another prison?

7      A    No.  Would not be aware of that.

8      Q    And that really isn't a medical issue.

9           Were you aware that Aaron McCroy had

10   repeatedly asked people in the health care unit

11   and in the institution to transfer him to another

12   institution where they may have an ophthalmologist

13   either on staff or more accessible?

14     A    I don't recall any of the dealings with.

15   that.

16     Q    Who was it that transferred Aaron McCroy

17   into the general population?

18     A    Well, at this point he was discharged

19   from the infirmary, so at that point it would be

20   security.

21     Q    So they didn't have to get a discharge

22   from the health care unit in June of the year

23   following because they already had sole custody of

24   the patient even though he was assigned for

Page 39

3/9/07                          McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

1     housing?

2          MS. CHOATE:  Objection to form.

3          MR. LONDRIGAN:  Well, I haven't finished yet,

4     but you can have a continuing objection.

5               Would you read that back and I'll finish

6     it up.

7                         (Whereupon the requested

8                         portion of the record was read

9                         back by the Reporter.)

10         MR. LONDRIGAN:  Q  At the time he was released

11    into the general population?  They didn't come

12    back to you for permission, did they?

13         A    No.  I don't believe so.

14         Q    I believe you told me earlier that if

15    Aaron were discharged from the infirmary and

16    placed into the general population, that you had

17    authority to request that he be placed in a single

18    cell so he wouldn't be confronted with possibly

19    violent cell mate.  Did I understand you

20    correctly?

21         A    But he was in the infirmary with four

22    other inmates, so I don't see, I don't understand

23    how, you know.

24         Q    Did you have anybody in the infirmary who

                        Page 40

3/9/07                          McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

1    had just been released from segregation because of

2    fighting with a cell mate?

3         A    I would not know that.

4         Q    Well, if he were there, you'd know it,

5    wouldn't you?  Wouldn't you have access to his

6    history?

7         A    Not the security reasons.

8         Q    Again, I really do not want to argue with

9    you at least at this time.  Simply want to

10   understand how this happened and who's responsible

11   for it happening.  And what I understand from what

12   you told me, you lost control as far as whether or

13   not this patient would be released into the

14   general population when he was discharged from the

15   health care unit six months before; isn't that

16   right?

17        A    There would be other physicians in and

18   out overseeing Inmate McCroy.

19        Q    Well, there certainly should be,

20   shouldn't there?

21        A    Well, there's other notes here from other

22   doctors.

23        Q    Yes, there are, and I'm not going to take

24   the time to go through all those, but you'll have

                          Page 41

1    the time between now and May 1 to read again all

2    these records because they'll be with your

3    deposition.  And you'll have that time at your

4    leisure to go through these.

5              Again, I don't want to argue with you,

6    but did anyone even consult you at the time that

7    Aaron was being sent for assignment to the

8    assignment office and placed in the general

9    population?

10        A    I don't believe so.

11        MR. LONDRIGAN:  I don't either.  And that's

12   all the questions that I have.  Thank you.

13        MS. POWELL:  I don't have any questions.

14        MS. CHOATE:  I have just a couple, Theresa.

15        MS. POWELL:  Okay.

16                    EXAMINATION

17                    BY MS. CHOATE:

18        Q    Hi.  I'm Kelly Choate, and I represent

19   the DOC employees and the Department of

20   Corrections in this case.  Let me ask you

21   something.  You were asked a lot of questions

22   about an inmate, specifically Inmate McCroy, being

23   either under security jurisdiction or under the

24   health care jurisdiction.  Are those necessarily

Page 42

3/9/07                          McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

1     separate things?

2        A    No.

3        Q    In other words, can an inmate who is

4     housed in the general population still be under

5     the care of physicians for ongoing problems?

6        A    Yes.

7        Q    Can an inmate who's housed in general

8     population or segregation for that matter go to

9     see a physician whenever he needs to?

10       A    Yes.  Through the proper channels and

11    health care requests, yes.

12       Q    And are inmates who are housed in the

13    infirmary for whatever reason, are they not also

14    subject to security measures?

15       A    Yes.

16       Q    Security is involved even if they're

17    housed in the health care unit; is that correct?

18       A    Yes.

19       Q    And they're subject to health care even

20    when they're not in the health care unit, correct?

21       A    Yes.
          MS. CHOATE:  That's all I have.
22        MR. LONDRIGAN:  No more.
          MS. CHOATE:  Thank you.
23        MS. POWELL:  You have a right to read the
      transcript.  I think we want to read it.
24                      (Further deponent saith not.)

                         Page 43

1      I, RHONDA S. MILLS, having read the above and

2   foregoing, find the same to be true and correct

3   with the following additions and/or corrections,

4   if any:

5   Page_____Line_____Change:

6   Page_____Line_____Change:

7   Page_____Line_____Change:

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Rhonda S. Mills (03/09/07(                    DATE

3/9/07                         McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

1    STATE OF ILLINOIS   )
                         )  SS
2    COUNTY OF SANGAMON  )

3                    C E R T I F I C A T E

4          I, Rhonda K. O'Neal, a Notary Public,

5    Certified Shorthand Reporter, and Registered

6    Professional Reporter, in and for said County and

7    State do hereby certify that the Deponent herein,

8    RHONDA S. MILLS, prior to the taking of the

9    foregoing deposition, and on the 9th of March

10   A.D., 2007, was by me duly sworn to testify to the

11   truth, the whole truth and nothing but the truth

12   in the cause aforesaid; that the said deposition

13   was on that date taken down in shorthand by me and

14   afterwards transcribed, and that the attached

15   transcript contains a true and accurate

16   translation of my shorthand notes referred to.

17          Given under my hand and seal this 15th day

18   of March A.D., 2007.

19          _Rhonda K. O'Neal_

20          Notary Public and
            Certified Shorthand Reporter
21          and Registered Professional Reporter

22

23   License No. 084-004158

24

                         Page 45

3/9/07                          McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

Page 46

**A**

Aaron 1:5 21:1
 22:17,24 24:2
 25:23 26:24
 30:5 31:24
 38:16 39:9,16
 40:15 42:7
able 9:22 11:15
 14:3,3,8
about 7:10 9:1
 9:20 11:4
 12:20 17:13
 21:15,18 23:2
 27:8 28:2
 29:15,17
 32:16 35:12
 36:5,13,23
 42:22
above 44:1
above-entitled
 1:13
absence 15:20
accept 28:10
access 27:13
 41:5
accessible 39:13
accident 5:10
According
 37:19
accurate 45:15
acting 1:15 15:9
acts 22:9
actually 16:9
acute 12:13
addition 23:23
additions 44:3
adequate 21:19
administrativ...
 18:18
administrator
 18:19 19:2
admission 31:1
 31:2
admit 27:21
admitted 30:21
 30:24
admitting 27:11
advanced 22:1
advanced-pra...
 9:13 10:1
 13:10
advice 36:16
aforesaid 45:12

after 10:7 30:23
 31:2 38:23
 39:4
afterwards 4:9
 45:14
again 41:8 42:1
 42:5
agreed 4:2
agreement 12:1
 13:19,20,24
 15:13 16:15
 16:18,19,22
 17:2,8,21 28:1
agreements 13:6
 15:1,13,22
 17:17,17
al 1:8
ALLEN 2:5
alone 36:3
already 29:11
 39:23
always 14:8,8
 24:10,13
American 11:12
ANCC 11:12
Anderson 2:11
and/or 44:3
another 19:5
 23:18 33:15
 37:1 39:6,11
answer 23:9
 26:9 35:10
 36:14 37:11
 37:24 38:13
answered 19:21
answers 4:8
 27:17 37:1
anybody 36:3
 40:24
anyone 38:15
 42:6
anything 6:18
 21:7 37:5
anyway 22:21
anyways 11:12
anywhere 30:18
apart 26:7
APPEARAN...
 2:1
application 15:8
applied 8:16
apply 8:12
appointment
 28:22

appointments
 21:20
appropriate
 23:8 37:4
approvals 29:4
Approving
 28:23
area 7:13 17:24
 33:5
areas 7:10 9:24
argue 41:8 42:5
argument 36:12
asked 36:13
 39:10 42:21
asking 12:12
 19:19,22
 33:24 34:1,15
 35:1 37:2
assault 24:2
assessment 27:5
assigned 21:2
 24:22 37:5
 39:24
assignment 42:7
 42:8
assistant 2:12
 6:20,24 19:24
Association
 11:12
assume 12:7
assumes 36:21
assuming 27:16
assurance 26:17
attached 45:14
attempted 22:5
Attorney 2:5,12
attorneys 4:3
August 6:14
author 12:22
authority 14:6
 20:10 24:21
 27:20 40:17
Authorize 28:21
authorizing
 17:2
avoid 31:7
aware 39:7,9
A.D 4:5 45:10
 45:18
a.m 29:19

**B**

B 3:9
bachelor's 9:22

10:7
back 6:8 23:11
 23:15 29:18
 31:10 33:8,12
 35:4,12,18
 40:5,9,12
background
 5:24 16:23
BALDWIN 1:22
base 32:24
based 12:18
basis 26:17
Beardstown
 6:14
became 6:3,23
 9:6
become 6:9 7:16
before 1:13 4:3
 5:9 6:19 36:16
 41:15
began 8:16
beginning 8:15
behalf 2:4,8,11
 2:14
being 8:22 10:2
 21:4 22:24
 24:21 30:9
 33:19 42:7,22
believe 26:20
 37:15 40:13
 40:14 42:10
ben 27:5
best 20:21 34:7
 34:11 37:14
better 37:10
between 4:2
 17:8 42:1
beyond 11:9
bibliography
 8:6
bit 10:17 14:12
 14:17
Blaesing 32:15
books 8:3 13:4
boss 19:21
bottom 29:16,23
briefly 5:23
 29:18
bring 16:11
Brown 15:20
Buford 12:22
build 10:9

**C**

C 45:3,3
call 37:20 38:8
called 10:5
 11:24
calling 38:22
came 19:24
 20:10
Capitol 1:17 2:7
 4:6
care 7:5,11,11
 9:2 11:18
 12:13 16:8
 17:11 18:18
 19:2 21:2 23:3
 24:6 26:23
 28:21 32:21
 36:17 37:4,7
 38:7 39:10,22
 41:15 42:24
 43:5,11,17,19
 43:20
cared 12:19
Carl 2:9
case 1:13 19:3
 42:20
catch 14:18
categories 22:4
 22:12
cause 28:12
 45:12
cell 24:18,23,23
 25:4 33:5,15
 33:21,22 36:7
 40:18,19 41:2
center 2:6 6:7
 6:11 25:22
CENTRAL 1:2
certain 8:3,12
certainly 31:23
 41:19
certification 7:2
 7:4,7 8:8,17
 9:3 11:9,15
 14:20
certifications
 6:1 7:3
certified 4:4
 7:16 45:5,20
certify 45:7
certifying 8:20
 9:1
Change 44:5,6,7
channels 43:10
charge 27:14

Choate 2:12 3:3
 20:13 36:22
 38:21 40:2
 42:14,17,18
 43:21,22
chosen 34:13
Cindy 26:12,16
City 2:6
Civil 4:11
clear 17:14 33:8
clinic 6:14 11:21
 30:19
clinical 10:16,18
 11:1 19:10
clinically 18:17
closely 35:13
CNP 29:24
collaborating
 19:8
collaboration
 14:2
collaborative
 12:1 13:6,20
 13:24 15:1,13
 16:15,17,19
 17:8,17
collaborator
 18:2,8
collaborators
 15:20 18:9
combining 9:14
 10:4
come 8:22 29:1
 40:11
comes 26:16
comfortable
 14:2
committed 22:9
common 30:14
communicate
 26:10
company 29:3
competency
 4:12
competent 4:16
complaints
 23:20
Compound
 22:10
condition 21:3
 27:4 32:22
 34:3 36:5
conditions 25:13
conferences

3/9/07
Rhonda S. Mills

McCroy v. Illinois Dept. of Corrections

Page 47

13:3
confronted
40:18
confused 35:9
confusion 35:12
consult 42:6
contact 26:15
32:18
contained 17:1
contains 45:15
context 25:18
28:2
continuing 9:19
11:6 16:14
24:6 32:21
40:4
contract 13:16
13:19
contracts 13:5
control 41:12
copies 4:18
copy 16:11,21
corner 29:23
correct 9:9
14:21 16:1
17:12 18:12
18:14 19:4,6
19:14 20:23
22:22 24:19
24:19 31:19
38:12,14,14
43:17,20 44:2
correction 25:22
correctional 6:7
6:11 7:5,17
9:3
corrections 1:8
2:14 7:4,14
8:5 11:20
13:18 15:4,24
16:5 42:20
44:3
correctly 11:8
40:20
County 1:15,15
1:18 4:6 45:2
45:6
couple 42:14
course 8:16 9:24
10:16 25:5
Court 1:1 4:11
CSR 1:14
currently 5:20
custody 39:23

**D**

**D** 3:1 5:3
danger 33:20
date 44:24 45:13
David 2:11
day 45:17
DEA 14:6
dealings 39:14
Debra 19:3,12
27:7,14
Decatur 2:10
December 6:15
decided 9:7
36:16
decision 33:1,17
34:7 36:2
37:11,16
decisions 27:19
27:20,24 28:7
dedimus 4:11
Defendant 2:8
2:11,14
Defendants 1:9
definitive 12:10
degree 9:22
10:22 11:3,6
deliver 17:3
demanding
21:10
demands 23:3
denying 27:12
department 1:8
2:14 6:6 8:5
11:20 13:9,18
15:4,24 16:5,7
16:9,16 17:18
18:16 19:13
19:16 26:12
42:19
Depending
18:24
depends 17:22
20:14
deponent 3:1
5:1 20:14
23:16 33:13
35:2,20 38:7
43:24 45:7
deposeth 5:5
deposition 1:12
4:3,15,18 5:9
42:3 45:9,12
depositions 4:15

description
16:12 17:10
designated 33:5
determination
20:17
diagnose 12:6
14:3
diagnoses 10:4
diagnosing 18:5
diagnosis 12:5,9
12:10,11
different 7:10
9:4,24 11:19
13:3 19:8 22:4
24:7 25:1
differently 20:8
difficult 34:20
direct 20:5
32:18
directing 18:7
direction 19:7
19:15,23 20:2
26:6
director 15:21
32:15 37:19
discharge 27:21
30:6 32:4 33:1
35:23 39:4,21
discharged 30:9
34:4 38:23
39:18 40:15
41:14
discharging
27:12
discovery 25:21
discretion 28:5
discussions 32:3
dispute 21:22
disputes 21:12
21:15,18
DISTRICT 1:1
1:2
division 37:3
DOC 42:19
doctor 2:11
12:21 14:1,4,7
14:8 17:20
18:21 29:9
32:7
doctors 15:23
18:10,23 34:2
34:5 41:22
doctor's 28:22
doing 5:12 14:2

28:23
done 11:1 25:2
32:8 38:11
down 4:8 5:17
19:24 20:10
45:13
Dr 15:19,20,21
26:2,11,19
28:13 37:20
draw 37:9
duly 5:4 45:10
during 31:21
duties 13:17
28:9

**E**

E 3:1,9 45:3,3
each 5:16 11:23
earlier 40:14
easy 39:2
education 9:14
9:21 30:13,20
educational
5:24
either 14:9
34:20 39:13
42:11,23
eligible 7:15,15
elsewhere 25:12
else's 37:12
Elyea 26:2,11,19
Elyea's 28:13
emphatically
19:22
employed 5:20
18:10
employee 7:17
18:19,20
19:12
employees 19:16
42:19
employment 6:1
6:19 13:5
encompasses
16:19
ended 31:15
entered 17:20
entry 29:19 30:3
escape 22:6
Especially 12:13
Esq 2:2,9
et 1:8
evaluation
12:15

even 39:24 42:6
43:16,19
ever 5:8 16:7
18:6 22:3,5,7
22:8 24:2 25:2
27:7 31:20
every 25:2
evidence 36:21
exam 7:16,18,19
7:21 8:4,17
11:13
Examination
3:2,3 5:6
42:16
excuse 7:20
exercising 27:10
Exhibit 25:19
38:4
exhibits 25:16
exist 22:12
expense 4:18
explain 9:5,17
11:17 12:19
13:21 17:1
explained 32:7
explaining
29:13
expressly 4:11
extensive 7:8
extent 36:23
eye 21:3 24:22
30:15 31:4,15
32:22

**F**

F 2:2 45:3
face 20:2,2
fact 22:14
facts 36:21
factual 25:17
familiar 20:24
familiarity
12:18
family 10:15
far 13:5 17:10
20:4 27:10
30:18 34:7
41:12
fast 14:12
Fax 1:23
Federal 4:10
feel 12:14
field 9:6 11:18
fighting 24:18

41:2
fights 22:7
31:20 32:1
file 16:4
filed 22:24 27:1
filing 28:3
fill 26:18
find 12:3 30:3
fine 28:10
finish 37:24
40:5
finished 40:3
first 5:4 8:21
15:18 30:22
39:3
follow 20:2,12
25:7 26:6
following 39:23
44:3
follows 5:5
foregoing 44:2
45:9
form 4:13 17:6
17:17 20:13
23:4 24:8
27:15 36:20
38:18 40:2
foundation 4:16
four 33:21 36:7
40:21
from 9:4 10:22
13:2,14 17:9
19:7,15,23
20:9 23:22
26:7,12 27:2
27:12,21 29:1
30:6,9 31:4
33:1 34:2,4
36:3,4,6,17
38:15,23
39:19,22
40:15 41:1,11
41:14,21
full 5:18
Fuqua 19:3,12
27:7,14
furlough 21:20
22:2,4 28:5,19
29:5
furloughs 28:8
29:5
furnished 4:17
further 9:14
43:24

3/9/07                    McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

Page 48

---

**G**

gang 22:8
general 2:12
  11:22 14:1
  20:11 30:19
  31:8 39:17
  40:11,16
  41:14 42:8
  43:4,7
generally 23:16
generic 16:18
  17:23
getting 29:4
  37:1
give 10:5 23:18
given 7:23 21:19
  34:16 45:17
glaucoma 23:23
go 6:15 9:22,23
  13:8 21:19
  25:16 28:5,18
  28:19 29:4
  41:24 42:4
  43:8
goes 28:4
going 13:14
  14:12 22:1
  23:6 25:10,13
  28:7 33:21,22
  35:24,24 36:6
  41:23
good 12:18 13:8
graduate 6:8
graduated 6:9
grandchildren
  19:20
grievance 27:1
  28:3
grievances
  22:24
group 5:22 6:16
  34:13

---

**H**

H 3:9 5:3
hand 25:19
  45:17
handwriting
  29:20
happened 41:10
happening
  41:11
happens 18:10

hard 21:9
having 5:4 10:7
  11:14 21:24
  44:1
head 5:17 29:12
health 6:5 7:5
  7:11 9:2 11:18
  16:8 18:18
  19:2 21:2 23:3
  24:6 26:23
  28:21 36:17
  37:4,7 38:7
  39:10,22
  41:15 42:24
  43:11,17,19
  43:20
help 29:13 35:11
helpful 25:15
her 4:18 17:8,10
  23:12 26:15
  33:9 35:13
  37:24,24
hereto 4:2,16,17
HEYL 2:5
Hi 42:18
high 6:21,23
higher-up 29:3
HILL 2:9
him 14:3 23:20
  27:2,3 30:20
  36:1,17,18
  38:9,11,17
  39:5,11
himself 33:22
historically 8:21
history 6:1 12:7
  21:1 22:5 41:6
Hobrock 26:12
  26:16
hospital 6:5
  11:20
hour 4:5
hours 10:16
housed 43:4,7
  43:12,17
housing 40:1
hrs 1:23
HUGHES 2:9
Huh-uh 8:8
hunger 25:24
  26:24 28:4

---

**I**

IDENTIFICA...

3:11
IDOC 16:9
Illinois 1:2,8,16
  1:19,23 2:3,7
  2:10,13,14 4:7
  10:22 13:9,18
  14:5 16:5
  18:20 45:1
illnesses 12:14
immediate
  18:15
independent 8:9
  8:10 20:17
INDIANA 1:23
individual 15:5
  15:23
infirmary 21:3,5
  24:4 27:11,12
  27:22 30:9,16
  30:22,24 31:2
  31:16,21
  32:17 33:2,4,5
  33:14,23 34:4
  34:18 37:5,8
  38:17,23
  39:19 40:15
  40:21,24
  43:13
information
  32:24 34:2
initial 29:22
injury 31:4,14
inmate 21:1,4
  21:10 22:17
  23:1 30:8 34:7
  37:7,21 39:5
  41:18 42:22
  42:22 43:3,7
inmates 17:4,11
  21:24 31:17
  36:7 40:22
  43:12
input 36:3
inside 34:9
instance 4:5
  12:4 24:22
instances 23:2
institution 18:11
  22:18 24:9
  26:8 34:6,8,9
  36:19 39:6,11
  39:12
interest 20:22
  34:11 37:14

interested 9:6
interrogatories
  4:5,8
involved 22:7
  43:16
issue 22:20,21
  27:8 28:12
  39:8
issues 13:4
  19:10

---

**J**

J 2:9
January 6:16
Jennifer 32:15
job 16:11 17:10
join 36:22
judge 23:7
judgment 22:16
  27:10
June 39:22
jurisdiction
  36:17,18,23
  38:16,20
  42:23,24
just 5:10 7:13
  9:13 13:19,24
  14:12 16:16
  16:24 17:6,14
  17:23 18:4
  20:20 23:16
  29:18 30:18
  30:19 33:14
  35:13 37:2
  41:1 42:14

---

**K**

K 1:13 4:3 45:4
keep 28:22
  38:17
keeping 20:4
Kelly 2:12 42:18
kept 34:17
keratoconus
  23:24
kind 18:3
know 8:22 9:19
  14:7 16:20
  17:24 22:11
  22:13 24:5,14
  26:2,9,14
  27:24 29:2
  30:20 31:16
  32:2,13,14

35:14 38:1,19
  39:3 40:23
  41:3,4
knowing 35:24
knowledge 9:15
  36:4 37:12

---

**L**

L 4:1 5:3,3
later 23:7 27:1
Law 2:5
lawyer 13:22
layman 17:1
learned 13:2
least 7:13 41:9
leave 28:21 33:4
left 6:15
legal 13:4
legally 11:16
  13:15
LEGAL-VIS...
  1:22
leisure 42:4
let 17:6 25:1,10
  25:19 30:20
  35:14 36:24
  37:24 42:20
letter 13:20
letters 11:13
level 10:5 28:13
license 14:5
  45:23
licensed 24:20
like 10:18 12:13
  14:5 16:17
  17:9,10 20:6
  30:18 34:13
Line 44:5,6,7
lines 13:11
listen 35:13
literature 12:19
little 14:12,17
local 6:5
Lochard 15:21
Londrigan 2:2,2
  3:2 5:7 17:12
  17:16 20:16
  22:11 23:6,11
  23:18 27:18
  32:10 33:7,17
  35:4,10 36:2
  36:24 38:1,5
  38:10,22 40:3
  40:10 42:11

43:22
long 8:14 14:7
look 26:21 29:16
looked 22:3
looking 28:15
  38:2,3
loop 29:6
lost 41:12
lot 23:7 29:11
  29:16 42:21
L.L.C 2:9

---

**M**

M 5:3
made 12:22 23:2
  25:6 30:4 33:7
  33:18 37:13
maintained
  22:12 25:22
make 10:1,4
  12:10 17:14
  20:16 22:16
  27:6,19,20
  28:7 34:7,19
  38:8
makes 35:8
making 20:6
  23:20 27:23
mandated 25:9
many 7:12 10:16
  13:3
March 1:17 4:5
  30:23 45:9,18
MARKED 3:11
master's 9:23
  10:10,12,18
  11:4,5
mate 40:19 41:2
materiality 4:13
materials 7:23
  8:1,11,13
mates 24:18
matter 17:20
  43:8
may 4:3,8,15,17
  14:17 17:12
  29:14 35:3
  39:12 42:1
Maybe 45:15
McCROY 1:5
  21:1,4 22:17
  22:24 24:2
  25:23 26:24
  30:5 37:21

---

39:5,9,16
41:18 42:22
MD 12:16
MDs 10:19
mean 9:1 24:14
25:10,12
28:20 38:19
measures 43:14
medical 5:22
6:16,20,24
9:15 10:4,22
12:7 15:21
20:5,6,14,17
20:24 22:21
25:13 26:22
27:2,10 28:15
31:18 33:17
34:1,5,15,20
36:1,4,10,15
39:8
medically 25:3
medication
21:12
medications
27:13
medicine 9:7
meetings 26:13
member 22:8
mentioned 12:5
14:24 22:23
mid 10:5
might 36:4
Mills 1:12 3:2
4:3 5:8,19
29:24 34:19
44:1,24 45:8
mind 20:4
mirroring 18:1
18:3
MISSOURI
1:23
monthly 26:13
26:17
months 41:15
more 12:15 20:9
23:17 25:15
26:14 36:4
37:12 39:13
43:22
move 21:8 39:5
Mt 6:7 10:21
much 10:18 14:1
16:18 18:1
22:1 30:14

must 11:24

_____
N
_____
N 3:1 4:1 5:3
name 5:18
Nancy 12:22
narrower 25:17
national 2:6
8:11 11:13
near 39:3
necessarily
42:24
need 9:5,17
12:14,15
14:19 29:13
33:3 36:12
37:11
needs 38:1 43:9
nervous 14:17
never 33:4
new 8:19
next 26:21 30:3
Nodded 5:17
None 3:12
normally 24:8
North 1:17 2:7
2:10 4:6
Notary 1:14 4:3
5:2,4 45:4,20
note 26:22 30:6
30:10 32:4
37:18,19 39:4
noted 4:14
notes 25:20
41:21 45:16
nothing 9:19
45:11
notice 1:19
notify 30:8
November
29:19
number 3:1,11
14:6 16:23
22:23
nurse 5:8,21 6:3
6:9,11 8:20
9:2,8,11,13,13
9:15,18,20
10:1,2,15,19
11:10,18,23
12:20,23 13:4
13:10,10,12
13:15 14:22
15:9,14 19:5

34:19
nurses 32:16,17
nurse's 26:22
nursing 6:19
9:14,21,23
10:7,9,11,12
11:6 13:11
29:12 32:15
37:20

_____
O
_____
O 4:1 5:3
object 17:6
20:13 23:4
27:15 32:9
36:20 38:18
38:21
objection 4:13
22:10 35:5,7
36:22 37:10
40:2,4
objections 4:12
obtained 8:1,4
occasions 24:7
occurred 32:1
office 11:2 26:14
42:8
okay 5:11,23 6:3
6:12 8:24 9:5
9:17,18,21
10:8,13,24
11:17 12:24
13:13 14:14
14:16 15:7,12
15:16,18,22
17:5 18:15,17
19:7,15 20:20
20:24 24:2
25:15 27:18
28:10 30:6
35:21 37:18
38:9,11,15
42:15
Old 1:17 2:7 4:6
one 1:17 2:7 4:6
10:1 13:18
15:19 16:6,9
18:19,20,21
22:13
ongoing 43:5
only 27:16
ophthalmologic
32:21
ophthalmologist

23:22 27:3
28:6 32:7,11
39:12
ophthalmologi...
21:20
opportunity
21:21
oral 4:4,8 7:8,19
7:20
order 20:12
orders 20:5
org 8:10
organization 8:9
8:11
other 5:16 10:19
15:17 19:1
21:7 22:13
23:2 24:3,15
24:23 25:12
28:24 31:17
36:7 40:22
41:17,21,21
43:3
others 22:18
25:14
otherwise 11:14
out 6:6,21,23
12:3 13:11,17
22:1,3 25:11
25:12 26:18
28:18,20 29:4
29:6 39:6
41:18
outline 5:23
17:19
outside 23:21
27:3 28:19
32:6,11
over 7:14 21:12
24:3 34:17
38:16
overseeing
41:18
own 4:18 7:9,22
8:1 14:6 20:16
o'clock 1:16 4:6
O'Neal 1:14 4:3
45:4

_____
P
_____
P 4:1
page 3:1 26:21
38:3 44:5,6,7
pages 29:18

particular 23:17
particularly
34:12
parties 4:2,16
parts 4:15
party 4:17 15:17
part-time 10:3
past 6:15,15
patient 12:21
20:11,22 21:1
22:17 23:1
24:12,21 25:3
28:3 30:5,8,13
30:20 33:1,14
34:11 39:5,24
41:13
patients 14:4
17:3 18:3 24:3
28:18 31:18
37:4
patient's 34:14
people 23:3
24:16,17
33:21 39:10
perform 9:15
period 8:14
31:22
periodically
26:10
permission
40:12
person 19:1
personally
32:12
physician 12:1
17:9 18:17
27:6,23 29:2,2
32:19 34:16
43:9
physicians 15:3
15:6 19:9
41:17 43:5
pick 14:15
place 13:8 15:12
16:6 21:16
24:17 30:22
36:18
placed 20:11
24:8,15,23
25:4 40:16,17
42:8
placement 25:2
25:7
Plaintiff 1:6 2:4

4:5
Plaza 1:18 2:7
4:6
please 5:18
plural 15:13
point 31:9 39:18
39:19
poked 24:21
population
20:12 31:8
39:17 40:11
40:16 41:14
42:9 43:4,8
portion 23:14
33:11 35:17
40:8
position 26:23
28:11
possibly 40:18
POTTER 2:2
Powell 2:5 17:6
17:13 22:10
23:4 27:15
32:9 34:24
35:3,7,19
36:20 37:24
38:3,6,18
42:13,15
43:23
practice 11:11
11:15,22
13:12 16:20
practitioner
5:21 6:9,11
9:2,8,11,16,18
9:20 10:2,15
11:10,19,24
12:20 13:12
13:15 14:22
15:10,14
24:20
practitioners
8:21 10:19
12:23 13:4,11
predator 22:6
preparation
8:15
prepare 7:24
8:4,6,13
prepared 17:18
prescriptions
12:11 18:6
prescriptive
14:6

3/9/07                          McCroy v. Illinois Dept. of Corrections
Rhonda S. Mills

Page 50

present 6:2
31:24
pretty 13:24
16:18 18:1
30:14
prevent 27:2
primarily 27:14
prior 29:12 45:8
prison 39:6
prisoners 7:11
24:24
privileges 27:13
probably 14:18
29:17
problem 35:14
problems 5:14
34:14 43:5
Procedure 4:11
process 5:11
professional 4:4
16:7,16 34:13
45:6,21
program 10:3,6
progress 25:20
proof 4:16
proper 43:10
protect 24:11,12
30:15 31:4
protest 27:1
protests 28:3
provide 26:18
32:19
provided 8:5
25:21
providing 17:11
provisional 12:9
Public 1:14 4:4
5:2,4 45:4,20
punishment
24:9,13,14
purpose 4:15
purposes 24:11
pursuant 1:19
put 25:10 31:13
33:5,14
P.C 2:2
P.M 1:16 4:6

_____ Q _____

QA 26:13
qualified 12:4
12:21 15:8
34:2,16 36:15
quality 26:17

question 4:13
12:12 14:10
17:7,14 18:7
19:21 22:10
23:5,8,10
27:16 32:9
33:8 35:6,8,11
35:12,19,23
36:8,10,11,13
36:21 37:1
38:19
questions 5:15
25:17 29:14
37:2 42:12,13
42:21
question's 20:7
Quincy 5:21
6:16,17 10:21
quite 7:8

_____ R _____

R 5:3 29:24 45:3
RANDLE 2:2
rather 15:23
reach 14:8
reachable 14:10
read 8:7 23:11
23:14 33:8,11
35:4,12,17
40:5,8 42:1
43:23,23 44:1
really 17:13
19:7 20:6 39:8
41:8
reason 27:2
30:21,24 31:1
31:13 34:21
35:9 43:13
reasons 21:23
21:24 24:15
34:16 41:7
recall 21:14,16
21:22 23:2
26:1 27:9
37:15 39:14
receive 7:6
received 7:4
8:17 14:20
recommendati...
25:6,7 37:13
recommended
8:2,12 13:1
record 17:15
23:14 28:16

33:11 35:17
40:8
records 26:22
29:11 30:4
42:2
refer 12:16
reference 12:17
references 8:2
referral 29:1
referred 18:9
45:16
registered 4:4
6:3 19:5 45:5
45:21
Regulation 13:9
16:7,16 17:18
relative 30:4
released 33:19
40:10 41:1,13
relevancy 4:13
relied 34:21
remember 8:5
8:18 21:4,6,7
21:9 23:20
25:23
remove 36:16
repeatedly
39:10
rephrase 5:15
35:3
report 26:18
Reporter 4:4,4,9
23:15 33:12
35:18 40:9
45:5,6,20,21
REPORTING
1:22
represent 42:18
representing
26:14
request 16:8
29:1 40:17
requested 23:13
33:10 35:16
40:7
requests 43:11
requirements
4:10
reserved 4:13
responding
36:12
responsibilities
13:17 17:19
responsibility

28:23
responsible 19:2
41:10
resulted 22:24
retained 32:19
reword 20:8
Rhonda 1:12,13
3:2 4:3,3 5:19
44:1,24 45:4,8
right 5:13 6:21
6:23 9:10 11:7
11:11,11 12:8
12:8 16:2,3
17:21 18:13
18:22 20:8
26:2 29:20
31:12 32:10
41:16 43:23
risk 22:18 24:21
25:3 31:14
36:1
risks 32:8
RN 6:7 9:22
room 31:17 36:6
ROYSTER 2:5
RPR 1:14
rule 23:7 25:11
25:11
Rules 4:10,11

_____ S _____

S 1:12 3:9 4:1,3
5:3,3 44:1,24
45:8
saith 5:5 43:24
same 14:4 44:2
sample 16:17
Sangamon 1:14
1:16,18 4:6
45:2
saying 14:1,7
17:24 20:18
37:6,9
says 20:1
school 6:8,8,21
6:23
schooling 7:1
scope 11:22
13:11,12
16:20 17:2
seal 45:17
Second 2:13
section 13:10
security 19:16

19:24 20:4,9
20:21 21:23
22:12,18,20
24:10,15
34:17 36:19
37:3,6 38:15
38:24 39:4,20
41:7 42:23
43:14,16
see 8:19 14:3,5
28:6,8,19
35:22,23 36:8
39:2 40:22
43:9
seeing 27:2
37:21
seek 34:2 36:3
36:16
seeking 17:15
sees 26:18
segregation 24:8
24:16,18 33:3
33:6,15 41:1
43:8
sense 30:14 35:8
sent 16:9 28:12
42:7
separate 17:9
26:7 43:1
September 6:10
services 1:22
17:3
SERVING 1:23
set 11:13 21:16
setting 13:5,6
30:19
settings 11:19
Seventh 2:3
Seventy-one
38:5
several 9:24
18:23
sexual 22:6
share 21:6
shorthand 4:4,9
45:5,13,16,20
shots 38:23
shower 21:21
signature 29:22
signed 32:4
signs 28:18,20
Simms 15:19
simple 12:14
simply 20:20

38:17 41:9
since 16:21
31:21
single 24:22
25:4 40:17
sit 7:15,15
site 11:23 16:17
17:22
situation 14:11
20:15
six 41:15
slowly 16:24
sole 39:23
some 9:14 25:16
25:17,20 27:2
29:14 35:9
somebody 25:11
27:11,12
37:12
someone 19:23
20:9 38:7
something 9:3
13:2 21:8
42:21
Sometimes
24:10,17
sorry 33:7
sources 19:8
South 2:3,13
Southern 10:22
sp 26:13
specialist 28:19
34:12 37:21
38:8
specialist's
36:15
specialization
10:15
specific 23:17
23:19 29:14
specifically 4:14
20:9 24:1
42:22
spells 13:16
spent 24:3
Springfield 1:18
2:3,7,13 4:6
SS 45:1
staff 39:13
standpoint 36:5
start 6:16 8:20
10:3
started 6:4,6,10
15:18

3/9/07
Rhonda S. Mills

McCroy v. Illinois Dept. of Corrections

Page 51

| | | | | | |
|---|---|---|---|---|---|
| state 1:16,17 2:7 4:6 5:18 13:14 13:15 18:20 45:1,7 | taking 7:11 9:13 9:21 26:23 45:8 | time 8:3,17 9:11 12:20 14:18 16:24 22:16 31:2,9,15,22 32:4,5 40:10 | understand 5:11 5:16 7:18 9:10 9:12 11:8 13:22 16:23 34:5,24 35:19 | 21:11,11,11 32:8 warden 19:24 warning 21:19 22:1 | working 6:4 7:12,14 10:10 11:20,21 17:23 18:1 39:5 |
| statement 14:1 statements 17:23 | talk 27:7 29:3 32:6,10 talking 9:1 11:4 28:2 32:16 | 41:9,24 42:1,3 42:6 times 24:14 | 36:6 40:19,22 41:10,11 understanding | wasn't 17:13 31:11 34:22 35:22 38:24 | workings 34:9 works 34:6 wouldn't 19:23 |
| STATES 1:1 stayed 6:13 Sterling 6:7 10:21 | talks 36:23 TB 25:11 team 18:5 telephone 2:14 | told 17:16 20:1 20:21 23:21 25:2 30:14 37:17 40:14 | 7:10,10 unit 16:8 18:18 19:2 21:2 23:3 24:6 26:23 | Water 2:10 way 6:18 20:6 22:13 25:1 31:10 | 20:20 22:21 27:5 35:21 38:10,11 40:18 41:5,5 |
| steroid-induced 23:23 still 33:4,22 43:4 stipulated 4:2 | 14:9 television 21:16 tell 5:15 12:17 19:22 25:19 | 41:12 totally 9:4 towards 10:10 transcribed 4:9 | 28:22 36:17 39:10,22 41:15 43:17 43:20 | well 17:7,22 19:20 20:3 21:9 24:13 26:10 27:7 | write 12:11 31:7 writing 18:6 written 7:21,21 30:10 33:13 |
| Street 2:3,10,13 strike 25:24 26:24 studies 10:14 | 27:18 28:11 28:15 34:22 34:22 38:1 Tenney 2:9,9 | 45:14 transcript 43:23 45:15 transfer 39:11 | UNITED 1:1 University-Ed... 10:23 unless 4:14 | 31:23 34:8,10 36:24 37:18 38:21,22 39:18 40:3 | wrote 31:6 **X** X 3:1,9 |
| study 8:16 10:17 13:1 subject 43:14,19 Sue 5:19 | test 7:9,24 8:12 testify 45:10 text 12:18,24 13:1 | transferred 39:16 translation 45:16 | until 6:13 use 30:14 used 4:15 12:24 16:15 | 41:4,19,21 went 6:8,14,19 6:22 14:21 22:3 25:23 | **Y** yeah 7:3 10:12 12:6 18:24 |
| suffering 23:22 Suite 1:18 2:6 4:6 summary 31:1 | texts 12:23 Thank 42:12 43:22 their 4:2 8:11 | treat 27:3 34:14 treating 18:5 23:21 28:6 32:6,11,18 | usually 25:7 27:22 _____ **V** | 26:24 were 7:15,23 8:3 10:14 15:3,3,8 | 29:24 35:20 year 7:14 24:3 39:4,22 years 7:12 |
| supervisor 18:15 28:1 suppose 19:24 34:10 | 24:18 29:4 34:11 38:16 38:19 thereof 4:15 | 34:3 treatment 10:5 17:11 18:4 21:3 | various 11:2 vary 13:14 vehicle 28:4 vendor 18:10,19 | 15:9,14,22,22 17:17,18,19 19:1,9,16 21:12,15,18 | _____ **Z** Zeh 37:20 zeros 29:16 |
| Supreme 4:11 sure 8:23 15:19 16:10,22 17:13 27:24 | Theresa 2:5 42:14 thesis 10:17 things 13:22 | true 44:2 45:15 truth 45:11,11 45:11 try 5:15 | 29:3 verbally 20:1 versed 34:8,10 very 16:24 | 31:18,22 32:8 34:3,16 39:9 40:15 41:4 42:21 | _____ **0** 01 6:10,10 |
| 28:14 32:2,5 38:8 surgery 30:23 31:3 | 20:3 22:23 25:12 43:1 think 17:7 20:10 31:14 35:5,8,8 | trying 12:3 25:11 34:19 turn 38:16 turned 34:17 | 19:21 21:10 29:18 via 2:14 violence 22:9 | weren't 20:21 Western 14:21 15:10,14 17:4 24:9 32:17 | 02-3171 1:7 03 29:19 30:7 03/09/07 44:24 05 6:13,14 |
| sworn 5:2,4 45:10 system 12:4 | 35:20 36:13 43:23 Thomas 2:2 though 31:10 | two 18:17 19:8 27:16 type 12:12 14:4 types 18:2 | violent 40:19 vis-a-vis 12:21 VOELKER 2:5 vs 1:7 | Wexford 19:9 32:19 34:13 we're 5:12 while 15:9,14 | 084-004158 45:23 _____ **1** |
| _____ **T** T 3:9 4:1,1 45:3 45:3 | 34:6 39:24 thought 17:16 33:7 three 31:17 | _____ **U** U 4:1 | _____ **W** waived 4:11,13 | 21:2 23:1 24:3 whole 10:17 45:11 wing 36:19 | 1 25:19 38:4 42:1 1-800-248-2835 1:24 |
| take 7:16 12:7 12:20 13:7 14:18 16:24 | three-year 10:3 10:6 through 4:2 | Uh-huh 15:2 18:24 29:21 unable 35:10 | want 5:18 14:19 20:1 21:24 23:11 29:14 | witness 4:8 5:10 worded 20:7 words 28:24 | 1:57 1:16 4:6 10 29:17,18 10:30 29:19 |
| 19:15,23 21:21 26:21 41:23 | 19:10 25:16 29:12 35:11 41:24 42:4 | under 13:9 26:22 36:18 42:23,23 43:4 | 30:3 34:21,22 41:8,9 42:5 43:23 | 31:5 43:3 work 6:16 11:23 12:2 14:21 | 11-21 30:7 11-6-03 26:22 12 29:18 |
| taken 1:12 4:3,8 5:9 45:13 | 43:10 | 45:17 | wanted 9:7 | worked 6:4 | 1227 2:3 |

**15th** 45:17
**17** 29:19

---
### 2
**2007** 1:17 4:5
   45:10,18
**217** 1:23,23
**236** 2:10
**24** 1:23

---
### 4
**42** 3:3

---
### 5
**5** 3:2
**500** 2:13
**575** 1:18 2:6 4:6

---
### 6
**6** 29:17
**62525-0560** 2:10
**62701** 2:7
**62703** 2:3
**62706** 2:13

---
### 7
**71** 38:3
**788-2835** 1:23
**788-2838** 1:23

---
### 9
**9** 1:17 29:17
**9th** 4:5 45:9
**91** 6:4,4
**96** 6:6
**98** 6:8