3:02-cv-03171-HAB-BGC   # 380-11   Page 1 of 47

E-FILED

2/2/07
Bryon Law

McCroy v. Illinois Department of Corrections

Friday, 04 May, 2007 02:25:18 PM
Clerk, U.S. District Court, ILCD

```
 1                UNITED STATES DISTRICT COURT

 2            FOR THE CENTRAL DISTRICT OF ILLINOIS

 3                   SPRINGFIELD DIVISION

 4

 5   AARON McCROY,

 6           Plaintiff,

 7      vs.                        No. 02-3171

 8   ILLINOIS DEPARTMENT OF
     CORRECTIONS, et al,
 9
             Defendants.
10

11

12

13           THE DEPOSITION of BRYON LAW, taken in the

14   above-entitled case before Debra K. Baldwin, a

15   Notary Public of Sangamon County, acting within and

16   for the County of Sangamon, State of Illinois, at

17   10:30 o'clock A.M., on February 2, 2007, at Western

18   Illinois Correctional Center, Mt. Sterling, Brown

19   County, Illinois, pursuant to notice.

20

21

22

          Baldwin Reporting & Legal-Visual Services
23           Serving Illinois, Indiana & Missouri
        24hrs (217)788-2835    Fax (217)788-2838
24                  1-800-248-2835
```



Page 1

```
 1     APPEARANCES:

 2          LONDRIGAN, POTTER & RANDLE
            BY:  Thomas F. Londrigan, Esq.
 3               1227 South Seventh Street
                 Springfield, Illinois 62703
 4               On behalf of Plaintiff.

 5          MS. KELLY CHOATE
                 Assistant Attorney General
 6               500 South Second Street
                 Springfield, Illinois 62706
 7               On behalf of Defendant Illinois
                 Department of Corrections.
 8
            HEYL, ROYSTER, VOELKER & ALLEN
 9          BY:  Ms. April Troemper
                 Attorney at Law
10               National City Bank Building, Suite 575
                 Springfield, Illinois 62701
11               On behalf of Defendant.

12          HUGHES, HILL & TENNEY, LLC.
            BY:  Carl J. Tenney, Esq.
13               236 North Water Street
                 Decatur, Illinois 62525
14               On behalf of Defendant Doctor David
                 Anderson.
15

16

17

18

19

20

21

22

23

24
```

2/2/07                    McCroy v. Illinois Department of Corrections
Bryon Law



1                          I N D E X

2     DEPONENT                              PAGE NUMBER

3     Bryon Law

4          Examination by Mr. Londrigan        5, 38
           Examination by Ms. Choate             32
5

6

7

8

9

10

11                     E X H I B I T S

12    NUMBER                      MARKED FOR IDENTIFICATION

13    (None.)

14

15

16

17

18

19

20

21

22

23

24

Baldwin Court Reporting & Legal Video Services
1-800-248-2835

2/2/07                          McCroy v. Illinois Department of Corrections
Bryon Law

1                        S T I P U L A T I O N

2              It is stipulated and agreed, by and
     between the parties hereto, through their
3    attorneys, that the deposition of BRYON LAW may be
     taken before Debra K. Baldwin, a Notary Public and
4    Certified Shorthand Reporter and Registered
     Professional Reporter, upon oral interrogatories,
5    on the 2nd of February A.D., 2007, at the instance
     of the Plaintiff at the hour of 10:30 o'clock A.M.,
6    Western Illinois Correctional Center, Mt. Sterling,
     Brown County, Illinois;
7
               That the oral interrogatories and the
8    answers of the witness may be taken down in
     shorthand by the Reporter and afterwards
9    transcribed;

10             That all requirements of the Federal
     Rules of Civil Procedure and the Rules of the
11   Supreme Court as to dedimus, and the reading over
     and signing of the deposition by the witness, are
12   expressly waived;

13             That any objections as to competency,
     materiality or relevancy are hereby reserved, but
14   any objection as to the form of question is waived
     unless specifically noted;

15
               That the deposition, or any parts thereof
16   may be used for any purpose for which depositions
     are competent, by any of the parties hereto,
17   without foundation proof;

18             That any party hereto may be furnished
     copies of the deposition at his or her own expense.
19

20

21

22

23

24

                              Page 4

                Baldwin Court Reporting & Legal Video Services
                            1-800-248-2835

```
 1                    (Whereupon the Deponent was

 2                    sworn by the Notary Public.)

 3              B R Y O N   L A W

 4    having been first duly sworn by the Notary Public,

 5    deposeth and saith as follows:

 6                    EXAMINATION

 7              BY MR. LONDRIGAN:

 8        Q    State your full name, please.

 9        A    Bryon David Law. It's B-r-y-o-n.

10        Q    o-n?

11        A    Right.

12        Q    And your current rank is lieutenant?

13        A    That's correct.

14        Q    And in what division of the department?

15        A    Department of corrections. You mean as

16    far as the agency is the department of corrections

17    in Western Illinois Correctional Center here.

18    Mt. Sterling.

19        Q    Have you ever seen an organizational

20    chart here as to the various divisions within the

21    department, particularly here at Western, as to how

22    they're interrelated and who occupies those

23    positions?

24        A    I'm not sure what you mean.
```

Page 5

1      Q    That shows who your supervisor is and the

2    chain of command, in general.

3      A    No particular chart.  I mean, it's pretty

4    understood the chain of command. It's dealt with by

5    rank. It starts from the correctional officers, to

6    the sergeants, to the lieutenants, and then to the

7    majors now, and then to the assistant wardens and

8    the warden as far as that goes.

9      Q    Who is the assistant warden that the

10   majors answer to?

11     A    Well, I mean depending on--directly would

12   be the assistant warden of operations, but they all

13   kind of answer to each other as they have duty--as

14   service duty wardens.

15     Q    And your group handles security.  Is that

16   right?

17     A    Yes.

18     Q    Give me a brief summary of your

19   educational background and your employment history

20   up to the present time.

21       THE DEPONENT: As far as education, I mean, is

22   that relevant for this?

23       MS. CHOATE: Well, just did you complete high

24   school?

Page 6

1          THE DEPONENT: Yes.

2          MS. CHOATE: I would object to any specific

3    schools for security reasons and instruct him not

4    to answer specific schools.

5          THE DEPONENT: I'm a high school graduate. As

6    far as my years of service with the department,

7    I'll be 18 years in about four days, four years as

8    a correctional officer, and almost 13 years as a

9    lieutenant. Be 14 this August.

10         MR. LONDRIGAN:   Q   And do correction officers,

11   do they follow the chain of command under security?

12   In other words, when you went from correctional

13   officer to your current or prior rank, was that a

14   change within a department or the same department?

15         A    No. It would be the same department. It's

16   all department of corrections. I guess I don't

17   understand the question.

18         Q    Well, you're with this institution here--

19         A    That's correct.

20         Q    (Continuing)--here at Western?

21         A    Right.

22         Q    Are you in any subdivision of the

23   department? Does it have a name?

24         A    Not that I'm aware of. I guess I don't

Page 7

1    understand.

2        Q.    Well, could you be rotated, for instance,

3    to other positions within this department?

4        A     You mean facilities?

5        Q     Your current job description. What's your

6    current job description?

7        A     My current job description says that I'm

8    a correctional lieutenant and I'm responsible for

9    the subordinant staff assigned to me as far as

10   sergeants, officers. I mean, your question's kind

11   of vague. I don't understand the specifics of it.

12       Q     Well, I need to know if you have

13   different jurisdiction, for instance, than the

14   healthcare department?

15       A     No. I don't have any anything to do with

16   healthcare. I mean, we have certain security

17   requirements that we provide over there, but as far

18   as the healthcare needs of an inmate, or even in

19   the staff or emergency needs, we don't have

20   anything to do with that, just the initial

21   response, and then first aid, and then the

22   healthcare unit as far as assignment and stuff like

23   that.

24       Q     What was your initial rank when you came

Page 8

1    in?

2        A    Correctional officer.

3        Q    And you came right out of high school.

4    Right?

5        A    Right.

6        Q    And right now you're a lieutenant?

7        A    That's correct.

8        Q    What, if any, material were you given to

9    review before your deposition here today?

10       A    I haven't--. I don't recall ever

11   receiving a copy of the complaint even. I don't

12   know if you have a copy of where I've signed for. I

13   don't think I was ever given it.  So I really don't

14   know what my involvement in this case is until now.

15       Q    When were you first informed that you

16   were to give testimony here today?

17       A    Whenever you guys scheduled the last

18   appointment that you changed. What was that? I

19   don't know.

20       Q    So nobody had talked to you before about

21   the need to give a deposition or testimony at

22   trial?

23       A    No. Just the litigation coordinator here

24   said that you guys were coming and I think it was a

Page 9

1    month or ago or so that you had originally planned

2    to come and then something happened, couldn't make

3    it or whatever.

4        Q    Well, did the coordinator or anyone else

5    ask that you review any records or documents that

6    are maintained here at Western?

7        A    No.

8        Q    It's my understanding, and you correct me

9    if that's wrong, that you conducted an

10   investigation that involved a fight between Aaron

11   McCroy and another inmate whose last name was

12   Durham. Is that correct?

13       A    No.

14       MS. CHOATE: I think you've got Crary mixed up

15   with Law. Crary was the IA guy.

16       MR. LONDRIGAN: All right. Just a second.

17           Q  Do you recall when this fight

18   occurred?

19       A    No. I was--. No.

20       Q    Do you recall before the fight being

21   asked by Aaron McCroy for a transfer from his cell?

22       A    No.

23       Q    Do you recall another defendant by the

24   name of Kellerman here? Do you know who he is?

                        Page 10

1        A    Officer Kellerman?

2        Q    Yes.

3        A    Yes. I know who Officer Kellerman is.

4        Q    And what's his rank?

5        A    I believe it's still officer.

6        Q    And vis-a-vis what your job and

7   responsibility is, what were his duties in the

8   summer of 2004?

9        A    Well, I don't know exactly that date.

10  Without looking at rosters or reports, I don't know

11  what his actual job would have been that day.

12       Q    Do you remember Aaron McCroy?

13       A    Mr. McCroy? Yes, I do. I do recall him.

14       Q    And do you remember when this incident

15  occurred, when the fight occurred and he lost his

16  eye?

17       A    Not exactly. I mean, I recall it as,

18  I mean, just basic memory, but as far as the dates,

19  I didn't know that he lost his eye. I remember an

20  altercation, but I wasn't here when it happened.

21       Q    What's Kellerman's rank?

22       A    Officer.

23       Q    So you would be a senior officer to him

24  as a lieutenant?

Page 11

2/2/07                    McCroy v. Illinois Department of Corrections
Bryon Law

1        A    Well, I'd be his supervisor.

2        Q    Do you recall Kellerman asking you about

3    a request that was made by my client Aaron McCroy

4    for a transfer from that cell?

5        A    No.

6        Q    If that request had been made of you, or

7    any other officer, what are your instructions to

8    inmates as to tell them what they have to do to get

9    out of that cell if they they've, for instance, had

10   some fear that there may be a fight or an

11   altercation?

12       A    Well, if an inmate comes to me and tells

13   me he fears for his safety, we're going to place

14   him in either investigative confinement or if he

15   wants to refuse housing, if he doesn't want to--if

16   he fears for his safety and will refuse direct

17   orders to accept his housing assignment, then he'll

18   be moved to segregation for his safety.

19            Usually what will happen is he'll be

20   placed in investigative confinement if he would

21   make those statements until they can conduct an

22   investigation to determine whether or not he does

23   have a safety concern.

24       Q    What are you instructed if an inmate

                    Page 12

1    comes to you verbally and tells you he wants a

2    transfer for his own safety?

3         A    A transfer? Just a routine transfer?

4         Q    Yes.

5         A    Or a cell transfer?

6         Q    Well,--

7         A    I don't deal with transfers to another

8    facility.

9         Q    Hold on. You obviously draw a distinction

10   between a transfer and a cell transfer?

11        A    Well,--

12        Q    Explain to me what you mean when you

13   say--

14        A    A transfer to me means an inmate's moving

15   from facility to facility. That's a transfer. A

16   cell change is when they go from one cell to

17   another. That's a cell change.

18        Q    Okay. I want you to understand I'm not

19   familiar with these terms and maybe your inmates

20   are.

21        A    Okay.  Well, I just want to make sure.

22        Q    What are you instructed to do if a

23   cellmate asks for a cell transfer because he fears

24   for his own safety?

1        A    If an inmate comes to me, it don't make--

2    like I said, if he comes to me and asks, says I

3    fear for my safety, then we have to make a move.

4    There's no going back. The inmate's going to be

5    escorted to segregation. He's going to be placed in

6    investigative confinement until they can do--

7    internal affairs can do their investigation to

8    determine whether or not a safety concern exists.

9        Q    How do you document the fact when a

10   cellmate tells you I need to get out of here

11   because I fear for my safety?

12       A    There'll be an incident report written

13   and then an investigative report will be written.

14       Q    Is there a written requirement here that

15   an incident report be made when that happens?

16       A    Yes. It would be considered an unusual

17   incident. Anytime an unusual incident would occur,

18   then an incident report would be written, along

19   with, in this case, a disciplinary report, slash,

20   investigative report. They're on the same form. You

21   check one box or the other.

22       Q    And you don't have any discretion in that

23   regard?  If that request is made, you should fill

24   out an incident report.  Is that right?

Page 14

1        A    If an inmate would come to me, is that

2    what you're saying?  And if an inmate would come to

3    me and make that statement, is that what you're

4    saying?

5        Q    Yes. Yes.

6        A    Yes. In that instance, yes, I would have

7    done a report and he would have been escorted to

8    segregation and an investigation would have ensued.

9        Q    Suppose you spoke to an inmate and he

10   told you that he feared for his own safety and he

11   wanted out of that cell, and you then told him, all

12   right, I've got to take you to segregation or I've

13   got to place you -- in what type of confinement did

14   you call it? --

15       A    Investigative confinement.

16       Q    (Continuing) -- investigative

17   confinement, and he said I don't want to go to

18   segregation. Would you then place him in an

19   investigative confinement?

20       A    Once he's already said to me that he

21   fears for his safety, that's it. I mean, I'm not

22   going to put myself in a position to second-guess

23   whether he fears for his safety now that he's going

24   to segregation. I'm not going to do that.  If he

Page 15

2/2/07                McCroy v. Illinois Department of Corrections
Bryon Law

1    says that he fears for his safety, I mean, it's

2    pretty much open and shut.

3        Q    And you're telling me that that simply

4    did not happen in this case.  Is that right?

5        A    No.

6        Q    Yes, you are telling me that that type of

7    request was never made to you by McCroy?

8        A    He made no request.

9        Q    All right.

10       A    He never stated to me that he feared for

11    his safety, if that's what you're...

12       Q    All right. Did you and Kellerman ever

13    discuss a request that he made to Kellerman?

14       A    I don't recall. I mean, I recall very

15    little conversation with them. This was in what,

16    2004? I mean, he doesn't even work here anymore,

17    Kellerman doesn't. But I don't recall any specific

18    conversation about Mr. McCroy or any other inmate,

19    as far as that goes, in 2004.

20       Q    Is there a specific rule which requires

21    you to document this with an incident report?

22       A    Is this the same question that you just

23    asked earlier? I mean, is that the same? I don't

24    understand the question.

Page 16

1      Q    Well, you explained to me that you would

2    do this in any instance. My question is do you do

3    that because that's an exercise of your own

4    judgment and discretion, or do you do that because

5    there's a specific rule that requires you to do

6    that?

7      A    I don't know if there's a specific rule.

8    I think it's going to be covered under unusual

9    incidents. It's not a usual incident for an inmate

10   to come up to you and say he fears for his safety.

11     Q    Where would you find, in any manual

12   that's given to you,--

13     A    I don't know.

14     Q    Well, you mentioned an unusual incident.

15     A    Uh-huh.

16     Q    Where would you find that if you went to

17   your regulations that you are to follow and

18   implement here?

19     A    I don't know. I'm sure we could find it.

20   But I don't have any specific knowledge of what it

21   would be.

22     Q    Well, without having it in front of you

23   and being able to use the index, can you tell me

24   what the title of that document is?

Page 17

1          A     I can't recall it. No.

2          Q     Can you tell me the last time that you

3    had to consult it?

4          A     No.

5          Q     Can you tell me how often it's been

6    revised in the last three years?

7          A     No, I can't.

8          Q     Have you ever heard of what's been

9    referred to in other context by other people as a

10   fight first policy?

11         A     No.

12         Q     Regardless of whether or not you agree

13   with it or don't agree with it, you've never heard

14   that--

15         A     No.

16         Q     (Continuing)--term used.  Is that right?

17         A     No.

18         Q     What, if anything, do you know or what

19   knowledge do you have about the subsequent fight

20   that occurred between Durham and McCroy?

21         A     I don't know anything about it. It

22   happened off shift. I wasn't on shift then.  I

23   think it happened on second shift.

24         Q     Now, not too long after that, after his

Page 18

1    medical treatment, you did perform a urine test on

2    inmate McCroy. Do you recall that?

3         A    Not specifically. I would have to look at

4    records and see. I mean, like I said, I'm

5    responsible for doing a lot of drug drops, so, I

6    mean, in particular, I don't recall.

7         Q    Will you explain to me what regulations

8    it is that you follow when you administer a urine

9    test.

10        A    Well, there's a protocol for the drug

11   test. I don't know what number or anything like

12   that it is, but, I mean, I can refer to it if I had

13   the documentation that we used for it.

14        Q    Well, what is the document? What do you

15   call the documentation you used?

16        A    Well, it's a--. I don't know.  It's part

17   of the AD or something that I can't--like I say,

18   usually when I do it, I have it all right in front

19   of me, and without being able to refer to it, I

20   can't give you that number.

21        Q    So if you administer that type of test,

22   do you do that alone or are you assisted?

23        A    No. It's always with a witness. Yeah.

24        Q    And do you recall in McCroy's case who

Page 19

1    that witness was?

2        A    I don't know if--. I may have given the

3    test. Or I could have been the witness. I don't

4    recall it specifically, no.

5        Q    Do you recall at that time that this was

6    after the fight and the assault where McCroy had

7    lost his eye?

8        A    No, I can't recall that.

9        Q    Do you recall that this test was the

10   basis that was used to transfer him to another

11   facility?

12       A    No. I don't have anything to do with it.

13   After administering the test, I have nothing to do

14   with it.

15       Q    Do you recall why McCroy failed that

16   test?

17       A    No.

18       Q    Would it refresh your recollection if I

19   told you it was because he was unable to produce

20   sufficient urine to conduct the analysis?

21       A    That's not uncommon. I mean, it wouldn't

22   refresh it specifically. I have a lot of inmates

23   that fail to produce within the two hour time

24   frame.

Page 20

1      Q    And if they're unable to produce the

2    quantity of urine that's required, according to

3    your protocol, is this customarily used as a basis

4    to transfer them from one facility to another?

5      A    Depends on what their discipline is

6    administered through the adjustment committee.

7      Q    And who is it that decides what

8    discipline is to be administered if they're unable

9    to produce sufficient urine?

10     A    It would be the adjustment committee.

11     Q    And what's the adjustment committee

12   composed of?

13     A    It's got several different members. They

14   have to--basically, it's a small in-house--small

15   court, basically. They receive a disciplinary

16   report, and then they take it, they hear all the

17   facts, they let the inmate talk on their behalf,

18   and then they make a determination at that time

19   whether he's guilty or innocent of the charges.

20     Q    Do you know how that panel is chosen?

21     A    No. I don't know.

22     Q    It's certainly not an automatic penalty

23   that if someone doesn't produce sufficient urine

24   that they're transferred from one institution to

Page 21

2/2/07                    McCroy v. Illinois Department of Corrections
Bryon Law

1      the other, is it?

2          A    I don't know.

3          Q    Have you ever seen that happen before?

4          A    I'm not responsible for the

5      administration of discipline, so I don't know. I

6      don't even track it. Like I say, if I'm responsible

7      for writing a ticket, I write a ticket, but I don't

8      have anything to do with it.

9          Q    Are you aware of any other administrative

10     transfers because of an inability to produce a

11     sufficient quantity of urine?

12         A    No.  Not specifically.

13         Q    Were there any aggravating circumstances

14     that you recall with respect to that test?

15         A    Like I said before, I don't specifically

16     recall his test.  And I guess the answer to your

17     question now would be no.

18         Q    Did you attempt to analyze the quantity

19     of urine that you did receive for any type of

20     drugs?

21         A    For this test?

22         Q    Yes.

23         A    The one that I don't really recall? No, I

24     guess I don't because I don't recall it

Page 22

1     specifically.

2          Q    And you haven't reviewed any of those

3     records prior?

4          A    No.

5          Q    So you're relying upon your independent

6     recollection right now?

7          A    Right. If I could pull some records, I

8     could probably draw more attention to and recall

9     it, yes.

10         Q    Do you recall if you allowed him

11    additional time and gave him additional fluids to

12    consume--

13         A    No.

14         Q    (Continuing)--so he might be able to

15    comply with the test?

16         A    No.

17         Q    Do you normally do that?

18         A    No.

19         Q    Why?

20         A    Because they got two hours to produce.

21    They're allowed 24 ounces of water in a two hour

22    time frame.

23         Q    Were you aware at the time you

24    administered the test that for other conditions he

Page 23

2/2/07                    McCroy v. Illinois Department of Corrections
Bryon Law

1    was being administered diuretics?

2        MS. CHOATE: Objection. Foundation. There's no

3    evidence that he--.  He said he doesn't remember.

4    So to ask him what was happening at the time he

5    administered the test.

6        MR. LONDRIGAN:  Q  Do you want to adopt her

7    objection you don't remember?

8        A    Well, we're going--keep asking questions

9    about this and I've told you I don't really recall

10   it specifically. I mean if you want to pull some

11   documentations and let me review it, maybe I can

12   recall.

13       Q    I don't have those documentation, your

14   counsel does.

15       MS. CHOATE: Just a minute. Counsel for

16   plaintiff has had access to both the master file

17   and medical records of plaintiff McCroy, so I'm

18   sure plaintiff's counsel has those documents if

19   they exist.

20       MR. LONDRIGAN: Not the questions that I'm

21   asking this witness about, Kellie.

22       MS. CHOATE: And I don't have any documents you

23   don't have.

24       MR. LONDRIGAN: Do you have the protocol?

                        Page 24

1        MS. CHOATE: I don't have them with me, no. And

2    I'm sure--. I'm talking about protocol.

3        MR. LONDRIGAN: Did you produce the protocol?

4        MS. CHOATE: I don't know. I've had to produce

5    so much stuff.

6        MR. LONDRIGAN: All right.  Then let's not

7    argue about it. If he doesn't know, he doesn't

8    remember, he can say I don't know and I don't

9    remember and that's responsive to these questions.

10       MS. CHOATE: Sure.  But you're not asking him

11   protocol. Ask him the protocol. You're asking him

12   what he did for this specific thing, does he know

13   if he was there.

14       MR. LONDRIGAN: Then he can say I don't

15   remember. He doesn't need prompting from you.

16       MS. CHOATE: He's said it over and over, Tom.

17       MR. LONDRIGAN: Well, he can say it over again

18   and I'll accept that as his answer.

19       MS. CHOATE: Okay. Good.

20       MR. LONDRIGAN:  Q  Who has custody over the

21   protocol that you're given at the time that you

22   administer the test? In other words, who gives it

23   to you?

24       A    Who gives me the list?

Page 25

1        Q    Who gives you what you referred to as the

2    protocol?

3        A    I guess I don't understand what your

4    question is.

5        Q    Where do you get the protocol?

6        A    Well, I'm sure this approved through

7    legal. I mean, I don't understand. We don't write

8    it at a local level. I guess I don't understand

9    your question.

10       Q    How is the protocol delivered to you?

11   Where do you find it? Where do you get it?

12       A    I don't know.

13       Q    Okay. When you go in to administer these

14   tests, do you take the protocol with you?

15       A    I guess I don't--. What's your definition

16   of the protocol?

17       Q    That's your term. You tell me what you

18   meant when you used the term protocol.

19       A    Okay. We have a set-up method of how we

20   give these tests where we get training on it

21   annually.  I'm sure we can come up with something

22   for you to look at that. When an inmate is notified

23   that he's being selected for a drug test, whichever

24   the case may be, if it's a random list that comes

1    from Springfield, or whatever, they choose--we just

2    don't pick inmates at random. We don't say, hey,

3    we're going to take these guys.  It's a list that's

4    generated on the random list from Springfield.

5              We put them on a two hour time frame.  In

6    a two hour time frame they get three glasses of

7    water, three eight ounce glasses of water, at half

8    hour intervals.  And if at the end of a two hour

9    time frame, if they don't produce the adequate

10   amount of urine, which is on the side of the cup,

11   and we show them in this advance, show them if you

12   can't produce this much urine, don't even attempt

13   to go in to the cup because it contaminates it if

14   it doesn't have the minimum amount of urine. After

15   that, if they can't produce it in the two hour time

16   frame, then that's failure to produce.

17        Q    Are you saying that you have independent

18   recollection that Aaron McCroy didn't produce any

19   urine at the time?

20        A    No. I'm saying you want to know what the

21   protocol was.  I'm telling you that's what it was.

22        Q    No. But you told me that you instruct the

23   person--

24        A    Person, whoever it is.

                        Page 27

2/2/07                McCroy v. Illinois Department of Corrections
Bryon Law

1        Q      (Continuing)--that if they can't fill

2    this cup not to deposit any amount of urine in the

3    cup because it will contaminate it.  Is that right?

4        A      Right.

5        Q      And is that because that's what the

6    protocol says?

7        A      It's inadequate to test. They have to

8    produce a minimum. What will happen is if they

9    contaminate the test, they'll be issued a ticket

10   for damage and misuse of property of the cup and

11   then they'll have to use another cup to produce it.

12   So they'll be charged for the cup that they

13   contaminated without adequate sample.

14       Q      How much does a cup cost?

15       A      I have no idea.

16       Q      But, in any event, do you have

17   independent recollection whether or not Aaron

18   McCroy produced any quantity of urine when you

19   administered the test?

20       A      No. I don't recall.

21       MS. CHOATE: Objection. Foundation.

22       MR. LONDRIGAN: Would you care to explanation

23   that foundation exhibit so maybe I can--

24       MS. CHOATE: Well, the foundation is that when

Page 28

1    you said when you administered the test, talking to

2    McCroy, there's no evidence.  He's claimed over and

3    over I don't remember administering the test to

4    McCroy. It could have been somebody else. So you're

5    putting in the record--

6         MR. LONDRIGAN: Okay.  Thank you. Thank you.

7         MS. CHOATE: Okay.  That's my foundation

8    objection.

9         MR. LONDRIGAN:  Q  Do you agree with Kellie

10   that you don't remember administering this test to

11   McCroy which was used to transfer him from this

12   institution to another?

13        A    No, I don't have any knowledge of that. I

14   mean, I don't remember it specifically.

15        Q    Do you remember that as the basis of this

16   test that McCroy was transferred--the failure of

17   this test that he was transferred from this

18   facility?

19        A    No, I don't.

20        Q    Do you know who assigned--. Strike that.

21   Let me ask it a different way.

22             Did you receive any information as to

23   Aaron McCroy's medical condition at the time he was

24   transferred in to the general population for cell

                    Page 29

1    assignment?

2        A    No.

3        Q    So did anyone in security and any of the

4    shift members, were they aware of the physical

5    disability of Aaron McCroy prior to the time of

6    this fight?

7        MS. CHOATE: Objection. Calls for speculation

8    for what someone else might know or not know.

9        MR. LONDRIGAN: I'll ask it differently, but

10   thank you.  I'll clarify it.

11           Q  As you sit there today, do you know of

12   anyone, including yourself, that was ever informed

13   of the risk of loss of vision that Aaron McCroy had

14   at the time he was assigned in to the general

15   population?

16       A    Well, I can only answer for myself, and

17   for myself, no, I had no knowledge of it.

18       Q    Did you have anything at all to do with

19   the assignment of Durham as a cellmate with Aaron

20   McCroy?

21       A    No.

22       Q    Prior to--. You are aware of the injury

23   that McCroy sustained in a fight?

24       A    No. Not specifically.  No.

1       Q     Okay. You are not.

2             Who was your immediate supervisor in the

3       summer of 2006?

4       A     Without being able to refer to a roster

5       for that specific day, I wouldn't know right now.

6       It's been a long time.

7       Q     All right. Who were some of your

8       supervisors that you've worked for here in the past

9       three years?

10      A     The past three years? Major Steve Ruiz,

11      Major Denny Ruiz, Major Carlton, Major McKee.

12      Q     According to the procedures here at this

13      institution, as you understand it, are you ever

14      given any information as to inmates disabilities or

15      health risks after the time that they're assigned

16      in to the general population?

17      A     No.

18      Q     And, as you sit there today, you can't

19      give me, based upon your independent recollection,

20      where that has ever happened as long as you've

21      worked here at Western?

22      A     We don't have any idea as far as the

23      medical abilities or disabilities of inmates.

24      That's not passed on to us. As far as infectious

                          Page 31

1    disease and stuff like that, we're trained in

2    training to treat every inmate as if they're

3    infectious. So it's just for universal precautions

4    for our own safety and protection.

5        Q    So, as far as you knew, as far as any

6    health risks, Aaron McCroy was just the same as any

7    other prisoner?

8        A    To my knowledge, yes.

9        MR. LONDRIGAN: That's all I have.

10       MS. CHOATE: I have a couple followup.

11                        EXAMINATION

12                        BY MS. CHOATE:

13       Q    During routine--. Let's go back to the

14   beginning. As far as refusing housing, the

15   situation you talked about where they go to

16   segregation, a ticket's written, et cetera, do

17   inmates, are they aware of these rules?

18       A    Yes.

19       Q    In your experience have you ever had

20   inmates--

21       MR. LONDRIGAN: I object to that as foundation.

22       MS. CHOATE: Which question? Which one are you

23   at?

24       MR. LONDRIGAN: As to whether or not they're

                        Page 32

1    aware of these before it's explained to them.

2        MS. CHOATE: I'm asking if he knows.

3        MR. LONDRIGAN: I mean the competence, the

4    competency of this witness to testify to that.

5        MS. CHOATE:  Q  Do you know if the inmates

6    have--in general, are made aware of this?

7        A    (No response.)

8        Q    Either via orientation manuals or other

9    means?

10       A    I don't know about specific guidelines.

11   Usually if they have problems, they'll deal with it

12   with his zone supervisor, and they know that they

13   contact us, and then that's--I mean, they can even

14   go to an officer and say, hey, I'm having problems

15   with a cellmate. It may not even be related to a

16   cell issue.  It may be that they have enemies in

17   the housing or whatever. I don't want to speculate

18   on a whole big area, but inmates, in general, know

19   that if they have issues or concerns that they'll

20   get with the zone supervisor and then it will be

21   addressed.

22       Q    And are there correctional personnel on

23   the housing units at all times or do they come and

24   go?

Page 33

1      A      Yes. There are security officers in each

2      housing unit. They may be assigned two wings, but

3      they're at least on a wing at least every half

4      hour.

5      Q      Do you know if inmates are allowed to

6      tell other staff like nurses or doctors or dietary

7      staff if they have a problem with another inmate?

8      A      Yes. They can tell those.

9      Q      Would the situation or would the

10     procedure be the same then as far as refusing

11     housing?

12     A      Right. And usually what will happen is if

13     they would tell a nurse, or even some non-security

14     person, they'll let the zone supervisor know about

15     housing and say, hey, this guy told me this, and

16     then we'll go deal with it then.

17     Q      Now, when a person refuses housing you

18     said there was a disciplinary report written.

19     Correct?

20     A      Right. Or investigative report depending

21     on what the situation is.

22     Q      Then what happens when the situation has

23     been investigated and the inmate is found to have a

24     valid complaint?

Page 34

1       A    If he has a valid complaint, then I

2    don't--I'm not involved with that decision-making

3    process, but if they have a valid complaint, then

4    they'll make a determination whether they need to

5    transfer an inmate. It may not be him, it may be

6    the other person, or whatever. But they'll do an

7    investigation and they'll make a recommendation.

8       Q    Do you know if that inmate is disciplined

9    then if he's got a valid complaint?

10      A    Sometimes. I mean, if they can

11   determine--like I said, I'm kind of on the edge

12   here because if they can determine if there was an

13   infraction, or whatever, then they will then write

14   a ticket and then it will be converted over to a

15   disciplinary ticket like I talked about earlier and

16   referred to the adjustment committee.

17      Q    But there are times when those tickets

18   don't go over to a disciplinary ticket?

19      A    Right. Sometimes an investigation will

20   be--an inmate will be housed in investigative

21   status and then once internal affairs investigates

22   it, determines that there is a problem or there

23   isn't a problem, then they'll either be released

24   from investigative custody or an incident--or a

Page 35

1    ticket, excuse me, an inmate disciplinary report

2    will be written and then be converted from

3    investigative confinement to temporary confinement

4    depending on disciplinary hearing.

5        Q    And you also talked about the urine

6    testing.  Do you determine how much urine is

7    required for the test?

8        A    I do not determine it. It's determined.

9        Q    Do you determine when someone is--.

10   Excuse me. Let me rephrase that. Do you make the

11   rules about-- I don't know the term you used --

12   abusing state property? Is that your rule--

13       A    No.

14       Q    (Continuing)--or are you told to do that

15   as far as writing a ticket for abusive property?

16       A    No.  That's not my rule, no. That comes

17   from above us.

18       Q    So you don't determine that the cost of

19   the urine cup--

20       A    No. It's been my experience too over time

21   that depending on which vendor we're dealing with

22   the cost may vary, I mean, depending on what we

23   buy, the lowest bid that lot is. I mean, I don't

24   have anything to do with determining the cost of

Page 36

1    it.

2        Q    And do you have access to inmates'

3    medical records?

4        A    No.

5        Q    Do you have access to their master files?

6        A    No.

7        Q    Now, you talked about you don't know what

8    specific medical risks that a person has.

9        A    Yeah.

10       Q    What is a permit?

11       A    A permit.  I mean, as far as some inmates

12    will have--. I'll give you an example, and this is

13    not specific to any one inmate, but they may have

14    a--.  I can't even think of an example.  I'm

15    drawing a blank right now. Slow eating permits or

16    something.  They'll have to get extra cups of water

17    or something like that. It's a written thing from

18    the doctor. It's a doctor's order saying that they

19    need more time or they need whatever. Low bunking.

20    That's what I want.  Low bunk or low bed permit are

21    often written for inmates that can't get on the top

22    bunk or they can't climb stairs, stuff like that.

23       Q    If you see an inmate with a permit, does

24    that permit tell you what the medical condition

Page 37

1      behind the permit is?

2          A    No.

3          Q    So you would have no knowledge of what

4      caused the permit to be written?

5          A    No.

6          Q    As a lieutenant and your subordinant

7      staff, to your knowledge, do they honor those

8      permits when the inmates have them?

9          A    Yes.

10         Q    And that does come from the physicians.

11     Correct?

12         A    Right.

13         Q    So you can't determine on your own if a

14     person should be, for medical reasons, in a certain

15     place or not a certain place?

16         A    No.

17         MS. CHOATE: I have nothing further.

18         MS. TROEMPER: I don't have anything.

19                         EXAMINATION (CONT'D)

20                         BY MR. LONDRIGAN:

21         Q    I think you told me before you don't know

22     who the zone supervisor was in McCroy's area in

23     2004.  Is that right?

24         A    I don't know, no. What day?  I mean, I'd

                         Page 38

1    have to refer to a roster to see. I may not have

2    even been there on the day in question. I don't

3    know without looking at a roster.

4          Q    Have you ever acted as a zone supervisor?

5          A    I am a zone supervisor.

6          Q    And so you would be the person, or one of

7    the persons, that Aaron McCroy or somebody else

8    would come to if he was concerned about injury from

9    another cellmate?

10         A     If he was in housing unit 3 on the day in

11   question and I was there working that day, I would

12   be the one that he would come to, yes.

13         Q    And I think you've clearly answered

14   Kellie Choate's question that it wasn't just Aaron

15   McCroy, but, as far as any of these prisoners in

16   the general population, you had no information

17   about any health problems that any of them had?

18         A    No.

19         MR. LONDRIGAN: All right. That's all.

20         THE DEPONENT: I mean, unless you see somebody

21   that's missing a limb or something like that, it's

22   going to be obvious and then that's--I mean, they

23   don't, they don't share that information. I mean,

24   that's a big privacy thing. I don't want to know

                          Page 39

2/2/07                          McCroy v. Illinois Department of Corrections
Bryon Law

```
1    most of them, you know. So we don't have any

2    knowledge of them.

3          MR. LONDRIGAN: Okay.

4          MS. CHOATE: We'll waive.

5                FURTHER DEPONENT SAITH NOT.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Baldwin Court Reporting & Legal Video Services
1-800-248-2835

```
 1    STATE OF ILLINOIS   )
                          )  SS
 2    COUNTY OF SANGAMON  )

 3                    C E R T I F I C A T E

 4            I, Debra K. Baldwin, a Notary Public and

 5    Certified Shorthand Reporter and Registered

 6    Professional Reporter in and for said County and

 7    State do hereby certify that the Deponent herein,

 8    BRYON LAW, prior to the taking of the foregoing

 9    deposition, and on the 2nd of February A.D., 2007,

10    was by me duly sworn to testify to the truth, the

11    whole truth and nothing but the truth in the cause

12    aforesaid; that the said deposition was on that

13    date taken down in shorthand by me and afterwards

14    transcribed, and that the attached transcript

15    contains a true and accurate translation of my

16    shorthand notes referred to.

17            Given under my hand and seal this 6th day

18    of February A.D., 2007.

19                         Debra K. Baldwin

20                         Notary Public and
                           Certified Shorthand Reporter and
21                         Registered Professional Reporter

22

23    License No. 084-002128          "OFFICIAL SEAL"
                                       DEBRA K BALDWIN
24                                     COMMISSION EXPIRES 05/20/10
```

Page 41

2/2/07
Bryon Law

McCroy v. Illinois Department of Corrections

Page 42

## A

Aaron 1:5 10:10
10:21 11:12
12:3 27:18
28:17 29:23
30:5,13,19
32:6 39:7,14
abilities 31:23
able 17:23 19:19
23:14 31:4
about 7:7 9:20
12:2 16:18
18:19,21 24:9
24:21 25:2,7
32:15 33:10
34:14 35:15
36:5,11 37:7
39:8,17
above 36:17
above-entitled
1:14
abusing 36:12
abusive 36:15
accept 12:17
25:18
access 24:16
37:2,5
according 21:2
31:12
accurate 41:15
acted 39:4
acting 1:15
actual 11:11
AD 19:17
additional 23:11
23:11
addressed 33:21
adequate 27:9
28:13
adjustment 21:6
21:10,11
35:16
administer 19:8
19:21 25:22
26:13
administered
21:6,8 23:24
24:1,5 28:19
29:1
administering
20:13 29:3,10
administration
22:5

administrative
22:9
adopt 24:6
advance 27:11
affairs 14:7
35:21
aforesaid 41:12
after 18:24,24
20:6,13 27:14
31:15
afterwards 4:8
41:13
again 25:17
agency 5:16
aggravating
22:13
ago 10:1
agree 18:12,13
29:9
agreed 4:2
aid 8:21
al 1:8
ALLEN 2:8
allowed 23:10
23:21 34:5
almost 7:8
alone 19:22
along 14:18
already 15:20
altercation
11:20 12:11
always 19:23
amount 27:10
27:14 28:2
analysis 20:20
analyze 22:18
Anderson 2:14
annually 26:21
another 10:11
10:23 13:7,17
20:10 21:4
28:11 29:12
34:7 39:9
answer 6:10,13
7:4 22:16
25:18 30:16
answered 39:13
answers 4:8
anymore 16:16
anyone 10:4
30:3,12
anything 8:15
8:20 18:18,21
19:11 20:12

22:8 30:18
36:24 38:18
Anytime 14:17
APPEARAN...
2:1
appointment
9:18
approved 26:6
April 2:9
area 33:18
38:22
argue 25:7
asked 10:21
16:23
asking 12:2 24:8
24:21 25:10
25:11 33:2
asks 13:23 14:2
assault 20:6
assigned 8:9
29:20 30:14
31:15 34:2
assignment 8:22
12:17 30:1,19
assistant 2:5 6:7
6:9,12
assisted 19:22
attached 41:14
attempt 22:18
27:12
attention 23:8
Attorney 2:5,9
attorneys 4:3
August 7:9
automatic 21:22
aware 7:24 22:9
23:23 30:4,22
32:17 33:1,6
A.D 4:5 41:9,18
A.M 1:17 4:5

## B

B 3:11 5:3
back 14:4 32:13
background
6:19
Baldwin 1:14,22
4:3 41:4
Bank 2:10
based 31:19
basic 11:18
basically 21:14
21:15
basis 20:10 21:3

29:15
bed 37:20
before 1:14 4:3
9:9,20 10:20
22:3,15 33:1
38:21
beginning 32:14
behalf 2:4,7,11
2:14 21:17
behind 38:1
being 10:20
17:23 19:19
24:1 26:23
31:4
believe 11:5
between 4:2
10:10 13:10
18:20
bid 36:23
big 33:18 39:24
blank 37:15
both 24:16
box 14:21
brief 6:18
Brown 1:18 4:6
Bryon 1:13 3:3
4:3 5:9 41:8
Building 2:10
bunk 37:20,22
bunking 37:19
buy 36:23
B-r-y-o-n 5:9

## C

C 41:3,3
call 15:14 19:15
Calls 30:7
came 8:24 9:3
care 28:22
Carl 2:12
Carlton 31:11
case 1:14 9:14
14:19 16:4
19:24 26:24
cause 41:11
caused 38:4
cell 10:21 12:4,9
13:5,10,16,16
13:17,23
15:11 29:24
33:16
cellmate 13:23
14:10 30:19
33:15 39:9

Center 1:18 4:6
5:17
CENTRAL 1:2
certain 8:16
38:14,15
certainly 21:22
Certified 4:4
41:5,20
certify 41:7
cetera 32:16
chain 6:2,4 7:11
change 7:14
13:16,17
changed 9:18
charged 28:12
charges 21:19
chart 5:20 6:3
check 14:21
Choate 2:5 3:4
6:23 7:2 10:14
24:2,15,22
25:1,4,10,16
25:19 28:21
28:24 29:7
30:7 32:10,12
32:22 33:2,5
38:17 40:4
Choate's 39:13
choose 27:1
chosen 21:20
circumstances
22:13
City 2:10
Civil 4:10
claimed 29:2
clarify 30:10
clearly 39:13
client 12:3
climb 37:22
come 10:2 15:1
15:2 17:10
26:21 33:23
38:10 39:8,12
comes 12:12
13:1 14:1,2
26:24 36:16
coming 9:24
command 6:2,4
7:11
committee 21:6
21:10,11
35:16
competence
33:3

competency
4:13 33:4
competent 4:16
complaint 9:11
34:24 35:1,3,9
complete 6:23
comply 23:15
composed 21:12
14:8
concern 12:23
14:8
concerned 39:8
concerns 33:19
condition 29:23
37:24
conditions 23:24
conduct 12:21
20:20
conducted 10:9
confinement
12:14,20 14:6
15:13,15,17
15:19 36:3,3
considered
14:16
consult 18:3
consume 23:12
contact 33:13
contains 41:15
contaminate
28:3,9
contaminated
28:13
contaminates
27:13
context 18:9
Continuing 7:20
15:16 18:16
23:14 28:1
36:14
CONT'D 38:19
conversation
16:15,18
converted 35:14
36:2
coordinator
9:23 10:4
copies 4:18
copy 9:11,12
7:19 9:7 10:8
10:12 34:19
38:11
correction 7:10
correctional

2/2/07
Bryon Law

McCroy v. Illinois Department of Corrections

Page 43

1:18 4:6 5:17
6:5 7:8,12 8:8
9:2 33:22
**corrections** 1:8
2:7 5:15,16
7:16
**cost** 28:14 36:18
36:22,24
**counsel** 24:14
24:15,18
**County** 1:15,16
1:19 4:6 41:2
41:6
**couple** 32:10
**court** 1:1 4:11
21:15
**covered** 17:8
**Crary** 10:14,15
**cup** 27:10,13
28:2,3,10,11
28:12,14
36:19
**cups** 37:16
**current** 5:12
7:13 8:5,6,7
**custody** 25:20
35:24
**customarily**
21:3

_____ **D** _____
**D** 3:1
**damage** 28:10
**date** 11:9 41:13
**dates** 11:18
**David** 2:14 5:9
**day** 11:11 31:5
38:24 39:2,10
39:11 41:17
**days** 7:7
**deal** 13:7 33:11
34:16
**dealing** 36:21
**dealt** 6:4
**Debra** 1:14 4:3
41:4
**Decatur** 2:13
**decides** 21:7
**decision-maki...**
35:2
**dedimus** 4:11
**defendant** 2:7
2:11,14 10:23
**Defendants** 1:9

**definition** 26:15
**delivered** 26:10
**Denny** 31:11
**department** 1:8
2:7 5:14,15,16
5:21 7:6,14,14
7:15,16,23 8:3
8:14
**depending** 6:11
34:20 36:4,21
36:22
**Depends** 21:5
**Deponent** 3:2
5:1 6:21 7:1,5
39:20 40:5
41:7
**deposeth** 5:5
**deposit** 28:2
**deposition** 1:13
4:3,11,15,18
9:9,21 41:9,12
**depositions** 4:16
**description** 8:5
8:6,7
**determination**
21:18 35:4
**determine** 12:22
14:8 35:11,12
36:6,8,9,18
38:13
**determined** 36:8
**determines**
35:22
**determining**
36:24
**dietary** 34:6
**different** 8:13
21:13 29:21
**differently** 30:9
**direct** 12:16
**directly** 6:11
**disabilities**
31:14,23
**disability** 30:5
**disciplinary**
14:19 21:15
34:18 35:15
35:18 36:1,4
**discipline** 21:5,8
22:5
**disciplined** 35:8
**discretion** 14:22
17:4
**discuss** 16:13

**disease** 32:1
**distinction** 13:9
**DISTRICT** 1:1
1:2
**diuretics** 24:1
**division** 1:3 5:14
**divisions** 5:20
**doctor** 2:14
37:18
**doctors** 34:6
**doctor's** 37:18
**document** 14:9
16:21 17:24
19:14
**documentation**
19:13,15
24:13
**documentations**
24:11
**documents** 10:5
24:18,22
**doing** 19:5
**done** 15:7
**down** 4:8 41:13
**draw** 13:9 23:8
**drawing** 37:15
**drops** 19:5
**drug** 19:5,10
26:23
**drugs** 22:20
**duly** 5:4 41:10
**Durham** 10:12
18:20 30:19
**During** 32:13
**duties** 11:7
**duty** 6:13,14

_____ **E** _____
**E** 3:1,11 41:3,3
**each** 6:13 34:1
**earlier** 16:23
35:15
**eating** 37:15
**edge** 35:11
**education** 6:21
**educational**
6:19
**eight** 27:7
**either** 12:14
33:8 35:23
**emergency** 8:19
**employment**
6:19
**end** 27:8

**enemies** 33:16
**ensued** 15:8
**escorted** 14:5
15:7
**Esq** 2:2,12
**et** 1:8 32:16
**even** 8:18 9:11
16:16 22:6
27:12 33:13
33:15 34:13
37:14 39:2
**event** 28:16
**ever** 5:19 9:10
9:13 16:12
18:8 22:3
30:12 31:13
31:20 32:19
39:4
**every** 32:2 34:3
**evidence** 24:3
29:2
**exactly** 11:9,17
**Examination**
3:4,4 5:6
32:11 38:19
**example** 37:12
37:14
**excuse** 36:1,10
**exercise** 17:3
**exhibit** 28:23
**exist** 24:19
**exists** 14:8
**expense** 4:18
**experience**
32:19 36:20
**explain** 13:12
19:7
**explained** 17:1
33:1
**explanation**
28:22
**expressly** 4:12
**extra** 37:16
**eye** 11:16,19
20:7

_____ **F** _____
**F** 2:2 41:3
**facilities** 8:4
**facility** 13:8,15
13:15 20:11
21:4 29:18
**fact** 14:9
**facts** 21:17

**fail** 20:23
**failed** 20:15
**failure** 27:16
29:16
**familiar** 13:19
**far** 5:16 6:8,21
7:6 8:9,17,22
11:18 16:19
31:22,24 32:5
32:5,14 34:10
36:15 37:11
39:15
**Fax** 1:23
**fear** 12:10 14:3
14:11
**feared** 15:10
16:10
**fears** 12:13,16
13:23 15:21
15:23 16:1
17:10
**February** 1:17
4:5 41:9,18
**Federal** 4:10
**fight** 10:10,17
10:20 11:15
12:10 18:10
18:19 20:6
30:6,23
**file** 24:16
**files** 37:5
**fill** 14:23 28:1
**find** 17:11,16,19
26:11
**first** 5:4 8:21
9:15 18:10
**fluids** 23:11
**follow** 7:11
17:17 19:8
**follows** 5:5
**followup** 32:10
**foregoing** 41:8
**form** 4:14 14:20
**found** 34:23
**foundation** 4:17
24:2 28:21,23
28:24 29:7
32:21
**four** 7:7,7
**frame** 20:24
23:22 27:5,6,9
27:16
**from** 6:5 7:12
10:21 12:4

13:15,16 21:4
21:24 25:15
27:1,4 29:11
29:17 35:24
36:2,17 37:17
38:10 39:8
**front** 17:22
19:18
**full** 5:8
**furnished** 4:18
**further** 38:17
40:5

_____ **G** _____
**gave** 23:11
**general** 2:5 6:2
29:24 30:14
31:16 33:6,18
39:16
**generated** 27:4
**give** 6:18 9:16
9:21 19:20
26:20 31:19
37:12
**given** 9:8,13
17:12 20:2
25:21 31:14
41:17
**gives** 25:22,24
26:1
**glasses** 27:6,7
**go** 13:16 15:17
26:13 27:13
32:13,15
33:14,24
34:16 35:18
**goes** 6:8 16:19
**going** 12:13 14:4
14:4,5 15:22
15:23,24 17:8
24:8 27:3
39:22
**Good** 25:19
**graduate** 7:5
**group** 6:15
**guess** 7:16,24
22:16,24 26:3
26:8,15
**guidelines** 33:10
**guilty** 21:19
**guy** 10:15 34:15
**guys** 9:17,24
27:3

**H** 3:11
half 27:7 34:3
hand 41:17
handles 6:15
happen 12:19
    16:4 22:3 28:8
    34:12
happened 10:2
    11:20 18:22
    18:23 31:20
happening 24:4
happens 14:15
    34:22
having 5:4
    17:22 33:14
health 31:15
    32:6 39:17
healthcare 8:14
    8:16,18,22
hear 21:16
heard 18:8,13
hearing 36:4
her 4:18 24:6
hereto 4:2,16,18
hey 27:2 33:14
    34:15
HEYL 2:8
he'll 12:17,19
high 6:23 7:5
    9:3
HILL 2:12
him 7:3 11:13
    11:23 12:14
    15:11,18
    20:10 23:10
    23:11 24:4
    25:10,11,11
    29:11 35:5
history 6:19
Hold 13:9
honor 38:7
hour 4:5 20:23
    23:21 27:5,6,8
    27:8,15 34:4
hours 23:20
housed 35:20
housing 12:15
    12:17 32:14
    33:17,23 34:2
    34:11,15,17
    39:10
HUGHES 2:12

―――――― **I** ――――――

**IA** 10:15
idea 28:15 31:22
**IDENTIFICA...**
    3:12
Illinois 1:2,8,16
    1:18,19,23 2:3
    2:6,7,10,13
    4:6,6 5:17
    41:1
immediate 31:2
implement
    17:18
inability 22:10
inadequate 28:7
incident 11:14
    14:12,15,17
    14:17,18,24
    16:21 17:9,14
    35:24
incidents 17:9
including 30:12
independent
    23:5 27:17
    28:17 31:19
index 17:23
Indiana 1:23
infectious 31:24
    32:3
information
    29:22 31:14
    39:16,23
informed 9:15
    30:12
infraction 35:13
initial 8:20,24
injury 30:22
    39:8
inmate 8:18
    10:11 12:12
    12:24 14:1
    15:1,2,9 16:18
    17:9 19:2
    21:17 26:22
    32:2 34:7,23
    35:5,8,20 36:1
    37:13,23
inmates 12:8
    13:19 20:22
    27:2 31:14,23
    32:17,20 33:5
    33:18 34:5
    37:2,11,21
    38:8
inmate's 13:14

14:4
innocent 21:19
instance 4:5 8:2
    8:13 12:9 15:6
    17:2
institution 7:18
    21:24 29:12
    31:13
instruct 7:3
    27:22
instructed 12:24
    13:22
instructions
    12:7
internal 14:7
    35:21
interrelated
    5:22
interrogatories
    4:4,7
intervals 27:8
investigated
    34:23
investigates
    35:21
investigation
    10:10 12:22
    14:7 15:8 35:7
    35:19
investigative
    12:14,20 14:6
    14:13,20
    15:15,16,19
    34:20 35:20
    35:24 36:3
involved 10:10
    35:2
involvement
    9:14
in-house 21:14
issue 33:16
issued 28:9
issues 33:19

―――――― **J** ――――――

**J** 2:12
job 8:5,6,7 11:6
    11:11
judgment 17:4
jurisdiction
    8:13
just 6:23 8:20
    9:23 10:16
    11:18 13:3,21

16:22 24:15
    27:1 32:3,6
    39:14

―――――― **K** ――――――

**K** 1:14 4:3 41:4
keep 24:8
Kellerman
    10:24 11:1,3
    12:2 16:12,13
    16:17
Kellerman's
    11:21
Kellie 24:21
    29:9 39:14
**KELLY** 2:5
kind 6:13 8:10
    35:11
knew 32:5
know 8:12 9:12
    9:14,19 10:24
    11:3,9,10,19
    17:7,13,19
    18:18,21
    19:11,16 20:2
    21:20,21 22:2
    22:5 25:4,7,8
    25:12 26:12
    27:20 29:20
    30:8,8,11 31:5
    33:5,10,12,18
    34:5,14 35:8
    36:11 37:7
    38:21,24 39:3
    39:24 40:1
knowledge
    17:20 18:19
    29:13 30:17
    32:8 38:3,7
    40:2
knows 33:2

―――――― **L** ――――――

**L** 4:1 5:3
last 9:17 10:11
    18:2,6
Law 1:13 2:9
    3:3 4:3 5:9
    10:15 41:8
least 34:3,3
legal 26:7
Legal-Visual
    1:22
let 21:17 24:11

29:21 34:14
    36:10
let's 25:6 32:13
level 26:8
License 41:23
lieutenant 5:12
    7:9 8:8 9:6
    11:24 38:6
lieutenants 6:6
like 8:22 14:2
    19:4,11,17
    22:6,15 32:1
    34:6 35:11,15
    37:17,22
    39:21
limb 39:21
list 25:24 26:24
    27:3,4
litigation 9:23
little 16:15
**LLC** 2:12
local 26:8
Londrigan 2:2,2
    3:4 5:7 7:10
    10:16 24:6,20
    24:24 25:3,6
    25:14,17,20
    28:22 29:6,9
    30:9 32:9,21
    32:24 33:3
    38:20 39:19
    40:3
long 18:24 31:6
    31:20
look 19:3 26:22
looking 11:10
    39:3
loss 30:13
lost 11:15,19
    20:7
lot 19:5 20:22
    36:23
low 37:19,20,20
lowest 36:23

―――――― **M** ――――――

made 12:3,6
    14:15,23 16:7
    16:8,13 33:6
maintained 10:6
Major 31:10,11
    31:11,11
majors 6:7,10
make 10:2 12:21

13:21 14:1,3
    15:3 21:18
    35:4,7 36:10
manual 17:11
manuals 33:8
**MARKED** 3:12
master 24:16
    37:5
material 9:8
materiality 4:13
may 4:3,8,16,18
    12:10 20:2
    26:24 33:15
    33:16 34:2
    35:5,5 36:22
    37:13 39:1
maybe 13:19
    24:11 28:23
**McCROY** 1:5
    10:11,21
    11:12,13 12:3
    16:7,18 18:20
    19:2 20:6,15
    24:17 27:18
    28:18 29:2,4
    29:11,16 30:5
    30:13,20,23
    32:6 39:7,15
McCroy's 19:24
    29:23 38:22
McKee 31:11
mean 5:13,24
    6:3,11,21 8:4
    8:10,16 11:17
    11:18 13:12
    15:21 16:1,14
    16:16,23 19:4
    19:6,12 20:21
    24:10 26:7
    29:14 33:3,13
    35:10 36:22
    36:23 37:11
    38:24 39:20
    39:22,23
means 13:14
    33:9
meant 26:18
medical 19:1
    24:17 29:23
    31:23 37:3,8
    37:24 38:14
members 21:13
    30:4
memory 11:18

**mentioned**
17:14
**method** 26:19
**might** 23:14
30:8
**minimum** 27:14
28:8
**minute** 24:15
**missing** 39:21
**Missouri** 1:23
**misuse** 28:10
**mixed** 10:14
**month** 10:1
**more** 23:8 37:19
**most** 40:1
**move** 14:3
**moved** 12:18
**moving** 13:14
**Mt** 1:18 4:6 5:18
**much** 16:2 25:5
27:12 28:14
36:6
**myself** 15:22
30:16,17

**N**

**N** 3:1 4:1 5:3
**name** 5:8 7:23
10:11,24
**National** 2:10
**need** 8:12 9:21
14:10 25:15
35:4 37:19,19
**needs** 8:18,19
**never** 16:7,10
18:13
**nobody** 9:20
**None** 3:13
**non-security**
34:13
**normally** 23:17
**North** 2:13
**Notary** 1:15 4:3
5:2,4 41:4,20
**noted** 4:14
**notes** 41:16
**nothing** 20:13
38:17 41:11
**notice** 1:19
**notified** 26:22
**number** 3:2,12
19:11,20
**nurse** 34:13
**nurses** 34:6

**O**

**O** 4:1 5:3
**object** 7:2 32:21
**objection** 4:14
24:2,7 28:21
29:8 30:7
**objections** 4:13
**obvious** 39:22
**obviously** 13:9
**occupies** 5:22
**occur** 14:17
**occurred** 10:18
11:15,15
18:20
**off** 18:22
**officer** 7:8,13
9:2 11:1,3,5
11:22,23 12:7
33:14
**officers** 6:5 7:10
8:10 34:1
**often** 18:5 37:21
**Okay** 13:18,21
25:19 26:13
26:19 29:6,7
31:1 40:3
**once** 15:20
35:21
**one** 13:16 14:21
21:4,24 22:23
32:22 37:13
39:6,12
**only** 30:16
**open** 16:2
**operations** 6:12
**oral** 4:4,7
**order** 37:18
**orders** 12:17
**organizational**
5:19
**orientation** 33:8
**originally** 10:1
**other** 6:13 7:12
8:3 12:7 14:21
16:18 18:9,9
22:1,9 23:24
25:22 32:7
33:8 34:6 35:6
**ounce** 27:7
**ounces** 23:21
**out** 9:3 12:9
14:10,24
15:11

**over** 4:11 8:17
25:16,16,17
25:20 29:2,3
35:14,18
36:20
**own** 4:18 13:2
13:24 15:10
17:3 32:4
38:13
**o'clock** 1:17 4:5
**o-n** 5:10

**P**

**P** 4:1
**PAGE** 3:2
**panel** 21:20
**part** 19:16
**particular** 6:3
19:6
**particularly**
5:21
**parties** 4:2,16
**parts** 4:15
**party** 4:18
**passed** 31:24
**past** 31:8,10
**penalty** 21:22
**people** 18:9
**perform** 19:1
**permit** 37:10,11
37:20,23,24
38:1,4
**permits** 37:15
38:8
**person** 27:23,24
34:14,17 35:6
37:8 38:14
39:6
**personnel** 33:22
**persons** 39:7
**physical** 30:4
**physicians**
38:10
**pick** 27:2
**place** 12:13
15:13,18
38:15,15
**placed** 12:20
14:5
**plaintiff** 1:6 2:4
4:5 24:16,17
**plaintiff's** 24:18
**planned** 10:1
**please** 5:8

**policy** 18:10
**population**
29:24 30:15
31:16 39:16
**position** 15:22
**positions** 5:23
8:3
**POTTER** 2:2
**precautions**
32:3
**present** 6:20
**pretty** 6:3 16:2
**prior** 7:13 23:3
30:5,22 41:8
**prisoner** 32:7
**prisoners** 39:15
**privacy** 39:24
**probably** 23:8
**problem** 34:7
35:22,23
**problems** 33:11
33:14 39:17
**procedure** 4:10
34:10
**procedures**
31:12
**process** 35:3
**produce** 20:19
20:23 21:1,9
21:23 22:10
23:20 25:3,4
27:9,12,15,16
27:18 28:8,11
**produced** 28:18
**Professional** 4:4
41:6,21
**prompting**
25:15
**proof** 4:17
**property** 28:10
36:12,15
**protection** 32:4
**protocol** 19:10
21:3 24:24
25:2,3,11,11
25:21 26:2,5
26:10,14,16
26:18 27:21
28:6
**provide** 8:17
**Public** 1:15 4:3
5:2,4 41:4,20
**pull** 23:7 24:10
**purpose** 4:16

**pursuant** 1:19
**put** 15:22 27:5
**putting** 29:5

**Q**

**quantity** 21:2
22:11,18
28:18
**question** 4:14
7:17 16:22,24
17:2 22:17
26:4,9 32:22
39:2,11,14
**questions** 24:8
24:20 25:9
**question's** 8:10

**R**

**R** 5:3 41:3
**RANDLE** 2:2
**random** 26:24
27:2,4
**rank** 5:12 6:5
7:13 8:24 11:4
11:21
**reading** 4:11
**really** 9:13
22:23 24:9
**reasons** 7:3
38:14
**recall** 9:10
10:17,20,23
11:13,17 12:2
16:14,14,17
18:1 19:2,6,24
20:4,5,8,9,15
22:14,16,23
22:24 23:8,10
24:9,12 28:20
**receive** 21:15
22:19 29:22
**receiving** 9:11
**recollection**
20:18 23:6
27:18 28:17
31:19
**recommendati...**
35:7
**record** 29:5
**records** 10:5
19:4 23:3,7
24:17 37:3
**refer** 19:12,19
31:4 39:1

**referred** 18:9
26:1 35:16
41:16
**refresh** 20:18,22
**refuse** 12:15,16
**refuses** 34:17
**refusing** 32:14
34:10
**regard** 14:23
**Regardless**
18:12
**Registered** 4:4
41:5,21
**regulations**
17:17 19:7
**related** 33:15
**released** 35:23
**relevancy** 4:13
**relevant** 6:22
**relying** 23:5
**remember** 11:12
11:14,19 24:3
24:7 25:8,9,15
29:3,10,14,15
**rephrase** 36:10
**report** 14:12,13
14:15,18,19
14:20,24 15:7
16:21 21:16
34:18,20 36:1
**Reporter** 4:4,4,8
41:5,6,20,21
**Reporting** 1:22
**reports** 11:10
**request** 12:3,6
14:23 16:7,8
16:13
**required** 21:2
36:7
**requirement**
14:14
**requirements**
4:10 8:17
**requires** 16:20
17:5
**reserved** 4:13
**respect** 22:14
**response** 8:21
33:7
**responsibility**
11:7
**responsible** 8:8
19:5 22:4,6
**responsive** 25:9

review 9:9 10:5
   24:11
reviewed 23:2
revised 18:6
right 5:11 6:16
   7:21 9:3,4,5,6
   10:16 14:24
   15:12 16:4,9
   16:12 18:16
   19:18 23:6,7
   25:6 28:3,4
   31:5,7 34:12
   34:20 35:19
   37:15 38:12
   38:23 39:19
risk 30:13
risks 31:15 32:6
   37:8
roster 31:4 39:1
   39:3
rosters 11:10
rotated 8:2
routine 13:3
   32:13
ROYSTER 2:8
Ruiz 31:10,11
rule 16:20 17:5
   17:7 36:12,16
rules 4:10,10
   32:17 36:11

_____
         S
S 3:11 4:1
safety 12:13,16
   12:18,23 13:2
   13:24 14:3,8
   14:11 15:10
   15:21,23 16:1
   16:11 17:10
   32:4
saith 5:5 40:5
same 7:14,15
   14:20 16:22
   16:23 32:6
   34:10
sample 28:13
Sangamon 1:15
   1:16 41:2
saying 15:2,4
   27:17,20
   37:18
says 8:7 14:2
   16:1 28:6
scheduled 9:17

school 6:24 7:5
   9:3
schools 7:3,4
seal 41:17
second 2:6
   10:16 18:23
second-guess
   15:22
security 6:15
   7:3,11 8:16
   30:3 34:1
see 19:4 37:23
   39:1,20
seen 5:19 22:3
segregation
   12:18 14:5
   15:8,12,18,24
   32:16
selected 26:23
senior 11:23
sergeants 6:6
   8:10
service 6:14 7:6
Services 1:22
Serving 1:23
set-up 26:19
Seventh 2:3
several 21:13
share 39:23
shift 18:22,22,23
   30:4
shorthand 4:4,8
   41:5,13,16,20
show 27:11,11
shows 6:1
shut 16:2
side 27:10
signed 9:12
signing 4:11
simply 16:3
sit 30:11 31:18
situation 32:15
   34:9,21,22
slash 14:19
Slow 37:15
small 21:14,14
some 12:10 23:7
   24:10 31:7
   34:13 37:11
somebody 29:4
   39:7,20
someone 21:23
   30:8 36:9
something 10:2

19:17 26:21
   37:16,17
   39:21
Sometimes
   35:10,19
South 2:3,6
specific 7:2,4
   16:17,20 17:5
   17:7,20 25:12
   31:5 33:10
   37:8,13
specifically 4:14
   19:3 20:4,22
   22:12,15 23:1
   24:10 29:14
   30:24
specifics 8:11
speculate 33:17
speculation 30:7
spoke 15:9
Springfield 1:3
   2:3,6,10 27:1
   27:4
SS 41:1
staff 8:9,19 34:6
   34:7 38:7
stairs 37:22
starts 6:5
state 1:16 5:8
   36:12 41:1,7
stated 16:10
statement 15:3
statements
   12:21
STATES 1:1
status 35:21
Sterling 1:18
   4:6 5:18
Steve 31:10
still 11:5
stipulated 4:2
Street 2:3,6,13
Strike 29:20
stuff 8:22 25:5
   32:1 37:22
subdivision 7:22
subordinant 8:9
   38:6
subsequent
   18:19
sufficient 20:20
   21:9,23 22:11
Suite 2:10
summary 6:18

summer 11:8
   31:3
supervisor 6:1
   12:1 31:2
   33:12,20
   34:14 38:22
   39:4,5
supervisors 31:8
Suppose 15:9
Supreme 4:11
sure 5:24 13:21
   17:19 24:18
   25:2,10 26:6
   26:21
sustained 30:23
sworn 5:2,4
   41:10

_____
         T
T 3:11 4:1,1
   41:3,3
take 15:12 21:16
   26:14 27:3
taken 1:13 4:3,8
   41:13
taking 41:8
talk 21:17
talked 9:20
   32:15 35:15
   36:5 37:7
talking 25:2
   29:1
tell 12:8 17:23
   18:2,5 26:17
   34:6,8,13
   37:24
telling 16:3,6
   27:21
tells 12:12 13:1
   14:10
temporary 36:3
Tenney 2:12,12
term 18:16
   26:17,18
   36:11
terms 13:19
test 19:1,9,11,21
   20:3,9,13,16
   22:14,16,21
   23:15,24 24:5
   25:22 26:23
   28:7,9,19 29:1
   29:3,10,16,17
   36:7

testify 33:4
   41:10
testimony 9:16
   9:21
testing 36:6
tests 26:14,20
thank 29:6,6
   30:10
their 4:2 14:7
   21:5,17 37:5
thereof 4:15
thing 25:12
   37:17 39:24
think 9:13,24
   10:14 17:8
   18:23 37:14
   38:21 39:13
Thomas 2:2
three 18:6 27:6
   27:7 31:9,10
through 4:2
   21:6 26:6
ticket 22:7,7
   28:9 35:14,15
   35:18 36:1,15
tickets 35:17
ticket's 32:16
time 6:20 18:2
   20:5,23 21:18
   23:11,22,23
   24:4 25:21
   27:5,6,9,15,19
   29:23 30:5,14
   31:6,15 36:20
   37:19
times 33:23
   35:17
title 17:24
today 9:9,16
   30:11 31:18
told 15:10,11
   20:19 24:9
   27:22 34:15
   36:14 38:21
Tom 25:16
top 37:21
track 22:6
trained 32:1
training 26:20
   32:2
transcribed 4:9
   41:14
transcript 41:14
transfer 10:21

12:4 13:2,3,3
   13:5,10,10,14
   13:15,23
   20:10 21:4
   29:11 35:5
transferred
   21:24 29:16
   29:17,24
transfers 13:7
   22:10
translation
   41:15
treat 32:2
treatment 19:1
trial 9:22
Troemper 2:9
   38:18
true 41:15
truth 41:10,11
   41:11
two 20:23 23:20
   23:21 27:5,6,8
   27:15 34:2
type 15:13 16:6
   19:21 22:19

_____
         U
U 4:1
Uh-huh 17:15
unable 20:19
   21:1,8
uncommon
   20:21
under 7:11 17:8
   41:17
understand 7:17
   8:1,11 13:18
   16:24 26:3,7,8
   31:13
understanding
   10:8
understood 6:4
unit 8:22 34:2
   39:10
UNITED 1:1
units 33:23
universal 32:3
unless 4:14
   39:20
until 9:14 12:21
   14:6
unusual 14:16
   14:17 17:8,14
urine 19:1,8

20:20 21:2,9
21:23 22:11
22:19 27:10
27:12,14,19
28:2,18 36:5,6
36:19
**use** 17:23 28:11
**used** 4:16 18:16
19:13,15
20:10 21:3
26:18 29:11
36:11
**usual** 17:9
**usually** 12:19
19:18 33:11
34:12

---
**V**
---
**vague** 8:11
**valid** 34:24 35:1
35:3,9
**various** 5:20
**vary** 36:22
**vendor** 36:21
**verbally** 13:1
**very** 16:14
**via** 33:8
**vision** 30:13
**vis-a-vis** 11:6
**VOELKER** 2:8
**vs** 1:7

---
**W**
---
**W** 5:3
**waive** 40:4
**waived** 4:12,14
**want** 12:15
13:18,21
15:17 24:6,10
27:20 33:17
37:20 39:24
**wanted** 15:11
**wants** 12:15
13:1
**warden** 6:8,9,12
**wardens** 6:7,14
**wasn't** 11:20
18:22 39:14
**water** 2:13
23:21 27:7,7
37:16
**way** 29:21
**Well** 6:11,23
7:18 8:2,12

10:4 11:9 12:1
12:12 13:6,11
13:21 17:1,14
17:22 19:10
19:14,16 24:8
25:17 26:6
28:24 30:16
**went** 7:12 17:16
**were** 9:8,15,16
9:24 11:7
22:13 23:23
30:4 31:7
**Western** 1:17
4:6 5:17,21
7:20 10:6
31:21
**we'll** 34:16 40:4
**we're** 12:13 24:8
27:3 32:1
36:21
**whichever** 26:23
**whole** 33:18
41:11
**wing** 34:3
**wings** 34:2
**witness** 4:8,11
19:23 20:1,3
24:21 33:4
**words** 7:12
25:22
**work** 16:16
**worked** 31:8,21
**working** 39:11
**wouldn't** 20:21
31:5
**write** 22:7 26:7
35:13
**writing** 22:7
36:15
**written** 14:12,13
14:14,18
32:16 34:18
36:2 37:17,21
38:4
**wrong** 10:9

---
**X**
---
**X** 3:1,11

---
**Y**
---
**Y** 5:3
**Yeah** 19:23 37:9
**years** 7:6,7,7,8
18:6 31:9,10

---
**Z**
---
**zone** 33:12,20
34:14 38:22
39:4,5

---
**0**
---
**02-3171** 1:7
**084-002128**
41:23

---
**1**
---
**1-800-248-2835**
1:24
**10:30** 1:17 4:5
**1227** 2:3
**13** 7:8
**14** 7:9
**18** 7:7

---
**2**
---
**2** 1:17
**2nd** 4:5 41:9
**2004** 11:8 16:16
16:19 38:23
**2006** 31:3
**2007** 1:17 4:5
41:9,18
**217)788-2835**
1:23
**217)788-2838**
1:23
**236** 2:13
**24** 23:21
**24hrs** 1:23

---
**3**
---
**3** 39:10
**32** 3:4
**38** 3:4

---
**5**
---
**5** 3:4
**500** 2:6
**575** 2:10

---
**6**
---
**6th** 41:17
**62525** 2:13
**62701** 2:10
**62703** 2:3
**62706** 2:6