3:02-cv-03171-HAB-BGC   # 380-16   Page 1 of 12

2/2/07
Philip Crary

McCroy vs. Illinois Dept. of Corrections

**E-FILED**
Friday, 04 May, 2007  02:28:02 PM
Clerk, U.S. District Court, ILCD

```
 1                  UNITED STATES DISTRICT COURT

 2              FOR THE CENTRAL DISTRICT OF ILLINOIS

 3                       SPRINGFIELD DIVISION

 4

 5   AARON McCROY,

 6             Plaintiff,

 7      vs.                              No. 02-3171

 8   ILLINOIS DEPARTMENT OF
     CORRECTIONS, et al,
 9
               Defendants.
10

11

12

13        THE DEPOSITION of PHILIP CRARY, taken in

14   the above-entitled case before Debra K. Baldwin, a

15   Notary Public of Sangamon County, acting within and

16   for the County of Brown, State of Illinois, at

17   11:15 o'clock A.M., on February 2, 2007, at Western

18   Illinois Correctional Center, Mt. Sterling, Brown

19   County, Illinois, pursuant to notice.

20

21

22
             Baldwin Reporting & Legal-Visual Services
23              Serving Illinois, Indiana & Missouri
            24hrs (217)788-2835    Fax (217)788-2838
24                       1-800-248-2835
```

COPY

Page 1

2/2/07  McCroy vs. Illinois Dept. of Corrections
Philip Crary

```
1              (Whereupon the Deponent was
2              sworn by the Notary Public.)
3              P H I L I P   C R A R Y
4   having been first duly sworn by the Notary Public,
5   deposeth and saith as follows:
6                   EXAMINATION
7                   BY MR. LONDRIGAN:
8       Q    Give us your full name, please.
9       A    It's Philip Mark Crary.
10      Q    And would you briefly outline to me your
11  education and employment background up to the
12  present and the different positions you've held.
13      MS. CHOATE: And I would object for security
14  reasons to any names of schools, but degrees
15  certainly or diplomas or whatever's fine.
16      THE DEPONENT: High school graduate, military
17  service, police experience, then here. At the same
18  time I'm also an officer on the streets right now.
19  I have numerous investigative schools. No college
20  education.
21      MR. LONDRIGAN:  Q  But are you currently a
22  full-time employee with the department?
23      A    Yes. Yes, sir, I am.
24      Q    And explain to me the various positions
```

Page 5

3:02-cv-03171-HAB-BGC    # 380-16    Page 3 of 12

2/2/07                    McCroy vs. Illinois Dept. of Corrections
Philip Crary

1   that you've occupied with the department since you
2   joined them.
3       A   I'm currently an officer which is where
4   I've always been an officer. Special assignments
5   have been--I was a training officer and now in the
6   internal affairs investigating officer.
7       Q   How long have you been assigned to
8   Western?
9       A   Here at this prison?
10      Q   Yes.
11      A   Almost 11 years.
12      Q   And you've been doing essentially the
13  same thing during that period of time?
14      A   No. Because I was a wing officer for five
15  years, did two years of training officer, and I'm
16  on my third year of being an investigative officer.
17  Different outlined duties.
18      Q   Now, what were your duties and
19  responsibilities, your job title and description,
20  in other words, in the year 2004?
21      A   I was a correctional officer and I was in
22  the investigations internal affairs office.
23      Q   And did you head up that division or
24  department?

Page 6

3:02-cv-03171-HAB-BGC    # 380-16    Page 4 of 12

2/2/07　　　　　　　　　McCroy vs. Illinois Dept. of Corrections
Philip Crary

```
1      A    No.

2      Q    Was there only one?

3      A    No. At the time there was a major that
4  was working down there. He did staff issues and I
5  did inmate issues.

6      Q    Okay. And who was your superior at that
7  time?

8      A    That would have been Major McKee.

9      Q    M-c-K?

10     A    M-c-K-e-e.

11     Q    And now are you handling both?

12     A    No, sir. I do staff issues. I mean,
13 inmate issues only.

14     Q    Who occupies McKee's position now?

15     A    Lieutenant Ashcraft.

16     Q    When is the first time that you had any
17 contact with an inmate that I've been appointed to
18 represent in the federal court, Aaron McCroy?

19     A    McCroy. Would have been when he had the
20 fight with his cellmate.

21     Q    And is that the first time?

22     A    Yes, sir.

23     Q    And, in other words, you had never heard
24 anything of McCroy prior to that time?
```

Page 7

3:02-cv-03171-HAB-BGC    # 380-16    Page 5 of 12

2/2/07                   McCroy vs. Illinois Dept. of Corrections
Philip Crary

| | | |
|---|---|---|
| 1 | A | Not that I'm aware of.  No, sir. |
| 2 | Q | How about Durham? |
| 3 | A | No, sir. |
| 4 | Q | Are you aware that he had been involved in other altercations or fights prior to this one with McCroy? |
| 7 | A | Which one? McCroy? |
| 8 | Q | No, not McCroy. |
| 9 | A | Durham? |
| 10 | Q | Durham. |
| 11 | A | No, sir. |
| 12 | Q | So you had not investigated any of those? |
| 13 | A | No. No, sir. |
| 14 | Q | And at the time you conducted this investigation you were not aware that he had been involved in any previous altercations or fights? |
| 17 | A | No. |
| 18 | Q | And you're not-- |
| 19 | A | You're saying prior to this, sir? |
| 20 | Q | Yes. |
| 21 | A | Yes, sir. You're right. |
| 22 | Q | And you're not aware of any prior altercations or fights that he was involved in today, as you sit there, is that right? |

Page 8

2/2/07                     McCroy vs. Illinois Dept. of Corrections
Philip Crary

```
1     A    I've had no reason to check on it.
2  No, sir.
3     Q    Who was it that called you in to
4  investigate what happened here?
5     A    Basically the way this one went was I
6  came in the next morning after the altercation had
7  happened. Normally on a regular fight I wouldn't
8  investigate just a normal fight. These two were
9  placed in what's called an investigative status.
10 That's where I'm brought into, that they didn't
11 witness the fight, they just knew they had both
12 parties with injuries.
13         So the next morning when I got there, I
14 went in the cell, took a couple little pictures of
15 blood that was on the toilet, I got statements from
16 both, and then I issued them both an IDR, I mean a
17 ticket for fighting, based on their statements.
18    Q    Were you aware that there had been an
19 investigation conducted the evening of the fight
20 which was around the dinner hour?
21    A    No, sir.
22    Q    What rules, regulations, protocols or
23 other requirements are set forth as to what should
24 be done to preserve the scene of a fight where
```

Page 9

3:02-cv-03171-HAB-BGC    # 380-16    Page 7 of 12

2/2/07                           McCroy vs. Illinois Dept. of Corrections
Philip Crary

1    aware of that?

2        A    No, sir.

3        Q    And no one volunteered that to you at the

4    time you were conducting your investigation and you

5    issued the citations?

6        A    No, sir.

7        Q    Did you arrive at a personal conclusion

8    as to who initiated this fight? By that I don't

9    mean the argument itself, but to who struck the

10   first blow?

11       A    I would have to read my--. Can I read my

12   report?

13       Q    Sure.

14       A    You don't mind?

15       Q    No.

16       A    I believe you guys all have a copy of

17   this. I believe in my--. You're asking me my

18   belief? Is that how you said it?

19       Q    Yes.

20       A    In my opinion?

21       Q    Did you arrive at any conclusion, and

22   then I want you to explain to me what are the

23   factors that you used in arriving at that

24   conclusion.

Page 15

3:02-cv-03171-HAB-BGC    # 380-16    Page 8 of 12

2/2/07                    McCroy vs. Illinois Dept. of Corrections
Philip Crary

1    A    Okay. The only thing I have to do--I
2    mean, there's a different standard between
3    department of corrections and the outside world.
4    You understand that as far as us writing--
5    Q    I'm coming to that conclusion.
6    A    Well, what I'm saying as far as
7    disciplining an inmate.
8    Q    And for good reason.
9    A    Okay.  Under DL504, as far as this kind
10   of inmate, there's different circumstances and be a
11   burden of proof, okay. And, basically, on this I
12   have both of their statements. There was physical
13   evidence of course.  Both of them had scratches.
14   Mr. McCroy had the injury to his eye.  Durham had
15   scratches, abrasions on him which proved to me that
16   there was a physical altercation in the cell.
17          If it was just as easy as Mr. McCroy said
18   in that he was struck in the eye and he did
19   nothing, never touched them, then the other guy
20   wouldn't have had marks on him, fresh marks on him.
21   What's the other guy's name? Mr. Durham says in his
22   statement, and I believe, and I can't quote it for
23   a fact, unless you really want me to, that McCroy
24   had come up and kissed him on the lips. And that's

Page 16

3:02-cv-03171-HAB-BGC    # 380-16    Page 9 of 12

2/2/07  McCroy vs. Illinois Dept. of Corrections
Philip Crary

```
 1    what started the argument.
 2            And McCroy states that Durham, I believe
 3    he stated that Durham started to choke him. No.
 4    That's what Durham stated, that McCroy was choking
 5    him and that he had to swing back. But he said he
 6    didn't remember swinging at him. Of course he swung
 7    at Mr. McCroy because he had the injury to his eye.
 8    It's obvious.
 9            So based on them factors, I have to
10    factor that all together.  In our departmental
11    rule, okay, like I said, it's totally different
12    than the outside burden of proof. That's why I
13    wrote the administrative ticket on them saying that
14    they were fighting in the cell.
15       Q    So you issued the same tickets to each
16    one, that they were fighting?
17       A    Yes, sir. Yeah.
18       Q    At the time that you received these
19    statements, did you have the advantage of the
20    initial statement that was given by Durham the
21    night before when the security on guard interviewed
22    him as to what happened?
23       A    Let me see what I had the night before.
24    Is that all right?
```

Page 17

3:02-cv-03171-HAB-BGC    # 380-16    Page 10 of 12

2/2/07                           McCroy vs. Illinois Dept. of Corrections
Philip Crary

```
1    lie. Correct?
2        A    Correct.
3        Q    Do you have any reason to doubt the
4    incident reports from the officers at the scene?
5        A    No, ma'am.
6        Q    Do you know the relative sizes of
7    Mr. McCroy and Mr. Dunham (sic)? Or do you recall?
8        A    No. I could find that out real quick by
9    looking at that sheet.
10       Q    How big is Mr. McCroy according to the
11   sheet you have in front of you?
12       A    Mr. McCroy is 250 pounds, six foot one.
13       Q    And that was back in?
14       A    This was 9/24 of '04.
15       Q    So the day after the incident I believe
16   or the day before the incident?
17       A    The day after. Because this happened on
18   the 23rd. And Mr. Durham was 160 pounds, five foot
19   nine. Much smaller.
20       Q    Are you generally, as a correctional
21   officer, which you said you've been a wing officer
22   as well, are you privy to inmates' medical
23   information?
24       A    No, ma'am.
```

Page 26

## ILLINOIS DEPARTMENT OF CORRECTIONS
## COMMITTED PERSON'S GRIEVANCE

Committed Person: Aaron McCroy
(Please Print)
ID#: N51882

Date: [Nov] 2 2004

Facility: Western Illinois C.C.
Facility where grievance issue occurred: SAME

**NATURE OF GRIEVANCE:**
- [ ] Personal Property
- [ ] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Disciplinary Report
- [ ] Mail Handling
- [ ] Dietary
- [ ] Transfer Denial by Transfer Coordinator
- [ ] Restoration of Good Time
- [x] Medical Treatment
- [x] Disability
- [ ] Other (specify):

Date of Report: ____  Facility where issued: ____

Note: Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

**Brief Summary of Grievance:** This Emergency Grievance is filed pursuant to I.D.O.C.'s Rules governing the American With Disability Act to be forwarded either to the Warden of Western Illinois C.C. American With Disability Cooridinator.

On June 8 2004 I was released from the infirmary against my treating surgeon's orders/recommendations. This recommendation was made because of the fact that my cornea transplant had not yet healed and my continual poor vision due to Keratoconus. I filed an emergency grievance to Warden Winter's concerning my improper placement in general population on June 15, 2004. These grievances were denied emergency status by Warden Winter's. Therefore, I resubmitted the grievances on the institutional level but as of this date not action has been taken on either grievance.

Subsequently, on September 23, 2004 I was assaulted by my cell mate inmate Durhim, who despite his extensive history of fighting his cell mates was placed in the cell with me. This cell placement

_____ listed: _____

**CONTINUED ON REVERSE**
**INCLUDING RELIEF REQUESTED**

[x] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

Committed Person's Signature: _____ ID: N51882 Date: 11.12.04
(Continue on reverse side if necessary)
Resubmitted 11-30-04

### Counselor's Response (if applicable)

Date Received: 11/30/04
[ ] Send directly to Grievance Officer
[ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: D. Fugua, HCU Admin. stated that per Dr. Brown, Offender McCroy was released from the infirmary per his request. There was not existing surgeon's order violated. The eye was not worsened by a corneal graft. The loss of vision following the injury was trivial as his vision was 20/200 prior to the injury which up is already blind. Mr. McCroy was seen 12/8/04 by a specialist who recommended to have contact lense fitting and a prosthesis or glass eye for left eye.
12/28/04

Print Counselor's Name: K. Kaser, CCI
Counselor's Signature: Kaser
Date of Response: [illegible]

### EMERGENCY REVIEW

Date Received: 11/17/04

Is this determined to be of an emergency nature?
[ ] Yes; expedite emergency grievance
[x] No; an emergency is not substantiated. Committed person should submit this grievance in the normal manner.

Follow-up with HCU

Chief Administrative Officer's Signature: [signature]
Date: 11/19/04

EXHIBIT 17

Distribution: Master File; Committed Person
Page 1
DOC 0046 (Eff. 10/2)

ILLINOIS DEPARTMENT OF CORRECTIONS
## COMMITTED PERSON'S GRIEVANCE (Continued)

was done after inmate Durhim was released from segregation after being picked up for first fighting with his cell mate in unit R4 and then fighting with his cell mate in segregation. These I.D.R.'s are but two of the nerous tickets he has received for altercations with his cell mates.

It goes without saying that if HCU Staff and WICC Officials would have listened to the warning of Dr. Zeh concerning the fragility of my cornea trasplant and the possibility of the loss of my left eye if it was hit, together with his orders/recommendations to keep me in the infirmary until my sugery healed and my poor vision was improved. I would still have my left eye and it's sight.

Instead, despite pending litigation concerning Wexford's and WICC's Staff deliberate indifference to my serious medical needs of my visual disabilities. Not to mention the fact that due to HCU Staff's prior disregard for Doctor's Orders.I developed cataract and Glaucoma in my left ey further lessening my vision. Dr. Brown and Dr. Andersen without so much as an examination of my eyes discharged me to the general population and placed me as medically unassignable, preventing me from enrolling in the early release program.
See attached Emergency Grievance of June 15, 2004

Now I find my self back in the infirmary with not sight in my left eye and the mandated fit of a right contact lens having been ignored for over three(3) years; and once again facing the hostility and retaliation of HCU Staff and Correctional Officers assigned there. i.e.

1) having my property search and being accused of misuse of medication. Called to internal affairs and questioned for what turn out to be another mistake made by HCU in the count of the pills given me.

2) C/O Hendrix on 10-28-04 while I was out on a medical furlough taking my fan without issuing me a shakedown slip or I.D.R. ( It should be noted that I have previously file grievance concerning her harrassment)

3) C/O Wilson on 11-01-04 without cause taking my water pitcher without issuing me a shake down slip or I.D.R. ( It should be noted that I have filed many grievances concerning c/o Wilson's retaliatory actions and have and will seek court decisions concerning her part in pending matters)

4) Correctional and HCU Staff requiring me to place my t.v. under a high ly lit window despite there knowledge that my eye is extremely light sensi ive and I can see it.

In total I have previously filed over 20 grievances concerning WICC's durib rate indifference to my serious medical needs and as a result of these grievances being ignored or overlooked I have loss the sight in my left ye and substained extreme damage to my right cornea.

---

RELIEF REQUESTED

to be given all medical records concerning the person or persons responsible for my discharged from the infirmary on or about June 8, 2004. to be sent for a contact lens fitting for my right eye and a glass eye fitting for my left eye as soon as possible, to be transferred to another institution where I can enroll in the early release program and receive all the mandated care due my disability. and any other measure deem needed.