**E-FILED**
Friday, 04 May, 2007 02:28:38 PM
Clerk, U.S. District Court, ILCD

# Deposition of
# **Julius Flagg**

## Aaron McCroy
### -vs-
## Illinois Department of Corrections, et al

## 2002-3171

## December 21, 2006

## Reporter: Karen Waugh, CSR

Keefe Reporting Company
618-277-0190 or  800-244-0190
Reporter@KeefeReporting.com

1          JULIUS FLAGG, produced, affirmed and examined on

2    behalf of the Plaintiff, testified and deposed as

3    follows:

4                         EXAMINATION

5    BY MR. QUIVEY:

6          Q.    Sir, please state your name.

7          A.    Julius Flagg.

8          Q.    And, sir, what's your business address?

9          A.    Centralia Correctional Center, PO Box 1266.

10         Q.    And, sir, do you have any relatives living

11   in the Central District of Illinois, in central Illinois?

12               MS. CHOATE:  I would object to the relevance

13   and security issues.

14         Q.    Well, my next question is do you have any

15   relatives in central Illinois with a different last name,

16   and the purpose is for when we're picking a jury, I can

17   identify if there's any of those people related.  That's

18   the whole purpose of my question.  I don't need specific

19   locations or anything like that.  It's just for purposes

20   of picking a jury.

21               MS. CHOATE:  Well, I would continue to

22   object, because those people might not be guarding their

23   privacy as well as the people who actually work here at

24   the institution, and the Judge generally will ask --

1    Judge Baker always asks, do you know any of the parties,

2    are you familiar with them, etc.  Those things will be

3    asked at trial, and I would object to having that on the

4    record that would, you know, possibly put their security

5    in jeopardy if those were in the record.

6              MR. QUIVEY:  Are you instructing him not to

7    answer the --

8              MS. CHOATE:  I am instructing him not to

9    answer that.

10             Q.  (By Mr. Quivey)  Sir, what is your current

11   position with the Illinois Department of Corrections?

12             A.   Assistant warden of operation.

13             Q.   And how long have you been in that position

14   here at Centralia?

15             A.   Centralia, I arrived here April '06.

16             Q.   And since arriving at Centralia, have you

17   been in that position the entire time?

18             A.   Correct.

19             Q.   Okay.  Prior to that -- well, strike that.

20   How long have you been employed by the Illinois

21   Department of Corrections?

22             A.   Over 23 years.

23             Q.   Prior to becoming assistant warden for

24   operations at Centralia, you were at Pinckneyville,

1    correct?

2          A.    Correct.

3          Q.    And your last position at Pinckneyville was

4    acting warden, correct?

5          A.    Correct.

6          Q.    While you were acting warden, did you hold

7    any other positions?

8          A.    Correct.

9          Q.    What was that?

10          A.    Assistant warden of programs.

11          Q.    Approximately how long were you at

12    Pinckneyville?

13          A.    Arrived in Pinckneyville in June of 2001.

14          Q.    And did you have any positions at

15    Pinckneyville other than assistant warden for programs

16    and acting warden?

17          A.    ADA coordinator.

18          Q.    And approximately how long were you ADA

19    coordinator?

20          A.    Since the time arriving at Pinckneyville

21    Correctional Center.  Probably about a month later I was

22    appointed.

23          Q.    And is that a position that you hold along

24    with another position?

```
 1              Q.    And so you served as ADA coordinator at

 2    Pinckneyville until you left Pinckneyville in April?

 3              A.    Correct.

 4              Q.    While you were acting warden at

 5    Pinckneyville, were you the -- considered the chief

 6    administrative officer there?

 7              A.    Correct.

 8              Q.    Besides this manual that you testified

 9    about, are you aware of any other protocol -- well,

10    strike that.  In the manual you talked about that you had

11    as ADA coordinator and that is still at Pinckneyville, is

12    there anything in that manual about protocol or rules

13    regarding placement for inmates in ADA cells?

14              A.    I don't recall what's all in that manual.

15              Q.    Are you aware that in a request to produce

16    in this lawsuit that Mr. McCroy asked for protocols --

17    among other things, protocols for placement in the ADA

18    cells?

19                    MS. CHOATE:  He wouldn't know that.  You can

20    ask him, but --

21                    MR. QUIVEY:  Well, I'm just -- my gripe is

22    we asked for it repeatedly and we never got it.

23                    MS. CHOATE:  And we were told there weren't

24    any documents, and not by this witness, but by the
```

20

1    coordinator at Pinckneyville, and I will ask for it

2    again, Doug, no problem, but I can only tell you what I

3    was told.

4            Q.    (By Mr. Quivey)  Sir, what is the criteria

5    for placement of an inmate in an ADA cell?

6            A.    That's all handled by placement and medical.

7            Q.    So the ADA coordinator -- well, strike that.

8    That wasn't an answer to my question.  What is your

9    understanding of what is the criteria for placement of an

10    inmate in an ADA cell at Pinckneyville during the time

11    that you were the ADA coordinator?

12            A.    And I just answered.  That's all done by

13    placement and done by medical.  Basically, the ADA

14    coordinator does not make no ruling on who goes in an ADA

15    cell.

16            Q.    Okay.  I didn't ask who made the ruling or

17    who made the decision.  I asked you what the criteria

18    was.

19            MS. CHOATE:  You can answer if you know.

20            A.    Criteria, basically there's really not --

21    basically, ADA cell is for inmates basically with

22    wheelchairs.  There's really no big difference in the

23    cell that they go in.  It's just a bigger cell so that

24    inmates that's in wheelchairs can move around in.

21

1         Q.    Sir, are there any different rules than what

2   you've previously discussed if the underlying grievance

3   concerns an allegation of disability discrimination or

4   failure to provide an accommodation under the ADA?

5         A.    What?

6               MR. QUIVEY:  Please --

7         A.    I'm not sure I'm clear on your question.

8               MR. QUIVEY:  Please read back the question.

9               (Question read back by the reporter.)

10        A.    Depends on how the inmate submits the

11  grievance.  If the inmate submits the grievance as an ADA

12  violation or whatever, then there's a different process,

13  correct.

14        Q.    (By Mr. Quivey)  And what is that process?

15        A.    That process means then the grievance is

16  reviewed by the ADA coordinator.

17        Q.    And does -- what does the ADA coordinator do

18  as part of that review?

19        A.    Would be the same thing as which the

20  grievance officer does, look into the inmate's

21  allegations.

22        Q.    Is there any requirement that a response to

23  an inmate grievance get provided to the inmate?

24        A.    A requirement that a response?  What you

1    mean?

2           Q.    Well, an inmate files a grievance.  Is there

3    any requirement that at some point in time, be it 60 days

4    or whenever, that the inmate be informed of the

5    resolution of his or her grievance?

6           A.    The inmate's always made aware of what the

7    resolution of the grievance is.

8           Q.    And what is the mechanism for doing that?

9           A.    Basically, he gets back the same form which

10   shows that either his grievance was denied or granted.

11          Q.    Sir, when Aaron McCroy was transferred to --

12   into Pinckneyville on or about August 24, 2005, did you

13   review his transfer records at or near the time of his

14   transfer?  Did you have any occasion to review that?

15          A.    No.

16          Q.    Were you involved at all with the decision

17   of where he would be placed within Pinckneyville after he

18   arrived at Pinckneyville?

19          A.    No.

20          Q.    Who were the people responsible at that time

21   period, August 24, 2005, to make that placement decision

22   within Pinckneyville?

23          A.    That's all done by the placement office.

24          Q.    And those were the -- to the best of your

1    you would have to see the cell or is there some document

2    that would tell you that?

3            A.    Sometime -- I don't recall exactly how the

4    cell numbers are set up.  Sometime an ADA cell might be

5    at the beginning of the wing on this side; other times it

6    might be on the other side.

7            Q.    Okay.  Is there any document that I could

8    get from Pinckneyville that would show that?

9            A.    There's no document I'm aware of.

10           Q.    Are you aware of a person that would know

11   that?

12           A.    As I said before, there -- placement office

13   knows which cells are designated ADA cells.

14           Q.    Sir, would you agree with me that on January

15   9, 2006, that you wrote a memo to Aaron McCroy?

16           A.    Correct.

17           Q.    Okay.  And in that memo you advise that you

18   reviewed his file; is that correct?

19           A.    That is correct.

20           Q.    Okay.  As part of your review of the file,

21   did you review the medical component of his file?

22           A.    Basically, the part of the file which I

23   reviewed is whether or not he needed to be in an ADA

24   cell.

36

1          A.    Correct.

2          Q.    Prior to you becoming acting warden, other

3    than as ADA coordinator, did you have any involvement in

4    any grievances that Aaron McCroy had submitted?

5          A.    Any involvement as far as what?

6          Q.    Okay.  Well, I'm assuming after you became

7    acting warden, any grievance that made it to your desk as

8    chief administrative officer, you had involvement in all

9    grievances at that point, correct?

10         A.    Uh-huh.

11         Q.    Okay.  And I'm sorry.  I don't remember

12    exactly when you became acting warden.

13         A.    Around December.

14         Q.    Okay.  Prior to December, did you have any

15    involvement in any grievances submitted by Aaron McCroy?

16         A.    Not that I recall.

17         Q.    I'm now handing you the January 9 memo that

18    we talked about earlier, and do you have a copy of that?

19         A.    Yes, I do.

20         Q.    Okay.  Why did you write that memo?

21         A.    Basically, that memo was written to him

22    after he had written a letter to Deputy Director Meek.

23         Q.    And I'm assuming that Deputy Director Meek

24    forwarded the letter to you; is that correct?

40

1    in the mouth, and what -- as I understood your prior

2    testimony, the part of his file that you reviewed was the

3    medical portion of his file in preparation of writing

4    this January 9, 2006, memo.

5          A.    The part about whether or not he met the

6    criteria to be an ADA cell.  Did I review his file

7    entirely?

8          Q.    Okay.  And would you agree with me in this

9    memo you say he does not meet the criteria for placement

10   in an ADA cell?  Correct?

11         A.    That is correct.

12         Q.    Okay.  Why did he not meet the criteria?

13         A.    Basically, from what I received, review of

14   his file and from the medical people who actually makes

15   that determination is he had no need to be in an ADA

16   cell.

17         Q.    Okay.  Which medical people did you talk to?

18         A.    Which would have been at the time -- which

19   would be Christine Brown, which is the health care unit

20   administrator.

21         Q.    Okay.  Are you aware of any changes in Aaron

22   McCroy's medical condition between August 24, 2005, and

23   January 9, 2006, from your review of his file?

24               MS. CHOATE:  I would object to foundation

```
 1          A.    However they do it.

 2          Q.    Do you know whether or not Inmate McCroy was

 3   moved from an ADA cell to a cell at R2 A-37 on or about

 4   December 29, 2005?

 5          A.    As I testified before, I don't know exactly

 6   which date he was moved.  Yes, I do.  I'm aware that he

 7   was moved out of ADA cell.

 8          Q.    Okay.  As you previously testified, B refers

 9   to a wing or a block, correct?

10          A.    A wing.

11          Q.    A wing.  And I'm assuming A refers to a

12   separate wing.

13          A.    Correct.

14          Q.    Are there ADA cells in both the A wing and

15   the B wing?

16          A.    It could be.  Not every wing has an ADA cell

17   on it.

18          Q.    And again, just so we're clear, we're

19   talking about Pinckneyville at the time that you were

20   acting warden.  Would you agree with me that you were the

21   one that made the decision to move him out of the ADA

22   cell?

23          A.    No, I won't agree with you.

24          Q.    Okay.  Who made that decision?
```

1          A.    That's done by the placement office.

2          Q.    Okay.  And it would have also been the

3    placement office that initially placed him in the ADA

4    cell, correct?

5          A.    That is correct.

6          Q.    Do you know why the placement office --

7    whomever at the placement office -- I mean, the office

8    doesn't move, but the person in the placement office made

9    the decision -- do you know why that person decided to

10   move him out of the ADA cell?

11         A.    No, I don't.

12         Q.    Were you consulted as the ADA coordinator

13   prior to that move being effectuated?

14         A.    They don't have to consult me about ADA

15   cells, placement or removal of inmates from ADA.

16         Q.    Who is Christine Brown?

17         A.    Christine Brown's the health care unit

18   administrator.

19         Q.    Okay.  Is she a physician?

20         A.    No, she's not a physician.

21         Q.    Is she a nurse?

22         A.    She's a health care unit administrator.

23   Now, as far as what her degrees is, whether she's RN or

24   all that, I don't know.

59

1          A.    I don't know.

2          Q.    Okay.  Based on your experience of seeing

3    medical permissions, have you ever seen that before?

4          A.    I can't answer that.  I don't know, because

5    circumstance -- because a doctor write an order, it might

6    not get in the inmate's master file or medical file right

7    away.  Some might get it right away.  It depends on the

8    filing of whoever's placing it in there.

9          Q.    No, I understand that, but I -- what I'm

10   saying is there's no reason to think that it would have

11   gotten into the file prior to January 16, 2006, is what

12   I'm asking.  I agree with you that this doesn't

13   necessarily mean that it got in his file on January 16,

14   2006, but there's no reason to believe that this would

15   have been put in his file when you reviewed his file on

16   January 9, 2006, is there?

17         A.    No.

18         Q.    After you reviewed his file on January 9,

19   2006, as it relates to the removal of the ADA cell, did

20   you ever have occasion to revisit the issue as to whether

21   or not he should be in an ADA cell?

22         A.    There was no reason for me to revisit the

23   issue.

24         Q.    Did you ever have any conversations with

1                        EXAMINATION

2    BY MS. POWELL:

3            Q.   Okay.  Warden Flagg, I just have a couple

4    questions for you, if I may.

5            A.   Okay.  That's fine.

6            Q.   It's my understanding that you were -- or as

7    part of your duties you were the ADA coordinator at

8    Pinckneyville in 2005; is that correct?

9            A.   Correct.

10           Q.   What does that mean when you're the ADA

11   coordinator?  What are your duties in that role?

12           A.   Basically, my duties in that role is if for

13   some reason there is an ADA issue or whatever, then

14   usually it's ran through my office to try to address that

15   issue at the institutional level, as well as addressing

16   that issue if for some reason that it's an area that I'm

17   unfamiliar with, basically then I would reach out to the

18   ADA coordinator, which is for Springfield.

19           Q.   Okay.  And with respect to ADA cells, what

20   is the size of a non-ADA cell; do you know?

21           A.   The only difference in between an ADA cell

22   and a regular cell is it's just a little bit larger so

23   that inmates that's in wheelchairs can move around in the

24   room.

70