**E-FILED**
Friday, 04 May, 2007  02:38:11 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| AARON MCCROY, #N-51882, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No.  02-3171 |
| | ) | |
| ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF APPLICABLE LAW AND ARGUMENT IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NOW COME the Defendants, ILLINOIS DEPARTMENT OF CORRECTIONS (IDOC), JULIUS FLAGG, SANDRA FUNK, DEBRAH K. FUQUA, DENNIS HOCKADAY, BYRON LAW, ROGER E. WALKER, JR., and KEVIN WINTERS, by and through their attorney, Lisa Madigan, Attorney General for the State of Illinois, and in support of the Motion for Summary Judgment submit the following Memorandum of Applicable Law and Argument:

### INTRODUCTION

Plaintiff, an inmate incarcerated in the Illinois Department of Corrections, has filed his Third Amendment Complaint alleging the defendants violated his rights under the First, Eighth, and Fourteenth Amendments to the Constitution, the Americans With Disabilities Act, and the Rehabilitation Act.

Plaintiff alleges while he was incarcerated at Western Illinois Correctional Center, he suffered from an eye disease, Keratoconus, in both eyes [Complaint generally].  While Plaintiff acknowledges he received a corneal transplant in his left eye, he alleges the care he received while in the Department of Corrections was inadequate in that, among other things, he suffered delays in receiving the transplant, contact lenses, was the victim of a nurse's medication error,

1

and had to keep changing Ophthalmologists [Complaint generally]. Plaintiff further alleges that he was placed in general population even though the defendants knew of a risk to his eye, and that the eye was subsequently lost after being assaulted by his cell mate [Complaint generally]. Plaintiff also alleges he was written a disciplinary ticket and transferred to a maximum security institution for failing to produce enough urine for a drug test without first determining whether Plaintiff was on medication that would hinder his ability to produce urine. Plaintiff also alleges he was denied the ability to participate in the early release program, to shop in the commissary so he could buy personal hygiene items, shower, exercise in the yard and participate in other activities to the same extent allowed by non-disabled inmates [Complaint; Fact 37]. Plaintiff also alleges he was removed from an ADA cell at Pinckneyville for approximately one year [Complaint generally]. Finally, it appears Plaintiff is complaining that he was harassed by health care and security staff because of filing grievances [Complaint generally].

Plaintiff's Third Amended Complaint sets out five counts: In Count I, Plaintiff alleges violations of the First Amendment when the defendants, Walker, Hockaday, Winters, Funk, Fuqua, Law, and Kellerman retaliated against Plaintiff for filing grievances. In Count II, Plaintiff alleges the Illinois Department of Corrections violated Plaintiff's rights under the Americans With Disability Act and the Rehabilitation Acts by retaliating against him for complaining about disability discrimination. In Count III, Plaintiff alleges Defendants Walker, Hockaday, Winters, Funk, Fuqua, Law and Kellerman violated his rights under the Eighth Amendment when they failed to protect him from his cell mate, inmate Durham. In Count IV, Plaintiff alleges Defendants Walker, Hockaday, Winters, Funk, Fuqua, Law, Kellerman and Flagg, violated the Eighth Amendment when they were deliberately indifferent to his serious medical needs, and finally, in Count V, Plaintiff alleges Defendant Illinois Department of Corrections violated his rights under the Americans with Disability Act and Rehabilitation Act by failing to give Plaintiff

the same privileges and public accommodations as allowed non-disabled inmates at Western Illinois Correctional Center.

## LAW ON SUMMARY JUDGMENT

### I.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party.  Beraha v. Baxter Health Corp., 956 F.2d 1436, 1440 (7th Cir. 1992).

The mere existence of some factual dispute will not frustrate an otherwise proper summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  "[T]he preliminary question for the judge [is] not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it upon whom the onus of proof is imposed."  Id. at 251 *citing*, Improvement Co. v. Munson, 14 Wall. 442, 448 (1872).  Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue to try.  Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365-67 (7th Cir. 1988).

### Argument on Applicability of Summary Judgment

It is uncontroverted that Plaintiff has received abundant medical care for his eye disease, both within and outside the institution, by general physicians, and specialists.  It is also uncontroverted that none of these defendants is a physician, able to determine the course of Plaintiff's medical care or to override the determinations of physicians directing that care.  It is

3

uncontroverted that Plaintiff was released from the Health Care Unit by the medical director with no restrictions as to whom he could be celled, and that none of the defendants worked in the placement office or were responsible for assigning inmate Durham to Plaintiff's cell. Additionally, taking the facts in the light most favorable to Plaintiff, it is uncontroverted that when Plaintiff raised the issue of his cell mate's past with Defendants Law and Kellerman, they gave him the option of refusing housing and going to segregation, which would have protected him from Durham. It is also uncontroverted that Plaintiff, himself, while asserting his rights to inmate Durham even after learning of Durham's past, was not in fear of being assaulted. It is uncontroverted that Plaintiff was transferred to Menard because he was not able to provide enough urine for a drug test. Finally, it is uncontroverted that plaintiff did not medically require an ADA cell for his particular disability [Feinerman Affidavit], and that he has received accommodations for his disability, including the use of a cane, safety glasses, an eye shield, contact lenses, sunglasses, and much of the time while at Pinckneyville, an ADA cell.

Because the facts in this case are uncontroverted, and Plaintiff cannot succeed on any of his claims, summary judgment is proper.

**COUNT I:  LAW ON FIRST AMENDMENT RETALIATION**

An act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution. DeWalt v. Carter, 224 F.3d 607, 618 (7th Cir. 1999), citing Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 283-4, 97 S.Ct. 568 (1977). Inmates have a right protected by the First Amendment to raise matters of public interest or concern, including complaints about prison procedures or policies. Brookins v. Kolb, 990 F.2d 308, 313 (7th Cir. 1993). That protection does not extend to communication regarding personal matters. Id. The requirement that the speech be of a matter of public concern has not been abandoned simply because the person making the speech is an inmate. Sasnett v. Litscher, 197 F.3d 290,

4

292 (7th Cir. 1999).  Just because speech relates to prisons, does not automatically made it a matter of public concern.  Spiegla v. Hull, 731 F.3d 928, 936 (7th Cir. 2004).

In the context of grievances, the Seventh Circuit has stated that the right to file grievances is protected in that exhaustion of administrative remedies is required before seeking relief in court.  DeWalt at 618, citing Preiser v. Rodriquez, 411 U.S. 475, 493 (1973).

### Argument on First Amendment Retaliation

Plaintiff's complaints in this count mirror the complaints in the deliberate indifference, failure to protect and ADA and Rehabilitation Act claims, and will be discussed in detail below. This count is different in that Plaintiff appears to allege all of the ills that befell him while he was incarcerated came as a result of his filing grievances and this lawsuit.  In most instances, Plaintiff cannot show that these alleged acts were performed by the defendants.  Also, as to acts these Defendants are alleged to have performed, Plaintiff cannot establish the acts were motivated by any decision to retaliate against Plaintiff.  For example, Plaintiff complains about his medical care.  However, as discussed in detail in the argument on deliberate indifference, none of these Defendants are alleged to be physicians who could prescribe medication, change Paintiff's ophthalmologists, have any say as to when he would be fitted for contact lenses, schedule needed medical appointments, initiate or change a medically unassigned classification [facts cited below].  The only Defendant who had any input into whether Plaintiff received his corneal transplant, Defendant Fuqua, was lobbying for him to receive the transplant without having to come up with the payment himself [facts below].  Additionally, none of these Defendants had any role in transferring him to general population without a cell mate restriction or assigning inmate Durham to his cell [facts cited below].  Defendants Law and Kellerman, following protocol, gave Plaintiff a constitutionally permissible choice between staying in his cell and refusing housing [see facts below].  There is also no evidence that any

of these Defendants were involved in disciplining Plaintiff after he lost his eye.  Plaintiff was written a disciplinary ticket for fighting by investigator, Phil Crary [Facts 273, 274].

Plaintiff also alleges his being drug tested and his subsequent transfer to Menard Correctional Center was motivated by retaliation.  Assuming any of the defendants were involved in administering the drug test, there is no evidence that the test was a result of anything other than a random list generated from Springfield [Fact 248].  There is also no evidence that the test was not performed pursuant to protocol [Facts 285, 286, 287] or that the issuance of a ticket for failure to provide a specified amount of urine was anything other than procedure [Facts 285, 286].  There is also no evidence that any of these defendants served on the Adjustment Committee that found Plaintiff guilty of the infraction [Fact 290].  Plaintiff asserts that he was found guilty after Defendant Fuqua said the drugs he was taking would not affect the test [Fact 282].  Notwithstanding, there is no evidence that the diuretic Plaintiff was taking would inhibit urination rather than encourage it [Fact 283], and there is no evidence that Defendant Fuqua initiated or caused Plaintiff to flunk the test.

Other than grievances that were reviewed by certain Defendants, there is no evidence any of the other Defendants even knew of Plaintiff's grievances, let alone decided to retaliate against him for them.

### COUNT II: PLAINTIFF CANNOT SUSTAIN THIS COUNT FOR RETALIATION AGAINST THE ILLINOIS DEPARTMENT OF CORRECTIONS, AS IT IS BARRED BY THE ELEVENTH AMENDMENT:

I.      **To the extent that Plaintiff sues the Department of Corrections or other Defendants under the Constitution for damages in their official capacities for damages for alleged constitutional violations, this Count, and all others are barred by the Eleventh Amendment.**

Plaintiff only asks for injunctive relief against Defendants Walker and the Department of Corrections pursuant to the ADA and Rehabilitation Acts, yet he sues all of the defendants in both their individual and official capacities.  The Eleventh Amendment bars suits against

state officials when the state is the real substantial party in interest. <u>Pennhurst State Sch. &</u>

<u>Hosp.</u>, 465 U.S. 89, 101 (1984) <u>citing</u> <u>Ford Motor Co. v. Dept. of Treasury of Indiana</u>, 323 U.S.

459, 464 (1945). Suits against state officials in their official capacities are suits against the

state, <u>Kentucky v. Graham</u>, 473 U.S. 159, 167 (1985), even though the state may not be a

named party to the action. <u>Edelman v. Jordan</u>, 415 U.S. 651, 662 (1974). The Eleventh

Amendment did not create the sovereign immunity that the states enjoy, but merely ratified the

immunity that was based in the Constitution and in common law. <u>Alden v. Maine</u>, 527 U.S. 706

(1999). According to the Seventh Circuit in <u>Duckworth v. Franzen</u>, "Section 1983 did not

abrogate the State's Eleventh Amendment immunity from damage suits and Illinois has not

waived that immunity." 780 F.2d 645, 649 (7th Cir. 1985).

Plaintiff has sued Defendant Walker in his official capacity only, for ignoring Plaintiff's

health concerns in his grievances [Fact 43], and because Defendant Walker took the place of

Defendant Snyder, the former Director [Fact 44]. Plaintiff acknowledges he sued Walker for

the same reasons he sued Snyder; that both were the Director and were responsible for those

they supervised [Facts 45, 46]. Any suit for damages against Defendant Walker in his official

capacity is barred by the Eleventh Amendment. See <u>Kentucky v. Graham</u>, 473 U.S. 159, 167

(1985) and <u>Edelman v. Jordan</u>, 415 U.S. 651, 662 (1974).

In this case, Plaintiff also sued the remaining Defendants in their official capacities. As

to all of the defendants, the allegations in paragraph 20 of the Complaint indicate this is an

official capacity suit by claiming that his Complaint proved a "policy or custom of

unconstitutional practice." Because in his Complaint, Plaintiff's allegations seemed to be that

these Defendants acted to implement an official policy or custom regarding health care in the

Illinois Department of Corrections. Such a suit for damages is barred by the Eleventh

Amendment and should be dismissed. *See* <u>Hill v. Shelander</u>, 924 F.2d 1370, 1372 (7th Cir. 1991) <u>citing</u> <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985).

Moreover, in Count II, Plaintiff sued the Illinois Department of Corrections for retaliating against the Plaintiff for complaining about discrimination about his disability. Simply because Plaintiff claims the speech at issue is about his disability, does not bring it under the ADA or the Rehabilitation Act.

Plaintiff cannot maintain a First Amendment claim against the Department, as such a claim is barred by the Eleventh Amendment, Defendants are entitled to summary judgment in Count II as well as any count in which they are sued in their official capacities for damages.

## COUNT III: LAW ON FAILURE TO PROTECT

Prison officials can be held liable under the Eighth Amendment for an injury suffered by one prisoner at the hands of another only if two requirements are met.

The first requirement is objective: the plaintiff must show that "he is incarcerated under conditions posing a substantial risk of serious harm." <u>Farmer v. Brennan</u> 511 U.S. 825, 834; 114 S. Ct. 1970, 1977 (1994). The second requirement is subjective: the plaintiff must prove the prison official exhibited deliberate indifference to plaintiff's safety. <u>Id</u>.

Deliberate indifference, as defined in <u>Farmer</u>, occurs when a prison official "knows of and disregards an excessive risk to inmate . . . safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." 511 U.S. at 837; 114 S. Ct. at 1979. The official must "demonstrate something approaching total unconcern for his [the inmate's] welfare in the face of serious risks," <u>Duane v. Lane</u>, 959 F.2d 673, 677 (7th Cir. 1992) <u>citing</u> <u>McGill v. Duckworth</u>, 944 F.2d 344, 347 (7th Cir. 1991), or must demonstrate a "conscious, culpable refusal to

prevent harm." Id, citing Duckworth v. Franzen, 780 F. 2d 645, 653 (7th Cir. 1985), cert. denied, 479 U.S. 816, 107 S. Ct. 71 (1986).

Additionally, the Seventh Circuit has found that placing inmates in segregation is a common and acceptable means of protecting them. Case v. Ahitow, 301 F.3d 605, 607 (7th Cir. 2002). Moreover, the court opined that a reasonable response to the danger in which inmate Case found himself, would have been for the defendants to have kept him in segregation longer than his original placement. Id.

### Argument on Failure to Protect

Plaintiff complains that the defendants[1] placed him in general population and in a cell with a dangerous inmate, who subsequently assaulted plaintiff and caused him to lose his eye. Plaintiff's allegations begin with being transferred out of the infirmary to general population [Complaint generally] and then end with Defendants Kellerman and Law telling him he would have to refuse housing, get a disciplinary ticket, and go to segregation if he was afraid of his cell mate [Facts 218, 233].

Because there are two separate components to Plaintiff's allegations that the Defendants failed to protect him, these will be addressed separately.

a.     **Plaintiff was released by the Medical Director from the Health Care Unit to general population with no restrictions, and there is no evidence that any of the Defendants knew Plaintiff faced a general risk of harm as a result of his medical condition.**

### Plaintiff's release to general population:

According to Dr. Brown the Medical Director at Western Illinois Correctional Center at the time Plaintiff was transferred to general population, the Medical Director, or the doctor to

---

[1] The only Defendants who could be subject to liability in this Count are Defendants Fuqua, Funk, Winters, Law, and Kellerman, as Defendant Hockaday was no longer at the institution at the time of Plaintiff's transfer to general population and subsequent injury by inmate Durham.

whom he had signed out, could discharge from the infirmary [Fact 188]. In his deposition, Doctor Lochard reiterated that the medical director would be the person to sign an inmate medically out of the Health Care Unit [Fact 193]. Although Nurse Practitioner Mills prepared Plaintiff's discharge summary, the nurse practitioner's authority would be linked to whatever doctor was covering the institution [Facts 188, 208]. However, according to Nurse Practitioner Mills, she would also make an independent medical determination before placing someone in general population [Fact 197]. While Mills could admit and discharge from the infirmary, it was usually the doctor who would make the decision to deny privileges or access to medications [Fact 199].

Dr. Brown made the decision to release Plaintiff to general population sometime before he was actually released [Fact 180]. When Plaintiff finally left the infirmary for general population, he did so because Dr. Brown felt there was no further reason to hold Plaintiff in the infirmary [Fact 181]. Moreover, while Dr. Brown was aware of a previous outside physician's recommendation that Plaintiff not be placed in general population because of possible danger to his eye, Dr. Brown believed the Ophthalmologist was basing his recommendation on unrealistic expectations [Fact 184]. According to Dr. Brown, placing Plaintiff in a single room or sheltering him was impractical and overkill of the problem [Fact189]. According to a progress note written by Dr. Brown on June 8, 2004, Plaintiff had no restrictions placed on him and doctor Brown did not believe there was any medical reason Plaintiff should not be around other inmates [Facts 191, 192].

When Plaintiff finally left the infirmary for general population, he did so with no medical restriction that he could not be celled with another inmate [Fact 191].

10

Additionally, Plaintiff was not immediately placed with Durham, the inmate with whom he fought [Fact 121].  In fact, he was housed with other inmates with whom he did not have any problems [Fact 122].

**b.    None of the Defendants had any role in where, or with whom, Plaintiff would be placed in general population, as that role was filled by the placement office.**

### 1.    General housing and placement considerations:

Housing assignments at Western are made by the Placement Office [Fact 159], and are done according to assignment [Fact 126].   Inmates who were assigned to jobs or other programs were generally housed together for ease of movement and security considerations [Fact 127], while inmates who were "unassigned" for medical or any other reason, were also housed together [Fact 128].  Therefore, a note that an inmate is "medically unassigned" means that he cannot be assigned to a job.  Though consideration in placement was given to offenders who were designated "vulnerable" or "predator," or who were members of a security threat group, also known as a gang, the general rule within the Illinois Department of Corrections and followed at Western, was that an inmate assigned to a particular institution was appropriate for placement in general population at that institution [Facts 129, 136, 142].  If an inmate was considered to be of great threat to himself or other offenders, he would most likely be in segregation for an extended period or would be transferred to a higher security institution [Fact 143].

Plaintiff appears to allege that his medical condition made him vulnerable, and that he should have been designated as such.  However, a "vulnerable" designation, that would be taken into account by placement, is a designation that is initiated by the clinical services staff and follows an inmate throughout his incarceration [Facts 130, 169].  A "vulnerable" designation does not mean that an inmate is at risk because of medical concerns [Facts 131, 169].  In the context of placement, a "vulnerable" inmate is one that is made according to the sexual assault

11

prevention codes, and denotes an inmate who, by reason of stature, age, or other traits, would be more at risk of sexual assault [Facts 135, 170].

In the alternative, Plaintiff appears to argue that inmate Durham, with whom he got into the fight, should have been flagged as a "predator," so to alert the staff of a propensity to fight or assault his cell mates [Complaint generally]. Like the "vulnerable" designation, an inmate is not considered a "predator," simply because of a disciplinary history of fighting or physical assaults [Fact 173], rather a "predator" in the Illinois Department of Corrections is an inmate who has a past history or characteristics that would make it more likely that he would sexually assault another inmate, especially one who is vulnerable to such attacks [Facts 168, 171]. Also, homosexuality is not the determining factor in whether an inmate is vulnerable or predator [Fact 173].

While it is possible for consideration in placement in a single cell could be made for medical reasons, such consideration would have to come as a result of a doctor's order [Facts 133, 211], and in this case, such a consideration was specifically ruled out by the Medical Director, Dr. Brown [Facts 189, 191].

## 2. Defendants had no knowledge of any restrictions on cell mate or placement as a result of Plaintiff's medical condition.

Plaintiff alleges the Defendants knew of his medical condition and, at least in the case of Defendant Funk and presumably Defendant Fuqua, knew of the previous recommendation of a treating Ophthalmologist that he be single celled, and should not be in general population [Complaint generally; Facts 83, 236, 237]. However, there is no evidence that any of these Defendants knew of a general or specific restriction as a result of his medical condition that would place them on notice that being double celled with any particular inmate would cause him to be at risk for serious harm. There is also no evidence, other than as to Defendant Fuqua,

that any of these Defendants had any specific medical information about Plaintiff's condition other than that which was transmitted either via the grievance process or by Plaintiff himself.

It is undisputed that Dr. Brown did not place any restrictions on Plaintiff's cell assignment after his release from the Health Care Unit in June of 2004 [Fact 191]. Therefore, there could be no restrictions known to anyone inside or outside of the Health Care Unit, because there were no restrictions. Moreover, while non-medical staff, including the placement office, might know of general restrictions ordered by a physician, such as low bunk, low gallery, or special accommodations such as a cane or safety glasses, the specifics of an inmate's medical condition are not shared with non-medical staff because of privacy issues [Facts 132, 141, 176, 177, 194, 210, 212, 211]. Even when restrictions were necessary, it would require a doctor's order to transmit that information to the placement office [Fact 209].

Dr. Brown does not know if anything specific about Plaintiff's medical condition was brought to the attention of the Placement Office [Fact 190]. However, it was not the usual practice of the Health Care Unit to give such information to the Placement Office [Fact 194]. The default, in this case, would be for the Placement Office to assume that Plaintiff was safe to be housed in general population with any other inmate.

> **3.  Defendants' had no role in initial placement or placement with Durham, and no other Defendants are alleged to have been told specifically by Plaintiff of the specific threat from Durham.**

These defendants are wardens, assistant wardens, a Health Care Unit administrator, lieutenant, and a correctional officer. They are not alleged to have worked in the Placement Office, and in fact, did not work in the Placement Office or have any role in either placing Plaintiff in general population or assigning him inmate Durham as a cell mate [Facts 40, 213, 156, 158, 159, 223, 226, 245].

13

Because personal involvement is required for liability to attach pursuant to §1983, the defendants are entitled to summary judgment to the extent the failure to protect Plaintiff is predicated on his release to general population or the assignment of Durham as a cell mate.

Plaintiff does not allege that he told any Defendant other than Defendants Law and Kellerman that he did not want to be celled with inmate Durham.

### 4.    Risk of harm from Durham.

Though Plaintiff alleges he was at substantial risk of serious harm from inmate Durham, both because of his medical condition and because of Durham's propensity for fighting, that risk is questionable. Plaintiff believed he and Durham were incompatible as cell mates because Durham would continually play his television, listen to rap music and was not very clean [Fact 253]. He also said Durham would get aggressive when plaintiff would talk to him about these issues, but that aggressiveness took the form of Durham getting loud and his posture changing [Fact 255]. Prior to September 22, 2004, the day before the alleged assault, although Plaintiff says he had the same problems with Durham, he never complained about it, and he was never hit by Durham [Fact 256].

The day of the assault[2], Plaintiff admits he was sitting on his bunk reading his Bible [Fact 258]. His cell mate was sitting in a chair by the cell door watching TV and eating [Fact 257]. Plaintiff admits he asked Durham to please cut down the music and give him a half hour to read several chapters of the Bible, but Durham told him he did not have to [Fact 260]. Plaintiff went on to explain to Durham that they lived in a space the size of a bathroom and had to show each other common courtesy and Plaintiff would appreciate it if he (Durham) would cut down the music, but again Durham refused [Fact 261]. Not letting the situation go, Plaintiff got up out

---

[2] For purposes of this pleading only, Defendants will refer to the incident between Plaintiff and inmate Durham as an "assault" because that is how Plaintiff characterizes the incident; however, both Plaintiff and Durham were disciplined for fighting [Facts 275, 276,277].

of his bunk and walked over to sit on the sink, approximately 2½ feet from Durham, so he could be closer to talk to Durham [Fact 262]. Plaintiff admits he continued to tell Durham to cut it down and show common courtesy, including buying headphones, but Durham said he did not want to do that because he was going home soon [Fact 263]. Before he hit him, Durham warned Plaintiff to get out of his way and stop talking to him, but Plaintiff would not stop [Facts 264, 265]. Instead, Plaintiff said to Durham, "now do you understand that about common courtesy and compromises where you want to do something and you're asking me to do something, and I am, the same thing that I am doing?" Plaintiff continued, "I am asking you, would you please cut down your TV, so I can do something?" [Fact 265].

Plaintiff rather naively professes that Durham then hit him and he does not know why Durham would do that, because when Plaintiff had these same conversations before, Durham would just ignore him [Facts 266, 267]. Although, Plaintiff also says that at other times when they had the same conversation, Durham would get belligerent and aggressive [Fact 268].

The fact remains; however, that prior to September 22, 2004, Plaintiff never complained about his cell mate, and that even the day of the assault when Plaintiff got up and moved closer to Durham to continue to complain about the noise, Plaintiff did not believe Durham was going to punch him [Fact 242]. Also, Plaintiff was given an eye shield to wear in general population while he slept, in case he were to scratch or hit his eye during sleep [Fact 119, 120]. He had the eye shield up to and including September 23, 2004 [Fact 119]. Plaintiff could have worn the eye shield during his waking hours, or when he was confronting his cell mate if he believed he was in danger of injury to his eye, but did not do so [Fact 120].

If Plaintiff did not appreciate the danger he now alleges he was in from Durham, how can any of these Defendants, who were not with the inmates 24 hours a day, seven days a week, appreciate the danger, especially when Plaintiff never complained about his cell mate

15

until the day before the assault, and that complaint was not specific. Such information does not satisfy the objective component that Plaintiff was housed in a situation that put him at substantial risk of serious harm, nor does that information to these Defendants place them on notice of any substantial risk.

### 5. Defendants Law and Kellerman took reasonable steps to protect Plaintiff from Durham.

Defendants Law and Kellerman are alleged to have failed to protect Plaintiff when they did not remove Plaintiff from his cell prior to Durham's assault even though they knew of the danger faced by Plaintiff from his cell mate [Complaint generally].  According to Plaintiff's account, even though he had problems with Durham prior to September 22, 2004, he did not tell Defendants Kellerman and Law that he did not want to be celled with inmate Durham until September 22, 2004, the day before Plaintiff alleges he was assaulted by Durham [Facts 251, 252, 256].  Even then, Plaintiff did not tell those Defendants that he was afraid of Durham, but rather told Kellerman that Durham was noisy, that he listened to rap music, was not very clean, and that when Plaintiff tried to talk to him, Durham would become aggressive [Fact 253].  Plaintiff says he told Law about the situation with his cell mate and added that he felt his cellie was violent and that Defendant Kellerman had told Plaintiff his cellie had been transferred from Galesburg or Hill Correctional Center for fighting, and had just gotten out of segregation for fighting [Facts 234, 240].

According to Kellerman, who was a correctional officer at Western from 1986 through August of 2006, the protocol when an inmate asks a correctional officer for a transfer for his own safety, is for the officer to notify the Zone Lieutenant [Fact 224].  After that, the officer would step out of the situation [Fact 225].  As a correctional officer, Defendant Kellerman had no authority in cell transfers [F26].  Plaintiff admits that Defendant Kellerman told him to tell

Defendant Law about his issues with his cell mate because Defendant Law had the power (presumably to get him out of the cell)[Fact 220].

While Defendant Law does not recall Plaintiff ever telling him that he wanted a cell transfer or being told by Kellerman that Plaintiff wanted out of his cell [Fact 243], because a defendant's summary judgment requires taking the facts in the light most favorable to the Plaintiff, Defendant Law will concede for purpose of this motion only, that Plaintiff spoke with him about his cell mate.  However, as previously discussed, Plaintiff did not tell Law that he feared for his safety, just that he feared his cellie was violent because of information he claims Defendant Kellerman gave him [Fact 219].

Plaintiff admits that in response to his concerns, Defendant Law told him that his cell mate was going home in a few days and to just wait it out or go to segregation [Fact 241]. Plaintiff also alleges Law told him he would have to fight or commit a disciplinary infraction in order to get away from his cell mate [Fact 234].   Notwithstanding Plaintiff's unfounded allegation that he was told he would have to fight, both Defendants Kellerman and Law took steps to protect plaintiff, even if that protection would initially cause him to be issued a disciplinary report and taken to segregation [Facts 148, 149, 150, 161, 162, 249].  The Seventh Circuit has found this to be constitutionally permissible means of protecting inmates from risk of harm.  *See* Case, supra.

Accordingly, Defendants Law and Kellerman are entitled to summary judgment in their favor.

**COUNT IV:  LAW ON DELIBERATE INDIFFERENCE AND PERSONAL INVOLVEMENT**

In Estelle v. Gamble, 429 U.S. 97 (1976), the Supreme Court held that in order to violate a prisoner's Eighth Amendment rights as they relate to medical care, an official must demonstrate deliberate indifference to the serious medical needs of that inmate, and concluded that "deliberate indifference to serious medical needs of prisoners" constitutes the

17

"unnecessary and wanton infliction of pain," 429 U.S. 97, 104 (1976). However, the Court drew a distinction between an "inadvertent failure to provide adequate medical care," Estelle at 105, and "an unnecessary and wanton infliction of pain" that is "repugnant to the conscience of mankind." Estelle at 106.

"To raise an Eighth Amendment issue, 'the infliction [of punishment] must be deliberate or otherwise reckless in the criminal law sense, which means that the Defendant must have committed an act so dangerous that his knowledge of the risk can be inferred or that the Defendant actually knew of an impending harm easily preventable.'" Snipes v. Detella, 95 F.3d 586, 590, citing Antonelli v. Sheahan, 81 F.3d 1422, 1427 (7th Cir. 1995). Furthermore, "mere negligence or even gross negligence does not constitute deliberate indifference." Id., citing Wilson v. Seiter, 501 U.S. 294,305 (1991). Likewise, "medical decisions that may be characterized as 'classic example[s] of matter[s] for medical judgment *such as whether one course of treatment is preferable to another'* are beyond the Amendment's purview." Snipes v. Detella, 95 F.3d 586, 591 (7th Cir. 1996)(emphasis added).

While the state has "an affirmative obligation under the Eighth Amendment to provide persons in its custody with a medical care system that meets minimal standards of adequacy," (Meriwether v. Faulkner, 821 F.2d 408, 4ll (7th Cir. 1987)), inmates are not entitled to unqualified access to health care. Hudson v. McMillian, 503 U.S. 1, 112 S.Ct. 995, 1000 (1992); see also Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321 (1991). "A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." Snipes at 592.

Finally, "except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely

18

on the judgment of medical professionals." Johnson v. Doughty, 433 F.3d 1001, 1011 (7th Cir. 2006) quoting Bond v. Aguinaldo, 228 F.Supp. 218, 236 (N.D.Ill. 2002).

### A.    Law in Personal Involvement

In order to impose individual liability under 42 U.S.C. §1983, a Plaintiff must prove that the defendant had some personal responsibility for the alleged violation. Duckworth v. Franzen, 780 F.2d 645 (7th Cir. 1985).

### Argument on Deliberate Indifference

Plaintiff has made broad, sweeping allegations against all of the defendants, regarding their deliberate indifference to his serious medical needs. These allegations include, but are not limited to, medication errors, changing physicians, not following doctor's orders in a timely manner, and transferring Plaintiff to institutions where he cannot get the care he needs. However, Plaintiff has had abundant medical care, including a corneal transplant, care by numerous outside specialists, specially fitted contact lenses, and assistance devices [Fact 1]. Defendants adopt the arguments of Co-Defendants regarding medical care provided to Plaintiff.

As outlined below, it is undisputed that none of the defendants had the license or training to determine what medical care would be received by Plaintiff. It is also undisputed that Plaintiff received a great deal of medical care, not only within Western Illinois Correctional Center, but by outside specialists on an ongoing basis [Fact 1]. In responding to grievances, even if the answer was "no," the wardens or their designees could not be found to be deliberately indifferent. As for Defendant Fuqua, her efforts in securing Plaintiff's corneal transplant, and otherwise providing responses to Plaintiff's grievances, combined with her inability to take on the role of physician in actually determining Plaintiff's medical care, defeats any of Plaintiff's claims that she was deliberately indifferent to Plaintiff's serious medical needs.

**Medical Care Generally:**

Dr. Elyea was the Agency Medical Director for the Illinois Department of Corrections, who notified the vendors that they would have to pay for corneal transplants as they are not organ transplants [Facts 110, 111]. However, the decision about what Ophthalmologist Plaintiff would see would have to be made by Wexford [Fact 113]. Dr. Elyea had a background in Ophthalmology [Fact 110], and noted that Keratoconus can be treated with contact lenses for a varying degree of time, including years, as long as the cornea is not thinning rapidly [Facts114].

According to Dr. Brown, the Medical Director at Western Illinois Correctional Center, the warden and other non-medical people would have no role in the gate keeping process, which was determining what outside tests or treatment might be approved for an inmate. That decision, during Dr. Brown's tenure, was between him and another doctor [Fact 115].

Notwithstanding, Plaintiff has sued non-medical people for this deliberate indifference, including the Director of the Illinois Department of Corrections, two former wardens, a former assistant warden, a correctional lieutenant, a correctional officer, and a Health Care Unit administrator who is not alleged to be a physician. However, the uncontroverted facts establish that none of these defendants were licensed or trained to determine the course of Plaintiff's medical care, and that they relied upon the medical expertise of the physicians who were hired to provide that care.

**Defendant Hockaday:**

Plaintiff sued Defendant Hockaday for deliberate indifference because he delegated his responsibility to the assistant wardens [Fact 2], and allegedly ignored every complaint Plaintiff brought to his attention through his grievances [Facts 3, 4]. Even though Plaintiff received

responses to the grievances he directed to Defendant Hockaday, he still believes the his grievances were not handled correctly because they were denied [Facts 5, 6].

Defendant Hockaday was the warden of Western Illinois Correctional Center June of 2001 until September, 2002, at which time he retired [Fact 7]. Because of the volume of grievances filed by inmates at Western, Defendant Hockaday delegated the reviewing of inmate grievances to his Assistant Warden of Programs, who he trusted to perform the assignment [Facts 8, 9]. In order to be held liable for deliberate indifference, a person has to know of a serious medical need and basically refuse to do anything. In this case, there is no evidence that Defendant Hockaday ever reviewed a grievance from the plaintiff. Assuming, arguendo, that he had reviewed grievances regarding Plaintiff's dissatisfaction with this medical care or need for a transplant, Defendant Hockaday could not have given Plaintiff the relief he seeks. Wardens could not make decisions about outside, treating physicians [Fact 10], nor could he determine what medical treatment a person would get [Fact 15]. Likewise, he could not determine where an inmate went on a medical writ or whether an inmate needed, or could receive, a corneal transplant [Fact 16]. He had to rely on the medical personnel to make that determination [Fact 17].

Plaintiff admitted his grievances were answered, but he apparently did not like the fact that they were denied. Neither Defendant Hockaday, nor any of his designees, could interfere in or change the medical care already in place at the institution.

**Debra Fuqua:**

Plaintiff's complaints about Defendant Fuqua are that, as the Health Care Unit Administrator, it was her job to act as a liaison or arbitrator between Wexford and IDOC inmates, and she did not do that [Fact 18]. Moreover, Plaintiff believes Defendant Fuqua allowed the switching of medication, harmful medication, and the contact cleaners [Fact 19].

He alleges Defendant Fuqua took his contact lenses when he came to Western Illinois Correctional Center without a doctor's evaluation, and would not return them until he had everyone call to get them back [Fact 20]. He also alleges he told Defendant Fuqua that he needed a refit of his contact lenses, but she ignored it [Fact 21]. While Plaintiff does not allege Defendant Fuqua refused to discuss his problems with him, he says she refused to correct the problems he brought to her attention [Fact22].

Again, Plaintiff's Complaint, the medical records submitted to the court, and the summary judgment motions of the co-defendants are replete with the medical care received by Plaintiff, including contact lens fittings, surgery, and medications, all directed by qualified physicians [Fact 1]. Defendant Fuqua is not alleged to be a physician, but rather an administrator, who cannot determine what medical restrictions should be placed on a person and is not involved in direct patient care as part of her duties [Fact 36]. Contrary to Defendant Winters' belief voiced in his deposition to the contrary, Defendant Fuqua also does not have the authority to admit or discharge anyone from the infirmary [Facts 38, 39].

However, she did act as a liaison between Wexford and the Department of Corrections to secure Plaintiff's corneal transplant [Facts 31-36]. She was in contact with Dr. Elyea and other health care officials regarding the issue of Plaintiff's corneal transplant that had been recommended by treating physicians, but refused by Wexford [Facts 31-36]. In a serious of e-mail correspondence, Defendant Fuqua encouraged Dr. Sims, to continue to resubmit Plaintiff's request for the transplant to Wexford, since Dr. Elyea, the Agency Medical Director had determined the corneal transplants should be provided to Plaintiff [Facts 32-35]. She also responded to a grievance written by Plaintiff, when she was contacted by Terri Anderson of the Administrative Review Board [Facts 30, 31]. In that response, she reassured Ms. Anderson that she would, again, ask Dr. Sims to get the paper work done in order to resubmit the request

to Wexford for a corneal transplant [Fact 31]. She could do no more than she did to secure a corneal transplant for Plaintiff. She also responded to a grievance received by Karen Wear on November 30, 2004 [Fact 41].

Plaintiff also complains that Defendant Fuqua did not allow him to do the same things the other inmates could do, such as go to the store, go to the yard, use the phone, as well as other unnamed activities [Fact 23]. Plaintiff admits, however, that he was not denied the right to do these things the entire time he was in the infirmary [Fact 24]. In fact, he admits he was able to go to the yard, to the law library and use the phone while he was in the infirmary [Facts 25, 26]. At least one reason for his phone restriction was the fact that he was in segregation some of the time he was housed in the infirmary [Fact 27]. Finally, and most importantly, Plaintiff cannot say for sure that Defendant Fuqua denied him the right to participate in any of these activities at all, but believes that as the Health Care Unit Administrator, his issues about activities and privileges should have been taken care of [Facts 28, 29].

Defendant Fuqua must be personally involved in the alleged constitutional violation. See Duckworth v. Franzen, 780 F.2d 645 (7th Cir. 1985). Moreover, simply saying that a person should have done something because it was their job, is an official capacity suit and barred by the Eleventh Amendment.

**Defendant Winters:**

Plaintiff sued Defendant Winters for deliberate indifference because he "routinely and repeatedly" denied Plaintiff's grievances about his eye problems [Fact 47]. While he admits he received responses to the grievances he filed during Defendant Winter's tenure, he complains that his grievances were denied [Facts 48, 50]. Like Defendant Hockaday, Defendant Winters was the Warden of Western Illinois Correctional Center from December 2002 to December 2004 [Fact 51]. Prior to that, he served as Assistant Warden of Operations

23

at Western Illinois Correctional Center from sometime in 2000 to December 2002 [Fact 51]. Defendant Winters is not currently employed by the Illinois Department of Corrections [Fact 52].

Defendant Winters had very little, if any, involvement with the grievance process when he was Assistant Warden of Operations, though he might occasionally review a grievance while he was the duty warden [Fact 61]. Because of the vast number of responsibilities, when he became Warden, he delegated the responsibility for reviewing grievances to his Assistant Warden of Programs [Fact 63]. Like Hockaday, Defendant Winters had full faith in the people to whom he delegated the responsibility to review inmate grievances [Fact 64]. In fact, there are only two grievances that could be found in which Defendant Winters had any participation [Facts 75-81]. On June 9, 2004, Defendant Winters granted emergency status to a grievance sent by Plaintiff on June 7, 2004 [Fact 75]. Defendant Winter's designee finalized that grievance [Fact 76]. If a grievance is marked as "emergency" by the offender, the grievance is sent directly to the warden or his designee to review prior to any investigation by the grievance officer [Fact 58]. The warden or his designee will look at the nature of the grievance and determine if it is truly of an emergency nature, and if so, will expedite a response to the grievance [Fact 59]. If the warden or his designee determines the grievance is not of an emergency nature, he will return it to the inmate for processing through regular channels [Fact 60].

Regular channels include the grievance officer, who is the fact finder for the grievance [Fact 53]. In the case of a medical grievance, the grievance officer would likely contact the Health Care Unit to find out if the offender has medical issues that are not known to medical personnel [Fact 54]. The grievance officer then writes a report on the grievance form and forwards the form to the warden or his designee [Fact 55]. The warden or designee will then review the grievance and the responses and will determine if he or she agrees with the

disposition of the grievance as recommended by the grievance officer, will either concur or not concur with that recommendation, and will return the grievance to the inmate [Fact 57]. An inmate may appeal a ruling on a grievance to the Administrative Review Board in Springfield [Fact 57].

On June 28, 2004, Defendant Winters denied emergency status to another grievance dated June 24, 2006 [Fact 77]. In that particular grievance, Plaintiff complained of his medical care, a medication error, and that the health care staff was deliberately indifferent to his medical needs [Fact 78]. Plaintiff noted in the grievance that he had gone to see another Ophthalmologist and was told by a nurse that the pharmacy could not reorder one of his medications until the end of June. The relief requested was to be given the names of individuals who denied him the medication, to be given the medication, to be sent out for another examination as soon as possible, and to be compensated [Fact 79]. Defendant Winters did not believe that grievance to be of an emergency nature, and determined it could be resolved through regular channels [Fact 80]. Defendant Winters does not believe he reviewed any of Plaintiff's other grievances [Fact 81].

If a grievance is about a medical issue, there is only so much the warden or his designee can do [Fact 65]. The warden or designee can only determine that the offender's medical issues are being addressed by health care personnel [Fact 66]. This is true even if the inmate is not satisfied with the medical care he is receiving [Fact 67]. Neither Winters nor his Assistant Wardens were medically trained or able to make any decision on the medical care being provided to an offender [Fact 66]. This includes directing medical care, changing the course of care already being given, choosing outside physicians, or determining when an offender gets to see that outside physician [Facts 68, 69]. Those determinations have to be made through the medical staff [Fact 70].

Some of Plaintiff's complaints surround furloughs and the security measures in place that caused him to miss a doctor's appointment [Complaint generally]. Security considerations are taken into account when it comes to furloughs for outside medical care [Fact 71]. For example, offenders are not generally informed when they have a furlough for medical care [Fact 72]. This is because the offender will be taken to a non-secure facility, and if he has advance notice, he could contact outside persons to effect an escape [Fact 73]. All offenders, not just Plaintiff, are subject to this rule [Fact 73]. Additionally, because of staffing considerations, offenders might not be given a great deal of time to prepare for a furlough, and/or a furlough might be postponed due to weather related issues or security issues such as a facility lock-down [Fact 74].

To the extent that Plaintiff complains he had to miss a doctor's appointment for the weather or because he was not allowed to take a shower prior to leaving the facility, Plaintiff cannot show any detriment to his health, or any animus directed at him in the furtherance of these facility-wide policies.

**Defendant Funk:**

Plaintiff sued Defendant Funk for deliberate indifference because she denied Plaintiff's grievances about his eye problems while acting as Warden Winter's designee [Fact 82]. Plaintiff complained on numerous occasions to Defendant Funk while she was Assistant Warden [Fact 84]. He complains that she would tell him she would resolve his problems, but never did [Fact 85]. As previously stated, he admits he received responses to his grievances during this time [Facts 48, 50], and admits that Defendant Funk gave him permission to set his television away from the window [Fact 86]. However, he was later taken to segregation because he was found to be without a permit for the television [Fact 86]. Other than the fact that Plaintiff alleges Defendant Funk knew Plaintiff was in danger because of his vision and

26

should not be sent to general population, Plaintiff does not know the extent of Defendant Funk's involvement in any other of his complaints [Facts 83, 87].

Defendant Funk is currently employed as Assistant Manager in the Transfer Coordinator's office in Springfield; however, she was Assistant Warden of Programs (A/W/P) at Western Illinois Correctional Center from August, 2002 through March 2005 [Facts 88, 89]. While she was A/W/P at Western Illinois Correctional Center, her areas of responsibility included the Health Care Unit, education and vocational units, the record office, and clinical services [Fact 90]. Even though she responded to grievances as the warden's designee, she is not licensed to deal with the medical aspects of the Health Care Unit [Facts 91, 92]. As stated by Winters, Defendant Funk dealt with both regular and emergency grievances [Facts 92-99]. Like Winters, Defendant Funk is not a physician and cannot determine what care or treatment an offender should have [Fact 100]. She had to rely on the medical personnel in place at the facility to provide medical care, and could not grant an offender relief that would be contrary to the medical determinations made by the physicians [Facts 101, 102]. She never based her decisions on her personal feelings about an offender or mistreated an offender for using the grievance process [Facts 103, 104].

Defendant Funk was never apprised by anyone with medical knowledge about the specifics of Plaintiff's medical condition, other than that which was included in the grievances she reviewed [Fact 105].

To Defendant Funk's knowledge, Plaintiff was continually under the care of physicians for his medical concerns and was not precluded from participating in any activities he was medically and physically able to perform [Facts 108, 109]. She also never saw any employee of Wexford or the Illinois Department of Corrections mistreat, discriminate against, or retaliate against Aaron McCroy [Fact 109].

27

**Defendant Flagg:**

The allegations against Defendant Flagg mirror the allegations in Count V against the Illinois Department of Corrections under the ADA and Rehabilitation Acts. However, Defendant Flagg is sued only in this Count. He is alleged to have been deliberately indifferent to Plaintiff's serious medical needs because he disregarded doctor's orders and removed Plaintiff from an ADA cell [Facts 322, 324]. Plaintiff also alleges Defendant Flagg gained "unauthorized access" to his medical records and removed Plaintiff from his ADA cell and canceled all of Plaintiff's permits [Fact 323].

Defendant Flagg was the Assistant Warden of Programs at Pinckneyville from 2001 to April, 2006. At one point he became Acting Warden and was also the ADA coordinator [Fact 332]. The criteria for placement in an ADA cell was made by the Placement Office and medical personnel [Fact 334]. The ADA Coordinator makes no ruling on who goes in an ADA cell [Fact 335]. According to Flagg, ADA cells are basically the same as a regular cell, except they are approximately twice as large so wheelchair bound inmates can move around [Fact 336]. If an inmate files a grievance regarding an ADA issue, however, the grievance is reviewed by the ADA coordinator, and the coordinator would look into the inmate's allegations [Facts 337, 338]. While Defendant Flagg was not involved in where Plaintiff was initially placed when he came to Pinckneyville or involved in removing Plaintiff from his ADA cell, he became aware of Plaintiff's complaints about his ADA cell [Facts 339, 343]. On January 9, 2006, Defendant Flagg wrote a memo to Plaintiff regarding a letter Plaintiff had written to Deputy Director Meeks regarding not being in an ADA cell [Fact 340]. Defendant Flagg reviewed Plaintiff's medical file to determine whether or not Plaintiff needed to be in an ADA cell [Fact 341]. Based on his review of Plaintiff's medical file and discussion with the Health Care Unit Administrator (a non-defendant), Defendant Flagg believed Plaintiff did not meet the criteria for ADA cell placement

28

[Fact 341]. Flag did not review Plaintiff's ADA permission form at the time he wrote the memo of January 9, 2006, nor would that information have been in the medical records, as Dr. Feinerman did not write the order giving him permission for an ADA cell until January 16, 2006 [Facts 345, 347]. Defendant Flagg had no occasion to revisit the issue of ADA cell placement after January 9, 2006 [Fact 346].

Plaintiff alleges that while he was at Pinckneyville, he was not in an ADA cell for approximately one year [Fact 330], however, he admits that during that time, he was never placed in an upper bunk or upper gallery at Pinckneyville [Facts 326, 327]. He also was given safety glasses, sunglasses, his contact lenses, and talking books and tapes during the time he was not in an ADA cell at Pinckneyville [Fact 331].

On this record, the only involvement Defendant Flagg had in Plaintiff's "medical care" was to review his records and consult with the Health Care Unit Administrator to see if Plaintiff was appropriate for placement in an ADA cell. There is no evidence he knew Plaintiff had permission for an ADA cell or that he believed Plaintiff's medical condition required an ADA cell which, as it turned out, it did not.

**Defendants Law and Kellerman:**

While Plaintiff lists Defendants Law and Kellerman in his complaint as being deliberately indifferent to his serious medical needs, in his deposition, he said he was only suing them because they did not move him away from his cell mate, Durham [Facts 218, 233]. Neither are alleged to be physicians who could affect Plaintiff's medical care, and would have had no involvement in Plaintiff's medical care. Without personal involvement in the alleged violations, they cannot be held liable for deliberate indifference to Plaintiff's serious medical needs.

**Defendant Walker:**

Notwithstanding that Defendant Walker was only sued in his official capacity, to the extent Plaintiff alleges he had any personal involvement in Plaintiff's medical care or review of grievances, Defendant Walker delegated the review of grievances to the Office of Inmate Issues and never received, reviewed, or responded to grievances by Plaintiff [Facts 374, 375].

**COUNT V:  LAW ON AMERICANS WITH DISABILITIES AND REHABILITATION ACTS**

Section II of the Americans With Disabilities Act of 1990 (ADA), provides that, [n]o qualified individual with a disability shall, by reason of such disability, be excluded from participating or denied the benefits of the services, programs or activities of a public entity." 42 U.S.C. §12132.  The Rehabilitation Act states that "no otherwise qualified individual with a disability int he United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C.A. §794.  The ADA applies to prisons, and its reasoning is equally applicable to the Rehabilitation Act.  <u>Stanley v. Litscher</u>, 213 F.3d 340, 343 (7th Cir. 2000), <u>citing</u> <u>Pennsylvania Dept. of Corrections v. Yeskey</u>, 524 U.S. 206 (1998).

**Argument on Americans with Disabilities Act and Rehabilitation Act.**

**a.    Plaintiff's allegations:**

In Count V of his Complaint, Plaintiff alleges Defendant Illinois Department of Corrections violated Plaintiff's rights under the Americans With Disabilities Act (ADA) and the Rehabilitation Act [Complaint generally].  Specifically, Plaintiff alleges the defendant denied Plaintiff the same privileges and public accommodations, in nature and extent, as allowed similarly situated non-disabled inmates at Western Illinois Correctional Center by denying him access to employment and programs that would allow Plaintiff to earn credit towards his

release; and access to the commissary, exercise facilities and activities to the same extent that non-disabled inmates were and are allowed [Complaint, Count V]. It is supposed that the disability of which Plaintiff complains is his extremely poor eyesight caused by the Keratoconus. The Count also alleges his rights under the ADA were violated when Plaintiff was removed from an ADA cell at Pinckneyville [Complaint, Count V]. In his deposition; however, Plaintiff admits he originally sued the defendants under the ADA because his disability did not get the same consideration as those with chronic illnesses or disabilities, such as a speciality clinic, and follow-up care and treatment [Fact 291]. He claims that he had to complain and sustain substantial injury before he could get treated, while others were scheduled for specialty clinics such as hypertension and diabetic clinics on pre-determined schedules [Fact 292].

> **b.    Plaintiff's claims are without merit, as he was able to participate in all activities and was not denied based on his disability.**

Plaintiff's claims are without merit. Plaintiff believes he should have been able to turn the lights out over his head at Western while he was in the Health Care Unit, and to draw the curtains to block out other people's lights [Fact 297]; however, Plaintiff admits coverings over the cells are generally not allowed [Fact 298]. Plaintiff admits that once he was in general population, he was able to manipulate the lights in his cell, and the inability to turn off the light over his bed was only in the infirmary [Fact 299]. Plaintiff also admits that the other inmates in the infirmary were not allowed to manipulate their lights either [Fact 300]. Therefore, the ability to turn off lights was a function of the infirmary, not something that was utilized against Plaintiff because of his disability, since he was allowed the same ability to manipulate lights as the other inmates in both general population and the infirmary.

Plaintiff also claims he was not allowed access to other activities to the same extent as other inmates. However, Plaintiff admits he was able to go to the law library, unescorted, two to three times per week [Fact 307], that he was allowed to go to the commissary intermittently

31

when the infirmary staff turned in the request slips [Fact 308], and that he was allowed to go to the yard, even while he was in the infirmary after February 3, 2003, every other day [Fact 306]. There is no evidence that Plaintiff was ever denied these activities, or that they were denied to him because of his disability. Moreover, referencing the commissary "denial," Plaintiff admits that be believes he did not get to go to the commissary all the time because the commissary slips were not turned in [Fact 309], not because of his disability.

Plaintiff alleges the Defendant Illinois Department of Corrections violated the ADA and Rehabilitation Acts when it denied him access to employment and programs that would allow Plaintiff to earn credit towards his release [Complaint, ¶ 366]. However, Plaintiff admits he wanted to work, "but not until he got out." [Facts 47-50]. He participated in the early release programs at Hill and Western, and is currently in the program at Pinckneyville [Fact 303]. In fact, Plaintiff admits the only time he was off the early release program at Western was when the physicians made him "medically unassigned" [Fact 302]. But, this was only when he would get eye infections and the hospital would not inform the school that the medication they were giving him would render him unable to see, so he could not go to school [Fact 304]. The Illinois Department of Corrections never discriminated against Plaintiff because of his disability. At most, there were certain times when Plaintiff's medical condition, not his poor eyesight, caused him to be unable to participate in the early release program. However, even that alleged denial was not caused by any policy of the Illinois Department of Corrections, but rather by the medical considerations of his physicians, who were not employed by the Department of Corrections. Plaintiff alleges he asked Defendants Fuqua and Funk who had made him medically unassigned, but did not tell them he did not want to be medically unassigned [Facts 310, 311].

32

### c.     ADA claims at Pinckneyville:

Plaintiff alleges his rights under the ADA and Rehabilitation Act were violated when he was removed from an ADA cell by Defendant Flagg [Complaint, ¶ 368].  Plaintiff alleges the difference between an ADA cell and regular cell is that because of his decreased vision, in a regular cell, he was always hitting things and cutting himself on "razor sharp" edges [Fact 357].  Plaintiff believes an ADA cell has room to maneuver and no sharp edges.  ADA cells at Pinckneyville are twice the size of regular cells [Fact 315].

Plaintiff received permission to be housed in an ADA cell when he was examined by Dr. Feinerman at Pinckneyville on January 16, 2006, when Plaintiff presented to Dr. Feinerman asking for an ADA cell [Fact 347].   Dr. Feinerman's assessment was that Plaintiff had decreased visual acuity, and his plan was that Plaintiff was ok for an ADA cell, low bunk, low gallery, and physically challenged permit [Fact 349].  At the time Dr. Feinerman determined Plaintiff could have permission to be housed in an ADA cell, however, that determination was not made because Dr. Feinerman believed that Plaintiff needed a larger cell [Fact 350].  In fact, in Dr. Feinerman's opinion, it would be easier for someone who is visually challenged to maneuver around a smaller area [Fact 350].  Mainly, Dr. Feinerman believed, at the time he examined Plaintiff, that due to his decreased vision, Plaintiff would benefit from any accommodations that might assist him, and since Plaintiff wanted in an ADA cell, Dr. Feinerman gave him permission to be in one [Facts 351, 352].  Dr. Feinerman does not believe that Plaintiff's disability requires him to be in an ADA cell [Fact 353].  According to Dr. Feinerman, an ADA cell would be required for someone in a wheelchair who required additional space, as well as for someone who needed the assistance of rails on the wall to get in or out of a chair or on or off of the commode [Fact 354].  Plaintiff was not in either situation [Fact 355].

Plaintiff's assertions that regular cells had razor sharp edges has no basis in fact.  All of the bunks at Pinckneyville are manufactured by Correctional Industries at Shawnee Correctional Center and are made to the same specifications [Facts 367, 368].  All cell furnishings are inspected to make sure there are no sharp edges, as sharp edges in a cell could be a safety hazard for both staff and inmates alike [Fact 368].

Plaintiff also claims he had numerous injuries from cutting his head on the cabinets above the toilet [Fact 359].  However, Plaintiff's medical records belie these allegations. Plaintiff was seen in the Health Care Unit on February 12, 2006, claiming he wanted ointment for all of his bumps and cuts because he was constantly bumping into things [Fact 360].  The nurse's note read, "this nurse looked at so called bumps and cuts - no bumps, cuts or bruised - I/M left angry."  [Fact 360].  Again, on April 9, 2006, Plaintiff complained of hitting his head frequently, but the nurse could find no marks on his bald head [Fact 362].  When he complained to an LPN on June 23, 2006, about constantly bumping into things, the nurse noted a small (dime sized) bruise on top of his head and a medium size, purple bruise on right shin of approximately 1½ cm. [Fact 364].  Finally, on June 27, 2006, Plaintiff complained to the physician about headaches he claimed were caused by bumping his head.  The doctor did not note anything superficially about his head [Fact 365] denoting that there were no superficial injuries of his head.  On January 29, 2007, Plaintiff saw the physician and the plan was to have physically challenged, low bunk and low gallery [366].

### d.  Current accommodations at Pinckneyville:

Plaintiff admits he was never in an upper bunk or upper gallery at Pinckneyville, even when he was not in an ADA cell [Fact 331].  Moreover, he was allowed to have safety glasses, sunglasses, contact lenses, and talking books and tapes during the time he was not in an ADA cell [Fact 331].  There is no evidence that Plaintiff is not currently allowed those

34

accommodations, and he admits he is currently housed in an ADA cell at Pinckneyville [Fact 356]. Also, Plaintiff currently attends college as part of his early release program, even though he can only take classes for a couple hours at night because he cannot tolerate his contact lenses for more than two hours per day [Facts 320, 321]. Plaintiff also has attendants who help him lift his property boxes at Pinckneyville [Fact 316]. At Western, even though there were no attendants, the correctional officers would help him lift his boxes [Fact 316].

The Department of Corrections has accommodated and continues to accommodate Plaintiff's disability, both with accommodations he requires, such as sunglasses, talking books, low bunk and low gallery permits, but also with accommodations his disability does not require, such as an ADA cell and education. Under no circumstances can the Department be found to have discriminated against plaintiff on the basis of his disability, and is entitled to summary judgment as to Count V.

## LAW ON QUALIFIED IMMUNITY

Defendants are also entitled to qualified immunity. The Supreme Court in <u>Harlow v. Fitzgerald</u> held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800 (1982).

In defining the right, the Court stated that "the contours of the right must be sufficiently clear that a reasonable official would understand that what he was doing violates the right. . . it is to say that in the light of the preexisting law the unlawfulness must be apparent." <u>Anderson v. Creighton,</u> 483 U.S. 635, 640 (1987).

While the "Plaintiff bears the burden of establishing the existence of the allegedly clearly established constitutional right," (<u>Rakovich v. Wade</u>, 850 F.2d 1180, 1209 (7th Cir. 1988)) it is

35

not enough to simply invoke a particular right in its most general terms.  If this were the case, "any action that violates that clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right." Anderson, 483 U.S. at 639.  This would bear "no relationship to the 'objective legal reasonableness' that is the touchstone of Harlow." Id.

### Argument on Qualified Immunity

In order to overcome Defendants' qualified immunity defense, the plaintiff would have to show in the context of health care, that not only was he constitutionally entitled to unlimited medical care, but he would have to show that non-medical defendants would be on notice that to fail to provide the unlimited care and to keep him free from incidental problems that might arise as a result of decisions of others relating to that care, would violate plaintiff's constitution rights.  Moreover, Plaintiff would have to show that the non-medical Defendants would be violating his rights to rely on the medical expertise of the physicians who were charged with providing the care.

In the context of failure to protect, Plaintiff would have to show that Defendants with no involvement in housing him, and with no indication that Plaintiff could not be housed with any other inmate at Western Illinois Correctional Center, would be liable simply because an inmate with a history of fighting was placed with Plaintiff.  Additionally, in the case of Law and Kellerman, he would have to show that it was unconstitutionally impermissible for officers to offer an inmate who claims to be afraid of his cell mate, the choice of staying in the cell or going to segregation and possibly facing discipline.  Plaintiff cannot show any of these things and therefore, these defendants are entitled to qualified immunity.

## LAW ON INJUNCTIVE RELIEF

Plaintiff seeks injunctive relief as well as damages.  It is well established that "[w]hen there is no continuing violation of federal law, injunctive relief is not part of a federal court's remedial powers."  <u>Al-Alamin v. Gramley</u>, 926 F.2d 680,685 (7th Cir. 1991).

### Argument:  Plaintiff Is Not Entitled to Injunctive Relief

Plaintiff cannot show that the medical care he received in the past or that he continues to receive is unconstitutional.  He also cannot show that he is not being given accommodation for his disability.  In short, he cannot establish that there is any ongoing constitutional violation, or violation of the ADA or Rehabilitation Acts such that injunctive relief would be available.

Respectfully submitted,

ILLINOIS DEPARTMENT OF
CORRECTIONS, JULIUS FLAGG, SANDRA
FUNK, DEBRAH K. FUQUA, DENNIS
HOCKADAY, BYRON LAW, ROGER E.
WALKER, JR., and KEVIN WINTERS,

　　Defendants,

LISA MADIGAN, Attorney General,
State of Illinois

By:　s/ Kelly R. Choate_____
　　Kelly R. Choate, #6269533
　　Assistant Attorney General
　　Attorney for Defendants
　　500 South Second Street
　　Springfield, Illinois  62706
　　Telephone:  (217) 782-9026
　　Facsimile:   (217) 524-5091
　　E-Mail:  kchoate@atg.state.il.us

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

AARON MCCROY, #N-51882,                  )
                                         )
          Plaintiff,                     )
                                         )
     -vs-                                )          No.  02-3171
                                         )
ILLINOIS DEPARTMENT OF                   )
CORRECTIONS, et al.,                     )
                                         )
          Defendants.                    )

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2007, I electronically filed a Memorandum of Applicable Law and Argument in Support of Defendants' Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to the following:

Thomas Londrigan                          Douglas J. Quivey
Londrigan, Potter & Randle, P.C.          Londrigan, Potter & Randle, P.C.
tom@lprpc.com                             doug@lprpc.com

Theresa Powell                            Carl J. Tenney
Heyl, Royster, Voelker & Allen            Hughes, Hill & Tenney, L.L.C.
tpowell@hrva.com                          ctenney@hhtlaw.com

April Gowdy Troemper                      Carissa A. Haning
atroemper@hrva.com                        carissa@lprpc.com

and I hereby certify that on May 4, 2007, I mailed by United States Postal Service, the document(s) to the following non-registered participant(s):

None

Respectfully Submitted,
 s/ Kelly R. Choate_____
Kelly R. Choate, #6269533
Assistant Attorney General
Attorney for Defendants
500 South Second Street
Springfield, Illinois  62706
Telephone:  (217) 782-9026
Facsimile:   (217) 524-5091
E-Mail:  kchoate@atg.state.il.us