**E-FILED**
Friday, 07 September, 2007  04:20:49 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| AARON MCCROY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02-CV-3171 |
| | ) | |
| THE ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS, ROGER E. | ) | |
| WALKER, JR., (in his official | ) | |
| capacity only), DENNIS HOCKADAY, | ) | |
| KEVIN WINTERS, SANDRA FUNK, | ) | |
| DEBORAH FUQUA, LIEUTENANT BRYON | ) | |
| LAW,  KENNETH KELLERMAN, JULIUS | ) | |
| FLAGG, all in their official and | ) | |
| individual capacities, WEXFORD | ) | |
| HEALTH SOURCES, Inc., | ) | |
| Dr. LOWELL BROWN, MD., | ) | |
| Dr. HUGHES LOCHARD, MD., and | ) | |
| RHONDA MILLS, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S JOINT RESPONSE TO DEFENDANTS'
SEPARATE MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff, AARON MCCROY, by his attorneys, LONDRIGAN, POTTER, &

RANDLE, P.C., for his Response to Defendants' Motion for Summary Judgment states

as follows:

## I.  INTRODUCTION

Plaintiff Aaron McCroy, ("McCroy",) is an inmate incarcerated by the Illinois

Department of Corrections (IDOC) since April 27, 1993.

Shortly after incarceration, McCroy was diagnosed with Keratoconus, a progressively degenerative eye disease. Keratoconus can be controlled, but if left untreated, can result in blindness. IDOC and its medical provider, Defendant Wexford Health Services, Inc. ("Wexford"), repeatedly denied McCroy a corneal transplant recommended by several treating ophthalmologists (outside medical providers). McCroy filed numerous grievances, in addition to direct correspondence sent to IDOC officials, detailing his complaints about his medical treatment and related issues. McCroy also filed a *pro se* complaint alleging violations of his rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution, the Rehabilitation Act (RA) and the Americans with Disabilities Act (ADA). Several months later, following the filing of his Complaint, McCroy was provided with a corneal transplant for his left eye but he later lost that eye when he was attacked by an inmate. His right eye problems continue.

The current Complaint asserts four types of claims against the IDOC and Wexford Defendants: (1) Eighth Amendment deliberate indifference to serious medical need; (2) Eighth Amendment failure to protect; (3) First Amendment, Americans with Disabilities Act (ADA), and Rehabilitation Act (RA) retaliation; and (4) ADA and RA failure to accommodate.

*"...deliberate indifference"*

McCroy asserts that the Defendants were deliberately indifferent to his serious medical need during three distinct periods of time:

First, McCroy asserts that Defendants were deliberately indifferent during the delay of eleven (11) months between the time a corneal transplant was first recommended by outside ophthalmologists and when he finally received the transplant. During that delay, McCroy's vision rapidly deteriorated and he suffered cumulative scarring and pain in both eyes due to ill fitting contact lenses.

Second, McCroy maintains that after his corneal transplant, Defendants continued their deliberate indifference by ignoring the medical orders of his treating ophthalmologist and placing him in the general population. After learning of the violent history of one of his cellmates and experiencing his aggression, McCroy requested an emergency cell transfer. Security denied his request. The following day, McCroy was struck in the left eye by this cellmate, resulting in surgical removal of that eye.

Third, McCroy alleges that Defendants continued their deliberate indifference by failing to treat Keratoconus in his remaining (right) eye. McCroy was transferred from one institution to another, resulting in care being shuffled between a series of treating ophthalmologists resulting in further delays preventing him from being properly fitted with contact lenses and causing further loss of vision in his right eye.

*"... retaliation"*

The First Amendment, Americans with Disabilities Act (ADA), and Rehabilitation Act (RA), retaliation claims are predicated upon what the Defendants did to McCroy after he filed repeated grievances and his *pro se* Complaint filed with this Court.

*"... failure to protect"*

McCroy contends that the Defendants failed to protect him from foreseeable injury from cellmate assault in which he lost his left eye.

*"...ADA/RA"*

Lastly, McCroy brings direct claims pursuant to the ADA and RA relating to the failure of Defendants to accommodate his disability and disability discrimination.

## II.  ARGUMENT

### Summary Judgment Legal Standard

Summary judgment is only proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED.R.CIV.P. 56C.  ***Celotex Corp. V. Catrett***, 477 U.S. 317, 322 (1986).  In determining whether factual issues exist, the court must review all of the evidence in the light most favorable to the non-moving party.  ***Beraha v. Baxter Health Corp.***, 956 F.2d 1436, 1440 (7th Cir. 1992).

A.     **DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED**

Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976). A claim of deliberate indifference to a serious medical need contains both an objective and a subjective component.

To satisfy the objective component, a prisoner must demonstrate that his medical condition is "objectively, sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious even a lay person would perceive the need for treatment. *Faelker v. Outagamie County*, 394 F.3d 510, 512-513 (7th Cir. 2005).

To satisfy the subjective component, a prisoner must demonstrate that prison officials acted with a "'sufficiently culpable state of mind'." *Farmer*, 511 U.S. at 834 (*quoting, Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). The officials must know of and disregard an excessive risk to inmate health; indeed they must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "must also draw the inference." *Farmer*, 511 U.S. at 837.

1)     **Objective Component:  Keratoconus**

Defendants do not dispute that McCroy's condition, keratoconus, is a serious medical condition.   Therefore, the undisputed facts satisfy the objective component.

2)    **Subjective Component #1: Delayed Surgery; (Defendants Hockaday, Winters & Funk)**

A delay in medical treatment that unnecessarily prolongs and exacerbates pain gives rise to deliberate indifference. ***Williams v. Liefer,*** 491 F.3d 710 (2007). McCroy was diagnosed with Keratoconus in 1993. (C1, 9-9-93 Prog. Note). After an emergency furlough on February 27, 2002, Dr. Weller of Quincy Medical Group noted that McCroy was to follow-up with Dr. Sieck regarding a corneal transplant. (C3, 2-27-02 Rpt. of Consult). Thereafter, on May 13, 2002, Dr. Brian Plattner of Kehoe Eye Care in Galesburg, Illinois indicated that McCroy needed to discontinue contact lens wear in his left eye and consider a corneal transplant for that eye. (C5, 5-13-02 Rpt. of Consult). On 5/14/02, Dr. Anderson, a Wexford optometrist who considered himself unqualified to treat keratoconus, initiated a referral request for a corneal transplant for McCroy. (C6, 5-14-02 Ref. Req). On May 14, 2002, the referral request was made by Wexford's Dr. Anderson, noting that McCroy could no longer tolerate a contact lens, was denied without comment. (C6, 5-14-02 Ref. Req).

Despite the repeated recommendations of outside ophthalmologists, McCroy did not receive corneal surgery until February 3, 2003. (C16, 2-3-03 Rpt. of Consult). At no time during this delay did a qualified opthamologist opine that a transplant was not needed. During this delay, McCroy suffered from "hydrops"[1] with progressive and

---

[1] "Hydrops - an excessive accumulation of clear, watery fluid in any of the tissues or cavities of the body; synonymous, according to its character and location, with ascites, anasarca, or edema." Stedman's Med. Dictionary, p. 464 (©2001).

painful scarring of the cornea. (Ct. Docket 372-17, McCroy Dep., p. 81; Ex. H, Anderson Dep., p. 48). During the roughly eleven month period of time when it was known he needed eye surgery, McCroy filed numerous grievances and a ***pro se*** complaint in this Court to try and bring attention to the issue.

During this delay, Defendant, Hockaday was Warden at WICC. Defendants, Winters and Funk were assistant Wardens involved in adjudicating McCroy's grievances. Defendant, Fuqua, was the Health Care Unit (HCU) Administrator. All grievances submitted by McCroy were denied while at WICC.

Despite denying all the grievances, Defendants Hockaday and Winters were aware of the need for the transplant. For example, on March 12, 2002, Hockaday wrote McCroy stating, "Doctors recommend that you receive a corneal transplant or be seen by Dr. Kehoe in Galesburg for refitting your contacts." (B5, 3-12-02 Hockaday Memo). At that time, there was no opthamologist recommending to continue to refit a contact lens for his left eye. The need for a corneal transplant was ignored while IDOC and Wexford argued over who would pay for it.

> The IDOC nor Wexford will pay for transplantations. Suggest that patient talk with HCUA if he and/or his family is willing to take care of the cost of transplant.

> (C7, 5-15-02 Wexford Memo).

Moreover, Hockaday, repeatedly cancelled and delayed appointments with Dr. Kehoe, McCroy's treating ophthalmologist. (B3, 3-11-02 Grievance).

On June 17, 2002, McCroy filed a grievance noting that all three outside ophthalmologists agreed he needed corneal surgery. (B8, 6-17-02 Grievance). On August 11, 2002, McCroy wrote Defendant Hockaday for the third time, pleading with him to do something. (B9, 8-11-02 McCroy Ltr). Hockaday referred the issue to IDOC Medical Director, Dr. Elyea, but otherwise failed to act and nothing was done. (B10, 8-13-02 Hockaday Memo). In addition, Dr. Schultz on 9/23/02 clearly stated to WICC Medical Director Sims:

> [McCroy] has been intolerant of the contact in his left eye for the past seven to eight years. ... The vision in the left eye could not be improved by any means. ... The left cornea showed central apical scarring with approximately 80% loss of corneal thickness.

> (C13, 9-23-02 Schultz Ltr).

Again, IDOC and Wexford did nothing. Also, it is undisputed that Hockaday acknowledges receipt of McCroy's legal complaint in this case on August 22, 2002. (B11, 8-23-02 Hockaday Memo). McCroy was shuttled between numerous ophthalmologists for "second" opinions and surgery did not occur until February of 2003.

Despite numerous grievances and letters from McCroy, Hockaday testified that since he did not personally review his grievances, he was not aware of McCroy's medical need. (Ct. Docket#380-4, Hockaday Dep., pp. 25, 27, 49). Instead, Hockaday designated Assistant Wardens Funk and Winters[2] to make these reviews. Conversely,

---

[2]If Assistant Warden Winters made the reviews, he was well aware of McCroy's serious medical need when he became WICC Warden.

8

Hockaday did not hesitate to allow prison "security" to cancel appointments with outside treating ophthalmologists.  In one case, an appointment for contact lens fitting was delayed for months. (C4, 3-5-02 Ref. Req). Warden Hockaday offers no explanation why he allowed his name to be signed to various forms that he did not personally review. Warden Winters succeeded Hockaday as Warden that December and continued the practice of delegating grievance review to assistant wardens.  Polk, not a defendant, later abandoned this practice when he succeeded Winters as Warden at WICC, "[m]ainly so I would know what was going on.  I wanted to be more informed in that area. ... that way I'd know more what's going on.  Be involved." (Ex. I, Polk Dep., p. 9).

As noted by the Supreme Court, a non-medical prison official cannot bury his head in the sand when medical professionals refuse to act and a prisoner clearly needs medical attention.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (noting that deliberate indifference can manifest itself if prison guards intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment).

In this case, the combined misconduct of Wardens Hockaday and Winters reaches levels far beyond "prison guards;" they were top WICC administrators that ignored the warnings of qualified treating physicians chosen by Wexford to treat McCroy.

Assistant Warden Funk also regularly reviewed McCroy's medical related grievances for Wardens Hockaday and Winters.  She signed both wardens' names denying relief without input from either treating ophthalmologists or Wardens

9

Hockaday and Winters. (Ex. M, Funk Dep. pp. 13-15). ***See also, Greeno v. Daley***, 414 F.3d 645, 656 (7th Cir. 2005) (explaining that non "medical professional" prison officers have a duty to investigate and refer patients to competent medical professionals); ***Zentmyer v. Kendall County, ILL***, 220 F.3d 805, 810 (7th Cir. 2000) (noting that if a defendant consciously chose to disregard a nurse or doctor's directions in the face of medical risks, then he may well have exhibited the necessary deliberate indifference).

The bottom line is that material issues of fact exist whether Defendants Hockaday, Winters, and Funk were deliberately indifferent to McCroy's serious medical need.

### 3) Subjective Component #2: Transfer to General Population; (Defendants Brown, Fuqua, Mills &Winters)

On February 3, 2003, McCroy finally had left eye surgery. Thereafter, he was housed in the infirmary at WICC. On October 22, 2003, a security reclassification review was conducted and it was noted that McCroy was "ineligible" for transfer to another prison. (D2, 10-22-03 Sec.Reclass.Rev). McCroy was ineligible for a transfer because he was a medical patient in the HCU infirmary and required further observation. HCU Administrator Fuqua explains:

> Q. There are instances where someone may be denied the ability to transfer if they have a medical condition that would prohibit them from being sent out, right?
>
> A. That's correct.
>
> (Ex. E, Fuqua Dep., p. 140).

10

Shortly thereafter, on November 6, 2003, Warden Winters began an administrative effort to transfer McCroy to another prison. McCroy was taken to his treating ophthalmologist, Dr. Zeh, along with a form from the HCU asking: "from eye point of view need to know if inmate can be moved to general population of the corrections center with his impaired vision can he move freely and independently." (C20, 11-6-03 Rpt of Consult). Dr. Zeh did not wait to respond in writing. Instead, on that same afternoon he placed a telephone call to the HCU regarding a request to move McCroy to general population. The nurses' note states: "Dr. Zeh stated that *offender needed to stay in the infirmary ... he doesn't want offender to get poked in the eye.*" (Emphasis added.) This note was entered by the HCU Head of Nursing, J. Blaesing, R.N. (C23, 11-6-03 Prog. Note). Weeks later, on November 21, 2003, a follow-up call was placed to Dr. Zeh by Nurse Blaesing. While there is no record what she discussed, her note concludes: "... offender can be placed in Seg (single cell)." (C24, 11-21-03 Prog. Note). Nurse Blaesing communicated that conversation to Defendant Mills (Nurse Practitioner) who then, without consultation with a medical doctor, discharged McCroy from the infirmary to segregation in a single cell. The discharge note signed by Defendant Mills states that offender can go to a "single cell in segregation." (C24, 11-21-03 Disch. Note). Warden Winters was now in control over McCroy's medical need.

Nurse Practitioner Mills resolutely refused to answer if she acted alone and on her own authority, when discharging McCroy from the infirmary. (Ct. Docket #3801-10,

Mill Dep., pp. 35-38). Finally, when pressed for an answer she testified she would <u>not</u> have approved it without the treating doctor's approval, inferring that Dr. Zeh approved the discharge.(Ct. Docket #380-10, Mills Dep pp.32-37). Mills acknowledged that from the time she discharged McCroy from the infirmary that Security was "calling the shots" as to where he was housed. (Ct. Docket #380-10, Mills Dep. pp. 38-39). It is abundantly clear that no treating ophthalmologist, including Dr. Zeh, approved discharging McCroy from the infirmary, much less housing him among the general population.

On November 29, 2003, without a medical examination, McCroy was given the status of "Medically Unassigned"[3] for a period of one year by Defendant Dr. Lochard. Dr. Lochard ordered McCroy to be medically evaluated in January 2004. (C26, 11-29-03 WICC Memo). That January medical evaluation did not occur and McCroy remained "Medically Unassigned". (*See* "Failure to Protect Argument" at pp. 34-38).

IDOC Defendants suggest that Defendant Dr. Lochard, acting in the absence of a medical director, tacitly approved Nurse Practitioner Mills' discharge of McCroy from the HCU infirmary. However, Lochard was Medical Director at Taylorville CC and only "on call" for WICC (Ct. Docket #372-4, Lochard Dep., p.11). and had no recollection of examining McCroy. (Ct. Docket #372-4Lochard Dep., p.13). Lochard was never

---

[3]This status means the inmate is medically unable to be assigned job duties and therefore will be housed with other unassigned prisoners leaving segregation. (*See* "Retaliation Argument" at pp. 26-34).

involved with a corneal transplant patient in his entire practice, (Ct. Docket #372-4, Lochard Dep., p. 46). and admitted he never even saw McCroy. (Ct. Docket #372-4, Lochard Dep., pp. 79-80). Nevertheless, he recorded the medical finding that McCroy was "medically" unassignable. (C26, 11-29-03 Lochard Memo). There was no qualified medical doctor who approved McCroy's discharge from the infirmary, certainly not his treating ophthalmologist (Dr. Zeh), as suggested by Defendant Mills. (Ct. Docket #380-10, Mills Dep., pp. 36-38).

On December 23, 2003, the nurses notes indicate McCroy is "housed in the infirmary," but with no medical indication why. (C28, 12-23-03 Prog. Note). A note entered on January 23, 2004, indicates that McCroy is housed in the infirmary "per warden." (C30, 1-23-04 Prog. Note). One month later, on February 23, 2004, the nurses' notes indicate that McCroy "remains housed in infirmary per security." (C31, 3-8-04 Prog. Note). The same "per security" notation is repeated throughout the months of March, April and May. (C31, 32, 33, Prog. Notes).

Also, a Transfer Report dated March 2, 2004 states McCroy is "housed in gen pop" and that his transfer is denied. (D4, 3-9-04 Transfer Rpt. Denial). On March 16, 2004, Defendant Fuqua noted that McCroy was "placed on seg status in room 2 in infirmary per D. Fuqua, R.N." (C32, 3-16-04 Prog. Note). On April 20, 2004, another note reflects that McCroy is still housed in infirmary, "*per security*." (C35, 4-20-04 Prog. Note). In late April and throughout May, nurses notes continue to indicate that

McCroy is in the infirmary "per security," no mention is made of his medical status or need.  (C35, 36, 37, 39, 41, Prog. Notes). Defendant Fuqua, as Administrator of the HCU, testifies to the significance of these entries.

> A. [June 4, 2004] 7:15 A.M., remains housed in infirmary per security. ...  The plan is to continue to house per security, S. Moore, L.P.N.

> * * *

> Q.  Well, you have interpreted the P, paren, as plan.   What does plan mean in terms of usage in nurse's notes?

> A. ...  What the **medical plan** is.  **In this case, there is no medical plan**, because he is no longer a patient in the infirmary.  So she's just saying continue to house.

> Q.  He is here because–.

> A.  Because security.

> Q.  Security puts him here.

> A.  Right.

> (Ex. E, Fuqua Dep., p. 100)(Emphasis added).

On May 30, 2004, the nurses notes read that McCroy "remains housed in health care per security."  (C41, 5-30-04 Prog. Note). The same notation was made on June, 8, 2004 **just hours before McCroy was ordered by Acting Medical Director, Dr. Brown to be integrated into the general population.** (C43, 6-8-04 Prog. Note).(Emphasis added).

14

HCU Administrator Fuqua had never before seen an inmate medically discharged from the infirmary and yet continue to be housed there at the direction of Security. Defendant Fuqua had no idea why McCroy was housed in the infirmary.

> Q.  Are you aware that he was discharged from the infirmary prior to the time that he was sent to the assignment office to be given cell mates?
>
> A.  No, sir.
>
> Q.  Have you ever seen that happen before?
>
> A.  Not to my knowledge.
>
> Q.  Do you know why it was done in this case?
>
> A.  No, I do not know that it was done.
>
> (Ex. E, Fuqua Dep., p. 66)

Finally, near the end of her deposition, while interpreting medical records, Fuqua acknowledges that "medical" decisions were made by the Warden[4].

> Q.  I am only going to ask you about what appears to be a fairly legible note at the bottom.  Nurse's notes 2/23/04.
>
> A.  Yes.
>
> Q.  Eight A.M., remains housed infirmary per security.  What does that mean to you?
>
> A.  That the warden has made a decision to keep him in the infirmary.  Maybe there's no cells or something.  I don't know the reason why exactly.

---

[4]At this point in time, Defendant Winters was WICC Warden.

15

Q.  But the warden doesn't make medical judgments as to when a person should come and go out of the infirmary, does he?

A.  No.

(Ex. E, Fuqua Dep., p. 99)

On June 7, 2004, McCroy triggered immediate retaliation by filing two grievances relating to restrictions placed upon him in the infirmary.  One of the grievances pertained to an incident on March 16, 2004, when infirmary staff required McCroy to place his TV on a shelf under a brightly lit window. (B19-20, 6-7-04 Grievance). McCroy's eyes were sensitive to light and placement of the TV near direct sunlight caused him a pain and made viewing the TV impossible.  After McCroy refused to place his TV on the shelf and was sent to segregation for twenty days. (B17, 3-23-04 Final Summ. Rpt).  While in segregation, McCroy talked to Defendant Funk about the TV placement and was told that if Defendant Dr. Brown approved, he could place his TV on the table. (Ct. Docket #372-17, McCroy Dep., pp. 75 &146).  On April 7, 2004, McCroy did receive Dr. Brown's permission to place the TV on the table, out of direct sunlight.  (C34, 4-7-04 Prog. Note).   On June 4, 2004, McCroy confirmed this conversation with Defendant Funk about placing the TV on the table.  However, on June 6, 2004, McCroy was once again ordered to place his TV on the shelf under the brightly lit window.   The June 7th grievance also references the delays McCroy experienced seeking contact lens fittings appointments, the misreading of his steriod

prescription and denial of yard and recreation restrictions while in the infirmary. The second grievance McCroy filed on June 7th, relates to the infirmary not allowing him to go to the commissary for personal hygiene items. (B21, 6-7-04 Grievance).

The following morning, on June 8, 2004, Defendant Dr. Brown wrote an order transferring McCroy to general population. (C43, 6-8-04 Prog. Note). Dr. Anderson, on the same date noted a lifetime restriction of no weight lifting "over five pounds". (C42, 6/8/04 WICC Memo).

There was a medical need to keep McCroy in the infirmary, his transfer to general population was **_not_** a medical decision. Before ordering McCroy into the general population, Dr. Brown made a referral request to yet another outside ophthalmologist, Dr. Steahly. (C37, 5-10-04 Ref. Req.; C40, 5-26-04 Ref. Req). Coincidentally, Dr. Steahly was Dr. Brown's personal opthamologist. (Ct. Docket 373-8, Brown Dep., p. 28). Shortly thereafter, McCroy was seen again by Dr. Zeh on May 21, 2004, just days before Dr. Brown ordered him into the general population. Dr. Steahly never expressed the opinion that McCroy should be in the general population. Nevertheless, Dr. Brown now regarded Dr. Zeh as McCroy's "previous ophthalmologist". (Ct. Docket #373-8, Brown Dep., p. 8).

After Defendant Dr. Brown was appointed acting medical director in 2004, he and Defendant Fuqua came up with the plan to place McCroy into the general population and get him out of the HCU infirmary. Dr. Brown explains:

17

Q.  You made that decision?

A.  And, of course, it was in conjunction in discussion with the nurse administrator of the place, Ms. Fuqua, and others. You know, we talk about things.

* * *

MR. LONDRIGAN: There's a transcription in the record that a request was made of his treating ophthalmologist to place him in the general population and he said no, he didn't want him poked in the eye.

Q.  Did you ever review that before this deposition today?

A.  Yes.  I know all about that.

Q.  Did you call this treating physician back when you exercised your medical judgment to have this patient transferred into the general population?

A.  No.

Q.  Why not?

A.  I determined that an opinion or recommendation was based on probably unrealistic expectations and playing it safe. He wasn't on the scene, he doesn't know entirely what's going on here, and I decided that I knew better in view of everything that was going on.  ***And he was a previous ophthalmologist***, at any rate.

(Ct. Docket #373-8, Brown dep, pp. 25 & 28). (Emphasis added).

Not only did Defendant Dr. Brown not communicate with Dr. Zeh, he did not communicate with IDOC Medical Director, Dr. Elyea, an ophthalmologist.

18

Q.  Did you communicate at all with the medical director for department of corrections?

* * *

A.  You mean like Doctor Elyea?

Q.  Yes.

A.  I don't know that this case reached his desk.

Q.  Well, you certainly didn't call and ask for his opinion, did you?

A.  No, I don't believe so.

Q.  Who did you consult when you made the decision to transfer him to general population?

A.  *I don't know that I spoke specifically to an ophthalmologist about my decision.*

(Ct. Docket #373-8, Brown Dep., pp. 29-30). (Emphasis added).

Dr. Elyea was an IDOC Medical Director and Defendant Fuqua's immediate supervisor. His specialty was ophthalmology and he was familiar with McCroy's case. (Ex. E, Fuqua Dep., p. 8; C8, 9, 10, Fuqua E-mails).  Dr. Brown characterized Dr. Zeh's medical warning to the HCU as "impractical overkill" and an "exaggerated response to the problem generated by an ophthalmologist who was being a little overprotective I think." (Ct. Docket #373-8, Brown Dep., pp. 45-46)  He then volunteered : "I'm only guessing that he [Dr. Lochard] was the only logical person they had available to consult in the capacity of medical director". (Ct. Docket #372-8, Brown Dep., p. 47). Dr. Brown then

19

admitted he also did not talk to Defendant Lochard about the "problem". (Ct. Docket #373-8, Brown Dep. , p. 47).

Brown and Fuqua acted together, choosing to ignore the clear warning of Dr Zeh. Instead, they "presumed", in concert, that a violent prisoner would never be assigned as McCroy's cellmate.

> Q. Well, what was done, from a medical standpoint, to make sure that when this patient went into the general population that he wouldn't be put together with a known violent cellmate who had previously been placed in segregation for fighting and that had a history of violence?
>
> A. Well, there is a – there is an action that security performs under the heading of placement where they're supposed to consider the variables involved in how people get put in certain cells. And I *presume that that process took place* when he went from the infirmary to the population.
>
> Q. Why do you *presume* that?
>
> A. I expect it is written somewhere.
>
> &ast; &ast; &ast;
>
> Q. You just assumed that that's something that security would be doing to make sure that this patient wasn't put in with a violent cellmate?
>
> A. Well, I've had *reputable* people tell me that that's what happened so it isn't just a mere assumption.
>
> Q. Tell me a couple of those *reputable* people that told you that.
>
> A. This is Debbie Fuqua, the healthcare administrator.

20

Q.  Anybody else?

A.  I don't remember any other incidents, but I remember she told me that that's a specific action that is performed.  Or should be performed.

(Ct. Docket #373-8, Brown Dep., pp. 50-52). (Emphasis added).

This was never a medical issue.  Defendant Dr. Brown's cavalier assumption frames the issue as he and Defendant Fuqua saw it. When asked what he did to alert "security" personnel in the Assignment Office to the medical need of a vulnerable "medically unassigned" prisoner, he responded: " I don't know that anything specific was brought to their attention, but I think he was a ***notorious*** case that they would know quite a bit about."  (Ct. Docket #373-8, Brown Dep., pp. 55-56). (Emphasis added).

Dr. Brown, did not seek any medical consultation whether it was safe to move McCroy to general population. (Ct. Docket #373-8, Brown Dep., p. 50).  Moreover, Dr. Brown's assertion that McCroy asked to be moved from the infirmary is denied by McCroy. (A5, McCroy Aff).   McCroy also contemporaneously filed an emergency grievance complaining that Dr. Zeh's orders were violated by transferring him into the general population. (B22-23, 6-13-04 Grievance).  Assuming, ***arguendo***,  McCroy made a verbal request to Dr. Brown, it is not relevant whether it was in his best medical interest to remain in the infirmary.

As a direct result of Defendant Dr. Brown's June 8, 2004 order, McCroy was struck by a disturbed and violent cell mate resulting in the loss of his left eye.  The fact

that Defendant Dr. Brown did not know the violent propensities of the specific cell mate that attacked McCroy, does not break the causal connection. (*See* "Failure to Protect Argument" at p. 34-38).

The bottom line is there is a material issue of fact as to whether Dr. Brown's abrupt and ill-considered action on June 8, 2004 constitutes deliberate indifference. *See Jones v. Simek*, 193 F.3d 485, 491 (7th Cir. 1999) (fact question existed as to whether decision by prison doctor to disregard treatment ordered by outside specialist was deliberate indifference); *Sherrod v. Lingle*, 223 F3d 605,611 97th Cir. 2000) (fact question existed as to whether medical decision to return inmate with appendicitis symptoms to his cell exhibited deliberate indifference); *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (explaining that even if the inmate did receive some medical treatment, it is possible that the received treatment was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" his condition). This is not a case where there was a difference of opinion among competent medical providers. In this case, Defendant Dr. Brown was not qualified to countermand the order of McCroy's treating ophthalmologist. It is persuasive, if not conclusive, that since Defendant Dr. Brown made no effort to examine, or have McCroy examined by Dr. Zeh, or any other qualified ophthalmologist, that he was deferred to the plan of "Warden/Security" officials at WICC.

As it relates to the IDOC Defendants, there is no question that McCroy's transfer to general population was not a medical decision, it was a warden/security decision. IDOC and Wexford Defendants selectively argue facts that best suit their arguments. Alternatively, each Defendant uses as the date of discharge, the November '03 date or the June '04 date. It is clear from nurses' notes in the Offender Outpatient Progress Notes, as well as the Transfer Report, that McCroy was in need of "additional observation": *i.e.*, post-operative protection of McCroy's vulnerable left eye. (D4, 3-9-04 Transfer Denial).

Dr. Zeh, a qualified treating opthamologist, accepted the responsibility for McCroy's care and assigned him to the infirmary based upon informed medical judgment. However, Defendant Fuqua admits medical judgment is not a factor when an inmate is housed in the infirmary by order of "Security." (Ex. E, Fuqua Dep., p. 100). Dr. Zeh repeatedly made it clear to both HCU nurses and Dr. Anderson that McCroy's left eye was unstable and any activity, including lifting 5 to 10 lbs. could jeopardize sight in his left eye. (C42, 6-8-04 WICC Memo; C44, 6-8-04 Prog. Note). However, in early 2004, when Dr. Brown came to WICC, McCroy was already housed in the infirmary "per security" or "per warden". (C30, 31, 32, 33, 34, Prog. Notes).

Warden Winters, who succeeded Warden Hockaday, contradicts HCU Administrator Fuqua, clearly stating Fuqua had authority to discharge inmates from the infirmary. (Ex. G, Winters Dep., p.86). If on June 8, 2004, McCroy was transferred to general population based upon a "security" plan. All IDOC Defendants, Winters, Funk

23

and Fuqua, in concert with Wexford Defendant Brown, acted with deliberate indifference. The preemptive transfer of McCroy into the general population ignored a documented medical need for McCroy to remain in the infirmary.

### 4)    Subjective Component #3: Delays in Treatment Following Surgery (Defendants, Winters, Funk, Fuqua & Brown)

After the eye surgery, Springfield Eye Clinic physicians continued to recommend that McCroy be fitted with contact lenses. Several appointments were cancelled, the last after McCroy lost his left eye. (C45, 8-11-04 Ref.Req). However, McCroy's right eye still needed to be fitted. During this period, McCroy's right eye could no longer tolerate an ill-fitting contact lens, making it difficult for him to accomplish even simple tasks. (Ct. Docket 372-17, McCroy Dep., p. 96; A2, McCroy Aff).

Finally, in December, 2004, McCroy was seen by Dr. Kass, a Court appointed specialist. Dr. Kass recommended a lens fitting for the right eye, as well as a prosthesis to replace the left eye. (C46, 12-8-04 Rpt. of Consult). It was not until January 2005, after a disciplinary transfer from WICC to Menard, that McCroy finally was scheduled to fit his right eye for contacts. (C49, 50, 51, 52, 53, 1-27-05 Marion Eye Ctr Rpt). Medical need was totally ignored . As a result, McCroy was unable to wear a contact lens in his right eye more than a short time without a great deal of pain. (C47-48, 1-25-05 Menard Off. Opt Exam).

24

**B.     RETALIATION (DEFENDANTS WINTERS, FUNK, FUQUA, FLAGG, BROWN, MILLS; IDOC)**

**Legal Standard**

A claim of retaliation by prison officials is properly brought pursuant to 42 U.S.C. §1983. ***Babcock v. White***, 102F.3d 267, 276 (7th Cir. 1996). Prisoners are entitled to utilize available grievance procedures without threat of recrimination. ***Hoskins v. Lear***, 395 F.3d 372, 375 (7th Cir. 2005). A prison official may not retaliate against a prisoner because that prisoner filed a grievance, even if the adverse action does not independently violate the constitution. ***DeWalt v. Carter***, 224 F.3d 607, 618 (7th Cir. 2000). While it is true that a plaintiff alleging First Amendment retaliation must prove that his protected activity in bringing a grievance was a motivating factor in the defendant's retaliatory action ***Mt. Healthy Board of Education v. Doyle***, 429 U.S. 274, 287, 97 S.Ct. 568, 50 Led.2d 471 (1977); ***Babcock v. White***, 102 F3d 267, 275 (7th Cir. 1996); ***Spiegla v. Hull***, 371 F.3d 928, 942-943 (7th Cir. 2004) (a motivating factor does not amount to a "but-for" factor or to the "only" factor, but is rather *a* factor that motivated the defendant's actions). Once the plaintiff proves that an improper purpose was *a* motivating factor, the burden shifts to the defendant to prove that the same actions would have occurred in the absence of the protected conduct. ***Id.*** "[R]etaliation against persons who make complaints under Title II [ADA] and §504 [RA] is actionable and applicable to inmates in state prisons." ***Bane v. Virginia Dept of Corrections***, WL 1378523 (W.D.Va. 2007).

25

**Argument**

During his three year stay at WICC, McCroy filed over 35 grievances.  He also filed suit on August 9, 2002.  These grievances and legal process implicate both the First Amendment, ADA, and RA.   As a consequence of these grievances and this legal action, Defendants repeatedly retaliated against McCroy.

For several years at Hill Correctional Center (HCC), McCroy received competent medical care from Dr. Kehoe and others at Kehoe Eye Care in Galesburg.  After he was transferred to WICC, however, Wardens Hockaday and Winters and other IDOC employees refused to schedule, and in other cases cancelled, appointments for lens fittings with Kehoe Eye Care.  In addition, McCroy wrote letters to Defendants Hockaday, Fuqua and others pleading with them to recognize the seriousness of his medical condition.  These letters clearly explained:

> Keratoconus is a degenerative cornea decease which causes the thinning, conning and perforating of the cornea.  Contact lenses that are specially fitted maintain/replace the cornea and allows me to have limited vision. However, the fit must be check on a regular basis and the development of proteins and etc. on the lenses must be removed because this effects the fit of the lenses and lessens the time that I can wear them.  Which is 10 hours under optimum conditions.   Also, because Keratoconus perforates the corneas any dirt allowed to to build up on the lenses will enter my eyes thru the cornea, be trapped between them and my retinal and set up an infection.  For these reasons I am given Enzyme cleaner and extra cases and my prescribtion is continual not intermittent.
>
> (B2, 12-17-01 McCroy Ltr).

In June, McCroy again met with institutional intransigence at WICC.

> An appeal of the grievance filed at WICC concernign the misconduct of Wexford Health Sources employees and WICC staff. This grievance as answered and the answer was concurred to by Warden Hockaday on 3/29/02 and submitted to the ARB by mail on 4/27/02.

> Your office despite the filing of this appeal on the 28th day from decision and the 20th day from receipt of the decision, renamed this grievance and denied it as untimely.

> Even though, the grievance appeal was timely filed under either the 30 day from reciept rule under which the original grievance was filed, or the 30 days from decision rule that was instituted without notice to inmates. Your office has unlawfully denied the grievance as untimely, because it was stamped received on May 3, 2002. I can not be held responsible for the delays of I.D.O.C. employees.

> (B6-7, 6-17-02 McCroy Ltr).

In August, McCroy again cried out for help outside the grievance process.

> Because I suffer from frequent eye infections I have to take certain medications, specifically Hyoscine, this medication effectively blinds me by freezing my pupil responses and making the wearing of my only contact lense impossible. ...I am no only able to wear my right contact lense for 3 hours a day and the time of comfortable fit is decreasing each day, without which I am legally blind.

> Therefore, I am requesting that I be sent out to see a qualified Ophthalmologists as soon as possible to determine the status of my advance Keratoconus and contact Lense fit. It should be again noted that because I suffer from Advance Keratoconus the mandated care by an Ophthalmologist is long overdue.

> (B9, 8-11-02 McCroy Ltr).

27

After eye surgery finally occurred in early 2003, McCroy's recovery was complicated while in the HCU infirmary. Delay of scheduled appointments with his new outside treaters in Springfield continued. Retaliatory discipline included cancellation of an important outside appointment in the fall of 2003.

McCroy, when awakened on the morning of October 29th, was told of his appointment for the first time and ordered to dress and depart in ten minutes. McCroy refused to leave without a shower. Correctional Officer Wilson, when asked why McCroy was not told of the appointment the night before, explained it was a "security" matter. (Ex. F, Wilson Dep., p. 48) Even Defendant Warden Winters could offer no reason why McCroy was not awakened earlier.

> Q. Is there any rule in the institution which prevents employees of IDOC from going down and waking up the inmate early enough that he can take a shower and clean himself up before he attends an appointment?
>
> A. No.
>
> (Ex. G, Winters Dep., pp. 47-48).

That same morning his appointment was cancelled by "security". McCroy immediately announced a "hunger strike" . (C19, 10-29-03 Prog. Note). Further retaliatory discipline followed. Two days later, McCroy was placed in segregation for one month. (B12-13, 10/31/03 Final Summary Rpt). McCroy filed another grievance in response to this discipline. (B14-15, 12-27-03 Grievance). After finally being released from

28

segregation and allowed to see his doctor, McCroy was diagnosed with "steriod induced" glaucoma. (C29, 1-8-04 Rpt. for Consult).

Steriod induced glaucoma was the result of HCU nurses giving McCroy steriod medication for 30 days when the prescription was for 3 days. (Ex. K, Blaesing Dep., p. 76; Ex. E, Fuqua Dep, pp. 90 & 105). (C22, 11-6-03 Prog. Note; C20, 11-6-03 Rpt. of Consult; & C21, 11-6-03 Maxitrol Prescr). Dr. Lochard approved the giving of medication for 30 days, without reading the prescription. (C22, 11-6-03 Prog. Note). Defendant Fuqua originally claimed the prescription was not clear. (B16, 2-24-04 Grievance Rsp). However, in her deposition Fuqua clearly read the prescription into the record and then explained what must be done if there is medically any question about a prescription. (Ex. E, Fuqua Dep., p. 105-106). Defendant Winters, now WICC Warden, followed up this series of medical mistakes by attempting to administratively transfer McCroy to another IDOC institution, something McCroy had repeatedly requested since arriving at WICC two years before.

To implement Defendant Warden Winters' transfer "plan", Defendant Mills, discharged McCroy from the HCU to "Security." This supposed "medical" discharge was never communicated to Dr. Zeh who gave clear orders to HCU nurses. (C25, 11-21-03 Mills Disch. Note). From the date of his discharge from the HCU infirmary, McCroy was housed "per warden" "per security". (*See* "Deliberate Indifference Argument" at pp. 6-25).

During this period, Defendant Dr. Lochard acted as medical director for WICC while "on-call" from Taylorville. (Ct. Docket #372-4, Lochard Dep., pp. 9-11).

Defendant Nurse Practitioner Mills offered no explanation as to the role of "Security" in McCroy's transfer to the general population.

> Q.  Who was it that transferred Aaron McCroy into the general population?
>
> A.  Well, at this point he was discharged from the infirmary, so at that point it would be security.
>
> ***
>
> MR.  LONDRIGAN: At the time he was released into the general population?  They didn't come back to you for permission, did they?
>
> A.  No, I don't believe so.
>
> (Ct. Docket #380-10, Mills Dep., pp. 39-40).

The WICC plan to transfer McCroy to another prison continued into the spring of 2004 when a dispute occurred in the infirmary involving placement of McCroy's TV set near a window. (B17-18, 3-23-04, Final Summ. Rpt). The TV dispute resulted in further retaliatory discipline against McCroy that housed him among the general population.  (*See* "Deliberate Indifference Argument" at p. 6-25).  In response to McCroy's TV grievance, IDOC tried to finesse this issue because he was transferred to general population:

> Offender's concerns have been reviewed and as of 6/8/04 has been moved to general population.  His television issue and his recreation issue are now moot in that he can place his television anywhere in his assigned cell . . .

30

(B24, 6-14-04 Grievance Rsp).

Review by the ARB echoed the same retaliatory rationale:

> The Grievance officer's report 04-0557E and subsequent recommendation dated June 16, 2004 and approval by the Chief Administrative Officer on June 18, 2004 have been reviewed. You have been placed in general population where you may place your TV set in a fashion that reduces glare and discomfort.

(B27, 8-20-04 Brian Fairchild Letter).

The highest level management of IDOC was aware that on June 8, without medical consultation, McCroy was ordered to leave the infirmary and enter the general population. Dr. Brown's "notorius" patient was sent to the Assignment Office to be assigned a cell mate without any cautionary medical instruction.

According to IDOC rules, McCroy was "medically" unassigned and therefore grouped for housing among other temporarily unassigned inmates. Unassigned inmates include violent prisoners leaving segregation for fighting. Upon learning he was ordered into the general population, McCroy promptly filed an emergency grievance; his grievance was declared not to be an "emergency". (B25, 6-18-04 Em. Review Determination).

After *pro se* disclosure of yet a further medical complication, steroid induced glaucoma, this Court appointed counsel to represent McCroy in March of 2004. (*See* "Deliberate Indifference Argument" at pp. 6-25). The June 8th transfer from the HCU infirmary to general population followed, without notice to McCroy or his recently

31

appointed counsel, his outside treater, Dr. Zeh, or this Court. By the time court appointed counsel learned of his status, McCroy had lost his eye.

McCroy was then administered further discipline for a "fight" with his cell mate that he attempted to avoid. (*See* "Failure to Protect" at pp. 34-38). Emergency grievances were again filed regarding placement in the general population and improper investigation of the "fight" were also denied. (B28-29, 11-12-04 Grievance; B30-31, 11-12-04 Grievance).

After the effort to administratively transfer McCroy away from WICC failed, "Security" pursued a disciplinary transfer. McCroy had already lost his left eye and was just released from segregation for "fighting" when Defendant Law, who previously denied McCroy a cell transfer, conducted a "random" urine test on December 16, 2004. McCroy produced two samples of urine of insufficient quantity to test. Despite the fact that McCroy was prescribed diuretics and there was no direct or circumstantial evidence of drug use during his convalescence in segregation, McCroy was deemed to fail the test under IDOC rules. (B32-33, 1-2-05 Grievance; B34-35, 1-20-05 Grievance).

Again without notice to appointed counsel or the Court, McCroy was further disciplined by a transfer to a distant, high security prison, Menard, far away from his treating ophthalmologists in Springfield. Appointed counsel was unaware of the disciplinary transfer and renewed McCroy's previously filed ***pro se*** Preliminary Injunction motion to argue for transfer to a facility close to his treating opthamologists and court

32

appointed counsel. (Ct. Docket #71, Memo in Support of Mot. For Preliminary Inj., p. 15). Only Menard officials attended the Feb. 1, 2005 hearing and testified eye appointments were already in place for lens fitting for McCroy's right eye as recommended by Dr. Kass. (Ex. O, Trans. of 2-1-05 Preliminary Inj. Hrg., pp. 39-40). Therefore, the relief sought was unilaterally mooted by a disciplinary transfer.(Ct. Docket #194, 9-26-05 Court Order).

McCroy was also retaliated against for raising ADA and RA disability issues. For example, Defendant Flagg, a non-doctor, decided on his own that McCroy did not meet the criteria for an ADA cell and then removed him from his ADA cell. (C56, 1-9-06 Memo). Even after his doctor said McCroy needed an ADA cell, he was not given one. (A6, McCroy Aff). Later, after McCroy's counsel took Defendant Flagg's deposition, McCroy was placed back in an ADA cell. (A6, McCroy Aff).

McCroy suffered further retaliation when he asked for accommodations for his disability. Examples of retaliation include, but are not limited to: the TV incident while housed by "Security" in the WICC infirmary, confiscation of McCroy's safety glasses for "security reasons", and the back and forth/in and out of ADA cells.

The bottom line is that McCroy filed a number of grievances, letters and a formal legal complaint. As a result, Defendants repeatedly retaliated against him. Perhaps the best example of this retaliation are the June 7, 2004 grievances resulted in McCroy's transfer into general population one day later. At a minimum, the cumulative instances

of retaliation against McCroy raise questions of material fact that prevent summary judgment.

### C.     FAILURE TO PROTECT (DEFENDANTS WINTERS, FUQUA, LAW, KELLERMAN, BROWN)

**Legal Standard**

To establish a failure-to-protect claim, a prisoner must show that he has been incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his need for protection. *Farmer*, 511 U.S. at 834. With respect to the first requirement, "[f]or a claim based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.*

For the second requirement, "[u]nder the Eighth Amendment, deliberate indifference amounts to criminal recklessness - the defendant must have known that the plaintiff was a serious risk of being harmed, [and] decided not to do anything to prevent that harm from occurring even though he could easily have done so." *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998); *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). In other words, a prison official may be found liable if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

**Argument**

There are two parts to the failure to protect claim. The first concerns the June 8, 2004 decision to transfer McCroy to the general population. That argument is set forth above in Section III(B)(2)(#3), which establishes there are material questions of fact that prevent the entry of summary judgment as it relates to both the IDOC Defendants and Defendant Brown. *See DeShaney v. Winnebago City, Dept of Soc. Servs.*, 812 F.2d 298, 304 (7th Cir. 1987), *rev'd on other grounds*, 498 U.S. 189 (1989) (explaining that "prison authorities, having placed the inmate in a position of danger, cannot shrug off all responsibility when the danger materializes and injury results").

In this case, Dr. Zeh's clear medical directive that McCroy should stay in the infirmary because he might get poked in the eye is not in dispute. Moreover, it is a matter of common sense that a functionally blind inmate or any other disabled inmate is at a greater risk of being attacked in prison. Thus, there is no doubt that Defendants knew McCroy was "at risk."

Likewise, the Defendants argument that no one had control over which inmates would be housed with McCroy does not hold water. *See Mayoral v. Sheahan*, 245 F.3d 934, 940-41 (7th Cir. 2001) (noting in the context of cell assignments based upon gangs that "it is impossible to say as a matter of law that one who leaves such a volatile situation under the control of an inmate is not deliberately indifferent to inmate health and safety. It is a question for a jury to decide."). In this case, the Defendants were

35

medically warned of the substantial risk of housing McCroy in the general population and cannot bury their collective heads in the sand to ignore that warning.

_____The second part of the claim relates to housing McCroy with a violent inmate named Durham who was just returning from segregation for fighting with his previous cellmate.  (D11, Durham Rcd).  In addition, Durham was also involved in an altercation while he was in segregation. (D11, Durham Rcd).   The decision not to separate Durham and McCroy, after McCroy raised the issue of Durham's violence, is not a matter of prison procedure, it is a matter of substance.

Defendants, Lieutenant Law and Correctional Officer Kellerman, both spoke to McCroy the day before the physical assault that resulted in the loss of McCroy's left eye. A cell transfer for either Durham or McCroy was denied because no fight had yet occurred and McCroy would not first agree to "refuse housing" and be disciplined by being placed in segregation.

Q.  What did you tell Lieutenant Law?

A.  I told him that I felt that my cellie was violent.  That your officers had told me, Officer Kellerman in particular told me about him being transferred from Galesburg or Hill for fighting, him getting, just getting out of seg for fighting, him fighting while he was in seg.  And I felt that, "Hey, because you all had told me to be careful, why is it that you all – your officers told me to be careful.  Why is it that you all won't move him?"  He is sitting there telling me, "Well, he is going to home in thirty days, just, you know, just let him, you know, let him, you know, unless you want to go to seg or you

36

want to commit a disciplinary infraction, just wait it out.  He is going home in thirty days."

Q.  So he basically told you that you could go to seg if you wanted, you know, or stick it out, correct?

A.  Yeah.

* * * * *

Q.  Let me ask you about CO Kellerman.  You just mentioned him.  You said that he warned you about Durham or told you his history?

A.  Yes.

Q.  When was that?  How soon after Durham got in your cell?

A.  He told me when I first – the 22nd, that's when he told me.

Q.  The 22nd of?

A.  Of September.  The day before the incident.

Q.  Is that the day you talked to Law?

A.  Yeah.  Yeah.

(Ct. Docket #372-17, McCroy Dep., pp. 129-130).

_____Defendants Law and Kellerman claim not to remember talking to McCroy the day before the incident. (Ct. Docket #380-11, Law Dep., p. 16; Ct. Docket #380-15, Kellerman Dep., p. 8). Thus, there is a factual dispute as to their knowledge and intent. *See*, ***Santiago v. Lane***, 894 F.2d 218, 224 (7th Cir. 1990) (finding disputed issue of material fact based upon the difference in deposition testimony between the inmate and guards). There are material questions of disputed fact, summary judgment should be denied.

### D. ADA & RA (DEFENDANT IDOC)

### Legal Standard

Title II of the ADA applies to prisoners. ***Pennsylvania Dept. of Corrections v. Yeskey***, 524 U.S. 206 (1998). Because there is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act, the RA also applies. ***Ross v. Knight***, WL 3626372 (S.D.Ind. 2006). Sovereign immunity does not bar prisoner Title II ADA claims that also implicate the 14th Amendment. ***U.S. v. Georgia***, 546 U.S. 151 (2006); ***see also, Kim v. New Hampshire Dept. of Corrections***, 451 F.3d 274 (1st Cir. 2006).

"To establish a violation of Title II of the ADA, a plaintiff must show that (1)[he] is a qualified individual with a disability; (2)[he] was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or

activities; and (3) such exclusion or discrimination was by reason of [his] disability."
***Lovell v. Chandler***, 303 F.3d 1039, 1052 (9th Cir. 2002).

**Argument**

Based upon McCroy's very limited vision in his remaining right eye and his restriction of no lifting over 5 pounds,[5] at a minimum, there is a material question of fact as to whether McCroy is disabled within the meaning of both the ADA and RA. (A6, McCroy Aff). In fact, in response to a grievance, Defendants acknowledge McCroy is legally blind. (B28, 11-30-04 Grievance Rsp). There are also material factual questions in dispute regarding treatment of McCroy's disability and the discrimination flowing from it.

For example, there are questions of material fact whether, as compared to able bodied inmates, McCroy was denied access to employment, educational programs, the commissary, exercise facilities, and other programs and facilities while he was in the infirmary at WICC. (A4, McCroy Aff). More specifically, WICC did not have ADA cells available for inmates with disabilities like McCroy. Therefore, inmates with disabilities had to be housed in the infirmary, the general population, or be transferred to another institution.

---

[5]On June 8, 2004, the date McCroy was ordered into the general population by Dr. Brown, Dr. Anderson gave McCroy a permanent restriction of no lifting ***more than five pounds***. (C42, 6/8/04 Anderson Memo). (Emphasis added).

In this case, instead of agreeing to McCroy's repeated requests to be transferred to a facility that could accommodate his disability and allow him to more fully participate in programs, WICC refused to seek a transfer and initially kept McCroy in the infirmary at WICC for eleven months. (D3-4, 3-2-04 Transfer Rpt). Thereafter, on June 8, 2004, one day after McCroy filed two grievances, WICC Security with the assistance of Defendant Dr. Brown, abruptly housed him in the general population where he was attacked by a violent cell mate.

The IDOC also discriminated against McCroy because of his disability after he was transferred from WICC to Menard CC.  McCroy was in protective custody.  (Ex. J, Flagg Dep. p. 16).   Thereafter, he was transferred from Menard CC to Pickneyville CC. Upon arrival at Pickneyville, his prescribed safety glasses were taken from him and not returned for approximately 15 days.  (Ex. J, Flagg Dep. p. 38).  In fact, they were not returned until after McCroy filed a grievance.  The stated reason for the confiscation was "safety precautions".  (C55, 9-8-05 IDOC Memo).  No reason, however, was given why it took approximately 15 days to review McCroy's medical file.  In the meantime, McCroy's eye was unprotected.  This confiscation is further evidence of discrimination because of his disability.

Upon McCroy's arrival at Pickneyville CC, he was initially placed in an ADA cell.  Thereafter,  Defendant Flagg decided that McCroy did not meet the criteria for an ADA cell and he was removed from that cell. (C56, 1-9-06 Memo).  Defendant Flagg is

not a doctor. At that time, McCroy had a medical permission slip authorizing "low bunk, low gallery, *physically challenged*." (C54, 9-6-05 Med. Permission). (Emphasis added). IDOC defendants assert there is no problem because McCroy was assigned a low bunk, although in general population. IDOC, however, does not address the "physically challenged" issue. Moreover, on January 16, 2006, McCroy received an ADA medical permission. (C57, 1-16-06 Med. Permission). Nevertheless, McCroy was not placed back into an ADA cell until after Flagg's deposition was taken on December 21, 2006. (A6, McCroy Aff).

The RA and ADA discrimination is continuing. For example, the IDOC initially refuse to allow McCroy to have books on tape and have denied him from participating in early release programs. (A6, McCroy Aff). The bottom line is that there are material factual questions in dispute as to whether IDOC has in the past and continues to discriminate against McCroy because he is disabled.

### Defendant's Affirmative Defenses

All of the Defendants have raised the defense of qualified immunity. In assessing qualified immunity, a court must use a two step inquiry: (1) does the alleged conduct violate a constitutional right; and (2) was that constitutional right clearly established at the time of the alleged conduct. *Wernsing v. Thompson,* 423 F.3d 732, 742 (7th Cir. 2005).

In regard to the deliberate indifference to a serious medical need, the general standard required for liability under the Eighth Amendment for refusal to treat a serious medical condition was well established prior to 2002. ***Walker v. Benjamin***, 293 F3d 1030, 1040 (7th Cir. 2002). Specifically, it was well established that intentional interference with prescribed medical treatment for an inmate that results in the infliction of pain violated the 8th Amendment. ***Id. See also Estelle v. Gamble***, 429 U.S. 97 (1976).

In this case, according to the medical records, McCroy suffered continuous pain from his ill-fitting contact lenses during the period he was denied transplant surgery. (C6, 5-14-02 Ref. Req; C15, 11/20/02 Rpt. of Consult). During that period, all treating ophthalmologists recommended surgery. In other words, Defendants intentionally interfered with prescribed treatment.

The decision to disregard Dr. Zeh's order and place McCroy in general population also clearly constitutes intentional interference with prescribed treatment. If it was not medically important, the specific inquiry by HCU would not have been made to Dr. Zeh nine months after surgery to get his opinion whether McCroy could be moved into general population. Dr. Zeh also clearly stated why McCroy needed to stay in the infirmary—the risk of getting poked in the eye. Defendants' refusal to schedule appointments for prescribed lens fittings for McCroy's right eye also constitutes intentional interference with prescribed treatment that caused pain.

The bottom line is that *Estelle* was decided in 1976.  Thus, Defendants were on notice that their conduct of interference with prescribed medical treatment was unconstitutional.

The same is also true for the retaliation claim.  It has long been understood that prison officials can't retaliate against a prisoner on the basis of that prisoner's complaints about prison conditions.  *Pearson v. Welborn*, 471 F.3d 732, 741 (7th Cir. 2006).  There is nothing unique about McCroy's grievances and *pro se* Complaint that would cause Defendants to reasonably believe that it would be constitutional to retaliate against him because of his medical related complaints.  To name just one example, McCroy's complaints about the lack of privileges in the WICC HCU was a constitutionally protected right and Defendants violated that constitutional right when they retaliated against him for complaining by moving him to general population one day later. (*See* "Retaliation Argument" at pp. 26-34).

In regard to the failure to protect claim, none of the Defendants argue that they were unaware of the unreasonable threat of injury to Plaintiff by placing him in the general population.  Instead, they argue they were not responsible for this placement because it was a "medical" decision.  Moreover, at the time of the cell mate assault upon McCroy, it was well established that deliberate indifference to a substantial risk of serious harm resulting from inmate on inmate violence would violate the constitution.  Notice of a specific threat from a specific inmate is not

43

necessary if the inmate is a member of an identifiable group for whom risk of assault is substantial. *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997).

In this case, all Defendants knew McCroy had undergone eye surgery and received a corneal transplant, they knew he was at a greater risk to getting hit in the eye than an able bodied inmate. *See O'Brien v. Indiana Dept. of Corrections*, WL 2128328 (7th Cir. 2007) (explaining that Defendant Warden had subjective knowledge that inmate was at a substantial risk of harm based solely on fact that the inmate used to be a guard). In other words, inmates that are at risk, for whatever the reason, are entitled to greater protection. *Farmer v. Brennan*, 511 U.S. 825 (1994) (remanding on the issue of deliberate indifference where prison officials placed a transsexual in general population). Based on *Farmer*, Defendants are not entitled to qualified immunity.

Accordingly, none of the Defendants can properly establish a claim to qualified immunity and their request for summary judgment should be denied.

### III. CONCLUSION

For the foregoing reasons, Defendants motions for summary judgment should be denied.

Respectfully submitted,
AARON MCCROY, Plaintiff


By: s/Thomas F. Londrigan
THOMAS F. LONDRIGAN, Bar No. 1686542
Attorney for Plaintiff
LONDRIGAN, POTTER & RANDLE, P.C.
1227 South Seventh Street
Post Office Box 399
Springfield, IL 62705
Telephone: (217) 544-9823
tom@lprpc.com

45

## Certificate of Service

The hereby certify that on September 7, 2007, I presented the foregoing to the

Clerk of the Court for filing and uploading to the CM/ECF system which will send

notification to such filing to the following;

Ms. Theresa Powell
Heyl, Royster, Voelker & Allen
National City Center, Ste. 575
1 North Old State Capitol Plaza
PO Box 1687
Springfield, IL 62705-1687

Lisa Madigan, Illinois Attorney General
Attn: Kelly Choate, A.A.G. &
Julie L. Morgan. A.A.G.
500 South Second Street
Springfield, IL 62706

and I hereby certify that I have mailed by United States Postal Service the document
to the following non CM/ECF participants:

Aaron McCroy,#N51882
Receiving Cell 15
P. O. Box 900
Ina,  IL 62846

By: s/Thomas F. Londrigan
THOMAS F. LONDRIGAN, Bar No. 1686542
Attorney for Plaintiff
LONDRIGAN, POTTER & RANDLE, P.C.
1227 South Seventh Street
Post Office Box 399
Springfield, IL 62705
Telephone: (217) 544-9823
tom@lprpc.com

46