3:02-cv-03171-HAB-BGC    # 399-7    Page 1 of 10    E-FILED
                                                    Friday, 07 September, 2007 04:25:32 PM
8/24/07            McCroy v. Illinois Dept. of Corrections  Clerk, U.S. District Court, ILCD
Deborah Fuqua

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF ILLINOIS

 3

 4  AARON McCROY,

 5              Plaintiff,

 6  vs.                              No.  02-3171

 7  ILLINOIS DEPARTMENT OF CORRECTIONS
    et. al.,
 8
                Defendants.
 9

10

11

12

13              CONTINUED DEPOSITION of DEBORAH FUQUA,

14  taken in the above-entitled case before Angela C.

15  Turner, a Notary Public of Sangamon County, acting

16  within and for the County of Sangamon, State of

17  Illinois, at 10:05 o'clock A.M., on August 24, 2007, at

18  3000 Montvale, Springfield, Sangamon County, Illinois,

19  pursuant to notice.

20

21

22
           Baldwin Reporting & Legal-Visual Services
23          Serving Illinois, Indiana & Missouri
        24 hrs   (217)788-2835   Fax (217)788-2838
24                   1-800-248-2835
```

EXHIBIT E

ORIGINAL

Page 1

8/24/07  McCroy v. Illinois Dept. of Corrections
Deborah Fuqua

```
1         Q     Is responsible for effectively and
2    efficiently managing the institution's overall health
3    care delivery system.
4               Do you agree with that statement?
5         A     Yes.
6         Q     And then it lists some of the things that
7    you're required to do under this job description.  Act
8    as a liaison between health services.
9               All right.  Health services in the
10   context of WICC is what?
11        A     It would be Dr. Elyea and Cindy Hobrock.
12        Q     And Dr. Elyea was your immediate
13   supervisor as it related to health care?
14        A     Yes.
15        Q     And you were answerable to him, not to
16   Cindy Hobrock, who was a coordinator, but you were
17   directly responsible to Dr. Elyea?
18        A     Yes.
19        Q     And you're also responsible to the
20   institutional administration, which means the warden
21   and the assistant warden.  And during this time, most
22   of the relevant period, that would have been Assistant
23   Warden Funk?
24        A     I am not sure on the years.  I have
```

Page 8

8/24/07                McCroy v. Illinois Dept. of Corrections
Deborah Fuqua

```
 1   that was cancelled?
 2        A    I don't recall it being cancelled, but I
 3   can only go by what I replied to her is that I must
 4   have reviewed the file with Dr. Sims and that's the
 5   information he gave me.  Apparently, I've already
 6   talked to Dr. Elyea, because I said Dr. Elyea told them
 7   they have to do it.
 8        Q    So this has a history before these
 9   e-mails, doesn't it?
10        A    Apparently.
11        Q    Because you say that he was sent to the
12   Kehoe Clinic on April 12, right?
13        A    That's what it says, yes.
14        Q    And again on May 13?
15        A    Yes.
16        Q    And each time, Dr. Kehoe had recommended
17   a corneal transplant.
18        MS. CHOATE:  I would object to that
19   characterization.  It doesn't say each time.
20        MR. LONDRIGAN:  Well, I am asking the author of
21   this a question.  And she can clarify it or deny it
22   with her answer.
23           Q  I am reading a corneal transplant was
24   recommended.  Wexford denied this and Dr. Elyea told
```

Page 25

8/24/07  McCroy v. Illinois Dept. of Corrections
Deborah Fuqua

```
 1        Q    Do you recall that he was discharged?
 2        A    I was made aware of it after he was hit
 3   in the eye or something.  That's when I first found out
 4   he had left the infirmary.
 5        Q    Are you aware of a difference between
 6   being discharged from the infirmary and when he left
 7   the infirmary?
 8        A    The time frame difference?
 9        Q    Yes.
10        A    No, I am not.  I don't recall that.
11        Q    Are you aware that he was discharged from
12   the infirmary prior to the time that he was sent to the
13   assignment office to be given cell mates?
14        A    No, sir.
15        Q    Have you ever seen that happen before?
16        A    Not to my knowledge.
17        Q    Do you know why it was done in this case?
18        A    No, I do not know that it was done.
19        Q    Do you remember the dispute about a
20   medical furlough and Aaron McCroy being awakened and
21   told that he had to leave in 10 minutes to attend the
22   furlough and that he was then disciplined for that
23   fact?
24        A    No.
```

Page 66

8/24/07                    McCroy v. Illinois Dept. of Corrections
Deborah Fuqua

```
 1   please.
 2        A    I am sorry.  I forgot the question.
 3        Q    I am sure you did.
 4             Now, just read what you see here.  You
 5   just came on shift and it appears that this is what Dr.
 6   Lochard was notified.  Do I read that right?
 7        A    Yes.
 8        Q    And these are supposed to be orders
 9   received from Dr. Zeh?
10        A    Correct.
11        Q    What's the first line say?
12        MS. POWELL:  I just want my objection noted for
13   the record, foundation and relevance.
14             Go ahead and read it.
15        THE DEPONENT:  Maxitrol OS, QID times 30 days,
16   then stopped.
17        MR. LONDRIGAN:  Q  Interpret that for me.  What
18   does that mean?
19        A    They're eye drops, but I am not sure.  I
20   don't know a lot about it.  I just know it's an eye
21   drop and it's to be given four times a day for 30 days.
22        Q    Did you ever see the original
23   prescription?
24        A    No, sir.
```

Page 90

Baldwin Court Reporting & Legal Video Services
1-800-248-2835

8/24/07  McCroy v. Illinois Dept. of Corrections
Deborah Fuqua

```
 1        A     Yes, uh-huh.
 2        Q     I am only going to ask you about what
 3   appears to be a fairly legible note at the bottom.
 4   Nurse's notes 2/23/04.
 5        A     Yes.
 6        Q     Eight A.M., remains housed in infirmary
 7   per security.
 8              What does that mean to you?
 9        A     That the warden has made a decision to
10   keep him in the infirmary.  Maybe there's no cells or
11   something.  I don't know the reason why exactly.
12        Q     But the warden doesn't make medical
13   judgments as to when a person should come and go out of
14   the infirmary, does he?
15        A     No.
16        Q     Now, what is the A plus 0 times three?
17   Read that and interpret it for me.
18        A     That means alert and oriented times
19   three.  Voiced no complaints.
20        Q     Now, I want you to assume that he was
21   sent to the assignment office to be assigned cell mates
22   on June 8 of '04 in the context of this next question.
23              Four days before that, there is an entry
24   on June 4 of '04.  A nurse's note.  Would you read that
```

Page 99

8/24/07  McCroy v. Illinois Dept. of Corrections
Deborah Fuqua

```
 1    for me, please?
 2         A     7:15 A.M., remains housed in infirmary
 3    per security.  Alert and oriented times three.  Up and
 4    about cell.  Healthy male voiced no complaints.  The
 5    plan is to continue to house per security, S. Moore,
 6    L.P.N.
 7         Q     What does plan mean to you?
 8         A     This particular plan or?
 9         Q     Well, you have interpreted the P, paren,
10    as plan.
11               What does plan mean in terms of usage in
12    nurse's notes?
13         A     Just what you --.  What the medical plan
14    is.  In this case, there is no medical plan, because he
15    is no longer a patient in the infirmary.  So she's just
16    saying continue to house.
17         Q     He is here because --.
18         A     Because security.
19         Q     Security puts him there.
20         A     Right.
21         Q     All right.  Look at the next page.  This
22    is the date that he was assigned into the general
23    population and given cell mates.
24               Would you read that nurse's note?
```

Page 100

1    there?

2         A    I will do the best I can. I am not too
3    good at ophthalmology. Not really trained in that
4    area. The findings, looks like visual acuity is what
5    he means with VA less than 20, 400 in OD. And I don't
6    know what CFOS is. OD Keratoconus and punctate Kerato
7    --. I can't read that word.

8         Q    Keratopathy.

9         A    Keratopathy or Keratoplasty. OS marked
10   Keratoplasty clear graft. Enterococcal pressure less
11   than 30 OS. Fundus. I don't know. Those are
12   measurements I am not familiar with. I am sorry. I
13   can't make some of that out. There is a dot hemorrhage
14   in the OD. Then he ordered the drugs. Remove corneal
15   sutures is what he did at that visit.

16             Medications Maxitrol OS QID for three
17   days then stop. Lotemax O.5 percent OS one drop every
18   A.M. Can't read next one. OS one drop every P.M.
19   Artificial tears OU QID. Check blood pressure and
20   serum glucose. No rubbing eye. No bending, no lifting
21   over 10 pounds. I think that's return in one month.
22   Call ASAP for any increased pain or decreased vision
23   OS.

24        Q    Now, realizing that some of these entries

8/24/07  McCroy v. Illinois Dept. of Corrections
Deborah Fuqua

```
 1   are outside your field of specialty, Dr. Grosh, to your
 2   knowledge, wasn't an ophthalmologist either, is that
 3   right?
 4        A    Correct.
 5        Q    And are doctors trained the same as
 6   nurses that if they have problems interpreting
 7   handwriting or prescriptions that they call the
 8   originating specialist --
 9        A    That's correct.
10        Q    (Continuing) -- and clarify that?
11             That's all I have.
12                  CROSS EXAMINATION
13                  BY MS. POWELL:
14        Q    All right, Ms. Fuqua.  Are we say that
15   correctly?
16        A    That's close enough.
17        Q    We want to say it correctly.
18             Could I please have all the exhibits?
19             Let me just start.  You were asked some
20   questions about Exhibit 11, which was a grievance
21   wherein Karen Wear referenced that she had a
22   conversation with you.
23        A    Yes.
24        Q    And you said that you do not recall
```

Page 106

8/24/07  McCroy v. Illinois Dept. of Corrections
Deborah Fuqua

```
1      Q     And you can't admit or discharge patients
2   from the infirmary, can you?
3      A     No.
4      Q     With respect to an inmate being
5   transferred from one correctional facility to another,
6   do you have any role in that?
7      A     No.
8      Q     Are you aware of anyone in the health
9   care unit having a role in determining whether or not
10  an inmate should or should not be transferred to
11  another facility?
12     A     Only if it's a medical placement.
13     Q     There are instances where someone may be
14  denied the ability to transfer if they have a medical
15  condition that would prohibit them from being sent out,
16  right?
17     A     That's correct.
18     Q     Are you aware of any medical person
19  placing a hold on Mr. McCroy?
20     A     No.
21     MS. POWELL:  Okay.  I think that's all I have.
22     MS. CHOATE:  I just have a few.
23                    CROSS EXAMINATION
24                    BY MS. CHOATE:
```

Page 140