3:02-cv-03171-HAB-BGC    # 399-9    Page 1 of 11

E-FILED
Friday, 07 September, 2007 04:26:38 PM
Clerk, U.S. District Court, ILCD

2/26/07
Kevin Winters
McCroy v. Illinois Dept. of Corrections

```
1              UNITED STATES DISTRICT COURT
2           FOR THE CENTRAL DISTRICT OF ILLINOIS
3                    SPRINGFIELD DIVISION
4
5    AARON McCROY,
6              Plaintiff,
7       vs.                              No. 02-3171
8    ILLINOIS DEPARTMENT OF
     CORRECTIONS, et al,
9
               Defendants.
10
11
12
13         THE DEPOSITION of KEVIN WINTERS, taken in
14   the above-entitled case before Debra K. Baldwin, a
15   Notary Public of Sangamon County, acting within and
16   for the County of Sangamon, State of Illinois, at
17   1:00 o'clock P.M., on February 26, 2007, at 3000
18   Montvale Drive, Springfield, Sangamon County,
19   Illinois, pursuant to notice.
20
21
22
             Baldwin Reporting & Legal-Visual Services
23              Serving Illinois, Indiana & Missouri
            24hrs (217)788-2835   Fax (217)788-2838
24                    1-800-248-2835
```



EXHIBIT G
ORIGINAL

Page 1

1  Western in the form of grievances as to how he was
2  treated with respect to his eye problems?
3      A    I don't recall specifically any
4  grievances or any requests that he would have done,
5  no.
6      Q    Who had the responsibility for ruling
7  upon inmate grievances during the period of time
8  that you were at Western?
9      A    We had an assigned grievance officer. I
10 can't recall who that would have been at that time.
11     Q    And during that period of time it was
12 that person's responsibility to make rulings and
13 disposition of grievances?
14     A    Yes.
15     Q    What did you understand the warden's
16 responsibility to be with respect to grievances?
17     A    The warden would have final say on
18 emergency grievances declaring whether a grievance
19 was an emergency nature or not and then would
20 forward that immediately to the grievance officer
21 for immediate handling.
22     Q    What was your role when you were deputy
23 warden at the time that these grievances were
24 filed?

Page 9

```
 1       A    (No response.)
 2       Q    I don't mind you taking the time here to
 3  read this in its entirety, seeing as you haven't
 4  read anything before you came to the deposition,
 5  but my question simply asked you what this is, to
 6  identify it for the record.
 7       A    This is a grievance officer's report back
 8  from--back from a grievance that was authored by
 9  Mr. McCroy.
10       Q    And grievance officers are employees of
11  whom?
12       A    DOC at this point.
13       Q    And what do you understand to be their
14  role in their duties as grievance officers?
15       A    They fact-find incidences of what the
16  complaint is in regards to the grievance. They'll
17  do small level investigation, or whatever, to
18  determine factual statements and just see if it's
19  correct, whatever, and come to some type of resolve
20  for that grievance, if one is warranted.
21       Q    And after a grievance officer's report is
22  filed in response to an inmate's grievance,
23  somebody has to make a ruling, is that right?
24       A    Uh-huh.
```

Page 16

1     Q    And who was it that made the ruling in
2 this case as it relates to Exhibit Number 1?
3     A    I can't even read it.
4     Q    Can you tell me whose writing that is?
5     A    I assume that it was signed by
6 Mr. Hockaday, or a designee, but I don't know who
7 that would be.
8     Q    In any event, you don't recognize that as
9 your handwriting?
10     A    No, it's not mine. No.
11     Q    And you can't tell me who that might be?
12     A    No, sir.
13     Q    Who all had authority to rule on
14 grievances, besides the warden?
15     A    What's the dates on this? Actually, at
16 that time I think any AOD serving in the absence of
17 Mr. Hockaday.
18     Q    Is it AOD?
19     A    Yes.
20     Q    And what does AOD stand for?
21     A    AOD would be administrative officer on
22 duty.
23     Q    And were you at times the administrative
24 officer on duty?

```
 1      Q    And how is it determined who it is that's
 2   going to rule on the grievance?
 3      A    It just depends on whose on duty, you
 4   know, who might be assigned the duty. Duty is an
 5   extra duty in regards to your daily work.
 6      Q    Would the warden come in and say I want
 7   you to handle this?
 8      A    No. It would be a pre-determined schedule
 9   of time of when you would have duty. Duty would be
10   considered you took care of everything after hours
11   for a scheduled period of time. That's why he was
12   the AOD on duty. Some of those duties included
13   going over stuff in the absence of the warden.
14      Q    Well, how would you, say--assuming it's
15   Schnepel, how would you rotate this duty period?
16   Would it be according to schedule, or would it be
17   something you'd sort out between yourselves, or
18   would you be specifically designated by the warden?
19      A    It could be a combination of all of
20   those. I mean, depending on the absence of the
21   warden or the absence of the--another assistant
22   warden on how the duty would fall. If I was on a
23   schedule, per se, and the warden was gone, then
24   there would only be one more person there to assume
```

Page 19

```
1    gate receipt, showing him leaving and going on a
2    medical furlough as it's stamped.
3        Q    Is this something that you approved?
4        A    My name's on it. It's not my signature.
5        Q    Who signed your name to it?
6        A    I don't know.
7        Q    Who was authorized to sign your name at
8    that time?
9        A    It would have been--. When was this?
10   September 20th. That could have been Assistant
11   Warden Funk at that time.
12       Q    Do you see some initials after that name?
13       A    Yeah.
14       Q    Well, let me ask you this question. Who
15   decided that after years of being treated by
16   Doctor Kehoe in Galesburg that this patient should
17   be sent to Doctor Schultz in Jacksonville?
18       A    That would be a medical issue. I have no
19   idea of who that person would have been.
20       Q    Well, who would know? Who should I ask
21   that question to?
22       A    I have no idea.
23       Q    Well, if you were a warden and somebody
24   was signing your name to this and they say, hey,
```

```
 1   we've been sending this guy up to Galesburg all
 2   this time, the person that was going to sign your
 3   name here, and--
 4       A    Yeah.  They sign it as an assistant
 5   warden.
 6       Q    Right.
 7       A    Yes.
 8       Q    And they said who's sending him to
 9   Jacksonville, how would you find out?
10       A    If I wanted to know?
11       Q    Yes. Well, assuming that the guy that
12   signed your name wanted to know and he asked you
13   that, how would you find out?
14       A    Probably have to go through medical to
15   find that out.
16       Q    And when you say medical, give me some
17   names.
18       A    I would call the medical administrator.
19       Q    And at that time who was that?
20       A    Debbie Fuqua.
21       Q    Would she have the authority to change
22   outside specialist physicians?
23       A    I don't know that. I wouldn't know that.
24       Q    Who does Debbie Fuqua answer to at
```

Page 39

```
 1      Q    What I'm trying to find out is if anyone
 2   at the institution, while you were there, took a
 3   look at the background and propensities of violent
 4   offenders and the risk to vulnerable inmates to see
 5   whether or not they should be placed together in
 6   the general population.
 7      A    I do not know that.
 8      Q    I hand you Exhibit 18.
 9           MS. CHOATE: That's not complete.
10           MR. LONDRIGAN:  Q  What I want to ask you
11   about 18 is the practices and rules, or lack of
12   rules, that relate to allowing an inmate to take a
13   shower before he attends a scheduled appointment
14   that he knows nothing about.
15      A    What's the question?
16      Q    I just wanted you to read this so you
17   knew the complaint. For security reasons, inmates
18   are not told the night before that they're going to
19   be taken on furlough to a medical appointment. Is
20   that right?
21      A    Yes.
22      Q    Is there any rule in the institution
23   which prevents employees of IDOC from going down
24   and waking up the inmate early enough that he can
```

Page 47

2/26/07  McCroy v. Illinois Dept. of Corrections
Kevin Winters

```
 1    take a shower and clean himself up before he
 2    attends an appointment?
 3         A    No.
 4         Q    So instead of waking the inmate up, say,
 5    ten minutes ahead of the departure time from the
 6    institution, they could also wake him up 30 minutes
 7    or 45 minutes before they leave?
 8         A    Possibly. Situations arise sometimes
 9    where notification is late, for whatever reason.
10    Situations like this have happened, whether it be
11    medical, courts, whatever.
12         Q    And it looks like Sue Redshaw was the
13    grievance officer. By the way, do you know if there
14    was a single grievance that was filed by Aaron
15    McCroy which was allowed in all the time he was at
16    Western?
17         A    I do not know.
18         Q    This is Exhibit 19.
19         A    (Reviewing document.)
20         Q    All right. Have you seen this grievance
21    before I showed it to you?
22         A    I can't recall that I have, no.
23         Q    Well, is that your name at the bottom of
24    the emergency review?
```

Page 48

```
 1      Q    So you're saying that that came to you
 2  before the counselor's response?
 3      A    Yes.
 4      Q    And that happens as a matter of routine
 5  or just on occasion?
 6      A    Matter of routine in an emergency
 7  grievance, yes.
 8      Q    Let me hand you Exhibit 26. Now, is that
 9  your signature at the bottom?
10      A    No.
11      Q    Can you tell who signed your name?
12      A    No.
13      Q    Aren't they supposed to initial so you or
14  anybody else in the chain of authority can see?
15      A    Yes.
16      Q    And you just don't know, right now
17  anyway, recognize that handwriting?
18      A    Like I said, it's one of those two
19  people, Assistant Warden Funk or Mr. Zimmerman, at
20  this time.
21      Q    And they would have had the authority to
22  deny an emergency review without coming to you and
23  talking to you about it?
24      A    Yes.
```

Page 69

```
1      Q     When you look at emergency grievances --
2  and I believe at least a couple of the exhibits you
3  had reviewed.  Is that correct? --
4      A     Yes.
5      Q     (Continuing) -- do you make a
6  determination as to the truthfulness of the
7  assertions by the inmate?
8      A     Not just distinctly the truthfulness, but
9  the issues that's being addressed as a whole.
10     Q     To your knowledge, besides Debra Fuqua,
11 who I believe you said you believe ordered
12 Mr. McCroy in or out of healthcare unit, were there
13 other people, other than yourself -- you said you
14 could also have someone housed there? --
15     A     Yes.
16     Q     (Continuing) -- were there people other
17 than yourself who could order an inmate in the
18 infirmary?
19     A     Assistant wardens or person acting in a
20 duty warden capacity could also do that as well.
21     Q     What about for medical reasons?
22     A     Pardon?
23     Q     Who could order an inmate into the
24 healthcare unit for medical reasons?
```

Page 86