# Deposition of
# Julius Flagg

Aaron McCroy

-vs-

Illinois Department of Corrections, et al

2002-3171

December 21, 2006

Reporter: Karen Waugh, CSR

**EXHIBIT J**

Keefe Reporting Company
618-277-0190 or 800-244-0190
Reporter@KeefeReporting.com

```
 1  when an inmate is being transferred at the request of the
 2  institution, for whatever the reason is on the comment
 3  section, how does that process work as far as those
 4  decisions being made?
 5        MS. POWELL: I'd like to object to the form
 6  of the question in that it assumes facts not in evidence.
 7     Q. Go ahead and answer. I'm not talking about
 8  this specific transfer. I'm talking about transfers
 9  generally.
10        MS. POWELL: Same objection.
11        MS. CHOATE: You can answer.
12        THE WITNESS: I can answer?
13        MS. CHOATE: Over the objection, sure.
14     A. Basically, an institutional request or
15  whatever, basically it will state in there that the
16  offender is being submitted for transfer for whatever
17  reason, whether disciplinary or whatever.
18     Q. (By Mr. Quivey) Okay. And I'm assuming
19  that the warden at whatever institution is the approval
20  authority at that level wanting the transfer.
21     A. Not necessarily. Depends on what the
22  transfer's being submitted for.
23     Q. I'm only talking about transfers that are at
24  the request of the institution.
                                                        13
```

```
 1     A. Well, what I'm saying is you have to be more
 2  specific whether or not it's a disciplinary transfer,
 3  whether it's an administrative move or whatever. That's
 4  why I say you have to go by comment section up under
 5  number 9.
 6     Q. Okay. Let's assume it's an administrative
 7  transfer. All I'm asking is how does the process work?
 8  Does somebody come to the warden and say, "I think we
 9  need to do an administrative transfer"?
10        MS. CHOATE: I would object. It's cause for
11  speculation. I'm sure there are all sorts of scenarios,
12  and, you know, you might ask him if it's the same every
13  time, but unless there's something specific you're
14  wanting to know about Mr. McCroy, I don't see the
15  relevance of this.
16     Q. I do believe it is relevant because it goes
17  to the process which is used when the Department of
18  Corrections transfers inmates, but I will ask
19  specifically about this one, which you testified is a
20  record that's kept in the normal course of business. On
21  number 9, what does it say under the comment section as
22  to the reason for this transfer?
23        MS. CHOATE: Again, I would object as to
24  foundation for this witness. He didn't sign it. Unless
                                                        14
```

```
 1  it says -- It is what it is. It's a business record. If
 2  you want to submit the record --
 3        MR. QUIVEY: Are you instructing him not to
 4  answer?
 5        MS. CHOATE: If you want to read number 9,
 6  go ahead. Go ahead and read number 9, but I'm going to
 7  object to this line of questioning as to this document.
 8     A. It says, "The offender is being submitted
 9  for transfer to Pinckneyville Correctional Center on
10  protective custody concerns. P.C. to general pop."
11     Q. (By Mr. Quivey) Just on -- I read it, "To
12  alleviate protective custody concerns, P.C. to general
13  population," correct?
14     A. That's correct.
15     Q. Sir, I'm handing you another document which
16  I'll state also has a run date of August 19, 2005, and I
17  believe it's called inmate data summary. Sir, is that a
18  record kept in the ordinary course of business based on
19  your experience with the Illinois Department of
20  Corrections?
21     A. Yes. It's under offender's tracking system.
22     Q. And, sir, according to that report, does
23  that show that as of 6-22-05 that Aaron McCroy was in
24  protective custody, voluntary group 2 at Menard?
                                                        15
```

```
 1     A. Which area again?
 2     Q. The first -- well, the last entry, Menard
 3  protective custody, voluntary group 2, starting date
 4  6-22-05.
 5     A. Yes, that's what it shows.
 6     Q. Sir, based on your experience and your --
 7  with Illinois Department of Correction, what does
 8  protective custody, voluntary group 2 mean?
 9     A. I do not know because I have not worked at a
10  facility that has protective custody.
11     Q. Have you ever received any training in which
12  protective custody was discussed?
13     A. Yes, I have.
14     Q. And based on your training, do you have an
15  opinion as to whether there is protective custody that is
16  voluntary and protective custody that is involuntary?
17     A. Yes, there is.
18     Q. And what's that difference?
19     A. The difference is is usually whenever an
20  inmate requests to be placed in protective custody, and
21  involuntary, if for some reason security or the operation
22  takes precaution if they know something's going to happen
23  to an inmate, then they might place him in protective
24  custody.
                                                        16
```

```
 1      Q. Okay. My question is, what part of his file
 2   did you review?
 3      A. I can't tell you what all part of his file I
 4   reviewed.
 5      Q. Well, what --
 6      A. As far as whether I reviewed his whole file,
 7   partial or whatever, I can't tell you that.
 8      Q. Well, what part of the file do you think you
 9   would have needed to review to be able to make the
10   determination that you made?
11      A. The only part of the file that I would need
12   to review is basically as far as what the medical
13   director had recommended on whether or not he met
14   criteria to be in an ADA cell or not.
15      Q. Sir, I'm handing you a document that is
16   dated September 8, 2005. Have you ever seen that
17   document before?
18      A. No, I haven't.
19      Q. Okay. It states that it's from John Evans.
20   Could you tell us who John Evans is?
21      A. John Evans was the warden at the time.
22      Q. And so he was the warden at the
23   Pinckneyville on September 8, 2005, correct?
24      A. Correct.
```
37

```
 1      Q. And are memorandums of this type routinely
 2   used to communicate to inmates from the warden when an
 3   inmate raises an issue?
 4      A. Sometime.
 5      Q. Okay. But, I mean, have you yourself
 6   written memos similar to this to other inmates?
 7      A. Depends on what the inmate issue is.
 8   Sometime I write an inmate a memo. Other times I might
 9   go down and talk to the inmate in person.
10      Q. Okay. Let me ask you this: According to
11   this memo, Mr. McCroy's safety glasses were taken from
12   him upon arrival at Pinckneyville and then returned to
13   him sometime on or around September 8, 2005. Do you have
14   any reason to believe that that in fact occurred or did
15   not occur?
16      A. Don't know if that occurred.
17      Q. Okay. Do you have any reason to believe
18   that this memo is not accurate?
19      A. Don't know. It would be accurate if the
20   warden sent it.
21      Q. Sir, when you talked about grievances
22   earlier, what happens if an inmate has a grievance that
23   has not been resolved and during that process he's
24   transferred to another institution? What happens to the
```
38

```
 1   grievance?
 2          MS. CHOATE: You can answer if you know.
 3      A. If the inmate's been transferred to another
 4   facility and his grievance has not been -- you mean he
 5   hasn't received a response back? Is that what you're
 6   asking?
 7      Q. Well, either a response or it hasn't been
 8   resolved, but either way.
 9      A. Then basically, once the decision is made,
10   then basically that is forwarded to the inmate once the
11   resolution is made.
12      Q. Sir, as part of the review of the file that
13   you previously talked about, did you review any of the
14   grievances that Aaron McCroy had filed prior to January
15   of 2005?
16      A. Medical file and master file's two different
17   things, so I would have no need to review his master file
18   if I'm looking for medical stuff.
19      Q. And so then you wouldn't be aware of whether
20   or not he had any grievances pending regarding medical
21   issues, then, correct?
22      A. No.
23      Q. So my -- the answer to my question is
24   correct, you do not know, correct?
```
39

```
 1      A. Correct.
 2      Q. Prior to you becoming acting warden, other
 3   than as ADA coordinator, did you have any involvement in
 4   any grievances that Aaron McCroy had submitted?
 5      A. Any involvement as far as what?
 6      Q. Okay. Well, I'm assuming after you became
 7   acting warden, any grievance that made it to your desk as
 8   chief administrative officer, you had involvement in all
 9   grievances at that point, correct?
10      A. Uh-huh.
11      Q. Okay. And I'm sorry. I don't remember
12   exactly when you became acting warden.
13      A. Around December.
14      Q. Okay. Prior to December, did you have any
15   involvement in any grievances submitted by Aaron McCroy?
16      A. Not that I recall.
17      Q. I'm now handing you the January 9 memo that
18   we talked about earlier, and do you have a copy of that?
19      A. Yes, I do.
20      Q. Okay. Why did you write that memo?
21      A. Basically, that memo was written to him
22   after he had written a letter to Deputy Director Meek.
23      Q. And I'm assuming that Deputy Director Meek
24   forwarded the letter to you; is that correct?
```
40

10 (Pages 37 to 40)