3:02-cv-03171-HAB-BGC    # 419-8    Page 1 of 4

3/8/07
Lowell Brown, M.D.

McCroy v. Illinois Dept. of Corrections

E-FILED
Monday, 15 October, 2007  03:02:16 PM
Clerk, U.S. District Court, ILCD

## Page 1

```
          UNITED STATES DISTRICT COURT
       FOR THE CENTRAL DISTRICT OF ILLINOIS
                SPRINGFIELD DIVISION

AARON McCROY,
          Plaintiff,
     vs.                          No. 02-3171
ILLINOIS DEPARTMENT OF
CORRECTIONS, et al,
          Defendants.


     THE DEPOSITION of LOWELL BROWN, M.D.,
taken in the above-entitled case before Debra K.
Baldwin, a Notary Public of Sangamon County, acting
within and for the County of Sangamon, State of
Illinois, at 8:30 o'clock A.M., on March 8, 2007,
at Western Illinois Correctional Center,
Mt. Sterling, Brown County, Illinois, pursuant
to notice.


     Baldwin Reporting & Legal-Visual Services
        Serving Illinois, Indiana & Missouri
     24hrs (217)788-2835    Fax (217)788-2838
                  1-800-248-2835
```

## Page 2

```
APPEARANCES:
     LONDRIGAN, POTTER & RANDLE
     BY:  Thomas F. Londrigan, Esq.
          1227 South Seventh Street
          Springfield, Illinois 62703
          On behalf of Plaintiff.
     MS. KELLY CHOATE
          Assistant Attorney General
          500 South Second Street
          Springfield, Illinois 62706
          On behalf of Defendant Illinois
          Department of Corrections.

     HEYL, ROYSTER, VOELKER & ALLEN
     BY:  Ms. Theresa Powell
          Attorney at Law
          National City Bank Building, Suite 575
          Springfield, Illinois 62701
          On behalf of Defendant.
     HUGHES, HILL & TENNEY, LLC.
     BY:  Ms. Lyndsay Dudgeon
          Attorney at Law
          236 North Water Street
          Decatur, Illinois 62525
          On behalf of Defendant Doctor David
          Anderson.
```

## Page 3

```
                   I N D E X
DEPONENT                              PAGE NUMBER
Lowell Brown, M.D.
     Examination by Mr. Londrigan         5
     Examination by Ms. Powell           58
     Examination by Ms. Choate           65


                  E X H I B I T S
NUMBER                        MARKED FOR IDENTIFICATION
Exhibit 1, 2, 3                         43
```

COPY

## Page 4

```
              S T I P U L A T I O N
     It is stipulated and agreed, by and
between the parties hereto, through their
attorneys, that the deposition of LOWELL BROWN,
M.D., may be taken before Debra K. Baldwin, a
Notary Public and Certified Shorthand Reporter and
Registered Professional Reporter, upon oral
interrogatories, on the 8th of March A.D., 2007, at
the instance of the Plaintiff at the hour of
8:30 o'clock A.M., Western Illinois Correctional
Center, Mt. Sterling, Brown County, Illinois;

     That the oral interrogatories and the
answers of the witness may be taken down in
shorthand by the Reporter and afterwards
transcribed;
     That all requirements of the Federal
Rules of Civil Procedure and the Rules of the
Supreme Court as to dedimus, and the reading over
and signing of the deposition by the witness, are
expressly waived;
     That any objections as to competency,
materiality or relevancy are hereby reserved, but
any objection as to the form of question is waived
unless specifically noted;

     That the deposition, or any parts thereof
may be used for any purpose for which depositions
are competent, by any of the parties hereto,
without foundation proof;
     That any party hereto may be furnished
copies of the deposition at his or her own expense.
```

PLAINTIFF'S EXHIBIT 7

Page 53

1  after this--after his transfer from -- Western? You
2  say some time after. Give me some framework when
3  you had this conversation with Debra Fuqua.
4      A    December of '06.
5      Q    So it was sometime after the fight?
6      A    Yes.
7      Q    As a matter of fact, it was sometime
8  after the cellmate Durham was discharged from the
9  penitentiary, wasn't it?
10     A    Oh. Well, I don't know his history. But
11 that would be--
12     Q    In having this conversation with you, did
13 Debra Fuqua tell you that she thought that this was
14 a perfectly safe inmate for this type of patient to
15 be housed with?
16     A    I don't know that she stated her opinion
17 of his safety or compatibility. I mean, the result
18 was that it was incompatibility. But I don't know
19 that she had any statement on that regard.
20     Q    Did she tell you who it was under her
21 jurisdiction that was responsible for the
22 placement?
23     MS. CHOATE: Object to the form "under her
24 jurisdiction". There's no evidence to that.

Page 54

1      THE DEPONENT: She doesn't have anything to do
2  with the placement process.
3      MR. LONDRIGAN: Q  Tell me, as best you can
4  recall, what it was she told you after this
5  occurred.
6      MS. POWELL: About the placement process?
7      MR. LONDRIGAN: Yes.
8      THE DEPONENT: Well, that the placement people
9  review the personality and the profile of the
10 individuals that are to be housed together and try
11 to come up with a match that is going to be
12 mutually beneficial rather than dangerous.
13     MR. LONDRIGAN: Q  And what I'm learning from
14 you, and also the objections here, is that Debra
15 Fuqua has nothing to do with that process. Is that
16 right? She just explained it, how it should work.
17     A    That's my understanding, yes.
18     Q    Did she explain to you who the people in
19 placement were that made the decision to put these
20 two prisoners together?
21     A    No.
22     Q    How would I learn that information as to
23 who made those assignments?
24     A    Well, you'd have to go through the

Page 55

1  authorities here. There must be a way, but I don
2  know what it is.
3      Q    Okay. Who would I ask to determine who
4  had the final authority to review placement?
5      A    I guess you'd have to speak to the leg
6  counsel here or the warden or somebody in that
7  capacity.
8      Q    Do you know if when placement occurs i
9  the individual, or individuals, who make that
10 placement record a record and who the person was
11 who made those assignments?
12     A    I don't know this.
13     Q    Would Debra Fuqua know that?
14     A    She might have a glimmer of an eye. I
15 don't know that she does though.
16     MS. CHOATE: Objection.
17     THE DEPONENT: She might.
18     MR. LONDRIGAN: Q  Do you know whether or no
19 these people that make these same assignments hav
20 medical training?
21     A    I don't know that.
22     Q    Did you do anything, or, to your
23 knowledge, did anyone else at your direction to
24 flag this patient, Aaron McCroy, and his medical

Page 56

1  problems so that placement people were aware of th
2  risk should a fight occur?
3      A    I don't know that anything specific was
4  brought to their attention, but I think he was a
5  notorious case that they would know quite a bit
6  about.
7      Q    Well, when you say a notorious case, do
8  you mean because of his medical condition, or the
9  fact that he filed a number of grievances, or
10 something else?
11     A    Well, news travels fast around the
12 prison. And I don't think there are too many
13 secrets that go unnoticed.
14     Q    Okay. What was Aaron McCroy notorious for
15 in the prison, according to your understanding?
16     A    Well, notorious might be too strong a
17 word, but let's say he was well known. But I
18 believe there was some talk, and this is hearsay,
19 of some sexual hostility or aggressiveness. I
20 understood that he he was supposed to have put his
21 arms around and kissed Durham provoking the attack.
22     Q    Do you know of anyone that claimed that
23 other than Durham, his assigned cellmate?
24     A    No, I don't.

Page 57

1  Q  Have you ever looked at Aaron McCroy's
2  records in the number of years he's been at this
3  institution and other institutions as to whether or
4  not there was ever any indication that he was a
5  predator?
6  A  I don't know that. I didn't know it.
7  Q  Other than the rumor that you heard,
8  which came from the assailant in this case that
9  caused the loss of this eye, have you ever reviewed
10 any of his records to find out if he was a person
11 of violence who had ever been in any fights before?
12 A  No, I didn't do that.
13 Q  Or whether or not he even had homosexual
14 tendencies? There are those records that are kept
15 in this institution, aren't there?
16 A  Well, I had heard one other story
17 somewhere that he did the same type of thing to
18 somebody else.
19 Q  And who told you that story?
20 A  One of the nurses.
21 Q  Who?
22 A  Am I obliged to divulge the name of my
23 source?
24 Q  Yes.

Page 58

1  A  Cathy Ashcraft.
2  MR. LONDRIGAN: I think that's all the
3  questions I have. We're now off the record.
4            (Discussion off the record.)
5  MS. POWELL: Doctor, I just have a few followup
6  questions for you for clarification.
7            EXAMINATION
8            BY MS. POWELL:
9  Q  In general, Doctor, would you be advised
10 of any inmate's criminal history before seeing them
11 as a patient?
12 A  Generally, no.
13 Q  With respect to Exhibit 1, Doctor, it's
14 dated November 21st of 2003. I just wanted to
15 clarify. You were not working at Western Illinois
16 Correctional Center on November 21st, 2003, were
17 you?
18 A  Correct. I wasn't.
19 Q  That document was written by Nurse
20 Practitioner Mills?
21 A  Yes.
22 Q  Okay. And when you testified previously
23 you indicated that of his discharge note, and you
24 specifically referenced, I believe you said there

Page 59

1  was a caveat, referencing avoid yard activity with
2  others so as to protect the keratoplasty site. Do
3  you recall saying that?
4  A  Yes, I certainly do, yes.
5  Q  Can you tell me under what section of
6  that discharge note that language is placed?
7  A  Patient education.
8  Q  And when a note says patient education,
9  can you tell us what patient education means?
10 A  Well, that would be part of the
11 prescription. It would be helpful instructions to
12 promote a better long term result. It would be
13 behavioral advice, lifestyle.
14 Q  That would all be information given to
15 the patient, as it indicates?
16 A  Yes. It would be verbalized.
17 Q  And Exhibit 1 also indicates, Doctor,
18 that the patient was discharged from the infirmary
19 to single cell in segregation. Is that accurate?
20 Where it says under plan.
21 A  That's right. Yeah.
22 Q  You weren't here, so do you know why
23 Mr. McCroy was sent to segregation?
24 A  No, I don't know.

Page 60

1  Q  It could have been for disciplinary
2  reasons?
3  A  That's the usual reasons all right.
4  Q  And if they were for disciplinary
5  reasons, you don't know what those reasons were?
6  A  No.
7  Q  Now, in looking at Exhibit--. Again, with
8  respect to Exhibit 1, if a patient was transferred
9  from the infirmary to segregation, he would be
10 aware of being transferred to segregation by the
11 mere fact that he was moved from one place to the
12 other?
13 MR. LONDRIGAN: Objection. Leading.
14      Go ahead.
15 THE DEPONENT: Yeah. He'd catch on fast. Yeah.
16 MS. POWELL:  Q  Now, with respect to
17 Exhibit 2, I think you testified earlier that the
18 patient remained housed in the infirmary per
19 security, and you referenced March 31st of 2004. Do
20 you recall testifying about that date?
21 A  Yes.
22 Q  Okay. If you look further down on
23 Exhibit 2 for the entry on April 4th of '04, can
24 you read what that entry says?

15 (Pages 57 to 60)

3:02-cv-03171-HAB-BGC   # 419-8   Page 4 of 4

3/8/07                                    McCroy v. Illinois Dept. of Corrections
Lowell Brown, M.D.

Page 65

1  Q   So even if you went to the medical
2  librarian right now, she wouldn't have access to
3  his prior records?
4  A   Not the original records. I mean, I'm
5  sure there are some copies floating around, but not
6  the originals.
7  Q   Where is his chart?
8  A   Wherever his facility is situated.
9  MS. POWELL: That's all I have, Doctor. Thank
10 you very much.
11 MS. CHOATE: I have a few questions.
12                EXAMINATION
13              BY MS. CHOATE:
14 Q   Doctor Brown, going back to--or you
15 talked about some office gossip from a Nurse
16 Ashcraft, and you said that she said he had done
17 the same thing to someone else, and that wasn't
18 clear. Do you mean that McCroy had done the same
19 thing, allegedly tried to kiss someone else, or the
20 other inmate had tried to harm someone else? What
21 was your conversation with Ashcraft?
22 A   No. He kissed someone else.
23 Q   That McCroy had done the same thing he
24 was alleged to have done to Durham?

Page 66

1  A   Yes.
2  Q   And did this conversation take place
3  after the fight with Durham, if you recall?
4  A   What now?
5  Q   The conversation with Ashcraft, with
6  Nurse Ashcraft.
7  A   It took place quite recently.
8  Q   As of March, or, I'm sorry, as of
9  June 8th of 2004 when you wrote your note that is
10 in I believe -- is it Exhibit 2, Theresa?
11 MS. POWELL: I think it's 3.
12 MS. CHOATE: 3.
13 Q   Exhibit 3, your progress note on
14 June 8th of 2004. At that time were there any
15 restrictions placed on Mr. McCroy as far as going
16 to commissary?
17 A   Well, it looks like Doctor Anderson, our
18 optometrist, entered a note in there.
19 Q   Did you place any restrictions on
20 Mr. McCroy as far as he could--
21 A   No, I didn't say anything about that. But
22 Mr.--Doctor Anderson had something to say. He said
23 no yard or gym due to eye condition, which is
24 curious.

Page 67

1  Q   Did you believe that Mr. McCroy should
2  not be able to be around other inmates?
3  A   No, I didn't believe that.
4  Q   Did you believe there was any medical
5  reason that he could not be around other inmates?
6  A   No.
7  Q   You talked about Deb Fuqua and said that
8  she was the healthcare unit administrator. Correct?
9  A   Yes.
10 Q   And as the healthcare unit administrator,
11 are you familiar with some of her duties or her
12 role in the healthcare unit?
13 A   Yes.
14 Q   Does Deb Fuqua admit inmates to the
15 infirmary?
16 A   Well, nurses have the power to
17 tentatively place them there pending my--maybe my
18 beeper went crazy or I couldn't be reached or
19 something, so until I show up again, if there's a
20 delay, they have the power to place them in there
21 pending my--I mean they have good sense.
22 Q   How about discharging someone from the
23 infirmary? Did Deb Fuqua have that power, without
24 a doctor's order or okay, to do that?

Page 68

1  A   I believe that would be overstepping that
2  boundary.
3  Q   To your knowledge, has Deb Fuqua ever
4  discharged someone from the infirmary without
5  consulting a physician?
6  A   No. No. She doesn't do that.
7  Q   You also testified that you talked to
8  Ms. Fuqua about the placement office.
9  A   About the what?
10 Q   The placement office and how that's done.
11 During the time that you've known Ms. Fuqua, have
12 you ever known her to work in the placement office?
13 A   I don't know if she did or didn't. She
14 spends a lot of time with the administration.
15 Q   But do you know if she has any
16 specialized knowledge of the placement office?
17 A   I don't know what she knows, but she's
18 pretty sharp.
19 Q   So you don't know if she has actual
20 knowledge of the placement office or if she's also
21 speculating as to what happens in the placement
22 office. Is that fair?
23 A   That's a fair statement.
24 Q   And you also talked about how word gets