**Page 1**

```
             U.S. DISTRICT COURT
           CENTRAL DISTRICT OF ILLINOIS

AARON McCROY,              )
         Plaintiff,        )
   vs.                     )  Case No. 02-3171
                           )
THE ILLINOIS DEPARTMENT    )
OF CORRECTIONS, et al,     )
                           )
         Defendants.       )
```

Deposition of DR. STEPHEN A. KWEDAR, taken at the instance of the Defendants, on September 11, 2006 scheduled for the hour of 11:00 a.m., at 1227 South Seventh Street, Springfield, Illinois, before Donna M. Dodd, Certified Shorthand Reporter and Notary Public, pursuant to the attached stipulation.

GOLEMBECK REPORTING SERVICE
Connie S. Golembeck, Owner
(217) 523-8244
(217) 632-8244

**Page 2**

APPEARANCES:

THOMAS LONDRIGAN
Londrigan, Potter & Randle, P.C.
Attorneys at Law
1227 South Seventh Street
Springfield, Illinois 62703

    Appeared on behalf of the Plaintiff,

THERESA M. POWELL
Heyl, Royster, Voelker & Allen
Attorneys at Law
One North Old State Capitol Plaza, Fifth Floor
Springfield, Illinois 62701

    Appeared on behalf of Defendant,
    Wexford Health Sources.

KELLY CHOATE
Assistant Attorney General
Attorney at Law
500 South Second Street
Springfield, Illinois 62701

    Appeared on behalf of Defendant, IL
    Department of Corrections.

CARL J. TENNEY
Hughes, Hill & Tenney, LLC
Attorney at Law
236 North Water Street P.O. Box 560
Decatur Illinois 62525

    Appeared on behalf of Defendant, Dr.
    Anderson.

**Page 3**

INDEX

| | PAGE |
|---|---|
| Direct Examination by Ms. Powell | 5 |
| Cross Examination by Mr. Tenney | 82 |
| Examination by Ms. Choate | 109 |
| Redirect Examination by Ms. Powell | 120 |
| Examination by Mr. Londrigan | 121 |
| Further Examination by Ms. Choate | 131 |

| EXHIBITS | MARKED |
|---|---|
| Defendant's Exhibit 1 | 16 |
| Defendant's Exhibit 2 | 60 |
| Defendant's Exhibit 3 | 82 |
| Defendant's Exhibit 4 | 84 |
| Defendant's Exhibit 5 | 94 |

**Page 4**

STIPULATION

It is stipulated and agreed, by and between the parties hereto, through their attorneys, that the deposition of DR. STEPHEN KWEDAR, may be taken before Donna M. Dodd, a Certified Shorthand Reporter, upon oral interrogatories, on September 11, 2006 at the instance of the Defendants, scheduled for the hour of 11:00 a.m. at 1227 S. Seventh, Springfield, Illinois.

That the oral interrogatories and the answers of the witness may be taken down in shorthand by the Reporter and afterwards transcribed.

That any requirement as to the reading over and signing of the deposition by the witness or the filing of the same are not expressly waived.

That all objections are hereby reserved except as to the form of the question which is waived unless specifically noted.

That the deposition or any part thereof may be used for any purpose for which depositions are competent, by any of the parties hereto, without foundation proof.

That any party hereto may be furnished copies of deposition at his or her own expense.

Page 5

1   (The witness was sworn by the Reporter.)
2       STEPHEN A. KWEDAR, M.D.
3   called as a witness herein, at the instance of the
4   Defendants, having been duly sworn upon his oath,
5   testified as follows:
6           DIRECT EXAMINATION
7   BY MS. POWELL:
8       Q.  Could you please state your name for the
9   record, Doctor?
10      A.  Stephen A. Kwedar, K-W-E-D-A-R.
11      Q.  And my understanding is that you currently
12  reside in Naples, Florida?
13      A.  I do.
14      Q.  How long have you been living there?
15      A.  I think 12 years.
16      Q.  Are you practicing medicine down there?
17      A.  No, I'm not.
18      Q.  Are you retired?
19      A.  I am.
20      Q.  And when did you retire?
21      A.  Twelve years ago.
22      Q.  Okay.  So you've never practiced down
23  there?
24      A.  No.

Page 6

1       Q.  Okay.  You used to practice in
2   Springfield, is that correct?
3       A.  Correct.
4       Q.  Where did you practice?
5       A.  In Springfield Clinic.
6       Q.  Okay.  Is that the only place where you
7   practiced, in Springfield, Illinois?
8       A.  Well, I also practiced when I was in the
9   military.
10      Q.  Okay.  That probably was sometime ago,
11  correct?
12      A.  That was before Springfield, yeah.
13      Q.  Okay.  What dates did you practice with
14  the Springfield Clinic?
15      A.  Let's see, I got home from Southeast Asia
16  in September of '72, and I retired in September of
17  '94.
18      Q.  How is it that you became involved in this
19  lawsuit?
20      A.  Well, I've known Tom for a while and Tom
21  called me, oh, a while back and asked me, he said,
22  he had a patient that he thought he had steroid
23  induced glaucoma and he needed to know somebody
24  that was descending to and so fortunately within a

Page 7

1   few hundred miles of Springfield you have a worl
2   expert which is Michael Kass, and I told him to
3   call Michael and to use my name to get him in.
4       Q.  So you actually recommended that the
5   patient see Michael Kass?
6       A.  Yes.
7       Q.  Do you know what year it was that you had
8   that communication with Mr. Londrigan?
9       A.  That was a couple of years ago.
10      Q.  Okay.
11      A.  Do you want the date?
12      Q.  No, not right now.
13          Did you have any written
14  communications regarding that recommendation?
15      A.  With, no.
16      Q.  Okay.  That was just a telephone
17  conversation?
18      A.  Uh-huh.
19      Q.  That would be a yes?
20      A.  Yes.  I'm sorry.
21      Q.  That's all right.
22          And at that time you weren't formally
23  hired to serve as an expert in this case, were you?
24      A.  Correct.

Page 8

1       Q.  Okay.  Did you receive any written
2   communication from Mr. Londrigan in this case at
3   anytime?
4       A.  Yes.
5       Q.  Do you have letters?
6       A.  No.  I have a document file.
7       Q.  Okay.  Did he send any correspondence from
8   himself to you when he sent those records to you?
9           MR. LONDRIGAN:  Theresa, I think maybe
10  just a cover letter, but we'll get those.
11          MS. POWELL:  Okay.
12          THE DEPONENT:  Theresa, I don't -- I don't
13  recall any letters from him.  Something says like,
14  here's a packet of information.  I don't even have
15  the letter.  If there was something, I don't even
16  have it.
17  BY MS. POWELL:
18      Q.  Did you bring the documents that you've
19  reviewed with you today?
20      A.  Uh-huh, yes.
21      Q.  Okay.  But just not any correspondence or
22  cover letters, is that right?
23      A.  There -- I don't believe there were any.
24  I came in -- I'm closing my eyes and seeing the F

**Page 9**

Ex thing that weighed about 50 pounds. That's an exaggeration. The Fed Ex thing came in there and the only cover letter said there was private and confidential information on it stamped on the front of it and it was protected under client/lawyer privilege, and then there was just this hundreds of sheets of stuff.

Q. Okay. Did you have any direct communications with Mr. Kass or Doctor Kass?
A. No.
Q. Have you communicated with any of the physicians in this case?
A. No.
Q. Did you ever work with any of the physicians that you may have seen their names in this case?
A. Yes.
Q. With whom did you work?
A. Lohse, his name appears in the case. A. George Schulz, his name appears. Those are the only ones I worked with.
Q. Okay.
A. I do know Staley. I did never work with Staley, but I know Staley. Sandy Yeh's name

**Page 10**

appears on a couple of letterheads. I knew her.
Q. But you didn't work with her?
A. No.
Q. Now, with Doctor Schulz, I saw that he actually worked in Jacksonville?
A. Yes, he does. A. George Schulz, III works in Jacksonville.
Q. Did you work with him at that location?
A. No. I'm sorry, he and I exchanged patients. I was a referal. I served as a referal for him.
Q. Okay.
A. We -- we shared patients.
Q. Okay.
A. I didn't mean that we actually worked in practice together.
Q. All right. And how would you consider your relationship with Doctor Lohse?
A. We were partners. I hired him.
Q. Okay. And he actually worked for --
A. Worked with us.
Q. -- the Springfield Clinic?
A. Yes.
Q. That's okay.

**Page 11**

A. I didn't mean to mislead you. I didn't understand what worked with meant.
Q. Did you ever discuss this patient's care with Doctor Lohse?
A. Never.
Q. And when was it that you were asked to become more involved in this case?
A. Well, Tom called me up again and he said would you mind looking at this case, I'll send som stuff down to you.
    Okay. And it was a bright sunny day and I was sort of, I said, yeah, send it down. I'll look and here I am.
Q. Do you have a written agreement between the two of you?
A. No, I have no agreement.
Q. Do you have a dollar amount that you're charging him for your time in this case?
A. We haven't discussed it yet.
Q. Okay. So you're not charging for this deposition time?
A. Of course I am.
Q. Do you know how much you're charging?
A. Not yet. I haven't discussed it. I'm not

**Page 12**

trying to be evasive, but we just plain haven't discussed it.
Q. Is the reason that you're serving as an expert in this case because you had a relationship with Mr. Londrigan?
A. I've had a relationship with Mr. Londrigan before.
Q. And could you just tell us how you would describe that relationship?
A. I feel very -- he was a patient and I was a client.
Q. But I bet you don't serve as experts for all of your patients, do you?
A. Not all my patients are lawyers.
Q. Okay. Have you ever been to Mr. Londrigan's house?
A. Yes.
Q. Has Mr. Londrigan ever been to your house?
A. I don't think so.
Q. Has he ever been down to visit you in Florida?
A. No.
Q. Okay. And why were you at his house?
    Was that a social visit or was it a

```
                                    13
 1  house call?
 2      A.  I think he invited my children and myself
 3  over for a barbecue in the summer maybe 25 years
 4  ago or so.  It's pretty hard for me to remember,
 5  maybe 27 years ago.
 6      Q.  Okay.  Have you kept in touch with him
 7  over the years?
 8      A.  Define that, please.
 9      Q.  Well --
10      A.  I don't know what keep in touch is.  I
11  mean, have I talked with him?  Probably the last
12  time before this I talked with him was four or five
13  years ago.  Is that keep in touch?
14      Q.  Okay.  When he called you you knew who he
15  was, right?
16      A.  Sure.
17      Q.  All right.  And did Mr. Londrigan ask you
18  specifically what he wanted you to do with respect
19  to the records that he was sending to you?
20      A.  You'll have to restate.  I really didn't
21  understand.  I don't understand what you want me to
22  answer there.  I'm sorry.
23      Q.  Okay.  Did Mr. Londrigan give you any
24  direction when he provided you all of those
```

```
                                    14
 1  records --
 2      A.  No.
 3      Q.  -- as to what he wanted you to look for?
 4      A.  No.
 5      Q.  He just sent you a hundred pages or more
 6  of documents and said, would you look at these?
 7      A.  More or less.
 8      Q.  Okay.  And when you looked through them,
 9  what were you looking for?
10      A.  Well, first of all, they're almost
11  impossible to look through.  If you've looked
12  through them, you'd know, but I was looking to see
13  the quality of care and what happened to Mr.
14  McCroy.
15      Q.  Do you know what the dates were on the
16  records you were provided?
17      A.  Uh-huh.
18      Q.  Okay.  Would you tell me specifically what
19  documents you were sent to review with respect to
20  this case?
21          Was it medical records?
22      A.  Some.
23      Q.  Okay.  Tell me --
24      A.  Some medical records, some prison records,
```

```
                                    15
 1  some -- one court hearing, one deposition, several,
 2  I don't know, several things from Aaron that he had
 3  written.  It was voluminous.
 4      Q.  Do you know what the court hearing
 5  involved?
 6      A.  Yeah.  The same thing that the deposition
 7  was.
 8      Q.  What was that?
 9      A.  Doctor Zeh, Z-E-H.
10          Is that how you pronounce it?
11      Q.  Doctor Zeh.
12      A.  Zeh.
13      Q.  Yeah.
14          Have you ever communicated with Doctor
15  Zeh directly?
16      A.  No.  I don't know him.
17      Q.  Okay.  Are you going to criticize Doctor
18  Zeh's qualifications?
19      A.  No.
20          MR. LONDRIGAN:  Maybe I can help.
21  Theresa, he's not been asked to criticize any
22  ophthalmologist's care.  I tried as best I could in
23  the disclosure to give you the idea of what he was
24  going to testify to.
```

```
                                    16
 1          But he's not here to testify as to the
 2  standard of ophthalmological care by any of these
 3  outside treating physicians.
 4  BY MS. POWELL:
 5      Q.  Do you know why you are here?  I mean,
 6  what the purpose of your testimony is?
 7      A.  Well, I think so.
 8      Q.  And what is your understanding as to the
 9  opinions you're going to give in this case?
10      A.  Well, I think I'm going to comment on the
11  overall care that he received while he was an
12  inmate, as far as his ophthalmology goes,
13  ophthalmological care.
14      Q.  Okay.  Now, I've been provided with a
15  written report, and the date on the letter that I
16  was given says August 30th of '06, and the date of
17  your signature appears to be August 29th, and this
18  also has a copy of your CV, and I'll go ahead and
19  mark this entire document as Exhibit Number 1.
20      A.  What do we got?
21      Q.  That's the letter I was given by your
22  attorney with the written report.
23          (Defendant's Exhibit No. 1 was
24           marked for identification.)
```

**Page 17**

BY MS. POWELL:
Q. Would you agree, Doctor, that Exhibit 1 contains a written report from you?
A. Yeah, dated August 29th. It was faxed, looks like it was -- is this the faxed copy, because I faxed it? I faxed it and also sent it hard copy, so I don't know which one I'm looking at here.
Q. Okay.
A. But yes.
Q. All right. And attached to that appears to be a CV. Is that your CV?
A. A CV. This is my CV.
Q. Okay. Doctor, did you author any other written reports in association with this case?
A. No, not that I'm aware of.
Q. This is the only written report that we have from you, is that right?
A. Uh-huh, uh-huh.
Q. Is that yes?
A. Yes, I'm sorry.
Q. And would you agree this contains the opinions you are going to give in this case?
A. Yes.

**Page 18**

Q. Okay. Does it say anywhere in this document specifically the records that you referenced?
A. No, it does not.
Q. Are you basing your opinions on the medical records that you reviewed?
A. I am.
Q. Anything else?
A. No.
Q. Can you tell me the -- well, let me ask you this.
When reviewing Exhibit 1 you indicate that the agents and employees of the IDOC significantly departed from the care and treatment of the prisoner/patient recommended by Doctor Michael Kass.
Are the opinions in this case that you are giving today referencing a point in time after the patient saw Doctor Michael Kass?
A. Some.
Q. Are some of the opinions referencing a point in time before that?
A. Yes.
Q. Does it indicate that in Exhibit 1

**Page 19**

anywhere?
A. You know, I'm not a lawyer.
Q. I'm asking you. You apparently wrote this.
A. The prisoner suffers from Keratoconus, which has been aggravated by Department of Corrections failure to provide proper care during his incarceration.
Where did Michael Kass even appear i number one? I don't see that.
Q. He doesn't in number one.
A. Oh, okay.
Q. I don't have a date on this anywhere to indicate a specific point in time.
A. Okay.
Q. So are your opinions relating to all times when this patient was in the Department of Corrections?
A. Well, prior to Michael Kass too, yes.
Q. Okay. What's the -- what is the starting point for your opinions?
A. Well, see, probably early nineties. I can tell you exactly. I made a couple. This is a voluminous. If you don't mind, I made a couple

**Page 20**

little notes here.
Q. Okay.
MR. LONDRIGAN: We'll copy that.
THE DEPONENT: You won't be able to read it. I don't think. Starting with 3/6/99.
BY MS. POWELL:
Q. Okay. Where was the patient incarcerated at that time?
A. I believe he was in, I think it was in Hill. You know, I don't know your prison system. I have to be very honest. I don't know the prison system. He was in Statesville. Either in Statesville, no. He was in Statesville and he was being transferred to Hill, and I think it was -- don't they send like a summary or something and they're saying it's sort of like a transfer note?
I think that was where, I think that was where he first was, and I'm going to have to tell you something. From the records that I have, it's really hard to tell where he is. There were a couple of transfer notes that were missing from my -- I really didn't have a complete file, because I would find him at Pinkneyville and I don't know how he got to Pinkneyville because there was no

21

1  record of a transfer note to Pinkneyville. So it's
2  really hard for me to keep track of where he is.
3  You know, I have to tell you, and I'm quite sure
4  it's not Mr. Londrigan's problem to provide this.
5  But it's, some of the records were incomplete.
6  But, yes, I think 3/6/99 would be the first.
7  Q. Okay. And what's the date, the last
8  record that you saw?
9  A. I don't know. I saw some today that had a
10 date of -- I can't remember. I didn't -- it was
11 like '06, something '05 or '06. Late '05 or
12 beginning of '06 and I was just provided with those
13 today.
14 Q. All right. Do you know who Cleveland
15 Rayford is?
16 A. No.
17 Q. Are you going to provide any opinions
18 specifically critical of any act or omission on the
19 part of Cleveland Rayford?
20 A. I'm not going to comment on Cleveland
21 Rayford, because if I'm provided information, okay,
22 on Cleveland Rayford, today I'm not going to
23 provide any information. That does not mean I
24 won't in the future.

22

1  Q. Well, you haven't thus far indicated any
2  critical opinions of Cleveland Rayford, correct?
3  A. That's correct.
4  Q. And I don't have any written information
5  to indicate that you have criticized him, correct?
6  A. That's correct.
7  Q. And there is nothing in any of the reports
8  that I've been provided that would indicate that
9  you would be critical of him, right?
10 A. That is correct.
11 Q. And I don't have any specifics as to what
12 those opinions would be, correct?
13 A. Let me ask you this. Who is Cleveland
14 Rayford?
15 Q. That's what I'm asking you, sir, because I
16 can't tell from your Exhibit 1 whether or not
17 you're going to criticize him.
18 A. See, I don't know necessarily who the
19 wardens are. I don't know who the head prison guys
20 are. I don't know the structure. I was not
21 provided with that, so I cannot comment on things I
22 was not provided with.
23 Q. That's okay. In looking at the records,
24 do you have a recollection of ever seeing Cleveland

23

1  Rayford's name on anything?
2  A. No.
3  Q. Okay. Are you going to provide any
4  criticisms today regarding Stanley Sims?
5  A. Let's see, Stanley Sims, his name does
6  appear on the records a couple of places. Let me
7  just see. Sims, I have to go through all of this
8  to find him. Sims, Sims, Sims, Sims, Sims. Where
9  did I see Sims? I saw Sims name someplace, but
10 I don't have any criticisms of him at this point at
11 this time.
12 Q. And --
13 A. Part of the -- part of the problem is, is
14 this man, this man was supposed to be fit with a
15 contact lens.
16 Q. Okay. That would be Mr. McCroy, correct?
17 A. Uh-huh, Mr. McCroy, Aaron McCroy.
18 Q. Let me ask my questions, Doctor, and then
19 if you have any additional comments, you can make
20 those later.
21 A. All right.
22 Q. Would you agree with me as well that
23 Exhibit 1 does not reference the name Stanley Sims
24 or any act or omission on his part that's going to

24

1  be referenced by you?
2  A. Number one does not reference Stanley
3  Sims.
4  Q. Okay.
5  MR. LONDRIGAN: Counsel, let me make a
6  continuing objection here, because of the problem
7  we've had with production of records. We still
8  don't have medical records for the period 12/8/04
9  to 6/9/06, and we're in the process of making a
10 third supplemental request for those records. So I
11 can't provide all of these records to the doctor if
12 they aren't first provided to us.
13 MS. POWELL: Okay. What --
14 MR. LONDRIGAN: I won't say anymore. I'm
15 just pointing that out as a continuing objection to
16 that type of question.
17 MS. POWELL: But as we sit here right now,
18 sir, what does that have to do with Doctor Sims or
19 Cleveland Rayford?
20 MR. LONDRIGAN: Until I see the records, I
21 can't answer that question either. I'm not saying,
22 because I'm not under oath. It just means I can't
23 forward the information to this witness unless I've
24 received it in discovery.

25

1  MS. POWELL: Okay. Well, I know for a
2  fact that Doctor Sims wasn't at -- wasn't even
3  working in the Department of Corrections after '03,
4  at least --
5  MR. LONDRIGAN: There are people though
6  who have acting supervisory capacity and don't
7  supervise, and don't look at these records as we
8  have had to do in this case.
9  All I'm telling you is that that isn't
10 fair to this witness to suggest that if we haven't
11 received records from Rayford or Sims or about
12 Rayford or Sims, how he could take them into
13 account in expressing an opinion, and I don't want
14 to argue about it further. I'm just pointing it
15 out as a continuing objection.
16 MS. POWELL: That would be if there was
17 some reference to either of them in the records
18 that you don't have.
19 MR. LONDRIGAN: Right. I think there is
20 ultimate supervisory responsibilities that may go
21 in an entirely different frame of reference other
22 than the opinions that this witness is going to
23 express.
24

26

1  BY MS. POWELL:
2  Q. Okay. But you do have -- do you know what
3  the dates are on the medical records that you have?
4  It's my understanding that you were
5  given records as you indicated from '99 through
6  sometime in '05?
7  A. That's correct.
8  Q. Okay.
9  A. That doesn't mean they're complete.
10 Q. Well, that's fine.
11 Actually, do you have -- I think you
12 need to go and get all the records then that he has
13 looked at so that I know exactly which ones.
14 MR. LONDRIGAN: Did you bring them all?
15 THE DEPONENT: I don't know that I did. I
16 lightened the load. It was a long way up here. I
17 took some out.
18 BY MS. POWELL:
19 Q. And when you say, Doctor --
20 A. But not much.
21 Q. -- that doesn't mean they're complete, I
22 don't know without you bringing them in here what
23 your lawyer has provided to you.
24 A. He's not my lawyer.

27

1  MR. LONDRIGAN: Counsel, you didn't ask
2  him to bring the records I provided him. As a
3  matter of fact, I told him, we're still getting
4  records, and any records they want to use in the
5  deposition that you've provided, I'll bring them
6  down here and put them on the table and you can ask
7  him about it.
8  BY MS. POWELL:
9  Q. That's fine. I'd just like to see what
10 he's seen, because I could hand you a page of a
11 medical record, but I would doubt, Doctor, that you
12 would know whether it was contained in the stack
13 that was given to you.
14 A. Well, try me.
15 Q. Well, that's just silly if I just pull a
16 page out.
17 A. Try me.
18 Q. That's just -- I don't want to spend the
19 whole day in asking you.
20 A. Just pull one out and let's see.
21 Q. Okay.
22 A. I'll tell you if I think I've seen it.
23 Just pull one.
24 Q. I mean, I don't want to ask you that with

28

1  every single page of all the medicals records.
2  A. Well, you just said one. We do every
3  single page, this is going to be an expensive
4  deposition.
5  Q. That's what I mean. I just want to know
6  where your documents start and what you have seen.
7  A. I think they started, as I said, in 3/99
8  and.
9  Q. Did they have numbers on them?
10 A. No.
11 Q. None of the documents you received had --
12 A. Well, they had numbers. They had a lot
13 numbers on them.
14 Do you mean, were they numbered
15 consecutively?
16 Q. Right.
17 No. With Bates Stamp numbers on them
18 like the ones I have?
19 A. Some did, but I have more than those. I
20 never had a deposition.
21 MR. TENNEY: Tom, can he just bring into
22 this room the records that he brought with him
23 from --
24 MR. LONDRIGAN: I don't have any

                                                                 29
1   objection.
2           MS. POWELL: I think it would help,
3   because we could look at Bates Stamp numbers and
4   then I'll know exactly what records he's already
5   looked at, if he's seen Attorney General Numbers
6   10031 through whatever number.
7           THE DEPONENT: What does it say? I can
8   tell you whether I've seen it. Just flip it over
9   here.
10  BY MS. POWELL:
11      Q. This is Attorney General Number 10031.
12  Have you seen that?
13      A. **Well, yeah, I did and I couldn't read it.**
14  **It says, follow-up one week. I couldn't read the**
15  **name of the signature of the doctor, and I couldn't**
16  **read the writing and I do believe I saw that one.**
17      Q. That was from Doctor --
18      A. **I do believe I saw that one.**
19      Q. Well, there is many records here from like
20  Western Illinois Correctional Center with similar
21  numbers on them. If you could have him go get
22  those and then we could see what dates he actually
23  has. That would be helpful before we keep going.
24          MR. LONDRIGAN: I'll go get them. I

                                                                 30
1   think, are they the ones that are in the notebook?
2           THE DEPONENT: Uh-huh.
3           MR. LONDRIGAN: Okay. I'll get them. I
4   thought you might have exhibits, specific exhibits
5   that you wanted to ask him about.
6           MS. POWELL: I don't want to make exhibits
7   of records I don't --
8           THE DEPONENT: I do believe I saw that,
9   because I couldn't read who the doctor was.
10          (Whereupon there was a recess
11          taken.)
12  BY MS. POWELL:
13      Q. Okay. Doctor, for the record, I've been
14  handed a black volume, a black binder that has tabs
15  in it. The first tab is an A. There is a B and
16  then there is numbers. Looks like it starts 26.
17          Do you know what the tabs mean? Were
18  you advised what the tabs mean?
19      A. **I think it's self-explanatory.**
20      Q. Okay. Self-explanatory based on this
21  McCroy Medical Time Line that starts the
22  information, is that correct?
23      A. **Correct.**
24      Q. And this was a document that was provided

                                                                 31
1   to you by counsel, is that correct?
2       A. **By Mr. Londrigan.**
3       Q. Right.
4           And you received all of the pages of
5   this, correct?
6       A. **Correct.**
7       Q. And you actually made notes on this or is
8   that Mr. Londrigan's handwriting?
9       A. **No, that's my handwriting.**
10      Q. Okay. So even though this document says
11  confidential attorney work product, he did provide
12  that to you, correct?
13          MR. LONDRIGAN: I just waived that to you.
14  I'm not claiming attorney/client.
15          MS. POWELL: I know. I'm just making a
16  record.
17          MR. LONDRIGAN: I'm trying to assist you
18  with this deposition process.
19          MS. POWELL: That's fine. I'm just making
20  a record.
21          MR. LONDRIGAN: I'm not claiming this as
22  privileged in this deposition.
23  BY MS. POWELL:
24      Q. Okay. And let's see here, it appears to

                                                                 32
1   be a 25 page document, right?
2       A. **That's 25 pages, counselor?**
3          **That looks more like 250 pages.**
4       Q. Just the work product document?
5       A. **I don't know, counselor. I didn't look at**
6   **it.**
7       Q. You don't have any records apart from the
8   binder, do you?
9       A. **Uh-huh.**
10      Q. You do?
11      A. **Uh-huh.**
12      Q. That's a yes?
13      A. **Yes.**
14      Q. What records do you have outside of the
15  binder?
16      A. **One page.**
17      Q. And what would that be?
18      A. **6/8/04.**
19      Q. What is that?
20      A. **That's where he was released to the**
21  **general prison population when he was postop**
22  **corneal transplant by a Doctor Brown.**
23          MR. LONDRIGAN: I think he yanked this out
24  before the deposition.

**Page 33**

1    MS. POWELL: Okay.
2    MR. LONDRIGAN: Because he thought you
3  might want to ask questions about that.
4  BY MS. POWELL:
5    Q. Okay. And this document was a part of the
6  records that were in the binder, but you took it
7  out for yourself?
8    A. Correct.
9    Q. Okay. It looks like under Section A we've
10 got the Continued Deposition of Doctor Zeh,
11 correct?
12   A. Uh-huh.
13   Q. That's a yes?
14      The only reason I'm doing that,
15 Doctor --
16   A. I know. I understand.
17   Q. Did you receive the court records, the
18 court proceeding wherein Doctor Zeh was also
19 questioned before the judge?
20   A. I believe that was prior to that
21 deposition.
22   Q. Yes, it was.
23   A. It's right behind it.
24   Q. Okay.

**Page 34**

1    A. Is that correct?
2    Q. Yes, it is.
3       And have you looked at all the records
4  that are in the binder?
5    A. Yes.
6    Q. Okay.
7    A. That doesn't mean I could read them all.
8    MS. POWELL: Okay. And, counsel, just
9  before we keep going, I don't recall. I know I
10 have records that have the Attorney General stamp
11 numbers, but these have the different Bates Stamp
12 numbers.
13      Do we know, before we keep going, are
14 these records numbered by your office?
15   MR. LONDRIGAN: It was done clerically not
16 by me, so I can't answer that question.
17   MS. POWELL: You don't know if your office
18 did it or whether you received them this way?
19   MR. LONDRIGAN: I don't even know what
20 you're looking at.
21   MS. POWELL: Okay.
22   MR. LONDRIGAN: All I can tell you, is
23 that someone in my office put that together.
24   MS. POWELL: Okay. And, Mr. Londrigan,

**Page 35**

1  you don't know whether or not the 893 at the bottom
2  of the page came from someone in your office or
3  whether it was already in the record before you
4  sent them to Doctor Kwedar?
5    MR. LONDRIGAN: No, I don't.
6    MS. CHOATE: Theresa, I think there is
7  going to be more than one Bates Stamp groupings. I
8  know the first group of records Pat picked up and
9  took to Bates Stamp. You should all have those
10 original stack of about 1200 pages.
11   MS. POWELL: Right.
12   MS. CHOATE: And then we subsequently wer
13 able to --
14   MS. POWELL: Send some addition ones.
15   MS. CHOATE: Additional ones, and that's
16 where the Attorney General Bates Stamp will come
17 in, at least on these most recent ones.
18 BY MS. POWELL:
19   Q. Okay. I'll tell you what, it appears to
20 me that from the time line, all of the records that
21 are listed in this binder are identified by their
22 title and their date in the time line. Would that
23 be accurate?
24   A. I believe they are.

**Page 36**

1    Q. There is no need to really go through each
2  page. They're already listed in the time line,
3  correct?
4    A. I believe so.
5    Q. But they just don't reference that Bates
6  Stamp number.
7       Okay. Did you specifically ask for
8  any additional records?
9    A. No.
10   Q. Did you ever say, hey, could I get a copy
11 of any diagnostic tests or any additional progress
12 notes?
13   A. Well, I assume that Mr. Londrigan gave n
14 everything that he had available and if I didn't
15 have it, it wasn't available.
16   Q. Okay. And you didn't ask him to limit any
17 records, right?
18   A. No.
19   Q. Okay. And you don't know whether or not
20 he sent you every record that he has?
21   A. No, and I don't know that he has every
22 record that you have.
23   Q. Okay.
24   MR. LONDRIGAN: I sent him what I thought

## Page 37

1 was the relevant material for him to satisfy
2 himself whether or not he felt strongly enough
3 about what happened here to be willing to express
4 an expert opinion.
5 BY MS. POWELL:
6    Q. Okay. And you haven't requested any
7 additional records?
8    A. No.
9    Q. And he hasn't provided you any additional
10 records since he sent this binder, is that correct?
11    A. I looked at something today that.
12    MR. LONDRIGAN: We promised to try and
13 make sure that he has complete records sometime
14 before this trial.
15 BY MS. POWELL:
16    Q. Well, what else was it that you looked at
17 today?
18    A. Just a few notes from -- from, that they
19 were just provided with for the last, I don't know,
20 six, eight months.
21    Q. Okay. I'll tell you what, since you gave
22 me this other record regarding 6/8, I'm going to
23 skip down.
24    Do you have any specific criticisms of

## Page 38

1 Doctor Lochard, Doctor Hughes Lochard?
2    A. Hughes Lochard? Let me see. I need to
3 find out where his name appears in the chart to
4 tell you.
5    Can I have --
6    Q. You sure can.
7    A. Since we brought this in, we might as well
8 use it.
9    All right. Now, you want to tell me
10 where to start looking or --
11    Q. No. I just want to know what you're going
12 to say about Doctor Hughes Lochard.
13    A. I wrote his name someplace. See if I can
14 find it.
15    Q. Well, would you agree with me, Doctor,
16 that his name is not listed on Exhibit 1?
17    A. It's not listed in A, B -- A or B.
18    Q. No, I'm talking about Exhibit 1 that I
19 handed you?
20    A. Oh, no, it's not listed in Exhibit 1. No,
21 it's not.
22    Doctor Weller, Tenney, Anderson,
23 Lochard.
24    Here, we go. Lochard, when did he see

## Page 39

1 him? He saw him, let's see, Script, QID.
2    Let's see what that is. Four times a
3 day. See script. Now, is that -- let's just find
4 out where that is here. Let's find out what it is.
5    Where was the copy of that? What page
6 is the copy of that prescription on? I want to see
7 that script, 12/4/03.
8    12/4/03, here's the thing that says
9 Maxitrol ophthalmic ointment apply left eye four
10 times a day, Nurse somebody, Bosey or something.
11 It was apparently a verbal order from Doctor
12 Lochard, and the prescription for this Maxitrol,
13 I'm sorry, I can't do this any faster, but this is
14 a huge chart and you've got a lot of new players in
15 here, a lot of new people that I don't know.
16    There is a prescription, that was
17 chart copy of a prescription. It's got to be,
18 let's see if I can find it.
19    There is a copy of a prescription that
20 was written by Doctor Zeh, Z-E-H, that calls for it
21 to be dc'd after several days, and I'm sure that's
22 in here.
23    Here it is. All right. I'll show you
24 this is the prescription that was written by Doctor

## Page 40

1 Zeh. It says Maxitrol four times a day, okay,
2 times three days, then dc to the left eye. That
3 prescription was written on the 6th of November.
4    MR. TENNEY: Of what year?
5    THE DEPONENT: '03, excuse me. Here is a
6 verbal order from Nurse Bower or something rather,
7 that she took from Doctor Lochard that says, use
8 Maxitrol ointment, apply OS four times a day.
9 That's the left eye.
10 BY MS. POWELL:
11    Q. Yes. And what is your opinion?
12    A. Well, he didn't follow the
13 ophthalmologist's order.
14    Q. Do you know what information specifically
15 was provided to Doctor Lochard?
16    A. I would assume the prescription is.
17    Q. Do you know whether or not he ever saw
18 that prescription?
19    A. No, I do not.
20    Q. Okay. And do you know how that verbal
21 order came about?
22    A. I do not. I do not.
23    Q. You don't know what information was ever
24 given to Doctor Lochard, right?