## Page 81

1 and he may or may not even know who he was. You
2 know, that peeked my curiosity to find out who he
3 was.
4 BY MS. POWELL:
5   Q.  Well, let me just ask you this. Was there
6 anything when you read Doctor Zeh's deposition that
7 struck you as, oh, I don't agree with this?
8   A.  **No. I think he did a very good job for**
9 **where he was.**
10  Q.  Okay. And, again, you're not criticizing
11 any care provided by any of the outside physicians,
12 right?
13  A.  **No, I am not. I am not.**
14      MS. POWELL: All right. I don't think
15 I've going to have very much more.
16      THE DEPONENT: Could I get a glass of
17 water?
18      MS. POWELL: Sure. We can take a little
19 break.
20      THE DEPONENT: I don't really need a
21 break.
22      MR. LONDRIGAN: Unless the others
23 assembled want to take a short break.
24      THE DEPONENT: I'd just as soon go on.

## Page 82

1       MS. POWELL: I'll let someone else start
2 questioning.
3            (Whereupon there was a recess
4              taken.)
5            (Defendant's Exhibit No. 3 was
6              marked for identification.)
7       MS. POWELL: Thank you very much, Doctor.
8            CROSS EXAMINATION
9 BY MR. TENNEY:
10  Q.  Doctor, let me show you what's been marked
11 as Defendant's Number 3.
12       Can you tell us what that is?
13  A.  **It's notes I made myself when I was going**
14 **through this voluminous record.**
15  Q.  And that's, the exhibit is actually a
16 copy, is it not?
17  A.  **Yes, it is.**
18  Q.  And is it a double-sided copy?
19  A.  **Yes, it is.**
20  Q.  And what's on the other side?
21  A.  **It says McCroy Medical Timeline,**
22 **Confidential Attorney Work Product.**
23  Q.  And that used -- the original of that
24 document has three holes punched in it?

## Page 83

1   A.  **It was in this binder, and I needed a**
2 **piece of paper and that was convenient, otherwise**
3 **it would have been the last page or the first page**
4   Q.  Okay. So that Exhibit Number 3 includes
5 all the notes that you made on your review of
6 the --
7   A.  **Uh-huh.**
8   Q.  -- documents in the binder?
9   A.  **Yes.**
10  Q.  And while we're talking about that binder,
11 I'd like to put an exhibit sticker on that. Call
12 it Exhibit Number 4.
13      THE DEPONENT: I would like to take that
14 binder with me if I'm going to have to testify.
15      MR. LONDRIGAN: That's all right. We'll
16 make copies for all of these people.
17      THE DEPONENT: All right.
18      MR. LONDRIGAN: They're going to fill in
19 the blanks.
20      MS. POWELL: Why don't we make it Group
21 Exhibit 4 and we can reference all those numbers?
22      MR. TENNEY: Why don't we just let the
23 reporter take a break here and call it Group 4?
24

## Page 84

1           (Defendant's Group Exhibit No. 4
2             was marked for identification.)
3 BY MR. TENNEY:
4   Q.  Now, we just, in the short break there, we
5 just put an exhibit sticker, Group Number 4 on your
6 black three-ring binder, did we not?
7   A.  **You did.**
8   Q.  And is that the binder that you've
9 referenced in the earlier part of your testimony --
10  A.  **Correct.**
11  Q.  -- when Ms. Powell was asking you
12 questions?
13  A.  **Yes.**
14  Q.  And Exhibit Number 3 then includes all the
15 notes that you made on your review of everything in
16 Exhibit Number 3 --
17  A.  **No.**
18  Q.  -- or 4?
19  A.  **No.**
20  Q.  Did you make other notes?
21  A.  **Yes.**
22  Q.  Where are they?
23  A.  **In the binder.**
24  Q.  They're on the various pages.

Page 85

1  A. Correct.
2  Q. Other than what's on Exhibit Number 3 and
3  what are on the documents within the binder, which
4  is Exhibit 4, did you make notes any other place?
5  A. No other place.
6  Q. Did you ever write any kind of report or
7  summary or anything like that?
8  A. Only what's been provided to you in --
9  Q. And that would have been --
10 A. -- Exhibit 1 or whatever that was.
11 Q. Yes.
12 A. Okay. That's it.
13 Q. Now, and this is kind of housekeeping, but
14 on our exhibits, we've got an exhibit sticker on
15 this correspondence. It's an original letter from
16 Doug Quivey dated August 30, '06.
17         That's where the sticker, the exhibit
18 sticker is, correct?
19 A. Yes.
20 Q. But that letter is a transmittal letter
21 with your August 29, '06 report and your CV,
22 correct?
23 A. Correct. I also sent my publications and
24 wherever they were. I don't know where they are.

Page 86

1  Q. I was looking for a paper clip, but I
2  don't, I think we all would agree that Exhibit 1
3  includes all of these documents, that they ought to
4  be kept together. Clip that before the day is
5  over.
6          We were talking or you were talking
7  about Mr. McCroy needing a contact lens fitted for
8  his eye or either of his eyes.
9          Would it require an ophthalmologist to
10 make that fitting?
11 A. Not at all.
12 Q. Can an optometrist do it?
13 A. Could very well.
14 Q. Let's also go back to some of your
15 testimony about an order in November of '03 that
16 Mr. McCroy be restricted from certain things that
17 we need to clarify what your understanding of that
18 is for a one year period.
19         Do you remember that?
20 A. Uh-huh, I do.
21 Q. Okay. Who was it that you think made that
22 order?
23 A. Well, all right. Now, there is several
24 here. Get where I can see this. 11/21/03.

Page 87

1  Q. Is that the one you're referencing?
2  A. There is a bunch of them here. Let me
3  just go through them here: 11/29, weight lifting
4  and sports on 11/29. There is another one that
5  says, isolation for a year, and let me see if I can
6  find that one, Lotemax.
7         MS. POWELL: Doctor, if you would, when
8  you reference documents like that, reference the
9  Section Number in Group Exhibit 4.
10        THE DEPONENT: I don't know what you're
11 talking about.
12        MS. POWELL: There is a number on the
13 side.
14        THE DEPONENT: Constant pain. I think it
15 was this January, so I don't think we've come to
16 it. See, that pressure went up 44. I know it's in
17 here, because I remember it.
18 BY MR. TENNEY:
19 Q. And tell me again, make sure we're both
20 looking for the same thing.
21 A. We're looking for something that says he's
22 got a year, that he's supposed to be kept away from
23 everybody else.
24 Q. While you're looking, are those documents

Page 88

1  arranged chronologically?
2  A. Sort of. I know that's not very
3  satisfying, but it's sort of.
4  Q. Just to whatever might help you. I'm
5  thinking you might find something around
6  November the 29th of '03.
7  A. All right. Weight lifting. I thought
8  there was another page in here. I wonder if I took
9  that out.
10 Q. What's that?
11 A. This says medical assign, reason being
12 assigned medical, but it said they gave a year.
13 They said for a year. Oh, yeah, ending date 12/04.
14 Q. Now, is that a document that this is in,
15 it's the first page under your --
16 A. 141.
17 Q. Tab Number 141, correct?
18 A. Correct.
19        MS. POWELL: Of Group Exhibit 4.
20        MR. TENNEY: Thank you. Group Exhibit 4.
21 BY MR. TENNEY:
22 Q. And the date on it is what?
23 A. 12/29/04 ending date, excuse me, 12/29/0
24 ending date 12/29/04.

89

1  Q. And is there any way for you to identify
2  who the doctor is that made that order?
3  A. That signature right there.
4  Q. So your answer is, I know what your answer
5  is going to be.
6      But you can't read the signature,
7  right?
8  A. I cannot read the signature, as much of
9  the documents.
10  Q. Is that the document you have referred to
11  in your previous testimony when you spoke about
12  someone having placed Mr. McCroy on restriction for
13  one year?
14  A. Yeah. I think there was a transfer
15  document also and I'm not finding that now that
16  also had something on that, and I'm just not
17  finding it. I thought it was a transfer document.
18  I looked at these a couple of weeks ago, so my
19  memory is not serving me well here.
20      I'll have to -- I'm sorry, I can't
21  produce it at this time.
22  Q. Let's go back to the one under Tab 141.
23  It's got a date, and it's got Mr. McCroy's name.
24  It has signatures of physicians or other people

90

1  that we can't read, and the subject on there is,
2  you see where it says medically unassigned?
3  A. Right.
4  Q. Is that significant to you?
5  A. I don't know what that means.
6  Q. Okay. And what is it he's supposed to be
7  restricted from from November 29, '03 to
8  November 29, '04?
9  A. I assume that meant he was in the
10  infirmary.
11  Q. What did you base that assumption?
12  A. Just an assumption.
13  Q. Okay. And then what's the next page under
14  Tab 141?
15  A. It says weight lifting, is restricted from
16  weight lifting and sports and, again, for a year.
17  Q. And that's dated November 29, '03?
18  A. Same date.
19  Q. And stop date November 29 '04?
20  A. Right.
21  Q. And do you have any disagreement with that
22  restriction?
23  A. No.
24  Q. Okay. In your opinion, in fact, would

91

1  that be a good idea --
2  A. For sure.
3  Q. -- for that period of time, to make those
4  restrictions?
5  A. Yes.
6  Q. Okay. Thank you.
7      You may have said in some of your
8  earlier testimony that Doctor Zeh had imposed some
9  sort of restrictions over a one year period?
10  A. Uh-huh, yes. I thought -- I thought I saw
11  something and, I'm sorry, I can't produce it, but
12  thought I saw something which said Zeh said in
13  November or when he sent him back, after he too
14  the sutures out, that he was, I thought he put a
15  one year restriction on him at that time and, I'm
16  sorry, I can't produce it, but I think it's in
17  here.
18  Q. You think it's in --
19  A. I don't think I dreamed it.
20  Q. You think it's in the binder, which is
21  Group Exhibit 4?
22  A. Yeah. Someplace in here. It could have
23  been in his testimony too. He gave several, you
24  know. No, it wouldn't have been in his testimony

92

1  Q. Is the transcript --
2  A. It could have been in his testimony.
3  Q. Is the transcript of Doctor Zeh's
4  testimony in Exhibit Number 4?
5  A. Yes.
6  Q. So --
7  A. It's the first part, the very first thing.
8  Q. I want to make --
9  A. And I would be happy to research this fo
10  you, okay, and look for it, because it bothers me
11  that I can't produce it, because I didn't dream it
12  up. I know it's significant.
13  Q. I want to make sure that, as best I can, I
14  understand all the criticisms that you have
15  generally or specifically in any aspect of Mr.
16  McCroy's care or his lawsuit, and I don't want to
17  put words in your mouth. I want to tell you what
18  my notes reflect you've talked about and make sure
19  that we're complete.
20  A. For sure.
21  Q. I think the first thing you said was that
22  he -- something happened and he got steroid induced
23  glaucoma and that shouldn't have happened, is that
24  correct?

Page 93

```
 1    A.  He got steroid induced glaucoma.  I didn't
 2  say that that shouldn't have happened.  The
 3  Maxitrol should have been discontinued as per
 4  Doctor Zeh's order and that didn't happen.
 5    Q.  Okay.  And was the steroid induced
 6  glaucoma a consequence of the failure to
 7  discontinue Maxitrol in your opinion?
 8    A.  Yes.
 9    Q.  And do you have any opinion about who is
10  responsible for the failure to discontinue
11  Maxitrol?
12    A.  I don't know if the doctor is responsible
13  and I don't know what the communication was.  I
14  know what Zeh's prescription says, and that's
15  quite -- that's quite clear, and I know what was
16  written in the chart.  We've gone over that, not
17  the chart, the record.  All I know is the beginning
18  and the ending.  I don't know the in-between.
19    Q.  So you don't know who or you don't have
20  any opinion about who is responsible?
21    A.  No, I do not.
22    Q.  For --
23    A.  I know that it was signed by a doctor,
24  okay, or not signed, but it said verbal order by a
```

Page 94

```
 1  doctor, but I don't know what he knew.
 2    Q.  What was the verbal order?
 3    A.  Well, it says four times a day on that
 4  December, we did all of that, December 19th or --
 5    Q.  Is that the same order that says
 6  discontinue after --
 7    A.  No.  It was the one I -- oh, I got to go
 8  through here again.  That was December, excuse me,
 9  that wasn't December.  It was -- yeah, it was,
10  December 19th.
11    Q.  Of what year?
12    A.  I think '03.
13    Q.  '03?
14    A.  I think.  Isn't that what we were talking?
15    Q.  I think.
16    A.  Yeah.  I think that's it.  Oh, I pulled
17  that out.  No, I didn't pull it out.  We pulled it
18  out now.
19    Q.  Thank you.  What Tab did that come out of?
20    A.  143.  You know, I'm really sorry I can't
21  put my finger on this stuff faster but.
22        (Defendant's Exhibit No. 5 was
23          marked for identification.)
24
```

Page 95

```
 1  BY MR. TENNEY:
 2    Q.  Let me show you what's been marked as
 3  Defendant's Exhibit Number 5, I believe, is that
 4  right?
 5    A.  Yes.
 6    Q.  And what's the pertinent part of that?
 7    A.  12/9/03, it says, there is an order here
 8  that says Maxitrol ophthalmic ointment, apply OS
 9  QID.  It says printed physician name is Lochard I
10  believe and noted by B. Bower or I think that's B.
11  Bower, RN.
12    Q.  And what's indicated in regards to
13  Maxitrol?
14    A.  Four times a day.
15    Q.  Is that inconsistent with --
16    A.  With the prescription that we did.
17    Q.  -- the prescription?
18    A.  Yes.
19        MR. LONDRIGAN:  What are the two dates?
20        THE DEPONENT:  And the prescription was
21  written on 11/6/03, and it says Maxitrol Ophthalmic
22  ointment, apply OS QID times three days and then
23  dc'd on 11/6.  That would mean it should have been
24  dc'd on 11/9.
```

Page 96

```
 1  BY MR. TENNEY:
 2    Q.  Getting back to the other general
 3  criticisms you might have.  We've spoken about the
 4  failure to discontinue Maxitrol and the steroid
 5  induced glaucoma.  I also understood you to say
 6  that you think it was inappropriate for Mr. McCroy
 7  to have been released from wherever he was,
 8  presumably in the infirmary into general
 9  population, is that correct?
10    A.  That is correct.
11    Q.  And are there any particular people that
12  you are critical of in that regard?
13    A.  I don't know whose responsibility that is.
14  That's not -- I don't know the chain of command or
15  the line or who is responsible or who is
16  responsible for picking his roommate.
17    Q.  Okay.
18    A.  That was -- that's not available to me and
19  I doubt that I'm going to see that, and I don't
20  know that it's my responsibility as a physician to
21  pinpoint who in the system was responsible for
22  that.
23    Q.  I understood that one of your other
24  criticisms of the treatment and care provided to
```

97

1  Mr. McCroy generally was that he was not fitted for
2  a contact lens, is that correct?
3      A.  Many, yes.
4      Q.  Are there any particular people that you
5  are critical of in that regard?
6      A.  Well, let's, you know, I mean, the last
7  note was probably in May of '02, and he was
8  supposed to be fit at that time and, to my
9  knowledge, or refit. He always has had a contact.
10 The problem is he can't tolerate wearing it and the
11 contact is probably incorrectly fitted for his eye,
12 that contact probably was.
13          So whoever was responsible for his
14 care from the period of, let's just say May 13th of
15 '02 to the current time.
16     Q.  How is that May 13th date significant?
17     A.  Well, that's just one I took from the
18 chart, which he actually had pretty good vision
19 with his right eye and they were going to fit him
20 about a contact, and there was never really an
21 awful lot of follow-up on it that I could see, and
22 it looked like the guy was doing a pretty good job
23 with him, and then all of a sudden there is no more
24 notes and he still has this old contact, and

98

1  whoever was responsible -- who ever is responsible
2  for his care in that period of time.
3          Now, again, I don't know whether
4  that's responsibility of the warden, because I
5  notice in there at one point in time there were
6  three or four different cancellations of contact
7  lens things. Two or three of them were for
8  weather, and I can't -- I've lived in Illinois. I
9  don't know, but maybe once for weather, you know,
10 but there is just so much. So he has had at least
11 four years where he should have been refitted. And
12 he needs to have a contact lens, because it helps
13 correct his irregular stigmatism.
14     Q.  Did you, on your notes, which are
15 portrayed by this Exhibit Number 3, did you make a
16 note of that May 13, '02 date?
17     A.  No. I just looked at it. 5/13/02.
18     Q.  I see that, and that's kind of over on the
19 right side?
20     A.  Yeah. After that point of time, I think
21 that was when he was fit. I didn't tell you that
22 these are legible or make any sense. These are my
23 notes for my brain.
24     Q.  What do those mean by abbreviations? What

99

1  did you write down relative to May 13, '02?
2      A.  I said 20/30 and I got a couple of
3  exclamation marks. That's the best vision he ever
4  had in that eye, and I think that is absolutely
5  outstanding. The only time he ever had it was at
6  that time in that office, and that's why I made
7  note of that. There was never anything of the
8  vision in a report from anybody else in that right
9  eye that has ever been about 2200 or 2400, and th
10 fact that he got that from that eye, the fact that
11 he should have had that contact and he should hav
12 been a follow-up on that contact, and you'd
13 probably had a different person now, but that
14 didn't happen and it's probably too late.
15     Q.  Is there anything significant in regards
16 to this May 13, '02 date --
17     A.  No.
18     Q.  -- in connection with --
19     A.  That was when he was supposed -- I belie
20 that he did it with a Rose set, and I believe he
21 gave him his own personal contact to take home,
22 that the optometrist did.
23     Q.  Do you know who that was?
24     A.  Well, you can go look at that and find out

100

1  on May 13, '02.
2      Q.  Can you find that readily?
3      A.  Well, I'm sure I could, not readily, but
4  I'm sure I can find it.
5      Q.  Why don't we see who that was?
6      A.  Okay.
7          Do you have any -- well, let's just
8  start here. I'm sorry, I'm in the wrong year.
9  We're getting closer.
10          Here it is. Plattner, and he says
11 he's got -- he says here, with his contact he's
12 got -- achieved 20/30 vision, good contact lens
13 fit, a lot of discomfort with the left eye. It
14 says return to Doctor Anderson.
15          He has Hydrops, use Artificial Tears
16 and he's to return three weeks follow-up for
17 contact lens fitting.
18     Q.  Okay. Before we get too much off track in
19 terms of identifying the things that you are
20 critical of generally, is there anything else?
21 We've most recently talked about the fact that he
22 was not fitted for a contact lens?
23     A.  Here's what I'm critical of, okay. I'm
24 critical of the fact that he's never really been

                                                                                          101
1  fit for contact lenses, very little follow-up, and
2  any continuing care. Because as your colleague had
3  asked me, this is a continually changing problem
4  that worsens. That's number one.
5           Number two, there is some culpability
6  with the steroid induced glaucoma. But I think
7  that's probably a mute point, because he lost his
8  eye, which I think is much more culpable, and I do
9  believe, if he had not been in the general
10 population or he had a more benign assignment for
11 roommates, that he probably would not have lost his
12 other eye. That's it.
13     Q. That's all I want to do, is make sure that
14 we know all of your criticisms are.
15          Let me show you what had earlier been
16 marked as Defendant's Exhibit Number 2. Do you
17 recognize that note?
18     A. Uh-huh. Yes, I do.
19     Q. Do you see near the bottom, June 8, '04 at
20 apparently 10:10 a.m., it's noted, no yard or gym
21 due to eye condition, decreased visual acuity? Do
22 you see that?
23     A. Yeah, by Doctor Anderson.
24     Q. Was that appropriate at that time?

                                                                                          102
1      A. Absolutely. I wish he had called them up
2  and said, you know, this guy shouldn't be in the
3  general population either, but he didn't.
4      Q. Do you have any criticisms of anything
5  that Doctor David Anderson did or did not do
6  relative to Mr. McCroy's care?
7      A. I believe he probably -- he actually saw
8  him a lot. I believe he probably -- this goes back
9  to the contact lens issue, and getting it fit with
10 a contact lens. And you just don't send a contact
11 lens to an infirmary and have the patient wear it.
12          And, I mean, it's just specifically
13 for Doctor Anderson, I believe that he could have
14 been a little bit more attentive to the contact
15 lens issue and getting him to somebody who could
16 fit him. But I do a lot is placing those
17 restrictions on him, I think that's very good.
18     Q. So your criticism of Doctor Anderson is --
19     A. Only with the contact lens.
20     Q. And what should he have done that he
21 didn't do?
22     A. Well, I think all through here, he never
23 gets back for follow-up for contact lens or for the
24 fitting. It's all through.

                                                                                          103
1      Q. Do you have any other criticism of Doctor
2  Anderson --
3      A. No.
4      Q. -- aside from --
5      A. No, I do not.
6      Q. -- that?
7      A. No, I do not.
8      Q. If Doctor Anderson made another note on
9  June 8, '04 later in the day that Mr. McCroy was
10 restricted from contact sports and weight lifting
11 over five pounds, would you concur with that
12 restriction?
13     A. Absolutely.
14     Q. Do you know whether or not Doctor Anderson
15 was involved to any degree in the decision to move
16 Mr. McCroy from the infirmary to the general
17 population?
18     A. I do not.
19     Q. Do you know if Doctor Anderson was
20 involved in any way in the decision about which
21 roommate or cellmate to give Mr. McCroy?
22     A. I do not.
23     Q. I'm kind of going backwards here. You
24 retired from the practice of ophthalmology in

                                                                                          104
1  September of 1994?
2      A. Correct.
3      Q. And prior to that you had practiced here
4  in Springfield in that type of practice since 1972?
5      A. Correct.
6      Q. So you practiced here in Springfield for
7  22 years?
8      A. Correct, I guess.
9      Q. And prior to that you were in the
10 military?
11     A. Correct.
12     Q. For how long were you in the military?
13     A. Two years. I was a ophthalmologist in the
14 military. One of those years I was in Southeast
15 Asia.
16     Q. And did you practice ophthalmology
17 anywhere before you went to the military?
18     A. No. I was a resident as Barnes.
19     Q. Have you -- have you done transplant
20 surgery before?
21     A. Yes.
22     Q. And have you treated patients with
23 Keratoconus?
24     A. Yes.

### 105

1  Q. Is that common in your practice?
2  A. No.
3  Q. How many Keratoconus patients do you think
4  you treated in your career?
5  A. I don't know. I had a lot of Downs
6  Syndrome children in my practice, and that's pretty
7  common with them or not uncommon.
8  Q. What about adults, did you treat very much
9  adults with that condition?
10  A. Well, not all the Downs Syndrome were
11  children. Some of them were adults. Yeah, I
12  treated some adults with it.
13  Q. Is Keratoconus a common condition?
14  A. No.
15  Q. Have you ever given a deposition before
16  today?
17  A. Yes.
18  Q. How many times?
19  A. What kind of deposition?
20  Q. A discovery deposition?
21  A. Well, I mean, you talking medical or, you
22  know, you talking about divorce?
23  Q. Any opinion -- any deposition where you're
24  asked about your opinions?

### 106

1  A. Yes, I have.
2  Q. How many times have you done that?
3  A. I don't know, less than -- less than ten.
4  Q. And then what were the circumstances
5  there? I mean, under what circumstances were you
6  called upon to render opinions?
7  A. I was an expert witness.
8  Q. In more than one case?
9  A. Several, but not more than -- not very
10  many.
11  Q. What kind of cases were they?
12  A. All related to ophthalmology and I've
13  literally given testimony on both, for the
14  plaintiff and for the defendant.
15  Q. Have you ever testified in court in any of
16  those cases?
17  A. No. I don't -- no. No, I didn't. I gave
18  evidentiary deps that were videotaped, but no.
19  Q. Was Mr. Londrigan in any of those cases?
20  A. One of them.
21  Q. Is that how you met Mr. Londrigan?
22  A. No or maybe two. I don't know.
23  Q. When you testified in the other cases
24  giving depositions or whatnot, did you charge for

### 107

1  your time?
2  A. Yes.
3  Q. At what rate did you charge?
4  A. You know, I don't remember. I was tryin
5  to remember that today. I just don't remember.
6  Q. Let me show you Exhibit Number 3 if you
7  don't mind. In the top right, you know, if I
8  understand right, those are notes that you made
9  while you were reviewing the documents in Exhibit
10  Number 4, is that right?
11  A. Yes. Actually, it was the second time
12  that I reviewed them.
13  Q. Did you make any notes the first time
14  around?
15  A. No, only in the record.
16  Q. There in the top right there is a
17  handwritten note, Doctor Anderson.
18      Do you see that?
19  A. Uh-huh.
20  Q. And above that there is the name of the
21  word Tenney.
22  A. Uh-huh.
23  Q. Do you know why that's there?
24  A. I put it there, because that was the --

### 108

1  8/5/02, that's when they first entered the pictur
2  I was trying to figure out who did what, you knov
3  And, well, she, you know, let the record reflect
4  that one of the counselor's giggled, and then that
5  is really correct. This is very difficult to go
6  through here and figure out who is responsible a
7  who is doing what from this record as you well
8  know, sir.
9  Q. What's the reference to Tenney?
10  A. Well, that's when -- that must have been
11  the first time he was there, 8/5/02. That must
12  have been something in the record that reference
13  in there.
14  Q. I think that's me, and I'm just wondering
15  why my name is on your notes.
16  A. Oh, because you asked a question in a
17  deposition. Okay. You asked a question in a
18  deposition of Zeh or Zeh, okay, and the question
19  you asked him, you asked him if he had anything
20  if he knew of anything wrong with Mr. Anderson,
21  Doctor Anderson, and I giggled when I saw that,
22  because I didn't think he knew who Anderson wa
23  and if he did, he had much more concerns during
24  that deposition than him, and I just thought that

109

1 made me giggle.
2 Q. Who had concerns?
3 A. Zeh, Zeh. How do you say his name? Is it
4 Zeh?
5 Q. I think it's Zeh.
6 A. Okay.
7     MR. TENNEY: Okay. That's all I've got
8 for you.
9     EXAMINATION
10 BY MS. CHOATE:
11 Q. Hi, Doctor. I'm Kelly Choate and I
12 represent the Department of Corrections Defendants.
13     Let me ask you first as a general
14 proposition. You said earlier that you don't know
15 how the prison system works. Is that fair?
16 A. That's correct.
17 Q. And you don't know who makes the decision
18 as to when to send someone outside, is that
19 correct?
20 A. That's correct.
21 Q. Is it fair to say that the decision as to
22 what care is to be provided, what medical care,
23 would be made by a physician?
24 A. I would hope.

110

1 Q. In your review of the records did you find
2 that the decisions as to what care Mr. McCroy
3 received was made by physicians?
4 A. I couldn't tell.
5 Q. There were notes in the medical records
6 and you couldn't tell if they were physicians or
7 someone else?
8 A. Correct.
9 Q. Would you expect that lay people would be
10 ordering things in a medical record?
11 A. Well, you know, canceling appointments
12 doesn't, you know, there were appointments that
13 were canceled that weren't canceled by anybody that
14 had any kind of a medical degree.
15 Q. But you don't know who canceled those
16 appointments, do you?
17 A. No, I do not.
18 Q. And you don't know what considerations
19 would go into canceling a medical appointment, do
20 you?
21 A. No, I do not.
22 Q. And you don't know what security measures
23 might be in place relative to an appointment with
24 an outside vendor?

111

1 A. Absolutely correct.
2 Q. And as you sit here, you don't know what
3 the weather was on those dates that were
4 referenced, correct?
5 A. No, I do not.
6 Q. Now, when you talk about the Department of
7 Corrections deviating from the care of -- let me
8 strike that.
9     Do you have any opinion as to how
10 Dennis Hockaday might have figured into any of Mr.
11 McCroy's care or anything having to do with this
12 case?
13 A. I do not know Dennis Hockaday, who he is.
14 Q. Do you know who David Schnepel is?
15 A. No, I do not.
16 Q. Do you know who Sandra Funk is?
17 A. I believe I've seen her name in the
18 report, but I do not know, no.
19 Q. How about Pam Graubean?
20 A. No.
21     Are all these signatures presented
22 legibly in the records?
23 Q. These are, for the record, these are the
24 defendants that I represent who are either

112

1 administrators, nonmedical administrators or who
2 are nurses who work as health care unit
3 administrators.
4 A. Just for my own knowledge, would I have
5 access to their names in this document that you've
6 provided for me?
7 Q. That's what I'm asking you.
8     Did you come across their names
9 anywhere in the records you were provided?
10 A. I'm just going to tell you Funk, I think I
11 saw that name in there, but other than that, those
12 others, I just don't remember seeing them, but I
13 don't know that they're there.
14 Q. Let me ask you --
15 A. Would you like to look through there and
16 tell me if they're there?
17 Q. I can tell you that most of them are not,
18 because they are not medical providers.
19 A. Okay.
20 Q. And -- but you said you've also looked at
21 other documents.
22 A. No, just these documents. I didn't say
23 that.
24 Q. Okay. Now, would you agree with me that

113

1  Mr. McCroy received medical care for his
2  Keratoconus while in the Department of Corrections?
3     A.  Yes.
4     Q.  Would you agree with me that he received
5  care from specialists for his Keratoconus while in
6  the Department of Corrections?
7     A.  Yes.
8     Q.  More than one specialist?
9     A.  Many.
10    Q.  And this care has been ongoing since, at
11 least the beginning of the records that you've
12 seen?
13    A.  Define ongoing for me, please.
14    Q.  From the records you testified earlier
15 that you had began in '99, is that correct?
16    A.  Uh-huh.
17    Q.  And you said went up to '06.  We've had
18 some disagreement.
19    A.  No, no.  Ongoing to me would be continual,
20 okay, continual, without a pause.  Okay.  And
21 following, you know, if you use the drops four
22 times a day for two days, you do that, and then
23 come back in three months, you come back in three
24 months.  I would say this, it's been discontinuous

114

1  care.
2     Q.  But he has --
3     A.  I'm not saying --
4     Q.  -- discontinuous care.
5         Let me ask you this, Doctor.
6         Has he continued to see physicians
7  throughout the medical records, whether you
8  consider it continuous or not?
9     A.  Yes, yes, but I don't know within the last
10 couple of years.
11    Q.  Because you don't have the records for
12 that time period?
13    A.  I have no indication.
14    Q.  Okay.  So as you sit here, although you
15 claim he is currently in --
16    A.  I'm sorry, I didn't make any claim.
17    Q.  In Exhibit 1, which is your document that
18 you put as your expert opinion --
19    A.  Uh-huh.
20    Q.  -- you said the patient is currently at
21 risk for further vision loss, which may make him
22 unemployable upon his release.
23        Upon what do you base that since you
24 don't know what his current condition is?

115

1     A.  From Michael Kass's report, which is
2  really the last medical piece of thing in the
3  record.
4     Q.  And you don't know what's happened since
5  Michael Kass saw him?
6     A.  No.
7     Q.  And you don't know what records Michael
8  Kass reviewed in making his opinion, do you?
9     A.  No.
10    Q.  Or that any history was given to Michael
11 Kass other than that by Mr. McCroy, is that fair?
12    A.  Correct.
13    Q.  Now, you've talked about the fact that you
14 are critical of the fact that Mr. McCroy was placed
15 in general population, is that correct?
16    A.  Correct.
17    Q.  Now, isn't it true, Doctor, that from the
18 records we have in front of us, Mr. McCroy was in
19 the health care unit in the infirmary as you've
20 called it, from at least the time of his corneal
21 transplant until June of -- in February of '03,
22 which is when the transplant happened, to June
23 of '04, is that fair?
24    A.  Was that the date?  I'm sorry.  Yes.

116

1     Q.  So he was in the health care unit for over
2  a year after his corneal transplant, is that
3  correct?
4     A.  I believe that's true.
5     Q.  Now, in your experience as a physician, as
6  an ophthalmologist, do you know of anybody who has
7  remained in the hospital for a year after a corneal
8  transplant?
9     A.  Excuse me.  He wasn't in the hospital, w
10 he?
11    Q.  He was in the infirmary?
12    A.  Well.
13    Q.  I'm asking you, do you know of anyone in
14 the hospital for a year?
15    A.  No, I don't know anybody who's ever be
16 in a hospital.
17    Q.  Let me ask you this, Doctor --
18    A.  But I don't know that your infirmary is a
19 hospital.  I would take issue with that.  I would
20 take a great deal of issue, the fact that you
21 equate your infirmary as a hospital, and I do thir
22 the people in St. John's and Memorial would too.
23    Q.  For purposes of this deposition, would you
24 agree that to have someone or let me strike that.

117

1    When would you expect a patient in the
2 general public to be, you know, with no
3 complications, just your basic corneal transplant,
4 when would you expect them to be discharged from
5 the hospital to home?
6    A.  Soon.
7    Q.  What do you mean by soon?
8    A.  Within a week, ten days.  Depends on how
9 they did, maybe even earlier today than it used to
10 be.  They don't need to be in the hospital very
11 long.
12         What they don't need to do is be hit
13 in the eye.
14    Q.  Would you agree with me that a person can
15 be hit in the eye at anytime outside in the general
16 public?
17    A.  Absolutely.
18    Q.  Would you agree that if a person goes home
19 with children, that children are highly likely to
20 hit somebody in the eye, even an accident?
21    A.  No, I disagree with that.  I don't think
22 children are highly likely to hit anybody in the
23 eye, but it could happen.
24    Q.  It could.  And a person who --

118

1    A.  They could also be hit with a golf ball
2 going down the street.
3    Q.  Absolutely.
4         A person could be in a car wreck,
5 correct?
6    A.  Absolutely.
7    Q.  So there are many things that could happen
8 to a person's eye in the general public?
9    A.  Absolutely.
10    Q.  You don't know as you sit here what Mr.
11 McCroy's disciplinary background was, do you?
12    A.  Absolutely not.
13    Q.  And you don't know as you sit here what
14 caused the fight that led to him losing his eye, do
15 you?
16    A.  I read a number of counts in there and,
17 no, I don't know what caused the fight.
18    Q.  So you would probably tell one of your
19 patients in the general public not to pick a fight
20 either, would you?
21    A.  I would tell my patient not to fight,
22 although I don't think I would have to.
23    Q.  You've talked about having the
24 restrictions and the restrictions lifted at some

119

1 point.
2    A.  I didn't talk about lifting.
3    Q.  You didn't say that the restrictions were
4 lifted at the time that he was sent to general
5 population, that some of the restrictions at least
6 were lifted?
7    A.  No.  Those were put back.  Anderson put
8 those back.
9    Q.  Is there anything that you saw in those
10 records that indicated Mr. McCroy was not to be
11 around other inmates?
12    A.  Well, he was around other inmates in the
13 infirmary, was he not?
14    Q.  Exactly.
15         So you saw nothing that said he wasn't
16 to be around other inmates at any point?
17    A.  No.
18    Q.  Do you know what medically unassigned
19 means?
20    A.  No.
21         MS. CHOATE:  I don't believe I have
22 anything else.
23         MS. POWELL:  I just have a couple other
24 questions.

120

1         REDIRECT EXAMINATION
2 BY MS. POWELL:
3    Q.  Doctor, did you ever treat any inmates in
4 the course of your practice?
5    A.  Yes.
6    Q.  And how did that come about?
7    A.  They brought them in.  I saw them.
8    Q.  And you agreed to do that, right?
9    A.  Yes.
10    Q.  And you were paid for that?
11    A.  Presumably.
12    Q.  You don't recall?
13    A.  No.
14    Q.  Do you know in this case how many eye
15 doctors were approached to provide care for Mr.
16 McCroy?
17    A.  No.
18    Q.  Do you know how many refused?
19    A.  No.
20         Are you asking me if I would have?
21 would have provided care for him.
22    Q.  Right.  But you don't know how many
23 doctors have been approached to provide care to
24 him, do you?