### Page 121

1  A. No, I do not.
2  Q. And if they refused, you don't know why
3  they refused?
4  A. No.
5  Q. And you're not aware of any other
6  specifics as to why a physician may not have seen
7  Mr. McCroy again, right?
8  A. No. The price of medicine has changed
9  since I was there.
10  Q. Okay. And you would agree that a
11  physician has the right not to see a particular
12  patient if they choose to, right?
13  A. Right, certainly.
14      MS. POWELL: That's all I have. Thanks.
15              EXAMINATION
16  BY MR. LONDRIGAN:
17  Q. Based on the information that I've been
18  able to provide you, do you have any idea or
19  conclusion or opinion who is responsible on behalf
20  of Wexford, Department of Corrections, to
21  reassigning this inmate/patient from community to
22  community, ophthalmologist to ophthalmologist over
23  the past six years?
24  A. No. I have no idea. That does seem sort

### Page 122

1  of strange to me, that he's been in a whole bunch.
2  Maybe this is standard operating procedures, but it
3  seems to me that he's been in at least four or
4  five, maybe more institutions and I don't
5  understand why.
6  Q. Is it important in the treatment of a rare
7  eye, such as Keratoconus, for there to be a
8  continuity as far as that treatment is concerned
9  with a primary ophthalmologist?
10  A. Or optometrist. I would think that, yes.
11  I would think there needs to be continuity of care,
12  because as you alluded to, this is a progressive
13  disease, and how do you know if it's -- if a tree
14  has grown if you haven't seen the tree, you know,
15  three or four months before? You know, if this is
16  the first time you've seen the tree, you don't know
17  if it's grown.
18      MS. POWELL: I'm --
19      THE DEPONENT: I'm sorry.
20      MS. POWELL: I want to object to both the
21  question and the answer as both, neither of that
22  information has been previously provided in your
23  disclosures. So with respect to any questions
24  you're going to ask --

### Page 123

1      THE DEPONENT: Wait a second. Counselor,
2  I don't want to be argumentative.
3      MS. POWELL: I'm just making legal
4  objections. You can ask him all the questions
5  you'd like, but just for the record, I'm going to
6  object to any information --
7      MR. LONDRIGAN: She might tell me
8  something that I don't know. Go ahead.
9      MS. POWELL: I'm just going to object to
10  any information that has not been previously
11  disclosed in Exhibit 1 as it pertains to this case.
12      MR. LONDRIGAN: Well, I object to
13  information not being previously disclosed, so it
14  could be communicated to me and to this witness.
15  BY MR. LONDRIGAN:
16  Q. As you sit there today, do you know who,
17  either alone or in combination with somebody else,
18  either for Wexford or the Illinois Department of
19  Corrections, that made the decision, based upon
20  your review of these limited records, Doctor Kass's
21  report, and also the treating ophthalmologist, that
22  it was appropriate, based upon the conditions at
23  that time, for this prisoner/patient to be
24  transferred into the general population and

### Page 124

1  assigned, not just one cellmate, but several
2  different cellmates?
3      MS. POWELL: Okay. Wait a second. Same
4  objection, no foundation, leading, something else,
5  wait a second, compound question.
6  BY MR. LONDRIGAN:
7  Q. All right. I'm not sure you understand or
8  need to understand her objection.
9      But based upon your training as an
10  ophthalmologist and your understanding of the
11  condition that presented itself to employees of
12  Wexford and the Illinois Department of Corrections,
13  do you see any medical indications why this
14  particular patient should be assigned into general
15  population and assigned several different
16  cellmates?
17      MS. POWELL: Same objection, leading,
18  compound, not previously disclosed, and no
19  foundation. You can answer, Doctor.
20  BY MR. LONDRIGAN:
21  Q. If you can remember that question, go
22  ahead and answer it.
23  A. Let me answer the cellmates, multiple
24  cellmates. If we're talking in the postop period,

### Page 125

and we're talking a release from the infirmary, I don't think that should have been done.

If you're talking in the preop period when, in the nineties, earlier part of the nineties, I have no opinion on that. I don't think that would have influenced his outcome.

The fact that he was put in many, many prisons and has seen many, many different ophthalmologists and optometrists, I do think it is detrimental to his care. I do think you need continuity of care.

I don't think it necessarily had to be one ophthalmologist or one optometrist, but I certainly don't think it ought to have been 15 or 20 or whatever vast number there is portrayed in this chart or record.

I think several would have been -- would have been appropriate, and I think they need to keep coming back and it doesn't happen to this guy.

Q. More importantly, based on the information that I've been able to provide you and that you've shared with these attorneys present at this table, can you determine as you sit there today who made

### Page 126

these decisions?

A. Absolutely not.

Q. Can you determine as you sit there today who made the decision to continue him on the Maxitrol in derogation of the prescribed medication that was given him by one of his many treating ophthalmologists?

A. No, I cannot.

Q. What would you need to see so that we collectively could make that determination?

A. Some records. But, you know, Tom, part of the problem I've got is, I don't know who did what. And, you know, I'm looking at this, I've read this twice, and I read this with a pretty critical mind, you know, and I just -- it's really hard to tell, you know, who is responsible.

When I say who did what, I'm talking about as far as moved him from one prison population to another or moved him from one prison to another, you know.

Q. Assuming that at sometime in the undefined future that Aaron McCroy is released from prison and sent into the general population, either to his family or elsewhere, do you have an opinion whether

### Page 127

or not he's currently disabled from gainful employment?

A. Yeah. You know, yeah, he is. No question about it. He's -- I present -- what I did, I did something here that I'd like to share with you guys so that you understand why I really got involved in this.

What I did is, I took Mike Kass's refraction and I did the opposite. Refraction is what you wear for glasses.

MS. POWELL: I object to our answer to the extent that it's nonresponsive to the question. He asked you whether or not the patient was disabled and you're talking about something from Doctor Kass.

MR. LONDRIGAN: Hold on.

THE DEPONENT: If you could let me.

MR. LONDRIGAN: Responsiveness to the answer, the question.

My objection is, you have to have some objection to the substance of the answer of it being inadmissible. I think this is needed by way of clarification and I want to hear his answer. Go ahead and give it.

### Page 128

THE DEPONENT: Okay. This is why he needs a contact.

What I've done is, I've taken Mike Kass's numbers and done the opposite, that would mean that what Mike Kass found, that would correct this. And I've added this Saran Wrap, because in Keratoconus, a stigmatism is irregular and you got these little strings and things that go across, and I put a little bit on here, because he's probably got a little cataract in that eye, and I want you to look through this, each one of you, and hold it right here so it doesn't fall apart, and just see, close one eye and just see what his vision is like. Close your good eye and just peek through that and see what his vision is like. That's his uncorrected vision. You got to hold it up right next to your eye.

Yeah, that's good, and just hold it up and take a look. This is why, yeah, it's terrible.

Just go ahead and do that. I know you don't want to do it, counselor. I'm sorry.

MS. POWELL: I'm sure I can't see through plastic anyway and can't give testimony.

THE DEPONENT: This is what his corrected

**Page 129**

```
 1  vision, uncorrected vision is, and this is why.
 2  I'm sorry you wouldn't look through it.
 3       MS. POWELL:  Well, I'm sorry, I can't see
 4  anything.
 5       THE DEPONENT:  No, you can.  You can see
 6  about 2400 through it.  That's the point, and I'm
 7  really sorry you didn't do it.
 8       But when you put a contact lens on, a
 9  lot of that aberration, the tear film fills this
10  space between the contact and the cornea and it
11  mitigates a lot of that irregular stigmatism, so
12  that he can have pretty good vision with it.
13       Now, whether or not it's better than
14  2400 now, I don't know, because I haven't seen
15  anything.  But he should have had that contact
16  lens.  It would have let him see something with it,
17  and then you do an overrefraction with a pair of
18  glasses, so that's why he needed to have this.  He
19  needed to have this for four or five years.  I'm
20  sorry, I didn't mean to ramble.
21  BY MR. LONDRIGAN:
22    Q.  I've often heard the term used in the
23  legal context, legally blind.
24       Does that mean anything to you as an
```

**Page 130**

```
 1  ophthalmologist?
 2    A.  2400 or less in the best corrected vision
 3  in one eye.
 4    Q.  Why, in your judgment, as an
 5  ophthalmologist was there a limitation that there
 6  be no weight lifting above five pounds?
 7       MS. POWELL:  Objection, leading.  Again, I
 8  want a continuing objection as to any opinions that
 9  have not been previously disclosed.
10       MR. LONDRIGAN:  What was leading about
11  that question?
12       MS. POWELL:  He didn't say that.  Some
13  other doctor did.
14  BY MR. LONDRIGAN:
15    Q.  I asked him and I'll ask it again, why was
16  there a limitation in the records you reviewed,
17  just gave testimony about, that was provided me by
18  the defendants at this table?  Was there --
19       MS. POWELL:  Object to foundation.
20  BY MR. LONDRIGAN:
21    Q.  What was the medical basis for placing the
22  limitation on him to not to lift more than five
23  pounds?
24       MS. POWELL:  Objection as to foundation.
```

**Page 131**

```
 1       THE DEPONENT:  Okay.  I can go ahead ar
 2  answer, correct?
 3       MS. POWELL:  Sure.
 4       THE DEPONENT:  Okay.  When you lift, yo
 5  strain.  Okay.  When you strain, the pressure in
 6  your eye goes up.  Okay.  Pressure in your eye goe
 7  up.  You've got a corneal transplant that you just
 8  took out both running sutures that you really only
 9  wanted to take one out, but he apparently moved
10  blinked his eye or something or other and he took
11  both of them out.  You don't have any vasculation
12  of that cornea.  It's a nice clear cornea.  You've
13  got him on steroids, you know, and you don't wanl
14  that button to come off and don't want any pressu
15  on it.  You want to do whatever you can to let that
16  heal and that's why they put a restriction on it.
17       MR. LONDRIGAN:  That's all I have.
18       MS. CHOATE:  I have a couple of
19  follow-ups.
20            EXAMINATION
21  BY MS. CHOATE:
22    Q.  Doctor, we've talked a lot about the
23  infirmary, the different institutions, but
24  specifically Hill, which is where he was when he
```

**Page 132**

```
 1  got the transplant, you don't know what their bed
 2  space was, do you?
 3    A.  No.
 4    Q.  You don't know what other inmates with
 5  medical needs were there, do you?
 6    A.  No.
 7    Q.  In fact, you don't know what the bed space
 8  of the institution as a whole was, do you?
 9    A.  No.
10    Q.  So you don't know what considerations we
11  faced by the people, whoever they were, who
12  assigned him to the general population?
13    A.  Nope.
14    Q.  And as you sit here, you talked about him
15  being disabled when he leaves the Department of
16  Corrections.
17       Do you know what Mr. McCroy did prio
18  to committing his crime?
19    A.  No.
20    Q.  Do you know what he is trained to do?
21    A.  No.
22    Q.  So you don't know if he would be employe
23  even if he did not have this eye problem, do you?
24    A.  Well, let me put it like this.  If he had
```

Page 133

1  20/20 in his eye, he'd be employable at something.
2      Q.  If he were seeking a job that might be
3  correct, correct?
4      A.  That's not -- do you know that, that he's
5  not seeking a job?
6      Q.  I'm asking you.
7      A.  I don't know.
8      Q.  Do you know what care Mr. McCroy would
9  have received for his eye had he not been in the
10 Department of Corrections?
11     A.  I do not.
12     Q.  And do you know that he, whether or not he
13 would have gotten a corneal transplant if he had
14 not been in the Department of Corrections?
15     A.  Been on Public Aid he probably would have.
16     Q.  If he wasn't on Public Aid?
17     A.  I don't know. I'll tell you, in all
18 honesty, I really think he probably would have. I
19 think he would have found somebody that would have
20 done it.
21     Q.  But you don't know as you sit here whether
22 he would have followed up with the care that he was
23 prescribed had he not been in the Department of
24 Corrections, do you?

Page 134

1      A.  I do not.
2          MS. CHOATE: I don't have anything
3  further.
4          MS. POWELL: I don't have anything else.
5          MR. TENNEY: Nothing.
6          MS. POWELL: Thank you, Doctor.
7          THE DEPONENT: Thank you.
8          FURTHER DEPONENT SAITH NOT.

Page 135

1  McCROY vs. IL DOC. No. 02-3171 Deposition taken on
2  Sept 11, 2006. Attorneys Ms. Powell, Ms. Choate,
3  Mr. Tenney, Mr. Londrigan.
4  STATE OF FLORIDA    )
                       )
5  COUNTY OF           )
6      I, DR. STEPHEN KWEDAR, deponent herein, do
   hereby certify that I have read the foregoing
7  deposition and that it is a true and accurate
   translation of the questions asked of me, and the
8  answers given by me, with the following change(s):
9  PAGE_____, LINE_____
10 CHANGE DESIRED_____
11 REASON FOR CHANGE_____
12
13 PAGE_____, LINE_____
14 CHANGE DESIRED_____
15 REASON FOR CHANGE_____
16
17 PAGE_____, LINE_____
18 CHANGE DESIRED_____
19 REASON FOR CHANGE_____
20      _____
         DR. STEPHEN KWEDAR
21
   Subscribe and sworn to before me
22
   this _____ day of _____,
23
   A.D., 2006. _____
24          NOTARY PUBLIC

Page 136

1  STATE OF ILLINOIS  )
                      )
2  COUNTY OF SANGAMON )
          C E R T I F I C A T E
3
4      I, DONNA M. DODD, a Certified Shorthand
5  Reporter and Notary Public, in and for said County
6  and State, do hereby certify that the Deponent
7  herein, DR. STEPHEN KWEDAR, prior to the taking of
8  the foregoing deposition, and on September 11, 2006
9  was by me duly sworn to testify to the truth, the
10 whole truth and nothing but the truth in the cause
11 aforesaid; that the said deposition was taken down
12 by me in shorthand and afterwards transcribed, and
13 that the attached transcript contains a true and
14 accurate translation of my shorthand notes referred
15 to.
16     Given under my hand and seal this 22nd
17 day of September, A.D. 2006.
18     _____
19     Certified Shorthand Reporter
20     and Notary Public
21     CSR # 084-003912
22
23 My commission expires
24 May 19, 2010.

"OFFICIAL SEAL"
Donna M. Dodd
Notary Public, State of Illinois
My Commission Exp. 05/19/2010