10/15/07
William Zeh, M.D.
McCroy v. Illinois Dept. of Corrections

## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2           FOR THE CENTRAL DISTRICT OF ILLINOIS
 3                    SPRINGFIELD DIVISION
 4
 5   AARON McCROY,
 6            Plaintiff,
 7       vs.                    No. 02-3171
 8   ILLINOIS DEPARTMENT OF
     CORRECTIONS, et al,
 9
              Defendants.
10
11
12
13        THE AUDIO-VISUAL DEPOSITION of WILLIAM ZEH, M.D.,
14   taken in the above-entitled case before Debra K.
15   Baldwin, a Notary Public of Sangamon County,
16   Illinois, acting within and for the County of
17   Marion, State of Indiana, at 1:02 o'clock P.M., on
18   October 15, 2007, at 600 East 96th Street,
19   Indianapolis, Indiana, Marion County, Indiana,
20   pursuant to notice.
21
22
         Baldwin Reporting & Legal-Visual Services
23          Serving Illinois, Indiana & Missouri
         24hrs (217)788-2835   Fax (217)788-2838
24                  1-800-248-2835
```

COPY

## Page 2

```
 1   APPEARANCES:
 2       LONDRIGAN, POTTER & RANDLE
         BY:  Thomas F. Londrigan, Esq.
 3            1227 South Seventh Street
              Springfield, Illinois 62703
 4            On behalf of Plaintiff.
 5       MS. KELLY CHOATE
              Assistant Attorney General
 6            500 South Second Street
              Springfield, Illinois 62706
 7            On behalf of Defendant Illinois
              Department of Corrections.
 8
         HEYL, ROYSTER, VOELKER & ALLEN
 9       BY:  Ms. Theresa Powell
              Attorney at Law
10            National City Bank Building, Suite 575
              Springfield, Illinois 62701
11            On behalf of Defendant.
12   ALSO PRESENT:
13       HILL, FULWIDER, McDOWELL, FUNK & MATTHEWS
         BY:  Ms. Beth Knotts
14            Attorney at Law
              One Indiana Square, Suite 2000
15            Indianapolis, Indiana  46204
              On behalf of William Zeh, M.D.
16
         Mrs. Carol Londrigan
17
         J. Randy Baldwin, CLVS
18       Baldwin Reporting & Legal Visual
         107 East Allen Street
19       Springfield, Illinois 62704
20
21
22
23
24
```

## Page 3

```
 1                      I N D E X
 2   DEPONENT                         PAGE NUMBER
 3   William Zeh, M.D.
 4       Examination by Mr. Londrigan       5, 82
         Examination by Ms. Powell          39
 5       Examination by Ms. Choate          77
 6
 7
 8                      E X H I B I T S
 9   NUMBER                  MARKED FOR IDENTIFICATION
10   Exhibits 1 - 4                      5
11
12
13
14                     O B J E C T I O N S
15   BY MS. POWELL:                  BY MS. CHOATE:
16   Page 23, Line 1                 Page 36, Line 18
     Page 31, Line 6                 Page 57, Line 6
17   Page 32, Line 4                 Page 84, Line 15
     Page 34, Line 10
18   Page 35, Lines 13, 18
     Page 82, Line 8
19
20   BY MR. LONDRIGAN:
21   Page 54, Line 2
     Page 56, Line 24
22   Page 70, Line 22
23
24
```

## Page 4

```
 1                    S T I P U L A T I O N
 2       It is stipulated and agreed, by and
     between the parties hereto, through their
 3   attorneys, that the deposition of WILLIAM ZEH,
     M.D., may be taken before Debra K. Baldwin, a
 4   Notary Public and Certified Shorthand Reporter and
     Registered Professional Reporter, upon oral
 5   interrogatories, on the 15th of October A.D., 2007,
     at the instance of the Plaintiff at the hour of
 6   1:02 o'clock P.M., 600 East 96th Street,
     Indianapolis, Indiana, Marion County, Indiana;
 7
 8       That the oral interrogatories and the
     answers of the witness may be taken down in
 9   shorthand by the Reporter and afterwards
     transcribed;
10
         That all requirements of the Federal
11   Rules of Civil Procedure and the Rules of the
     Supreme Court as to dedimus, and the reading over
12   and signing of the deposition by the witness, are
     expressly waived;
13
         That any objections as to competency,
14   materiality or relevancy are hereby reserved, but
     any objection as to the form of question is waived
15   unless specifically noted;
16       That the deposition, or any parts thereof
     may be used for any purpose for which depositions
17   are competent, by any of the parties hereto,
     without foundation proof;
18       That any party hereto may be furnished
     copies of the deposition at his or her own expense.
19
20
21
22
23
24
```

EXHIBIT B

Page 41

1   Q   (Continuing)--on the same date. Correct?
2   A   Correct.
3   Q   Okay. Now, would it be fair to say that
4   at some point in time you would be lifting those
5   restrictions?
6   A   With a cornea and what I'll just call a
7   regular cornea transplant patient, my--after suture
8   removal I do have the patient typically take it
9   easy for the first month in terms of not lifting
10  any more than about 25 pounds in most cases.
11       My specification of a lower weight limit
12  for him was simply because the sutures were out a
13  little bit earlier than they would have been for
14  many transplant patients.
15       Their--. Patients different very much in
16  how quickly they heal. Most of the transplants that
17  I perform are in much, much older patients who do
18  not heal nearly as quickly as young healthy people
19  otherwise do. So I wanted to be careful.
20       I thought it was--if I really thought
21  that he was highly likely to have a--an accidental
22  wound dehiscence from physical exertion, I would
23  have made appropriate plans to take him back to the
24  operating room and to place new sutures. I didn't

Page 42

1   think that that was necessary or--or--I don't think
2   that that was medically necessary, but I did think
3   it was a good idea to place him on more restrict
4   activity restrictions until just a little bit more
5   time had gone by and to place him in an environment
6   that would be appropriate and decrease the risk of
7   trauma to the eye.
8   Q   Well, first of all, how long would you
9   typically have those weight restrictions?
10  A   I would have left him on those same
11  weight restrictions until he returned from his next
12  visit. So 30 days.
13  Q   And that would have been?
14  A   That was, you know, a month. And then in
15  a month I would have gone up on the weight
16  restrictions to what I probably--. Now remember
17  ordinarily I take out stitches about a year after
18  the operation in most cases. He would not have been
19  at a full year. At that point in time I probably
20  would have just left him on the same weight
21  restrictions until a calendar year from the date of
22  his surgery just to be save.
23  Q   Okay. And that would have been
24  approximately February of 2004?

Page 43

1   A   That's correct.
2   Q   And at that point in time how much weight
3   could he have lifted?
4   A   I would have had him go up to 25, 30
5   pounds, and if he tolerated that well, probably no
6   restrictions at that point.
7   Q   Okay. So let's say by 15 or 16 months out
8   would he have been at a point where he would have
9   no weight restrictions?
10  A   In all likelihood, yes. And that's for a
11  normal cornea transplant patient a year after--a
12  year or more after surgery. Having had the sutures
13  out and not having any problems, weight
14  restrictions would have been essentially unlimited.
15       My concerns at that point were far more
16  about the accidental or deliberate trauma than they
17  were about a level of physical activity and
18  exertion resulting in a spontaneous dehiscence of
19  the transplant.
20  Q   Okay. And as of the time you saw the
21  patient again, which I believe was December 21st or
22  23rd of 2003?
23  A   Uh-huh. December.
24  Q   Right. The patient had not had any

Page 44

1   problems with his eye since you had removed the
2   sutures, had he?
3   A   No, he had not.
4   Q   Okay. And your note does not indicate
5   that you had increased any restrictions. Correct?
6   A   No, I had not increased any restrictions.
7   Q   Okay. And, again, on your note I don't
8   see that you had re-established any restrictions on
9   his activities?
10  A   No. I think that I was waiting for him to
11  run out another couple months until the--
12  the anniversary of his transplant before starting
13  to increase his level of physical activity.
14  Q   Okay. Again, Doctor, I don't see anywhere
15  in your records where you made any specific
16  restrictions about keeping this patient away from
17  all people?
18  A   I'm not sure. I think that the telephone
19  conversations that I had definitely reflect my
20  concern that the patient could be subjected to
21  trauma if he were in the--in an inappropriate
22  environment. This one specifically, you know--and
23  also he doesn't want offender to get poked in the
24  eye, end quote. And that was definitely my

11 (Pages 41 to 44)

3:02-cv-03171-HAB-BGC    # 432-3    Page 3 of 3

10/15/07                           McCroy v. Illinois Dept. of Corrections
William Zeh, M.D.

Page 45

1 concern.
2  Q   That was in November of 2003. Right?
3  A   Right. That's--that is a lifelong
4 concern. I have seen many transplant patients with
5 corneal suture and without corneal sutures have
6 trauma to eye that's resulted in a dehiscence, or
7 separation, of the transplant in a ruptured globe
8 injury.
9      They're not nicely protected from that by
10 the presence of corneal sutures. I've seen quite a
11 few patients, even with sutures still in place, get
12 hit in the eye and have the eye rupture. So that
13 is the--the--the trauma concern is definitely a
14 lifelong concern for this patient and I think I
15 made that abundantly clear to him.
16  Q   Any patient could have that concern.
17 Right?
18  A   Absolutely.
19  Q   Okay. Anyone regardless--
20  A   But not every patient is in--in an
21 incarcerated situation.
22  Q   Okay. And I believe, Doctor, that you
23 testified previously that you're not aware of the
24 exact conditions of confinement--

Page 46

1  A   I am not.
2  Q   (Continuing)--for Mr. McCroy. Right?
3  A   I am not. I just wanted to make sure that
4 he was as separated from everyone as he could be.
5  Q   Okay. You don't know when he was in the
6 infirmary how many people were in his cell?
7  A   I have--. No, I don't.
8  Q   So if he were with four people while he
9 was in the infirmary, you don't know that?
10  A   No.
11  Q   And if he was with one person when he was
12 in the general population, you have no information
13 regarding that?
14  A   No.
15  Q   And you weren't made aware of the
16 individuals that he was actually being housed with?
17  A   No. My--my only--my--my last interaction
18 with the correctional facility on that was that
19 they were--they had indicated to me that they were
20 putting him in a single cell.
21  Q   That was in November of 2003?
22  A   Correct. And I had no reason to--no one
23 ever told me that his situation was anything but
24 that, and so I assumed that he was in a place where

Page 47

1 he was not going to be housed with other--other
2 people who might have a physical conflict with.
3  Q   Okay. Do you know anything--. Okay. When
4 you treat patients who are not incarcerated, you
5 would tell them probably similar information.
6 Right?
7  A   Absolutely. Even for--
8  Q   Try to avoid conflict?
9  A   Yeah. Wear--wear protective goggles when
10 playing sports, things--things of that nature. You
11 know, avoid--you know, I generally will tell people
12 that probably full contact sports are not a good
13 idea, to gradual escalate the level of physical
14 activity. You know, don't just--.
15      You know, if I tell someone--. I wouldn't
16 tell someone at any given in point in time, okay,
17 go right out from having a very limited level of
18 activity to go out and lifting a hundred pounds.
19 It's a--a gradual escalation as the patient
20 tolerates it; but there is always the lifelong
21 risks.
22      That is one of the biggest major possible
23 complications of having a cornea transplant is the
24 eye is always more susceptible to trauma. And that

Page 48

1 lasts forever.
2  Q   And with respect to the trauma, could any
3 amount of trauma cause the--the eye to be injured
4 to the point that the corneal transplant fails?
5  A   It's possible. There are--. I have seen
6 case reports of doctors who've removed stitches
7 after more than two years of being in place in a
8 patient's transplant and having the graft
9 spontaneously open up following suture removal. So
10 presumably no trauma at all, the eye just didn't
11 heal well there.
12  Q   So he could pump it himself? That could
13 cause--
14  A   Possibly.
15  Q   He could--
16  A   That's one of the reasons why I tell him,
17 and it's documented in my note, no eye rubbing.
18  Q   Okay. Patients who have children could
19 have their kid bump them in the eye. Right?
20  A   Absolutely.
21  Q   But you don't tell those patients they
22 can't be around their children?
23  A   I tell them to be careful around them.
24  Q   Right.

12 (Pages 45 to 48)