IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| AARON MCCROY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02-CV-3171 |
| | ) | |
| THE ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS, ROGER E. | ) | |
| WALKER, JR., (in his official | ) | |
| capacity only), DENNIS HOCKADAY, | ) | |
| KEVIN WINTERS, SANDRA FUNK, | ) | |
| DEBORAH FUQUA, LIEUTENANT BRYON | ) | |
| LAW,  KENNETH KELLERMAN, JULIUS | ) | |
| FLAGG, all in their official and | ) | |
| individual capacities, WEXFORD | ) | |
| HEALTH SOURCES, Inc., | ) | |
| Dr. LOWELL BROWN, MD., | ) | |
| Dr. HUGHES LOCHARD, MD., and | ) | |
| RHONDA MILLS, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTIONS TO BAR**

NOW COMES the Plaintiff, Aaron McCroy, by and through his attorneys, LONDRIGAN,

POTTER & RANDLE, P.C., and for his response to all Defendants' "First Motion to Bar" (Court

Docket # 430) and all Defendants' "Second Motion to Bar" (Court Docket #431), states as follows:

Once again, this time belatedly on Monday, October 22, 2007, Defendants joined together

in yet another motion *in limine*, labeled as a "First Motion to Bar" regarding Dr. Kwedar, but also

seeking the following relief: "...prays that this Court will enter a Motion in Limine directing counsel

to refrain from referring to himself as appointed counsel and advise his witnesses to refrain from

such references as well." This relief was previously sought in Defendants' Combined "Second

Motion in Limine" filed 10/19/07.

**"Appointed Counsel"**

See Plaintiff's Response to Wexford's first & Defendants' Combined Second Motions *in Limine* filed herewith.

**FIRST MOTION TO BAR:**

**Dr. Kwedar**

Based on Defendants' Motion, there is no dispute that Dr. Kwedar may testify regarding all of the opinions noted in his disclosures and rendered at his deposition. Accordingly, it is clear that Defendants' Motion is much to broad.

Dr. Kwedar's opinion disclosure was based upon information available to him at the time of his deposition in September of last year. At that time, not one Wexford employee had been deposed. In fact, no Wexford employee was deposed until March of 2007. The discovery cutoff was extended to March 15, 2007 and trial was set for May 1, 2007.

The only discovery available to Plaintiff at the time of Dr. Kwedar's deposition in September of last year were incomplete medical records produced by IDOC. Wexford claimed it had **no** medical records and that they **all** belong to IDOC. In fact, that is Wexford's claim even today. Dr. Zeh's deposition taken October 15, 2007, just days ago, reads:

> Mr. Londrigan: ...Those are records we've asked for updated from you for the past six months. We haven't received them. If we did receive them we would give them to the Doctor so that he could answer that question.

> Ms. Choate: I would further object as those records are available to Mr. McCroy and he could give them to his attorney should he choose to do so.

> Mr. Londrigan: Not at this point in time they are not.

Ms. Choate: I would disagree with you, Mr. Londrigan.

Mr. Londrigan: Well, the judge will resolve that question, but I'm objecting to this question because you have the answer to that question by simply providing him with his current records.

Ms. Powell: Okay. Let me respond to your objection. *I don't have any records.* My clients in this case do not work at the current correctional facility where Mr. McCroy is housed and no request was made to me for any records as I would not have them. All of Mr. McCroy's records are maintained by the department of corrections...

(William Zeh Dep. taken 10/15/07, p. 56-57). (Emphasis added).

Dr. Zeh was asked questions about the Plaintiff's current disability that can only be answered with recent medical records that neither he nor Plaintiff's counsel has yet seen.

In the early deposition of Dr. Kwedar taken over a year ago, Wexford counsel tried to press him with questions of individual employees of Wexford named as defendants. The following occurred:

Q. Would you agree with me that would be hard for me to read Exhibit 1 and tell what opinions you're going to have relating to Wexford Health Sources?

A. Well you haven't asked me. You haven't really asked me.

Mr. Londrigan: I'm going to make a continuing objection.

Ms. Powell: I'm asking you right now.
Deponent: Okay.

Mr. Londrigan: And I'm not going to repeat it. We do not have to offer specific testimony, and this witness is not offering specific testimony at this time with regard to all of Wexford's employees. No one has come forward yet and identified who made these critical decisions, either in the records or in testimony. This witness is here to testify that Wexford by and through its agents and employees, and that's the only way that a corporation can take action, departed from the ophthalmologic prescribed treatment for this patient. Now, the

3

fact that no one has come forward and said, I did it, I'm the one that made that decision, doesn't get Wexford off the hook.  Having said that, and I'm not going to repeat it again, that's a continuing objection throughout the remainder of this deposition.

Deponent: That's what my problem is.

Ms. Powell: I object to your speaking objection.  That is not a legal objection, and I also object to your indicating that something is contained in this exhibit that is not contained in the exhibit.  This is our time to depose an expert who is supposed to be disclosed under Federal Rule 26; and this, as I've already filed a Motion to object and strike this, does not comply with Federal Rule 26 and give those specific opinions.  And I would disagree with your statement that it does and that you are not required to provide us with that information, because I believe that you are.

Mr. Londrigan: Theresa, this can be used for evidentiary purposes, and may well be used for evidentiary purposes.  The court is going to make ruling on what you filed, and also with regard to motions that we filed for the incompleteness of the records.

Ms. Powell: That doesn't have anything to do with me, sir, so if you have a legal objections...

Mr. Londrigan: We can only work with what we've been provided.

Ms. Powell: That's fine.  That's fine.

Deponent: That's why I'm – I can't answer it.

(Dr. Kwedar Dep, taken 9/11/06, pp. 49-52).

The Plaintiff dismissed one important Wexford defendant, Dr. Cleveland Rayford, on the eve of the prior trial setting on reliance from Wexford counsel that he was deceased.  The trial was then continued based upon the representation that an IDOC defendant was too ill to be deposed.  All the available discovery and depositions were sent to Dr. Kwedar who still stands by his earliest opinions shared in his June 30, 2006 Expert Witness Disclosure.

4

1.   That the PRISONER/PATIENT, Aaron McCroy, suffers from Keratoconus, which has been aggravated by the Department of Illinois Department of Corrections (IDOC) failure to provide proper care and treatment during his incarceration.

2.   That the PRISONER/PATIENT's condition was further aggravated by IDOC's failure to isolate him from other inmates in order to prevent physical injury to his eye.

3.   That agents and employees of IDOC significantly departed from the care and treatment of the PRISONER/PATIENT recommended by Dr. Michael Kass (court appointed expert).

4.   That the PRISONER/PATIENT is currently at risk for further vision loss which may make him unemployable upon his release.

5.   As noted in the medical records, PRISONER/PATIENT's current eyesight is significantly reduced, limiting his ability to see.

6.   The foregoing opinions are based upon my background and training in ophthalmology and my review of the prison and medical records of this PRISONER/PATIENT.

7.   My Curriculum Vitae is attached.

8.   In regard to compensation, I have not required a retainer, but expect to be paid on a *quantum meriut* basis with my hourly rate to be determined.

9.   I have not authored any publications or testified as an expert witness in the last ten years.

(Pl's Supplemental Expert Witness Disclosure, filed 8/30/06).

* * *

I, Dr. Stephen A. Kwedar, supplement my report dated August 29, 2006, as follows:

1.   Based upon my medical training as a board certified opthamologist, my medical experience, and my review of the IDOC medical records, I hold the following opinions within

5

> a reasonable degree of medical certainty and the rational for
> them as found on pages 18-21, 35-36, 40-41, 52-56, 62-63,
> 65-68, 71, 73-74, 79-80, 101-102, 110, and 121-127 of my
> deposition given on September 11, 2006.

(Pl.'s Supplemental Expert Witness Disclosure, filed 10/2/06)

Dr. Kwedar's opinions are now also supported by the IDOC medical records and the testimony of IDOC witnesses and Wexford, including the Defendant, Rhonda Mills and the most recent testimony of Dr. Zeh.

No one was sure of Rhonda Mills' medical basis for discharging the Plaintiff from the HCU Infirmary in the face of Dr. Zeh's clear medical direction not to house him with other prisoners. Today, her role is now clear based upon her own under oath testimony. She either acted solely on her own or at the direction of a person other than Dr. Zeh.

## SECOND MOTION TO BAR

**Dr. Michael Kass:**

Defendants, again, file a belated "Second Motion to Bar" seeking yet another *in limine* ruling before trial with regard to Dr. Kass.

Dr. Kass is not disclosed as an expert witness and will not be called at trial. Dr. Kass was appointed by the court to examine and recommend a course of treatment after Plaintiff was diagnosed with steroid induced glaucoma. This resulted in Plaintiff's Motion for Physical Examination pursuant to Rule 35(a) and this Court's order. (*See* Ex. A & B, attached). In the interim, before entry of the court order, the Plaintiff lost his eye in an attack by his cellmate.

Thereafter, Plaintiff disclosed Dr. Kwedar as the expert witness who would address several issues, including the following:

6

3.    That *agents* and employees of IDOC significantly departed from the care and treatment of the PRISONER/PATIENT recommended by Dr. Michael Kass (court appointed expert).

(Pl's Supplemental Expert Witness Disclosure, filed 8/30/06). (Emphasis added).

The objection to all reference to the report of Dr. Kass was never made in timely fashion. In fact, Defendants' claim compliance with the treatment recommended by Dr. Kass after Plaintiff received a disciplinary transfer to Menard..

The Defendants' random arguments are no reason to *bar* reference to the narrowly worded and impartial report to the court from Dr. Kass, written in full compliance with this court's order of November 19, 2004. Finally, this report is *not* critical of Defendants' prior care and treatment and speaks prospectively with regard to future care of the sight remaining in Plaintiff's right eye.

Before any witness was deposed by Plaintiff, both counsel for IDOC and Wexford elicited further opinions from Dr. Kwedar.

1.    A.              ...Here it is. All right. I'll show you this is the prescription that was written by Dr. Zeh. It says Maxitrol four times a day, okay, times three days, then dc to the left eye. That prescription was written on the 6th of November.

      Mr. Tenny:      Of what year?

      The Deponent:   '03, excuse me. Here is a verbal order from Nurse Bower or something rather, that she took from Doctor Lochard that says, use Maxitrol ointment, apply OS four times a day. That's the left eye.

      By Ms. Powell:  Yes. And what is your opinion?

      A.              Well, he didn't follow the ophthalmologist's order.

      Q.              Do you know what information specifically was provided to Doctor Lochard?

      A.              I would assume the prescription is.

7

(Dr. Kwedar's Dep, taken 9/11/06, pp. 39-40)

2.   Q.[Ms. Powell]:        Okay.  What about Doctor Lowell Brown, what opinions do you intend to give with respect to him?

     A.                     ...  And, yeah, I do have objection of placing him in the general population without a doctor's order, without an ophthalmologist order.  I do have objection to that.

                            And not only that, but it sounds from the tone of what I read in here and I don't know exactly who assigned him, because you're going to ask me, but I don't know who assigned him to that cell.  I don't know who did that.

                            But, from reading McCroy's things, it leads me to believe that this cellmate of his had a history of violent behavior towards his other–other roommates or cellmates that he had had.

                            And this would be for a one–for a guy who has got a cornea that you're really, really worried about it could pop, this would really be inappropriate behavior.

                            I don't know who that is.  If that's one of the people you've asked me about, I'm going to say that that person, because I don't know how did that.

(Dr. Kwedar's Dep, taken 9/11/06, pp. 52-54)

3.   Q. [Ms. Powell]:       Well, I need to know, Doctor, what you are saying, because I'm not sure you understand exactly what happened.

     A.                     I guess I don't know.  Tell me what happened.

     Q.                     Well, that's what I want to know.   How can you criticize somebody if you don't know what happened?  So I want to know what you're–

     A.                     Here's what I think happened.  I think he was released into the general population of the prison because of this order.  I think the choice of roommates that he was given was, as an ophthalmologist, I shudder to think that you–that he was placed in with somebody that had a history of having hit and fought with his other roommates.  I just shudder that, with this guy with a corneal transplant that, you know, is not well healed, I just shudder to think of that, and I think

8

that was incorrect and that's what I'm testifying to.

(Dr. Kwedar's Dep, taken 9/11/06, p. 63)

4.    Q.[Ms. Powell]:    ...I need to know.  Are you saying that that's a criticism?

       A.               My criticism is that he lifted the restriction and put him out in the general population, and he was not supposed to have that.

       Q.               When you say...

       A.               Per the order–per the order on, I can find the order for you if you really want to look, but there was an order around December that said that, for a year.

       Q.               Okay.  And you're talking about an order that was written by Doctor Zeh, is that correct?

       A.               Uh-huh.

       Q.               Is that a yes?

       A.               Yes.

(Dr. Kwedar's Dep, taken 9/11/06, pp. 65-66)

5.    Q.[Ms. Powell]:    And you would agree, Doctor, that that lens would have to be fitted by the ophthalmologist, right?

       A.               No.  An optometrist could do it also.

       Q.               Or an optometrist?

       A.               Uh huh.

       Q.               With those specific qualifications, right?

       A.               Well, it would have to be somebody that was used to doing them. These are very, very difficult to fit.

       Q.               Okay.

       A.               Extremely difficult.  And that's one of the reasons.  I mean, he was

9

supposed to have been refit with a contact lens for his other eye, right eye starting as late as '02, and I don't know that he's ever gotten one. That's one of my main objections here. Here's a guy who in March of '02 or something is supposed to have been refit for his good eye now and, to my knowledge, he hasn't had that contact.

(Dr. Kwedar's Dep, taken 9/11/06, p. 74)

6.   Q[Ms. Powell]:      Okay. It's my understanding that Keratoconus is a progressive condition. Would you agree with that?

     A.                 In some patients.

     Q.                 Okay. Would you agree that it's a progressive condition in this patient?

     A.                 Yes.

     Q.                 And that even with treatment, can't stop the progression?

     A.                 Yeah. I think in this case that that's true, this specific case.

     Q.                 And that the form of treatment of Keratoconus changes over time? You may want to try conservative measures before actually going to the corneal transplants?

     A.                 Correct.

     Q.                 And that's the standard procedure for treating this condition, correct?

     A.                 Yes.

     Q.                 All right. And would you agree with Doctor Kass's opinion that he would not recommend corneal transplant for the right eye so long as he is incarcerated?

     A.                 I agree with what Michael said, that unless he could be provided a secure environment. I believe that's what he said, something close to that. Yes, I would agree.

     Q.                 And as you sit here today, you don't recall having any specific disagreements with what Doctor Kass had in his report, is that correct?

10

A.                    No.  I had none.

(Dr. Kwedar's Dep, taken 9/11/06, pp. 78-80)

7.    Q.[Mr. Tenney]:    Okay.  And was the steroid induced glaucoma a consequence of the failure to discontinue Maxitrol in your opinion?

      A.                    Yes.

      Q.                    And do you have any opinion about who is responsible for the failure to discontinue Maxitrol?

      A.                    I don't know if the doctor is responsible and I don't know what the communication was.  I know what Zeh's prescription says, and that's quite–that's quite clear, and I know what was written in the chart.  We've gone over that, not the chart, the record.  All I know is the beginning and the ending.  I don't know the in-between.

      Q.                    So you don't know who or you don't have any opinion about who is responsible?

      A.                    No, I do not.

(Dr. Kwedar's Dep, taken 9/11/06, p. 93)

8.    Q.[Ms. Choate]:    Would you agree with me that he received care from specialists for his Keratoconus while in the Department of Corrections?

      A.                    Yes.

      Q.                    More than one specialist?

      A.                    Many.

(Dr. Kwedar's Dep, taken 9/11/06, p. 113)

9.    *See* Exhibit C, attached hereto.

Dr. Kwedar's opinions disclosed in his formal disclosures and his deposition remain the same and are now supported by the testimony of Wexford and IDOC witnesses, in addition to the most recent testimony of Dr. Zeh.

Pursuant to Fed.R.Evid 703, Dr. Kwedar was entitled to rely upon Dr. Kass's Report.

Accordingly, to the extent that Defendants seek to bar all mention of Dr. Kass's Report, they are

wrong.

WHEREFORE, Plaintiff respectfully pray that the court deny Defendants' Motion to Bar.

Respectfully submitted,
AARON MCCROY, Plaintiff

By: s/Thomas F. Londrigan
THOMAS F. LONDRIGAN, Bar No. 1686542
Attorney for Plaintiff
LONDRIGAN, POTTER & RANDLE, P.C.
1227 South Seventh Street
Post Office Box 399
Springfield, IL 62705
Telephone: (217) 544-9823
tom@lprpc.com

**Certificate of Service**

The hereby certify that on October 23, 2007, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification to such filing to the following;

Ms. Theresa Powell
Heyl, Royster, Voelker & Allen
National City Center, Ste. 575
1 North Old State Capitol Plaza
PO Box 1687
Springfield, IL 62705-1687

Lisa Madigan, Illinois Attorney General
Attn: Kelly Choate, A.A.G. &
Julie L. Morgan. A.A.G.
500 South Second Street
Springfield, IL 62706

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

Aaron McCroy,#N51882
Receiving Cell 15
P. O. Box 900
Ina,  IL 62846

By: s/Thomas F. Londrigan
THOMAS F. LONDRIGAN, Bar No. 1686542
Attorney for Plaintiff
LONDRIGAN, POTTER & RANDLE, P.C.
1227 South Seventh Street
Post Office Box 399
Springfield, IL 62705
Telephone: (217) 544-9823
tom@lprpc.com