IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| AARON MCCROY, #N-51882, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No.  02-3171 |
| | ) | |
| ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW,
OR IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL**

NOW COME the Defendants, ILLINOIS DEPARTMENT OF CORRECTIONS (IDOC),

SANDRA FUNK, DEBRA K. FUQUA, ROGER E. WALKER, JR., and KEVIN WINTERS, by and

through their attorney, Lisa Madigan, Attorney General of the State of Illinois, and in support

of their Renewed Motion for Judgment as a Matter of Law, or in the Alternative, Motion for a

New Trial, submit the following memorandum of law:

**BACKGROUND**

Plaintiff alleged Defendants Winters, Funk, and Fuqua violated his rights under the

Eighth Amendment to the Constitution when they were deliberately indifferent to his serious

medical needs and when they were deliberately indifferent to a substantial risk of serious harm

he alleges he faced, in general, from being double celled, and specifically, from his cell mate,

Brandon Durham.  Apparently, the deliberate indifference to Plaintiff's serious medical needs

arose, among other things, from Plaintiff's eye solutions being confiscated when he arrived at

Western Illinois Correctional Center (WICC), cancelled appointments with outside physicians,

and a delay in receiving a corneal transplant that Plaintiff alleges had been recommended by

both outside physicians, and by on site physicians.  He also alleged Defendant Fuqua was

1

deliberately indifferent by overriding a prescription of the physician for an enzyme to clean his contact lens. The failure to protect allegations arose when Plaintiff was double celled in June of 2004. In February of 2004, Plaintiff alleged he was assaulted by his cell mate, Brandon Durham, and as a result of his injuries, lost his left eye.

Plaintiff's allegations under the Americans With Disabilities and Rehabilitation[1] Acts were more difficult to ascertain. Plaintiff alleged he was denied the opportunity while in the infirmary to go to the commissary, the yard, and had to drop one out of school because he missed too many classes. He also appeared to allege that he did not receive the accommodation that he wanted as a result of his disability, specifically, an "ADA" cell at Pinckneyville Correctional Center, and possibly a single cell at Western Illinois Correctional Center. Additionally, Plaintiff alleged the Illinois Department of Corrections retaliated against him for complaining about his disability.

Defendants filed a summary judgment, which was never ruled upon prior to trial. The Court denied Defendants' Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50 at the close of Plaintiff's case, and again at the close of all the evidence. After deliberating, the jury returned a verdict against Defendants Winters, Funk, and Fuqua on the Eighth Amendment violation(s) and against the Illinois Department of Corrections on both ADA claims. This renewed motion for judgment as a matter of law, or in the alternative for a new trial follows.

**STANDARDS FOR JUDGMENT AS A MATTER OF LAW OR FOR NEW TRIAL:**

The standard that governs the adjudication of a motion for judgment as a matter of law is the same standard used in assessing a motion for summary judgment. Deimber v. Cincinnati Sub-Zero Products, 58 F.3d 341, 343 (7th Cir. 1995). In considering a motion for judgment as

---

[1] The claim under the Rehabilitation Act did not go to the jury, as it was determined by the Court that the analysis under both were the same.

a matter of law, the court must view the evidence in the light most favorable to the non-moving party and ascertain whether there exists any evidence upon which a jury could reach a verdict for the party producing it, upon whom the onus of proof is imposed. Id. at 343.

If there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party, judgment as a matter of law should not issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 2511 (1986). However, if there is not an issue of any material fact, judgment as a matter of law should issue. Id. at 247, 106 S. Ct. at 2510.

The mere existence of some alleged factual dispute between the parties will not defeat a motion for judgment as a matter of law. Id. at 247-48, 106 S. Ct. at 2510. Factual disputes that are irrelevant or unnecessary cannot create an issue sufficient to overcome a motion for judgment as a matter of law. Id. at 248, 106 S. Ct. at 2510. Only disputes over facts that might affect the outcome of the suit under the governing law preclude entry of judgment as a matter of law. Id. at 248, 106 S. Ct. at 2510. If the evidence is merely colorable or is not significantly probative, it is proper to grant judgment as a matter of law. Id. at 249-50, 106 S. Ct. at 2511.

Substantive law identifies which facts are material. Id. at 248, 106 S. Ct. at 2510. The Court must view the evidence presented through the prism of the substantive evidentiary burden. Id. at 254, 106 S. Ct. at 2513. Rather when the movant has met the burden of showing no material issue of fact exists, judgment as a matter of law is appropriate. Id. at 256, 106 S. Ct. at 2514.

Federal Rule of Civil Procedure 59 provides that a party may move for a new trial within 10 days of the entering of a judgment. Hillard v. Hargraves, 197 F.R.D. 358, 359, 2000 U.S. Dist. LEXIS 1512 (N.D. Ill. 2000). The authority to grant a new trial "is confided almost entirely to the exercise of discretion on the part of the trial court" because of its ability to "observe witnesses and follow the trial in a way that [the Appellate Court] cannot replicate by reviewing

3

a cold record." Id. [citations omitted.]  A new trial should be granted when the verdict is against the weight of the evidence, is either excessive or inadequate, where probative evidence is newly discovered, where conduct by the court, counsel or the jury improperly influences the deliberative process, or if for any reasons the trial was not fair to the moving party.  Id., citing McNabola v. Chicago Transit Authority, 10 F.3d 501, 516 (7th Cir. 1993) and Emmel v. Coca-Cola Bottling Co., 95 F.3d 627, 636 (7th Cir. 1996).

**EIGHTH AMENDMENT DELIBERATE INDIFFERENCE TO MEDICAL NEEDS STANDARD:**

In Estelle v. Gamble, 429 U.S. 97 (1976), the Supreme Court held that in order to violate a prisoner's Eighth Amendment rights as they relate to medical care, an official must demonstrate deliberate indifference to the serious medical needs of that inmate, and concluded that "deliberate indifference to serious medical needs of prisoners" constitutes the "unnecessary and wanton infliction of pain," 429 U.S. 97, 104 (1976).  However, the Court drew a distinction between an "inadvertent failure to provide adequate medical care," Estelle at 105, and "an unnecessary and wanton infliction of pain" that is "repugnant to the conscience of mankind."  Estelle at 106.

"To raise an Eighth Amendment issue, 'the infliction [of punishment] must be deliberate or otherwise reckless in the criminal law sense, which means that the defendant must have committed an act so dangerous that his knowledge of the risk can be inferred or that the defendant actually knew of an impending harm easily preventable.'"  Snipes v. Detella, 95 F.3d 586, 590, citing Antonelli v. Sheahan, 81 F.3d 1422, 1427 (7th Cir. 1995).  Furthermore, "mere negligence or even gross negligence does not constitute deliberate indifference."  Id., citing Wilson v. Seiter, 501 U.S. 294,305 (1991).  Likewise, "medical decisions that may be characterized as 'classic example[s] of matter[s] for medical judgment *such as whether one course of treatment is preferable to another'* are beyond the Amendment's purview."  Snipes v. Detella, 95 F.3d 586, 591 (7th Cir. 1996)(emphasis added).  Finally, "except in the unusual

case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals." Johnson v. Doughty, 433 F.3d 1001, 1011 (7th Cir. 2006) quoting Bond v. Aguinaldo, 228 F.Supp. 218, 236 (N.D.Ill. 2002).

**There was insufficient evidence to find against Defendants Winters, Funk, or Fuqua for violations of Plaintiff's rights under the Eighth Amendment.**

**Deliberate Indifference to Plaintiff's serious medical needs:**

Because the deliberate indifference claims were combined in the jury instructions and verdict forms, it is impossible to determine whether the jury found the defendants deliberately indifferent to his serious medical needs or that they knowingly failed to protect him from substantial risk of serious harm. However, there is insufficient evidence to find against these defendants under either theory.

The only evidence that Defendant Winters had any subjective knowledge of Plaintiff's medical care was from two grievances Defendant Winters processed as for possible emergency status [Plaintiff's Group Exhibit 41, pp. 134 and 140], and possibly from memoranda or Administrative Review Board letters forwarded to his office after handling [see Plaintiff's Group Exhibit 41, pp. 143, 137, 140-141, and 134]. With regard to the emergency status of Plaintiff's grievances, Defendant Winters granted one, and denied the other. However, neither action precluded Plaintiff's grievances from being processed, and there is no evidence of injury related to the denial of emergency status of the grievance. Winters merely determined whether Plaintiff would have to go through regular channels for his grievance or if the grievance would be expedited. In each of these documents, Defendant Winters would have been provided with information that the issue had been referred to Dr. Elyea, the Agency Medical Director [Plaintiff's Group Exhibit 41, p. 143], that Assistant Warden Funk had looked into the issue and determined Plaintiff was being seen by Dr. Zeh, that a second opinion was

ordered and scheduled [Plaintiff's Group Exhibit 41, p. 137], that Plaintiff was receiving care from outside physicians, and that the grievance would be processed through regular channels [Plaintiff's Group Exhibit 41, p. 140] or that Plaintiff's complaints received by him on June 9, 2004 would be facilitated in an emergency manner on Defendant Winters' behest [Plaintiff's Group Exhibit 41, p. 134].

According to Plaintiff's evidence, Defendant Winters had no subjective knowledge that Plaintiff had a serious medical need that was not being addressed by physicians. There was no evidence that Defendant Winters had any role whatsoever of denying or delaying Plaintiff's corneal transplant. That decision was made by Wexford as a result of a confusion over whether a corneal transplant was an organ transplant, and thus prohibited by Departmental Rule. There also was no evidence that Defendant Winters had any role whatsoever in confiscating Plaintiff's medications and/or contact lens solutions. The evidence is overwhelming that Defendant Winters took the steps available to him to respond to Plaintiff's complaints. He could not overrule the physicians or determine what physicians Plaintiff saw inside or outside of the institution.

Regarding any missed appointments, the only evidence that could be possibly tied to Winters was that there were approximately three appointments canceled during one month, at least one of those was due to the weather. Defendant Winters testified that even if there was bad weather, he would not cancel a writ unless it was okayed by someone in the Health Care Unit. Plaintiff had no evidence to rebut this. Nonetheless, the mere fact that Winters might have agreed to cancel a writ does not establish deliberate indifference, especially when Plaintiff could not show any injury from that missed appointment, nor any subjective knowledge that there was a serious medical need that would be affected negatively by his actions. There was no evidence Plaintiff suffered any detriment whatsoever from the delay in keeping an appointment for follow up of his lens fitting.

Defendant Funk, as Assistant Warden, was charged at various times with reviewing grievances, including those regarding the Americans With Disabilities Act.   Plaintiff alleged that the defendants denied all of his grievances.   There was no evidence, however, that Defendant Funk did not contact the Health Care Unit to determine whether Plaintiff was receiving medical care, or that she did not review the findings of the grievance officer when the grievance officer had contacted the HCU.  In fact, Plaintiff's Exhibit 41, p. 137, establishes that in response to Plaintiff's emergency grievance in June of 2004, Defendant Funk reviewed his placement for his complaints that he could not place his television where he wanted in the infirmary or go for recreation when and where he wanted, and for the medical issues.  She does not have any duty to do more.   The evidence was that neither Defendant Winters nor Defendant Funk could countermand or overrule the care already being provided by physicians.

In fact, the Seventh Circuit found no deliberate indifference on the part of correctional administrators when, for example, the Warden concurred with a denial of a grievance because he knew the inmate was being treated for the grieved condition.  The Assistant Warden was deemed to have acted reasonably when, faced with the inmate's complaints, she met with the Health Care Unit Administrator to discuss the inmate's medical care.  Her actions in taking the inmate's complaint seriously and investigating the matter, and then relying on the judgment of the medical professionals did not evidence deliberate indifference.  Johnson v. Doughty, 433 F.3d 1001, 1012 (7th Cir. 2006).  The actions in taking Plaintiff's grievances regarding his medical care seriously and reviewing his grievances are not sufficient to evidence deliberate indifference, and given the current state of the law, would also entitle them to qualified immunity on this count.

The evidence against Defendant Fuqua is that Plaintiff believes she kept an ordered enzyme cleaner from him soon after his arrival at WICC in December of 2001.  There was a note attached to the medical records indicating that, pursuant to Ms. Fuqua, the enzyme would

have to be reviewed for safety and security reasons.  Defendant Fuqua testified that she never countermanded an order by a physician, and that any concern about the enzyme was because the bottle could be used to harm staff or other inmates when other liquids are placed inside. Her testimony was that any medication not allowed to be kept with Plaintiff could be used at the nurses desk.

The visit with Dr. Anderson from which the issue of the enzyme arose was in December of 2001 [Defendants' Exhibit 1].  During that visit, Plaintiff asked about his enzyme and Dr. Anderson noted he would order a Boston Advanced Care kit.  Defendant Fuqua testified that while there is a contact lens cleaner and conditioner in the kit, it did not include an enzyme.  Dr. Williams testified that the Boston contact lens cleaner was superior to the old enzymes previously used by optometrists.  Even assuming, arguendo, that Ms. Fuqua denied Plaintiff the enzyme, there is no evidence that she had any subjective knowledge that denial of the enzyme, when combined with her knowledge that the Boston care kit is either the same or superior would cause him any harm.  There is also absolutely no evidence that he had any injury as a result of that single denial.  Moreover, there is no evidence that any injury would not have been a result of Plaintiff's refusal of the superior Boston care solutions that were offered to him, rather than a denial of the enzyme [see Defendants' Exhibit 1].

The undisputed evidence with respect to Defendant Fuqua was that she did not confiscate any of his medications, rather confiscation is done by property officers upon an inmate's entrance into the facility.  It is also undisputed that she facilitated the review of the denial of the corneal transplant by Wexford and was therefore instrumental in obtaining the transplant.  While Plaintiff alleges he complained to her that his trial of contact lenses was not working, it is also undisputed that she could not order treatment or referrals for inmates and that her role in the Health Care Unit was administrative.  There is no evidence that Defendant Fuqua was aware of any serious medical need of Plaintiff's that was not being addressed by

8

physicians, either inside the institution or by outside consultants and treating physicians. As such, there was insufficient evidence for any reasonable jury to find Defendant Fuqua deliberately indifferent to Plaintiff's serious medical needs. Additionally, there was evidence that when asked for information as a result of Plaintiff's grievances, Defendant Fuqua provided that information. Much was made of a comment in a response to a grievance dated November 12, 2004, in which Plaintiff grieved the loss of his eye by Brandon Durham. According to the counselor's response a statement was made that "the loss of vision following the injury was trivial as his vision was 20/200 prior to the injury which is legally blind," [Plaintiff's Group Exhibit 41, p 153], and it was erroneously argued by counsel that the statement was the loss of the eye was trivial. While Dr. Brown denied using the word "trivial" there is no evidence that Defendant Fuqua either used the word or believed the injury to Plaintiff's eye was not substantial. Nonetheless, any comment in response to a grievance about a situation that has already happened does not establish any deliberate indifference on Ms. Fuqua's part to any of Plaintiff's serious medical needs.

The Seventh Circuit has found no deliberate indifference on the part of a Health Care Unit Administrator who reviewed the medical records and gave her input into requests for information as a result of an inmate's grievances about his medical care and accommodation for a disability. Johnson v. Snyder, 444 F.3d 579, 585-86 (7th Cir. 2006). The court also found that she was entitled to rely on his medical records and the doctor's diagnosis. Id. Not only is there insufficient evidence that Defendant Fuqua knew Plaintiff had a serious medical need and did nothing about that need or turned a blind eye to the need, but based on the existing case law currently and at the time of the facts alleged in this case, she is also entitled to qualified immunity.

**EIGHTH AMENDMENT FAILURE TO PROTECT STANDARD:**

Prison officials can be held liable under the Eighth Amendment for an injury suffered by one prisoner at the hands of another only if two requirements are met.

The first requirement is objective:  the plaintiff must show that "he is incarcerated under conditions posing a substantial risk of serious harm."  Farmer v. Brennan 511 U.S. 825, 834; 114 S. Ct. 1970, 1977 (1994).  The second requirement is subjective:  the plaintiff must prove the prison official exhibited deliberate indifference to plaintiff's safety.  Id.

Deliberate indifference, as defined in Farmer, occurs when a prison official "knows of and disregards an excessive risk to inmate . . . safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  511 U.S. at 837; 114 S. Ct. at 1979.  The official must "demonstrate something approaching total unconcern for his [the inmate's] welfare in the face of serious risks," Duane v. Lane, 959 F.2d 673, 677 (7th Cir. 1992) citing McGill v. Duckworth, 944 F.2d 344, 347 (7th Cir. 1991), or must demonstrate a "conscious, culpable refusal to prevent harm." Id, citing Duckworth v. Franzen, 780 F. 2d 645, 653 (7th Cir. 1985), cert. denied, 479 U.S. 816, 107 S. Ct. 71 (1986).

Additionally, the Seventh Circuit has found that placing inmates in segregation is a common and acceptable means of protecting them.  Case v. Ahitow, 301 F.3d 605, 607 (7th Cir. 2002).  Moreover, the court opined that a reasonable response to the danger in which inmate Case found himself, would have been for the defendants to have kept him in segregation longer than his original placement.  Id.

**Deliberate Indifference and Failure to Protect:**

Plaintiff also alleged that Defendants Winters, Funk, and Fuqua were instrumental in failing to protect him from assault at the hands of Brandon Durham.  As a starting point, Dr. Brown's order of June 8, 2006 placed no medical restrictions on where McCroy could be

10

housed.  Dr. Brown knew of Dr. Zeh's recommendation months earlier, yet used his medical judgment to determine that there was no need to single cell McCroy.  None of these defendants could have known McCroy's medical condition was such that he needed to be single celled.

Moreover, It is also undisputed that none of these defendants placed him in a cell with Brandon Durham or any other inmate, or affirmatively determined he could or should be double celled.  There is no evidence that any of these defendants had any knowledge of Brandon Durham's history of fighting with his cell mates, or any subjective knowledge that Plaintiff should not be celled with another inmate.  There is also no evidence that any of these defendants were aware of the notation from Dr. Zeh in Plaintiff's medical records from February of 2004, that Plaintiff needed to be protected from having his eye poked when determining if he could be double celled in segregation.  While there was evidence that Plaintiff stayed in the infirmary longer than necessary because of "security" which had to be approved by the Warden, there was no evidence that the decision to keep him in the infirmary was anything more than a bed space issue.  Also, while it was suggested that the warden would have to approve the plaintiff coming out of the infirmary while placed there "per security" [see Defendants' Exhibit 1], there was no evidence to confirm whether Winters personally approved his removal from the infirmary or whether that was done by some other person from his office.

Therefore, Plaintiff's entire case against Winters, Funk, and Fuqua on the failure to protect issue is that they should have known he was at risk of harm from other inmates because of his medical condition, that they had access to Brandon Durham's disciplinary file and should have known he would be dangerous to Plaintiff, and that they should have known about Dr. Zeh's order from earlier in the year.  Plaintiff's counsel also vigorously argued that as administrators, these individuals, especially Defendant Winters, were responsible for whomever did place McCroy in a double cell with Durham.  In his closing argument, Mr. Quivey argued that the warden can delegate his duties, but not his responsibilities, and that the buck

11

stopped with the warden. That is not, and has never been the law. An official must have some personal responsibility for the alleged violation for liability under 42 U.S.C. §1983. Duckworth v. Franzen, 780 F.2d 645 (7th Cir. 1985). Likewise, the law is clear that it is not enough that an official "ought to have recognized the risk," rather, the official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Riccardo v. Rausch, 375 F.3d 521, 526 (7th Cir. 2004) citing Farmer v. Brennan, 511 U.S. 825, 837 (1970).

Notwithstanding the complete lack of subjective knowledge or personal involvement of these individuals, even had they worked in the placement office, they would have been on notice only that Plaintiff and Durham were both properly housed at Western Illinois Correctional Center [testimony of Funk] and that there was no medical restriction in June of 2004 through September of 2004 against double celling for Plaintiff [Defendants' Exhibit 1, testimony of Brown][2]. It is also undisputed that they would have been on notice that anyone at Western, absent medical restrictions, sexual vulnerability or violence, or security restrictions such as segregation time, is proper to be placed in general population [Funk testimony]. Without the subjective knowledge that Plaintiff was at substantial risk of serious harm either from being double celled with any other person or, in particular Brandon Durham, and without any evidence whatsoever that these defendants were involved in the decision to place McCroy with Durham or generally in a double cell, there can be no liability for deliberate indifference.

_____

[2] Plaintiff also appeared to argue via "admissions" of Dr. Brown that his determination of Plaintiff's safety or lack thereof in general population was influenced, in part by a conversation or conversations with Defendant Fuqua regarding what the placement office would consider in placing an inmate. Defendants objected to any of the admissions being used against any defendant other than Brown. The objection was overruled. There is no evidence that Dr. Brown believed McCroy was at increased risk or that he would have changed his note of June 8, 2004, had he not engaged in the alleged conversation with Defendant Fuqua.

Plaintiff also did not offer any evidence that would tend to prove any pervasive risk of harm at Western Illinois Center or pervasive acts of violence by inmates against each other. Over the objection of the defendants, Plaintiff offered that there had previously been a "murder" at Western Illinois Correctional Center.  Other than that one incident, he did not offer any evidence to show that WICC was a particularly violent place, or that incidents of violence followed requests for protection, which would impute subjective knowledge of an official who did not have his head in the sand.  *See* Riccardo v. Rausch, 375 F.3d 521, 527 (7th Cir. 2004). In fact, the "murder" at Western Illinois Correctional Center in March of 2004, was the result of a fight between two inmates who did not request protection [3].

In addition to Defendants Winter, Funk, and Fuqua, Plaintiff also sued the Lieutenant and Correctional Officer assigned to his wing at the time of the fight with Durham, Defendants Law and Kellerman.  The verdict in favor of Defendants Law and Kellerman is instructive as to the jury's state of mind with regard to the failure to protect claim as a whole.

The only evidence of any knowledge on the part of any defendant regarding a substantial risk of serious harm faced by Plaintiff at the hands of Durham, was Plaintiff's testimony that he told Kellerman and Law that he was afraid of Durham and that Durham would get aggressive.  Though it was disputed by both Kellerman and Law, Plaintiff also testified that at least one of these defendants knew about Durham's disciplinary history.  Plaintiff then testified that both of those individuals told him he could refuse housing and go to segregation, but Plaintiff said he did not want to do that and face the possible loss of good time.  The jury found no liability on the part of either Defendant Law or Defendant Kellerman.  Therefore, they must have either believed that Plaintiff did not tell these individuals about his history with

---

[3] Defendants were precluded from offering this evidence to rebut Plaintiff's blanket statement of a previous "murder" at Western.

13

Durham and ask for protection, or that their response in offering him a way out of the situation was reasonable and would not subject them to liability.

The same rationale that caused the jury to find in favor of Law and Kellerman can also be imputed to Winters, Funk, and Fuqua. Even if Winters, Funk, or Fuqua had actually placed Plaintiff in a double cell, had known of a substantial risk of harm as a result of his medical care, or had known of Brandon Durham's past, the same refusal of Plaintiff to choose safety when offered cuts the causal connection against any person who originally placed in him a double cell.

For all the reasons stated above, there is no evidence sufficient for any reasonable jury to find that Defendants Winters, Funk, or Fuqua had a subjective knowledge of a substantial risk of serious harm to Plaintiff and failed to take action to alleviate that harm. As a matter of law, these defendants are entitled to judgment in their favor, and considering the state of the law on this issue, they are also entitled to qualified immunity.

**There is insufficient evidence for a reasonable jury to find against the Illinois Department of Corrections for violations of the Americans With Disabilities Act.**

Section II of the Americans With Disabilities Act of 1990 (ADA), provides that, [n]o qualified individual with a disability shall, by reason of such disability, be excluded from participating or denied the benefits of the services, programs or activities of a public entity." 42 U.S.C. §12132. The Rehabilitation Act states that "no otherwise qualified individual with a disability int he United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C.A. §794. The ADA applies to prisons, and its reasoning is equally applicable to the Rehabilitation Act. Stanley v. Litscher, 213 F.3d 340, 343 (7th Cir. 2000), citing Pennsylvania Dept. of Corrections v. Yeskey, 524 U.S. 206 (1998).

14

Plaintiff testified he had to drop classes at Western Illinois Correctional Center, and that at times, he was unable to go to the commissary and yard. However, he admitted that he was able to take classes both before and after his corneal transplant, even though he still suffered from the same visual disability. He admitted he was able to go to the yard and the commissary. On at least one occasion, Plaintiff's evidence (consisting of allegations in a grievance dated June 7, 2004) showed that the entire infirmary missed their commissary date. This complaint, that the infirmary in general, and he in particular, missed commissary dates while the general population got to shop, had no relationship to his "disability", but rather his status as an infirmary patient. Certain temporary deprivations while an inmate is in the infirmary, are not only reasonable, but expected. As would deprivations caused by an inmate's segregation status. There was evidence while at Western Illinois Correctional Center McCroy's segregation status, would also affect his ability to go to the commissary and yard.

Plaintiff testified he went to the law library on his own volition. Plaintiff admitted he was given low bunk, low gallery permits; that he was given safety glasses, both tinted and clear; that he was given a cane and attendants to help lift his heavy boxes; that much of the time at Pinckneyville and at Big Muddy Correctional Center, he was in the so called "ADA" cell. While he alleged he was denied an "ADA" cell during various times he was at Pinckneyville, there is no evidence that a larger cell with hand rails is necessary for his visual disability. Moreover, even though Plaintiff testified he was on an upper gallery and in an upper bunk while at Western Illinois Correctional Center, he admitted he had no injury as a result of that housing situation. On this record, there is insufficient evidence to find that he was unable to participate in any services or programs offered by the Department of Corrections to the same extent as non-disabled inmates. Moreover, there is no evidence that the accommodations given to him were not reasonable when viewed in the context of his disability and not merely his desires. In addition, the lack of evidence of any injury that can be attributed to the Illinois Department

of Corrections' alleged failure to accommodate Plaintiff's disability is more evidence of the reasonableness of the Department's actions. The law does not require unlimited accommodation, but rather reasonable accommodation. The Department of Corrections reasonably accommodated Plaintiff, and the Department is entitled to judgment as a matter of law.

ADA violations, even if true, did not cause $900,000.00 in damages, and would be distinct from injuries caused by the other defendants.

> **The Court erred in allowing a claim against the Illinois Department of Corrections for Retaliation in violating the Americans With Disabilities Act as such a claim is barred by the Eleventh Amendment.**

The State of Illinois is not a "person" subject to suit under 42 U.S.C. §1983. Will v. Michigan Department of State Police, 491 U.S. 58, 64 (1989). The Eleventh Amendment bars suits against a State for alleged deprivations of civil liberties unless the State has waived that immunity or unless Congress has exercised its power under §5 of the Fourteenth Amendment to abrogate that immunity. Will at 66. It is important to note that the Eleventh Amendment did not create the sovereign immunity that the states enjoy, but merely ratified the immunity that was based in the constitution and in common law. Alden v. Maine, 527 U.S. 706 (1999).

Section II of the Americans With Disabilities Act of 1990 (ADA), provides that, [n]o qualified individual with a disability shall, by reason of such disability, be excluded from participating or denied the benefits of the services, programs or activities of a public entity." 42 U.S.C. §12132. The Rehabilitation Act states that "no otherwise qualified individual with a disability int he United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C.A. §794. The ADA applies to prisons, and its reasoning is equally applicable to the Rehabilitation Act. Stanley v.

Litscher, 213 F.3d 340, 343 (7th Cir. 2000), citing Pennsylvania Dept. of Corrections v. Yeskey, 524 U.S. 206 (1998).

While the ADA prohibits discrimination against the disabled, it does not specifically contain a provision by which an entity can be held liable specifically for retaliating against a person for *complaining* about their disability. Retaliation for protected speech is prohibited by the First Amendment to the Constitution, and actionable under that amendment. In allowing the claim against the Illinois Department of Corrections for retaliation for speech about Plaintiff's disability, the Court cited United States v. Georgia, 546 U.S. 151 (2006). US v. Georgia only holds that to the extent Title II of the Americans With Disability Act "creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." US v. Georgia at 159. However, there is no private cause of action in the Americans With Disabilities Act for retaliation for speech regarding disabilities.

Defendants objected in their summary judgment and at trial to the Court's ruling and jury instructions allowing Plaintiff to maintain his claim against the Department of Corrections for retaliation for filing grievances under the Americans With Disabilities Act. Simply because Plaintiff claims the speech at issue is about his disability, does not bring it under the ADA or the Rehabilitation Act. Plaintiff also maintained a claim against the individual Defendants (except Law and Kellerman) for retaliation under the First Amendment. The right to seek redress of grievances is a First Amendment right. Because an independent cause of action for retaliation for protected speech, does not arise under the Americans With Disabilities Act, it is barred by the Eleventh Amendment, as is any claim against the Department under the First Amendment. *See* Will v. Michigan Department of State Police, supra.

17

**The Court failed to rule on the claim against Director Walker for Prospective Injunctive Relief.**

The complaint for injunctive relief originally sought the corneal transplant. Even though that issue became moot upon Plaintiff's surgery, the issue of injunctive relief remained in the case and was before the Court at trial. No ruling was made by the Court regarding this issue. Prospective injunctive relief is not within the powers of the Court absent a continuing constitutional violation. Al-Alamin v. Gramley, 926 F.2d 680,685 (7th Cir. 1991). Plaintiff is currently incarcerated at Big Muddy River Correctional Center [testimony of Plaintiff]. He had no complaints about the care he is receiving at Big Muddy, or about his accommodations pursuant to the Americans With Disabilities Act. Moreover, he also testified that he is scheduled to be released from prison in December of 2007. Because the only evidence of any possible constitutional violation was in the past, the Court has no grounds upon which to enter prospective injunctive relief against Defendant Walker, and he is entitled to judgment as a matter of law.

## THE DEFENDANTS ARE ENTITLED TO A NEW TRIAL

**The Court's error in evidentiary rulings and Jury Instructions were prejudicial to the Defendants.**

In the alternative, to the extent the Defendants are not granted judgment as a matter of law, the defendants are entitled to a new trial. A new trial should be granted when the verdict is against the weight of the evidence, is either excessive or inadequate, where probative evidence is newly discovered, where conduct by the court, counsel or the jury improperly influences the deliberative process, or if for any reasons the trial was not fair to the moving party. Id., citing McNabola v. Chicago Transit Authority, 10 F.3d 501, 516 (7th Cir. 1993) and Emmel v. Coca-Cola Bottling Co., 95 F.3d 627, 636 (7th Cir. 1996).

18

As stated previously, the verdict in this case, and against these Defendants, is against the weight of evidence.  Moreover, the defendants were prejudiced by several rulings made during the course of the trial.  These examples are not exhaustive.

Throughout the trial, the Court overruled the defendants' objections to exhibits and testimony as "notice" in general even though there was no foundation that the individual defendants had any knowledge of the document or information elicited in the testimony (for example the phone call between Dr. Zeh and a nurse early in 2004; grievances and memos with no evidence they were ever reviewed by the defendant).  Defendants also objected, both in their Motion in Limine and at trial, to the evidence of Brandon Durham's disciplinary history coming before the jury without evidence that any of the defendants were aware of that history.  However, Durham's disciplinary history was not only put into evidence as a document, it was argued extensively.  In reality, however, there was absolutely no evidence that any of the defendants had knowledge of Durham's disciplinary history, yet it was offered even though the only testimony elicited prior to admission, was that certain individual defendants "could have" accessed the Offender Tracking System (OTS) and/or an inmate's master file (also testimony to which there were objections).  There was no testimony that any of the defendants had actually accessed OTS or otherwise had knowledge of Durham's history.  As was discussed previously, it is not enough that an official "could have" known something.  Actual subjective knowledge of a risk is required before liability can attach under §1983. *See* Crowder v. Lash, 687 F.2d 996 (7th Cir. 1982).

The Court also erred in allowing Plaintiff to testify about the "murder" at Western without giving the Defendants the opportunity to put into evidence the result of the investigation that showed neither of the two inmates who fought had asked for protection.

The Defendants objected to the admissions of one Defendant being admitted against another without a limiting instruction, as in the case of Dr. Brown's admissions against Defendant Fuqua. That objection was overruled as well.

Counsel for the Plaintiff argued extensively that the Defendants could be held liable for the actions of their subordinates. In fact, that is the only way the Defendants could have been liable for failing to protect Plaintiff, as they had no knowledge of a risk and had no role whatsoever in either placing Plaintiff in a double cell or placing Durham with Plaintiff. However, Defendants' jury instruction #23 and Co-Defendants' instruction 13 were refused by the Court, and no other instruction regarding required personal involvement and/or whether liability can attach under a theory of respondeat superior was given to the jury. It is likely that Defendants Winters, Funk, and Fuqua were held liable for the actions of the placement office personnel in placing Durham with McCroy, the medical personnel who did not place any restrictions on celling, and/or the Transfer Coordinator's Office personnel who determined McCroy and Durham properly placed at Western Illinois Correctional Center.

Defendants also object to the extent their jury instructions and Co-Defendants' jury instructions regarding the law of deliberate indifference and failure to protect were refused. The evidence in this case is that Plaintiff was unhappy with certain aspects of his medical care, not that he did not receive medical care. The evidence was also that Plaintiff was unhappy when the physicians disagreed with the course his care should take. Neither of these situations can be the basis for liability under §1983, yet the jury instructions relating to those issues were refused (see for example Co-Defendants' Instructions Numbers 3 and 5 and Defendants' Exhibits generally).

Additionally, Defendants objected to the Court's punitive instruction, the refusal to give Defendants' proffered instruction #27, as well as the Court's determination to allow the issue of punitive damages to go to the jury. There was no evidence of an evil motive or subjective

knowledge the Defendants were violating Plaintiff's rights that is necessary for the jury to find punitive damages. <u>Kyle v. Patterson</u>, 196 F.3d 695 (7th Cir. 1999). The Defendants' instruction included the standard that, as a fundamental notion of fairness, the Defendants are required to have subjective knowledge that their actions or inactions would violate the Plaintiff's rights and subject them to liability. <u>BMW of North America v. Gore</u>, 517 U.S. 559 (1996).

Because there was no evidence that any of these Defendants had such subjective knowledge, the Defendants were prejudiced by the Court's instruction, and the jury awarded punitive damages against all of the individual Defendants (Winters, Funk, and Fuqua).

The cumulative effect of these errors is that the jurors were led to believe, not only that each Defendant had more knowledge and responsibility than he or she actually had, but that it was enough that something happened to Plaintiff that might have been avoided had a Defendant taken some action regardless of subjective knowledge. Such a standard is closer to negligence, and not actionable under §1983. <u>Snipes v. Detella</u>, 95 F.3d 586, 591 (7th Cir. 1996).

> **Defendant IDOC is entitled to a new trial to the extent it is impossible to determine how much of the compensatory damage award goes to the Department.**

To the extent that Plaintiff claims compensable injury against the Department of Corrections for violations of the Americans With Disabilities Act, because of the Court's verdict form listing one amount for all compensatory damages, the defendants are unable to determine which portion of the award goes to actual injuries caused by the Department, and which portion was caused by the actions of individual defendants.

## CONCLUSION

In conclusion, because there was insufficient evidence to find any of the Defendants violated Plaintiff's constitutional rights, or that Plaintiff suffered a deprivation by the Department

of Corrections under the Americans With Disabilities Act, all of the Defendants are entitled to

judgment as a matter of law.

 Moreover, because the Defendants did not receive a fair trial due to various rulings of

the Court, Defendants have met the standard for a new trial.

     Respectfully submitted,

     ILLINOIS DEPARTMENT OF CORRECTIONS,
     SANDRA FUNK, DEBRA K. FUQUA, ROGER
     E. WALKER, JR., and KEVIN WINTERS,

      Defendants,

     LISA MADIGAN, Attorney General,
     State of Illinois

By: s/ Kelly R. Choate
     Kelly R. Choate, #6269533
     Assistant Attorney General
     Attorney for Defendants
     500 South Second Street
     Springfield, Illinois  62706
     Telephone:  (217) 782-9026
     Facsimile:   (217) 524-5091
     E-Mail:  kchoate@atg.state.il.us

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| AARON MCCROY, #N-51882, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No.  02-3171 |
| | ) | |
| ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on November 27, 2007, I electronically filed a Memorandum of Law in Support of Defendants' Renewed Motion for Judgment as a Matter of Law, or in the Alternative, Motion for a New Trial with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to the following:

Thomas Londrigan                                    Douglas J. Quivey
Londrigan, Potter & Randle, P.C.       Londrigan, Potter & Randle, P.C.
tom@lprpc.com                                          doug@lprpc.com

Theresa Powell
Heyl, Royster, Voelker & Allen
tpowell@hrva.com

and I hereby certify that on November 27, 2007, I mailed by United States Postal Service, the document(s) to the following non-registered participant(s):

None

Respectfully Submitted,
 s/ Kelly R. Choate
Kelly R. Choate, #6269533
Assistant Attorney General
Attorney for Defendants
500 South Second Street
Springfield, Illinois  62706
Telephone:  (217) 782-9026
Facsimile:   (217) 524-5091
E-Mail:  kchoate@atg.state.il.us