IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |  |
|---|---|---|
| AARON MCCROY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02-cv-3171 |
| | ) | |
| THE ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS, ROGER E. | ) | |
| WALKER, JR., (in his official | ) | |
| capacity only), DENNIS HOCKADAY, | ) | |
| KEVIN WINTERS, SANDRA FUNK, | ) | |
| DEBORAH FUQUA, LIEUTENANT BRYON | ) | |
| LAW, KENNETH KELLERMAN, JULIUS | ) | |
| FLAGG, all in their official and | ) | |
| individual capacities, WEXFORD | ) | |
| HEALTH SOURCES, Inc., | ) | |
| Dr. LOWELL BROWN, MD., | ) | |
| Dr. HUGHES LOCHARD, MD., and | ) | |
| RHONDA MILLS, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS
RESPONSE TO THE WEXFORD DEFENDANTS' MOTION FOR
JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(b),
OR IN THE ALTERNATIVE MOTION FOR A NEW TRIAL
PURSUANT TO RULE 59**

Plaintiff, AARON MCCROY, by one of his attorneys, in additional support of his response to the Wexford Defendants' post-trial motion pursuant to Fed. R. Civ. P. 50(b) and 59 states as follows:

**I. Legal Standard**

Pursuant to Fed. R. Civ. P. 50(b), when a Rule 50(a) motion is revived within 10 days following judgment, the Court may: (1) allow the judgment to stand; (2) order a new trial; or (3) direct entry of judgment as a matter of law. Fed. R. Civ. P. 50(b).

In making the determination of whether the judgment should stand or judgment as a matter of law should be directed against the jury verdict, a court must: (1) review all of the evidence in the record; (2) draw all reasonable inferences in favor of the non-moving party; (3) not make any credibility determinations; (4) not weigh the evidence; and (5) disregard all evidence favorable to the moving party that the jury was not required to believe. ***Reeves v. Sanderson Plumbing Products, Inc.***, 530 U.S. 133, 135 (2000). The jury's verdict can be overturned only if no rational jury could have found for the Plaintiff. ***Emmel v. Coca-Cola Bottling Co.***, 95 F.3d 627, 630 (7th Cir. 1996).

The Court should order a new trial pursuant to Rule 50(b) or Rule 59(a), "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. P. 59(a). A new trial is warranted because of an evidentiary error only if the error has a substantial and injurious effect or influence on the jury. ***Bintz v. Bertrand***, 403 F.3d 859, 869 (7th Cir. 2005). If there was an evidentiary error, a new trial is warranted only if the existing result was "inconsistent with substantial justice." Fed. R. Civ. P. 61 (effective December 1, 2007 Rule 61 was amended to use the term "substantial rights.").

A new trial is warranted based upon an erroneous jury instruction if the instructions, taken as a whole, did not adequately state the law and that the error was prejudicial because the jury was likely confused or misled. ***Boyd v. IL State Police***, 384 F.3d 888, 894 (7th Cir. 2004). Again, an improper jury instruction must be inconsistent with substantial justice or affect a party's substantial rights to warrant granting a new trial.

## II. Argument

**A. Wexford's Customs and/or Policies**

There was sufficient evidence to support the finding that a Wexford policy was a cause of the constitutional injury. Specifically, a reasonable jury could have found that Defendant Wexford had a policy of not allowing <u>any</u> transplants and because of that policy, Plaintiff's corneal transplant surgery was delayed. The specific evidence includes but is not limited to: (1) Dr. Rayford's testimony; (2) Dr. Anderson's testimony; and (3) various exhibits to include but not limited to Pl's Ex. 5, p. 19.

Defendant Wexford's argument that it denied the transplant "on the grounds that such a procedure was not covered by of [sic] its contract with the State", (Def's Mem. of Law p. 3), was rejected by the jury. Specifically, the contract clearly states that IDOC has sole responsibility for <u>organ</u> transplants. (Pl's Ex. 1, p. 24). The clear evidence in the trial, from multiple sources, is that Plaintiff's cornea was not an organ and that the language in the contract did not apply. Thus, the jury's finding was reasonable.

The jury could also have reasonably concluded that Defendant Wexford had a persistent practice/policy of releasing disabled inmates from the infirmary into general population without adequately communicating the risk posed by their disability to the placement office. Evidence of this includes but is not limited to the testimony of Defendants Brown, Flagg, Fuqua, and others. It also includes Exhibits such as Pl.'s Ex. 5, p. 157, 160, 209, 210 and the various medical permits that were introduced into evidence.

Finally, Defendant Wexford can also be held liable because Defendant Brown possessed "final policy-making authority" and he knew of the pattern/policy and allowed it to continue. **See Brokaw v. Mercer County**, 235 F.3d 1000, 1013 (7th Cir. 2000) (explaining that a constitutional violation by a "final policy-making authority" is one of the three forms of an

unconstitutional custom or policy). The evidence that Defendant Brown was a "final policy-making authority" is the Wexford contract wherein it clearly states that: "[t]he on-site Medical director shall plan, implement, direct and control all clinical aspects of the health care program." (Pl.'s Ex. 1, p. 19). The jury could also have reasonably concluded that Defendant Dr. Brown knew of and implemented the practice/policy regarding the medical permits and the placement office that violated Plaintiff's constitutional rights.

### B. The Delay in Surgery Caused Injury

Defendant Wexford's argument that the delay in surgery did not cause injury is simply not supported by the evidence and was reasonably rejected by the jury. First, Defendant Wexford is improperly trying to narrow the relevant time frame. Specifically, on February 26, 2002, Dr. Weller recommended that Plaintiff be seen by a corneal specialist. (Pl's Ex. 5, p. 2). On May 14, 2002, Dr. Anderson again recommended that Plaintiff be seen by a corneal specialist. (Pl.'s Ex. 5, p. 18). Despite these recommendations, Defendant Wexford did not approve said appointment with a corneal specialist until October 3, 2002. ( Pl's Ex. 5, p. 40). Plaintiff was not actually seen by the corneal specialist, Dr. Fedor, until November 20, 2002. (Pl.'s Ex. 5, p. 41). He did not have surgery until February 3, 2003. (Pl.'s Ex. 5, p. 63).

There is also ample evidence in the record to support the finding that Plaintiff suffered damage as a result of the delay in surgery. For example, on November 20, 2002, Dr. Fedor noted: "[p]atient has episodes of corneal hydrops with acute painful swelling of cornea." (Pl.'s Ex. 5, p. 41). Previously, on May 14, 2002, Dr. Anderson noted in a progress note: "that at this point a corneal transplant is probably the only option since he can no longer tolerate a contact lens and has recurrent episodes of hydrops etc." (Pl.'s Ex. 5, pp. 16-17). Dr. Zeh also testified in

4

response to Defense Counsel's attempt to suggest that the delay did not cause any problems: "[h]owever, he did have a significant amount of discomfort and pain documented in some of the earlier notes, and that, by itself, can be an indication to proceed with surgery." (Zeh. Dep. p. 54). Dr. Zeh also clearly testified that one of the two purposes of corneal transplant surgery for keratoconus patients is "to reduce discomfort or pain for someone whose disease is causing them that problem." (Zeh. Dep. p. 9). Dr. Zeh went on to explain that: "Mr. McCroy had both a significant level of visual impairment as well as chronic pain." (Zeh Dep. p. 10). Lastly, Dr. Kwedar and Plaintiff also testified about the pain. The bottom line is that there was ample evidence for the jury to conclude Plaintiff suffered an injury as a result of the delay in surgery.

**C. Defendant Brown and First Amendment Retaliation**

There is ample evidence that Defendant Dr. Brown was aware that Plaintiff had filed grievances and/or complained about the conditions of his confinement in the infirmary prior to June 8, 2004. For example, there is evidence that it was common knowledge among workers in the HCU that Plaintiff had filed grievances. For example, although he did not talk directly to Defendant Dr. Brown about Plaintiff's grievances, Dr. Anderson testified in response to whether he talked to Plaintiff about the move to general population:

    A:    No. Sir, To my knowledge, he [Plaintiff] grieved his way out of the medical unit to go to general population.

    Q:    So it's your opinion that he grieved and put grievances in requesting to be moved, correct?

    A:    Yes, sir. To my knowledge, that's what happened.

    Q:    And what's the basis for your knowledge?

    A:    Secondhand, nurses, that type of thing.

(Anderson Dep. p.89). Dr. Anderson also testified that he issued the no yard restriction because one of the nurses told him that Plaintiff was going to the yard or wanted to go to the yard. (Anderson Dep. p. 100). Various nurses also testified about knowing about the various grievances and talking about them with others. In other words, it was common knowledge in the HCU that Plaintiff had filed grievances and complained about various aspects of his confinement in the infirmary.

The June 11, 2004 Memorandum written by Defendant Funk that talks about the grievances being moot is also evidence of Defendant Dr. Brown's knowledge because the Memorandum discusses information regarding Dr. Zeh that likely came from Defendant Dr. Brown. (Pl's Ex. 41, p. 137). More specially, it was Defendant Dr. Brown who authored all of the records noted by Defendant Funk when she discusses the "vision issue." (Pl's Ex. 41, p. 137).

Also, according to the Wexford contract, "[a]ny grievance filed by committed persons may be referred to the Medical Director, who shall review the claim and gather information concerning the complaint, and take appropriate action consistent with institutional grievance procedures." (Pl.'s Ex. 1, p. 34). Dr. Brown abided by this provision. For example, he provided information to respond to Plaintiff's grievance about being moved to general population. (Pl.'s Ex. 41, p. 153).

Defendant Dr. Brown was also on the Quality Improvement Committee charged with reviewing "significant issues" in the HCU and, as Medical Director, likely participated in the mandated monthly Health Care Staff meetings. (Pl.'s Ex. 1, p. 33). Thus, it is reasonable to conclude that Plaintiff's situation of being held for a long time in the infirmary and his filing of

6

numerous complaints and grievances would qualify as "significant issues" that Defendant Dr. Brown was made aware of during the meetings.

There is also direct evidence that Defendant Dr. Brown knew about some of the grievances. For example, regarding the TV grievance, on April 7, 2004, he talked to Plaintiff about the TV while Plaintiff was in segregation. (Def's Ex. 1, p. 992). In fact, Defendant Dr. Brown's April 7, 2004 conversation with Plaintiff is referenced in a grievance. (Pl.'s Ex. 41, p. 153). Some of Plaintiff's complaints/grievances are also in the medical records to include his hunger strike. (Pl.'s Ex. 5, p. 126, 141). A reasonable inference can also be made that Defendant Dr. Brown knew about the complaints/grievances regarding the steroid induced glaucoma that he was involved in treating. (Pl.'s Ex. 5, p. 206).

Defendant Dr. Brown also testified that he talked to Defendant Fuqua before he ordered Plaintiff out of the infirmary on June 8, 2004 and there is no question that Defendant Fuqua was aware of the numerous grievances. More specifically, as it relates to the move to general population, Defendant Dr. Brown admitted that he made the decision "in conjunction" with Defendant Fuqua and that they talked about "things."

Finally, Defendant Dr. Brown admitted that he moved Plaintiff to the general population in direct opposition to Dr. Zeh because he "knew better [than Dr. Zeh] in view of everything that was going on." A reasonable inference "of everything that was going on" includes Plaintiff making complaints and filing grievances. Dr. Brown also later claimed that Plaintiff asked to be removed from the infirmary. (Pl.'s Ex. 41, p. 153).

The bottom line is that the jury could have reasonably concluded that Defendant Dr. Brown was aware of the numerous grievances and complaints that Plaintiff had filed and voiced

7

about a variety of issues regarding his stay in the infirmary post-surgery and that Defendant Dr. Brown took it upon himself to "moot" the grievances/complaints by moving Plaintiff into the general population.

### D. The June 8, 2004 Move Caused Injury

The Wexford Defendants' argument that there was no harm caused by the June 8, 2004 move into general population and no medical need for protection of the eye defies both common sense and the evidence. Dr. Zeh testified that he did not want Plaintiff moved into the general population or in a place that risked an injury to his eye because he did not want him poked in the eye. (Zeh. Dep. p. 44). Dr. Zeh also testified that he clearly communicated this order. (Dr. Zeh Dep. p. 44). Dr. Zeh further testified that having the cornea transplant put Plaintiff "at a lifelong risk to an increased susceptibility for trauma." (Zeh Dep. p. 49). Moreover, Defendant Dr. Brown admitted that he knew "all about" Dr. Zeh's concerns and orders and disregarded them. The November 21, 2003, discharge note also clearly states "needs placement to protect eye from injury. Avoid general population." (Pl.s Ex. 5, p. 155). A fair reading of Dr. Zeh's testimony is that Plaintiff's medical need did not change between November 21, 2003 and June 8, 2004. Thus, there was a serious medical need at the time in question.

The jury could also have reasonably concluded that the general population was a much more dangerous place than the infirmary and that it was the move to the general population that was a cause of the injury. ***See Helling v. McKinney***, 509 U.S. 25, 33 (1993) (noting that "[w]e have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year."). After all,

contrary, to the suggestions of Defense Counsel, if the infirmary was just as dangerous as the general population, why did Defendant Mills indicate that the general population needed to be avoided to protect Plaintiff's eye? (Pl.'s Ex. 5, p. 155). There was also a murder in the general population a little more than two months prior to the move.

>   E.   **The Evidence Supports the Jury's Determination that Defendant Dr. Brown violated the 8th Amendment**

There is ample evidence in the record to support the finding that Defendant Dr. Brown was deliberately indifferent to a substantial risk of serious harm to Plaintiff both in terms of a serious medical need and risk of an attack. In this regard, two Supreme Court cases, ***Helling v. McKinney*** and ***Farmer v. Brennan*** are illustrative. As previously noted, in ***Helling***, the Supreme Court, when considering whether an inmate subject to environmental tobacco smoke may bring an 8th Amendment claim, explained: "[w]e have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." ***Helling***, 509 U.S. at 33.

In ***Farmer***, the Supreme Court reversed the Seventh Circuit and found that a transsexual inmate placed in general population and subsequently raped and assaulted was allowed to present his case to the jury. In so doing, the ***Farmer*** court held: "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." ***Farmer v. Brennan,*** 511 U.S 825, 837 (1994). In other words, it does not really matter if the risk is couched in terms of health or safety. ***See e.g Hutto v. Finney***, 437 U.S. 678, 682 (1978) (placing inmates in isolation cells with contagious inmates can constitute deliberate indifference);

*O'Brien v. Indiana Dept. of Corrections,* 495 F.3d 505 (7th Cir. 2007) (finding defendants were not deliberately indifferent but noting that the plaintiff, a former police officer, faced a substantial risk of harm because of his status ); *Board v. Farnham*, 394 F.3d 469 (7th Cir. 2005) (deliberately indifferent to health risks associated with inadequate jail ventilation system when inmate suffered from asthma); *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917 (7th Cir. 2004) (deliberately indifferent to risk of suicide when jail inmate reported history of psychiatric treatment and previous suicide attempts); *Haley v. Gross*, 86 F.3d 630 (7th Cir. 1996) (deliberately indifferent to risk of inmate being burned by mentally ill cellmate); *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556 (1st Cir. 1988) (deliberately indifferent to health and safety of inmate when psychiatrically disturbed inmate placed in general population and subsequently killed).

    Likewise, Defendants' argument that the failure to protect issue against Defendant Dr. Brown was not in the pretrial order is without merit. Specifically, conditions of confinement was in the pretrial order and the issue of Defendant Dr. Brown releasing Plaintiff into the general population was in the pretrial order. There is simply no merit to Defendants semantics game.

    As it relates to Defendant Dr. Brown, there is also no question that he was aware of the serious risk of Plaintiff getting hit in the eye. Specifically, Defendant Dr. Brown admitted that he knew all about Dr. Zeh's concerns and Dr. Zeh testified to exactly what risk Plaintiff's eye condition presented. (Zeh's Dep. p. 40). The medical records also support the conclusion that the risk was known. (Pl.'s Ex. 5, 118, 143, 154, 155). Specifically, the discharge note on 11-21-2003 clearly states that the reason for admission was "needs placement to protect eye from injury. Avoid general population." (Pl.'s Ex. 5, p. 155). As late as March 17, 2004, a nurse had also

medically recommended Plaintiff be placed in a single cell segregation cell. (Pl.'s Ex. 29, p. 2). In other words, the evidence supports the conclusion that Defendant Dr. Brown was aware of the risk.

Because Defendant Dr. Brown was aware of the risk, the next relevant question is whether there was evidence to support the conclusion that he disregarded the risk by failing to take reasonable measures to abate it. *See O'Brien*, 495 F.3d at 508. Simply put, there is ample evidence to support a finding that Defendant Dr. Brown utterly and completely disregarded the known risk when he ordered Plaintiff into the general population with no restrictions.

First, the evidence is clear from Dr. Zeh that the need to protect the eye was a life-long concern and that the need to protect the eye had not changed over time. In other words, the serious medical need that Dr. Zeh addressed in November of 2003 was still a serious medical need in June of 2004. Defendant is simply wrong when he argues that "there was no evidence of any medical need for the Plaintiff to remain as a patient in the infirmary." (Def.'s Memo of Law, p. 11).

Second, Defendant Dr. Brown decided not to consult with any qualified ophthalmologist before moving Plaintiff into the general population. Instead, Defendant Dr. Brown, who basically admitted to knowing virtually nothing about cornea transplants, unilaterally deemed that Dr. Zeh's recommendations were probably based upon unrealistic expectations and "playing it safe." Instead of following-up with Dr. Zeh, as had Dr. Ghosh, or asking another qualified ophthalmologist, Defendant Dr. Brown claimed only to having consulted with Defendant Fuqua. In other words, Defendant Dr. Brown did not exercise any medical judgment.

11

Third, Defendant Dr. Brown, after Dr. Anderson issued an order for no yard or gym due to eye condition, expressly ordered that Plaintiff did not need a low bunk or low galley permit. (Pl.'s Ex. 5, p. 209). In other words, Defendant Dr. Brown went out of his way to make sure Plaintiff would not get any accommodation by the placement office when he could have indicated that Plaintiff was "physically challenged" or at least indicated that Plaintiff had a protective custody or special need. (Def.'s Ex. 1, p. 452; Pl.'s Ex. 56). Moreover, Defendant Dr. Brown made this order despite believing that the surgery had failed, Pl.'s Ex. 5, p. 206, and considering Plaintiff to be legally blind. (Pl.'s Ex. 41, p. 153). There is ample evidence to support the jury's finding on the 8th Amendment.

**F.  There is No Reason to Reduce The Punitive Damages**

Defendant Dr. Brown in his motion asks that the $50,000 punitive damages award be reduced or eliminated. However, except for stating that, "there was no evidence that his actions were done with spite or ill will or with malice", (Defs.' Mot. p. 7), Defendant makes no additional argument on the issue.

In regard to reduction, based upon the fact that compensatory damages were $810,000 there is absolutely no reason to reduce the amount of the punitive damages assessed against Defendant Dr. Brown because the award is not "monstrously excessive." ***Frazier v. Norfolk & Western R.R.***, 996 F.2d 922, 925 (7th Cir. 1993).

Likewise, there was sufficient evidence in the record to support the finding of punitive damages. The jury reasonably concluded that Defendant Dr. Brown maliciously and recklessly disregarded Plaintiff's rights. Specifically, among other things, the jury could have concluded that Defendant Dr. Brown: (1) totally disregarded Dr. Zeh's orders and the known risk; (2)

moved Plaintiff into general population in retaliation for Plaintiff exercising his First Amendment rights; (3) went out of his way to not give Plaintiff a physically challenged permit or any restriction before moving him into the general population; (4) falsely indicated that Plaintiff was released from the infirmary at Plaintiff's request; and (5) considered the loss of Plaintiff's eye trivial.

### G.  There Are No Evidentiary Errors or Instruction Errors That Warrant A New Trial

Although the Wexford Defendants assert various instruction and evidentiary errors, they fail to show how any alleged error affected their substantial rights. In regard to instructions, in their Memorandum of Law, the Wexford Defendants first claim error because the Court did not instruct the jury as it relates to its contract and its obligation to provide medical care. As pointed-out previously, however, the contract did not limit any aspect of medical treatment relevant to the case. The contract clearly states <u>organ</u> transplant and all of the admitted evidence shows that an <u>organ</u> was not transplanted.

The Wexford Defendants next claim that the Court did not properly instruct as it relates to the delay in medical treatment. Defendant Wexford, however, does not identify how the instructions, as a whole, failed to accurately state the law as it relates to serious medical need. Moreover, Defendant Wexford is simply wrong when it argues that there was no medical evidence in the record establishing the damages resulting from the delay.

Next, Defendant claims that the Court did not properly instruct as to *respondeat superior* liability. Defendant, however, fails to identify exactly how the instruction on the issue misstated the law. Specifically, the instruction on page 15 clearly indicates that to hold Wexford liable the

13

jury had to find " that those violation(s) were a result of Wexford's policy." (Instruction p. 15). The bottom line is that there were no jury instruction errors. Moreover, even if Defendants are correct regarding any of the alleged instruction errors, none warrant a new trial because no alleged error was significant.

Likewise, for any of the alleged evidentiary errors. Although it is difficult to determine exactly what errors Defendants claim and some of the alleged errors were clearly waived (for example Defendants assert that Plaintiff's Counsel made improper arguments but did not object during the trial), none of the alleged errors warrant a new trial because Defendants were not significantly prejudiced by any evidentiary ruling against them.

### III. Conclusion

For the above noted reasons, Defendants' motion should be denied.

Respectfully submitted,

AARON MCCROY, Plaintiff

/s/ Douglas J. Quivey
Douglas J. Quivey, #6225888
Attorney for Plaintiff
LONDRIGAN, POTTER & RANDLE, P.C.
1227 South 7th Street, P.O Box 399
Springfield, Illinois 62705
Telephone:  (217) 544-9823
Fax:  (217)544-9826
E-Mail: doug@lprpc.com

## Certificate of Service

The hereby certify that on December 4, 2007, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification to such filing to the following;

Ms. Theresa Powell
Heyl, Royster, Voelker & Allen
National City Center, Ste. 575
1 North Old State Capitol Plaza
PO Box 1687
Springfield, IL 62705-1687

Lisa Madigan, Illinois Attorney General
Attn: Kelly Choate, A.A.G.
Julie L. Morgan. A.A.G. &
Matthew Lurkins, A.A.G.
500 South Second Street
Springfield, IL 62706

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

Aaron McCroy,#N51882
Receiving Cell 15
P. O. Box 900
Ina, IL 62846

/s/ Douglas J. Quivey
Douglas J. Quivey, #6225888
Attorney for Plaintiff
LONDRIGAN, POTTER & RANDLE, P.C.
1227 South 7th Street, P.O Box 399
Springfield, Illinois 62705
Telephone: (217) 544-9823
Fax: (217)544-9826
E-Mail: doug@lprpc.com