IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| AARON MCCROY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 02-cv-3171 |
| | ) |
| THE ILLINOIS DEPARTMENT OF CORRECTIONS, ROGER E. WALKER, JR., (in his official capacity only), DENNIS HOCKADAY, KEVIN WINTERS, SANDRA FUNK, DEBORAH FUQUA, LIEUTENANT BRYON LAW, KENNETH KELLERMAN, JULIUS FLAGG, all in their official and individual capacities, WEXFORD HEALTH SOURCES, Inc., Dr. LOWELL BROWN, MD., Dr. HUGHES LOCHARD, MD., and RHONDA MILLS, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS
RESPONSE TO THE IDOC DEFENDANTS' MOTION FOR
JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(b),
OR IN THE ALTERNATIVE MOTION FOR A NEW TRIAL
PURSUANT TO RULE 59**

Plaintiff, AARON MCCROY, by one of his attorneys, in additional support of his response to the IDOC Defendants' post-trial motion pursuant to Fed. R. Civ. P. 50(b) and 59 states as follows:

**I. Legal Standard**

Pursuant to Fed. R. Civ. P. 50(b), when a Rule 50(a) motion is revived within 10 days following judgment, the Court may: (1) allow the judgment to stand; (2) order a new trial; or (3) direct entry of judgment as a matter of law. Fed. R. Civ. P. 50(b).

In making the determination of whether the judgment should stand or judgment as a matter of law should be directed against the jury verdict, a court must: (1) review all of the evidence in the record; (2) draw all reasonable inferences in favor of the non-moving party; (3) not make any credibility determinations; (4) not weigh the evidence; and (5) disregard all evidence favorable to the moving party that the jury was not required to believe. ***Reeves v. Sanderson Plumbing Products, Inc.***, 530 U.S. 133, 135 (2000). The jury's verdict can be overturned only if no rational jury could have found for the Plaintiff. ***Emmel v. Coca-Cola Bottling Co.***, 95 F.3d 627, 630 (7th Cir. 1996).

The Court should order a new trial pursuant to Rule 50(b) or Rule 59(a), "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. P. 59(a). A new trial is warranted because of an evidentiary error only if the error has a substantial and injurious effect or influence on the jury. ***Bintz v. Bertrand***, 403 F.3d 859, 869 (7th Cir. 2005). If there was an evidentiary error, a new trial is warranted only if the existing result was "inconsistent with substantial justice." Fed. R. Civ. P. 61 (effective December 1, 2007 Rule 61 was amended to use the term "substantial rights.").

A new trial is warranted based upon an erroneous jury instruction if the instructions, taken as a whole, did not adequately state the law and that the error was prejudicial because the jury was likely confused or misled. ***Boyd v. IL State Police***, 384 F.3d 888, 894 (7th Cir. 2004). Again, an improper jury instruction must be inconsistent with substantial justice or affect a party's substantial rights to warrant granting a new trial.

## II. Argument

### A. The Jury Properly Found That Defendant Winters Violated the Eighth Amendment

2

There was sufficient evidence to support the finding that Defendant Warden Winters violated the Eighth Amendment. Specifically, there is ample evidence in the record to support the finding that Defendant Winters was deliberately indifferent to a substantial risk of serious harm to Plaintiff both in terms of a serious medical need and risk of an attack. In this regard, two Supreme Court cases, **Helling v. McKinney** and **Farmer v. Brennan** are illustrative.

In **Helling**, the Supreme Court, when considering whether an inmate subject to environmental tobacco smoke may bring an 8th Amendment claim, explained: "[w]e have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." **Helling**, 509 U.S. 25, 33 (1993).

In **Farmer**, the Supreme Court reversed the Seventh Circuit and found that a transsexual inmate placed in general population and subsequently raped and assaulted was allowed to present his case to the jury. In so doing, the **Farmer** court held: "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." **Farmer v. Brennan,** 511 U.S 825, 837 (1994). In other words, it does not really matter if the risk is couched in terms of health or safety. *See e.g* **Hutto v. Finney**, 437 U.S. 678, 682 (1978) (placing inmates in isolation cells with contagious inmates can constitute deliberate indifference); **O'Brien v. Indiana Dept. of Corrections,** 495 F.3d 505 (7th Cir. 2007) (finding defendants were not deliberately indifferent but noting that the plaintiff, a former police officer, faced a substantial risk of harm because of his status ); **Board v. Farnham**, 394 F.3d 469 (7th Cir. 2005)

(deliberately indifferent to health risks associated with inadequate jail ventilation system when inmate suffered from asthma); ***Woodward v. Correctional Medical Services of Illinois, Inc.***, 368 F.3d 917 (7th Cir. 2004) (deliberately indifferent to risk of suicide when jail inmate reported history of psychiatric treatment and previous suicide attempts); ***Haley v. Gross***, 86 F.3d 630 (7th Cir. 1996) (deliberately indifferent to risk of inmate being burned by mentally ill cellmate); ***Cortes-Quinones v. Jimenez-Nettleship***, 842 F.2d 556 (1st Cir. 1988) (deliberately indifferent to health and safety of inmate when psychiatrically disturbed inmate placed in general population and subsequently killed).

As it relates to Defendant Warden Winters, Defendant is conveniently overlooking the fact that the jury could have reasonably concluded that it was Defendant Winters who made the decision to remove Plaintiff from the infirmary to the general population on June 8, 2004. In so doing, Defendant Warden Winters knowingly disregarded the risk to Plaintiff that he would be hit in the eye.

Specifically, Defendant Funk testified that when an inmate is being housed in the infirmary by the Warden, only the Warden had the authority to remove said inmate from the infirmary. In other words, based upon Defendant Funk's testimony, only Defendant Warden Winters had the authority to remove Plaintiff from the infirmary. Defendant Funk's testimony is supported by Defendant Mills admissions that after Plaintiff was discharged from the infirmary, "security was calling the shots," and that "security" discharged Plaintiff from the infirmary. In this context, based upon Defendant Funk's testimony, "security" could only refer to Defendant Warden Winters.

Defendant Fuqua also admitted that she was the "relayer" between Defendant Warden Winters to the staff and that it was Defendant Warden Winters who placed Plaintiff into the infirmary after he was discharged from the infirmary by Defendant Mills on November 21, 2003. She also admitted that the medical records indicated that after November 21, 2003 and before June 8, 2004, when Plaintiff was in the infirmary he was there at the direction of the "Warden" or "Security," i.e., Defendant Warden Winters. Defendant Fuqua also testified that prior to being moved Plaintiff was not subject to a medical plan because he was no longer a patient in the infirmary. In other words, Defendant Warden Winters would not rely upon the medical judgment of others because he considered it a "security" issue.

Some of the medical records are also illustrative of this point. For example, starting November 22, 2003, the progress notes are entitled "Offender Outpatient Progress Notes" where as before they were "Offender Infirmary Progress Notes." (Def.'s Ex. 1, pp. 965 & 967). It is also relevant that there are only isolated notes for November 22, 2003, November 26, 2003, December 21, 2003 for the entire period November 22, 2003 through December 22, 2003. In other words, although Defendants never produced the housing records, Plaintiff was not in the infirmary during that period and Plaintiff testified he was in the general population and assigned cell mates during this period.

Starting on December 23, 2003 and going until June 8, 2004, however, Plaintiff was "housed" in the infirmary either "per warden" or "per security." On December 23, 2003, Dr. Zeh signed a consult report diagnosing steroid induced glaucoma. (Def.'s Ex. 1, p. 330). Dr. Zeh saw Plaintiff, during this period, on December 17, 2003. Interestingly, December 17, 2003, is the first time Dr. Zeh saw Plaintiff after his two telephone calls in November conveying the need to

5

protect Plaintiff's eye. Arguably, on December 23, 2003, however, it was not a medical person that ordered Plaintiff to be housed in the infirmary, it was Defendant Warden Winters.

For example, on January 16, 2004, Plaintiff was moved from Rm 1 to Ward B and the Shift Commander was notified of the need for a single cell and ok'd the move to Ward B. (Pl.' s Ex 5, p. 176). If it was for medical reasons, why would the Shift Commander need to ok the move? More importantly, on January 23, 2004, a progress note states that Plaintiff "remains housed in inf per warden." (Pl.'s Ex. 5, p. 177). Numerous entries of Plaintiff being housed in the infirmary "per security" followed including the entry on June 8, 2004, the date Plaintiff was moved into the general population. (Pl.'s Ex. 5, p. 209). Likewise, on March 16, 2004, Defendant Warden Winters gave a specific instruction allowing Plaintiff to receive medical eye treatment while in a segregation status in the infirmary. (Def.'s Ex. 1, p. 988). In other words, the jury could reasonably conclude that Defendant Warden Winters was in total control, initially placing and later removing Plaintiff from being housed in the infirmary.

There is also ample evidence to conclude that when Plaintiff was removed from the infirmary on June 8, 2004, Defendant Warden Winters was aware of the risk of harm. First, the mere fact that Defendant Warden Winters placed Plaintiff back into the infirmary the same day the report from Dr. Zeh was received is evidence of his concern over Dr. Zeh's orders.

Second, on March 4, 2004, Defendant Warden Winters approved a request to transfer Plaintiff to a different correctional center. (Pl.'s Ex. 30, 31, & 32). Defendant Warden Winters approved the request--which states that Plaintiff was in the General Population--despite knowing that Plaintiff was actually housed in the infirmary to protect his eye. In fact, the form itself notes that Plaintiff was "medically unassigned" and a "clinical services participant." (Pl.'s Ex. 32).

6

Third, Defendant Warden Winters processed grievances that leave no doubt that he was aware of Plaintiff's risk of injury. For example, ten days after Plaintiff was moved to the general population but before he was struck in th eye, Defendant Warden Winters denied emergency status to Plaintiff's grievance that notes Dr. Zeh's recommendations and specifically states that Plaintiff is functionally and legally blind. (Pl.'s Ex. 41, pp. 140-141).

As admitted by Defendant, Defendant Warden Winters also denied emergency status to two grievances on June 9, 2004, one of which that states: "I have been housed in the infirmary for aprs. 18 months because of my visual disability." (Pl.'s Ex. 41, p. 134). Also, on June 11, 2004, Defendant Warden Winters received a memo from Defendant Funk that clearly states that Plaintiff was moved to general population on June 8, 2004. (Pl.'s Ex. 41, p. 137).

Lastly, the Jury could have reasonably concluded from the circumstances that Defendant Warden Winters and the other Defendants, Brown, Funk, and Fuqua, were all aware of Plaintiff and the risks associated to his eye. In other words, Plaintiff would have been a continuing topic of discussion at staff meetings. After, all, according to Defendant Dr. Brown, Plaintiff was a "notorious inmate." Plaintiff had also complained to numerous people in and outside WICC about his medical care and had requested a transfer that was approved by WICC officials, including Defendant Warden Winters, but denied by Springfield. Thus, it was reasonable for the jury to conclude that despite their denials, Defendant Warden Winters and the other Defendants were well aware of Plaintiff's precarious eye condition.

The bottom line is that there was ample evidence to conclude that Defendant Warden Winters was deliberately indifferent to Plaintiff's serious risk/medical need.

    **B.**    **The Jury Properly Found That Defendant Fuqua Violated the Eighth Amendment**

The starting point for the evidence against Defendant Fuqua is that Defendant Warden Winters admitted in his deposition and reaffirmed at trial that Defendant Fuqua made the decision to remove Plaintiff from the infirmary and place him in the general population on June 8, 2004. Moreover, Defendant Fuqua admitted that she was the "relayer" of information between the staff and the Warden and that "per security" means at the direction of the Warden. In other words, the jury could have reasonably concluded that Defendant Warden Winters directed or allowed Defendant Fuqua to make the decision. Because there is testimony by Defendant Warden Winters that Defendant Fuqua actually made the decision, the case relied upon by Defendant, *Johnson v. Doughty,* 433 F3d 1001 (7th Cir. 2006) is distinguishable. Defendant Fuqua simply did not rely upon the medical judgment of a doctor and by her own admission did not exercise her own medical judgment.

Likewise, there is ample evidence in the record to support the determination that Defendant Fuqua was aware of the risk of serious harm to Plaintiff when Plaintiff was moved to the general population. Defendant Dr. Brown testified that he consulted with Defendant Fuqua before he issued his order on June 8, 2004 and there is no question that Defendant Dr. Brown was also aware of Dr. Zeh's orders. Also, Defendant Dr. Brown testified that Defendant Fuqua told him that "security" had a cell placement procedure in place to make sure Plaintiff would not be housed with a violent cellmate. Defendant Fuqua was also in charge of the medical records department, periodically reviewed the medical records, and was familiar with Plaintiff's medical condition.

For example, on April 29, 2004, it was Defendant Fuqua and not a Wexford employee who tried to schedule an appointment for Plaintiff with the University of Illinois Medical Center.

(Def.'s Ex. 1, p. 342). Similarly, on March 16, 2004, it is specifically noted that "Per D. Fuqua RN HCUA & Warden" nurses may provide various medical items to Plaintiff. (Def.'s Ex. 1, p. 988). Finally, there is no question that Defendant Fuqua was made aware of the November 21, 2003 discharge. (Pl.'s Ex. 5, p. 321). The November 21, 2003 discharge form signed by Defendant Mills clearly conveys Dr. Zeh's directive to protect Plaintiff's eye from injury, avoid general population, and place him in a single cell in segregation. (Pl.'s Ex. 5, p. 966). The form also notes: "follow-up as needed from single cell in segregation." (Id.). Unfortunately, Defendant Fuqua did not follow-up.

Third, there is no question that Defendant Fuqua was aware of the grievances and the issues raised therein. For example, as early as August 13, 2002, Defendant Fuqua was instructed to communicate information directly from Dr. Elyea to Plaintiff. (Pl.'s Ex. 41, p. 53). Also, Counselor Karen Wear testified that she routinely obtained information from Defendant Fuqua to answer medical related grievances. An example of this is the grievance answer relating to Plaintiff's move to general population on June 8, 2004. (Pl.'s Ex. 41, p. 153).

The jury reasonably concluded Defendant Fuqua violated the 8th Amendment.

### C.    The Jury Properly Found That Defendant Funk Violated the Eighth Amendment

The jury also could have reasonably concluded that Defendant Assistant Warden Funk violated the Eighth Amendment. First, Defendant Assistant Warden Funk was the link between Defendant Warden Winters and Defendant Fuqua. She directly supervised Defendant Fuqua and she worked directly under the direction of Defendant Warden Winters. (Pl.'s Ex. 55). Second, as it relates to June 8, 2004, on June 11, 2004, Defendant Assistant Warden Funk wrote a memo

to Defendant Warden Winters explaining that since Plaintiff had been moved to general population, his grievances should be considered moot. (Pl.'s Ex. 41, p. 137).

Based on the June 11, 2004 memo, the jury could reasonably conclude that Defendant Funk had access to and reviewed Plaintiff's medical records to include the entries relating to Dr. Zeh's concerns. After all, she quotes extensively from the medical records in her June 11, 2004 memo. (Pl.'s Ex. 41, p. 137).

There is also no doubt from other evidence that Defendant Assistant Warden Funk was aware of Plaintiff's medical condition. For example, in August and September of 2002 she was copied on memos regarding Plaintiff's health status and grievances. (Pl.'s Ex. 41, pp. 53; 41). She also had a conversation with Plaintiff while he was in segregation post-surgery approving placement of his personal TV on a table because light from the outside was bothering his eyes. She also signed off on the March transfer request. (Pl.'s Ex. 30, 31, & 32).

Additionally, Defendant Assistant Warden Funk was the WICC ADA coordinator and required by regulation to take reasonable steps to investigate ADA grievances. (Pl.'s Ex. 4, p. 227). According to the regulation, a reasonable investigation may include talking to the grievant. (Id.). The June 11, 2004 memo addressed Plaintiff's ADA grievances. (Id.). Obviously, a reasonable investigation would have included talking to Plaintiff about being moved to general population against Dr. Zeh's directive one day after he filed two June 7, 2004 grievances.

As ADA coordinator, Defendant Assistant Warden Funk was also trained that housing assignments were a covered program under the ADA. (Pl.'s Ex. 4, p. 8). Defendant Assistant Warden Funk also had access to the OTS system to include Brandom Durham's disciplinary history. Thus, she was in a unique position to prevent what Dr. Zeh warned against.

The bottom line is that the jury was presented with sufficient evidence to find Defendant Assistant Warden Funk violated the Eighth Amendment.

> D.   **The Jury Properly Found That Defendant IDOC Violated the ADA**

There was ample evidence presented that Defendant IDOC violated Title II of the ADA and the Rehabilitation Act (RA). Defendant does not even challenge the fact that Plaintiff was a qualified individual with a disability and abundant evidence was presented on the issue. Thus, at issue is whether Plaintiff was excluded from participation in or denied the benefits of the IDOC's services, programs, or activities. If yes, the remaining issue is whether the reason for the denial was Plaintiff's disability. (Jury Instruction p. 27).

In regard to benefits, services, etc., the jury could have reasonably concluded that safe housing was an IDOC program and that Plaintiff was denied safe housing because of his disability. Specifically, the jury could have reasonably found that Plaintiff was moved from the infirmary and placed in general population because of his disability. More to the point, he was removed from the infirmary because he had complained about not being given the same access to the yard, tv placement, commissary, and other privileges as non-disabled inmates living in general population. Thereafter, instead of insuring Plaintiff was given the same access to the programs in the infirmary, where Plaintiff's eye could be protected, Defendant IDOC moved Plaintiff to general population and mooted the grievances. (Pl.'s Ex. 41, p.41).

Defendant's argument that Plaintiff was denied privileges because he was in the infirmary and that those restrictions had no relationship to his "disability" misses the mark. (Def.'s Memo of Law, p. 15). Specifically, the jury reasonably could have concluded that between at least December 23, 2003 and June 8, 2004, Plaintiff was housed in the infirmary because of his

11

disability. According to Defendant Fuqua, Plaintiff was not under a medical treatment plan at the time and he was housed in the infirmary at the direction Defendant Warden Winters who returned Plaintiff to the infirmary following receipt of Dr. Zeh's consultation report. In other words, based upon the November 21, 2003 discharge note and other circumstances, the jury could have reasonably concluded that Plaintiff was housed in the infirmary because of his disability.

Moreover, it was reasonable to house Plaintiff, a disabled inmate with a very vulnerable eye, in the infirmary. It, however, was not reasonable and violated the ADA to not provide Plaintiff the same access to the same programs as non-disabled inmates who did not live in the infirmary. Additionally, moving Plaintiff, a disabled inmate, into general population in an upper gallery and upper bunk and placing him in a cell with Brandon Durham violated the ADA and RA. It was akin to resolving a wheel chair access issue– an entry way not being wide enough-- by taking away the wheel chair and having the person crawl.

There is also other evidence in the record that the IDOC violated the ADA in other respects. For example, Plaintiff was forced to drop out of classes when he was forced into the infirmary against his will before the surgery. Also, he was denied an ADA cell for a long period time. In regard to the ADA cell issue, why did Plaintiff eventually receive permission for an ADA cell on a permanent basis if he did not need one earlier? The jury could have reasonably concluded that the reason was not a significant change in his medical condition but discrimination.

      **E.**    **The Eleventh Amendment Does Not Bar the ADA Retaliation Claim**

As noted in *United States v. Georgia*, 546 U.S. 151 (2006), the Eleventh Amendment does not bar Title II ADA claims that also violate the 14th Amendment. Retaliation because of protected status can violate the equal protection clause. *See e.g.*, *Collins v. City of Harker Heights, TX*, 503 U.S. 115, 119-120 (1992) (explaining that it would violate the constitution to retaliate against a state employee because of their race or gender); *Lytle v. Household Mfg. Inc.*, 494 U.S. 545 (1990) (allowing retaliation claim predicated on 42 U.S.C. §1981 to go forward); *North Carolina v. Pearce*, 395 U.S. 711, 725 (1969), *rev'd on other grounds*, *Alabama v. Smith*, 490 U.S. 749 (1989) (vindictive retaliation by a sentencing judge violated equal protection clause); *Booth v. Maryland*, 327 F.3d 377 (4th Cir. 2003) (explaining that public sector employees can bring equal protection gender and racial claims pursuant to 42 U.S.C. §1983). The Eleventh Amendment does not bar the retaliation claim.

### F. Injunctive Relief is Proper

Plaintiff previously addressed injunctive relief in a prior submission and will not go into detail again. Plaintiff, however, notes that Title II of the ADA allows for prospective injunctive relief. *United States v. Georgia*, 546 U.S. 151, 160 (2006). Moreover, the mere fact that Plaintiff is currently being housed in compliance with the ADA does not prevent an injunction preventing Defendant IDOC from doing what they did in the past. Also, Defendant IDOC is apparently conceding that declaratory relief is available. In other words, the Court has the authority to declare that Defendant IDOC violated the ADA and that Plaintiff is a qualified individual with a disability.

### G. A New Trial Is Not Warranted

A new trial is warranted because of an evidentiary error only if the error has a substantial and injurious effect or influence on the jury. **Bintz v. Bertrand**, 403 F.3d 859, 869 (7th Cir. 2005). A new trial is warranted based upon an erroneous jury instruction if the instructions, taken as a whole, did not adequately state the law and that the error was prejudicial because the jury was likely confused or misled. **Boyd v. IL State Police**, 384 F.3d 888, 894 (7th Cir. 2004).

The IDOC Defendants submit that there were numerous evidentiary errors and instruction errors. Plaintiff will not address each in detail other than to state that none of the alleged errors were errors and, even if one or more errors occurred, none substantially affected the rights of the Defendants. Specifically, the IDOC Defendants were allowed to put into evidence substantially everything they wanted and were allowed to argue all matters raised in their post-trail motion to the jury. For example, Counsel for IDOC did argue that the IDOC defendants did not actually look at Durham's OTS. The mere fact that a defendant does not admit to reading something in their possession, however, does not render said evidence non-admissible. In regard to the compensatory damages award, there is no problem because Plaintiff suffered the same compensatory damages as a result of all of the violations.

### H.    None of the Defendants Are Entitled to Qualified Immunity

In the IDOC Defendant's motion, they assert that they are entitled to qualified immunity. In their Memorandum of Law, however, they only briefly discuss qualified immunity and seem to rely exclusively on **Johnson v. Doughty**, 433 F3d 1001, 1012 (7th Cir. 2006), and the argument that they were relying upon the judgment of medical professionals. As previously noted, however, the evidence supports the finding that the IDOC Defendants were not and did not rely

upon the judgment of any medical professional. Accordingly, the IDOC Defendants are not entitled to qualified immunity.

### III. Conclusion

For the above noted reasons, Defendants' motion should be denied.

Respectfully submitted,

AARON MCCROY, Plaintiff

/s/ Douglas J. Quivey
 Douglas J. Quivey, #6225888
Attorney for Plaintiff
LONDRIGAN, POTTER & RANDLE, P.C.
1227 South 7th Street, P.O Box 399
Springfield, Illinois 62705
Telephone:  (217) 544-9823
Fax:  (217)544-9826
E-Mail: doug@lprpc.com

**Certificate of Service**

       The hereby certify that on December 13, 2007, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification to such filing to the following;

Ms. Theresa Powell
Heyl, Royster, Voelker & Allen
National City Center, Ste. 575
1 North Old State Capitol Plaza
PO Box 1687
Springfield, IL 62705-1687

Lisa Madigan, Illinois Attorney General
Attn: Kelly Choate, A.A.G.
Julie L. Morgan. A.A.G. &
Matthew Lurkins, A.A.G.
500 South Second Street
Springfield, IL 62706

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

Aaron McCroy,#N51882
Receiving Cell 15
P. O. Box 900
Ina, IL 62846

                                                  /s/ Douglas J. Quivey
                                                  Douglas J. Quivey, #6225888
                                                  Attorney for Plaintiff
                                                  LONDRIGAN, POTTER & RANDLE, P.C.
                                                  1227 South 7th Street, P.O Box 399
                                                  Springfield, Illinois 62705
                                                  Telephone: (217) 544-9823
                                                  Fax: (217)544-9826
                                                  E-Mail: doug@lprpc.com