UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

AARON MCCROY,

    Plaintiff,

                                                   02-CV-3171

ILLINOIS DEP'T OF
CORRECTIONS, et al.,

    Defendants.

### Order On Post Trial Motions

    The plaintiff suffers from a progressive eye disease called Keratoconus. The plaintiff filed this case *pro se* in July 2002, a case which began primarily about the defendants' alleged deliberate indifference to the plaintiff's eye disease while he was incarcerated in Western Illinois Correctional Center, particularly to his need for a corneal transplant for his left eye and the need for a properly fitting contact for his right eye. The plaintiff also alleged retaliation for complaining about that indifference and discrimination against him in the provision of services in violation of the Americans with Disabilities Act and the Rehabilitation Act.

    The plaintiff did receive a corneal transplant on his left eye in February 2003. His need for that surgery was only one aspect of the case, however. The plaintiff alleged continuing deliberate indifference to the post-operative care of his left eye, deliberate indifference to his progressing Keratoconus in his right eye (through, primarily, not fitting him properly for a contact), past and continuing retaliation, and past and continuing violations of his rights under the ADA and RA.

    The court appointed counsel on March 25, 2004. On June 8, 2004, the plaintiff was moved from the infirmary, where he had been housed since his corneal transplant (except for certain periods when he was housed in a single cell), into the general prison population for double-celling. In September 2004 the plaintiff's cellmate struck the plaintiff in his left eye, causing the plaintiff to lose not only the transplant, but his left eye entirely. This case then became also about the defendants' alleged deliberate indifference to a substantial risk of serious harm to the plaintiff, i.e. failure to protect him.

    A jury trial was held from October 29 through November 7, 2007. The claims presented to the jury were:

-     1st Amendment retaliation for the plaintiff's exercise of his First Amendment rights to file grievances and lawsuits and/or to claim his rights under the ADA

- 8th Amendment deliberate indifference to the plaintiff's serious medical needs

- 8th Amendment deliberate indifference to a substantial risk of serious harm to the plaintiff by his placement in general population with a cellmate and/or by leaving him celled with a potential attacker

- ADA discrimination and retaliation claim against the IDOC (exclusion from participation in services, programs or activities because of disability; retaliation for pursuing rights under ADA)[1]

On November 9, 2007, the jury reached a verdict in favor of Defendants Hockaday, Law, Kellerman, Flagg, Lochard, and Mills. The jury found against Defendants Funk, Fuqua, Wexford and Winters on the Eighth Amendment claim(s). The jury found against Defendant Brown on both the First Amendment claim and the Eighth Amendment claim(s). The jury found against the IDOC on the ADA discrimination and retaliation claims. The jury assessed compensatory damages of $810,000. Judgment was entered against Defendants IDOC, Wexford, Brown, Winters, Funk, and Fuqua for that amount. (d/e 457). The jurors also assessed punitive damages as follows: Dr. Lowell Brown ($50,000); Deborah Fuqua ($20,000); Kevin Winters ($10,000); Sandra Funk ($10,000).[2]  (d/e's 441, 457). The plaintiff was released on parole in December 2007 and appears to be on mandatory supervised release.

Before the Court are the defendants' motions for judgment as a matter of law or, in the alternative, for a new trial. (d/e's 462, 466). For the reasons below, the court denies the motions. The court also dismisses the plaintiff's request for injunctive relief as moot, necessitating the dismissal of Roger Walker, who was sued in his official capacity only for purposes of injunctive relief.

*Standard*

---

[1]Americans with Disabilities Act, 42 U.S.C. Section 12102 *et seq*. The plaintiff also pursued the same claims under the Rehabilitation Act of 1973, 29 U.S.C. Sections 701 *et seq*. The court put only the ADA claim to the jury for simplicity's sake, since "Title II of the ADA was modeled after Section 504 of the Rehabilitation Act; the elements of the claims under the two provisions are nearly identical, and precedent under one statute typically applies to the other." *Washington v. Indiana High School Athletic Assoc*., 181 F.3d 840, 845 n. 6 (7th Cir.1999), *cert. denied*, 528 U.S. 1046 (1999). The parties did not object to that treatment. The statutory basis for the ADA retaliation claim is 42 U.S.C. § 12203, but it is also based on the First Amendment right to petition for redress of grievances.

[2]Defendant Roger Walker was named in his official capacity only, for purposes of injunctive relief.

Federal Rule of Civil Procedure 50(a)(1) permits judgment as a matter of law against a party on an issue if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue . . . ." Fed. R. Civ. P. 50(a)(1). The test is "'whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed.'" *Susan Wakeen Doll Co., Inc., v. Ashton-Drake Galleries*, 272 F.3d 441, 449 (7th Cir. 2001)(quoting *Goodwin v. MTD Prods., Inc.*, 232 F.3d 600, 606 (7th Cir. 2000)(additional citations omitted)). "In considering a motion for judgment as a matter of law, a court must review all the evidence in the record; it must 'draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Equal Employment Opportunity Commission v. Bd of Regents*, 288 F.3d 296, 301 (7th Cir. 2002), *quoting Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 122, 150 (2000). The court "'must disregard all evidence favorable to the moving party that the jury is not required to believe.'" *Id.*

The test for determining whether to grant a new trial under Fed. R. Civ. P. 59(a) is whether "'the verdict is against the weight of the evidence, the damages are excessive [or insufficient], or if for other reasons the trial was not fair to the moving party.'" *Shick v. Illinois Dep't of Human Serv.*, 307 F.3d 605, 610 (7th Cir. 2002)(brackets in original)(quoted and other cites omitted). "Only when a verdict is contrary to the manifest weight of the evidence should a motion for a new trial challenging the jury's assessment of the facts carry the day." *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 424 (7th Cir. 2000).

*Defendant Wexford Health Sources, Inc.*

The jury found against Wexford on at least one of the plaintiff's Eighth Amendment claims. (*See* jury verdict, d/e 144)("Yes" answer to question,"Has the plaintiff proved either one of his Eighth Amendment claims against this defendant?" ).[3] [4]

---

[3] The jury found for Wexford on the 1st Amendment retaliation claims.

[4] The final pretrial order included as a contested question of law whether the Eighth Amendment claims could proceed against Wexford when the Third Amended Complaint did not name Wexford as a defendant in those claims. Dr. Brown also made that argument with regard to the claim against him for deliberate indifference to a substantial risk of serious harm to the plaintiff's health and safety (failure to protect). As the court stated in its prior order, a reasonable inference arises from the record to support those claims, which are not new to the case. (9/21/07 order). Naming Wexford as a defendant in the deliberate indifference count is not prohibited solely because Wexford was not so named in the Third Amended Complaint. *See Ash v. Wallenmeyer*, 879 F.2d 272, 274 (7th Cir. 1989)("The federal rules do not contemplate that parties will amend their pleadings to reflect new information obtained in the discovery process. The information is to be reflected in the framing of issues in the pretrial order, which supersedes the complaint.").

3

Wexford argues that evidence did not support a finding that it had a custom, policy or practice that amounted to deliberate indifference to inmates' serious medical needs. Wexford contends that, at most, the evidence shows a delay in approval of the plaintiff's recommended corneal transplant, which was not proven to cause any injury to the plaintiff. Wexford also objects to the court's refusal of Wexford's proposed jury instructions explaining that an inmate complaining of a delay in medical treatment "'must place verifying medical evidence in the record to establish the detrimental effect of delay . . . . .'" *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996)(quoted cite omitted); *Medical Defendant's proposed jury instruction no. 9*.

*Langston* involved a one hour delay in medical treatment following the rape of an inmate. The plaintiff in *Langston* failed to show that the one hour delay caused him injury. The court does not view *Langston*'s "'verifying medical evidence'" requirement as an additional evidentiary hurdle for inmates, but instead an explanation of what it takes to prove a delay in medical treatment proximately caused compensable damage. *See Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007)( "To satisfy section 1983, . . . [Plaintiff] must demonstrate not only that . . . [Defendants] violated his constitutional rights, but also that the violation caused . . .[Plaintiff] injury or damages."); *see also Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007)(". . . a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental."). That concept was already covered in the court's jury instructions explaining that a defendant is liable only if that defendant's conduct proximately caused the plaintiff's claimed damages. *Final Jury Inst. Pp. 5-6, 21 (definition of proximate cause), 25*. The court's instructions already explained that the plaintiff must prove: 1) that a defendant was deliberately indifferent to the plaintiff's serious medical need; 2) the plaintiff suffered damages; and 3) the defendant was a proximate cause of those damages. *Id. at 25*. A separate instruction about "verifying medical evidence" was unnecessary and would have been confusing and misleading. *See Williams*, 491 F.3d at 715-716 and n. 3 (declining to further define what the phrase means and declining to decide whether verifying medical evidence was necessary for all delayed treatment claims).

In any event, the plaintiff did offer evidence to show that the delay in the corneal transplant, as well as the delay in fitting him for contacts, caused him compensable injury. He testified that he suffered acute, chronic eye pain from "corneal hydrops" in his left eye, that he was no longer able to see out of his left eye because it was beyond fitting for a contact, and that his vision out of his right eye was extremely limited without a properly fitted contact. That testimony was backed up by medical records. Failure to treat a chronic, painful condition that significantly restricts daily activities can rise to the level of cruel and unusual punishment. *Gutierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir. 1997); *Williams,* 491 F.3d at 716 (jury could find "from the medical records that the delay unnecessarily prolonged and exacerbated Williams' pain and unnecessarily prolonged his high blood pressure.").

The evidence also permitted an inference that Wexford maintained a practice of deliberate indifference to the plaintiff's serious medical needs in violation of the plaintiff's Eighth Amendment rights. The plaintiff presented evidence that Wexford had an official practice and pattern of stalling and shuffling doctors to avoid indisputably necessary outside

4

consultations with specialists and to avoid following the unrefuted recommendations of those specialists. The delay in surgery was a prime example. Every specialist the plaintiff was shuffled to recommended surgery, opining that the left eye was beyond any possibility of fitting for contacts. Even IDOC officials arguably knew surgery was necessary by May 2002, when Wexford denied the request as "medically unnecessary" and for the stated reason that neither Wexford nor the IDOC pay for transplants. Seeing that tack was not working, Wexford then took the arguably untenable position that the corneal transplant was not its responsibility under the contract. Then, Wexford again denied the surgery in August 2002, again as "not medically necessary," this time for the stated reason that insufficient time had been given to trying contacts. This despite every specialist's opinion that the left eye was beyond any help a contact might give. (Inexplicably, Dr. Elyea of the IDOC also appeared to agree that a "substantial trial of contacts" was warranted, an apparent about face to the IDOC prior position). The delay was systemic, applying not only to the corneal surgery but also to the fitting of contact(s) and post-operative care. Different inferences might have been drawn in Wexford's favor, as were ably pointed out by Wexford's counsel. But, the reasons proffered by Wexford for its actions could have been reasonably disbelieved, given the evidence presented by the plaintiff. On this record the verdict against Wexford was not contrary to the manifest weight of the evidence, viewed in the light most favorable to the plaintiff.

Wexford also objects to the court's rejection of its proposed instruction advising the jury that it could not be liable on a theory of respondeat superior. *Medical Defendant's proposed instruction 13*. Wexford believes that the absence of this instruction may have led the jury to impose respondeat superior liability on it. The proposed instruction was rejected because the jury instructions already cover this. The court's instructions explained that Wexford was liable if one of its employees violated the plaintiff's constitutional rights "and that those violation(s) were a result of Wexford's policy." (d/e 458, p. 15). The instruction then defined what constituted a policy, practice and pattern. In addition to being redundant, the medical defendants' proposed instruction was confusing and unnecessary–there was no definition of "respondeat superior" or "vicarious liability,"-- legalese meaningful only to an audience of lawyers.[5]

---

[5] The medical defendants also argue that the court should have allowed a proposed jury instruction explaining that the legal duty owed by Dr. Brown to the plaintiff was no greater than the terms of the contract between Wexford and the IDOC. *Medical Defendants' proposed instruction no. 11*. The case cited in support by the medical defendants, *Gaines v. Ill. Central R.R. Co.*, 23 F.3d 1170, 1172 (7th Cir. 1994), involved contribution and indemnity liability for a train derailment and stated that, "A duty assumed because of a voluntary undertaking must be strictly limited to the scope of that undertaking." Here, it is true that the contract between the IDOC and Wexford was relevant to the scope of the medical defendants' duties to the inmates as those defendants understood them, and thus it was relevant to whether the medical defendants were deliberately indifferent. The contract was admitted as evidence and the medical defendants had the opportunity to argue for whatever inferences they believed arose in their favor from it. Additionally, the instruction proposed by the medical defendants was misleading because it

5

*Defendant Lowell Brown, M.D.*

The jury found against Dr. Brown on both the First Amendment retaliation claim and the Eighth Amendment claim(s).

As to the retaliation claim, Dr. Brown argues that the evidence did not support an inference that he was aware of the plaintiff's grievances, much less that his actions were motivated by them. The court disagrees. The plaintiff presented replete evidence to allow an inference that Dr. Brown knew of the plaintiff's grievances and lawsuit, including the plaintiff's long tenure in the infirmary while Dr. Brown was medical director and the testimony that a response to the plaintiff's grievances about his medical care would have required input from the medical director, then Dr. Brown, which was also consistent with documentary evidence (for example, the contract between Wexford and IDOC) that the medical director see grievances involving medical care. The jury could have reasonably disbelieved Dr. Brown's testimony that he did not know.

As to whether the plaintiff's grievances motivated Dr. Brown's conduct, the jury could have reasonably concluded that Dr. Brown, alone or in conjunction with the IDOC defendants, caused the transfer of the plaintiff out of the infirmary to a double cell in general population because of the plaintiff's grievances about the restrictions placed on him in the infirmary. The plaintiff filed two grievances on June 7, 2004, labeled as ADA grievances and complaining about access to commissary, hygiene products, yard, indoor and outdoor recreation, and placement of his t.v. in a brightly lit window. He asked, among other things, to be fitted for a contact lens and for indoor and outdoor recreation. The next day Dr. Brown put the wheels in motion to effect the plaintiff's transfer to general population with his note that "further medical detention" was unnecessary. As discussed below, the jury could have concluded that Dr. Brown's note was not grounded in any exercise of professional judgment and could have disbelieved his testimony that it was. Dr. Brown testified that he thought the plaintiff wanted to be transferred to the general population, but that could have been disbelieved because the plaintiff's June 7 grievances did not seek transfer to general population, and the plaintiff filed a grievance after his transfer stating that his medical condition prohibited placement in general population and that he was having difficulty moving about in general population. As discussed above, circumstantial evidence showed that Dr. Brown was aware of that grievance as well.

Dr. Brown also argues that there was insufficient evidence to infer that putting the plaintiff in general population with a cellmate presented a substantial risk of serious harm to the plaintiff, much less that Dr. Brown was aware of that harm and deliberately indifferent to it. "Because officials have taken away virtually all of a prisoner's ability to protect himself, the Constitution imposes on officials the duty to protect those in their charge from harm from other prisoners." *Mayoral v. Sheahan*, 245 F.3d 934, 938 (7th Cir. 2001). State actors must "'take

---

implied that a certain medical procedure or treatment would have to be *specifically and affirmatively* listed in the contract before the medical defendants had a duty to provide it.

6

reasonable measures to guarantee the safety of the inmates'" . . ." *Boyce v. Moore*, 314 F.3d 884, 887 (7th Cir. 2002), *citing Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994)(other citations omitted). However, to succeed, the plaintiff must show that a "substantial risk of serious harm" existed and that the state actor subjectively disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994). The plaintiff must show that he "was at serious risk of being harmed [and the defendants] decided not to do anything to prevent that harm from occurring even though [they] could have easily done so." *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1988). Actual notice of a specific threat or risk is necessary to prove a defendant knew of the risk and cannot be imputed through a generalized knowledge of danger or vague complaints. *Case v. Ahitow*, 301 F.3d 605 (7th Cir. 2002)(defendants are liable if they "really knew–not just should have known" of serious danger which could have easily been prevented). However, knowledge might be inferred if the risk was obvious, unless the state actor "believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Farmer v. Brennan*, 511 U.S. at 844.

The court believes the evidence at trial did support an inference that Dr. Brown was aware that he was placing the plaintiff's corneal transplant at serious risk of substantial harm by engineering the plaintiff's move out of the infirmary and into general population. It is true that Dr. Brown testified that he did not believe that putting the plaintiff in general population with a cellmate was any more dangerous than keeping the plaintiff in the infirmary. However, the jury could have disbelieved Dr. Brown's sincerity in this regard as a matter of common sense as well as contrary to the plaintiff's evidence otherwise. Testimony showed that fights between inmates were commonplace and in fact could not be prevented; an inmate had murdered another inmate just two months before the plaintiff's transfer. There was testimony by prison guards that, essentially, the striking by inmate Durham was the kind of thing that happened commonly and could happen again if the plaintiff was placed in general population, because of the volatility of the environment. Dr. Brown's knowledge of this environment can be inferred from his experience working at the prison as well as his testimony that he asked Defendant Fuqua whether the plaintiff would be kept from non-violent inmates after the move to general population.[6] Dr. Brown contends that the jury held him responsible for the lack of IDOC procedures to keep inmates with medical needs away from those with violent histories. That misses the point, however. The jury could have reasonably concluded that Dr. Brown knew of the lack of procedures and therefore knew that releasing the plaintiff from the infirmary without any medical restrictions would put the plaintiff at a serious risk of losing his corneal transplant. The evidence showed that an attack need not necessarily be particularly forceful to cause wound dehiscence.

Moreover, the risk here was not merely the general risk existing in general population

---

[6]In prior testimony under oath, Dr. Brown stated that Fuqua had told him that security had specific procedures they would follow to protect the plaintiff from being celled with a violent inmate. *Partial rough real-time transcript, Dr. Brown's testimony (11/1/07), pp. 92-94 (to be filed with this order).*

7

and prison life. Nor did the defendants have to know that inmate Durham in particular would be the one to hit the plaintiff. The plaintiff had a corneal transplant with a life-time risk of wound dehiscence from bumping, poking or other trauma.[7] He also had extremely limited vision. Dr. Brown was aware of both these conditions, or at least the jury could have reasonably inferred that. At the time Dr. Brown wrote the note that caused the plaintiff to be moved into a double cell in general population, Mr. McCroy did not have a contact lens for either eye. His vision was limited to hand movements, colors, shapes, and objects. The jury could have inferred that Dr. Brown did not check with any of the plaintiff's eye doctors before releasing the plaintiff to general population because he knew that those doctors would have advised against it. The jury could have also inferred that the substantial risk of dehiscense of the corneal transplant could have easily been avoided by keeping the plaintiff in the infirmary or recommending him for a single cell (as had been done in November 2003 for the protection of his eye)[8], or at least putting the placement office on notice of the plaintiff's inability to see and his fragile eye transplant. The jury could have found that Dr. Brown had the power to place restrictions on the plaintiff's housing placement for medical reasons and also knew that his release of the plaintiff meant that the plaintiff would be treated like any other inmate in the general population, despite the plaintiff's inability to see and his fragile transplant. The court agrees with the plaintiff that the evidence allows an inference that Dr. Brown "went out of his way" to prevent the plaintiff from getting any accommodations by the placement office, even though knowing that not doing so would put the plaintiff at the mercy of being placed anywhere with anyone. (d/e 470, p. 12). The jury could have inferred that Dr. Brown intentionally failed to put any medical restrictions on the plaintiff, even in light of Dr. Anderson's apparent scrambling to do so, not because of any medical judgment that those restrictions were unnecessary, but because doing so would have been an admission by Dr. Brown of knowledge of the plaintiff's serious medical needs and the risk posed by releasing him. The jury could have inferred that Dr. Brown deliberately refused to

---

[7] Dr. Zeh testified in his deposition that concerns of wound dehiscence were behind his direction to isolate plaintiff, particularly in light of sutures that had to be removed early. He also testified that in July 2004, the plaintiff's post-operative course had been fairly smooth and the chances of a problem were not high "in the absence of a traumatic injury." (Dr. Zeh. Dep. P. 29). He testified that wound dehiscence from trauma or bumping was a concern, that could result in the failure of the transplant "or possibly even something really bad like loss of the eye." (Dr. Zeh. Dep. P. 29). Dr. Zeh wanted to avoid placement of the plaintiff "in an environment where we were not going to subject him to over physical exertion of an inappropriate level or be placed in an environment where a physical trauma, either accident or deliberate, would be more likely to occur." (d/e 462, p. 6, *quoting* Dr. Zeh's video dep. p. 40).

[8] In November 2003, Dr. Zeh was called by a prison nurse and asked about moving the plaintiff out of the infirmary. The plaintiff' medical records state, "received order that offender can be placed in single-cell." The discharge note states that the plaintiff's eye needs protection, that he should avoid general population, avoid yard activity and be follow up on from single cell.

acknowledge the risk in order to plead ignorance later if something happened and thus hide behind the deliberate indifference standard.[9]  At the least, the jury could have reasonably concluded that Dr. Brown so recklessly ignored a known and substantial risk to the plaintiff's health and safety that he acted with deliberate indifference.  The jury could have also concluded that the injury inflicted by Durham was a proximate cause of Dr. Brown's release of the plaintiff from medical detention.

The evidence also supported a conclusion that Dr. Brown was deliberately indifferent to the plaintiff's serious medical needs regarding the need for a contact lens for his right eye.  Dr. Zeh had recommended a contact lens fitting in May 2004 (one of many recommendations for contact fittings), but Dr. Brown decided to submit the plaintiff to a different ophthalmologist for a "second opinion," describing the plaintiff's cornea graft as "failed."[10] That second opinion, by Dr. Steahly, confirmed Dr. Zeh's plan of action, which included the fitting of contacts, but Dr. Brown only remarked in his notes that he was going to follow up with Dr. Steahly to discuss the recommendations further.  That fitting never occurred, even as to the plaintiff's right eye, until the plaintiff was transferred out of Western in or around January 2005.  The jury could have disbelieved Dr. Brown's explanations for these actions and concluded instead that this was further evidence of shuffling and stalling to avoid implementing specialists' recommendations.

Dr. Brown also asks for a reduction of the $50,000 punitive damages award.  The court does not find that award excessive and does believe, in light of the discussion recounted above, that the jury could have reasonably concluded that Dr. Brown was recklessly or callously indifferent to the plaintiff's constitutional rights.  *See Alexander v. City of Milwaukee*, 474 F.3d 437, 454 (7th Cir. 2007), *discussing State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)(expressing concern about punitive award more than four times compensatory damages).

*Warden Kevin Winters, HCU Administrator Deborah Fuqua, and*
*Assistant Warden Sandra Funk (ADA Coordinator)*

These defendants argue that the evidence did not support a finding that they were deliberately indifferent to the plaintiff's serious medical needs or deliberately indifferent to a substantial risk of serious harm.

---

[9]The Court is looking at the evidence in favor of the plaintiff, as it must.  A jury verdict for Dr. Brown would have also been supported by the evidence.  The deliberate indifference standard is subjective, requiring the jurors to determine a defendant's subjective knowledge, belief, and motivation.  Whether Dr. Brown's explanations at trial for his actions could be believed in light of the other evidence ultimately came down to a credibility issue.

[10]Dr. Zeh moved, so a new ophthalmologist was needed, but the jury could have believed that characterizing it as a "second" opinion was further evidence of intentional delay.

As discussed above, the jury could have reasonably concluded that putting the plaintiff in a double cell in general population at the mercy of the placement office (which had no knowledge of the plaintiff condition), put the plaintiff at a serious risk of losing his corneal transplant from trauma inflicted by a cellmate. A reasonable inference arises from the evidence that Defendants Winters, Funk and Fuqua were subjectively aware of this risk. Evidence was sufficient to infer that they were familiar with the plaintiff, his eye problems and treatment, including Dr. Zeh's recommendation that the plaintiff be kept in the infirmary or in a single cell, the recommendations for contact fittings, and the plaintiff's lack of visual acuity. A reasonable inference also could have been drawn that these defendants had power over the plaintiff's placement and could have exercised it to keep the plaintiff in a single cell or in the infirmary, or to put him in general population. The evidence showed that the plaintiff was kept in a single cell or the infirmary "per security" from December 2003 until the plaintiff was moved to general population in June 2004. There was testimony that would have allowed the inference that Fuqua and Winters coordinated this placement. There was also evidence that Fuqua, Winters and Funk coordinated the plaintiff's move to general population, in conjunction with Dr. Brown, and knew of the plaintiff's grievances after that move, which put them on additional notice of Dr. Zeh's orders and the plaintiff's vulnerability in general population.[11] A reasonable inference could also be drawn that these IDOC defendants knew the placement office would *not* be so familiar with the vulnerability of Plaintiff's eye. A reasonable inference arguably arose that, at the least, the IDOC defendants working at Western when the plaintiff was transferred to general population "turned a blind eye" to a substantial risk of serious harm to him that could have been easily averted. On this record, construing all inferences in Plaintiff's favor, arguably even laypeople familiar with the plaintiff's medical history would have known that the June 2004 transfer to general population was obviously contrary to Plaintiff's serious medical needs and subjected him to a substantial risk of serious harm easily averted. The jury's finding for Defendants Law and Kellerman is not indicative of their thinking toward Defendants Winters, Funk and Fuqua. Law and Kellerman were not involved in or aware of the plaintiff's medical history and condition (or so the jury could have found). Thus, Law and Kellerman arguably did not know that the plaintiff's transplant was at serious risk of being lost if hit. The defendants also assert qualified immunity, but looking at the evidence in the plaintiff's favor, the defendants violated the plaintiff's well-established constitutional rights, making qualified immunity unavailable.

---

[11] There was also evidence to support the conclusion that Fuqua was deliberately indifferent to the plaintiff's serious medical needs by denying him access to the cleansers he needed for his contacts, though the evidence also showed that Fuqua also tried to facilitate the plaintiff's eye surgery, at least initially. There is also evidence that Fuqua coordinated outside appointments and acted as patient advocate, which would allow an inference that she knew of the plaintiff's serious medical needs and had at least some authority to control the plaintiff's access to outside appointments, along with Defendant Winters.

*IDOC and ADA Claim*[12]

IDOC argues that there was insufficient evidence for the jury to conclude that the plaintiff was "excluded from participating or denied the benefits of the services, programs or activities of a public entity " 42 U.S.C. § 12132 (Title II of ADA).

The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies or practices, the removal of architectural, communication, or transportation barrier, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." § 12131(2).  The defendants do not dispute that the plaintiff is a qualified individual with a disability.

ADA regulations require "reasonable modifications in policies, practices, or procedures when . . . necessary to avoid discrimination on the basis of disability . . . ." 28 C.F.R. § 35.130(7).  *See Kiman v. New Hampshire Dep't of Corrections*, 451 F.3d 274, 283 n. 8 (7th Cir. 2006)(ADA regulations given weight unless "'arbitrary, capricious, or plainly contrary to the statute'")(quoted cited omitted).  Unnecessary "eligibility criteria that screen out or tend to screen out" those with disabilities are prohibited.  28 C.F.R. § 35.130(8).  "Auxiliary aids and services" include, for the visually impaired, "[q]ualified readers, taped texts, audio recordings, . . . large print materials, or other effective methods . . . ." 28 C.F.R. § 35.104(2).

The ADA applies to prisoners in state prisons.  *Pennsylvania Dep't of Corrs. v. Yeskey*, 524 U.S. 206 (1998); *United States v. Georgia*, 546 U.S. 151, 154 (2006).  Education is a "program" and dining hall and library are "activities."  *Crawford v. Indiana Dep't of Corrections*, 115 F.3d 481 (7th Cir. 1997), *abrogated on other grounds by Erickson,* 207 F.3d 945 (7th Cir. 2000).  Medical "services," vocational "programs," and recreational "activities" also qualify.  *Yeskey*, 524 U.S. 206, 210 (1998)("Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in.'"); *Georgia*, 546 U.S. at 157 (" . . . it is quite plausible that the alleged deliberate refusal of prison officials to accommodate Goodman's disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constituted 'exclu[sion] from participation in or ... den[ial of] the benefits of' the prison's 'services, programs, or activities.'")(brackets in original); *see also Kiman*, 451 F.3d at 284.

However, the exclusion or denial must be *by reason of the individual's disability*, discrimination based on the individual's disability.  The ADA is not "a remedy for malpractice" or incompetent treatment; "the Act would not be violated by a prison's simply failing to attend to

---

[12]The plaintiff did not dispute Wexford's arguments that it was not amenable to suit under the RA or ADA.  Accordingly, Wexford was not included as a defendant in the final pretrial order as a defendant on these claims.

11

the medical needs of its disabled prisoners." *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996)(*Bryant* discussed in *dicta* doubt that the ADA applied to prisoners (which was this court's conclusion as well in *Bryant*), but *Bryant* came down before the Supreme Court determined that the Act *does* apply to prisoners, and before the Supreme Court's case of *Georgia*. The effect is not clear to this court of *Georgia* on *Bryant*'s holding that an inmate failed to allege an ADA violation due to the prison's refusal to provide guardrails for his bed (he was paraplegic) or to *Bryant*'s holding that "sleeping in one's cell is not a "'program.'" *Bryant*, 84 F.2d at 249. It is clear, however, from the plain language of the statute, that the challenged denials and exclusions must be *because of* the plaintiff's disability.

The IDOC does not address the plaintiff's argument that "safe housing" is a program covered by Title II of the ADA which was denied to the plaintiff. The court understands the argument that the plaintiff's fragile corneal transplant was a disability which required placing him where he was not subject to a serious risk of being struck. The court has trouble understanding that denial of that placement was because of the plaintiff's disability. It was arguably deliberate indifference under the Eighth Amendment, as discussed above. But it does not allow a reasonable inference that McCoy was denied protective placement *because* he was disabled.

In any event, the court need not decide that issue, which is not briefed sufficiently by either party, because there was evidence sufficient for the jury to conclude that the plaintiff's access to recreational, commissary and law library activities, and educational and vocational programs was curtailed *because of* his disability. The plaintiff did have some access to some of these activities (library, dining, commissary, yard), but the jury could have concluded that it was not on the same basis as non-disabled inmates. This was not a situation where the plaintiff was temporarily sick or disabled. He was placed in the infirmary indefinitely and classified as "medically unassigned" because of his vision problems. *See Georgia*, 546 U.S. at 161 (J. Stevens and J. Ginsburg concurrence)(citing Cal. Dep't of Justice's finding that "inmate with disabilities were unnecessarily 'confined to medical units where access to work, job training, recreation and rehabilitation programs is limited'"). The jury could have reasonably concluded that reasonable modifications could have allowed the plaintiff to participate in education or vocational programs.[13]

There was also sufficient evidence that the IDOC, through its employees, retaliated against the plaintiff for trying to seek the accommodation required by the ADA. 42 U.S.C. § 12203 provides in pertinent part:

(a) No person shall discriminate against any individual because such individual has

---

[13]Some possible examples of accommodation in the documentary evidence included a slow walk permit, low gallery permit, low bunk permit, magnifying devices, large print books, books on tape, placement in a physically challenged gym line, or assignment of an inmate tutor.

opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

(b) Interference, coercion, or intimidation

It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

\*     \*     \*

As it relates to this case, the remedies for violations of this section are the same as the remedies available for violations of Title II, which, under *Georgia,* includes money damages. 42 U.S.C. § 12203(c)(referencing 42 U.S.C. § 12133 for Title II violations).

The IDOC defendants argue that sovereign immunity bars the ADA retaliation claim. The Supreme Court has held that Title II of the ADA is a valid abrogation of sovereign immunity *to the extent* the claimed violations are also violations of the Fourteenth Amendment. *U.S. v. Georgia*, 546 U.S. 151 (2006)(paraplegic inmate).[14] The plaintiff's right to pursue his remedies under Title II of the ADA is part of his First Amendment right to petition for redress of grievances. *See Tennessee v. Lane*, 541 U.S. 509 (2004)(Title II allows private suits for damages and is a valid abrogation of sovereign immunity as applied to fundamental constitutional right to access courts)(paraplegic, no elevator to court hearing). The ADA retaliation claim is grounded in the Fourteenth Amendment, which makes the First Amendment applicable to the States. Accordingly, the court finds that the ADA retaliation claim for money damages based on 42 U.S.C. § 12203 is not barred by sovereign immunity, because that claim is also based on actions which would violate the First Amendment.

The IDOC also argues that it is impossible to determine how much of the compensatory damage award is assessed against the IDOC, which was sued only on the ADA claim. It further argues that any ADA injuries are distinct from the injuries caused by the civil rights violations, and that any ADA violations could not have been the proximate cause of $800,000 in compensatory damages. The IDOC asks for a new trial because it cannot tell which portion of the compensatory damages go to the ADA claims and which go to the constitutional claims. Plaintiff counters that he suffered the same compensatory damages from all the violations. The

---

[14]The IDOC does not argue for sovereign immunity on the ADA discrimination claim. In any event, on the evidence presented, the ADA discrimination claim was also arguably a violation of the Fourteenth Amendment (equal protection clause, irrational discrimination), which would make sovereign immunity unavailable under *Georgia*.

13

court has reviewed a partial rough real-time transcript of the jury instruction conference and the IDOC did not make an objection to the compensatory damages verdict form at the jury instruction conference nor did the IDOC ask for a separate compensatory damages form.[15] *Partial rough real-time transcript, Jury Instruction Conference (11/6/07) pp. 291-299 (to be filed with this order)*. The objection is therefore waived. *See* Fed. R. Civ. P. 51(c); *see also Frazier v. Boyle,* 206 F.R.D. 480, 493 (E.D.Wis. 2002)(Failure to object to the form or wording of a special verdict prior to its submission to the jury or when the verdict is returned results in a waiver of the right to object later.).

*Evidentiary Rulings and Jury Instructions*

The IDOC defendants object generally to the court's admission of exhibits and testimony for notice purposes, arguing that there was no foundation laid that the defendants had actual notice and knowledge of those exhibits. As an example, the IDOC defendants point to the plaintiff's medical records recounting Dr. Zeh's direction that the plaintiff remain in a single cell. There was ample documentary and testimonial evidence to infer that the defendants were subjectively aware of this directive. The IDOC defendants also object to Dr. Brown's testimony of his purported discussion with Defendant Fuqua before the plaintiff's discharge from the infirmary in June 2004. This testimony was probative as to knowledge and notice by Dr. Brown of the risk and it was probative as to Fuqua's involvement in the discharge decision. Fuqua had ample opportunity at the trial to address whether that conversation occurred as Dr. Brown testified.

The IDOC defendants also argue that there was no evidence that they personally knew that inmate Durham had a disciplinary history of fighting. Their access to the offender tracking system and inmates' master files was relevant to establish that potential knowledge, but, in any event, as discussed above there was sufficient evidence for the jury to find that these defendants were deliberately indifferent to a serious risk of substantial harm to the plaintiff by releasing him to the placement office without restrictions, even if they were not aware of inmate Durham or his disciplinary history. The IDOC defendants next argue that the court erred in allowing the plaintiff to testify about a murder at the prison without allowing the defendants to show that neither of the inmates involved in that incident had asked for protection. The murder, though, goes to notice of the risk the plaintiff faced by his release to general population without restriction. Whether the murdered inmate had asked for protection was not relevant.

The IDOC defendants additionally object to their refused instruction explaining that a defendant must be "personally involved" and cannot be held liable for what other employees did or did not do. *IDOC proposed instruction no. 23*. Those ideas were already in the court's

---

[15]The objections were to the damages form not specifically stating that punitive damages could only be awarded if the individual defendants were found liable on the First or Eighth amendment claims. *Partial rough real-time transcript, Jury Instruction Conference (11/6/07), pp. 294-95*.

instruction on deliberate indifference–that a defendant must have actual knowledge of the risk and have acted deliberately. The proposed instruction would have been confusing because it does not explain that personal involvement includes approval of a subordinate's actions or turning a blind eye to a known, substantial risk. Likewise, the court's instruction on punitive damages, based on the Seventh Circuit pattern instructions, was accurate and properly submitted to the jury for purposes of punishment and deterrence, in light of the evidence viewed in the plaintiff's favor.[16]

*Defendant Walker and Injunctive Relief*

Defendant Walker was named in his official capacity for purposes of injunctive relief. The plaintiff was released in December 2007, so injunctive relief sought regarding the accommodation of his disability in prison is moot. However, the plaintiff asks for an order "requiring the IDOC to make all post-confinement/parole programs that are available to similarly situated non-disabled parolees available to Plaintiff for as long as Plaintiff remains under IDOC control." (d/e 468, p. 2). The plaintiff, however, does not identify what these services, programs, or activities are from which he is being excluded. Accordingly, it does not appear to the court that any injunctive issues remain on this record.

IT IS THEREFORE ORDERED:

1) Wexford and Dr. Brown's motion for judgment as a matter of law or for a new trial is denied (d/e 462).

2) The motion for judgment as a matter of law or for a new trial by the IDOC and Defendants Funk, Fuqua and Winters is denied (d/e 466).

3) The plaintiff's request for injunctive relief is denied as moot. Defendant Roger Walker is dismissed as he is sued only in his official capacity for purposes of injunctive relief.

Enter this 2nd day of June, 2008.

s\Harold A. Baker
_____
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE

---

[16] The IDOC's proposed instruction states in relevant part: "In order to meet this burden, Plaintiff must prove that the Defendant committed acts which violated Plaintiff's constitutional rights, despite a subjective perception by the Defendant that his acts were unconstitutional."